UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| OCP S.A., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>UNITED STATES, )<br>)<br>Defendant. )<br>) | Court No. 21-00219 |

## COMPLAINT

Plaintiff OCP S.A. ("OCP"), by and through its attorneys, alleges and states as follows:

1. OCP contests portions of the affirmative final injury determinations of the U.S. International Trade Commission ("ITC" or "Commission") in the countervailing duty investigations of phosphate fertilizers from Morocco and Russia. *See Phosphate Fertilizers from Morocco and Russia*, 86 Fed. Reg. 17,642 (Int'l Trade Comm'n Apr. 5, 2021). The public versions of the Views and Dissenting Views of the Commission are contained in *Phosphate Fertilizers From Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final), USITC Pub. 5172 (Mar. 2021) ("*Final Determination*").[1]

## JURISDICTION

2. OCP brings this challenge to the Commission's *Final Determination* pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i). This court therefore has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c).

---

[1] The Commission released the confidential versions of the Views and Dissenting Views to the parties on the administrative protective order on April 5, 2021.

1

**STANDING**

3. OCP is a Moroccan producer and exporter of phosphate fertilizers. Thus, OCP is an interested party under 19 U.S.C. § 1677(9)(A).

4. During the proceedings before the Commission, OCP was the sole Moroccan producer. OCP participated as a respondent in the underlying investigation giving rise to this action and, therefore, is a "party to the proceeding in connection with which the matter arose." 28 U.S.C. § 2631(c); *see* 19 U.S.C. § 1516a(a)(2)(A).

**TIMELINESS OF THIS ACTION**

5. After the Commission issued the *Final Determination*, the U.S. Department of Commerce ("Commerce") published notice of the countervailing duty orders on April 7, 2021. *See Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Dep't of Commerce Apr. 7, 2021) ("*CVD Orders*").

6. OCP commenced this action on May 6, 2021, by filing its Summons within the time period specified in 19 U.S.C. § 1516a(a)(2)(A)(i)(II).

7. OCP has timely filed this Complaint within 30 days of the filing of its Summons, as required by 19 U.S.C. § 1516a(a)(2)(A) and U.S. Court of International Trade Rule 3(a)(2).

**STATEMENT OF FACTS**

**Procedural History**

8. On June 26, 2020, Petitioner The Mosaic Company ("Mosaic") filed a petition with Commerce and the ITC alleging that an industry in the United States is materially injured, or threatened with material injury, by reason of subsidized imports of phosphate fertilizers from Morocco and Russia.

9. On July 6, 2020, the Commission published its notice of institution of preliminary countervailing duty investigations into phosphate fertilizers from Morocco and Russia. *Phosphate Fertilizers from Morocco and Russia: Institution of Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 85 Fed. Reg. 40,319 (Int'l Trade Comm'n July 6, 2020).

10. On August 13, 2020, the Commission published its preliminary determination, finding that "there is a reasonable indication that an industry in the United States is materially injured by reason of imports of phosphate fertilizers from Morocco and Russia." *Phosphate Fertilizers From Morocco and Russia*, 85 Fed. Reg. 49,394, 49,394 (Int'l Trade Comm'n Aug. 13, 2020).

11. On December 2, 2020, the Commission commenced the final phase of these investigations. *See Phosphate Fertilizers From Morocco and Russia; Scheduling of the Final Phase of Countervailing Duty Investigations*, 85 Fed. Reg. 79,033 (Int'l Trade Comm'n Dec. 8, 2020).

12. On February 16, 2021, Commerce published notice in the *Federal Register* of its affirmative final determinations in its investigations of the subject phosphate fertilizers. *Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Dep't Commerce Feb. 16, 2021); *Phosphate Fertilizers From the Russian Federation: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,479 (Dep't Commerce Feb. 16, 2021).

13. On March 11, 2021, the Commission voted 4 to 1 that the U.S. phosphate fertilizer industry is materially injured by reason of imports from Morocco and Russia. The ITC published the notice of its final determinations in the *Federal Register* on April 5, 2021. *See Phosphate*

*Fertilizers from Morocco and Russia*, 86 Fed. Reg. 17,642 (Int'l Trade Comm'n Apr. 5, 2021). The Views and Dissenting Views of the Commission are set forth in the *Final Determination*.

14. In the Views, the majority (Chair Kearns, Vice-Chair Stayin, Commissioner Schmidtlein, and Commissioner Karpel) determined that the domestic industry is materially injured by reason of subject imports. In the Dissenting Views, Commissioner Johanson determined that the domestic industry is not materially injured or threatened with material injury by reason of subject imports.

15. Commerce published notice of countervailing duty orders covering such imports on April 7, 2021. *CVD Orders*, 86 Fed. Reg. 18,037.

## Analysis of the Volume of Cumulated Subject Imports

16. The Commission found in the *Final Determination* that the "volume of cumulated subject imports and the increase in that volume were significant in absolute terms and relative to apparent consumption in the United States during the period of investigation." *Final Determination*, USITC Pub. 5172 at 27.

17. In reaching this conclusion, the Commission found that Mosaic's idling of its Plant City facility in 2017 reduced supply to the U.S. market by approximately 700,000 short tons. The Commission did not explain why it gave decisive weight to this figure proffered by Mosaic, despite contradictory statements in 2019 from Mosaic's CEO identifying the resulting supply gap as 1.1 million short tons. *Id.* at 20.

18. The Commission's finding regarding the 700,000 short ton U.S. supply shortfall that resulted from Plant City's closure also failed to account for the impact on U.S. supply of the closure by U.S. producer Nutrien of its 600,000 short ton Redwater phosphate fertilizer facility in Alberta, Canada, which was announced in early 2018 and implemented in May 2019. The

4

Commission noted only that Nutrien increased its U.S. production capacity by 400,000 short tons between 2017 and 2018, and did not address record evidence that the closure directly resulted in a net reduction in U.S. supply and led U.S. customers to build up inventory in anticipation of the closure.  *Id.* at 40–41, n.214.

19. The Commission further found that the domestic industry could not meet domestic demand, but that subject imports exceeded the supply gap.  In so concluding, the Commission relied on the volume of subject import entries, rather than the volume of U.S. shipments of subject imports, which the Commission ordinarily uses to calculate apparent U.S. consumption and market share.  *Id.* at 20 n.94.  U.S. shipments of subject imports increased by only about 605,000 short tons from 2017 to 2018—an amount that did not exceed the U.S. supply shortfall even according to the Commission's own artificially low 700,000 short ton figure.  *Id.* at IV-17 (Table IV-7).

20. The Commission found that subject imports "contributed significantly to oversupply conditions" but, without sufficient explanation, gave no weight to evidence that domestic producers became unreliable and refused to supply and/or reduced availability to  U.S. purchasers.  *Id.* at 34, 41 n.216.

21. The Commission faulted U.S. importers for failing during a period of weather-induced low demand to supply U.S. customers from existing U.S. inventory or from weather-delayed shipments on barges on the Mississippi River system.  In so concluding, the Commission failed to identify any record evidence that it is economically or logistically feasible for U.S. producers, importers, or distributors to relocate inventories stored at inland terminals (or evidence that they have ever done so), and disregarded record evidence that such relocations are not feasible and that continued imports were necessary to serve demand in U.S. regions unaffected by poor weather conditions.  *Id.* at 41, n.217.

22. The Commission also effectively found that the mere existence of subject import inventories in a geographic region with unexpectedly low demand is evidence of injury by reason of subject imports, and not a dislocation of local supply by reason of unforeseen weather conditions. The Commission made this finding despite its recognition that both domestic products and imports are ordinarily inventoried at inland terminals in advance of each fertilizer application season, and without pointing to any evidence that holding those tons in inventory until the weather improved led to adverse price or volume effects on the domestic industry. *Id.* at 31–33.

23. The Commission characterized domestic industry production curtailments in 2019 as responses to the "collapse in U.S. prices," while subject imports "continued to enter the U.S. market," suggesting that most or all of the volume adjustment in the face of the weather-driven decline in demand was made by domestic producers. *Id.* at 36. However, the Commission never acknowledged or addressed partial year volume data and other evidence showing that domestic producers and importers in fact took parallel and proportionate actions to reduce supply in response to depressed demand.

### Analysis of Price Effects

24. The Commission found in the *Final Determination* that because "subject imports from Morocco and Russia depressed prices to a significant degree," "subject imports had significant price effects." *Final Determination*, USITC Pub. 5172 at 36.

25. In order to reach this finding, the Commission relied on its conclusion that "low prices" of subject imports significantly depressed U.S. prices. *Id*. at 33. The Commission recognized the "prevalence of overselling" by U.S. importers in the pricing data, and confirmed that these pricing data demonstrating such overselling were both "comprehensive" and corroborated by additional data identified by Mosaic. *Id*. at 28, 30. Nowhere did the Commission

reach any clear conclusion with regard to its statutory obligation to resolve "whether . . . there has been significant price underselling" by subject imports. *Id.* at 27. The Commission made no finding of significant underselling—as indeed it could not on this record—and should have concluded that there was no significant underselling.

26. The Commission implied that the "small margins of underselling and overselling" somehow prevented it from giving decisive weight to evidence of widespread overselling. Yet, at the very same time, the Commission—observing that "subject imports were in some instances lower priced"—relied on a small minority of instances of underselling, at what it viewed as "small margins," to conclude that the allegedly "low prices" of subject imports somehow caused price depression. *Id*. at 30, 33. Nowhere did the Commission attempt to reconcile its conclusion on price depression with the "prevalence of overselling."

27. The Commission also relied on Mosaic's submissions of trade press reports and email correspondence to find that "low prices" of subject imports depressed domestic prices. *Id*. at 31–33. In so concluding, the Commission did not explain why it gave more weight to anecdotal, unverified, and self-serving allegations supplied by Petitioner than to (i) pricing data from its questionnaires and (ii) importer/purchaser submissions given under oath, which showed predominant overselling by subject imports and the chronic unavailability of reliable domestic supply. Further, the Commission failed to account for the lack of correlation between trends in subject import volumes and domestic prices, and did not address the fact that purchasers pointed most frequently to Mosaic as the price leader in the U.S. market.

28. The Commission also found that the domestic industry lost sales to subject imports because of lower prices. *Id*. at 29–30. However, the Commission failed to address the argument that the reported "lost sales" in this case are likely overstated, given evidence of domestic supply

7

constraints and the ambiguity of a question posed to purchasers in the Commission's questionnaire. Specifically, due to the ambiguous phrasing of the relevant question, the record indicates that some purchasers reported purchasing subject imports "instead of" domestic product in instances where they purchased subject imports because domestic product was not available. The Commission nonetheless treated those purchases as "lost sales" for the domestic industry. Moreover, the Commission did not explain how its finding of lost sales could be reconciled with pricing data showing predominant overselling by subject imports.

29.     The Commission further concluded that its finding of price depression was supported by the observation that, although U.S. prices began to increase in 2020 as weather conditions improved, they did not rebound to the same level as 2017–2018 until after the petition was filed. *Id*. at 34–35. However, the Commission failed to consider evidence that U.S. prices were rising before the petition was filed and, driven by global fundamentals, would have continued to rise with or without the petition. The Commission also failed to explain why the post-petition increase in U.S. prices supported its view that subject imports depressed domestic prices earlier in the period of investigation ("POI"), rather than simply reflecting the weather-related demand shock of 2019 and the supply gap that the petition exacerbated in 2020.

## Analysis of the Impact of Subject Imports

30.     The Commission found in the *Final Determination* that "cumulated subject imports had a significant impact on the domestic industry," while also finding that "[n]onsubject imports increased over the POI." *Final Determination*, USITC Pub. 5172 at 43–44.

31.     In finding that subject imports adversely impacted the domestic industry, the Commission failed to give any weight to evidence of the domestic industry's contemporaneous articulation of the reasons for closing facilities and opening a gap in the U.S. market—a gap it

8

knew and acknowledged that imports would be needed to fill. When Mosaic announced the idling of Plant City in October 2017, it cited efforts to reduce high operating costs of its aging plant, to avoid capital spending, and to optimize supply chains as its joint venture in Saudi Arabia ramped up. Mosaic even expressly predicted that the closure would augment demand for imports. Similarly, Nutrien made no reference to subject imports when announcing the closure of Redwater; instead, Nutrien explained that it would repurpose the plant to produce ammonium sulfate and realize operational synergies.

32. In support of its finding of adverse impact, the Commission observed that the domestic industry had available excess capacity throughout the POI. *Id.* at 19. In focusing on the domestic industry's excess capacity, however, the Commission failed to address record evidence demonstrating that the reported excess capacity was substantially overstated. Indeed, the record indicates that in late 2020, after subject imports were shut out of the U.S. market by the petition, Mosaic chose to import fertilizer from nonsubject sources rather than utilize its claimed excess domestic capacity.

33. Further, the Commission's finding of adverse impact was based primarily on the domestic industry's performance indicators in calendar year 2019. *Id*. at 37–39. By focusing its analysis of impact at the low point in the market in 2019, the Commission failed to account for evidence showing that the weather-related challenges the domestic industry faced in 2019 had vanished by the time the petition was filed, as the temporary misalignment in supply and demand had corrected itself once the extreme weather conditions had passed.

**Analysis of Causation**

34. The Commission found in the *Final Determination* that the domestic industry was materially injured "by reason of" subject imports from Morocco and Russia. *Final Determination*, USITC Pub. 5172 at 44.

35. The Commission did not (and could not) find any causal link through underselling, as the record showed predominant overselling. The only remaining causal link is through volume, and the Commission found that subject imports caused injury by overshooting the supply gap and demand and thereby reducing U.S. prices and domestic industry revenues. *Id.* at 39.

36. Yet its findings with respect to volume misattribute to imports the effects of the domestic industry's own decisions to close phosphate fertilizer production facilities and the weather-related decline in demand. As noted above, for strategic business reasons wholly unrelated to import volumes or prices, the domestic industry closed down production facilities and thereby pulled imports into the U.S. market. Then, a historic run of wet weather across three seasons depressed demand and adversely affected the entire U.S. market, not just domestic producers.

37. As noted above, the Commission also effectively found that the mere existence of subject import inventories in a region with unexpectedly low demand was evidence of volume injury by reason of subject imports, rather than injury by reason of the weather. The Commission made this finding without explanation, and despite evidence that it was not feasible to reallocate inland inventories. *Id.* at 31–33.

38. Also, to the extent the Commission found that subject imports injured the domestic industry by failing to adjust instantaneously to the weather-related downturn in demand, this finding is at odds with what the Commission recognized to be the realities of the industry's

conditions of competition and business cycle, including the fact that phosphate fertilizer orders are placed months in advance based on demand forecasts to ensure adequate inventories are available in farmers' narrow seasonal application windows. *Id.* at 16. Moreover, this finding rests on the unsupported assumption that holding subject import inventories in place until demand recovers is inherently injurious, even in the absence of evidence that domestic producers were doing anything different than importers.

39. The Commission acknowledged in passing that distribution of fertilizers through the system takes significant time and that distributors rely on demand projections when obtaining product. *Id.* at 16. However, the Commission did not address this evidence in concluding that significant volumes of imports entered the U.S. market from 2017–2018 and remained at elevated levels in 2019 despite a significant decline in demand due to the weather. The Commission's findings with respect to volumes and prices therefore misattribute to subject imports the effects of the weather-related demand decline.

40. The Commission found that subject imports "contributed significantly to oversupply conditions in a declining market," and, without sufficient explanation, gave no weight to evidence that the domestic industry's unreliability as a supplier and admitted refusal to deal with disfavored U.S. purchasers affected its sales and market share. *Id.* at 34.

41. Also with respect to causation, the Commission failed to address record evidence showing the lack of correlation between subject import volume trends and trends in the domestic industry's financial performance.

## STATEMENT OF CLAIMS

42. The *Final Determination* is "unsupported by substantial evidence on the record, or otherwise not in accordance with law" as provided by 19 U.S.C. § 1516a(b)(1)(B)(i) for the following reasons:

11

## COUNT ONE

43. Paragraphs 1 through 42 are incorporated by reference.

44. The Commission's finding that the "volume of cumulated subject imports and the increase in that volume were significant in absolute terms and relative to apparent consumption in the United States during the period of investigation," and the subsidiary findings on which this conclusion rests, are unsupported by substantial evidence and otherwise not in accordance with law.

45. Among other errors, the Commission:

    a. incorrectly quantified the impact on the U.S. supply gap of the closures of Plant City and Redwater;

    b. incorrectly found that subject import volumes exceeded the domestic supply gap;

    c. failed to account for evidence that the U.S. market needed subject imports to remedy the domestic industry's unreliability and refusals to supply;

    d. failed to cite any evidence in support of its finding that the existence of subject import inventories after the weather-related decline in demand was inherently injurious to the domestic industry; and

    e. failed to account for evidence that importers, rather than forcing the domestic industry to adjust to depressed demand in the U.S. market, took actions in parallel with domestic producers in response to the weather-related downturn in demand.

## COUNT TWO

46. Paragraphs 1 through 45 are incorporated by reference.

47. The Commission's findings that "subject imports from Morocco and Russia depressed prices to a significant degree" and that "subject imports had significant price effects,"

and the subsidiary findings on which these conclusions rest, are unsupported by substantial evidence and otherwise not in accordance with law.

48. Among other errors, the Commission:

   a. failed to make a finding on underselling as required by the statute, even as it acknowledged the prevalence of overselling;

   b. failed to reconcile its finding on price depression with the few instances and small margins of underselling in the pricing data;

   c. failed to explain how its finding on lost sales is not undermined by the prevalence of overselling in the pricing data;

   d. failed to explain why it gave more weight to anecdotal and unverified information than to the Commission's own pricing data;

   e. failed to address the lack of correlation between volume and price trends;

   f. failed to account for evidence that domestic supply was often unavailable or unreliable;

   g. failed to account for evidence that U.S. prices were rising late in the POI and would have continued to rise in the absence of a petition; and

   h. failed to carry out its responsibility to make findings based on evidence collected by means of a thorough investigation.

## COUNT THREE

49. Paragraphs 1 through 48 are incorporated by reference.

50. The Commission's finding that "cumulated subject imports had a significant impact on the domestic industry" and the subsidiary findings on which this conclusion rests are unsupported by substantial evidence and otherwise not in accordance with law.

51. Among other errors, the Commission:

   a. failed to give any weight to the domestic industry's contemporaneous articulation of reasons for closing facilities and opening a gap in the U.S. market that it knew imports would be needed to fill;

   b. failed to explain how its finding on the domestic industry's excess capacity is not undermined by the industry's demonstrated failure to ramp up production after the petition was filed; and

   c. based its impact analysis primarily on the domestic industry's performance in 2019 instead of its condition closer to the petition filing date.

## COUNT FOUR

52. Paragraphs 1 through 51 are incorporated by reference.

53. The Commission's causation finding that the domestic industry is materially injured "by reason of" subject imports and the subsidiary findings on which this conclusion rests are unsupported by substantial evidence and otherwise not in accordance with law.

54. Among other errors, the Commission:

   a. failed to address the impact of the domestic industry's unreliability and refusals to deal on its sales and market share;

   b. based its causation analysis substantially on the existence of subject import inventories, despite the lack of any evidence that such inventories were injurious and despite evidence that it was not feasible or customary to reallocate inland inventories to higher demand regions within the U.S. market;

   c. failed to address the lack of correlation between subject import volume trends and the domestic industry's financial performance;

d.  misattributed any injury to subject imports rather than to the domestic industry's strategic decisions to close facilities and to the effects of the weather-related decline in demand; and

e.  faulted subject imports for overshooting the domestic supply gap and failing to adjust instantaneously to the weather-related downturn in demand, thereby contradicting what the Commission recognized to be the realities of the industry's conditions of competition and business cycle, including the fact that purchasers place phosphate fertilizer orders months in advance based on demand forecasts to ensure that adequate inventories are available in farmers' narrow seasonal application windows.

*   *   *

## PRAYER FOR RELIEF

For the reasons stated above, OCP respectfully requests that this Court:

1.  Hold that the Commission's *Final Determination* in the subject investigation is unsupported by substantial evidence on the record and otherwise not in accordance with law;

2.  Remand the investigation to the Commission for disposition consistent with any orders and opinions of this Court; and

3.  Grant such other relief as may be just and proper.

Respectfully submitted,

*[signature: Shara L. Aranoff]*

Shara L. Aranoff
James M. Smith
Victor D. Ban
Sooan (Vivian) Choi

Dated: June 4, 2021

**COVINGTON & BURLING LLP**
850 10th Street, NW
Washington, D.C. 20001

*Counsel to OCP S.A.*