# UNITED STATES COURT OF INTERNATIONAL TRADE

Before: HONORABLE STEPHEN A. VADEN, JUDGE

|  |  |
|---|---|
| OCP S.A., | ) |
| Plaintiff, | ) |
| EUROCHEM NORTH AMERICA CORPORATION, | ) |
| Consolidated Plaintiff, | ) |
| and | ) |
| PHOSAGRO PJSC, INTERNATIONAL RAW MATERIALS LTD., and KOCH FERTILIZER, LLC, | ) |
| Plaintiff-Intervenors, | ) |
| v. | ) Consol. Court No. 21-00219 |
| UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| THE MOSAIC COMPANY and J.R. SIMPLOT COMPANY, | ) |
| Defendant-Intervenors. | ) |

**JOINT *AMICUS CURIAE* BRIEF OF
AMERICAN SOYBEAN ASSOCIATION, NATIONAL CORN GROWERS
ASSOCIATION, NATIONAL COTTON COUNCIL OF AMERICA, NATIONAL
SORGHUM PRODUCERS, AND AGRICULTURAL RETAILERS ASSOCIATION**

John R. Magnus
TradeWins LLC
1330 Connecticut Ave. NW
Washington, DC 20036
(202) 744-0368
*Counsel to the American Soybean Association, National Corn Growers Association, National Cotton Council of America, National Sorghum Producers, and the Agricultural Retailers Association*

October 29, 2021

**TABLE OF CONTENTS**

I. INTEREST OF AMICI ............................................................................................1

II. ADMINISTRATIVE DETERMINATION CHALLENGED ........................................1

III. THE MAJORITY MADE UNSUPPORTED FACTUAL FINDINGS, PARTICULARLY ABOUT WHAT OCCURRED IN THE MARKET DURING 2019..................................................................................................................2

    A. THE MAJORITY'S FINDING THAT SUBJECT IMPORTS CAUSED A SUPPLY IMBALANCE IN 2019 IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE………………………………………………………………… 3

    B. THE OBSERVED INCREASE IN SUBJECT IMPORT VOLUME WAS DIRECTLY CAUSED BY DOMESTIC PRODUCERS' DECISION TO IDLE PRODUCTION FACILITIES AND PRIORITIZE EXPORT SALES; THE MAJORITY'S CONTRARY FINDING IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE………………………………………………… 5

        1. The Shuttering of U.S. Production Facilities Created a Large Supply Gap That Only Imports Could Fill…………………………………………………… 6

        2. The Prioritization of Foreign Markets by Domestic Suppliers Increased the Need to Resort to Imports…………………………………………………. 6

    C. THE MAJORITY'S FINDING THAT SUBJECT IMPORTS WERE UNNECESSARY TO SUPPLY FARMERS' NEEDS IN 2019 IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE………………………………………………………………..………………… 7

CONCLUSION........................................................................................................................8

## I. INTEREST OF AMICI

Amici are five agricultural industry associations representing hundreds of thousands of farmers that are the end users of, and the retailers who supply them with, both subject imports and the domestic like product. They include the American Soybean Association, National Corn Growers Association, National Cotton Council of America, National Sorghum Producers, and the Agricultural Retailers Association.

Amici have a deep understanding of the agricultural production sector, including the demand for and uses of phosphate fertilizer. Amici welcome this opportunity to assist the Court in reviewing the injury determination of the United States International Trade Commission (Commission). Amici particularly wish to draw attention to key differences – documented in the Commission's investigative record but ignored in the Commission majority's analysis – in business operations and decision-making between the agriculture production sector and heavy industry. In agriculture, timing matters in a completely different way. Simply, when farmers say they need delivery of an input "just in time," they are not referencing an economic theory for reducing financial exposure to excessive inventory. Rather, they are referencing a specific set of days on the calendar, after which, the input opportunity – and the benefits that might accrue from it – is permanently lost.

## II. ADMINISTRATIVE DETERMINATION CHALLENGED

This is an appeal from the Commission's final determination in *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (USITC Pub. No. 5172, March 2021) (Final), APPX0020557-0020819. The challenged (majority) decision held that the U.S. phosphate fertilizer producing industry was materially injured "by reason of" subject imports. Amici wish to draw the Court's attention to three key subsidiary findings by the majority that were not supported by substantial evidence or otherwise in accordance with law:

- that subject imports were the cause of a supply imbalance in 2019;

- that the increase in subject import volume was not created by domestic producers' decision to idle production facilities and prioritize sales to foreign markets; and

- that subject imports were unnecessary to supply farmers' needs in 2019.

The Commission's ultimate finding of material injury by reason of subject imports cannot be sustained if these underlying findings about the workings of the phosphate fertilizer market are corrected.

### III. THE COMMISSION MADE UNSUPPORTED FACTUAL FINDINGS, PARTICULARLY ABOUT WHAT OCCURRED IN THE MARKET DURING 2019

The Commission gathered extensive data depicting the conditions of competition in the phosphate fertilizer market. To recount in brief, farmers can only apply fertilizers during a finite window of days during the year.[1] If supply is not available during that window, fertilizer application must be delayed until some future window of opportunity.[2] This places a premium on reliability of supply, leading suppliers to diversify sourcing.[3] Fertilizer supply typically takes several months to work its way through the supply chain.[4] Therefore, in order to ensure

---

[1] Final Determination at APPX0020580; Hearing Tr. at APPX0017666 (Mr. O'Neill), APPX0017668 (Mr. Coppess).

[2] Koch Staff Conf. Testimony (Mr. McGinn) at APPX0003684; OCP Prehearing Br. at APPX0011945.

[3] Staff Rep. at APPX0020668 (27, 24, and 26 out of 28 purchasers ranked "Availability," Delivery time" and "Reliability of supply" as "Very important" to purchasing decisions, respectively); Hearing Tr. at APPX0017666 (Mr. O'Neill); OCP Prehearing Br. at APPX0011949; Koch Staff Conf. Testimony at APPX0003684 (Mr. McGinn) ("Both Koch and our customers desire, indeed require, multiple sources of supply of phosphate fertilizers to ensure we have sufficient supplies.").

[4] Final Determination at APPX0020580; Hearing Tr. at APPX0017668 (Mr. Coppess); Eurochem Prehearing Br., Affidavit, at APPX0011820 ("Given the compressed spring planting seasons, U.S. purchasers make fertilizer purchases, usually six months in advance to ensure adequate supply. In doing so, purchasers rely on projected levels of end-user demand based on, among other things, multiple USDA forecasts.").

that demand can be met, suppliers place orders on the basis of demand projections.[5]
Unexpected weather patterns, such as abnormally high precipitation, can – as the Commission recognized – negatively impact demand for fertilizers, causing a mismatch between projected demand and actual purchases. *See Final Determination* at APPX0020581.

Against this backdrop, the majority began its analysis with a finding (joined by Commissioner Johanson) that the volume of subject imports was significant. Unfortunately, and in a departure from Commission practice in other cases, the majority failed to consider <u>why</u> significant import volumes occurred. As a result, the majority reached findings on "impact" that were at odds with, rather than supported by, the record evidence. Amici address three specific unsupported factual determinations below.

### A. THE COMMISSION'S FINDING THAT SUBJECT IMPORTS CAUSED A SUPPLY IMBALANCE DURING 2019 IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

The Commission observed a supply imbalance that occurred during 2019 and blamed imports for it. The record evidence decisively refutes this finding. Specifically:

- On October 31, 2017, Mosaic announced that it would idle – and ultimately completely shutter – its Plant City facility, taking offline 1.5 million ST of North American production.[6]

- In February 2018, Nutrien announced that it would close its Redwater facility, taking offline another 600,000 ST of North American production, while promising to continue

---

[5] Staff Rep. at APPX0020667; Hearing Tr. at APPX0017668 (Mr. Coppess); OCP Prehearing Br. at APPX0011949; Eurochem Posthearing Br. at APPX0011809; IRM Posthearing Br. at APPX0016096.

[6] *See id.* at APPX0020624, citing OCP Prehearing Br., Ex. 40 (Mosaic, Global Chemicals and Agriculture Conference (Nov. 15, 2017)) at 2 (quoting Mosaic's CFO Richard Mack, "We've been producing roughly 1.5 million-or-so tonnes at that location in prior years. It's the least profitable that we have.").

3

- supplying Western Canada from its U.S.-based facilities.[7]

- A historic series of wet weather events during 2018-2019 resulted in reduced total plantings for three consecutive growing seasons.[8]

- Fall 2018 demand projections for phosphate fertilizers during those planting seasons were, therefore, not met.[9] Supplies imported in anticipation of meeting demand during those planting seasons were not exhausted on the expected timetable.[10]

---

[7] *See* Commissioner Johanson's Dissent at APPX0020610, citing OCP Posthearing Br., Att. C (Mr. Rahm Decl.) at APPX0012062. *See also id.* at APPX0020611, FN 13, citing OCP Prehearing Br., Ex. 38 at 1 ("The increase in production at the two remaining plants {in Aurora, North Carolina and White Springs, Florida} is expected to offset the reduction in supply from our Redwater facility, and ensure a continued supply of phosphate products to our customers in Western Canadian {sic}.").

[8] *See* Final Determination at APPX0020581. *See also id.* at APPX0020594, "{H}eavy precipitation in the fall of 2018, a polar vortex in the winter of 2018-2019, and record setting precipitation in the spring of 2019 caused massive flooding and prolonged river closures along the Mississippi River system that stranded fertilizer barges and resulted in delayed, destroyed, or abandoned plantings, especially in the Midwest and Great Plains regions."

[9] Hearing Tr. at APPX0017728-0017729 (Mr. Lambert) ("If you look at the USDA predictions in terms of planted acres, while there's no doubt you had a bad fall {2018}, There was still a prediction and there was still anticipation from our buyers and our customers that the acres were going to get planted…"); OCP Prehearing Br. at APPX0011955, Ex. 94 at APPX0013992 (Mosaic CEO James C. O'Rourke stating: "{I}n part due to a weak fall {2018} application season in North America, we expect inventories to be drawn down quickly and strong demand to emerge we move through North American spring…"); Ex 86 at APPX0013915-0013916 (Mosaic CEO James C. O'Rourke stating: "We've experienced a North American spring season that was wetter and later than any in recorded history . . . . Moving forward, strong price increases in grains together with depleted soil nutrients in North America are expected to drive fertilizer applications significantly higher this fall {2019}"); Koch Prehearing Br., Dec. at APPX0009910 ("In April-June 2019, the market prediction of phosphate fertilizer demand for the Fall season (fourth quarter) was optimistic.").

[10] Hearing Tr. at APPX0017687-0017688 (Mr. Niederer) ("We felt there was pent-up demand from the fall of 2018 and so you anticipate alleviating your inventories . . . And so the fall of '19 is what I would call your de-inventorying process where product is now pushed up into the interior and into the marketplace."), APPX0017701 (Mr. Coppess) ("{W}e had a tremendous backup of inventory due to the weather event . . . . {T}here was a tremendous amount of acres along the Missouri River that were not planted. It went into prevent {planting}, which isn't declared until June or July . . . . We had hoped we were still gonna sell inventory right up until mid-summer {2019}. And, at that point, inventories were backed up, and we carried some inventories into the fall.").

- Domestic producers were well aware of these market dynamics and aware that their decision to reduce domestic production dictated an increase in import supply.[11]

Equally important is what was <u>not</u> in the Commission's evidentiary record. There is no indication in the record that domestic producers made the decision to reduce their capacity and output in anticipation of unprecedented weather events. In other words, to the extent that there was a weather-induced supply imbalance, it would have existed whether or not U.S. plant closures had led distributors to place additional import orders. There is no evidence in the record, much less substantial evidence, to support blaming imports for the supply imbalance.

B. **THE OBSERVED INCREASE IN SUBJECT IMPORT VOLUME WAS DIRECTLY CAUSED BY DOMESTIC PRODUCERS' DECISION TO IDLE PRODUCTION FACILITIES AND PRIORITIZE EXPORT SALES; THE COMMISSION'S CONTRARY FINDING IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.**

1. **The Shuttering of U.S. Production Facilities Created a Large Supply Gap That Only Imports Could Fill**

The Commission staff collected a thorough record of what occurred in the market between 2017 and 2019, including domestic producers' business decisions designed to increase market share in growth markets while increasing overall operational efficiency. In practical terms, those decisions entailed idling and then shuttering production facilities in the mature market of the United States, while using remaining production capacity to fill orders destined for foreign markets. As highlighted in Commissioner Johanson's Dissent, within a single four-month period, two major domestic producers announced that they would, collectively, create a

---

[11] *See* Commissioner Johanson's Dissent at APPX0020611, quoting Mosaic officials, "{C}learly the import requirements into the US are increasing by {the closings of} both Red Water and Plant City there's no question of that . . . it certainly indicates that there will be a need for more imports . . ."; IRM Posthearing Br. at APPX0016095 and Ex. 2 at APPX0016134 (Mosaic, Q2 2018 Earnings Call) (Aug. 7, 2018) (emphasis supplied); Gavilon Prehearing Br., Ex. 1A at APPX0010324; OCP Prehearing Br., Ex. 25 at APPX0012836-0012837.

supply gap in the U.S. market of roughly 2.7 million tons.[12] Indeed, domestic producers explained to their shareholders that the supply gap was of their own making. *See Commissioner Johanson's Dissent* at APPX0020610 and FNs 7-8. The majority's discussion seeks to discount this amount to a few hundred thousand ST of reduced sales to particular customers.[13]

"When we shut down – sorry, idled Plant City, that opened a hole for some imports to increase . . . So we gave up 1 million tonnes {i.e., 1.1 million short tons (ST)} {sic} of market here in the U.S. intentionally."[14] Spoken by Mosaic's CEO in 2019, these are not the words of a manager coping with import injury, but those of an entrepreneur taking deliberate risks in pursuit of a business objective. Under these circumstances, there can be no doubt about what led distributors – who had to provide for <u>projected</u> demand and did not know what weather patterns would subsequently unfold – to place additional import orders. This is not a case featuring "contradictory evidence or evidence from which conflicting inferences could be drawn." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951).

### 2. The Prioritization of Foreign Markets by Domestic Suppliers Increased the Need to Resort to Imports

In addition to the large plant closures, U.S. producers allocated a portion of their remaining output to export markets, further exacerbating the supply gap inside the United States. The administrative record depicts numerous decisions by domestic producers to deny

---

[12] *See* Commissioner Johanson's Dissent at APPX0020610, noting the volume of the supply gap based on 2018 projections.

[13] According to the majority opinion, Mosaic both conceded it was creating a 1.1 million ST supply gap that only imports could fill, yet reduced its sales volume targets by only 300 thousand ST, *see id.* at APPX0020605. *But see also* Commissioner Johanson's Dissent, *id.* at APPX0020610 discussing the large volume of the supply gap, *and id.* at APPX0020613 stating clearly that import volumes, while increasing, did not exceed the volume of the supply gap.

[14] Commissioner Johanson's Dissent at APPX0020610 and FN 8, quoting from OCP Prehearing Br., Ex. 11 at APPX0012655-0012656 (Mosaic, Analyst Day (March 28, 2019) (emphasis supplied).

supply requests from distributors serving the U.S. market.[15] Distributors' efforts to fill orders from domestic suppliers, before resorting to imports, were clearly documented. Indeed, distributors were forced to pay more for foreign-sourced supply because they could not fill orders with domestic producers.[16] Meanwhile, export shipments by U.S. producers increased.[17] The picture is clear: domestic producers made the decision to prioritize markets seen as growth opportunities, leaving U.S. fertilizer purchasers to find supplies elsewhere (through imports). It was not reasonable, or lawful, for the Commission majority to find otherwise.

Regarding domestic producers' choice to prioritize export sales, the majority's only pertinent analysis was to cite certain adjustments, to better look after domestic customers, that one U.S. producer reportedly made *after petitioning for import relief*.[18]

### C. THE COMMISSION'S FINDING THAT SUBJECT IMPORTS WERE UNNECESSARY TO SUPPLY FARMERS' NEEDS IN 2019 IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

The record is full of discussion of the demand dynamics of 2019: unprecedented precipitation patterns in the American heartland throughout 2018-2019 – including extreme flooding in some areas – severely impacted three consecutive planting seasons. *See Final Determination* at APPX0020581. The Commission included in the record data from the U.S.

---

[15] *See* Commissioner Johanson's Dissent at APPX0020611, citing hearing testimony and confidential questionnaire responses from ADM, Eurochem, Gavilon, Heartland, and Koch detailing Mosaic's refusal to provide the requested supply.

[16] *Id*. at FN 22, quoting from Hearing Tr. at APPX0017726 (Mr. Wessel) ("I think there's a very easy rationale as to why we do see the overselling. It's companies like Gavilon not able to buy a U.S. made product and not having the availability and willing to pay a little bit more for a foreign product to meet that availability gap."); Hearing Tr. at APPX0017724 (Mr. Lambert *et al.*).

[17] *See* Commissioner Johanson's Dissent at APPX0020612, discussing confidential record data and other record evidence indicating an increase of shipments to foreign markets.

[18] *See* Final Determination at APPX0020606 discussing events taking place after petitions were filed to explain or characterize events that took place during the actual period of investigation.

Department of Agriculture's Farm Service Agency which showed, for example, a notable dip in total planted acreage during 2018-2019 when compared to prior and subsequent years, as well as high estimated prevented plantings for 2019.[19] The Commission majority correctly described the fact that actual fertilizer applications were substantially below projections. The majority's ensuing <u>analysis</u>, however, rests on a premise that distributors and farmers should have predicted these events – in other words, they should not have expected to apply, and should not have ordered, fertilizer in the usual amounts.

As discussed above, and evidenced throughout the record, fertilizer sourcing and supply decisions are made on the basis of projections about future use. The weather events that reduced consumption for three consecutive growing seasons were not only unforeseen, but unforeseeable and also history-making. Backward-looking analysis of supply flows can only serve to emphasize how disruptive these weather events really were. Farmers who expected to be deploying fertilizer, and whose orders drove increased purchases from the only available source (imports), <u>needed</u> that fertilizer even though the weather would later prevent them from applying it. The majority's contrary determination does not rest on record evidence or on reasonable inferences from record evidence, and should be remanded.

## IV. CONCLUSION

Agriculture production is a risky business. Farmers are in a constant battle with nature, the elements, pests, and now, apparently, corporate expansion strategy. As the Commission's record clearly documented, domestic producers reshuffled production in order to be more competitive in foreign growth markets and increase their profit margin. Meanwhile, the weather – as it often does – chose not to cooperate with the best laid plans of farmers, and their

---

[19] Final Determination at APPX0020594-0020595, noting that record-setting precipitation prevented the planting of some 19.6 million acres in 2019.

suppliers.

By domestic producers' own words, they undertook significant U.S. plant closures knowing that an enlarged and significant portion of their home market would as a direct result have to be supplied by additional imports. Without questioning the wisdom of these decisions, Amici maintain that the trade remedy laws were never meant to punish downstream users when domestic producers <u>elect</u> to stop or reduce supplying the domestic market. The mechanism by which the trade remedy laws avoid that absurd outcome is the injury test, which is only satisfied when material injury occurs "by reason of" subject imports. That did not happen in this case.

Accordingly, Amici respectfully urge the Court to remand with instructions to the Commission to revisit its material injury analysis, particularly on the points discussed above.

Respectfully submitted,

<u>/s/ John R. Magnus</u>
John R. Magnus
TradeWins LLC
1330 Connecticut Ave. NW
Washington, DC 20036
(202) 744-0368
*Counsel to the American Soybean Association, National Corn Growers Association, National Cotton Council of America, National Sorghum Producers, and the Agricultural Retailers Association*

Dated: October 29, 2021

# CERTIFICATE OF COMPLIANCE

This brief has been prepared utilizing Microsoft Word and a proportionally spaced typeface (12 point Times New Roman). In accordance with this Court's Chambers Procedures and Scheduling Order, the undersigned certifies that this brief complies with applicable word limitations. Specifically, excluding exempted portions per the Chambers Procedures, and based on the word count feature in Microsoft Word, this brief contains 2,852 words.

<u>/s/ John R. Magnus</u>
John R. Magnus
TradeWins LLC
1330 New Hampshire Ave. NW
Washington, DC 20036
(202) 744-0368
*Counsel to the American Soybean Association, National Corn Growers Association, National Cotton Council of America, National Sorghum Producers, and the Agricultural Retailers Association*