*PUBLIC VERSION*

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE

Consol. Court No. 21-00219

OCP S.A.,

*Plaintiff,*

EUROCHEM NORTH AMERICA CORPORATION,

*Consolidated Plaintiff,*

and

PHOSAGRO PJSC, INTERNATIONAL RAW
MATERIALS LTD., and KOCH FERTILIZER, LLC,

*Plaintiff-Intervenors,*

v.

UNITED STATES,

*Defendant,*

and

THE MOSAIC COMPANY and J. R. SIMPLOT COMPANY,

*Defendant-Intervenors*.

DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S
MEMORANDUM IN OPPOSITION TO PLANITIFFS'
MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

COURTNEY S. McNAMARA
Attorney for Defendant
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC  20436
Telephone (202) 205-3095
Fax (202) 205-3111


DATED:  JANUARY 28, 2022

DOMINIC L. BIANCHI
General Counsel
Telephone (202) 205-3061

ANDREA C. CASSON
Assistant General Counsel
for Litigation
Telephone (202) 205-3105

JASON F. MILLER
Attorney for Defendant

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... v

I.    STATEMENT PURSUANT TO RULE 56.2 ...............................................1

      A.    Administrative Determination Sought to be Reviewed ....................1

      B.    Questions Presented and Summary of Argument .............................1

            1.    Is the Commission's Volume Finding Supported by
                  Substantial Evidence and in Accordance with Law? ..............1

            2.    Is the Commission's Price Effects Finding Supported
                  by Substantial Evidence and in Accordance with Law? ............2

            3.    Is the Commission's Impact Finding Supported by
                  Substantial Evidence and in Accordance with Law? .................3

II.   STATEMENT OF THE CASE .....................................................................3

III.  ARGUMENT .................................................................................................6

      A.    Standard of Review............................................................................6

      B.    The Commission's Volume Finding is Supported by Substantial
            Evidence and in Accordance with Law ............................................9

            1.    Summary of the Commission's Volume Finding ......................9

            2.    The Commission's Volume Finding is in Accordance
                  with Law ..................................................................................9

            3.    The Commission's Volume Finding is Supported by
                  Substantial Evidence................................................................12

      C.    The Commission's Price Effects Finding is Supported by
            Substantial Evidence and in Accordance with Law...........................13

            1.    The Commission's Price Effects Finding is in
                  Accordance with Law ..............................................................13

            2.    The Commission's Price Effects Finding Is Supported
                  by Substantial Evidence...........................................................15

            3.    Plaintiffs' Attacks on the Commission's Price
                  Effects are Unavailing...............................................................21

**TABLE OF CONTENTS (cont'd)**

a. The Commission Did Not Find Significant Underselling...................................................................21

b. Plaintiffs' Factual Attacks on the Commission's Finding that Subject Imports Were Priced Lower than the Domestic Like Product Do Not Undermine the Commission's Price Depression Finding................................22

c. Plaintiffs' Argument Regarding Subject Import Inventories and the Oversupply Conditions Do Not Undermine the Commission's Finding of Price Depression ....................................................................24

d. The Court Should Reject Plaintiffs' Additional Attempts to Reweigh the Evidence................................28

e. OCP's Price Decline Correlation Argument Fails.........................31

D. The Commission's Impact Finding is Supported by Substantial Evidence and in Accordance with Law ....................................................32

 1. The Commission's Impact Finding is in Accordance with Law .............................................................................32

 2. The Commission's Impact Finding is Supported by Substantial Evidence.................................................................34

 3. OCP's Mischaracterization of the Commission's Impact Analysis Does Not Provide a Basis to Disturb the Commission's Findings........................................................35

 4. OCP's and PhosAgro's Arguments Regarding Interim Period Data Fail ....................................................................37

 5. OCP's Correlation Argument Fails................................................39

 6. Plaintiffs Have Failed to Provide a Basis for Disturbing the Commission's Non-attribution Analysis.............................40

  a. The Commission Reasonably Rejected Respondents' Argument that the Domestic Industry was Unwilling or Unable to Supply the U.S. Market ..........................................................40

**TABLE OF CONTENTS (cont'd)**

        b.     The Commission Reasonably Rejected Respondents' Arguments that Subject Imports Were Pulled into the U.S. Market Due to a Domestic Industry "Supply Gap" .................................................43

    7.    Amici's Arguments Regarding the Effects of Any Order Are Misplaced.....................................................................47

**IV.**    **CONCLUSION** ......................................................................................**48**

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Allegheny Ludlum Corp. v. United States*,
30 CIT 1995, 475 F. Supp. 2d 1370 (2006) .............................................................9

*Altx, Inc. v. United States*,
25 CIT 1100, 167 F. Supp. 2d 1353 (2001) ...........................................................21

*Altx, Inc. v. United States*,
370 F.3d 1108 (Fed. Cir. 2004)...............................................................7, 8, 11, 14

*AWP Indus., Inc. v. United States*,
783 F. Supp. 2d 1266 (Ct. Int'l Trade 2011) .................................................. 23, 29

*Cemex, S.A. v. United States*,
16 CIT 251, 790 F. Supp. 290 (1992), *aff'd*, 989 F.2d 1202 (Fed. Cir. 1993) ....... 15

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984)..................................................................................................9

*CHR. Bjelland Seafoods A/C v. United States*,
16 CIT 945 (1992) ..................................................................................................38

*CHR. Bjelland Seafoods A/C v. United States*,
19 CIT 35 (1995) ...............................................................................................30, 39

*Cleo, Inc. v. United States*,
501 F.3d 1291 (Fed. Cir. 2007)..............................................................................22

*Coal. for Preservation of Am. Brake Drum & Rotor Aftermarket Manufs. v. United States*,
15 F. Supp. 2d 918 (Ct. Int'l Trade 1998) .......................................................28, 29

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966).................................................................................................7

*Corus Grp. PLC v. USITC*,
352 F.3d 1351 (Fed. Cir. 2003)..............................................................................24

*DAK Americas LLC v. United States*,
456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ........................................................11

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                      **Page(s)**

*Goss Graphics Sys., Inc. v. United States,*
    22 CIT 983, 33 F. Supp. 2d 1082 (1998), *aff'd*, 216 F.3d 1357 (Fed. Cir.
    2000) ........................................................................................................ 8

*Grupo Indus. Camesa v. United States,*
    85 F.3d 1577 (Fed. Cir. 1996) ............................................................... 7

*Hitachi Metals, Ltd. v. United States,*
    949 F.3d 710 (Fed. Cir. 2020) .................................................... 7, 8, 22

*ITG Voma Corp. v. USITC,*
    253 F. Supp. 3d 1339 (Ct. Int'l Trade 2017), *aff'd*, 753 F. App'x 913 (Fed.
    Cir. 2019) ............................................................................................. 11

*Kenda Rubber Indus. Co. v. United States,*
    10 CIT 120, 630 F. Supp. 354 (1986) .................................................. 38

*Mitsubishi Elec. Corp. v. United States,*
    12 CIT 1025, 700 F. Supp. 538 (1988), *aff'd*, 898 F.2d 1577 (Fed. Cir. 1990) .................... 47

*Mittal Steel Point Lisas Ltd. v. United States,*
    542 F.3d 867 (Fed. Cir. 2008) .............................................................. 33

*Nippon Steel Corp. v. USITC,*
    345 F.3d 1379 (Fed. Cir. 2003) ............................................................ 33

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) .......................................................... 7, 8

*Nucor Corp. v. United States,*
    28 CIT 188, 318 F. Supp. 2d 1207 (2004) ................................. 8, 41, 42

*Nucor Corp. v. United States,*
    414 F.3d 1340 (Fed. Cir. 2005) ..................................................8, 14, 22

*OCTAL Inc. v. United States,*
    539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) ............................11, 14, 15

*Rhone Poulanc SA v. United States,*
    8 CIT 37, 592 F. Supp. 1318 (1984) .................................................... 14

*Saarstahl AG v. United States,*
    18 CIT 595, 858 F. Supp. 196 (1994) .................................................. 38

## TABLE OF AUTHORITIES (cont'd)

**Cases  (cont'd)**                                                                 **Page(s)**

*Siemens Energy, Inc. v. United States*,
   806 F.3d 1367 (Fed. Cir. 2015)................................................................. 7, 15

*Siemens Energy, Inc. v. United States*,
   992 F. Supp. 2d 1315 (Ct. Int'l Trade 2014), *aff'd*, 806 F.3d 1367 (Fed. Cir.
   2015) ................................................................................................ 15, 47

*Swiff-Train Co. v. United States*,
   793 F.3d 1355 (Fed. Cir. 2015)...................................................................33

*Taiwan Semiconductors Indus. Ass'n v. USITC*,
   266 F.3d 1339 (Fed. Cir. 2001)...................................................................33

*Timken U.S. Corp. v. United States*,
   421 F.3d 1350 (Fed. Cir. 2005)....................................................................8

*U.S. Steel Grp. v. United States*,
   96 F.3d 1352 (Fed. Cir. 1996).................................................8, 23, 24, 29

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951)....................................................................................7

*USEC Inc. v. United States*,
   34 F. App'x 725 (Fed. Cir. 2002) ...............................................................8

*USX Corp. v. United States*,
   12 CIT 205, 682 F. Supp. 60 (1988) ..................................................... 47, 48

## TABLE OF AUTHORITIES (cont'd)

**Statutes**                                                            **Page(s)**

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................6

19 U.S.C. § 1671d(b) ...........................................................................33

19 U.S.C. § 1677(7)(B) ....................................................................... 10

19 U.S.C. § 1677(7)(B)(i) ...................................................................33

19 U.S.C. § 1677(7)(C)(i) .............................................................1, 9, 10

19 U.S.C. § 1677(7)(C)(ii) ..............................................................10, 13

19 U.S.C. § 1677(7)(C)(iii) .............................................................32, 39

19 U.S.C. § 1677(7)(J) .......................................................................37

28 U.S.C. § 2639(a)(1) ..........................................................................6


**Legislative Materials**

H.R. Rep. 96-317 (1979) ......................................................................33

S. Rep. 96-249 (1979) .........................................................................33

Statement of Administrative Action for the Uruguay Round Agreements Act,
    H.R. Rep. No. 103-316, vol. I (1994) ............................................ 8, 33


**USITC Publications**

*Barium Carbonate and Strontium Carbonate from the Federal Republic of
    Germany and Strontium Nitrate from Italy*,
    Inv. Nos. 731-TA-31-33 (Prelim.), USITC Pub. 1105 (Oct. 1980) .........................43

*Utility Scale Wind Towers from Malaysia*,
    Inv. No. 701-TA-661 (Final), USITC Pub. 5215 (July 2021) .................................43

Defendant U.S. International Trade Commission ("Commission") opposes the motions for judgment upon the agency record filed by plaintiff, OCP S.A. ("OCP"); plaintiff-intervenors, International Raw Materials Ltd. ("IRM"), Koch Fertilizers LLC ("Koch"), and PhosAgro PJSC ("PhosAgro"); and supported by *amici curiae* ("Amici") (collectively, "plaintiffs").  The Commission respectfully asks the Court to affirm the Commission's final affirmative determinations in *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final) because they are supported by substantial evidence and in accordance with law.

## I.      STATEMENT PURSUANT TO RULE 56.2

### A.      Administrative Determination Sought to be Reviewed

Plaintiffs seek review of the Commission's final affirmative determinations in the countervailing duty investigations of phosphate fertilizers from Morocco and Russia.  Notice of the determinations in these investigations was published at 86 Fed. Reg. 17,642 (Apr. 5, 2021) (APPX0020820).  The public version of the Commission's views and Staff Report for these investigations is contained in USITC Pub. 5172 (Mar. 2021) (APPX0020557-0020819).  The confidential version of the Commission's views is at APPX0099573-0099666 and the confidential Staff Report is at APPX98373-0098571.

### B.      Questions Presented and Summary of Argument

#### 1.      Is the Commission's Volume Finding Supported by Substantial Evidence and in Accordance with Law?

Yes.  In accordance with its statutory mandate, the Commission "consider{ed} whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."  19 U.S.C. § 1677(7)(C)(i).  As the Commission explained, the volume of subject imports increased in absolute terms from 2017 to 2019.  The Commission also found that U.S. shipments of subject

imports likewise steadily increased during that time.  Additionally, the volume of subject import shipments increased relative to apparent U.S. consumption.

Plaintiffs' challenges to the Commission's volume findings are not based on any legitimate construction of the statute and, in fact, do not even implicate the Commission's actual analysis.  The Commission's views belie OCP's claim that the Commission did not consider import shipments.  Plaintiffs' other challenges ignore the Commission's actual record-based findings reflecting exactly what the import data show.

> **2.     Is the Commission's Price Effects Finding Supported by Substantial Evidence and in Accordance with Law?**

Yes.  Record evidence showed that subject imports were increasingly lower priced than the domestic like product and had significant price effects in the highly transparent U.S. market. Based on the increasing subject imports volumes, inventories and shipments, which were well in excess of demand, and lower prices, the Commission reasonably found that subject imports exerted downward pressure on prices for the domestic like product, thereby significantly depressing them.

Plaintiffs misread the statute and ignore well-established caselaw.  Patently, the statute requires only that the Commission "consider" factors such as whether there was significant underselling.  Contrary to OCP's argument, the statute neither requires the Commission to "determine" whether there was significant underselling, nor to make such a determination as a predicate to finding significant price effects.  Plaintiffs' efforts to undermine the Commission's factual findings are likewise based on a misreading of those findings and are grounded in a request for the Court to improperly reweigh the evidence.

### 3.     Is the Commission's Impact Finding Supported by Substantial Evidence and in Accordance with Law?

Yes.  Due to the downward pressure exerted by the significant and increasing volume of subject imports, the domestic industry was forced to reduce prices, which in turn, caused its revenues to be lower than they otherwise would have been.  As a result, the Commission reasonably found that subject imports had a significant impact on the domestic industry.

The Commission also considered the role of other factors so as not to attribute injury from other factors to subject imports.  It found declining demand in 2019 not to rebut that the domestic industry's performance would have been stronger in the absence of subject imports, given that these imports took market share from the domestic industry from 2018 to 2019, and depressed U.S. prices.  The Commission rejected respondents' argument that subject imports merely filled a supply gap, finding that the volume of subject imports eclipsed any reduction in U.S. supply.  The Commission also reasonably rejected respondent arguments that the domestic industry refused to supply U.S. customers in favor of exporting product, given the record evidence showing that the domestic industry prioritized shipments to the U.S. market, along with the fact that most purchasers reported that the domestically produced product was either comparable or superior to subject imports in availability and reliability.

Plaintiffs' arguments provide no basis for disturbing the Commission's findings as they mischaracterize the Commission's analysis and improperly invite this Court to reweigh the evidence.

## II.     STATEMENT OF THE CASE

On June 26, 2020, domestic producer Mosaic Company filed petitions with the Department of Commerce and the Commission, alleging that an industry in the United States is materially injured or threatened with material injury by reason of subsidized imports of

phosphate fertilizers from Morocco and Russia.  APPX0099573.  In March 2021, the

Commission determined that an industry in the United States was materially injured by reason of

subject imports.[1]  APPX0099573.  For purposes of these investigations, the Commission

collected and evaluated data covering the period from January 2017 to September 2020 ("period

of investigation" or "POI").  The Commission's staff report contained data for full years 2017,

2018, and 2019, as well as data comparing the first nine months of 2019 with those for the same

period in 2020 ("interim periods").  APPX0099573.

The Commission defined a single domestic like product coextensive with the scope,

defined the domestic industry as all U.S. producers of phosphate fertilizers, and cumulated

subject imports from Morocco and Russia.  APPX0099574-0099586.[2]  (Throughout this brief,

discussion of "subject imports" refers to cumulated subject imports.).  The Commission obtained

and relied on domestic industry data, through questionnaires, from the three largest domestic

producers – Mosaic, Nutrien, and Simplot, who together accounted for the vast majority of U.S.

production.  APPX0099593, APPX0098429.

In determining whether the subject imports caused material injury to the domestic

industry, the Commission analyzed the three required statutory factors – volume, price effects,

and impact.  Certain relevant conditions of competition and business cycle informed the

Commission's analysis, including but not limited to: the high degree of substitutability between

the subject imports and the domestic product (APPX0099597-0099598); the importance of price

---

[1] Chair Kearns, Vice Chair Stayin, and Commissioners Schmidtlein and Karpel voted in the affirmative, constituting the Commission's determinations, while Commissioner Johanson voted in the negative.  Commissioner Johanson joined the sections of the Commission's views pertaining to the domestic like product, the domestic industry, cumulation, conditions of competition, and volume.  APPX0099573.

[2] Plaintiffs have not appealed these issues.

4

and recognized price transparency in this market, with prices published daily or weekly and quickly transmitted (APPX0099599-0099600); that both the domestic and imported products are sold through inventories (APPX0099600-0099661); the increases in demand and consumption between 2017 and 2018 followed by a demand and consumption decline in 2019 that affected three consecutive planting seasons (APPX00995590-0099592); and the domestic industry's maintenance of excess capacity throughout the POI notwithstanding idling or closing of certain facilities (APPX0099593-0099594, APPX0099596-0099597).

Concerning volume, the Commission noted that import volumes, measured both by entries and U.S. shipments, increased overall in absolute terms between 2017 and 2019. APPX0099603-0099604. The Commission also observed that subject imports' market share – which was, as typical in Commission cases, measured by comparing subject import shipments to total apparent U.S. consumption – increased from 2017 to 2019 while domestic industry market share declined. APPX0099604-0099605. Subject imports' volume and market share were lower in interim 2020 than in interim 2019, as subject imports decreased substantially after the filing of the petitions during interim 2020. APPX0099605. The Commission found that the volume of subject imports and the increase in that volume were significant in absolute terms and relative to apparent consumption. APPX0099605.

Addressing price effects, the Commission considered whether there was significant price underselling by the subject imports and whether the subject imports significantly depressed or suppressed prices for the U.S. product. APPX009906-0099618. Upon exhaustive consideration of the record and the parties' arguments, the Commission found that subject imports depressed prices to a significant degree, and accordingly concluded that subject imports had significant price effects. APPX009906-0099618. Evaluating the impact factors, the Commission noted the

2017-2019 declines in the domestic industry's output and employment indicators, and the deterioration of the industry's financial indicators in 2019, which largely continued into interim 2020.  APPX0099619-0099621.  The Commission explained that the significant and increasing presence of subject imports in a declining market contributed to an oversupply in the U.S. market that depressed U.S. prices, which in turn caused the domestic industry's revenues to be lower than they would have been otherwise.  APPX0099622-0099623.

The Commission next assured that the injury attributed to the subject imports was not caused by any other factors – including declining demand in 2019, an alleged supply gap created by Mosaic's and Nutrien's idling or closure of certain facilities, an alleged refusal by Mosaic to supply U.S. customers in favor of exporting product, alleged domestic industry cost challenges, and nonsubject imports (which had only a small presence in the U.S. market during the POI).  APPX0099623-0099629.  Accordingly, the Commission found that subject imports had a significant impact on the domestic industry.  APPX009629.

Based on its evaluation of the statutory criteria, the Commission determined that an industry in the United States was materially injured by reason of the subject imports.  APPX0099629.

## III.   ARGUMENT

### A.   Standard of Review

This Court reviews the Commission's final determinations by assessing whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  The Commission's determinations are presumed to be correct, and the burden is on the party challenging the determination to demonstrate otherwise.  28 U.S.C. § 2639(a)(1).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (citation omitted).  The Federal Circuit has explained, "in the hierarchy of the four most common standards of review, substantial evidence is the second most deferential, and can be translated roughly to mean, 'is {the determination} unreasonable?'" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (internal citation omitted).

Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  Even if "individual Commissioners reach{} divergent conclusions, '{t}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Siemens Energy, Inc. v. United States,* 806 F.3d 1367, 1372 (quoting *Consolo*, 383 U.S. at 620); *see also Grupo Indus. Camesa v. United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996) ("Although {a party} points to evidence supporting the dissenting commissioners' decision that the domestic industry was not materially injured, this does not mean that the Commission's affirmative determination is unsupported by substantial evidence.") (citing *Consolo*, 383 U.S. at 619-20). Thus, under the substantial evidence standard, a court may not, "even as to matters not requiring expertise … displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera*, 340 U.S. at 488.  Rather, a court '"must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from

the Commission's conclusion.'"  *Hitachi Metals, Ltd. v. United States*, 949 F.3d 710, 716 (Fed. Cir. 2020) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004)).

    In injury investigations, the Commission is the trier of fact.  As such, "{i}t is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process."  *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996); *Nippon Steel Corp.*, 458 F.3d at 1350.  Accordingly, the Commission has "discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis."  *Goss Graphics Sys., Inc. v. United States*, 22 CIT 983, 1004, 33 F. Supp. 2d 1082, 1100 (1998) (citation omitted), *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000).  As the Federal Circuit has stated, if "the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert fact-finder – here the majority of the Presidentially-appointed, Senate-approved Commissioners – to decide which side's evidence to believe."  *Nippon Steel*, 458 F.3d at 1359.

    Furthermore, since the Commission "'is presumed to have considered all of the evidence on the record,'" it is "'not required to explicitly address every piece of evidence presented by the parties'" during an investigation.  *Nucor Corp. v. United States*, 28 CIT 188, 234, 318 F. Supp. 2d 1207, 1247 (2004) (quoting *USEC Inc. v. United States*, 34 F. App'x 725, 731 (Fed. Cir. 2002)), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005).  Instead, the Commission need only address the "issues material to {its} determination" so that the "path of the agency may reasonably be discerned."  Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103- 316, vol. I at 892 (1994) ("SAA"); *see also Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354–57 (Fed. Cir. 2005).

Finally, for statutory construction questions, this Court applies the test set out by the Supreme Court in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See, e.g.*, *Allegheny Ludlum Corp. v. United States*, 30 CIT 1995, 1998, 475 F. Supp. 2d 1370, 1375 (2006).

**B.      The Commission's Volume Finding is Supported by Substantial Evidence and in Accordance with Law**

**1.      Summary of the Commission's Volume Finding**

The statute provides that the "Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."  19 U.S.C. § 1677(7)(C)(i).  In accordance with this statutory mandate, the Commission considered the volume of subject import entries, which increased overall from 2017 to 2019.  APPX0099603-0099604.  The Commission also considered the volume of U.S. shipments of subject imports, which increased steadily during that time.  APPX0099604.  Additionally, the Commission considered the volume of subject import shipments relative to apparent U.S. consumption, finding that subject imports gained market share from 2017 to 2019.  APPX0099604-0099605.  Thus, the Commission reasonably found that the volume of subject imports and the increase in that volume were significant in absolute terms and relative to apparent consumption in the United States during the POI.  APPX0099605.

**2.      The Commission's Volume Finding is in Accordance with Law**

Plaintiffs' assertions that the Commission's analysis was not in accordance with law are flawed.  First, OCP wrongly claims that the Commission "conflate{d} import entries and import shipments."  OCPBr11.  To the contrary, the Commission *separately* discussed both the volume of subject import entries *and* U.S. shipments of subject imports.  Indeed, its discussion evinces

9

that, although the volume of subject import entries decreased in 2019, U.S. shipments of subject imports continued to increase that year, enabling subject imports to continue to gain market share.  APPX0099604-0099605.

Similarly baseless is OCP's allegation that the Commission departed from prior practice by allegedly using import entries as opposed to import shipment data to calculate apparent U.S. consumption.  OCPBr12.  As evident from the data cited in the Commission's views, the Commission calculated and considered market share of apparent consumption based on shipments of both domestic products and subject imports.  APPX0099604-0099605, APPX0098461, APPX0098547.

Further, rather than address the Commission's actual record-based analysis of the data concerning subject import volumes, plaintiffs argue that the Commission is supposedly required to evaluate a myriad of other factors in its volume analysis, such as certain purported *reasons for* and *effects of* subject imports.  *See, e.g.,* OCPBr8-21, 43; PhosAgroBr9-13; IRMBr3-11; KochBr3, 5; AmiciBr3.

Insofar as plaintiffs argue that the statute somehow implies a Commission obligation to perform a more expansive analysis as part of its consideration of volume, they are wrong. Unlike the statutory price and impact provisions, the volume provision contains no mention of effects.  *Compare* 19 U.S.C. § 1677(7)(C)(i) *with* 19 U.S.C. § 1677(7)(C)(ii) ("In evaluating the effect of imports of such merchandise on prices…"); *see also* 19 U.S.C. § 1677(7)(B) (bifurcating the Commission's injury assessment between an analysis of subject import "volume," on the one hand, and its "*consequent* impact" (*i.e.*, its effects), on the other) (emphasis added).

10

This Court has previously rejected a similar challenge to the Commission's finding of significant volume based on a putative lack of effects. *See ITG Voma Corp. v. USITC*, 253 F. Supp. 3d 1339, 1357 (Ct. Int'l Trade 2017), *aff'd*, 753 F. App'x 913 (Fed. Cir. 2019) (sustaining the Commission's volume finding and rejecting the plaintiff's presumption that the Commission is required by law to consider the domestic industry's condition and financial performance in its volume analysis.).  Likewise, in the recent *OCTAL* case, this Court explained that "the statute does not require that the Commission consider the effects of subject imports in its volume analysis." *OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291, 1300 (Ct. Int'l Trade 2021) (*citing* 19 U.S.C. § 1577(7)(C)(i) and *ITG Voma Corp.*, 253 F. Supp. 3d at 1357).  The Court should decline to "ask more of the Commission than required by the statute." *Altx,* 370 F.3d at 1123.[3]

Also failing are plaintiffs' arguments that the Commission erred in relying on the total volume of subject import entries in its volume analysis, OCPBr11-12, IRMBr5 n.2, KochBr4 n.4.  The Commission's questionnaires directed importers to report as "imports" only "{t}hose products identified for Customs purposes as imports for consumption."  APPX0008704.  The Commission reasonably relied on importers – including IRM and Koch – properly reporting imports in accordance with the Commission's explicit instructions.  Accordingly, staff compiled the import data based on the volumes represented by importers as being intended to be consumed

---

[3] Koch's reliance upon *DAK Americas. LLC v. United States*, 456 F. Supp. 3d 1340, 1353 (Ct. Int'l Trade 2020), for the proposition that "{t}he Commission's import volume finding is improper because it failed to reasonably address the constraints on domestic supply," KochBr3, is misplaced.  In *DAK*, the Court was addressing allegations of domestic industry supply constraints within the context of the Commission's *impact* analysis, not the volume analysis. 456 F. Supp. 3d at 1350-51.  As discussed below, in the current investigations, the Commission did in fact lawfully address reported supply constraints in its conditions of competition and impact discussions.  APPX0099595-0099597, APPX0099624-0099626.

**Business Proprietary Information Redacted**

within the United States.[4]  Moreover, as discussed above, the Commission also relied on U.S. shipment data.  These data, which do not include re-exports, demonstrated that the quantities of U.S. shipments of subject imports increased each full year of the POI, including 2019 when demand declined.  No party disputes these increases, and as noted, OCP explicitly endorses reliance on U.S. shipment data.  OCPBr11-12.

### 3.    The Commission's Volume Finding is Supported by Substantial Evidence

The record evidence underlying the Commission's volume analysis conclusively establishes the reasonableness of the Commission's volume finding.  In absolute terms, the volume of subject imports increased from 2.0 million short tons in 2017 to 3.0 million short tons in 2018 before decreasing to 2.7 million short tons 2019, for an overall increase of 36.8 percent from 2017 to 2019.  APPX0099603, APPX0098445, APPX0098448.[5]  Additionally, U.S. shipments of subject imports steadily increased from 1.8 million short tons in 2017 to 2.4 million short tons in 2018 and further increased to 2.5 million short tons in 2019.  APPX0099604, APPX0098547.

Subject import volume, relative to apparent U.S. consumption, also increased from 2017 to 2019.  The share of apparent U.S. consumption held by subject imports increased from [█████] percent in 2017 to [████] percent in 2018.  APPX0099604-0099605, APPX0098547.  Although the absolute volume of subject imports decreased from 2018 to 2019, U.S. shipments of subject imports continued to increase.  As apparent U.S. consumption decreased [███] percent from 2018

---

[4] OCP's own purportedly adjusted data show similar trends as the unadjusted import data, including an increase of over [████████] short tons in what it characterizes as "net imports" from 2017 to 2018 followed by a subsequent decline in 2019, for an overall increase of more than [███] percent.  APPX0097708.

[5] The views contain a minor typographical error, reporting the increase as 37.4.  APPX0099603.

*Business Proprietary Information Redacted*

to 2019, U.S. shipments of subject imports increased 6.2 percent.  APPX0099604-0099605,

APPX0098547.  This enabled subject imports to further increase their market share to [███]

percent in 2019, for an overall increase of [███] percentage points from 2017 to 2019.

APPX0099605, APPX0098547.

Critically, no party challenges the accuracy of the above data, which the Commission

relied upon in assessing the volume of subject imports.  Indeed, conspicuously absent from

plaintiffs' arguments regarding the Commission's volume findings is *any* discussion of or

citation to the Commission's actual volume analysis.  OCPBr7-21; PhosAgroBr9; IRMBr3-11.

Rather, they mischaracterize other aspects of the Commission's determinations as constituting

the Commission's volume findings, while failing to articulate any challenge to the Commission's

actual analysis.  We address the substance of those arguments in the proper context of our price

and impact discussions below.

> **C.     The Commission's Price Effects Finding is Supported by Substantial
>          Evidence and in Accordance with Law**
>
> **1.     The Commission's Price Effects Finding is in Accordance with Law**

The statutory provision regarding the Commission's price effects analysis provides as

follows:

> In evaluating the effect of imports of such merchandise on prices,
> the Commission shall *consider* whether –
>
> (I)     there has been significant price underselling by the
>         imported merchandise as compared with the price of
>         domestic like products of the United States, and
>
> (II)    the effect of imports of such merchandise otherwise
>         depresses prices to a significant degree or prevents price
>         increases, which otherwise would have occurred, to a
>         significant degree.

19 U.S.C. § 1677(7)(C)(ii) (emphasis added).

The Commission's price effects analysis fully complied with the statute.  That is, the Commission considered whether subject imports significantly undersold the domestic like product as well as whether subject imports depressed or suppressed prices to a significant degree. Based on these considerations, the Commission reasonably and lawfully found that subject imports had significant price effects on the domestic industry.  APPX000099605-0099619.

In attempting to show otherwise, OCP incorrectly paraphrases the statutory price effects obligation.  Specifically, OCP's legal challenge to the Commission's price effects finding hinges on its view that the Commission is required to make an underselling *determination*.  OCPBr21, 23.  This provision, however, plainly requires only that the Commission *consider* whether there has been significant underselling.  As the Federal Circuit has explained, the Commission's "consideration" of a statutory factor does not encompass an obligation to come to any conclusion regarding that factor.  *See Altx*, 370 F.3d at 1123 (discussing "consideration" of the magnitude of the margin of dumping).  *See also Rhone Poulenc S.A. v. United States*, 8 CIT 47, 55, 592 F. Supp. 1318, 1326 (1984) (declining to find a requirement for the Commission to make a categorically statement on underselling);[6] *Nucor Corp.*, 414 F.3d at 1339.  Thus, OCP's claim that "the absence" in the Commission's views of a finding on whether underselling by subject imports was significant "is not in accordance with law" lacks merit.  OCPBr23.

Moreover, a finding of significant underselling is not even required for the Commission to find significant price effects, let alone to make an affirmative injury determination.  *See, e.g.*,

---

[6] In *Rhone Poulenc*, the Court stated that "{a}lthough the concise expression of such a finding is preferable, we are reluctant to require the ITC to state its position with technical exactitude in this developing area of the law."  8 CIT at 55, 592 F. Supp. at 1326.  Although we recognize that the law is now developed in this area, it remains that the statute itself does not contain a requirement for a finding on underselling.  Had it contained such a requirement, the Court would have lacked authority to abstain from imposing one in *Rhone Poulenc.*

*OCTAL*, 539 F. Supp. at 1302 ("{T}he…Federal Circuit…and this Court have made clear that the Commission may rely on evidence *either* of significant underselling *or* significant price suppression or depression to support a finding for adverse price effects."); *Siemens Energy, Inc. v. United States*, 992 F. Supp.2d 1315, 1334-35 (Ct. Int'l Trade 2014) (sustaining the Commission's significant price effects finding based solely on price suppression, and holding that the Commission "did not need to find" underselling in these circumstances), *aff'd*, 806 F.3d 1367 (Fed. Cir. 2015); *Cemex, S.A. v. United States*, 16 CIT 251, 260–61, 790 F. Supp. 290, 299 (1992) ("To require findings of underselling would be inconsistent with the proposition that price suppression or depression is sufficient."), *aff'd*, 989 F.2d 1202 (Fed. Cir. 1993).

In sum, OCP's argument that the Commission "abdicat{ed}" its "statutory duty" to reach a finding on whether subject import underselling was significant (OCPBr23) is unavailing, as no such duty exists.

## 2.    The Commission's Price Effects Finding is Supported by Substantial Evidence

In addressing price effects, the Commission first *considered* whether there had been significant underselling by subject imports.  APPX0099606-0099609.  The Commission explicitly recognized that the monthly pricing data collected from importers and producers showed subject imports prevalently overselling the domestic product.  APPX0099607, APPX0098473-0098476, APPX98483.  Nevertheless, it found the number of instances of underselling and overselling to be less probative than other record evidence of the effects that subject imports had on prices in the U.S. market.  In this regard, the Commission noted that underselling and overselling margins were small and that the prices of the domestic like product and subject imports closely tracked each other over the POI.  APPX0099607-0099609,

APPX0098473-009876, APPX0098483.  Accordingly, in the context of its overall price effects analysis, it afforded these comparisons less weight.

Indeed, the Commission performed a comprehensive analysis of the role of subject import prices on prices for the domestic product, based on the totality of record evidence.  The Commission found the close price comparability to be consistent with the high degree of substitutability and price transparency that existed in the U.S. market.  APPX0099607-0099609, APPX0098422.[7]  Specifically, phosphate fertilizer prices are reported in various trade publications, which gather market intelligence, including from market participants, many of which reported providing their prices to these publications.  APPX0099600, APPX0098467-0098468, APPX0017611, APPX0017659-0017660, APPX0096112, APPX0091728, APPX0095919-0095921, APPX0095454, APPX0097679.  This price information is published on a daily or weekly basis, and quickly transmitted throughout the U.S. market, with the majority of U.S. producers and purchasers, as well as some importers, reporting that they rely upon these publications in setting or negotiating prices.  APPX0099600, APPX0098467-0098468, APPX0095919-0095921.

The Commission also cited other record evidence corroborating that the domestic like product and subject imports were closely priced, with subject imports priced lower in some instances.  APPX0099606-0099609.  Specifically, all responding purchasers (*i.e.*, purchasers who responded to the Commission's questionnaire) indicated that prices for the domestic like product were comparable or inferior (*i.e.*, higher priced) to prices for subject imports.  APPX0098422.  Additionally, a number of purchasers reported that subject imports were priced

---

[7] The Commission also considered whether subject imports had suppressed prices for the domestic like product to a significant degree, but ultimately did not reach a conclusion on this issue.  APPX0099616-0099618.

lower than the domestic like product and several further reported that the lower price was a primary reason for purchasing subject imports instead of the domestic like product. APPX0098486.  The Commission observed that the confirmed volume of sales lost by the domestic industry to lower priced subject imports, 733,895 short tons, equated to 97.3 percent of the increase in the reported volume of U.S. shipments of subject imports from 2017 to 2019. APPX0099608, APPX0098486.  Furthermore, as the market declined in 2019, the record indicated that there were other instances in which importers of subject imports offered prices below those of the domestic industry.  APPX0099609, APPX0097210-00997212, APPX0097567-0097578.

Further, the Commission found that the record showed that subject imports depressed prices to a significant degree.  Analyzing price trends, it observed that prices for both the domestic like product and subject imports increased between 2017 and most of 2018, and then declined between 2018 and 2019.  Prices also increased during the interim 2020 period but remained below their January 2017 levels.  After the filing of the petitions, prices dramatically increased as subject import volumes as well as subject import end-of-period inventories decreased.  APPX0099609-0099610, APPX0098473-0098476, APPX0098547, APPX0098551.

Additionally, significant volumes of subject imports entered the U.S. market between 2017 and 2018 and remained at elevated levels in 2019 despite a significant decline in demand. APPX0099610.  A consultant hired by OCP attributed this decline to "Black Swan" level rainfall beginning in the fall of 2018 and lasting through 2019.  APPX0099610, APPX0017655-0017656.  Respondents acknowledged that heavy precipitation in the fall of 2018, a polar vortex in the winter of 2018-2019, and record setting precipitation in the spring of 2019 caused massive flooding and prolonged closures along the Mississippi River system that stranded fertilizer

17

barges and resulted in delayed, destroyed, or abandoned plantings, especially in the Midwest and Great Plains regions.  APPX0099610, APPX0091853-0091854, APPX0091864-0091866, APPX0089665-0089666, APPX0095726-0095727, APPX0091555-0091556, APPX0096970-0096971.

Notwithstanding these market conditions, subject imports continued to enter the United States, maintain a significant presence, and gain market share in the declining U.S. market.  The record also shows a significant buildup of inventories of subject imports, at levels far in excess of what was maintained at the end of 2017.  APPX0099611-0099613.  U.S. importers' end-of-period inventories of subject imports in 2018 and 2019 were [███] percent and [███] percent higher, respectively, than ending inventories in 2017.  APPX0099613, APPX0098547.  Further, end-of-quarter inventories were higher in March, June, and September of 2019 than in equivalent quarters in prior years, and remained at elevated levels until the petitions were filed in June 2020.  APPX0099613, APPX0098551.  Despite these elevated inventories, importers reported continuing to import additional fertilizers because it was more "economical" than moving existing inventories and they also reported being unable to stop incoming imports.  APPX0099613, APPX0017687-0017688, APPX0017691.  Numerous contemporaneous trade publications reported on these oversupply conditions, with several specifically citing "heavy imports" in a "tank{ing}" U.S. market.  APPX0099611-0099612, APPX0080380, APPX0080386, APPX0080401, APPX0080406, APPX0080410, APPX0080418, APPX0080420, APPX0080423, APPX0080426, APPX0080433, APPX0080451, APPX0080453, APPX0097273, APPX0096032, APPX0096096.[8]

---

[8] The Commission noted that subject imports accounted for 84.9 percent of total import volume in 2019, up from 83.0 percent in 2018, and shipments of subject imports increased in

*(cont'd on next page)*

**Business Proprietary Information Redacted**

The Commission further cited evidence, including contemporaneous communications from purchasers, that subject imports were being offered at low prices at the same time they contributed to oversupply conditions.  For example, one purchaser reporting daily calls from importers "asking for homes to take phosphate barges," but not having space to take advantage of a "name your price" barge.  APPX00996113, APPX0097202-0097203, APPX97541-0097554.  Another reported that Mosaic was initially resistant to lower prices but eventually lowered them to compete with lower-priced imports, after which purchases of imports climbed [ ███████ ██████ ] as they reacted with discounts larger than Mosaic's.  APPX00996113, APPX0098488-0098489, APPX0088551.  Simplot also reported lowering prices due to subject imports.  APPX00996113, APPX0095894-0095896, APPX0095935-0095939, APPX0095952-0095962.

The record also showed that the number of instances in which the prices for subject imports was the lowest reported price was higher in 2019 compared to 2017.  Specifically, prices for subject imports were the lowest reported price in [ ██ ] percent of the 24 monthly comparisons in 2019 compared to [ █████ ] of the 24 monthly comparisons in 2017.  APPX0099613, APPX0097210-0097212, APPX0097570-0097578.  Additionally, acknowledging that lost sales data were not specific to 2019, the Commission also recalled the 733,895 short tons in sales that purchasers confirmed were lost to low priced subject imports.  APPX0099613.

The Commission therefore found that subject imports – through their significant volumes that contributed to oversupply conditions in a declining U.S. market and low prices – exerted downward pressure on prices for the domestic like product, thereby significantly depressing U.S.

---

2019 while shipments of nonsubject imports declined that year.  APPX0099612-0099613, APPX0098446, APPX0098547.

prices in 2019.  APPX0099614.  Prices also remained at lower levels in 2020 until after the

petitions were filed in June of that year.  APPX009614, APPX0098474, APPX0098476.

Additionally, other record evidence considered by the Commission established the adverse

effects of subject imports on U.S. prices.  Several purchasers confirmed that U.S. producers

lowered their prices to compete with lower-priced subject imports.  APPX0099614,

APPX0098487-0098488.  Several purchasers also reported the adverse effects of subject imports

on the U.S. market and domestic industry prices.  APPX0099614-0099615, APPX0098487-

0098488, APPX0088354, APPX0088365, APPX0088543, APPX0088551, APPX0088577.

Further, contemporaneous trade publications corroborated the downward pressure imports

exerted on U.S. prices, as discussed above.  Thus, although it recognized that some purchasers

were unable to obtain supply from Mosaic during the POI, the Commission reasonably

concluded that the record as a whole showed that subject imports contributed significantly to

oversupply conditions in a declining U.S. market and had significant price-depressing effects in

2019.  APPX0099615.

The Commission also addressed respondents' arguments that price declines were

attributable to global prices and U.S. demand.  Although it recognized that these factors may

have contributed to price movements, the Commission reasonably found that they did not negate

the record evidence showing the significant role that subject imports played in depressing prices

in the U.S. market.  APPX0099615.  The Commission noted that respondents' arguments failed

to account for the fact that prices in other markets were also affected by exports from subject

producers in Morocco and Russia, which collectively were the world's largest exporters of

phosphate fertilizers.  APPX0098533.  It also emphasized that U.S. prices were lower than global

prices in 2019 as subject imports remained at elevated levels in an oversupplied and declining

U.S. market.  APPX0098473-0098476.  Although U.S. prices began to increase in the beginning

of 2020 as weather conditions improved, they remained at lower levels compared to 2017 and

2018, until after the filing of the petitions in June 2020, at which point they sharply increased to

levels above other global markets as the volume of subject imports declined substantially.

APPX0098473-0098476, APPX009755-009757, APPX0097684, APPX0097755-0097757.  As

the Commission explained, this supports a finding that subject imports depressed U.S. prices

during the POI.  APPX0099615-0099616.

Having found upon a thorough examination that subject imports depressed prices in the

U.S. market to a significant degree, the Commission reasonably concluded that these imports had

significant price effects.

### 3.    Plaintiffs' Attacks on the Commission's Price Effects are Unavailing

#### a.    The Commission Did Not Find Significant Underselling

In a turnabout from its argument that the Commission allegedly acted unlawfully by

failing to make an underselling finding, OCP asserts that "the Commission apparently believed

underselling to be significant, a finding that it argues is not supported by substantial evidence."

OCPBr23.

As evident from the views, the Commission did not find significant underselling, either

explicitly or implicitly.  APPX009618.  To the extent that OCP seeks to create this

misimpression by emphasizing that evidence of low subject import pricing in 2019 played a role

in the Commission's price depression finding, OCP conflates two different analyses.  The

Commission's underselling and price depression analyses are separate and distinct.  *See Altx, Inc.

v. United States*, 25 CIT 1100, 1109, 167 F. Supp. 2d 1353, 1365 (2001) (stating that the

Commission's underselling and depression analyses are "discrete" and must not be

"collapse{d}").  Thus, that the Commission found that "subject imports were being offered at

low prices during {2019}" corroborative of price depression (along with the overwhelming evidence that these imports contributed to oversupply conditions that year), does not constitute or imply a finding that underselling was significant.[9]

> **b.    Plaintiffs' Factual Attacks on the Commission's Finding that Subject Imports Were Priced Lower than the Domestic Like Product Do Not Undermine the Commission's Price Depression Finding**

In challenging the Commission's lost sales findings, OCP merely cites to a path by which the evidence in the record could have been weighed differently.  OCPBr28-29.  For instance, OCP would rather the Commission afford greater weight to its preferred purchasers' responses. OCPBr28.

Equally unavailing is OCP's attempt to improperly invite this Court to reweigh evidence regarding the quantity of confirmed lost sales.  OCPBr28-29.  As described above, the Commission noted that four purchasers confirmed that they purchased a total of 733,895 short tons of subject imports rather than the domestic like product and that the lower price of subject imports was a primary reason for doing so.  As a point of reference to understand this quantity in the context of this market, the Commission further observed that the quantity of the these confirmed lost sales equated to 97.3 percent of the increase in the reported volume of U.S. shipments of subject imports from 2017 to 2019.  APPX0099608.  Notwithstanding OCP's

---

[9] Given that the Commission did not make a finding of significant underselling, OCP's citations to allegedly inconsistent findings in other investigations are beside the point. OCPBr24-25.  In any event, every investigation "'is *sui generis*, involving a unique combination and interaction of many economic variables.'"  *Hitachi Metals, Ltd.*, 949 F.3d at 718 (quoting *Nucor Corp.*, 414 F.3d at 1340).  "That the Commission reached different outcomes in cases with different circumstances do{es} not indicate that the Commission either committed legal error in the methodology it used in this case or departed from the mode of analysis it regularly employs.'"  *Hitachi Metals*, 949 F.3d at 718 (citing *Cleo Inc. v. United States*, 501 F.3d 1291, 1299 (Fed. Cir. 2007)).

misapprehension, OCPBr29, nowhere does the Commission state or imply that there is a causal

relationship or correlation between these factors.  At bottom, these purchaser confirmations

along with other record evidence, including additional purchaser statements and evidence from

domestic producers, discussed above, provide substantial evidence to support the Commission's

finding that the domestic industry lost sales to subject imports because of lower prices.

APPX0099609.

Plaintiffs also wrongly claim that the Commission did not explain why it relied upon

[          ] lost sales information.  OCPBr28-29; PhosAgroBr12-13.  To the contrary, the

Commission directly responded to arguments that [          ] data should be discounted

because the information it reported in the final phase of the investigations was contradictory to

what it reported in the preliminary phase.  Observing that Commission staff asked [          ]

to elaborate on the reporting differences, the Commission acknowledged that non-price reasons

may have played a role in some of the lost sales, but it emphasized that [          ] reported in

the final phase of the investigations that [          ] and that [          ].  APPX0099608-0099609, APPX0098485.  In crediting these statements,

the Commission was acting within its authority to determine the weight assigned to particular

evidence on the record.  *See, e.g.*, *U.S. Steel Grp.*, 96 F.3d at 1357 ("Certain decisions, such as

the weight to be assigned a particular piece of evidence, lie at the core of {the Commission's}

evaluative process.").  *See also AWP Indus., Inc. v. United States*, 35 CIT 774, 794, 783 F. Supp.

2d 1266, 1285 (2011) ("{I}t is the Commission's duty to evaluate the record evidence and

determine the credibility of the submitted evidence, . . . even where testimony comes from an

interested party.") (citations omitted).  That OCP and PhosAgro would prefer that the

Commission weigh [████████] lost sales information differently in no way establishes that

the Commission acted unreasonably in finding it to be credible record evidence showing that the

domestic industry lost sales to lower priced subject imports.[10]

> c. **Plaintiffs' Argument Regarding Subject Import Inventories and the Oversupply Conditions Do Not Undermine the Commission's Finding of Price Depression**

The Commission explicitly addressed the important role of inventories in the U.S.

market.  APPX0099600-0099601.  This belies OCP's claim, made in its causation arguments,

that the Commission "ignored evidence that holding inventories is standard practice."

OCPBr43.[11]

Nor did the Commission "deem{} the mere existence of inventories inherently injurious."

OCPBr18-19.  Rather, the Commission found that between 2017 and 2018 the volume of subject

imports increased by over 1 million short tons, which enabled U.S. importers to increase U.S.

shipments by over 600,000 short tons as well as increase end-of-period inventories.

APPX0099603-0099605.  End-of-period inventories of subject imports increased [████] percent

from [██████] short tons in 2017 to [██████] short tons in 2018.  APPX0098547.  End-of-

quarter inventories of subject imports were also higher in March, June, September, and

December of 2018 compared to equivalent quarters in 2017.  APPX0098551.  Subsequently, as

---

[10] Furthermore, PhosAgro's citation (PhosAgroBr12) to the factual analysis of the dissenting Commissioner is of no consequence to the issue of whether substantial evidence supports the findings of the Commission majority.  *See, e.g.*, *U.S. Steel Grp.*, 96 F.3d at 1362 (it is an "indisputable proposition that each commissioner is free to attach different weight to factual information bearing on, and determinate of, the many statutory tests" and "commissioners may ultimately reach different factual conclusions on the same record"); *see also Corus Grp. PLC v. USITC*, 352 F.3d 1351, 1363 (Fed. Cir. 2003).

[11] Moreover, OCP itself contradicts this assertion in its challenge to volume, where OCP states that the Commission "acknowledged that distributors build inventories based on anticipated demand." OCPBr18-19.  Because OCP's causation arguments concerning inventories (OCPBr43-46) largely duplicate those it raises in the price section of it brief, we address all of its arguments on this subject in our response here.

weather events that began in late 2018 and continued into 2019 caused the U.S. market to tank, U.S. shipments of subject imports increased even further, as those imports gained additional market share at the expense of the domestic industry.  APPX0099610-0099611, APPX0098547. By continuing to maintain inventory levels well in excess of 2017 levels while also continuing to import subject merchandise into the already oversaturated market, subject imports contributed significantly to the oversupply in the declining market.  APPX0099611-0099615.  At the same time, subject imports were increasingly lower priced than the domestic like product and exerted downward pricing pressure in the highly transparent U.S. market, as confirmed by certain purchasers as well as contemporaneous trade publications.  APPX0099609, APPX0099611-0099613.  This confluence of factors – increasing subject imports volumes, inventories and shipments well in excess of demand, and lower prices – led the Commission to reasonably conclude that subject imports depressed prices for the domestic like product to a significant degree.  APPX0099614-0099615.  Thus, the Commission did not rely upon the "mere existence" of inventories to find adverse price effects, as OCP claims.  Indeed, viewing the substantial buildup in subject import inventories, which predated the decline in demand, in the context of the entire POI, shows that the Commission reasonably rejected OCP's characterization of these events as a "temporary, weather-driven increase."  OCPBr18-19.[12]

Additionally, notwithstanding plaintiffs' claims to the contrary (OCPBr17; KochBr5, PhosAgroBr7; AmiciBr4, 8), the Commission reasonably rejected respondents' arguments that the oversupplied, declining U.S. market nonetheless required additional subject imports in 2019.

---

[12] Moreover, the Commission specifically considered the weather-related declines in demand in its non-attribution analysis and reasonably concluded that demand declines did not undermine its finding that the domestic industry's performance would have been stronger in the absence of the significant volume of subject imports that exerted downward pricing pressure on the domestic industry.  APPX0099623-0099624.

Responding to their attempts to blame oversupply conditions on demand projections that did not materialize, the Commission explained that, regardless of the reasonableness of those projections, the record nonetheless established that import levels and inventories exceeded demand and contributed to the oversupply conditions in the U.S. market.  APPX0099613.  Furthermore, the record refutes PhosAgro's assertion that, when considered in the context of demand projections, "importers exited the market quickly, significantly reducing their shipments in response to decreased demand."  PhosAgroBr7.  As demonstrated above, U.S. importers did not reduce shipments as the U.S. market tanked in 2019; rather, they *increased* shipments during that time, and gained market share from the domestic industry in the declining U.S. market.  Indeed, as the Commission observed, it was not until after the filing of the petitions that subject imports truly began to exit the U.S. market.  APPX0099604-0099605, APPX0098456-0098547.

Equally unpersuasive are plaintiffs' arguments regarding the supposed necessity for importers to import additional subject merchandise into the oversupplied U.S. market, rather than move existing inventories.  The Commission did not, as OCP claims, merely "speculate that 'it was *possible* for the U.S. importers . . . to move product by rail or back down the Mississippi.'" OCPBr17.  Rather, the Commission relied on the testimony of respondents' own witnesses, one of whom stated that it was simply "much more economical" to import additional subject merchandise "versus bring{ing} back product southbound on the river."  APPX0099613, APPX0017691.  Another respondent witness specifically testified about having shipped fertilizer by rail, as well as by truck, in response to flooding. APPX0017732.  Other record evidence establishes that fertilizer is routinely transported by rail.  APPX0098466, APPX0017709-0017711, APPX0017719, APPX0017721.  Thus, the Commission's finding is based on record evidence.  APPX0099626.

**Business Proprietary Information Redacted**

Finally, OCP and PhosAgro argue that the Commission erred by not comparing domestic production and inventory levels in 2019 and 2020 with subject import entry and inventory levels. OCPBr19-21; PhosAgroBr6-8. Neither cites, nor can cite, any statutory provision that requires such a comparison in analyzing the price effects of subject imports. Nor have they demonstrated that any such comparison renders the Commission's finding unsupported by substantial evidence. Indeed, their focus on 2019 and 2020 ignores the earlier part of the POI. For instance, OCP claims that subject import entries declined more than domestic production in 2019. OCPBr20. This ignores, however, the significant increase in subject imports in 2018 that resulted in a substantial buildup in subject import inventories that predated the decline in demand. Viewed in that context, the Commission reasonably found that continued entries of subject imports, even at levels lower than in 2018, combined with increasing shipments and continuing high levels of inventories, exceeded the declining demand and contributed substantially to the oversupply conditions in 2019. APPX0099611-0099615.

Likewise unavailing is PhosAgro's assertion that the ratios of subject import inventories to U.S. inventories "remained constant" between 2018 and 2019, ranging from [    ] percent. PhosAgroBr6-7. PhosAgro ignores the extent to which these ratios far exceed those from the beginning of the POI; these ratios ranged from [    ] percent in 2017. *Calculated from* APPX0098551. Moreover, in asserting that domestic and subject import inventories "moved in tandem" in 2019, PhosAgro ignores that subject import end-of-period inventories increased [    ] percent from 2017 to 2018 and remained at elevated levels that were [    ] percent higher in 2019 than 2017. APPX0098547. In contrast, domestic end-of-period inventories increased by only [    ] percent from 2017 to 2018 and were only [    ] percent higher in 2019 compared to 2017. APPX0098547. By the same token, in describing domestic

inventory levels of [░░░░░░] short tons and subject import inventory levels of [░░░░░] short

tons in the second quarter of 2020 as "return{ing} to [░░░░░░░░]", OCP ignores that in the

second quarter of 2017 inventories of domestic producers were indeed a relatively comparable

[░░░░░░] short tons, while subject import inventory levels were substantially lower at only

[░░░░].  APPX0098551.  Thus, while plaintiffs may prefer that the Commission ignore the

earlier part of the POI, the Commission reasonably found that inventories of subject imports,

which increased substantially from 2017 to 2018 and remained at elevated levels in 2019,

contributed to the oversupply conditions in the declining U.S. market and depressed U.S. prices

to a significant degree.

Nor is OCP's argument bolstered by its citation to *Coalition for the Preservation of*

*American Brake Drum and Rotor Aftermarket Manufacturers v. United States*, 15 F. Supp. 2d

918, 927 (Ct. Int'l Trade 1998).  OCPBr19.  The Commission in the instant investigations has

not claimed that the increases in inventories by themselves compelled an affirmative

determination.  Rather, as set out above, the Commission's consideration of inventories was one

piece of a comprehensive analysis.  Moreover, the *Brake Drum* case is inapposite to OCP's

argument, which concerns *subject import* inventories.  In the quoted language, the Court was

referring to an increase in *domestic* inventories in the context of affirming the Commission's

finding that subject imports did not have a significant impact on the domestic industry.  15 F.

Supp. 2d at 927.

>  **d.   The Court Should Reject Plaintiffs' Additional Attempts to Reweigh the Evidence**

What is relevant and instructive from the *Brake Drum* case is the Court's declination of

plaintiffs' invitation to reweigh the evidence.  *See* 15 F. Supp. at 927 (noting that the plaintiff's

argument "concerns the weight the Commission assigned to the increase in inventories, which is

28

*Business Proprietary Information Redacted*

within its discretion," and concluding that "{t}he Court's duty is not to reweigh the evidence").
Plaintiffs' arguments here, concerning various aspects of the Commission's factual findings on
price, likewise improperly seek to have the Court reweigh evidence.

OCP challenges the Commission's finding that certain emails and other evidence were
credible evidence showing that subject imports were offered at lower prices than the domestic
like product in 2019.  OCPBr26-29.  It is precisely the Commission's role, however, to evaluate
the record evidence and determine the weight and credibility of the submitted evidence, even
when it comes from an interested party.  *See U.S. Steel Grp.*, 96 F.3d at 1357; *AWP Indus., Inc.*,
35 CIT at 794, 783 F. Supp. 2d at 1285.[13]  Equally unavailing are OCP's attacks on the
Commission's citation to the lost sales data as not being specific to 2019.  OCPBr29.  The
Commission specifically acknowledged this, recalling the confirmed lost sales discussed in its
underselling analysis as additional evidence that subject imports were priced lower during the
POI.  APPX0099613.  Indeed, the dates of the lost sales do not negate the evidence showing that
subject imports had the lowest reported price more frequently in 2019 compared to 2017 –
evidence that is unchallenged by plaintiffs.

---

[13] OCP also incorrectly characterizes Mosaic's emails as "contradicted" by certain
purchaser questionnaire responses, namely those of [███████████████████].  OCP
Br27.  The fact that [████████████] reported that they did not purchase imports instead of
domestic products is not inconsistent with the evidence that imports were priced lower.
Moreover, [████] response actually corroborates the evidence that imports were priced lower at
times; it reported that [████]████████████████████████████████████████████].
APPX0098486.  Similarly unavailing are OCP's attempts to dismiss Mosaic's evidence for a
purported lack of certain additional detail, OCP Br27, which is merely another stab at
discrediting that evidence.  OCP also mischaracterizes Simplot's additional evidence of lost sales
and lost revenue as being "raised belatedly."  OCP Br27-28.  Despite OCP's insinuations to the
contrary, [████████]████████████████████████████████].  APPX0087429-0087430.  The fact
that it subsequently provided *additional* evidence does not mean that this evidence was late or
improperly submitted.

OCP's challenge to the Commission's reliance upon trade publications is likewise infirm. OCPBr29-30.  By denigrating the value of the numerous trade publications validly admitted into the administrative record, OCP is again merely advancing its own preference for the weighing of the evidence in the light that leads to the result it favors.  For example, OCP criticizes the Commission for having "lifted verbatim from Mosaic's petition" quotes from trade publications reporting that "heavy imports" contributed to the oversupply conditions, depressing U.S. prices.  OCPBr30.  Absent from OCP's complaint, however, is any demonstration that either Mosaic in its petitions or the Commission in its views misquoted or mischaracterized the publications, which were attached to the petitions.  APPX0080380, APPX0080386, APPX0080401, APPX0080406, APPX0080410, APPX0080418, APPX0080420, APPX0080423, APPX0080426, APPX0080433, APPX0080451, APPX0080453.  Having accurately cited to these pertinent trade publications, as well as others, it was entirely reasonable for the Commission to rely upon them.  Indeed, these publications corroborate the undisputed facts discussed above: that prices in the U.S. phosphate fertilizer market are highly transparent, with multiple market participants specifically reporting their reliance upon these publications in setting or negotiating prices.  APPX0099600.  OCP's attempts to dismiss these trade publications as "cherry-picked and unsubstantiated press anecdotes," OCPBr30, thus ignores the vital role that they played in the U.S. market.[14]  Moreover, contrary to OCP's claim that these trade reports are "contradicted" by pricing data, OCPBr30, pricing data relied on by the Commission are in

---

[14] OCP's citation to *Chr. Bjelland Seafoods A/S v. United States,* 19 CIT 35, 41 (1995), which involved only a single press report, is inapposite.  OCP Br30.  Here, the Commission cited to numerous relevant trade publications that discussed imports contributing to oversupply conditions and price pressure.  APPX0080380, APPX0080386, APPX0080401, APPX0080406, APPX0080410, APPX0080418, APPX0080420, APPX0080423, APPX0080426, APPX0080433, APPX0080451, APPX0080453, APPX0097273, APPX0096032, APPX0096096.

fact consistent with these reports, showing that, as subject imports contributed substantially to the oversupply conditions in 2019, subject imports also had the lowest reported price more frequently that year compared to 2017.  APPX0099613, APPX0097210-0097212, APPX0097570-0097578.

Plaintiffs also incorrectly assert that the Commission "ignored" that certain questionnaire responses cited Mosaic as a price leader.  OCPBr30; IRMBr11-13; PhosAgroBr8-9.  Plaintiffs' assertion is disproven by the fact that the parties and the Commissioners discussed this information at the Commission's hearing.  APPX0017599-0017600, APPX0017680-0017681, APPX0017783.  Moreover, Mosaic being reported as a price leader does not undermine the Commission's price depression finding, because this would not necessarily insulate it from the downward pressure that subject imports exerted on U.S. prices, particularly given the highly transparent nature of the U.S. phosphate fertilizers market.  Whether the Commission may have weighed price leadership differently in other investigations, PhosAgroBr8-9, has no bearing on its assessment of the facts in this case, as each investigation is *sui generis*.  *See supra*, footnote 9.

Finally, the Commission specifically addressed respondents' arguments regarding global factors, contrary to plaintiffs' assertion otherwise.  OCPBr31; KochBr5-6.  The Commission reasonably found that, although these factors may have contributed to price movements, they did not negate the record evidence showing the significant role that subject imports played in depressing prices in the U.S. market.  APPX0099615.

      e.      **OCP's Price Decline Correlation Argument Fails**

Taking certain price trends out of context and overlooking the actual events that occurred in the 2020 interim period, OCP incorrectly asserts that the record shows "no correlation between domestic producers' price trends and the presence of subject imports."  OCPBr30-31.  First, in claiming that this supposed lack of correlation is demonstrated by the fact that prices

increased in 2018 as the volume of subject imports also increased, OCP ignores that demand also increased between 2017 and 2018.  OCPBr30-31.  That prices increased in an expanding market is not surprising and does not contradict the price depressing effects caused by subject imports when the market subsequently bottomed out in 2019.  Furthermore, in 2020 there was a direct correlation between the presence of subject imports and price trends, notwithstanding OCP's claims otherwise.  OCPBr31.  As the Commission explained, although prices increased somewhat at the beginning of 2020 as weather conditions improved, they remained at lower levels than they were at the beginning of 2019, which in turn were lower than those in 2017.  APPX0099609-0099610, APPX0098473-0098476.  After the petitions were filed in June of 2020, and the volume and inventories of subject imports consequently decreased considerably, prices dramatically increased.  APPX0099609-0099610, APPX0098456, APPX0098473-0098476, APPX0098547, APPX0098551.  Rather than show a lack of correlation, the record demonstrates a direct correlation between the presence of subject imports and prices in the U.S. market.

### D. The Commission's Impact Finding is Supported by Substantial Evidence and in Accordance with Law

#### 1. The Commission's Impact Finding is in Accordance with Law

The statute provides that in examining the impact of subject imports, the Commission "shall evaluate all relevant economic factors which have a bearing on the state of the industry," and provides a non-exclusive list of output, sales, employment and financial factors.  19 U.S.C. § 1677(7)(C)(iii).  No single factor is dispositive, and all relevant factors are considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." *Id.*

32

The Commission's assessment of whether the domestic industry is "materially injured or threatened with material injury by reason of" unfairly traded imports (19 U.S.C. §§ 1671d(b)) "does not require the Commission to address the causation issue in any particular way" as long as "the injury to the domestic industry can reasonably be attributed to the subject imports." *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 876, 878 (Fed. Cir. 2008). Further, "{a}s long as its effects are not merely incidental, tangential, or trivial, the foreign product sold at less than fair value meets the causation requirement." *Nippon Steel Corp. v. USITC*, 345 F.3d 1379, 1381 (Fed. Cir. 2003).

The Commission also examines factors other than subject imports to ensure that it is not attributing injury from other factors to the subject imports. *See* SAA at 851-52; S. Rep. 96-249 at 75 (1979) H.R. Rep. 96-317 at 47 (1979). In performing this non-attribution analysis, however, the Commission need not isolate the injury caused by other factors from injury caused by unfairly traded imports. SAA at 851-52; *Taiwan Semiconductor Industry Ass'n v. USITC,* 266 F.3d 1339, 1345 (Fed. Cir. 2010). Nor does the "by reason of" standard require that unfairly traded imports be the "principal" cause of injury or contemplate that injury from unfairly traded imports be weighed against other factors which may be contributing to overall injury to an industry. S. Rep. 96-249 at 74-75; H.R. Rep. 96-317 at 47; s*ee Nippon Steel Corp.*, 345 F.3d at 1381.

In these investigations, the Commission performed a proper causation analysis by "consider{ing} the statutory factors of the volume of subject imports, their price effects, and their impact on the domestic industry, 19 U.S.C. § 1677(7)(B)(i), and {finding} substantial record evidence established a causal link between subject imports and material injury to the domestic industry." *Swiff-Train Co. v. United States*, 793 F.3d 1355, 1361 (Fed. Cir. 2015).

*Business Proprietary Information Redacted*

**2.    The Commission's Impact Finding is Supported by Substantial Evidence**

In accordance with the statutory mandate, the Commission considered all relevant economic factors.  APPX0099618-0099622.  The Commission noted that many of the domestic industry's output indicators declined from 2017 to 2019 but were higher in interim 2020 than in interim 2019 (APPX0099619-0099620); that the industry's employment indicators declined between 2017 and 2019 and were lower in interim 2020 than interim 2019 (APPX0099620-0099621); and that many of its financial indicators increased between 2017 and 2018, but deteriorated in 2019, with most being lower in interim 2020 than in interim 2019 (APPX0099621-0099622).

In summarizing its conclusion, the Commission reiterated its finding that the volume of subject imports and the increase in that volume were significant during the POI, emphasizing that subject imports gained [███] percentage points of market share from the domestic industry.  APPX0099622.  Additionally, subject imports continued to enter the U.S. market and remain at elevated levels in 2019, as demand declined from the second half of 2018 through 2019, causing an oversupply and significantly depressing U.S. prices.  APPX0099622-0099623, APPX0098547, APPX0098551.  Due to the downward pressure exerted by subject imports, the industry was forced to reduce prices, which in turn caused its revenues to be lower than they otherwise would have been.  APPX0099623.  The Commission emphasized that the domestic industry's sales revenue declined between 2018 and 2019 along with its profitability as its ratio of costs of goods sold (COGS) to net sales rose above [███] percent.  APPX0099623, APPX0098492, APPX0098494-0098495.  Sales revenues and profitability continued to be weak in interim 2020 and the industry's COGS-to-net sales ratio remained above [███] percent.  APPX0098492, APPX0098494-0098495.  Based on the foregoing, the Commission reasonably

34

**Business Proprietary Information Redacted**

found that subject imports had a significant impact on the domestic industry.  APPX0099622-0099623.

The Commission then considered the role of other factors to ensure that it was not attributing injury from other factors to subject imports.  APPX0099623-0099629.  It found that declining demand in 2019 did not rebut its view that the domestic industry's performance would have been stronger in the absence of subject imports, given that these imports took market share from the domestic industry from 2018 to 2019, and depressed U.S. prices.  APPX0099623-0099624.  The Commission rejected respondents' argument that subject imports merely filled a "supply gap," finding that the volume of subject imports eclipsed any reduction in U.S. production between 2018 and 2019.  APPX0099624-0099626.  The Commission also reasonably rejected respondent arguments that the domestic industry refused to supply U.S. customers in favor of exporting product, given the record evidence showing that the domestic industry prioritized shipments to the U.S. market along with the fact that most purchasers perceived the domestically produced product as either comparable or superior to subject imports in availability and reliability.  APPX0099626-0099627.

> **3.      OCP's Mischaracterization of the Commission's Impact Analysis Does Not Provide a Basis to Disturb the Commission's Findings**

OCP inaccurately claims that "the Commission's impact analysis [████████████████ ███] direct effects of the Plant City closure."  OCPBr33-36, 41-42.  As an initial matter, OCP ignores that the adverse impact on the domestic industry from subject imports was not limited to Mosaic.  Rather, the other domestic producers also experienced declines in relevant economic indicators and reported adverse effects due to subject imports.  APPX0098434, APPX0098437, APPX0098442, APPX0098494-0098496, APPX0098505-0098507.  Indeed, the Commission emphasized that [████████████████████████] reported negative effects on

investment and growth and development that [███] attributed to subject imports.
APPX0099622, APPX0098505-0098507.  OCP also ignores that the adverse effects of subject
imports were not limited to 2018, which was the year that followed the idling of Plant City.
Instead, the adverse effects of subject imports occurred predominantly in 2019, when subject
imports contributed substantially to the oversupply conditions, gained market share in a
declining U.S. market, and depressed U.S. prices.  APPX009548.  Similarly, in focusing solely
on certain output and employment indicators, OCPBr33-36, OCP ignores the declines in other
indicators, including net sales, gross profits, operating income, and net income.  As discussed
above, the depressing effects that subject imports had on U.S. prices, and the resulting declines
in the domestic industry's revenues and profitability – which are unrelated to the idling and
closure of Plant City – also provide the basis for the Commission's finding of significant impact.
Thus, the Commission's impact finding does not, as OCP claims "[████████████████]" the
Plant City closure.

Moreover, OCP's efforts to discredit the Commission's findings concerning Plant City
are unavailing.  OCP cites to a question from Chair Kearns to domestic producers during the
hearing that concerned Plant City, inaccurately characterizing this question as an observation
regarding Mosaic's decision to idle this facility.  OCPBr35 (citing APPX0017586-0017587).
Commissioner comments and questions during a hearing, however, represent part of the
deliberative process in considering party arguments, and they do not constitute either the
Commission's or even the individual Commissioner's position.  Indeed, Chair Kearns's question
was one of several posed by Commissioners regarding the role that imports played in the
decision to idle and subsequently close Plant City, which Mosaic responded to in its posthearing
brief.  APPX0097175-0097183.  The Commission specifically cited to Mosaic's response to

**Business Proprietary Information Redacted**

these questions in its views, along with respondents' arguments regarding this issue. APPX0099624.  In any event, the reasons behind the idling and closure of Plant City are beside the point as the Commission's impact finding does not depend upon it nor does it explain the increase in subject imports that eclipsed any reduction in domestic supply, as discussed below.

### 4.    OCP's and PhosAgro's Arguments Regarding Interim Period Data Fail

OCP and PhosAgro incorrectly argue that the Commission ignored improvements in certain domestic industry indicators in interim 2020 and that these improvements compel a negative determination.  OCPBr38-40; PhosAgroBr11.  The Commission specifically discussed these particular improvements throughout its impact analysis.  APPX0099619-0099622.  The Commission explained that, while some improvement was due to improving weather conditions, other improvement was the direct result of the reduced presence of subject imports in the market following the filing of the petitions.  APPX0099609-0099610, APPX0099619.  The Commission, however, also found that sales revenues and profitability continued to be weak in interim 2020 as the industry's ratio of COGS to net sales remained above [█] percent during that time.  APPX0099621, APPX0099623, APPX0098495.

Moreover, in arguing that recent improvement to the domestic industry's condition compels a negative determination, OCP and PhosAgro ignore the statutory directive that "{t}he Commission may not determine that there is no material injury or threat of material injury to an industry in the United States merely because that industry is profitable or because the performance of that industry has recently improved."  19 U.S.C. § 1677(7)(J).  Thus, the statute makes clear that the mere fact that a domestic industry's performance has recently improved is not a sufficient basis for a negative injury determination.

Even prior to the 2015 amendment that added the provision cited above, this Court expressly rejected an argument, much like the one OCP makes here, that the Commission should ignore earlier parts of the POI.  In *Saarstahl AG v. United States*, 18 CIT 595, 858 F. Supp. 196 (1994), the plaintiffs argued that the Commission failed to determine that the subject imports were causing "present" material injury to the domestic injury, pointing to the improvement in certain factors during the January through September 1992 interim period as proof of the lack of "present" material injury.  *Id.*, 858 F. Supp. at 200.  In rejecting this argument, the Court dismissed plaintiffs' reliance upon the very case to which OCP cites.  *Id.,* 858 F. Supp. at 200 (citing *CHR. Bjelland Seafoods A/C v. United States*, 16 CIT 945 (1992)).  As the Court explained, "the Court normally defers to the Commission's discretion in choosing the most appropriate period of time for its investigation."  *Id.* (citing *Kenda Rubber Indus. Co. v. United States*, 10 CIT 120, 126–27, 630 F. Supp. 354, 359 (1986) ("As the statute does not expressly command the Commission to examine a particular period of time, the Court finds that the Commission has discretion to examine a period that most reasonably allows it to determine whether a domestic industry is injured by LTFV imports.").  Accordingly, the Court held that the Commission properly based its determination on the full POI.  *Id.*, 858 F. Supp. at 200. Likewise, the Commission here assessed the trends and developments throughout the POI, as discussed above.  The Court should reject OCP's proposal to rely instead on an isolated point of time.[15]

---

[15] OCP's reliance upon *CHR. Bjelland Seafoods A/C v. United States*, 16 CIT 945 (1992), OCPBr40, is particularly misplaced because in affirming the Commission's determinations on remand, the Court further clarified the proposition to which OCP cites.  The court explained that "because the record demonstrates that the lingering effects of past sales of unfairly traded Norwegian salmon are presently causing an adverse impact on the domestic industry, the court finds that the plurality's conclusion that subject imports negatively affected the domestic

*(cont'd on next page)*

5.      OCP's Correlation Argument Fails

As with its assertions regarding a purported lack of correlation between subject import

volumes and price decline, the record belies OCP's claim that there is "no correlation between

subject import volume trends and the domestic industry's financial performance."  OCPBr46-47.

First, in arguing that there was no correlation because the domestic industry's operating income

increased in 2018 as the volume of subject imports increased (OCPBr30-31), OCP ignores that

demand also increased during this time (between 2017 and 2018).  That the domestic industry

experienced gains in profitability in a growing market does not undermine the Commission's

finding regarding the causal effects that the significant volumes of low-priced subject imports

had on the domestic industry's performance when the market subsequently declined in 2019.

While OCP emphasizes that the increases in U.S. shipments of subject imports and

accompanying gains in market share were "smaller" in 2019 compared to 2018, it fails to

recognize that these increases, even if comparatively smaller, demonstrate that subject imports

were increasing in a declining, oversupplied market.  Nor does the fact that the domestic

industry's operating income was lower in interim 2020 compared to interim 2019 refute the

Commission's impact finding.  Operating income is only one economic indicator that the

Commission considers, and no single factor is dispositive.  *See* 19 U.S.C. § 1677(7)(C)(iii).  As

the Commission explained, after the petitions were filed in June of 2020, and the volume and

inventories of subject imports consequently decreased considerably, the domestic industry's

market share, capacity, production, and U.S. shipments were all higher in interim 2020 compared

to interim 2019.  APPX0099619, APPX0087856, APPX0086941, APPX0087397.  Rather than

show a lack of correlation, the record, as the Commission found, demonstrates a clear link

industry is supported by substantial evidence in the record and is in accordance with law."  19
CIT at 48-49.

between the presence of subject imports and the domestic industry's performance.

APPX0099619.

6.    **Plaintiffs Have Failed to Provide a Basis for Disturbing the Commission's Non-attribution Analysis**

a.    **The Commission Reasonably Rejected Respondents' Argument that the Domestic Industry was Unwilling or Unable to Supply the U.S. Market**

Plaintiffs incorrectly argue that the Commission ignored or failed to consider the

domestic industry's purported unreliability and refusals to supply the U.S. market with phosphate

fertilizers in favor of exporting such products.  OCPBr42-43; IRMBr8-11; KochBr3-5;

AmiciBr6-7.  To the contrary, the Commission explicitly addressed these assertions.

APPX0099626-0099627.  The Commission acknowledged that some purchasers were unable to

obtain supply from Mosaic at times during the POI.  APPX0099596-0099597, APPX0099615,

APPX0099624-0099625.  It also acknowledged that a number of market participants reported

experiencing supply constraints during the POI.  APPX0099595, APPX0099627.  It noted,

however, that the reported supply constraints were not limited to domestic producers, but rather

also included importers.  APPX0099595, APPX0099627.  Indeed, in emphasizing the

importance of reliability of supply in the U.S. market, plaintiffs overlook that the majority of

purchasers reported that domestically produced product was either comparable or superior to

subject imports in terms of availability.  APPX0098422.  As the Commission reasonably found,

this evidence undermines assertions of widespread issues with domestic supply compared to

subject sources.  APPX0099627.

The Commission also addressed respondents' assertions that domestic producers

prioritized export markets, reasonably concluding that the record did not support these claims.

APPX0099626.  As the volume of subject imports declined as a result of the filing of the

40

petitions, the record showed that the domestic industry prioritized U.S. shipments at the expense

of exports.  Indeed, the domestic industry diverted export shipments to the U.S. market in

addition to increasing production, which enabled it to increase U.S. shipments and regain market

share.  APPX0099605, APPX0099626, APPX0098434, APPX0098459, APPX0098547,

APPX0097250, APPX0087812, APPX008756, APPX0017505.

Plaintiffs fail to provide a basis for disturbing these findings, which are founded on

substantial record evidence.  Particularly unavailing is OCP's recharacterization of witness

testimony by taking a statement out of context and adding emphasis that was not there.

Specifically, OCP argues that "Mosaic admitted that it does not 'leave *good* sales opportunities

on the table.'"  OCPBr15.  Reviewing that statement by Mosaic's CEO in context, and without

OCP's added emphasis, demonstrates that OCP's characterization of this statement as some sort

of an admission is unwarranted:

> Another argument that I hear is Mosaic's poor performance is the
> result of our refusal to sell to U.S. customers.  But, when Morocco
> and Russian producers withdrew from the U.S. market after the
> petitions were filed, Mosaic significantly increased its U.S. sales.
> We stepped up for our U.S. customers.  We don't leave good sales
> opportunities on the table, as the other side argues.

APPX0017488.

Plaintiffs also continue to argue, incorrectly, that the Commission "ignored" selective

evidence that allegedly detracts from the Commission's findings.  IRMBr8-11; KochBr3-5.

Much of what they identify, however, was either discussed at the hearing or cited by the

Commission in its extensive discussion regarding alleged supply constraints.  *See*

APPX0099595-0099597, APPX0099615, APPX0099624-0099626.  Thus, the Commission did

not "ignore" this evidence.  Furthermore, to the extent that the Commission did not specifically

discuss a certain piece of evidence, this does not establish that it did not consider it. *See Nucor Corp.*, 28 CIT at 233-34, 318 F. Supp. 2d at 1247.

OCP's argument that the domestic industry was unable to supply additional product to the U.S. market because it lacked available capacity during the POI also fails. OCPBr37-38. The Commission acted within its role as factfinder to find domestic producers' reported capacity credible, and OCP has provided no legitimate basis to intrude upon that role. Moreover, in emphasizing that the domestic industry's production level in interim 2020 was only slightly higher than its production level in interim 2019, OCPBr37-38, OCP overlooks that the record also shows that, after subject imports began to exit the market following the filing of the petitions, the domestic industry was also able to increase U.S. shipments by drawing down inventories. APPX0099619. Thus, the difference in production between the interim periods does not undermine the Commission's conclusion that the domestic industry had excess capacity during the POI. Indeed, contrary to OCP's assertions, the domestic industry did, in fact, "take{} advantage of {the} golden opportunity" presented by subject imports reduction in the U.S. market: its market share, capacity, production, and U.S. shipments were all higher in interim 2020 compared to interim 2019. APPX0099619.

Also unpersuasive is OCP's citation to the fact that Mosaic imported nonsubject imports for the first time following the abrupt departure of subject imports from the U.S. market after the filing of the petitions. OCPBr38. Given that subject imports declined from 62,426 short tons in June of 2020 to 10,599 in September 2020, APPX0098456, it was reasonable for Mosaic to need time to adjust and to ramp up production, as the Commission observed. APPX0099629, APPX0097190-0097192. The fact that it relied on imports or inventories during the three months following the filing of the petitions does not establish that it did not have available

capacity in the full three years of the POI.  APPX0099625-0099626, APPX0098434,

APPX0017567-0017568.  Indeed, a temporary increased need for imports is consistent with

Mosaic's expectation that additional imports would be needed on a short-term basis following

the idling of Plant City to give it "time to adjust."  APPX0099597, APPX0017574.

> **b.    The Commission Reasonably Rejected Respondents'**
> **Arguments that Subject Imports Were Pulled into the U.S.**
> **Market Due to a Domestic Industry "Supply Gap"**

The Commission reasonably rejected respondents' arguments that subject imports did not

injure the domestic industry because they were simply filling an alleged supply gap in the U.S.

market.  OCPBr9-13; PhosAgroBr9-11; IRMBr3-8.  The Commission did not miscalculate a

domestic industry "supply gap" because it found no such gap.  As the Commission has explained

in other investigations, a domestic industry supply gap is generally understood to be "the

shortfall between domestic capacity and demand."[16]  Here, the Commission found that the

domestic industry had available excess capacity throughout the POI and that finding is supported

by substantial evidence, as discussed above.  APPX0099594, APPX0098434, APPX0098547.

To the extent that the Commission mentioned any "gap," it did so in the context of discussing

party argument regarding respondents' assertions that subject imports were "pulled" into the U.S.

market to fill an alleged domestic industry supply gap.  APPX0099595-0099597,

APPX0099624-0099626, APPX0098405.  That the Commission addressed allegations of a

supply gap does not mean that the Commission found one.  Rather, as demonstrated below, the

Commission reasonably found that the volume of subject imports eclipsed any purported gap.

---

[16] *Barium Carbonate and Strontium Carbonate from the Federal Republic of Germany and Strontium Nitrate from Italy,* Inv. Nos. 731-TA-31-33 (Preliminary), USTIC Pub. 1105 at 14 (Oct. 1980); *cf. Utility Scale Wind Towers from Malaysia*, Inv. No. 701-TA-661 (Final), USITC Pub. 5215 at n.187 (July 2021) (rejecting the argument that subject imports were needed to fill a supply gap and noting that domestic producers reported available capacity throughout the period of investigation).

**Business Proprietary Information Redacted**

First, relying on a statement made by Mosaic's CEO in 2019, plaintiffs argue that the 2017 idling of Plant City created a gap in domestic supply of 1.1 million short tons that was filled by the over 1 million short ton increase in subject imports in 2018.  OCPBr8-9, 12; PhosAgroBr9-10; IRMBr4-8; AmiciBr5-6.  Mosaic, however, estimated that, to the extent that the idling of Plant City reduced domestic supply, it did so only by about 700,000 short tons, and the Commission found this to be credible.  APPX0099596, APPX0099624-0099625, APPX0017503, APPX0017575.  As discussed above, decisions about credibility and the weight assigned to a particular piece of evidence lies at the core of the Commission's evaluative process.

Moreover, OCP's claim that "the Commission offered no explanation" for accepting Mosaic's estimate is false.  OCPBr9.  The Commission explained that Mosaic's estimate was consistent with other record evidence.  Specifically, a representative from Mosaic testified that Plant City produced about 1.4 million short tons at the time it was idled in 2017.  APPX0099596, APPX0017503.  Mosaic also exported [███] percent of its total shipments in 2017, with U.S. shipments accounting for [███] percent of total shipments that year.  APPX0099596,[17] APPX0098439, APPX0087812.  Thus, Mosaic's estimate that idling Plant City reduced its supply to the U.S. market by about 700,000 is consistent with other record evidence.

OCP's argument that the Commission erred by comparing Mosaic's estimate to the increase in the total volume of subject imports rather than the increase in U.S. shipments of subject imports is also unavailing.  OCPBr12-13.  Even a comparison of U.S. shipments shows that subject imports exceeded any reduction in supply by Mosaic.  Mosaic's U.S. shipments decreased from 2017 to 2018 by [███] short tons, APPX0087812, whereas U.S. shipments of

---

[17] The views contained minor typographical errors, reporting export shipments accounting for [███] percent and U.S. shipments accounting for [███] percent, respectively, of total shipments.  APPX0099596.

subject imports increased by [          ] short tons.  APPX0098459, APPX0098547.  Thus, even

focusing solely on U.S. shipments shows that subject imports exceeded any reduction in supply.

Additionally, the increase in U.S. shipments is only one part of the broader picture.  The over 1

million short ton increase in the volume of subject imports that entered the U.S. market also

enabled importers to increase their end-of-period inventories [          ] percent from [          ]

short tons in 2017 to [          ] short tons in 2018.  APPX0098547.  This considerable increase

in inventories, which continued to remain at elevated levels as the market declined in 2019,

along with even further imports of subject merchandise that year in excess of demand,

contributed substantially to the oversupply conditions that depressed U.S. prices.  This

oversupply also enabled subject imports to push even further into the declining U.S. market,

taking additional market share from the domestic industry.  The Commission's conclusion that

subject imports were not merely pulled into the U.S. market is reasonable.

Equally unavailing are plaintiffs' arguments that Nutrien's closure of its Redwater

facility in Canada in May 2019 contributed to a reduction in the supply of fertilizers in the

United States.  OCPBr9-10; IRMBr5; AmiciBr5-6.  Nonsubject imports accounted for the

smallest share of the U.S. market, and Canada was not even a major source of nonsubject

imports to the United States.  APPX0099595, APPX0098404.  The record thus refutes IRM's

claim that Canada was a "major source of supply" to the U.S. market.  IRMBr5.  OCP's claim

that the Commission did not explain its basis for rejecting respondents' assertions that the

Redwater closure should be imputed to the U.S. market is equally baseless.  OCP Br9-10.  As the

Commission explained, at the time that the closure was announced, Nutrien's CEO stated that it

would increase production at its U.S. facilities to offset the reduction in supply and ensure a

continued supply of phosphate fertilizers to customers in Canada.  APPX0099594,

**Business Proprietary Information Redacted**

APPX0099624, APPX0098431.  Nutrien did, in fact, increase production as well as capacity in the United States.  APPX0099594, APPX0099624, APPX0098434.  Specifically, between 2018 and 2019, Nutrien increased its U.S. production by [          ], which was more than sufficient to cover its [        ] short ton increase in exports during that time.  APPX0086941.  Nutrien also had excess capacity throughout the POI, as detailed below.

Indeed, that the domestic industry had available excess capacity throughout the POI rebuts plaintiffs' arguments that there was a domestic supply gap.  APPX0099594.  Plaintiffs attack this finding, focusing primarily on Mosaic.  *See, e.g.*, OCPBr37.  Although the Commission acted within its discretion to find the reported capacity of the entire domestic industry to be credible, plaintiffs overlook that, even without Mosaic's data, the domestic industry had more than enough excess capacity to cover the alleged reductions in supply.  In 2018, Nutrien and Simplot had a combined [        ] short tons of excess capacity, which was more than sufficient to cover either Mosaic's reasonable estimated 700,000 short ton reduction in supply or its actual reduction of U.S. shipments in the amount of [        ] short tons from 2017 to 2018.  APPX0098434, APPX0087812, APPX0017503.  Likewise, although the Commission reasonably declined to impute Nutrien's closure of its facility in Canada to the U.S. market, even if it had, Nutrien and Simplot had a combined excess capacity of [        ] short tons in 2019, which more than would have covered the 600,000 short tons that was purportedly produced in the Redwater facility.  APPX0098434.

Plaintiffs further claim, incorrectly, that the Commission "ignored" evidence that allegedly detracts from the Commission's findings.  Notwithstanding the ample evidence supporting the Commission's finding, plaintiffs would have preferred the Commission to rely instead on their interpretation of various statements made by Mosaic, reports that they submitted,

the hypothetical future production of an unrelated company, and other testimony.  OCP Br13,

PhosAgro Br11-12; IRM Br3-8; Koch Br4.  Again, the fact that the Commission may not have

explicitly discussed each piece of evidence does not establish that it "ignored" such evidence.

*See, e.g., Siemens Energy, Inc.*, 992 F. Supp. 2d at 1315.[18]

Furthermore, neither the court cases nor Commission opinions cited by plaintiffs support

the proposition that the Commission must assign decisive weight to certain pieces of evidence in

these investigations.  PhosAgro Br9-10; IRM at 6-7.  Plaintiffs also again overlook that each case

is *sui generis*, as discussed above.  That the Commission might in one set of circumstances have

weighed a type of evidence one way does not dictate the same result in this case, involving an

entirely different industry and record.

### 7.    Amici's Arguments Regarding the Effects of Any Order Are Misplaced

To the extent that Amici argue that the trade laws were never meant to "punish

downstream users," such arguments are misplaced.  The statute does not authorize the

Commission to assess the impact of any order on consumers or purchases of the domestic like

product.  In fact, it has long been recognized that the trade laws are "not to be concerned with

effects on U.S. purchasers . . . ." *Mitsubishi Elec. Corp. v. United States*, 12 CIT 1025, 1051, 700

F. Supp. 538, 559 (1988), *aff'd*, 898 F.2d 1577 (Fed. Cir. 1990); *see also USX Corp. v. United

States*, 12 CIT 205, 211, 682 F. Supp. 60, 67 (1988) (noting that "Congress has made a judgment

that causally related injury to the domestic industry may be severe enough to justify relief from

less than fair value imports even if from another viewpoint the economy could be said to be

better served by providing no relief," and observing the statute's focus is on "injury to industry"

---

[18] Additionally, as discussed above, that Commissioner Johanson reached a different result in his dissenting views does not detract from the reasonableness of the Commission's findings or render it unsupported by substantial evidence.  AmiciBr5-6.

not injury to "competition").  Because the statute does not authorize the Commission to consider the effects of any subsequent order on end users, there is no basis to find that the Commission acted inconsistently with the statute in failing to address these concerns.

**IV.    CONCLUSION**

For the foregoing reasons, the Court should affirm the Commission's affirmative determinations.  They are supported by substantial evidence and otherwise fully in accordance with law.

Respectfully submitted,

Dominic L. Bianchi
General Counsel

*/s/ Andrea C. Casson*
Andrea C. Casson
Assistant General Counsel for Litigation

*/s/ Courtney S. McNamara*
Courtney S. McNamara
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3095
Facsimile: (202) 205-3111
courtney.mcnamara@usitc.gov

*(cont'd)*

_/s/ Jason F. Miller_
Jason F. Miller
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3233
Facsimile: (202) 205-3111
jason.miller@usitc.gov


_Attorneys for Defendant United States_

DATE:  January 28, 2022

49

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chambers Procedures 2(B)(1) and (2), I hereby certify that the attached

**DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S PUBLIC**

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR JUDGMENT**

**ON THE AGENCY RECORD** contains 13,825 words, according to the word-count function of

the word processing system used to prepare this brief (Microsoft Office 365 ProPlus).

Dated:  January 28, 2022              _/s/ Courtney S. McNamara_
                                      Courtney S. McNamara
                                      Attorney-Advisor
                                      Office of the General Counsel
                                      U.S. International Trade Commission
                                      500 E Street, SW
                                      Washington, DC 20436
                                      Telephone: (202) 205-3095
                                      Facsimile: (202) 205-3111
                                      courtney.mcnamara@usitc.gov