## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| OCP S.A., | ) |
| Plaintiff, | ) |
| | ) |
| EUROCHEM NORTH AMERICA | ) |
| CORPORATION, | ) |
| Consolidated Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| PHOSAGRO PJSC, INTERNATIONAL RAW | ) |
| MATERIALS LTD., and KOCH FERTILIZER, | ) |
| LLC, | ) |
| Plaintiff-Intervenors, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| THE MOSAIC COMPANY and J. R. SIMPLOT | ) |
| COMPANY, | ) |
| Defendant-Intervenors. | ) |
| | ) |
| | ) |

Consol. Court No. 21-00219

**<u>NON-CONFIDENTIAL VERSION</u>**

Business Proprietary Information
removed from Pages 6-18, 20-22

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
## MOTION FOR JUDGMENT ON THE AGENCY RECORD

Shara L. Aranoff
James M. Smith
Victor D. Ban
Sooan (Vivian) Choi
Caroline Garth
Kwan Woo (Kwan) Kim

**COVINGTON & BURLING LLP**
850 10th Street, NW
Washington, D.C. 20001
(202) 662-5999
saranoff@cov.com

March 3, 2022

*Counsel to Plaintiff OCP S.A.*

**Business Proprietary Information Has Been Deleted**

## <u>TABLE OF CONTENTS</u>

I.    Introduction .................................................................................................. 1

    A.    The Commission's failure to consider arguments and evidence cannot be cured with *post hoc* rationalizations. ..................................................... 1

    B.    The Commission dismissed comprehensive overselling data in favor of anecdotal evidence and without addressing relevant arguments. .......................... 2

    C.    By focusing on subject import volumes in isolation, the Commission neglected its duty to evaluate the impact of those volumes in context. ................. 2

    D.    The Commission misattributed to subject imports the effects of poor weather and the corresponding decline in demand. ................................. 3

II.   The Commission's Affirmative Determination is Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law. ....................................... 4

    A.    Volume ................................................................................................ 4

        1.    The U.S. supply gap grew over the POI, and the Commission's analysis of that gap is unsupported by substantial evidence. .................... 5

        2.    Subject import inventories were not injurious. ........................................... 8

    B.    Price ................................................................................................... 9

        1.    Isolated instances of low price offers are not substantial evidence of price depression. ................................................................................. 10

        2.    Reported lost sales are entirely contradicted by the record. ..................... 12

    C.    Impact ................................................................................................ 14

        1.    Plant City explains the domestic industry's performance declines. ......... 15

        2.    Record evidence cannot support the Commission's "excess" capacity finding. ................................................................................... 16

    D.    Causation ........................................................................................... 18

        1.    The Commission fails to adequately account for the conditions of competition that pulled subject imports into the market. .......................... 19

        2.    The Commission misattributes to subject imports the effects of a superseding intervening cause:  historically poor weather. ..................... 21

**Business Proprietary Information
Has Been Deleted**

3.   The Commission assumed, without evidence, that subject imports
caused material injury. ............................................................. 23

Business Proprietary Information
Has Been Deleted

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Bonney Forge Corp. v. United States*,
   2022 WL 304956 (Ct. Int'l Trade Feb. 2, 2022)...............................................1, 2, 7

*Gerald Metals, Inc. v. United States*,
   132 F.3d 716 (Fed. Cir. 1997)................................................................18

*Hynix Semiconductor, Inc. v. United States*,
   431 F. Supp. 2d 1302 (Ct. Int'l Trade 2006) .........................................18

*Nitrogen Solutions Fair Trade Comm. v. United States*,
   58 F. Supp. 2d 1314 (Ct. Int'l Trade 2005) .............................................................2

**Statutes**

19 U.S.C. § 1673d(b) .............................................................................................18

19 U.S.C. § 1677(7)(C)(iii).............................................................................14, 19

**Legislative History**

H.R. Rep. 317, 96th Cong. 1st Sess. (1979) ..................................................18

S. Rep. 249, 96th Cong. 1st Sess. (1979) .....................................................18

*Statement of Administrative Action*, *Uruguay Round Agreements Act*,
   H.R. Doc. 103-316 (1994) .......................................................................18

**Administrative Materials**

*Phosphate Fertilizers from Morocco and Russia*,
   Inv. Nos. 701-TA-650-651 (Final), USITC Pub. 5172 (Mar. 2021) ............................. *passim*

**Business Proprietary Information Has Been Deleted**

## I.    Introduction

Plaintiff OCP S.A. ("OCP") respectfully replies to the briefs of Defendant

U.S. International Trade Commission ("ITC" or the "Commission") and Defendant-Intervenors

The Mosaic Company ("Mosaic") and J.R. Simplot Company ("Simplot").  With a summary of

certain categorical failures in Part I followed by explanations of specific defective findings in

Part II, this reply brief makes clear that the Commission failed to meet its statutory obligations in

its final affirmative determination in the countervailing duty investigations of *Phosphate*

*Fertilizers from Morocco and Russia*.

### A.    The Commission's failure to consider arguments and evidence cannot be cured with *post hoc* rationalizations.

The affirmative determination is unsupported by substantial evidence.  Throughout its

brief, the Commission asks the Court to "presume" it considered Respondents' arguments,

neglecting the agency's duty to address arguments "in the record to allow for meaningful judicial

review."  *Bonney Forge Corp. v. United States*, 2022 WL 304956 at *1 (Ct. Int'l Trade Feb. 2,

2022).  The Commission, for instance, claims it did not "ignore" two economic studies showing

that subject imports did not exceed market demand, but its opinion makes no mention of these

analyses.  ITCBr46-47; II.A.1.

Elsewhere, counsel for the Commission offer *post hoc* rationalizations absent from the

record.  "{E}xplanations offered by Government counsel after-the-fact" cannot satisfy the

substantial evidence standard.  *Bonney Forge*, 2022 WL 304956 at *6.  For example, while the

Commission's Views ("Views") inadequately address the supply gap created by domestic

industry closures, counsel for the Commission now assert it never acknowledged such a gap at

all.  ITCBr43.  Agencies must "explain their actions 'on the record' to prevent inconsistency,

hypocrisy, and irrationality from governing agency decision making." *Bonney Forge*, 2022 WL

304956 at *8.

### B.   The Commission dismissed comprehensive overselling data in favor of anecdotal evidence and without addressing relevant arguments.

In order to find that subject imports significantly depressed U.S. prices, the Commission

had no alternative but to dismiss its traditional pricing data analysis, which showed predominant

overselling, in favor of anecdotal evidence purportedly showing that subject imports were

offered at low prices and that the domestic industry lost sales based on price.  After

acknowledging that evidence of overselling is "comprehensive" and "consistent," the

Commission offered logically and factually infirm reasons for dismissing that evidence.  *See*

II.B.  Meanwhile, the anecdotal evidence favored by the Commission—scattered emails from

domestic producers, unsubstantiated trade publications, and inconsistent purchaser responses to

misleading questions—is unreliable and contradicted by the pervasive overselling data.  With

one exception, *see* II.B.2, the Commission ignored OCP's arguments and failed to address them

*in the record*—and thus failed to support its price effects finding with substantial evidence.

### C.   By focusing on subject import volumes in isolation, the Commission neglected its duty to evaluate the impact of those volumes in context.

In its volume analysis, the Commission reported subject import volume trends in

isolation, and now claims that finding "significant" import volume does not require assessing

whether the market needed imports.  ITCBr9-13.  Yet its duty—with respect to volume and other

factors—is to evaluate whether injury is by reason of subject imports "in the context of

prevailing market conditions."  *Nitrogen Sol. Fair Trade Comm. v. United States*, 358 F. Supp.

2d 1314, 1327 (Ct. Int'l Trade 2005) (upholding finding that "significant" subject import

volumes did not have adverse price effects or impact).  Whether that evaluation of volume trends

Business Proprietary Information
Has Been Deleted

*in context* is labeled Volume, Price, or Impact is beside the point, ITCBr9-13, provided it is done.

The Commission failed altogether to undertake this evaluation.  Its volume analysis focused narrowly on absolute growth in subject import volumes, inventories, and market share, never assessing whether subject imports met a legitimate need when imported and placed into inventory.  Its price analysis faulted importers of these "significant" volumes for failing—in response to unforeseeable weather-related demand shocks—to move subject import inventories *backwards* through the distribution network, a reaction that is both infeasible and unsupported by record evidence.  ITCBr24-28; II.A.2.  Then, its impact analysis summarily concluded that because "significant" subject imports contributed to "oversupply conditions" and price depression, subject imports caused material injury to the domestic industry.  ITCBr34-35.  At no point did the Commission conduct a meaningful assessment of market conditions that drove the increase in subject imports, and then made "oversupply conditions" unavoidable in 2019.

> **D.**    **The Commission misattributed to subject imports the effects of poor weather and the corresponding decline in demand.**

While the Views focus on a purported "oversupply" of subject imports in 2019, this is fundamentally a case about *under-demand*.  As Amici explained, the Commission misunderstood how the fertilizer market operates, and these misconceptions led it to erroneously attribute to subject imports consequences driven by vagaries of weather that farmers know too well.  AmicusBr6-8.

Subject imports in the U.S. market expanded to offset voluntary contractions in domestic supply.  *See* II.A.1, II.C.1.  Throughout the period of investigation ("POI"), imports entered the U.S. market in quantities ordered up to six months prior based on demand projections on which domestic producers likewise rely.  *See* II.A.2.  Subject imports consistently sold at higher prices

**Business Proprietary Information Has Been Deleted**

than domestic fertilizers.  *See* II.B.2.  If the weather had been good throughout the country in 2019, regional "oversupply conditions" would not have materialized, and thus could not have contributed to any observed price depression.  *See* II.C.2.  Rather than an independent cause of injury, "oversupply" was the effect of poor weather and the resulting temporary decline in demand.  Importers suffered from the same weather-induced market contraction as did the domestic industry, and did more than the domestic industry to keep supply off the market where not needed.  *See* II.A.2, II.D.2.

Subject imports and inventories cannot be found to be inherently injurious merely for existing—especially when well justified by demand projections, needed by importers and farmers given reductions in domestic supply, and either predominantly oversold or not sold at all. Because the record lacks evidence of injurious conduct by subject imports, the Commission's finding that the domestic industry is materially injured "by reason of" subject imports is unsupported by substantial evidence and not in accordance with law.

## II.  The Commission's Affirmative Determination is Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law.

### A.  Volume

Even if the Court finds the Commission's "significant" volume conclusion to be supported by substantial evidence, its ultimate determination that the domestic industry is materially injured by reason of that volume of imports is not.  *See* I.C.  The affirmative determination rests on "oversupply conditions" without addressing the conditions of competition underlying subject imports' market presence.  In particular, its analysis of import volumes rests on deficient analyses of the U.S. supply gap and subject import inventories.

Business Proprietary Information
                                    Has Been Deleted

    1.      **The U.S. supply gap grew over the POI, and the Commission's analysis of that gap is unsupported by substantial evidence.**

As Respondents made clear throughout the investigation, the "supply gap" is the gap between what farmers need and what the domestic industry offers. The gap can be filled by increasing domestic production, by decreasing U.S. exports, or—absent such actions—by pulling imports into the U.S. market. To the extent subject imports do not exceed that gap, they do not injuriously displace domestic industry sales, especially in a context where subject imports are predominantly and consistently sold at higher prices than domestic fertilizers. OCPBr8.

The assertion in the Commission's brief that it "found no such gap," and had merely referenced a gap when "discussing party argument," is both *post hoc* and inaccurate. ITCBr43. What the Commission found—erroneously, and without record support—was that subject import growth exceeded the supply gap opened by the Plant City and Redwater closures, not that no supply gap existed. APPX0099595-0099597; APPX0099624-0099625 ("{W}e find that subject imports eclipsed any reduction in U.S. production between 2018 and 2019 when U.S. demand declined.").[1]

Worse, the Commission's counsel now offer an alternative definition of "supply gap"— as the difference between demand and *domestic capacity*, ITCBr43—that is nowhere to be found in the Views and also inconsistent with the record. Defining the "supply gap" in relation to claimed domestic capacity ignores both the domestic industry's prioritization of exports and its overstated "excess capacity." *See* II.C.

---

[1] The Commission also asserts that it did not conflate import entries and import shipments and discussed these data separately. ITCBr10-12. This is a red herring. The Commission improperly used import entry data when finding that imports exceeded the supply gap because those entry data included fertilizer destined for Canada. OCPBr11-13.

Business Proprietary Information
Has Been Deleted

As the Commission acknowledged, the domestic industry prioritized "substantial"

volumes for export markets, APPX0099592, accounting for *more than* [    ] of its total POI

shipments.  Staff Report ("SR"), APPX0098438.  This commitment to export markets pulled

imports into the U.S. market even early in the POI.  In 2017, [    ] of U.S. producers' total

shipments, or [        ], went abroad, SR, APPX0098438, requiring 1,970,346 ST in U.S.

shipments of imports to cover [    ] of U.S. demand.  SR, APPX0098459-0098461.  The Plant

City and Redwater closures augmented that gap.  AmicusBr5; OCPBr15.  The fact that the

domestic industry diverted [            ] of exports to the U.S. *post-petition* changes nothing

about the consistently high export levels throughout the POI.  ITCBr40-41 (citing Views,

APPX0099605, APPX0099626); AmicusBr7.

The Commission and Defendant-Intervenors also engage in new data gymnastics on the

supply gap.  First, although 700K ST may reflect total Plant City production sold into the U.S. in

2017, substantial evidence does not support a finding that this figure represented the supply gap

*opened in 2018* by the Plant City closure.  ITCBr44; MosaicBr21; OCPBr9.  For the latter, the

best contemporaneous evidence is Mosaic's own quantification in 2019, when the magnitude of

sales ceded in 2018 was clear—1.1 million ST in sales, given up "intentionally" according to

Mosaic's CEO, in a formal statement to investors that Mosaic now attempts to discredit as an

"isolated extemporaneous statement."[2]  Analyst Call, APPX0012655-0012656.  Tellingly, the

Commission now changes its tune, asserting for the first time on appeal that Plant City's impact

was the [    ] drop in Mosaic's U.S. shipments from 2017 to 2018.  ITCBr44-45; *see also*

---

[2] Although Mosaic attempts now to discredit its CEO's formal, public assessment of surrendered
sales volumes, MosaicBr21, that figure was accurate enough for investors and the market, *see* 17
C.F.R. § 240.10b-5 (making unlawful "any untrue statement of a material fact . . . in connection
with the purchase or sale of any security"); *see* AmicusBr6.

Business Proprietary Information
Has Been Deleted

MosaicBr21-22.  The reduction in Mosaic's U.S. shipments does not capture the supply gap; the proper reference point is not 2017 shipments, but what Mosaic's U.S. shipments *would have been in 2018*, absent the closure.  This *post hoc* comparison of U.S. shipments also contradicts the Commission's excess capacity finding.  APPX0099594.  If, after excluding Plant City, Mosaic still had [          ] ST of excess capacity in 2018, SR, APPX0098434, there should have been *no reduction* in its U.S. shipments in 2018, especially given that U.S. demand increased from 2017, SR, APPX0098459.

Next, in dismissing the 600K ST supply reduction from the Redwater closure, the Commission points to Nutrien's promise to increase U.S. production to offset the closure. ITCBr45.  But Nutrien failed to follow through:  its [          ] in total U.S. production between 2017 and 2019 covered just [          ] of Redwater's lost annual production.  SR, APPX0098434; OCPBr10.  Meanwhile, U.S. fertilizer exports to Canada nearly doubled, growing by 740K ST to compensate for Redwater's loss and further depriving the U.S. market of supply.  OCPBr10; RahmDecl., APPX0016606.

Lastly, the Commission wholly ignored two economic analyses demonstrating that imports did not exceed the supply gap, which pulled them into the U.S. market.  OCPBr13.  The Commission claims its failure to "explicitly discuss{}" these analyses does not mean they were "ignored." ITCBr46-47.  But this is at best a concession that the Commission failed to "place {its} responses in the record to allow for meaningful judicial review."  *Bonney Forge*, 2022 WL 304956 at *1.  The omission is striking, given that one of the economic experts is a former Mosaic executive who analyzed market trends throughout much of the POI.  *See, e.g.*, MosaicEarningsCalls, APPX0012790-0012804, APPX0012829-0012841; Hearing, APPX0017654 (Rahm).

Business Proprietary Information
Has Been Deleted

### 2.      Subject import inventories were not injurious.

The Commission's finding that from late 2018 into 2019, "inventories . . . well in excess of demand" were indicative of injury,[3] "regardless of the reasonableness of any demand projections,"[4] misapprehends market realities and defies logic.

Holding phosphate fertilizers in inventory is the norm, as is sometimes having excess inventory after the season; both producers and distributors use inventories to manage risk.  As the Commission acknowledged, distributors acquiring domestic and imported fertilizer must place orders months in advance.  APPX0099613.  Given high demand for advance commitments, the [

].  *Id.*  Such [                              ] merely underscore the need for reliable supply and demonstrate the U.S. supply gap's existence. Even in good times, distributors err on the side of ordering more fertilizer than they expect to need, lest they commit the "mortal sin" of running out.[5]  Hearing, APPX017755 (O'Neill). These practices make sense because fertilizer held in inventory has an extended shelf life and can be sold in a subsequent year.  Hearing, APPX0017578 (Stone).  Unsurprisingly, there is no evidence of distributors clearing out subject import inventories at fire-sale prices after the bad weather events of fall 2018 and 2019.  *See* II.B.

Nor does any record evidence support the Commission's assertion that existing inventories could have been relocated in lieu of importing new product.  APPX0099613; ITCBr25-26.  All record evidence showed that distribution is uni-directional from production

---

[3] ITCBr24-25; Views, APPX0099611; APPX0099625 (subject imports "continued to enter" the U.S. market "beyond levels demanded").

[4] Views, APPX0099613; ITCBr26.

[5] Views, APPX0099613; AmicusBr8.

Business Proprietary Information
Has Been Deleted

sites or ports to farms; there is no evidence of inventories moving the other way, back downriver

or into distribution channels in other parts of the country.  The Commission cites testimony that

importing was "more economical" than relocating inventory—but this comment refers to

transportation costs, and nowhere suggests that relocation in the reverse direction occurred.

ITCBr26; Views, APPX0099613; Hearing, APPX0017691 (Lambert) ("{I}t's prohibitive to

move a barge from Minneapolis-St. Paul back down to Mississippi.  Just the economics don't

allow it.").

Lastly, the Commission's suggestion that "plaintiffs may prefer that the Commission

ignore the earlier part of the POI" in analyzing inventories is disingenuous.  ITCBr28.  It was the

Commission—not Respondents—that, in finding inventory levels to be injurious, opted to focus

on absolute growth in subject import inventories during the 2018-2019 period, to divorce that

trend from demand shocks and projections of strong recovery, to overlook the parallel [           ]

in the ratio of subject import inventories to U.S. shipments, and to neglect the fact that importers

adjusted to the demand downturn to a greater extent than did the domestic industry.

APPX0099611-0099613, APPX0099625; OCPBr19-21.

Ignoring the reality that distributors serve the market out of inventory, the Commission

effectively finds that when subject import inventories fail to disappear immediately in response

to a weather-related demand drop, and when importers decline to [              ] for orders on

the water, there is injury by reason of subject imports.  Such a view has no basis in law or fact.

### B.    Price

The Commission concedes that it did not find significant underselling by subject imports,

ITCBr21.  On this record, how could it?  Rather, the Commission decided that the "prevalence of

overselling" in the pricing data was "less probative" because "prices of the domestic product and

subject imports tracked each other closely and were generally comparable with small margins of

**Business Proprietary Information<br>Has Been Deleted**

underselling and overselling," and because other evidence showed that "subject imports were in some instances lower priced, and the domestic industry lost sales to subject imports because of lower prices." ITCBr15; Views, APPX0099609. The Commission then leapt to conclude that "low prices" of subject imports "significantly depressed U.S. prices in 2019." APPX0099614.

The Commission's reasons for dismissing its own overselling data are logically and factually infirm.[6] If small margins are a reason to dismiss pervasive overselling, the Commission does not explain how the few instances of underselling by *even smaller* margins can significantly depress domestic prices.[7] By giving weight only to rare instances of underselling, the Commission effectively and inappropriately "zeroed" its pricing data. Further, as discussed below, the Commission's conclusion that subject imports were lower priced and caused lost sales is unsupported by the record.

### 1. Isolated instances of low price offers are not substantial evidence of price depression.

In finding that "subject imports were being offered at low prices {in 2019}" which "exerted downward pricing pressure" on domestic fertilizer, the Commission cited Mosaic's exhibit showing that "[                                                                    ]

was the lowest priced in the U.S. market [

                                                                    ]."

---

[6] The Commission confirmed that the pricing data are "comprehensive" and show "consistent" overselling by subject imports over time and across products. Views, APPX0099607; Hearing, APPX0017537. Contrary to Simplot's suggestion, SimplotBr12-13, the Commission never raised issues with pricing data coverage. Nor did Simplot request alternative pricing data when given the opportunity. Meanwhile, the Commission accommodated Mosaic's pricing data preferences, including data collection at the first level of trade and monthly, and atypical inclusion in domestic prices of inland freight—yet the data *still* showed predominant overselling. Views, APPX0099606-0099607.

[7] *See* SR, APPX0098483. In 2019, the average underselling margin was [    ] and the average overselling margin was [    ]. *See* SR, APPX0098473-0098476.

APPX0099613-0099614.  The Commission's brief suggests that this exhibit was central to

finding that subject imports significantly depressed prices in 2019.  *See* ITCBr19, 29-31.

However, the Commission failed to consider significant flaws and contradictory evidence that

undermine its conclusion.

　　　　First, Mosaic's exhibit also shows that there was at least one importer higher priced than

the sole domestic producer [   ] of the time in 2019, and *all seven* importers were higher priced

[   ] of the time.[8]  Moreover, the fact that one importer reported the lowest price in a given

month in no way demonstrates that subject imports depressed U.S. prices.  For example,

downward pricing pressure is unlikely if the six other importers' prices were higher than

domestic prices, the quantity sold by that importer at that price was *de minimis*, or that importer's

price was lower than domestic prices by just $0.01/ST.  The Commission did not evaluate any of

these possibilities.

　　　　Second, the Commission failed to consider the prevalence of overselling specifically in

2019, supposedly the pivotal year for finding price depression.[9]  Instead, the Commission turned

---

[8] MosaicPosthr'g, APPX0097573-0097574.  Given that seven importers and only one U.S.
producer ([        ]) reported pricing data, simple statistics dictate that the odds of being the
lowest-priced firm in a given month are 7/8 (87.5%) for importers and 1/8 (12.5%) for the
domestic producer, especially if the Commission is correct that prices "tracked each other
closely."  Yet according to Mosaic's exhibit, an importer was lowest priced in only [   ] of
instances in 2019, [            ] than expected, while the domestic producer was lowest priced in
[   ] of instances, [            ] than expected.  In light of these probabilities, the Mosaic
exhibit should be read as confirming the pervasive overselling in 2019, not contradicting it.  At
most, the exhibit merely suggests that overselling was even more prevalent in 2017.

[9] While the Commission observed that prices for both domestic product and subject imports
declined between 2017 and 2019, APPX0099609-0099610, it failed to consider that domestic
prices [                ] subject import prices, and that Mosaic is the "price leader" in the
U.S. market.  OCPBr30.  The Commission argues that it sufficiently considered the evidence of
Mosaic's price leadership by asking a question *at the hearing*.  ITCBr31.  Mosaic argues that
price leader responses from "some questionnaire respondents (including parties who oppose
duties)" deserve less weight, MosaicBr14—yet has no issue with the Commission's reliance on
just four questionnaire responses reporting lost sales, one of which is from [      ].  *See* II.B.2.

Business Proprietary Information Has Been Deleted

to anecdotes to support its conclusion that subject imports were being offered at low prices, ignoring OCP's arguments and evidence that such anecdotes were unreliable or unrepresentative. OCPFinalCmts, APPX0099553-0099556.  But neither the trade publications[10] nor the domestic producers' emails[11] demonstrate that subject imports were sold at prices or quantities that could exert downward pricing pressure on domestic products.  Subject imports that, throughout 2019, sold at higher prices in [   ] of comparisons involving [   ] of the reported subject import volume—an *increase* in overselling from 2018 on a volume basis—are incapable of causing price depression during that period.  *See* SR, APPX0098473-0098476.  Therefore, the Commission's finding that subject imports were offered at low prices in 2019 to such an extent that they significantly depressed U.S. prices is unsupported by substantial evidence.

### 2.    Reported lost sales are entirely contradicted by the record.

In finding that subject imports depressed prices in 2019, the Commission also relied on purchaser reports that the domestic industry lost sales of 733,895 ST to lower-priced subject imports at unspecified times between January 2017 and September 2020.  APPX0099608-0099609, APPX0099613.  Notably, only 4 out of 28 responding purchasers reported any lost sales, and 733,895 ST represents just 2.7% of total purchases and imports reported by purchasers during the POI.  SR, APPX0098484-0098485.  Moreover, a single purchaser, [          ], accounted for [   ] of the quantity of reported lost sales; the purchaser with the second largest

---

[10] The Commission argues it acted reasonably because it "accurately cited" trade publications from the petition, and did not "misquote" them.  ITCBr30.  However, the Commission does not satisfy the substantial evidence standard by "accurately cit{ing}" articles that merely describe falling prices amid falling demand in 2019.

[11] When OCP argued that Simplot's evidence of low-price offers was "raised belatedly," the issue was not whether Simplot was time-barred, but rather that—even though the reported events predate the petition—Simplot made its claims too late in the investigation for the Commission independently to verify them.  OCPBr27-28.

quantity of reported lost sales was [          ].  SR, APPX0098485-0098486.  The Commission

argues that relying on [          ] reported lost sales was reasonable because the Commission

acknowledged inconsistencies in [          ] responses and still deemed them credible.

ITCBr23-24.  However, separate and apart from the credibility of [          ] responses, other

problems plague the Commission's reliance on the reported lost sales quantity.

    [          ] reported [          ] ST of lost sales.  APPX0098486.  Since "lost sales" are

sales captured by subject imports at the expense of the domestic industry on the basis of price,

the Commission should expect to see a decrease in [          ] domestic product purchases

over the POI that are offset by a corresponding increase in subject import purchases, with that

difference being equal to [          ] ST (or greater, given that [          ] reported [

                                                 ], [          ],

APPX0095738).  Instead, the record shows that [          ] *total*

purchases of subject imports over the POI.  SR, APPX0098484.

    Crucially, while the domestic share of [          ] purchases [

    ] from 2017 to 2019, the subject import share [          ].

*Id*.  [          ] questionnaire shows that the [

                ], which [          ] from [          ] of purchases

([          ] ST) in 2017, to [          ] of purchases ([          ] ST) in 2019.  APPX0088537.  Thus,

[          ] did not purchase subject imports "instead of" domestic product—it purchased

[          ].  *Id*.  Because the Commission failed to

consider this significant record evidence, it improperly relied on [          ] to

find that the domestic industry lost sales to subject imports.

**Business Proprietary Information Has Been Deleted**

Further, in an odd sleight of hand, the Commission stated that the lost sales volume of 733,895 ST "equates to approximately 97.3 percent of the increase in U.S. shipments of subject imports, which increased by 753,938 {ST}, from 2017 to 2019." APPX0099608.  This juxtaposition cannot withstand scrutiny.  The reported lost sales volume is unreliable, since [          ] flawed report accounts for the [                    ] of that volume.  But the comparison is intrinsically flawed, because lost sales are *cumulative* across the POI (from January 2017 to September 2020), and there is no indication of when the alleged lost sales occurred.  By contrast, the increase in subject import shipments is the *difference* between the 2017 and 2019 shipment volumes.  Based on the Commission's logic, the only relevant lost sales would be those made in 2018 and especially 2019, yet it made no finding and offered no evidence as to whether the alleged lost sales in fact occurred during those years—and, as noted, [          ] responses undermine any such claim.

Given these fatal flaws and contradictory evidence, the Commission's conclusion that the domestic industry lost sales to subject imports, and its finding of price depression on that basis, are unsupported by substantial evidence.

### C.    Impact

The Commission's finding that declines in domestic industry performance represent material injury by reason of subject imports is indefensible when those declines are viewed, as they must be, in the context of the prevailing conditions of competition. 19 U.S.C. § 1677(7)(C)(iii).  Far from "consider{ing} all relevant economic factors," ITCBr34, the Commission focused narrowly on declining data trends, failing to address evidence that the observed declines in domestic industry performance [                    ] Mosaic's entirely voluntary Plant City closure.  Further, the Commission failed to address—or explain its rejection

of—evidence that domestic producers' claimed excess capacity was wildly exaggerated or simply false.

### 1.    Plant City explains the domestic industry's performance declines.

OCP showed that Plant City's closure accounted for [      ]%, [      ]%, and [      ]% of the declines in the domestic industry's capacity, production, and U.S. shipments from 2017 to 2019, respectively, and was [                    ] for the decline in domestic employment. OCPBr33-34.  The Commission now argues the reasons behind Plant City's idling and closure are "beside the point" because its impact finding "does not depend on it."  ITCBr37.  Of course it does:  excluding the direct impact of Plant City's closure [                    ] the declining trends on which the ITC relied.

Counsel's *post hoc* rationalization seeks to divert attention from the ITC's failure to address numerous contemporaneous public statements—by senior Mosaic executives—that unambiguously attribute the closure to Mosaic's "asset optimization strategy," a motivation entirely unrelated to subject imports.  OCPBr34-35.  The Commission asserts that it "specifically cited" both parties' arguments.  ITCBr36-37.  However, it merely cited Mosaic's *post hoc* denial, never responding to contrary evidence, APPX0099624, or addressing the fact that Mosaic acquired the aging Plant City facility in 2014 as a byproduct of an acquisition valuable for entirely different and uncontested reasons:  to bolster Mosaic's depleted ore reserves, MosaicAnnualReport, APPX0013482-0013656.[12]

---

[12] The Commission's claim that OCP mischaracterized Chair Kearns's quote is a red herring, ITCBr36, as is Mosaic's argument that its "asset optimization" statements are "consistent with record evidence" that subject imports drove Plant City's closure, MosaicBr21.  Chair Kearns asked a very good question about internal documents linking the Plant City decision to subject imports, to which Mosaic provided an exceedingly thin response—one contradicted by numerous, consistent, and contemporaneous public statements going back to October 2017.  *See, e.g.*, MosaicEarningsCall, APPX0012791.

Rather than directly addressing OCP's argument, the Commission falsely accuses OCP of cherry-picking certain impact factors.  ITCBr36.  While OCP referenced illustrative examples, the domestic industry's voluntary decision to reduce production affects almost every factor the Commission tracks in its impact analysis.  In particular, its argument that OCP "ignored" financial indicators is unavailing:  a voluntary reduction in production will result in lower net sales, and can reduce operating income or raise the per unit cost of goods sold by spreading fixed costs over fewer tons.  *Id*.

OCP agrees that the Commission's impact analysis "focuses on aggregated data for the domestic industry," SimplotBr18, but so does OCP's argument:  given that Mosaic alone made up [     ]% of domestic production and [     ]% of domestic capacity from 2017 to 2019, *see* APPX0098434, [              ] of the *industry-wide* declines in domestic performance indicators are traceable to Plant City, OCPBr33-34.  Further, any declines experienced by Simplot and Nutrien during the POI were caused by weather events, not by subject imports.  *See* II.D.2.

Finally, the Commission accuses OCP of "ignor{ing}" that the alleged adverse effects of subject imports "occurred predominantly" in 2019.  ITCBr36.  This is plainly wrong:  the observed declines in domestic industry performance in 2018, traceable to Plant City's idling, were [              ] those in 2019.  *See* APPX0098434, APPX0098438.  Further, the observed declines in 2019 were caused by the weather.  *See* II.D.2.

### 2.    Record evidence cannot support the Commission's "excess" capacity finding.

The Commission's finding that "the domestic industry . . . had available excess capacity throughout the POI" is its primary justification for concluding that no supply shortage pulled imports into the market.  APPX0099594.  But calling its decision to rely on domestic producers' reported capacity a "credibility" determination, ITCBr42, cannot excuse the Commission's

failure to explain why it rejected unmistakable evidence that the claimed excess capacity was wildly exaggerated or simply false, OCPBr36-38.  At no time during the POI did the domestic producers operate [                    ] the capacity levels they reported to the Commission.  *See* APPX0098434.  Indeed, record evidence demonstrates that the domestic industry's claimed excess capacity was never available during the POI when the market needed it.

After Plant City's idling, Mosaic expressly directed the market to fill the shortfall with imports.  MosaicEarningsCalls, APPX0012694-0012708, APPX0012827-0012841.  Indeed, in 2018, when prices rose and demand increased by [       ] ST over 2017, the domestic industry actually *decreased* production by [       ] ST, despite reporting [       ] ST in available capacity.  *See* APPX0098548.  Asked at the Hearing to explain its failure to ramp up production in 2018 to fill the hole left by Plant City, Mosaic's CEO had no better answer than that "{i}t takes time for us to adjust."  APPX0017574.  Nutrien's and Simplot's excess capacity claims are equally suspect:  when Plant City's idling caused a supply gap amidst 2018's strong demand, Nutrien [            ] its production by a paltry [      ] ST, whereas Simplot actually [                ] its production by [         ] ST.  *See* APPX0098434.  Demand for phosphate fertilizers peaks twice a year, but the domestic industry did not or could not activate much if any of its more than [         ] ST of supposedly idle capacity when demand increased in 2018.  Nonetheless, the Commission unquestioningly accepted the claimed excess capacity as fully available.

In the second half of 2020, when subject imports exited the market as preliminary duties went into effect, the domestic industry passed on yet another opportunity to increase production and U.S. shipments.  Mosaic's claim that "facilities need{ed} time to ramp up production" is a smokescreen:  as petitioner, Mosaic had all the time from deciding to prepare a petition until duties went into effect to plan domestic production increases.  APPX0099626.  Similarly

unavailing is Commission counsel's claim that the domestic industry was able to increase U.S.

shipments by drawing down inventories post-petition.  ITCBr42.  By March 2020—months

before the petition—both domestic producers and U.S. importers of subject imports

[                              ] their inventories to [          ] levels.  *See* PrelimSR, APPX0086422,

APPX0086493.

###### D.      Causation

In determining whether the domestic industry is materially injured "by reason of" subject

imports, the Commission must ensure that subject imports are more than a minimal or tangential

cause of injury and that there is a sufficient causal, not merely temporal, nexus between subject

imports and injury.  19 U.S.C. § 1673d(b); *see also Gerald Metals, Inc. v. United States*, 132

F.3d 716, 719-20 (Fed. Cir. 1997).  The Commission must not attribute to subject imports injury

caused by other factors.  *See* Statement of Administrative Action, Uruguay Round Agreements

Act, H.R. Doc. 103-316, 851-52 (1994); S. Rep. 249, 96th Cong. 1st Sess. 75 (1979); H.R. Rep.

317, 96th Cong. 1st Sess. 47 (1979).  Additionally, the Commission must "analyze compelling

arguments that purport to demonstrate the comparatively marginal role of subject imports in

causing that injury." *Hynix Semiconductor, Inc. v. United States*, 431 F. Supp. 2d 1302, 1317

(Ct. Int'l Trade 2006).  The Commission's determination fails to meet each of these core

requirements.

The Commission's causation determination rests on two conclusions:  first, that as a

consequence of the "significant" volume of subject imports, the phosphate fertilizer market

experienced "oversupply conditions" in 2019; and second, that these "oversupply conditions"

"contributed to" price depression and therefore materially injured the domestic industry.  The

fact that subject imports were present in the market at a time of low demand reveals a temporal

nexus, but not a causal link.  In standard boilerplate, the Commission's Views state that it

**Business Proprietary Information Has Been Deleted**

considered the role of other factors to ensure that it was not misattributing injury to subject imports.  However, the Commission (1) fundamentally misunderstands or dismisses without explanation the commercial realities of the phosphate fertilizer market; and thereby (2) confuses cause and effect, misattributing to subject imports the depressive effects of unforeseen adverse weather and resulting poor demand.

1.   **The Commission fails to adequately account for the conditions of competition that pulled subject imports into the market.**

The Commission readily dismissed the domestic industry's own strategic choices and the unforeseen weather as superseding causes because it misunderstood or ignored without explanation the impact of key "conditions of competition" in the U.S. market.  19 U.S.C. § 1677(7)(C)(iii); AmicusBr2-8.

First, the Commission acknowledged that distributors reasonably rely on demand projections to fill their supply chains given long lead times for imports to reach their final destinations near farmers.  *See* II.A.2.  However, the Commission disregarded the impact of that practice:  distributors stock up for peak anticipated demand each season to avoid committing the "mortal sin" of running out of supply mid-season.  Hearing, APPX017755 (O'Neill); AmicusBr1-3.

Second, the Commission never addressed—let alone explained why it ignored—record evidence indicating that the domestic industry *intentionally* reduced supply to the U.S. market by shuttering domestic production facilities for reasons *unrelated* to subject imports, widening a pre-existing supply gap.  *See* II.A.1, II.C.1.

Third, the Commission did not account for evidence that the domestic industry had been unreliable business partners in the years prior to and including the POI due to shrinking capacity, aging facilities, and vulnerability to weather-related production stoppages.  OCPBr14.

Business Proprietary Information
Has Been Deleted

Fourth, the Commission hardly mentioned the domestic industry's well-documented pre-petition refusals to supply certain purchasers and ignored the impact of this unreliability: purchasers who were denied access to domestic product—even if they constituted a minority of total purchasers—had no choice but to obtain supply from imports.[13]

Fifth, the Commission never responded to arguments that Mosaic is the only domestic source of supply for much of the Mississippi River system.  Hearing, APPX0017724.  [

].  [          ], APPX0087417; [          ], APPX0087775.  The Commission ignored the fact that, for distributors serving the agricultural heartland along the Mississippi river system, SR, APPX0098399, imports were the only option for reliable supply given Mosaic's inability and unwillingness to deal.

Sixth, the Commission discounted without explanation the impact of the domestic industry's prioritization of export markets on the need for imports.  *See* II.A.1.  The Commission cited the domestic industry's diversion of [          ] export shipments to supply the U.S. market post-petition, Views, APPX0099626, ITCBr35, but this changes nothing about the effect of consistently high levels of exports throughout the POI.  *See* II.A.1.

Finally, the Commission never addressed evidence that these market conditions required distributors to diversify their supply chains by turning to imports.  Hearing, APPX0017657 (Rahm), APPX0017666 (O'Neill), APPX0017670 (Coppess).

---

[13] Mosaic admitted to choosing its customers based on a strategic supply plan.  MosaicPosthr'g, APPX0097253.  Simplot admitted that it refused to deal with certain distributors or traders, not wanting "to end up cannibalizing {its} own {retail} business."  Hearing, APPX0017562 (Byers); *see* SimplotPosthr'g, APPX0095867-0095868.  In response, the Commission merely noted that a majority of purchasers checked a box in their questionnaires indicating that the domestic product was either comparable or superior to subject imports in terms of availability.  Views, APPX0099627.

Business Proprietary Information
Has Been Deleted

Taken together, these market dynamics demonstrate why and how subject imports were pulled into the market for reasons entirely unrelated to their prices or any otherwise unfair trading.  AmicusBr6.  However, the Commission's willful ignorance of key conditions of competition led it to misattribute to subject imports the unforeseeable events of 2019.

> ### 2.   The Commission misattributes to subject imports the effects of a superseding intervening cause:  historically poor weather.

In its Views (17 references) and brief (19 references), the Commission repeats constantly that its affirmative determination is a direct consequence of subject imports' contribution to "oversupply" conditions in a declining U.S. market in 2019 and early 2020.  But the market declined in 2019 because of under-demand, not "oversupply."  That reduced demand was the direct result of historically bad weather in parts of the country during three successive fertilizer application seasons, from fall 2018 through fall 2019.

The Commission erred in finding a causal nexus between subject imports and material injury because, if not for the bad weather, "oversupply conditions" would not have materialized.  "Oversupply conditions" were the effect; not the cause.  Subject imports were pulled into the market for all the reasons described above, in quantities that matched strong demand projections on which importers and domestic producers both relied.  Views, APPX0099590-0099591, APPX0099613; SR, APPX0098413.  Then, beginning in fall 2018 and continuing through 2019, historic levels of precipitation and a polar vortex destroyed fertilizer demand in significant parts of the country.  Views, APPX0099591; SR, APPX0098407.

If the weather had been good in 2019, demand would have been more or less as projected and supply would have been closely aligned.  Indeed, this is what happened in regions that experienced better weather from fall 2018 through 2019.  OCPPosthr'g, APPX0097717;

[                               ], APPX0091771-0091772.  It was historically poor weather, not subject

Business Proprietary Information Has Been Deleted

imports, that proximately caused any "oversupply conditions" in the market, and those conditions were regional, not nationwide.  IRMPosthr'g, APPX0096293.

Moreover, the Commission disregarded record evidence showing that, once it became clear that projected 2019 demand would not materialize, importers and distributors adjusted to a greater degree than did the domestic industry, reducing new orders (such that total imports in the second half of 2019 dropped sharply) and leaving unneeded supplies already in the distribution system unsold in inventory until the weather improved in spring 2020.[14]  SR, APPX0098445; OCPPosthr'g, APPX0097757.

Further, the lack of correlation between subject import volume trends on the one hand and price and domestic industry financial performance on the other confirms the absence of a causal nexus between subject imports and any injury to the domestic industry.  Subject import volumes and market share increased from 2017 to 2018, when both prices and the domestic industry's operating income [                    ].  SR, APPX0098492-0098493.  In its brief, the Commission offered a *post hoc* reason to disregard these trends, claiming that it was "not surprising" for prices and domestic industry performance to improve when demand increased from 2017 to 2018.  ITCBr32, 39.  However, the same principle applies to what happened in 2019:  if it was not surprising for prices and domestic industry operating income to increase when demand increased, it also was no surprise that prices and operating income [                    ].  In sum, the weather-related demand shock is a

---

[14] In the first half of 2020, the market had already begun to improve:  demand recovered, inventories [                    ], prices [                    ], and domestic capacity [                    ]. OCPBr20-21, 31, 39-40.  That these existing domestic and global trends continued post-petition is not evidence that subject imports caused injury; it merely reflects an exacerbated supply gap and strong demand.

Business Proprietary Information
Has Been Deleted

superseding cause that breaks any causal link between subject imports and the domestic industry's performance.

### 3. The Commission assumed, without evidence, that subject imports caused material injury.

In the end, this case is simple: the Commission confused cause with effect and imputed to subject imports injury caused by unforeseen and unforeseeable weather events that slashed demand in the second half of 2019.

Imports were pulled into the U.S. market during the POI for good reason, given the domestic industry's strategic decisions to voluntarily reduce supply. *See* II.A.1, II.C.1, II.D.1. Imports entered the market based on the same projections that distributors, importers, and the domestic industry all utilized. *See* II.A.2, II.D.2. In the overwhelming majority of pricing comparisons, imports oversold the domestic product. *See* II.B.1. When demand increased in 2017 and 2018, prices and domestic industry performance improved, even as subject import volumes rose. *See* II.D.2. Then, from fall 2018 through 2019, historically bad weather caused projected demand not to materialize in certain regions. Importers adjusted by reducing the quantity of imports purchased and holding product in inventory until it was needed. *See* II.A.2, II.D.2. There was no injurious conduct by subject imports.

Indeed, based on the Commission's reasoning, it is unclear how importers could have possibly avoided an affirmative injury determination. The Commission effectively found that importers should have been clairvoyant and not purchased imports that, in the end, were not immediately needed, despite robust demand projections when orders were placed up to six months in advance. *See* AmicusBr8; II.D.2. Then, when the weather turned bad, the Commission effectively concluded that the only way importers and distributors could escape responsibility for injury linked to "oversupply conditions" was to have breached existing

Business Proprietary Information
Has Been Deleted

purchase commitments; turned ships around in the Atlantic; and shifted to regions with better

weather inventories that had already moved upriver, despite evidence that doing so was

infeasible.  In short, the Commission seemingly expected importers to conduct business in a way

that no rational market actor could or would so that the domestic industry could have a right of

first refusal on sales to customers it previously was unable or unwilling to supply.  *See* Views,

APPX0099613, APPX0099626; AmicusBr8.  The Tariff Act of 1930 is not insurance against

adverse weather.

The Commission failed to meet its obligation to analyze whether injury occurred by

reason of subject imports in the context of prevailing market conditions.  Any suggestion that

injury to the domestic industry proximately caused by bad weather was something that importers

and distributors of subject fertilizer could realistically have prevented is baseless.  The

Commission's finding that injury was "by reason of" subject imports is likewise unsupported by

substantial evidence and otherwise not in accordance with law.

*    *    *

For the reasons stated in Plaintiff's Rule 56.2 brief and above, OCP respectfully requests

that the Court remand the Commission's final affirmative determination for reconsideration.

**Business Proprietary Information
Has Been Deleted**

Dated:  March 3, 2022                              Respectfully submitted,


                                                  */s/ Shara L. Aranoff*

                                                  Shara L. Aranoff
                                                  James M. Smith
                                                  Victor D. Ban
                                                  Sooan (Vivian) Choi
                                                  Caroline Garth
                                                  Kwan Woo (Kwan) Kim

                                                  **COVINGTON & BURLING LLP**
                                                  850 10th Street, NW
                                                  Washington, D.C. 20001
                                                  (202) 662-5997
                                                  saranoff@cov.com

                                                  *Counsel to Plaintiff OCP S.A.*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the attached Reply Brief in Support of Motion for Judgment on the Agency Record, filed March 3, 2022, contains 6,994 words, including headings, footnotes, and quotations, and excluding the cover page, table of contents, table of authorities, counsel's signature block, and this certificate, according to the word count function of the word-processing system used to prepare this brief, and therefore complies with the maximum 7,000 word count limitation set forth in the Scheduling Order issued by the Court on August 30, 2021 (ECF No. 52).

Dated:  March 3, 2022                                Respectfully submitted,

                                                     */s/ Shara L. Aranoff*

                                                     Shara L. Aranoff
                                                     James M. Smith
                                                     Victor D. Ban
                                                     Sooan (Vivian) Choi
                                                     Caroline Garth
                                                     Kwan Woo (Kwan) Kim

                                                     **COVINGTON & BURLING LLP**
                                                     850 10th Street, NW
                                                     Washington, D.C. 20001
                                                     (202) 662-5997
                                                     saranoff@cov.com

                                                     *Counsel to Plaintiff OCP S.A.*