# Note 4- Operational data

## 4.1 OPERATING REVENUE

### 4.1.1 REVENUE

#### 4.1.1.1 ACCOUNTING TREATMENT OF REVENUE

Revenue from the sale of goods is measured at the fair value of the consideration received or receivable, taking into account the amount of any trade discounts and volume rebates allowed. Revenue is recognized upon the transfer of the significant risks and rewards of ownership of the goods, and when the amount of revenue can be reasonably estimated. This transfer of ownership is made at the time of delivery of goods for local sales and as per Incoterms for export sales:

- *Sales carried out FOB (Free on Board):* transfer of risk takes place when the goods are placed on board the ship at the port of shipment. This primarily concerns sales related to the mining activities
- *Sales carried out under the incoterm CFR (Cost and Freight):* OCP bears, in addition, the transport costs to the destination port, loading costs, export formalities and the related duties and taxes.

#### 4.1.1.2. INFORMATION BY PRODUCT FAMILY

| (In millions of dirhams) | FY 2018 | FY 2017 |
|---|---|---|
| Phosphate | 9,900 | 10,245 |
| Phosphoric acid | 9,813 | 7,273 |
| Fertilizers | 30,490 | 26,087 |
| Other income | 5,703 | 4,898 |
| **Revenue** | **55,906** | **48,503** |

| (In millions of dirhams) | Rock | | Phosphoric acid | | Fertilizers | |
|---|---|---|---|---|---|---|
| Main markets | FY 2018 | FY 2017 | FY 2018 | FY 2017 | FY 2018 | FY 2017 |
| Local sales | 1,601 | 1,864 | 1,377 | 1,108 | 627 | 1,000 |
| South America | 2,340 | 2,398 | 3,665 | 2,589 | 4,811 | 5,471 |
| Europe | 907 | 1,375 | | | 7,569 | 4,824 |
| Africa | 1,572 | 1,193 | 2,625 | 2,251 | 2,705 | 194 |
| North America | 6 | 2 | 46 | 19 | 5,292 | 6,801 |
| India | 2,022 | 1,845 | 413 | 263 | 7,262 | 6,580 |
| Asia | 1,091 | 1,132 | 1,687 | 1,043 | 2,138 | 1,314 |
| Oceania | 359 | 435 | | | 86 | 36 |
| **Total** | **9,900** | **10,245** | **9,813** | **7,273** | **30,490** | **26,220** |

| (In millions of dirhams) | Rock | | Phosphoric acid | | Fertilizers | |
|---|---|---|---|---|---|---|
| Break down by third parties | FY 2018 | FY 2017 | FY 2018 | FY 2017 | FY 2018 | FY 2017 |
| **Revenue** | **14,448** | **11,908** | **9,813** | **7,273** | **32,380** | **27,493** |
| Outside the group | 7,450 | 7,610 | 7,326 | 5,138 | 30,516 | 26,203 |
| Joints ventures | 2,450 | 2,635 | 2,488 | 2,135 | (25 ) | 17 |
| Intercompany sales | 4,548 | 1,663 | | | 1,890 | 1,273 |
| **Eliminations** | **4,548** | **1,663** | | | **1,890** | **1,273** |
| **Total** | **9,900** | **10,245** | **9,813** | **7,273** | **30,490** | **26,220** |

OCP GROUP
Consolidated financial statements
at 31 December 2018

APPX0001958

Phosphate sales posted a net decrease of 3% between 2017 and 2018. This decrease is explained by:

- The increase in volumes exported to Latin America and to Europe as a result of the continuity of the Group's strategy of offering rock at more competitive costs.
- The decline in sales in North America and the decline in Asian demand due to the closure of some capacities.
- The decline in volumes sold on the local market following the prolonged shutdown of the Pakistan Maroc Phosphore subsidiary during the first half of 2018.

It should be noted that average prices remained stable at $78 / T FOB on the international market between the two years of 2017 and 2018. Phosphoric acid sales increased significantly by MAD 2.5 billion between 2017 and 2018 (+35%). This variation is mainly attributable to a 31% rise in average prices, due in particular to the rise in sulfur prices on the international market.
The volumes sold for export also increased by 8% with an impact of +489 million dirhams which mainly concerns Mexico and the European continent.

Fertilizer sales increased MAD 4.3 billion between 2017 and 2018 (+16%). This trend is explained by a positive price effect of +5 billion dirhams (the average price, all products combined, amounts to $383 / t in 2018 against $319 / t in 2017 following, on the one hand, the rise in input prices namely sulfur, and on the other hand, a slight decline in supply on the international fertilizer market.

Volumes remained virtually stable over the period, nevertheless recording a positive effect of 47 million dirhams following these variations:

- A greater demand in India and Latin America following a restriction of local supply, thus orienting the interest of operators towards import. Offset by,
- A decline in volumes sold in Africa and Europe due to unfavorable weather conditions that delayed the season.

The other products mainly concern the freight business and other ancillary products, particularly the sale of gypsum, sulfuric acid, ammonia, etc.). This line amounts to 5.7 billion dirhams, ie + 20% in 2018 compared to 2017.

In addition, this increase in revenue achieved in 2018 was mitigated by a negative overall foreign exchange effect of 1.2 billion dirhams following the depreciation of the dollar exchange rate (9.67 dirhams in 2017 against 9.40 dirhams in 2018).

### 4.1.2 TRADE RECEIVABLES

#### 4.1.2.1 ACCOUNTING TREATMENT OF TRADE RECEIVABLES

This category includes operating receivables, deposits and guarantees, as well as loans. Upon initial recognition, loans and receivables are recorded in the balance sheet at their fair value plus transaction costs directly attributable to the acquisition or issue of the asset. At the closing date, these assets are measured using the amortized cost method. A loss in value is recorded depending on the risk of non-recovery.

#### 4.1.2.2 ANALYSIS OF TRADE RECEIVABLES

| (In millions of dirhams) | 31 December 2018 | 31 December 2017 |
|---|---|---|
| Trade receivables invoiced | 10,659 | 6,276 |
| Provisions - trade receivables | (380) | (240) |
| Net trade receivables | 10,279 | 6,036 |

Trade receivables rose by MAD 4.3 billion between 2017 and 2018, in line with the rise in revenue, mainly in the fourth quarter.

Net trade receivable maturities as at 31 December 2018 are as follows:

| (In millions of dirhams) | Unmatured receivables | Matured receivables | | | Total |
|---|---|---|---|---|---|
| | | < 30 days | 30 - 180 days | More than 180 days | |
| Net trade receivables | 7,533 | 900 | 633 | 1,213 | 10,279 |

#### 4.1.3 MANAGEMENT OF EXCHANGE RISK AND CREDIT RISKS

**Exchange risk**

The Group's exposure to risk mainly results from the performance of a large part of its operating flows and its financial flows in currencies other than that in which the Group keeps its books (MAD), mainly the US dollar and the euro. OCP Group hedges its currency flows through natural hedging (foreign Currencies revenues – foreign currency expenses) and transfers the balance on the market throught spot transactions.

**Foreign exchange risk on financing flows**

**Setting up exchange rate hedge accounting**

As part of these activities, OCP realizes sales in dollars and has issued two bonds in dollars in fine respectively on April 25, 2014 and April 22, 2015. The first debt of $ 1.25 billion comes to maturity on April 25, 2024 and the second debt of $ 1 billion matures on October 22, 2025. At each closing, these debts generate an exchange rate effect in income under IAS 21. In this context, OCP would like to limit this impact by using hedge accounting under IAS 39.

Accordingly, it was envisaged to document under IAS 39 a cash flow hedge (CFH) between the highly probable future sales in dollars (hedged item) and the two bond issues in dollars (hedging instrument).
The hedge started on September 1, 2018.

Thus, the hedged item relates to the highly probable revenue that will be realized:

- from April 2024 for a total amount equal to the nominal value of the first bond issue, ie 1, 25 billion dollars.

- from October 2025 for a total amount equal to the nominal value of the first bond issue, ie $ 1 billion.

Both bond issues will be used as hedging instruments.
According to the strategy initially described, OCP expects the hedge to be highly effective over the life of the transaction, the effectiveness of the hedge must be regularly tested over the life of the transaction and must be in the range of 80 % to 125 % .

The hedging strategy described above will result in the following accounting treatment:

- Recognition in OCI (Other Comprehensive Income), for the effective part, of the currency effect on the debt until maturity.

- Recycling as a result of OCI accumulated at the maturity of the debt. This recycling will be progressive over a period of 8 months from the date of repayment of the two debts.

**Credit risks**

The credit risk stems in particular from the client risk in the event that the customers are unable to fulfill their commitments under the agreed conditions, bank and political risk.

The OCP Group is present in more than fifty countries in the world. Its turnover is mainly generated by export sales. OCP counts among its clients large international groups that have been in business relations with the Group for several years.
Credit risk management is based on the following elements:

- OCP has a comprehensive credit risk hedging policy based on periodic assessments of the financial strength of its clients and counterparties.

- The Group carries out a very active monitoring of trade receivables and counterparty risks. The monitoring is also permanent and rigorous with preventive reminders and in case of exceeding deadlines.

- Reporting and monitoring indicators are produced monthly to assess the payment performance of customers and counterparties.

The Group covers credit risk through a non-recourse credit insurance and factoring program signed with world-class players.

### 4.2 PURCHASES CONSUMED AND EXTERNAL CHARGES

#### 4.2.1 ACCOUNTING TREATMENT OF OPERATING CHARGES

Operating expenses are those related to the operating business cycle of the company. They correspond to the expenses which contribute to sustainable wealth creation. The main operating expenses are generally the consumption of raw materials, consumable, non-storable materials and supplies expenditure, external consumptions, staff costs (see Note 5 : expenses and employee benefits) and taxes.
In accordance with the principle of matching revenues and expenses, revenues and expenses are directly related to each other and recorded in the same period.

APPX0001960

**4.2.2 ANALYSIS OF PURCHASES CONSUMED AND EXTERNAL CHARGES**

| (In millions of dirhams) | FY 2018 | FY 2017 |
|---|---|---|
| Purchases of materials and supplies | (525) | (412) |
| Purchases of raw materials | (14,091) | (11,318) |
| Sulfur | (8,069) | (5,106) |
| Ammonia | (3,873) | (3,945) |
| Sulfuric acid | (1,276) | (700) |
| KCL | (560) | (712) |
| Phosphoric acid | (51) | (571) |
| Acid return | (216) | (168) |
| Other raw materials | (46) | (116) |
| Energy comsumption | (3,273) | (2,860) |
| Electric energy | (1,476) | (1,448) |
| Fuel | (1,123) | (885) |
| Diesel fuel | (583) | (457) |
| Others | (91) | (70) |
| Spare parts | (1,076) | (1,099) |
| Purchases of works, studies and services | (1,945) | (1,690) |
| Water supply | (149) | (100) |
| Auxiliary materials and othe purchases | (1,338) | (1,306) |
| **Purchased consumables of materials and supplies** | **(22,398)** | **(18,786)** |

Commodities purchases increased by MAD 3.6 billion (+18%) between 2017 and 2018. This variation is mainly due to higher purchases of sulfur and sulfuric acid.

In fact, sulfur purchases increased by MAD 2,963 million following a 54% increase in the price per tonne during 2018 ($ 94 /T CFR in 2017 compared to $ 145 /T CFR in 2018). As for volumes, they increased by 7% over the same period in line with production trends.

Sulfuric acid consumption rose by 576 million dirhams, which is also explained by a surge in the price per tonne, which went from $ 46 /T CFR in 2017 to 83 /T in 2018 (+81%). Volumes increase by 5% 2017 and 2018 in correlation with the evolution of production.

Energy consumption amounted to 3,276 million dirhams in 2018, an increase of 413 million dirhams over 2017. This trend mainly concerns fuel oil and gas oil, which experienced a rise in prices over the period.

APPX0001961

**External expenses:**

| (In millions of dirhams) | FY 2018 | FY 2017 |
|---|---|---|
| Transport | (5,843) | (5,315) |
| ONCF transport on sales | (980) | (1,173) |
| Shipping on sales-Freight | (3,848) | (3,114) |
| Truck phosphates transport | (365) | (384) |
| Personal transport | (140) | (110) |
| Other operating transport | (511) | (534) |
| Consulting and fees | (446) | (464) |
| Contributions and donations | (369) | (463) |
| Maintenance and repairs | (1,321) | (764) |
| Leases ans lease expenses | (309) | (320) |
| Insurance premiums | (215) | (190) |
| Advertising, publications and public relations | (244) | (221) |
| Postal and telecommunications expenses | (71) | (82) |
| Study, analysis, research and documentation | (165) | (106) |
| Remuneration of personal outside the company | (161) | (99) |
| Other external expenses | (636) | (511) |
| **External expenses** | **(9,780)** | **(8,534)** |

The increase in external expenses of 1.2 billion dirhams is mainly due to:

- The increase in shipping costs of 734 million dirhams between 2017 and 2018, in line with the increase in volumes shipped and the increase in transportation costs per tonne.
- The rise on the «maintenance and repairs» item of MAD 557 million, due in particular to the ramp-up of outsourcing projects on Jorf Lasfar mainly in the maintenance sector. It should be noted that the retirements of the OCP staff responsible for this activity have not been replaced (about 700 departures per year).

**4.2.3 RISKS RELATED TO RAW MATERIALS**

**Sulfur supplies**

On a global trade of 35 million tonnes per year, OCP Group imports nearly 6 million (2018) tonnes and is expected to import 7 million tonnes after the start of the new fertilizer production units (Horizon 2020-2021), equaling 25 % of the world trade. These rising imports are provided through direct contracts with the world's leading sulfur producers. The supplier portfolio is thus diversified from a regional standpoint but also from their position in the sulfur value chain. OCP portfolio consists of the main suppliers: Middle East, Europe, North America (US Gulf & Canada), FSU (Russia, Kazakhstan).

**Sulfur prices**

Prices are fixed quarterly. The prices negotiated by the OCP Group are among the most competitive as a result of the diversification policy and the Group's weight on the international market.

**Ammonia supplies**

Global trade in ammonia represents approximately 20 million tonnes per year. This market is a very regional one due to the high logistics costs involved. The Group's annual procurements represent around 1.8 million tonnes per year and should reach 2 million tonnes after the start-up of the granulation units and the fertilizers production units. Morocco's geographical situation is advantageous in that it enables the Group to be close to the locations of the world's main exporters of ammonia (Trinidad, FSU,Far East)

The new dynamic of shale gas in North America and the ammonia projects announced in Russia will provide further potential supply sources for the Group in the future.

OCP GROUP
Consolidated financial statements
at 31 December 2018

APPX0001962

### Ammonia prices

Prices of ammonia are volatile and consequently are fixed cargo by cargo or over a short period. However, the Group has entered into contracts with all the main suppliers (Russia, Trinidad, Ukraine …) to guarantee the availability of the product in the medium and long term .

### 4.2.4 INVENTORIES

#### 4.2.4.1 ACCOUNTING TREATMENT OF INVENTORIES

Inventories are measured at the lower of cost and net realizable value.
The cost of inventories is determined according to the weighted average cost method. It comprises the costs of purchase, production, conversion and other costs incurred in bringing the inventories to their present location and condition. For manufactured inventories and work-in-progress, the cost includes an appropriate share of the overheads based on normal production capacity.

At the moment of the sale, inventories are accounted as expenses in current operating income at the same period as the corresponding product.
Net realizable value is the estimated selling price in the ordinary course of business less the estimated costs of completion and the estimated costs necessary to make the sale.
Incorporable costs exclude the portion of sub-activity.

#### 4.2.4.2 ANALYSIS OF THE INVENTORIES EVOLUTION

| (In millions of dirhams) | 31 December 2018 | | | 31 December 2017 | | |
|---|---|---|---|---|---|---|
| | Gross | Depreciation | Net | Gross | Depreciation | Net |
| Consumable materials and supplies | 5,737 | (1,409) | 4,327 | 4,674 | (1,450) | 3,224 |
| In-process inventory | 5,735 | | 5,735 | 4,719 | | 4,719 |
| Finished products | 3,241 | (90) | 3,151 | 2,631 | (231) | 2,400 |
| **Total Inventories** | **14,713** | **(1,500)** | **13,213** | **12,023** | **(1,681)** | **10,343** |

Inventories of consumables and supplies consist mainly of non-strategic spare parts for installations. Due to their short useful lifetime, these spare parts are not classified as an immobilization. The risk of obsolescence of parts is an indication of impairment that is reviewed annually to estimate whether impairment is required.

### 4.2.5 TRADE PAYABLES

| (In millions of dirhams) | 31 December 2018 | 31 December 2017 |
|---|---|---|
| Trade payables | 3,702 | 4,967 |
| Fixed assets liabilities | 8,529 | 8,739 |
| **Trade payables** | **12,230** | **13,706** |

Trade payables correspond to payables and fixed assets liabilities. This item shows a slight decrease of 4.8 % at 31 december 2018 compared to 31 December 2017.

His improvement was made possible thanks to OCP's privileged relationship with its diversified ecosystem. Moreover, the Group has conducted a reeingineering of processes, a reorganization of resources and the implementation of dematerialization and digitization solution throughout the process.

APPX0001963

# Note 5 - Expenses and employee benefits

## 5.1 PERSONNEL EXPENSES

| (In millions of dirhams) | FY 2018 | FY 2017 |
|---|---|---|
| Employee remuneration and related social charges | (6,639) | (6,669) |
| Retirement benefits and medical cover | (1,178) | (1,168) |
| Other employee benefits | (664) | (641) |
| Personnel expenses | (8,481) | (8,478) |

Personnel costs remained virtually stable between 2017 and 2018. This is explained by the increase in payroll following the implementation of the 2018 Protocol of Agreement, that was mitigated by the impact of the retirements.

## 5.2 NUMBER OF EMPLOYEES

| (On number) | 31 December 2018 | 31 December 2017 |
|---|---|---|
| Non-executives | 2,844 | 2,376 |
| Technicians, Supervisors and Administrative executives | 6,782 | 6,972 |
| Manual workers and Clerical staff | 10,463 | 11,102 |
| Number of employees | 20,089 | 20,450 |

## 5.3 POST-EMPLOYMENT BENEFIT AND OTHER BENEFITS

### 5.3.1 GENERAL PRESENTATION OF SCHEMES EXISTING WITHIN THE GROUP AND ACCOUNTING TREATMENT

OCP Group has three types of benefits schemes:

- Post-employment defined contribution plans are those for which the obligation of the OCP Group is limited to the payment of a contribution that does not include any commitment by the employer to the level of benefits provided by the Group Allowance Plan. RCAR pension. Contributions are expensed during the period in which the employees rendered the related services. Amounts assumed during the year under other defined contribution plans amounted to MAD 564 million in 2018 compared to MAD 539 million in 2017.

- Post-employment defined benefit plans include all post-employment benefits for which the OCP Group is committed to a benefit level. These include: death benefit, end-of-career benefits and post-employment medical coverage for OCP staff.

- Other long-term benefits are benefits, other than post-employment benefits and termination benefits, that are not due in full within 12 months of the end of the year in which the benefits are earned. staff rendered the corresponding services. This includes the closed own plans for the death and disability benefit and the workers' compensation agreement. The other long-term benefit obligation is measured using an actuarial valuation method similar to that applied to defined-benefit post-employment benefits.

Defined benefit plans are subject to a provision, determined on the basis of an actuarial valuation of the commitment using the projected unit credit method, taking into account demographic and financial assumptions. Actuarial assumptions are reviewed on an annual basis. Differences related to changes in actuarial assumptions and experience-related adjustments (the effect of differences between previous actuarial assumptions and what actually happened) are actuarial gains and losses recorded in non-recyclable equity in accordance with the provisions of IAS 19 revised and appear in the «Actuarial Gap» column in the consolidated statement of changes in equity.

### 5.3.2 MAIN ACTUARIAL ASSUMPTIONS USED

All defined benefit obligations have been calculated on the basis of actuarial calculations based on assumptions such as the discount rate, the medical inflation rate, future salary increases, the employee turnover rate and the number of employees and mortality tables. The main assumptions used are as follows:

APPX0001964

**Notes to the Consolidated Financial Statements**

| | 31 December 2018 | 31 December 2017 |
|---|---|---|
| **Discount rate** | | |
| Pension supplement | 4.52 % | 4.58 % |
| Medical plans | 4.22 % | 4.28 % |
| **Expected salary increase rate** | **5.10%** | **5.10%** |
| **Rate of increase in medical costs** | **1.00%** | **1.00%** |

The discount rates are determined by reference to market yields on bonds issued by the Moroccan State, to which is added a basic risk premium to estimate the market yields on high quality corporate bonds over durations equivalent to those of the plans.

The new medical consumption curve assumed in the calculation of the commitment corresponds to the median age-specific medical consumption curve estimated from the history of new medical expenses for the years 2015, 2016 and 2017 instead of the previously used curve estimated for the years 2013 and 2014.

Moreover, regarding the outsourcing of health insurance plan to the AMO, OCP had fixed 2020 as the year of changeover.

### 5.3.3 OBLIGATIONS RELATED TO SOCIAL LIABILITIES

| (In millions of dirhams) | Post-employment benefits | | | | Other long-term benefits | Total employee benefits |
|---|---|---|---|---|---|---|
| | Pension supplement | Medical plans | Fixed retirement allocation | Total post-employment benefits | | |
| **Net obligations recognized at 1st January 2017** | **441** | **3,315** | **658** | **4,414** | **148** | **4,561** |
| Benefits paid | (8) | (631) | (72) | (711) | | (710) |
| Service cost | 6 | 49 | 79 | 133 | | 134 |
| Expenses related to discounting of obligations | 19 | 136 | 27 | 183 | | 183 |
| Actuarial losses or (gains) for the period resulting from changes in: | (48) | (59) | (24) | (130) | | (130) |
| Contributions | | 235 | | 235 | | 235 |
| Other changes | 35 | | | 35 | | 35 |
| **Net obligations recognized at 1st January 2018** | **445** | **3,045** | **669** | **4,159** | **148** | **4,307** |
| Benefits paid | (9) | (579) | (88) | (676) | (18) | (694) |
| Service cost | 5 | 83 | 78 | 165 | | 165 |
| Expenses related to discounting of obligations | 20 | 130 | 29 | 180 | | 180 |
| Actuarial losses or (gains) for the period resulting from changes in: | (34) | 434 | (22) | 378 | | 378 |
| Contributions | | 250 | | 250 | | 250 |
| Other changes | 30 | | | 30 | | 30 |
| **Net obligations recognized at 31 December 2018** | **458** | **3,363** | **665** | **4,486** | **130** | **4,616** |

APPX0001965

5.3.4  ANALYSIS OF SENSITIVITY TO THE ASSUMPTIONS USED FOR DEFINED-BENEFIT  PLANS AND OTHER LONG-TERM BENEFITS RECOGNIZED

| (as % of the item measured) Sensitivity analysis +1% | 31 December 2018 | | 31 December 2017 | |
|---|---|---|---|---|
| | Pension supplement | Medical plans | Pension supplement | Medical plans |
| **Discount rate** | | | | |
| Impact on the current value of gross obligations at 31 December | -16% | -10% | -17% | -9% |
| **Rate of change in medical costs** | | | | |
| Impact on the current value of gross obligations at 31 December | | 12% | | 16% |

| (as % of the item measured) Sensitivity analysis -1% | 31 December 2018 | | 31 December 2017 | |
|---|---|---|---|---|
| | Pension supplement | Medical plans | Pension supplement | Medical plans |
| **Discount rate** | | | | |
| Impact on the current value of gross obligations at 31 December | 21% | 13% | 22% | 12% |
| **Rate of change in medical costs** | | | | |
| Impact on the current value of gross obligations at 31 December | | -10% | | -13% |

## 5.4 KEY MANAGEMENT COMPENSATION

Key management includes the Chairman and Chief Executive Officer, Deputy Executive Officers, Executive Vice-Presidents, seniors Vice-Presidents, Vice-Presidents and advisors to the Chief Executive Officer.

| (In millions of dirhams) | FY 2018 | FY 2017 |
|---|---|---|
| Short-term employee benefits | 130 | 127 |
| Post-employment benefits | 21 | 20 |
| Termination benefits employment contract | 1 | 1 |
| **Total management compensation** | **151** | **148** |

# Note 6 - Investments in joint ventures and associates

## 6.1 ANALYSIS OF INVESTMENTS IN JOINT VENTURES AND ASSOCIATES

Group's investments in associates* and joint ventures are analyzed as follows:

| (In millions of dirhams) | 31 December 2018 | 31 December 2017 |
|---|---|---|
| Paradeep Phosphates Limited - PPL | 1,049 | 1,079 |
| Groupe PRAYON | 1,132 | 1,061 |
| Pakistan Maroc Phosphore - PMP | 729 | 764 |
| Euro Maroc Phosphore - EMA | 140 | 141 |
| Indo Maroc Phosphore - IMA | 422 | 348 |
| Société d'Aménagement et de Développement de Mazagan - SAEDM | 287 | 294 |
| Teal Technology Services - TTS | 4 | |
| Others | 39 | 40 |
| **Total interests in joint-ventures** | **3,802** | **3,726** |

*SAEDM and TTS being two associated companies.

## 6.2 BALANCE SHEETS AND INCOME STATEMENTS OF ASSOCIATES AND JOINT VENTURES

The note hereafter details at 100 % the lines of the balance sheet and income statement of the consolidated associates and joint ventures:

**Balance sheet:**

| (In millions of dirhams) | PRAYON | EMA | IMA | PMP | PPL | SAEDM | Others |
|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | |
| **Current assets** | | | | | | | |
| Cash and cash equivalents | 23 | 96 | 81 | 695 | 17 | 413 | 593 |
| Inventories | 1,994 | 305 | 158 | 107 | 1,791 | 790 | |
| Trade receivables | 1,123 | 388 | 514 | 70 | 2,506 | | 1,390 |
| Current tax receivables | | | 2 | | | | 65 |
| Other current assets | 121 | 129 | 722 | 148 | 469 | 29 | 209 |
| **Total current assets** | **3,260** | **919** | **1,477** | **1,020** | **4,783** | **1,232** | **2,258** |
| **Non-current assets** | | | | | | | |
| Non-current financial assets | 10 | | | | 16 | | 11 |
| Investments in equity-accounted companies | 819 | | | | | | |
| Equity securities | 16 | | | | | | 121 |
| Deferred tax assets | 135 | | | | | | |
| Property, plant and equipment | 1,715 | 79 | 405 | 749 | 1,870 | | 36 |
| Intangible assets | 92 | | 22 | 21 | 1 | 1 | 5 |
| **Total non-current assets** | **2,787** | **79** | **427** | **770** | **1,888** | **2** | **173** |
| **Total Assets** | **6,047** | **998** | **1,904** | **1,790** | **6,671** | **1,233** | **2,432** |

APPX0001967

**Notes to the Consolidated Financial Statements**

| (In millions of dirhams) | PRAYON | EMA | IMA | PMP | PPL | SAEDM | Others |
|---|---|---|---|---|---|---|---|
| **LIABILITIES** | | | | | | | |
| **Current liabilities** | | | | | | | |
| Current loans and financial debts | 1,394 | | | | 2,747 | | 5 |
| Current provisions | 13 | | 2 | | 90 | | 15 |
| Trade payables | 1,308 | 562 | 407 | 276 | 1,497 | 59 | 336 |
| Current tax liabilities | | 8 | 60 | 22 | | | 68 |
| Other current liabilities | 364 | 9 | 127 | 12 | 218 | 3 | 784 |
| **Total current liabilities** | **3,080** | **579** | **596** | **310** | **4,552** | **62** | **1,208** |
| **Non-current liabilities** | | | | | | | |
| Non-current loans and financial debts | 294 | | | 1 | | 608 | |
| Non-current provisions for employee benefits | 171 | | | | | | |
| Other non-current provisions | 24 | | | | 20 | | |
| Deferred tax liabilities | 208 | | | | | | |
| Other non-current liabilities | 20 | | | | | | |
| **Total non-current liabilities** | **718** | | | **1** | **20** | **608** | |
| Equity - Group share | 471 | 180 | 620 | 800 | 789 | 608 | 116 |
| Paid-in capital | | 110 | | | | | |
| Reserves | (30) | 59 | 216 | 507 | 1,140 | (1) | 8 |
| Retained earnings | 1,682 | | 7 | 8 | | (32) | 991 |
| Net profit (loss) - Group share | 127 | 69 | 466 | 164 | 169 | (13) | 108 |
| **Total equity** | **2,250** | **418** | **1,308** | **1,479** | **2,098** | **563** | **1,223** |
| **Total liabilities and equity** | **6,047** | **998** | **1,904** | **1,790** | **6,671** | **1,233** | **2,432** |

**Income statement**

| (In millions of dirhams) | PRAYON | EMA | IMA | PMP | PPL | SAEDM | Others |
|---|---|---|---|---|---|---|---|
| Revenue | 7,643 | 1,641 | 2,959 | 1,778 | 4,016 | | 1,992 |
| Production held as inventory | 176 | 102 | (3) | (95) | 518 | 54 | |
| Purchases consumed | (4,875) | (1,495) | (1,849) | (1,082) | (4,748) | (76) | (834) |
| External expenses | (1,449) | (131) | (520) | (313) | (569) | (4) | (154) |
| Personnel expenses | (1,118) | | (1) | (9) | (179) | (11) | (800) |
| Taxes | | (2) | (3) | (1) | (55) | | (2) |
| Exchange gains and losses on operating receivables and payables | 116 | (2) | 5 | (6) | | | 1 |
| Other operating income and expenses | 174 | 1 | 5 | 13 | 1,651 | 22 | (4) |
| **EBITDA** | **667** | **115** | **593** | **286** | **634** | **(16)** | **199** |
| Amortization, depreciation and operating provisions | (326) | (12) | (48) | (96) | (138) | | (23) |
| **Operating profit (loss) before exceptional items** | **341** | **103** | **546** | **190** | **496** | **(16)** | **176** |
| Other non-current operating income and expenses | (5) | (8) | 10 | 8 | (9) | | (11) |
| **Operating profit (loss)** | **336** | **95** | **555** | **198** | **487** | **(16)** | **166** |
| Cost of net financial debt | (63) | 2 | 13 | 13 | (115) | (12) | 7 |
| Exchange gains and losses on financial receivables and payables | (129) | | | | (97) | | |
| Other financial income and expenses | | | | | (2) | 15 | (1) |
| **Financial profit (loss)** | **(192)** | **2** | **13** | **13** | **(215)** | **3** | **6** |
| **Profit (loss) before tax** | **145** | **97** | **569** | **211** | **272** | **(13)** | **171** |
| Corporate tax | (17) | (28) | (103) | (47) | (103) | | (63) |
| **Net profit (loss) for the period** | **127** | **69** | **466** | **164** | **169** | **(13)** | **108** |

OCP GROUP
Consolidated financial statements
at 31 December 2018

### 6.3 SERVICES PROVIDED BY OCP TO JOINT VENTURES

OCP provides its joint ventures with various services as summarized below:

#### 6.3.1 SUPPLY OF PHOSPHATE

Contractual provisions govern OCP's supply of phosphate to its joint ventures. These provisions notably concern the following:

- The quality of the rock, defined according to specifications determined by the joint venture annually.

- The price invoiced to the joint venture which corresponds to the average export market prices for the year. The same price determination formula is used for all of the joint ventures.

- And other conditions related to invoicing and payment terms.

As part of these transactions, OCP recorded sales of phosphates to joint ventures for MAD 1,883 million in 2018 compared to MAD 2,355 million in 2017.

#### 6.3.2 SUPPLY OF SERVICES AND UTILITIES

The services and utilities provided by OCP to its joint ventures based on the Jorf Lasfar platform mainly concern the use of the infrastructures of Jorf Lasfar, the supply of utilities (liquid sulfur, water, steam etc.) necessary for the industrial exploitation, the know-how of the OCP personnel, the services of maintenance of the installations and equipment and the services of handling, and finally the services of rental of materials of storage.

#### 6.3.3 LEASES

OCP has signed lease agreements with local joint ventures based on the Jorf Lasfar platform. Rents are payable in advance at the beginning of the year and revised according to the terms and conditions set out in the contracts.
OCP has also entered into a lease agreement with the TTS joint venture for the rental of a workspace at OCP headquarters.

#### 6.3.4 FINANCIAL AGREEMENT

OCP and Prayon entered into a subordinated loan agreement of EUR 9 million in 2013 to tackle the company's cash requirements. The interest rate applied is 5.5 %. The outstanding amount of this loan amounts to EUR 3.4 million as of December 31, 2018.
In addition, OCP has entered into cash pooling agreements with certain joint ventures (Indo Maroc Phosphore-IMA, Pakistan Morocco Phosphore-PMP ...)

#### 6.3.5 OTHER SERVICES

OCP also provides marketing services (marketing products manufactured by the joint venture) and chartering to some of its joint ventures.
OCP also signed a multiparty contract for the sale of spare parts on the Jorf Lasfar platform in 2017 with several subsidiaries and joint ventures, including Indo Maroc Phosphore-IMA and Euro Maroc Phosphore-EMAPHOS.

#### 6.3.6 BENEFITS PROVIDED BY JOINT VENTURES TO OCP

Dupont OCP Operations Consulting-DOOC and OCP have entered into a Master Consulting Services Agreement, through which DOOC provides consulting services to OCP primarily in the areas of security, operational efficiency and environmental management. The contract was amended in 2015, 2017 and 2018.

Jacobs Engineering-JESA provides OCP with engineering services through the Framework Services Agreement signed in 2017.

Teal Technology & Services and OCP have entered into a Master Services Agreement through which Teal Technology & Services provides data center services, digital transformation and outsourcing for existing businesses.

APPX0001969

# Note 7- Other operating items

## 7.1 ACCOUNTING TREATMENT OF THE OTHER OPERATING ITEMS

Other operating items primarily include taxes, foreign exchange gains and losses on operating receivables and payables, and other non-current operating income and expenses.

Non-current items are items (income and expenses) that have little predictive value due to their nature, frequency and / or materiality. These income and expense concern:

- Impairment losses on fixed assets (cf. Note 8.1.3 «Impairment tests and impairment losses «), if so, the reversals of impairment losses on intangible assets, being generated by an event that substantially modify the economic viability of the concerned products;
- Gains or losses on business disposals;
- Income of equity revaluation previously held in activities in which the Group takes control;
- Other unusual and materials items which nature is not directly related to current operations.

## 7.2 ANALYSIS OF OTHER OPERATING ITEMS

| (In millions of dirhams) | FY 2018 | FY 2017 |
|---|---|---|
| Gains and losses on other assets | 27 | 59 |
| Subsidies granted | (421) | (295) |
| Donations, legacies, liberalities | (376) | (409) |
| Tax inspection | (218) | (110) |
| Others | (262) | (351) |
| **Other non-current operating income and expenses** | **(1,250)** | **(1,107)** |

Operating income and expenses recorded a net loss of MAD 142 million between 2017 and 2018. This variation is mainly explained by the increase in subsidies granted of MAD 125 million, including MAD 95 million in favor of the Institute of Socio-Educational Promotion (IPSE).

## 7.3 OTHER CURRENT ASSETS

| (In millions of dirhams) | 31 December 2018 | | | 31 December 2017 | | |
|---|---|---|---|---|---|---|
| | Gross | Depreciation | Net | Gross | Depreciation | Net |
| Receivables from suppliers, advances and payments on account | 4,113 | (6) | 4,107 | 3,053 | (6) | 3,047 |
| Personnel | 76 | (1) | 75 | 60 | (1) | 58 |
| Social organizations | 293 | (17) | 277 | 268 | | 268 |
| State (excluding corporate income tax) | 4,610 | | 4,610 | 5,703 | | 5,703 |
| Tax receivables | 34 | | 34 | 106 | | 106 |
| Other receivables | 290 | (10) | 280 | 1,029 | (9) | 1,021 |
| **Total other current assets** | **9,417** | **(34)** | **9,383** | **10,220** | **(16)** | **10,204** |

"State (excluding corporate income tax)" mainly includes VAT, the phosphate exploitation fee and other taxes.

The tax receivable maturities as at 31 December 2018 are detailed in the table below:

| (In millions of dirhams) | | | Matured | | |
|---|---|---|---|---|---|
| | Total | Unmatured | <30 days | 30 - 120 days | > 120 days |
| State, VAT | 2,198 | 2,188 | 2 | | 8 |
| VAT credit | 2,143 | 1,396 | | 693 | 54 |
| State, other taxes | 267 | 42 | | | 226 |
| **Total** | **4,610** | **3,627** | **2** | **693** | **287** |

OCP GROUP
Consolidated financial statements
at 31 December 2018

### 7.3 OTHER CURRENT LIABILITIES

| (In millions of dirhams) | 31 December 2018 | 31 December 2017 |
|---|---|---|
| Trade receivable credit balances, advances and payments on account | 763 | 442 |
| State | 1,229 | 1,750 |
| Social payables | 1,079 | 1,220 |
| Tax liabilities | 30 | 68 |
| Other creditors | 2,156 | 1,788 |
| **Total other current liabilities** | **5,257** | **5,268** |

Other payables mainly include adjustments to the cost of outsourcing the pension plan to RCAR for 737 million dirhams, the credit position towards IMACID for cashpooling for MAD 440 million and certain lines of credit. Commitments with social partners taken by the OCP Foundation for 450 million dirhams and by the Phosboucraâ Foundation for 150 million dirhams.

# Note 8 – Property, plant & equipment and intangible assets

### 8.1 ACCOUNTING TREATMENT OF ASSETS

#### 8.1.1 PROPERTY, PLANT & EQUIPMENT

#### MEASUREMENT AND USEFUL LIVES OF OPERATING ASSETS
The equipment controllers and maintenance managers in the Northern, Central and Phosboucrâa axis identify the useful lives of the various categories of assets (main assets and components). These lives correspond to the potential duration of technical utilization. The useful lives and depreciation methods used are examined at the close of each period and prospectively adjusted, if necessary.

Property, plant & Equipment (PP&E) are recognized at their historic acquisition cost, production cost or cost of entry to the Group, less depreciation and possible loss of value. Borrowing costs incurred during the construction of a qualified asset are incorporated into the cost of the asset. Costs of day-to-day maintenance are recognized as maintenance costs if the frequency of renewal of this maintenance in terms of volume is annual. The partial or total restoration of one or several components constitutes major maintenance. This is recognized in fixed assets and the net carrying amount is derecognized.

#### DEPRECIATION
In accordance with the component approach, the Group uses differentiated depreciation periods for each of the significant components of the same asset if the useful life of one of the components is different from the useful life of the principal asset to which it belongs. Depreciation is calculated using the straight-line method on useful lives corresponding to the following technical lives:

| Property, plant and equipment | Duration |
|---|---|
| Mining land | 10 to 30 years |
| Buildings | 15 to 60 years |
| Technical installations equipment and tools | 5 to 30 years |
| Transport equipment | 5 to 30 years |
| Furniture, office equipment, fitings | 3 to 30 years |

APPX0001971

## LEASES

Leases that transfer to the Group substantially all the risks and rewards incidental to ownership of an asset are classified as finance leases. All other leases are classified as operating leases.

Finance leases: Finance leases are recognized as assets in the balance sheet, at the fair value of the leased property or, if lower, the present value of the minimum lease payments under the lease. The corresponding debt due to the lessor is recognized as a liability under financial debts in the balance sheet. A leased asset is depreciated over the shorter of the lease term and its useful life (unless the Group is reasonably certain that it will obtain ownership by the end of the lease term).

Operating leases: Payments made under operating leases are expensed in the statement of profit and loss on a straight-line basis over the duration of the lease contract.

## BORROWING COSTS

Borrowing costs directly attributable to the acquisition, construction or production of a 'qualifying asset' are included in the cost of the asset, in accordance with IAS 23 "Borrowing costs".

OCP capitalize the borrowing costs for MAD 817 million in 2018, versus an amount of MAD 1,207 billion in 2017.

### 8.1.2 INTANGIBLE ASSETS

## INITIAL AND SUBSEQUENT MEASUREMENT

Intangible assets are composed of patents, licenses, software, and research and development costs. They are recognized at their acquisition cost less accumulated amortization and impairment losses. Expenses thus recorded in assets include costs for equipment and services, costs of personnel directly assigned to the production and preparation of some softwares for their use and costs of borrowing if eligibility conditions are satisfied.

Expenses undertaken over the development phase are capitalized when the criteria for recognition of an asset set forth in IAS 38 are met: technical feasibility, intention to complete the asset and to use it or to sell it, probability of future economic benefits, availability of resources, ability to measure the development expenses reliably. Expenses incurred during the research phase are not capitalized, but are expensed.

## DEPRECIATION

Intangible assets consist mainly of softwares and are amortized on a straight-line basis according to their useful life, which ranges from 1 year to 5 years.

## DEVELOPMENT EXPENDITURES

The development phase starts when the deposit has been analyzed as economically feasible and a decision has been taken to develop it. Only the expenditure incurred before the production phase and for the development of the deposit is capitalized. Development expenditure incurred to maintain the existing production is recognized as expenses.

## GOODWILL

There is no significant goodwill in the Group.

### 8.1.3 IMPAIRMENT TESTS AND IMPAIRMENT LOSSES

## VALUATIONS USED FOR IMPAIRMENT TESTS

The assumptions and estimates which are made to determine the recoverable value of goodwill, intangible assets and PP&E relate in particular to the market prospects necessary to evaluate cash flows and the discount rates used. Any modification of these assumptions could have a significant effect on the amount of the recoverable value, and could lead to a modification of the impairment to be recognized.

A cash-generating unit (CGU) is the smallest identifiable group of assets that generates cash inflows that are largely independent of the cash inflows from other assets or groups of assets.

Given the group's activities, three main cash generating units are identified:

APPX0001972

• **Northern Axis (Khouribga – Jorf Lasfar) :** this axis hosts the integrated phosphate chemical processing hub. Phosphate extracted at Khouribga is transported by slurry pipeline to Jorf Lasfar, where it is processed into phosphoric acid and fertilizer. The finished products are exported from the Jorf Lafar port.

• **Central Axis (Youssoufia and Benguérir – Safi) :** this axis hosts: the integrated phosphate chemical processing hub. The phosphate extracted at Youssoufia and Benguérir is transported by rail to Safi, where it is processed into phosphoric acid and fertilizer. The finished products are exported from the Safi port.

• **Phosbou                                                                                                                                                    craâ Axis :** Phosboucraâ extraction site. The phosphate that is extracted there is transported by conveyer to the processing center at Laâyoune, and then exported by sea.

The impairment tests for assets apply the following rules:

• Goodwill and intangible assets with indefinite useful lives are tested for impairment at least once a year.

• PP&E and intangible assets with finite lives are tested for impairment if there is an indication of impairment, as defined hereafter
  - significant reduction in the market price of the asset
  - obsolescence or physical deterioration of the asset
  - significant negative changes in the past or planned use of an asset
  - significant change in the technological, economic or legal environment
  - increase in interest rates or yield which could affect useful value

An impairment loss is recognized when the recoverable value of a CGU is lower than the net carrying amount of the assets that belong to it. The recoverable amount of a CGU is the higher of its fair value less costs to sell, and its value in use. The value in use is equal to the present value of the future cash flows that it generates, as per the budget and strategic plan approved by the Board of Directors, increased, by its exit value at the end of its expected useful life.

**No impairment losses were identified at the close of financial years 2017 and 2018.**

## 8.2 PROPERTY, PLANT AND EQUIPMENT VARIATION

| (In millions of dirhams) | 31 December 2017 | Aquisitions | Provisions | Reductions / Reversals | Reclassification | Translation difference | Other changes | 31 December 2018 |
|---|---|---|---|---|---|---|---|---|
| **Gross amount** | | | | | | | | |
| Land | 6,011 | 473 | | (433) | 70 | (1) | | 6,120 |
| Buildings | 36,029 | 1,723 | | (669) | 3,535 | (3) | | 40,615 |
| Technical installations, equipment and tools | 101,471 | 3,345 | | (488) | (6,981) | (1) | 3 | 97,349 |
| Transport equipment | 953 | 32 | | (4) | (11) | | | 971 |
| Furniture, office equipment and various fittings | 2,508 | 143 | | (25) | 52 | (2) | 25 | 2,702 |
| Other property, plant and equipment | 2,875 | (501) | | 502 | 7,998 | | 2 | 10,876 |
| Property, plant and equipment under construction | (28) | 4,378 | | (39) | (4,285) | | 9 | 35 |
| **Total gross amount** | **149,821** | **9,593** | | **(1,156)** | **379** | **(7)** | **38** | **158,668** |
| **Depreciations** | | | | | | | | |
| Land | (1,028) | | (69) | | | | | (1,098) |
| Buildings | (11,142) | | (995) | 494 | 9 | | | (11,633) |
| Technical installations, equipment and tools | (38,330) | | (3,915) | 461 | (8) | | | (41,792) |
| Transport equipment | (694) | | (48) | 3 | | | | (738) |
| Furniture, office equipment and various fittings | (997) | | (197) | 14 | (1) | | (4) | (1,184) |
| Other property, plant and equipment | (612) | | (80) | 61 | | | | (631) |
| **Impairment losses** | | | | | | | | |
| Buildings | (3) | | (1) | 1 | | | | (3) |
| **Total depreciation and impairment losses** | **(52,806)** | | **(5,304)** | **1,035** | | **1** | **(5)** | **(57,079)** |
| **Net carrying amount** | **97,015** | **9,593** | **(5,304)** | **(122)** | **380** | **(6)** | **33** | **101,589** |

APPX0001973

**Notes to the Consolidated Financial Statements**

| (In millions of dirhams) | 31 December 2016 | Aquisitions | Provisions | Reductions / Reversals | Reclassi-fication | Translation difference | Other changes | 31 December 2017 |
|---|---|---|---|---|---|---|---|---|
| **Gross amount** | | | | | | | | |
| Land | 5,968 | 7 | | (2) | 36 | 2 | | 6,011 |
| Buildings | 36,317 | 3,955 | | (35) | (4,213) | 7 | (1) | 36,029 |
| Technical installations, equipment and tools | 86,526 | 4,993 | | (367) | 10,323 | 2 | (5) | 101,471 |
| Transport equipment | 925 | 45 | | (6) | (10) | | | 953 |
| Furniture, office equipment and various fittings | 2,180 | 248 | | (92) | 172 | 5 | (5) | 2,508 |
| Other property, plant and equipment | 7,119 | 400 | | | (4,645) | | | 2,875 |
| Property, plant and equipment under construction | 64 | 1,688 | | (97) | (1,656) | | (26) | (28) |
| **Total gross amount** | **139,099** | **11,336** | | **(599)** | **8** | **16** | **(38)** | **149,821** |
| **Depreciations** | | | | | | | | |
| Land | (955) | | (73) | | | | | (1,028) |
| Buildings | (10,308) | | (823) | 2 | (12) | (1) | | (11,142) |
| Technical installations, equipment and tools | (33,757) | | (4,833) | 363 | (102) | | | (38,330) |
| Transport equipment | (655) | | (44) | 6 | (1) | | | (694) |
| Furniture, office equipment and various fittings | (905) | | (187) | 96 | (1) | | | (997) |
| Other property, plant and equipment | (281) | | (447) | | 116 | | | (612) |
| **Impairment losses** | | | | | | | | |
| Buildings | (3) | | (1) | 1 | | | | (3) |
| **Total depreciation and impairment losses** | **(46,865)** | | **(6,408)** | **468** | | **(2)** | | **(52,806)** |
| **Net carrying amount** | **92,234** | **11,336** | **(6,408)** | **(131)** | **8** | **14** | **(38)** | **97,015** |

The increase during 2018 mainly concern the following projects:

**Mining activity:**
- Extension of the Merah washing plant in Khouribga for the treatment of high, medium and low grade. This extension provides an additional capacity of 3 million tonnes per year and brings the global laundry capacity to 12 million tonnes per year,
- Opening of the new Beni Amir mine with a production capacity of 5.5 million tonnes per year of phosphate in selective mode;

**Chemical activity:**
- Complete start-up of the fourth fertilizer production unit JFC4. This unit, with a capacity of 1 million tonnes per year, brings the total capacity of the Group to 12 million tonnes.
- Building of a new plant producing crystalline MAP (soluble fertilizer suitable for irrigation: fertigation of irrigated crops), with a capacity of 100,000 tonnes per year and equipped with ancillary units (storage of raw materials, utilities, administrative building, technical rooms, storage of the finished product,...).
- Building of a new phosphoric acid unit (line F) with a capacity of 1,400 tonnes of $P_2O_5$ per day (450 KT/year).

APPX0001974

### 8.3 INTANGIBLE ASSETS VARIATION

| (In millions of dirhams) | 31 December 2017 | Aquisitions | Dotations | Reclassification | 31 December 2018 |
|---|---|---|---|---|---|
| **Gross amount** | | | | | |
| R&D assets | 74 | 10 | | | 85 |
| Patents, trademarks, rights and similar items | 72 | 6 | | | 78 |
| Licences and software | 443 | 64 | | 45 | 551 |
| Other intangible assets | 54 | 495 | | (316) | 233 |
| **Total gross amount** | **643** | **574** | | **(271)** | **947** |
| **Amortization** | | | | | |
| Amortization of R&D assets | (27) | | (12) | | (40) |
| Amortization of patents, trademarks, rights and similar items | (51) | | (6) | 2 | (55) |
| Amortization of licences and software | (170) | | (64) | | (235) |
| Amortizaiton of other intangible assets | (75) | | (31) | (2) | (107) |
| **Total amortization and impairment losses** | **(322)** | | **(114)** | **(1)** | **(437)** |
| **Net carrying amount** | **321** | **574** | **(114)** | **(271)** | **510** |

| (In millions of dirhams) | 31 December 2016 | Aquisitions | Dotations | Reclassification | 31 December 2017 |
|---|---|---|---|---|---|
| **Gross amount:** | | | | | |
| R&D assets | 28 | 46 | | | 74 |
| Patents, trademarks, rights and similar items | 65 | 4 | | 3 | 72 |
| Licences and software | 235 | 209 | | | 443 |
| Other intangible assets | 157 | 23 | | (126) | 54 |
| **Total gross amount** | **485** | **282** | | **(124)** | **643** |
| **Amortization:** | | | | | |
| Amortizaiton of R&D assets | (23) | | (4) | 0 | (27) |
| Amortization of patents, trademarks, rights and similar items | (46) | | (6) | 1 | (51) |
| Amortization of licences and software | (138) | | (32) | 0 | (170) |
| Amortizaiton of other intangible assets | (48) | | (25) | (1) | (75) |
| **Total amortization and impairment losses** | **(255)** | | **(67)** | | **(322)** |
| **Net carrying amount** | **230** | **282** | **(67)** | **(124)** | **321** |

### 8.4 NET DEPRECIATION AND AMORTIZATION

| (In millions of dirhams) | FY 2018 | FY 2017 |
|---|---|---|
| Net depreciation and amortization | (5,489) | (5,777) |

The decrease in net depreciation for the year is due to the combined effects below:

- During its transition to IFRS in 2008, the Group defined economic useful lives for calculating depreciation of fixed assets. Considering the importance of the investments made during these last financial years, in 2018 the Group reviewed the useful lives to reflect the technological evolution of its fixed assets.

- Suspension of amortization of part of the Downstream project. This project involves the construction of a plant with three components namely filtration, drying and storage. Indeed, technical problems related to the ignition and the control of the flame of the drying furnaces delayed the rampup of the project which is expected during 2019.

APPX0001975

**Notes to the Consolidated Financial Statements**

# Note 9 – Provisions and contingent liabilities

## 9.1 ACCOUNTING TREATMENT OF PROVISIONS

The Group recognizes a provision as soon as there is a current, legal or constructive obligation, resulting from a past event, and where it is probable that an outflow of resources will be required to extinguish the obligation.
An obligation is qualified as constructive if the following two conditions are met:
- It has been indicated to other parties, by past practice, published policies or a sufficiently specific current statement, that the entity will accept certain responsibilities ;
- The entity has created a valid expectation on the part of those other parties that it will discharge those responsibilities.

## 9.2 ACCOUNTING TREATMENT OF PROVISIONS

| (In millions of dirhams) | FY 2018 | FY 2017 |
|---|---|---|
| Net provisions | (332) | (373) |

## 9.3 PROVISIONS FOR LIABILITIES AND CHARGES

Current and non-current provisions can be broken down as follows:

| (In millions of dirhams) | 31 December 2017 | Increase | Reversals | Other changes | 31 December 2018 |
|---|---|---|---|---|---|
| Non-current provisions | 4,828 | 360 | (29) | 214 | 5,373 |
| Provisions for employee benefits | 4,307 | 15 | (16) | 311 | 4,616 |
| Provisions for environmental risks & for site rehabilitation | 294 | 13 | | | 307 |
| Other non-current provisions | 227 | 332 | (13) | (97) | 450 |
| Current provisions | 263 | 63 | | | 328 |
| Other current provisions | 263 | 63 | | | 328 |
| Total provisions | 5,092 | 423 | (29) | 214 | 5,701 |

**Measurement of provisions for employee benefits**

Provisions for employee benefits cover benefits related to the death benefit, medical plans, fixed retirement allocations and other long-term benefits. Details of these advantages are disclosed in Note 5 «Expenses and employee benefits».

**Measurement of provisions for site rehabilitation**

The rehabilitation of mining soils is an integral part of the OCP's sustainable development policy. The group anticipates the rehabilitation of the land from the beginning of the extraction. Its approach involves recovering the topsoil and storing it during the operation of the mine. Subsequently, at the end of the operation, these excavated materials are used to create a regular ground and prepare the soil for agricultural use. The Group also takes advantage of the opportunity to initiate agricultural and forestry activities that benefit the communities. This approach is based on the involvement of the local populations as well as the authorities and associations or agencies concerned at the start of the project. In addition to respecting the peculiarities of the soils and the local climatic conditions, the cultures and the introduced activities are done in the light of the local know-how. The former Khouribga mine testifies to the value of this approach. The program that has been deployed has rehabilitated 3,410 hectares to date and allowed the planting of 3.5 million trees, not to mention the rehabilitation of 330 hectares of old mining installations for an investment of MAD 15 million.

## 9.4 CONTINGENT LIABILITIES

Contingent liabilities concern bank guarantees and other items arising in the ordinary course of the Group's business. Group OCP does not expect these items to result in significant liabilities.

## 9.5 COMMITMENT GIVEN

| (In millions of dirhams) | 31 December 2018 | 31 December 2017 |
|---|---|---|
| Letters of credit | 1,289 | 1,135 |
| Miscellaneous rights and commitments | 256 | 426 |
| Total Commitments given | 1,545 | 1,561 |

OCP GROUP
Consolidated financial statements
at 31 December 2018

APPX0001976

# Note 10 – Financial instruments, net debt and net cost of financing

## 10.1 CASH MANAGEMENT FINANCIAL ASSETS, FINANCIAL LIABILITIES, NET DEBT AND NET COST OF FINANCING:

### 10.1.1 DEFINITIONS AND ACCOUNTING TREATMENT:

### FINANCIAL LIABILITIES

Financial liabilities include financial loans and debts, and bank overdrafts, they are initially recognized at the fair value of the amount required to settle the corresponding obligation, less related costs. Upon subsequent measurement, these financial liabilities are recognized at amortized cost, using the effective interest rate method. The interest calculated at the effective interest rate is recognized in the item "Cost of gross financial debt" over the term of the financial debt.

Financial assets and liabilities are classified as current when expected maturity of the instrument cash flows is less than one year.

### CASH AND CASH EQUIVALENTS

"Cash and cash equivalents" include cash as well as short-term investments (with a maturity of less than three months) classified in this category as long as the following criteria are met

- Highly liquid.

- Easily convertible to a known cash amount.

- Subject to a negligible risk of change in value.

Short-term investments primarily correspond to cash unit trusts measured at fair value at the closing date, and changes in fair value are recognized in financial profit or loss.

### CASH MANAGEMENT FINANCIAL ASSETS

Cash financial assets mainly correspond to term deposits. These are investments whose maturity and income conditions are determined when they are made and which the Group intends and has the means to keep until their maturity. They are measured at amortized cost. Remuneration of term deposits is recognized in financial profit or loss.

### NET DEBT

Net debt is defined as the sum of current and non-current financial debt less cash and cash equivalents and financial cash assets.

### COST OF NET FINANCIAL DEBT

The cost of net financial debt includes the cost of gross debt plus financial income from cash investments.

- Cost of gross debt: This includes interest charges calculated using the effective interest rate method, the costs of early repayment of loans or cancelation of lines of credit.

- Financial income from cash investments: This is composed of income from investments of cash and cash equivalents as well as financial cash assets.

**10.1.2 ANALYSIS OF FINANCIAL DEBTS**

**10.1.2.1 BREAKDOWN OF FINANCIAL DEBTS BY TYPE**

The table below shows the breakdown of the Group's financial debts by type :

| (In millions of dirhams) | 31 December 2018 | 31 December 2017 |
|---|---|---|
| **Current financial debts** | | |
| **Government credits** | 65 | 67 |
| Long-term bank loans, portion due in less than one year | 5,178 | 5,288 |
| Finance leases, portion due in less than one year | 114 | 110 |
| Bond issue | | 2,000 |
| Financial debts resulting from Murabaha | 387 | 818 |
| Accrued interest not yet due | 588 | 437 |
| Bank overdrafts | 1 | 33 |
| Other credits | 789 | |
| **Total current financial debts** | **7,123** | **8,753** |
| **Non-current financial debts** | | |
| Government credits | 374 | 449 |
| Long-term bank loans, portion due in more than one year | 20,105 | 19,172 |
| Bond issue | 26,718 | 26,010 |
| Finance leases, portion due in more than one year | 134 | 239 |
| Other credits | 3,533 | 373 |
| **Total non-current financial debts** | 50,864 | 46,244 |
| **Total financial debts** | **57,988** | **54,997** |

The change in financial debts is explained by:

- the conclusion during 2018 of new financing contracts for a global amount of MAD 6 billion (see Note «10.1.2.4 Main financing contracts of the Group»), in addition to the recognition of a debt of MAD 4 billion corresponding to the cost of factoring the VAT credit.
- repayment of MAD 7.5 billion of debt in the same year, mainly the MAD 2 billion bond issue.

APPX0001978

**10.1.2.2 ANALYSIS OF FINANCIAL DEBTS: RATES AND MATURITIES**

The table below shows the breakdown of total loans according to interest rate, maturity date and currency.

| (In millions of dirhams) | Interest rate | Weighted average interest rate | Weighted average residual maturity | 31 December 2018 |
|---|---|---|---|---|
| **Current financial debts** | | | | |
| Denominated in EUR | [1.30 % -2.50 %] | 2.09 % | | 65 |
| **Long-term bank loans, portion due in less than one year** | | | | |
| Denominated in USD | [2.94 % -4.15 %] | 3.57 % | | 1,345 |
| Denominated in MAD | [3.00 % -3.90 %] | 3.46 % | | 3,570 |
| Denominated in EUR | [1.13 % -4.47 %] | 3.36 % | | 263 |
| **Finance lease debts** | | | | |
| Denominated in MAD | [3.50 % -4.70 %] | 3.54 % | | 114 |
| **Financial debts resulting from Murabaha** | | | | |
| Denominated in USD | | | | 387 |
| Accrued interest not yet due | | | | 588 |
| **Bank overdraft** | | | | |
| Denominated in MAD | | | | 1 |
| **Other credits** | | | | 789 |
| **Total current financial debts** | | | | **7,123** |
| Government credits | | | | |
| Denominated in EUR | [1.30 % -2.50 %] | 2.31 % | 12 | 374 |
| **Long-term bank loans, portion due in more than one year** | | | | |
| Denominated in EUR | [1.13 % -4.47 %] | 2.17 % | 7 | 2,607 |
| Denominated in MAD | [3.20 % -3.90 %] | 3.62 % | 5 | 11,886 |
| Denominated in USD | [2.94 % -4.15 %] | 3.56 % | 6 | 5,612 |
| **Finance lease debts** | | | | |
| Denominated in MAD | [3.50 % -4.70 %] | 3.58 % | 2 | 134 |
| **Bond issue** | | | | |
| Denominated in MAD | | | | |
| Denominated in USD | [4.50 % -6.88 %] | 5.49 % | 10 | 26,718 |
| Other credits | | | | 3,533 |
| **Total non-current financial debts** | | | | **50,864** |
| **Total financial debts** | | | | **57,988** |

**10.1.2.3 FINANCIAL DEBT MATURITIES**

The table below shows the maturities of financial debts as at 31 December 2018:

| (in millions of dirhams) | <1 yr | 1-5 yrs | > 5 yrs | Total at 31 December 2018 |
|---|---|---|---|---|
| Medium and long-term debt | 7,123 | 34,153 | 16,711 | 57,988 |

APPX0001979

**10.1.2.4 THE GROUP'S MAIN FINANCING AGREEMENTS**

The Group's main financing agreements as at 31 December 2018 are as follows:

- OCP S.A. successfully closed on May 14, 2018, the perpetual subordinated bond issue with early repayment and deferred payment options for a total amount of MAD 5 billion issued in Five tranches. Given the characteristics of this hybrid issue, financing is recognized in equity under IFRS9.

- In March 2018, OCP S.A. concluded a loan totaling MAD 2 billion at fixed interest rates and maturing in March 2025 with «Société Générale Maroc». The borrowing outstanding as of December 31, 2018 is 2 billion dirhams.

- In April 2018, OCP S.A. concluded a loan totaling MAD 1 billion at a fixed interest rate maturing April 2023 with the "Banque Marocaine pour le Commerce et l'Industrie –BMCI". The amount outstanding as of December 31, 2018 for this line is MAD 1 billion.

- In April 2018, OCP S.A. concluded a loan totaling MAD 2 billion at fixed interest rates and maturing in December 2024 with "Banque Centrale Populaire". The amount outstanding as of December 31, 2018 for this line is 2 billion dirhams.

- In April 2018, OCP S.A. concluded a loan totaling 1.5 billion dirhams at a fixed interest rate and maturing in June 2025 with "Crédit Agricole du Maroc". The borrowing outstanding as of December 31, 2018 for this line is 500 million dirhams.

- In September 2018, OCP S.A. concluded a loan for an aggregate amount of MAD 500 million at fixed interest rates maturing in July 2023 with "Crédit du Maroc". Outstanding as of December 31, 2018 for this line is 500 million dirhams.

**10.1.3 ANALYSIS OF FINANCIAL ASSETS**

**10.1.3.1 CASH AND CASH EQUIVALENT**

| (In millions of dirhams) | 31 December 2018 | 31 December 2017 |
|---|---|---|
| Cash | 3,252 | 3,670 |
| Cash equivalents | 13,889 | 4,748 |
| **Total cash and cash equivalents** | **17,141** | **8,419** |
| Bank (credit balances) | 1 | 31 |
| **Cash and cash equivalents in the consolidated statement of Cash Flows** | **17,140** | **8,388** |

**10.1.3.2 CASH MANAGEMENT FINANCIAL ASSETS**

| (In millions of dirhams) | 31 December 2018 | 31 December 2017 |
|---|---|---|
| Cash financial assets | 5,654 | 2,709 |
| **Total** | **5,654** | **2,709** |

Cash management financial assets include mainly term deposits with a maturity more than three months contracted mostly by OCP S.A. for MAD 5.6 billion as at 31 December 2018 versus MAD 2.7 billion as at 31 December 2017.

**10.1.3.3 MATURITIES AND FAIR VALUE OF FINANCIAL CASH ASSETS**

**Financial cash assets maturities**

The investment portfolio must remain sufficiently liquid to respond to the financing needs generated by the Group's operations and investment. As such, assets portfolio is composed of a very short-term and liquid instruments providing for daily operating needs, and short-term instruments in order to improve yields and be in line with targets.

| (In millions of dirhams) | 0-3 month | 3-6 months | 6-12 months | >1 year | Total |
|---|---|---|---|---|---|
| Money market funds | 6,873 | | | | 6,873 |
| Term deposit | 7,015 | 5,654 | | | 12,669 |
| **Total** | **13,889** | **5,654** | | | **19,543** |

#### 10.1.4   ANALYSIS OF NET DEBT

**10.1.4.1 NET DEBT BY CATEGORY**

| (In millions of dirhams) | | 31 December 2018 | 31 December 2017 |
|---|---|---|---|
| Liabilities measured at amortized cost | Financial credits | 25,726 | 24,905 |
| | Bonds | 26,718 | 28,010 |
| | Other loans and assimilated debts | 4,966 | 1,335 |
| | Financial lease debt | 578 | 716 |
| | Long-term financial debt | 57,987 | 54,966 |
| | Bank overdrafts | 1 | 31 |
| | Gross financial debt | 57,988 | 54,997 |
| Assets measured at fair value through profit or loss | | 17,141 | 8,419 |
| | Cash equivalents | 13,889 | 4,748 |
| | Cash | 3,252 | 3,670 |
| Assets measured at amortized cost | | | |
| | Financial assets for cash management | 5,654 | 2,709 |
| | Financial assets | 22,795 | 11,128 |
| | Net financial debt | 35,193 | 43,868 |

**10.1.4.2 RECONCILIATION OF NET DEBT ACCOUNTS**

The reconciliation with balance sheet items is shown below:

| (In millions of dirhams) | 31 December 2018 | 31 December 2017 |
|---|---|---|
| Current loans and financial debts | 6,736 | 7,935 |
| Financial debts resulting from Murabaha | 387 | 818 |
| Non-current loans and financial debts | 50,864 | 46,244 |
| Gross financial debt | 57,988 | 54,997 |
| Financial assets for cash management | (5,654) | (2,709) |
| Cash and cash equivalents | (17,141) | (8,419) |
| Net financial debt | 35,193 | 43,868 |

Reconciliation of net financial debt with cash flow in statement of Cash Flows:

| (In millions of dirhams) | 31 December 2018 | 31 December 2017 |
|---|---|---|
| Net change in cash | (8,752) | 2,621 |
| Change in marketable securities | (2,945) | 2,176 |
| Insuance/ repayment of loans | 2,978 | 2,798 |
| Other variations | 43 | (1,746) |
| Change in net financial debt | (8,676) | 5,849 |

APPX0001981

**Notes to the Consolidated Financial Statements**

## 10.1.5 COST OF NET DEBT

The cost of net debt can be broken down as follows:

| (In millions of dirhams) | FY 2018 | FY 2017 |
|---|---|---|
| Interest expenses | (1,865) | (1,388) |
| **Cost of gross financial debt** | **(1,865)** | **(1,388)** |
| Financial income from cash investments | 122 | 77 |
| Other financial income | 177 | 142 |
| **Financial income from cash investments** | **299** | **220** |
| **Cost of net financial debt** | **(1,567)** | **(1,168)** |

The increase in the cost of gross financial debt, which amounts to MAD 477 million, is due to the combined effect of the remuneration of new drawings made in 2018 and the decrease in the capitalization of borrowing costs after the commissioning of industrial projects.

## 10.2 OTHER FINANCIAL ASSETS

### 10.2.1 DEFINITIONS AND ACCOUNTING TREATMENT:

**Other financial assets**
Other financial assets are classified as « Available-for-sale» and primarily include non-consolidated investment shares. They are valued at fair value, Subsequent changes in fair value are recognized directly in "Other items of comprehensive income"», except in the case of significant or prolonged unrealized loss.

The Group considers that a significant loss is assumed if the asset available for sale has lost 20 % of its value and that loss is prolonged if it lasts for more than 6 months

Fair value corresponds to the market price for quoted shares or to an estimate of fair value for non-quoted shares, determined according to the most appropriate financial criteria for the particular situation of each shareholding. The Group uses historic cost less any possible depreciation to value its shares that are not quoted on an active market and whose fair value cannot be measured reliably.

**Other financial income and expenses**
Other financial income and expenses primarily include income from loans and receivables calculated using the effective interest rate method, dividends from non-consolidated entities, exchange gains and losses on financing operations, accretion of provisions and of receivables and payables, impairment losses and income relating to financial assets.

### 10.2.2 NON-CURRENT FINANCIAL ASSETS

| (In millions of dirhams) | 31 December 2018 | | | 31 December 2017 | | |
|---|---|---|---|---|---|---|
| | Gross | Depreciation | Net | Gross | Depreciation | Net |
| Financial assets at fair value by equity | 489 | (81) | 408 | 573 | (78) | 495 |
| Financial assets at fair value through profit or loss | 27 | | 27 | 27 | | 27 |
| Receivables from fixed assets disposals | 34 | (5) | 30 | 47 | (5) | 42 |
| VAT credit | | | | 14,575 | | 14,575 |
| Other financial receivables | 407 | (1) | 407 | 76 | (1) | 76 |
| **Total non-current financial assets** | **958** | **(86)** | **872** | **15,298** | **(83)** | **15,215** |

The receivables relating to the VAT credit were repaid following the agreement signed between the State, OCP Group and moroccan banks. This is a non-recourse factoring contract with transfer of all the risks and benefits to banks. This transaction enabled the Group to break down the VAT credit for its current and non-current portion totaling MAD 20.5 billion in return for the recognition of a financial debt of MAD 4.2 billion corresponding to the overall cost of the factoring. This debt will be repaid on a 9-year schedule.

OCP GROUP
Consolidated financial statements
at 31 December 2018

APPX0001982

**10.2.3 OTHER FINANCIAL INCOME AND EXPENSES**

Other financial income and expenses are as follows:

| (In millions of dirhams) | FY 2018 | FY 2017 |
|---|---|---|
| Exchange income from financing operations | (412) | 2,901 |
| Revenue from financial receivables | (1,321) | (851) |
| Other | (4) | (30) |
| **Other financial income and expenses** | **(1,737)** | **2,021** |

The foreign exchange loss on borrowings recorded in the 2018 financial year amounted to MAD -410 million, explained by the increase in MAD / $ exchange rates. In fact, the closing rate goes from 9.32 MAD / $ at 31 December 2017 to 9.56 MAD / $ at 31 December 2018. As a reminder, the foreign exchange result was particularly positive in 2017 of MAD 2.9 billion due to the fall in the MAD / $ exchange rate, which went from 10.08 at 31/12/2016 to 9.32 at 31 December 2016. / 12/2017.

This foreign exchange loss was limited by the implementation of an accounting hedge relationship as of September 1, 2018. The total foreign exchange loss of MAD 535 million was recorded in foreign exchange on the statement of profit and loss for MAD 204 million for the period up to August 31, 2018 and in shareholders' equity for the change in exchange rate recorded from September 1 to end December 2018 (331 million dirhams) corrected for the effective portion of the hedging for 2 million dirhams.

The «VAT receivable credit discount» shows a decrease of MAD 471 million compared to the 2017 financial year. This is due to the recognition, during the 2018 financial year, of a net additional provision of MAD1,321 million following the agreement to finance VAT credit by non-recourse factoring. The overall cost of the operation is 4.2 billion dirhams.

## 10.3 WEIGHT OF FINANCIAL INSTRUMENTS AND FINANCIAL RISK MANAGEMENT

**10.3.1  WEIGHT OF FINANCIAL INSTRUMENTS**

In accordance with IFRS 7, "Financial instruments: Disclosures", fair value measurements must be classed according to a hierarchy based on the input used to measure the fair value of the instrument which includes the following three levels:

- Level 1: the use of quoted (unadjusted) market prices in active markets for identical assets or liabilities.

- Level 2: the use of quoted market prices in active markets for similar assets or liabilities or measurement techniques where the relevant inputs are based on observable market data.

- Level 3: the use of measurement techniques where the relevant inputs are not all based on observable market data.

| (in millions of dirhams) Balance sheet captions and instrument classes | At 31 December 2018 | | | | |
|---|---|---|---|---|---|
| | Carrying value | Fair value | Level 1 : quoted prices and available funds | Level 2 : internal model with observable inputs | Level 3 : internal model with unobservable inputs |
| Cash and cash equivalents | 17,141 | 17,141 | 17,141 | | |
| Cash financial assets | 5,654 | 5,654 | | 5,654 | |
| Available-for-sale financial assets | 408 | 408 | | | 408 |
| Financial assets measured at fair value through profit or loss | 27 | 27 | | | 27 |
| Total financial assets | 23,230 | 23,230 | 17,141 | 5,654 | 436 |
| Current loans and financial debts | 7,123 | 7,123 | | 7,123 | |
| Non-current loans and financial debts | 50,864 | 53,326 | 28,783 | 24,543 | |
| Total financial liabilities | 57,988 | 60,450 | 28,783 | 31,666 | |

| (in millions of dirhams) Balance sheet captions and instrument classes | At 31 December 2017 | | | | |
|---|---|---|---|---|---|
| | Carrying value | Fair value | Level 1 : quoted prices and available funds | Level 2 : internal model with observable inputs | Level 3 : internal model with unobservable inputs |
| Cash and cash equivalents | 8,419 | 8,419 | 8,419 | | |
| Cash financial assets | 2,709 | 2,709 | | 2,709 | |
| Available-for-sale financial assets | 495 | 495 | | | 495 |
| Financial assets measured at fair value through profit or loss | 27 | 27 | | | 27 |
| Other receivables* | 14,275 | 14,275 | | | 14,575 |
| Total financial assets | 26,225 | 26,225 | 8,419 | 2,709 | 15,097 |
| Current loans and financial debts | 8,753 | 8,781 | 2,028 | 6,753 | |
| Non-current loans and financial debts | 46,244 | 49,280 | 28,192 | 21,088 | |
| Total financial liabilities | 54,997 | 58,060 | 30,220 | 27,840 | |

(*) Represents the VAT credit reclassified as non-current financial assets, this VAT credit was repaid in October 2018.

### 10.3.2 RISK MANAGEMENT

#### 10.3.2.1 CERTAIN CONTRACTUAL PROVISIONS AND TERMS OF THE DEBT

The negotiations undertaken with the international financial institutions as from July 2016 led to the consideration of the Group's rating level, which is now reflected in a single commitment to have at least an "investment grade" rating «. This commitment is to be respected for 6 institutions: KFW, European Investment Bank, French Development Agency, Islamic Development Bank, African Development Bank, US EXIM.

#### 10.3.2.2 CASH RESERVES

To meet its commitments, OCP Group also has potential cash reserves in the form of overdraft facilities and Documentary Credits, accompanied by guarantees granted to Group entities. These reserves represent a total of MAD 6 billion, activated without prior authorization in case of Short position on the Cash.

Moreover, the multi entities cash pooling mechanism implemented in 2015 allows a particular operational flexibility in managing cash and achieving loans- borrowings between centralized / centralizing entities. This mechanism is based on the indirect ZBA (Zero Balancing Account) mode that allows viewing on a single account overall cash position of the entities that are included in the cash pooling.

The Group also has the ability to turn with the Moroccan partner banks, the discount mechanism without recourse of trade receivables held by OCP on some of its customers.

#### 10.3.2.3 COMMITMENTS RECEIVED

| (In millions of dirhams) | 31 December 2018 | 31 December 2017 |
|---|---|---|
| Unused borrowings | 3,097 | 2,707 |
| Other commitments received for contracts | 6,658 | 8,632 |
| Loans guaranteed by the State | 440 | 517 |
| Total Commitments received | 10,195 | 11,855 |

"Other commitments received for contracts" concern commitments received from suppliers relating to advances paid within the context of the industrial programs undertaken by the Group. The analysis of the loans guaranteed by the state are presented in Note 13 «relations with the State».

APPX0001984

### 10.3.2.4 COUNTERPARTY RISK MANAGEMENT

Capital security is a fundamental principle of the Group's investment policy. Cash surpluses are invested at an accepted level of risk, with high-quality counterparties

In this respect, the Trading Room acts in compliance with the following rules and procedures:

**Pre-qualifying counterparties**

Pre-qualifying bank counterparties, issuers of debt, management companies and mutual funds with which the OCP Group is exposed directly or indirectly .

The Trading Room is authorized to deal with bank counterparties if the latter have a rating that is higher than the minimum rating required of three notches below the S&P and Fitch ratings for the Moroccan debt.

As for Debt issuers, the Trading Room is authorized to deal with debt issuers if the following conditions are met:

- State Treasury issue: treasury bills with a residual maturity less than or equal to two years. Derogations may be granted by the Management Committee for any other maturities on a case-by-case basis.

- Private debt issue other than with bank counterparties: any subscription must be validated by the Management Committee on a case-by-case basis

Finally, the prequalification of UCITS consists of the following two stages:

- Choice of the management company: the management company must have a minimum management rating of M2 according to the Fitch scale.

- Choice of the UCITS: the investment mainly concerns low-sensitivity, fairly liquid UCITS in order to allow the Group to manage its liquidity under the best conditions.

**Diversifying the counterparties**

Diversifying the counterparties to which Group OCP is exposed in accordance with prudential rules defined internally.

**Fixing limits by type of instruments held by counterparties**

Outstanding direct investment with a bank counterparty is classified by instrument type and is limited according to the credit standard of the said counterparty. These limits fix:

- The maximum outstanding amount authorized with a counterparty as a percentage of equity.

- The outstanding amount with a counterparty by instrument type which must not exceed the Group's total outstanding amount invested directly in this type of instrument.

- The outstanding amount with a counterparty by instrument type which must not exceed a percentage of the counterparty's total outstanding amount in this type of instrument.

Otherwise, the outstanding amount with a UCITS is limited according to the credit rating of the management company and of the said UCITS. These limits fix the maximum outstanding amount authorized with a UCITS as a percentage of net assets and the maximum outstanding amount authorized with the management company.

Any exception to the rules above is subject to validation by the Executive Committee.

### 10.3.2.5 LIQUIDITY RISK

The investment portfolio must remain sufficiently liquid to respond to the financing needs generated by the Group's operations and investment. To this end, it must be composed of liquid, flexible and available instruments.

The breakdown of assets invested between the investment portfolios is based on cash flow forecasts and is as follows:

- Very short-term, liquid instruments, providing for daily operating needs.

- Short-term instruments, in conformity with counterparty risk management, generating a yield which is in line with the yield objectives of the investment policy.

# Note 11 – Corporate Income taxes

## 11.1 ACCOUNTING TREATMENT OF INCOME TAXES

Income taxes include the current tax expense (or income) and the deferred tax expense (or income). Tax is recognized in profit or loss, unless it relates to items that are recognized directly in equity, in which case it is recognized in equity. The tax rates used are those that have been enacted or substantially enacted as of the closing date.

Deferred tax is determined according to the balance sheet approach. The Group applies the liability method. OCP Group recognizes deferred tax for all temporary differences that exist between the tax bases and the carrying amounts of the assets and liabilities in the balance sheet except for goodwill.

Tax assets relating to temporary differences, net of chargeable deferred tax liabilities, and loss carry-forwards are only recognized if it is probable that a likely future profit, determined with sufficient precision, will be generated by the tax entity.
A Group entity shall offset current tax assets and current tax liabilities if, and only if, the entity:

- has a legally enforceable right to set off the recognized amounts.

- Intends either to settle on a net basis, or to realize the asset and settle the liability simultaneously.

Deferred tax assets and liabilities, whatever their maturity, must be offset when they are levied by the same tax authority and concern a single tax entity that has the right to set off current tax assets against current tax liabilities.

## 11.2 ANALYSIS OF TAX EXPENSE

| (In millions of dirhams) | FY 2018 | FY 2017 |
|---|---|---|
| Current tax expense/current tax income | (1,071) | (1,012) |
| Deferred tax expense/deferred tax income | (29) | (617) |
| **Corporate income tax** | **(1,100)** | **(1,629)** |

## 11.3 RECONCILIATION BETWEEN THE TOTAL TAX EXPENSE AND THE THEORETICAL TAX EXPENSE

| (In millions of dirhams) | FY 2018 | FY 2017 |
|---|---|---|
| +Net income - Group share | 5,425 | 4,567 |
| +Net income - Minorities' share | 178 | 122 |
| -Share of profit (loss) of equity-accounted companies | (399) | (337) |
| +/-Tax for the period | 1,100 | 1,629 |
| **Consolidated accounting income before tax** | **6,302** | **5,980** |
| +/- Permanent differences* | 136 | 1,808 |
| **= Consolidated taxable income** | **6,438** | **7,789** |
| Theorical tax rate | 21.11 % | 20.00 % |
| **=Theoretical tax ** | **(1,359)** | **(1,571)** |
| Tax losses | 45 | (52) |
| Difference in tax rate in relation to OCP S.A. | 77 | (60) |
| Prior years' income taxes | 53 | (1) |
| Other items | 85 | 56 |
| **= Corporate income tax** | **(1,100)** | **(1,629)** |
| including | | |
| *current tax* | *(1,071)* | *(1,012)* |
| *deferred tax* | *(29)* | *(617)* |

(*)The main permanent differences are the previous exercises' expenses, tax control expenses subsidies and non-deductible donations and income equity.
(**)The theoretical tax rate takes into account local sales taxed at 30 % and export sales realized in foreign currency taxed at 17.5 %

APPX0001986

## 11.4 DEFERRED TAX ASSETS AND LIABILITIES

The trend in deferred tax assets and liabilities is as follows :

| (In millions of dirhams) | 31 December 2017 | Activity changes in income | Change in consolidation scope | 31 December 2018 |
|---|---|---|---|---|
| Gross deferred tax assets | 16 | | | 16 |
| Unrecognized deferred tax assets | | | | |
| **Net deferred tax assets** | **16** | | | **16** |
| **Deferred tax liabilities** | **1,112** | **(119)** | | **993** |

The breakdown by type of deferred tax asset and liability is as follows:

| (In millions of dirhams) | 31 December 2018 | 31 December 2017 |
|---|---|---|
| Temporary differences | 903 | 630 |
| Eliminations of intercompany transactions | 500 | 447 |
| Intangible assets | (179) | (21) |
| Tangible assets | 13 | 14 |
| Financial assets available for sale | 49 | 49 |
| Other asset items | (16) | (70) |
| Provisions for employee benefits | 1,617 | 1,617 |
| Other provisions | 664 | 664 |
| Tax loss carryforwards | 9 | 9 |
| Offsetting | (3,545) | (3,323) |
| **Total deferred tax assets** | **16** | **16** |

| (In millions of dirhams) | 31 December 2018 | 31 December 2017 |
|---|---|---|
| Temporary differences | 3 | 3 |
| Intangible assets | 81 | 72 |
| Tangible assets | 4,027 | 3,533 |
| Financial assets at fair value by equity | 49 | 49 |
| Inventories | 399 | 399 |
| Other assets items | (332) | (79) |
| Other provisions | 127 | 221 |
| Tax loss carryforwards | (43) | |
| Other | 226 | 235 |
| Offsetting | (3,545) | (3,323) |
| **Total deferred tax liabilities** | **993** | **1,112** |

APPX0001987

# Note 12 – Equity, perpetual subordinated debt, dividends and earnings per share

## 12.1  ISSUED CAPITAL

As at 31 December 2018, the share capital amounts to MAD 8,287 million. It is composed of 82,875,000 shares with a nominal value of MAD100. 729,300 OCP shares are held by its subsidiary SADV.

| (In number of shares) | Ordinary shares |
|---|---|
| Outstanding at 1 January 2018 | 82,875,000 |
| Issues of shares for cash in FY 2018 | - |
| Outstanding at 31 December 2018 | 82,875,000 |
| Nominal value | 100 Dirhams |

During the first half of 2018, Banque Centrale Populaire (BCP), a shareholder in OCP S.A., sold 0.82% (681,538 shares) of its capital held in OCP S.A. to its subsidiary Socinvest. This sale was completed with the use right on January 1st, 2018.

## 12.2 PERPETUAL SUBORDINATED DEBT

OCP Group closed on May 4th, 2018, a perpetual subordinated bond issue with early repayment and deferred payment options in the amount of MAD 5 billion. This issue by Public offering concerns the issue of 50,000 perpetual subordinated bonds with a nominal value of 100,000 dirhams each.

This transaction enables OCP Group to diversify its sources of financing within the framework of its investment plan to 2025 and is part of the strategy to consolidate its position as world leader. This operation also strengthens the Group's financial structure and supports its transformation while strengthening its credit ratios.

The Group issued:

- MAD 1,058 million to 4.03% of yield on unlisted tranche A/ reviewable 10 years and listed tranche B/ reviewable 10 years.
- MAD 109 million to 3% of yield on unlisted tranche C/ reviewable 52 weeks.
- MAD 2,708 million to 4.72% of yield on unlisted tranche D/ reviewable 5 years.
- MAD 1,125million to 5.08% of yield on unlisted tranche D/ reviewable 5 years.

This instrument includes the following features:

- Bonds are subordinated securities. The principal and interest related to the bonds constitute unconditional direct commitments without security and subordinate rank.
- At the discretion of the issuer, the payment of the coupon payable may be deferred subject to notification of the shareholders.

If the issuer, at its discretion, has elected to defer the coupon payment payable it is no longer entitled to:

- Declare or pay dividends on shares of the issuer for the current year, pay interest on a tranche of the same rank as the bonds.
- Refund, cancel, buy or redeem securities equal to the bonds, or common shares.

The issue is not rated in accordance with IFRS 9 and considering its characteristics, this instrument is accounted for in equity.

The coupon cost attributable to holders of super-subordinated securities amounted to MAD328 million for the financial year of 2018 compared with MAD180 million for the financial year 2017.

## 12.3  DIVIDENDS

The MAD 2,478 billion in dividends paid in respect of FY 2018 correspond to a net dividend per share of MAD 30.17.

| | 31 December 2018 | 31 December 2017 |
|---|---|---|
| Amount of dividends (in millions of dirhams) | 2,478 | 1,661 |
| Dividend per share (in dirhams) | 30.17 | 20.22 |

OCP GROUP
Consolidated financial statements
at 31 December 2018

APPX0001988

## 12.4 EARNINGS PER SHARE

Basic earnings per share are calculated by dividing the net profit for the year attributable to ordinary shareholders of the parent company, OCP S.A., by the weighted average number of ordinary shares outstanding excluding treasury stock.

|  | FY 2018 | FY 2017 |
|---|---|---|
| Net profit, Group share (in millions of dirhams)* | 5,097 | 4,388 |
| Average number of shares in circulation as at 31 December | 82,875,000 | 82,875,000 |
| Average number of own shares in circulation during the period | 729,300 | 729,300 |
| Number of shares used for the calculation of income | 82,145,700 | 82,145,700 |
| Basic and diluted net earnings per share (in dirhams) | 62.04 | 53.41 |

_____

*In accordance with IAS 33.19 and 12, adjusted net profit includes the cost of the coupon attributable to holders of subordinated shares issued by the OCP Group (MAD -328 millions).

APPX0001989

# Note 13 – Relations with the State

The Moroccan State is the majority shareholder of OCP with a 94.12 % stake. As such, the State receives annual dividends in accordance with the company's dividend distribution policy. The dividends to be paid are proposed by the Board of Directors to the General Meeting of Shareholders. Their amount depends on several parameters, in particular the profits made, cash available and the company's financial structure, as well as other factors that the Board of Directors may consider to be relevant.

In 2018, the Moroccan State received dividends net of taxes amounting to MAD 2.48 billion in respect of the distributable profit for financial year 2017.

OCP has been a *Société Anonyme* (public limited liability company) since March 2008. Prior to that date, OCP, as a public enterprise, benefited from the State guarantee for loans taken out with foreign organizations.

| Loan subject | Loan currency | Date of loan | Amount in millions of dirhams as at 31 December 2018 | Amount in millions of dirhams as at 31 December 2017 |
|---|---|---|---|---|
| AFD outstanding loans consolidation | EUR | 2005 | 313 | 351 |
| Sidi Chennane mining operations | EUR | 2002 | 117 | 154 |
| Renewal of the sulfur unit circulation tank and supply circuit | EUR | 2007 | 7 | 8 |
| Renewal of three absorption towers | EUR | 2003 | | 1 |
| Acquisition of two hydraulic excavators | EUR | 2001 | 2 | 4 |
| TOTAL | EUR | | 440 | 517 |

Like all companies located in Morocco, OCP is subject to the tax legislation in force, which requires the payment of duties, taxes and levies to the Moroccan State.

The following table shows the transactions performed with the State or with State-controlled companies for financial years 2017 and 2018:

| (In millions of dirhams) | 31 December 2018 | | 31 December 2017 | |
|---|---|---|---|---|
| | State and State-controlled enterprises | BCP | State and State-controlled enterprises | BCP |
| Interest on investments | 64 | 55 | 21 | 18 |
| Utility costs | 1,382 | | 1,372 | |
| Other operating expenses | 281 | | 360 | |
| Interest on loans | 9 | 83 | | 59 |
| Social charges | 503 | | 496 | |
| Transport expenses ONCF | 1,088 | | 1,281 | |
| Subscription ONCF / lump-sum contributions | 400 | | 400 | |
| Assets and inventories purchases | 50 | | 38 | |

| (In millions of dirhams) | 31 December 2018 | | 31 December 2017 | |
|---|---|---|---|---|
| | State and State-controlled enterprises | BCP | State and State-controlled enterprises | BCP |
| Trade payables | 581 | | 848 | |
| Other receivables | 911 | | 1,029 | |
| Cash and cash equivalents | 2,716 | 1,841 | 878 | 1,533 |
| Investments | 3,846 | 3,560 | 1,000 | |
| Loans | 872 | 4,111 | | 1,714 |

APPX0001990



**Building a better
working world**

37, Bd Abdellatif Benkaddour
20050 Casablanca
Maroc

**Deloitte.**

288, Boulevard Zerktouni
Casablanca
Maroc

Aux actionnaires de la société
**OCP S.A.**
2, Rue Al Abtal - Hay Erraha - Immeuble OCP
Casablanca

**RESUME DU RAPPORT D'AUDIT SUR LES ETATS FINANCIERS CONSOLIDES
EXERCICE DU 1er JANVIER AU 31 DECEMBRE 2018**

Nous avons effectué l'audit des états financiers consolidés ci-joints de la société OCP S.A., et
de ses filiales (Groupe OCP), comprenant l'état de la situation financière consolidée au 31
décembre 2018, le compte de résultat consolidé et l'état du résultat global consolidé, l'état de
variation des capitaux propres consolidés et l'état consolidé des flux de trésorerie pour
l'exercice clos à cette date, et des annexes aux comptes consolidés contenant un résumé des
principales méthodes comptables et d'autres notes explicatives. Ces états financiers
consolidés font ressortir un montant de capitaux propres consolidés de MMAD 80.290 dont un
bénéfice net consolidé de MMAD 5.602.

La direction est responsable de l'établissement et de la présentation sincère de ces états
financiers, conformément au référentiel IFRS tel qu'adopté dans l'Union Européenne.

Notre responsabilité est d'exprimer une opinion sur ces états financiers sur la base de notre
audit. Nous avons effectué notre audit selon les Normes de la Profession au Maroc.

A notre avis, les états financiers consolidés présentent sincèrement, dans tous leurs aspects
significatifs, la situation financière de l'ensemble constitué par les entités comprises dans la
consolidation au 31 décembre 2018, ainsi que sa performance financière et ses flux de
trésorerie pour l'exercice clos à cette date, conformément au référentiel IFRS tel qu'adopté
dans l'Union Européenne.

Casablanca, le 22 mars 2019

**Les Auditeurs Indépendants**

**ERNST & YOUNG**

Bachir TAZI
Associé

**DELOITTE AUDIT**

Deloitte Audit
288, Boulevard Zerktouni
- CASABLANCA -
Tél : 05 22 22 40 25/26/34/8*
Fax : 05 22 22 40 78

**Sakina BENSOUDA**
Associée



2 - 4, rue Al Abtal · Hay Erraha · 20 200 Casablanca · Maroc
www.ocpgroup.ma

# Exhibit II-53



(https://www.leconomiste.com/e-leconomiste?
utm_source=Desktop&utm_medium=Banniere&utm_campaign=Banni%C3%A8re%20ePaper%20mobile)

**4.035 lecteurs à vous connecter sur leconomiste.com chaque jour. Vous consultez 211.063 articles (chiffres relevés l**

(https://www.leconomiste.com/e-leconomiste?
utm_source=mobile&utm_medium=Banniere&utm_campaign=Banni%C3%A8re%20ePaper%20mobile)

# FLASH

## Emprunt : Attijari Finances Corp. et CDG Capital conseillent l'OCP

Par L'Economiste| Le 25/04/2018 - 15:16 | Partager



(/sites/default/files/eco7/public/flash_attijari_tt.jpg)

Attijari Finances Corp. et CDG Capital sont les deux organismes conseils et coordinateurs globaux de l'emprunt obligataire du groupe OCP. Pour rappel, le géant mondial des phosphates compte lever 5 milliards de DH sur le marché. L'opération a reçu le visa de l'Autorité marocaine du marché des capitaux (AMMC). La souscription est réservée aux investisseurs qualifiés de droit marocain et s'étale du 2 au 4 mai 2018 inclus, avec une date de règlement/livraison prévue le 14 mai 2018.

Attijariwafa bank (AWB) et CDG Capital interviennent en qualité de co-chefs de file du syndicat de placement. L'enregistrement de l'opération à la Bourse de Casablanca a été confié à la société de bourse Attijari Intermédiation, alors que la domiciliation et le service financier des titres sont assurés par AWB.

Commentaires                                                                    Se connecter

Publier un nouveau commentaire

**Loan: "Attijari Finances Corp." and "CDG Capital" advise the "OCP" (Office Cherifien des Phosphates)**

**By l'Economiste, 04/25/2018 – 3:16PM – Share**

Attijari Finances Corp. and CDG Capital are the two consultants and global coordinators of the OCP group's bond loan. As a reminder, the world leader of phosphate production is planning on raising 5 billion DH on the market. The operation was approved by the Moroccan Capital Market Authority (MCMA). The subscription is limited to qualified investors under Moroccan law and will run from May 2nd to 4th, 2018 inclusive, with a settlement date scheduled for May 14, 2018.

Attijariwafa bank (AWB) and CDG Capital act as co-lead managers of the underwriting syndicate. The registration of the transaction at the Casablanca Stock Exchange has been entrusted to the brokerage firm "Attijari Intermédiation", while the domiciliation and financial service of the securities are carried out by AWB.

# Exhibit II-54



EN ⌄



Attijari Finances Corp. is the subsidiary bank of Attijariwafa bank group.

Providing recognised expertise in M&A advisory services (buying and selling consultancy, strategic financial advisory, privatisation consultancy, etc.) and in primary equity market activities (IPO, capital increase, takeover bids, public exchange offers, etc.) and bonds (issue of bonds, quasi-equity, commercial paper, etc.), the merchant bank positions itself as the national and regional leader in Corporate Finance.

**Attijari Finances Corp.** advises and assists large businesses and corporations, whether national or international, in the context of their strategic and/or market operations.



Become a customer

With multi-sector expertise for over 20 years, the consulting bank provides big businesses and corporations with all advisory activities related to high-profile transactions.

**Attijari Finances Corp.** is active across all sectors of Corporate Finance, including:

Mergers and Acquisitions (M&A): preparation and implementation of transfer or merging transactions, whether through acquisitions, mergers, partnership or asset exchange.
Equity Capital Market (ECM): setting up capital issues for companies, notably through a stock market launch (IPO), capital increase, etc.
Debt Capital Market (DCM): structuring and issuing of negotiable debt securities for companies (commercial paper, financing company bonds, conventional bonds, subordinated bonds, etc.).
Financial structuring.
Privatisations.

Whether in the context of mergers and acquisitions, financial structuring and privatisation, or the activities of Equity and Debt Capital Markets, the consulting bank teams will be able to assist you in the realisation of your transactions as well as in structuring appropriate financing solutions.

In each of the countries in which it is present, the investment bank's expertise in advisory activities also demonstrates proven expertise.

In this context, and fully in keeping with Attijariwafa bank's international strategic vision, Attijari Finances Corp. has established itself in a regional dynamic ensured by its presence in:

The Middle East via Attijari Middle East (AME) based in Dubai.

Tunisia through its subsidiary Attijari Finances Tunisie (AFT) based in Tunis.
West Africa via the SGI African stock exchange based in Abidjan.
Central Africa via SGI ASCA based in Douala.
The Middle East via Attijari Middle East (AME) based in Dubai.

**Head office**

APPX0001997

# Exhibit II-55



# State-Owned Enterprises in the Middle East and North Africa

## ENGINES OF DEVELOPMENT AND COMPETITIVENESS?





State-Owned Enterprises in the Middle East and North Africa
Engines of Development and Competitiveness?
© OECD 2013

# ANNEX A

## *Strategic state-owned enterprises in the MENA region*

APPX0002000

|  | Telecom | Finance | Electricity | Oil and gas | Transport | Consumer goods | Construction Real Estate | Infrastructure | Other |
|---|---|---|---|---|---|---|---|---|---|
| Morocco | Maroc Telecom Meditelecom Société nationale de radiodiffusion et de télévision Wana | Société Nationale des Investissements Attijariwafa Baque Crédit Immobilier et Hôtelier Crédit Agricole du Maroc | Office National d'Électricité | Office National des Hydrocarbures et des mines | Royal Air Maroc Office National des Chemins de Fer Autoroutes du Maroc |  | Compagnie Générale Immobilière | Poste Maroc Office National d'Eau Potable | Office Chérifien des Phosphates ONA Holding |
| Oman | Oman Telecommunication Company | Bank Dhofar National Bank of Oman Bank Sohar | Electricity Holding Company | Oman Petroleum Development Oman Oil Company Oman Gas Company Oman LNG | Oman Air |  |  | Oman Post | Raysut Cement Company Oman Cement Company ORPIC |
| Saudi Arabia | Saudi Telecom | Samba Financial Group Riyadh Bank Al Rajhi Bank Alinma Bank Al Khalij Commercial Bank Saudi Investment Bank Banque Saudi Francis SABB The Company for Cooperative Insurance | Saudi Electricity Company | Yanbu National Petrochemical Company Saudi Kayan Petrochemical Company National Gas and Industrialisation Company Saudi International Petrochemical Company National Petrochemical Company Rabigh Refining and Petrochemical Company | Saudi Public Transport Company The National Shipping Company of Saudi Arabia Saudi Railways Organization |  | Saudi Real Estate Company | Saudi Post | Saudi Arabian Mining Company Southern Province Cement Company SABIC Saudi Arabian Fertilizer Company National Industrialisation Company Saudi Industrial Investment Group |

# Exhibit II-56

Case 1:21-cv-02069-MMB Document 108-7 Filed 03/17/22 Page 46 of 163

MEDIA PARTNERS: The Guardian | The New York Times | La Tercera | DIE WELT | The Daily Telegraph

# The Report Company.

| REPORTS | ARTICLES | ABOUT US | SERVICES | CONTACT | SEARCH 🔍 |
|---|---|---|---|---|---|

**Morocco**

DEVELOPMENT | ARTICLE

## Morocco's new African ambition

SHARE:



The main square of Marrakesh in old Medina, Morocco. Photo: Shutterstock.com

**W**ith stable growth, a growing middle class and a policy of national and continental economic expansion focused on expanding sectors such as renewable energy, Morocco is emerging as North Africa's economic leader

🕐 28 JANUARY 2016

**Fifteen years which changed Morocco**

Fifteen years ago, King Mohammed VI faced a sizeable challenge: successfully juggling the need for change with the apparent political and economic inertia in his deeply traditional kingdom.

APPX0002003

Today, although there is still much to be done, the country has nevertheless achieved the privileged status of a stable, peaceful Arab nation, governed smoothly by a democratically elected Islamist party. The successful transition from traditional kingdom to a modern global player, envied throughout the Arab and Muslim world, means that today more than ever Morocco is a key force in the region.

Numerous institutional and societal advances have laid the foundation for this stability, while economic reforms have succeeded in improving the day-to-day life of the Moroccan people and positioned the country comfortably and sustainably in the global arena.



> ## "Morocco has successfully made the transition from traditional kingdom
> ## to modern global player"


Tweet This

**The emergence of national champions**

In order to foster the emergence of its long-overlooked middle class, Morocco has refocused its economy through a policy of promoting "national champions" – those large enterprises which are capable of supporting the country's economic development.

In 2004, the Emergence plan came into being, led by Mounir El Majidi, with the aim of implementing a new model of economic governance alongside Mohammed VI.

Emergence was built around several long-term sectoral plans in the fields of textiles, aeronautics, agriculture and infrastructure. These included the construction of a vast highway network that has grown from 43 miles (70 kilometers) in 1999 to 1,240 miles today; the Tangier-Med Port, which was inaugurated in 2007 and has since created over 30,000 jobs; the high-speed Casablanca-Rabat-Tangiers train link, the first on the African continent, which will open in 2018; as well as the development of one of the world's biggest solar plants in Ouarzazate, which will be completed in 2020 and will provide almost half of the country's electricity.

The National Investment Company (SNI), whose major shareholder is the royal holding company, is the catalyst for all of these future investments. It was completely overhauled at the same time as the Moroccan economy, going from a conglomerate with historical holdings in all the companies producing

APPX0002004

THE VIEW FROM ABROAD  A new African ambition  Morocco  The new Morocco report  The Report Company

staples such as milk, water, sugar and oil – which it sold between 2012 to 2014 – into a real investment fund, focused on the more capital-intensive sectors of the future: banking, telecommunications, energy, transport and real estate. SNI's bias today is toward non-majority shareholding, in order to create linkages with and among other talented companies in the same sectors. Its mission has been accomplished, and national brands such as Inwi, Nareva, Marjane and Attijariwafa Bank have now been established as symbols of the Moroccan economy.

Another Moroccan economic priority is renewable energy. The kingdom imports almost all of its fossil fuels. Because of this unsustainable situation, Mohammed VI has emphasized the need for the country to switch to new sources of clean energy. As announced by the king at the COP 21 meetings in Paris in December 2015, by the end of the decade, renewables should represent 42 percent of the energy mix (compared with the current 19 percent). Symbolic of this new green path are the Tarfaya wind park, Africa's biggest, and the solar park, among the world's largest, that is currently under construction at Ouarzazate. The COP 22 will be held this year in Marrakech.

**Mounir El Majidi, a key figure**



Mounir El Majidi, who was named by King Mohammed VI upon his accession to the throne as head of the royal holding company.

Behind this radical change at the SNI is one man, the unassuming Mounir El Majidi, an entrepreneur whom Mohammed VI, upon his accession to the throne, decided to place in charge of his private secretariat, the royal holding company, the music festival Mawazine and the Royal Football Academy.

APPX0002005

Case 1:21-cv-00206-MMB Document 108-7 Filed 03/17/22 Page 49 of 163

This is not an easy mission. Political, financial and economic issues were a key theme during the Arab Spring, and Mounir El Majidi's reputation suffered when a group of his detractors condemned this supposed mix of interests. Despite the difficulties faced by its leader in maintaining a positive public image, the royal holding company is clearly recognized throughout Morocco as an engine of national and pan-African growth.

### Morocco's African strategy



Today, 55 percent of Royal Air Maroc's traffic goes to African countries, making Casablanca a regional hub. Photo: Morocco Airports

The transformation of the Moroccan economy is ongoing. Today, the strategy laid out for the country at the highest state level is about to set off on a new phase of development which will see Morocco embark upon a pan-African economic expansion. This strategy is supported by the chamber of commerce and major economic players such as SNI and its shareholdings, which are gradually establishing themselves on the continent. Attijariwafa Bank is now the top banking group in the CFA franc zone by number of branches, and the cumulative economic weight of the five Moroccan banks makes them the major banking force in Africa. Today, 55 percent of Royal Air Maroc's traffic goes to African countries, making Casablanca a regional hub. Morocco is also now the best-connected African country by sea routes, according to a United Nations Conference on Trade and Development (UNCTAD) report, and has seen a 20 percent increase in 2015 in the number of containers going through its ports.

The most recent visits by King Mohammed VI with more than 70 entrepreneurs to sub-Saharan Africa bear witness to the strategy's achievements on the diplomatic and economic levels, and demonstrate the growing Moroccan influence in Africa. More than ever, the development of this South-South cooperation reinforces the role of the Kingdom of Morocco as a major geopolitical player within the continent and on the global economic stage.

APPX0002006

# Exhibit II-57

# THE NORTH AFRICA POST

## Morocco's SNI Changes Name into Al Mada, Gears Activity to Africa

🌍 Africa, Business, Headlines, International, Morocco   🕐 March 28, 2018



SNI, the largest stakeholder in the Moroccan economy, announced that it has changed its name into Al Mada in tandem with gearing its activity towards becoming a pan-African investment fund.

This change was approved at a meeting of SNI's board of directors on March 28 in Casablanca, said the company in a statement noting that expanding in Africa was a decision taken in 2014.

Some 6.5 billion dirhams have been invested by former SNI, now Al Mada, in Africa, the company said, adding that now the bulk of the company's activities are focused on Africa.

Al Mada currently operates in 24 African countries including Benin, Burkina Faso, Cameroun, Côte d'Ivoire, Egypt, Ethiopia, Gabon, Guinea Conakry, Equatorial Guinea, Mali, Mauritius, Mauritania, Niger, CAR, DRC, Congo Brazzaville, Rwanda, Senegal, Sudan, Chad, Togo and Tunisia. It also operates in Belgium, France and the United Arab Emirates.

In 2013, SNI started withdrawing its activities from the food industry. It sold its stakes in dairy firm Centrale Laitière to French partner Danone, and the remaining 50 percent holding in biscuit maker Bimo to Kraft Heinz Company. It also sold the sole operator in Morocco's sugar industry, Cosumar, in 2015.

Al Mada now plans to focus its growth strategy on sectors such as tourism, telecoms and renewable energy and to expand in Africa.

Rabat has recently launched a major renewable energy development plan, designed to turn the North African country into a main supplier of clean electricity to Europe. SNI's subsidiary Nareva has been a major player in the plan with heavy investment.

SNI is the main shareholder in some of the country's biggest firms, including AttijariWafa Bank, miner Managem, energy firm Nareva, cement company Lafarge Maroc and Marjane, Morocco's main supermarket chain.

---



POSTED BY **NORTH AFRICA POST**

North Africa Post's news desk is composed of journalists and editors, who are constantly working to provide new and accurate stories to NAP readers.

🌐

---

TAGGED WITH   Al Mada   Morocco   pan-African investment fund   SNI

WP2Social Auto Publish Powered By : XYZScripts.com

APPX0002008

# Exhibit II-58





**Annual report**
and corporate
social responsibility
report 2017

APPX0002010

### Supporting government-sponsored corporate programs

Attijariwafa bank has supported various government-sponsored programs in Morocco for many years. In 2017, Attijariwafa bank lent its support to 33% of the companies accredited under Morocco's SME programs such as « Istitmar Croissance », which subsidises small businesses up to a maximum of 30% of their investment or up to MAD 2 million and 'Imtiaz Croissance', which helps small businesses access funding by providing a subsidy of up to MAD 10 million.

### Shoulder to shoulder with Moroccan farmers

This year, once again, Attijariwafa played an active role in the International Agriculture Show in Morocco (SIAM). Its participation is part-and-parcel of the Group's proactive policy of supporting every segment of the agricultural sector and agribusiness. The El Kheir Plan, which is a tailor-made offer aimed exclusively at the agricultural sector, illustrates the Group's commitment. The Plan consists of solutions which have been specifically adapted for funding agricultural investment, co-financing schemes to help farmers invest and develop their export business, pre-financing state subsidies and a finance package to help with agricultural harvests and operational needs. The Plan is primarily focused on eight sub-sectors with strong growth potential: vegetable production, citrus production, arboriculture, olive production, wine growing, date palm cultivation, dairy, red meat production and industrial crop production.



### Contributing to developing Morocco's foreign trade

As part of the national E-GOV program, Attijariwafa bank Group signed an agreement with the Directorate-General of Customs and Indirect Taxes (ADII) to provide import-export customers with a solution enabling them to securely dematerialise customs guarantees in relation to accounts subscribed under customs control arrangements via its online automated customs clearance system for merchandise (BADR). This national digitisation



project, entirely consistent with Attijariwafa bank's « Energies 2020 » strategic plan, has incited the Group to expand its range of secure remote banking solutions for corporate customers to enable them to dematerialise payments, meet administrative requirements and carry out international transactions via Online Trade and Attijarinet Entreprise.

### Financing cornerstone projects

Attijariwafa bank Group's commitment to the real economy is also reflected in the way in which it actively contributes to the success of sector-specific programs in those countries in which it has operations. In 2017, the Group signed a number of financing agreements totalling more than MAD 3.5 billion in some of the economy's strategically-important sectors. These include the energy, transport, education, hospitality, property and automotive industries.

MAD **3.5** billion
of fresh funding for
major projects

# Exhibit II-59



ANNUAL REPORT AND
CORPORATE SOCIAL
RESPONSIBILITY REPORT
2   0   1   6

ENERGIES 20/20

APPX0002013

# Agreements and partnerships

Attijariwafa bank has established an assertive and proactive policy of building strategic partnerships. The Bank is constantly striving to forge strong ties with public and private entities. Based on knowledge transfer, sharing resources and expertise and joint development, these partnerships enable the Bank to generate synergies with its partners so as to realise its strategic goals, achieved by promoting banking inclusion, encouraging entrepreneurship and funding major infrastructure projects in Morocco and in Africa.

## Attijariwafa bank, a trusted partner in developing the domestic economy

Attijariwafa bank's commitment to developing the domestic economy is unfailing. The Bank wholeheartedly supports the major government-backed programmes. In 2016, the Bank was chosen as a trusted partner to support 'Auto Emploi', a recently initiated programme by the Ministry of Industry, Trade, Investment and the Digital Economy to support auto-entrepreneurship.

## Attijariwafa bank and Barid Al Maghrib, a longstanding agreement in support of auto-entrepreneurship

In January 2016, Attijariwafa bank and Barid Al Maghrib signed a partnership agreement which authorises the Bank to register auto-entrepreneurs on the national register. Barid Al Maghrib, which is responsible for managing the national register of auto-entrepreneurs, has given Attijariwafa bank access to its systems, so that the latter may register auto-entrepreneurs from any of its bank branches or from a Wafacash branch.



# Exhibit II-60

ANNUAL REPORT 2015

Believe in you



ANNUAL REPORT | ATTIJARIWAFA BANK | 2015



**By supporting cornerstone public and private sector projects, Attijariwafa bank group makes a significant contribution to the economic development of Morocco and the African continent.**

Its policy is consistent with that of governments across the region. It is developing appropriate financing methods and vehicles by bringing together entities which have common interests, signing international partnerships and setting up specialised investment funds. By acting as a catalyst for economic growth, Attijariwafa bank group is playing a key role in the continent's development.

77

# Exhibit II-61



les

**AFIFA DASSOULI**

LPL, 3 MM
pour plusi

**FAHD YATA**

PRESSE É
bien les jo

**AFIFA DASSOULI**

COVID-19
Finances :
obsolète !

**FAHD YATA**

Covid-19,

**AFIFA DASSOULI**

Maroc, un
économiq

**ÉCONOMIE ET FINANCE**

# OCP's MAD 5 billion bond issue, 311% oversubscribed!

LE 31 MAI 2018

J'aime 0

Last week, OCP issued a MAD 5 billion perpetual subordinated bond. The subscription period ran from 2 May to 4 May 2018.

ADVERTISING



Promote health. Save lives. Serve the vulnerable. Visit who.int



J'ai

Soyez le premier d
aimer ça.

ABON

La Tribune

JE

APPX0002019

OCP's perpetual subordinated bond issue was 311% oversubscribed with applications received for as many as 155,480 securities versus the 50,000 on offer.

All subscriber categories were catered for with a higher pro-rata allocation granted to mutual funds. The latter, which had subscribed for 122,480 securities, were awarded 22,000 i.e. MAD 2.2 billion or 44% of the offering.

The other institutional investors accounted for the remaining 56% with the following breakdown: pension funds 22.6%, Caisse de Dépôt et de Gestion, which alone accounted for 20%, banks 9.4% and insurance companies 4% only.

The results of the offering also reveal that OCP's allocation by tranche was consistent with its interest rate risk calculations. Pride of place given to the longer-dated tranches as can be seen from the manner in which the MAD 5 billion worth of subscriptions was allocated.

Demand for Tranche C, which has an annually adjustable interest rate, exceeded MAD 10 billion but only MAD 109 million was allocated to it.

Demand for Tranche E, with a 20-year maturity, totalled MAD 1.125 billion and was fully met, followed by Tranche D, with a 15-year maturity, which was satisfied to the tune of 84.4%.

As far as unlisted Tranche A was concerned, with a 10-year maturity, just under 90% of subscriptions were met, totalling MAD 875 million dirhams. This was not the case for Tranche B, identical but listed, which garnered just MAD183 million.

This second perpetual subordinated bond issue, similar to the MAD 2 billion issue of 2016, has to be seen in the context of OCP Group's corporate strategy.

The offering was proposed by OCP's Board of Directors of 14 March 2017 and approved by the Ordinary General Meeting of 22 June 2017.

This domestic bond issue, comprising several tranches, with principal of up to 5 billion dirhams (MAD 5,000,000,000), took the form of perpetual subordinated notes, listed and unlisted, with the risk premium increased at each ratchet up date. The purpose of the 2018 perpetual bond issue was the same as that previously issued, which was to continue financing the Group's investment programme.

This is entirely in keeping with the Group's corporate growth strategy, adopted in 2008, which aims to position OCP as market leader in its industry.

Three fundamental pillars underpin OCP's strategy, which is designed to not only develop the business but to transform it, as follows:

To enhance its status as a globally competitive enterprise by asserting leadership on both the cost front and in terms of production capacity and, above all, by adopting a flexible and nimble approach to both manufacturing and sales.

5/7/2020     Case 1:21-cv-00219-MMS   OCP's MAD 5 billion bond issue, 311% oversubscribed La Nouvelle Tribune   Filed 03/17/22   Page 64 of 163

THE NEW TRIBUNE     OCP's MAD 5 billion bond issue, 311% oversubscribe...     ABONNEZ-V

along the entire value chain, and increase the Group's penetration of every importing region and the largest markets around the world.

The investment programme is designed to be modular and flexible and to be implemented in phases, the first of which was completed in early 2018.

This first phase, which was focused on the Khouribga-Jorf Lasfar northern axis, consisted of bolstering extraction, beneficiation and production capacity at the Khouribga mine, which now stands at 44 million tons.

Likewise, for the Jorf-Lasfar chemicals platform, which now has a production capacity of 12 million tons, after construction of 4 additional fertiliser production units, JFC1, JFC2, JFC3, JFC4 (JFC stands for Jorf Fertiliser Complex).

During this first phase of OCP's industrial plan, a supply pipeline linking the Khouribga mine to the Jorf Lasfar platform was built, to be able to transport the washed rock as pulp and to enable it to be transformed automatically in the different units.

This pipeline has generated savings in terms of transportation and energy costs, resulting in lower production costs.

The capacity at the Jorf Lasfar port was also expanded to allow for larger loads. A seawater desalination unit for industrial processes was built, thereby preserving the water table.

Such developments are designed to diversify OCP's product portfolio and satisfy the needs of an increasingly broad range of customers by offering specific products, which are available in more than 40 formulas that have been developed to date.

Over the past 10 years (2008-2018), OCP Group has spent nearly MAD 75 billion in implementing Phase 1. The majority of the investment has been made over the past 5 years.

The forthcoming second phase will focus on the central axis (Gantour-Safi) and the southern axis (Phosboucraa) and will also aim to optimise production in a similar way to that achieved along the northern axis.

OCP is financing this major investment programme by debt as well as equity financing.

The programme is being strictly monitored by two credit rating agencies, Fitch Ratings and Standard & Poor's, which are reviewing the financial strength of Morocco's largest industrial group very closely.

---

**POUR ALLER PLUS LOIN**

 Pourquoi le Maroc n'échappera pas à la spirale de l'endettement public

 Coronavirus, le temps des faux prophètes…

---

The main role of both agencies is to ascertain and gauge the Group's solvency as an issuer.

APPX0002021

In particular, this type of very long-term finance enables the issuer to bolster its capital structure and meet the capital requirements of its rating agencies.

So much so that, so as to maintain the same level of long-term finance as part of the company's capital structure, OCP intends to finance any eventual redemption of this bond, at the time of redemption, by issuing either equity securities or *pari passu*-ranked securities on terms that are at least equivalent to the redeemed securities' level of capital, as mentioned in the prospectus.

**The issue's features:**

OCP's perpetual subordinated bond offering comprises five tranches. Each tranche has a ceiling of MAD 5,000,000,000 (five billion dirhams) and a nominal value of MAD 100,000.

The unlisted Tranche A has an interest rate that is adjustable every 10 years and a first repayment option on its 10th anniversary.

Tranche B, which is listed on the Casablanca Stock Exchange, also has an interest rate that is adjustable every 10 years and a first repayment option on its 10th anniversary.

The unlisted Tranche C has an interest rate that is adjustable annually and also a first repayment option on its 10th anniversary.

The unlisted Tranche D has an interest rate that is adjustable after 15 years for the initial period preceding the first repayment option and every 10 years thereafter, with a first repayment option on its 15th anniversary.

Lastly, the final unlisted Tranche E has an interest rate that is adjustable every 20 years and a first repayment option on its 20th anniversary.

The total amount raised from the five tranches shall not under any circumstance exceed the sum of MAD 5,000,000,000 (five billion dirhams). For each tranche, the ceiling is MAD 5,000,000,000 with a maximum number of 50,000 perpetual subordinated bonds, each with a nominal value of MAD 100,000, being the maximum number of shares permitted.

Careful consideration has been given to the chosen rate of interest for each tranche to enable each investor category to make a choice on the basis of the terms of their liabilities.

As a result, for the unlisted A and listed B tranches, the interest rate is adjustable every 10 years, benchmarked against the 10-year rate, determined on the basis of primary market Treasury bond yields with the same maturity as of 27 March 2018 i.e. 3.23% for the initial 10 years, plus a risk premium of between 80 basis points and 100 basis points i.e. between 4.03% and 4.23%.

This rate is fixed for the first 10 years, in the knowledge that the first repayment option date is 14 May 2028. However, the perpetual bond's repayment option is hypothetical since the issuer may not in fact exercise it in exchange for offering a step-up, that is to say, an increase in the rate of interest rate which will be, as of 14 May 2028, +25 basis points for the unlisted tranches and, as of 14 May 2048, an additional step-up of +75 basis points

Case 1:21-cv-00219-MMB Document 108-7 Filed 03/17/22 Page 66 of 163

premium of between 70 basis points and 90 basis points i.e. between 3.0% and 3.2% for the first year. It is worth recalling that its first repayment option is 14 May 2018.

Tranche D, also unlisted, has an interest rate that is adjustable after 15 years until the first repayment date and adjustable every 10 years thereafter.

Its interest rate is adjustable, benchmarked against the 15-year rate, determined on the basis of primary market Treasury bond yields with the same 15-year maturity as of 13 March 2018 i.e. 3.67%, for the first 15 years, plus a risk premium of between 100 basis points and 125 basis points i.e. between 4.72% and 4.92% for the first 15 years. Its first repayment option will be 14 May 2033.

As of 14 May 2033, a first step-up (rate increase) of +25 basis points will be proposed by OCP, another of +25 basis points on 14 May 2038, and on 14 May 2053, an additional step-up of +75 basis points.

Lastly, Tranche E, also unlisted, has an interest rate that is adjustable every 20 years, benchmarked against the 20-year rate, determined on the basis of primary market Treasury bond yields with a 20-year maturity as of 27 March 2018 i.e. 3.98%, for the first 20 years, plus a risk premium of between 110 basis points and 130 basis points i.e. between 5.08% and 5.28% for the first 20 years with a first repayment date of 14 May 2038.

Of course, from 14 May 2038, a first step-up (rate increase) of +25 basis points will be introduced, a second from 14 May 2058, with an additional step-up of +75 basis points.

The perpetual subordinated notes are allocated by auction, which enables the issuer to select subscriptions that best match the rating agencies' requirements as well as complying with the same requirements as for OCP's international offerings, as a result of which the company has become a benchmark in terms of its risk profile.

Therefore, Tranche E's interest rate is adjustable every 20 years, Tranche D every 15 years, Tranches A and B every ten years. Only Tranche C has a rate that is adjustable annually.

As a result, OCP is able to minimise the interest rate risk arising at each revision date…

**Afifa Dassouli**

*Original article* : https://lnt.ma/lemission-obligataire-docp-de-5-mrdh-sursouscrite-a-311/



**WEB TV**      voir toutes les vidéos

APPX0002023

# Exhibit II-62



GLOBAL

Bond data API | Loans.Cbonds | Cbonds Congress

Log in    Forgot password?

Login/e-mail    Password

☑ Remember    Enter

Registration

Subscription/Trial access

BOND SEARCH

Issuer # RN ISIN CUSIP

NEWS AND RESEARCH

BONDS

PRICES

WATCHLIST

TOOLS

ISSUERS

INVESTMENT BANKS

INDICES AND STATISTICS

ABOUT US

HELP

FAQ    next

I can't log in. What should I do?

Follow Cbonds

App Store    Google Play

Questions? Ask us    Request online training    Contact us (+ 7 (921) 446-25-10)

## S&P Global Ratings revised outlook on OCP SA to negative and affirmed at "BBB-" (Local Currency LT) credit rating

October 17, 2018 | CBonds

S&P Global Ratings affirmed the "BBB-" Local Currency LT credit rating of OCP SA on October 16, 2018. At the same time the rating agency revised outlook to negative from stable.

**Company: OCP SA**

| | |
|---|---|
| Full company name | Office Cherifien des Phosphates SA |
| Country of risk | Morocco |
| Country of registration | France |
| Industry | Chemical and petrochemical industry |

Share:

**Similar news:**

> Fitch Ratings downgrades LT Int. Scale (foreign curr.) credit rating of OCP SA to "BB+"; outlook negative
> Fitch Ratings affirms OCP SA at "BBB-" (LT Int. Scale (foreign curr.) credit rating); outlook stable
> S&P Global Ratings revised outlook on OCP SA to stable and affirmed at "BBB-" (Local Currency LT) credit rating
> S&P Global Ratings revised outlook on OCP SA to stable and affirmed at "BBB-" (Foreign Currency LT) credit rating
> Fitch Ratings revised outlook on OCP SA to stable and affirmed at "BBB-" (LT Int. Scale (foreign curr.)) credit rating

CBONDS IS A GLOBAL FIXED INCOME DATA PLATFORM

This site uses cookies to make your browsing experience more convenient and personal. Cookies store useful information on your computer to help us improve the efficiency and relevance of our site for you. In some cases, they are essential to making the site work properly. By accessing this site, you consent to the use of cookies.

Ok

# Exhibit II-63

**OCP Group**

**Financial Ratios**

| Financial Ratios | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Current Ratio | 2.78 | 3.55 | 2.36 | 3.98 | 3.03 | 1.98 | 1.28 | 1.63 | 1.62 | 1.35 | 2.23 | 1.80 |
| Quick Ratio | 0.58 | 0.69 | 0.46 | 0.96 | 2.19 | 0.97 | 0.84 | 0.98 | 0.95 | 0.72 | 1.49 | 1.02 |
| Debt to Total Assets Ratio | 0.73 | 0.67 | 0.61 | 0.51 | 0.45 | 0.46 | 0.55 | 0.55 | 0.52 | 0.52 | 0.51 | 0.53 |
| Debt to Equity Ratio | 2.70 | 2.06 | 1.58 | 1.04 | 0.83 | 0.87 | 1.23 | 1.22 | 1.10 | 1.09 | 1.02 | 1.12 |
| Cash Flow Coverage Ratio | -0.11 | 0.00 | | 0.40 | 0.27 | 0.14 | 0.12 | 0.11 | 0.12 | 0.10 | 0.09 | 0.14 |
| Return on Equity | 1.73 | 0.08 | 0.36 | 0.44 | 0.26 | 0.13 | 0.09 | 0.13 | 0.05 | 0.06 | 0.07 | 0.04 |

**Descriptions of Ratios**

*Current Ratio:* Relative measure of short-term solvency.

*Quick Ratio:* Measure of the company's ability to cover its current liabilities with cash and highly-liquid assets (excludes at least inventory and prepaid expenses).

*Debt to Total Assets Ratio:* Measure used to assess the risk that the company will become insolvent in the long-run.

*Debt to Equity Ratio:* Liquidity ratio that compares a company's total debt to total equity. A higher debt to equity ratio indicates that more creditor financing is used than investor financing.

*Cash Flow Coverage Ratio:* Shows ability of company to pay its debt from the cash it generates from its operations. A low ratio can indicate too much debt and/or poor cash generation.

*Return on Equity:* ROE is the amount of net income returned as a percentage of shareholder's equity. Return on equity measures a firm's profitability by revealing how much profit a company generates with the money shareholders have invested.

**OCP Group**

**Financial Data**
*(in millions of MAD)*

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Statement of Profit and Loss** | | | | | | | | | | | | |
| Net profit for the period | 23,414 | 1,283 | 8,850 | 16,332 | 13,641 | 7,087 | 5,073 | 8,010 | 3,780 | 4,689 | 5,602 | 3,016 |
| Net profit for the Group | 23,414 | 1,283 | 8,850 | 16,332 | 13,641 | 7,087 | 5,077 | 8,011 | 3,779 | 4,567 | 5,425 | 2,843 |
| **Statement of Cash Flow** | | | | | | | | | | | | |
| Net Cash Flow from Operating Activities | -3,968 | -6 | unknown | 15,567 | 11,427 | 6,440 | 8,635 | 8,372 | 9,463 | 8,345 | 7,700 | 11,996 |
| **Balance sheet** | | | | | | | | | | | | |
| Total Current Assets | 37,257 | 35,465 | 45,163 | 53,727 | 53,443 | 41,277 | 38,928 | 42,812 | 41,629 | 37,711 | 55,669 | 52,323 |
| Cash and cash equivalents | 1,372 | 1,476 | 2,085 | 2,823 | 9,390 | 5,440 | 8,996 | 9,246 | 11,017 | 8,419 | 17,141 | 13,487 |
| Cash financial assets | | | | | 18,142 | 4,627 | 4,767 | 7,097 | 4,885 | 2,709 | 5,654 | 573 |
| Inventories | 6,775 | 6,236 | 5,671 | 8,970 | 6,990 | 7,832 | 9,039 | 10,224 | 9,956 | 10,343 | 13,213 | 14,996 |
| Trade receivables (customer account | 5,243 | 4,352 | 5,696 | 7,682 | 6,644 | 3,946 | 6,564 | 5,569 | 5,269 | 6,276 | 10,659 | 9,133 |
| Provisions trade receivables | | | | | -74 | -104 | -152 | -160 | -222 | -240 | -380 | -991 |
| Receivables from suppliers, advances and payments on accounts | 1,114 | 1,085 | 1,037 | 2,463 | 4,519 | 6,252 | 5,488 | 4,016 | 3,414 | 3,047 | 4,107 | 7,472 |
| Personnel and payroll | 7 | 50 | 58 | 75 | 41 | 35 | 49 | 47 | 44 | 58 | 75 | 67 |
| Social agencies and organizations | 70 | 154 | 644 | 232 | 178 | 189 | 145 | 145 | 213 | 268 | 277 | 284 |
| Government/State (excluding corpor. | 3,263 | 3,657 | 3,287 | 4,381 | 6,234 | 10,980 | 3,069 | 5,802 | 5,200 | 5,703 | 4,610 | 6,945 |
| Tax receivables and defered taxes | 608 | 501 | 928 | 2,152 | | | | 46 | 896 | 106 | 34 | 39 |
| Other (incl. debtors, accruals, shareholder's accounts) | 487 | 842 | 711 | 841 | 307 | 928 | 741 | 779 | 957 | 1,021 | 280 | 317 |
| Current tax receivables | | | | | 1,053 | 1,152 | 222 | | | | | |
| Investments | 18,260 | 17,087 | 24,997 | 24,094 | | | | | | | | |
| Currency adjustments | 58 | 25 | 49 | 14 | | | | | | | | |
| Total Non-Current Assets | 12,969 | 15,736 | 18,072 | 22,078 | 41,185 | 61,079 | 89,319 | 99,027 | 109,283 | 116,293 | 106,788 | 114,540 |
| Total Assets | 50,226 | 51,201 | 63,235 | 75,805 | 94,628 | 102,356 | 128,247 | 141,839 | 150,912 | 154,004 | 162,457 | 166,863 |
| Total Current Liabilites | 13,413 | 9,985 | 19,098 | 13,504 | 17,620 | 20,830 | 30,461 | 26,298 | 25,670 | 27,991 | 24,939 | 29,014 |
| Total Non-Current Liabilities | 23,251 | 24,449 | 19,628 | 25,068 | 25,199 | 26,658 | 40,196 | 51,763 | 53,436 | 52,184 | 57,230 | 59,223 |
| Total Liabilities | 36,664 | 34,434 | 38,726 | 38,572 | 42,819 | 47,488 | 70,657 | 78,061 | 79,106 | 80,175 | 82,169 | 88,237 |
| Total Shareholders Equity | 13,562 | 16,741 | 24,486 | 37,212 | 51,808 | 54,867 | 57,590 | 63,778 | 71,805 | 73,830 | 80,290 | 78,627 |

Notes:

| | | | | |
|---|---|---|---|---|
| | Total Current Liabilities is the TOTAL II (G+H+I) and Bank creditor balance of Liabilities, p 16. Non-current liabilities is financing debts, sustainable provision for liabilities and charges, and currency translation. Shareholder's Equity is "total equity capital" at p. 16 .Total liabilities = Total Assets – Shareholder's Equity. Non-current liabilities = Total liabilities - Current Liabilities. | Total Current Liabilities is the TOTAL II (G+H+I) and Bank creditor balance of Liabilities, p 16. Non-current liabilities is financing debts, sustainable provision for liabilities and charges, and currency translation. Shareholder's Equity is "total equity capital" minus assimilated shareholder's equity at p.16 .Total liabilities = Total Assets – Shareholder's Equity. Non-current liabilities = Total liabilities - Current Liabilities. | Total Current Liabilities is the TOTAL II (G+H+I) and Bank creditor balance of Liabilities, p 16. Non-current liabilities is financing debts, sustainable provision for liabilities and charges, and currency translation. Shareholder's Equity is "total equity capital" minus assimilated shareholder's equity at p.16 .Total liabilities = Total Assets – Shareholder's Equity. Non-current liabilities = Total liabilities - Current Liabilities. | Total Current Liabilities is the TOTAL II (G+H+I) and Bank creditor balance of Liabilities, p 16. Non-current liabilities is financing debts, sustainable provision for liabilities and charges, and currency translation. Shareholder's Equity is "total equity capital" minus assimilated shareholder's equity at p.16 .Total liabilities = Total Assets – Shareholder's Equity. Non-current liabilities = Total liabilities - Current Liabilities. |

Sources:

OCP 2009 Annual Repo; OCP 2009 Annual Repo; OCP 2011 Annual Report. | OCP 2011 Annual Report. Net cash flow from operating activities retrieved from an OCP 2014 | OCP Consolidated Financial Statements at December 31, 2014. | OCP Consolidated Financial Statements at December 31, 2014. | OCP Consolidated Financial Statements at December 31, 2014. | OCP Group Consolidated Financial Statements Q4 2016. December 31, 2016 | OCP Group Consolidated Financial Statements Q4 2016. December 31, 2016 | OCP Group Consolidated Financial Statements Q4 2017. December 31, 2017 | OCP Group Consolidated Financial Statements Q4 2018 December 31, 2018, and Q4 2019 | OCP Group Consolidated Financial Statements at 4 2019., for the year ended

# Exhibit II-64

APPX0002029



RATING ACTION COMMENTARY

# Fitch Affirms OCP at 'BBB-'; Outlook Stable

Fri 01 Nov, 2019 - 3:39 PM ET

Fitch Ratings - London - 01 Nov 2019: Fitch Ratings has affirmed Morocco-based phosphate producer OCP S.A.'s (OCP) Long-Term Issuer Default Rating (IDR) at 'BBB-'. The Outlook on the IDR is Stable. The agency has simultaneously affirmed the group's senior unsecured rating at 'BBB-'.

The 'BBB-' IDR of OCP incorporates a one-notch uplift for state support (Morocco, BBB-/Stable) from its 'bb+' standalone credit profile (SCP), in line with Fitch's Government Rated Entities (GRE) rating methodology. The 'bb+' SCP reflects a strong business profile underpinned by OCP's vertical integration, competitive cost position, exceptionally large ore reserves and leading market positions. It also factors in a weak, albeit improving, financial profile, primarily due to sizeable debt-funded expansionary investments.

OCP's credit metrics offer limited headroom for unforeseen cash outflows in 2019-2020 under our base case with funds from operations (FFO)-adjusted net leverage forecast at 2.8x vs. our 3.0x negative sensitivity. The Stable Outlook captures our opinion that the group would have the flexibility and willingness to scale back investments should cash flows come under pressure. We forecast a gradual improvement in financial headroom from 2021 onwards on the back of lower expansionary capex, higher volumes and moderate pricing improvements.

## KEY RATING DRIVERS

Deleveraging with Limited Headroom: FFO-adjusted net leverage was 2.7x at end-2018 vs. 2.2x forecast in our previous base case, reflecting a solid but weaker-than-expected operational performance in 2018. We forecast the ratio at 2.8x at end-2019 and at end-2020 before deleveraging to 2.4x and below from 2021 onwards. While these credit metrics remain within our 3.0x negative sensitivity for the rating, they offer limited headroom for unforeseen cash outflows in the next two years and we assume that any material pressure on cash flows would be met with cutbacks in expansionary capex. Our base case projects capex peaking at MAD15 billion in 2020 compared with an average MAD11 billion over 2015-2019.

Operational Flexibility Supports Resilience: The completion of the first phase of OCP's expansion programme resulted in enhanced production flexibility, allowing the group to adjust its output and sales strategy to take advantage of shifts in market dynamics for its key products, phosphate rock, phosphoric acid and phosphate derivatives. This supported a 15% increase in revenues in 2018 as the group captured strong pricing conditions for phosphoric acid, along with the benefit of additional fertiliser volumes at the Jorf Lasfar units. Fitch-adjusted EBITDA margin was 29.8%, up from 25.5% in 2017 but lower than our 32% forecast due to higher-than-expected costs.

Growth to Resume in 2020: For 2019, we assume no revenue growth, reflecting weaker market conditions with pricing pressure offset by higher volumes in phosphoric acid and fertilisers. EBITDA margin is forecast to remain flat yoy. Our base case continues to assume that growth beyond 2019 will be driven by a moderate improvement in prices and a gradual increase in fertiliser and phosphate rock volumes, with supply of merchant rock adjusted to market conditions. This should translate into high single-digit growth in revenues and EBITDA margins in the 30%-33% range.

Rating Linkage with Morocco: Under our GRE methodology, OCP scores 22.5 for overall support, which maps to a one-notch uplift. This reflects Fitch's view that the group would likely receive exceptional support from the state if its financial profile weakens to the extent where its ability to maintain its expansionary efforts or refinance its debt is threatened. In our opinion, this assessment is supported by OCP's completion of the first phase of its strategic investment programme as well as its status as Morocco's largest non-financial corporate issuer of international bonds. This also reflects that despite its 94% state ownership, OCP is run as an independent profit-oriented entity with no legal ties to the state.

Phosphate Prices to Bottom Out: Diammonium Phosphate (DAP) prices fell below our previous 2019 assumptions as poor weather conditions in the US, weaker application rates in China and lower ammonia prices exacerbated the effect of the Ma'aden capacity ramp-up. We expect prices to bottom out in 2020 as oversupply starts to ease and high inventories in import markets are liquidated. From 2020, higher ammonia input prices should push non-integrated producers' costs up and support higher DAP prices.

VAT Credit Build-up Unlikely to Recur: Our base case assumes that the buildup of sizeable VAT claims against the state, which exacerbated the deterioration in OCP's credit metrics in 2016-2017, will not be repeated. The group accounted for roughly half of the state's total overdue VAT credit liabilities in 2018 (1.8% of GDP), due in large part to its investment programme. In May 2017, the tax regime for capital investments was amended to exempt existing companies for sums of MAD100 million and above. As a result, OCP's VAT credit claims should be materially lower in the new wave of capex. The government is also implementing a series of measures to digitalise and simplify the reimbursement procedures and reduce delays.

VAT Credit Factoring Scheme: The build-up of large VAT credit arrears by the Moroccan state exacerbated the impact of weak market conditions and large debt-funded expansionary investments on OCP's leverage. In 2018, the government secured long-term factoring facilities from banks to settle the VAT credit claims of state-owned entities, including OCP. In return, OCP will be responsible for servicing interest payments on the factoring facilities used to refund the group's VAT claims. The interest payments, which are due over nine years, amount to MAD4.2 billion and were pre-funded in the MAD20.5 billion cash OCP received in October 2018 to settle the VAT arrears. Fitch treats the MAD4.2 billion of capitalised interest as debt, in line with OCP's reporting. Leverage was restored to 2.7x at end-2018, down from 5.5x and 4.7x at end-2016 and end-2017 respectively as a result of the transaction.

Capex Offers Flexibility: Our base case assumes that capex peaks at MAD15 billion in 2020. The second phase of the programme is no longer expected in the form and timing envisaged 10 years ago. We assume capex at around MAD11 billion beyond 2020, i.e. well above maintenance levels, to support granulation and phosphoric acid capacity increases, logistics and debottlenecking exercises. Along with dividend distributions, this translates into negative FCF until 2021, but OCP has demonstrated its ability to scale back investments should operating cash flows come under pressure.

Cadmium Restrictions: In June 2019, the European Parliament and the European Council brought in a new regulation on fertilisers sold in the EU, including a limit of 60mg cadmium per kg of phosphorus pentoxide (cd/kg P2O5) from 2022, and voluntary green labelling for fertilisers with less than 20 mg cd/kg P2O5 starting this year. The 60 mg Cd/kg P2O5 limit will be reviewed in 2026 by the European Commission. Sedimentary phosphate rock deposits such as OCP's have high cadmium content and previous iterations of the proposed restrictions had considered gradually reducing the limits to below 40mg, which could have affected OCP's capacity to export to the EU, its third-largest market at 20% of sales in 2018.

We understand from the group that its products are currently fully compliant with all aspects of the new regulation and that it has been actively working on cost-effective ways to address these changes including two pilots for de-cadmiation technology and selective mining of layers with lower cadmium content.

## DERIVATION SUMMARY

OCP's 'BBB-' rating incorporates a one-notch uplift for state support in line with Fitch's GRE methodology. Its SCP is constrained by high leverage but its business profile is strong and commensurate with peers in the 'BBB' category, given its vertical integration, competitive cost position, exceptionally large ore reserves, and leading market positions. Following the reimbursement of MAD20.5 billion of VAT credit arrears, the group's FFO adjusted net leverage is expected to gradually decline to around 2.4x by 2021.

Peers include Russia-based PJSC PhosAgro (BBB-/Stable), and EuroChem AG (BB/Stable), Israel-based Israel Chemicals Limited (ICL, BBB-/Positive) and US-based The Mosaic Company.

Phosagro's rating reflects a leading position as Russia's largest phosphate fertiliser producer, low-cost mining operations, ability to switch between DAP/MAP and complex fertilisers, efficient capex and a conservative financial profile with net leverage sustained below 2.0x through the cycle.

EuroChem benefits from a competitive cost position and, similarly to OCP, is coming out of a phase of expansionary investments which, against the backdrop weak market conditions, has put some pressure on its financial profile. FFO-adjusted net leverage is expected to trend down from an estimated 3.3x at end-2019 as capex levels normalise and FCF turns positive. The ratings of OCP's Russian peers also capture the risks associated with their jurisdictional and business environment.

Israel Chemicals Limited has higher-cost phosphate and potash operations but resilient specialty chemicals underpinning stable margins through the cycle. The group has focused on debt reduction and net leverage is expected to drop below 2.5x.

US peer The Mosaic Company benefits from its market position as the largest integrated fertiliser producer with a presence across potash and phosphate, good cost control and long mines lives. Net leverage peaked as a result of the acquisition of Vale Fertilizantes and is expected to decline on the back of positive FCF generation.


**KEY ASSUMPTIONS**

- Volumes for 2019 in line with 2018, then growing 8%-9% per annum over 2020-2022;

- Phosphate rock price stable at USD95U/t (Fitch's deck); Average fertilisers price at USD350/t in 2019, USD360/t in 2020, USD380/t in 2021 and USD390/t in 2022 (Fitch's deck); Phosphoric acid price to increase by USD100/t by 2022;

- EBITDA margins at 30% for 2019, gradually increasing to 32.5% in 2022;

- Capex at MAD12 billion in 2019, MAD15 billion in 2020 and MAD11 billion in 2021 and 2022; and

- Annual dividends ranging between MAD2.7 billion and MAD4.7 billion up to 2022.


**RATING SENSITIVITIES**

OCP

Developments That May, Individually or Collectively, Lead to Positive Rating Action

- FFO adjusted net leverage sustainably below 2.5x

Developments That May, Individually or Collectively, Lead to Negative Rating Action

- FFO adjusted net leverage sustainably above 3.0x

- Negative rating action on Morocco

- A weakening in the linkage between OCP and the sovereign, as evidenced by strategic changes or upstreaming of cash (dividend or tax) adverse to the credit standing of the group.

Morocco (see latest rating action commentary dated 11 April 2019)

The main factors that may, individually or collectively, lead to negative rating action are as follows:

- An increase in government debt/GDP, driven by the fiscal stance or a materialisation of contingent liabilities;

- Security developments or social instability affecting macroeconomic performance or external balances or leading to significant fiscal slippages;

- Weakening of medium-term growth prospects leading to a widening of the gap between Morocco's development indicators and the 'BBB' category medians.

## LIQUIDITY AND DEBT STRUCTURE

Adequate Liquidity: As of June 2019, OCP held cash and cash equivalent reserves of MAD13.7 billion against short-term debt of MAD7.3 billion. Liquidity was also supported by term deposits of MAD3 billion with maturities of three to six months. Under our base case, FCF is expected to remain negative until 2021 due to high expansionary capex and increasing dividend outflow. We assume that OCP will continue to access domestic and international banks and debt capital markets for its investment and refinancing needs. Furthermore, we believe OCP will be willing and able to tailor capex to match fluctuations in cash flow generation.

## PUBLIC RATINGS WITH CREDIT LINKAGE TO OTHER RATINGS

OCP's rating benefits from one notch uplift for support from the sovereign (Morocco BBB-/Stable).

## ESG CONSIDERATIONS

Unless otherwise disclosed in this section, the highest level of ESG credit relevance is a score of 3. This means ESG issues are credit-neutral or have only a minimal credit impact on the entity, either due to their nature or to the way in which they are being managed by the entity.

For more information on our ESG Relevance Scores, visit www.fitchratings.com/esg.

## RATING ACTIONS

| ENTITY/DEBT | RATING | | | PRIOR |
|---|---|---|---|---|
| OCP S.A. | LT IDR | BBB- ◉ | Affirmed | BBB- ◉ |
| ● senior unsecured | LT | BBB- | Affirmed | BBB- |

VIEW ADDITIONAL RATING DETAILS

## FITCH RATINGS ANALYSTS

**Myriam Affri**
Senior Director
Primary Rating Analyst
+44 20 3530 1919
Fitch Ratings Ltd 30 North Colonnade, Canary Wharf London E14 5GN

**Roberta Mori**
Analyst
Secondary Rating Analyst
+44 20 3530 1139

# Exhibit II-65

☰    **ⓘ Investopedia**    🔍

CORPORATE FINANCE & ACCOUNTING › FINANCIAL RATIOS

# Return on Equity – ROE

By **MARSHALL HARGRAVE** | Reviewed By **JULIUS MANSA** ⓒ | Updated Apr 27, 2020

≡ TABLE OF CONTENTS

⌐ What Is Return on Equity (ROE)?    ⌐ Understanding Return on Equity (ROE)

⌐ Example of How to Use ROE

## What Is Return on Equity (ROE)?

Return on equity (ROE) is a measure of financial performance calculated by dividing net income by shareholders' equity. Because shareholders' equity is equal to a company's assets minus its debt, ROE is considered the return on net assets. ROE is considered a measure of how effectively management is using a company's assets to create profits.

> **KEY TAKEAWAYS**
>
> - Return on equity measures how effectively management is using a company's assets to create profits.
> - Whether an ROE is considered satisfactory will depend on what is normal for the industry or company peers.
> - As a shortcut, investors can consider an ROE near the long-term average of the S&P 500 (14%) as an acceptable ratio and anything less than 10% as poor.



Return On Equity (ROE)

## Understanding Return on Equity (ROE)



☰     **Investopedia**     🔍

common shareholders and after dividends to preferred shareholders and interest to lenders.

$$\text{Return on Equity} = \frac{\text{Net Income}}{\text{Average Shareholders' Equity}}$$

Net income is the amount of income, net of expense, and taxes that a company generates for a given period. Average shareholders' equity is calculated by adding equity at the beginning of the period. The beginning and end of the period should coincide with the period during which the net income is earned.

Net income over the last full fiscal year, or trailing 12 months, is found on the income statement—a sum of financial activity over that period. Shareholders' equity comes from the balance sheet—a running balance of a company's entire history of changes in assets and liabilities.

It is considered best practice to calculate ROE based on average equity over a period because of the mismatch between the income statement and the balance sheet.

**What Does ROE Tell You?**
Whether ROE is deemed good or bad will depend on what is normal among a stock's peers. For example, utilities have many assets and debt on the balance sheet compared to a relatively small amount of net income. A normal ROE in the utility sector could be 10% or less. A technology or retail firm with smaller balance sheet accounts relative to net income may have normal ROE levels of 18% or more.

A good rule of thumb is to target an ROE that is equal to or just above the average for the peer group. For example, assume a company, TechCo, has maintained a steady ROE of 18% over the last few years compared to the average of its peers, which was 15%. An investor could conclude that TechCo's management is above average at using the company's assets to create profits. Relatively high or low ROE ratios will vary significantly from one industry group or sector to another. When used to evaluate one company to another similar company, the comparison will be more meaningful. A common shortcut for investors is to consider a return on equity near the long-term average of the S&P 500 (14%) as an acceptable ratio and anything less than 10% as poor.

**Using ROE to Estimate Growth Rates**
Sustainable growth rates and dividend growth rates can be estimated using ROE, assuming that the ratio is roughly in line or just above its peer group average. Although there may be some challenges, ROE can be a good starting place for developing future estimates of a stock's growth rate and the growth rate of its dividends. These two calculations are functions of each other and can be used to make an easier comparison between similar companies.

To estimate a company's future growth rate, multiply the ROE by the company's retention ratio. The retention ratio is the percentage of net income that is retained or reinvested by the company to fund future growth.

**ROE and a Sustainable Growth Rate**



shareholders in a dividend, which means company A retains 70% of its net income. Business B also has an ROE of 15% but returns only 10% of its net income to shareholders for a retention ratio of 90%.

For company A, the growth rate is 10.5%, or ROE times the retention ratio, which is 15% times 70%. Business B's growth rate is 13.5%, or 15% times 90%.

This analysis is referred to as the sustainable growth rate model. Investors can use this model to make estimates about the future and to identify stocks that may be risky because they are running ahead of their sustainable growth ability. A stock that is growing slower than its sustainable rate could be undervalued, or the market may be discounting risky signs from the company. In either case, a growth rate that is far above or below the sustainable rate warrants additional investigation.

This comparison seems to make business B more attractive than company A, but it ignores the advantages of a higher dividend rate that may be favored by some investors. We can modify the calculation to estimate the stock's dividend growth rate, which may be more important to income investors.

### Estimating the Dividend Growth Rate

Continuing with our example from above, the dividend growth rate can be estimated by multiplying ROE by the payout ratio. The payout ratio is the percentage of net income that is returned to common shareholders through dividends. This formula gives us a sustainable dividend growth rate, which favors company A.

The company A dividend growth rate is 4.5%, or ROE times the payout ratio, which is 15% times 30%. Business B's dividend growth rate is 1.5%, or 15% times 10%. A stock that is growing its dividend far above or below the sustainable dividend growth rate may indicate risks that should be investigated.

### Using ROE to Identify Problems

It is reasonable to wonder why an average or slightly above average ROE is good rather than an ROE that is double, triple, or even higher the average of their peer group. Aren't stocks with a very high ROE a better value?

Sometimes an extremely high ROE is a good thing if net income is extremely large compared to equity because a company's performance is so strong. However, an extremely high ROE is often due to a small equity account compared to net income, which indicates risk.

### Inconsistent Profits

The first potential issue with a high ROE could be inconsistent profits. Imagine a company, LossCo, that has been unprofitable for several years. Each year's losses are recorded on the balance sheet in the equity portion as a "retained loss." The losses are a negative value and reduce shareholder equity. Assume that LossCo has had a windfall in the most recent year and has returned to profitability. The denominator in the ROE calculation is now very small after many years of losses, which makes its ROE misleadingly high.

### Excess Debt

A second issue that could cause a high ROE is excess debt. If a company has been borrowing aggressively, it can increase ROE because equity is equal to assets minus debt. The more debt a company has, the lower equity can fall. A common scenario is when a company



**Negative Net Income**

Finally, negative net income and negative shareholder equity can create an artificially high ROE. However, if a company has a net loss or negative shareholders' equity, ROE should not be calculated.

If shareholders' equity is negative, the most common issue is excessive debt or inconsistent profitability. However, there are exceptions to that rule for companies that are profitable and have been using cash flow to buy back their own shares. For many companies, this is an alternative to paying dividends, and it can eventually reduce equity (buybacks are subtracted from equity) enough to turn the calculation negative.

In all cases, negative or extremely high ROE levels should be considered a warning sign worth investigating. In rare cases, a negative ROE ratio could be due to a cash flow supported share buyback program and excellent management, but this is the less likely outcome. In any case, a company with a negative ROE cannot be evaluated against other stocks with positive ROE ratios.

**ROE vs. Return on Invested Capital**

While return on equity looks at how much profit a company can generate relative to shareholders' equity, return on invested capital (ROIC) takes that calculation a couple of steps further.

The purpose of ROIC is to figure out the amount of money after dividends a company makes based on all its sources of capital, which includes shareholders equity and debt. ROE looks at how well a company uses shareholder equity while ROIC is meant to determine how well a company uses all its available capital to make money.

**Limitations of ROE**

A high ROE might not always be positive. An outsized ROE can be indicative of a number of issues—such as inconsistent profits or excessive debt. Also, a negative ROE due to the company having a net loss or negative shareholders' equity cannot be used to analyze the company, nor can it be used to compare against companies with a positive ROE.

## Example of How to Use ROE

For example, imagine a company with an annual income of $1,800,000 and average shareholders' equity of $12,000,000. This company's ROE would be as follows:

$$ROE = \left( \frac{\$1,800,000}{\$12,000,000} \right) = 15\%$$

Consider Apple Inc. (AAPL)—for the fiscal year ending Sept. 29, 2018, the company generated US$59.5 billion in net come. At the end of the fiscal year, it's shareholders' equity was $107.1 billion versus $134 billion at the beginning. Apple's return on equity, therefore, is 49.4%, or $59.5 billion / (($107.1 billion + $134 billion) / 2).

Compared to its peers, Apple has a very strong ROE.

- Amazon.com Inc. (AMZN) has a return on equity of 27%
- Microsoft Corp. (MSFT) 23%

# Exhibit II-66



**Ready Ratios** — IFRS financial reporting and analysis software

Sign up or Log in

Financial Analysis ▾ | Features | Start! | Pricing | News | IFRS ▾ | Reference | Forum | Support ▾

search

Start free **ReadyRatios** financial analysis now!

**START ONLINE**

No registration required! But if you signed up extra ReadyRatios features will be available.

# Cash Flow Coverage Ratio

Cash Flow Indicator Ratios     🖨 Print     ✉ Email

## Definition

The **cash flow coverage ratio** is an indicator of the ability of a company to pay interest and principal amounts when they become due. This ratio tells the number of times the financial obligations of a company are covered by its earnings. A ratio equal to one or more than one means that the company is in good financial health and it can meet its financial obligations through the cash generated by operating activities. A ratio of less than one is an indicator of bankruptcy of the company within two years if it fails to improve its financial position.

It is an important indicator of the liquidity position of a company. This ratio is often used by the banks to decide whether to make or refinance any loan.

## Calculation (formula)

There are different formulas used for the calculation of this ratio. Some of the most commonly used formulas are given below.

Cash Flow Coverage Ratio = Operating Cash Flow / Total Debt

The figure for operating cash flows can be found in the statement of cash flows. Total debt includes the interest, short-term borrowings, current portion of long-term debt and long-term debt. This ratio shows the ability of a company to pay its debt from the cash it generates from its operations. A very low ratio can be an indication of too much debt or poor cash generation.

Another formula used for the calculation of cash flow coverage ratio is

Cash flow coverage ratio = (Net Earnings + Depreciation + Amortization) / Total Debt

This ratio also has some variations. For example, free cash flows can be used instead of operating cash flows. This will be a more conservative ratio which provides for the capital expenditure. Another variation may be used to include the payments for preferred dividends, non-cancelable financial lease payments, redeemable shares, and rental payments. This will be a more conservative ratio which takes into account more financial obligations.

Share: 🔖 📘 ✖ 💼 📇 🐦

## See also

- Free Cash Flows / Operating Cash Flows Ratio
- Operating Cash flow / Sales Ratio
- Price/Cash Flow Ratio

👤 Yvonne Hay, 20 May, 2014     ❝ Quote

📄 Debt ratios
📄 Liquidity ratios
📄 Profitability ratios
📄 Asset management ratios
📄 Cash Flow Indicator Ratios
📄 Market value ratios
📄 Financial analysis
📄 Accounting
📄 Business Terms
📄 Audit
📄 Appraisal
📄 Taxation
📄 Financial education
📄 International Financial Reporting Standards (EU)
📄 IFRS Interpretations (EU)
📄 Financial software

**Most Wanted Financial Terms**

Most Important Financial Ratios

Debt-to-Equity Ratio

# Exhibit II-67

# CRÉDIT DU MAROC

Crédit du Maroc offers a comprehensive range of retail banking and corporate and investment banking services



**338**
branches

**800.000**
customers

**2400**
staff

Crédit du Maroc is a subsidiary of Crédit Agricole, present in Morocco since 1929. With 2.400 employees, Crédit du Maroc develops the "universal retail banking" concept of Crédit Agricole and is recognized as a major player by individual customers, corporates, and more recently, agri-agro (in total some 800.000 customers). The bank's "CAP 2020" development plan reflects its two development priorities : operational and relational excellence in customer relations, and synergy development with the Crédit Agricole Group in two directions :

- Corporates / with CACIB, Regional Banks', and LCL networks

- And in retail markets, with the Group's business lines which are also present in Morocco (CALF, CACF, Amundi...)

## Crédit du Maroc News

(https://www.credit-agricole.com/en/business-lines-and-brands/all-brands)

APPX0002042

# Exhibit II-68

**PROSPECTUS**

**NOT FOR GENERAL DISTRIBUTION
IN THE UNITED STATES**

# OCP S.A.

*(a joint stock company organised and existing under the laws of the Kingdom of Morocco)*

## U.S.$1,250,000,000 5.625% Notes due 2024
### Issue Price: 99.059%

## U.S.$300,000,000 6.875% Notes due 2044
### Issue Price: 93.992%

The U.S.$1,250,000,000 5.625% Notes due 2024 (the "**2024 Notes**") and the U.S.$300,000,000 6.875% Notes due 2044 (the "**2044 Notes**", or the 2024 Notes, both referred to as the "**Notes**") to be issued by OCP S.A. (the "**Issuer**" or "**OCP**") will mature and be redeemed at their principal amount on 25 April 2024 and 25 April 2044, respectively. The 2024 Notes will bear interest from, and including 25 April 2014 (the "**Issue Date**") at a rate of 5.625% per year and will be payable semi-annually in arrear on 25 April and 25 October in each year. The 2044 Notes will bear interest from, and including the Issue Date at a rate of 6.875% per year and will be payable semi-annually in arrear on 25 April and 25 October in each year. The first payment of interest in respect of the Notes will be made on 25 October 2014. Payments on the Notes will be made in U.S. Dollars without deduction for or on account of any Moroccan withholding taxes unless the withholding is required by law, in which case the Issuer will pay additional amounts in respect of such taxes, subject to certain exceptions as set forth in "*Terms and Conditions of the Notes—Condition 8*" and "*Taxation*".

The Notes have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), or any U.S. state securities laws and are being offered and sold in the United States only to qualified institutional buyers ("**QIBs**") (as defined in Rule 144A under the Securities Act ("**Rule 144A**")) pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. Prospective purchasers that are QIBs are hereby notified that the seller of Notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A (such Notes so offered and sold, the "**Rule 144A Notes**"). In addition, Notes are being offered outside the United States in reliance on Regulation S under the Securities Act ("**Regulation S**", and such Notes so offered and sold, the "**Regulation S Notes**"). Transfers of Notes are subject to the restrictions described under "*Transfer Restrictions*".

This prospectus (the "**Prospectus**") has been approved by the Central Bank of Ireland, as competent authority under Directive 2003/71/EC (the "**Prospectus Directive**"). The Central Bank of Ireland only approves this Prospectus as meeting the requirements imposed under Irish and EU law pursuant to the Prospectus Directive. Application has been made to the Irish Stock Exchange Limited (the "**Irish Stock Exchange**") for the Notes to be admitted to the Official List (the "**Official List**") and trading on its regulated market. This Prospectus constitutes a prospectus for the purpose of the Prospectus (Directive 2003/71/EC) Regulations 2005 (the "**Prospectus Regulations**") (which implement the Prospectus Directive in Ireland). Reference in this Prospectus to being listed (and all date references) shall mean that such Notes have been admitted to trading on the regulated market of the Irish Stock Exchange.

**Investing in the Notes involves risks. Please see "Risk Factors" beginning on page 14.**

The Notes will be offered and sold in registered form in minimum denominations of U.S.$200,000 and any amount in excess thereof that is an integral multiple of U.S.$1,000. The Regulation S Notes will initially be represented by beneficial interests in a unrestricted global certificate (the "**Unrestricted Global Certificate**") in registered form without interest coupons attached, which will be registered in the name of Citivic Nominees Ltd, as nominee for, and shall be deposited on or about the Issue Date with, Citibank Europe Plc, as common depositary for, and in respect of interests held through, Euroclear Bank SA/NV ("**Euroclear**") and Clearstream Banking, société anonyme ("**Clearstream, Luxembourg**"). Beneficial interests in the Unrestricted Global Certificate will be shown on, and transfers thereof will be effected only through, records maintained by Euroclear and Clearstream, Luxembourg and their participants. The Rule 144A Notes will initially be represented by a restricted global certificate (the "**Restricted Global Certificate**" and, together with the Unrestricted Global Certificate, the "**Global Certificates**") in registered form, without interest coupons attached, which will be deposited with a custodian (the "**Custodian**") for, and registered in the name of Cede & Co., as nominee of, The Depository Trust Company ("**DTC**") on or about the Issue Date. Beneficial interests in the Restricted Global Certificate will be shown on, and transfers thereof will be effected only through, records maintained by DTC and its participants. See "*Clearing and Settlement*". Except as described herein, definitive registered certificates evidencing holdings of Notes issued in exchange for beneficial interests in the Global Certificates will be available only in certain limited circumstances. See "*The Global Certificates—Registration of Title*".

The Notes are expected to be rated BBB– by Standard & Poor's Credit Market Services Europe Limited ("**S&P**") and BBB– by Fitch Ratings Limited ("**Fitch**"). A rating is not a recommendation to buy, sell or hold securities and may be subject to revision, suspension, reduction or withdrawal at any time by the assigning rating organisation. The credit ratings included or referred to in this Prospectus will be treated for the purposes of Regulation (EC) No 1060/2009 on credit rating agencies (the "**CRA Regulation**") as having been issued by S&P and Fitch, respectively. Each of S&P and Fitch is established in the European Union (the "**EU**") and is registered under the CRA Regulation. As such, each of S&P and Fitch is included in the latest update of the list of registered credit rating agencies published by the European Securities and Markets Authority on its website (http://www.esma.europa.eu/page/List-registered-and-certified-CRAs) in accordance with the CRA Regulation as at the date of this Prospectus. Any change in the rating of the Notes could adversely affect the price that a purchaser will be willing to pay for the Notes. See "*Risk Factors—Risks Relating to the Notes—Credit ratings may not reflect all risks*".

**Joint Lead Managers**

**Barclays**         **J.P. Morgan**         **Morgan Stanley**

**The date of this Prospectus is 17 April 2014.**

- expanding the Group's fertiliser and phosphoric acid production capacity at the Jorf Phosphate Hub, by constructing four fully integrated fertiliser production units which are expected to become operational starting 2014 through to 2016, and potentially six additional units in accordance with market demand. Each of these units are expected to have an annual production capacity of one million tonnes of fertiliser; and

- as part of the expansion of the Jorf Phosphate Hub, expanding, amongst other things, its port and storage facilities and water-related infrastructure to accommodate such increased production.

Other significant planned long-term investments include: the development of the Safi complex through the addition of further integrated fertiliser production units, along with associated infrastructure, including port expansion; the development of the Laâyoune port; and other facilities in connection with new product development initiatives.

Based on its current plans and estimates and in accordance with its Capital Expenditure Programme, the Group expects its annual production capacity of phosphate rock to increase from 32.2 million tonnes in 2013 to 38.2 million tonnes in 2016 and 52.2 million tonnes in 2025, of phosphoric acid from 4.7 million tonnes in 2013 to 6.5 million tonnes in 2016 and 9.2 million tonnes in 2025, and of fertilisers from 7.4 million tonnes in 2013 to 11.4 million tonnes in 2016 and 17.4 million tonnes in 2025.

Based on current plans, the total costs of the Capital Expenditure Programme since its launch in 2008 to 2025 are estimated to be approximately Dh 145 billion, with Dh 26.3 billion already incurred between 2008 and 2013. As at 31 December 2013, approximately 22% of the remaining estimated total costs of the Capital Expenditure Programme were contractually committed, representing the Group's Capital Expenditure Programme projects until 2016. In the next three years, the Group expects to incur capital expenditure of approximately Dh 59.2 billion (including maintenance capital expenditure). These costs are expected to be funded from internally-generated cash flows, existing and future external financings and the proceeds of the Notes. The Group has the ability to delay projects according to its cash position and market demand. See *"Risk Factors—Risks Relating to the Group's Business—The Group may not be able to realise all of the expected benefits of its Capital Expenditure Programme or secure funding sufficient for the implementation of its Capital Expenditure Programme."*

### Contractual Obligations and Commercial Commitments

The following table sets forth the Group's aggregate contractual obligations and commercial commitments as at 31 December 2013 and the payments due, by period, under such obligations and commitments:

|  | As at 31 December 2013 | | | | |
|  | Less than one year | 1-3 years | 3-5 years | More than 5 years | Total |
|---|---|---|---|---|---|
|  | (Dh millions) | | | | |
| Capital commitments[1] | 17,015 | 15,146 | — | — | 32,161 |
| Long-term and short-term loans[2] | 5,891 | 7,225 | 6,629 | 4,387 | 24,132 |
| Letters of credit | 1,944 | 528 | — | — | 2,472 |
| Total | 24,850 | 22,899 | 6,629 | 4,387 | 58,765 |

_____
(1) Principally includes contracts for purchase or construction of plant and equipment.
(2) This amount excludes future interest payments associated with the loans.

### Debt Obligations

Over the past few years, the Group has raised significant amounts, principally through long-term borrowings, to supplement the net cash generated by its operating activities in order to fund its Capital Expenditure Programme.

APPX0002045

The following table sets forth the total interest-bearing loans, borrowings and leases of the Group as at the dates indicated.

| | As at 31 December | | |
|---|---|---|---|
| | 2013 | 2012 | 2011 |
| | (Dh millions) | | |
| **Current interest-bearing loans, borrowings and leases** | | | |
| Sovereign-guaranteed bank loans | 63 | 60 | 49 |
| Current portion of long-term bank loans | 2,577 | 2,046 | 1,496 |
| Finance lease liabilities | 314 | 175 | 162 |
| Short Term borrowings | 1,898 | 2,920 | 1,417 |
| Other loans | 912 | 1,542 | 59 |
| Accrued interest payable | 128 | 146 | 92 |
| **Sub-total** | **5,891** | **6,888** | **3,275** |
| **Non current interest-bearings loans, borrowings and leases** | | | |
| Sovereign guaranteed bank loans | 724 | 774 | 837 |
| Non current portion of long-term bank loans | 13,288 | 9,688 | 6,648 |
| Domestic bond issue | 2,000 | 2,000 | 2,000 |
| Finance lease liabilities | 1,345 | 1,036 | 405 |
| Other loans | 885 | 285 | 314 |
| **Sub-total** | **18,242** | **13,783** | **10,203** |
| **Total borrowings** | **24,132** | **20,671** | **13,479** |

The following table sets forth certain rate and currency denomination information related to certain of the interest-bearing loans, borrowings and leases of the Group at the dates indicated.

| | Interest Rate(s) | Weighted Average Interest Rate | As at 31 December | | |
|---|---|---|---|---|---|
| | | | 2013 | 2012 | 2011 |
| | (%) | (%) | (Dh millions) | | |
| **Current interest-bearing loans and borrowings and leases** | | | | | |
| Sovereign-guaranteed loans (€-denominated) | 1.30-2.50 | 2.06 | 63 | 60 | 49 |
| Bank loans (U.S.$-denominated) | 1.94 | 1.94 | 6 | 6 | 6 |
| Bank loans (Dh-denominated) | 4.70-6.07 | 4.97 | 2,571 | 2,039 | 1,490 |
| Short-term borrowings (U.S.$-denominated) | 0.80-0.96 | 0.88 | 563 | 582 | 247 |
| Short-term borrowings (€-denominated) | — | — | — | — | 577 |
| Short-term borrowings (Dh-denominated) | — | — | 522 | 1,575 | 285 |
| Short-term borrowings (INR-denominated) | 10.20-14.00 | 10.54 | 812 | 763 | 308 |
| Finance lease liabilities (Dh-denominated) | 5.25-5.75 | 5.61 | 275 | 110 | 101 |
| Finance lease liabilities (€-denominated) | 4.10 | 4.10 | 39 | 65 | 61 |
| Other loans | 3.11-4.42 | 3.17 | 912 | 1,542 | 59 |
| Accrued Interest payable | — | — | 128 | 146 | 92 |
| **Sub-total** | **—** | **—** | **5,891** | **6,888** | **3,275** |
| **Non-current interest-bearing loans and borrowings and leases** | | | | | |
| Sovereign-guaranteed loans (€-denominated) | 1.30-2.50 | 2.20 | 724 | 774 | 837 |
| Bank loans (U.S.$-denominated) | 1.94-4.15 | 3.41 | 4,429 | 2,574 | 24 |
| Bank loans (€-denominated) | 3.05-6.00 | 3.50 | 2,721 | 2,785 | 1,074 |
| Bank loans (Dh-denominated) | 4.70-6.07 | 4.94 | 6,138 | 4,318 | 5,500 |
| Bank loans (INR-denominated) | — | — | — | 10 | 50 |
| Finance lease liabilities (Dh-denominated) | 5.25-5.75 | 5.60 | 1,291 | 945 | 269 |
| Finance lease liabilities (€-denominated) | 4.10 | 4.10 | 53 | 91 | 136 |
| Domestic bond issue | 4.46 | 4.46 | 2,000 | 2,000 | 2,000 |
| Other loans | — | — | 885 | 285 | 314 |
| **Sub-total** | **—** | **—** | **18,242** | **13,783** | **10,203** |
| **Total** | **—** | **—** | **24,132** | **20,671** | **13,479** |

APPX0002046

# Exhibit II-69

APPX0002047



Worldwide VAT, GST and Sales Tax Guide

2019

EY
Building a better
working world

APPX0002048

# Morocco

ey.com/GlobalTaxGuides
ey.com/TaxGuidesApp

| Casablanca | GMT |
|---|---|

**EY**
37, Boulevard Abdellatif Ben Kaddour
20 050
Casablanca
Morocco

**Indirect tax contacts**

| | |
|---|---|
| Abdelmejid Faiz | +212 (522) 957-900 |
| | abdelmejid.faiz@ma.ey.com |
| Maria Chafii | +212 (522) 957-900 |
| | maria.chafii@ma.ey.com |

## A. At a glance

| | |
|---|---|
| Name of the tax | Value-added tax (VAT) |
| Local name | Taxe sur la Valeur Ajoutée (TVA) |
| Date introduced | 1 January 1986 |
| Trading bloc membership | None |
| Administered by | Ministry of Finance (www.finances.gov.ma) |
| VAT rates | |
| Standard | 20% |
| Reduced | 7%, 10% and 14% |
| Other | Exempt |
| VAT number format | 12345678 |
| VAT return periods | Monthly or quarterly |
| Thresholds | |
| Registration | Nil |
| Recovery of VAT by non-established businesses | Yes, in some situations |

## B. Scope of the tax

VAT applies to all transactions involving the supply of goods and services performed in Morocco and to the importation of goods and services, including the one-off supply or importation of goods.

## C. Who is liable

A taxable person is a person or legal entity that carries out a taxable transaction. A taxable transaction is a transaction involving the sale or importation of goods or services that is subject to VAT even if such transaction occurs only once. A person liable to VAT in Morocco must register with the local tax service.

Morocco does not provide a VAT registration threshold. A business registers for VAT when it registers for corporate or income tax purposes.

**Group registration.** The Moroccan VAT law does not allow VAT grouping. Legal entities that are closely connected must register for VAT individually.

**Non-established businesses.** Nonresident companies that perform a taxable activity in Morocco are liable to Moroccan VAT.

**Tax representatives.** Under the VAT law, nonresident companies must appoint a tax representative to handle their VAT obligations (VAT returns, filings and payments). If a nonresident company does not appoint a tax representative, the Moroccan customer becomes liable for the declaration and the payment of VAT due on behalf of the nonresident supplier on its own VAT return (auto-liquidation).

**Registration procedures.** When the taxpayers apply for registration, they must provide the following documents:
• "Declaration d'existence," which is a printed form delivered by the tax administration that includes, in addition to the corporate name of the nonresident company, mainly the following information
Information regarding the nonresident company:
— Nationality
— Corporate business address
— City
— Activity
— Phone number
— Email
Information regarding the foreign provider's legal representatives (individuals):
— Last and first name of the legal representative(s)
— Function of the representative(s)
— Address
— City
• Copy of the contract signed by the nonresident company with the Moroccan client
• Representation letter signed by the nonresident company that allows the representative to collect, declare and pay VAT on its behalf
• Letter from the tax representative stating that it commits itself to fulfill VAT obligations of the nonresident company

The tax administration usually provides the VAT ID certificate within one week.

The procedure above is applicable to nonresident companies. For resident companies, a unique tax identification (VAT, CIT) is given upon normal registration process of a company in Morocco.

**Late-registration penalties.** Late filing of the statement of corporate existence ("Declaration d'existence") is subject to a penalty of MAD1,000. Besides, VAT due for the period preceding registration results in late filing and payment penalties (see Section I).

**Reverse charge.** Pursuant to Article 115 of the Moroccan tax code, nonresident entities performing VAT taxable activities are required to appoint a tax representative in Morocco in order to comply with VAT obligations and pay due VAT to the tax authorities on their behalf. In case the foreign entity does not appoint a tax representative, the mechanism of the VAT reverse charge applies. This mechanism provides that, in case a tax representative is not appointed, the Moroccan client is required to report and pay VAT on behalf of its foreign provider using its own VAT ID number. In other terms, VAT registration of the nonresident company is not mandatory if the Moroccan client declares and pays VAT to the tax authorities on its behalf.

**Digital economy.** The Moroccan tax code states that any service used or rendered within the Moroccan territory is subject to Moroccan VAT. For digital services, the VAT rate applicable is 20%. As the services rendered by the provider will be used in Morocco, the operation will be subject to VAT in Morocco.

For business-to-business (B2B) transactions, nonresident companies that are performing a taxable activity in Morocco are required to appoint a tax representative to handle their VAT obligations (VAT returns filings and payments). If no tax representative is appointed, the Moroccan business should report and pay VAT on behalf of the nonresident company using its own VAT ID number.

For business-to-consumer (B2C) operations, there are no special VAT rules for digital services, or supplies relating to the digital economy. Normal VAT rules apply.

There are no specific changes regarding the digital economy within the scope of the 2019 finance law.

**Deregistration.** Once the nonresident entity ends its activities in Morocco and has appointed a tax representative, it is required to deregister from VAT.

In practice, the deregistration process consists of sending a "deregistration letter" to the tax authorities in which the nonresident entity requests to be deregistered from VAT.

The tax authorities do not provide a deregistration certificate.

**Exemption from registration.** Please note that agricultural products (non-transformed), noncommercial activities, nonindustrial activities and civil acts are outside the scope of VAT. Therefore, VAT registration is not required for individuals/entities exercising these activities.

As Morocco does not have a VAT registration threshold, all other businesses must register for VAT.

**Voluntary registration.** Voluntary VAT registration is allowed for:
• Traders and service providers who directly export products, objects, goods or services for their export turnover
• Manufacturers and service providers who do not exceed an annual turnover of MAD500
• Traders who sell without transformation, product and foodstuffs other than those that are exempted without the right to deduct the input VAT

The taxpayer should send the application for optional VAT registration to the local tax administration office that is responsible for the taxpayer and takes effect on the expiry of thirty (30) days following the date of the notification.

## D. VAT rates

The term "taxable supplies" refers to supplies of goods and services that are subject to VAT. The term "exempt supplies" refers to supplies of goods and services that are not subject to VAT. A business engaged in the sale of exempt supplies may have a right to deduct input VAT. If supplies are exempt with a right to deduct, no VAT is chargeable but the supplier may recover related input tax.

The standard rate of VAT is 20%. Reduced rates apply to specific business activities, including the following:
• Supply of water, electricity and pharmaceutical products: 7%
• Petroleum products, banking transactions, and hotel and restaurant operations: 10%
• Transport services: 14% (however, rail transport of passengers and goods is subject to VAT at a rate of 20%)

The 2019 finance law extended the list of VAT exempted medicines to include drugs treating meningitis disease, as well as drugs that manufacturer's price (excluding tax) by regulation exceeds Moroccan dirhams MAD588.

**Option to tax for exempt supplies.** Not applicable.

## E. Time of supply

The time when VAT becomes due is called the "time of supply" or "tax point." In Morocco, the "tax point" generally corresponds to the time when the payment is made.

The Moroccan tax code provides that the tax point is the date of cash receipt. After a company receives cash, VAT becomes due, even if the cash received represents only part of the total outstanding amount for the goods or services provided.

The Moroccan tax code provides an optional regime under which VAT is due when the transaction is booked in the accounts of the seller or service provider. However, if the payment precedes the invoicing, the time of payment constitutes the tax point. Any company that wants to use the optional system must file a declaration with the tax administration before 1 January. A list of the company's customers that sets forth the unsettled VAT for each of the customers must be attached to the declaration. Newly registered taxpayers must file the declaration within one month after the commencement of their activity.

**Prepayments.** A prepayment or deposit constitutes a tax point. As a result, the time of effective delivery of the goods or services is ignored for VAT purposes.

**Continuous supplies of services.** If services are received continuously but payment is made periodically, a tax point is created each time payment is made (unless option for the debit system is chosen) or a VAT invoice is issued, whichever is earlier. No specific regulation provides for the VAT treatment of continuous services.

**Goods sent on approval.** The tax point for goods sent on approval is when the customer accepts the goods and a supply is made.

**Imported goods.** VAT on imported goods is due at the time of customs clearance.

**Leased assets.** The time of supply for leased assets is the date of rent income cash collection. However, under the debit regime, the VAT is due when the rent income is booked in the accounts of the owner/lessor.

The following types of leases are not subject to VAT:
• Rental of unfurnished premises, whether or not intended for professional use
• Rental of equipped premises that does not exceed MAD500,000

The following types of leases are subject to VAT:
• Furnished premises
• Premises that are equipped for professional use
• Premises located in commercial complexes (malls)
• Machines
• Vehicles

**Reverse-charge services.** The declaration and the payment of VAT to the tax authorities has to be performed during the month following the payment of the nonresident provider of services. (Please refer to the *reverse-charge subsection in Section C, Who is liable* above.)

## F. Recovery of VAT by taxable persons

Input tax is VAT charged on goods and services acquired by an entity for business purposes. A taxable person generally recovers input tax by deducting it from output tax (VAT charged on supplies made). Input tax consists of VAT charged on goods and services purchased in Morocco and VAT paid on imports of goods.

Until 31 December 2013, Moroccan tax law permitted input VAT paid on purchases of non-fixed assets (non-capital expenses) to be recovered on the VAT return of the month following the one during which the tax was reported as paid. The finance bill for 2014 canceled this time lag rule, and effective 1 January 2014, companies may offset such input VAT against output VAT on the same month's VAT return.

However, in order to limit the significant cash impact of this new provision on the government's budget, the finance bill provided that the deductibility of the input VAT reported as paid by companies in December 2013 with regard to non-fixed assets would be deductible over a five-year period, with one-fifth of the deduction appearing on the first VAT return of each year during the following five years.

**Nondeductible input tax.** Input tax may not be recovered on purchases of goods and services that are not used for business purposes and that are considered to be nondeductible expenses for corporate tax purposes (for example, goods acquired for private use by an entrepreneur). VAT charged on purchases, works or services, where the amount exceeds MAD5,000 per day and per supplier and MAD50,000 per month and per provider, is not recoverable unless settlement is made by a check, bill of exchange, magnetic means of payment, bank transfer, electronic process or by compensation.

### Examples of items for which input tax is nondeductible
- Goods and services not related to the business requirements
- Transport cars not used for the business needs
- Petroleum products not used as fuel
- Water pumps that run on solar energy or any other renewable energy used in the agricultural sector (introduced from the 2019 finance law)

### Examples of items for which input tax is deductible
### (if related to a taxable business use)
- Purchases and services related to a business use
- Transport cars having a business use

**Partial exemption.** Input tax deduction is granted for taxable supplies and for supplies that are exempt with a right to deduct. If a taxable person makes both taxable supplies and exempt supplies, it may recover only the input tax related to supplies that are taxable or exempt with a right to deduct.

**Refunds.** If the amount of input VAT recoverable in a period exceeds the amount of output VAT payable in the same period, a refund is not generally granted. In most cases, the taxable person must carry the excess forward to a future VAT period. Refunds of the excess are generally only available with respect to the following VAT:
- VAT incurred on supplies of exported goods except for recycling metals (ferrous and nonferrous)
- VAT incurred on supplies of goods and services that are exempt with a right to deduct
- VAT incurred on purchases of equipment goods (fixed assets) during the first 36 months of activity of newly incorporated companies

- VAT incurred on purchases of other assets except office equipment and certain passenger transport vehicles
- VAT incurred on financial leasing activities

**Preregistration costs.** Not applicable.

## G. Recovery of VAT by non-established businesses

Nonresident entities conducting taxable activities in Morocco are not eligible for VAT refunds. Nevertheless, input VAT incurred in Morocco by nonresident entities may be offset against output VAT.

## H. Invoicing

**VAT invoices and credit notes.** A Moroccan taxable person must provide VAT invoices for taxable supplies, including exports, made to other taxable persons. Recipients of supplies must maintain copies of invoices.

Credit notes must be issued with VAT included.

Taxpayers must issue valid VAT invoices to customers including the below mandatory details:
- Identity of the seller
- Supplier identification tax number
- Supplier business tax number
- Date of the transaction
- Name or business name and address of the purchaser or customer
- Prices, quantity and nature of goods sold, the executed work or services rendered
- Reference to the overall amount of VAT, if applicable
- Reference to the VAT rate, if applicable
- Reference to rebates, discounts or rebates granted
- References and payment modalities
- Common corporate identifier (ICE: (this is a mandatory requirement to include from 1 January 2018, where the customer is based in Morocco)
- Supplier social security number
- Supplier trade registration number

**Proof of exports.** Moroccan VAT is not chargeable on supplies of exported goods. However, to qualify as VAT-free, export supplies must be supported by evidence confirming that the goods have left Morocco. The evidence required is the customs declaration, which must clearly identify the exporter, the customer, the goods and the export destination, and must provide invoice information.

**Foreign-currency invoices.** A VAT invoice for a domestic supply is generally issued in Moroccan dirhams (MAD). VAT based on the applicable VAT rate must be shown on the invoice.

**B2C.** There are no special VAT invoicing rules for supplies made by taxable persons to private consumers in Morocco. Hence, full VAT invoices are required to be issued (see above).

**Electronic invoicing.** In Morocco, electronic invoicing is not mandatory, but it is allowed. There are no special rules regarding electronic invoicing in Morocco. However, in case of a VAT refund request, the tax administration requires the original invoice in hard-copy format, including the company stamp.

If taxpayers issue electronic invoices, then they must use an electronic billing system connected to the central billing station of the tax administration.

## I. VAT returns and payment

**VAT returns.** The filing of VAT returns may be on a monthly or quarterly cycle based on certain criteria.

The following taxpayers must file monthly VAT returns:
• Taxpayers that had taxable turnover during the preceding year of MAD1 million or more
• Nonresident persons that carry out taxable activities in Morocco

The following taxpayers must file quarterly VAT returns:
• Taxpayers that had taxable turnover during the preceding year of less than MAD1 million
• Taxpayers operating through seasonal establishments, practicing periodic activities or carrying out occasional activities
• New taxpayers in their first calendar year of activity

The above taxpayers can opt for the monthly declaration system by filing a request with the tax administration before 31 January.

Taxpayers under the tele-declaration and tele-payment system must file VAT returns and make VAT payments within one month after the end of the relevant month or quarter.

Other taxpayers must file their VAT returns and pay VAT due before the 20th day of the month following the relevant month or quarter.

Electronic filing and electronic payment is mandatory for all companies, regardless of the turnover performed.

**Special schemes.** There is one optional regime, called the "debit regime." This is where the VAT is due when the rent income is booked in the accounts of the owner/lessor.

The following types of leases are not subject to VAT:
• Rental of unfurnished premises, whether or not intended for professional use
• Rental of equipped premises that does not exceed MAD500,000

The following types of leases are subject to VAT:
• Furnished premises
• Premises that are equipped for professional use
• Premises located in commercial complexes (malls)
• Machines
• Vehicles

**Electronic filing and archiving.** See above (*Section I relating to VAT returns*)

**Annual returns.** The VAT returns are either monthly or quarterly.

## J. Penalties

In case of deposit of the VAT declaration beyond the deadline:
• Thirty days within the deadline: 5% penalty
• Beyond 30 days following the deadline: 15% penalty

Please note that in case of tax reassessment procedure due to lack of filing, the above penalty is increased up to 20%.

In the case of a tax audit, the applicable penalty is increased up to 30%.

If no VAT is due, the penalty equals MAD500. In case of VAT payment beyond the deadline:

• A penalty of 20% on the VAT amount due
• Additional 5% penalty in case of late payment within the first month and 0.50% per additional month (or fraction of month)

If the VAT declaration provides that no tax is due, the amount of any VAT credit is reduced by 15%. This means that where input tax exceeds output tax in the same period, this generates a VAT credit in the VAT return for the taxpayer. However, where the return is filed late (after the legal deadlines), then the VAT credit for that period is decreased by 15%.

An increase of 1% is applicable on the VAT due or that would have been due in the absence of exemption, in case of noncompliance with the obligations of electronic filing and payment.

# Exhibit II-70

# Oxford Business Group (/)

Keywords (optional)

All 40 Countries ▼

Search

# Changing regulations: Key points of the Finance Law of 2014

Morocco (/country/morocco)Tax (/search-results?sector=52399&country=all&keywords=)

Overview

View in online reader (/node/872460/reader)

Text size +-

Recommend

One of the main features of the Finance Law of 2014 is that it was adopted in a rather particular political, economic and financial situation marked by the necessity to rebalance public finances through progressive reduction of the budget deficit, consolidation of tax resources and progressive reduction of tax exemptions. The tax measures of the Finance Law of 2014 focus essentially on the progressive implementation of the recommendations of the last national tax conference held in April 2013, the main features of which were the broadening of the tax base, rationalisation of fiscal expenses, improvement of companies' competitiveness, simplification of procedures and the strengthening of administrative control. A revision of the value-added tax (VAT) – a reform postponed for many years – was also introduced in 2014. The Finance Law of 2014 maintained the trend initiated in 2012 through the creation of special taxes such as an air passenger ticket tax and a luxury tax designed to support the social cohesion fund. Here, we present the key measures included in the Finance Law of 2014. 1. CORPORATE INCOME TAX (CIT) A. Progressive taxation of the agricultural sector: Since 1984 the agricultural sector has benefitted from a tax exemption. Due to the years of drought that Morocco experienced at that time, agricultural income was exempted from any direct tax until December 31, 2000. In the same context, article 12 of the Finance Law No. 55-00 for the financial year 2001 extended the exemptions for agricultural income of any present or future direct tax until December 31, 2010. This exemption was extended until 2013 by the Finance Law No. 40-08 for the financial year 2009. It should also be pointed out that the tax exemptions granted to the agricultural sector represent 11-12% of overall tax expenditures (as specified in the annual report on tax expenditures of 2012 and 2013).

The Finance Law of 2014 introduces progressive taxation for the agricultural sector. This taxation will affect large agricultural companies, large farm holdings and farmers who generate sales in excess of Dh5m (€444,000), while farm holdings and farmers with sales of less than Dh5m (€444,000) will continue to benefit from the permanent exemption from CIT.

On a transitional basis, the Finance Law of 2014 plans for the continuity of the exemption from CIT as

- From January 1, 2014 until December 31, 2015 for farm holdings generating sales of less than Dh35m
- From January 1, 2016 until December 31, 2017 for farm holdings generating sales of less than Dh20m
- From January 1, 2018 until December 31, 2019 for farm holdings generating sales of less than Dh10m (€888,000); The Finance Law of 2014 introduces a reduced tax rate of 17.5% for farm holdings during the first five consecutive years from the first year of taxation. B. Fiscal deductibility of compensation for delays related to the timeliness of payment: The Finance Law of 2014 authorises the fiscal deductibility of compensation for delays governed by Law No. 31-10 and Law No. 15-95 forming the commercial code. This measure is applicable to compensation for delays paid and recovered as of January 1, 2014.

So, regarding the fiscal side, this compensation for delays can be regarded, depending on the case, either as income or as an expense, for the determination of the taxable result during their collection or payment. Consequently, the accounting of this compensation will be made according to the current accounting rules and the determination of the taxable fiscal result will be made by proceeding to the extra accounting rectifications. C. Tax exemptions granted to "Africa50", or "Fonds Afrique 50": In order to stimulate foreign investments, article 4 of the Finance Law of 2014 establishes a total and permanent exemption from corporate taxation for the Africa50. The African Development Bank (ADB) decided to create this fund during its last annual assembly held in Marrakech in May 2013 in order to finance Africa's large infrastructure projects. The fund is planned to be domiciled in the financial centre of Casablanca Finance City. Thus, the Africa50 benefits from total and permanent exemption from corporate tax on all income, activities or operations and for potential income therefrom. 2. PERSONAL INCOME TAX (PIT) A. Introduction of a flat-rate tax scheme to support the "auto-entrepreneur": A new taxation regime has been introduced by the Finance Law of 2014 in order to reduce the size of the informal sector, develop entrepreneurial spirit and facilitate access to the job market for young people.

In this context, the Finance Law of 2014 complemented article 32 of the General Tax Code by introducing a specific and optional tax regime for natural persons who carry out their professional activities as a self-employed worker (although this excludes taxpayers practising liberal professions). The option for the auto-entrepreneur scheme is subject to compliance with the following conditions. The amount of the annual turnover must not exceed:

- Dh500,000 (€44,400) for commercial, industrial and artisanal activities; or
- Dh200,000 (€17,760) for the provision of services. The self-employed must adhere to the social security scheme and must maintain a register of purchases and sales that is endorsed on a regular basis by a competent tax service in the place where they are domiciled for tax purposes. This option remains valid until the turnover does not exceed, for any period of two consecutive financial years, the aforementioned threshold. B. Abatement rates applicable to pensions & life annuities: Before January 1, 2014, the net taxable income corresponding to pensions and annuities was determined after application of a flat-rate reduction of 55% on the gross taxable income of pensions and life annuities. As of January 1, 2014, article 4 of the aforementioned Finance Law of 2014 amends these provisions by providing the following abatement rates:
- 55% on the gross amount that does not exceed Dh168,000 (€14,918) annually; and
- 40% on the gross amount that exceeds Dh168,000 (€14,918) annually. These rates apply to the gross taxable amounts of such pensions and annuities, subject to the deduction thereafter of social contributions. C. Introduction of tax neutrality with respect to income tax on the contribution of equity securities for a Moroccan resident that is subject to corporate tax: The Finance Law of 2014 introduces a specific regime allowing deferred taxation of income tax for capital gains resulting from the contribution of equity securities to a holding company.

Indeed, the Finance Law of 2014 states that natural person who carries out the transfer of the whole of the equity securities they hold in one or more corporations to a holding company resident in Morocco and subject to corporate tax is not taxable in respect to the capital gains resulting from this transfer. This tax exemption is granted provided that the following conditions are met:

- The contribution shall be carried out between January 1, 2014 and December 31, 2015;
- The equity securities transferred must be evaluated by someone selected from among the persons entitled to perform the duties of an auditor;
- The beneficiary company of the contribution is committed in the act of contribution to keep the shares received for a minimum period of four years from the date of the aforementioned transfer;
- The person who carried out the contribution of all of his or her equity securities is committed in the contribution act to pay the income tax related to net capital gain resulting from the contribution, in case of partial or total redemption, reimbursement or cancellation of securities received against the contribution. For the company receiving the shares, the net capital gain resulting from the sale of the above capital securities, after the expiry of a period of four years, is determined by the difference between the transfer price and the value of the securities at the time of the contribution.

Regarding the tax returns level, the Finance Law of 2014 provides that taxpayers who made the contribution of all of their equity securities should return against a receipt, to the inspector of taxes instead of their fiscal domicile, a tax return on the basis of a model form prepared by the administration within 60 days of the date of the contribution. 3. VALUE-ADDED TAX The main tax measures provided by the Finance Law of 2014 fall within the context of a total reform of VAT. These measures concern the reduction of VAT rates, the introduction of the reverse charge system of VAT, the abolition of the rule of one-month lag and the introduction of the refund for accumulated VAT credit. A. Changes in VAT rates: Application of the rate of 10% or 20% for some exempt goods or services:

- The rate of 10% is applicable to catering services provided directly by a company to its employees and equipment intended exclusively for agricultural use.
- The rate of 20% is applicable to dried grapes, fishing gear, local acquisitions of a property, and equipment and goods used by the University Al Akhawayn in Ifrane.
- Application of the 10% rate to certain products initially subjected to the rate of 7%. It is proposed that with effect from January 1, 2014, the tax rate of 10% will be applicable to livestock feed.
- Application of the 20% rate to certain products subjected initially to the rate of 14%. It is proposed that, with effect from January 1, 2014, the tax rate of 20% will be applicable to certain products subject to the 14% rate, such as fats (animal or vegetable) and utility vehicles. B. Introduction of the VAT reverse charge system: The Finance Law of 2014 amends the provisions of the article 115 of the General Tax Code in order to simplify the tax return obligations that local companies must fulfil on behalf of foreign companies.

In practice, and in case of absence of accreditation of a tax representative in Morocco, the Moroccan client has to file a declaration of existence in the name and on behalf of the non-resident company and declare the VAT on a separate tax return with a different tax identification number.

Furthermore, the Moroccan company should continue to file, even in the absence of any operation with the foreign company, on a monthly basis, the VAT returns on behalf of the non-resident provider until submitting a declaration for cessation of activity on behalf of this client.

In this context, and in order to simplify the procedure of declaration of the withholding tax applicable to the payments made to the foreign companies, the Finance Law of 2014 allows the Moroccan client to declare the amount of the operation exclusive of VAT on its own VAT return, to calculate the tax payable and at the same time proceed to the deduction of the amount of the aforementioned VAT due.

In the case where client activity is excluded from the scope of VAT, the Moroccan customer is required to proceed to the recovery of VAT due in the name and for the account of the foreign company by way of the withholding tax.

This deduction is made on behalf of the Treasury on each payment made to the foreign company and remitted to the receiver of the tax administration in the month following the payment. C. The abolition of the one-month lag rule: It should be noted that before the Finance Law of 2014 and regarding the right of deduction, the basic rule is that this right arises at the end of the month following the month of the partial or total payment of the invoices made in the name of the beneficiary.

Furthermore, and starting from January 1, 2014, the right to deduct the VAT shall arise in the month of the total or partial payment of local purchases or imports of goods, wares or services.

The amount of VAT paid on purchases during the month of December 2013 and deductible in January 2014 will be deductible over a period of five years up to a proportion of one-fifth of that amount. This deduction is made during the first month or the first quarter of each year from 2014.

However, it should be noted that the amount of VAT deductible during the month of January 2014 on purchases paid during the month of December 2013 may be deducted in full in the month of January 2014 when the VAT amount does not exceed Dh30,000 (€2664). D. Introduction of a reimbursement system for VAT credit: The Finance Law of 2014 allows, by way of derogation, the reimbursement of the non-refundable VAT credit under the conditions of ordinary law.

Indeed, the VAT credit accumulated to the date of December 31, 2013 is eligible for reimbursement according to the conditions and the procedures laid down by the relevant regulations (decree), which will specify the mode, the time frame and the limits for appropriations.

The accumulated VAT credit, which is entitled to reimbursement, corresponds to the credit generated from January 1, 2004 and resulting from the difference between the VAT rate applied on the turnover and the production or acquisition costs as far as the credit generated by the acquisition of fixed assets.

The companies concerned are required to file, within two months following the publication in the official bulletin of the regulation (decree), an application for refund of the VAT credit, established according to a template provided by the tax administration, and to proceed to the cancellation of that VAT credit in respect of the return of turnover following the month or the quarter of the filing of the application.

The amount to be returned is limited to the total amount of VAT originally paid in respect of purchases, subtracting the amount of such purchases with application of the reduced VAT rate applicable by the taxpayer to its turnover.

With regard to the resulting VAT credit on the acquisition of capital goods, the amount to be returned is limited to the amount of the VAT charged on the acquisition of the property.

The tax administration proceeds to liquidate the VAT credit when it ensures the veracity of such credit. The liquid reimbursements are subject to decisions of the minister of finance or the person delegated by him for that purpose and give rise to the establishment of reimbursement orders.

The Finance Law of 2014 establishes a derogation to the limitation period allowing the tax administration to correct irregularities noted during the liquidation of the reimbursement of the cumulative tax provision above, even if the limitation period has expired. 4. REGISTRATION FEES A. Exemption of the "Fonds Afrique 50": The Finance Law of 2014 exempts the ADB's "Fonds Afrique 50" from registration fees. This fund shall be exempt from all national and local duties and taxes. B. Changes of the conditions for the entitlement of the benefits granted to the purchasers of housing for the middle class: Prior to the Finance Law of 2014, purchasers of housing for the middle class were exempt from rights registration, stamp duty and fees on land books under the following conditions:

- The per square metre sale price must not exceed Dh6000 (€533), VAT included;
- The covered area should be between 80 sq metres and 120 sq metres; and

- The housing must be intended for citizens whose monthly income net of tax does not exceed Dh20,000 (€1776) and the housing will be assigned as their main residence for four years from the date of conclusion of the contract of purchase. The Finance Law of 2014 changes the first two conditions by specifying that:
- The square-metre sale price must not exceed Dh6000 (€533), excluding VAT; and
- The covered area should be between 80 sq metres and 150 sq metres. 5. GOVERNMENT AMNESTY REGARDING CASH & FUNDS HELD ABROAD Recently the Moroccan government decided to grant amnesty to Moroccans who have illegal assets and cash abroad. It is an amnesty for exchange and tax offenses relating to possession of real or financial assets abroad by Moroccans resident in Morocco. The amnesty is part of measures taken by the government to provide funds to the state budget and strengthen foreign reserves. A. The persons concerned: Under the provisions of the Finance Act 2014, this contribution is granted for individuals of Moroccan nationality having resident status in Morocco and legal persons of Moroccan law which held, before January 1, 2014, property, assets and cash abroad in violation of foreign exchange regulations and tax legislation. B. Exchange offenses concerned: Offenses covered by this contribution are those related to the establishment of foreign assets in the form of:
- Real estate properties held in any form abroad;
- Financial assets, securities, other equity securities and receivables held abroad; and
- Liquid assets deposited in accounts of financial institutions, credit agencies or banks located abroad. C. Tax offenses concerned: Tax offenses covered by this contribution are those governed by the General Tax Code relating to a failure to file a tax return relating to income, products, profits and capital gains on real estate and movable assets as well as cash in foreign currencies held abroad. D. Conditions to be filled: The persons concerned may benefit from the non-application of penalties relating to exchange offences as well as tax offences referred to above under the following conditions:
- Deposit with a credit institution with the status of a bank, governed by Act No. 34-03 relating to the credit institutions and similar institutions, a declaration according to the model form prepared by the administration showing the nature of the assets held abroad;
- Repatriate cash in foreign currency as well as income and products and convert at least 25% of the foreign exchange liquidity into Moroccan dirhams, with the possibility to deposit the remaining part into foreign currency accounts or convertible dirham accounts that have been opened in a credit institution located in Morocco that has the status of a bank; and
- Proceed to the payment of a final withholding contribution. The discharge contribution rate is fixed at:
- 10% of the value of acquisition of the real estate in foreign countries or the value of subscription or acquisition of financial assets and securities and other securities capital or debt held abroad;
- 5% of the amount of the liquid assets in foreign currency repatriated to Morocco and deposited in accounts in foreign currency or in convertible dirhams; and
- 2% of foreign currency liquidity repatriated to Morocco and transferred on the foreign exchange market into dirhams. The payment of the contribution releases the person concerned from the payment of penalties relating to infringements of foreign exchange regulations. Similarly, payment of this contribution releases the concerned of the payment of PIT or CIT as well as fines, penalties and increases applicable in case of infringement to the obligations of declaration or payment of the tax concerned. The contribution will be assigned to support the social cohesion fund.

Request reuse or reprint of article (mailto:syndication@oxfordbusinessgroup.com?subject=Request to reuse Changing regulations: Key points of the Finance Law of 2014 from The Report: Morocco 2014)

**You have reached the limit of premium articles you can view for free.**

Choose from the options below to purchase print or digital editions of our Reports. You can also purchase a website subscription giving you unlimited access to all of our Reports online for 12 months.

If you have already purchased this Report or have a website subscription, please login to continue.

Login or register.

Login or register

**Email address (required)**

○ I am a new customer

◉ I am an existing customer

**Password Forgot password? (/user/password)**

Log in

# The Report: Morocco 2014

✎ Buy printed edition £175

# Tax chapter from The Report: Morocco 2014

View Full Website Subscription Options (/subscriptions)

Keep browsing

# Exhibit II-71

**Covid-19 Economic Impact Assessments**
Register for FREE daily updates

(https://oxfordbusinessgroup.com/covid-19-update-registration)

Keywords (optional)                                          Search

# A guide to the main tax measures adoped by Morocco's new Finance Law of 2016

Morocco (/country/morocco) | Tax (/search-results?
sector=52399&country=all&keywords=)              View in online reader (/node/911652/reader)

Text size ─ ＋
Overview

Recommend

**As part of the numerous reforms that have made Morocco an economic model in the region, the Finance Law for 2016 is the next step in the implementation of profound tax reforms initiated by the government following the work carried out during the national conference on taxation held in Skhirat in April 2013. As published in the Official Bulletin No. 6423, Finance Law 70-15 (Law 70-15), enacted by Decree No. 1-15-150 of December 19, 2015, aims, in particular, to:**

- Strengthen tax fairness in Morocco;

- Improve company competitiveness; and

- Encourage investment in the country.

## Corporate Income Tax

Law 70-15 also institutes a new scale for corporate income tax (CIT) rates. As regards CIT, the main measures adopted by Law 70-15 are the institution of a rate scale applicable on the net benefits of companies instead of the previous rates of 10% and 30%. However, credit institutions and assimilated establishments, Bank Al Maghrib, insurance and reinsurance firms are not included under this measure and remain taxable at the flat rate of 37%.

## Changes

Amendments have also been made to some articles in the tax code. In order to clarify the meaning of some articles in relation to CIT, Law 70-15 included amendments to the General Tax Code of Morocco. These amendments particularly concern the following articles:

- Article 6-I-A;
- Article 6-I-C-1°; and
- Article 170-III.

Article 6-I-A provides that companies exempted from CIT are excluded from the benefit of a 100% tax deduction on received dividends and exemption of gains on securities sales. In 2016 the phrasing of the article was amended, and henceforth it stipulates that the companies concerned by the provisions listed above are those which benefit from a permanent exemption in terms of corporate tax and which benefit from 100% tax deduction.

Article 6-I-C-1° grants an exemption from withholding tax on dividends paid by offshore holding companies, up to the offshore turnover share. The new phrasing states that this exemption is granted to these companies, up to the income which corresponds to the activity eligible for the flat tax rate as provided for under Article 19-III-C of the General Tax Code, and the conditions as stipulated in Article 7-VIII of the aforementioned code.

Article 170-III concerns the calculation of tax instalments following the expiry of a tax exemption in terms of the minimum contribution or CIT. In order to avoid misinterpretations, this article henceforth specifies that tax instalments are calculated on the basis of corporate tax rates applicable to companies during the taxable year.

## Income Tax

As regards income tax, Law 70-15 has set up a tax regime that is applicable for *ijara mountahia bitamlik* (IMB), an Islamic banking offer which is designed as a leasing contract covering properties intended for principal residential uses, with a purchase option, according to the provisions of Law No. 103-12 of December 24, 2014.w

## IMB Contracts Tax Regime

The tax regime applicable as regards IMB contracts is the same as the one that was previously adopted regarding the Islamic banking offer known as *mourabaha*, which is a type of sale contract, particularly for real estate assets. Hereafter, the main tax incentives provided for IMB contracts include the following:

- Deduction with a ceiling of 10% of the total taxable income, and the amount of the rental margin paid by the taxpayer under an IMB contract;
- Deduction from wage income of the amount of cost acquisition and rental margin paid by the taxpayer, as part of an IMB contract for the purchase of social housing intended for principal residence;

- In terms of the exemption granted upon the sale gain, one must take into account the period of occupation of the house by the taxpayer contracting an IMB in his or her quality as a leaseholder; and

- For the calculation of the sale gain, the acquisition cost and the rental of the property acquired under an IMB contract must be taken into consideration.

## Joint Possession Contracts

The tax code also offer procedures for joint possession contracts for properties acquired under mourabaha or IMB. In addition to the institution of the tax regime applicable to IMB offer, Law 70-15 cancelled deductibility limits for interest or remuneration agreed on in advance on loans contracted for the acquisition of properties as principal residence as part of joint possession contracts.

In fact, in accordance with Article 28-II of the General Tax Code, taxpayers contracting the type of loans mentioned above are now given the benefit of a deduction not exceeding 10% of their taxable global income for every contracting party of the acquisition agreement and up to his/her share in the property acquired. Therefore, the ceiling of 10% of interest deductibility is no longer applicable; a total deduction is granted instead. It should be noted that the tax incentive provided in Article 28-II is applicable to interest on loans contracted under a mourabaha contract or to the rental margin as part of an IMB contract as of January 1, 2016.

## Professional Income

In terms of tax compliance, taxpayers having a professional income only – defined as following a flat profit regime and taxed on the basis of the minimum profit – are exempt from the obligation to submit an annual income tax return. This exemption is granted under the following conditions:

- The annual profit is taxed on the basis of the minimum profit and the notified payable tax, in principal, does not exceed Dh5000 (€458);

- The determination of the flat profit has not undergone any changes which might increase the taxable base initially retained; and

- The profit of this exemption is granted within the period when the business of the taxpayer is still being carried out.

Thus, this measure is not applicable to a taxpayer whose annual income is based only on the flat profit provided in Article 40 of the General Tax Code. Furthermore, in case of an interruption in the taxpayer's activity, the latter will be required to comply with obligations stated in Articles 85 and 150 of the tax code. It should also be noted that the exemption from filing an annual income return for taxpayers with a professional income only is effective during the year that follows the one in which the conditions above are fulfilled.

## Agricultural Properties

In order to align tax treatment applicable on rental incomes, Law 70-15 widened the 40% tax deduction to cover rental income issued from agricultural properties. Therefore, according to the new adopted measure, taxable rental income from these types of properties after the application of the 40% tax deduction is defined as following:

- The gross amount of the rent as stipulated in the contract;

- The gross amount obtained by multiplying the average price of the crop used by quantities specified in the contract, in the case of rentals paid in kind; and/or

- The share of flat farm income in the case of rentals share fruit.

This measure is applicable to income revenues from agricultural properties as of January 1, 2016.

## Tax Collection

Law 70-15 also includes tax collection procedures that are applicable to taxpayers under a real/simplified net income regime. According to the Finance Law of 2016, the due tax on the professional income of a taxpayer under the real/simplified net income regime, as well as taxpayers practising independent professions, is no longer payable by assessment of the tax administration following the submission of an annual income tax return, but spontaneously to the tax collector of the tax administration. This measure is applicable in cases of minimum contribution as well, starting from January 1, 2016.

## Legal Deadline

The new tax code also includes modifications of the legal deadline to submit an annual income return for taxpayers under the real/ simplified net income regime. Further to the measures detailed above, taxpayers under the real/ simplified net income regime that have professional and/or agricultural income are granted an extra month to submit their annual income return and to submit tax payments accordingly.

Instead of the legal deadline of April 1, these taxpayers have until May 1 to fulfil their obligations in terms of declaration and payment as regards income tax. Following this measure, Law 70-15 also amended the provisions of Article 44-I of the General Tax Code, providing the legal deadline during which the concerned taxpayers can choose the option of the simplified net income regime.

## Value-Added Tax

In terms of value-added tax (VAT), the main measures that have been adopted under the Finance Law of 2016 concern, in particular, the introduction of new regulations regarding aircraft and railway transportation, second-hand moveable goods, and activities related to the agri-food sector. Other measures have been adopted in relation to VAT credits, refunds and the fixation of some tax rates.

## Transport & VAT

In order to align international tax treatment of aircraft imports Law 70-15 exempted any imported aircraft with a capacity of 100 seats, as well as equipment and spare parts intended to repair such aircraft, and cancelled the previous 20% VAT tax rate.

In addition, to promote aerospace industry, aircraft dismantling operations benefit from a VAT exemption as of January 1, 2016, since these segments are henceforth considered to be services related to international transportation.

The new taxation procedures also include railway transportation, which is certainly the main measure of Law 70-15 as regards VAT, where the applicable VAT has been revised upwards to alleviate the VAT credit allocated to the national railways agency, Office National des Chemins de Fer. Therefore, instead of 14%, railway transport is now subject to the normal VAT rate of 20%. However, other transport operations remain subject to the reduced rate of 14%. Another measure affecting the rail sector is the import of railway equipment, which is now exempted from VAT.

## Other VAT Rules

While Article 125 of the General Tax Code allows for taxation of second-hand goods, this article has been amended by Law 70-15 to include the sale of second-hand moveable assets, along with the sale of the business capital.

Prior to 2016 agri-food business supported VAT without any possibility of deducting VAT from certain inputs since agricultural products are outside the scope of VAT, which led to an automatic sales tax and not a tax on the real value-added generated by a business. This situation has made the agri-food business in Morocco uncompetitive and caused overgrowth of informal businesses. In order to address this situation, Finance Law of 2016 introduced a tax on agricultural products intended for the agri-food sector in Morocco. Therefore, and notwithstanding the provisions of Articles 101 and 104 of the General Tax Code, even if it is not apparent in the purchasing price of locally obtained fruits and unprocessed vegetables, VAT is henceforth deductible.

## VAT Refund

Currently, and in accordance with Article 103 of the General Tax Code, VAT refunds are granted to taxpayers performing operations that are tax exempt or in a tax-suspension period in compliance with Articles 92 and 94 of the General Tax Code. As part of VAT reform, the VAT refund process covers 2015, 2016 and 2017 for companies which have a cumulative VAT credit of between Dh20m (€1.8m) and Dh500m (€45.8m).

In addition, Law 70-15 widened the scope of application for items eligible for a VAT refund to cover investment goods, with the exception of equipment, office furniture and passenger transport vehicles, other than those used for the purposes of public transport or collective staff transport. Finally, Finance Law of 2016 modified the VAT rate applicable to IMB contracts to align their tax treatment with the terms of mourabaha contracts. Therefore, instead of a 20% rate applicable to the margin generated by such contracts, a reduced rate of 10% is henceforth in effect.

# Registration Fees

The recent reforms also saw other specific measures concerning registration fees adopted under Law 70-15. The main measures can be summarised as the following:

- Exemption for the sale of collective lands located in an irrigation district and which were subject to registration fees under the common law regime;

- Bare-land acquisition or lands comprising buildings to be demolished, intended for construction projects, benefit from a reduced rate of 4%, but are limited to five times the covered area of the land(s); the application of this reduced rate was unlimited before 2016;

- Clarification of the taxable basis for mourabaha and IMB contracts, which is now the acquisition price of properties or business capital, instead of the higher amount calculated as provided in Article 132-II of the tax code; and

- Reduction of the taxable base regarding rental acts through emphyteutic leases from 20 times the annual rental price to just one annual rental price; this measure is limited to emphyteutic leases concerning state-owned lands intended for investment projects in the industrial, agricultural or services sectors.

## Sanctions & Penalties

In addition to taxes, it is important for taxpayers to be aware of new measures adopted by Law 70-15 as regards penalties and surcharges in cases of non-compliance with tax regulations that are in effect. As such, the main amendments introduced by Article 8 of Finance Law of 2016 are summed up below.

## Expenses & Deductibility

To avoid the proliferation of informal businesses in Morocco, other measures have been adopted. In fact, in order to encourage companies to be more transparent in their transactions, Article 8 of Law 70-15 provides that expenses which are not paid by non-transferable crossed checks, commercial bills, magnetic means of payment or bank transfers are deductible from the taxable income of companies within the limit of Dh10,000 (€917) per day and per supplier, up to a monthly amount of Dh100,000 (€9170) per supplier, VAT included. It should also be noted that in terms of assets acquired and not settled following the above payment means the recorded depreciations on these assets are not considered deductible from taxable income of companies. As regards VAT, deductibility is no longer permitted for purchases of goods or services exceeding Dh10,000 (€917) per purchase and per supplier up to a monthly amount of Dh100,000 (€9170) per supplier, VAT included. These measures are applicable to financial years opened counting from 2016.

## Company's Common Identifier

Introduced by Decree No. 2.11.63 of May 20, 2011, ICE is a new common identifier for companies and is intended to be used by different authorities in Morocco. Following its effective application since 2014, Article 8 of Law 70-15 has amended the provisions of Article 145 of the General Tax Code to highlight

taxpayers' obligation to include in their invoices, or similar documents, as well as in the tax returns, this new common identifier. Therefore, invoices not containing the ICE do not give the taxpayer the right to deduct VAT from a purchase.

# Tax Treaties

Morocco has expressed over time its strong commitment to cooperation and development in Africa. The country has always attached special importance to building up strong relationships with other African countries through strengthened economic ties and the establishment of various partnerships relying on measures for promoting South-South cooperation. One of the leading measures is the conclusion of tax treaties that aim to avoid double taxation as part of business binding Moroccan and African companies. They are also meant to avoid fraud and tax evasion by providing administrative support for collection of taxes between signatory countries.

Morocco currently has tax treaties in effect with the Arab Maghreb Union, Egypt, Senegal, Gabon and Guinea, and agreements are at various stages of development with another 15 African countries. Given the few tax treaties in effect, efforts are still needed to support Morocco's ambitions in terms of economic and social cooperation with African countries. It is important for Morocco today to implement an overall tax strategy in line with its expectations on the continent. This strategy is no longer an option; it is a necessity given the growing competitive environment in many African markets.

Request reuse or reprint of article (mailto:syndication@oxfordbusinessgroup.com?subject=Request to reuse A guide to the main tax measures adoped by Morocco's new Finance Law of 2016 from The Report: Morocco 2016)



# Exhibit II-72

**FitchRatings**

# OCP S.A.

The 'BBB-' Issuer Default Rating (IDR) of Morocco-based phosphate producer OCP S.A. incorporates a one-notch uplift for state support (Morocco, BBB-/Stable) from its 'bb+' Standalone Credit Profile (SCP), in line with Fitch Ratings' *Government-Related Entities (GRE) Rating Criteria*.

The 'bb+' SCP reflects a strong business profile underpinned by OCP's vertical integration, competitive cost position, exceptionally large ore reserves and leading market positions. It also factors in a weak, albeit improving, financial profile, primarily due to sizeable debt-funded expansionary investments.

OCP's credit metrics offer limited headroom for unforeseen cash outflows in 2019-2020 under our base case with funds from operations (FFO)-adjusted net leverage forecast at 2.8x compared with our 3.0x negative sensitivity. The Stable Outlook captures our opinion that the group would have the flexibility and willingness to reduce investments should cash flow generation be lower than expected. We forecast a gradual improvement in financial headroom from 2021 on lower expansionary capex, higher volumes and moderate pricing improvements.

## Key Rating Drivers

**Growth to Resume in 2020:** Our base case continues to assume that growth beyond 2019 will be driven by a moderate improvement in prices and a gradual increase in fertiliser and phosphate rock volumes, with supply of merchant rock adjusted to market conditions. This should translate into high-single-digit revenue growth and EBITDA margins in the 30%-33% range.

We believe that OCP's decision to temporarily curtail phosphate production by 500,000 metric tonnes from mid-December 2019 to end-February 2020, due to adverse weather conditions, will not have a negative effect on OCP's operating performance, given demand is seasonally low during first quarter of the year.

**Rating Linkage with Morocco:** Under our GRE methodology, OCP scores 22.5 for overall support, which maps to a one-notch uplift. This reflects Fitch's view that the group would likely receive exceptional support from the state if its financial profile weakens to the extent where its ability to maintain its expansionary efforts or refinance its debt is threatened.

In our opinion, this assessment is supported by OCP's completion of the first phase of its strategic investment programme as well as its status as Morocco's largest non-financial corporate issuer of international bonds. This also reflects that despite its 94% state ownership, OCP is run as an independent profit-oriented entity with no legal ties to the state.

**Phosphate Prices to Bottom Out:** Diammonium phosphate (DAP) prices fell below our previous 2019 assumptions as poor weather conditions in the US, weaker application rates in China and lower ammonia prices exacerbated the effect of the Ma'aden capacity ramp-up. We expect prices to bottom out in 2020 as oversupply starts to ease and high inventories in import markets are liquidated. From 2020, higher ammonia input prices should push non-integrated producers' costs up and support higher DAP prices.

**VAT Credit Build-Up Unlikely to Recur:** Our base case assumes that the build-up of sizeable VAT claims against the state, which exacerbated the deterioration in OCP's credit metrics in 2016-2017, will not be repeated. The group accounted for roughly half of the state's total

## Ratings

| Rating Type | Rating | Outlook | Last Rating Action |
|---|---|---|---|
| Long-Term IDR | BBB- | Stable | Affirmed 1 Nov 2019 |
| Long-Term senior unsecured rating | BBB- | | Affirmed 1 Nov 2019 |

Click here for full list of ratings

### Applicable Criteria and Related Research

Government-Related Entities Rating Criteria (November 2019)

Corporate Hybrids Treatment and Notching Criteria (November 2019)

Corporate Rating Criteria (February 2019)

Corporates Notching and Recovery Ratings Criteria (October 2019)

Sector Navigators (March 2018)

### Analysts

Peter Archbold
+44 20 3530 1172
peter.archbold@fitchratings.com

Roberta Mori
+44 20 3530 1139
roberta.mori@fitchratings.com

### CRU Research

Phosphate Fertilizers and Rock

CRUGroup.com⧉

Contact CRU⧉



overdue VAT credit liabilities in 2018 (1.8% of GDP), due in large part to its investment programme.

In May 2017, the tax regime for capital investments was amended to exempt existing companies for sums of MAD100 million and above. As a result, OCP's VAT credit claims should be materially lower in the new wave of capex. The government is also implementing a series of measures to digitalise and simplify the reimbursement procedures and reduce delays.

**VAT Credit Factoring Scheme:** The build-up of large VAT credit arrears by the Moroccan state exacerbated the impact of weak market conditions and large debt-funded expansionary investments on OCP's leverage. In 2018, the government secured long-term factoring facilities from banks to settle the VAT credit claims of state-owned entities, including OCP. However, OCP is responsible for servicing interest payments on the factoring facilities. These are due over nine years, amount to MAD4.2 billion, and were pre-funded in the MAD20.5 billion cash OCP received in October 2018 to settle the VAT arrears.

Fitch treats the MAD4.2 billion of capitalised interest as debt, in line with OCP's reporting. Leverage was restored to 2.7x at end-2018, down from 5.5x and 4.7x at end-2016 and end-2017, respectively, as a result of the transaction.

**Capex Offers Flexibility:** Our base case assumes that capex will peak at MAD15 billion in 2020 and decline to MAD11 billion thereafter but remain well above maintenance levels, to support granulation and phosphoric acid capacity increases, logistics and debottlenecking exercises. Along with dividend distributions, this translates into negative FCF until 2021, but OCP has demonstrated its ability to scale back investments should operating cash flows come under pressure.

**Cadmium Restrictions:** In June 2019, the EU brought in a new regulation on fertilisers sold in the EU, including a limit of 60mg cadmium per kg of phosphorus pentoxide (cd/kg $P_2O_5$) from 2022, and voluntary green labelling for fertilisers with less than 20 mg cd/kg $P_2O_5$ starting in 2019. The European Commission will review the 60 mg cd/kg $P_2O_5$ limit in 2026. Sedimentary phosphate rock deposits such as OCP's have high cadmium content.

Previous iterations of the proposed restrictions had considered gradually reducing the limits to below 40mg, which could have affected OCP's capacity to export to the EU, its third-largest market at 20% of sales in 2018. We understand from the group that its products currently fully comply with all aspects of the new regulation and that it has been investing in the development of cost-effective ways to address these changes while focusing on selective mining of layers with lower cadmium content.

APPX0002071

# Exhibit II-73

HOME     ABOUT US     OUR SERVICES     RECRUITMENT     NEWS     CONTACT US

☎ +212.522.29.58.28 - +212 522 29 85 32     ✉ contact@cegor.net     



HOME     ABOUT US     OUR SERVICES     RECRUITMENT     NEWS     CONTACT US

## NEWS

# KEY PROVISIONS OF MOROCCAN FINANCE LAW FOR 2018

**PROVISIONS RELATING TO CORPORATE INCOME TAX:**

**Institution of a sliding scale for corporate tax:**

- 10% for a net income lower or equal to MAD 300,000
- 20% for a net profit of MAD 300.001 to 1,000,000
- 31 percent to more than 1,000,000MAD

**Exemption of all operations and activities conducted by collective investment vehicles in real estate (OPCI) according to their object in the conditions defined in article 7-XI of the CGI (tax law), since profits distributed as dividends by such vehicles are taxed in the hands of their unit holders.**

**Amendment in the taxation of capital gains in case of merger or spin off:** Now tax corresponding to these capital gains whose tax is deferred must be paid spontaneously by the acquiring company (or the new company resulting from the spin off). Such payment should be made through the corporate income tax return of the tax year during which the related goods are withdrawn from the company's assets, regardless of the taxable profit or loss of the year concerned.

**Possibility for the acquiring companies to carry forward the losses available during FY** prior to the merger or spin-off and corresponding to regularly accrued depreciation.

**PROVISIONS RELATING TO INDIVIDUAL INCOME TAX:**

### LATEST POSTS

KEY PROVISIONS OF MOROCCAN FINANCE LAW FOR 2018

Newsletters – Documentation

Law of finance 2016: Main Provisions

MODIFICATION ON MANDATORY HEALTH INSURANCE RATES

APPX0002073

are granted pursuant to a Court decisionor further to a Conciliation procedure.

**Exemption from income tax on salaries for a 24-month period in favor of companies created between 1St January 2015 and 31 December 2022**, within the limit of 10 employees and a gross salary capped at 10,000 MAD. This provision applies to employees hired under a permanent contract within the first two years after starting date of business.

**Exemption from land profit tax in respect of gifts made in the framework of a "Kafala"** subject to an order from the guardianship judge.

**Back to the provisions applicable prior to 2013 relating to land profits in respect of sale of property acquired throughinheritance:** Now the acquisition price to be considered is either the market value on death date of the property owned by the deceased and listed on the inventory made by the heirs; or the market value of the property on death date, as declared by the taxpayer.

**Back to the provisions applicable prior to 2013 relating to land profits on sale of unbuilt land:** Now those profits are taxed at the flat rate of 20%.

**Extension of tax neutrality to the contributions of real property owned by a private taxpayer to the inventory of a company**, being recalled that the provisions of the Finance Law 2017 limited this neutrality to contributions of such goods to the fixed assets.

**Exemption from corporate tax of the sport federations and associations that are** recognized of public utility, for all their activities or operations and related to their potential revenues.

**Obligation to all taxpayers to submit their income tax return electronically**, excluding taxpayers whose earned income is determined according to the plan of flat-rate benefit.

<u>**PROVISIONS THAT ARE COMMON TO CORPORATE INCOME TAX AND PROFESSIONAL INCOME TAX**</u>

**Tax reduction for taxpayers taking stakes in the capital of young innovative companies in** the **new technology sector**: the tax reduction is granted up to the amount of participation capped at 200,000 MAD by young innovative company and 30% of the tax due in respect of the fiscal year of equity participation, subject that innovative company meets certain criteria defined by the tax regulation.

The incentives granted to exporters for their turnover in foreign currency (exemption for 5 years followed by the reduced rate) is **extended to tourism animation businesses.**

**Deductibility of all para-fiscal taxes**

**Obligation to attachto annual income tax returns a sales report** indicating the common identifier of customers according to a model established by tax administration.

<u>**PROVISIONS RELATING TO VAT:**</u>

- Refund of the VAT credit to the benefit of companies acting in the desalination of sea water business;

HOME    ABOUT US    OUR SERVICES    RECRUITMENT    NEWS    CONTACT US

provided in the customs code;

- VAT exemption of goods, material, goods and services for the benefit of the Mohammed V Foundation for solidarity;
- Right to recovery of not apparent VAT on purchases of local-origin milk used in the production of dairy derivatives;
- Exemption without the right to deduction of all of the activities and operations carried out by sport federations recognized of public utility

**PROVISIONS RELATING TO REGISTRATION DUTIES :**

- **Exemption from registration duties on creation and increase in capital** of companies or economic interest groups, made by contribution in cash, capitalization of debt towards shareholders or of profits and reserves. Exemption also applies certain contributions in-kind, as provided by the Moroccan tax code.
- **Exemption from registration duties on transfers (whether free or for consideration) of shares** incompanies or economic interest groups, excluding shares inreal estate companies.
- **Registration duty at the reduced rate of 1.5%** applicable to acts of free transfers by a "Kafil" to the benefit of the dependent child
- **Fixed registration duty of MAD 200 MAD applicable to the termination** of preliminary sale agreements, booking contracts and deeds relating to the release of fundsas part of sales before completion (VEFA)
- **Exemption from registration duties on acquisitions of bare lands for the purpose of building hotels,** under certain conditions (construction within a period of 6 years, conservation of the assets for 10 years, mortgage in favor of the State).
- **Dematerialization of the registration** formality for the benefit of notaries as from 1St January 2018 and "adouls"; accountants and chartered accountants as from 1St January 2019.

<u>**PROVISIONS RELATING TO STAMP DUTIES:**</u>

- Exemption from proportional stamp duty applicable to non-polluting vehicles.
- Limitation of the application of proportional stamp duty to the first registration of the vehicles whose total weight is less than or equal to 3,000 kg and 4 x 4 vehicles.
- Limitation of the application of the MAD 20 stamp duty only to deeds that are mandatorily subject to the registration formality as well as other deeds, documents and writings expressly subject to stamp duties pursuant to the Moroccan tax code.
- Increase in the rate of stamp duty applicable to passports from MAD 300 to MAD 500.
- **Precision made to article 252 of the Moroccantax code** : now, are subject to the stamp duty rate of 0.25%, the pure and simple receipts or acquittals given at the foot of invoices and memoirs, receipts or discharges of sums and all titles that carry release or discharge <u>settled in cash</u>. Stamp tax return must be submitted monthly instead of quarterly.

subject to registration, payment by e-filing for some operations..).

OTHER PROVISIONS:

**Alignment of the tax treatment of new participatory finance products to conventional banking products:**

- Tax treatment of income from « sukuk » certificates has been included in article 14 of tax regulation code, i.e., application of the 20% withholding tax.

- Clarification of the VAT taxable basis for 'Ijara Mountahiya Bitamlik' products: rental margin in respect of acquisitions of residential housing and rents in respect of acquisitions of business premises.

- Transfer of the right to deduct VAT charged on acquisitions made as part of « Murabaha » to buyers that are subject to VAT.

- Exclusion for credit institutions and assimilated from the right to deduct VAT charged on acquisitions of housingunits intended for rental in the frame of 'Ijara Mountahiya Bitamlik' contracts and « Murabaha » acquisitions contracts.

- Reduced rate of registration duty depending on the nature of the property in favor of credit institutions and assimilated (instead of the standard rate) and application of the MAD 200 minimum rate for deeds relating to the partial transfer of buildings for the benefit of clients.

**Relief from tax obligations for businesses subscribing a declaration of temporary cessation of activity for a period of 2 years, renewable for one year:** Exemption from the minimum income tax contribution, filing a single annual statement VAT before the end of the month of January of each year. Note that, however, they must continue to file their corporate income tax or professional income tax returns.

**Possibilityfor taxpayers to ask the tax administration to decide on the tax regime applicable to certain transactions under the legislation and regulations provisions in force (ruling)**. This new provision only covers certain transactions including legal and financial arrangements related to investment projects, restructuring operations, transactions between related Moroccan companies.

SPECIFIC PROVISIONS RELATING TO VERIFICATION PROCEDURES, COMMUNICATION RIGHTS AND SANCTIONS:

**Obligation for companies to keep their books in electronic format** according to criteria defined by separate regulation.

**Obligation for taxpayers keeping their books in electronic format** to show in case of a tax audit their books in electronic format, otherwise a penalty of MAD 50,000 per fiscal year applies.

**Requirement for companies keeping their books in electronic format to keep their electronic accounting documents for 10 years as referred to in article 211 of the Moroccan tax code :** note that article 211 considers as accounting documents copies of invoices or receipts as well as expenses and investment vouchers, in addition to the books and accounting journals that are required in the context of tax audits.

**Clarification of the provisions of article 213 of the CGI related to serious irregularities questioning the probative value of accounting**: from now on,

HOME     ABOUT US     OUR SERVICES     RECRUITMENT     NEWS     CONTACT US

of turnover or taxable income or if the accounts do not allow to document the reported profits or losses.

**Obligation for the tax administration to begin the tax audit within a period not exceeding (5) working days from the date set for the beginning of the audit.**

**Suspension of the statute of limitation period between the date of submission of applications to the administrative courts (article 232-VI of the CGI)** and the expiry of the period of 3 months following the date of notification of the final decision of the Local Taxation Commission or the National Commission, according to the case**.**

**Extension of the accelerated rectification procedure (article 220 and 221 of the CGI) to the partial transfer of tangible or intangible assets of the company or in case of temporary termination of activity.**

**Generalization of the common business identifier ("ICE"):** The taxpayer must in addition to its own ICE, mention the ICE of its customers in the invoices issued, its tax returns and in the annual report of sales attached to the taxable profit statement. Otherwise a penalty of MAD 100 per omission is applied, as well as the loss of tax benefits provided by the Moroccan tax code.

**Obligation to have an electronic billing system** for taxpayers subject to the corporate income tax and professional income tax according to the regime of net real or simplified net income and VAT, that meets the technical criteria and conditions determined by a regulation taking into account the specificities of each sector**.**

**I**ntroduction of a final withholding contribution** for the income and profits generated by assets and liquidity held by individual foreign residents, in respect of tax offences.

**Cancellation of penalties, surcharges and collection fees related to taxes, rights and duties assessed** in addition to the principal tax amount prior to 1st January 2016 and remained unpaid on 31st December 2017, provided that taxpayers pay spontaneously the principal amount before 1st January 2019.

**Reduction of 50% of the fines, penalties, surcharges and collectionfees** remained unpaid as of 31st December 2017, provided the remaining 50% are paid prior to 1[st]January 2019.

## Share

        

ABOUT US                OUR SERVICES                CONTACT US

# Exhibit II-74

# SUSTAINABILITY REPORT



2018

Working together for sustainable agriculture

GRI 103-1 | GRI 103-2 | GRI 103-3

**Use of non-conventional resources**

## OCP gives priority to reusing treated domestic wastewater, thereby protecting the environment and preserving natural freshwater resources.

Merah Larach is one of the first washing plants in the world to use treated wastewater. OCP commissioned the Khouribga Wastewater Treatment Plant in 2010 to provide water at its washing facility. Two other wastewater treatment plants followed at the Benguerir and Youssoufia mining sites, bringing OCP's industrial reuse of treated water to around 10 million m³ per year. In addition, part of the water from the Benguerir wastewater treatment plant will be used to irrigate green spaces in the Mohammed VI Green City.

Moreover, biogas recovered from the wastewater treatment process is used to generate electricity, covering up to 30% of the wastewater treatment plant's energy needs.

The success of this pilot, will spur the use of wastewater in other industrial projects.

As part of the Circular Economy Program, several feasibility studies are underway with key national stakeholders for further industrial reuse of treated wastewater, based on new and existing wastewater treatment plants.

OCP is investing in seawater desalination to cover all the additional needs for its industrial development, without any reliance on conventional water resources.

The industrial platform of Jorf Lasfar is now supplied by the largest desalination plant in Morocco with an annual capacity of 25 million m³. Its expansion is planned to be commissioned in 2022 to reach a total capacity of 40 million m³ per year. This station is also designed to take advantage of the platform's existing facilities and infrastructure, as well as the energy surplus the platform generates.

Another 7.5 million m³ capacity station is planned in Laayoune to meet the water needs of the Phosboucraa site's industrial development program, in addition to the existing reverse osmosis desalination plant with a capacity of 1.4 million m³, commissioned in 2006.

Finally, for Safi, desalination is also planned to meet the future needs of its industrial development program.

**Innovation to streamline water use**

As part of the Circular Economy Program, OCP Group is investing in R&D and innovation to streamline water usage. Numerous projects have been launched in collaboration with various partners, including Mohammed VI Polytechnic University, in order to develop solutions for optimizing water in the industrial process and to use the most appropriate and advanced water treatment technologies (purification and desalination).

### OCP's goals

**Implement 2 Wastewater Treatment Plants at Safi & Fkih Ben Salah towns by 2022**

> An overall capacity of 10 Million m3/year recovered from urban wastewater

**Recover 90% of Water used in Phosphate Washing Plants**

> Invest in dehydration technologies at the MERAH, DAOUI and YOUSSOUFIA washing plants to recover 50% of the remaining water from the residual sludge by 2010

**90% reduction of water used for watering mine runways**

> Leveraging on cutting edge runways treatment technology and saving 2 Million m³



APPX0002080

# Exhibit II-75

FitchRatings

RATING ACTION COMMENTARY

# Fitch Revises OCP's Outlook to Stable; Affirms at 'BBB-'

Mon 05 Nov, 2018 - 7:50 AM ET

Fitch Ratings-London-05 November 2018: Fitch Ratings has revised the Outlook on Morocco-based phosphate producer OCP S.A.'s Long-Term Issuer Default Rating (IDR) to Stable from Negative and the Long-Term IDR and senior unsecured ratings at 'BBB-'.

The revision of the Outlook reflects the expected improvement in OCP's financial profile in 2018 on the back of the reimbursement of MAD20.5 billion in VAT arrears from the state, and to a lesser extent, favourable market conditions. Under our base case, funds from operations (FFO) adjusted net leverage will be sustained below 3.0x (4.8x at end-2017) against our 4.0x negative sensitivity for 2019. Beyond 2019, profitability and cash flow generation should be supported by positive pricing momentum and the full contribution from the four Jorf Lasfar units. We forecast reducing but sill high expansionary capex which along with dividends, translates into sustained negative free cash flow (FCF).

The 'BBB-' rating incorporates a one-notch uplift for state support (Morocco, BBB-/Stable), in line with Fitch's Government Rated Entities (GRE) rating methodology. OCP's business profile is strong and underpinned by its vertical integration, competitive cost position, exceptionally large ore reserves and leading market positions.

KEY RATING DRIVERS

Deleveraging on VAT Credit Reimbursement: Our rating case factors in the reimbursement of MAD20.5 billion of the VAT arrears in October 2018. As the largest contributor to the investment drive of state-owned companies, OCP had accumulated MAD21.3 billion in VAT credit of since 2012. In line with the mechanisms put in place for the private sector in early 2018, the government is securing long-term factoring facilities from banks to settle the VAT claims of state-owned entities. The proceeds are paid by the banks to the VAT creditors on a no recourse basis for principal. Interest payments will be serviced by the companies.

Improving Headroom Under SCP: The repayment of the arrears restores much needed headroom under OCP's standalone credit profile (SCP), which incorporates an investment grade business profile but has been constrained by sustained high leverage over 2016-2017 on the back of weak market conditions, high expansionary capex and the VAT credit arrears build-up. FFO adjusted net leverage excluding the VAT arrears peaked at 3.4x in 2016 (5.5x including arrears) and is expected to be sustained just below 3.0x until end-2019, post VAT settlement. Our base case assumes that the funds will cover upcoming debt maturities and negative FCF as capex is expected to peak in 2019.

The net leverage ratio is forecast to decline to 2.3x at end-2021, which leaves limited headroom for unforeseen outflows vs. the 2.5x sustained threshold commensurate with a 'BBB-' rating. Our base case assumes no reoccurrence of the VAT arrears over 2019-2021 and positive pricing market dynamics beyond 2019. Evidence of sustainable increase in headroom under the 2.5x sensitivity beyond 2019 would support positive rating action on the group's 'BB+' SCP.

Rating Linkage with Morocco: Under our GRE methodology, OCP scores 22.5 for overall support, which maps to a one-notch uplift. This reflects Fitch's view that the group would be likely to receive exceptional support from the state should its creditworthiness deteriorate materially. This is particularly the case as OCP has completed the first phase of its investment programme and ranks as Morocco's largest non-financial corporate issuer of international bonds. This assessment also captures the fact that despite its 94% state ownership, OCP is run as an independent profit-oriented entity with no legal ties to the state.

Positive Outlook for Phosphates Prices: In contrast with its previous outlook, Fitch has revised its pricing assumptions for phosphate fertilisers. This reflects the upwards trends observed in 2018, which have been driven by the high cost of ammonia and sulphur, the slower-than-expected pace of ramp-up for OCP and Ma'aden phosphates production, strong imports from India and a pick-up of demand in Brazil. Prices are assumed to decline in 2019 on the back of OCP and Ma'aden's ramp-ups and potential pressures from a recovery in utilisation rates in China. Beyond 2019, strong demand growth and the absence of further meaningful capacity additions should support prices.

Strong 2018 Performance Expected: EBITDA increased 35.5% in 1H18 vs 1H17, bringing margins back to 30%. This was primarily driven by higher fertilisers export prices, only partially offset by higher sulphur prices on the cost side. The remarkable increase in fertiliser revenue was also a consequence of exports to India and increased volumes at the Jorf Lasfar units. We forecast revenue growth of around 15% in 2018 and Fitch-adjusted EBITDA margin at 32%. We assume low single digit growth on the back of supply-driven pricing pressure in 2019, and a slight reduction in margins as the ramp up of the fourth integrated unit partly offsets lower profitability.

Phase 1 Completion Underpins Ratings: The successful completion of the first phase OCP's programme and the associated product diversification, production flexibility and efficiency improvements is a key support for the ratings and underlying investment grade business profile. The fourth fertilizer unit in Jorsf-Lasfar was commissioned in April 2018 and will bring OCP's capacity to 12 million tonnes per year. This marks the end of the first phase of its 2008-2025 MAD179 billion investment programme, which has included the slurry pipeline, the expansion of mine capacity (open pit), beneficiation and granulation plants, the expansion of its port infrastructure and the construction of four identical fully integrated fertiliser production units of 1mt each.

Capex Offers Flexibility: Our base case assumes that capex peaks at MAD15.6 billion in 2019 as the last payments related to phase one are settled. The second phase of the programme is no longer expected in the form and scale envisaged 10 years ago and OCP is exploring alternatives such as the MOU signed with Abu Dhabi National Oil Company. We assume capex at around MAD11 billion beyond 2019, i.e. well above maintenance levels, to support granulation and phosphoric acid capacity increases, logistics and debottlenecking exercises. Along with dividend distributions, this translates into sustained negative FCF, but OCP has demonstrated its ability to scale back investments should operating cash flows come under pressure.

Cadmium Restrictions: The potential impact of cadmium restrictions in fertilisers exported to the EU are not captured in OCP's ratings. The European Commission is considering proposals to gradually reduce the

cadmium content in phosphate fertilisers to 60mg/kg, 40mg/kg after three years and ultimately 20mg/kg. North African phosphate reserves have high cadmium content and the restrictions below 40mg would affect OCP's capacity to export towards the EU or require the adoption of a decadmiation technology, which will likely affect their final price to customers. Fitch is monitoring these developments and the timeline for the adoption and implementation of these proposals remains uncertain and likely to pose challenges beyond the rating horizon.

DERIVATION SUMMARY

OCP's 'BBB-' rating incorporates a one-notch uplift for state support (Morocco) in line with Fitch's GRE methodology. Its SCP has been constrained by its sustained high leverage but its business profile is strong and commensurate with peers in the 'BBB' category, with vertical integration, competitive cost position, exceptionally large ore reserves, and leading market positions. Following the reimbursement of MAD20.5 billion of VAT credit arrears, the group's FFO adjusted net leverage is expected to gradually decline to around 2.3x by 2021.

Peers include PJSC PhosAgro (BBB-/Stable), whose rating reflects its leading position as Russia's largest phosphate fertiliser producer, low-cost mining operations, ability to switch between DAP/MAP and complex fertilisers, efficient capex spending and conservative financial profile with net leverage sustained below 2.0x through the cycle.

EuroChem AG (BB/Stable) benefits from a competitive cost position and, similarly to OCP, is coming out of a phase of expansionary investments which, against the backdrop weak market conditions, had put some pressure on its financial profile. FFO adjusted net leverage is expected to trend down from 4.5x at end-2017 as capex levels normalise and FCF turns positive. OCP's Russian peers' ratings also capture the risks associated with their jurisdictional and business environment.

Other international peers include Israel Chemicals Limited's (ICL, BBB-/Stable) with higher cost phosphate and potash operations but resilient specialty chemicals underpinning stable margins through the cycle. ICL's net leverage is expected at around 2.5x. US peer The Mosaic Company's (BBB-/Stable) rating reflects its market position as the largest integrated fertilizer producer with presence across all nutrients, good cost control, long mines lives. Net leverage peaked as a result of the acquisition of Vale Fertilizantes and is expected to decline on the back of positive FCF generation.

KEY ASSUMPTIONS

Fitch's Key Assumptions Within Our Rating Case for the Issuer
- Volume growth of 10% in 2018, 2% in 2019 and 9-10% in 2020-2021, as capacity ramps up
- Single digit drop in phosphate fertiliser prices in 2019 and gradual recovery thereafter. Low single digit increases in phosphate rock prices yoy beyond 2019. Phosphoric acid prices to remain broadly stable in 2019-2021;
- EBITDA margins at 32% for 2018, 31% in 2019 and gradually increasing to 35% in 2021;
- Capex: MAD13.8 billion in 2018, MAD15.6 billion in 2019, MAD11.2 billion in 2020 and MAD10.7 billion in 2021;
- VAT credit refunds from the government of MAD20.5 in 2018;
- Annual dividends ranging between MAD2.5 billion and MAD4.3 billion in 2021

RATING SENSITIVITIES

Developments That May, Individually or Collectively, Lead to Positive Rating Action
- FFO adjusted net leverage sustainably below 2.5x

- Completion and ramp up of phase one expansionary programme with incremental profitability improvements
Developments That May, Individually or Collectively, Lead to Negative Rating Action
- FFO adjusted net leverage sustainably above 3.0x
- Pressure on Morocco's ratings and/or evidence of upstreaming of cash (dividends, taxation) or recurrence of sizeable VAT arrear build up detrimental to the credit standing of the group.

LIQUIDITY

Strong Liquidity: As of June 2018, OCP reported cash and cash equivalent of MAD10.3 billion against short-term debt of MAD7.7 billion. Under our base case, cash reserves will be significantly boosted by the reimbursement of the MAD20.5 billion VAT credit arrears in 2018. We assume that these will be used to cover debt maturities and negative FCF, which we forecast at MAD8.9 billion and MAD7.0 billion in 2018 and 2019, respectively, on the back of high capex and dividends.

We assume that OCP will continue to access the domestic and international bank and debt capital markets for its investment and refinancing needs. In 1H18, the group issued a new local currency hybrid of MAD5 billion. Terms and conditions are in line with the instrument issued in 2016 and the debt has been granted a 50% equity credit in line with Fitch's Corporate Hybrids Treatment and Notching Criteria.

Furthermore, we view positively the company's willingness and ability to tailor capex and dividend payments to match fluctuations in operating cash flow generation.

Contact:
Principal Analyst
Roberta Mori
Analyst
+44 20 3530 1139

Supervisory Analyst
Myriam Affri
Senior Director
+44 20 3530 1919
Fitch Ratings Limited
30 North Colonnade
London E14 5GN

Committee Chairperson
Maxim Edelson, CFA
Senior Director
+7 495 956 9986

Summary of Financial Statement Adjustments
- 50% equity credit for hybrid debt.
- MAD31 million of overdraft was reclassified to debt from cash
- MAD9.4 billion was reclassified from trade payables to other payables

Media Relations: Adrian Simpson, London, Tel: +44 20 3530 1010, Email: adrian.simpson@thefitchgroup.com

Additional information is available on www.fitchratings.com. For regulatory purposes in various jurisdictions,

# Exhibit II-76



| Morocco | ∨ | Taxes on corporate income | ∨ |

# Morocco

## Corporate - Taxes on corporate income

**Last reviewed - 06 September 2019**

In general, the Moroccan Tax Code considers that all revenues and capital gains generated in Morocco are subject to Moroccan taxation.

Companies are taxed on the difference between their trading income and expenditure. Business expenses incurred in the operation of the business are generally deductible unless specifically excluded.

The CIT rates are as follows (progressive scale):

| Taxable income (MAD) | | CIT rate (%) |
|---|---|---|
| **From** | **To** | |
| 0 | 300,000 | 10 |
| 300,001 | 1,000,000 | 17.5 |
| 1,000,001 | and above | 31 |

A higher CIT rate of 37% applies to credit institutions and insurance companies.

Non-resident companies can, under certain conditions, opt for an alternative tax at the rate of 8% of the amount of their contract, whatever the taxable income is.

## Minimum contribution

CIT cannot be lower than a minimum contribution of 0.75% (or 0.25% for specific products) levied on the turnover and other specific revenues. The minimum contribution is not due during the first 36 months following the beginning of activities.



There are no provincial or local taxes levied on income in Morocco.



© 2017 - 2020 PwC. All rights reserved. PwC refers to the PwC network and/or one or more of its member firms, each of which is a separate legal entity. Please see www.pwc.com/structure for further details.

Legal notices

Privacy

Cookie policy

Legal disclaimer

Terms and conditions

Support



Contacts



News



Print



Search

APPX0002088

# Exhibit II-77

**Covid-19 Economic Impact Assessments**

Register for FREE daily updates

(https://oxfordbusinessgroup.com/covid-19-update-registration)

| Keywords (optional) | Search |

# Morocco's new finance law updates tax rates and exemptions

Morocco (/country/morocco) │ Tax (/search-results?
sector=52399&country=all&keywords=)

View in online reader (/node/955886/reader)

Text size ▼

Overview ▬

Recommend

**Finance Law No. 70-19 (FL 2020), relating to FY 2020, was enacted by Dahir No. 1-19-125 on December 13, 2019 and published in Official Gazette No. 6838 bis on December 14, 2019. The provisions of the new finance law should be read in conjunction with the recommendations from the national tax conference that took place in May 2019, as well as the conclusions made by the European Commission that placed Morocco on the grey list of tax jurisdictions in non-EU countries. This article includes an overview of the main measures introduced by FL 2020.**

Corporate income tax (CIT) and individual income tax (IIT) on professional activities are now subject to the standard regime.

## Changes to the Standard CIT Rates

FL 2020 amended the progressive CIT rate that came into force in 2019, increasing the intermediary rate of 17.5% to 20% for companies having a taxable income between Dh300,000 ($13,300) and Dh1m ($104,000). In addition, the marginal rate of 31% was reduced to 28% for companies performing industrial activities with taxable income under Dh100m ($10.4m).

FL 2020 also extended the 37% flat rate currently applicable to insurance companies to *takaful* (Islamic insurance) insurance and reinsurance companies and takaful insurance and reinsurance funds. These new rates are applicable for financial years open as of January 1, 2020.

# Minimum Contribution Rate

The Moroccan Tax Code provides for a minimum CIT contribution, notably for companies that are in a tax loss position after a 36-month exemption period. This contribution is calculated based on the turnover plus other income as defined by Article 144 of the tax code.

The finance law from 2019 increased the rate of these types of contributions from 0.5% to 0.75%. This rate was applicable for financial years as of January 1, 2019.

FL 2020 decreased this rate again to 0.5% but introduced an exception: where the current income, excluding capital allowances, of a company is declared as a loss position for two consecutive years beyond the exemption period mentioned, the applicable rate becomes 0.6%.

These new rates are applicable to declarations filed as of January 1, 2020, and therefore to financial years ending on December 31, 2019.

# Changes to the Export Regime

Before FL 2020, the Moroccan Tax Code provided for a fiveyear CIT or professional IIT exemption, followed by a reduced CIT rate of 17.5% and professional IIT rate of 20% for export transactions. FL 2020 changed this by repealing the five-year exemption and increasing the 17.5% CIT rate to 20%.

Transitional measures were introduced along with this provision: enterprises that performed their first export transaction before January 1, 2020 are allowed to benefit from the five-year exemption until its expiry.

The new 20% rate is applicable to financial years that were opened on or after January 1, 2020, which means that the 17.5 is still applicable to financial year 2019.

# Casablanca Finance City Tax Policies

Before FL 2020, two distinct regimes were applicable to companies benefitting from Casablanca Finance City (CFC) status:

• A five-year exemption followed by a permanent taxation rate of 8.75% for service companies applied to export transactions and foreign source capital gains on the sale of securities; and

• A permanent 10% taxation rate for regional and international headquarters of multinational companies. In addition to this reduced rate, companies were subject to a specific calculation of the taxable basis whereby it corresponded to a minimum of 5% of their operating expenses. FL 2020 repealed the specific regime for CFC companies applicable to regional and international headquarters and introduced a new 15% rate

DOC Investigation No. C-714-001
USITC Inv. No. TA-701-__
Total No. of Pages: 628

**PUBLIC DOCUMENT**

**BEFORE THE**

**UNITED STATES DEPARTMENT OF COMMERCE**

**AND THE**

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

---

**PHOSPHATE FERTILIZERS FROM MOROCCO AND RUSSIA**

---

**PETITIONS FOR THE IMPOSITION OF**

**COUNTERVAILING DUTIES PURSUANT TO**

**SECTION 701 OF THE TARIFF ACT OF 1930, AS AMENDED**

**ON BEHALF OF THE MOSAIC COMPANY**

---

**VOLUME II: MOROCCO COUNTERVAILING DUTY**

David J. Ross
Patrick J. McLain
Sarah S. Sprinkle
Stephanie E. Hartmann
Semira Nikou
WILMER CUTLER PICKERING
 HALE and DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

*Counsel for The Mosaic Company*

June 26, 2020

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ON OCP GROUP ......................................................................1

III.    PERIOD OF INVESTIGATION AND ALLOCATION PERIOD FOR NON-RECURRING SUBSIDIES ........................................................................................7

IV.     ESTIMATION OF SUBSIDY BENEFITS ...........................................................8

V.      SUBSIDY ALLEGATIONS..................................................................................8

        A.      PROGRAMS INVOLVING THE PROVISION OF GOODS AND SERVICES FOR LTAR ......................................................................................9

                1.      Provision of Phosphate Mining Rights for LTAR .........................9

                2.      Provision of Phosphogypsum Waste Disposal Services for LTAR...............14

        B.      PROGRAMS INVOLVING THE DIRECT TRANSFERS OF FUNDS OR POTENTIAL DIRECT TRANSFER OF FUNDS ....................................18

                1.      Arrangement of Bond Issuances and Government Purchases, and Direction of Purchases, of Bonds ........................................................................19

                2.      Direct Government Loans...............................................................30

                3.      Government Loan Guarantees ........................................................32

        C.      TAX PROGRAMS .......................................................................................34

                1.      VAT Tax Reform ...........................................................................34

                2.      Tax Incentives for Export Operations – Reduction in Income Tax ..............38

VI.     CONCLUSION.....................................................................................................39

APPX0002093

PUBLIC DOCUMENT

**PETITIONS REGARDING**
**PHOSPHATE FERTILIZERS FROM MOROCCO AND RUSSIA**

## I.  INTRODUCTION

This volume presents information reasonably available to Petitioner, The Mosaic Company ("Mosaic" or "Petitioner"), demonstrating that the Government of Morocco ("GOM") is providing countervailable subsidies, within the meaning of section 771(5) of the Tariff Act of 1930, as amended (the "Act"), 19 USC § 1677(5), to the sole Moroccan producer of phosphate fertilizers, OCP Group (also known as OCP S.A. and referred to hereinafter as "OCP Group" or "OCP").  Pursuant to section 701(a) of the Act, 19 USC § 1671(a), the U.S. Department of Commerce (the "Department") shall impose a countervailing duty on merchandise imported from a "Subsidies Agreement" country where:  (1) the government or any public entity in the country at issue is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of subject merchandise; and (2) an industry in the United States is materially injured or threatened with material injury by reason of subject imports.  As discussed in detail below, the OCP Group benefits massively from numerous countervailable subsidies provided by the GOM and other public entities in Morocco.  Moreover, as demonstrated in Volume I of this Petition, subject imports from Morocco are causing material injury to the domestic phosphate fertilizer industry.[1]  Accordingly, the Department should initiate a countervailing duty ("CVD") investigation of imports of phosphate fertilizers from Morocco.

## II.  BACKGROUND ON OCP GROUP

Morocco's phosphate industry is dominated by a single company: the state-owned OCP Group (formerly the Office Chérifien des Phosphates), which has exclusive access to Morocco's

---

[1] Volume I of this Petition also provides the general information required under section 351.202 of the Department's regulations, 19 C.F.R. § 351.202, and section 207.11 of the U.S. International Trade Commission's (the "Commission") regulations, 19 C.F.R. § 207.11, and a description of the subject merchandise.

APPX0002094

phosphate mineral reserves.[2,3]  The Office Chérifien des Phosphates was founded in 1920, when

the GOM issued an edict (Dahir of January 27, 1920) declaring that prospecting for and the

exploitation of phosphates was to be exclusively reserved to the Government.[4]  The GOM issued

a separate edict in August 1920 (Dahir of August 7, 1920) announcing the creation of the Office

Chérifien des Phosphates as a state monopoly charged with the exploration, management, and

exploitation of the phosphate reserves of Morocco.[5]  When the GOM issued revised mining

regulations in 1951 (Dahir of April 16, 1951), it protected the monopoly granted to the Office

Chérifien des Phosphates over research and operations phosphate reserves.[6]  The Office

Chérifien des Phosphates became the OCP Group in 1975.[7]

In 2008, the GOM transformed the OCP Group into a Société Anonyme (public limited

liability company) pursuant to Law No. 46-07 (of February 26, 2008).[8]  The law provides that

OCP's shares may be held only by State establishments and corporations.[9]  The law also

maintains OCP's monopoly on the exploitation, distribution, and commercialization of

---

[2] *See* OCP, The Slurry Pipeline Revolution at 3, attached as Exhibit II-1.
[3] The names and addresses of known Moroccan phosphate fertilizer producers are provided in Exhibit I-19 to Volume I of this Petition.
[4] Dep't of Commerce, I.C. 6266, Information Circular on Mining Laws of French Morocco at 1 (1930), attached as Exhibit II-2; *id.* at 7 ("Article 2 of this edict reads as follows: 'Prospecting for and exploitation of phosphates are exclusively reserved to the Government.'").
[5] Dep't of Commerce, I.C. 6266, Information Circular on Mining Laws of French Morocco at 1 (1930), attached as Exhibit II-2; *id.* at 7-8 ("By the Edict of August 7, 1920, the Cherifien Phosphate Office was established, charged with the exploration, management, and exploitation of the phosphates of Morocco.").
[6] *See* OCP, Summary of the Final Prospectus at 35 (Dec. 2016), attached as Exhibit II-3.
[7] *See* Sophia Maazouz, *Tout Savoir Sur L'OCP: L'Office Chérifien des Phosphates*, AgriMaroc.ma (Nov. 14, 2016), https://www.agrimaroc.ma/l-ocp-l-office-cherifien-des-phosphates/, attached as Exhibit II-4.
[8] *See* Sophia Maazouz, *Tout Savoir Sur L'OCP: L'Office Chérifien des Phosphates*, AgriMaroc.ma (Nov. 14, 2016), https://www.agrimaroc.ma/l-ocp-l-office-cherifien-des-phosphates/, attached as Exhibit II-4; Organisation for Economic Co-Operation and Development ("OECD"), OECD Investment Policy Reviews: Morocco at 82 (2010), attached as Exhibit II-5.
[9] Organisation for Economic Co-Operation and Development ("OECD"), OECD Investment Policy Reviews: Morocco at 82 (2010), attached as Exhibit II-5.

- II-2 -

phosphates and their byproducts.[10]  Although the law provides that the conditions for such

exploitation were to be set in a separate contract concluded with the State, publicly available

information indicates that no such contract has been concluded.[11]

As provided in Law No. 46-07, the GOM is the OCP Group's majority shareholder and

state-owned corporations—including OCP itself—control all remaining shares in the company.

The GOM holds a 94.12% ownership stake in OCP.[12]  As noted in OCP's 2018 bond prospectus,

the remaining shares are held by Banque Centrale Populaire S.A. ("BCP") (0.92%), Société

d'Aménagement et de Développement Vert ("SADV") (0.88%), Infra Maroc Capital (2.98%),

and Upline Infrastructure Fund (1.10%).[13]  BCP is a partially-privatized state bank.[14]  The Upline

Infrastructure Fund is managed by Upline Group,[15] a business bank that manages investments for

BCP.[16]  SADV is wholly-owned by OCP.  Infra Maroc Capital is wholly-owned by BCP.[17]

Thus, as a 2015 bond prospectus states explicitly, "the Moroccan State has the ability to control

the operations of the Group," *i.e.*, OCP.[18]

Publicly available information indicates not only that OCP is owned and controlled by

the GOM, but also that the government is heavily involved in its business operations.  Given its

legal form and its predominantly state-owned capital, OCP is governed by Moroccan laws

---

[10] *See* OCP, Summary of the Final Prospectus at 36 (Dec. 2016), attached as Exhibit II-3 ("Law no 46-07 relative to the transformation of the Office Chérifien des Phosphates into a joint stock company, promulgated by dahir no 1-08-5 of February 26th 2008.  Article 2 of this law specifies that the main purpose of OCP SA is the use of a monopoly over research and operations of phosphate reserves granted by the State under article 6 of the Dahir of April 16th, 1951 on mining regulation{.}").
[11] World Bank Group, Creating Markets in Morocco at 108 (Oct. 2019), attached as Exhibit II-6.
[12] *See* OCP, Consolidated Financial Statements at 30 June 2019, at 38, attached as Exhibit II-7.
[13] *See* OCP, Summary of the Prospectus at 39 (Apr. 2018), attached as Exhibit II-8.
[14] World Bank Group, Creating Markets in Morocco at 108 (Oct. 2019), attached as Exhibit II-6.
[15] Upline Group, Upline Infrastructure Fund, http://www.uplinegroup.gbp.ma/En/Ourbusinesslines/Privateequity/Pages/Presentation.aspx (last visited May 26, 2020), attached as Exhibit II-9.
[16] LinkedIn, Upline Group, About Us, https://www.linkedin.com/company/upline-group/about/ (last visited May 26, 2020), attached as Exhibit II-10.
[17] OCP, Prospectus at 32 (Apr. 20, 2015), attached as Exhibit II-11.
[18] OCP, Prospectus at 32 (Apr. 20, 2015), attached as Exhibit II-11.

APPX0002096

pertaining to the State's financial control over public companies and other organizations (Law

No. 69-00) and nominations to senior government posts (Law No. 02-12).[19]  OCP's Board of

Directors is composed almost exclusively of government officials, including: the Interior

Minister; the Minister of Industry, Investment, Trade, and Digital Economy; the Minister of

Foreign Affairs and International Cooperation; the Minister Delegate to the Head of Government

in charge of General Affairs and Governance; the Minister of Economy and Finance; the

Minister of Energy, Mines and Sustainable Development; and the General Secretary of the

Ministry of Agriculture and Fisheries.[20]  Only two of the ten board members are *not* government

officials, namely the Chairman and CEO of OCP and the President and CEO of BCP,[21] which, as

noted above, is a partially privatized state bank.[22]  All OCP directors are reportedly appointed by

the government or the king of Morocco.[23]

OCP is the largest company in Morocco (public or private), with approximately 20,000

employees.[24]  OCP is a fully-integrated phosphate fertilizer producer with operations at every

stage from mining to processing to sales of phosphate products, including phosphate rock,

phosphoric acid, and phosphate fertilizers.[25]  OCP's phosphate mining activities are located at

four main sites: Khouribga, Gantour, and Youssoufia in Morocco, and Phosboucraa in

Moroccan-occupied Western Sahara.[26]  OCP has two primary phosphate processing facilities,

located at Safi and Jorf Lasfar in Morocco, which process its phosphate rock into phosphoric

---

[19] OCP, Summary of the Final Prospectus at 36 (Dec. 2016), attached as Exhibit II-3.
[20] *See* OCP, Our Governance, https://www.ocpgroup.ma/en/who-we-are/our-governance (last visited May 26, 2020), attached as Exhibit II-12.
[21] *See id.*
[22] World Bank Group, Creating Markets in Morocco at 108 (Oct. 2019), attached as Exhibit II-6.
[23] World Bank Group, Creating Markets in Morocco at 108 (Oct. 2019), attached as Exhibit II-6.
[24] World Bank Group, Creating Markets in Morocco at 108 (Oct. 2019), attached as Exhibit II-6.
[25] *See* OCP, The Slurry Pipeline Revolution at 5, attached as Exhibit II-1; WTO Secretariat, *Trade Policy Review, Kingdom of Morocco*, WTO Doc. WT/TPR/S/329, at 104 (Dec. 7, 2015), attached as Exhibit II-13.
[26] OCP, 2019 Sustainability Report at 27, attached as Exhibit II-14.

APPX0002097

acid and phosphate-based fertilizers.[27]  OCP produces and exports four major types of

phosphate-based fertilizer: MAP, DAP, TSP, and NPK.[28]  OCP also has a vast developmental

mandate from the GOM that includes the promotion of agriculture, employment, and the overall

chemical industry sector in the country.[29]

In 2008, OCP launched a comprehensive Industrial Transformation Strategy to transform

its operations to extract greater value-added from its phosphate rock mining operations.  The

plan aims to double the extraction capacity of OCP's phosphate mines and triple its phosphate

processing capacity by 2025 in order to raise OCP's world market share for phosphates and their

byproducts from 21% to 40%, with the ultimate objective of allowing OCP to regulate supply

and demand and control prices.[30]  The strategy initially called for investment of MAD 145

billion[31] ($14.6 billion) and, as of 2017, had reportedly mobilized a total of MAD 200 billion[32]

($20.2 billion) financed through debt and equity.[33]  One of the key projects OCP implemented as

part of its Industrial Transformation Strategy was construction of a slurry pipeline from its mines

in Khouribga to its processing facilities near the port of Jorf Lasfar, now the longest slurry

pipeline in the world—a project that required MAD 4.5 billion ($455 million) in investment.[34]

Another key project is construction of the chemical complex at Jorf Lasfar, which includes a

---

[27] OCP, 2019 Sustainability Report at 27, attached as Exhibit II-14; OCP, Summary of the Final Prospectus at 41 (Dec. 2016), attached as Exhibit II-3.
[28] See OCP, Summary of the Final Prospectus at 41 (Dec. 2016), attached as Exhibit II-3.
[29] World Bank Group, Creating Markets in Morocco at 108 (Oct. 2019), attached as Exhibit II-6.
[30] See OCP, The Slurry Pipeline Revolution at 7, attached as Exhibit II-1; WTO Secretariat, *Trade Policy Review, Kingdom of Morocco*, WTO Doc. WT/TPR/S/329, at 104 (Dec. 7, 2015), attached as Exhibit II-13.
[31] See OCP, The Slurry Pipeline Revolution at 7, attached as Exhibit II-1.
[32] See OCP, 2017 Annual Report at 22, attached as Exhibit II-15.
[33] See OCP, Summary of the Final Prospectus at 34 (Dec. 2016), attached as Exhibit II-3.
[34] See OCP, The Slurry Pipeline Revolution at 21, attached as Exhibit II-1.

group of integrated phosphate fertilizer plants and a seawater desalination plant—a project that required at least MAD 40 billion ($4 billion) in investment.[35]

OCP continues to make significant investments in its phosphate mining and processing operations to achieve its ultimate goal of doubling mining capacity and tripling phosphate fertilizer processing capacity by 2025. In 2017, OCP commissioned several flagship projects pursuant to its Industrial Transformation Strategy, including: two new phosphate rock mines; two new washing plants; adaptation of two existing washing plants to the slurry pipeline; one new downstream plant for drying phosphate rock at Jorf Lasfar; the extension of existing mines and washing plants; and increased mining capacity and construction of new beneficiation units in Gantour.[36] When OCP completed construction of its fourth plant at its Fertilizer Industrial Complex in Jorf Lasfar in 2017, it announced plans to build an additional six new plants in order to raise its total phosphate fertilizer production capacity to 18 million tons by 2025.[37] OCP has also announced plans for a major industrial development project in Phosboucraa for the period 2014-2022. OCP has stated that, as part of its long-term investment program for the region, it will improve its phosphate operations through mining investments, building a new flotation/washing unit, and upgrading extraction equipment; diversify its product portfolio and develop the regional business ecosystem by installing a phosphate fertilizer production plant; and contribute to the socioeconomic development of the region.[38]

---

[35] WTO Secretariat, *Trade Policy Review, Kingdom of Morocco*, WTO Doc. WT/TPR/S/329, at 104 (Dec. 7, 2015), attached as Exhibit II-13.
[36] OCP, 2017 Annual Report at 22, attached as Exhibit II-15.
[37] Lahssen Moqana, *Morocco's Fertilizer Industry Receives $3 Bln Investment Boost*, Asharq Al-Awsat (Nov. 25, 2017), attached as Exhibit II-16.
[38] OCP, 2019 Sustainability Report at 27, attached as Exhibit II-14. *See also* Western Sahara Resource Watch Report, P for Plunder: Morocco's Export of Phosphates from Occupied Western Sahara at 9 (2019), attached as Exhibit II-17.

In order to finance its ambitious industrial strategy, OCP launched a three-pronged

Capital Expenditure Program ("CapEx") that, according to the Moroccan Capital Market

Authority ("AMMC"), has pumped billions in cash into OCP.[39]  The CapEx program consisted

of:  (1) arrangement of bond issuances and government or government-directed purchases of the

bonds; (2) direct government loans; and (3) government loan guarantees.  Petitioner believes that

OCP benefited from these and other countervailable subsidies provided by the GOM, as detailed

below.

## III.    PERIOD OF INVESTIGATION AND ALLOCATION PERIOD FOR NON-RECURRING SUBSIDIES

The period of investigation ("POI") in a countervailing duty case is normally the most

recently-completed fiscal year for the governments and producers or exporters in question.[40]  The

Department has clarified that it will normally "set the POI according to the fiscal year of the

individual exporters or producers."[41]  OCP's fiscal year is January 1 through December 31.[42]

Accordingly, the Department should establish the POI in this case as January 1 to December 31,

2019.

Petitioner's allegations relate to benefits received during calendar year 2019 as well as

non-recurring benefits received prior to January 1, 2019.  Consistent with the Department's

practice of allocating non-recurring subsidies over time,[43] these subsidies received prior to 2019

benefited the subject merchandise during the POI.  The subsidy allegations in this Petition

presume a 10-year allocation period in accordance with the Internal Revenue Service ("IRS")

---

[39] OCP, Summary of the Final Prospectus at 34 (Dec. 2016), attached as Exhibit II-3.

[40] 19 C.F.R. § 351.204(b)(2).

[41] *Final Rule:  Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,309 (Int'l Trade Admin. May 19, 1997).

[42] *See* OCP, Consolidated Financial Statements at 31 Dec. 2019, at 11, attached as Exhibit II-18.

[43] *See* 19 C.F.R. § 351.524(b)(1) ("The Secretary will normally allocate a non-recurring benefit to a firm over the number of years corresponding to the average useful life ("AUL") of renewable physical assets as defined in paragraph (d)(2) of this section.").

APPX0002100

guidelines for depreciating productive assets used in mining of metallic and non-metallic

minerals and the milling, beneficiation, and other primary preparation of such materials.[44]

## IV.    ESTIMATION OF SUBSIDY BENEFITS

As discussed below, Petitioner estimates a subsidy benefit of 71.5% *ad valorem* for the

Provision of Mining Rights for Less Than Adequate Remuneration program.  Petitioner does not

have access to business proprietary information from the respondent to calculate the total subsidy

benefit resulting from all of the programs alleged in this petition.  Petitioner has used the best

information that is publicly available, where possible, to estimate subsidy benefits for the

programs alleged in this petition, as discussed below.  As is evident, the subsidy allegations

included in this petition will result in a total *ad valorem* subsidy rate that is well above the

Department's *de minimus* threshold.

## V.    SUBSIDY ALLEGATIONS

OCP—the sole Moroccan producer of phosphate fertilizers—benefits from a wide range

of countervailable subsidies, including the provision of mining rights and waste disposal services

for less than adequate remuneration ("LTAR"); loans and loan guarantees; government bond

purchases; and tax rebates and incentives.  As discussed below, the information that is

reasonably available to Petitioner indicates that each of these programs constitutes a

countervailable subsidy within the meaning of section 771(5) of the Act.[45]  Petitioner reserves

the right to supplement these subsidy allegations, or make new subsidy allegations, as

information becomes available during the course of the investigation, as provided for under the

Department's regulations.[46]

---

[44] U.S. IRS, Pub. 946, How to Depreciate Property, App. B tbl.B-2 (2019), attached as Exhibit II-19.
[45] 19 U.S.C. § 1677(5).
[46] 19 C.F.R. §§ 351.301(c)(2)(iv), .311.

APPX0002101

## A.    PROGRAMS INVOLVING THE PROVISION OF GOODS AND SERVICES FOR LTAR

The GOM provides countervailable subsidies to OCP through the provision of goods and services for less than adequate remuneration, notably including mining rights for phosphate, as detailed below.

### 1.    Provision of Phosphate Mining Rights for LTAR

At the time OCP's predecessor, the Office Chérifien des Phosphates, was founded in 1920, prospecting for and the exploitation of phosphates was to be exclusively reserved to the Government, pursuant to Dahir of January 27, 1920,[47] and the Office Chérifien des Phosphates was granted a monopoly on the exploration, management, and exploitation of the phosphates reserves of Morocco, pursuant to Dahir of August 7, 1920.[48]  As recently as 2014, Morocco's mining sector was governed by the Mining Law of 1951, the 1957 Mining Regulations, and the Mining Code Bill No. 1-73-412 of 12 August 1973.[49]  This legal framework provided that all minerals were the property of the State, and rights to explore and exploit minerals were granted by permit and license by the State, but the Office Chérifien des Phosphates retained its monopoly on phosphate production.[50]

Morocco revised its mining laws in 2015, pursuant to Law No. 33-13; however, this new, more market-oriented legal framework covers "all mineral substances *with the exception of*

---

[47] Dep't of Commerce, I.C. 6266, Information Circular on Mining Laws of French Morocco at 1 (1930), attached as Exhibit II-2; *id.* at 7 ("Article 2 of this edict reads as follows: 'Prospecting for and exploitation of phosphates are exclusively reserved to the Government.'").

[48] Dep't of Commerce, I.C. 6266, Information Circular on Mining Laws of French Morocco at 1 (1930), attached as Exhibit II-2; *id.* at 7-8 ("By the Edict of August 7, 1920, the Cherifien Phosphate Office was established, charged with the exploration, management, and exploitation of the phosphates of Morocco.").

[49] *See* USAID, Country Profile: Property Rights and Resource Governance – Morocco at 17, attached as Exhibit II-20.

[50] *See* USAID, Country Profile: Property Rights and Resource Governance – Morocco at 17, attached as Exhibit II-20; OCP, Summary of the Final Prospectus at 35 (Dec. 2016), attached as Exhibit II-3 ("Pursuant to article 2 of the company's charter, the Company's purpose is: {t}he use of a monopoly over research and operations of phosphate reserves granted by the State under article 6 of the Dahir of 9 Rejeb 1370 (16 April 1951) on mining regulation . . . .").

APPX0002102

*phosphates (reserved for the State)* and construction materials."[51]  Accordingly, the GOM has

sovereign rights over phosphate mining, and, pursuant to Law No. 46-07 (of February 26, 2008),

has granted OCP a monopoly on the exploitation, distribution, and commercialization of

phosphates and their byproducts in Morocco.[52]

Petitioner requests that the Department investigate the GOM's provision of phosphate

mining rights to OCP for LTAR.

### a.        Financial Contribution

The GOM has sovereign rights over phosphates in Morocco and it provides OCP

exclusive mining rights to access these resources.  Accordingly, the GOM's granting of

phosphate mining rights to OCP constitutes a financial contribution in the form of the provision

of a good within the meaning of section 771(5)(D)(iii) of the Act.[53]

### b.        Benefit

The GOM's provision of phosphate mining rights accords a benefit to OCP because the

government provides those rights for less than adequate remuneration.[54]  Section 351.511(a)(2)

of the Department's regulations provides a hierarchy for identifying a suitable benchmark for

measuring the adequacy of remuneration for government-provided goods and services in order of

preference:  (1) market prices from actual transactions within the country under investigation

(tier one); (2) world market prices that would be available to purchasers in the country under

---

[51] *Mining in Morocco: a Legal Snapshot*, DLA Piper (July 13, 2017),
https://www.dlapiper.com/en/africa/insights/publications/2017/07/mining-in-morocco-a-legal-snapshot/ (emphasis added), attached as Exhibit II-21.
[52] World Bank Group, Creating Markets in Morocco at 108 (Oct. 2019), attached as Exhibit II-6.
[53] *See id.*; 19 U.S.C. § 1677(5)(D)(iii).  *See also Certain Hot-Rolled Carbon Steel Flat Products from India: Final Results of Countervailing Duty Administrative Review*, 73 Fed. Reg. 40,295 (July 14, 2008), and accompanying Issues and Decision Memorandum at 18, 20; *Countervailing Duty Investigation of 1,1,1,2 Tetrafluoroethane from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 79 Fed. Reg. 62,594 (Oct. 20, 2014), and accompanying Issues and Decision Memorandum at 25.
[54] 19 U.S.C. § 1677(5)(E)(iv); 19 C.F.R. § 351.511(a)(1).

investigation (tier two); or (3) an assessment of whether the government price is consistent with market principles (tier three).[55] The Department's first preference is to use a tier one benchmark, which in this case would require market-determined prices for mining licenses resulting from actual transactions in Morocco.[56] However, there are no private, market-determined prices for phosphate mining rights in Morocco because the GOM retains sovereign rights over phosphates and has granted a monopoly on exploitation of phosphates to OCP.[57]

The Department's second preference is to use a tier two, world market price benchmark.[58] However, as the Department found in *Certain Cold-Rolled Steel Flat Products from Russia*, mining licenses are goods that do not lend themselves to a comparison to world market prices, because it is not reasonable to conclude that such prices for mining licenses would be available to purchasers in Morocco.[59]

Accordingly, the Department should rely on a tier three benchmark and examine whether the value of the resource acquired with the mining rights—in this case phosphate ore—is market-based under section 351.511(a)(2)(iii) of its regulations.[60] This is consistent with the approach the Department took in *Certain Cold-Rolled Steel Flat Products from Russia* and *Hot Rolled Steel from India.* Under a tier three methodology, the Department finds it "appropriate to conduct a benefit analysis based not on mining rights *per se*, but on the value of the underlying good conveyed via the mining rights."[61] Because there are no market prices for "the underlying

---

[55] 19 C.F.R. § 351.511(a)(2).
[56] 19 C.F.R. § 351.511(a)(2)(i).
[57] *See Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (Int'l Trade Admin. July 29, 2016), and accompanying Issues and Decision Memorandum at 28 ("*Certain Cold-Rolled Steel Flat Products from the Russian Federation,* Final I&D Memo").
[58] 19 C.F.R. § 351.511(a)(2)(ii).
[59] *See Certain Cold-Rolled Steel Flat Products from the Russian Federation*, Final I&D Memo at 29.
[60] 19 C.F.R. § 351.511(a)(2)(iii).
[61] *See Certain Cold-Rolled Steel Flat Products from the Russian Federation,* Final I&D Memo at 30.

APPX0002104

good," *i.e.*, phosphate ore, in Morocco, Petitioner has obtained market prices for phosphate rock

that are comparable to prices based on market principles, in accordance with Department

practice.[62]  Based on Petitioner's experience, phosphate ore is not a traded commodity, because it

typically contains high levels of impurities and would be prohibitively expensive to transport in

an unrefined state.  The process of removing impurities from phosphate ore and converting it to

phosphate rock is called beneficiation.[63]  Beneficiation of phosphate rock removes impurities in

the ore such as sand, clay, carbonates, organics, and iron oxide.  Beneficiation typically involves

one or more of the following processes:  washing and screening (wet or dry) to separate oversize

material and remove sand and clays; flotation of fine ore to remove silica; and calcination to

remove organic matter.[64]  After beneficiation, the phosphate rock can be used to produce

phosphate fertilizer or sold on the global market.  For example, OCP reports its global sales of

phosphate rock in its financial results.[65]  Accordingly, phosphate rock is an appropriate proxy to

use for the price of phosphate ore.

Petitioner obtained pricing information for phosphate rock from *Argus Reports* and CRU,

reputable sources that the Department has used in the past.[66]  *Argus Reports* and CRU collect

pricing information from a variety of countries with varying qualities of phosphate rock.[67]  The

phosphate content or grade of phosphate rock can be measured by its Bone Phosphate of Lime

("BPL").[68]  *Argus Reports* has price data points for Jordan, India, north Africa, and Algeria.[69]

---

[62] *See, e.g., Silicon Metal from Australia: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 9834 (Mar. 8, 2018), and accompanying Issues and Decision Memorandum at Comment 5.
[63] IPNI, Phosphorous Fertilizer Production and Technology at 9, attached as Exhibit II-22.
[64] *See id.* at 9-12.
[65] *See, e.g.*, OCP, 2017 Annual Report at 18, attached as Exhibit II-15.
[66] *See, e.g., Silicon Metal from Australia: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 9834 (Mar. 8, 2018), and accompanying Issues and Decision Memorandum at Comment 5.
[67] *See* Exhibit II-23, Argus Phosphate Prices, and Exhibit II-24, CRU Phosphate Rock Prices.
[68] Michael R Rahm Consulting LLC, A Comparison of Peru's Bayóvar Phosphate Rock with Alternatives at 3, attached as Exhibit II-25.
[69] *See* Exhibit II-23, Argus Phosphate Prices.

APPX0002105

CRU has pricing points from Morocco, India, Egypt, Jordan, Peru, and Algeria.[70]  Phosphate rock prices from Jordan and India are for phosphate rock with a BPL quality most comparable to phosphate rock from Morocco.[71]  Accordingly, Petitioner used phosphate rock prices from Jordan and India to calculate a benchmark.

The terms of the Jordanian prices are f.o.b., whereas the terms of the Indian prices include freight.[72]  Using *Argus Reports*, Petitioner added freight to the Jordanian price to calculate the price that OCP would have had to pay according to market principles in Morocco (*i.e.*, the good must be shipped to Morocco).[73]  The average benchmark price is $119.92 per ton.[74]  Petitioner is unable to obtain the actual prices that OCP pays for the phosphate rock. Accordingly, Petitioner estimated the price OCP paid based on its financial statement and other public information.[75]  The estimated price paid is $21.03 per ton.[76]  Using OCP's global financial statement, which is conservative because it includes offshore revenue, Petitioner calculates a subsidy rate of 71.5% *ad valorem*.[77]

Thus, the GOM's provision of mining rights for less than adequate remuneration accords a benefit to the recipient Moroccan phosphate fertilizer producer, OCP.

---

[70] *See* Exhibit II-24, CRU Phosphate Rock Prices.

[71] *See* Argus Media, Argus Phosphates: Methodology and Specifications Guide at 9-10 (Apr. 2020), attached as Exhibit II-26; Michael R Rahm Consulting LLC, A Comparison of Peru's Bayóvar Phosphate Rock with Alternatives at 4, attached as Exhibit II-25 (stating that phosphate rock from Morocco and Jordan are of a comparable grade).

[72] *See* Exhibit II-23, Argus Phosphate Prices, and Exhibit II-24, CRU Phosphate Rock Prices.

[73] *See* 19 U.S.C. § 1677(5)(E)(iv) (providing that the adequacy of remuneration must take into account prevailing market conditions, including transportation costs).  Petitioner used average world shipping rates as reported in *Argus Reports* to calculate a per-ton shipping rate from Jordan to Morocco.  *See* Exhibit II-27, Phosphate Rock Freight Rates.

[74] *See* Exhibit II-28, OCP's Estimated Subsidy Rate.

[75] *See* Exhibit II-29, Estimated Price of Phosphate Rock for OCP.

[76] Petitioner calculated this price based on OCP's 2019 financial statements.  *See* Exhibit II-29, Estimated Price of Phosphate Rock for OCP.  The figure is corroborated by OCP's 2016 earnings call.  *See* OCP, Full Year and 4Q 2016 Earnings Conference Call Presentation at 2 (Mar. 23, 2017), attached as Exhibit II-30 ("Rock production cost reduced from $34/T to less than $20/T").

[77] *See* Exhibit II-28, OCP's Estimated Subsidy Rate.

- II-13 -

### c.    Specificity

The GOM's granting of a monopoly on phosphates mining to OCP is *de jure* specific,
within the meaning of section 771(5A)(D)(iii) of the Act.[78]  Moreover, as the Department has
determined in prior investigations, mining rights are, as a matter of fact, provided to a limited
number of industries or enterprises, and are thus specific under section 771(5A)(D)(iii)(I) of the
Act.[79]

### 2.    Provision of Phosphogypsum Waste Disposal Services for LTAR

Moroccan law prohibits the dumping of pollutants in water without prior authorization
from the GOM.  In particular, Morocco's Law No. 10-95 on Water, Art. 52, states that:[80]

> No discharges, spills, disposals, and direct or indirect releases into surface
> or groundwater that are likely to modify its physical characteristics, to
> include thermal, radioactive, chemical, biological or bacteriological
> properties, may be effected without previous authorization granted by the
> basin agency after conducting an inquiry. . . .  This authorization gives rise
> to the payment of fees under the terms set through normal regulatory
> channels.

Similarly, Article 37 of Law No. 81-12 prohibits discharges causing pollution of the Moroccan
coast above certain limits, unless authorized by the competent Moroccan governmental
authority.[81]  It also provides that such authorization gives rise to payment of a fee to be collected
in accordance with the laws on collection of public debts.[82]

---

[78] 19 U.S.C. § 1677(5A)(D)(iii).

[79] *See, e.g., Certain Hot-Rolled Carbon Steel Flat Products from India: Final Results of Countervailing Duty
Administrative Review*, 73 Fed. Reg. 40,295 (July 14, 2008), and accompanying Issues and Decision Memorandum
at 18; *Certain Cold-Rolled Steel Flat Products from the Russian Federation*, Final I&D Memo at 28.

[80] Dahir (Royal Decree) No. 1-95-154 of 18 Rabii I 1416 (16 Aug. 1995) promulgating Law No. 10-95 on Water,
Official State Gazette No. 4325 of 20 Sept. 1995, art. 52, attached as Exhibit II-31.

[81] Dahir (Royal Decree) No. 1-15-87 of 29 Ramadan 1436 (16 July 2015) promulgating Law No. 81-12 on the
Coasts, Official State Gazette No. 6404 of 15 Oct. 2015, art. 37, attached as Exhibit II-32.

[82] *See id.*

APPX0002107

Gypsum, or phosphogypsum, is a radioactive byproduct generated from phosphate fertilizer production. The disposal of phosphogypsum in water emissions results in the release of a considerable amount of toxic impurities, including phosphorous and fluorine compounds, cadmium, mercury, lead, and other heavy metals, and radionuclides.[83] Consequently, in the normal course, a producer of phosphate fertilizer must recycle the phosphogypsum byproduct or manage it as hazardous or non-hazardous industrial waste—depending on the level of radiation—through such mechanisms as backfilling in mine pits and dry or wet stacking.[84]

That is not the case for OCP, however. According to publicly available information, it appears that OCP dumps phosphogypsum produced from its phosphate fertilizer operations in the Atlantic Ocean and other waters near its plants at Safi and Jorf Lasfar. For example, according to its 2013 Activity Report, OCP's phosphate fertilizer plant at Jorf Lasfar produces phosphogypsum waste at a rate of $30m^3/s$ which it discharges into the ocean through a series of offshore pipes.[85] A 2006 study by Morocco's national fisheries research institute (INRH) found significant contamination of cadmium in shellfish around OCP's water emissions points.[86] Another study from 2013 recorded high levels of heavy metal contamination in saltwater lagoons near OCP sites.[87]

---

[83] Int'l Finance Corp., Environmental, Health, and Safety Guidelines: Phosphate Fertilizer Plants & Manufacturing at 5, 7 (Apr. 2007), attached as Exhibit II-33.
[84] See id. at 8.
[85] OCP, Activity Report 2013, at 41, 47, attached as Exhibit II-34.
[86] See Samir Benbrahim, et al., Survey of the Carriers Influencing the Geographical and Temporal Distribution of Contamination by Heavy Metals Along the Atlantic Moroccan Coasts: the Case of Mercury, Lead and Cadmium at 43, Institut National de Recherche Halieutique (INRH) (Mar. Life, Vol. 16, 2006), attached as Exhibit II-35. See also Natasha White, Toxic Shadow: Phosphate Miners in Morocco Fear They Pay a High Price, The Guardian (Dec. 16, 2015), attached as Exhibit II-36.
[87] See Z. Idardare, et al., Evaluation de la Contamination Métallique dans deux Lagunes Marocaines: Khnifiss et Oualidia at 41, Rev. Mar. Sci. Agron. Vét. (2013), attached as Exhibit II-37. See also Natasha White, Toxic Shadow: Phosphate Miners in Morocco Fear They Pay a High Price," The Guardian (Dec. 16, 2015), attached as Exhibit II-36.

- II-15 -

The GOM is presumably aware of OCP's phosphogypsum dumping, given publicly available information about this practice and OCP's role as a prominent state-owned company in Morocco. Indeed, OCP's disposal of phosphogypsum in Morocco's waters is conducted openly, as confirmed by OCP's discussion of its practice of "phosphogypsum (PG) spills into the marine environment" in its 2019 sustainability report.[88] It therefore appears that the GOM has granted OCP permission to dump phosphogypsum pollutants in the Atlantic Ocean and other bodies of water. However, our research has not uncovered publicly available information as to the precise form and terms of this permission from the GOM. Public reports also suggest that the GOM may not collect fines and fees established by law for pollution discharges into bodies of water.[89]

### a.      Financial Contribution

The GOM's granting of permission to OCP to dump phosphogypsum waste from its phosphate fertilizer operations in bodies of water constitutes a financial contribution in the form of the provision of a good or services within the meaning of section 771(5)(D)(iii) of the Act.[90] Normally, a phosphate fertilizer producer itself stores or otherwise disposes of phosphogypsum from its production operations.[91] The industry standard method for doing so is to stack the phosphogypsum on land in what is known as a "gypstack," which is an engineered structure that must be constructed and then managed both during the operation of the facility and after its closure.[92] By permitting OCP to dump phosphogypsum in Morocco's waters, the GOM provides

---

[88] OCP, 2019 Sustainability Report at 125, attached as Exhibit II-14.

[89] *See* United Nations Economic Commission for Europe & United Nations Economic Commission for Africa, *Morocco: Environmental Performance Reviews*, ECE/CEP/170, at xxvi (2014), attached as Exhibit II-38 ("*Fines and sanctions for non-compliance with environmental standards (notably for air, water and waste), even if stipulated in the legislation, are not applied in general, and neither are emissions charges. . . .* {T}he regulations for the establishment of various taxes, even those that have been partially established by the legislation are slow to be implemented: e.g., fees for discharges, flows, direct and indirect deposits into surface or ground water.").

[90] *See id.*; 19 U.S.C. § 1677(5)(D)(iii).

[91] *See* Mosaic 2019 Annual Report on SEC Form 10-K at F-27, attached as Exhibit II-39.

[92] *See* Mosaic 2019 Annual Report on SEC Form 10-K at F-27, attached as Exhibit II-39 ("Processing of phosphate rock with sulfuric acid generates phosphogypsum that is stored in Gypstacks."); OCP, 2019 Sustainability Report at 98, attached as Exhibit II-14 (referring to OCP's "goal" of starting phosphogypsum stacking by 2023).

APPX0002109

a valuable waste disposal service for OCP. If the GOM did not provide this service, OCP would need to store or otherwise dispose of its phosphogypsum waste itself or through a third party.

Alternatively, to the extent that the GOM does not collect fees or fines to which it is otherwise entitled (*e.g.*, if, despite what the available information indicates, the GOM has not granted OCP permission to dump phosphogypsum waste from its phosphate fertilizer operations but has instead exempted OCP from the general obligation to pay fees for dumping in violation of Moroccan law), this constitutes a financial contribution under section 771(5)(D)(ii) of the Act in the form of foregone revenue that is otherwise due.[93]

### b.    Benefit

The GOM's provision of phosphogypsum waste disposal services accords a benefit to OCP because the government provides those services for less than adequate remuneration.[94] Information regarding the terms of GOM's issuance of permission to OCP to dump phosphogypsum waste is not publicly available. Moreover, Petitioner does not believe there are available private, market-determined prices for the waste disposal services at issue because the GOM retains sovereign rights over its waters. Nor are there world market prices for this service because other governments typically hold sovereign rights over their own waters, and in any event, the standard practice for phosphate fertilizer producers is to store phosphogypsum on land in gypstacks, as discussed above. At a minimum, however, the existence of a benefit is clear from the significant phosphogypsum storage costs that OCP avoids by dumping into Morocco's waters, as compared to the costs incurred by a phosphate fertilizer producer like Mosaic that maintains gypstacks. For example, at the end of 2019, Mosaic carried $660.2 million in

---

[93] 19 U.S.C. § 1677(5)(D)(ii).
[94] 19 U.S.C. § 1677(5)(E)(iv); 19 C.F.R. § 351.511(a)(1).

APPX0002110

gypstack closure costs for its Florida and Louisiana facilities on its balance sheet.[95]  Thus, the GOM's provision of phosphogypsum waste disposal services for less than adequate remuneration accords a benefit to the recipient Moroccan phosphate fertilizer producer, OCP.

Alternatively, to the extent the GOM does not collect fees or fines to which it is otherwise entitled (*e.g.,* if, despite what the available information indicates, the GOM has not granted OCP permission to dump phosphogypsum waste from its phosphate fertilizer operations but has instead exempted OCP from the general obligation to pay fees for dumping in violation of Moroccan law), this program confers a benefit in the amount of the government revenue foregone, within the meaning of section 771(5)(E) of the Act.[96]

### c.    Specificity

Based on publicly available information, this program appears to be *de facto* specific, within the meaning of section 771(5A)(D)(iii) of the Act,[97] either because the recipients of the subsidy are limited in number—as OCP is the sole phosphate fertilizer producer in Morocco and thus the only entity dumping phosphate gypsum waste—or because OCP is a predominant user of the subsidy.[98]

### B.    PROGRAMS INVOLVING THE DIRECT TRANSFERS OF FUNDS OR POTENTIAL DIRECT TRANSFER OF FUNDS

The GOM provides countervailable subsidies to OCP pursuant to its CapEx program to fund its ambitious investment strategy and achieve its ultimate goal of doubling phosphate mining capacity and tripling phosphate processing capacity by 2025.  These subsidies take three

---

[95] *See* Mosaic 2019 Annual Report on SEC Form 10-K at F-70, attached as Exhibit II-39.
[96] 19 U.S.C. § 1677(5)(E).
[97] 19 U.S.C. § 1677(5A)(D)(iii).
[98] *See* 19 U.S.C. § 1677(5A)(D)(iii)(I), (II).

APPX0002111

forms: (1) arrangement of bond issuances and government or government-directed purchases of the bonds; (2) direct government loans; and (3) government loan guarantees.

### 1. Arrangement of Bond Issuances and Government Purchases, and Direction of Purchases, of Bonds

The GOM provides subsidized financing to OCP to fund its CapEx program through the arrangement of bond issuances and GOM purchases of, or direction of private entities to purchase, such bonds. In 2016, OCP announced plans to raise MAD 5 billion ($505 million) through issuance of domestic perpetual bonds.[99] These are subordinate bonds, which means they are unsecured and, in the case of borrower default or liquidation, bondholders would be prioritized lower than other classes of bonds.[100] The AMMC, Morocco's capital market authority, approved OCP's maximum issuance amount of MAD 5 billion in perpetual subordinated bonds on December 9, 2016.[101,102] CDG Capital—a subsidiary of the Caisse de Dépôt et de Gestion ("CDG")[103]—acted as the financial advisor and global coordinator, placement agent, custodian, and entity in charge of registration for the bond issuance.[104] CDG is a state-owned financial institution that invests in national projects of high priority[105] and is responsible for managing savings funds which require special protection.[106] Morocco's Court of

---

[99] Aziz El Yaakoubi, *Moroccan Phosphate Producer OCP to Raise $500 Mln in Domestic Bond Issue*, Reuters (Nov. 29, 2016), https://af.reuters.com/article/idAFL8N1DU41P, attached as Exhibit II-40.
[100] *See* James Chen, *Subordinated Debt Definition*, Investopedia (Apr. 30, 2020), https://www.investopedia.com/terms/s/subordinateddebt.asp, attached as Exhibit II-41.
[101] AMMC, Annual Report 2016, at 59, attached as Exhibit II-42.
[102] OCP also issued a bond on the domestic stock market in 2011 – the terms of this bond are unknown to the Petitioner – and it may have issued additional bonds in 2014. *See* Souhail Karam, *Morocco's OCP Raises $1.55 Billion in Debut Sale of Bonds Abroad*, Bloomberg News (Apr. 16, 2014), attached as Exhibit II-43.
[103] United Nations Environment Programme Finance Initiative, CDG Capital, https://www.unepfi.org/member/cdg-capital/#:~:text=CDG%20Capital%20is%20a%20major,institutional%20investor%20in%20the%20country (last visited June 10, 2020), attached as Exhibit II-44.
[104] OCP, Summary of the Final Prospectus at 1 (Dec. 2016), attached as Exhibit II-3.
[105] World Economic Forum, Caisse de Dépôt et de Gestion (CDG), https://www.weforum.org/organizations/caisse-de-depot-et-de-gestion-cdg (last visited May 27, 2020), attached as Exhibit II-45.
[106] Tarek Bazza, *Court of Auditors Slams CDG, Depository of Moroccan Social Security*, Morocco World News (Jan. 9, 2019), https://www.moroccoworldnews.com/2019/01/262874/morocco-court-auditors-cdg/, attached as Exhibit II-46.

APPX0002112

PUBLIC DOCUMENT

Auditors has found that the CDG lacks risk control and monitoring mechanisms and engages in irregular behavior such as making equity investments in some of its own subsidiaries and holdings.[107]  According to its 2018 annual report, CDG Capital works to support the GOM's numerous sectoral plans for driving economic growth and its National Sustainable Development Strategy through providing financing in connection with the capital markets.[108]  In keeping with the CDG's commitment to the economic development of Morocco, CDG Capital has made it a priority to support major players in Morocco's economy engaging in large-scale investment projects,[109] such as OCP.

OCP completed the subordinated bond issuance on December 16, 2016, issuing 50,000 bonds with a nominal value of MAD 100,000 each for a total of MAD 5 billion ($505 million). The bonds were set at rates lower than the market rate for subordinated bonds at the time of issuance.  OCP based its rates on "primary market Treasury bond" yields[110] with risk premiums depending on the tranche, as shown in the table below.  The highest interest rate available to bond purchasers was for Tranche A, at 4.07%:[111]

[107] Tarek Bazza, *Court of Auditors Slams CDG, Depository of Moroccan Social Security*, Morocco World News (Jan. 9, 2019), https://www.moroccoworldnews.com/2019/01/262874/morocco-court-auditors-cdg/, attached as Exhibit II-46.
[108] CDG Capital Groupe, Rapport D'Activité et de Responsabilité Sociale 2018, at 35, attached as Exhibit II-47.
[109] CDG Capital Groupe, Rapport D'Activité et de Responsabilité Sociale 2018, at 36, attached as Exhibit II-47; *see also* CDG, About Us, https://www.cdgcapital.ma/fr/propos-de-nous (last visited May 27, 2020), attached as Exhibit II-48.
[110] OCP, Summary of the Final Prospectus at 1 (Dec. 2016), attached as Exhibit II-3.
[111] OCP, Summary of the Final Prospectus at 1 (Dec. 2016), attached as Exhibit II-3; OCP, Consolidated Financial Statements at 31 Dec. 2016, at 50, attached as Exhibit II-49.

APPX0002113

**Interest Rates for OCP's 2016 Perpetual Subordinated Bond Issuance**

| | Tranche A (Unlisted) | Tranche B (Listed) | Tranche C (Unlisted) | Tranche D (Listed) | Tranche E (Unlisted) | Tranche F (Listed) |
|---|---|---|---|---|---|---|
| Interest Rate | 10-year resettable in reference to the 10-year rate based on the primary market Treasury bond yield curve as at 31 October 2016 i.e 3.07% for the first 10 years, increased by a risk premium, i.e between 3.77% and 4.27% for the first 10 years. | | Annually resettable, in reference to the 52-week rate based on the primary market Treasury bond yield curve (money market base) as at November 21 2016, i.e 2.28% for the first year, increased by a risk premium, i.e between 2.98% and 3.48%. | | 5-year resettable, in reference to the 5-year rate based on the primary market Treasury bond yield curve as at November 14, 2016, i.e 2.67%, increased by a risk premium i.e between 3.37% and 3.87% for the first 5 years. | |
| Risk Premium | 70 to 120 bps | | | | | |
| 1st Optional Redemption | December 23, 2026 | | | | | |

Source: OCP, Summary of the Final Prospectus at 1 (Dec. 2016), attached as Exhibit II-3.

OCP ultimately issued perpetual bonds as follows: MAD 1,683.3 million at 4.07% on unlisted tranche A and listed tranche B; MAD 3,021.1 million at 3.28% on unlisted tranche C; and MAD 295.6 million at 3.67% on unlisted tranche E.[112] Thus, the subordinated bonds OCP issued in 2016 offered approximately a 1% risk premium over Moroccan sovereign bonds, which significantly undervalued the risk involved with the purchase of these subordinated bonds. By comparison, in its debut international bond sale in 2014, OCP reportedly sold $1.25 billion of 10-year bonds at a yield of 5.75—about 3.1 percentage points higher than similar-maturity U.S. Treasuries—and $300 million of 30-year bonds at a yield of 7.375 percent—or 3.9 percentage points higher than similar Treasuries.[113] According to an analysis by New York University Corporate Finance professor Aswath Damodaran, private equity bonds in Morocco should command a 5% risk premium over Moroccan sovereign bonds.[114] At the time of the first subordinated bond issuance in 2016, Fitch Ratings downgraded OCP's outlook from stable to

---

[112] OCP, Consolidated Financial Statements at 31 Dec. 2016, at 50, attached as Exhibit II-49.

[113] *See* Souhail Karam, *Morocco's OCP Raises $1.55 Billion in Debut Sale of Bonds Abroad*, Bloomberg News (Apr. 16, 2014), attached as Exhibit II-43.

[114] *See* ctrypremJuly18.xlsx, http://people.stern.nyu.edu/adamodar/pc/datasets/ (last visited May 28, 2020), attached as Exhibit II-50 (This workbook estimated that in July 2018 the Country Risk Premium associated with Morocco was 3.53% and the Equity risk premium was 8.9%. Therefore, the additional risk of private equity over sovereign bonds for Morocco is 5.37%.).

APPX0002114

negative and gave it a credit rating of BBB-, the lowest possible investment grade rating.[115]

Moreover, as noted above, subordinate bonds are unsecured and, in the case of borrower default

or liquidation, holders of subordinated bonds would be prioritized lower than other classes of

bonds.[116] Thus, bondholders would be expected to demand an even higher risk premium for this

type of bond.

OCP completed a second subordinated bond issuance in May 2018, again issuing 50,000

bonds with a nominal value of MAD 100,000 each for a total of MAD 5 billion ($505

million).[117] CDG Capital, a state-owned financial entity that works to support the GOM's

national and sectoral development policies, again acted as one of OCP's primary financial

advisors and global coordinators of the bond issuance.[118] CDG Capital and Attijari Finances

Corp., a subsidiary of the state-owned Attijariwafa bank group, also acted as a financial advisor

and global coordinator on the bond issuance.[119] In 2016, the Attijariwafa bank group was

majority-owned by Société Nationale d'Investissement ("SNI") or National Investment

Company of Morocco, a holding company owned by the Moroccan royal family.[120] According

to its annual reports, the Attijariwafa bank group has supported various government-sponsored

---

[115] *Fitch Ratings Revised Outlook on OCP SA to Negative*, CBonds (Dec. 20, 2016), http://cbonds.com/news/item/863621, attached as Exhibit II-51.

[116] *See* James Chen, *Subordinated Debt Definition*, Investopedia (Apr. 30, 2020), https://www.investopedia.com/terms/s/subordinateddebt.asp, attached as Exhibit II-41.

[117] OCP, Consolidated Financial Statements at 31 Dec. 2018, at 4, attached as Exhibit II-52.

[118] *See* OCP, Summary of the Prospectus at 1 (Apr. 2018), attached as Exhibit II-8. *See also Loan: Attijari Finances Corp. and CDG Capital Advise OCP*, L'Economiste. (Apr. 25, 2018), https://www.leconomiste.com/flash-infos/emprunt-attijari-finances-corp-et-cdg-capital-conseillent-l-ocp, attached as Exhibit II-53.

[119] *See* OCP, Summary of the Prospectus at 1 (Apr. 2018), attached as Exhibit II-8; *Loan: Attijari Finances Corp. and CDG Capital Advise OCP*, L'Economiste. (Apr. 25, 2018), https://www.leconomiste.com/flash-infos/emprunt-attijari-finances-corp-et-cdg-capital-conseillent-l-ocp, attached as Exhibit II-53; Attijariwafa bank, Attijari Finances Corp., https://www.attijariwafabank.com/en/brands-and-Moroccan-subsidiaries/attijari-finances-corp (last visited May 28, 2020), attached as Exhibit II-54.

[120] *See* OECD, State-Owned Enterprises in the Middle East and North Africa: Engines of Development and Competitiveness? at 118 (2013), attached as Exhibit II-55; *Morocco's New African Ambition*, The Report Company (Jan. 28, 2016), http://www.the-report.com/reports/morocco/the-new-morocco/moroccos-new-african-ambition/, attached as Exhibit II-56. In 2018, SNI changed its name to Al Mada. *See Morocco's SNI Changes Name into Al Mada, Gears Activity to Africa*, North Africa Post (Mar. 28, 2018), https://northafricapost.com/22909-moroccos-sni-changes-name-al-mada-gears-activity-africa.html, attached as Exhibit II-57.

PUBLIC DOCUMENT

programs in Morocco for many years—including programs to expand Moroccan exports and develop strategically-important sectors of the economy.[121]  The bank also finances projects that make a significant contribution to the economic development of Morocco, consistent with GOM policy.[122]  CDG Capital and Attijariwafa bank group were the co-lead managers of bond placement.[123]  State-owned institutional investors, including the CDG, reportedly accounted for a large portion of the bond purchases.[124]

In addition to being heavily subscribed by GOM entities, OCP's subordinated bonds were also set at rates lower than the market rate for subordinate bonds at the time of issuance in 2018.  OCP again based its rates on "primary market Treasury bond" yields[125] with risk premiums depending on the tranche, as shown in the table below.  The highest interest rate investors were able to obtain were for Tranche E, at 5.08% to 5.28%:[126]

### Interest Rates for OCP's 2018 Perpetual Subordinated Bond Issuance

| | Tranche A (Unlisted) | Tranche B (Listed) | Tranche C (Unlisted) | Tranche D (Unlisted) | Tranche E (Unlisted) |
|---|---|---|---|---|---|
| Interest Rate | 10-year resettable in reference to the 10-year rate based on the primary market Treasury bond yield curve as at 27 March 2018 i.e 3.23% for the first 10 years, increased by a risk premium, i.e between 4.03% and 4.23% for the first 10 years. | | Annually resettable, in reference to the 52-week rate based on the primary market Treasury Bond yield curve (money market base) as at April 3rd 2018, i.e increased by a risk premium, i.e between 3.00% and 3.20%. | For the first time, 15-year resettable until the first optional redemption date, and hereafter beyond the 15th year, revised every 10 year. For the first 15 year period, the rate is determined in reference to the 15-year rate based on the primary market treasury bond yield curve as at 13 March 2018, i.e 3.67% for the first 15 years, increased by a risk premium i.e 4.72% and 4.92% for the first 15 years. | 20-year resettable in reference to the 20-year rate based on the primary market treasury bond yield curve as at 27 March 2018, i.e 3.98% increase by a risk premium i.e between 5.08% and 5.28% for the first 20 years. |
| Risk Premium | 80 to 100 bps | | 70 to 90 bps | 105 to 125 bps | 110 to 130 bps |
| 1st Optional Redemption | 5/14/2028 | 5/14/2028 | 5/14/2028 | 5/14/2033 | 5/14/2038 |

Source: OCP, Summary of the Prospectus at 1 (Apr. 2018), attached as Exhibit II-8.

---

[121] See Attijariwafa bank, Annual Report and Corporate Social Responsibility Report 2017, at 53, attached as Exhibit II-58; see also Attijariwafa bank, Annual Report and Corporate Social Responsibility Report 2016, at 108, attached as Exhibit II-59 ("Attijariwafa bank's commitment to developing the domestic economy is unfailing.  The Bank wholeheartedly supports the major government-backed programmes.").
[122] See Attijariwafa bank, Annual Report 2015, at 77, attached as Exhibit II-60.
[123] See OCP, Summary of the Prospectus at 1 (Apr. 2018), attached as Exhibit II-8.
[124] See Afifa Dassouli, OCP's MAD 5 Billion Bond Issue, 311% Oversubscribed!, La Tribune (May 31, 2018), https://lnt.ma/ocps-mad-5-billion-bond-issue-311-oversubscribed/, attached as Exhibit II-61.
[125] OCP, Summary of the Prospectus, at 1 (Apr. 2018), attached as Exhibit II-8.
[126] OCP, Summary of the Prospectus, at 1 (Apr. 2018), attached as Exhibit II-8.

PUBLIC DOCUMENT

OCP closed on the perpetual bond issuance on May 4, 2018, issuing bonds as follows: MAD 1,058 million at 4.03% on unlisted tranche A and listed tranche B; MAD 109 million at 3% on unlisted tranche C; MAD 2,708 million at 4.72% yield on unlisted tranche D; and MAD 1,125 million at 5.08% on unlisted tranche E.[127]  Thus, OCP's subordinated bonds offered approximately a 0.7-1.1% risk premium over Moroccan sovereign bonds.  This significantly undervalued the risk involved with the purchase of these subordinated, unsecured bonds.  OCP's credit rating at the time of its second subordinated bond issuance in 2018 was still BBB-, the lowest investment grade.[128]  These types of bonds should have commanded a minimum 5% premium over Moroccan sovereign bonds.[129]

### a.    Financial Contribution

The GOM arranged the issuance of OCP's subordinated bonds, purchased a significant portion of the bonds, and directed private financial entities to purchase the MAD 10 billion ($1.01 billion) in bonds.  As discussed above, the bond issuances were arranged by CDG Capital and Attijari Finances Corp.  CDG Capital and Attijari Finances Corp. are both state-owned entities that support the GOM's economic development policies and are thus government authorities within the meaning of section 771(5)(B) of the Act.  Publicly available information indicates that other government authorities, including the CDG, purchased a significant portion of the bonds.  Thus, the GOM's purchases of bonds constitutes a financial contribution in the form of a direct transfer of funds, within the meaning of section 771(5)(D)(i) of the Act and its

---

[127] OCP, Consolidated Financial Statements at 31 Dec. 2018, at 48, attached as Exhibit II-52.

[128] *S&P Global Ratings Revised Outlook on OCP SA to Negative and Affirmed at "BBB-" (Local Currency LT) Credit Rating*, CBonds (Oct. 17, 2018), http://cbonds.com/news/item/1049001, attached as Exhibit II-62.

[129] *See*, ctrypremJuly18.xlsx, http://people.stern.nyu.edu/adamodar/pc/datasets/ (last visited May 28, 2020), attached as Exhibit II-50 (This workbook estimated that in July 2018 the Country Risk Premium associated with Morocco was 3.53% and the Equity risk premium was 8.9%.  Therefore, the additional risk of private equity over sovereign bonds for Morocco is 5.37%.).

arrangement of the bond issuances constitutes a financial contribution in the form of provision of services, within the meaning of section 771(5)(D)(iii) of the Act.[130]

### b.    Benefit

OCP's MAD 10 billion ($1.01 billion) in subordinated bonds should be treated as long-term loans for purposes of assessing benefit under section 771(5)(E)(ii) of the Act.[131]  Consistent with the statute and the Department's regulations, the Department generally measures the benefit conferred to the recipient of long-term loans as the difference between the interest rate(s) the recipient pays on the loans and the amount it would pay on a comparable commercial loan the recipient could actually obtain on the market, unless the loan recipient was uncreditworthy.[132] Publicly available information indicates that OCP's bonds were issued at below-market rates and, at a minimum, should have offered a 5% premium over Moroccan sovereign bonds.[133]

Moreover, OCP was uncreditworthy at the time of both the December 2016 and May 2018 bond issuances, such that the Department should calculate a benchmark according to section 351.505(a)(4)(i) of its regulations.  Under section 351.505(a)(4)(i) of its regulations, the Department considers the following four factors in assessing a loan recipient's creditworthiness: (1) the receipt by the firm of comparable commercial long-term loans; (2) the present and past financial health of the firm, as reflected in its financial indicators; (3) the firm's past and present ability to meet its costs and fixed financial obligations with its cash flow; and (4) evidence of the

---

[130] 19 U.S.C. § 1677(5)(D)(i), (iii).

[131] *See Final Affirmative Countervailing Duty Determination: Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 68 Fed. Reg. 37,122 (Int'l Trade Admin. June 23, 2003), and accompanying Issues and Decision Memorandum at 21 ("For the new long-term loans and bonds that were issued as part of the restructuring program, we compared the interest rates on the directed long-term loans and new bonds to the benchmark interest rates detailed in the "Subsidies Valuation Information" section, above, in accordance with section 771(5)(E)(ii) of the Act. . . .  For long-term fixed-rate loans and bonds, consistent with Cold Rolled Steel, we calculated the benefit using the Department's standard fixed-rate methodology specified in 19 CFR 351.505(c)(2).").

[132] 19 U.S.C. § 1677(5)(E)(ii); 19 C.F.R. § 351.505(a)(1), (a)(3)(iii).

[133] *See*, ctrypremJuly18.xlsx, http://people.stern.nyu.edu/adamodar/pc/datasets/ (last visited May 28, 2020), attached as Exhibit II-50.

APPX0002118

PUBLIC DOCUMENT

firm's future financial position, such as market studies, country and industry economic forecasts, and project and loan appraisals.[134] The application of these criteria to OCP indicates that the company was uncreditworthy for the following reasons.

*First*, information regarding the existence and terms of OCP's commercial loans, and in particular whether such loans would be considered "comparable" to the perpetual bonds issued in 2016 and 2018, is not readily available to Petitioner. Nonetheless, OCP is a government-owned entity, and thus whether it received comparable commercial long-term loans is not dispositive of its creditworthiness.[135]

*Second*, OCP's financial indicators demonstrate that it was uncreditworthy at the time of the bond issuances in 2016 and 2018. A firm's current and quick ratios are "highly relevant" in this context, because they are indicators of a firm's financial health and its ability to meet its costs and fixed financial obligations with cash flow.[136] The Department has previously found firms with a current ratio below 2 and a quick ratio below 1 to be uncreditworthy.[137] OCP's quick ratio was well below the Department's benchmark from 2008 to 2011 and from 2013 to 2017, and its current ratio was below the Department's benchmark each year from 2013 to 2019, except 2018.[138] As of December 31, 2016, prior to the first bond issuance in December 2016, OCP's current ratio was 1.62 and its quick ratio was 0.95.[139] As of January 1, 2018, prior to the

---

[134] 19 C.F.R. § 351.505(a)(4)(i).

[135] 19 C.F.R. § 351.505(a)(4)(ii).

[136] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 77 Fed. Reg. 63,788 (Oct. 17, 2012), and accompanying Issues and Decision Memorandum at 56 ("{T}he meaning of these ratios is clear: either the respondents have liquid funds available to cover upcoming obligations, or they do not.").

[137] *Id.* at 58 (Trina's debt was estimated to rate at "Ba" or "B" on Moody's scale—ratings for obligations judged to have speculative elements and be subject to substantial credit risk—equivalent to "bb+" on Fitch's scale).

[138] *See* OCP Financial Ratios, 2008 to 2019, attached as Exhibit II-63.

[139] *See* OCP, Consolidated Financial Statements at 31 Dec. 2016, at 7, attached as Exhibit II-49.

APPX0002119

second bond issuance in May 2018, OCP's current ratio was 1.34 and its quick ratio was 0.97.[140]

Thus, OCP's financial indicators demonstrate it did not have sufficient liquid funds to cover

upcoming obligations, and thus was not creditworthy, at the time of the bond issuances.

In addition, as previously noted, at the time of the two bond issuances, OCP had a credit

rating of BBB-, the lowest possible investment grade, even with the boost it received from its

close association with the GOM.[141]  In its rating comments, Fitch stated that OCP's independent

credit profile would be bb+—a level that Fitch defines as "speculative"—but for the GOM's

financial backing, and the BBB- rating of OCP "incorporates a one-notch uplift for state support

(Morocco, BBB-/Stable) from its 'bb+' standalone credit profile (SCP), in line with Fitch's

Government Rated Entities (GRE) rating methodology."[142]  In *Solar Panels from China*, the

Department found a non-state-owned entity, Trina, to be uncreditworthy based in part on a

similar credit rating.[143]

*Third*, OCP's financial indicators show that it could not meet its costs and financial

obligations with cash flow at the time of the bond issuances.  OCP has taken on a large amount

of debt since 2008 to fund its ambitious investment program.  High debt-to-equity ratios indicate

that a company has more debt than equity financing, and the Department generally considers a

debt-to-equity ratio above 1 to be "high."[144]  In this case, OCP's debt-to-equity ratio rose above

---

[140] *See* OCP, Consolidated Financial Statements at 31 Dec. 2018, at 13, attached as Exhibit II-52.
[141] *Fitch Ratings Revised Outlook on OCP SA to Negative*, CBonds (Dec. 20, 2016),
http://cbonds.com/news/item/863621, attached as Exhibit II-51; *S&P Global Ratings Revised Outlook on OCP SA to Negative and Affirmed at "BBB-" (Local Currency LT) Credit Rating*, CBonds (Oct. 17, 2018),
http://cbonds.com/news/item/1049001, attached as Exhibit II-62.
[142] *Fitch Affirms OCP at 'BBB-'; Outlook Stable*, FitchRatings (Nov. 1, 2019),
https://www.fitchratings.com/research/corporate-finance/fitch-affirms-ocp-at-bbb-outlook-stable-01-11-2019,
attached as Exhibit II-64.
[143] *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 77 Fed. Reg. 63,788 (Oct. 17, 2012), and accompanying Issues and Decision Memorandum at 58.
[144] *See id.*

- II-27 -