Barcode:4085906-01 C-821-825 INV - Investigation  -

Comment 3f:   Whether the Provision of Natural Gas for LTAR Confers a Benefit

*PhosAgro Case Brief:*[221]

- Gazprom natural gas prices charged to customers in Russia are market prices and do not confer a benefit, and independent gas suppliers in Russia sell at market prices.
- The question of whether domestic natural gas sales to producers constitute a countervailable benefit was addressed as part of Russia's accession to the WTO.[222] Russia's commitments ensure that the producers and distributors of natural gas in Russia operate "on the basis of normal commercial considerations, based on recovery of costs and profit," and have been incorporated into the Accession Protocol on December 17, 2011.  Therefore, those obligations are equally binding as any other obligations contained in the General Agreement on Tariffs and Trade and other WTO agreements.
- It is inappropriate for Commerce independently to conclude that Russia has not abided by its commitments with respect to its natural gas industry.  Such a conclusion would require that the United States government, per the lead of the United States Trade Representative, raise such concerns through formal WTO channels and have the WTO as a whole confirm such concerns.  Therefore, Commerce must assume that Russia has abided by its commitments under its WTO Accession Protocol in the absence of evidence to the contrary, because to do otherwise would inappropriately place Commerce as the arbiter of Russia's compliance with its WTO commitments.

*Petitioner Rebuttal Brief:*[223]

- PhosAgro does not, and cannot, cite any U.S. legal authority (or any provision of the WTO Agreement on Subsidies and Countervailing Measures, for that matter) for the proposition that Russia's WTO accession commitments somehow prevent Commerce from determining whether the GOR provides countervailable subsidies under the Act. Commerce should therefore reject this argument.

**Commerce Position:**  We agree with the petitioner that PhosAgro does not cite to any U.S. legal authority that commitments made by Russia upon joining the WTO constrain or prevent Commerce from determining whether Russia has provided countervailable subsidies under the U.S. CVD law.  Contrary to PhosAgro's claims, Commerce has not reached any conclusions as to whether Russia has complied with its WTO commitments and these commitments have no bearing on Commerce's obligations under U.S. CVD law.

---

[221] *See* PhosAgro Case Brief at 7-9.
[222] *Id.* at 8 (citing The Eighth Ministerial Conference of the WTO formally approved the Accession Package of the Russian Federation on 16 December 2011.  *See* Accessions:  Russian Federation, WORLD TRADE ORGANIZATION (September 24, 2013, 5:49 AM), http://www.wto.org/english/thewto_e/acc_e/a1_ russie_e htm.  Also citing Report of the Working Party on the Accession of the Russian Federation to the World Trade Organization, WT/ACC/RUS/70, WT/MIN(11)/2, November 17, 2011 (Russian Accession Report)).
[223] *See* Petitioner Rebuttal Brief at 10-11.

Filed By: George Ayache, Filed Date: 2/9/21 12:20 PM, Submission Status: Approved

APPX0018577

Comment 3g:  Whether Commerce Should Adjust the Natural Gas Benchmark to "Tier One"

*PhosAgro Case Brief:*[224]

- The Russian domestic market-determined prices for natural gas should be used to determine adequate remuneration as this is Commerce's preferred basis for benchmarks, *i.e.*, "Tier One"[225]
- The GOR does not provide a majority or substantial portion of the market for natural gas. In fact, Gazprom's domestic market share has been declining and in 2019 was below 50 percent, according to the "Brattle Report" and "Gazprom Factbook" provided in PhosAgro's responses.  The Brattle Report also shows growth in the prices of independent gas producers and suppliers (IGS) that are not regulated.  Therefore, use of "Tier One" benchmarks is appropriate.
- PhosAgro provided evidence of both its and EuroChem's gas purchases and prices paid for natural gas produced by independent gas producers during the POI.  Novatek, which supplied natural gas to EuroChem, is the third largest gas company in terms of proven reserves and produces over 10 percent of Russia's natural gas.  None of these independent producers and suppliers is affiliated with Gazprom or is state owned, as shown by record evidence such as Novatek's 2019 annual report.
- Independent gas producers and suppliers in Russia, including Novatek, set prices for the natural gas they sell in Russia freely, based on the market considerations of demand and supply.  The record shows that these are monthly gas prices and purchases.  The appropriateness of using monthly prices as a comparable benchmark was confirmed in *Russia Cold-Rolled Steel* in which Commerce stated, "{w}e further note that the natural gas prices on the record are not comparable.  We conduct our analysis using monthly prices.  The NLMK Companies reported their purchases of natural gas from Gazprom on a monthly basis.  The Novatek prices on the record are quarterly and annual prices."[226]
- This approach was also followed in *Turkey Rebar INV* in which Commerce stated*:* "{h}owever, because the natural gas prices charged by Gazprom were derived on a quarterly basis and not a monthly basis, we determine that those prices are not useable for the construction of monthly benchmark prices …"[227]
- PhosAgro submitted evidence from privately-owned Russian gas supplier Novatek, whose prices in 2019 were below Gazprom's and were profitable, as compared to the gas tariff regulations provided by the Russian State which regulates wholesale prices of natural gas produced and supplied by Gazprom and companies affiliated by Gazprom.  Independent gas producers and suppliers are not subject to state regulation of gas prices and set their prices freely based on the market.  As such, independent gas producers' prices can be lower or higher than regulated prices and they are not influenced by Gazprom prices.  The fact that such independent prices can be lower is important because these lower prices are also profitable, thereby establishing them as a comparison benchmark for benefit measurement purposes.

---

[224] *See* PhosAgro Case Brief at 10-14.
[225] *Id*. at 10 (citing *Russia Cold-Rolled Steel* IDM at 15).
[226] *Id*. at 12 (citing *Russia Cold-Rolled Steel* IDM at Comment 7).
[227] *Id*. at 12 (citing *Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final Affirmative Countervailing Duty Determination Final Critical Circumstances Determination*, 79 FR 54963 (September 15, 2014) (*Turkey Rebar INV*), and accompanying IDM at 11).

APPX0018578

- The fact that a major part of Novatek's revenue is derived from domestic sales of natural gas demonstrates that natural gas sales by Novatek in Russia are highly profitable; therefore, the price charged is adequate and representative of a market price.[228]

*EuroChem Rebuttal Brief:*[229]
- EuroChem agrees with PhosAgro that Commerce erred in its selection of natural gas benchmarks.
- If Gazprom's natural gas price was subsidized (*i.e.*, the lowest gas price in Russia), natural gas consumers would keep sourcing natural gas from Gazprom. As the record demonstrates, Gazprom is forced to sell its natural gas at the higher regulated tariffs, progressively losing its market share in Russia to private, independent (*i.e.*, not government authority) natural gas suppliers like Rosneft, Novatek and SPIMEX.
- The record shows that Gazprom too sells into the unregulated market (*e.g.*, SPIMEX) at lower prices than it sells in the regulated market. In other words, the regulated market is meant to artificially boost natural gas prices above what would otherwise be. That is not a subsidy to natural gas users; rather, it is the opposite.
- PhosAgro correctly argues in its case brief that Commerce should use actual transaction prices for natural gas in Russia, namely those of Novatek, as a "Tier One" benchmark.

*Petitioner Rebuttal Brief:*[230]
- It is well-established that Commerce will not use domestic prices where it is reasonable to conclude that they are significantly distorted by a government's involvement in the market. The *CVD Preamble* specifically contemplates that government involvement can be significant where "the government provider constitutes a majority or, in certain circumstances, a substantial portion of the market."[231]
- PhosAgro cites to various graphics of its self-commissioned "Brattle Report" to claim that Gazprom accounts for only 49 percent of total Russian gas consumption. Even according to the data it cites, PhosAgro is incorrect in asserting that the GOR does not provide a substantial portion of the market for natural gas. Moreover, PhosAgro is unable to contest the evidence reported by the GOR and cited by Commerce demonstrating that Gazprom alone accounted for 68 percent of Russian natural gas production in 2019, and as noted above, PhosAgro has nothing to say about the other evidence relied upon by Commerce, such as the information relating to barriers to imports and exports and Gazprom's monopoly over natural gas transportation in Russia.
- Commerce should continue to find that there are no viable "Tier One" benchmarks for natural gas because of the GOR's involvement in the Russian domestic market.

---

[228] *See* PhosAgro Case Brief at 14 (citing *Circular Welded Carbon Quality Steel Pipe form the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 73 FR 31966 (June 5, 2008), and accompanying IDM at Comment 7).
[229] *See* EuroChem Rebuttal Brief at 5-6.
[230] *See* Petitioner Rebuttal Brief at 11-13.
[231] *Id.* at 11 (citing *CVD Preamble* ("While we recognize that government involvement in a market may have some impact on the price of the good or service in that market, such distortion will normally be minimal unless the government provider constitutes a majority or, in certain circumstances, a substantial portion of the market. Where it is reasonable to conclude that actual transaction prices are significantly distorted as a result of the government's involvement in the market, we will resort to the next alternative in the hierarchy.") and PDM at 13-14).

Filed By: George Ayache, Filed Date: 2/9/21 12:20 PM, Submission Status: Approved

APPX0018579

**Commerce Position:**  Based on the record evidence, we continue to find the domestic natural gas market to be distorted because of the predominant role played by the GOR in the Russian natural gas market through the significant portion of the market supplied by Gazprom and Rosneft, both government authorities, and because of other interventions in the natural gas market by the GOR, as described in further detail below.

Notwithstanding the regulatory preference for the use of prices stemming from actual transactions in the country, where Commerce finds that the government provides the majority, or a substantial portion of the market for a good or service, prices for such goods and services in the country will be considered significantly distorted and will not be an appropriate basis of comparison for determining whether there is a benefit.  This is because where the government's role as provider of the good or service is so predominant, it in effect determines the prices for private sellers of the same or similar goods or services such that comparing the government prices to those or private prices would amount to comparing the financial contribution to itself.

In reaching this conclusion, Commerce relied on information reported by the GOR to find that (1) a substantial proportion of total Russian domestic natural gas production during each of 2017, 2018, and 2019 is attributable to companies in which the GOR maintains a direct or indirect ownership/management interest; and (2) Gazprom alone accounted for a majority of the natural gas production in each of these years, such that it is reasonable to conclude that Gazprom accounts for a substantial portion of the market.

According to its 2019 annual report, Gazprom alone produced 68 percent of the natural gas consumed in Russia in 2019, which represents a predominant market share.  Through its predominant role as a supplier of natural gas in the market and monopoly over the transportation of natural gas, Gazprom has sufficient market power to effectively determine the prices of private suppliers of natural gas in Russia.

The GOR also stated that the domestic natural gas market is divided into a "regulated" market and an "unregulated" market.[232]  The record shows that the regulated market, in which Gazprom operates, accounts for a majority of the domestic natural gas market.[233]  Further, the record shows that domestic consumption needs are met by domestic production, as only two percent of domestic consumption is derived from imports of natural gas into Russia.[234]

In addition, the GOR reported that there were VAT and import tariffs on natural gas of 20 percent and five percent, respectively, in place during the POI.[235]  The GOR also reported that an export customs duty of 30 percent is applicable on natural gas, and that export licenses are required for the export of natural gas.[236]  The GOR further reported that, pursuant to Article 3 of the Federal Law N 117-FZ of July 18, 2006, "On Export of Gas," Gazprom holds the exclusive

---

[232] *See* GOR Questionnaire Response at 47.
[233] *Id.* at 42-44.
[234] *Id.* at 43.
[235] *Id.* at 54.
[236] *Id.* at 54-55.

rights to transport and export natural gas via pipeline; thus, Gazprom enjoys a "natural monopoly" over natural gas transportation.[237]

Based on this record evidence, we continue to determine that the market for natural gas is distorted through the GOR's predominant role in the market via Gazprom, and through other interventions in the market, in particular its controls on imports and exports of natural gas. We therefore continue to determine that actual transaction prices for natural gas in Russia cannot be used as a "Tier One" benchmark pursuant to 19 CFR 351.511(a)(2)(i), because they reflect the significant distortion resulting from the government's involvement in the market, as discussed above. On this basis, we find that prices stemming from private, domestic suppliers of natural gas within Russia, such as the prices of Novatek, a private Russian natural gas company, which were submitted by the respondents who advocate the use of a "Tier One" benchmark, cannot be considered to meet the statutory and regulatory requirement for the use of market-determined prices to measure the adequacy of remuneration.

Comment 3h:  Whether Commerce Should Adjust the Natural Gas Benchmark to "Tier Two"

*PhosAgro Case Brief:*[238]
- If Commerce declines to use "Tier One" benchmarks for its LTAR analysis, Commerce should find that "Tier Two" benchmarks are an appropriate alternative.
- In *Turkey Rebar INV*, Commerce stated that the "Tier Two" benchmark standard looks to "prices placed on the record …{for} natural gas that would be potentially available to purchasers in {the country under investigation}."[239]  In *Turkey Rebar 2017 Prelim*, Commerce further clarified that, with respect to the analysis of natural gas benchmarks, the "Tier Two" benchmark should include "the price which is valid in those countries that are connected to {the country under investigation} through natural gas pipe lines."[240]  In effect, there needs to only be an actual potential physical means for natural gas to be delivered from the countries in question to Russia, either in liquified or gaseous form, to establish eligibility for use under "Tier Two".
- The Brattle Report hub prices provide the most reasonable "Tier Two" benchmark.
- In the alternative, the World Trade Atlas report that PhosAgro submitted in Appendix 1 of its Rebuttal to Mosaic's Benchmark Submission provides the most applicable prices in Europe.
- While the situation in this case is similar to that in *Russia Cold-Rolled Steel,* Commerce has the authority to change its practice.  In *Clearon Corp. v. United States,* the Court determined that "{a}lthough adherence to previous methodology may be required in some instances, a change in Commerce's practice or methodology may be permitted in an administrative review {only} if the change is for an adequate cause, if Commerce provides a reasoned explanation, and in making this change Commerce provides parties with timely notice and sufficient opportunity to provide the information required by the

---

[237] *Id.* at 55 and 57.
[238] *See* PhosAgro Case Brief at 14-16.
[239] *Id.* at 15 (citing *Turkey Rebar INV* IDM at 11).
[240] *Id.* at 15 (citing *Steel Concrete Reinforcing Bar from the Republic of Turkey:  Preliminary Results of Countervailing Duty Administrative Review; 2017,* 84 FR 48583 (September 16, 2019) (*Turkey Rebar 2017 Prelim*), and accompanying PDM at 10).

APPX0018581

revised methodology."[241]

*Petitioner Rebuttal Brief:*[242]
- Commerce properly determined that there were no useable "Tier Two" benchmarks.
- PhosAgro contends that "Brattle Report hub prices provide the most reasonable "Tier Two" benchmark," referring to information on pages 12, 14, and Appendix E of that report.  It is unclear exactly which prices PhosAgro wants Commerce to use, but in any event, there is nothing on the cited Brattle Report pages that undermines Commerce's conclusion that there are no viable "Tier Two" benchmarks.  The cited information on pages 12, 14, and Appendix E consists of a variety of data for natural gas sold in the United States, Japan, and/or Europe.  The existence of such price information says nothing about whether those prices are for natural gas that would be available to purchasers in Russia.  Moreover, the Brattle Report itself states that "it makes relatively little sense to compare tariffs paid by the Russian fertilizer industry to market prices outside of Europe," and that "it was physically impossible to import gas from Europe to Russia in 2019."
- PhosAgro also cites *Turkey Rebar 2017 Prelim* in an attempt to support its assertion that "there needs to only be an actual potential physical means for natural gas to be delivered from the countries in question to Russia, either in liquid or gaseous form, to establish eligibility for use under 'tier-two'."  However, Commerce in that determination clearly indicated that the viability of proffered "Tier Two" natural gas benchmarks is a function of the relevant factual circumstances.[243]  Critically, PhosAgro fails to cite any record evidence that undermines Commerce's reliance on its findings in *Russia Cold-Rolled Steel* concerning Russian natural gas pipelines.

**Commerce Position:**  We continue to find that there are no "Tier Two" natural gas benchmark prices available to purchasers in Russia.  We agree with the petitioner that PhosAgro fails to cite any record evidence that undermines our reliance on either the current record or the findings in *Russia Cold-Rolled Steel.*  The idea proposed by PhosAgro that there only theoretically needs to be the potential for access to natural gas in Russia from outside the country, is a mischaracterization of Commerce's findings in *Turkey Rebar 2017 Final.*  In that case, Commerce stated with respect to the analysis of natural gas benchmarks, that the "Tier Two" benchmark should include "the price which is valid in those countries that are connected to {the country under investigation} through natural gas pipe lines."[244]  The analysis must go further and confirm that the pipe lines are capable of conveying gas in the appropriate direction.  There is no record evidence cited to overturn Commerce's findings in *Russia Cold-Rolled Steel* that none of

---

[241] *Id.* at 15-16 (citing *Clearon Corp. v. United States*, Slip Op. 14-88 (CIT 2014)).

[242] *See* Petitioner Rebuttal Brief at 14-16.

[243] *Id* at 15 (citing *Turkey Rebar 2017 Prelim*  PDM at 10-11 ("Commerce has previously found that the only applicable tier two benchmark price for natural gas in Turkey 'would be the price which is valid in those countries that are connected to Turkey through natural gas pipelines' (*i.e.*, Russia, Azerbaijan, and Iran).  European natural gas prices are, therefore, not available to purchasers in Turkey, as these countries are not connected to Turkey via natural gas pipelines (*i.e.*, the only method for transporting natural gas into Turkey).").

[244] *See Turkey Rebar 2017 Prelim* PDM at 10, unchanged in *Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final Results of Countervailing Duty Administrative Review; 2017*, 85 FR 16056 (March 20, 2020) (*Turkey Rebar 2017 Final*).

51

the pipelines in Russia are bi-directional.[245]  Because we determine that it is inappropriate to apply a "Tier Two" benchmark to calculate the benefit from the provision of natural gas by Gazprom and Rosneft in the final subsidy calculations, the arguments made by PhosAgro regarding the appropriate standard for selecting a "Tier Two" benchmark are moot.

**Comment 3i:  Whether Commerce Should Change the Data Relied Upon in its Natural Gas Benchmark "Tier Three" Analysis**

*PhosAgro Case Brief:*[246]
- Commerce should first evaluate prices of Gazprom versus its own costs.
- If Commerce rejects that comparison, it should select a country with natural gas producers that are profitable.  As previously stated in the "Tier One" arguments, private Russian producers match this description.  However, the European OECD countries fail to pass this test.
- The data submitted by the petitioner from International Energy Agency (IEA) which Commerce selected in the *Preliminary Determination* does not represent industrial prices based on market principles.  Page 18 of the 2019 IEA report submitted by the petitioner states that energy prices, including gas, are end users' prices inclusive of taxes which represent a mix of industrial and residential users.
- In *Turkey Rebar 2015*, Commerce used IEA data as a benchmark but specified that it represented "country-specific industrial natural gas prices."[247]
- The IEA report itself states that there are difficulties analyzing gas prices for industrial customers because end-use prices are often regulated through fixed and variable tariffs.
- The only data on the record in this investigation that provide a meaningful market analysis is contained in the Brattle Report.
- Commerce should rely on the prices in the Brattle Report for the final determination.

*EuroChem Rebuttal Brief:*[248]
- EuroChem agrees with PhosAgro's articulation of the flaws in Commerce's construction of a regional European OECD natural gas price as a "Tier Three" benchmark (*e.g.*, it impermissibly included household, retail prices and prices subject to special EU regulation).  As PhosAgro notes, even assuming Commerce could resort to the use of an out-of-Russia benchmark to assess the adequacy of remuneration for the provision of gas, it should ensure that such benchmark (a) relates to prevailing market conditions in Russia and (b) reflects price, quality, availability, marketability, transportation and other conditions of sale of gas in Russia.  Using EU gas prices as a benchmark to assess the adequacy of remuneration for gas provision in Russia is tantamount to countervailing Russia's comparative advantage in gas.

---

[245] *See Russia Cold-Rolled Steel* IDM at Comment 5.
[246] *See* PhosAgro Case Brief at 16-18.
[247] *Id.* at 17 (citing *Countervailing Duty Investigation of Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final Affirmative Countervailing Duty Determination*, 82 FR 23188 (May 22, 2017) (*Turkey Rebar 2015*), and accompanying IDM at 9).
[248] *See* EuroChem Rebuttal Brief at 7-10.

APPX0018583

*Petitioner Rebuttal Brief:*[249]
- Commerce properly used European IEA data in calculating a "Tier Three" benchmark.
- Commerce did, in fact, conduct a "market principles" analysis in the *Preliminary Determination*. That analysis cited an array of record evidence – including the fact that Gazprom's prices are administratively set – that amply supports Commerce's finding that "we cannot conclude that the government natural gas prices are reflective of market principles during the POI" and is consistent with Commerce's prior findings in *Russia Cold-Rolled Steel*.
- PhosAgro makes a bare, uncited assertion that "European OECD countries" do not have natural gas producers that are profitable. This unsupported assertion does not constitute record evidence, and as such, it provides no basis for disturbing Commerce's approach to benchmarking natural gas provided by the GOR.
- PhosAgro mistakenly contends that Commerce used IEA data that "are a combination of industrial and retail prices and are not market based prices to industrial users." The IEA data that the petitioner submitted, and on which Commerce relied, clearly state that the listed price data are for the "industry" sector.
- The information in the Brattle Report is neither superior to the IEA data nor useable in the natural gas benchmark calculation. The Brattle Report was prepared at the request of PhosAgro and EuroChem for purposes of this investigation, and the data contained in that report – most notably the data in Exhibit E – are not accompanied by original source documentation describing the methodology and sources of the data.
- Commerce has relied upon IEA European OECD natural gas prices in prior cases.[250] Accordingly, Commerce should continue to rely on the IEA data, and it should not rely on the data in the Brattle Report, whether on its own or by averaging it with the IEA data.

**Commerce Position:** As discussed above, we determine that there are no "Tier One" (domestic prices for natural gas that are market-based) or "Tier Two" (world market prices for natural gas that are available to purchasers in Russia) prices that can serve as the benchmark for measuring the adequacy of remuneration for the natural gas that Gazprom and Rosneft sold to the respondent companies during the POR. The final alternative in the benchmark hierarchy, set forth under 19 CFR 351.511(a)(2)(iii), is to determine whether Gazprom's and Rosneft's prices are consistent with market principles.

Under a "Tier Three" analysis, Commerce's regulations explain that it will normally assess whether the prices charged by the government are set in accordance with market principles through an analysis of such factors as the government's price-setting methods, costs (including rates of return sufficient to ensure future operations), or possible price discrimination.[251] Although the *CVD Preamble* suggests that such an analysis might entail looking at those factors, the regulations do not prescribe any particular analysis under this prong. Rather, by its nature, the analysis depends upon available information concerning the market sector at issue and,

---

[249] *See* Petitioner Rebuttal Brief at 16-19.
[250] *Id* at 18 (citing *Turkey Rebar 2017 Final* IDM at Comment 1; and *Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2016*, 84 FR 36051 (July 26, 2019) (*Turkey Rebar 2016*), and accompanying IDM at Comment 1).
[251] *CVD Preamble* at 65378

Filed By: George Ayache, Filed Date: 2/9/21 12:20 PM, Submission Status: Approved

APPX0018584

therefore, must be developed on a case-by-case basis.[252]

The respondents submit that Commerce can test the laws that provide for cost recovery, investment, and profit for natural gas by looking at the performance of unregulated suppliers in Russia, such as Novatek, which, they claim, price below regulated prices and realize profits. They assert that such a test will prove that the GOR-regulated prices allow for adequate remuneration through the application of market principles. However, we find that such a test is not possible. First as discussed above, in the *Preliminary Determination* Commerce found the Russian natural gas market is distorted and that as a result, the prices charged by private suppliers cannot provide a basis for determining whether Gazprom's prices are market-based. Therefore, we find that the Novatek prices on the record are not suitable benchmarks, nor are they informative to any analysis proffered by the respondents.

We also agree with the petitioner that PhosAgro's assertion that "European OECD countries" do not have natural gas producers that are profitable is unsupported by record evidence, and as such, it provides no basis for changing our approach to benchmarking the prices of natural gas provided by the GOR.

PhosAgro and EuroChem also mistakenly contend that Commerce used IEA data that "are a combination of industrial and retail prices and are not market based prices to industrial users." The IEA data that the petitioner submitted, and on which Commerce relied, clearly state that the listed price data are for the "industry" sector. The information in the Brattle Report provided by the respondents is neither superior to the IEA data nor useable in the natural gas benchmark calculation because the Brattle Report was prepared at the request of PhosAgro and EuroChem for purposes of this investigation, and the data contained in that report – for example the data in Exhibit E – are not accompanied by original source documentation describing the methodology and sources of the data. Whereas, Commerce has relied upon IEA European OECD natural gas prices in prior cases.[253]

Based on the record evidence, we continue to find that the most appropriate proxy for a market-based natural gas benchmark to apply under "Tier Three" is a regional, European OECD natural gas price. On the record are European OECD export prices sourced from the IEA. In the final determination, we continue to calculate the program benefit by comparing the corresponding quarterly benchmark unit prices to the unit prices that the respondents paid to Gazprom and Rosneft, including delivery charges, surcharges, and taxes during the POI, as described in the *Preliminary Determination*.

Comment 3j:   Whether Commerce Should Adjust the Natural Gas Benchmark Data in its "Tier Three" Analysis.

*PhosAgro Case Brief:*[254]
- Where there is more than one world market price available on the record, it is Commerce's practice to average the available prices. Commerce's regulations state that

---

[252] *Id.*

[253] *See Turkey Rebar 2017 Final* IDM at Comment 1; and *Turkey Rebar 2016* IDM at Comment 1.

[254] *See* PhosAgro Case Brief at 16-18.

"{w}here there is more than one commercially available world market price, {Commerce} will average such prices to the extent practicable."[255] Commerce should average the prices submitted by all parties.

- Natural gas sold by Gazprom for export is subject to a 30 percent export tax in Russia. Russia is the major gas supplier to the EU which effectively means that EU gas prices are prices of Russian gas sold for export to the EU.
- Commerce's preliminary benchmark calculation includes VAT twice because it takes into consideration both the Russian VAT and European VAT. Commerce should remove the European VAT taxes from the benchmark calculations.

*Petitioner Case Brief:*[256]
- Commerce did not adjust the European natural gas benchmark prices to account for the distortive influence on those prices from Russian imports into Europe. Commerce should make such an adjustment in the final determination, consistent with its practice in *Turkey Rebar 2017 Final*, where Commerce adjusted "the IEA data to remove the Russian price component," consistent with the adjustment made to the IEA benchmark in *Turkey Rebar 2016*.[257]

*PhosAgro Rebuttal Brief:*[258]
- The petitioner proposes removing Russian export prices from European prices to determine if Gazprom's prices are set "in accordance with market principles." This argument is the inverse of the necessary analysis.
- In fact, only Russian prices of natural gas sold in the EU should be compared to prices of Russian natural gas sold in Russia. No party has submitted any evidence or argued that natural gas produced in Russia and sold in Europe is distorted or suppressed. In fact, the very regulations at issue in this matter (internal price regulations setting wholesale tariffs for gas produced by Gazprom and its affiliates which is allegedly impacting the price of natural gas within Russia) are not present in the EU. As such, the Russian price of natural gas sold in Europe provides a reasonable benchmark against which to determine if Russian internal prices are in accordance with market principles.
- Conversely, removing Russian natural gas sold in the EU creates a distorted comparison with no meaningful ability to determine if Russian natural gas prices are in accordance with market principles. Under section 771(5)(E)(iv) of the Act, Commerce must assess the adequacy of remuneration "in relation to prevailing market conditions for the good... in the country which is subject to the investigation...{which} include price, quality, availability, marketability, transportation, and other conditions of purchase or sale."

---

[255] *Id.* at 18 (citing 19 CFR 351.511(a)(2)(ii)).
[256] *See* Petitioner's Case Brief at 29-32.
[257] *Id.* at 29-30 (citing *Turkey Rebar 2017 Final* IDM at 18 and 23; and *Steel Concrete Reinforcing Bar from the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent to Rescind the Review in Part; 2016*, 83 FR 63472 (December 10, 2018), and accompanying PDM at 22, unchanged in *Turkey Rebar 2016*).
[258] *See* PhosAgro Rebuttal Brief at 10-12.

Filed By: George Ayache, Filed Date: 2/9/21 12:20 PM, Submission Status: Approved

APPX0018586

*Petitioner Rebuttal Brief:*[259]
- Commerce should reject PhosAgro's cursory and unsupported argument in favor of adjustments to the IEA data.

**Commerce Position:** As explained in the *Preliminary Determination,* because we found that the Russian government price for natural gas is not set in accordance with market principles, we decided to rely on an appropriate proxy for a market-based natural gas benchmark, and determined that EU natural gas prices are an appropriate benchmark. This approach is consistent with Commerce's practice in other proceedings, such as *Uncoated Paper from Indonesia.*[260] When determining a benchmark under "Tier Three," Commerce is not limited to identifying market prices that would be available to purchasers in Russia. Indeed, as we have previously noted, "{t}he regulations do not specify how {Commerce} is to conduct a market principles analysis."[261] Thus, consistent with our prior practice, it is possible to consider the world market prices on the record as potential benchmark prices in a "Tier Three" analysis.

We agree with PhosAgro that the record does not support removing sales of natural gas from Russia in the EU from consideration as market benchmarks. No party has submitted any evidence that natural gas produced in Russia and sold in Europe is distorted or suppressed. In fact, the very regulations at issue in this matter (internal price regulations setting wholesale tariffs for gas produced by Gazprom and its affiliates which is allegedly impacting the price of natural gas within Russia) are not present in the EU. Instead, prices for natural gas sold in Europe are reflective of the market dynamics in that market, which include sales of numerous sources, including Russia. We therefore continue to find that EU natural gas prices provide a reasonable, market-determined benchmark against which to assess whether and to what extent sales of natural gas from authorities in Russia confer a benefit to the respondents. Furthermore, with respect to petitioner's argument that Commerce should adjust the European gas prices in the same manner it did in *Turkey Rebar 2017*, we disagree. Commerce's findings in that case pertained to certain record facts that Russian exports to the EU were distorted during the period of review in that proceeding.[262] Such information is not on the record of this proceeding pertaining to the POI. Therefore, we have no basis grounded in record facts to make any adjustments to EU natural gas prices in this proceeding.

While it is Commerce's practice to average benchmark prices where there is more than one commercially available market price on the record to construct a benchmark price, we explain above why prices contained in the "Brattle Report" are unreliable. Among the reasons discussed above, in Comment 3i, we find that this report is contradictory to information provided by parties directly and there is no information on how the data provided were obtained or source documentation to support those data. Therefore, we did not average these prices with the IEA data, as suggested by PhosAgro.

---

[259] *See* Petitioner Rebuttal Brief at 19.
[260] *See Certain Uncoated Paper from Indonesia: Final Affirmative Countervailing Duty Determination,* 81 FR 3104 (January 20, 2016) (*Uncoated Paper from Indonesia*), and accompanying IDM at 15-16 ("Provision of Standing Timber for Less Than Adequate Remuneration") (where Commerce found that the government price was not set in accordance with market principles, and thus sought a proxy to determine a market-based stumpage benchmark).
[261] *See Uncoated Paper from Indonesia* IDM at 15.
[262] *See Turkey Rebar 2017 Final* IDM at Comment 1.

56

Finally, we disagree with PhosAgro that Commerce's benchmark calculation double-counted VAT. As explained in the *Preliminary Determination*, when measuring the adequacy of remuneration, Commerce will adjust the benchmark price to reflect the price that a firm actually paid or would pay if it imported the product by including delivery charges and import duties to construct a "delivered" price to the company's facility.[263] To ensure that the quarterly benchmark prices reflect what the respondents would have paid if they had imported natural gas directly, we adjusted the average prices by adding the delivery charges for the transmission and distribution of natural gas in Russia, any import duties and taxes, and surcharges. The GOR reported that imports of natural gas into Russia would be subject to a 20 percent VAT and five percent import duty. Therefore, to the monthly benchmark prices, we added import-specific VAT and the import duty in addition to the EU export VAT that was included in the IEA benchmark price to reflect the price that a firm would pay if it imported the product into Russia.[264]

Comment 3k: Whether Commerce Should Use a VAT Inclusive Sales Denominator

*EuroChem Case Brief:*[265]
- The benefits calculated by Commerce for the Natural Gas for LTAR program included VAT in the numerator, but Commerce's sales denominators did not include VAT. Commerce should remedy this inconsistency and distortion either by (a) including VAT in the sales denominators or (b) removing VAT from the numerator of the benefit calculation.

*Petitioner Rebuttal Brief:*[266]
- Commerce should reject EuroChem's argument concerning VAT in the sales denominator. Commerce properly ensured that the numerator consists of a subsidy benefit figure reflecting an apples-to-apples comparison to a market benchmark – *i.e.*, a VAT-inclusive benchmark price minus a VAT-inclusive government price. That has nothing to do with the value of the sales to which the benefit is attributed, because a subsidy numerator resulting from an apples-to-apples comparison will represent the amount of the subsidy, not the amount of VAT. Thus, EuroChem provides no basis to include VAT in the sales denominator.

**Commerce Position:** We agree with the petitioner that the inclusion of VAT in the subsidy benefit numerator ensures a proper comparison to the market benchmark and has no bearing on the value of the sales to which the benefit is attributed. In its CVD questionnaire, Commerce intentionally requested that "{i}f your sales are inclusive of VAT or other indirect taxes, please ensure that such taxes are removed from your sales figures."[267] Thus, we have not made the revision requested by EuroChem in the final subsidy calculations.

---

[263] *See* 19 CFR 351.511(a)(2)(iv).
[264] *See Turkey Rebar 2017 Prelim* PDM at 15, unchanged in *Turkey Rebar 2017 Final.*
[265] *See* EuroChem Case Brief at 2.
[266] *See* Petitioner Rebuttal Brief at 20.
[267] *See* Initial Questionnaire at Section III, p.5.

APPX0018588

Barcode:4085906-01 C-821-825 INV - Investigation -

Comment 3l:   Whether 19 CFR 351.525(b)(6) Applies to EuroChem's Natural Gas for LTAR

*EuroChem Case Brief:*[268]

- The *Preliminary Determination* relies on 19 CFR 351.525(b)(6), entitled "Corporations with cross-ownership." This regulation does not address allocation by relative use of the input.
- There is no record evidence that natural gas is primarily dedicated to the production of subject phosphate fertilizer.
- EuroChem's December 7, 2020 supplemental questionnaire response at Exhibit 1 (Sales) and Exhibit 5 (supporting accounting data) prove that NAK Azot, EuroChem NW and Nevinka are not engaged in the production of the input product that is primarily dedicated to the production of the downstream product. The sales of inputs from these facilities to phosphate fertilizer producing plants are only a small/negligible fraction of their total sales.
- Natural gas is first used in the production of ammonia which is then used by these entities to produce various different fertilizers including the subject merchandise. Ammonia is also used by cross-owned plants to produce nitrogen fertilizers which are sold for export through EuroChem's own distribution channels, such that these sales should also be captured by using EuroChem's consolidated sales to allocate any natural gas subsidy.
- A subsidy should be allocated over all products that it benefits, and to the extent they benefit from it.[269]

*Petitioner Rebuttal Brief:*[270]

- Commerce should reject EuroChem's argument regarding 19 CFR 351.525(b)(6)(iv). It is uncontested that Phosphorite received inputs from the EuroChem cross-owned entities at issue to produce the subject merchandise. As such, Commerce's attribution of input supplier subsidies is consistent with its practice in *Russia Cold-Rolled Steel*.[271] In contrast, EuroChem's proposed "consolidated sales" attribution approach would be inconsistent with both 19 CFR 351.525(b)(6)(iii) and *Russia Cold-Rolled Steel* because there is no evidence that the parent company of the EuroChem Group companies is a producer of the subject merchandise.[272]

**Commerce Position:**  We agree with the petitioner.  In the *Preliminary Determination*, pursuant

---

[268] *See* EuroChem Case Brief at 2-4.

[269] *Id.* at 4 (citing *Mannesmann-Sumerbank Boru Endustrisi T.A.S. v. United States,* Slip Op. 99-141 at 33 (CIT December 23, 1999).

[270] *See* Petitioner Rebuttal Brief at 20-21.

[271] *Id.* at 21 (citing *Russia Cold-Rolled Steel* IDM at 10-11 ("Because we find Altai-Koks OJSC, Dolomite OJSC, Stoilensky OJSC, Studenovskaya (Stagdok) OJSC, Trading House LLC, Vtorchermet NLMK LLC, Vtorchermet OJSC, and Vtorchermet NLMK Center LLC to be cross-owned input producers, we find, pursuant to 19 CFR 351.525(b)(6)(iv), that any subsidies received by these firms are attributable to the respective firm's total sales and the sales of the NLMK Companies, net of intracompany sales.")).

[272] *Id.* at 21 (citing *Russia Cold-Rolled Steel* IDM at 10 ("NLMK is a producer of subject merchandise and also a parent company of the firms that comprise the NLMK Companies. Therefore, pursuant to 19 CFR 351.525(b)(6)(iii) and Commerce's practice, 40 we attributed any subsidies received by NLMK to the total consolidated sales of the NLMK Companies, net of intra-company sales."), and PDM at 5 (noting that the EuroChem group's ultimate parent is based in Switzerland)).

Filed By: George Ayache, Filed Date: 2/9/21 12:20 PM, Submission Status: Approved

APPX0018589

to 19 CFR 351.525(b)(6)(iv), Commerce attributed subsidies received by EuroChem Group cross-owned input suppliers to their total sales plus the combined total sales of Phosphorite, BMU, and Nevinka, net of intercompany sales.  EuroChem does not deny that Phosphorite received inputs from the EuroChem cross-owned entities at issue to produce the subject merchandise.  As such, Commerce's attribution of input supplier subsidies is consistent with its practice in *Russia Cold-Rolled Steel*.[273]  We agree that EuroChem's proposed "consolidated sales" attribution approach would be inconsistent with both 19 CFR 351.525(b)(6)(iii) and *Russia Cold-Rolled Steel* because there is no evidence that the parent company of the EuroChem Group companies is a producer of the subject merchandise.  Below we further address EuroChem's proposed changes to the preliminary attribution methodology.

**Comment 3m:**  Whether Commerce Should Consider the Relative Consumption of Natural Gas in the Production of Subject Merchandise for Purposes of Attribution

*EuroChem Case Brief*:[274]
- EuroChem produces many different types of fertilizers that use natural gas – *e.g.*, urea, UAN, ammonia nitrate, CAN, methanol, *etc.*  There is no record evidence that they all use the same amount of natural gas.  In fact, phosphate fertilizers consume far less natural gas than other non-subject EuroChem fertilizers.  Commerce's statutory mandate is to calculate subsidy margins as accurately as possible.[275]  To do so, Commerce should account for the difference in natural gas use in the production of subject phosphate fertilizers versus other non-subject fertilizers.
- Commerce never requested information regarding natural gas use in the production of non-subject merchandise.  There was no indication that the onus was on EuroChem to provide this information.  EuroChem provided information on December 24, 2020, to assist Commerce in addressing this matter, but Commerce rejected this submission.  As noted on the record previously, this submission should have been accepted as a matter of law.[276]  Therefore, Commerce should open the record and allow this information to calculate an accurate margin calculation.
- In its final determination, Commerce should refine its preliminary calculation to consider only subsidies that flow to subject phosphate fertilizers per its practice.  The record shows the intertwined relationships among the ten cross-owned companies.  To reflect the economic realities of the group, Commerce should collapse the cross-owned companies into one entity and perform the subsidy calculation for the combined group.

---

[273] *See Russia Cold-Rolled Steel* IDM at 9-10.
[274] *See* EuroChem Case Brief at 4-9.
[275] *Id.* at 5 (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)).
[276] *Id.* at 6-7 (citing *Usinor Sacilor v United States*, 907 F. Supp. 426, 427 (CIT 1995) (Standard applied not indicated to respondent until after deadlines to submit facts passed, such that the respondent should now be given opportunity to provide information); *Creswell Trading Co. v. United States*, 15 F 3d 1054 (Fed. Cir. 1994) (It is inherently unfair for Commerce not to indicate what information is relevant until after factual submission deadlines pass.  Respondent should be allowed to submit information ); *Nihon Cement v. United States*, 17 CIT 400, 410 (1993) ("Commerce must... properly instruct the respondent as to the information requested."); *Daewoo Elec. Co. v. United States*, 13 CIT 253, 266 (1989) (Commerce must provide proper instructions to respondent as to methods of compiling the information and then give the respondent an opportunity to provide that information); *NACCO Materials Handling Group v. United States*, Slip Op 96-99 at 17 (CIT July 1996) (Commerce must articulate to the respondent the proper standard/criteria as to information needed, provide the respondent the opportunity to provide the information, and then undertake the necessary analysis of that submitted information)).

- Commerce should request the total consumption of natural gas, either directly, or through the consumption of ammonia, nitric acid, ammonium nitrate melt and other inputs from each of the three Russian mills. By aggregating the POI totals for the three plants, a total POI usage of natural gas to produce subject phosphate fertilizers by the cross-owned companies is achieved.
- The record contains the total POI natural gas purchases made by the three Russian producers of subject merchandise and the seven additional cross-owned companies. Dividing the total POI quantity of natural gas consumed to produce subject phosphate fertilizers in the POI by the total purchases of natural gas made during the POI yields an allocation factor for subject phosphate fertilizer. That factor can be used to allocate the total benefits for natural gas received by all the companies to subject merchandise only. The denominator of this equation is the total sales of subject phosphate fertilizers by the three plants that produced subject phosphate fertilizers in the POI.
- There are more EuroChem plants outside of Russia that should also be considered - – i.e., EuroChem Belgian and Lithuanian plants all run (fully or partially) on ammonia produced by Russian plants. As the record indicates, all these fertilizers further go into the EuroChem-owned distribution network in the USA, Brazil, the EU, and Russia. Any natural gas subsidy should be allocated over all products made from that natural gas to accurately calculate the margin.
- If Commerce incorrectly fails to do the above, Commerce should at least allocate the natural gas benefits to subject phosphate fertilizers with corrections to the preliminary decision methodology so that the allocation is not even more distorted than it already is. To start, Commerce should calculate the percentage of natural gas purchases used to produce subject phosphate fertilizers for Phosphorite, Nevinka, and BMU. This information is not currently on the record but could easily be provided.
- Each of these three companies would have a company-specific ratio that could be applied to the company-specific benefits determined by Commerce. For the other cross-owned companies, there was no production of subject merchandise. Thus, the most appropriate measure of the benefits flowing to the subject merchandise is the weighted-average ratio of the benefits used for producing the subject merchandise by the three companies named above.

*PhosAgro Case Brief:*[277]
- With respect to 19 CFR 351.525(b)(5)(i) {i}n general, if a subsidy is tied to the production or sale of a particular product, the Secretary will attribute the subsidy only to that product. In the instant case, the subsidy should be attributed to phosphate fertilizers. Therefore, in the numerator, natural gas used for the production of nitrogen fertilizers should not be included, whereas in the denominator, revenue from sales of natural fertilizers should be excluded.

*EuroChem Rebuttal Brief:*[278]
- PhosAgro argues that Commerce should attribute the natural gas subsidy benefit only to phosphate fertilizers (*i.e.*, only consider natural gas used by phosphate fertilizers versus

---

[277] *See* PhosAgro Case Brief at 20.
[278] *See* EuroChem Rebuttal Brief at 1.

APPX0018591

other products). EuroChem agrees with this argument and reiterates that it can provide the necessary information to make such an adjustment. Doing so fulfills Commerce's statutory mandate to calculate accurately CVD/AD margins within the statutory time limits; here, the interests of fairness and accuracy outweigh any concerns as to finality and burden.[279]

*GOR Rebuttal Brief:*[280]
- The GOR supports EuroChem's and PhosAgro's request to reopen the record for the narrow purpose of allowing an examination of natural gas usage between subject and non-subject merchandise production.

*Petitioner Rebuttal Brief:*[281]
- Commerce should reject the respondents' argument as it has done in prior cases with respect to LTAR subsidies.[282] The *CVD Preamble* directs Commerce to "tie" a subsidy if the "stated purpose of the subsidy or the purpose we evince from record evidence at the time of bestowal" establishes that the subsidy was provided for a particular product.[283] Both EuroChem and PhosAgro produce a variety of fertilizer products in which natural gas is a major input. Therefore, Commerce should not tie the respondents' natural gas subsidies to any one particular fertilizer.
- Even if tying were appropriate, EuroChem has not provided the information necessary to do so. Similarly, PhosAgro did not cite to any record information in its case brief that would allow Commerce to do so.

**Commerce Position:** We agree with the petitioner that it is inappropriate to consider the relative consumption of natural gas used in the production of the subject merchandise, phosphate fertilizers, when attributing the subsidy under the natural gas for LTAR program. Commerce has consistently rejected similar claims to tie input subsidies in the manner advocated by the respondents.[284]

Commerce's regulations state that "if a subsidy is tied to production of an input product, then {Commerce} will attribute the subsidy to both the input and downstream products produced by a

---

[279] *Id.* at 1 (citing *NTN Bearing Corp. v. United States*, 74 F.3d. 1204, 1207 (Fed. Cir. 1995); *Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 815 F. Supp. 2d 1342, 1365 (CIT January 18, 2012); *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353-54 (Fed. Cir. 2006); *U.S. Magnesium LLC v. United States*, 895 F. Supp. 2d 1319, 1325 (CIT 2013)).
[280] *See* GOR Rebuttal Brief at 28-29.
[281] *See* Petitioner Rebuttal Brief at 21-22.
[282] *Id.* at 21 (citing *Drill Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination*, 76 FR 1971 (January 11, 2011), and accompanying IDM at Comment 6.
[283] *Id.* at 21 (citing *CVD Preamble*, 63 FR at 65403.)
[284] *See, e.g., CFS Paper from China* IDM at Comment 18; *Supercalendered Paper from Canada* IDM at Comment 18; and *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from India: Preliminary Results of Countervailing Duty Administrative Review, 2017-2018 (CDMT from India)*, 85 FR 12897 (March 5, 2020), and accompanying PDM at 24-25 (where Commerce stated that, "… in accordance with our regulations, we do not consider the manner in which Goodluck used its inputs as a factor that is germane to Commerce's subsidy analysis …"), unchanged in *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from India: Final Results of Countervailing Duty Administrative Review, 2017-2018 (CDMT from India AR)*, 85 FR 66304 (October 19, 2020).

Filed By: George Ayache, Filed Date: 2/9/21 12:20 PM, Submission Status: Approved

corporation."[285]  Further, consistent with the *CVD Preamble*, under Commerce practice we will not trace how subsidies are used by companies, but rather analyze the purpose of the subsidy based on information available at the time of bestowal.[286]  With respect to input subsidies, for situations where there is an input producer whose production is dedicated almost exclusively to the production of higher value-added product, the *CVD Preamble* states that "the purpose of a subsidy provided to the input producer is to benefit the production of both input and downstream products …" and "(b)(6)(iv) requires the Department to attribute the subsidies received by the input producer to the combined sales of the input and downstream products (excluding the sales between the corporations)."[287]  Thus, Commerce's established practice is not to trace subsidized inputs through a company's production process.[288]

For example, in *CFS Paper from China*, Commerce rebuts claims that it should attribute input subsidies on the basis of how they were used during a certain period, stating that the respondent GE was "essentially asking us to trace the subsidized pulp input to non-U.S. merchandise."[289]  Citing its prior findings in *Industrial Phosphoric Acid from Israel*, Commerce rejected GE's reasoning because it would "mean that the Department would have to trace subsidies and subsidized inputs on a dollar-by-dollar, input-by-input basis through the recipient companies and their production processes."[290]  Commerce concluded that such an approach would be impractical and is not required by the CVD law.

In this case, consistent with 19 CFR 351.511 and 351.525(b)(6)(iv), we computed natural gas benefits for all fertilizer products produced by the respondents, as appropriate, and divided this total benefit by the respondents' total sales during the POI.  Because this calculation completely captures the benefits attributable to subject merchandise, we disagree that it would be appropriate to modify it for purposes of the final determination.

For these reasons, we disagree with EuroChem, PhosAgro, and the GOR that we should revise the natural gas benefit calculation to limit the benefit to just the natural gas used in the production of subject merchandise.  Natural gas is used to make many products and can be used for any number of purposes, including production of subject or non-subject merchandise or basic electricity.

---

[285] *See* 19 CFR 351.525(5)(ii).
[286] *See CVD Preamble*, 63 FR at 65403 ("We have generally stated that we will not trace the use of subsidies through a firm's books and records.  Rather we analyze the purpose of the subsidy based on information available at the time of bestowal.  Once the firm receives the funds, it does not matter whether the firm used the government funds, or some of its own funds that were freed up as a result of the subsidy, for the stated purpose or the purpose that we evince.").
[287] *Id.* at 65401.
[288] *See CFS Paper from China*, and accompanying IDM at Comment 18; *Supercalendered Paper from Canada* IDM at Comment 18; and *CDMT from India* and accompanying PDM at 24-25 (where Commerce stated that, "… in accordance with our regulations, we do not consider the manner in which Goodluck used its inputs as a factor that is germane to Commerce's subsidy analysis …"), unchanged in *CDMT from India AR*
[289] *CFS Paper from China* IDM at 94.
[290] *Id.* at 95.

Comment 3n:  Whether Commerce Should Use EuroChem's 2019 Audited Financials for Its
            Sales Denominators

*EuroChem Case Brief:*[291]

- The record indicates that EuroChem plants sell outside of Russia.  That fact should also be considered in a proper allocation - – *i.e.*, EuroChem Belgian and Lithuanian plants all run (fully or partially) on ammonia (in turn produced from natural gas) produced by Russian plants.  Because all these fertilizers further go into the EuroChem-owned distribution network in the U.S., Brazil, the EU, and Russia, any natural gas subsidy should be allocated over those sales as well.  Use of EuroChem's consolidated financial statement achieves that proper allocation.
- Commerce practice, supported by court decisions, is that if several legal entities are in reality one entity, Commerce treats them as one entity.[292]  The Supreme Court likewise repeatedly employs a "doctrine of substance over form" in which it "has looked to the objective economic realities, ... rather than to the particular form the parties employed."[293]
- The record establishes that in reality and in substance EuroChem operates as a single entity, though it is composed in form of several legal entities.  EuroChem is a vertically integrated group of companies, managed through means of common corporate ownership.
- In prior AD cases involving urea and ammonium nitrate fertilizers from Russia, Commerce collapsed the EuroChem Group and treated it as a single company/entity.  It should do so here too.
- Commerce should use EuroChem's consolidated financial statement, with adjustments to get to the net sale FOB values.  Commerce has done so in other cases.[294]
- Alternatively, Commerce should use the combined sales from the ten cross-owned affiliates less intercompany sales.
- In its Post-Preliminary Determination, Commerce updated its sales denominators to eliminate cross-owned company sales, rather than affiliated sales as done in the *Preliminary Determination*.  Commerce used these sales eliminations to combine (a) the sales of the three subject merchandise producing companies and b) each of the other cross-owned companies with the three subject merchandise producing companies.  These eliminations are overstated.  Commerce should conduct a separate elimination analysis for each group of companies where only sales made to the other companies in each group are eliminated.
- All Phosphorite's sales should be included as part of this collapsed group.  As to

---

[291] *See* EuroChem Case Brief at 10-14.

[292] *Id.* at 10 (citing *Ta Chen Stainless Steel Pipe, Ltd. v. United States*, Slip Op. 99-117 at 14 (CIT October 28, 1999)).

[293] *Id.* at 10 (citing *Frank Lyon Co. v. United States,* 435 U.S. 561, 572-573 (1978); *Boulware v. United States*, 128 S. Ct. 1168, 1176 (2008); *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 688 (1985)).

[294] *Id.* at 12 (citing *Russia Cold-Rolled Steel* IDM at 130 ("we have attributed any subsidies received by cross-owned members of the Severstal Companies to the consolidated sales of the Severstal Companies")*; Non-Oriented Electrical Steel from Taiwan: Final Affirmative Countervailing Duty Determination*, 79 FR 61602 (October 14, 2014), and accompanying IDM at 8 (used consolidated total of the China Steel companies); and *Ripe Olives from Spain: Final Affirmative Countervailing Duty Determination*, 83 FR 28186 (June 18, 2018), and accompanying IDM at Comment 23 ("we treat a respondent and its cross-owned input suppliers as one entity for purposes of calculating the countervailing duty subsidy rate.")).

Filed By: George Ayache, Filed Date: 2/9/21 12:20 PM, Submission Status: Approved

Nevinka, only the sales made to BMU should be eliminated from the analysis.  For BMU, only the sales to Nevinka should be eliminated.

*Petitioner Rebuttal Brief:*[295]
- Commerce should reject EuroChem's "single entity" subsidy attribution arguments as contrary to its regulations.  Section 351.525(b)(6) of Commerce's regulations provides a well-defined set of rules governing how a subsidy is to be attributed in situations involving corporations with cross-ownership.  EuroChem does not, and cannot, show that it would be consistent with those rules to allocate the natural gas subsidies to the EuroChem Group's consolidated sales or a collapsed group of ten entities.  The lack of support for EuroChem's arguments is apparent from its citations to court cases and Commerce AD determinations that have nothing to do with Commerce's subsidy attribution regulations.
- Even assuming *arguendo* Commerce ignored its regulations and attempted to "consolidate" the subsidies from the entire group, the calculation would require that EuroChem report all subsidies from all of its subsidiaries.  EuroChem did not provide that information.

**Commerce Position:**  We agree with the petitioner.  Section 351.525(b)(6) of Commerce's regulations provide rules governing how a subsidy is to be attributed in situations involving corporations with cross-ownership.  Commerce has laid out its attribution methodology in detail in the *Preliminary Determination*.[296]  EuroChem does not demonstrate that it would be consistent with those rules to attribute the natural gas subsidies to the EuroChem Group's consolidated sales or a collapsed group of ten entities.  Among the reasons this would be contrary to Commerce's regulations and practice is that the proposed entity would include foreign companies that would then be required to report subsidies they received from the GOR.  This concept on its face is illogical.  Commerce is not investigating subsidies to entities outside of Russia, nor is Commerce investigating whether sales of subject merchandise to third countries are unfairly subsidized.  It is not consistent, therefore, to attribute any benefit of subsidies received by Russian companies to the sales made by non-Russian companies or to unrelated third countries regardless of whether they are part of the same corporate structure.  Additionally, EuroChem's citations to AD cases in which Commerce collapsed EuroChem entities are not relevant to this CVD proceeding.

Comment 3o:  Whether the Delivery Cost of SPIMEX Natural Gas from Energo to Nevinka and EuroChem NW Should Be Considered in Any Natural Gas Subsidy Calculation

*EuroChem Case Brief:*[297]
- The final subsidy calculations should include freight costs associated with SPIMEX purchases and Commerce should open the record to accept more information on this issue.
- Energo purchased natural gas from SPIMEX and resold it to EuroChem's Nevinka and EuroChem NW plants.  Commerce's preliminary calculations excluded Energo's

---

[295] *See* Petitioner Rebuttal Brief at 22.
[296] *See* PDM at 4-7.
[297] *See* EuroChem Case Brief at 16, incorporating comments in Exhibit 4 at 1-4.

delivered sales to both Nevinka and EuroChem NW as intercompany sales. Instead, Commerce used Energo's natural gas purchases from the SPIMEX that did not include Energo's delivery costs on its sales to Nevinka and EuroChem NW. Such delivery costs were inadvertently omitted.

- EuroChem did not separately report the transportation expense in the Energo gas purchases spreadsheet, assuming that Commerce would use the Nevinka and EuroChem NW delivered natural gas purchase figures.

*Petitioner Rebuttal Brief:*[298]

- EuroChem does not provide a valid basis for adding freight to the natural gas purchases of Energo on SPIMEX. In the natural gas purchase table that EuroChem submitted in its initial questionnaire response, EuroChem failed to report this information, then attempted to change its reporting by filing untimely new factual information, but Commerce correctly rejected that attempt.

**Commerce Position:** We agree that the freight charges that were properly reported as requested in the initial and supplemental questionnaires should be included in the cost of natural gas purchases in general. We have corrected our calculations to include such charges for purchases by NAK Azot that were inadvertently omitted from the calculations for the *Preliminary Determination.*

However, we disagree with EuroChem that Commerce is able to extract the delivery costs embedded in the delivered prices of Energo natural gas from SPIMEX sold to Nevinka and EuroChem NW, which despite EuroChem's claims, were not reported in a distinguishable manner. The respondents were requested to provide all costs in a separate column in the *Natural Gas Purchases Template.*[299] However, except for some minor purchases, each of the natural gas purchase tables provided by EuroChem were devoid of any information in the appropriate column for freight costs. Instead, EuroChem reported that all purchases were made on a delivered basis.[300] EuroChem admits that it intentionally did not report the transportation expense in the Energo gas purchases spreadsheet, but assumed that Commerce would use the Nevinka and EuroChem NW delivered natural gas purchase figures that reflect the delivered price to Nevinka and EuroChem NW.

First, EuroChem was asked to provide this specific information and failed to do so in a timely manner.[301] Commerce did not receive any supplementary information such as the regulated tariff schedule for transportation costs charged by Gazprom that it could use as facts available. Second, EuroChem did not provide enough information to make the calculation it suggests.[302] We are unable to match the purchases of Energo on the SPIMEX to the subsequent resales to Nevinka and EuroChem NW. We are therefore unable to remove those purchases from the EuroChem chart in favor of using the delivered prices reported for resales to Nevinka and EuroChem NW because we cannot determine which are the relevant purchases. We cannot

---

[298] *See* Petitioner Rebuttal Brief at 19.
[299] *See* Initial Questionnaire at Section III, p. 29.
[300] *See* EuroChem Questionnaire Response at Exhibit PQ-A11.
[301] *See* Initial Questionnaire at Section III, p. 29.
[302] *See* EuroChem Questionnaire Response at Exhibit PQ-A11.

65

APPX0018596

include both the purchases by Energo and the reported intercompany purchases from Energo in our calculation methodology because to do so would result in double counting certain natural gas purchases.  Therefore, we continue to consider Energo resales to Nevinka and EuroChem NW as intercompany sales and exclude them from the final subsidy calculations.

Comment 4:    Whether the Tax Incentives for Mining Operations – Income Tax Deduction for Exploration Expenses Program Is Specific

*GOR Case Brief:*[303]

- Commerce's use of the term "limited in number" as provided in section 771(5A)(D)(iii)(I) of the Act is flawed as it considers only the numerical dimension of the issue, which states that any program used by any number of companies less than all corporate income tax filers or companies in a certain region would be recognized as specific.
- Commerce implies that any economic regulation concerning a certain field of economy or a type of corporate activity (like capital investments) will be found specific as it is less than the economy as a whole.
- The eligibility for the income tax deduction for exploration expenses provided for in the Tax Code of the Russian Federation (TCRF) is automatic and no enterprise or industry is a predominant user of the exploration deductions or receives a disproportionately large amount of the exploration deductions.
- The exploration expense deduction does not provide more favorable treatment (tax savings) than any other expenses included in a federal tax return.  While it may be that only a certain group of companies used the deduction, it is not limited to those companies pursuant to any plan or scheme (in law or fact).
- While Article 2.1(c) of the WTO SCM provides that an investigating authority may find a subsidy to be *de facto* specific, *inter alia*, if "the use of a subsidy programme by a limited number of certain enterprises" is observed, the WTO Appellate Body in *US – Countervailing Measures (China)* clarified that while a subsidy scheme may be evidenced by a systematic series of actions pursuant to which financial contributions that confer a benefit have been provided to certain enterprises, the mere fact that financial contributions have been provided to certain enterprises is not sufficient, however, to demonstrate that such contributions have been granted.[304]
- The 10,471 companies that were considered by Commerce to be a proxy for the usage of the tax deduction for exploration expenses represent various sectors of the Russian economy.  In *Bethlehem Steel Corp. v. United States*, the CIT recognized that Commerce reasonably determined that 190 customers that represented 16 different industries constituted "a large number of customers, across a wide range of industries."[305]
- There is no record evidence as to how many of the active subsoil users were eligible for this exploration expense deduction, and Commerce did not explain why it used the active subsoil users in Russia for the *de facto* specificity decision.

---

[303] *See* GOR Case Brief at 33-39.
[304] *Id.* at 37 (citing WTO Appellate Body Report, *United States – Countervailing Measures on Certain Products from China*, WT/DS437/AB/R (adopted January 16, 2015) (*US – Countervailing Measures (China)*) at paragraphs 4.141 and 4.143).
[305] *Id.* at 38 (citing *Bethlehem Steel Corp. v. United States*, 140 F.Supp.2d 1354, 1368 (CIT 2001)).

66

- According to Article 2.2 of the SCM Agreement, setting or changing the generally applicable tax rates by all levels of government entitled to do so cannot be deemed a specific subsidy for the purposes of the SCM. This tax deduction is set in the tax law and is available to all enterprises in Russia as long as they have expenses that qualify.

*Petitioner Rebuttal Brief:*[306]
- Commerce properly found this program to be *de facto* specific by using the number of active subsoil users in Russia and the total number of corporate income tax filers during the POI as a proxy for users of the program because the GOR failed to provide the information needed to assess the issue.
- The GOR is conflating the concepts of *de jure* and *de facto* specificity, because if there was record evidence that the number of companies eligible for the deduction was limited, that would be evidence that this program was *de jure* specific, not that it was not specific at all. Commerce's analysis is focused solely on whether the number of recipients was limited as a matter of fact.
- The legislative history of section 771(5A)(D)(iii) states that in determining whether a subsidy is limited in number, "the proper comparison to be made is one between the beneficiaries of the subsidy and the economy of the subsidizing jurisdiction as a whole— not one between the actual beneficiaries and the universe of potential beneficiaries." It is plainly the case here that the subsidy is used by discrete segments of the economy.[307]
- The WTO Appellate Body reports do not limit Commerce's discretion in implementing the U.S. CVD law. The GOR's quote of the WTO Appellate Body refers to the facts that an administering authority must assess in determining whether a subsidy "programme," such as the tax deduction in question, exists. The WTO Appellate Body states that the *de facto* specificity analysis is on "the use of a subsidy programme, and in particular, whether the use of a subsidy programme is by a 'limited number of certain enterprises.'"[308]

**Commerce Position:** In making their arguments that the Tax Deduction for Exploration Expenses program is not *de facto* specific, the GOR ignores facts on the record, which are critical for understanding Commerce's specificity finding.

In Commerce's initial questionnaire, we instructed the GOR to provide usage information for the Tax Deduction for Exploration Expenses program, *e.g.*, the number of recipient companies and industries and the amount of annual assistance approved under the program.[309] In its initial response, the GOR reported that the expenses for the development of natural resources are included by the taxpayer in the category "Other Expenses," and as such, the Federal Tax Service did not collect statistics on the companies incurring exploration expenses.[310]

Because we determined that this program is not *de jure* specific, we again requested the GOR to submit usage data for the Tax Deduction for Exploration Expenses program in order to determine

---

[306] *See* Petitioner Rebuttal Brief at 41-45.
[307] *Id.* at 43 (citing SAA at 92-94).
[308] *Id.* at 44 (citing *US – Countervailing Measures (China)* at paragraph 4.141, 4.143, and 4.145)
[309] *See* Initial Questionnaire at Section II, "Standard Questions Appendix" p.25.
[310] *See* GOR Questionnaire Response at 96-97.

whether the tax deduction is in fact specific. The GOR responded that the information was not reasonably available to the GOR.[311] However, the GOR did state that during the POI, there were 10,471 active subsoil users in Russia, of which six companies had licenses to explore phosphate sites.[312] In lieu of actual usage data, Commerce properly thus relied on this data as an appropriate proxy to analyze whether the Tax Deduction for Exploration Expenses program is *de facto* specific. We find no merit in the GOR's arguments that the use of this alternate information, which it submitted on the record, is inappropriate simply because it dislikes Commerce's *de facto* specificity finding for the Tax Deduction for Exploration Expenses program.

The GOR argues that the proxy data relied on by Commerce do not demonstrate that the program was, in fact, provided to a limited number of users. We disagree. The proxy data supplied by the GOR (*e.g.*, the number of active subsoil users in Russia) indicate that six firms received phosphate mining rights during the POI. We thus continue to find that the provision of benefits to six firms constitutes a limited number of users as described under section 771(5A)(D)(iii)(I) of the Act and is, therefore, *de facto* specific.

Comment 5:    Whether the Income Tax Deduction for R&D Expenses Is Specific

*GOR Case Brief*:[313]
- The income tax deduction for qualifying R&D expenses provided for in Article 262 of the TCRF is automatic and the eligibility criteria or conditions state that any Russian company has the right to deduct R&D expenses if it meets the requirements stipulated in the TCRF.
- While it may be that only a certain group of companies used the deduction, it is not limited to those companies pursuant to any plan or scheme (in law or fact). Commerce's application of the "limited in number" provision in the "specificity" requirement of the CVD statute for this program is an overly expansive reading of specificity and is clearly at odds with the language and purpose of the "specificity" requirement.
- While Article 2.1(c) of the WTO SCM provides that an investigating authority may find a subsidy to be *de facto* specific, *inter alia*, if "the use of a subsidy programme by a limited number of certain enterprises" is observed, the WTO Appellate Body in *US – Countervailing Measures (China)* clarified that while a subsidy scheme may be evidenced by a systematic series of actions pursuant to which financial contributions that confer a benefit have been provided to certain enterprises, the mere fact that financial contributions have been provided to certain enterprises is not sufficient, however, to demonstrate that such contributions have been granted.[314]
- There is no record evidence that more companies than those that actually applied for the deduction were eligible for this assistance but were refused, while the 765 companies that used the R&D expenses deduction represent numerous sectors of the Russian economy. In *Bethlehem Steel Corp. v. United States*, the CIT recognized that Commerce reasonably

---

[311] *See* GOR Supplemental Response at 19.
[312] *Id.* at 4 and 6.
[313] *See* GOR Case Brief at 39-42.
[314] *Id.* at 41 (citing *US – Countervailing Measures (China)* at paragraphs 4.141 and 4.143).

Filed By: George Ayache, Filed Date: 2/9/21 12:20 PM, Submission Status: Approved

APPX0018599

determined that 190 customers that represented 16 different industries constituted "a large number of customers, across a wide range of industries."[315]

- According to Article 2.2 of the SCM Agreement, setting or changing the generally applicable tax rates by all levels of government entitled to do so cannot be deemed a specific subsidy for the purposes of the SCM. This tax deduction is set in the tax law and is available to all enterprises in Russia as long as they have expenses that qualify.

*Petitioner Rebuttal Brief:*[316]
- Commerce properly found that the program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(I) of the Act because record evidence shows the actual number of recipients of the subsidy is limited.
- The GOR is conflating the concepts of *de jure* and *de facto* specificity, because if there was record evidence that the number of companies eligible for the deduction was limited, that would be evidence that this program was *de jure* specific, not that it was not specific at all. Commerce's analysis is focused solely on whether the number of recipients was limited as a matter of fact.
- Article 2.2 of the SCM Agreement is not relevant because this subsidy program is not limited to a designated geographical region in Russia, and because Commerce did not "deem" this program to be specific, but rather determined that it is *de facto* specific based on record evidence.

**Commerce Position:** As addressed in the "Analysis of Programs" section above, we find that neither mandatory respondent received a measurable benefit from this program. Therefore, it is not necessary to make a determination regarding the issue of specificity raised with regard to this program at this time.

Comment 6:  Whether the Regional Industrial Development Programs, the SPIC with Perm Krai, and the Preferential Debt Financing of Projects Aimed at Introducing the Best Available Technologies Program Are Specific

*GOR Case Brief:*[317]
- While it may be that only a certain group of companies used these programs, they are not limited to those companies pursuant to any plan or scheme (in law or fact). Commerce's application of the "limited in number" provision in the "specificity" requirement of the CVD statute for this program is an overly expansive reading of specificity, and is clearly at odds with the language and purpose of the "specificity" requirement.
- While Article 2.1(c) of the WTO SCM provides that an investigating authority may find a subsidy to be *de facto* specific, *inter alia,* if "the use of a subsidy programme by a limited number of certain enterprises" is observed, the WTO Appellate Body in *US – Countervailing Measures (China)* clarified that while a subsidy scheme may be evidenced by a systematic series of actions pursuant to which financial contributions that confer a benefit have been provided to certain enterprises, the mere fact that financial contributions have been provided to certain enterprises is not sufficient, however, to

---

[315] *Id.* at 42 (citing *Bethlehem Steel Corp. v. United States,* 140 F.Supp.2d 1354, 1368 (CIT 2001)).
[316] *See* Petitioner Rebuttal Brief at 45-47.
[317] *See* GOR Case Brief at 42-63.

APPX0018600

demonstrate that such contributions have been granted.[318]

- There is no record evidence that more than the listed number of companies were eligible for the programs, while the number of companies that used them represent various different industries. In *Bethlehem Steel Corp. v. United States*, the CIT recognized that Commerce reasonably determined that 190 customers that represented 16 different industries constituted "a large number of customers, across a wide range of industries."[319]
- For the Vologda region program, Commerce did not explain why it used the total number of companies in the region for the *de facto* specificity decision.
- A SPIC is an agreement between the federal or regional government and an investor, and is aimed at stimulating investment activity, including establishment or modernization of industrial production, introducing the best available technologies, increasing environmental efficiency, and protecting the environment. SPICs are broadly available, evaluated and granted in a transparent and non-discriminatory manner, and are widely used throughout the Russian economy.
- Commerce simply examined the number of SPICs in existence to reach its "limited number" decision, which removes any practical limitation on the tax programs that would be considered "specific."

*PhosAgro Case Brief:*[320]
- These programs are not *de facto* specific because the setting or change of generally applicable tax rates by all levels of government entitled to do so shall not be deemed to be a specific subsidy for the purposes of the SCM.
- Record evidence demonstrates that everyone has access to the tax incentives, the only condition being the obligation to invest.

*Petitioner Rebuttal Brief:*[321]
- Commerce properly found that these programs are *de facto* specific within the meaning of section 771(5A)(D)(iii) of the Act because record evidence shows the actual number of recipients of each subsidy is limited.
- PhosAgro's assertion that the granting authorities condition the receipt of the subsidies on an obligation to invest suggests, if anything, that the programs may be *de jure* specific.
- The GOR is conflating the concepts of *de jure* and *de facto* specificity, because if there was record evidence that the number of companies eligible for the deductions was limited, that would be evidence that these programs were *de jure* specific, not that they were not specific at all.

**Commerce Position:**  In the *Preliminary Determination*, we found that the Regional Industrial Development Programs (*i.e.*, Murmansk, Saratov, Vologda, Leningrad, Tula, Stavropol Krai, and Krasnodar Krai), the SPIC with Perm Krai, and the Preferential Debt Financing of Projects Aimed at Introducing the Best Available Technologies Program are all *de facto* specific under section 771(5A)(D)(iii)(I) of the Act.[322]  In making their arguments that these programs are not

---

[318] *Id.* (citing *US – Countervailing Measures (China)* at paragraph 4.141 and 4.143).
[319] *Id.* (citing *Bethlehem Steel Corp. v. United States*, 140 F.Supp.2d 1354, 1368 (CIT 2001)).
[320] *See* PhosAgro Case Brief at 19-20.
[321] *See* Petitioner Rebuttal Brief at 47-50.
[322] *See* PDM at 22-33.

70

APPX0018601

*de facto* specific, the GOR ignores facts on the record which are critical for understanding Commerce's specificity finding. In Commerce's initial questionnaire, we instructed the GOR to provide usage information for all of these programs, *e.g.*, the number of recipient companies and industries and the amount of annual assistance approved under each program.[323] In its initial and supplemental questionnaire responses, the GOR provided the requested information for all these programs demonstrating that each of them was limited to a certain number of recipients.[324] In each of the Regional Industrial Development Programs and the SPIC with Perm Krai, the GOR stated that only companies making capital investments in the region can obtain benefits such as corporate income and/or property tax reductions and/or exemptions.[325] The regional authorities approve the investment projects based on specific criteria and, with the exception of the Tula region, sign an investment agreement with the company.[326] For example, with respect to the SPIC with Perm Krai, the GOR requires applicants to implement an investment project of at least 750 million rubles in the corresponding region or territory, which will be reviewed and approved by the relevant authority.[327] This requirement demonstrates that the SPIC is available only to a limited number of enterprises. Regarding the Preferential Debt Financing of Projects Aimed at Introducing the Best Available Technologies Program, record evidence shows that only a limited number of companies applied for and received a loan under this program.[328] Because these programs are not specific in law, we relied on the number of recipients of the subsidies under the programs out of all companies located in the specific regions, or on the number of recipients of the loans, to make our *de facto* specificity finding under section 771(5A)(D)(iii)(I) of the Act.[329]

## Company-Specific Issues

Comment 7:    Whether Commerce Used the Appropriate Denominator to Calculate PhosAgro's Subsidy Rates

*PhosAgro Case Brief:*[330]
- 19 CFR 351.525(a) directs Commerce to divide the amount of the benefit allocated to the POI by the sales value during the same period of the product or products to which the subsidy is attributed, which should reflect the sales value of the producer's subject merchandise.[331]
- In the *Preliminary Determination*, Commerce's subsidy calculation erroneously used a denominator which included only domestic sales, rather than all sales, made by JSC Apatit.

---

[323] *See* Initial Questionnaire at Section II, "Standard Questions Appendix" p.25.
[324] *See* GOR Questionnaire Response at 141 and 167, and Exhibits XVI, OTHER-1, OTHER-2, OTHER-3, OTHER-4, and OTHER 5; and GOR Supplemental Response at Exhibit FS-14.
[325] *See* GOR Questionnaire Response at 125-161, and Exhibits OTHER-1, OTHER-2, OTHER-3, OTHER-4, and OTHER 5; and GOR Supplemental Response at Exhibit FS-14.
[326] *Id.*; *see also* GOR Supplemental Response at 24.
[327] *See* PDM at 31; *see also* GOR Supplemental Response at Exhibit FS-14.
[328] *See* GOR Questionnaire Response at Exhibit XVI.
[329] *See* PDM at 22-33; *see also* GOR Questionnaire Response at 141 and 167, and Exhibits XVI, OTHER-1, OTHER-2, OTHER-3, OTHER-4, and OTHER 5; and GOR Supplemental Response at Exhibit FS-14.
[330] *See* PhosAgro Case Brief at 1-7.
[331] *Id.* at 1 (citing *Yama Ribbons & Bows Co., Ltd. v. United States*, 865 F. Supp. 2d 1294, 1296 (CIT 2012)).

Filed By: George Ayache, Filed Date: 2/9/21 12:20 PM, Submission Status: Approved

- JSC Apatit and JSC Metachem sold a certain amount of subject merchandise to affiliated parties both domestically and for export during the POI. Commerce included domestic sales through affiliated resellers in the denominator of the calculations but omitted export sales as intercompany sales to foreign-registered affiliated resellers.
- In *Korea CORE 2010*, Commerce stated that its practice is to "calculate net subsidy rates based on sales denominators that are exclusive of intracompany sales between cross-owned firms. Importantly, the purpose of this approach is to prevent the sales denominator from being unduly inflated by double-count{ing} sales values."[332]
- In the final determination, Commerce should use the 2019 total sales of JSC Apatit and JSC Metachem, including sales revenues from affiliated resellers in all markets; PhosAgro's total consolidated sales which already includes JSC Metachem; and JSC Apatit and JSC Metachem revenues without excluding intracompany sales.
- PhosAgro is a holding company owning JSC Apatit's shares, and as such, does not produce or sell any products. JSC Apatit and JSC Metachem (until April 1, 2019) are the producers and sellers of subject merchandise.
- Note (v) of the 2019 PhosAgro consolidated financial statements demonstrate that intra-group balances and transactions, and any unrealized gains arising from intra-group transactions, are eliminated in preparing the financial statements.
- Commerce should use the breakdown of sales by JSC Apatit to affiliated and unaffiliated parties provided in the ILOV questionnaire response to correctly calculate the total sales of JSC Apatit in the POI and avoid double-counting.

**Commerce Position:** We agree with PhosAgro that it is appropriate to update its sales denominator to account for sales that were improperly excluded during the *Preliminary Determination*. In Commerce's ILOV Questionnaire, we requested PhosAgro to break out JSC Apatit's intercompany sales by affiliated party.[333] In its ILOV Response, JSC Apatit provided the breakdown of sales to both Russian and foreign affiliated parties, which demonstrated that Commerce inappropriately excluded the portion of JSC Apatit's sales to its foreign affiliates as intercompany sales.[334] Therefore, for this final determination, we updated JSC Apatit denominator to include its sales to foreign affiliates while excluding sales to its Russian affiliates. In addition, as stated in the *Preliminary Determination*, we added JSC Metachem's total FOB sales, net of intercompany sales, to JSC Apatit's total sales because JSC Metachem merged with JSC Apatit during the POI.[335] We also continued to include the total FOB sales for the POI, net of intercompany sales, for the following cross-owned affiliates involved in the sales of subject merchandise: PhosAgro-Belgorod LLC, PhosAgro-Don LLC, PhosAgro-Kuban LLC, PhosAgro-Kursk LLC, PhosAgro-Lipetsk LLC, PhosAgro-Orel LLC, PhosAgro- Stavropol LLC, PhosAgro-Volga LLC, PhosAgro-SeveroZapad LLC, PhosAgro- Tambov LLC, and Martynovsk AgrokhimSnab LLC.[336] As such, we attributed subsidies received by any of the above listed companies to the total sales of all the companies listed above and used this updated denominator,

---

[332] *Id.* at 3 (citing *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2010*, 87 FR 19210 (March 29, 2013) (*Korea CORE 2010*), and accompanying IDM at Comment 2).
[333] *See* PhosAgro ILOV Questionnaire.
[334] *See* PhosAgro ILOV Response at 1-3 and Exhibits 1.1, 2, and 3.2.
[335] *See* PDM at 6.
[336] *Id.*

72

APPX0018603

net of the appropriate intercompany sales, to calculate subsidy rates for all programs found countervailable at the *Preliminary Determination*.[337]

## VIII.   RECOMMENDATION

We recommend approving all of the above positions.  If these positions are accepted, we will publish the final determination in the *Federal Register* and will notify the U.S. International Trade Commission of our determination.

☒                                    ☐
_____          _____
Agree                              Disagree

2/8/2021

X  _____

Signed by: CHRISTIAN MARSH

_____
Christian Marsh
Acting Assistant Secretary
 for Enforcement and Compliance

---

[337] *See* PhosAgro Final Calculation Memo.

73

APPX0018604

(Rosneft) Is a Government Authority that
Provides a Financial Contribution

Comment 3c: Whether the Saint Petersburg
International Commodity Exchange
(SPIMEX) Is a Government Authority
that Provides a Financial Contribution

Comment 3d: Whether the Provision of
Natural Gas by Gazprom Is Specific

Comment 3e: Whether the Provision of
Natural Gas by SPIMEX Is Specific

Comment 3f: Whether the Provision of
Natural Gas for LTAR Confers a Benefit

Comment 3g: Whether Commerce Should
Adjust the Natural Gas Benchmark to
"Tier One"

Comment 3h: Whether Commerce Should
Adjust the Natural Gas Benchmark to
"Tier Two"

Comment 3i: Whether Commerce Should
Change the Data Relied Upon in its
Natural Gas Benchmark "Tier Three"
Analysis

Comment 3j: Whether Commerce Should
Adjust the Natural Gas Benchmark Data
in its "Tier Three" Analysis.

Comment 3k: Whether Commerce Should
Use a VAT Inclusive Sales Denominator

Comment 3l: Whether 19 CFR
351.525(b)(6) Applies to EuroChem's
Natural Gas for LTAR

Comment 3m: Whether Commerce Should
Consider the Relative Consumption of
Natural Gas in the Production of Subject
Merchandise for Purposes of Attribution

Comment 3n: Whether Commerce Should
Use EuroChem's 2019 Audited
Financials for Its Sales Denominators

Comment 3o: Whether the Delivery Cost of
SPIMEX Natural Gas from EuroChem-
Energo LLC (Energo) to JSC
Nevinnomyssky Azot (Nevinka) and
EuroChem Northwest JSC (EuroChem
NW) Should Be Considered in Any
Natural Gas Subsidy Calculation

Comment 4: Whether the Tax Incentives
for Mining Operations—Income Tax
Deduction for Exploration Expenses
Program Is Specific

Comment 5: Whether the Income Tax
Deduction for Research and
Development (R&D) Expenses Is Specific

Comment 6: Whether the Regional Support
of Industrial Development Programs, the
Special Investment Contract (SPIC) with
Perm Krai, and the Preferential Debt
Financing of Projects Aimed at
Introducing the Best Available
Technologies Program Are Specific

Comment 7: Whether Commerce Used the
Appropriate Denominator to Calculate
PhosAgro's Subsidy Rates

VIII. Recommendation

[FR Doc. 2021–03010 Filed 2–12–21; 8:45 am]

**BILLING CODE 3510-DS-P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

### [C–714–001]

### Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that countervailable subsidies are being provided to producers and exporters of phosphate fertilizers from the Kingdom of Morocco (Morocco).

**DATES:** Applicable February 16, 2021.

**FOR FURTHER INFORMATION CONTACT:** Robert Palmer or Janae Martin, AD/CVD Operations, Office VIII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–9068 or (202) 482–0238, respectively.

**SUPPLEMENTARY INFORMATION:**

## Background

On November 30, 2020, Commerce published its *Preliminary Determination*.[1] On December 29, 2020, Commerce published its *Amended Preliminary Determination*.[2] On January 6, 2021, Commerce released its Post-Preliminary Determination.[3] For a complete description of the events that followed the *Preliminary Determination*, *see* the Issues and Decision Memorandum.[4] The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users

at *http://access.trade.gov*. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn/index.html*. The signed and electronic versions of the Issues and Decision Memorandum are identical in content.

## Period of Investigation

The period of investigation is January 1, 2019, through December 31, 2019.

## Scope of the Investigation

The products covered by this investigation are phosphate fertilizers from Morocco. For a complete description of the scope of this investigation, *see* Appendix I.

## Scope Comments

No interested party commented on the scope of the investigation as it appeared in the *Preliminary Determination*. Therefore, no changes were made to the scope of the investigation.

## Analysis of Subsidy Programs and Comments Received

The subsidy programs under investigation and the issues raised in the case and rebuttal briefs that were submitted by parties in this investigation are addressed in the Issues and Decision Memorandum. For a list of the issues raised by interested parties and addressed in the Issues and Decision Memorandum, *see* Appendix II to this notice.

## Methodology

Commerce conducted this investigation in accordance with section 701 of the Tariff Act of 1930, as amended (the Act). For each of the subsidy programs found countervailable, Commerce determines that there is a subsidy, *i.e.*, a financial contribution by an "authority" that gives rise to a benefit to the recipient, and that the subsidy is specific.[5] For a full description of the methodology underlying our final determination, *see* the Issues and Decision Memorandum.

## Verification

Commerce was unable to conduct on-site verification of the information relied upon in making its final determination in this investigation. However, we took additional steps in lieu of an on-site verification to verify

---

[1] *See Phosphate Fertilizers from the Kingdom of Morocco: Preliminary Affirmative Countervailing Duty Determination*, 85 FR 76522 (November 30, 2020) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

[2] *See Phosphate Fertilizers from the Kingdom of Morocco: Amended Preliminary Determination of Countervailing Duty Investigation*, 85 FR 85585 (December 29, 2020) (*Amended Preliminary Determination*), and accompanying PDM.

[3] *See* Memorandum, "Post-Preliminary Determination of Countervailing Duty Investigation: Phosphate Fertilizers from the Kingdom of Morocco," dated January 6, 2020 (Post-Preliminary Determination).

[4] *See* Memorandum, "Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Phosphate Fertilizers from the Kingdom of Morocco," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[5] *See* Commerce's Letters, "Supplemental Questionnaire in Lieu of On-Site Verification," dated December 17, 2020; *see also* OCP's Letter, "Response to Questionnaire in Lieu of On-Site Verification," dated December 30, 2020; and the GOM's Letter, "In Lieu of On-Site Verification Questionnaire Response of the Government of the Kingdom of Morocco," dated December 29, 2020.

the information relied upon in making this final determination, in accordance with section 782(i) of the Act.[6]

**Changes Since the Preliminary Determination**

Based on our review and analysis of the comments received from parties, we made certain changes to OCP S.A.'s subsidy rate calculations. For a discussion of these changes, *see* the Issues and Decision Memorandum.

**Final Determination**

Commerce determines that the following estimated countervailable subsidy rates exist:

| Company | Subsidy rate ad valorem (percent) |
|---------|-----------------------------------|
| OCP S.A.[6] ........................... | 19.97 |
| All Others ............................. | 19.97 |

**All-Others Rate**

We continue to calculate the all-others rate using the estimated weighted-average subsidy rate calculated for OCP S.A., the only individually examined exporter/producer in this investigation, pursuant to section 705(c)(5)(A)(i) of the Act.

**Disclosure**

Commerce intends to disclose to interested parties the calculations and analysis performed in this final determination within five days of any public announcement or, if there is no public announcement, within five days of the date of the publication of this notice in the **Federal Register**, in accordance with 19 CFR 351.224(b).

**Continuation of Suspension of Liquidation**

As a result of our *Preliminary Determination,* and pursuant to sections 703(d)(1)(B) and (d)(2) of the Act, we instructed U.S. Customs and Border Protection (CBP) to suspend liquidation of entries of subject merchandise as described in the scope of the investigation section entered, or withdrawn from warehouse, for consumption on or after November 30, 2020, the date of publication of the *Preliminary Determination* in the **Federal Register**.

As a result of the *Amended Preliminary Determination,* the amended rates for OCP and all others resulted in decreased cash deposits,

which were applied retroactively to November 30, 2020, the date of publication of the *Preliminary Determination.*

If the U.S. International Trade Commission (ITC) issues a final affirmative injury determination, we will issue a CVD order and require a cash deposit of estimated countervailing duties for entries of subject merchandise in the amounts indicated above, in accordance with section 706(a) of the Act. If the ITC determines that material injury, or threat of material injury, does not exist, this proceeding will be terminated, and all estimated duties deposited or securities posted as a result of the suspension of liquidation will be refunded or canceled.

**ITC Notification**

In accordance with section 705(d) of the Act, Commerce will notify the ITC of its final affirmative determination that countervailable subsidies are being provided to producers and exporters of phosphate fertilizers from Morocco. As Commerce's final determination is affirmative, in accordance with section 705(b) of the Act, the ITC will determine, within 45 days, whether the domestic industry in the United States is materially injured or threatened with material injury. In addition, we are making available to the ITC all non-privileged and nonproprietary information related to this investigation. We will allow the ITC access to all privileged and business proprietary information in our files, provided the ITC confirms that it will not disclose such information, either publicly or under an administrative protective order (APO), without the written consent of the Assistant Secretary for Enforcement and Compliance.

**Notification Regarding APO**

In the event that the ITC issues a final negative injury determination, this notice will serve as the only reminder to parties subject to an APO of their responsibility concerning the destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

**Notification to Interested Parties**

This determination is issued and published pursuant to sections 705(d) and 777(i) of the Act, and 19 CFR 351.210(c).

Dated: February 8, 2021.

**Christian Marsh,**
*Acting Assistant Secretary for Enforcement and Compliance.*

**Appendix I**

**Scope of the Investigation**

The merchandise covered by this investigation is phosphate fertilizers in all physical forms (*i.e.,* solid or liquid form), with or without coating or additives such as anti-caking agents. Phosphate fertilizers in solid form are covered whether granular, prilled (*i.e.,* pelletized), or in other solid form (*e.g.,* powdered).

The covered merchandise includes phosphate fertilizers in the following forms: Ammonium dihydrogenorthophosphate or monoammonium phosphate (MAP), chemical formula $NH_4H_2PO_4$; diammonium hydrogenorthophosphate or diammonium phosphate (DAP), chemical formula $(NH_4)_2HPO_4$; normal superphosphate (NSP), also known as ordinary superphosphate or single superphosphate, chemical formula $Ca(H_2PO_4)_2CaSO_4$; concentrated superphosphate, also known as double, treble, or triple superphosphate (TSP), chemical formula $Ca(H_2PO_4)_2H_2O$; and proprietary formulations of MAP, DAP, NSP, and TSP.

The covered merchandise also includes other fertilizer formulations incorporating phosphorous and non-phosphorous plant nutrient components, whether chemically-bonded, granulated (*e.g.,* when multiple components are incorporated into granules through, *e.g.,* a slurry process), or compounded (*e.g.,* when multiple components are compacted together under high pressure), including nitrogen, phosphate, sulfur (NPS) fertilizers, nitrogen, phosphorous, potassium (NPK) fertilizers, nitric phosphate (also known as nitrophosphate) fertilizers, ammoniated superphosphate fertilizers, and proprietary formulations thereof that may or may not include other nonphosphorous plant nutrient components. For phosphate fertilizers that contain non-phosphorous plant nutrient components, such as nitrogen, potassium, sulfur, zinc, or other non-phosphorous components, the entire article is covered, including the non-phosphorous content, provided that the phosphorous content (measured by available diphosphorous pentaoxide, chemical formula $P_2O_5$) is at least 5% by actual weight.

Phosphate fertilizers that are otherwise subject to this investigation are included when commingled (*i.e.,* mixed or blended) with phosphate fertilizers from sources not subject to this investigation. Phosphate fertilizers that are otherwise subject to this investigation are included when commingled with substances other than phosphate fertilizers subject to this investigation (*e.g.,* granules containing only non-phosphate fertilizers such as potash or urea). Only the subject component of such commingled products is covered by the scope of this investigation. The following products are specifically excluded from the scope of this investigation:

---

[6] Commerce has found the following companies to be cross-owned with OCP S.A.: Jorf Fertilizers Company I, Jorf Fertilizers Company II, Jorf Fertilizers Company III, Jorf Fertilizers Company IV, Jorf Fertilizers Company V, and Maroc Phosphore.

(1) ABC dry chemical powder preparations for fire extinguishers containing MAP or DAP in powdered form;

(2) industrial or technical grade MAP in white crystalline form with available $P_2O_5$ content of at least 60% by actual weight;

(3) industrial or technical grade diammonium phosphate in white crystalline form with available $P_2O_5$ content of at least 50% by actual weight;

(4) liquid ammonium polyphosphate fertilizers;

(5) dicalcium phosphate, chemical formula $CaHPO_4$;

(6) monocalcium phosphate, chemical formula $CaH_4P_2O_8$;

(7) trisodium phosphate, chemical formula $Na_3PO_4$;

(8) sodium tripolyphosphate, chemical formula $Na_5P_3O_{10}$;

(9) prepared baking powders containing sodium bicarbonate and any form of phosphate;

(10) animal or vegetable fertilizers not containing phosphate fertilizers otherwise covered by the scope of this investigation;

(11) phosphoric acid, chemical formula $H_3PO_4$.

The Chemical Abstracts Service (CAS) numbers for covered phosphate fertilizers include, but are not limited to: 7722–76–1 (MAP); 7783–28–0 (DAP); and 65996–95–4 (TSP). The covered products may also be identified by Nitrogen-Phosphate- Potash composition, including but not limited to: NP 11–52–0 (MAP); NP 18–46–0 (DAP); and NP 0–46–0 (TSP).

The covered merchandise is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) at subheadings 3103.11.0000; 3103.19.0000; 3105.20.0000; 3105.30.0000; 3105.40.0010; 3105.40.0050; 3105.51.0000; and 3105.59.0000. Phosphate fertilizers subject to this investigation may also enter under subheadings 3103.90.0010, 3105.10.0000, 3105.60.0000, 3105.90.0010, and 3105.90.0050. Although the HTSUS subheadings and CAS registry numbers are provided for convenience and customs purposes, the written description of the scope is dispositive.

## Appendix II

**List of Topics Discussed in the Issues and Decision Memorandum**

I. Summary
II. Background
III. Subsidies Valuation
IV. Benchmarks and Interest Rates
V. Analysis of Programs
VI. Analysis of Comments
   *General Issues*
   Comment 1: Whether the Petition Demonstrated Sufficient Industry Support
   Comment 2: Whether Commerce's "Other Assistance" Question Is Contrary to Law
   *Mining Rights for Less Than Adequate Remuneration (LTAR)*
   Comment 3: Whether Commerce Should Revise the Phosphate Rock Benchmark
   Comment 4: Whether to Include or Exclude HQ, Support, Debt, and Other Costs as Costs of Producing Phosphate Rock
   Comment 5: Whether to Include a Profit Component

Comment 6: Whether Freight Costs Are Double Counted in the Mining Costs
Comment 7: The Appropriate Quantity for the Mining Rights for LTAR Benefit Calculation
Comment 8: The Appropriate Analysis for the Provision of Mining Rights for LTAR
*Creditworthiness*
Comment 9: Whether Commerce Correctly Analyzed OCP S.A. (OCP)'s Financial Ratios
Comment 10: Whether OCP Is Uncreditworthy in 2018
Comment 11: Whether Commerce Should Consider OCP's Long-Term Loans in the Creditworthiness Analysis
Comment 12: Whether Commerce Misinterpreted OCP's Credit Ratings
*Authority Determinations*
Comment 13: Whether BCP[7] Is an Authority and Provides a Financial Contribution
Comment 14: Whether Al Mada and AWB[8] Are Authorities and Provide a Financial Contribution
*OCP 2016 and 2018 Bond Issuance*
Comment 15: Whether OCP's 2016 Bond Issue Conferred a Benefit
Comment 16: Whether OCP's Bond Issuance Is Specific
Comment 17: Whether Commerce Should Revise the Uncreditworthy Benchmark Interest Rate
*Loans*
Comment 18: Whether Direct Loans From AWB, BCP, and CAM[9] Are Countervailable
Comment 19: Whether the Provision of Loan Guarantees Is Countervailable
*Tax Programs*
Comment 20: Whether Commerce Overstated Taxable Income for the Tax Incentives for Export Operations Program
Comment 21: Whether Commerce Should Adjust OCP's Cash Deposit Rate
Comment 22: Whether the Reductions in Tax Fines and Penalties Is Specific
*Value-Added Tax (VAT)*
Comment 23: Whether the MAD[10] 20.5 Billion VAT Refund Is Countervailable
Comment 24: Whether VAT Exemptions for Capital Goods, Machinery and Equipment Are Countervailable
*Other Subsidies*
Comment 25: Whether the Provision of Phosphogypsum Waste Disposal Is Countervailable
Comment 26: Whether the Provision of Phosphogypsum Waste Disposal Was Properly Initiated
Comment 27: Whether the Provision of Rail Service for LTAR Is Specific
VII. Recommendation

[FR Doc. 2021–03011 Filed 2–12–21; 8:45 am]

**BILLING CODE 3510–DS–P**

---

[7] Banque Centrale Populaire (BCP).
[8] Attijariwafa Bank Group (AWB).
[9] Crédit Agricole du Maroc (CAM).
[10] Morocco dirhams (MAD).

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

**[C–570–118]**

## Wood Mouldings and Millwork Products From the People's Republic of China: Countervailing Duty Order

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** Based on the affirmative final determinations by the Department of Commerce (Commerce) and the International Trade Commission (ITC), Commerce is issuing its countervailing duty order on wood mouldings and millwork products (millwork products) from the People's Republic of China (China).

**DATES:** Applicable February 16, 2021.

**FOR FURTHER INFORMATION CONTACT:** Irene Gorelik or Faris Montgomery, AD/ CVD Operations, Office VIII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–6905 or (202) 482–1537, respectively.

**SUPPLEMENTARY INFORMATION:**

## Background

On January 4, 2021, Commerce published its *Final Determination* in the countervailing duty investigation of millwork products from China.[1] On February 10, 2021, the ITC notified Commerce of its final determination, pursuant to sections 705(b)(1)(A)(i) and 705(d) of the Tariff Act of 1930, as amended (the Act), that an industry in the United States is materially injured by reason of subsidized imports of millwork products from China.[2]

## Scope of the Order

The products covered by this order are millwork products from China. For a full description of the scope of this order, *see* the appendix to this notice.

## Countervailing Duty Order

On February 10, 2021, in accordance with sections 705(b)(1)(A)(i) and 705(d) of the Act, the ITC notified Commerce of its final determination in this investigation, in which it found that an industry in the United States is materially injured by reason of

---

[1] *See Wood Mouldings and Millwork Products from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 FR 67 (January 4, 2021) (*Final Determination*).
[2] *See* ITC Notification Letter, Investigations, Inv. Nos. 701–TA–636 and 731–TA–1470 (Final) (February 10, 2021).

February 18, 2021 at 10:00 a.m. Central Time. The purpose of the meeting is for the committee to discuss civil rights concerns in the state, and to work on logistics for their upcoming briefings.

**DATES:** The meetings will be held on:

• Thursday, February 18, 2021, at 10:00 a.m. Central Time, *https://civilrights.webex.com/civilrights/j.php?MTID=madd740b602a57f45fe85eec1114633eb* or Join by phone, 800–360–9505 USA Toll Free, Access code: 1990 598 676.

**FOR FURTHER INFORMATION CONTACT:** David Barreras, Designated Federal Officer, at *dbarreras@usccr.gov* or (202) 499–4066.

**SUPPLEMENTARY INFORMATION:** Members of the public may listen to this discussion through the above call-in number. An open comment period will be provided to allow members of the public to make a statement as time allows. Callers can expect to incur regular charges for calls they initiate over wireless plan, according to their wireless plan. The Commission will not refund any incurred charges. Individuals who are deaf, deafblind and hard of hearing may also follow the proceedings by first calling the Federal Relay Service at 1–800–877–8339 and providing the Service with the conference call number and conference ID number.

Members of the public are entitled to submit written comments; the comments must be received in the regional office within 30 days following the meeting. Written comments may be emailed to David Barreras at *dbarreras@usccr.gov*.

Records generated from this meeting may be inspected and reproduced at the Regional Programs Unit Office, as they become available, both before and after the meeting. Records of the meeting will be available via *www.facadatabase.gov* under the Commission on Civil Rights, Alabama Advisory Committee link. Persons interested in the work of this Committee are directed to the Commission's website, *http://www.usccr.gov*, or may contact the Regional Programs Unit at the above email or street address.

**Agenda**

I. Welcome & Roll Call
II. Chair's Comments
III. Committee Discussion
IV. Next Steps
V. Public Comment
VI. Adjournment

Dated: February 9, 2021.
**David Mussatt,**
*Supervisory Chief, Regional Programs Unit.*
[FR Doc. 2021–03005 Filed 2–12–21; 8:45 am]
**BILLING CODE P**

---

**COMMISSION ON CIVIL RIGHTS**

**Notice of Public Meetings of the Tennessee Advisory Committee**

**AGENCY:** U.S. Commission on Civil Rights.

**ACTION:** Announcement of meeting.

**SUMMARY:** Notice is hereby given, pursuant to the provisions of the rules and regulations of the U.S. Commission on Civil Rights (Commission) and the Federal Advisory Committee Act that the Tennessee Advisory Committee (Committee) will hold a meeting via the web platform Webex on Thursday, February 18, 2021 at 12:00 p.m. Central Time. The purpose of the meeting is for the committee to discuss civil rights concerns in the state.

**DATES:** The meetings will be held on:

• Thursday, February 18, 2021, at 12:00 p.m. Central Time, *https://civilrights.webex.com/civilrights/j.php?MTID=m992749f83df222cdaaa858ecac88662f* or Join by phone: 800–360–9505 USA Toll Free, Access code: 1992 414 037.

**FOR FURTHER INFORMATION CONTACT:** David Barreras, Designated Federal Officer, at *dbarreras@usccr.gov* or (202) 499–4066.

**SUPPLEMENTARY INFORMATION:** Members of the public may listen to this discussion through the above call-in number. An open comment period will be provided to allow members of the public to make a statement as time allows. Callers can expect to incur regular charges for calls they initiate over wireless plan, according to their wireless plan. The Commission will not refund any incurred charges. Individuals who are deaf, deafblind and hard of hearing may also follow the proceedings by first calling the Federal Relay Service at 1–800–877–8339 and providing the Service with the conference call number and conference ID number.

Members of the public are entitled to submit written comments; the comments must be received in the regional office within 30 days following the meeting. Written comments may be emailed to David Barreras at *dbarreras@usccr.gov*.

Records generated from this meeting may be inspected and reproduced at the Regional Programs Unit Office, as they become available, both before and after the meeting. Records of the meeting will be available via *www.facadatabase.gov* under the Commission on Civil Rights, Tennessee Advisory Committee link. Persons interested in the work of this Committee are directed to the Commission's website, *http://www.usccr.gov*, or may contact the Regional Programs Unit at the above email or street address.

**Agenda**

I. Welcome & Roll Call
II. Chair's Comments
III. Committee Discussion
IV. Next Steps
V. Public Comment
VI. Adjournment

Dated: February 9, 2021.
**David Mussatt,**
*Supervisory Chief, Regional Programs Unit.*
[FR Doc. 2021–03006 Filed 2–12–21; 8:45 am]
**BILLING CODE P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[C–821–825]**

**Phosphate Fertilizers From the Russian Federation: Final Affirmative Countervailing Duty Determination**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that countervailable subsidies are being provided to producers and exporters of phosphate fertilizers from the Russian Federation (Russia).

**DATES:** Applicable February 16, 2021.

**FOR FURTHER INFORMATION CONTACT:** George Ayache or William Horn, AD/CVD Operations, Office VIII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–2623 or (202) 482–4868, respectively.

**SUPPLEMENTARY INFORMATION:**

**Background**

On November 30, 2020, Commerce published its *Preliminary Determination*.[1] On December 21, 2020, Commerce released its Post-Preliminary Analysis.[2] For a complete description of

---

[1] *See Phosphate Fertilizers from the Russian Federation: Preliminary Affirmative Countervailing Duty Determination*, 85 FR 76524 (November 30, 2020) (*Preliminary Determination*) and accompanying Preliminary Decision Memorandum.

[2] *See* Memorandum, ''Decision Memorandum for the Post-Preliminary Analysis of the Countervailing
Continued

the events that followed the *Preliminary Determination, see* the Issues and Decision Memorandum.[3] The Issues and Decision Memorandum is a public document and is made available to the public via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov.* In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/ frn/index.html.* The signed and electronic versions of the Issues and Decision Memorandum are identical in content.

**Period of Investigation**

The period of investigation is January 1, 2019, through December 31, 2019.

**Scope of the Investigation**

The products covered by this investigation are phosphate fertilizers from Russia. For a complete description of the scope of this investigation, *see* Appendix I.

**Scope Comments**

No interested party commented on the scope of the investigation as it appeared in the *Preliminary Determination.* Therefore, no changes were made to the scope of the investigation.

**Analysis of Subsidy Programs and Comments Received**

The subsidy programs under investigation and the issues raised in the case and rebuttal briefs that were submitted by parties in this investigation are addressed in the Issues and Decision Memorandum. For a list of the issues raised by interested parties and addressed in the Issues and Decision Memorandum, *see* Appendix II to this notice.

**Methodology**

Commerce conducted this investigation in accordance with section 701 of the Tariff Act of 1930, as amended (the Act). For each of the subsidy programs found countervailable, Commerce determines that there is a subsidy, *i.e.,* a financial contribution by an "authority" that gives rise to a benefit to the recipient,

and that the subsidy is specific.[4] For a full description of the methodology underlying our final determination, *see* the Issues and Decision Memorandum.

In making this final determination, Commerce relied, in part, on facts available pursuant to section 776(a) of the Act. Additionally, as discussed in the Issues and Decision Memorandum, because one or more respondents did not act to the best of their ability in responding to our requests for information, we drew adverse inferences, where appropriate, in selecting from among the facts otherwise available, pursuant to section 776(b) of the Act. For further information, see the section "Use of Facts Otherwise Available and Adverse Inferences" in the accompanying Issues and Decision Memorandum.

**Verification**

Commerce was unable to conduct on-site verification of the information relied upon in making its final determination in this investigation. However, we took additional steps in lieu of an on-site verification to verify the information relied upon in making this final determination, in accordance with section 782(i) of the Act.[5]

**Changes Since the Preliminary Determination**

Based on our review and analysis of the comments received from parties, we made certain changes to Industrial Group Phosphorite LLC (Phosphorite) and Joint Stock Company Apatit (JSC Apatit)'s subsidy rate calculations. For a discussion of these changes, *see* the Issues and Decision Memorandum.

**Final Determination**

Commerce determines that the following estimated countervailable subsidy rates exist:

| Company | Subsidy rate ad valorem (percent) |
|---|---|
| Industrial Group Phosphorite LLC[6] | 47.05 |
| Joint Stock Company Apatit[7] | 9.19 |
| All Others | 17.20 |

**All-Others Rate**

We continue to calculate the all-others rate using a weighted average of the individual estimated subsidy rates calculated for the examined respondents using each company's publicly-ranged data for the value of their exports to the United States of subject merchandise, in accordance with section 705(c)(5)(A)(i) of the Act.[8]

**Disclosure**

Commerce intends to disclose to interested parties the calculations and analysis performed in this final determination within five days of any public announcement or, if there is no public announcement, within five days of the date of the publication of this notice in the **Federal Register**, in accordance with 19 CFR 351.224(b).

**Continuation of Suspension of Liquidation**

As a result of our *Preliminary Determination* and pursuant to sections 703(d)(1)(B) and (d)(2) of the Act, we instructed U.S. Customs and Border Protection to suspend liquidation of entries of subject merchandise as described in the scope of the investigation section entered, or withdrawn from warehouse, for consumption on or after November 30, 2020, the date of publication of the *Preliminary Determination* in the **Federal Register**.

If the U.S. International Trade Commission (ITC) issues a final affirmative injury determination, we will issue a CVD order and require a cash deposit of estimated countervailing duties for entries of subject merchandise in the amounts indicated above, in accordance with section 706(a) of the Act. If the ITC determines that material injury, or threat of material injury, does not exist, this proceeding will be terminated, and all estimated duties deposited or securities posted as a result

---

Duty Investigation of Phosphate Fertilizers from the Russian Federation," dated December 21, 2020 (Post-Preliminary Analysis).

[3] *See* Memorandum, "Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Phosphate Fertilizers from the Russian Federation," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[4] *See* sections 771(5)(B) and (D) of the Act regarding financial contribution; section 771(5)(E) of the Act regarding benefit; and section 771(5A) of the Act regarding specificity.

[5] *See* Commerce's Letters, "Countervailing Duty Investigation of Phosphate Fertilizers from the Russian Federation: Supplemental Questionnaire in Lieu of On-Site Verification," dated December 18, 2020; *see also* EuroChem Group's Letter, "Phosphate Fertilizers from Russia," dated December 28, 2020; and PhosAgro PJSC's Letter, "Countervailing Duty Investigation of Phosphate Fertilizers from Russia: PhosAgro PJSC In Lieu of Verification Questionnaire Response," dated December 29, 2020.

[6] Commerce has found the following companies to be cross-owned with Phosphorite: Mineral and Chemical Company EuroChem, JSC; NAK Azot, JSC; EuroChem Northwest, JSC; Joint Stock Company Kovdorksy GOK; EuroChem-Energo, LLC; EuroChem-Usolsky Potash Complex, LLC; EuroChem-BMU, LLC; JSC Nevinnomyssky Azot; and EuroChem Trading Rus, LLC.

[7] Commerce has found the following companies to be cross-owned with JSC Apatit: PhosAgro PJSC;

PhosAgro-Belgorod LLC; PhosAgro-Don LLC; PhosAgro-Kuban LLC; PhosAgro-Kursk LLC; PhosAgro-Lipetsk LLC; PhosAgro-Orel LLC; PhosAgro-Stavropol LLC; PhosAgro-Volga LLC; PhosAgro-SeveroZapad LLC; PhosAgro-Tambov LLC; and Martynovsk AgrokhimSnab LLC.

[8] For discussion of the calculation of this rate, *see* Memorandum, "Countervailing Duty Investigation of Phosphate Fertilizers from the Russian Federation: Final Determination Calculation of the All-Others Rate," dated February 8, 2021.

of the suspension of liquidation will be refunded or canceled.

## ITC Notification

In accordance with section 705(d) of the Act, Commerce will notify the ITC of its final affirmative determination that countervailable subsidies are being provided to producers and exporters of phosphate fertilizers from Russia. As Commerce's final determination is affirmative, in accordance with section 705(b) of the Act, the ITC will determine, within 45 days, whether the domestic industry in the United States is materially injured or threatened with material injury. In addition, we are making available to the ITC all non-privileged and nonproprietary information related to this investigation. We will allow the ITC access to all privileged and business proprietary information in our files, provided the ITC confirms that it will not disclose such information, either publicly or under an administrative protective order (APO), without the written consent of the Assistant Secretary for Enforcement and Compliance.

## Notification Regarding APO

In the event that the ITC issues a final negative injury determination, this notice will serve as the only reminder to parties subject to an APO of their responsibility concerning the destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

## Notification to Interested Parties

This determination is issued and published pursuant to sections 705(d) and 777(i) of the Act, and 19 CFR 351.210(c).

Dated: February 8, 2021.

**Christian Marsh,**

*Acting Assistant Secretary for Enforcement and Compliance.*

## Appendix I—Scope of the Investigation

The merchandise covered by this investigation is phosphate fertilizers in all physical forms (*i.e.,* solid or liquid form), with or without coating or additives such as anti-caking agents. Phosphate fertilizers in solid form are covered whether granular, prilled (*i.e.,* pelletized), or in other solid form (*e.g.,* powdered).

The covered merchandise includes phosphate fertilizers in the following forms: Ammonium dihydrogenorthophosphate or monoammonium phosphate (MAP), chemical formula NH4H2PO4; diammonium hydrogenorthophosphate or diammonium phosphate (DAP), chemical formula (NH4)2HPO4; normal superphosphate (NSP), also known as ordinary superphosphate or single superphosphate, chemical formula Ca(H2PO4)2·CaSO4; concentrated superphosphate, also known as double, treble, or triple superphosphate (TSP), chemical formula Ca(H2PO4)2·H2O; and proprietary formulations of MAP, DAP, NSP, and TSP.

The covered merchandise also includes other fertilizer formulations incorporating phosphorous and non-phosphorous plant nutrient components, whether chemically-bonded, granulated (*e.g.,* when multiple components are incorporated into granules through, *e.g.,* a slurry process), or compounded (*e.g.,* when multiple components are compacted together under high pressure), including nitrogen, phosphate, sulfur (NPS) fertilizers, nitrogen, phosphorous, potassium (NPK) fertilizers, nitric phosphate (also known as nitrophosphate) fertilizers, ammoniated superphosphate fertilizers, and proprietary formulations thereof that may or may not include other nonphosphorous plant nutrient components. For phosphate fertilizers that contain non-phosphorous plant nutrient components, such as nitrogen, potassium, sulfur, zinc, or other non-phosphorous components, the entire article is covered, including the non-phosphorous content, provided that the phosphorous content (measured by available diphosphorous pentaoxide, chemical formula P2O5) is at least 5% by actual weight.

Phosphate fertilizers that are otherwise subject to this investigation are included when commingled (*i.e.,* mixed or blended) with phosphate fertilizers from sources not subject to this investigation. Phosphate fertilizers that are otherwise subject to this investigation are included when commingled with substances other than phosphate fertilizers subject to this investigation (*e.g.,* granules containing only non-phosphate fertilizers such as potash or urea). Only the subject component of such commingled products is covered by the scope of this investigation. The following products are specifically excluded from the scope of this investigation:

(1) ABC dry chemical powder preparations for fire extinguishers containing MAP or DAP in powdered form;

(2) industrial or technical grade MAP in white crystalline form with available P2O5 content of at least 60% by actual weight;

(3) industrial or technical grade diammonium phosphate in white crystalline form with available P2O5 content of at least 50% by actual weight;

(4) liquid ammonium polyphosphate fertilizers;

(5) dicalcium phosphate, chemical formula CaHPO4;

(6) monocalcium phosphate, chemical formula CaH4P2O8;

(7) trisodium phosphate, chemical formula Na3PO4;

(8) sodium tripolyphosphate, chemical formula Na5P3O10;

(9) prepared baking powders containing sodium bicarbonate and any form of phosphate;

(10) animal or vegetable fertilizers not containing phosphate fertilizers otherwise covered by the scope of this investigation;

(11) phosphoric acid, chemical formula H3PO4.

The Chemical Abstracts Service (CAS) numbers for covered phosphate fertilizers include, but are not limited to: 7722–76–1 (MAP); 7783–28–0 (DAP); and 65996–95–4 (TSP). The covered products may also be identified by Nitrogen-Phosphate- Potash composition, including but not limited to: NP 11–52–0 (MAP); NP 18–46–0 (DAP); and NP 0–46–0 (TSP).

The covered merchandise is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) at subheadings 3103.11.0000; 3103.19.0000; 3105.20.0000; 3105.30.0000; 3105.40.0010; 3105.40.0050; 3105.51.0000; and 3105.59.0000. Phosphate fertilizers subject to this investigation may also enter under subheadings 3103.90.0010, 3105.10.0000, 3105.60.0000, 3105.90.0010, and 3105.90.0050. Although the HTSUS subheadings and CAS registry numbers are provided for convenience and customs purposes, the written description of the scope is dispositive.

## Appendix II—List of Topics Discussed in the Issues and Decision Memorandum

I. Summary
II. Background
III. Use of Facts Otherwise Available and Adverse Inferences
IV. Subsidies Valuation
V. Benchmarks and Interest Rates
VI. Analysis of Programs
VII. Analysis of Comments
Comment 1: Whether Commerce's Rejection of PhosAgro's Extension Request to Submit Case and Rebuttal Briefs Was Unreasonable
Comment 2: Whether the Mining Rights for Less than Adequate Remuneration (LTAR) Program Is Countervailable
Comment 2a: Whether the Mining Rights for LTAR Program Constitutes a Financial Contribution
Comment 2b: Whether the Mining Rights for LTAR Program Is Specific
Comment 2c: Whether the Mining Rights for LTAR Program Confers a Benefit
Comment 2d: Whether Mining Rights Provided Prior to the Non-Market Economy "Cut-off" Date Should Be Included in the Mining Rights for LTAR Calculation
Comment 2e: Whether Commerce Should Include Freight, Value Added Taxes (VAT), and Import Duties in the Mining Rights Benchmark
Comment 2f: Whether the Calculation Methodology of the Mining Rights for LTAR Program Was Appropriate
Comment 3: Whether the Natural Gas for LTAR Program Is Countervailable
Comment 3a: Whether PJSC Gazprom (Gazprom) Is a Government Authority that Provides a Financial Contribution
Comment 3b: Whether Oil Company Rosneft, Public Joint Stock Company

**9482**    Federal Register / Vol. 86, No. 29 / Tuesday, February 16, 2021 / Notices

(Rosneft) Is a Government Authority that Provides a Financial Contribution

Comment 3c: Whether the Saint Petersburg International Commodity Exchange (SPIMEX) Is a Government Authority that Provides a Financial Contribution

Comment 3d: Whether the Provision of Natural Gas by Gazprom Is Specific

Comment 3e: Whether the Provision of Natural Gas by SPIMEX Is Specific

Comment 3f: Whether the Provision of Natural Gas for LTAR Confers a Benefit

Comment 3g: Whether Commerce Should Adjust the Natural Gas Benchmark to "Tier One"

Comment 3h: Whether Commerce Should Adjust the Natural Gas Benchmark to "Tier Two"

Comment 3i: Whether Commerce Should Change the Data Relied Upon in its Natural Gas Benchmark "Tier Three" Analysis

Comment 3j: Whether Commerce Should Adjust the Natural Gas Benchmark Data in its "Tier Three" Analysis.

Comment 3k: Whether Commerce Should Use a VAT Inclusive Sales Denominator

Comment 3l: Whether 19 CFR 351.525(b)(6) Applies to EuroChem's Natural Gas for LTAR

Comment 3m: Whether Commerce Should Consider the Relative Consumption of Natural Gas in the Production of Subject Merchandise for Purposes of Attribution

Comment 3n: Whether Commerce Should Use EuroChem's 2019 Audited Financials for Its Sales Denominators

Comment 3o: Whether the Delivery Cost of SPIMEX Natural Gas from EuroChem-Energo LLC (Energo) to JSC Nevinnomyssky Azot (Nevinka) and EuroChem Northwest JSC (EuroChem NW) Should Be Considered in Any Natural Gas Subsidy Calculation

Comment 4: Whether the Tax Incentives for Mining Operations—Income Tax Deduction for Exploration Expenses Program Is Specific

Comment 5: Whether the Income Tax Deduction for Research and Development (R&D) Expenses Is Specific

Comment 6: Whether the Regional Support of Industrial Development Programs, the Special Investment Contract (SPIC) with Perm Krai, and the Preferential Debt Financing of Projects Aimed at Introducing the Best Available Technologies Program Are Specific

Comment 7: Whether Commerce Used the Appropriate Denominator to Calculate PhosAgro's Subsidy Rates

VIII. Recommendation

[FR Doc. 2021–03010 Filed 2–12–21; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[C–714–001]**

### Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that countervailable subsidies are being provided to producers and exporters of phosphate fertilizers from the Kingdom of Morocco (Morocco).

**DATES:** Applicable February 16, 2021.

**FOR FURTHER INFORMATION CONTACT:** Robert Palmer or Janae Martin, AD/CVD Operations, Office VIII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–9068 or (202) 482–0238, respectively.

**SUPPLEMENTARY INFORMATION:**

#### Background

On November 30, 2020, Commerce published its *Preliminary Determination*.[1] On December 29, 2020, Commerce published its *Amended Preliminary Determination*.[2] On January 6, 2021, Commerce released its Post-Preliminary Determination.[3] For a complete description of the events that followed the *Preliminary Determination, see* the Issues and Decision Memorandum.[4] The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users

at *http://access.trade.gov.* In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn/index.html.* The signed and electronic versions of the Issues and Decision Memorandum are identical in content.

#### Period of Investigation

The period of investigation is January 1, 2019, through December 31, 2019.

#### Scope of the Investigation

The products covered by this investigation are phosphate fertilizers from Morocco. For a complete description of the scope of this investigation, *see* Appendix I.

#### Scope Comments

No interested party commented on the scope of the investigation as it appeared in the *Preliminary Determination.* Therefore, no changes were made to the scope of the investigation.

#### Analysis of Subsidy Programs and Comments Received

The subsidy programs under investigation and the issues raised in the case and rebuttal briefs that were submitted by parties in this investigation are addressed in the Issues and Decision Memorandum. For a list of the issues raised by interested parties and addressed in the Issues and Decision Memorandum, *see* Appendix II to this notice.

#### Methodology

Commerce conducted this investigation in accordance with section 701 of the Tariff Act of 1930, as amended (the Act). For each of the subsidy programs found countervailable, Commerce determines that there is a subsidy, *i.e.,* a financial contribution by an "authority" that gives rise to a benefit to the recipient, and that the subsidy is specific.[5] For a full description of the methodology underlying our final determination, *see* the Issues and Decision Memorandum.

#### Verification

Commerce was unable to conduct on-site verification of the information relied upon in making its final determination in this investigation. However, we took additional steps in lieu of an on-site verification to verify

---

[1] *See Phosphate Fertilizers from the Kingdom of Morocco: Preliminary Affirmative Countervailing Duty Determination,* 85 FR 76522 (November 30, 2020) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

[2] *See Phosphate Fertilizers from the Kingdom of Morocco: Amended Preliminary Determination of Countervailing Duty Investigation,* 85 FR 85585 (December 29, 2020) (*Amended Preliminary Determination*), and accompanying PDM.

[3] *See* Memorandum, "Post-Preliminary Determination of Countervailing Duty Investigation: Phosphate Fertilizers from the Kingdom of Morocco," dated January 6, 2020 (Post-Preliminary Determination).

[4] *See* Memorandum, "Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Phosphate Fertilizers from the Kingdom of Morocco," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[5] *See* Commerce's Letters, "Supplemental Questionnaire in Lieu of On-Site Verification," dated December 17, 2020; *see also* OCP's Letter, "Response to Questionnaire in Lieu of On-Site Verification," dated December 30, 2020; and the GOM's Letter, "In Lieu of On-Site Verification Questionnaire Response of the Government of the Kingdom of Morocco," dated December 29, 2020.

# COVINGTON

BEIJING  BRUSSELS  DUBAI  FRANKFURT  JOHANNESBURG
LONDON  LOS ANGELES  NEW YORK  SAN FRANCISCO
SEOUL  SHANGHAI  SILICON VALLEY  WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 6000

March 8, 2021

*VIA ELECTRONIC FILING*

The Honorable Lisa R. Barton
Secretary
U.S. International Trade Commission
500 E Street, S.W.
Washington, D.C. 20436

Inv. Nos. 701-TA-650-651 (Final)

Total Pages: 22

**PUBLIC VERSION**

Business Proprietary Information deleted
from pages 3-11, 13-14

Re:     *Phosphate Fertilizers from Morocco and Russia, Inv. Nos. 701-TA-650-651 (Final):*
         *Public Version of Final Comments*

Dear Secretary Barton:

On behalf of OCP S.A., we hereby submit the enclosed public version of OCP's Final Comments in the above-captioned proceeding.

The public version deleted the business proprietary information contained in the confidential version. Disclosure of that information, which is not otherwise publicly available, would cause substantial harm to the competitive position of the parties submitting such information. It has not been possible to prepare meaningful public summaries of the redacted materials. *See* §19 U.S.C. 1677f(b)(l)(A)(i).

Please do not hesitate to contact me if you have any questions.

**COVINGTON**
Page 2

Respectfully submitted,

*/s/ Shara L. Aranoff*
Shara L. Aranoff
James M. Smith
Victor D. Ban
Sooan (Vivian) Choi
Minwoo Kim
Caroline Garth

**COVINGTON & BURLING LLP**

*Counsel to OCP S.A.*

## COUNSEL CERTIFICATION

### U.S. International Trade Commission

### Investigation Nos. 701-TA-650-651 (Final)

### Phosphate Fertilizers from Morocco and Russia

I, Shara L. Aranoff, of Covington & Burling LLP, counsel to OCP S.A., hereby certify, pursuant to 19 C.F.R. § 201.6(b)(3)(iii), that to the best of my knowledge and belief, any information for which proprietary treatment has been requested in this submission is not available to the general public.

Further, in accordance with 19 C.F.R. § 207.3(a), I hereby certify that (1) I have read the attached submission, and (2) to the best of my knowledge, the information contained in this document is accurate and complete.

_Shara L. Aranoff_

_____
Shara L. Aranoff
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001

Date: March 8, 2021

## PUBLIC CERTIFICATE OF SERVICE

**Phosphate Fertilizers from Morocco and Russia**

**Inv. Nos. 701-TA-650-651 (Final)**

I, Joel Cannon, certify that on March 8, 2021, a copy of the public version of the attached submission has been served via electronic mail on the following:

**On behalf of The Mosaic Company:**

Patrick J. McLain
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
patrick.mclain@wilmerhale.com

**On behalf of International Raw Materials Ltd.:**

Melissa M. Brewer
Kelley Drye & Warren LLP
3050 K Street, NW
Washington, DC 20007
mbrewer@kelleydrye.com
tradenotifications@kelleydrye.com

**On behalf of Gavilon Fertilizer, LLC:**

H. Deen Kaplan
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, DC 20004
deen.kaplan@hoganlovells.com

**On behalf of Koch Fertilizer, LLC:**

Kenneth G. Weigel
Alston & Bird LLP
950 F Street, NW
Washington, DC 20004
Ken.weigel@alston.com
Yuzhe.PengLing@alston.com

**On behalf of PhosAgro PJSC:**

Daniel J. Cannistra
Crowell & Moring LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
dcannistra@crowell.com
intltrade@crowell.com

**On behalf of J. R. Simplot Company:**

Jamieson L. Greer
King & Spalding
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006-4706
jgreer@kslaw.com
tradeservice@kslaw.com

**On behalf of the Government of Morocco:**

Jonathan M. Zielinski
Cassidy Levy Kent (USA) LLP
900 19th Street, NW, Suite 400
Washington, DC 20006
jzielinski@cassidylevy.com
records@cassidylevy.com

**On behalf of the Ministry of Economic Development of the Russian Federation:**

Elena G. Nosyreva
Ministry of the Economic Development of the Russian Federation
Presnenskaya Naberzhnaya, 10/2
Moscow, Russia, 125039
NosyrevaEG@economy.gov.ru

**On behalf of EuroChem North America Corp.:**

Peter Koenig
Squire Patton Boggs
2550 M Street, NW
Washington, DC 20037
peter.koenig@squirepb.com

**On behalf of Archer-Daniels-Midland Co.:**

Warren E. Connelly
Trade Pacific PLLC
700 Pennsylvania Ave, SE, Suite 500
Washington, DC 20003
wconnelly@tradepacificlaw.com
rgosselink@tradepacificlaw.com

*/s/ Joel Cannon*
Joel Cannon

PUBLIC VERSION

Inv. Nos. 701-TA-650-651 (Final)

Total Pages: 22

**PUBLIC VERSION**

Business Proprietary Information deleted
from pages 3–11, 13–14

**BEFORE THE**

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

---

**IN THE MATTER OF**

**PHOSPHATE FERTILIZERS FROM MOROCCO AND RUSSIA**

---

**FINAL COMMENTS OF**

**OCP S.A.**

Shara L. Aranoff
James M. Smith
Victor D. Ban
Sooan (Vivian) Choi
Minwoo Kim
Caroline Garth

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956

*Counsel to OCP S.A.*

March 8, 2021

<u>**PUBLIC VERSION**</u>

<u>**TABLE OF CONTENTS**</u>

<u>Page</u>

I.      **SUBJECT IMPORTS DID NOT EXCEED THE U.S. SUPPLY GAP, WHICH WAS CREATED BY THE DOMESTIC INDUSTRY FOR UNRELATED REASONS** .............................................................................. 2

II.     **RELIABLE PRICE DATA IN THE RECORD ESTABLISH PREDOMINANT AND CONSISTENT OVERSELLING** .......................................... 7

       A.      **The predominant overselling is reliable and confirmed by other data.** ........... 7

       B.      **Documents and declarations allegedly showing price negotiations are not evidence of lost sales, lost revenues, or price depression/suppression.** ........................................................................ 9

       C.      **Mosaic and Simplot have failed to rebut the crucial fact that U.S. prices are driven by global fundamentals, not by subject imports.** ............... 11

III.     **PRE- AND POST-PETITION DEVELOPMENTS CONFIRM THAT THE DOMESTIC INDUSTRY IS NOT AND WILL NOT BE MATERIALLY INJURED** .................................................................................................... 12

i

**PUBLIC VERSION**

At the Hearing, Tr. at 86, Chair Kearns observed that "{i}t seems like something just isn't adding up in this case" as presented by The Mosaic Company ("Mosaic" or "Petitioner") and J.R. Simplot Company ("Simplot"). At a glance, the facts are distinct from traditional Title VII investigations of commodity products: imported and domestically produced MAP and DAP fertilizers are generally interchangeable, price indices for MAP and DAP are widely reported, and the market share of subject imports increased over the period of investigation ("POI"), yet— as the Chair emphasized, *id.*—"overselling predominates." Both Mosaic and Simplot have struggled to account for this anomalous pattern—first by claiming that closures driven by operational efficiencies were instead somehow linked to subject imports, and second by attempting to cast doubt on the Commission's pricing products and find hidden underselling.

As explained below on behalf of OCP S.A. ("OCP"), these belabored attempts to salvage the Petition's claims of injury by reason of subject imports all fail. Though atypical, the fact pattern in this investigation is not difficult to explain. First of all, the domestic industry announced the closure of two production facilities, deliberately creating a supply gap that imports were expected to fill. While remaining fully committed to export markets, domestic producers repeatedly declined to supply U.S. purchasers, forcing (and at times encouraging) reliance on subject imports, which necessarily rose despite persistent overselling. After weather events unexpectedly curbed demand, subject imports then declined from mid-2019 onward, in tandem with curtailments in domestic production. By the date of the Petition, the market had been in recovery for months, with rising prices, increased demand, and reduced inventories of domestic fertilizers and subject imports alike.

This straightforward account of prevailing market conditions—as corroborated in questionnaire responses, Hearing testimony, and contemporaneous documents—demonstrates

1

that subject imports did not and will not cause injury to the domestic industry. In order to reach a negative determination, the Commission need not rely solely on the sworn submissions and contemporaneous documents of Respondents and purchasers. Instead, it can rely also on the contemporaneous statements and internal documents of Petitioner, which confirm, *inter alia*, that the Plant City closure was unrelated to subject imports; that its intended result was a massive supply gap to be filled by imports; that export markets have been and remain a strategic priority; that domestic production levels cannot readily be increased; and that non-subject imports, including from Mosaic's joint venture in Saudi Arabia, are now needed to fill the supply gap.

## I. SUBJECT IMPORTS DID NOT EXCEED THE U.S. SUPPLY GAP, WHICH WAS CREATED BY THE DOMESTIC INDUSTRY FOR UNRELATED REASONS

The domestic industry's claims that subject imports indiscriminately flooded the market is belied by the record evidence, which shows that imports were needed to fill a massive supply gap intentionally created by the domestic industry through the closures of Plant City and Redwater. When adverse weather reduced demand in the second half of 2019, imports receded as the market worked down domestic and import inventories. By the time the Petition was filed in mid-2020, this temporary, weather-induced supply-demand imbalance was resolved.

At the outset, nothing in Mosaic's belatedly submitted "evidence" shows that subject imports caused the closure of Plant City, an aging, high-cost facility that Mosaic acquired incidental to a bundle of more attractive assets—specifically the South Pasture mine.[1] Indeed, the

---

[1] *See* OCP Posthr'g Br., Q&A at Q13; Mosaic Posthr'g Br., Ex. 14 ("So in 2010, we're faced with running out of reserves at our 2 largest mines in Central Florida. We are contemplating building 2 new additional mines, complete with beneficiation plants, farther to the south here in Florida. And at that time, we estimated these mines would cost approximately $1 billion a piece. In 2014, we acquired CF's South Pasture mine. And because South Pasture is right in the center of our existing operations, it provided a new opportunity to process all of our reserves in that area with active, low-cost assets. With this change, we expected a savings of about $500 million and the deferral of our new DeSoto mine for 4 more years. With our new mine strategy today in 2019, we're continuing to leverage South Pasture to access owner reserves in an area we call Pioneer. We are also acquiring additional reserves contiguous to active mining areas, and with the new owner permit, we now have decades of mining potential.").

**PUBLIC VERSION**

"public communications" cited by Mosaic confirm that nothing linked subject imports and the decision to idle Plant City.[2] Nor do Mosaic's [                              ] draw a causal connection.[3] In particular, Mosaic's detailed [

].[4] [

].[5] Thus, no contemporaneous evidence contradicts Mosaic's many prior statements explicitly attributing the closure not to imports but to the company's ongoing "transformation efforts" to improve cost efficiency.[6] The result in 2018, as intended and publicly confirmed, was a massive 1.1M ST supply gap that Mosaic told investors and customers would need to be filled by imports.[7]

Redwater's announced closure further augmented the need for imports.[8] In early 2018, Nutrien announced that it would shutter its phosphate fertilizer operations in Redwater, Alberta,[9]

---

[2] Mosaic Posthr'g Br., Q&A at Q3, Exs. 13-18. Nine of 12 statements are from 2019 and say nothing about why Plant City was idled. Among the few from 2017, none even mentions Plant City, let alone ties subject imports to its idling. U.S. imports are mentioned in Exhibit 12, a 2017 earnings call, only with respect to alleged price compression for Mosaic's premium MES products, an effect that Mosaic described as "transitory." *Id.*, Ex. 12 at 3, 7, 14.

[3] *Id.*, Q&A at Q3, Exs. 19–22. Exhibit 19 is addressed below. Exhibits 20 and 21 [
                ] Exhibit 22 [
        ]

[4] *Id.*, Ex. 19. In the context of [

], not actual *reasons* for it. And the reference is to [
                ]—not just subject imports.

[5] *Id.* at 4, 5 & 7.

[6] Mosaic Posthr'g Br., Ex. 14 at 16; *see also* Tr. at 18–19 (Mr. Rosenthal); OCP Prehr'g Br. at 19–24.

[7] OCP Posthr'g Br. at 2, 4. Mosaic's [                        ]. Mosaic Posthr'g Br., Ex. 19. [

]

[8] OCP Prehr'g Br. at 7, 67.

[9] *Id.*, Ex. 89 & Ex. 106. The anticipated end 2018/early 2019 close was delayed to May 2019.

3

**PUBLIC VERSION**

which had an annual capacity of 730K ST of MAP, and average annual production of 600K ST.[10]

The plant was converted to ammonium sulfate production, capitalizing on cheap raw materials.[11]

Because Nutrien assured customers that it would continue to serve the Western Canadian market

from its U.S. facilities,[12] distributors expected a U.S. supply shortfall via increased exports to

Canada and reduced imports from Canada.[13]

      This shortfall was widened by the domestic industry's emphasis on export markets.

Exports were not suddenly "push{ed} . . . out" of the U.S. in 2019 by subject imports;[14]

throughout the POI, the domestic industry exported [        ] of its production.[15] In the case

of Mosaic, Latin America is particularly attractive due to transportation efficiencies, rapid

demand growth, counter-seasonality, and the need to service extensive distribution investments

in Brazil.[16] Tellingly, Mosaic tries to walk back its testimony that "better returns" net of

transportation costs drove its preference to serve Latin America,[17] but Mosaic's export

volumes—even at times of high U.S. prices—attest to the enduring importance of non-U.S.

markets to the company.[18]

      As the domestic industry repeatedly noted,[19] imports were needed to fill the supply gap—

especially given the domestic industry's refusals to deal with specific customers and limitations

---

[10] OCP Posthr'g Br., Att. C, Rahm Decl. ¶ 3.4.

[11] OCP Prehr'g Br., Ex. 106, 107, 108.

[12] *Id.*, Ex. 38.

[13] Tr. at 241 (Mr. Lambert) ("So you had the anticipation of Redwater being shut down, which obviously was drawing or was calling a need for more product, you had more exports in 2019 than 2018, so, therefore, there was even a further hole {in the U.S. market}."); OCP Prehr'g Br., Ex. 25 at 9.

[14] Mosaic Posthr'g Br. at 14.

[15] Staff Rep. at Table III-6; OCP Posthr'g Br., Q&A at Q3.

[16] OCP Posthr'g Br., Q&A at Q2; Tr. at 119 (Mr. O'Rourke).

[17] Tr. at 122 (Mr. McLellan); *see also id.* at 121–22 (Mr. McLellan) ("We would be able to buy the barge, . . . load it onto a vessel, send it to Brazil, and still have money in our pocket."); Tr. at 197 (Mr. McGinn) (given transportation cost differential, "exports were significantly more profitable for Mosaic than U.S. sales west of the Mississippi").

[18] OCP Posthr'g Br., Q&A at Q3.

[19] OCP Prehr'g Br., Ex. 25 ("{I}mport requirements into the U.S. are increasing by both Redwater and Plant City.").

4

on supply to others. In their briefs, Mosaic and Simplot confirm witness testimony that their selective distribution model caused certain customers to go unserved,[20] but claim that during the POI generally or post-Petition farmers obtained all needed fertilizer.[21] U.S. farmers got what they needed thanks only to imports, which filled the supply gap in 2018 and 2019, making up for the structural shortage of domestic fertilizers. At the Hearing, witnesses confirmed that distributors paid a premium for reliable import supply when domestic product was unavailable.[22]

Contrary to Petitioner's post hoc claims, the record makes clear that imports (including but not limited to subject imports) did not overshoot the supply gap. Mosaic continues to confuse subject import entries with U.S. shipments of subject imports, to ignore the growth in demand from 2017 to 2018, and to fail to acknowledge Mr. O'Rourke's confirmation in March 2019 that Mosaic had intentionally surrendered 1.1M ST in U.S. sales.[23] That figure is corroborated by a document that Mosaic placed on the record after the Hearing, which shows [

].[24] At bottom, the growth in U.S. shipments of subject imports from 2017 to 2018—which was 605K ST[25]—is less than Mosaic's lowball estimate of 700K ST, even before factoring in the 600K ST shortfall from Redwater's impending closure.[26]

---

[20] *See* OCP Posthr'g Br., Q&A at Q2; Mosaic Posthr'g Br., Q&A at Q26 (arguing that it "is not in the domestic industry's interest" to do business with importers that may "resell those volumes to domestic producers' own customers"); Simplot Posthr'g Br., Q&A at Q4; Tr. at 98 (Ms. Byers) (explaining that domestic producers are concerned about "cannibalizing their own business").

[21] Simplot Posthr'g Br., Q&A at Q4 and Q13; Mosaic Posthr'g Br., Q&A at Q26.

[22] Tr. at 262 (Mr. Wessel) (noting that Gavilon was "willing to pay a little bit more for a foreign product to meet that availability gap"); Tr. at 260 (Mr. Lambert) ("If you're on the Mississippi River there is one domestic supply source and that's Mosaic. . . . But if you can't purchase from them, your alternative is the importers.").

[23] OCP Posthr'g Br. at 4.

[24] Mosaic Posthr'g Br., Ex. 19 at 5 ([                                                                        ]); *id.* at 7 (showing [                                                                                                              ]).

[25] Staff Rep. at Table C-1.

[26] OCP Posthr'g Br. at 4 (citing Rahm Decl. ¶ 3.4). Simplot claims to have heard that OCP prohibits re-exportation of its deliveries to U.S. customers. Simplot Posthr'g Br., Ex. 5, ¶ 6. This unsubstantiated claim does not show that OCP "exacerbates {any} oversupply" because OCP sells only to customers with a distribution footprint and specified needs, not to traders, and never ships on contingency or consignment. OCP Posthr'g Br., Att. B. ¶ 2; Tr. at

5

To understand 2019, the Commission needs to consider separately the first half of the year, when strong demand forecasts drove distributors to build inventories, and the second half of the year, when the cumulative effects of bad weather on spring fertilizer application led to reduced imports and limited off-season restocking to unaffected areas. Both domestic industry and subject import inventory levels reached their POI peak in Q1 2019, in anticipation of strong spring demand.[27] But when adverse weather in spring 2019 depressed demand, the domestic industry and subject imports responded accordingly. Between March 2019 and early 2020, Mosaic briefly curtailed production at various plants, citing the need to "accelerate the reduction of high . . . inventories."[28] In 2019, Mosaic's forgone production was [

]; in Q1 2020, Mosaic cut production by [

].[29] Meanwhile, subject import entries in 2019 declined by 9.5% from 2018, and the decline in H2 2019 was even greater: 22% from H1 2019, and 9.7% from H2 2018.[30] In Q1 2020, subject import entries dropped 47.8% from Q1 2019.[31] Proportionately, the decline in subject imports was comparable to—if not larger than—Mosaic's curtailments.

Beginning in early 2020, the U.S. market started on the path to normalcy. As imports declined, the market [                              ] U.S. producer and importer inventories, which returned to [              ] after a typical spring planting season in 2020.[32] In Q1 2020, the

---

253–54 (Mr. Bensari) ("{W}e never send what is not sourced from a firm buyer."); *see also* Tr. at 261 (Mr. Niederer) ("We choose not to export product because we bring it here for a reason.").

[27] OCP Posthr'g Br., Q&A at Q5.

[28] OCP Prehr'g Br., Ex. 10 at 6.

[29] Staff Rep. at Table III-4; Prelim. Staff Rep. at Table III-4 (Q1 2019 production). The 2019 curtailments include: (i) March 2019 curtailment (300K ST), Pet. at I-34; and (ii) October to December 2019 idling of St. James, Louisiana facilities (500 K ST), Staff Rep. at III-5. From late December 2019 [                              ], Mosaic idled its Bartow, Florida, facility ([                                          ]), Pet. at I-55, Staff Rep. at III-5, Mosaic U.S. Producer QR at II-2a.

[30] Staff Rep. at Table IV-2, IV-6; OCP Posthr'g Br., Q&A at Q5. Between the 2018–19 and 2019–20 fertilizer years, which run from July 1 to June 30, subject imports dropped 16.8% (or 547K ST). Staff Rep. at Table IV-6.

[31] Staff Rep. at Table IV-6.

[32] Staff Rep. at Table D-1 (corrected inventory data).

6

**PUBLIC VERSION**

domestic industry's market share rose to [      ]%, up from [      ]% in 2019.[33] In H1 2020, subject import entries dipped to 1.3M ST, down by 402K ST (or 23%) from H1 2019.[34] Global prices began to rebound as well.[35] This recovery in early 2020 was driven by market fundamentals, both in the United States and globally. Subject imports deserve no credit for changes in fundamentals—or blame for disruptions that preceded those changes. In sum, with respect to volume, it is crucial to bear in mind that subject imports did not exceed the domestic industry's net supply gap across the POI's three calendar years or four fertilizer years.[36]

## II.    RELIABLE PRICE DATA IN THE RECORD ESTABLISH PREDOMINANT AND CONSISTENT OVERSELLING

### A.    The predominant overselling is reliable and confirmed by other data.

The final Staff Report confirms predominant overselling by subject imports.[37] Yet the frequency and margins of overselling in the record are likely to be *understated*, as the Commission—in a departure from prior practice, including in fertilizer cases[38]—allowed the domestic industry to include [      ]/ST of Florida-to-NOLA inland U.S. transport costs in its pricing product data.[39] The consistency of overselling over time and across products reinforces the reliability of the pricing product data, as do the AUV comparisons, all of which point to the same conclusion: that subject imports consistently oversold domestic fertilizers during the POI.[40]

---

[33] Prelim. Staff Rep. at Table IV-8.

[34] Staff Rep. at Table IV-6.

[35] *See infra* Part III (discussing H1 2020 pre-Petition price recovery).

[36] The complementary volume analyses of Mr. Dougan and Mr. Rahm, which are based on distinct data sources, time periods, and methodologies, both confirm that subject imports did not overshoot the supply gap across the POI. *See* OCP Posthr'g Br., Q&A at Q4 (discussing Figures 7 and 8).

[37] *See* Staff Rep. at Table V-7.

[38] *See* OCP Prehr'g Br. at 86, n.328; OCP Comments on Draft Questionnaires at 3.

[39] *See* Mosaic Posthr'g Br., Q&A at 29-30 (acknowledging that Mosaic competes at NOLA with shipments from its plants in Florida, and that cross-Gulf freight is roughly $[      ]/ST); *id.*, Ex. 19 at 5 (showing that [      ]).

[40] *See* Staff Rep. at Tables E-1 and E-2 (showing that [      ]). *See also* OCP Posthr'g Br., Q&A at Q9.

7

**PUBLIC VERSION**

Domestic producers' posthearing attempts to undermine the pricing data repackage issues that have already been resolved or are without merit. *First*, Simplot argues that subject imports and domestic fertilizers may initially be offered at different prices but ultimately sold at the same NOLA price, such that the NOLA price index "masks" subject import underselling.[41] Yet if subject imports were sold at the same price as domestic fertilizers, the pricing product data would not show persistent overselling. *Second*, Simplot argues that AUVs at which subject imports enter the U.S. market are more reliable than AUVs of U.S. importers' U.S. shipments of subject imports.[42] The Commission already rejected this argument when it declined to collect purchase cost data.[43] Because the AUVs are less precise than the pricing product data, which have more than sufficient coverage, there is zero reason to rely on AUVs in this context. Still, to test the domestic producers' claim that the level of trade is somehow "masking" underselling, Staff collected monthly import entry AUVs for MAP and DAP[44] and [

].[45] Strikingly, both sets of supplemental pricing data [

] overselling by subject imports—[                              ] the reliability of the pricing product data.[46] *Finally*, Mosaic and Simplot invoke trade press reports, but the Commission's confidential data—submitted under oath and verified by Staff—are more reliable than unsubstantiated and self-serving anecdotes provided anonymously to reporters.[47]

---

[41] *See* Simplot Posthr'g Br. at 8.
[42] *See id.*, Q&A at 68.
[43] OCP has also explained that collecting pricing data at this level of trade would be inappropriate, given the robust coverage of pricing data and the fact that internal consumption and transfers to related firms comprised [
        ] of U.S. shipments of subject imports. *See* OCP Posthr'g Br., Q&A at 49-50.
[44] *See* Staff Rep. at Appendix F.
[45] *See* Emails between [        ] and Staff, ITC Doc. No. [        ].
[46] Monthly import AUVs show that subject imports oversold domestic product in [    ]% of monthly comparisons and [    ]% of the reported volume. *See* Staff Rep. at Tables V-4, V-5, F-1 & F-2. [
                            ] show that subject imports oversold domestic product in [    ]% of monthly comparisons and [    ]% of the reported volume. *See id.* at Tables V-4 & V-5, ITC Doc. No. [        ].
[47] *See* Mosaic Posthr'g Br., Q&A at Q12; Simplot Posthr'g Br., Q&A at 19.

8

**PUBLIC VERSION**

**B.     Documents and declarations allegedly showing price negotiations are not evidence of lost sales, lost revenues, or price depression/suppression.**

Mosaic exhibited [     ] emails discussing [         ] that it claims show subject import underselling, price depression/suppression, and lost sales/lost revenues.[48] Each exhibit has serious credibility issues. Most of the communications are entirely unclear as to such basic facts as whether [

].[49] As explained below, each exhibit is either

[                                                                          ]:

- [                                        ] all reported either that [
  ], or that [
                                                           ].

- [                                   ] did not appear in the Petition's lost sales/lost revenue allegations. As a result, the Commission had no opportunity to verify Mosaic's claim with [            ]. While [     ] submitted a purchaser questionnaire, this response deserves no weight because it comes from a [
                        ].

- No communication from [         ] appears in Exhibit 35 of Mosaic's posthearing brief, which is [                       -                                                        ]. Moreover, this purchaser [                              ]. Thus, Mosaic's self-serving [            ] has not been and cannot be confirmed.

- [               ] recently clarified that [

                        ] Staff Rep. at V-23, n.14. This information invalidates any claim that [                                                                   ].

In any event, Mosaic's email exhibits are outweighed by sworn importer and purchaser statements that domestic producers could not meet their volume needs and often declined requests for volume without any reference to price at all. Even if one were to disregard the

---

[48] *See* Mosaic Posthr'g Br. at 6, Q&A at Q9, and Exs. 27–36.
[49] In one instance, [                                                                            ].
*Id.*, Ex. 28. Customers [                                                   ]; Mosaic [
].  *Id.*, Exs. 27, 31.

9

APPX0020217

**PUBLIC VERSION**

obvious flaws in Mosaic's exhibits, only [

].[50] By

contrast, [        ] importers provided contemporaneous documentation of Mosaic declining to

supply a minimum of [        ] tons during the POI prior to the Petition, all with no mention of

price.[51] These documented tons capture only a portion of the domestic producers' refusals to

supply, as numerous purchaser responses make clear.[52]

    Simplot did not submit any contemporaneous evidence of customer negotiations, but

provided a list of heretofore undisclosed lost sales and lost revenue allegations,[53] which are

similarly [                                        ]. Most involve

[                                        ] and come too late to be verified.[54]

[                        ], reported that [

].[55] Mosaic also exhibited communications purportedly showing that customers

shared market intelligence on import pricing,[56] but these exhibits provide no evidence of subject

import underselling or adverse price effects. The communications are entirely unclear as to

[

---

[50] *See id.*, Exs. 28, 35 (indicating that [
], respectively). A typical barge is 1,500 ST. *See* Pet. Vol. I, Ex.
I-20 (Argus Methodology and Specifications Guide) at 6.
[51] *See* Gavilon Posthr'g Br., Q&A at 1-2 (testifying that "Mosaic cut our supply by 100,000 tons {in 2018} and
encouraged us to buy from elsewhere, including from foreign suppliers"); [        ] Posthr'g Br., Ex. 4 ([
]); [        ]
Posthr'g Br., Ex. 1 ([
]).
[52] *See* Staff Rep. at II-8 (16 of 28 purchasers reporting supply constraints), II-9 ([
] reporting supply constraints from Mosaic or other domestic producers).
[53] *See* Simplot Posthr'g Br., Ex. 4.
[54] *See id.* These [
]. Only [
]. *See* Simplot US Prod. QR at IV-20.
[55] *See* Staff Rep. at Table V-9.
[56] *See* Mosaic Posthr'g Br., Q&A at 28, 36–37, and Exs. 41–46.

10

**PUBLIC VERSION**

].[57] Record evidence

demonstrates there was no price depression or suppression by subject imports,[58] and the domestic

producers' posthearing submissions fail to prove otherwise.

### C.    Mosaic and Simplot have failed to rebut the crucial fact that U.S. prices are driven by global fundamentals, not by subject imports.

U.S. prices are primarily determined by global supply and demand fundamentals. While

the Commission does not often need to give weight to global price factors, the phosphate

fertilizer market is distinctively global.[59] Outside of this investigation, Mosaic has acknowledged

that China and India—as the world's two high-cost suppliers setting the global price floor—are

the key drivers of global prices, with China as the "swing supplier" that will "moderate their

level of exports" depending on global demand and prices.[60] In this investigation, Mosaic

contends that even if prices are global, Morocco and Russia affect global supply conditions and

thereby U.S. prices.[61] But in 2019, Morocco and Russia together accounted for approximately

[    ] of global production, while China and India collectively accounted for 43% of global

consumption *and* 45% of global production.[62] For that reason, CRU's 2019 list of the "Main

Risks to the Phosphate Fertilizer Outlook" included conditions in China, India, Pakistan, and

Brazil as potentially impacting prices, but made no mention of Morocco or Russia.[63]

---

[57] *See id.*, Exs. 41, 44–45 ([                                        ]) and Exs. 42–46 ([                ]).

[58] *See* OCP Prehr'g Br. at Part III.B.3–4; OCP Posthr'g Br. at 9, Q&A at Q11–Q12.

[59] Mosaic's empirical analyses erroneously presume that U.S. prices are exclusively driven by local supply and demand factors, when in reality global factors predominate. Mosaic claims that its empirical analyses are a rebuttal to "respondents merely assert{ing} that the observed decline in U.S. prices can be fully attributed to lower demand." Mosaic Posthr'g Br. at 11. This is false. OCP has demonstrated that U.S. prices are primarily driven by global supply and demand factors. *See* OCP Prehr'g Br. at Part III.B.1 (explaining, *inter alia*, that global prices, and in turn U.S. prices, are heavily influenced by supply and demand factors in China and India).

[60] OCP Prehr'g Br., Ex. 11 (Mosaic Analyst Day, Mar. 28, 2019) at 32-33.

[61] *See* Mosaic Posthr'g Br., Q&A at 66.

[62] *See* OCP Prehr'g Br. at 79 and Att A-3; Staff Rep. at Tables VII-3 and VII-7.

[63] OCP Prehr'g Br., Ex. 122 (CRU Phosphate Fertilizer Market Outlook, Apr. 2019) at 16. Indeed, OCP is committed to sustaining its phosphate operations over the long term, and carefully plans new capacity so as to avoid

11

**PUBLIC VERSION**

Local U.S. conditions may impact any temporary differential between U.S. and global prices, but contrary to Mosaic's claim, they do not drive overall U.S. price trends.[64] A domestic supply gap led to a NOLA premium in the second half of 2018.[65] The weather-driven demand shocks in the U.S. market caused an extended NOLA discount in 2019, but the differential disappeared by early 2020, when more typical fluctuations resumed.[66] Thus, the POI saw an isolated year of prices declining globally and in the United States, but a recovery in global and U.S. prices was well underway by the filing date of the Petition, demonstrating that subject imports did not have adverse price effects.

## III. PRE- AND POST-PETITION DEVELOPMENTS CONFIRM THAT THE DOMESTIC INDUSTRY IS NOT AND WILL NOT BE MATERIALLY INJURED

"Prevailing market conditions" severed any causal link during the POI between subject import volumes and any injury to the domestic industry.[67] A supply gap created by the domestic industry drew in higher-priced imports in 2018, at levels commensurate with that gap.[68] To the extent supply and demand for subject imports were mismatched at all in 2019, the imbalance was temporary, comparable for both domestic production and subject imports, and caused by adverse weather,[69] not aggressive selling or low prices.[70]

The Commission's task is to assess material injury based on a time period as close to vote

---

placing downward pressure on global prices. *See id.* at 120; *see also* Tr. at 186 (Mr. Ameziane) (testifying that OCP "carefully plan{s} new capacity to grow in line with global demand, not outpace it").

[64] *See* Mosaic Posthr'g Br. at 14.

[65] OCP Posthr'g Br., Att. C, Rahm Decl., at 3.7.

[66] *Id.*, at 3.6, 3.8, 5.3, and Figures 3–4.

[67] *See Urea Ammonium Nitrate Solutions from Belarus, Russia, and Ukraine*, Inv. Nos. 731-TA-1006, 1008, 1009 (Final), USITC Pub. 3591 at 14 (Apr. 2003); OCP Posthr'g Br., Q&A at Q1 (reviewing cases). Other cases cited by the domestic industry are inapposite; several involve products sold through different distribution channels or with evidence of underselling. Mosaic Posthr'g Br., Q&A at Q21; Simplot Posthr'g Br., Q&A at Q9.

[68] *See supra* Part I; OCP Prehr'g Br. at Part II.A; OCP Posthr'g Br. at I, Q&A at Q4.

[69] *See supra* Part I; OCP Posthr'g Br. at 5, Q&A at Q5.

[70] *See supra* Part II.

12

**PUBLIC VERSION**

day as possible.[71] Here, there is no evidence that subject imports caused "present" material injury because the weather-induced misalignment between supply and demand had been corrected by the filing date of the Petition, the time closest to vote day that is unaffected by any post-filing effects. By June 2020, demand had rebounded from weather-induced disruptions;[72] prices were several months into a recovery;[73] and inventories of both subject imports and U.S. producers had returned to [                ], as shown by corrected inventory data in the final Staff Report.[74]

Lacking support for their theory of the case in the data for 2017 through June 2020, the domestic producers fabricate a counterfactual "but/for" injury claim based on post-Petition developments.[75] Yet their counterfactual does not hold, because U.S. prices were rising before the Petition was filed and would have continued to rise with or without the Petition. During the first half of 2020, strong demand in India and Brazil and lower supply from China and India drove increases in global and U.S. prices alike.[76] Prices kept rising post-Petition, not just in the U.S. market but globally, driven by continued demand growth in India and Brazil and soaring crop prices.[77] Thus, global demand fundamentals would have continued to lift U.S. prices even if the Petition had not been filed and subject imports had remained in the U.S. market. The

---

[71] *Chr. Bjelland Seafoods A/S v. United States ("Salmon II")*, 19 C.I.T. 35, 43 n. 22 (Ct. Int'l Tr. 1995) ("{A} finding of 'present' injury must reference a time period which is as nearly contemporaneous to vote day as possible and for which reliable record evidence is available . . . ."); *Nucor Corp. v. United States*, 318 F. Supp. 2d 1207, 1224 (Ct. Int'l Tr. 2004) (ITC reasonably focused on interim 2002 imports in reaching a negative determination even though data from earlier in the POI (1999-2001) served as a "historical frame of reference").

[72] Prelim. Staff Rep. at II-11; [        ] U.S. Importer Questionnaire at III-13 ([

]).

[73] OCP Posthr'g Br., Att. C, Rahm Decl. at Figures 3 and 4.

[74] Staff Rep. at Table D-1 (corrected inventory data showing Q3 2020 inventory at [

]); *id.* at VII-18 n.14 (explaining inventory data corrections, consistent with OCP Prehr'g Br., Att. A-6).

[75] *See, e.g.*, Tr. at 107 (Mr. McLain, referring to post-Petition as a "natural experiment" without subject imports); Simplot Posthr'g Br., Ex. 4, ¶ 5 (asserting that post-Petition developments show "the market clearly thinks that there is a correlation between the presence of subsidized imports and prices").

[76] *See* OCP Posthr'g Br., Q&A at Q11.

[77] *See id.*, Q&A at Q12.

APPX0020221

principal effect of the Petition on U.S. prices was to widen the NOLA premium, but that premium grew only because of the exacerbated shortfall in domestic supply.[78]

If anything, post-Petition developments underscore the weakness in domestic producers' pre-Petition injury narrative. Faced with a U.S. market desperate for supply in interim 2020 given the withdrawal of subject imports from the market, Mosaic's [                    ] in U.S. shipments between interim 2019 and interim 2020 is telling.[79] *First*, it shows that Mosaic's [                ] capacity [                ] is significantly overstated: between the interim periods, Mosaic [                                ].[80] The domestic industry as a whole purportedly [                                ], but it [                    ] between the interim periods by [                ].[81] If the domestic industry truly had as much "excess" capacity as it claimed, it would have taken advantage of the golden opportunity to increase domestic production and shipments to a far greater degree. *Second*, the experience of 2020 confirms what Mosaic has labored to avoid admitting: Brazil is Mosaic's strategic focus, not a market of last resort. Even with U.S. prices at historically high levels, Mosaic favored exports to Brazil over the opportunity for much higher U.S. sales volumes.[82] *Third*, the domestic supply gap is real. Without subject imports, and with the domestic industry unwilling or unable to meet customer needs, the U.S. market is now pulling in nonsubject imports in record volumes,[83] as Mosaic is finding it more profitable to import from its Saudi joint

---

[78] *Id.*

[79] Mosaic Prehr'g Br. at 97 (citing Mosaic U.S. Producer QR at IV-16).

[80] Staff Rep. at Table III-4.

[81] *Id.*

[82] OCP Posthr'g Br., Att. C, Rahm Decl. at Figures 3 and 4 (showing dramatic rise in NOLA index starting in July 2020). Other factors driving Mosaic to export include rapid demand growth, the development of specialized products for Brazil and Canada, and the need to service its distribution investments in Brazil. *See* OCP Posthr'g Br., Q&A at Q2; Tr. at 257 (Mr. McMullin); *see also id.* (Mr. Lambert); Tr. at 120 (Mr. Jung).

[83] OCP Prehr'g Br., Ex. 17 (showing projected U.S. imports by country of origin for Q1 2021).

APPX0020222

venture than to even consider reopening Plant City.[84]

As a final point, the post-Petition period also helps demonstrate why there is no threat of material injury by reason of subject imports. The recovery of the U.S. market began in early 2020 and continued post-Petition for reasons unrelated to subject imports, and this trend will not change in the imminent future. Mosaic effectively concedes there is no threat of material injury, as it did not address threat at the Hearing or in its posthearing brief.[85] Simplot makes generic threat claims without engaging any facts or arguments put on the record by OCP.[86] Absent any evidence to the contrary, the Commission can be assured that a return of subject imports to the U.S. market will merely fill the same need as during the POI, without any adverse volume or price effects, and will not negatively impact the domestic industry's development or production. Consequently, the domestic industry is neither materially injured nor threatened with material injury by reason of subject imports.

*          *          *

For the reasons stated above, on behalf of OCP S.A., we urge the Commission to issue a negative determination.

Dated: March 8, 2021

Respectfully submitted,
/s/ *Shara L. Aranoff*
**COVINGTON & BURLING LLP**
*Counsel to OCP S.A.*

---

[84] OCP Posthr'g Br., Q&A at Q13; OCP Prehr'g Br., Ex. 28; Tr. at 123-24 (Mr. O'Rourke).

[85] The timing of OCP's future capacity additions in Mosaic's prehearing brief is outdated. *See* Mosaic Prehr'g Br. at 99-100. OCP provided updated timing in its prehearing brief and Hearing testimony, *see* OCP Prehr'g Br. at 120-121 and Tr. at 186, but Mosaic does not discuss threat at all in its posthearing brief, where it simply states in one footnote that it requests an affirmative determination even "{i}f {the Commission} does reach threat." Mosaic Posthr'g Br. at 15, n.98.

[86] On threat, Simplot merely argues that subject producers have new capacity, projected inventory, and exports to the U.S. market—utterly ignoring that the world has lots of farmers. *See* Simplot Posthr'g Br. at 14. As OCP has explained, its new capacity is anticipated to come online between late 2022 and 2025, which is not "imminent," and will serve demand growth in non-U.S. markets, but neither Simplot nor Mosaic has engaged these arguments. *See* OCP Prehr'g Br. at 116–17 (explaining that the appropriate "imminence" timeframe in this industry is one year in the future), 120–21 (stating that OCP's new capacity is intended to serve demand in Africa, Latin America, and South and Southeast Asia); Tr. at 184 (Mr. Ameziane, testifying that the United States is "not a market that OCP looks to for growth" and that OCP's sales in the U.S. market "simply reflect {its} customers' stated needs").

15