Slip Op. No. 23-136

## UNITED STATES COURT OF INTERNATIONAL TRADE

OCP S.A.,

> *Plaintiff*,

EUROCHEM NORTH AMERICA CORPORATION,

> *Consolidated Plaintiff*,

> *and*

PHOSAGRO PJSC, INTERNATIONAL RAW MATERIALS LTD., and KOCH FERTILIZERS LLC,

> *Plaintiff-Intervenors*,

v.

UNITED STATES,

> *Defendant*,

> *and*

THE MOSAIC COMPANY and J.R. SIMPLOT COMPANY,

> *Defendant-Intervenors*.

Before: Stephen Alexander Vaden, Judge

Consol. Court No. 21-00219

## <u>OPINION</u>

[The Determination of the United States International Trade Commission is remanded in conformity with this opinion.]

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 2 of 50

Consol. Court No. 1:21-cv-00219                                    Page 2

Dated:  September 19, 2023

*Shara L. Aranoff*, Covington & Burling LLP, of Washington, DC, for Plaintiff OCP S.A.  With her on the brief are *James M. Smith*, *Victor D. Ban*, *Sooan (Vivian) Choi*, *Caroline Garth*, and *Kwan Woo (Kwan) Kim*.

*Peter Koenig*, Squire Patton Boggs LLP, of Washington, DC, for Consolidated Plaintiff EuroChem North America Corporation.  With him on the brief is *Jeremy W. Dutra*.

*Paul C. Rosenthal*, Kelley Drye & Warren LLP, of Washington, DC, for Plaintiff-Intervenor.  With him on the brief is *Melissa M. Brewer*.

*Courtney S. McNamara*, Attorney-Advisor, Office of the General Counsel, International Trade Commission, of Washington, DC, for the Defendant United States.  With her on the brief are *Dominic L. Bianchi*, General Counsel, and *Andrea C. Casson*, Assistant General Counsel for Litigation of the International Trade Commission.

*Stephanie E. Hartmann,* Wilmer Cutler Pickering Hale and Dorr LLP, of Washington, DC, for Defendant-Intervenor Mosaic Company.  With her on the brief are *Jeffrey I. Kessler*, *Patrick J. McLain*, *Alexandra Maurer,* and *David J. Ross*.

*Stephen P. Vaughn* and *Jamieson L. Greer*, King & Spalding LLP, of Washington, DC, for Defendant-Intervenor the J. R. Simplot Company.  With them on the brief is *Clinton R. Long*.

*John R. Magnus*, TradeWins LLC, of Washington, DC, for *amici curiae* American Soybean Association, National Cotton Council of America, National Sorghum Producers, and Agricultural Retailers Association.

**Vaden, Judge:**  Before the Court is a Motion for Judgment on the Agency Record, pursuant to United States Court of International Trade (USCIT) Rule 56.2, submitted by Plaintiff OCP S.A. (OCP) on its own behalf and on behalf of Consolidated Plaintiff EuroChem North America Corporation (EuroChem).  *See* Pl.'s Mot. for J. on the Agency R., ECF No. 56 (Pl.'s Br.).  Plaintiff's Motion, supported by Plaintiff-Intervenors PhosAgro PJSC (PhosAgro), International Raw Materials Ltd. (International Raw Materials), and Koch Fertilizer, LLC (Koch), contests the

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 3 of 50

Consol. Court No. 1:21-cv-00219                                    Page 3

affirmative material injury determinations of the United States International Trade Commission (the Commission) in its final determinations in the countervailing duty investigations in *Phosphate Fertilizers from Morocco and Russia* published in the *Federal Register* on April 5, 2021. 86 Fed. Reg. 17,642 (ITC Apr. 5, 2021). *See* Pl.-Int. PhosAgro's Mot. for J. on the Agency R., ECF No. 66; Pl.-Int. International Raw Materials' Mot. for J. on the Agency R., ECF No. 77; Pl.-Int. Koch's Mot. for J. on the Agency R., ECF No. 75. The Commission opposes Plaintiff's Motion, requesting the Court sustain its determinations. Def. ITC's Opp'n to Pl.'s Mot. for J. on the Agency R., ECF No. 102 (Def.'s Br.). Defendant-Intervenors the Mosaic Company (Mosaic) and J.R. Simplot Company (Simplot) join the Commission in opposing Plaintiff's Motion.[1] *See* Def.-Int. Mosaic's Resp. Br. in Opp'n to Pl.'s Rule 56.2 Mot. for J. on the Agency R., ECF No. 101; Def.-Int. Simplot Resp. Br. in Opp'n to Pl.'s Mot. for J. on the Agency R., ECF No. 98. The Plaintiffs bring multiple challenges against the Commission's determination. Because one factually unsupported finding undergirds the Commission's determination across all statutory factors, the Court addresses that error only. Any consideration of other issues will come after the Commission's redetermination on remand should they remain relevant. The Court therefore **GRANTS** Plaintiffs' Motions for Judgment on the Agency Record and **REMANDS** this matter to the Commission for further proceedings consistent with this opinion.

---

[1] Because the relevant arguments are all taken from Plaintiff OCP's Motion, the Court will generally refer to the Motions using the singular Plaintiff's Motion. The arguments, however, cover all named Plaintiffs. Plaintiff OCP has standing to challenge the results of Inv. No. 701-TA-650, and Consolidated Plaintiff EuroChem has standing to challenge the results of Inv. No. 701-TA-651.

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 4 of 50

Consol. Court No. 1:21-cv-00219                                          Page 4

## BACKGROUND

### I.  Factual Record

Phosphate fertilizer is one of the key ingredients that allows modern agriculture to efficiently feed the world.  It facilitates photosynthesis — the process by which plants use sunlight, water, and carbon dioxide to create oxygen and energy. *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651, USITC Pub. 5172 (Mar. 2021) (ITC Final Determination) at 7, 14, J.A. at 20,571, 20,578, ECF No. 116.  Farmers' need for phosphate fertilizer fluctuates because variations in weather impact the number of acres that farmers can cultivate.  *Id.*  Fewer plants need less fertilizer.  ITC Final Determination at I-10, II-14, J.A. at 20,644, 20,664, ECF No. 116; *Staff Report – Final and Preliminary* (Staff Report) at I-10, I-15, J.A. at 98,390, 98,411, ECF No. 107.

Demand for phosphate fertilizer is also influenced by economic speculation on the prices of major crops.  When agricultural commodities are expected to be less valuable, fewer of them are grown, requiring less fertilizer.  Further complicating any measurement of demand is the brief period that farmers have to apply fertilizer before spring planting and after harvest.  ITC Final Determination at 16, J.A. at 20,580, ECF No. 116; Views at 20–21, J.A. at 99,590–91, ECF No. 107; *Hearing Transcript* (Hearing) at 204–05, J.A. at 17,668–69, ECF No. 116; *Pre-Hearing Brief of EuroChem North America Corporation, Public Version* (Feb. 4, 2021) (EuroChem Pre-Hearing Pub. Br.) at attach. B:2–3, J.A. at 11,821–22, ECF No. 111; *Pre-Hearing Brief of EuroChem North America Corporation, Confidential* (Feb. 3, 2021)

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 5 of 50

Consol. Court No. 1:21-cv-00219                                    Page 5

(EuroChem Pre-Hearing Confidential Br.) at attach. B:2–3, J.A. at 91,792–93 (discussing a two-week "peak period"), ECF No. 107. The predictability of fertilizer application windows — assuring that the "peak period" is struck — varies with the region, crops, and weather, among other factors. Missing these brief windows prevents effective application of fertilizer, curtailing demand. *Pre-Hearing Brief of OCP S.A., Public Version* (Feb. 4, 2021) (OCP Pre-Hearing Pub. Br.) at 7, J.A. at 13,933, ECF No. 113; *Pre-Hearing Brief of OCP S.A., Confidential* (Feb. 3, 2021) (OCP Pre-Hearing Confidential Br.) at 15, J.A. at 88,573, ECF No. 107. Distributors and retailers attempt to build inventory in the months preceding the spring and fall application seasons, as buyers project their needs for the upcoming seasons, often submitting orders three to six months in advance. ITC Final Determination at I-10, J.A. at 20,664, ECF No. 116; Staff Report, J.A. at 98,411, ECF No. 107; *Response to U.S. Importers' Questionnaire of The Mosaic Company* (Mosaic Questionnaire Response) at 47, J.A. at 87,369, ECF No. 107; *Response to U.S. Importers' Questionnaire of Koch Fertilizer, LLC*, (Koch Questionnaire Response) at 46, J.A. at 87,621, ECF No. 107; EuroChem Pre-Hearing Pub. Br. at attach. B:1, J.A. at 11,820, ECF No. 111; EuroChem Pre-Hearing Confidential Br. at attach. B:1 J.A. at 91,791, ECF No. 107 (fertilizer purchases made "usually six months in advance to ensure adequate supply"); *Post-Hearing Brief of International Raw Materials Ltd., Public Version* (Feb. 18, 2021) (Int'l Raw Materials Post-Hearing Pub. Br.) at Ex. 5:2, J.A. at 16,158, ECF No. 115; *Post-Hearing Brief of International Raw Materials, Ltd.,*

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 6 of 50

Consol. Court No. 1:21-cv-00219                                                    Page 6

*Confidential* (Feb. 17, 2021) (Int'l Raw Materials Post-Hearing Confidential Br.) at Ex. 5:2, J.A. at 96,305, ECF No. 107;  Hearing at 228, J.A. at 17,692, ECF No. 116.

The domestic supply chain for fertilizer reflects these realities.  ITC Final Determination at 16, II-1, J.A. at 20,580, 20,651, ECF No. 116; Staff Report at II-1, J.A. at 98,397, ECF No. 107; Views at 20–21, J.A. at 99,590–91, ECF No. 107.  Three corporations are responsible for the overwhelming majority of U.S. phosphate fertilizer production:  Mosaic, Nutrien, and Simplot.  Staff Report at III-1, J.A. at 98,429, ECF No. 107; Views at 23, J.A. at 99,593, ECF No. 107.  A steady supply is necessary because farmers are unsure of exactly when they will need phosphate fertilizer and what volume they will require.  ITC Final Determination at II-18, J.A. at 20,668, ECF No. 116; Staff Report at II-20, J.A. at 98,416, ECF No. 107; Hearing at 202, J.A. at 17,666, ECF No. 116.  A web of distributors convey the product from manufacturers to co-ops and other agricultural retailers who sell to individual farmers for application on their fields.  Mosaic Questionnaire Response at 10, J.A. at 87,442, ECF No. 107; Koch Pre-Hearing Pub. Br. at Ex.6, J.A. at 9,910, ECF No. 110; Koch Pre-Hearing Confidential Br. at Ex.6, J.A. at 91,771, ECF No. 107.  Sellers cannot delay their stocking decisions to correspond to farmer demand because delay in ordering would prevent the product from arriving by the time it is needed.  ITC Final Determination at 16, II-16, J.A. at 20,580, 20,666, ECF No. 116; Views at 20–21, J.A. at 99,590–91, ECF No. 107; Staff Report at II-17, J.A. at 98,413, ECF No. 107; *Pre-Hearing Brief of Koch Fertilizer, LLC, Public Version* (Feb. 4, 2021) (Koch Pre-Hearing Pub. Br.) at Ex.6, J.A. at 9,910, ECF No. 110; *Pre-Hearing Brief of Koch*

*Fertilizer, LLC, Confidential* (Feb. 3, 2021) (Koch Pre-Hearing Confidential Br.) at Ex.6, J.A. at 91,771, ECF No. 107.  Redundancy of supply remains the cheapest and most effective means to hedge against potential delays.  Hearing at 184, 202, J.A. at 17,648, 17,666, ECF No. 116; *Koch Witness Testimony* at Ex. 1:1, J.A. at 3,684, ECF No. 109.

During the Commission's investigation into whether the domestic fertilizer industry was materially injured by reason of subject imports between January 2017 and September 2020, two major developments impacted the phosphate fertilizer market.  None of the parties dispute these developments.  They do, however, dispute their implications.

First, during the initial two years of the period of investigation, domestic producers closed facilities resulting in decreased fertilizer production.  In December 2017, Mosaic shuttered its two-million-ton production facility in Plant City, Florida.  Views at 23, J.A. at 99,593, ECF No. 107.  Following this shutdown, Mosaic's CEO stated that its decision "opened a hole for some imports to increase . . . . So we gave up 1 million tonnes of market here in the U.S. intentionally."  OCP Prehearing Br., Ex. 11 at 30–31, J.A. 12,655–56, ECF No. 112.  Nutrien increased production capacity between 2017 and 2018 but closed its Redwater, Canada facility in May 2019.  Views at 24, J.A. at 99,594, ECF No. 107.  Over the course of 2019, Mosaic temporarily idled facilities in Louisiana and Barstow, Florida, leading to additional production curtailments.  *Id.* at 23, J.A. at 99,593.

Case 1:21-cv-00219-SAV    Document 141    Filed 09/19/23    Page 8 of 50

Consol. Court No. 1:21-cv-00219                                                    Page 8

Second, starting in fall 2018, abnormally high rainfall resulted in "massive flooding and prolonged river closures along the Mississippi River system that stranded fertilizer barges and resulted in delayed, destroyed or abandoned plantings, especially in the Midwest and Great Plains regions." Views at 40, J.A. at 99,610, ECF No. 107. This extreme weather affected three consecutive fertilizer application seasons and caused a large decrease in demand for fertilizer, negatively impacting prices and leading to a rise in inventories that lasted through 2019. ITC Final Determination at 17, 33, J.A. at 20,581, 20,597, ECF No. 116; Views at 21, 43, J.A. at 99,591, 99,613, ECF No. 107. Like their domestic counterparts, foreign suppliers reduced their production and shipments to the United States. ITC Final Determination at IV-3, J.A. at 20,697, ECF No. 116; Staff Report at IV-3, J.A. at 98,445, ECF No. 107 (reduction in import volumes). Once normal weather returned in the spring of 2020, these trends reversed. Post-Hearing Brief of OCP S.A., Public Version (Feb. 18, 2021) (OCP Post-Hearing Pub. Br.) at 69, J.A. at 16,548, ECF No. 116; Post-Hearing Brief of OCP S.A., Confidential (Feb. 22, 2021) (OCP Post-Hearing Confidential Br.) at 69, J.A. at 97,757, ECF No. 107.

## II. The Present Dispute

Mosaic submitted petitions to the Department of Commerce (Commerce) and the Commission on June 26, 2020, asserting that subsidized imports from Morocco and Russia materially injured the U.S. fertilizer industry. *Views of the Commission* (Views), J.A. at 99,573, ECF No. 107. After receiving the petition, the Commission set the scope of its investigation. It first decided its period of investigation would

encompass January 2017 to September 2020.[2]  *Id*.  Second, the Commission defined the domestic like product as phosphate fertilizer and excluded other types of fertilizer from the investigation.  *Id*. at 4–16, J.A. at 99,574–86.  Third, the Commission described the domestic industry under investigation as including all producers of phosphate fertilizers in the United States as well as cumulated subject imports from Morocco and Russia.[3]  *Id*.  The Commission then sought and received domestic industry data — provided through questionnaires sent to and received from Nutrien, Simplot, and Mosaic — that were collectively responsible for the vast majority of U.S. phosphate fertilizer production during the period of investigation.  Staff Report at III-1, J.A. at 98,429, ECF No. 107; Views at 23, J.A. at 99,593, ECF No. 107.  On February 9, 2021, the Commission conducted a hearing with interested parties (the Hearing), received pre-Hearing and post-Hearing briefs from these parties, and collected its findings in a Staff Report published on February 26, 2021.  On April 5, 2021, the Commission determined by majority vote that the domestic phosphate fertilizer industry had been materially injured by reason of subject imports and laid out its reasoning in the Views of the Commission.  One Commissioner dissented.

To determine whether subject imports caused material injury to domestic industry in the United States, the Commission considers three statutory factors — the volume of subject imports, the effect of such imports on prices, and the economic

---

[2] The Commission's report ultimately contained full sets of collected data for 2017, 2018, and 2019; the same document incorporated data comparing the first nine months of 2019 with the same calendar months of 2020.  Views at 3, J.A. at 99,573.
[3] Throughout this opinion, discussion of "subject imports" refers to cumulated subject imports.

Case 1:21-cv-00219-SAV    Document 141    Filed 09/19/23    Page 10 of 50

Consol. Court No. 1:21-cv-00219                                        Page 10

impact of subject imports on the domestic industry. *See* 19 U.S.C. § 1677(7)(C)(i)–(iii). Regarding volume, the Commission determined that imports of subject merchandise underwent a significant increase in both absolute terms and relative to consumption in the United States. Views at 33–35, J.A. at 99,603–05, ECF No. 107. In an analysis totaling 311 words, exclusive of footnotes, the Commission found that imports "increased from 2.0 million short tons in 2017 to 3.0 million short tons in 2018, before decreasing to 2.7 million short tons in 2019, for an overall increase of 37.4 percent between 2017 and 2019" but that subject imports "were lower in interim 2020 at 1.2 million short tons than in interim 2019 at 2.0 million short tons." *Id.* at 33–34, J.A. 99,603–04. The Commission further found that subject imports gained market share relative to the domestic like product by making up a larger share of declining U.S. consumption during the period of investigation. *Id.* at 34–35, J.A. 99,604–05.

The Commission's analysis of price effects was more extensive. In accordance with 19 U.S.C. § 1677(7)(C)(ii), the Commission considered both whether the price of subject imports significantly undersold domestic prices and whether the effect of imports otherwise depressed prices or prevented price increases. The Commission's pricing data demonstrated that, in the vast majority of instances (136 of 170 instances, or 80%), subject imports actually sold at a higher price than the domestic like product. Views at 37, J.A. at 99,607, ECF No. 107. Nonetheless, the Commission found that "prices of the domestic like product and subject imports tracked each other closely" and that "subject imports and the domestic like product were similarly

priced[.]"  *Id.*  In the absence of significant underselling, the Commission instead found that subject imports depressed prices because their "significant volumes created oversupply conditions in a declining market and low prices[.]"  *Id.* at 44, J.A. at 99,614.  The Commission explained its interpretation of the record:

> The record shows that significant volumes of subject imports entered the U.S. market between 2017 and 2018 and remained at elevated levels in 2019 despite a significant demand decline due to what an OCP witness characterized as "Black Swan" level rainfall beginning in the fall of 2018 and lasting through 2019 . . . . Apparent U.S. consumption of phosphate fertilizers declined from 2018 to 2019 . . . . Yet notwithstanding these market conditions, subject imports continued to enter the market, and U.S. shipments of subject imports increased by 300,000 short tons (6.2 percent) between 2018 and 2019. As a result, U.S. shipments of subject imports exceeded demand, and shipments of subject imports increased their share of the market at the expense of the domestic industry and nonsubject imports. U.S. importers' inventories of subject imports in 2018 and 2019 remained at elevated levels compared to 2017.

Views at 40–43, J.A. at 99,610–13, ECF No. 107.  Because foreign producers continued to export despite declining demand, the Commission concluded that subject imports, rather than the weather, were responsible for price depression.  *See id.* at 45, J.A. at 99,615 (concluding that "the record as a whole shows that subject imports contributed significantly to oversupply conditions in a declining market" and that "[a]lthough U.S. prices began to increase in the beginning of 2020 as weather conditions improved, they remained at levels lower than those that existed in 2017 and 2018 until after the filing of the petitions at the end of June 2020[.]").

The cause of oversupply conditions in the U.S. market during 2018 and 2019 was hotly disputed by the parties to the Commission's investigation.  During the Hearing, Commissioner Rhonda Schmidtlein engaged in an extended colloquy with

fertilizer distributors regarding whether the oversupply was best attributed to unpredictable weather conditions or increasing volumes of subject imports:

> COMMISSIONER SCHMIDTLEIN: Given the unusually wet weather conditions that everyone agrees had an impact on demand and the already high inventory levels for both domestic producers and subject imports, why did imports continue to increase from 2018 to 2019 even though the bad weather had already started at the end of 2018?

Hearing at 222–23, J.A. 15,718–19, ECF No. 115. Distributor representatives answered that imports continued to enter the U.S. because of demand projections that were frustrated by the bad weather:

> NIEDERER:[4] [I]t's a little bit like watching a boat stop or a train wreck . . . it takes a lot of time to stop the imports, the import process, if you will, from the time you procure a vessel, get to port, and bring it here, the contracts that go into making that . . . we anticipated having a good spring of '19. We felt there was pent-up demand from the fall of 2018, and so you anticipate alleviating your inventories. And so you still make preparations for what would be a normal consumption for a year because a plant still needs a certain amount put down on the ground. And the unfortunate thing was we had unprecedented levels of moisture during the spring.

*Id.* at 223-24, J.A. at 15,719–20; s*ee also* Koch Fertilizer Post-Hearing Br. at 12–13, J.A. at 96,123–24, ECF No. 107 (noting that "imports that arrived in Q1 2019 were ordered in Q4 2018 in anticipation of strong spring 2019 demand" but that "imports declined once the extent of the spring 2019 flooding was understood"). The record indicated that subject imports into the United States were higher in the first quarter of 2019 compared to the equivalent period in 2018 but declined overall in 2019 compared to 2018. *See* Staff Report at IV-13–14, J.A. at 98,455–56, ECF No. 107 (recording 1,083,021 short tons of subject imports in January–March 2018 compared

---

[4] Jake Niederer, Director of Sales and Marketing, Archer Daniels Midland Company

to 1,415,262 short tons in the same period of 2019); Views at 33, J.A. at 99,603, ECF

No. 107 (recording 3.0 million short tons of subject imports overall in 2018 and 2.7

million short tons in 2019).  Distributors further argued that imports continued to fill

demand projections in early 2019 because of the lack of available supply from

domestic producers following announced facility closures:

> Distributors were planning for a normal spring season in 2019, and they
> were planning for this after Mosaic had closed Plant City and taken
> roughly one-and-a-half million tons out of supply.  At the same time,
> Nutrien in January of 2018 had indicated they were closing their
> Redwater, Alberta plant . . . . So the question coming back, why did these
> imports continue to increase, you know, I think the short answer is
> there's this gaping hole in supply left by the closure of both the Plant
> City and the Redwater, Alberta plant.  Combined, those were roughly 2
> million tons of product.  And so, when distributors were planning for the
> spring, a normal spring season, there was a big hole to fill, and most
> importantly, the market was calling for those tons.

Hearing at 229, J.A. at 15,725, ECF No. 115.[5]

That did not explain, however, why future demand could not be satisfied from

excess domestic inventory that had begun accumulating in 2018 rather than subject

imports.  Commissioner Schmidtlein asked "how [can we] square [new imports],

though, with the fact that you had excess capacity in the U.S. industry and that the

U.S. industry was sitting on increasing inventories of a substantial amount."  *Id.* at

230, J.A. at 15,726.  The distributors responded with a key point — the flooding had

affected demand in some regions but not others, and it was not feasible to move

fertilizer within the United States once it had already arrived at its location.  Instead,

---

[5] The Hearing transcript did not identify the speaker by name.

the economics of the supply chain mandated new imports rather than domestic
reshipment:

> NIEDERER: What I tried to qualify earlier is that as you had this
> product in inventory up in certain locations throughout the U.S., not
> everywhere was wanting in on that. So you had some terminals coming
> back open needing supply, and so that's why myself and others in the
> distribution business would begin to import again. *While you may have
> high inventory in one market, you need inventory in another market. It's
> cost-prohibitive to move it from that location to another.* That was the
> big reason for us to import again, and also it seem[ed] that we had gone
> through those weather events and demand was starting to recover.

*Id.* at 230-231, J.A. at 15,726–27 (emphasis added). The infeasibility of domestic

reshipment, requiring new imports to fill projected demand, was repeated throughout

the Hearing:

> LAMBERT:[6] In western Canada, in the northern plains, and in the
> delta at that point, the product is misplaced. So you had product, it got
> trapped. *It couldn't get to the right location and in order to fill in the
> new needs for new demand, the only way to accurately do it and
> economically do it is to bring in fresh product* . . . if you order a pair of
> shoes from Amazon and they ship it to China, is it cheaper for them to
> send those shoes back from China or is cheaper to send a new pair of
> shoes from a location in Las Vegas to wherever it may be in Missouri?

*Id.* at 264, J.A. at 15,760 (emphasis added).

> LAMBERT: [C]ustomers in the United States that don't have the ability
> to purchase from Mosaic have to make plans to bring product to
> facilitate for their customers. And those vessels were coming. And once
> they're on their way, they're coming here. Product is moving up-river.
> So it's sitting in barges, moving up-river, waiting for the normal river
> open period when it can reach the end destination. And when flooding
> occurs, it obviously logistically makes a different ball game. And then,
> once you get product north, once it was allowed, the rivers subsided and
> product was moved north, *it's prohibitive to move a barge from
> Minneapolis-St. Paul back down to Mississippi. Just the economics don't
> allow it. And so, in order to facilitate the needs for the farmers in the*

---

[6] Donal Lambert, President, EuroChem North America

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 15 of 50

Consol. Court No. 1:21-cv-00219                                    Page 15

*delta, you would bring in more product.*  It's much more economical to
do that versus bring back product southbound on the river.

*Id.* at 227, J.A. at 15,723 (emphasis added).

The parties emphasized this point in their post-Hearing briefs, which cited

prohibitive freight rates required to move product within the United States after it

had arrived at its destination.  *See, e.g.*, EuroChem Post-Hearing Br. at 10

(contrasting Mississippi barge rates of $18 per short ton with rail rates of $60-80 per

short ton and $35 per short ton to reship back down the Mississippi and noting that,

"[g]iven Mosaic's refusal to supply, the only economical option was to bring more

product to meet the demand of customers . . . . Absent the imports, there would have

been a shortage in the South Plains and Delta markets, and many customers would

not have had access to phosphate fertilizers."); OCP Post-Hearing Confidential Br. at

29–30, J.A. at 16,508–09, ECF No. 116 ("Shipping back downriver is prohibitively

expensive, and in other cases, river closures made reallocating supply impossible.

The upshot was that it was more economical for 'misplaced' or 'trapped' inventories

to be kept in place in certain areas to await improved demand, and to 'bring in fresh

product' to meet new demand elsewhere.").

The Commission took little notice of the parties' argument that it was cost-

prohibitive to reship fertilizer within the United States.  The Commission instead

found that domestic reshipment was a possible solution to weather related demand

disruptions.  In a footnote, it summarized the issue:

> Respondents blame the oversupply conditions on demand projections
> that failed to materialize . . . . Regardless of the reasonableness of any
> demand projections, the record supports that importers' import levels

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 16 of 50

Consol. Court No. 1:21-cv-00219                                            Page 16

and inventories exceeded demand and contributed to an oversupply of the U.S. market. *U.S. importers continued to import subject phosphate fertilizers because it was more "economical" to do so rather than pay U.S. inland freight to move existing inventories.*

Views at 43, J.A. at 99,613, ECF No. 107 (emphasis added). Having attributed the oversupply conditions to subject imports continuing to enter the United States in 2019 despite declining demand, the Commission concluded its price analysis with the finding that "the record as a whole shows that subject imports contributed significantly to oversupply conditions in a declining market and had significant price-depressing effects on prices in the U.S. market in 2019." *Id.* at 45, J.A. at 99,615.

Finally, the Commission evaluated "all relevant economic factors which have a bearing on the state of the industry," including, but not limited to, output, sales, inventories, capacity utilization, market share, employment, wages, productivity, profits, cash flow, return on investment, ability to raise capital, research and development, and factors affecting domestic prices. 19 U.S.C. § 1677(7)(C)(iii); Views at 48, J.A. at 99,618, ECF No. 107. The statute requires the Commission to consider these factors "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii). The Commission generally found that these indicators declined between 2017 and 2019. *See* Views at 49–52, J.A. at 99,619–22, ECF No. 107 (finding that the domestic industry's "output indicators declined from 2017 to 2019 but were higher in interim 2020 than in interim 2019"; U.S. shipments declined between 2017 and 2019 but were higher in interim 2020; employment indicators "also declined between 2017 and

2019"; and financial indicators "increased between 2017 and 2018, but deteriorated in 2019").

In its impact analysis, the Commission returned to its oversupply theory, stating that:

> Subject imports continued to enter the U.S. market at elevated levels in 2019 even as demand declined in the second half of 2018 through 2019 . . . . Due to the downward pricing pressure exerted by the oversupply of subject imports on U.S. prices, the domestic industry was forced to reduce prices, which in turn, caused its revenues to be lower than they would have been otherwise.  The domestic industry's sales revenues declined between 2018 and 2019 along with its profitability . . . . As a consequence, we find that subject imports had a significant impact on the domestic industry.

*Id.* at 52–53, J.A. at 99,622–23.  The Commission noted that it considered "arguments that the domestic industry's poor performance was not caused by subject imports, but rather was the result of other factors," namely, "declining U.S. demand in 2019 due to unusually poor weather conditions."  *Id.* at 53, J.A. at 99,623.  However, the Commission discounted that explanation because imports had increased despite declining demand, explaining that "as record-setting precipitation impacted three planting seasons in a row beginning in the fall of 2018, the volume of subject imports persisted beyond levels demanded, resulting in a substantial buildup of U.S. importer inventories of subject imports and an oversupply condition in the U.S. market."  *Id.* at 55–56, J.A. at 99,625–26.  In a footnote to that statement, the Commission once again asserted that domestic product could have been reshipped to address regional demand instead of requiring new imports:

> Respondents argue that product was necessary to serve demand in U.S. regions unaffected by the poor weather conditions.  *However, this*

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 18 of 50

Consol. Court No. 1:21-cv-00219                                        Page 18

> *argument fails to explain why U.S. importers could not supply U.S.*
> *customers from its building inventories or from product that sat on*
> *barges on the Mississippi River system.* Indeed, as U.S. importers
> acknowledged, it was possible for the U.S. importers to do so, but that it
> was costly to move product by rail or back down the Mississippi River.
> Consequently, they chose to import more product.

*Id.* at 56 n.217, J.A. at 99,626 (emphasis added). The Commission concluded that

subject imports "had a significant impact on the domestic industry." *Id.* at 59, J.A.

at 99,629.

In rendering its Final Determination, the Commission found by a vote of four

to one that the phosphate fertilizer industry in the United States was materially

injured by reason of imports from Morocco and Russia. *Phosphate Fertilizers from*

*Morocco and Russia*, 86 Fed. Reg. at 17,642. Following these proceedings, Commerce

prepared and posted notice of countervailing duty orders on April 7, 2021. *Phosphate*

*Fertilizers from the Kingdom of Morocco and the Russian Federation: Countervailing*

*Duty Orders*, 86 Fed. Reg. 18,037 (Dep't of Com. Apr. 7, 2021). Plaintiff OCP appealed

the ITC's determination on May 6, 2021, commencing the present suit. Compl. ¶ 15,

ECF No. 10.

OCP's brief challenges each statutory element of the Commission's

investigation, arguing that its findings of significant volume, price effects, impact,

and injury causation were unsupported by substantial evidence. OCP drew the

Court's attention to the Commission's oversupply analysis, writing that the

Commission's volume determination "rest[s] on unsupported subsidiary findings

regarding subject import inventories," in particular that "subject imports that

resupplied regions unaffected by adverse weather constituted excess supply." Pl.'s

Br. at 16–17, ECF No. 56.   OCP faulted the Commission for asserting that respondents "'failed to explain why U.S. importers could not supply U.S. customers' in such regions by relocating fertilizer 'from its building inventories' in areas suffering reduced demand," and for "speculat[ing] that 'it was *possible* for the U.S. importers . . . to move product by rail or back down the Mississippi River' instead of buying imports." *Id.* at 17 (quoting Views at 41, 56, J.A. at 20,605, 99,626) (emphasis in original).   OCP argued that "the record made clear that it is cost-prohibitive to move product back down the Mississippi system.   Respondents put this evidence before the Commission and did not 'fail to explain' it.   Moreover, this evidence was uncontroverted."   *Id.*   OCP concluded that the Commission's assumption that "inventories anywhere in the U.S. should be available to supply other regions, such that imports were not needed, is unsupported by substantial evidence." *Id.* at 17–18.

OCP further argued that the Commission's wrongful assumption about the feasibility of reshipping domestic inventories broke the causal link between subject imports and adverse volume and price effects, despite 19 U.S.C. § 1677(7)'s requirement that material injury must be "by reason of" subject imports.   *See id.* at 43.   OCP faulted the Commission for "rel[ying] heavily on its finding that subject imports failed to adjust instantaneously — *e.g.*, through cancellation of orders or diversion of inventories to other regions — in response to demand disruptions across three seasons of historically wet weather."   *Id.* at 44.   OCP explained that inventories rose in 2019 "not because of an unwarranted import surge, but because demand projections proved spectacularly wrong" during the extended flooding.   *Id.* at 45.   In

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 20 of 50

Consol. Court No. 1:21-cv-00219                                        Page 20

support, OCP cited record evidence that "inventories cannot be relocated to geographic areas with higher demand"; "subject import entries fell sharply in late 2019 and early 2020 in response to the weather-related demand shock"; and "inventories of both domestic and imported fertilizers declined." *Id.*

The Commission's brief rejected these arguments and reiterated its position that the domestic market did not require additional imports in 2019. Def.'s Br. at 25, ECF No. 102. The Commission cited record evidence that inventories of subject imports were higher in 2018 and 2019 compared to 2017; but "[d]espite these elevated inventories, importers reported continuing to import additional fertilizers because it was more 'economical' than moving existing inventories[.]" *Id.* at 18. The Commission wrote that it "did not, as OCP claims, merely 'speculate that it was *possible* for the U.S. importers . . . to move product by rail or back down the Mississippi.' Rather, the Commission relied on the testimony of respondents' own witnesses, one of whom stated that it was simply 'much more economical' to import additional subject merchandise 'versus bringing back product southbound on the river.'" *Id.* at 26. The Commission cited record evidence that, it claimed, "establishes that fertilizer is routinely transported by rail" and that fertilizer was in fact shipped this way in response to flooding. *Id.* (citing J.A. 17,732, 98,466, 17,709–11, 17,719, and 17,721). The Commission's record evidence of this latter point — that domestic reshipment of inventories occurred in response to flooding — consisted of a statement at the Hearing made by David Coppess of Heartland, a farmers' cooperative:

> We have a terminal over in Nebraska City, Nebraska, that serve[s] northwest Missouri, southwest Iowa and Nebraska. We were

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 21 of 50

Consol. Court No. 1:21-cv-00219                                         Page 21

devastated.  26 feet of water.  It shut that facility down and it flooded
lots of acres.  But we still had 75 to 80 percent of our market share [that]
wasn't flooded.  And the farmers . . . were very aggressive yet about
trying to purchase fertilizer for the acres that were dry enough to plant
. . . .  And we had spot outages.  The river terminals were closed.  They
couldn't get resupply.  And we were crying for product from where we
could get it.  Primarily we had rail.  But mostly truck if we could find it
anywhere.  So there was spot shortage during that time period with
demand well within the central part of the corn belt that wasn't wet.

Hearing at 268, J.A. at 17,732, ECF No. 116.

On June 28, 2022, the Court held oral argument.  There, the parties devoted
considerable attention to whether record evidence demonstrated the feasibility of
reshipping domestic inventories in lieu of subject imports.   In particular, the Court
drew a distinction between the Commission's finding that such reshipment was
"possible" and whether there was evidence it had actually occurred:

THE COURT:  Can you tell me where in the record there is evidence
showing that it was a frequent occurrence in the fertilizer market for
people to ship fertilizer that had already been delivered to its intended
original destination and instead ship it somewhere else in the country?

MCNAMARA:  I don't know that this was something saying that there
was a frequent occurrence, but the Commission reasonably relied on the
information showing that there was — it's possible and there was —

THE COURT: Well now, let's stop there, you said "possible."  No one's
saying it's not possible . . . the statute says that you shall evaluate all
relevant economic factors . . . within the context of the business cycle
and conditions of competition that are distinctive to the affected
industry.  That seems to me to suggest not what's possible but what's
actually done.

Oral Arg. Tr. at 56:22–58:5, ECF No. 129.  In response, Commission counsel again
pointed to David Coppess's statement for record evidence "not just that it's possible,
there's evidence that it was done."  *Id.* at 58:8–9.

However, counsel for Defendant-Intervenor Mosaic later conceded that David Coppess's statement was not referring to the reshipment of fertilizer that had already reached its destination and sat in inventory but rather described measures to move fertilizer that had become stuck on river barges due to flooding:

> HARTMANN: Your Honor asked questions about is it — does the record show that fertilizer [that] has been delivered to a customer would ever be redirected, and I just want to clarify. The exchange that happened at the hearing . . . it wasn't about fertilizer that had actually been delivered to a customer, it was about fertilizer that was sitting on barges either at New Orleans or somewhere upward or — and couldn't move to customers' locations because parts of the river were shut down, and there was testimony from EuroChem witness as well as from a Heartland witness that in that scenario, they were trying to move around the river system by rail, by truck, because so much of the flooding caused the rivers to slow down.
>
> THE COURT: So what you're telling me is that the example to which the Commission was referring was an example to which whatever the final destination was, the fertilizer was inaccessible because of flooding, and in that instance they redirected it to somewhere that presumably was accessible?
>
> HARTMANN: Or that they could have.

*Id.* at 149:10–150:22. The Court continued to press for record evidence that reshipment of domestic inventories after delivery had ever occurred but instead only received references to "intermodal delivery" in which fertilizer sellers used multiple modes of transportation to initially deliver fertilizer to customers:

> HARTMANN: I believe the Commission was referring earlier to testimony by [Coppess] about how they couldn't get supply via rail — or via river because the flooding, so therefore, they had tried to get supply wherever they could, by rail or by truck. The EuroChem witness testified that product was moving upriver but got stuck, and because it would have been uneconomical to move via barge back down the river —
>
> THE COURT: They didn't do it.

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 23 of 50

Consol. Court No. 1:21-cv-00219                                          Page 23

> HARTMANN: — that's why they brought in new imports.
>
> THE COURT: Okay. So but would [it] be accurate to say that there is no evidence of there being a widespread practice of their redirecting it.
>
> HARTMANN: Your Honor, I think — and it would be accurate to say there's a widespread practice of intermodal delivery, meaning Mosaic, for example, can deliver via barge to rail or barge to truck, that is very common practice in this industry and something that could have been done to avoid the river flooding. I think it's accurate to say there's no record evidence that the importers chose to do that when faced with the widespread flooding in the Mississippi River, instead they brought in new imports to supply the delta region.

*Id.* at 152:3–153:14. It is on this record that the Court now considers whether the Commission's finding that the domestic phosphate fertilizer industry suffered material injury by reason of subject imports is supported by substantial evidence.

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c). The Court must assess the factual and legal findings underpinning the Commission's determinations and "hold unlawful any determination, finding or conclusion . . . unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 USC § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938). It must be "more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939). However, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being

supported by substantial evidence." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

This Court's review of the Commission's determination is limited to the administrative record that was before the agency. 19 U.S.C. § 1516a(b)(2)(A). To determine if substantial evidence exists, the Court considers "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). The Court assesses whether the Commission succeeded in putting forward a reasoned explanation by "mak[ing] the necessary findings and hav[ing] an adequate evidentiary basis for its findings." *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016) (internal citations omitted). To meet this threshold, the Commission must not only "examine the relevant data and articulate a satisfactory explanation for its action," it must also provide "a rational connection between the facts found and the choice made." *Id.*

## DISCUSSION

### I. Legal Background

The Commission is responsible for determining whether imports that have been sold for less than their fair value in the United States have materially injured a domestic industry. 19 U.S.C. § 1673d(b). "Material injury" is defined as a "harm which is not inconsequential, immaterial, or unimportant." § 1677(7)(A). When determining whether imports have caused material injury to a domestic industry, the

Commission is required to consider three factors:  (1) the volume of the imports,  (2) the effect of imports on prices of the domestic like product, and (3) the impact of imports on domestic producers of the like product.  19 U.S.C. § 1677(7)(B).  In considering these factors, the Commission must establish a "causal — not merely temporal — connection between the [less than fair value] goods and the material injury." *Gerald Metals, Inc. v. United States*, 123 F.3d 716, 720 (Fed. Cir. 1997).

The Commission does not analyze the statutory factors in a vacuum.  Under 19 U.S.C. § 1677(7)(C)(iii), the Commission "shall evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry."  Although the statute does not define the term "conditions of competition," the Commission's practice is to perform this analysis by making findings about U.S. market characteristics, U.S. purchasers, the supply chain, geographic distribution, demand trends, substitutability, purchasing patterns, elasticity, and other aspects of the market for the subject merchandise.  *See, e.g.*, Staff Report, J.A. at 98,397–428 (considering these factors).  "The Commission's findings regarding competition and market conditions must be supported by substantial evidence in the record."  *United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Serv. Workers Int'l Union, AFL-CIO, CLC v. United States*, 348 F. Supp. 3d 1328, 1333 (CIT 2018).  By ensuring that the Commission considers the characteristics and trends that shape the domestic industry, "the statute prevents the ITC from attributing to subject imports an injury

whose cause lies elsewhere." *Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1222 (2006).

The Commission "does not comply with its statutory mandate by simply describing various conditions of competition in isolation," but rather the Commission must apply its findings regarding the conditions of competition to its analysis of the three statutory factors: subject import volume, price effects, and impact on the domestic industry. *Altx, Inc. v. United States*, 26 CIT 709, 719 (2002); *see also Nucor Corp. v. United States*, 28 CIT 188, 207 (2004), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005) ("The material injury statute directs the ITC to evaluate all relevant economic factors (i.e. volume, price effects, and impact) 'within the context of the business cycle and conditions of competition that are distinctive to the affected industry.'"); *Nippon Steel Corp. v. United States*, 25 CIT 1415, 1420 (2001) (finding that "for the Commission's findings under section 1677(7)(C)(1) to be supported by substantial evidence, the Commission must analyze the volume and market share data in the context of conditions of competition"); *Hynix Semiconductor*, 30 CIT at 1220 (upholding the Commission's determination where it "examined both the business cycle and the unique conditions of the domestic industry in determining the impact of subject imports").

The Commission must analyze the conditions of competition on the basis of actual industry practices. When the Commission makes a finding on volume, price, or impact that is premised on speculation about industry conditions, that finding has not been "evaluate[d] . . . within the context of the business cycle and the conditions

of competition that are distinctive to the affected industry." 19 U.S.C.

§1677(7)(C)(iii); *see also Catfish Farmers of America v. United States*, 37 CIT 717, 733

(2013) ("[S]peculation does not amount to reasonable inference, as it provides no

factually-grounded basis for sustaining an agency's determination."). The opinion in

*Altx* confirmed this principle. In that case, the Commission considered whether the

volume of imports of circular seamless stainless steel hollow products was significant,

in accordance with § 1677(7)(C)(i). The Commission found that it was but separately

conceded that there was a large portion of the market "not supplied by the domestic

industry (either because of incapability or lack of viability)." *Altx*, 26 CIT at 717.

Although the Commission had not established that the imported products were in

fact available from domestic sources, the Commission nonetheless argued that import

volumes could still be significant if "the domestic industry is *capable* of producing a

particular product type, even if for practical considerations it does not produce it in

any significant quantity." *Id.* at 718 (emphasis in original).

The Court rejected this reasoning. It first found that the Commission had

failed to "indicate any evidence from which the court may discern whether the

increases in volume of subject imports it deemed significant . . . can be attributed to

product types or size ranges not produced by the domestic industry." *Id.* The Court

found that a "theoretical possibility of future production" or "the potential for future

viability" of a given industry practice have no "meaning that would bear on the

significance of actual subject import volume, or increases thereof, for the purpose of

determining present material injury[.]" *Id.* The Court reminded the Commission of

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 28 of 50

Consol. Court No. 1:21-cv-00219                                    Page 28

its duty to evaluate volume, price effects, and impact on the domestic industry within the context of the conditions of competition distinctive to the affected industry and noted that "[t]he Commission does not comply with its statutory mandate by simply describing various conditions of competition in isolation." *Id.* at 719.  It ordered the Commission to "analyze the significance of subject import volume in terms of product types available and practically unavailable from U.S. sources during the [period of investigation] . . . in a manner that reflects the actual limitations." *Id.*

Altx's lesson is plain:  Industry conditions must dwell in the realm of reality and not merely in the realm of the possible.  Industry conditions that are hypothetical, theoretical, or speculative are not part of the conditions of competition distinctive to the affected industry; and Commission findings that have been premised on such conjectures are legally deficient.  *See* 19 U.S.C. § 1677(7)(C)(iii).  *Altx*'s holding is supported by the language of the statute.  The term "distinctive" calls for an inquiry into qualities or characteristics that are extant in the industry rather than possibilities that may never come to be.  *See Distinctive*, *Webster's New International Dictionary* (2d ed. 1956) ("that which marks or distinguishes one thing regarded in its relation to other things . . . that which constitutes or expresses the character or quality of the thing itself, without necessary reference to other things"); *Distinctive*, *Oxford English Dictionary* (2d ed. 1989) ("Serving to differentiate or distinguish; peculiar to one person or thing as distinct from others, characteristic; having well-marked properties; easily recognized").  Accordingly, an industry condition must be

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 29 of 50

Consol. Court No. 1:21-cv-00219                                         Page 29

shown, by substantial evidence, to exist in fact before it can support determinations

of significant volume, price effects, and impact on the domestic industry.

## II. The Commission's Finding on Domestic Reshipment

In the present case, the Commission made a key finding regarding a condition

of competition in the fertilizer industry — a finding that would ground the

Commission's determinations that imports of subject fertilizer were significant in

volume, price effect, and impact.   The Commission found that it was "possible" to

supply fertilizer to high demand regions of the country by reshipping fertilizer that

had already been delivered to flooded, low demand regions so that additional foreign

imports were not necessary:

> Respondents argue that [imports were] necessary to serve demand in
> U.S. regions unaffected by the poor weather conditions. However, this
> argument fails to explain why U.S. importers could not supply U.S.
> customers from its building inventories or from product that sat on
> barges on the Mississippi River system.   Indeed, as U.S. importers
> acknowledged, it was possible for the U.S. importers to do so, but that it
> was costly to move product by rail or back down the Mississippi River.
> Consequently, they chose to import more product.

Views at 56 n.217, J.A. at 99,626, ECF No. 107.  This finding was an important one.

All  three  statutory  elements  of  the  Commission's  positive  material  injury

determination — significant volume, price effects, and impact on the domestic

industry — rested on the notion that subject imports oversupplied the U.S. market

in  excess  of  demand.   For  example,  the  Commission  concluded  that  the  record

"demonstrates that subject imports — through their significant volumes that created

oversupply conditions in a declining market and low prices — exerted downward

pricing pressure on the domestic like product and significantly depressed U.S. prices

in 2019." *Id.* at 44, 53 (finding similarly that "the oversupply of subject imports" caused a "significant impact on the domestic industry"). The Commission's oversupply thesis posited that subject imports continued to arrive in 2019 even after poor weather had disrupted plantings. It wrote, "Subject imports continued to enter the U.S. market at elevated levels in 2019 even as demand declined in the second half of 2018 through 2019, causing an oversupply in the U.S. market and significantly depressing U.S. prices." Views at 52–53, J.A. at 99,622–23.

However, Plaintiffs offered a simple explanation for why imports continued to enter the U.S. in 2019. Plaintiffs first noted that imports that arrived in 2019 had been ordered earlier based on normal demand projections. *See* Hearing at 223–24, J.A. at 15,719–20, ECF No. 115; *see also* Koch Fertilizer Post-Hearing Br. at 12–13, J.A. at 96,123–24, ECF No. 107 ("[I]mports that arrived in Q1 2019 were ordered in Q4 2018 in anticipation of strong spring 2019 demand[.]") However, flooding disrupted demand in certain regions, and it is cost-prohibitive to reship fertilizer from those locations to high demand regions that had not been flooded. Instead, new imports had to satisfy the demand from regions with good weather:

> [D]ownriver transportation inefficiencies and river closures . . . imposed localized supply constraints that limited distributors' ability to serve customers using existing inventories. Supply that had already been shipped upriver and warehoused was not always available to meet demand in . . . areas less affected by adverse weather. Shipping back downriver is prohibitively expensive, and in other cases, river closures made reallocating supply impossible. The upshot was that it was more economical for 'misplaced' or 'trapped' inventories to be kept in place in certain areas to await improved demand, and to 'bring in fresh product' to meet new demand elsewhere[.]

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 31 of 50

Consol. Court No. 1:21-cv-00219                                    Page 31

OCP Post-Hearing Confidential Br. at 29–30, J.A. at 16,508–09, ECF No. 115. Plaintiffs supported this explanation with record evidence. *See, e.g.*, EuroChem Post-Hearing Br. at 10 (contrasting Mississippi barge rates of $18 per short ton with rail rates of $60-80 per short ton and $35 per short ton to reship back down the Mississippi); *see also supra* Background II (recounting Hearing testimony regarding the infeasibility of reshipping fertilizer that had already arrived at its destination). Plaintiffs' point was that additional imports that arrived in 2019 were not part of an "oversupply." Rather, they filled demand that could not be filled by domestic inventories because those inventories could not feasibly be reshipped from low demand regions to supply high demand regions.

Nonetheless, the Commission concluded that domestic reshipment *was* feasible. In footnotes to its Views, the Commission offered its rebuttal to Plaintiffs' argument that imports were necessary to serve demand in U.S. regions unaffected by poor weather:

> Respondents blame the oversupply conditions on demand projections that failed to materialize. Regardless of the reasonableness of any demand projections, the record supports that importers' import levels and inventories exceeded demand and contributed to an oversupply of the U.S. market. U.S. importers continued to import subject phosphate fertilizers because it was more "economical" to do so rather than pay U.S. inland freight to move their existing inventories.

Views at 43, n.161, J.A. at 99,613, ECF No. 107 (quoting the testimony of Donal Lambert of EuroChem North America, Hearing at 227, J.A. at 15,723, ECF No. 115.); *see also* Views at 56, n.217, J.A. at 99,626, ECF No. 107 ("[T]his argument fails to explain why U.S. importers could not supply U.S. customers from its building

inventories . . . . Indeed, as U.S. importers acknowledged, it was possible for the U.S.

importers to do so, but that it was costly to move product by rail or back down the

Mississippi River.  Consequently, they chose to import more product.").

    The Commission's rebuttal cited only a single piece of record evidence for the

proposition that it was "possible" to reship domestic inventories from their original

destination to higher demand regions.   It quoted EuroChem President Donal

Lambert's Hearing testimony for the proposition that "it was more 'economical' to

[import] rather than pay U.S. inland freight[.]"  Views at 43, J.A. at 99,613, ECF No.

107.  Yet, quoted in full, Lambert's testimony makes a point opposite to the one the

Commission intended:

> Product is moving up-river.  So it's sitting in barges, moving up river,
> waiting for the normal river open period when it can reach the end
> destination.  And when flooding occurs, it obviously logistically makes a
> different ball game.  And then, once you get product north, once it was
> allowed, the rivers subsided and product was moved north, *it's
> prohibitive to move a barge from Minneapolis-St. Paul back down to
> Mississippi.  Just the economics don't allow it.*  And so, in order to
> facilitate the needs for the farmers in the delta, you would bring in more
> product.  It's much more economical to do that versus bring back product
> southbound on the river.

Hearing at 227, J.A. at 15,723, ECF No. 115 (emphasis added).  Faced with testimony

that reshipping product back downriver was prohibitively expensive, the Commission

used it as evidence that the practice was possible but merely "costly" and claimed

that Plaintiffs "acknowledged" this.  Views at 56, n.217, J.A. at 99,626, ECF No. 107.

But as Lambert's full testimony demonstrates, Plaintiffs acknowledged nothing of the

kind.  Rather, Plaintiffs placed evidence on the record that emphasized the *economic

impossibility* of doing what the Commission claimed.  *See*, *e.g.*, OCP Post-Hearing

Confidential Br. at 29–30, J.A. at 16,508–09, ECF No. 116; EuroChem Post-Hearing
Br. at 10; Hearing at 230–31, J.A. at 15,726–27, ECF No. 115 ("So you had some
terminals coming back open needing supply, and so that's why myself and others in
the distribution business would begin to import again.  While you may have high
inventory in one market, you need inventory in another market.  It's cost-prohibitive
to move it from that location to another.").  Plaintiffs' evidence — including its pricing
data demonstrating economic infeasibility — was uncontroverted.

The Government attempted to salvage the Commission's evidence-free
assumption by claiming that the Commission relied on record evidence to determine
that "mov[ing] existing inventories" was possible.  Counsel noted that a witness
"specifically testified about having shipped fertilizer by rail, as well as by truck, in
response to flooding," and that "[o]ther record evidence establishes that fertilizer is
routinely transported by rail."  Def.'s Br. at 26, ECF No. 102.  But that evidence did
not support the Commission's argument or address Plaintiffs' point.  It is the same
evidence Mosaic's counsel referenced at oral argument in response to the Court's
request for evidence of domestic reshipment from inventories:

> THE COURT:  Okay. So but would [it] be accurate to say that there is
> no evidence of there being a widespread practice of their redirecting it.
>
> HARTMANN:  Your Honor, I think — and it would be accurate to say
> there's a widespread practice of intermodal delivery, meaning Mosaic,
> for example, can deliver via barge to rail or barge to truck, that is very
> common practice in this industry and something that could have been
> done to avoid the river flooding.  I think it's accurate to say there's no
> record evidence that the importers chose to do that when faced with the
> widespread flooding in the Mississippi River, instead they brought in
> new imports to supply the delta region.

Oral Arg. Tr. 152:19–153:14, ECF No. 129.  Indeed, Mosaic's counsel conceded that

evidence of shipping fertilizer by rail and truck in response to flooding had nothing

to do with product that had already been delivered to its destination and sat in

inventory.  It instead referred to actions taken to remove fertilizer from river barges

that flooding had immobilized:

> HARTMANN:  Your Honor asked questions about is it — does the record show that fertilizer [that] has been delivered to a customer would ever be redirected, and I just want to clarify.  The exchange that happened at the hearing . . . it wasn't about fertilizer that had actually been delivered to a customer, it was about fertilizer that was sitting on barges either at New Orleans or somewhere upward or — and couldn't move to customers' locations because parts of the river were shut down, and there was testimony from EuroChem witness as well as from a Heartland witness that in that scenario, they were trying to move around the river system by rail, by truck, because so much of the flooding caused the rivers to slow down.
>
> THE COURT:  So what you're telling me is that the example to which the Commission was referring was an example to which whatever the final destination was, the fertilizer was inaccessible because of flooding, and in that instance they redirected it to somewhere that presumably was accessible?
>
> HARTMANN:  Or that they could have.

*Id.* at 149:10–150:22.  This evidence simply does not show what the Commission

claims.  Intermodal delivery — in which multiple methods of transportation are used

to deliver fertilizer to its destination — is distinct from reshipment of fertilizer that

has already reached its intended destination.  Such evidence does not show that

"mov[ing] existing inventories" occurred, much less that it was a normal condition of

competition.  19 U.S.C. § 1677(7)(C)(iii).  The same is true for methods used to remove

fertilizer from barges stuck in flooded rivers.  *See USX Corp. v. United States*, 11 CIT

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 35 of 50

Consol. Court No. 1:21-cv-00219                                    Page 35

82, 84 (1987) ("ITC may not rely upon isolated tidbits of data which suggest a result contrary to the clear weight of the evidence."). Far from having "fail[ed] to explain" why domestic reshipment was infeasible, Plaintiffs offered uncontroverted record evidence for the proposition. *Cf.* Views at 56, J.A. at 99,626, ECF No. 107.

Even if evidence existed that domestic reshipment was possible, the Commission may not ground its determinations in "theoretical possibilit[ies]." *Altx*, 26 CIT at 718 (finding that it is not what an industry is "capable of" or what it could potentially do in the future, but what is actually done that matters). Practices that are economically infeasible are not part of "the conditions of competition distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii). In order to meet that statutory requirement, it was incumbent on the domestic industry to place evidence on the record showing that domestic reshipment of fertilizer from inventories had occurred as a normal business practice. It failed to do so. It is easy to see why: A practice that is uneconomical will not be adopted by an industry as part of its conditions of competition. *Cf.* Hearing at 269–70, J.A. at 15,765–66, ECF No. 115 (Lambert: "If we didn't have that demand from our customers asking us to bring those tons, we wouldn't have brought them.").

The Commission's theory that the U.S. market was oversupplied by imports that exceeded demand rests like an inverted pyramid on an unsupported finding regarding what might be possible if economics did not matter. The Commission assumed that fertilizer delivered to one area of the country could be shipped via intermodal delivery to another area of the country to allow its immediate use. When

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 36 of 50

Consol. Court No. 1:21-cv-00219                                    Page 36

asked for record evidence demonstrating that this had happened during the period of investigation, no party cited any. Even the most forgiving articulations of the substantial evidence standard do not allow for the Commission to make findings based on evidence not present in the record. *See, e.g.*, *Columbian Enameling & Stamping Co.*, 306 U.S. at 300 (requiring that substantial evidence be "more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established"); *Consol. Edison Co. of New York*, 305 U.S. at 229 (describing substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). On remand, the Commission should conduct a new analysis of the conditions of competition with respect to domestic reshipment and make new findings that are supported by substantial evidence. To do so, the Commission may, at its discretion, reopen the record, accept new evidence, and take any other lawful procedural measures necessary to make factually supported findings.

### III. Volume, Price, and Impact

The Commission's determinations do not fail merely because they include a mistaken assumption about domestic industry practices. *See American Spring Wire Corp. v. United States*, 8 CIT 20, 23 (1984) ("No factor, standing alone, triggers a *per se* rule of material injury."). Nor does it matter whether the mistaken assumption was or was not part of the Commission's formal conditions of competition analysis. Rather, on discovering defects in the Commission's analysis of prevailing conditions in the domestic industry, wherever in the Views they appear, a reviewing court's task is to analyze the degree to which the Commission has incorporated such defects into

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 37 of 50

Consol. Court No. 1:21-cv-00219                                    Page 37

its determinations on volume, price effects, and impact. *See Nucor Corp.*, 28 CIT at 207 ("The material injury statute directs the ITC to evaluate all relevant economic factors (i.e. volume, price effects, and impact) 'within the context of the business cycle and conditions of competition that are distinctive to the affected industry.'").

Here, the Commission's finding that subject imports were oversupplied was central to its determination that the volume, price effects, and impact of subject imports was significant. *See, e.g.*, Views at 44, J.A. at 99,614, ECF No. 107 ("The record therefore demonstrates that subject imports — through their significant volumes that created oversupply conditions . . . exerted downward pricing pressure[.]"); *id.* at 52–53, J.A. at 99,622–23 ("Subject imports continued to enter the U.S. market at elevated levels in 2019 even as demand declined in the second half of 2018 through 2019, causing an oversupply in the U.S. market and significantly depressing U.S. prices."). However, the existence of uncontroverted record evidence that additional imports were needed in 2019 to supply regions unaffected by bad weather undermines the Commission's oversupply analysis. During the Commission's investigation, Plaintiffs argued that these imports were not in excess of demand but rather were "pulled in" to the U.S. market by the unavailability of domestic fertilizer. *See, e.g.*, OCP Post-Hearing Confidential Br. at 5, J.A. at 16,469, ECF No. 116 ("While the historically wet weather in fall 2018, spring 2019, and fall 2019 challenged the market's ability to match supply to demand in real time, subject import volumes . . . did not exceed the supply deficit they were pulled into the market to fill."). Plaintiffs claimed that the increase in subject imports between 2017 and

2019 (753,938 short tons) did not exceed the 1 million short ton supply gap that Mosaic created when it closed its Plant City facility.  *See* OCP Prehearing Br., Ex. 11 at 30–31, J.A. at 12,655–56. ECF No. 112 (quoting Mosaic CEO James O'Rourke's statement that its decision to close the facility "opened a hole for some imports to increase . . . . So we gave up 1 million tonnes of market here in the U.S. intentionally.").

The Court has determined that the Commission lacked substantial evidence to assert that domestic inventories were available in 2019 to supply high-demand regions in the U.S. market.  *See supra* Section II.  Because of this failure, the Commission failed to controvert Plaintiffs' record evidence that subject imports were not oversupplied but instead responded to authentic demand signals.  The centrality of the alleged oversupply to the Commission's determinations on volume, price effects, and impact compels the Court to conclude that these determinations are themselves unsupported by substantial evidence.  *See Universal Camera Corp.*, 340 U.S. at 488 ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").  Below, the Court explains how the Commission's failure impacted each determination.  On remand, the Commission must not only revisit its analysis of the conditions of competition with respect to domestic reshipment but also should apply any new findings to its analysis of volume, price effects, and impact and make any redetermination required by the evidence.[7]

_____

[7] The parties have raised additional issues with the Commission's volume, price, and impact findings, including potentially inflated lost sales totals and the domestic industry's alleged prioritization of exports over the U.S. market.  *See, e.g.*, Pl.'s Br. at 28, 41, ECF No. 56. Because the Commission's reconsideration of domestic reshipment may alter these findings,

*See Altx*, 26 CIT at 719 ("The Commission does not comply with its statutory mandate by simply describing various conditions of competition in isolation."); *see also JMC Steel Group v. United States*, 24 F. Supp. 3d 1290, 1308 (CIT 2014) (ordering the Commission on remand to explain finding in the context of the business cycle and providing that "the Commission may make additional determinations . . . as are necessary to account for such explanations").

## A. Volume

Under the Tariff Act of 1930, the Commission must consider "whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i). The touchstone of the inquiry is "significance." "Congress, this court, and ITC itself have repeatedly recognized that it is the *significance* of a quantity of imports, and not absolute volume alone, that must guide ITC's analysis under section 1677(7)." *USX Corp. v. United States*, 11 CIT 82, 85 (1987) (emphasis in original). To determine if a volume of imports is significant, the Commission "must analyze the volume and market share data in the context of the conditions of competition." *Nippon Steel*, 25 CIT at 1420; *see also Angus Chemical Co. v. United States*, 20 CIT 1255, 1266 (1996) ("The Commission evaluates import volume 'in light of the conditions of trade, competition, and development regarding

---

the Court will reserve any review of them until after remand. *Cf. Celanese Chemicals, Ltd. v. United States*, 31 CIT 279, 311 (2007) ("Because each of these findings may be subject to change on remand, judicial review of the Commission's volume and price effects findings would be inappropriate at this time.").

the industry concerned.'") (quoting *General Motors Corp. v. United States*, 17 CIT 697,

711 (1993), *aff'd*, 140 F.3d 1478 (Fed. Cir. 1998)).

The Commission's brief, 311-word volume analysis (out of 59 pages of its

Views) reported only the size of the increase in subject imports and market share

during the period of investigation and did not reference any conditions of competition

that bore on its conclusion that such increases were "significant." *See* Views at 33–

35, J.A. at 99,603–05, ECF No. 107. This volume analysis was not required, in the

first instance, to explicitly cite the Commission's findings on the conditions of

competition. *See Hynix Semiconductor*, 30 CIT at 1219 ("[T]he ITC need not lay out

its analysis in some prescribed way, as there is no 'magic word analysis.'"). But

because the Court now orders the Commission to make new findings concerning the

availability of domestic inventories to fill U.S. demand, the Commission's volume

analysis must be consistent with any such findings on remand. *See Nucor Corp.*, 28

CIT at 207 ("The material injury statute directs the ITC to evaluate . . . volume . . .

'within the context of the business cycle and conditions of competition that are

distinctive to the affected industry.'") (quoting 19 U.S.C. § 1667(7)(C)).

The facts of *Altx* parallel the situation here and highlight the importance of

ensuring that a determination of significant volume is not at odds with findings on

the conditions of competition in the domestic industry. In that case, "[t]he

Commission concluded that the volume of subject imports was significant without

discussing subject import volume in relation to its findings with respect to the

conditions of competition." *Altx*, 26 CIT at 717. Specifically, the Commission found

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 41 of 50

Consol. Court No. 1:21-cv-00219                                     Page 41

that there existed certain segments of the market for stainless steel products that the domestic industry did not supply; but it did not determine whether "the increase in subject imports [was] primarily or entirely in the range of product types not produced by the domestic industry." *Id.* at 717–18. The Court remanded the Commission's finding of significant volume and required it to "analyze the significance of subject import volume in terms of product types available and practically unavailable from U.S. sources during the [period of investigation][.]" *Id.* at 719. *Altx* therefore stands for the principle that imported volumes may not be significant if the imported quantities fill demand that the domestic industry is unable to meet "either because of incapability or lack of viability." *Id.* at 717. Accordingly, if the Commission finds on remand that fertilizer was "practically unavailable from U.S. sources" to supply high-demand regions in 2019 because doing so would not have been economically viable, the Commission must ensure that any determination of significant volume takes account of these conditions.

## B. Price

The portion of the Tariff Act that governs the Commission's evaluation of price effects requires consideration of whether:

I.  there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

II. the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).  Here, the Commission did not find significant price underselling by subject merchandise.  The Commission's pricing data demonstrated that, in the vast majority of instances (136 of 170, or 80%), subject imports actually sold at a *higher* price than the domestic like product.  Views at 37, J.A. at 99,607, ECF No. 107.  The Commission instead found that these imports caused price depression by entering the U.S. at significant volumes "despite a significant demand decline due to what an OCP witness characterized as 'Black Swan' level rainfall beginning in the fall of 2018 and lasting through 2019."  *Id.* at 40, J.A. at 99,610.  The Commission concluded that the record demonstrated that "subject imports — through their significant volumes that created oversupply conditions in a declining market and low prices — exerted downward pricing pressure on the domestic like product and significantly depressed U.S. prices in 2019."  *Id.* at 44, J.A. at 99,614.  In order to attribute this downward pricing pressure to the imports themselves, the Commission's price analysis invoked the availability of domestic reshipment:

> Respondents blame the oversupply conditions on demand projections that failed to materialize . . . Regardless of the reasonableness of any demand projections, the record supports that importers' import levels and inventories exceeded demand and contributed to an oversupply of the U.S. market.  U.S. importers continued to import subject phosphate fertilizers because it was more "economical" to do so rather than pay U.S. inland freight to move existing inventories.

*Id.* at 43, n.161, J.A. at 99,613 (quoting Hearing, J.A. at 15,723).

The Commission's finding of price depression was based on its conclusion that subject imports "exceeded demand."  *Id.*; *see also id.* at 41, J.A. at 99,611.  But that conclusion was vulnerable to the Plaintiffs' rebuttal that bad weather, not imports,

was responsible for declining demand.  Section 1677(7) requires that any material injury be "by reason of" subject imports, and unprecedented weather events that frustrated demand projections were a potential intervening cause.  The Commission bypassed this argument by finding that subject imports prevented domestic inventories from supplying remaining demand via "inland freight." *Id.* at 43, J.A. at 99,613.  Substantial evidence did not support this belief.  Like the Commission's impact analysis, its price analysis took testimony that the "inland freight" option was prohibitively expensive and used it to conclude that the practice was "possible" — a conclusion that was contradicted by the very evidence on which it was based.  The full portion of Hearing testimony that the Commission cited read:

> LAMBERT: [C]ustomers in the United States that don't have the ability to purchase from Mosaic have to make plans to bring product to facilitate for their customers.  And those vessels were coming. And once they're on their way, they're coming here.  Product is moving up-river. So it's sitting in barges, moving up-river, waiting for the normal river open period when it can reach the end destination.  And when flooding occurs, it obviously logistically makes a different ball game.  And then, once you get product north, once it was allowed, the rivers subsided and product was moved north, *it's prohibitive to move a barge from Minneapolis-St. Paul back down to Mississippi.  Just the economics don't allow it.  And so, in order to facilitate the needs for the farmers in the delta, you would bring in more product.  It's much more economical to do that versus bring back product southbound on the river.*

Hearing at 227, J.A. at 15,723, ECF No. 115 (emphasis added).  This cited evidence cannot rationally support the proposition that domestic supplies could meet demand by moving the fertilizer from its existing locations.  Quoted in full, it says the very opposite.  *Cf. Matsushita Elec.  Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933

(Fed. Cir. 1984) (Commission must base its assessments on "currently available evidence and on logical assumptions and extrapolations flowing from that evidence.").

The Commission's pricing analysis depended in part on a purported fact about the fertilizer market for which no evidence existed. *Cf. Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) (substantial evidence standard requires the agency to "articulate [a] rational connection between the facts found and the choice made"). Accordingly, on remand, the Commission must revisit its pricing analysis and make any redeterminations required by the evidence. *See Nucor Corp.*, 28 CIT at 207 ("The material injury statute directs the ITC to evaluate . . . price effects . . . 'within the context of the business cycle and conditions of competition that are distinctive to the affected industry.'") (quoting 19 U.S.C. § 1667(7)(C)).

## C. Impact

The Tariff Act's Section 771(7)(C)(iii) requires that, in evaluating the impact of subject imports on the domestic industry, the Commission "shall evaluate all relevant economic factors which have a bearing on the state of the industry." These factors include, but are not limited to:

I.  actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

II.  factors affecting domestic prices,

III.  actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,

IV.  actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 45 of 50

Consol. Court No. 1:21-cv-00219                                    Page 45

V.  in a proceeding under part II of this subtitle [concerning the imposition of antidumping duties], the magnitude of the margin of dumping.

19 U.S.C. § 1677(7)(C)(iii).  As stated above, these factors must be considered in the context of the business cycle and the conditions of competition distinctive to the affected industry.  *Id.*  The Commission found that "[d]ue to the downward pricing pressure exerted by the oversupply of subject imports on U.S. prices, the domestic industry was forced to reduce prices, which in turn, caused its revenues to be lower than they would have been otherwise" and that sales revenues and profitability declined between 2018 and 2019.  Views at 53, J.A. at 99,623, ECF No. 107.  "As a consequence, we find that subject imports had a significant impact on the domestic industry."  *Id.*

"By mandating consideration of 'all relevant economic factors,' the statute prevents the ITC from attributing to subject imports an injury whose cause lies elsewhere."  *Hynix Semiconductor*, 30 CIT at 1222.  Because Plaintiffs had argued that demand disruption caused by poor weather was responsible for any alleged injury, the Commission's impact analysis stated:

> We have considered the role of other factors so as not to attribute injury from other factors to the subject imports.  In doing so, we have considered respondents' arguments that the domestic industry's poor performance was not caused by subject imports, but rather was the result of other factors.  Specifically, we considered the role of declining U.S. demand in 2019 due to unusually poor weather conditions.  Subject imports increased their U.S. shipment volume even as demand declined significantly in 2019 . . . .  The downward force of demand declines in 2019 on the domestic industry's condition therefore does not rebut that the industry's performance would have been stronger in the absence of the significant volume of subject imports[.]

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 46 of 50

Consol. Court No. 1:21-cv-00219                                    Page 46

Views at 53–54, J.A. at 99,623–24, ECF No. 107.  The increase in shipments of subject imports in 2019 was key to the Commission's finding that subject imports, and not the weather, were responsible for the domestic industry's poor performance during the period of investigation.  Although the record did indicate that subject imports increased during the first quarter of 2019, it nonetheless reflects an overall *decline* in 2019 relative to 2018.  Staff Report at IV-13–14, J.A. at 98,455–56, ECF No. 107 (recording 1,415,262 short tons of subject imports in January–March 2019 compared to 1,083,021 short tons in the same period of 2018); Views at 33, J.A. at 99,603, ECF No. 107 (noting that the volume of subject imports reached "3.0 million short tons in 2018, before decreasing to 2.7 million short tons in 2019[.]").  The Commission's own Views, therefore, undermined its key conclusion that subject imports continued to "pour" into the U.S. in 2019 despite declining demand.  *See* Views at 52, J.A. at 99,622, ECF No. 107.  According to the Views, they did no such thing.

Further, the Court has found that respondents offered an explanation for why additional imports were needed in early 2019:  Imports initially arrived in response to projections of normal demand; but when the flooding persisted, imports remained the only cost-effective way to supply regions that were unaffected by poor weather.  The Commission's rebuttal that such imports were not needed because these regions could have been supplied by reshipping product from weather-affected regions was unsupported by substantial evidence.  This defect contaminated the Commission's impact analysis, which depended on the conclusion that "[s]ubject imports increased their U.S. shipment volume even as demand declined significantly in 2019[.]"  *Id.* at

53, J.A. at 99,623. Although the Commission intended to depict imports as entering an oversupplied market to drive down prices and harm the domestic industry, the record shows that domestic product could not effectively fill all U.S. demand during the severe flooding of late 2018 and 2019. This leaves open the possibility that subject imports were responding to bona fide demand signals in 2019 rather than oversupplying a saturated market. *See* Hearing at 269–70, J.A. at 15,765–66, ECF No. 115 (Lambert: "If we didn't have that demand from our customers asking us to bring those tons, we wouldn't have brought them.").

Not only did the Commission's impact analysis fail to consider the conditions of competition distinctive to the fertilizer industry, it also did not "analyze compelling arguments that purport to demonstrate the comparatively marginal role of subject imports in causing [the] injury." *Hynix Semiconductor,* 30 CIT at 1223. The Commission skipped over uncontroverted evidence that tended to support Plaintiffs' theory that weather related demand declines were an intervening cause of injury. The Commission must therefore revisit its impact analysis on remand. It must extend any relevant findings it makes concerning the possibility of domestic reshipment to the question of impact and make any redeterminations required by the evidence.

It should be noted that classifying the Commission's mistaken finding regarding the possibility of domestic reshipment as part of its "conditions of competition" analysis is unnecessary to the Court's holding. *See* 19 U.S.C. § 1677(7)(C)(iii). Although the descriptor is semantically accurate, the finding that

Case 1:21-cv-00219-SAV   Document 141   Filed 09/19/23   Page 48 of 50

Consol. Court No. 1:21-cv-00219                                              Page 48

domestic reshipment was feasible is ultimately a factual finding like any other. This finding, however, lacked support in the record. The Commission proceeded to incorporate this mistaken factual finding directly into its price and impact analyses and indirectly into its determination of significant volume — contaminating them. *See supra* Section III. The Court finds that the Commission's misapprehension of the evidence "was of sufficient importance that the Commission might have determined that there was no material injury or threat of material injury at all" had it not been incorporated into its Final Determination — requiring remand. *Borlem S.A.- Empreedimentos Industrias v. United States*, 913 F.2d 933, 937 (Fed. Cir. 1990) (upholding the CIT's remand of the Commission's positive material injury determination where "the decision under review rests on an erroneous fact"); *see also Catfish Farmers of America*, 37 CIT at 733 (acknowledging that, although "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . . speculation does not amount to reasonable inference, as it provides no factually-grounded basis for sustaining an agency's determination") (internal quotations omitted). This Court's holding does not depend on any formalism regarding the Commission's conditions of competition analysis but instead finds that its failure to ground a key finding in record evidence undermined the Final Determination by more than the substantial evidence standard will permit.

## CONCLUSION

The Commission enjoys significant discretion to determine that a domestic industry has suffered material injury by reason of subject imports. *See Goss Graphics Sys., Inc. v. United States*, 22 CIT 983, 1008 (1998), *aff'd*, 216 F.3d 1357 (Fed. Cir.

2000) (The Commission has the "discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis."). That discretion does not include the ability to assume facts for which there is insufficient evidence. Any Commission findings that depend on such evidence-free assumptions are not supported by substantial evidence and must be returned to the Commission for reconsideration. *See Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (Substantial evidence requires "the agency [to] examine the relevant data and articulate a satisfactory explanation for its action[.]"). Because the Commission grounded its findings on an unsupported assumption that fertilizer could be reshipped from one destination to another to meet existing demand, its current decision may not stand. It is therefore **ORDERED** that Plaintiffs' Motions for Judgment on the Agency Record are **GRANTED**, and the Commission shall take new action in accordance with this opinion.

The Commission may take new evidence, reconsider existing evidence, or take any other action allowed by its procedures on remand to come to a conclusion supported by substantial evidence. The Commission is directed to file its remand redetermination within 120 days of the date of this decision. Plaintiff shall have 30 days thereafter to file any comments on the remand redetermination. Plaintiff-Intervenors and the Consolidated Plaintiff shall have 14 days after the filing of Plaintiff's comments to file their own comments. The Commission shall file its comments within 30 days of the filing of Plaintiff-Intervenors' and the Consolidated

Plaintiff's comments.   Defendant-Intervenors shall file their comments within 14 days of the filing of the Commission's comments.   Plaintiff shall have the option of filing a reply to these comments, due 30 days from the filing of Defendant-Intervenors' comments.

   **SO ORDERED**.


           /s/  Stephen Alexander Vaden
            Stephen Alexander Vaden, Judge


Dated:  September 19, 2023
    New York, New York