Consol. Ct. No. 21-00219          Business Proprietary Information          NON-CONFIDENTIAL VERSION
                                        Has Been Deleted

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| OCP S.A.,<br>　　　　　　　Plaintiff,<br><br>EUROCHEM NORTH AMERICA CORPORATION,<br>　　　　　　　Consolidated Plaintiff,<br><br>　　and<br><br>PHOSAGRO PJSC, INTERNATIONAL RAW MATERIALS LTD., and KOCH FERTILIZER, LLC,<br>　　　　　　　Plaintiff-Intervenors,<br><br>　　v.<br><br>UNITED STATES,<br>　　　　　　　Defendant,<br><br>　　and<br><br>THE MOSAIC COMPANY and J. R. SIMPLOT COMPANY,<br>　　　　　　　Defendant-Intervenors. | Consol. Court No. 21-00219<br><br>**NON-CONFIDENTIAL VERSION**<br><br>Business Proprietary Information removed from Pages i, 3-7, 9-11, 14-19, 21-22, 24-28, 31-33 |

## PLAINTIFF'S COMMENTS IN OPPOSITION TO THE INTERNATIONAL TRADE COMMISSION'S FINAL REMAND DETERMINATION

Shara L. Aranoff
James M. Smith
Sooan (Vivian) Choi
Paula Ortiz Cardona
John J. Catalfamo
Julia Shults

**COVINGTON & BURLING LLP**
850 10th Street, NW
Washington, D.C. 20001
(202) 662-5997
saranoff@cov.com

*Counsel to Plaintiff OCP S.A.*

Dated: February 16, 2024

**Business Proprietary Information Has Been Deleted**

## TABLE OF CONTENTS

I.    THE REMAND INVESTIGATION DOES NOT COMPLY WITH THE COURT'S ORDER ..................................................................................... 1

    A.    The Commission Failed to Ask Questions That Shed Light on the Feasibility of Inventory Relocation Between Geographic Regions ...................... 1

    B.    Responses Confirm That Delivered Inventories Are Not Reshipped Between Regions ....................................................................................... 3

    C.    The Commission's Remand Decision Relies on Responses That Are Irrelevant to the Court's Order or At Odds With the Record ................................. 5

II.    THE COMMISSION FAILS TO DEMONSTRATE MATERIAL INJURY BY REASON OF THE VOLUME OF SUBJECT IMPORTS ................................... 7

    A.    The Commission Improperly Minimizes or Ignores the Domestic Industry's Planned Supply Shortfall ....................................................... 8

        1.    The Commission understates the supply shortfall caused by Mosaic's strategic closure of Plant City ....................................... 8

        2.    The Commission understates the supply shortfall caused by Nutrien's strategic closure of Redwater ....................................... 9

        3.    The Commission improperly discounts the domestic industry's refusals to sell to U.S. purchasers ............................................ 10

    B.    The Commission Overstates the Increased Presence of Subject Imports ............. 11

        1.    The Commission disregards the fact that customers make purchasing decisions based on projected future demand ......................... 12

        2.    The Commission overstates the increase in subject imports by relying on import entries, some of which were exported to Canada ........ 13

        3.    The Commission erroneously infers an oversupply of subject imports from inventory volumes when inventory ratios [      ] over the POI .............................................................................. 14

        4.    Subject imports adjusted more than domestic producers after unanticipated disruptions in U.S. demand ................................... 18

    C.    The Commission's Supply Gap Analysis Ignores Contrary Economic Analyses, Including From a Former Mosaic Executive ......................................... 19

III.    THE PRICE EFFECTS ANALYSIS FAILS TO COMPLY WITH THE ORDER ......... 22

**Business Proprietary Information
Has Been Deleted**

A.   The Commission Relies on the Same Cherry-Picked Evidence,
     Outweighed by Other Record Evidence, to Find that Subject Imports were
     Low Priced and Depressed U.S. Prices...................................................................... 23

     1.   The Commission improperly discards evidence of overselling, but
          gives weight to unrepresentative instances of low prices. ........................ 23

     2.   The Commission continues to rely on an inflated volume of lost
          sales, and gives more weight to unreliable responses from one
          purchaser. .................................................................................................. 25

     3.   The Commission relies on customer emails submitted by domestic
          producers without addressing contradictory record evidence.................. 27

     4.   The Commission rejects verified questionnaire data in favor of
          unsubstantiated press quotes from the Petition. ....................................... 28

B.   The Commission's Additional Attempts to Find a Causal Link Between
     Subject Imports and Price Declines Lack Support or Logic................................. 30

     1.   The finding that NOLA price trends demonstrate price depression
          caused by subject imports is unsupported.................................................. 30

     2.   The price depression finding relies on an unsupported assumption
          that subject importers had the foresight and ability to stop
          deliveries in advance of unexpected, record-setting precipitation........... 31

IV.  THE COMMISSION MISAPPLIES THE "BY REASON OF" STANDARD................ 34

V.   CONCLUSION............................................................................................................ 36

**Business Proprietary Information
Has Been Deleted**

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Chr. Bjelland Seafoods A/S v. United States*,
   19 C.I.T. 35, 41 (Ct. Int'l Trade 1995)…………………..........................................29

*Exxon Co., U.S.A. v. Sofec, Inc.*,
   517 U.S. 830 (1996)..................................................................................................34

*First Nationwide Bank v. Gelt Funding Corp.*,
   22 F.3d 763 (2d Cir. 1994).......................................................................................34

*Swiff-Train Co. v. United States*,
   999 F. Supp. 2d 1334 (Ct.  Int'l Trade 2014) ........................................................34

*Staub v. Proctor Hosp.*,
   562 U.S. 411 (2011)..................................................................................................34

**Administrative Materials**

*Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan*,
   Inv. Nos. 731-TA-1387-1391 (Final) (Remand), USITC Pub. 5125 at 19 (Sept. 2020) .........24

**Business Proprietary Information Has Been Deleted**

The Commission has issued a curious series of findings on remand.  First, it disclaims reliance on the key unsupported finding, arguing that the Court was incorrect to view inventory reshipment as "central to {its} material injury analysis."  APPX0099952.  Second, at length, it issues another affirmative determination, reiterating many of the same cherry-picked data points while disregarding mountains of contrary evidence.  Finally, despite its disclaimer, the Commission finds—after misconstruing newly collected evidence—that "the domestic industry's…extensive inventory locations, expansive multi-modal distribution network, and demonstrated ability to move and relocate product where it was needed shows {*sic*} that domestic producers were well-positioned to supply the U.S. market in 2019," when it finds that subject imports oversupplied the market and depressed prices.  APPX0099978, APPX0099984-0099986, APPX0099996-0099999.  How to square these various elements may be unclear, but as explained below what is obvious is that the Commission has again failed to issue an injury determination that is supported by substantial evidence and in accordance with law.

I.      **THE REMAND INVESTIGATION DOES NOT COMPLY WITH THE COURT'S ORDER**

A.      **The Commission Failed to Ask Questions That Shed Light on the Feasibility of Inventory Relocation Between Geographic Regions**

The Court directed the Commission to "conduct a new analysis of the conditions of competition with respect to domestic reshipment."  APPX0000036.  Specifically, the Court tasked the Commission with assessing the extent to which U.S. market participants reship or relocate inventory "that has already reached its intended destination" and emphasized that evidence on "intermodal delivery" of fertilizer to its destination was not relevant to this key issue.  APPX0000034.  Nevertheless, the Commission's remand questionnaires were not worded to elicit information responsive to the Court's directive.

1

Business Proprietary Information
Has Been Deleted

Upon receiving the questionnaire, OCP filed an Action Request asking the Commission to clarify the form consistent with the Court's instructions. APPX0020869-0020879. The Commission declined to act on the request and left unchanged a questionnaire designed to validate its presumption that inventory shipments in general are normal industry practice—a point that is not contested and irrelevant to the Court's remand. APPX00209204-00209206.

Question 2(a) asked responding firms to "describe {their} *inventory operations* and *distribution network*{s} including, but not limited to, identifying each location where {they} held inventories in 2017, 2018, and 2019, and describing the *modes of transportation used to distribute shipments*." APPX0020834 (emphases added). Nowhere in the remand questionnaire did the Commission define "inventory operations," "distribution network," or "modes of transportation used to distribute shipments" to focus on the feasibility and frequency of reshipping inventory from its original intended destination to a new location in a different region. APPX0020873-APPX0020874.

Questions 2(b) and 2(c) asked responding firms to explain if they ever "ship{ped}" or "moved phosphate fertilizers from one inventory location in the United States to another inventory location." APPX0020834-0020835. Here, the Commission failed to clarify that "inventory location" should refer to "inventory of fertilizer that has already reached its intended destination." APPX0000034. The Commission also asked importers and domestic producers to indicate in a checkbox whether they have the "capability" to move product from one inventory location to another inventory location, even if they have never done so. APPX0020872. In a departure from past practice, the Commission did not define "capability" or ask responding firms to do so. APPX0099921. This failure to define what it means to have the "capability" to move

**Business Proprietary Information Has Been Deleted**

inventory renders the checkbox responses essentially meaningless and ignores the key issue of whether reshipment is a standard practice. *Id.*

Last, question 2(d) sought data on domestic producer and importers' intermodal delivery. APPX0020835. Here, the Commission failed to distinguish between the customary unidirectional delivery to an intended destination and reshipment of delivered inventory from one original intended destination to another in a different geographic region. APPX0020875; APPX0099921. The Commission's decision not to clarify these poorly drafted questions reveals the agency's apparently deliberate avoidance of the key issue in the Court's remand.

## B. Responses Confirm That Delivered Inventories Are Not Reshipped Between Regions

Despite the poorly drafted questionnaires, responses from importers confirm that the distribution of phosphate fertilizer in the United States is unidirectional: "fertilizer moves from a port of entry or production facility to inventory terminals, usually upriver by barge or overland by rail, and then is distributed to retailers and eventually to U.S. farmers." APPX0099913. This new evidence confirms that reshipment of inventories from their original intended destinations to other regions is not a "normal business practice" for many reasons—including prohibitive costs, shipping logistics, legal rights, and lack of infrastructure. APPX0099913-0099918.

While the ITC majority's remand determination makes no mention of these points, importer responses addressed these limitations on domestic reshipment in tremendous detail:

- [

      ]
  APPX0099735-0099736.

- [

      ] APPX0099682.

3

**Business Proprietary Information**
**Has Been Deleted**

- [

    ] APPX0099673.

- [

                 ] APPX0099718.

- [

                            ] APPX0099691.

- [

                                 ]
APPX0099791-0099792.

- [

                   ] APPX0099691.

- "Title transfers from the importer to customers [

                      ].
APPX0099918.  As [    ] explained, [

           ]. *Id.;* APPX0099736.

- Overall, [

                             ] as well as the
loss due to shrinkage.  APPX0099736.

      Even the domestic producers' descriptions of their distribution networks confirm this

one-way pattern.  For Mosaic, movement is from: [

]. APPX0099770.  Simplot likewise explained that it ships from its [

] production facilities [

]. APPX0099755.  Nutrien conceded that

[

]. APPX0099785.

These responses confirm that U.S. fertilizer distribution networks are not designed to

reship phosphate fertilizer inventories from an intended destination in one region to a different

region.  Given infrastructure limitations and transportation logistics, it is hardly surprising that

there is no record evidence indicating that such reshipment at scale is even possible, let alone

standard practice.  On remand, however, the Commission fails to acknowledge how this evidence

undermines its renewed affirmative injury determination.

### C.    The Commission's Remand Decision Relies on Responses That Are Irrelevant to the Court's Order or At Odds With the Record

The Commission relies on domestic producer questionnaire responses to draw inferences

irrelevant to the Court's directive on the reshipment of delivered inventory.  Mosaic and Simplot

[              ] report that they have [

]. *See* APPX0099768;

APPX0099755.  On that basis, the Commission finds that "the additional questionnaire responses

. . . demonstrate . . . that the domestic industry reported moving inventories between locations

while importers generally did not."  APPX0100015.  However, a close read of those same

responses shows that domestic producers rarely, if ever, reship inventories from their originally

intended destination to another location in a different region.

**Business Proprietary Information**
**Has Been Deleted**

For example, not only does Mosaic [

], APPX0099773, but it provides [

]. APPX0099919.  Even if the [        ] ST of fertilizer

the Commission indicates that Mosaic [

] during the POI.

APPX0099969; APPX0087812.  Thus, its reshipment quantity is [                    ]

and does not support a finding that reshipment of delivered inventories is standard practice.

In its response, Nutrien describes [

].  APPX0099785.  Nutrien's response [

] that is irrelevant to the Court's inquiry.

Simplot also claims to [

], but [

]. APPX0099755, APPX0099760.  Simplot does

not identify [

]. Nor does Simplot [

].  Even if so, the reported volume accounts for [

] during the period of review.  *See* APPX0099759-0099760; APPX0099919.

In sum, these volumes do not clearly qualify as inter-regional reshipments of inventories already

delivered to an original intended destination—but even assuming they do qualify, the volumes

are not commercially significant.

**Business Proprietary Information Has Been Deleted**

The Commission also notes that due to [                    ] in 2019, [

                    ].  *See* APPX0099970;

APPX0099690; APPX0099917.  This example is the exception proving the rule.  It is also telling

that 2019 was [                                        ].

APPX0099691; *see also* APPX0100023.

Remarkably, the Commission cites to domestic producer questionnaires with only scarce

examples of *possible* reshipments to support its finding that the reshipment of inventories is

standard practice for the domestic industry.  In reality, the responses of domestic producers

confirm that the reshipment between regions of inventories previously delivered to an original

intended destination happens rarely, if ever.

## II.    THE COMMISSION FAILS TO DEMONSTRATE MATERIAL INJURY BY REASON OF THE VOLUME OF SUBJECT IMPORTS

The Commission's affirmative determination rests on a theory that subject imports

oversupplied the U.S. market.  In its Remand Views, the Commission finds no "domestic

industry supply gap" and that "the increase in volume of cumulated subject imports eclipsed any

such reduction."  APPX0099963.  This finding reflects erroneous and incomplete analyses of the

supply of both domestic phosphate fertilizer and subject imports.  The Commission's oversupply

finding is also contradicted by two economic analyses it never addressed: from Michael Rahm

and James Dougan.  Because the finding that subject imports oversupplied the domestic market

is foundational to its affirmative determination, the Commission's continuing failure to address

significant shortcomings in its analysis requires a second remand.

Business Proprietary Information<br>Has Been Deleted

A.    **The Commission Improperly Minimizes or Ignores the Domestic Industry's Planned Supply Shortfall**

Among key errors, the Commission significantly understates the decline in domestic supply over the POI.  Its discussion of the closures of Mosaic's Plant City facility and Nutrien's Redwater facility fails to address fundamental market dynamics in North America.  Meanwhile, the Commission disregards the impact of the domestic industry's refusals to supply significant segments of the market.  Only by ignoring or improperly discounting this contrary evidence is the Commission able to conclude again—erroneously—that subject imports oversupplied the market and injured the domestic industry.

1.    **The Commission understates the supply shortfall caused by Mosaic's strategic closure of Plant City**

The Commission has continued to discount the impact of Plant City's closure on availability in the U.S. market.  The Commission does not meaningfully address the fact that the closure of Plant City preceded—and required—increases in imports to satisfy U.S. market demand.

Mosaic idled Plant City and thereby deprived the U.S. market of 1.1 million ST of phosphate fertilizer for reasons unrelated to subject imports.  *See* OCPOpeningBr33-36 (ECF 56).  Mosaic acquired this aging facility in 2014 after buying part of CF Industries to obtain ore reserves, then secured antitrust approval based on the prospect of import competition.  APPX0097836; APPX0094927-0094931.  Mosaic later said it idled Plant City in December 2017 because it was an "older plant" that "require{d} a disproportionate amount of sustaining capital each year."  APPX0092700, APPX0092934.

The Commission credits Mosaic's *post hoc* claim that closing Plant City resulted in a supply shortfall of only 700,000 ST, based on Plant City's sales in the U.S. market *in 2017*.

APPX0099963; APPX0015535.  But the issue is not what Plant City sold in 2017; the question is

what it *would have sold* in 2018, when U.S. demand increased by [      ] ST over 2017, and in

later years.  APPX0097677.  The real impact of Plant City's closure was far more significant.

      At the time, Mosaic understood and communicated to the market what impact Plant

City's closure would have on domestic supply.  In February 2018, Mosaic noted that closing

Plant City would take "1.5 million tonnes out of the equation."  APPX0092614.  In August 2018,

Mosaic's CEO stated publicly that "more imports" into the United States would be needed.

APPX0092745.  Looking back in 2019, after Plant City closed but before the Petition was filed,

Mosaic's CEO reported on an earnings call that the closure of Plant City had "open{ed} a hole

for some imports to increase … . ***So we gave up 1 million tonnes*** {i.e., 1.1 million ST} ***of***

***market here in the U.S. intentionally***."  APPX0092564-0092565.  Despite Mosaic's admissions

and other contrary evidence it never addressed, the Commission accepts Mosaic's *post hoc* and

self-serving 700,000 ST figure.

      In reality, the idling of Plant City accounted for the [          ] of the declines in

domestic industry volumes over the POI: for [      ] of the decline in production capacity; for

[     ] of the decline in production; and for [      ] of the decline in U.S. shipments, where

[                          ] with the Mosaic CEO's assessment of a 1.1 million ST

drop.  APPX0098431; APPX0098434; APPX0098438; APPX0092564-0092565.

      **2.**     **The Commission understates the supply shortfall caused by Nutrien's**
                  **strategic closure of Redwater**

      Nutrien announced that it planned to close Redwater in spring 2018 and promised to

serve customers in Western Canada from its U.S. production facilities.  APPX0092917.

Naturally, U.S. market participants expected a supply shortfall once Nutrien's U.S. facilities

began serving Western Canada—expecting increased exports to, and reduced imports from,

Canada.  APPX0012836; APPX0017705-0017706.  Redwater's entire 600,000 ST in annual

production—serving both U.S. and Canadian purchasers—had to be replaced by other suppliers,

including imports.  APPX0097830.

The Commission continues to indicate that Redwater's closure did not affect U.S. supply,

noting that Nutrien's [          ] ST increase in U.S. production from 2018 to 2019 exceeded its

[          ] ST increase in exports.  APPX0099962.  The Commission's analysis of Redwater's

impact is fundamentally flawed.  Nutrien's U.S. production [                                ] of the

600,000 ST in lost annual production from Redwater.  OCPOpeningBr10.  Furthermore,

although Nutrien's exports increased by only [          ] ST from 2018 to 2019, overall MAP

exports from the United States to Canada over three years increased by **_740,000 ST_**—from

820,000 ST in 2016/2017 to 1.56 million ST in 2019/2020.[1]  APPX0097830.  Reduced supply in

Canada also meant fewer imports from Canada to satisfy U.S. demand.  APPX0097830.  The

Commission's blinkered focus on minor shifts in Nutrien's U.S. operations completely misses

these broader, and far more consequential, market dynamics following Redwater's closure.

### 3. The Commission improperly discounts the domestic industry's refusals to sell to U.S. purchasers

In its Remand Views, the Commission continues to discount the evidence of domestic

producers' refusals to sell to certain U.S. purchasers, noting that Mosaic "disputes other

allegations of its refusal or inability to supply product during the POI" and that Mosaic increased

production and U.S. shipments while diverting export shipments when subject imports declined

post-petition.  APPX0100013-0100014.  The Commission ignores extensive record evidence

---

[1] As explained in Part II.C, Mr. Rahm's analysis follows the prevailing practice in the phosphate
fertilizer industry of analyzing "fertilizer years" (July 1 to June 30), not calendar years.

Business Proprietary Information
Has Been Deleted

from U.S. purchasers who repeatedly were refused sales by domestic suppliers and thus were forced to buy imports.

As a business strategy, domestic producers have a selective distribution model. Mosaic admitted that "{i}t is not in the domestic industry's interest" to do business with importers that may "resell those volumes to domestic producers' own customers." APPX0097253; *see also* APPX0095868-0095869 (explaining that "selling product to a trading company – a company that competes directly with Simplot – whenever requested would ultimately undermine Simplot's business model"). Simplot's counsel conceded that Simplot avoids selling to distributors to avoid "cannibalizing their own business," which includes retail locations. APPX0017562. Not surprisingly, 16 of 28 purchasers reported experiencing supply constraints during the POI, and several reported that domestic producers were unwilling or unable to supply them. APPX0098404-0098405.

For example, Gavilon, EuroChem, ADM, and [          ] submitted correspondence documenting Mosaic's consistent practice of refusing to supply phosphate fertilizer with no reference to price. APPX0097696. ADM, Koch, and Heartland's former CEO all testified to Mosaic refusing to supply phosphate fertilizer. APPX0097696. Numerous purchaser questionnaires confirmed that Mosaic and other domestic producers outright refused to supply phosphate fertilizer. APPX0097696. The Commission brushed aside this evidence, which undermines its reliance on available domestic capacity as proof of "oversupply."

### B.    The Commission Overstates the Increased Presence of Subject Imports

In addition to erroneously understating the domestic supply shortfall, the Commission engaged in a series of analytical failures, which led the Commission to vastly overstate the increased presence of subject imports in the U.S. market.

11

Business Proprietary Information
Has Been Deleted

1.    **The Commission disregards the fact that customers make purchasing decisions based on projected future demand**

The Commission acknowledges that distributors "rely on demand projections in obtaining product." APPX0099953-0099954.  The Commission nevertheless concludes that "cumulated subject imports entered the U.S. market in significant volumes, contributed to oversupply conditions, and depressed U.S. prices to a significant degree, *regardless of how they were ordered*." APPX0099988 (emphasis added).  In effect, the Commission holds market participants to a decision-making standard that requires the benefit of 20/20 hindsight: U.S. purchasers should have known there would be a series of "Black Swan" weather events adversely affecting demand over three consecutive application seasons.  This expectation of clairvoyance is entirely unsupported by substantial evidence.

While projected and actual demand may not match exactly, the unprecedented wet weather during the three application seasons between fall 2018 and fall 2019 led farmers to forgo crop plantings and fertilizer applications because of saturated soil conditions.  APPX0086404, APPX0086406.

- Fertilizer demand projections were high for the fall 2018 season before "one of the wettest fourth quarters in over 100 years." APPX0091862-0091863.  Farmers delayed harvests and did not fertilize during the small application window following harvests. APPX0091863.

- After low demand in fall 2018, the market—including Mosaic[2]—expected higher than usual fertilizer demand in spring 2019 because the soil would be depleted of nutrients given reduced applications in fall 2018, leading distributors to restock over the winter of 2018-19. APPX0091863-0091864.  But the winter 2018-19 polar vortex and record-setting precipitation in spring 2019 led to a "100-year flooding event" and the "second wettest 6-month period in 125 years." APPX0086406; APPX0091864.  Again applications fell.

- In the runup to fall 2019, projections were again for high demand, with fields in need of nutrients after two seasons without adequate fertilizer applications.  Distributors reacted in

---

[2] Mosaic described the low demand in fall 2018 as a "temporary seasonal setback" with improved demand conditions going forward. APPX0094183.

Business Proprietary Information
                Has Been Deleted

turn, ensuring inventories were stocked so farmers could secure fertilizer in a timely manner. APPX0091868.  Despite these projections, fall 2019 became the third consecutive application season to face record-setting precipitation, with crop harvests and subsequent fertilizer applications delayed or forgone again.  APPX0091869.

The Commission has brushed aside these successive, once-in-a-century weather events that no one could have anticipated.  Instead, the Commission maintains, with the benefit of hindsight, that market participants should have reacted more quickly and stopped purchasing subject imports, even though the record clearly demonstrates that distributors expected fertilizer to be in high demand following each season of unexpectedly low applications. APPX0094146; APPX0093825; APPX0094296.

The Commission's reasoning is inherently contradictory and arbitrary.  On the one hand, the Commission finds that the mere presence of imports in the market—regardless of the rationale—is problematic.  APPX0099988.  On the other hand, the Commission finds that fertilizers are purchased based on future demand projections that remained high throughout the POI, which explains why imports continued to enter the U.S. market.  APPX0099953-0099954. In effect, the Commission takes issue with a condition of competition in the fertilizer industry— that orders are placed based on projected demand—and blames subject imports for that industry practice, even though all market participants (regardless of source) operate the same way.

> 2.    **The Commission overstates the increase in subject imports by relying on import entries, some of which were exported to Canada**

In its Remand Views, the Commission cites the increase of "more than one million short tons" in subject imports from 2017 to 2018 as evidence that subject imports outstripped the 700,000 ST reduction in domestic production that Petitioner alleges.  In the same sentence, the Commission also concedes that "importers' U.S. shipments of subject imports increased by 604,000 short tons."  APPX0099961.  This approximately 400,000 ST delta reflects the

Business Proprietary Information
Has Been Deleted

difference between import entries and import shipments.  APPX0098445, APPX0098547.  The

entry data upon which the Commission relies include re-exports to Canada, because phosphate

fertilizer can be imported into the U.S. market duty-free as U.S. entries for consumption, then

barged up the Mississippi River and re-exported to Canada.  APPX0003676-0003677;

APPX0085043-0085044.  Re-exports of subject imports were [          ] across the POI:

[        ] ST in 2017, [        ] ST in 2018, and [        ] in 2019.  APPX0097708.

By relying on entry data, the Commission materially overstates the supply of subject

imports in the U.S. market.  While subject import entries increased by approximately 1 million

tons from 2017 to 2018, U.S. shipments of subject imports increased by only 604,000 ST—

nearly 100,000 ST below the Commission's erroneously low 700,000 ST estimate of Plant City's

impact.  APPX0099960-0099961.  From 2017 to 2019, subject import shipments increased only

753,938 ST, substantially below the [                    ] in U.S. producers' U.S. shipments

and the 1.1 million ST in U.S. sales that Mosaic intentionally surrendered by closing Plant City.

OCPOpeningBr12-13; APPX0098547-0098548.

3.    **The Commission erroneously infers an oversupply of subject imports
from inventory volumes when inventory ratios [                    ] over
the POI**

From inventory data, the Commission erroneously infers an influx of subject imports.

Noting "the POI-high level of inventories of cumulated subject imports in March 2019," the

Commission suggests that the "substantial volumes" of subject imports peaking in January

2019—"together with the lower demand in three consecutive application periods"—led to

subject import volumes in excess of market needs.  APPX0099990.  The Commission also

maintains that subject import volumes exceeded whatever was needed to restock inventories.

APPX0099990-0099992.  The inventory data, however, do not support these findings.

14

**Business Proprietary Information
Has Been Deleted**

First, as background, subject import and domestic producer inventories vary seasonally and remain in place until sold.  New evidence confirms that the relocation of delivered inventories from one geographic region to another is *not* a common industry practice.  Indeed, during 2019, when inventories peaked, neither the domestic industry nor subject importers moved quantities at scale from low-demand to higher-demand regions.  *See* Part I.B.  Instead, both domestic and imported inventories remained in their originally delivered locations and did so for reasons unrelated to whether subject imports were entering the United States.

Second, inventory ratios [                    ] over the POI, contradicting any claim that subject import inventories overhung the market.  The [        ] relationship between subject import and domestic inventory levels is obvious from Table D-1 in the Staff Report, which shows that [                         ].  APPX0098552.  In particular, **Figure 1** shows that the ratio of subject import inventories and domestic producer inventories [

                    ] from the first quarter of 2018 to the first quarter of 2020.[3]  If the Commission were correct that imports oversupplied the U.S. market, then [

                                        ].  That did not happen.  Instead the ratio

[                                        ].

---

[3] APPX0098552.  The comparison begins in 2018 because any ratios from 2017 (*i.e.*, prior to the closing of Plant City) would not be comparable to 2018-2020, when import inventories necessarily increased after significant reductions in domestic supply.

**Figure 1: Share of All Quarterly Inventories – Quarterly, 2018 to 2020 (Per SR, Table D-1)**



Third, subject import inventories aligned with market trends.  For inventory analyses, import entries and domestic production are the starting point, as both move into inventory. **Figure 2** shows that on a monthly basis, import entries in 2019 were below 2018 in all but four months.  Subject import entries peaked in January 2019, leading inventories to crest in March 2019, but those peaks can be explained by high projected demand for the spring 2019 application season and by Redwater's expected closure.  These quantities also represent *gross* import entries, including re-exports, and thus overstate subject import volumes.  Given that re-exports of subject imports [                    ] percent from 2018 to 2019 (APPX0097708), the 2019 data are [                              ].  Meanwhile, **Figure 3** shows that subject import entries and inventories both declined substantially from Q1 to Q2 2019, *contra* the Commission's narrative.

**Business Proprietary Information
Has Been Deleted**
NON-CONFIDENTIAL VERSION

**Figure 2: Yearly Comparison of Monthly Imports (Qty in ST)**



**Figure 3: Quarterly Change in Subject Import Quantities and Inventories (Qty in ST)**

Business Proprietary Information
                                   Has Been Deleted

### 4.    Subject imports adjusted more than domestic producers after unanticipated disruptions in U.S. demand

In its Remand Views, the Commission continues to attribute the curtailment of the domestic industry's production as a response to the "collapse in U.S. prices" in 2019 when subject imports "continued to enter the U.S. market." APPX0100002-0100003. The Commission's assessment is unsupported by the record, and wholly ignores evidence that subject importers took larger corrective actions than the domestic industry to respond to changes in U.S. demand following unexpected weather events. Going into early 2019, distributors built up inventories in response to forecasts of strong demand in the spring, leading both domestic and subject inventories to reach their peak in Q1 2019. APPX0097714-0097721; APPX0098551. However, bad weather during the spring fertilizer application season led to a steep reduction in subject imports and limited off-season restocking to unaffected areas. APPX0096290-0096299.

Indeed, subject importers had a [          ] larger response than the domestic industry. Mosaic briefly limited production between March 2019 and early 2020 to "accelerate the reduction of high … inventories." APPX0092382. From 2018 to 2019, the domestic industry's production fell [     ]. APPX0098548. By contrast, subject import entries—a direct analogue to domestic production—declined by 9.5% from 2018 to 2019, with even higher declines "once the spring 2019 flooding was understood" in H2 2019, declining by 22% from H1 2019 and by 9.7% from H2 2018.[4] APPX0098445; APPX0097719-0097720. In Q1 2020, subject import entries fell by 47.8% from Q1 2019, compared to [          ] for domestic production. APPX0098455; APPX0086512. Imports declined in early 2020 as U.S. producer

---

[4] Between the 2018-19 and 2019-20 fertilizer years, subject imports dropped by 16.8% (547,000 ST). APPX0098455-0098456.

Business Proprietary Information
                                Has Been Deleted

and importer inventories [                    ], returning to [                    ] after the spring 2020

planting season returned to normal.  During H1 2020, U.S. producers' inventories [                    ]

from year-end 2019, while subject import inventories [                    ], by [        ].

APPX0098551.

> In sum, after unexpected weather-driven declines in U.S. demand, subject imports

adjusted by more than domestic producers.  The Commission's finding that subject imports

"continued to enter the U.S. market" "beyond levels demanded" is unsupported by substantial

evidence.  APPX0100008, APPX0100014.

### C.    The Commission's Supply Gap Analysis Ignores Contrary Economic Analyses, Including From a Former Mosaic Executive

> By understating the domestic supply shortfall and overstating the increased presence of

subject imports, the Commission again erroneously finds that no supply gap existed during the

POI.  APPX0099960-0099963.  In so doing, the Commission blithely takes the domestic industry

at its word on supply reductions while ignoring contrary evidence from Respondents—including

two detailed analyses, from Michael Rahm and James Dougan, of the supply gap.  Mr. Rahm

was Mosaic's Vice President of Market and Strategic Analysis and is currently a fertilizer

industry consultant; despite "burn{ing} bridges" with his former employer, he chose to testify

because he saw "a compelling case" of no material injury in non-confidential data sources.

APPX0017655.  Mr. Dougan is an economic expert who analyzed the confidential record.

OCPOpeningBr13.

> These economic analyses rely on different data sources, different measurements of

subject imports, and different time periods, yet they both reach the same conclusion: increases in

subject imports year-over-year did not exceed market needs and cumulatively were smaller than

the supply gap across the POI.  APPX0097705.  Nowhere does the Commission even

acknowledge these analyses, which directly contradict its central finding of "oversupply."

According to the Commission, the idling of the Plant City facility resulted in a

700,000 ST reduction in supply in the U.S. market from 2017 to 2018, while the closure of

Nutrien's Redwater facility in May 2019 was offset by an increase in production in its U.S.

facilities to "ensure a continued supply of phosphate fertilizers to customers in Canada."

APPX0099960-0099962.  The Commission also cites the domestic industry's claimed excess

capacity and "substantial and increasing inventories" across the POI as evidence that the

1 million ST increase in entries of subject imports injured the domestic industry. APPX0099962-

0099963.  But this is plainly disproven by both Mr. Rahm and Mr. Dougan.

Mr. Rahm concluded that the reduction in available domestic supply significantly

exceeded the increase in subject imports.  APPX0097712.  His analysis utilized public and

subscription data, and examined "fertilizer years" (July 1 to June 30)—the traditional timeframe

for the phosphate fertilizer industry, though the Commission addresses only calendar years.

APPX0097824.  According to Mr. Rahm, the total increase in subject imports from July 1, 2016

to June 30, 2020 (a few days after the petition) was more than 1 million ST smaller than the

cumulative total loss in U.S. domestic supply.  Subject imports increased by 657,000 ST from

2016/17 to 2017/18, and by 614,000 ST from 2017/18 to 2018/19, then decreased by 511,000 ST

from 2018/19 to 2019/20.  APPX0097831-0097832.  Meanwhile, domestic production decreased

by 770,000 ST from 2016/17 to 2017/18, mostly from Plant City but also from Hurricane Irma.

APPX0097831.  From 2017/18 to 2018/19, domestic production decreased again by 620,000 ST,

again mostly from Plant City but also in part from Redwater, which closed in 2019.

APPX0097832.  From 2018/19 to 2019/20, domestic production fell by another 530,000 ST due

Business Proprietary Information
Has Been Deleted

to Redwater. APPX0097832. In total, subject imports increased by 761,000 ST over the POI, while the combination of Plant City, Redwater, and Hurricane Irma reduced domestic supply by 1.92 million ST—such that subject imports filled only 40% of the domestic supply gap. APPX0097832-0097833.

Mr. Dougan's analysis compares changes in supply and U.S. demand against the increase in U.S. shipments of subject imports. APPX0097709. Examining supply, Mr. Dougan found that the reduction in supply consisted of both (i) the reduction in U.S. shipments by domestic producers after the idling of Plant City and (ii) the reduction in nonsubject Canadian imports after the closure of Redwater. APPX0097709. For demand, Mr. Dougan tracked changes in apparent U.S. consumption. APPX0097709. Using data from the confidential record, Mr. Dougan then compared the total market need for supply against the actual increase in U.S. shipments of subject imports on a calendar year basis. APPX0097709.

In every comparison—from 2017 to 2018, from 2018 to 2019, and across the full POI— [                                              ] than the total market need for additional supply, [                              ].[5] APPX0097709. From 2017 to 2018, the total market need for supply [        ] the increase in U.S. shipments of subject imports by [      ] ST after the idling of Plant City. APPX0097709. Across the full POI, accounting for the reduction in U.S. demand and the closures of Plant City and Redwater (including reduced imports from Canada, which the Commission never addressed), the market need [        ] the

---

[5] From 2018 to 2019, as the market faced repeated weather-related demand shocks that disrupted the balancing of supply and demand, [
                              ]. APPX0097709.

Business Proprietary Information
Has Been Deleted

increase in U.S. shipments of subject imports by [        ] ST, equal to [        ] of apparent U.S.

consumption in 2019.  APPX0097709-0097710.

Despite the clear evidence, the Commission never addressed either of these economic

analyses of the supply gap.  Both demonstrate that subject imports were needed to offset

reductions in supply, directly contradicting the Commission's linchpin finding of an

"oversupply" of subject imports—a finding that is unsupported by substantial evidence.

## III.    THE PRICE EFFECTS ANALYSIS FAILS TO COMPLY WITH THE ORDER

The remand determination also continues to lack substantial evidence of adverse price

effects, consideration of which the Court had deferred.  APPX0000038-0000039.  The Court

ruled that the Commission's original finding of price depression was tainted by its reliance on

the assumption that subject import oversupply and associated price depression could have been

avoided if domestic inventories had been reshipped to higher-demand regions.  APPX0000042-

0000043.  On remand, the Commission denies that it relied on this problematic assumption,

determining that "regardless of whether subject import inventories were being reshipped once

they reached their destination," the "oversupply of subject imports and their low prices exerted

downward pricing pressure on the domestic like product and significantly depressed U.S. prices

in 2019."  APPX0099952-0099953, APPX0099988-0099989.

In so concluding, the Commission again dismisses predominant overselling by subject

imports and relies on cherry-picked anecdotes contrary to the weight of the evidence.  These

errors result in a price effects analysis that continues to be unsupported by substantial evidence

and otherwise not in accordance with law.

Business Proprietary Information
Has Been Deleted

    **A.**    **The Commission Relies on the Same Cherry-Picked Evidence, Outweighed by Other Record Evidence, to Find that Subject Imports were Low Priced and Depressed U.S. Prices.**

The Petition alleged that subject imports were responsible for price declines during the POI.  To test those allegations, the Commission collected extensive pricing data through questionnaires, submitted under oath and verified by staff, which show predominant overselling by subject imports.  APPX0099980.  Yet the Commission dismisses this evidence, choosing instead to give decisive weight to unverifiable and anecdotal information.  In doing so, the Commission fails to address significant record data undermining the credibility of its chosen sources and the conclusions drawn from them.  Thus, its price depression finding is unsupported by substantial evidence and not in accordance with law.

    **1.**    **The Commission improperly discards evidence of overselling, but gives weight to unrepresentative instances of low prices.**

On remand, the Commission continues to give *zero* weight to the 80% of instances where subject import prices were higher than domestic prices, but give *decisive* weight to the few instances when they were slightly lower.  *See* OCPReplyBr10.  This is illogical and arbitrary. The Commission posits that evidence of predominant overselling deserves no weight because "prices of the domestic product and subject imports tracked each other closely and were generally comparable with small margins of underselling and overselling."  APPX0099982.  If that is sufficient reason to disregard price differences whenever subject import prices are higher, why not do the same when they are lower?  More importantly, why disregard the overselling data—meticulously collected through questionnaires—at all?  The Commission does not explain, yet proceeds to find that subject imports' "low prices" caused price depression.  APPX0099989.

In reiterating this finding, the Commission fails to address contrary record evidence and past practice.  When purchasers were asked whether subject imports were lower priced, higher

priced, or comparably priced compared to domestic product, 20 out of 24 reported that prices were "comparable"—yet the Commission found that these "comparable" ratings support a finding that subject imports were *lower* priced.  APPX0099980.  This is inconsistent with the Commission's past practice, as it has expressly found that "'comparable' indicates that subject imports were *not* lower priced than the domestic product."[6]  Meanwhile, average overselling margins (3.7%) were more than *double* average underselling margins (1.7%)—but the Commission dismisses the overselling margins as too "small" to have significance. APPX0099980-0099982.  If small margins are a reason to dismiss pervasive overselling, the Commission does not explain how fewer instances of underselling by *even smaller* margins can significantly depress domestic prices.

Meanwhile, the Commission finds that the pricing data show "importers of subject merchandise *in instances* offered lower prices than domestic producers in 2019," based on Mosaic's exhibit showing that [

].  APPX0099981-APPX0099982, APPX0099998 (emphasis added).  When the Commission's brief first highlighted the degree to which it had relied on this exhibit in its price effects analysis, OCP explained how this demonstrates the Commission's myopic focus on unrepresentative instances of lower-priced sales while ignoring the broader context.  OCPReplyBr11.  The Commission repeats Mosaic's claim that an importer was lowest priced in [    ] of monthly comparisons in 2019, but the same exhibit shows that at least one importer was *higher priced* than the sole domestic producer [      ]

---

[6] *Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan*, Inv. Nos. 731-TA-1387-1391 (Final) (Remand), USITC Pub. 5125 at 19 (Sept. 2020).

Business Proprietary Information
Has Been Deleted

of the time.[7]  Even when there was one importer with the lowest price in a given month,

downward pricing pressure would be unlikely if the six other importers' prices were higher than

domestic prices, or if the quantity that importer sold was *de minimis*.  Moreover, the

Commission's traditional price analysis shows that overselling was [

].  APPX0098473-0098476.

The Commission's remand determination does not address these facts and arguments

undermining its conclusion.  By giving weight only to rare instances of underselling to find that

subject imports were "low priced," the Commission inappropriately discards pricing data

contradicting its finding of price depression.

> **2.    The Commission continues to rely on an inflated volume of lost sales, and gives more weight to unreliable responses from one purchaser.**

The Commission continues to find that "the domestic industry lost sales to subject

imports because of lower prices" because four purchasers reported buying subject imports

"instead of" domestic product based on price.  APPX0099981-0099982.  This finding is key to

the Commission's decision to dismiss the predominant overselling and conclude that subject

imports' low prices caused price depression in 2019.  *Id.*  On remand, the Commission still fails

to address evidence and arguments demonstrating that this lost sales quantity is inflated and

unreliable.  OCPOpeningBr28-29; OCPReplyBr12-14.

---

[7] APPX0097573-0097574.  Since seven importers and one U.S. producer reported pricing data, statistics dictate that the odds of being the lowest-priced firm in a given month are 7/8 (87.5%) for importers and 1/8 (12.5%) for the domestic producer, especially if prices "tracked each other closely."  Yet according to Mosaic's exhibit, an importer was lowest priced in 2019 [          ] than expected ([       ]), while the domestic producer was lowest priced [            ] than expected ([      ]).  Thus, the exhibit should be read as confirming the pervasive overselling in 2019, not contradicting it.  *See* OCPReplyBr11.

As discussed during oral argument, [              ] reported [          ] ST in lost sales,
accounting for [        ] of total reported lost sales.  APPX0098484-0098486; OralArgTr210, 217.
Although [              ] stated that it "[

]" and that there were times it "[

]," the purchaser reported
[                                                    ].  APPX0098484-
0098486  The Commission acknowledges that "some portion of the reported quantity of lost
sales may also have been influenced by non-price reasons," yet relies on [

] rather than attempting to [

].  APPX0099981.  Any and all purchases of subject imports made
[                                                    ] cannot be lost sales.

Despite these contradictions, the Commission doubles down on [            ], finding that
"[            ] response regarding U.S. producers' price reductions further supports that it
increased its purchases of subject imports for price reasons."  *Id.*  The Commission quotes
[

].  APPX0099981-
0099982.  However, [                                        ].  [

].[8] In other words, to the extent [                ] response can be squared with reality, it is about [                            ].

Even setting [                ] responses aside, the Commission fails to address other evidence undermining its lost sales finding. Only 4 of 28 responding purchasers reported any lost sales, and the alleged 733,895 ST of lost sales (including [              ]) represents just 2.7% of total reported purchases and imports during the POI. APPX0098484-0098485. Moreover, since purchasers were not asked to specify when the alleged lost sales occurred, the total lost sales quantity over the entire POI is not evidence of low-priced subject imports *in 2019*. As noted, subject imports oversold domestic product in [      ] of reported volume in 2019, [

                        ]. APPX0098473-0098476. Because the Commission fails to address these fatal flaws, its findings that the domestic industry lost sales to subject imports, and that subject imports were low priced and caused price depression in 2019, are unsupported by substantial evidence.

### 3. The Commission relies on customer emails submitted by domestic producers without addressing contradictory record evidence.

The Commission continues to rely on unverified customer emails and lost sales/lost revenue allegations submitted by the domestic producers to conclude that "subject imports were being offered at low prices during {2019}." APPX0099997-0099998. OCP raised several issues regarding this evidence, which the Commission still fails to address. APPX0099554-0099556; OCPOpeningBr26-28.

---

[8] APPX0088537. The [

                                        ].

Business Proprietary Information
                                      Has Been Deleted

Several of Mosaic's customer emails were contradicted by questionnaires [

   ], reporting that [                                                    ];

[                                          ]; and/or [

                              ].  APPX0098486 (responses from [

         ]); APPX0097495-0097516 (emails discussing [

      ]).  ITC counsel argued that these contradictions do not matter, because it is the

Commission's prerogative to determine the weight and credibility of submitted evidence.

ITCBr29.  Even if credible, however, the emails often lack basic facts such as [



      ].[9]  These emails plainly do not reveal subject import sales of

sufficient magnitude to cause price depression.  Because the record also shows predominant

overselling by subject imports and domestic producers' refusals to supply,[10] the Commission's

reliance on these emails without addressing contrary evidence renders its finding of price

depression in 2019 unsupported by substantial evidence.

### 4. The Commission rejects verified questionnaire data in favor of unsubstantiated press quotes from the Petition.

With no reliable record evidence of subject imports causing price depression, the

Commission relies on trade press quotes, lifted verbatim from Mosaic's petition, to establish

causation.  APPX0099986-0099988, APPX0099992-0099994.  Unlike data submitted in

response to ITC questionnaires, these anecdotes—planted in industry publications by unnamed

---

[9] APPX0097500-0097505, APPX0097495-0097499.  Only [

                                                ].

[10] APPX0095807-0095808; APPX0096136; APPX0096164-0096165 (showing that [

                                                                    ]).

Business Proprietary Information<br>Has Been Deleted

sources—are not provided under oath and cannot be quantified or verified. The Commission still makes no attempt to justify its reliance on these soundbites, which are contradicted by its own pricing data. What the Commission does change is their prominence, upgrading these quotes from a footnote, APPX0099611-0099612, into the body of the remand determination. In whatever format, these trade press quotes remain unsubstantiated by record data and do not provide substantial evidence of causation. *Chr. Bjelland Seafoods A/S v. United States*, 19 C.I.T. 35, 41 (Ct. Int'l Trade 1995).

The Commission also states that "{t}hese articles discuss demand in the U.S. market as a whole and do not mention anywhere that there were areas of the U.S. market where demand was increasing." APPX0099986, APPX0099992. The Commission misconstrues the Court's reference to "higher demand regions": regions unaffected by flooding may not have had *increasing* demand, but normal demand peaks in Q2 and Q4. APPX0000032. Importantly, the Commission fails to address record evidence establishing the existence of regions with normal seasonal demand in 2019—including sworn Hearing testimony[11] and research reports.[12]

The Commission's decision to elevate unsubstantiated anecdotes over record pricing data sets the entire investigation on its head. The purpose of an investigation is to gather evidence, create a record upon which the Commission can test allegations made in the Petition, and make

---

[11] APPX0000014, APPX0000021; citing APPX0017694 ("you had some terminals coming back open needing supply"), APPX0017728 ("product is misplaced. . . . It couldn't get to the right location"), APPX0017732 ("we still had 75 to 80 percent of our market share {that} wasn't flooded. . . . there was spot shortage during that time period with demand well within the central part of the corn belt that wasn't wet").

[12] *See* APPX0095609 (USDA article reporting that the Deep South, the central Plains, and the lower South East had favorable planting conditions at various points in 2019); APPX0013761-0013766 (Farm Bureau maps showing that many counties did *not* have acres prevented from being planted due to the weather as of August 2019).

Business Proprietary Information
Has Been Deleted

an injury determination supported by substantial evidence.  In this case, however, when questionnaire data contradicted Petitioner's claims, the Commission arbitrarily set aside its own pricing evidence and relied instead on the Petition's bare allegations.  This is tantamount to what at Commerce would be "total AFA," or adverse facts available—yet it is being applied by the ITC in a case where respondents fully cooperated and provided substantial evidence supporting their arguments.  If unverified allegations from unknown sources in the Petition can carry more weight than certified evidence adduced in the investigation, why conduct an investigation at all?

In multiple respects, the Commission's finding that subject imports were low priced and depressed U.S. prices—based again on the same anecdotal and unverified evidence—continues to be unsupported by substantial evidence and otherwise not in accordance with law.

**B.** **The Commission's Additional Attempts to Find a Causal Link Between Subject Imports and Price Declines Lack Support or Logic.**

As discussed, there was no "oversupply" of subject imports to cause downward pricing pressure, and subject imports were not being sold at lower prices than domestic fertilizer. Fishing for a causal link between subject imports and declining prices, the Commission (i) argues that the decline in NOLA prices somehow confirms that higher-priced subject imports entering through NOLA caused price depression, and (ii) assumes without evidence that subject importers had the foresight and ability to stop imports in 2019 by predicting the weather.  These findings, too, are unsupported by substantial evidence.

**1.** **The finding that NOLA price trends demonstrate price depression caused by subject imports is unsupported.**

The Commission finds that the port of New Orleans (NOLA) is the nexus of price depression, stating that "contemporaneous trade publications cited above as well as purchasers' questionnaire responses show that the volumes of imports entering the port of New Orleans

Business Proprietary Information
                                        Has Been Deleted

contributed to oversupply in the U.S. market and had adverse effects on NOLA market prices."
APPX0099998-0099999.  The Commission cites to purchaser responses indicating that price
negotiations are informed by NOLA prices, but does not identify *any* questionnaire indicating
that subject imports *caused* NOLA prices to decline,[13] and ignores contrary record evidence and
arguments.  OCPOpeningBr30-31.

    The Commission's pricing product data, based on "U.S. point of shipment NOLA,"
demonstrate that: (i) subject imports predominantly oversold domestic product, [

];[14] (ii) any price decline [                                    ], as Mosaic is the "price leader";[15]
and (iii) domestic producers' prices and subject import volumes are *not* inversely related, as
domestic prices [                                    ] when subject import volumes [                    ],
and [                                    ] when subject import volumes [              ].[16]  OCP explained
that NOLA prices are primarily driven by *global* supply and demand, and the Commission's
cited chart shows that NOLA and global prices both declined in 2019 before increasing in
January 2020, months before the Petition.  APPX0097754-0097758; APPX0098482.  The
Commission addresses none of this contrary record evidence.

    **2.    The price depression finding relies on an unsupported assumption
            that subject importers had the foresight and ability to stop deliveries
            in advance of unexpected, record-setting precipitation.**

    While the Commission "recognize{s} that distributors rely on demand projections in
obtaining product," it does not take this condition of competition into account in its price effects

---

[13] This reaffirms that the trade publications are the Commission's only cited source for finding a
causal link between subject imports and the decline in U.S. prices.

[14] APPX0098471-0098476.

[15] APPX0091905-0091909; APPX0098470.

[16] APPX0098547-0098548; APPX0091904-0091905.

analysis, instead finding that subject import volumes in 2019 depressed prices "{r}egardless of why or when they were ordered."  APPX0099988.  This finding requires an unfounded and absurd assumption: that importers had the foresight and the ability to stop subject imports from arriving at NOLA *before* more rainfall occurred in Spring 2019 and Fall 2019.

To ensure "just-in-time" supply for farmers, distributors typically purchase fertilizer six months in advance of two narrow spring and fall application windows, using the off-seasons of Q1 and Q3 to restock the supply chain.  APPX0017668, APPX0098411, APPX0098413.  Thus, subject imports that arrived in Q1 2019 were ordered in Q4 2018 or earlier based on application projections for Q2 2019.  Furthermore, after adverse weather thwarted applications in Fall 2018, purchasers ordered more fertilizer than usual in Q4 2018 in anticipation of "catch-up" applications in Spring 2019.  APPX0017705-0017706.  When flooding commenced in certain regions in Q2 2019, subject imports had already been staged in inventory, having been ordered and shipped when no one could foresee that anticipated demand would again be disrupted by weather.  Yet the Commission suggests importers should have been able to predict the weather six months out and adjust subject import volumes to prevent oversupply.

Equally absurd, the Commission suggests importers should have had no trouble stopping imports at the first sign of bad weather, noting that "in 2019, [          ] percent of U.S. importers' U.S. commercial shipments were spot sales."  APPX0099988.  The Commission, however, is looking at the wrong contracts.  Contracts for U.S. importers' U.S. commercial shipments are between importers and their distributor/retailer customers, but the contracts that govern NOLA imports are between importers and fertilizer producers/suppliers, which are

[                                        ].[17]  In any event, [                    ] of U.S.

commercial shipments were sales (spot or otherwise) from existing inventories, not from new

production or new imports.  APPX0098413.

    The Commission also says "the record shows that foreign producers and/or importers are

able to move quickly to respond to changes in the market," noting "a large decrease in the

volume of cumulated subject imports" post-Petition.  APPX0099953-0099954.  This comparison

is misguided for three reasons.  First, demand projections remained high well into 2019 despite

the poor weather, as in each season the industry expected a rebound.  *See* Part II.B.1.  Second,

post-Petition events are completely distinct: adverse weather events could not be known until

*after* orders were placed and shipments made, but the risk of 75% duties was known *before*

decisions to make further orders and shipments.  APPX0017801.  Subject imports entered the

U.S. market in 2019 in response to firm customer demand, which foreign producers and

importers were obligated to supply.  APPX0017695.  In 2020, by contrast, foreign producers and

importers knew the risk of high tariffs once the Petition was filed, and mutually agreed to

suspend subject imports.  It is ridiculous to compare reactions to unforeseeable events requiring

clairvoyance with reactions to known risks.  Third, subject importers *did* respond to the changes

in demand in 2019, reducing volumes by more than the domestic industry.  *See* Part II.B.4.

    Because the Commission's finding that subject imports caused price depression rests on

the untenable assumption that subject imports could have prevented "oversupply" conditions in

2019, it is unsupported by substantial evidence.

---

[17] APPX0097727, APPX0097787-0097788.  By contrast, [      ] of domestic producers' U.S.
commercial shipments were spot sales.  APPX0098469; *see also* APPX0098405 (reporting that
[                                                                        ]).

## IV.    THE COMMISSION MISAPPLIES THE "BY REASON OF" STANDARD

On remand, the Commission fundamentally misunderstands and fails to implement the Court's instructions to address the unprecedented weather events of 2018 and 2019 as a potential intervening cause of injury.  The Court found that the Commission "skipped over uncontroverted evidence that tended to support Plaintiffs' theory that weather related demand declines were an intervening cause of injury."  APPX0000047.  The Court explained that "Section 1677(7) requires that any material injury be 'by reason of' subject imports, and unprecedented weather events that frustrated demand projections were a potential intervening cause."  APPX0000043. On remand, the Commission responds that it "did not and do{es} not find that subject imports were responsible for declining demand…{and that it} continu{es} to find that weather events…caused demand to decline."  APPX0099984.  This response misses the point.  The Commission's error arises from its failure to consider how this weather-related demand decline directly caused the "oversupply conditions" that it improperly links to subject imports.

This Court, in *Swiff-Train*, recognized that the "Federal Circuit has interpreted {the 'by reason of' language in} section 1673(b) as equivalent to the 'substantial factor' test," and explained that this "'substantial factor' test…effectively melds cause-in-fact and legal or 'proximate' cause into an encompassing analysis."  *Swiff-Train Co. v. United States*, 999 F.Supp.2d 1334, 1343, FN 13 (Ct. Int'l Trade 2014).  As the Supreme Court has recognized in other statutory contexts, proximate cause is severed by a superseding cause—or a "cause of independent origin that was not foreseeable."  *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011) (quoting *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996)); *First Nationwide Bank v. Gelt Funding Corp.*, 22 F.3d 763, 769 (2d Cir. 1994) (affirming RICO dismissal because the security's fall in price was "by reason of" a superseding cause—a market-wide real estate crash).

In this case, the abnormal and unforeseeable weather constitutes a superseding cause, severing the chain of causation between subject imports and any injury to the domestic industry. If not for three consecutive seasons of catastrophic rains—each independent of the others and each unanticipated—the supply of phosphate fertilizer staged for distribution to farmers for fall 2018 and both 2019 application seasons would have been consumed in the ordinary course, leaving no "oversupply." As the Commission's entire theory of injury rests on "oversupply conditions," there is no basis in law for its affirmative determination. APPX0000038 (noting the "centrality of the alleged oversupply to the Commission's determinations on volume, price effects, and impact").

The Remand Views recognize all facts necessary to support the conclusion that unprecedented weather was a superseding cause of injury. First, the Commission acknowledges the magnitude of the "Black Swan" level rainfall and polar vortex during the POI. APPX0099983. Second, it finds that these disastrous "weather events beginning in 2018 and continuing into 2019{} caused demand to decline," noting that the volume of "prevented planting acreage" set a U.S. record at 19.6 million acres. APPX0099954, APPX0099983-0099984. Third, it recognizes that, due to the time required to produce and move phosphate fertilizers to staging points near farmers prior to application seasons, distributors and retailers must order and move product during the off-seasons. APPX0099953. Fourth, this lag between when fertilizer is produced and when it is available to farmers means market participants place orders in advance based on demand projections. APPX0099953, APPX0099988.

The corollary to these factual findings is obvious: When the market projects "normal" demand for a "normal" season, supply and demand will find equilibrium. Extreme rainfall threw off that equilibrium in 2018 and 2019 in ways that no one could have predicted or planned for

**Business Proprietary Information Has Been Deleted**

until it happened.  In short, the "oversupply" the Commission identifies is really under-demand.  *See supra* Part II.B.1

The Commission erroneously claims the timing of imports in relation to unpredictable weather events does not matter, insisting that "regardless of how {subject imports} were ordered" and "regardless of why or when they were ordered" the mere presence in inventory of under-demanded subject imports is sufficient to be "a cause" of material injury.  APPX0099988.  This finding unreasonably and arbitrarily requires importers to have foresight into unpredictable future weather. *See supra* Parts II.B.1, III.B.2.  It also utterly fails to consider whether weather-related demand shocks were a superseding cause.

The Commission asserts that subject imports and bad weather are two distinct causes acting simultaneously on the domestic industry.  *See* APPX0099623-0099624; APPX0100010-0100011.  This case is not about distinct, simultaneous causes.  Here, weather is the true and only culprit.  Had the weather been normal, there would have been no "oversupply conditions" and no injury to the domestic industry.  This is the very definition of a superseding cause.  By not addressing weather-related demand shocks as a superseding cause of injury, the Commission fails to comply with the Court's order, and its finding of injury "by reason of" subject imports is unsupported by substantial evidence and not in accordance with law.

## V.    CONCLUSION

For the reasons explained above, Plaintiff respectfully urges this Court once again to remand the Commission's affirmative injury determination.

**Business Proprietary Information Has Been Deleted**

Dated: February 16, 2024

Respectfully submitted,

*Shara L. Aranoff*

_____

Shara L. Aranoff
James M. Smith
Sooan (Vivian) Choi
Paula Ortiz Cardona
John J. Catalfamo
Julia Shults

COVINGTON & BURLING LLP
850 10th Street, NW
Washington, D.C. 20001
(202) 662-5997
saranoff@cov.com

*Counsel to Plaintiff OCP S.A.*

Business Proprietary Information
Has Been Deleted

NON-CONFIDENTIAL VERSION

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the attached Plaintiffs' Comments in Opposition to the International Trade Commission's Final Remand Determination, filed February 16, 2024, contains 9,939 words, including headings, footnotes, and quotations, and excluding the cover page, table of contents, table of authorities, counsel's signature block, and this certificate, according to the word count function of the word-processing system used to prepare this brief, and therefore complies with the maximum 10,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

Dated: February 16, 2024                    Respectfully submitted,

*Shara L. Aranoff*

Shara L. Aranoff
James M. Smith
Sooan (Vivian) Choi
Paula Ortiz Cardona
John J. Catalfamo
Julia Shults

**COVINGTON & BURLING LLP**
850 10th Street, NW
Washington, D.C. 20001
(202) 662-5997
saranoff@cov.com

*Counsel to Plaintiff OCP S.A.*