## UNITED STATES COURT OF INTERNATIONAL TRADE
## NEW YORK, NEW YORK

BEFORE: THE HONORABLE STEPHEN A. VADEN

| | | |
|---|---|---|
| OCP S.A., | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| EUROCHEM NORTH AMERICA | ) | |
| CORPORATION, | ) | |
| Consolidated Plaintiff | ) | Consolidated Ct. No. 21-00219 |
| | ) | |
| and | ) | **PUBLIC VERSION** |
| | ) | **Confidential information removed** |
| | ) | **from pages 8, 10–12, 15, 17–19,** |
| | ) | **and 24–27** |
| PHOSAGRO PJSC, INTERNATIONAL RAW | ) | |
| MATERIALS., LTD. and KOCH FERTILIZER, | ) | |
| LLC, | ) | |
| Plaintiff-Intervenors | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE MOSAIC COMPANY and J. R. SIMPLOT | ) | |
| COMPANY, | ) | |
| Defendant-Intervenors. | ) | |

## PLAINTIFF-INTERVENOR PHOSAGRO PJSC COMMENTS ON THE U.S. INTERNATIONAL TRADE COMMISSION REMAND DETERMINATION

H. Deen Kaplan
Jared R. Wessel
Michael G. Jacobson
Cayla D. Ebert

HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, N.W.
Washington D.C., 20004-1109
(202) 637-8874
jared.wessel@hoganlovells.com

Date: March 1, 2024                    *Counsel to PhosAgro PJSC*

# <u>TABLE OF CONTENTS</u>

I.     THE APPLICABLE LEGAL STANDARD REQUIRES THE COMMISSION TO ACT IN ACCORDANCE WITH LAW AND TO JUSTIFY ITS FINDINGS ON THE BASIS OF SUBSTANTIAL EVIDENCE ............................................................................ 4

II.    THE *MAJORITY VIEWS* STILL FAIL TO ADDRESS THE DOMESTIC INDUSTRY'S "AUTHENTIC DEMAND SIGNALS" WHICH PULLED IMPORTS INTO THE MARKET TO MEET FARMERS' NEEDS ................................................................ 5

    A.    The *Majority Views* Contradict the Court's View that Subject Import Shipments Responded to "Authentic Demand Signals" Generated by Mosaic and Nutrien ... 7

    B.    The *Majority Views* Fail to Grapple With the Magnitude and Importance of the Domestic Industry's Failure to Serve Some of the Largest Buyers ................... 10

    C.    The *Majority Views* Continue to Use Inaccurate Data to Quantify the Supply Gap Caused by the Domestic Industry ................................................................. 11

    D.    Record Evidence Does Not Establish a Correlation Between Subject Import Volumes and Domestic Industry Performance ................................................. 11

III.   THE INVENTORYING OF SUBJECT IMPORTS DID NOT CAUSE MATERIAL INJURY ............................................................................................................. 13

    A.    The Commission's Disingenuous Questionnaire Process Did Not Produce New Evidence of Material Counter-Flow Movement of Inventories ....................... 14

    B.    The Commission Continues to View Subject Import Inventories in an Intellectual Vacuum ..................................................................................................... 15

IV.   THE COMMISSION MAJORITY'S DETERMINATION ON PRICE EFFECTS IS A DRASTIC DEPARTURE FROM PAST PRECEDENT ........................................... 17

    A.    The *Majority Views* Unlawfully Disregard Sworn Overselling Data on the Record ................................................................................................................ 18

    B.    The *Majority Views* Depart from Commission's Practice by Relying on Trade Publications to Override Questionnaire Data ................................................. 21

    C.    The Commission Majority Cannot Continue to Rely Upon Erroneous Lost Sales Data ............................................................................................................ 24

V.    THE COMMISSION'S DISINGENUOUS REMAND PROCESS WARRANTS THE COURT TO GIVE VERY SPECIFIC DIRECTIONS ON REMAND ........................ 27

VI.   CONCLUSION ................................................................................... 30

i

## TABLE OF AUTHORITIES

CASES

*Altx, Inc. v. United States,*
  26 CIT 709 (Ct. Int'l Trade 2002) ........................................................... 7
*Anshan Iron & Steel Co., Ltd. v. United States,*
  28 C.I.T. 1728, 358 F. Supp. 2d 1236 (Ct. Int'l Trade 2004) .................... 4
*Chung Ling Co. v. United States,*
  805 F. Supp. 45 (Ct. Int'l Trade 1992) .................................................... 24
*Consol. Edison Co. v. NLRB,*
  305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938) .................................... 4
*DAK Americas LLC v. United States,*
  456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ........................................... 22
*Davila–Bardales v. INS,*
  27 F.3d 1 (1st Cir. 1994) .......................................................................... 4
*Gerald Metals Inc. v. United States,*
  132 F.3d 716 (Fed. Cir. 1997) ............................................................ 4, 20
*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .............................................................................. 4, 22
*Nippon Steel Corp. v. U.S. Int'l Trade Comm'n,*
  494 F.3d 1371 (Fed. Cir. 2007) ................................................................ 5
*Rhone-Poulenc, Inc. v. United States,*
  20 C.I.T. 573, 927 F. Supp. 451(Ct. Int'l Trade 1996) .............................. 4
*Suramerica de Aleaciones Laminadas, C.A v. United States,*
  44 F.3d 978 (Fed. Cir. 1994) .............................................................. 4, 20
*Taiwan Semiconductors Industry Assn'n v. ITC,*
  266 F.3d 1339 (Fed. Cir. 2001) .......................................................... 4, 20
*Timken Co. v. United States,*
  699 F. Supp. 300 (Ct. Int'l Trade 1996) ................................................... 5
*Universal Camera Corp. NLRB,*
  340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) .................................... 5
*Usinor v. United States,*
  26 C.I.T. 767 (Ct. Int'l Trade 2002) ....................................................... 22
*Viraj Forgings v. United States,*
  283 F. Supp. 2d 1355 (Ct. Int'l Trade 2003) ............................................ 4

STATUTES

19 U.S.C. § 1677(7)(C)(ii) ......................................................................... 20

USITC PUBLICATIONS

*Hot-Rolled Steel Prod. from Kazakhstan, Romania, & South Africa,*
  Inv. No. 701-TA-407, USITC Pub. 4088 (July 2009) ..............................23
*Large Power Transformers from Korea,*
  Inv. No. 731-TA-1189 (Review), USITC Pub. 4826 (Sept. 2018)............. 23
*Stainless Steel Sheet & Strip from Germany, Italy, Japan, Korea, Mexico, & Taiwan,*
  Inv. No. 701-TA-382 (Second Review), USITC Pub. 4244 (July 2011)................. 23

*Sweaters Wholly or in Chief Weight of Manmade Fibers from Hong Kong, the Republic of Korea, and Taiwan*,
    Inv. Nos. 731-TA-448-450, USITC Pub. 2312 (Sept. 1, 1990) ................................................ 24

*Tapered Roller Bearings from Korea*,
    Inv. No. 731-TA-1380 (Final), USITC Pub. 4806 (Aug. 2018) ............................................. 20

*Urea Ammonium Nitrate Solutions from Russia and Trinidad &* Tobago,
    Inv. No. 701-TA-668 (Final), USITC Pub. 5338 (Aug. 2022) ..................................... 20, 22, 23

**PLAINTIFF-INTERVENOR PHOSAGRO PJSC COMMENTS ON THE U.S. INTERNATIONAL TRADE COMMISSION REMAND DETERMINATION**

Plaintiff-Intervenor PhosAgro PJSC ("PhosAgro") respectfully submits the following comments in opposition to the U.S. International Trade Commission's ("ITC" or "Commission") Remand Determination in the countervailing duty investigations in *Phosphate Fertilizers from Morocco and Russia*. ECF Nos. 145 and 146 ("*Majority Views*"), APPX0099947–0100018, APPX0021130–0021205 (incorporating by reference its Views, contained in *Phosphate Fertilizers From Morocco and Russia*, Inv. Nos. 701 TA 650-651 (Final), USITC Pub. 5172 (Mar. 2021) ("Final Determination"), APPX0020557–0020819). *See also* confidential versions of the Views ("*Original Views*"), APPX0099573–0099629. The *Majority Views* again erroneously found that the domestic industry was materially injured by reason of phosphate fertilizer imports from Morocco and Russia. Chairman Johanson again issued Dissenting Views, ECF No. 145 ("*Remand Dissent*"), APPX0100019–0100025, APPX0021201–0021205, finding that "there is nothing in the record that changes {his} original analysis, findings, or determinations." *Remand Dissent* at 1, APPX0100020, APPX0021201.

We agree with and incorporate by reference the comments set forth in *Plaintiff's Comments in Opposition to the U.S. International Trade Commission's Final Remand Determination*, ECF Nos. 156, 157 ("OCP's Comments"). We submit these comments to draw the U.S. Court of International Trade's ("CIT" or the "Court") attention to three fundamental flaws in the *Majority Views* which amount to violations of law, as well as the procedural problems with the Commission's conduct of the remand proceeding.

First, the *Majority Views* flatly ignore The Mosaic Company's ("Mosaic") own statements regarding the impact on the supply in the market of idling the Plant City facility. The *Majority Views* also look to public import data of entries of fertilizer into the United States, which include

large quantities of fertilizer that were subsequently exported to Canada—which is plainly wrong. As a result, the *Majority Views* under-account for the signaled North American supply that came offline in late 2017/early 2018, and they over-account for subject import supply to the U.S. market during that time. The increase in subject import ***shipments*** from 2017 to 2019, excluding product destined for Canada, was far below the supply gap that Mosaic and Nutrien announced to the industry, and that Mosaic expressly invited imports to fill.

Second, the *Majority Views* sidestep the Court's remand instructions by deemphasizing its prior findings on inventories, and continue to wholly de-textualize subject import inventories. The Commission's collection of new evidence confirms that supply is rarely moved counter-flow in the U.S. supply chain, closing the Court's open question on remand. Now the Commission majority points to the absolute increase of subject import inventories as the cause of injury. But subject import inventories actually fell relative to the domestic industry's inventories. This lack of contextualization is one of the primary reasons why, in the original determination, Chairman Johanson made a different determination, and why he continues to vote for negative determinations in his *Remand Dissent*, APPX0100019–0100025, APPX0021201–0021205.

Third, on the issue of price effects, rather than rely on the verified and sworn-under-the-threat-of-perjury information in the questionnaire responses, the *Majority Views* rely almost entirely on a trade publication grounded in hearsay. Such reliance is inconsistent with the Commission's past practice. More generally, the *Majority Views* rely on the type of information (such as press articles) that the Commission typically will only rely upon to ***confirm*** sworn questionnaire evidence. However, in this case the Commission uses this information to contradict sworn questionnaire evidence that would prevent a finding of injury—creating another inverted pyramid relying on hearsay instead of sworn questionnaire data.

Finally, the Commission's remand proceedings were marred by procedural irregularities that impugn the integrity of the process.

In sum, instead of following the clear record before it, the Commission's *Majority Views*, like its *Original Views*, are based on cherry-picked data, blatant disregard for overwhelmingly contradictory evidence, and hearsay trade publication stories. What is left once the incongruous and unreliable evidence is set aside is a simple explanation for what happened during the period of investigation ("POI"). Market and price leader Mosaic purposefully restricted supply by 1.1 million ST and expressly invited imports to fill the supply gap. Those imports came in at higher prices to meet desperate farmers' needs, and through 2018 higher shipments of imports correlated with strong, improving domestic industry performance. Then, historically poor weather caused harm to the entire industry in 2019, until the industry began to recover in 2020 when the weather returned to normal. None of this has anything to do with subject imports, which followed market prices set by Mosaic and came in at lower-than-invited volumes.

PhosAgro respectfully requests that this Court find the *Majority Views* to be contrary to law and unsupported by substantial evidence for the reasons set forth below. Due to the procedural anomalies during the first remand, coupled with the harm occurring to U.S. farmers, we respectfully request that this Court should remand with very specific instructions to the Commission to correct the errors detailed in these comments.

I.    **THE APPLICABLE LEGAL STANDARD REQUIRES THE COMMISSION TO ACT IN ACCORDANCE WITH LAW AND TO JUSTIFY ITS FINDINGS ON THE BASIS OF SUBSTANTIAL EVIDENCE**

The CIT has explained that an agency determination is not in accordance with law if the Commission "failed to carry out its duties properly, relied on inadequate facts or reasoning, or failed to provide adequate basis for its conclusions." *See Rhone-Poulenc, Inc. v. United States*, 20 C.I.T. 573, 927 F. Supp. 451, 451 (Ct. Int'l Trade 1996); *see also Anshan Iron & Steel Co., Ltd. v. United States*, 28 C.I.T. 1728, 358 F. Supp. 2d 1236, 1236 (Ct. Int'l Trade 2004). A determination is also unlawful if the agency departs from an established practice, and departs from that practice without "a reasoned analysis for the change." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). The CIT has explained that "should the agency reverse itself, {} it must confront the issue squarely and explain why its departure was reasonable." *Viraj Forgings v. United States*, 283 F. Supp. 2d 1355, 1342 (Ct. Int'l Trade 2003) (quoting *Davila–Bardales v. INS*, 27 F.3d 1, 5 (1st Cir. 1994)).

The CIT has also explained that the Commission's determination must be supported by substantial evidence, or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Suramerica de Aleaciones Laminadas, C.A v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). Further, the Federal Circuit has explained that "to properly make a material injury determination, the Commission must analyze 'contradictory evidence or evidence from which conflicting inferences could be drawn' {} to ensure that the subject imports are causing the injury, not simply contributing to the injury in a tangential or minimal way." *Taiwan Semiconductors Industry Assn'n v. ITC*, 266 F.3d 1339, 1345 (Fed. Cir. 2001) (quoting *Suramerica*, 44 F.3d at 985; *Gerald Metals Inc. v. United States,* 132 F.3d 716, 722 (Fed. Cir. 1997)). The CIT has previously emphasized that "{t}he 'whole record' means {} both sides of the

record.  It is not sufficient merely to examine the evidence that sustains the agency's conclusion." *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1996) (citing *Universal Camera Corp. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).  This Court has explained in its *Remand Order* that it considers "the record as a whole, including evidence that supports as well *as evidence that 'fairly detracts from the substantiality of the evidence*.'" *OCP v. United States*, Ct. No. 21-219, Slip. op. 23-136, ECF No. 141 (Ct. Int'l Trade Sept. 19, 2023) ("*Remand Order*") (emphasis added) at 24.

The CIT has broad authority to issue orders to the Commission on remand, including to order the Commission to address specific concerns.  *See e.g. Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 494 F.3d 1371, 1378 (Fed. Cir. 2007) (discussing the Federal Circuit's standard of review when the CIT orders the Commission to enter a negative determination).

## II. THE *MAJORITY VIEWS* STILL FAIL TO ADDRESS THE DOMESTIC INDUSTRY'S "AUTHENTIC DEMAND SIGNALS" WHICH PULLED IMPORTS INTO THE MARKET TO MEET FARMERS' NEEDS

The Court in its *Remand Order* identified a fatal flaw in the original determination.  The Court found that the Commission lacked substantial evidence to justify its view that subject imports in 2019 were excessive and the cause of injury.  Specifically, the Court explained that "subject imports were responding to bona fide demand signals in 2019 rather than oversupplying a saturated market." *Remand Order* at 47.  If oversold subject imports increased based on signaled market demand, as a result of the domestic industry's taking capacity offline and expressly inviting imports to fill the void, then those subject imports were not injurious.  The Court ruled that "the record shows that domestic product could not effectively fill all U.S. demand during the severe flooding of late 2018 and 2019." *Id.*  In short, it was the flood of water due to bad weather, and not a flood of subject imports, that caused problems for the market in 2019.  Acts of God cannot be attributed to subject imports.

Against this backdrop, the Court's *Remand Order* focused on the lynchpin evidence that was missing in the Commission's findings—whether inventories in parts of the U.S. market that were oversupplied as a result of the bad weather could reasonably have been moved backwards to meet demand in undersupplied locations. The Court has already found that absent such evidence, the rest of the Commission majority's determination is unsustainable. The Court explained its findings in detail:

> Here, the Commission's finding that subject imports were oversupplied was central to its determination that the volume, price effects, and impact of subject imports was significant. . . . However, the existence of uncontroverted record evidence that additional imports were needed in 2019 to supply regions unaffected by bad weather undermines the Commission's oversupply analysis. . . . The Court has determined that the Commission lacked substantial evidence to assert that domestic inventories were available in 2019 to supply high-demanded regions in the U.S. market. . . . Because of this failure, the Commission failed to controvert Plaintiffs' record evidence that subject imports were not oversupplied but instead responded to authentic demand signals.

*Remand Order* at 37–38.

As explained in detail in Section II of OCP's Comments and expanded upon below, there is no new evidence in the Commission's remand proceeding that shows that material inventories could have been reasonably expected to move counter-flow in the supply chain. Therefore imports were needed to supply farmers in areas where inventories had been depleted. Five agricultural industry associations representing hundreds of thousands of American farmers, participating as *amici* in this case, have clearly explained just how critical it is for farmers to be able to get the fertilizer they need and exactly when they need it. Jt. Amici Br. at 2, ECF No. 85. *Amici* explain that domestic producers' decreased production and increased exports, historically wet weather seasons, and high bounce-back demand projections caused the "supply imbalance" which could only be remedied by imports. *Id.* at 3. Without new evidence, and in light of the Court's prior

6

findings about subject imports responding reasonably to "authentic demand signals" (*Remand Order* at 38), the Commission majority has not established an adequate basis for its conclusion that the market was oversupplied by subject imports in 2019. The Commission's determination is therefore not in accordance with law.

    **A.**    **The *Majority Views* Contradict the Court's View that Subject Import Shipments Responded to "Authentic Demand Signals" Generated by Mosaic and Nutrien**

This Court explained that if subject imports filled demand that the domestic industry does not meet "either because of incapability or lack of viability," then those imported volumes may not be significant. *Remand Order* at 41 (citing *Altx, Inc. v. United States*, 26 CIT 709, 717 (Ct. Int'l Trade 2002)). This is still true following remand. Imports were necessary to meet U.S. demand to fill the supply gap caused by the domestic industry's purposeful undersupply of the U.S. market.

The Commission majority refuses to acknowledge that the subject imports coming into the U.S. market (and not reexported to Canada) in late 2018 and 2019 were, as the Court found, responding reasonably to "authentic demand signals." *Remand Order* at 38. And the Commission majority continues to reject the clear evidence supporting the respondents' argument. Accordingly, the *Majority Views*, APPX0099947–0100018, APPX0021130–0021205, are directly contrary to the Court's findings.

The "authentic demand signals" identified by the Court largely come from Mosaic idling its Plant City, Florida production facility in late 2017. *See* Hr'g Test. of Richard McLellan para. 5, APPX0015396. This was the clear catalyst for imports to increase in 2018 and 2019 to meet American farmers' anticipated needs. Mosaic made the decision to idle Plant City long before bringing this case, amidst strong prices and market conditions. Mosaic told its investors and the American farming community that its goal was to reduce its market share "from 55%, 60% market

**PUBLIC VERSION**
**PROPRIETARY INFORMATION DELETED FROM BRACKETS**

share to a more sustainable 50-ish percent market share," by "giving up 1 million tonnes {or 1.1 million ST} of market here in the U.S. intentionally," and that it viewed the idling as having "opened a hole for some imports to increase." *See* Gavilon Prehearing Br. at Exhibit 1A, APPX0090470–0090471,    APPX0010739–0010740;    APPX0089759,    APPX0010028; APPX0090040, APPX0090045–009046, APPX0010309, APPX0010314–0010315.  In February 2018, Mosaic quantified that Plant City closure would remove "1.5 million tonnes out of the equation," OCP's Prehearing Br. at Exhibit 16, APPX0092614, APPX0012705.

Mosaic, the price leader in the U.S. market, made this move in order to raise prices through restricting its U.S. production in this highly-consolidated U.S. industry.  In fact, Mosaic agreed at the hearing with Commissioner Schmidtlein's characterization of Mosaic's strategy for the closure: ***to restrict U.S. supply to "prop up" prices***.  *See* Hr'g Tr. at 109 (Mosaic CEO Joc O'Rourke), APPX0015605.  Unsurprisingly due to Mosaic's invitation, imports from several sources increased, including from Mosaic's affiliated Saudi Arabian supplier Ma'aden (which quickly grew to become the largest source of nonsubject imports in 2019).  *See Phosphate Fertilizers from Morocco and Russia - Staff Report*, Inv Nos. 701-TA-650-651 (Final) (Feb. 26, 2021), APPX0098373-0098571, APPX0020294-0020556 ("*Final Staff Report*"), *at Tbls. C-1*, APPX0098547–0098548,    APPX0020532–0020533,    *IV-2*,    APPX0098445–0098446, APPX0020434–0020435*; Majority Views at 14*, APPX0099959, APPX0021146*.*

This supply gap is supported by other record evidence.  As the Commission majority acknowledges in its analysis of conditions of competition, "the domestic industry also exported substantial volumes {[                                                    ]} of phosphate fertilizers to third country markets" during the POI.  *Majority Views* at 11, 58–72, APPX0099956, APPX0100003–0100017, APPX0021143.  This practice further deprived American farmers of

supply. However, the Commission ignores this information in its impact analysis. *Id.*, APPX0099956, APPX0100003–0100017, APPX0021143.

Notwithstanding Mosaic's own statements, the *Majority Views* confoundingly conclude: "we find that the record does not support respondents' assertions that the imports were 'pulled into' the U.S. market to fill a 'gaping hole in supply' of 1.1 million short tons that was filled by the over 1 million short ton increase in subject imports in 2018." *Id.* at 15, APPX0099960, APPX0021146–0021147. Instead of relying on Mosaic's clear and consistent statements regarding the supply gap it purposefully created, and its invitation for imports to fill that gap, the *Majority Views* continue to rely on Mosaic's *post hoc* statement through this litigation that the supply gap it created was a smaller 700,000 ST. 1/ The Commission relied on inadequate facts and reasoning by refusing to confront the Petitioner's own statements prior to filing this case when analyzing the supply gap that the domestic industry created. *See Majority Views*, n. 296, APPX0100013, APPX0021195. The Commission's determination is therefore not in accordance with law.

The *Majority Views* also wholly discard the impact of another supply shock that impacted U.S. market demand—Nutrien's announcement in February 2018 of the closure of its Redwater, Canada plant. In a stunning reversal from its treatment of Mosaic's statements, the Commission majority relies on Nutrien's CEO's statements that the loss in the Redwater capacity would be made up for by increased production in the United States. *Majority Views* at 12, 17, n. 295, APPX0099957, APPX0099962, APPX0100012, APPX0021144, APPX0021149, APPX0021195. This discounting of the Redwater closure fails, however, to properly take into account the

---

1/    The 700,000 ST figure proposed by Mosaic refers only to Plant City's 2017 U.S. shipments, not its expected production or shipments for 2018 and 2019. *See* OCP's Comments at 8–9.

quantities that the Redwater facility was exporting from Canada to the United States, and how that signaling would impact Redwater's U.S. customers' need to find alternative supply sources, including potentially from subject imports.

The Commission's discounting of the Redwater closure is an obvious contradiction by the Commission majority—it accepts market signals from Nutrien that says that Redwater's closure will not create a supply gap, but it rejects market signals from Mosaic that says that Plant City's idling will create a large supply gap.  The *Majority Views'* blatant contradictions make no sense and cannot constitute an adequate basis for its conclusions.

**B.    The *Majority Views* Fail to Grapple With the Magnitude and Importance of the Domestic Industry's Failure to Serve Some of the Largest Buyers**

The *Majority Views* fail to explain how evidence that Mosaic forced purchasers to buy imports does not detract from a finding of injury.  During the latter part of the POI, Mosaic failed to serve at least [                                                   ] Gavilon, and CHS, [                                             ].  By [

                              ] and by cutting supply to Gavilon and CHS by a total of 300,000 ST, Mosaic forced all of these major buyers to turn to imports. *See Majority Views* at 14–15, APPX0099959–0099960, APPX0021146; *Final Staff Report* at II-8–II-10, APPX0098404–0098406, APPX0020395–0020397; US Purchaser Questionnaire Response of [      ] at III-11, APPX0088781.  The *Majority Views* acknowledge that Mosaic was restricting supply even when market prices were very high in 2018 and early 2019, but then ignores these important facts in assessing the supply gap. *See Majority Views* at 15, APPX0099960, APPX0021146–0021147. Subject imports cannot be blamed for Mosaic's proverbial stiff-arm to these major buyers.

C.    **The *Majority Views* Continue to Use Inaccurate Data to Quantify the Supply Gap Caused by the Domestic Industry**

The Commission majority continues to stubbornly rely on total subject import levels to support its conclusion that the U.S. market was oversupplied by subject imports.  The *Majority Views* compare Mosaic's stated 700,000 ST supply gap from the closure of Plant City with public statistics showing subject imports increasing by about 1 million ST from 2017 to 2018. *See Majority Views* at 16–17, APPX0099961–0099962, APPX0021147–0021148 ("The volume of cumulated subject imports, however, increased by a greater amount – more than one million short tons – during {2017-2018}.").  The *Majority Views'* numbers are plainly wrong.  The record contains uncontroverted evidence of substantial quantities of imports into the United States that are ultimately reexported and consumed in Canada.  Specifically, the questionnaires submitted by importers from Russia and Morocco show that in 2019 [

].  APPX0097708.  Clearly, public import statistics are an inaccurate measurement of the market.  The large quantities of subject imports that are destined for Canada do not compete with U.S.-made phosphate fertilizer in the U.S. market at this time and, therefore, cannot serve as a basis for injury.

In sum, neither the calculation of the supply gap set forth by the *Majority Views* nor the calculation of the increase in subject imports to fill the gap are supported by substantial evidence or in accordance with law.

D.    **Record Evidence Does Not Establish a Correlation Between Subject Import Volumes and Domestic Industry Performance**

The *Majority Views* do not confront, and cannot rebut, the fact that trends for shipments of subject imports are inversely correlated with domestic industry performance.  This is emblematic of a lack of causation.  The Commission majority's failure to justify its findings on this basis is

PUBLIC VERSION
PROPRIETARY INFORMATION DELETED FROM BRACKETS

likewise lacking substantial evidence and grounds for overturning the Commission majority's determination.

The inverse correlation is obvious. The domestic industry's performance was strong in 2017, enjoying operating income of [                    ], and then improved to become even more successful in 2018 amidst increasing prices, to an operating income of [                    ] on the back of significant price increases. *Final Staff Report* at Tbl. C-1, APPX0098547–0098548, APPX0020532–0020533. At the same time, the domestic industry saw its shipments decline by [                    ], and its market share decline by [        ] percentage points amidst rising demand. *Id.*, APPX0098547–0098548, APPX0020532–0020533. Subject import shipments increased by 33.9 percent and their market share increased by [        ] percentage points. *Id.* This happened because Mosaic idled Plant City in late 2017 amidst a very strong market, continued to export large quantities to foreign markets, and invited imports in to fill the void. In short, the domestic industry decreased shipments and lost market share, and performed better, irrespective of subject imports' increase in shipments and market share at the same time. This is not surprising as it was Mosaic's stated plan. And yet, the *Majority Views* continue to misplace their focus on the quantity of increased subject imports in 2018 when the domestic industry was highly successful.

So what changed? After the domestic industry was successful in its plot to decrease the supply to farmers, Acts of God intervened. An unprecedented three planting seasons marred by wet weather—unexpected by the market—caused prices to decline in 2019. Subject imports certainly have nothing to do with the weather.

Once the weather improved in 1H 2020, Mosaic told its investors that "farm economics" and "demand is up" caused the improvement. Gavilon Prehearing Br. at Exhibit 1A, APPX0090104–0090116, APPX0010616–0010635. Mosaic even made clear after filing this case,

and as the market continued to improve in late 2020, that the CVD case was not "going to make a huge difference" in the market because demand had already normalized. *Id.*, APPX0090361, APPX0010630.

So while Mosaic blames subject imports for its problems in 2019, it credits the weather, farm economics, and resulting strong demand for its successes throughout the rest of the POI. That simply does not add up. And yet, the Commission majority has taken Mosaic at its word that subject imports, and not the weather, were the primary cause of the domestic industry's problems in 2019. In so doing, the Commission ignored: (1) these inverse correlation trends, (2) the significant improvement in Mosaic's financial performance before the Petitions were filed at the end of Q2 2020, and (3) Mosaic's own public pronouncements that the CVD cases had nothing to do with Mosaic's demand-driven improvements in the latter part of 2020. *See id.*, APPX0010811, APPX0090542. These glaring absences are yet another basis for overturning the *Majority Views*.

## III.    THE INVENTORYING OF SUBJECT IMPORTS DID NOT CAUSE MATERIAL INJURY

The Commission majority still has not demonstrated the existence of substantial evidence that material quantities of fertilizer could reasonably have been shipped between inventory locations to meet demand imbalances caused by the historically wet weather in late 2018 through 2019. 2/   In the face of a lack of evidence to support its views, the Commission majority sidestepped the issue of movement of inventories and failed to engage with relative inventory data:

> Thus the record shows that regardless of whether subject import inventories were being reshipped once they reached their destination, the substantial volume of cumulated subject imports continuing to enter the United States in 2019 was adversely impacting U.S. prices as demand remained low due to weather events and flood in the spring of 2019.

---

2/    We endorse and incorporate by reference Section II.B of OCP's Comments on this issue.

*Majority Views* at 43, APPX0099988, APPX0021172.

This conclusion by the Commission majority is contrary to the Court's findings in its *Remand Order* and is not based in substantial evidence. What really happened is that subject import inventories were actually ***more*** receptive than domestic producers' inventories to the decrease in demand caused by the weather events in 2019. Plain and simple. The revised *Majority Views* still lack substantial evidence and are not in accordance with law.

A.   **The Commission's Disingenuous Questionnaire Process Did Not Produce New Evidence of Material Counter-Flow Movement of Inventories**

The Commission majority lacks evidence to support its fundamental conclusion that existing inventories could have moved to satisfy demand in other parts of the U.S. market in 2019. The Commission's questionnaire process on remand was not genuinely designed to respond to the Court's remand order. 3/  Over respondents' objections, the Commission crafted its questions in a way that would lead to misleading or irrelevant responses to the Court's remand order. And even despite the Commission's faulty process, the questionnaire responses overwhelmingly demonstrated that the phosphate supply chain was almost universally unidirectional.

Lacking substantial evidence to support its prior presumption that material quantities of inventories could reasonably move backwards, the Commission majority chose to discard that lynchpin of its prior determination: "this observation was not central to our material injury analysis and, as described below, continue to find that an industry in the United States is materially injured by reason of {subject imports} without reliance upon that original finding." *Majority Views* at 7–8, APPX0099952–0099953, APPX0021139–0021140. But, the Court has already found, and it is thus *res judicata*, that inventory movement is the only piece of evidence that could plausibly show

---

3/     We endorse and incorporate by reference Section I of OCP's Comments on this issue.

PUBLIC VERSION
PROPRIETARY INFORMATION DELETED FROM BRACKETS

that subject imports were injuriously oversupplying the market in 2019 and not simply responding to demand signals in each U.S. sub-market.  The Court's finding that "the Commission lacked substantial evidence to assert that domestic inventories were available in 2019 to supply high-demand regions in the U.S. market" now stands unrebutted by substantial evidence.  *Remand Order* at 38.

### B.    The Commission Continues to View Subject Import Inventories in an Intellectual Vacuum

Inventories cannot be measured in a vacuum.  As we explained to the Commission in the original investigation, and as we explained in our submission to the Court in the original appeal, subject import inventories in 2019 behaved as expected, when measured in comparison to U.S. producers' inventories at the same time.  However, the *Majority Views* still continue to refer to absolute quantities of subject import inventories when finding that the subject imports sitting in inventory "were contributing to oversupply conditions."    *Majority Views* at 50–51, APPX0099995–0099996, APPX0021179–0021180.    The *Majority Views'* failure to assess inventories in their proper context is clear error.

In the build-up to the 2019 fall application period, the inventorying behavior of subject imports closely tracked the inventorying behavior of U.S. producers, as shown below—except in late 2019, where subject import inventories fell relative to domestic producers' inventories.  *See Final Staff Report* at Tbl. D-1, APPX0098552, APPX0020800; Gavilon Posthearing Br. at 6, APPX0096152, APPX0016208 (ratios calculated by dividing subject imports inventories by U.S. inventories).

| Ratio of Subject Import Inventories to U.S. Inventories | | | | |
|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 |
| **2018** | [    ] | [    ] | [    ] | [    ] |
| **2019** | [    ] | [    ] | [    ] | [    ] |

In fact, the Court has already acknowledged this parallel behavior: "the ratios appear to show that even though {} they were increasing, they were increasing in tandem." *OCP v. United States*, Ct. No. 21-219, Hr'g Tr. at 172, ECF No. 129. Further, unlike the Commission majority, Commissioner Johanson elected to ground his analysis in economic reality by comparing the relative inventory level movements and, as a result, came to a different conclusion about the impact of subject import inventories on the market in 2019: "Moreover, the ratio of subject import inventories to U.S. producers' inventories in 2019 was consistent with the ratios in 2018 for Q1 and Q2 and declined relative to 2018 ratios for Q3 and Q4." *Original Dissent* at 15–16, APPX0099642–0099643, APPX0020354. In considering all of the evidence on the record, Commissioner Johanson correctly states that, "if there was any supply/demand mismatch for subject imports in 2019, the imbalance was temporary, it was comparable for domestic production and subject imports, and it was caused by adverse weather, not aggressive selling or low prices." *Id.* at 16, APPX0099643, APPX0020618. Chairman Johanson got it right in his original dissent, and he got it right again in his dissent on remand.

In contrast, the Commission majority found that the "domestic industry maintained substantial and increasing inventories throughout the POI." *Majority Views* at 18, APPX0099963, APPX0021149–0021150. But it is obvious why absolute quantities of inventories increased across the board in 2019—demand projections exceeded actual demand for all sources of supply due to the unexpected bad weather. It is nonsensical that the Commission blamed relatively flat and at times decreasing subject import inventories from 2018 to 2019 as the cause of material injury to the domestic industry, while discarding the effect of weather events. *See Final Staff Report* at Tbl. D-1, APPX0098551–0098552, APPX0020799–0020780; *Majority Views* at 66, n. 298, APPX0100011, APPX0100014, APPX0021270–0021271, APPX0021273.

PUBLIC VERSION
PROPRIETARY INFORMATION DELETED FROM BRACKETS

The holes in the Commission majority's inventory analysis are easily explained by the weather. For example, the Commission majority (without comparing to domestic producers' inventories) finds that "US importers' end-of-period inventories of cumulated subject imports reached their highest level of the POI in March 2019." *Id.* at 44, APPX0099989, APPX0021173. However, this is predictable because those inventories, just like those of the domestic producers, were positioned ahead of an expected high demand period for spring application season that never came to pass because of another season of historically bad weather. All sources of supply were experiencing the same problems due to the weather, and thus subject import inventories and domestic producers' inventories were both elevated by a similar amount. In fact, subject sources' share of inventories at the end of March 2019 was [                    ] than their share of inventories at the end of March 2018, whereas the share of nonsubject inventories from Mosaic's Saudi affiliate in the same period was [                    ]. *See Final Staff Report* at Tbl. D-1, APPX0098551–0098552.

The law does not allow the Commission majority to cherry pick inventory data as the basis for its affirmative findings and ignore the context and conditions of competition that demonstrate that those subject import inventories were not actually injurious. The Court rejected this approach in its *Remand Order*, and it should do so again.

## IV. THE COMMISSION MAJORITY'S DETERMINATION ON PRICE EFFECTS IS A DRASTIC DEPARTURE FROM PAST PRECEDENT

Lacking evidence to justify its findings on volume and inventory, the Commission majority attempted to rehabilitate other parts of its findings, including on price. 4/ In particular, the

---

4/    The Court signaled that it would review additional issues raised with the "Commission's volume, price, and impact findings, including potentially inflated lost sales totals" after remand. *Remand Order* n. 7.

PUBLIC VERSION
PROPRIETARY INFORMATION DELETED FROM BRACKETS

Commission majority attempted to expand its discussion of overselling after failing to account for the large majority of overselling on the record in its *Original Views*. 5/ But again, the Commission majority falls short by failing to apply the clear and overwhelming evidence of overselling on the record in its pricing analysis. Specifically, the Commission majority again, and even more blatantly, disregards the pricing product data which was provided under oath by respondents. These data show that subject imports overwhelmingly oversold domestic producers' shipments throughout the POI. Instead, the Commission majority relies primarily on hearsay trade publication reports (almost exclusively from one publication, *Argus Media*) and *post hoc* statements made during litigation by Mosaic to determine that subject imports caused price depression in the U.S. market. The Commission majority also continues to rely on lost sales totals that are contrary to [



]. The Commission majority's price and lost sale findings are not supported by substantial evidence, inconsistent with agency practice, and not in accordance with law.

### A.    The *Majority Views* Unlawfully Disregard Sworn Overselling Data on the Record

On remand, the *Majority Views* observes that the sworn questionnaire data demonstrate the following evidence on pricing during the POI:

> The pricing data show that cumulated subject imports undersold the domestic like product in 34 of 170 instances (involving 381,132 short tons) at underselling margins ranging from 0.02 to 4.4 percent and an average underselling margin of 1.7 percent. ***Subject imports oversold the domestic like product in the remaining 136 instances (involving 2.0 million short tons) at overselling margins between***

---

5/    The Commission blatantly disregarded overselling data in its *Original Views*. *See Original Views* at 30, APPX0099600.

**PUBLIC VERSION**
**PROPRIETARY INFORMATION DELETED FROM BRACKETS**

> *0.02 and 17.6 percent with an average overselling margin of 3.7 percent.*

*Majority Views* at 34–35, APPX0099979–0099980, APPX0021164 (emphasis added). But then, in the very next sentence, the *Majority Views* completely negate its traditional source of pricing data, finding that that "underselling and overselling margins were small and prices of the domestic like product and subject imports tracked each other closely over the POI." *Id.* at 35, APPX0099980, APPX0021164–0021165. This finding ignores the significant volume of oversold product, which accounts for 88% of volume subject imports, and the overwhelming number of instances of overselling, which accounts for 80% of instances – sometimes as high as 17.6 percent. The Commission majority somehow equates 381,132 ST of undersold subject imports in a total market of nearly [    ] million ST, which it characterized as "some instances," as sufficient evidence to find that subject imports caused price depression and lost sales. *Id.*; *Final Staff Report* at Tbl. C-1, APPX0098547–0098548, APPX0020532–0020533. The Commission majority's conclusion is directly contradicted by the record before it. The record demonstrates that even in 2019, the year the Commission majority focuses on for injury, there was predominant overselling [                                        ]. *See Final Staff Report* at Tbls. V-4, V-5, APPX0098473–0098476, APPX0020723–0020726. In fact imports from Saudi Arabia were growing and [            ] in 2019, another fact that the Commission majority wholly ignores. *See Final Staff Report* at Tbl. C-1, APPX0098547–0098548, APPX0020532–0020533.

The Commission majority even acknowledges their blatant disregard for the record data by going on to say:

> {W}hile we recognize the prevalence of overselling in the pricing data, we continue to find that the record demonstrates that, consistent with the high degree of price transparency in this market, the prices of the domestic product and subject imports tracked each other closely and were generally comparable with small margins of

> underselling and overselling, that subject imports were in some
> instances lower priced, and that the domestic industry lost sales to
> subject imports because of lower prices.

*Majority Views* at 37, APPX0099982, APPX0021166.   In other words, the *Majority Views*

acknowledge that overselling was prevalent, but refuse to apply the record data when making its

determination.   There is no other way to describe the Commission's findings on overselling and

price effects than a pure failure to sufficiently analyze contradictory record evidence, as required

by law.   *See Taiwan Semiconductors Industry Assn'n*, 266 F.3d at 1345; *Suramerica*, 44 F.3d at

985; *Gerald Metals v. United States,* 132 F.3d at 722.

The Commission has frequently found no price depression with even less pronounced

evidence of overselling – including in the fertilizer market.   For example, in *Urea Ammonium*

*Nitrate Solutions from Russia and Trinidad & Tobago* ("UAN"), another fertilizer case initiated

soon after the conclusion of the phosphate fertilizer investigation, record evidence demonstrated

cumulated subject imports oversold domestic like product in 69 of 108 instances, or 64% of

instances, and the Commission made negative findings on price effects. Inv. No. 701-TA-668

(Final), USITC Pub. 5338 (Aug. 2022), Views at 26, 32.   Another example that is even more stark

was the Commission's finding in *Tapered Roller Bearings from Korea*.   There, record evidence

demonstrated subject imports oversold domestic like product in 37 of 84 instances, or just 44% of

instances, yet still the Commission made negative findings on price effects. *Tapered Roller*

*Bearings from Korea*, Inv. No. 731-TA-1380 (Final), USITC Pub. 4806 (Aug. 2018), Views at

30–31.

The Commission majority recognizes that the statute requires the Commission to make a

finding on underselling.  *Majority Views* at 33, APPX0099978, APPX0021163; *see also* 19 U.S.C.

§ 1677(7)(C)(ii)(I).   This is why the Commission collects pricing data in the first place.  But, to

then discard those data when they do not fit the Commission majority's theory of the case is not only inconsistent with the Commission's practice, it amounts to a failure to carry out its statutory mandate.

**B.    The *Majority Views* Depart from Commission's Practice by Relying on Trade Publications to Override Questionnaire Data**

To support their flawed conclusion that record evidence of vast overselling should be discarded, the Commission majority relies on trade publications. *See Majority Views* at 44, 49–50, 53, APPX0099989, APPX0099994–0099995, APPX0099998, APPX0021173, APPX0021178–0021179, APPX0021182; *see also id.* n. 177, APPX0099984, APPX0021168; *id.* n. 195 APPX0099988, APPX0021172. Notably, the Commission majority relies almost exclusively on reports from one publication, *Argus Media*, which are hearsay accounts of transactions in the market. *See* Pet. Vol. I at Exhibit I-20, APPX0080283–0080294, APPX0001125–0001136 (explaining that *Argus* collects its data primarily through a "survey process" – "by proactively polling participants for market data" including "by telephone, instant messenger, email or other means"). Even though the Commission majority spent a mere few sentences on overselling data collected from questionnaire responses (the entirety of their discussion has been provided above), the *Majority Views* fill almost eight pages with quotations from these *Argus Media* reports and reference to other trade publications providing hearsay reports assuming imports caused oversupply and price depression in the market. *Majority Views* 41–43, 47–49, 53–54, APPX0099986–0099988, APPX0099992–0099994, APPX0099998–0099999, APPX0021170–0021172, APPX0021176–0021178, APPX0021182–0021183. The Commission majority also briefly cites to a minority of approximately one-fourth of the U.S. purchaser questionnaires responses which reported a perceived correlation between subject imports and low prices. *Id.* at 52–53, APPX0099997–099998, APPX0021180–0021181.

Primarily tethered to this second-hand information, the Commission majority finds that cumulated subject imports that continued to enter the market "had significant depressing effects on U.S. prices." *Id.* at 53, APPX0099998, APPX0021259.  In particular, the *Majority Views* state: "The contemporaneous trade publications cited above as well as purchasers' questionnaire responses show that the volumes of imports entering the port of New Orleans contributed to oversupply in the U.S. market and had adverse effects on NOLA market prices." *Id.* at 53–54, APPX0099998–0099999, APPX0021259.

This reliance on hearsay trade publications over contradictory sworn questionnaire data is contrary to the Commission's practice.  Not only did the Commission majority change its practice by relying on these trade reports, it failed to explain its change.  Once an agency establishes a practice, any departure without "a reasoned analysis for the change" is unlawful.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). The Commission has established a practice to not rely on trade publication reports, particularly one source of reports, to support an affirmative finding when those reports contradict data gathered through questionnaire responses.  *See e.g. UAN Solutions from Russia and Trinidad & Tobago*, Inv. No. 701-TA-668, USITC Pub.5338 (Aug. 2022), Views at 31.  In the UAN case, notably another fertilizer case, the Commission rejected inventory reports from *Argus North American Fertilizer* (an affiliated publication to *Argus Media*) because those reports contradicted questionnaire data regarding inventory levels.  *Id.* at 31. 6/  There, the Commission found that although the reports may have supported Petitioner's arguments, they were contradicted by

---

6/    The CIT has previously held that the Commission acts unlawfully when it treats similar cases differently without an adequate explanation.  *DAK Americas LLC v. United States*, 456 F. Supp. 3d 1340, 1354 (Ct. Int'l Trade 2020) (quoting *Usinor v. United States*, 26 C.I.T. 767, 792 (Ct. Int'l Trade 2002)). Here, the Commission failed to explain on remand the disparate treatment of *Argus* between the two investigations.

"not detract from {its} conclusion" nor could the reports override questionnaire data. *Id.* n. 148. It is impossible to square the treatment of the Argus data by the Commission in the two recent fertilizer cases.

Moreover, in *Large Power Transformers from Korea*, the Commission relied on questionnaire responses instead of a news article when the two were at odds regarding whether a new law could affect the Korean industry's production capacity. Inv. No. 731-TA-1189 (Review), USITC Pub. 4826 (Sept. 2018) Views n. 174. There again, the Commission relied on "certified questionnaires responses" over a *Financial Times* article. *Id.* In *Stainless Steel Sheet & Strip from Germany, Italy, Japan, Korea, Mexico, & Taiwan*, the Commission weighed a respondent's direct statement in its questionnaire response regarding plans to increase capacity with a news article predicting something different. Inv. No. 701-TA-382 (Second Review), USITC Pub. 4244 (July 2011) Views at 25 n. 267. The Commission again chose to rely on the questionnaire response rather than the trade press. *Id.*

In fact, the Commission has explicitly held that one press source was not sufficient to override contradictory evidence on the record regarding shipment data. *See Hot-Rolled Steel Prod. from Kazakhstan, Romania, & South Africa*, Inv. No. 701-TA-407, USITC Pub. 4088 (July 2009) Views at 14. As demonstrated, the Commission's practice is to rely on questionnaire data over trade press reports when they are in conflict.

The *Majority Views* do not explain why the Argus reports are more reliable than the sworn questionnaire data. Instead, the *Majority Views* only summarily state: "Thus, the record shows that cumulated subject imports entered the U.S. market in the latter part of 2019 in excess of any purported depletion of inventories, contributing to oversupply conditions, and having a depressing effect on domestic prices as demand remained low through 2019." *Majority Views* at 49–50,

PUBLIC VERSION
PROPRIETARY INFORMATION DELETED FROM BRACKETS

APPX009994–0099995, APPX0021255–0021256. 7/  This falls far short in adequately justifying the Commission majority's discarding of 80+% overselling on this record. 8/

### C. The Commission Majority Cannot Continue to Rely Upon Erroneous Lost Sales Data

The Commission majority's reliance on *Argus* reports is part of a larger, more troubling pattern in its *Majority Views* of ignoring record evidence.  Another example is the Commission majority's continual acceptance of the full quantity of [                    ] lost sales reports even after it corrected its questionnaire response during the final stage.  The Court has already heard this issue in detail, and deferred ruling on it pending the Commission's remand proceeding.  *See* 21-219 Conf. Hr'g Tr. at 192–228; *Remand Order* n. 7.  The Commission's misplaced reliance and refusal to correct the data based on [            ] own explanation demonstrates that the Court should direct the Commission to correct its determination of negative price effects.  A negative determination is required when the entire record is properly analyzed, including and in particular, likely much smaller volumes of lost sales.

---

7/    Record evidence demonstrates that if any party can impact prices, it is the price leader, Mosaic—the dominant player in the industry with greater than [    ] of the market. Questionnaire responses universally acknowledged Mosaic's undeniable power in the market and made clear that Mosaic controls almost every facet of the domestic market, thereby having enormous pricing power.  *Staff Report* at V-8, APPX0020722, APPX0089164.

8/    Reliance on trade publications over sworn-under-oath record data could lead to manipulation of trade publications by parties.  Notably, the Commission and the CIT have previously warned against domestic industry's interference in an investigation using trade publications.  In *Sweaters Wholly or in Chief Weight of Manmade Fibers from Hong Kong, the Republic of Korea, and Taiwan*, there was evidence that the petitioner interfered with the questionnaire process by contacting members of the domestic industry through trade publications. The Commission found that its objectivity was not compromised in that case, but it was "concerned with ensuring the objectivity of its investigations." USITC Inv. Nos. 731-TA-448-450, USITC Pub. 2312 (Sept. 1, 1990) n. 80.  On appeal, the CIT remanded the case to the Commission to conduct a further investigation of petitioner's behavior.  *Chung Ling Co. v. United States*, 805 F. Supp. 45, 51–52 (Ct. Int'l Trade 1992).  The Court was concerned by the effect such actions could have on the objectivity of the Commission's investigation.  *Id.*

PUBLIC VERSION
PROPRIETARY INFORMATION DELETED FROM BRACKETS

The *Majority Views* determined that 733,895 ST of reported lost sales supported its determination that subject imports caused price depression. *Majority Views* at 36, APPX0099981. Notably, the overwhelming majority of that number, [          ] short tons (which is [

]), were reported, then corrected by [          ] in its response to the Commission's Staff questions.  Specifically, [          ] explains: [

].  [          ] response to Commission Staff question dated February 5, 2021, APPX0095738.

Rather than try to quantify the correct amount, and despite acknowledging the response to Commission Staff questions in both its *Original Views* (at 38–39, APPX0099608–0099609) and *Majority Views* (at 36–37 n. 168, APPX0099981–0099982, APPX0021243), the Commission majority once again relies upon the entirety of this lost sales number to substantiate its finding of negative price effects, when there can be no doubt that this figure is inaccurate.  Moreover, [

] at the preliminary stage of the investigation.  Chairman Johanson noted in dissent this stark change in reporting.  *See Original Dissent* at 20–21, APPX0099647–0099648, APPX0020619; *id.* at 18, APPX0099645, APPX0020619.  Yet, the Commission majority – in both its *Original Views* and *Majority Views* on remand – only focuses on the portions of its response that supports an

PUBLIC VERSION
PROPRIETARY INFORMATION DELETED FROM BRACKETS

affirmative injury, rather than the entire response. 9/  The Court can very clearly see through the Commission majority's use of italics the information it wants to use and the information it unlawfully discards:

[

]

*Majority Views* at 36 n. 168, APPX0099981, APPX0021243 (emphasis retained from original).  It defines logic that [        ] of the company's purchases of subject imports are lost sales, as explained by the company itself.

In its *Original Views*, the Commission majority failed to reconcile [

].

*See Original Views* at 38–39, APPX0099608–0099609; *Original Dissent* at 20–21, APPX0099647–0099648, APPX0020619; *id.* at 18–19, APPX0099645–0099646, APPX0020619. Despite the overwhelming evidence that [

], the Commission counted the entirety of

[        ] purchases of subject imports as lost sales.  *See Original Views* at 38–39,

---

9/      The Commission majority's explanation at footnote 168 is copied from its *Original Views*. Compare *Majority Views* at 36–37 n. 168, APPX0099981–0099982 to *Original Views* at 38–39 n. 168, APPX0099608–0099609.

PUBLIC VERSION
PROPRIETARY INFORMATION DELETED FROM BRACKETS

APPX0099608–0099610, APPX0020593–0020594.  The Commission majority again unlawfully chose an unjustifiable interpretation of [               ] lost sales reporting, which ignored major portions of that response that showed that large portions of these purchases of subject imports were undoubtedly for non-price reasons.

## V.   THE COMMISSION'S DISINGENUOUS REMAND PROCESS WARRANTS THE COURT TO GIVE VERY SPECIFIC DIRECTIONS ON REMAND

In addition to its failure to meet the substantial evidence standard described herein, the Commission also failed to conduct a fair remand process.  The unfair remand process is indicative of the fact that if the Court chooses to issue a second remand order, the Commission is again unlikely to conduct a fair second remand process absent specific directives from the Court.  Accordingly, we respectfully request that the Court issue a strong and clear directive to the Commission to address these errors on remand.

In particular, the Commission's skewed supplemental remand questionnaire shows its intent to sidestep the Court's specific factual query on remand related to reshipment. 10/  The Commission was well aware from the Court's decision and directive that the remand proceeding had nothing to do with inter-modal transportation, 11/ but the Commission asked about it anyway, over the objection of PhosAgro and others.  In particular, the Commission stated that "{t}he questions in this questionnaire have been reviewed with market participants" but clearly had not consulted any respondents when drafting the questions.  *US Producers' and Importers' Questionnaires* (Oct. 27, 2023) at Q. 1, APPX0099673, APPX0020834.  PhosAgro and other

---

10/     We endorse and incorporate by reference Section I of OCP's Comments on this issue.

11/     The Court stated that was not seeking information regarding "intermodal delivery" in which fertilizer sellers used multiple modes of transportation to initially deliver fertilizer to customers but rather "record evidence that reshipment of domestic inventories after delivery had ever occurred." *Remand Order* at 22.

respondents submitted letters to the Commission requesting that it clarify its instructions and definitions in its supplemental remand questionnaire regarding the movement of inventories.  *See e.g.* Hogan Lovells *Request for Action Pursuant to Commission Rule 201.12* (Nov. 1, 2023), APPX0020886.   PhosAgro expressed its "deep{} concern{} that it was not provided an opportunity by the Commission to comment on the questions to be included in the supplemental questionnaires prior to their issuance."  *Id.* at 1, APPX0020886.  Moreover, PhosAgro explained to the Commission that: " . . . as currently framed, the supplemental questionnaires will elicit data that are not germane to the {CIT's} concern on which this case was remanded and, even more concerning, distort the Commission's analysis on remand."  *Id.*   PhosAgro reminded the Commission that  "the CIT was deeply concerned with the lack of record evidence demonstrating the counter-flow of subject merchandise in the phosphate fertilizer distribution network, or, put another way, when fertilizer already delivered to its 'intended original destination' was later transported to a new intended destination," and what information would be germane to that inquiry."  *Id.* at 2, APPX0020887.  PhosAgro explained that the "Commission's broad questions regarding inventory to inventory movement will elicit responses discussing the normal flow of subject merchandise in the distribution chain" and "{a}bsent clear distinction from the Commission in its questions between these two types of inventory movement, the Commission's record will be skewed and not be responsive to the CIT's remand."  *Id.*

After hearing from several respondents, the Commission walked back this statement in the questionnaire about consulting with market participants on the questions, but refused to change the wording of the skewed questions.  Regardless, the end-result was designed by the Commission to elicit responses from parties that validate its *Original Views*, rather than any new evidence that could lead to a negative determination.  *See* Letter from ITC (Nov. 9, 2023), APPX0020924–

0020927.  The questions were not drafted in good faith as they were not framed to accurately gather evidence demonstrating the counter-flow of subject merchandise in the fertilizer distribution network as mandated by this Court.  Just as PhosAgro predicted, and contrary to the Court's clear explanation of its concern regarding this counter-flow transportation from an original destination, the Commission's poorly worded questions elicited responses discussing the normal flow of subject merchandise in the distribution chain, rather than backwards movement.  The Commission's deliberate avoidance of the real issue in an attempt to support its results-oriented conclusion is deeply troubling and undermines the objectivity and reliability of its investigation. 12/

Additionally troubling is the fact that the *Majority Views* make clear that it does not respect the Court's directives, and even has the temerity to tell the Court that it has gotten the legal standard wrong.  *See Majority Views* at 29–30, APPX0099974–0099975, APPX0021159–0021160.  There, the Commission majority attempts to give the Court a lesson in statutory interpretation, illogically arguing that the Commission does not have to consider the information it gathered regarding the conditions of competition in its injury analysis.  Nevertheless, the Commission majority purports to have included in its "volume analysis an explanation of how {its} volume findings are consistent with {its} findings on conditions of competition in the U.S. phosphate fertilizer market," and to

---

12/    PhosAgro also notes that the Commission's original remand instructions restricted comments to be no more than 25 pages per side, which is a departure from the agency's normal practice.  *Notice of Remand Proceedings* (Oct. 23, 2020), APPX0020826-0020829.  Respondents reasonably requested each respondent to have its own word allotment.  *See e.g.* Covington *Request for Action Pursuant to Commission Rule 201.12*, (Nov. 17, 2023), APPX0020934–0020941; Hogan Lovells *Request for Action Pursuant to Commission Rule 201.12*, (Nov. 20, 2023), APPX0020943–0020945.  Although the Commission did eventually grant the request, it did so with very little time before the November 27, 2023 submission deadline, still restricting the respondents' ability to prepare robust submissions. ITC *Request regarding Written Comments* (Nov. 21, 2023), APPX0020959-0020960.  This is another example of the Commission's failure to conduct a fair remand proceeding in accordance with the Court's *Remand Order*.

therefore be consistent with the *Court's Remand*, but its attempt still falls short of the substantial evidence standard. *Id.* As explained above, the Commission majority fails to address the conditions of competition evidence contradictory to an affirmative finding. The Court should not stand for the Commission's refusal to faithfully apply the Court's directives in reconsidering this case.

The Court should view the *Majority Views* for what they are—the product of an unfair remand proceeding that was designed from the start to reaffirm the Commission majority's fatally flawed *Original Views* rather than a good-faith effort to determine if injury had occurred. The Court should issue a strongly-worded second remand order that makes clear that the Commission in its second remand must address areas the Court finds deficient.

## VI.    CONCLUSION

For the reasons explained above, and those incorporated by reference in OCP's Comments, PhosAgro respectfully requests that this Court enter judgment on the agency record in its favor.

Respectfully submitted,

/s/ Jared R. Wessel

H. Deen Kaplan
Jared R. Wessel
Michael G. Jacobson
Cayla D. Ebert

HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, N.W.
Washington D.C., 20004-1109
(202) 637-6472
jared.wessel@hoganlovells.com

Date: March 1, 2024                    *Counsel to PhosAgro PJSC*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Hogan Lovells US LLP hereby certifies that the foregoing brief complies with the word-count limitation described in the Standard Chambers Procedures. This brief contains 9,897 words according to the word-count function of the word-processing software used to prepare the brief. This is less than the 10,000 words permitted for comments on Remand determinations set forth in SCP 2(B)(1)(b) and CIT Rule 56.2(h).

Respectfully submitted,

/s/ Jared R. Wessel
Jared R. Wessel

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
(202) 637-6472
jared.wessel@hoganlovells.com

*Counsel to PhosAgro PJSC*

March 1, 2024