*PUBLIC VERSION*

---

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE

---

Consol. Court No. 21-00219

---

OCP S.A.,

*Plaintiff,*

EUROCHEM NORTH AMERICA CORPORATION,

*Consolidated Plaintiff,*

and

PHOSAGRO PJSC, INTERNATIONAL RAW
MATERIALS LTD., and KOCH FERTILIZER, LLC,

*Plaintiff-Intervenors,*

v.

UNITED STATES,

*Defendant,*

and

THE MOSAIC COMPANY and J. R. SIMPLOT COMPANY,

*Defendant-Intervenors.*

---

**DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S
COMMENTS ON REMAND DETERMINATION**

---

**COURTNEY S. McNAMARA**
Attorney for Defendant
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone (202) 205-3095
Fax (202) 205-3111

**DOMINIC L. BIANCHI**
General Counsel
Telephone (202) 205-3061

**ANDREA C. CASSON**
Assistant General Counsel
for Litigation
Telephone (202) 205-3105

**DATED: APRIL 15, 2024**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iv

I.     LEGAL STANDARDS ..........................................................................1

II.    THE COMMISSION FULLY COMPLIED WITH THE COURT'S
       REMAND INSTRUCTIONS ................................................................3

III.   THE COMMISSION'S REMAND QUESTIONNAIRES COMPLIED
       WITH THE REMAND ORDER AND ELICITED PROBATIVE
       INFORMATION ....................................................................................7

IV.    THE COMMISSION'S VOLUME FINDING IS SUPPORTED BY
       SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW ....................10

       A.     The Commission's Volume Analysis is in Accordance with Law ........................10

       B.     The Commission's Volume Analysis is Supported by Substantial
              Evidence....................................................................................12

              i.     Plaintiffs Mischaracterize the Data that the Commission
                     Relied Upon in Its Volume Analysis .........................................12

              ii.    Plaintiffs Fail to Provide a Basis for Disturbing the
                     Commission's Finding that the Record Did Not Indicate
                     that Fertilizer Was Unavailable from U.S. Sources in 2019....................13

                     a.     Mosaic's and Nutrien's Plant Closures Fail to
                            Explain the Magnitude of Subject Import Volumes
                            and Inventories ...........................................................14

                     b.     Mosaic's Public Statements and Other Pieces of
                            Record Evidence Do Not Render the Commission's
                            Findings Unsupported by Substantial Evidence .........................16

                     c.     The Domestic Industry Was Well-Positioned to
                            Supply the U.S. Market in 2019....................................17

                     d.     The Domestic Industry Did Not Suffer from
                            Widespread Supply Issues .........................................17

**TABLE OF CONTENTS (cont'd)**

V.      THE COMMISSION'S PRICE FINDING IS SUPPORTED BY
        SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW ....................19

        A.      The Commission's Price Effects Finding is in Accordance with
                Law ................................................................................................19

        B.      The Commission's Price Effects Finding is Supported by
                Substantial Evidence ....................................................................21

        C.      Plaintiffs' Challenges on the Commission's Price Effects Analysis
                are Unavailing ..............................................................................28

                i.      Plaintiffs' Arguments that Instances of Overselling in the
                        Pricing Data Preclude a Finding of Price Depression are
                        Legally Infirm ....................................................................28

                ii.     Plaintiffs' Factual Attacks on the Commission's Finding
                        that Subject Imports Were Priced Lower than the Domestic
                        Like Product Do Not Undermine the Commission's Price
                        Depression Finding ............................................................30

                iii.    Plaintiffs' Arguments Regarding Subject Import
                        Inventories and Oversupply Conditions Do Not Undermine
                        the Commission's Finding of Price Depression .........................31

                iv.     The Court Should Reject Plaintiffs' Additional Attempts to
                        Reweigh the Evidence .........................................................33

                v.      Plaintiffs' Purported Lack of Ability to Stop Deliveries in
                        Advance of Unexpected, Record-Setting Precipitation is
                        Undermined by the Record ..................................................36

VI.     THE COMMISSION'S FINDING THAT SUBJECT IMPORTS
        MATERIALLY INJURED THE DOMESTIC INDUSTRY IS
        SUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE
        IN ACCORDANCE WITH LAW ...............................................................37

        A.      The Commission Explained in Detail the Causal Nexus Between
                Subject Imports and the Material Injury to the Domestic Industry ....................37

        B.      The Commission Fully Considered the Role of Other Factors and
                Provided a Meaningful Explanation with Substantial Evidentiary
                Support ..........................................................................................40

VII.    CONCLUSION ........................................................................................44

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                                  **Page(s)**

*Altx, Inc. v. United States*,
  25 CIT 1100, 167 F. Supp. 2d 1353 (2001) .................................................................28

*Altx, Inc. v. United States*,
  370 F.3d 1108 (Fed. Cir. 2004) .....................................................................2, 20

*AWP Indus., Inc. v. United States*,
  35 CIT 774, 783 F. Supp. 2d 1266 (2011) ......................................................30, 33

*Cemex, S.A. v. United States*,
  16 CIT 251, 790 F. Supp. 290 (1992), *aff'd*, 989 F.2d 1202 (Fed. Cir. 1993) ......................21

*Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n*,
  100 F. Supp. 3d 1314 (Ct. Int'l Trade 2015) ...................................................35

*Cleo Inc. v. United States*,
  501 F.3d 1291 (Fed. Cir. 2007).....................................................................17, 29

*Coal. for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*,
  22 CIT 520, 15 F. Supp. 2d 918 (1998) .........................................................33

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966).....................................................................................2

*Corus Grp. PLC v. USITC*,
  352 F.3d 1351 (Fed. Cir. 2003).....................................................................32

*Granges Mettalverken AB v. United States*,
  13 CIT 471, 716 F. Supp. 17 (1989) ...............................................................7

*Grupo Indus. Camesa v. United States*,
  85 F.3d 1577 (Fed. Cir. 1996)........................................................................2

*Grupo Simec Acerero S.A. de C.V. v. United States*,
  615 F. Supp. 3d 1339 (Ct. Int'l Trade 2023) ...................................................10

*Hitachi Metals, Ltd. v. United States*,
  949 F.3d 710 (Fed. Cir. 2020).......................................................2, 16, 17, 29

*Mittal Steel Point Lisas Ltd. v. United States*,
  542 F.3d 867 (Fed. Cir. 2008).......................................................................37

*Nevinnomysskiy Azot v. United States*,
  32 CIT 642, 565 F. Supp. 2d 1357 (2008) .......................................................35

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                                  **Page(s)**

*Nippon Steel Corp. v. ITC*,
   345 F.3d 1379 (Fed. Cir. 2003)...................................................................37, 41

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006)...................................................................2, 3

*Nucor Corp. v. United States*,
   28 CIT 188, 318 F. Supp. 2d 1207 (2004) ................................................3

*Nucor Corp. v. United States*,
   414 F.3d 1331 (Fed. Cir. 2005)...................................................3, 16, 20, 29

*OCTAL Inc. v. United States*,
   539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) ...........................................20

*Rhone Poulenc S.A. v. United States*,
   8 CIT 47, 592 F. Supp. 1318 (1984) .........................................................20

*Siemens Energy, Inc. v. United States*,
   38 CIT 879, 992 F. Supp. 2d 1315 (2014),
   *aff'd*, 806 F.3d 1367 (Fed. Cir. 2015) ..................................14, 16, 20, 21

*Siemens Energy, Inc. v. United States*,
   806 F.3d 1367 (Fed. Cir. 2015).................................................2, 14, 21

*Timken U.S. Corp. v. United States*,
   421 F.3d 1350 (Fed. Cir. 2005)..................................................................3

*U.S. Steel Grp. v. United States*,
   96 F.3d 1352 (Fed. Cir. 1996).......................................................... *passim*

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951)...............................................................................1, 2

*USEC Inc. v. United States*,
   34 F. App'x 725 (Fed. Cir. 2002), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005)................................3

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...................................................................1

19 U.S.C. § 1677(7)(B)(i) .........................................................................37

19 U.S.C. § 1677(7)(C) .............................................................................12

<u>**TABLE OF AUTHORITIES (cont'd)**</u>

**Statutes (cont'd)**                                                                **Page(s)**

19 U.S.C. § 1677(7)(C)(i)...................................................................................10, 12, 37

19 U.S.C. § 1677(7)(C)(ii)..................................................................................12, 19, 37

19 U.S.C. § 1677(7)(C)(iii)................................................................................12, 37, 39

28 U.S.C. § 2639(a)(1).................................................................................................1

**Other Authorities**

H.R. Rep. No. 96-317 (1979)......................................................................................40

S. Rep. No. 96-249 (1979).........................................................................................40

Statement of Administrative Action to Uruguay Round Agreements Act,
    H.R. Rep. No. 103- 316, vol. I (1994) ......................................................3, 40, 41

Defendant U.S. International Trade Commission ("Commission") hereby responds to the comments filed by plaintiff OCP S.A. ("OCP"), consolidated plaintiff EuroChem North America Corporation ("EuroChem"), and plaintiff-intervenors Phosagro PJSC ("PhosAgro"), International Raw Materials, Ltd. ("IRM"), and Koch Fertilizer, LLC ("Koch") (collectively, "Plaintiffs"), which challenge various aspects of the Commission's remand determinations regarding phosphate fertilizers from Morocco and Russia.  The Commission complied with the Court's remand instructions, considered all record evidence, including newly collected evidence, and provided a detailed analysis and explanation along with the evidentiary basis for each of its findings with respect to its analysis of volume, price effects, and impact.  Because the Commission's remand determinations are supported by substantial evidence and in accordance with law, and fully complies with the Court's remand instructions, we respectfully request this Court to affirm them.

## I.    LEGAL STANDARDS

This Court reviews the Commission's final determinations by assessing whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  The Commission's determinations are presumed to be correct, and the burden is on the party challenging the determination to demonstrate otherwise.  28 U.S.C. § 2639(a)(1).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (citation omitted).  The Federal Circuit has explained, "in the hierarchy of the four most common standards of review, substantial evidence is the second most deferential, and can be translated

roughly to mean, 'is {the determination} unreasonable?'" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (internal citation omitted).

Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Even if "individual Commissioners reach{} divergent conclusions, '{t}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Siemens Energy, Inc. v. United States,* 806 F.3d 1367, 1372 (Fed. Cir. 2015) (quoting *Consolo*, 383 U.S. at 620); *see also Grupo Indus. Camesa v. United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996) ("Although {a party} points to evidence supporting the dissenting commissioners' decision that the domestic industry was not materially injured, this does not mean that the Commission's affirmative determination is unsupported by substantial evidence.") (citing *Consolo*, 383 U.S. at 619-20). Thus, under the substantial evidence standard, a court may not, "even as to matters not requiring expertise … displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera*, 340 U.S. at 488. Rather, a court '"must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion.'" *Hitachi Metals, Ltd. v. United States*, 949 F.3d 710, 716 (Fed. Cir. 2020) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004)).

In injury investigations, the Commission is the trier of fact. As such, "{i}t is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain

decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process." *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996); *Nippon Steel Corp.*, 458 F.3d at 1350. As the Federal Circuit has stated, if "the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert fact-finder – here the majority of the Presidentially-appointed, Senate-approved Commissioners – to decide which side's evidence to believe." *Id.* at 1359.

Furthermore, since the Commission "'is presumed to have considered all of the evidence on the record,'" it is "'not required to explicitly address every piece of evidence presented by the parties'" during an investigation. *Nucor Corp. v. United States*, 28 CIT 188, 234, 318 F. Supp. 2d 1207, 1247 (2004) (quoting *USEC Inc. v. United States*, 34 F. App'x 725, 731 (Fed. Cir. 2002)), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005). Instead, the Commission need only address the "issues material to {its} determination" so that the "path of the agency may reasonably be discerned." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103- 316, vol. I at 892 (1994) ("SAA"); *see also Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354–57 (Fed. Cir. 2005).

## II.    THE COMMISSION FULLY COMPLIED WITH THE COURT'S REMAND INSTRUCTIONS

In its opinion and order of September 19, 2023, the Court remanded the Commission's original determinations in *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final), USITC Pub. 5172 (March 2021). *See OCP S.A. v. United States,* 658 F. Supp. 3d 1297 (Ct. Int'l Trade 2023) ("Remand Order").[1] The Court held that the Commission's factual finding regarding the feasibility of domestic reshipment of inventories was unsupported

---

[1] Slip Op. 23-136 (Ct. Int'l Trade Sept. 19, 2023).

by the record.  Remand Order at 29-39, 658 F. Supp. 3d at 1314-1319.  The Court found that

reshipment was "key" to the Commission's finding that subject imports oversupplied the market,

and was "central to its determinations that the volume, price effects, and impact of subject

imports was significant."  Remand Order at 37, 46, 658 F. Supp. 3d at 1318, 1322.  The Court

further held "that these determinations are themselves unsupported by substantial evidence."

Remand Order at 38, 658 F. Supp. 3d at 1319.  The Court ordered the Commission to "revisit its

analysis of the conditions of competition with respect to domestic reshipment," and also "apply

any new findings to its analysis of volume, price effects, and impact and make any

redeterminations required by the evidence."  *Id*.  The Court permitted the Commission to "take

new evidence, reconsider existing evidence, or take any other action allowed by its procedures

on remand to come to a conclusion supported by substantial evidence."  Remand Order at 49,

658 F. Supp. 3d at 1324.  On remand, the Commission fully complied with the Court's

instructions.

       The Commission reopened the record on remand for the narrow purpose of eliciting

information related to the remanded issues.  APPX0020827-0020829.  Specifically, the

Commission issued questionnaires to producers and importers requesting descriptions of their

inventory and distribution networks in the United States, including each location where

producers and importers held inventories.  In addition, the Commission asked whether

reshipment between inventory locations occurred during the period of investigation, as well as

the quantities involved and modes of transportation used.  APPX0099667-0099794.  Although

the questionnaires were targeted with regard to the information sought, they requested the

information in narrative form to maximize the firms' opportunity to provide context as they

chose.  APPX0099667-0099794.  As the Commission explained, "{t}he additional questionnaire

information gathered in these remand proceedings further demonstrate the breadth and superiority of U.S. producers' distribution networks," enabling domestic producers to move inventory between locations, while, on the other hand, importers "report{ed} less extensive inventory networks, and less movement of inventories," and a "unidirectional" movement, such that "once delivered to an inventory or customer location, product was not subsequently relocated but rather remained at that location."  APPX0099968-0099970, APPX0099667-0099794.

    As the Commission found, the volume of subject imports and their 36.8 percent increase and substantial gain in market share from 2017 to 2019 were significant in absolute terms and relative to apparent U.S. consumption during the period of investigation.  To comply with the Court's remand order, the Commission evaluated whether fertilizer was unavailable from U.S. sources in 2019.  The Commission found that, contrary to respondents' arguments of a supply gap, domestic producers maintained excess capacity throughout the period of investigation and held substantial inventories in 2019.  Coupled with extensive inventory locations, expansive multi-modal distribution network, and ability to move and relocate product to where it was needed, the evidence demonstrated that domestic producers were well-positioned to supply the U.S. market in 2019 and subject imports were not pulled into the U.S. market due to any practical unavailability from U.S. sources.  APPX0099973-0099978, APPX0098434, APPX0098551.

    The Commission next found that subject imports significantly depressed domestic prices due to a market imbalance as subject imports continued to enter the United States at elevated levels despite declining demand, exerting downward pressure on prices of the domestic like product.  APPX0099978-0100003.  Specifically, the Commission observed that prices for both

the domestic like product and subject imports increased between 2017 and most of 2018, but then declined between 2018 and 2019 as subject imports continued to enter the market in large volumes despite contracting demand.  The Commission noted that prices in 2020 remained below levels in January 2017 until after the filing of the petitions at the end of June 2020. Following the filing of the petitions, prices dramatically increased as subject import volumes and their end-of-period inventory levels declined.  Further confirming the significant price depression caused by subject imports, the Commission observed that industry publications such as *Argus* – used by most purchasers (16 of 28) to negotiate prices –  widely reported on the oversupply conditions caused by subject imports and the associated price declines.  APPX0099982-0099994. The Commission found that, as demand declined across three consecutive planting periods beginning in the fall of 2018, cumulated subject imports surged into the U.S. market in January 2019 and continued at elevated levels, notwithstanding substantial levels of import inventories that were already in place.  The Commission found that the additional volumes of subject imports in the latter half of 2019 did not merely replenish inventories in areas unaffected by the flooding or serve to restock depleted inventories as respondents argued, but rather came in at volumes that far exceeded any need for replenishment.  APPX0099989-0099992.  Purchasers themselves also reported on the downward pricing pressure caused by subject imports, particularly during 2019.  APPX0099997-0099998.

Finally, the Commission found that subject imports had a significant impact on the domestic industry.  It explained that the downward pricing pressure exerted by the oversupply conditions created by subject imports caused the domestic industry's revenues and profitability to be lower than they would have been otherwise.  APPX0100003-0100009.  In finding that the industry was injured by subject imports, the Commission also considered and discussed other

factors, including:  poor weather conditions; Mosaic's decision to idle its Plant City facility; and respondents' allegations that Mosaic refused to supply U.S. customers in favor of exports.  The Commission explained how those other factors did not rebut its finding that the domestic industry's performance would have been stronger in the absence of unfairly traded subject imports, given that these imports took market share from the domestic industry and significantly depressed domestic prices.  APPX0100010-0100017.

In sum, the Commission's remand determinations fully complied with the Court's instructions and are supported by substantial evidence and in accordance with law.  The Court should therefore affirm the remand determinations.

## III.    THE COMMISSION'S REMAND QUESTIONNAIRES COMPLIED WITH THE REMAND ORDER AND ELICITED PROBATIVE INFORMATION

The Commission reasonably exercised its discretion in seeking to collect information on remand that might, and did, yield probative information and additional evidence for its analysis. *See Granges Mettalverken AB v. United States*, 13 CIT 471, 481, 716 F. Supp. 17, 25 (1989) (The "Commission has broad discretion to pursue an investigation in a manner that will provide substantial evidence for its determination").  On remand, the Commission issued supplemental questionnaires that were directly targeted to gather complete data regarding the condition of competition with respect to inventory and distribution operations, including reshipment of fertilizers.  APPX0099667-0099794.

Notwithstanding the narrowly tailored and probative value of the questions asked, Plaintiffs assert that the questionnaires did not elicit information responsive to the Court's directive.  OCP Comments at 1-3; PhosAgro Comments at 27-30; IRM Comments at 2-3; Koch Comments at 2 n.2.  Plaintiffs' criticisms center on their claim that the Commission's questionnaires did not request information pertaining to reshipment of inventory "that has

already reached its intended destination." OCP Comments at 2-3; PhosAgro Comments at 27; IRM Comments at 2-3; and Koch Comments at 2 n.2. Plaintiffs ignore that the questions asked were intended to gather comprehensive information pertaining to the feasibility and occurrence of reshipment between inventory locations, *including reshipment from an original intended destination*, and how these reshipments occurred. As the Commission explained, "{t}he additional questionnaire information gathered in these remand proceedings further demonstrate the breadth and superiority of U.S. producers' distribution networks," enabling domestic producers to move inventory between locations, while, on the other hand, importers "report{ed} less extensive inventory networks, and less movement of inventories," and a "unidirectional" movement, such that "once delivered to an inventory or customer location, product was not subsequently relocated but rather remained at that location." APPX0099968-0099970. The questionnaire responses thus provided evidence that was relevant to the Court's instructions that the Commission consider whether fertilizer was practically unavailable from U.S. sources in its volume analysis as well as the Commission's finding of price depression.

Notably, in direct contradiction to their contentions that the questionnaire failed to gather key information, Plaintiffs at the same time recognize that the questionnaire responses yielded relevant evidence. Plaintiffs concede that "responses from importers confirm that the distribution of phosphate fertilizer in the United States {by importers} is unidirectional." OCP Comments at 3; *see also* IRM Comments at 4 ("{I}mporters' supplemental questionnaire responses confirm that IRM's distribution experience is shared by other industry participants and that phosphate fertilizer is not re-shipped once it arrives at its intended destination."); Koch Comments at 2 n.2 ("{B}ased on the questionnaire responses the Commission now correctly finds that import inventories could not be relocated to meet demand."). Plaintiffs' own

statements undermine their arguments over the clarity of the questionnaires and rebut their claims that the questionnaire did not elicit relevant information.

Similarly unavailing is Plaintiffs' objection to the inclusion of a question regarding modes of transport used for U.S. shipments. OCP Comments at 1; PhosAgro Comments at 27; IRM Comments at 2. They claim that the "Commission was well aware from the Court's decision and directive that the remand proceeding had nothing to do with inter-modal transportation." PhosAgro Comments at 27; *see also* OCP Comments at 1; IRM Comments at 2. While the Court informed that evidence of inter-modal transportation alone does not demonstrate reshipment to be a normal condition of competition, it did not, as Plaintiffs assert, hold that such information is entirely irrelevant to the issue. Nor did the Court proscribe the Commission from collecting such information. *See* Remand Order at 49, 658 F. Supp. 3d at 1324 ("The Commission may take new evidence, reconsider existing evidence, or take any other action allowed by its procedures on remand to come to a conclusion supported by substantial evidence.").

The Commission carefully crafted the questions in the remand questionnaires, aimed at obtaining the full breadth of responses to the issues raised in the Court's order. Indeed, the questions to which Plaintiffs object elicited information probative to the remand inquiry. Responses to questions on this point, together with information gathered with respect to distribution networks and occurrences of reshipments, show how all the collected data were important in providing a clear and complete picture as to the availability and movement of phosphate fertilizers in the U.S. market during the period of investigation.

Finally, PhosAgro's claim that the Commission "failed to conduct a fair remand process" is unsupported by the Commission's actual remand procedure, which was both measured and

reasonable.  PhosAgro Comments at 27.  PhosAgro complains that the Commission had not consulted with any respondents about the remand questionnaire but fails to mention that the Commission timely responded to respondents' concerns during the remand investigation by allowing for party comments on the questionnaire.  As the Commission explained in a letter to the parties, it had followed the normal course in which the Commission conducts remand proceedings and initially had not sought comments on the supplemental questionnaires from *any* party.  The supplemental questionnaire, the Commission further explained, had inadvertently included standard language from the reporting requirement question issued in original investigations.  Given the confusion the inserted language had caused, however, the Commission informed that it would accept all comments on questionnaires and gave all party's comments due consideration.  APPX0020924-0020927.  PhosAgro fails to demonstrate how the Commission's remand process was unfair or that it was harmed upon this basis.  *See Grupo Simec Acerero S.A. de C.V. v. United States*, 615 F. Supp. 3d 1339, 1348 (Ct. Int'l Trade 2023) (holding that a plaintiff must show how it was harmed by the agency's procedural error).

## IV.   THE COMMISSION'S VOLUME FINDING IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW

### A.   The Commission's Volume Analysis is in Accordance with Law

In accordance with its statutory mandate, 19 U.S.C. § 1677(7)(C)(i), the Commission considered the volume of subject import entries, and increase in that volume, in absolute terms and relative to apparent U.S. consumption.  The Commission found that the volume of cumulated subject imports increased 36.8 percent between 2017 and 2019.  It also found that the volume of U.S. shipments of subject imports increased steadily during that time, despite declining demand, enabling cumulated subject imports to gain market share from 2017 to 2019.  Thus, the Commission reasonably found that the volume of subject imports and the increase in

that volume were significant in absolute terms and relative to apparent consumption in the United States during the POI.  APPX0099972-0099973, APPX0098445-0098446, APPX0098459, APPX0098461, APPX0098547.

Although the Commission respectfully disagreed that, on its face, the statute requires it to consider conditions of competition in its *volume* analysis, to comply with the Court's remand order, the Commission proceeded to assess whether "fertilizer was 'practically unavailable from U.S. sources' to supply high-demand regions in 2019 because doing so would not have been economically viable."  APPX0099975-0099976 (citing Remand Order at 41, 658 F. Supp. 3d at 1320).  The Commission found that the record from the original investigations and as supplemented in the remand proceedings indicated that the domestic industry's excess capacity, substantial inventories, extensive inventory locations, expansive multi-modal distribution network, and demonstrated ability to move and relocate product where it was needed shows that domestic producers were well-positioned to supply the U.S. market in 2019.  It therefore concluded that, having considered the conditions of competition as directed by the court in its remand order, the record did not indicate that fertilizer was "practically unavailable from U.S. sources" such that it would alter its finding that that the volume of cumulated subject imports and the increase in that volume were significant in absolute terms and relative to apparent consumption in the United States during the POI.  APPX0099975-0099978, APPX0098434, APPX0098551 APPX0099749-0099786.

Notably, only one party, PhosAgro, argues that the Commission erred in its reading of the plain language of the statute as it pertains to the Commission's obligations regarding its analysis of the volume of subject imports.  PhosAgro Comments at 29.  PhosAgro's assertions that the Commission's analysis was not in accordance with law, however, are flawed.  First, PhosAgro

purports to challenge the Commission's statutory interpretation but in doing so fails to even discuss the statutory text at issue let alone explain any alleged error by the Commission. *Id.* Further, in claiming that the Commission "argu{ed} that the Commission does not have to consider the information it gathered regarding the conditions of competition in its injury analysis," *id.*, PhosAgro misrepresents the Commission's position. Nowhere in its Views did the Commission represent that it was not obligated to consider the conditions of competition in its injury analysis. Rather, the Commission explained that, on its face, section 1677(7)(C) requires that the Commission consider the relevant economic factors described in clause (iii) – the clause pertaining to impact of subject imports – within the context of the business cycle and conditions of competition, but that section does not impose such a requirement with respect to the Commission's analysis of volume, clause (i), and price effects, clause (ii). APPX0099974-0099975. Notwithstanding this, the Commission complied with the Court's remand order to assess whether "fertilizer was 'practically unavailable from U.S. sources' to supply high-demand regions in 2019 because doing so would not have been economically viable." APPX0099975-0099976.

### B.    The Commission's Volume Analysis is Supported by Substantial Evidence

#### i.    Plaintiffs Mischaracterize the Data that the Commission Relied Upon in Its Volume Analysis

As an initial matter, OCP's, Eurochem's, IRM's, and PhosAgro's arguments that the data relied on by the Commission in its volume analysis overstated the volume of cumulated subject imports by including reshipments are not born out by the record. OCP Comments at 13-14, Eurochem Comments at 2; IRM Comments at 8; PhosAgro Comments at 11. The Commission's questionnaires directed importers to report as "imports" only "{t}hose products identified for Customs purposes as imports for consumption." APPX0008704. Accordingly, staff compiled

the import data based on the volumes represented by importers in their responses to Commission questionnaires as being intended to be consumed within the United States, and the Commission relied on that information to calculate the volume of subject imports. APPX0099972; APPX0098445-0098446. The Commission reasonably relied on importers properly reporting imports in accordance with the Commission's explicit instructions. The Commission did not, as PhosAgro asserts, rely upon official Commerce statistics to calculate the volume of cumulated subject imports in its volume analysis. PhosAgro Comments at 11.

Also failing is OCP's claim that the difference between the reported volume of imports and the volume of U.S. shipments of imports is attributable to product that was allegedly re-shipped out of the United States to Canada. OCP Comments at 14. As the Commission thoroughly discussed in its pricing analysis and elsewhere in its remand Views, the record shows that the substantial volume of subject imports that entered the U.S. market in excess of what was needed to satisfy U.S. demand resulted in increasing and elevated levels of inventories in the United States. APPX0099978-100003. In other words, rather than be exported, such product remained in the United States, contributing to oversupply conditions that depressed U.S. prices, as discussed below. Moreover, U.S. shipments data, which the Commission relied upon in finding the volume and increase of subject imports to be significant relative to apparent U.S. consumption, does not include any product that was reshipped out of the United States. APPX0099972-0099973, APPX0098461, APPX0098547.

### ii. Plaintiffs Fail to Provide a Basis for Disturbing the Commission's Finding that the Record Did Not Indicate that Fertilizer Was Unavailable from U.S. Sources in 2019

As described above, the Commission complied with the Court's remand order and evaluated whether fertilizer was unavailable from U.S. sources in 2019. Specifically, the Commission found that the record from the original investigations and as supplemented in the

remand proceedings indicated that the domestic industry's excess capacity, substantial inventories, extensive inventory locations, expansive multi-modal distribution network, and demonstrated ability to move and relocate product where it was needed shows that domestic producers were well-positioned to supply the U.S. market in 2019.  While Plaintiffs may have preferred that the Commission have weighed the evidence differently, they have not, and cannot demonstrate that the Commission's findings are not supported by substantial evidence.  *See Siemens Energy, Inc. v. United States*, 38 CIT 879, 885, 992 F. Supp. 2d 1315, 1324 (2014), *aff'd*, 806 F.3d 1367 (Fed. Cir. 2015) ("That a plaintiff can point to evidence that detracts from the agency's conclusion or that there is a possibility of drawing two inconsistent conclusions from the evidence does not preclude the agency's finding from being supported by substantial evidence.").

### a.    Mosaic's and Nutrien's Plant Closures Fail to Explain the Magnitude of Subject Import Volumes and Inventories

Rather, Plaintiffs ignore the substantial evidence supporting the Commission's findings, and instead persist in arguing that cumulated subject imports were merely "pulled" into the U.S. market to fill a "supply gap."  OCP Comments at 8-9, 19-22; Eurochem Comments at 2; IRM Comments at 5-7; Koch Comments at 3-4; PhosAgro Comments at 7-10.  The Commission reasonably found that Mosaic's estimate that idling the Plant City facility resulted in approximately 700,000 short tons of reduced supply to the U.S. market between 2017 and 2018 was credible and consistent with other record evidence.  APPX0099955-0099961; APPX00117503, APPX0098439.  The Commission further found that, notwithstanding this estimate, the record shows that the actual amount that Mosaic's U.S. shipments decreased from 2017 to 2018 was considerably less than the estimated figure.  APPX0099960-0099962, APPX0087812.  The volume of cumulated subject imports, however, increased by a far greater

amount – more than one million short tons – during this time, and importers' U.S. shipments of subject imports increased by 604,000 short tons.[2] APPX0098445-0098446, APPX0098459, APPX0098461, APPX0098547. The Commission therefore reasonably found that the volume of cumulated subject imports far exceeded either Mosaic's reasonable estimate of its reduced supply to the U.S. market or the amount by which it actually reduced its U.S. shipments, following the idling of its Plant City facility. APPX0099961.

Equally unavailing are plaintiffs' arguments that Nutrien's closure of its Redwater facility in Canada in May 2019 contributed to a reduction in the supply of fertilizers in the United States. OCP Comments at 9-10; Eurochem Comments at 2; Koch Comments at 2. As the Commission explained, at the time that the closure was announced, Nutrien's CEO stated that it would increase production at its U.S. facilities to offset the reduction in supply from its Canadian facility and ensure a continued supply of phosphate fertilizers to customers in Canada. APPX0099962, APPX0098431. Nutrien did, in fact, increase production in the United States, by an amount more than sufficient to cover its increase in exports during that time. APPX0099962, APPX0098434. Additionally, Nutrien increased its capacity and its excess capacity in 2019, which would sufficiently cover the production in its Redwater facility. APPX0099962, APPX0086941. Indeed, the fact that Nutrien, as well as the domestic industry as a whole, possessed excess capacity and available inventories belies Plaintiffs' claims that there was a need for additional imports from Canada or an unmet need for exports to Canada. OCP Comments at 10; PhosAgro Comments at 9-10. In the same vein, domestic producers' excess capacity and

---

[2] As discussed below, in its analysis of price effects, the Commission found that the substantial volume of cumulated subject imports that exceeded demand and any purported need to restock depleted inventories along with elevated levels of inventories contributed to the oversupply conditions that exerted downward pricing pressure on the domestic like product and significantly depressed U.S. prices in 2019.

available inventories contradict Plaintiffs' assertion that the domestic industry's exporting

activities precluded it from supplying additional product to the U.S. market.  IRM Comments at

3-4; PhosAgro Comments at 8-9.

> **b.    Mosaic's Public Statements and Other Pieces of Record Evidence Do Not Render the Commission's Findings Unsupported by Substantial Evidence**

Plaintiffs further claim, incorrectly, that the Commission "ignored" evidence that

allegedly detracts from the Commission's findings.  *See, e.g.*, OCP Comments at 8, 19-22.

Notwithstanding the ample evidence supporting the Commission's finding, plaintiffs would have

preferred the Commission to rely instead on their interpretation of various statements made by

Mosaic, reports that they submitted,[3] and other testimony.  OCP Comments at 19-22, Eurochem

Comments at 2; IRM Comments at 5-7; Koch Comments at 2-4; PhosAgro Comments at 7-11.

However, the fact that the Commission may not have explicitly discussed each piece of evidence

does not establish that it "ignored" such evidence.  *See, e.g.*, *Siemens Energy*, 38 CIT at 885, 992

F. Supp. 2d at 1315.

Further, neither the court cases nor Commission opinions cited by plaintiffs support the

proposition that the Commission must assign decisive weight to certain pieces of evidence in

these investigations.  PhosAgro Comments 9-10; IRM Comments at 6-7, 9.  Plaintiffs overlook

that each case "'is *sui generis*, involving a unique combination and interaction of many

economic variables.'"  *Hitachi Metals*, 949 F.3d at 718 (quoting *Nucor Corp. v. United States*,

414 F.3d 1331, 1340 (Fed. Cir. 2005)).  "That the Commission reached different outcomes in

---

[3] Notwithstanding OCP's characterization of these reports as "directly contradicting the Commission's linchpin finding of an 'oversupply' of subject imports," OCP Comments at 19-22, OCP conveniently omits that the witnesses upon whose reports they rely conceded that there was a "temporary oversupply" in the U.S. market, APPX0017679 (Dougan), and a "hangover of phosphate inventories after the 2019 spring season," APPX0017656 (Rahm).

cases with different circumstances 'do{es} not indicate that the Commission either committed legal error in the methodology it used in this case or departed from the mode of analysis it regularly employs.'" *Id.* (quoting *Cleo Inc. v. United States*, 501 F.3d 1291, 1299 (Fed. Cir. 2007)). That the Commission might have in one set of circumstances weighed a type of evidence one way in no way constitutes a practice nor dictate the same result in this case, involving an entirely different industry and record.

### c.   The Domestic Industry Was Well-Positioned to Supply the U.S. Market in 2019

OCP also inaccurately claims that the Commission relied upon "examples of *possible* reshipments to support its finding that the reshipment of inventories is standard practice for the domestic industry." OCP Comments at 5-7. In fact, the Commission relied upon *actual* reshipments as reported by domestic producers to conclude that U.S. producers had a "demonstrated ability to move and relocate product where it was needed." APPX0099977-0099978, APPX0099968-0099969, APPX0099749-0099786. In any event, domestic producers' reshipments were only part of the basis for the Commission's finding that domestic producers were well-positioned to supply the U.S. market in 2019; it also relied upon their excess capacity, substantial inventories, extensive inventory locations, and expansive multi-modal distribution network. Accordingly, substantial evidence supports the Commission's finding that the record did not indicate that fertilizer was "practically unavailable from U.S. sources" such that it would alter its volume analysis.

### d.   The Domestic Industry Did Not Suffer from Widespread Supply Issues

The Commission also specifically addressed respondents' assertions of widespread or problematic issues with supply from domestic sources compared to subject sources,

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

APPX0099958-0099960, APPX0100015, notwithstanding Plaintiffs' arguments to contrary.

OCP Comments at 10-11; IRM Comments at 7-8; Koch Comments at 3; PhosAgro Comments at

10. The Commission acknowledged that Mosaic indicated that after its decision to idle its Plant

City facility in December 2017, it reduced its phosphate sales volume targets with certain

customers, including CHS and Gavilon in 2018. APPX0099959-0099960. The Commission,

however, emphasized that the majority of purchasers reported that the domestically produced

product was either comparable or superior to product from Morocco (16 of 24 firms) and Russia

(20 of 23 firms) in availability and reliability of supply. APPX0100015, APPX0098422. The

Commission also noted that only nine of 28 responding purchasers reported supply constraints

with respect to the domestic like product – three of which were U.S. importers ([ ▮ ],

[ ▮ ], and [ ▮ ]) of subject phosphate fertilizers and [ ▮

▮ ]. APPX0100015 (n.304). The Commission also reiterated

that most U.S. purchasers reported that the domestic product's U.S. distribution network was

superior to that of subject imports, that the additional questionnaire responses gathered in these

remand proceedings demonstrate the breadth and superiority of U.S. producers' distribution

networks, and that the domestic industry reported moving inventories between locations while

importers generally did not. APPX0100015.

Moreover, the Commission did not "brush aside" or fail to consider evidence that Mosaic

declined to supply certain firms, as Plaintiffs claim. OCP Comments at 11; IRM Comments at 8;

PhosAgro Comments at 10. The Commission discussed at length Mosaic's responses to these

assertions. APPX0100013 (n.296). Furthermore, Koch's claims in this regard are particularly

telling: "Koch explained to the ITC that in the last few years Koch has frequently asked Mosaic

if it would sell it barges of phosphate fertilizers *at market prices.* Mosaic has generally declined

these inquiries."  Koch Comments at 3 (emphasis added); *see also* APPX0015350 (written

testimony of Scott McGinn dated February 8, 2021).  That Mosaic refused to sell fertilizers at

Koch's preferred pricing offers no support to its or the other plaintiffs' arguments.  Koch

Comments at 3, OCP Comments at 11; PhosAgro Comments at 10.  In sum, the Commission's

finding that there were not widespread or problematic issues with supply from domestic sources

compared to subject sources is supported by substantial evidence, and the Commission fully

addressed allegedly conflicting evidence.

## V.    THE COMMISSION'S PRICE FINDING IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW

### A.    The Commission's Price Effects Finding is in Accordance with Law

The statutory provision regarding the Commission's price effects analysis provides as

follows:

> In evaluating the effect of imports of such merchandise on prices,
> the Commission shall *consider* whether –
>
> (I)    there has been significant price underselling by the
> imported merchandise as compared with the price of
> domestic like products of the United States, and
>
> (II)   the effect of imports of such merchandise otherwise
> depresses prices to a significant degree or prevents price
> increases, which otherwise would have occurred, to a
> significant degree.

19 U.S.C. § 1677(7)(C)(ii) (emphasis added).

The Commission's price effects analysis fully complied with the statute.  The

Commission considered whether subject imports significantly undersold the domestic like

product as well as whether subject imports depressed or suppressed prices to a significant degree.

Based on these considerations, the Commission reasonably and lawfully found that subject

imports had significant price effects on the domestic industry.  APPX0099978-0100003.

In attempting to show otherwise, PhosAgro misapprehends the statutory price effects obligation. Specifically, PhosAgro's legal challenge to the Commission's price effects finding hinges on its view that the Commission is required to make an underselling *finding*. PhosAgro Comments at 20-21. The statutory provision, however, plainly requires only that the Commission *consider* whether there has been significant underselling. As the Federal Circuit has explained, the Commission's "consideration" of a statutory factor does not encompass an obligation to come to any conclusion regarding that factor. *See Altx*, 370 F.3d at 1123 (discussing "consideration" of the magnitude of the margin of dumping). *See also Rhone Poulenc, S.A. v. United States*, 8 CIT 47, 55, 592 F. Supp. 1318, 1326-27 (1984) (declining to find a requirement for the Commission to make a categorical statement on underselling);[4] *Nucor Corp.*, 414 F.3d at 1339. Thus, PhosAgro's argument that the Commission's acknowledgement that "overselling was prevalent," but that it "refuse{d} to apply the record data when making its {price effects} determination" lacks merit. PhosAgro Comments at 20.

Moreover, a finding of significant underselling is not even required for the Commission to find significant price effects, let alone to make an affirmative injury determination. *See, e.g.*, *OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291, 1302 (Ct. Int'l Trade 2021) ("{T}he…Federal Circuit…and this Court have made clear that the Commission may rely on evidence *either* of significant underselling *or* significant price suppression or depression to support a finding for adverse price effects."); *Siemens Energy*, 38 CIT at 898, 992 F. Supp. 2d at 1334-35 (sustaining the Commission's significant price effects finding based solely on price

---

[4] In *Rhone Poulenc*, the Court stated that "{a}lthough the concise expression of such a finding is preferable, we are reluctant to require the ITC to state its position with technical exactitude in this developing area of the law." 8 CIT at 55, 592 F. Supp. at 1326. Although we recognize that the law is now developed in this area, it remains that the statute itself does not contain a requirement for a finding on underselling.

suppression, and holding that the Commission "did not need to find" underselling in these circumstances), *aff'd*, 806 F.3d 1367 (Fed. Cir. 2015); *Cemex, S.A. v. United States*, 16 CIT 251, 260–61, 790 F. Supp. 290, 299 (1992) ("To require findings of underselling would be inconsistent with the proposition that price suppression or depression is sufficient."), *aff'd*, 989 F.2d 1202 (Fed. Cir. 1993).

In sum, PhosAgro's argument that the Commission "fail{ed} to carry out its statutory mandate" to reach a finding on whether subject import underselling was significant is unavailing, as no such mandate exists.

**B.    The Commission's Price Effects Finding is Supported by Substantial Evidence**

In addressing price effects, the Commission first *considered* whether there had been significant underselling by subject imports.  APPX0099978-0099982.  The Commission explicitly recognized that the monthly pricing data collected from importers and producers showed subject imports prevalently overselling the domestic product.  APPX0099978-0099982.  While it recognized the prevalence of overselling in the pricing data, it continued to find that the record demonstrated that, consistent with the high degree of price transparency in the market, the prices of the domestic product and subject imports tracked each other closely and were generally comparable with small margins of underselling and overselling, that subject imports were in some instances lower priced, and the domestic industry lost sales to subject imports because of lower prices.  APPX0099978-0099982, APPX0098422, APPX0098473-0098476, APPX0098483, APPX0098486.

The Commission next performed a comprehensive analysis of the role that subject imports played on price declines for the domestic product, based on the totality of the record evidence.  It considered price trends for the domestic like product and subject imports, observing

that prices for both the domestic like product and subject imports increased between 2017 and most of 2018, and then declined between 2018 and 2019. The Commission also noted that prices in interim 2020 increased, but remained below levels in January 2017 until after the filing of the petitions at the end of June 2020, after which prices experienced dramatic increases as subject import volumes to the U.S. market decreased and subject import end-of-period inventory levels decreased. APPX0099982, APPX0098473-0098476, APPX0098547, APPX0098551.

The Commission observed that the record showed that significant and increasing volumes of subject imports entered the U.S. market between 2017 and 2018 and remained at significant levels in 2019 despite a substantial demand decline due to what an OCP witness characterized as "Black Swan" level of rainfall beginning in the fall of 2018 and lasting through 2019. As respondents acknowledged, heavy precipitation in the fall of 2018, a polar vortex in the winter of 2018-2019, and record setting precipitation in the spring of 2019 caused massive flooding and prolonged river closures along the Mississippi River system that stranded fertilizer barges and resulted in delayed, destroyed, or abandoned plantings, especially in the Midwest and Great Plains regions. Accordingly, the Commission observed that, while U.S. demand increased overall between 2017 and 2018, demand began to decline in the latter part of 2018 and continued into 2019, as the unusual weather conditions impacted three consecutive planting seasons - fall of 2018, spring of 2019, and fall of 2019. Apparent U.S. consumption of phosphate fertilizers declined from 2018 to 2019, to below the level of apparent U.S. consumption in 2017. APPX0099983-0099984, APPX0017655-0017656, APPX0091853-0091854, APPX0091863-0091866, APPX0089665-0089666, APPX009573-26-0095727, APPX0091555-0091556, APPX0096970-0096971, APPX0098547.

The Commission found that, despite these market conditions, subject imports continued to enter the market in large volumes in 2019 and in excess of any purported need to restock inventory in regions that were unaffected by weather.  It noted that it was uncontroverted that the volume of cumulated subject imports increased from 2.0 million short tons in 2017 to 3.0 million short tons in 2018, and it was likewise uncontroverted that demand for fertilizers in the U.S. market began to decline in 2018 due to heavy precipitation in the fall of 2018 as well as a polar vortex in the winter of 2018 to 2019.  In the context of the increased volume of cumulated subject imports in 2018 along with declining demand towards the latter part of that year, U.S. importers' end-of-period inventories were at their highest level for the years 2017 and 2018 in December 2018.  APPX0099984, APPX0098547.

Notwithstanding end-of-period inventories that were higher than the levels earlier in the POI and the decline in demand, the Commission found that at the beginning of 2019, cumulated subject imports nonetheless surged into the U.S. market.  The volume of cumulated subject imports reached its highest monthly level of the entire POI in January 2019 at 720,728 short tons, a level that was more than double the level of monthly imports in January 2018 (312,960 short tons) and more than triple the level of monthly imports in January 2017 (202,768 short tons).  The Commission further found that cumulated subject imports exceeded demand at the beginning of 2019, which was supported by the fact that U.S. importers' end-of-period inventories increased from December 2018 (their highest level at that point in the POI) to March 2019 (achieving their highest level of the entire POI at that time).  Notwithstanding this high level of inventories, which according to respondents remained in place after delivery and were not otherwise relocated, substantial volumes of cumulated subject imports still continued to enter the market even as demand remained low due to flooding that occurred in the spring and fall of

2019.  Consistent with this, several contemporaneous industry publications were reporting on oversupply conditions and price declines in the earlier part of 2019.  Thus, the Commission found that the record showed that regardless of whether subject import inventories were being reshipped once they reached their destination, the substantial volume of cumulated subject imports continuing to enter the United States in 2019 was adversely impacting U.S. prices as demand remained low due to weather events and flood in the spring of 2019.  It further found that this oversupply of subject imports and their low prices exerted downward pricing pressure on the domestic like product and significantly depressed U.S. prices in 2019.  APPX0099984-0099989, APPX001231-001255, APPX0097271-0097280.

The Commission next considered party arguments and found that the record, as supplemented by the remand questionnaires, did not support respondents' assertions that additional volumes of subject imports in the latter half of 2019 merely replenished depleted inventories in areas unaffected by flooding.  The Commission reiterated that U.S. importers' end-of-period inventories of cumulated subject imports reached their highest level of the POI in March 2019.  The Commission further found that the record indicated that substantial quantities of subject imports were in place in regional inventories by December 2018 and March of 2019, prior to the flooding that occurred in spring 2019, and such imports remained in those locations, available for subsequent application in the latter part of 2019.  Thus, the POI-high level of inventories of cumulated subject imports in March 2019 exceeded the levels maintained in prior years and according to respondents were already in place in regional locations prior to flooding.  Yet, monthly cumulated subject import volume peaked in January 2019 and continued at substantial volumes.  Taken together with the lower demand in three consecutive application periods, the Commission found that the record did not support a conclusion that inventories of

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

subject imports were depleted such that the observed volumes of subject imports were needed. The Commission found this to be particularly so in light of the substantial inventories, expansive network of inventories, and extensive multi-modal distribution capabilities of the domestic industry.  APPX0099989-0099990, APPX0098455-0098456, APPX0098551.

However, even assuming for the sake of argument that importers of subject merchandise did, as respondents argue, deplete some portion of these inventories to serve areas that were unaffected by flooding, the Commission found that the record showed that the volume of cumulated subject imports continued to exceed any demand created by alleged restocking needs. APPX0099991-0099992.  As discussed above, U.S. importers' end-of-period inventories of cumulated subject imports reached their highest level of the POI in March 2019 at [          ] short tons.  U.S. importers' next reported end-of-period inventories in June 2019 were [          ] short tons.  Accordingly, U.S. importers' end-of-period inventories of cumulated subject imports from March 2019 to June 2019 were reduced by [          ] short tons. Cumulated subject imports, however, far exceeded this amount in those months and the months that followed.  Indeed, over 329,000 short tons of subject imports entered from April to June 2019.  Moreover, whereas the difference between end-of-period inventories from March 2019 to June 2019 was only [          ] short tons, in July 2019 alone, the volume of cumulated subject imports was 281,132 short tons, and cumulated subject imports continued to enter the U.S. market at elevated levels – 264,191 short tons in August 2019 and 178,304 short tons in September 2019 – for a three-month total of 723,627 short tons.[5]  APPX0099990-0099991, APPX0098455-0098456, APPX0098551.

---

[5] Even if ten percent of this volume was re-exported (which, as discussed below, is above the percentage of re-exported imports in 2019), there was still over 650,000 short tons of subject imports in those three months, greater than the depletion of inventories from January to June

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

The Commission found that this pattern continued later in 2019.  U.S. importers' end-of-period inventories of cumulated subject imports in September 2019 were [      ] short tons, higher than in June of 2019 but lower, by [    ] short tons, than in March 2019.  Even assuming that this represents a depletion of inventories to serve areas unaffected by flooding, the record showed that the volume of cumulated subject imports far exceeded this amount in the months that followed.  Indeed, in October 2019 alone, the volume of cumulated subject imports was 244,672 short tons, and cumulated subject imports continued to enter the U.S. market at elevated levels – 164,187 short tons in November 2019 and 227,543 short tons in December 2019 – for a three-month total of 636,402 short tons.  Thus, whether or not U.S. importers depleted inventories to serve areas that were unaffected by flooding in 2019, the record shows that cumulated subject imports nonetheless continued to enter the U.S. market in excess of any purported need to replenish inventories, further contributing to the oversupply conditions. APPX0099991-0099992, APPX0098455-0098456, APPX0098551.  The Commission again noted that several contemporaneous industry publications were reporting on oversupply conditions and price declines persisted in the latter part of 2019.  APPX0099992-0099995, APPX001256-001300, APPX0096030-0096034, APPX0096092-0096092.  The Commission also found that the fact that cumulated subject imports continued to gain market share in 2019 as demand declined and the U.S. market contracted further demonstrates that they were not merely replenishing depleted inventories.  APPX0099995-0099996, APPX0098547.

Additionally, other record evidence considered by the Commission established the adverse effects of subject imports on U.S. prices.  Several purchasers confirmed that U.S.

---

2023.  Likewise, accounting for re-exports in the monthly import volumes discussed elsewhere does not alter the analyses or conclusions.

producers lowered their prices to compete with lower-priced subject imports. APPX0099997-0099998, APPX0098487-0098488. Several purchasers also reported the adverse effects of subject imports on the U.S. market and domestic industry prices. APPX0099997-0099998, APPX0098487-0098488, APPX0088543, APPX0088551, APPX0088354, APPX0088365, APPX0088577. The Commission also continued to find that other record evidence showed that subject imports were being offered at low prices during this time. APPX009997-0099998, APPX0098487-0098489, APPX0097202-0097203, APPX97541-0097554, APPX0088551, APPX0095894-0095896, APPX0095935-0095939, APPX0095952-0095953, APPX0097210-0097212, APPX0097570-0097578. Further, contemporaneous trade publications, which were used by multiple market participants, corroborated the downward pressure imports exerted on U.S. prices, as discussed above. Indeed, most purchasers (16 of 28) reported that they use prices reported in trade publications to negotiate purchase prices. APPX0098467-0098468. Thus, although it recognized that some purchasers were unable to obtain supply from Mosaic at certain times during the POI, the Commission reasonably concluded that the record as a whole showed that subject imports contributed significantly to oversupply conditions in a declining U.S. market and had significant price-depressing effects in 2019. APPX0099997-0100000.

The Commission also addressed respondents' arguments that price declines were attributable to global prices and U.S. demand. Although it recognized that these factors may have contributed to price movements, the Commission reasonably found that they did not negate the record evidence showing the significant role that subject imports played in depressing prices in the U.S. market. APPX0100000. The Commission further noted that respondents' arguments failed to account for the fact that prices in other markets were also affected by exports from subject producers in Morocco and Russia, which collectively were the world's largest exporters

of phosphate fertilizers. APPX0100000, APPX0098533. It also emphasized that U.S. prices were lower than global prices in 2019 as subject imports remained at elevated levels in an oversupplied and declining U.S. market. APPX0100000, APPX0098473-0098476, APPX0098482. Although U.S. prices began to increase in the beginning of 2020 as weather conditions improved, they remained at lower levels compared to 2017 and 2018, until after the filing of the petitions in June 2020, at which point they sharply increased to levels above other global markets as the volume of subject imports declined substantially. APPX0100000-0100001, APPX0098473-0098476, APPX0098482. As the Commission explained, this supports a finding that subject imports depressed U.S. prices during the POI. APPX0100000-0100001.

Having found upon a thorough examination that subject imports depressed prices in the U.S. market to a significant degree, the Commission reasonably concluded that these imports had significant price effects.

C.    **Plaintiffs' Challenges on the Commission's Price Effects Analysis are Unavailing**

i.    **Plaintiffs' Arguments that Instances of Overselling in the Pricing Data Preclude a Finding of Price Depression are Legally Infirm**

In arguing that the instances of overselling preclude an affirmative finding of price effects, Plaintiffs ignore the plain language of the statute and conflate underselling and price depression. OCP Comments at 22-23; IRM Comments at 10-12; Koch Comments at 7; PhosAgro Comments at 17-21. The Commission's underselling and price depression analyses are separate and distinct. *See Altx, Inc. v. United States*, 25 CIT 1100, 1110, 167 F. Supp. 2d 1353, 1366 (2001) (stating that the Commission's underselling and depression analyses are "discrete" and must not be "collapse{d}"). As discussed above, nothing requires the Commission to assign decisive weight to certain pieces of evidence in these investigations, and the statute, which provides for separate consideration of underselling and price depression,

nowhere suggests that predominant overselling by subject imports precludes a finding of price depression. *See U.S. Steel Grp.*, 96 F.3d at 1357 (emphasizing that it is "the Commission's task to evaluate the evidence it collects during its investigation," and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process").

Equally unavailing are OCP's and PhosAgro's assertions that the Commission has any sort of "practice" in how it weighs evidence in an investigation. OCP Comments at 23-24; PhosAgro Comments at 17-23. Again, every investigation "'is *sui generis*, involving a unique combination and interaction of many economic variables.'" *Hitachi Metals*, 949 F.3d at 718 (quoting *Nucor Corp.*, 414 F.3d at 1340). Because each investigation is based on a unique record, the Commission does not, and could not, develop a practice as to how it weighs evidence. "That the Commission reached different outcomes in cases with different circumstances 'do{es} not indicate that the Commission either committed legal error in the methodology it used in this case or departed from the mode of analysis it regularly employs.'" *Hitachi Metals*, 949 F.3d at 718 (quoting *Cleo*, 501 F.3d at 1299). Thus, OCP's and PhosAgro's citations to allegedly inconsistent findings in other investigations are beside the point. OCP Comments at 23-24; PhosAgro Comments at 17-23. The Commission fully explained that, notwithstanding the prevalence of overselling by subject imports in the pricing data, a comprehensive analysis of the totality of the record evidence supported a finding that subject imports depressed prices of the domestic like product to a significant degree. Moreover, the Commission's acknowledgement of the prevalence of overselling shows the fallacy of Plaintiffs' assertions that it disregarded such evidence. PhosAgro Comments at 17-19.

ii.    **Plaintiffs' Factual Attacks on the Commission's Finding that Subject Imports Were Priced Lower than the Domestic Like Product Do Not Undermine the Commission's Price Depression Finding**

OCP and PhosAgro also improperly invite this Court to reweigh evidence regarding the quantity of confirmed lost sales.  OCP Comments at 25-27; PhosAgro Comments at 24-27.  As described above, the Commission noted that four purchasers confirmed that they purchased a total of 733,895 short tons of subject imports rather than the domestic like product and that the lower price of subject imports was a primary reason for doing so.  These purchaser confirmations along with other record evidence, including additional purchaser statements and evidence from domestic producers, provide substantial evidence to support the Commission's finding that the domestic industry lost sales to subject imports because of lower prices.  APPX0099980-0099982, APPX0099997-0099998.

Plaintiffs also wrongly claim that the Commission did not explain why it relied upon a particular purchaser's lost sales information.  OCP Comments at 26-27; PhosAgro Comments at 24-27.  To the contrary, the Commission directly responded to arguments that such data should be discounted, relying upon the company's own first-hand explanation regarding its purchasing behavior.  APPX0099981-0099982 (n.168).  In crediting these statements, the Commission was acting well within its authority to determine the weight assigned to particular evidence on the record.  *See, e.g.*, *U.S. Steel Grp.*, 96 F.3d at 1357 ("Certain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of {the Commission's} evaluative process.").  *See also AWP Indus., Inc. v. United States*, 35 CIT 774, 794, 783 F. Supp. 2d 1266, 1285 (2011) ("{I}t is the Commission's duty to evaluate the record evidence and determine the credibility of the submitted evidence, . . . even where testimony comes from an interested party.") (citations omitted).  That OCP and PhosAgro would prefer that the Commission weigh lost sales information differently to support their theory of the case in no way establishes that the

Commission acted unreasonably in finding it to be credible record evidence showing that the

domestic industry lost sales to lower priced subject imports.

### iii. Plaintiffs' Arguments Regarding Subject Import Inventories and Oversupply Conditions Do Not Undermine the Commission's Finding of Price Depression

Plaintiffs inexplicably assert that the Commission "brushed aside" or disregarded the

adverse weather events. OCP Comments at 13; *see also* PhosAgro Comments at 15-17. This

assertion flies in the face of the Commission's comprehensive discussion of the volume and

inventories of cumulated subject imports in the context of weather-related demand declines

affecting three successive planting seasons beginning in fall 2018. Plaintiffs overlook that these

very factors – declining demand and the buildup of inventories over three successive planting

periods, which according to Plaintiffs were delivered and remained in place until used – were

key components to the Commission's finding that the continued flow of cumulated subject

imports contributed to the oversupply conditions in the U.S. market. Thus, Plaintiffs' claims that

the Commission did not consider the weather events are simply wrong.

Equally rebutted by the actual remand Views is PhosAgro's assertion that the

Commission considered inventories in a vacuum. PhosAgro Comments at 15. To the contrary,

the Commission provided an in-depth analysis of the volume of cumulated subject imports and

inventory levels within the context of declining demand that began in fall 2018. Indeed,

PhosAgro's assertion that additional volumes of imports were needed where inventories were

depleted, PhosAgro Comments at 6, ignores the Commission's analysis showing that the volume

of cumulated subject imports exceeded any purported need to replenish inventories. Not only do

Plaintiffs ignore the Commission's analysis and dismiss the substantial evidence supporting that

analysis, they proffer their own flawed comparison of domestic and subject import inventory

levels.  OCP Comments at 15-16, PhosAgro Comments at 14-16.[6]  Their challenge disregards both the volume of imports that surged into the U.S. market in January 2019, despite elevated subject import inventory levels at the end of 2018 when demand began to decline, as well as the continued flow of imports in 2019, as demand continued to decline, in excess of any purported need to replenish inventories.  Moreover, Plaintiffs fail to cite, nor can cite, any statutory provision that requires such a comparison of domestic and import inventory levels in analyzing the price effects of subject imports.

Similarly unavailing is OCP's argument that subject import inventories aligned with market trends.  OCP Comments at 16-17; *see also* Koch Comments at 6.  OCP fails to account for subject import volumes within the context of the declining demand beginning in 2018 and continuing into 2019, and although it acknowledges the subject imports reached their highest level of the period of investigation in January 2019, it fails to take into account the elevated levels of inventories that existed prior to that surge.  OCP's claim that subject import entries and inventories declined from the first quarter of 2019 to the second quarter of 2019 likewise ignores the Commission's analysis showing that as subject imports surged in January 2019, subject import inventories reached their highest level of the POI at the end of the first quarter of 2019, and that subject imports continued to flow into the U.S. market at elevated volumes, even as demand remained low, in excess of any alleged need to replenish depleted inventories.[7]

---

[6] Furthermore, PhosAgro's reference to the factual analysis of the dissenting Commissioner is of no consequence to the issue of whether substantial evidence supports the findings of the Commission majority.  PhosAgro Comments at 16; *see, e.g.*, *U.S. Steel Grp.*, 96 F.3d at 1362 (it is an "indisputable proposition that each commissioner is free to attach different weight to factual information bearing on, and determinate of, the many statutory tests" and "commissioners may ultimately reach different factual conclusions on the same record"); *see also Corus Grp. PLC v. USITC*, 352 F.3d 1351, 1363 (Fed. Cir. 2003).

[7] As discussed, *supra*, the Commission's annual volume and shipment data for subject imports were based upon questionnaire responses.  As OCP notes, monthly levels were based

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

### iv.    The Court Should Reject Plaintiffs' Additional Attempts to Reweigh the Evidence

Plaintiffs further challenge the weight of the evidence that the Commission placed on certain pieces of evidence in the record.  OCP Comments at 27-30.  Here too, the Court should reject Plaintiffs' improper invitation to reweigh the evidence.  *Coal. for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*, 22 CIT 520, 530, 15 F. Supp. 2d 918, 927 (1998) (noting that the plaintiff's argument "concerns the weight the Commission assigned to the increase in inventories, which is within its discretion," and concluding that "{t}he Court's duty is not to reweigh the evidence").

Specifically, OCP challenges the Commission's finding that certain purchaser emails credibly supported its finding that subject imports were offered at lower prices than the domestic like product in 2019.  OCP Comments at 27-28.  It is the Commission's direct role, however, to evaluate the record evidence and determine the weight and credibility of the submitted evidence. *See U.S. Steel Grp.*, 96 F.3d at 1357; *AWP Indus.*, 35 CIT at 794, 783 F. Supp. 2d at 1285. Contrary to OCP's assertion, these emails were not "contradicted" by those purchasers' questionnaire responses.  OCP Comments at 28.  For instance, the fact that [ ███████████ ]

---

upon official import statistics, which may have included product that was subsequently re-exported.  OCP Comments at 16.  That these import statistics may overstate the volume of monthly subject import that remained in the United States, as OCP claims, does not detract from the Commission's findings.  According to OCP, the quantity of re-exports reported by importers was [ ████ ] short tons in 2019, OCP Comments at 14, which was equivalent to only about [ ██ ] percent of the total 3.1 million short tons of total subject import volume based on official statistics in 2019.  *Calculated* from APPX0098854-0098856.  The fact that a small portion of the total volume of subject imports may have been subsequently re-exported does not undermine the Commission's comprehensive analysis rebutting Plaintiffs' claims that subject imports were needed to replenish depleted inventories.  Indeed, the surge in subject imports in January 2019 of 720,728 short tons alone would more than cover the small volume of re-exports.  APPX0098854-0098856.  In any event, these re-exports cannot explain the elevated U.S. inventories and continuing influx of subject imports that contributed to the oversupply conditions that existed in the U.S. market.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

reported that they did not purchase imports instead of domestic products is not inconsistent with the evidence that imports were priced lower.  Moreover, [ ███████ ] response actually corroborates the evidence that imports were priced lower at times; it reported that [ ████████████████ ████████████████████████████████████████████ ████████████████████ ].  APPX0098486.

Plaintiffs also take issue with the Commission's reliance upon trade publications.  OCP Comments at 28-30; Koch Comments at 7; PhosAgro Comments at 21-22.  By diminishing the probative value of the numerous trade publications submitted onto the administrative record, however, Plaintiffs again attempt to advance their own preference for weighing of the evidence in a manner to reach the result they favor.  For example, OCP criticizes the Commission for having "elevate{d} unsubstantiated anecdotes over record pricing data."  OCP Comments at 29; *see also* PhosAgro Comments at 22.  Far from dismissing the other record data, the Commission viewed these publications as corroborating the undisputed facts discussed above: that prices in the U.S. phosphate fertilizer market are highly transparent, with multiple market participants specifically reporting their reliance upon these publications in setting or negotiating prices, including a majority of purchasers.  APPX0098467-0098468.  The trade reports were consistent with the pricing data relied on by the Commission showing that, as subject imports contributed substantially to the oversupply conditions in 2019, subject imports also had the lowest reported price more frequently that year compared to 2017.  APPX0099986-0099999, APPX0097210-0097212, APPX0097570-0097578.  Moreover, Plaintiffs' attempts to dismiss these trade publications as "unsubstantiated press anecdotes," OCP Comments at 28-29, and "hearsay," PhosAgro Comments at 22, ignore that industry trade publications often are submitted onto the record by parties and relied upon by the Commission, particularly when they play a vital role in

the U.S. market as they did in these investigations.  *See Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n*, 100 F. Supp. 3d 1314, 1344-49 (Ct. Int'l Trade 2015) (finding that the Commission adequately addressed plaintiffs' grid parity argument, in part based upon a publication placed upon the record); *see also Nevinnomysskiy Azot v. United States*, 32 CIT 642, 657, 565 F. Supp. 2d 1357, 1371 (2008) (upholding the Commission's reliance upon pricing data as well as prices reported in the industry publication *Green Markets* in analyzing price effects because the Court "lacks authority to interfere with the Commission's discretion as trier of fact to interpret reasonably evidence collected in the investigation") (quotation omitted).

Plaintiffs also incorrectly assert that the Commission "ignored" evidence of Mosaic's price leadership and impact on the U.S. market.  IRM Comments at 5, 11-12; *see also* OCP Comments at 31.  Plaintiffs' assertion is disproven by the fact that the parties and the Commissioners discussed this information at the Commission's hearing.  APPX0017599-0017600, APPX0017680-0017681, APPX0017783.  Moreover, Mosaic being reported as a price leader does not undermine the Commission's price depression finding, because this would not necessarily insulate it from the downward pressure that subject imports exerted on U.S. prices, particularly given the highly transparent nature of the U.S. phosphate fertilizers market.

Equally unavailing is OCP's argument that the Commission's finding that the volumes of imports entering the port of New Orleans contributed to oversupply in the U.S. market and had adverse effects on NOLA market prices is unsupported.  OCP Comments at 30-31.  The Commission's finding was supported by the contemporaneous trade publications as well as purchasers' questionnaire responses, discussed above.  APPX0099986-0099988, APPX0099992-0099994, APPX0099997.  Indeed, OCP's claim that the Commission "does not identify *any* questionnaire indicating that subject imports *caused* NOLA prices to decline," OCP Comments

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

at 31, is inaccurate.  The Commission specifically cited to purchasers' questionnaire responses that confirmed the adverse effects of subject imports on U.S. prices and showed that domestic producers competed with subject imports based on NOLA prices and lowered their prices to compete with lower-priced imports.  APPX0099997, APPX0098487-0098488.

Finally, the Commission specifically addressed respondents' arguments regarding global factors, contrary to plaintiffs' assertion otherwise.  OCP Comments at 31.  The Commission reasonably found that, although these factors may have contributed to price movements, they did not negate the record evidence showing the significant role that subject imports played in depressing prices in the U.S. market.  APPX0010000-00100001.

> **v.    Plaintiffs' Purported Lack of Ability to Stop Deliveries in Advance of Unexpected, Record-Setting Precipitation Is Undermined by the Record**

Subject imports had the ability to control the oversupply condition in the U.S. market, yet they continued to enter the U.S. market at record volumes during a time of declining demand. OCP contends that distributors typically purchase fertilizer six months in advance but then inexplicably asserts that importers lacked the ability to stop imports from arriving during the approximately sixteen months of low demand spanning three successive planting seasons beginning in fall 2018 and extending throughout 2019.  OCP Comments at 31-33; *see also* Koch Comments at 4-5.  Indeed, Plaintiffs' claim that subject imports could not be stopped from entering the U.S. market is contradicted by the fact that they did abruptly withdraw from the U.S. market when the petitions were filed.  OCP Comments at 32-33; APPX0099972 (n.139); APPX0099988 (n.195).  Moreover, that importers were purportedly locked into [ ████ ████ ████ ] does not in any way mitigate or absolve the role subject imports played in creating an oversupply condition in the U.S. market during the POI.  OCP Comments at 32-33.

## VI.    THE COMMISSION'S FINDING THAT SUBJECT IMPORTS MATERIALLY INJURED THE DOMESTIC INDUSTRY IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE IN ACCORDANCE WITH LAW

The Commission's finding of material injury on remand is supported by substantial evidence and is otherwise in accordance with law.  In analyzing whether the phosphate fertilizers industry was materially injured "by reason of" subject imports, the Commission properly considered the volume of subject imports, their price effects, and their impact on the domestic industry.  19 U.S.C. §§ 1677(7)(B)(i), 1677(7)(C)(i)-(iii).  The Commission provided a detailed analysis demonstrating how the significant and increasing volume of subject imports that significantly depressed domestic prices had a significant impact on the domestic industry.  APPX0100003-0100017.  In doing so, the Commission fully complied with its legal obligations under the statute.  *See Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 876, 878 (Fed. Cir. 2008) (the statute "does not require the Commission to address the causation issue in any particular way" as long as "the injury to the domestic industry can reasonably be attributed to the subject imports"); *Nippon Steel Corp. v. ITC*, 345 F.3d 1379, 1381 (Fed. Cir. 2003) ("As long as its effects are not merely incidental, tangential, or trivial, the foreign product sold at less than fair value meets the causation requirement.").

### A.    The Commission Explained in Detail the Causal Nexus Between Subject Imports and the Material Injury to the Domestic Industry

The Commission evaluated "all relevant economic factors which have a bearing on the state of the industry," and did so "within the context of the business cycle and conditions of competition that are distinctive" to the industry.  19 U.S.C. § 1677(7)(C)(iii).  The Commission noted that many of the domestic industry's output indicators declined from 2017 to 2019, but were higher in interim 2020 compared to interim 2019; that the industry's employment indicators declined from 2017 to 2019, and were lower in interim 2020 compared to interim 2019; and that

many of its financial indicators increased between 2017 and 2018, as demand increased, but deteriorated in 2019, with most being lower in interim 2020 than in interim 2019. APPX0100003-0100007.

In addressing whether subject imports caused material injury to the domestic industry, the Commission began by discussing how the volume of subject imports and the increase in the volume were significant during the period of investigation, with subject imports gaining substantial market share at the direct expense of the domestic industry. As the Commission explained, notwithstanding substantial and increasing inventories and declining demand, subject imports surged into the U.S. market in January 2019 and continued to flow into the U.S. market in substantial quantities, even as demand declined in 2019. U.S. importers' quarterly inventories of subject imports reached their highest level in March 2019, but subject imports nonetheless continued to enter the U.S. market in the latter part of 2019 in excess of any purported need to replenish depleted inventories in the latter part of 2019. APPX0100007-0100008.

The Commission further found that regardless of the "unidirectional" movement of subject importers' inventories, the volumes of subject imports entering the U.S. market had significant depressing effects on U.S. prices. APPX0100008. It explained how substantial record evidence showed subject imports being offered and sold at lower prices, domestic producers lowering prices to compete with subject imports, and certain purchasers purchasing subject imports rather than the domestic like product for price reasons. Consequently, the Commission found that subject imports – through their significant volumes that contributed to the oversupply conditions in the U.S. market during the period of investigation and low prices – depressed prices in the U.S. market to a significant degree. APPX0100007-0100008.

The Commission then discussed how the downward pricing pressure exerted by subject imports forced the domestic industry to reduce prices, which in turn caused its revenues to be lower than they would have been otherwise. As the Commission observed, the domestic industry's sales revenues and profitability declined considerably in 2019 and continued to be weak in interim 2020. Based upon this analysis, the Commission concluded that there was a causal link between the domestic industry's declining condition and the significant price depression caused by the significant volume of subject imports. APPX0100008-0100009.

Plaintiffs' arguments regarding a purported lack of correlation between subject import volumes and the domestic industry's performance as being "emblematic" of a lack of causation fail because they do not account for the relevant conditions of competition during the period of investigation. *See* PhosAgro Comments at 11-12; 19 U.S.C. § 1677(7)(C)(iii) (requiring the Commission to evaluate all relevant economic factors within the context of the business cycle and conditions of competition in analyzing impact). First, in arguing that there was no correlation because the domestic industry's performance improved from 2017 to 2018 as subject imports also increased in volume, Plaintiffs ignore that demand also increased during this time. That the domestic industry experienced gains in profitability in a growing market does not undermine the Commission's finding regarding the causal effects that the significant volumes of low-priced subject imports had on the domestic industry's performance when the market subsequently declined in 2019. Plaintiffs disregard how U.S. shipments of subject imports and subject import market share continued to increase in 2019, demonstrating that subject imports were increasing in a declining, oversupplied market.

Second, Plaintiffs' argument that Mosaic's performance improved before the filing of the petitions and that the firm itself made public announcements that the trade case "was not going to

make a huge difference" in the market in light of improved demand also do not undercut the Commission's finding of a causal link.  PhosAgro Comments at 12-13.  As an initial matter, Mosaic is only one of three members of the domestic industry.  Plaintiffs also ignore that improvements within the context of rebounding demand and increased crop plantings do not necessary mean that the industry is not injured.  This is particularly evident in light of record evidence showing that subject imports continued to enter the U.S. market at elevated volumes, and only decreased abruptly after the petitions were filed in June 2020.  APPX0099972 (n.139), APPX0099988 (n.195), APPX0098456-0098547.  After the filing of the petitions, the volume and inventories of subject imports dramatically decreased, and the domestic industry was finally able to increase market share, capacity, production, and U.S. shipments, demonstrating that the industry could have performed better had it not been for the presence of subject imports.[8]  Rather than show a lack of correlation, the record, as the Commission found, demonstrates a link between subject imports and the domestic industry's performance.

## B.    The Commission Fully Considered the Role of Other Factors and Provided a Meaningful Explanation with Substantial Evidentiary Support

In finding a causal link between subject imports and the domestic industry's injury, the Commission also considered the role of other factors to ensure that it was not attributing injury from other factors to the subject imports, thereby inflating an otherwise tangential cause of injury into one that satisfies the statutory material injury threshold.  *See* SAA at 851-52; S. Rep. No. 96-249 at 75 (1979); H.R. Rep. No. 96-317 at 47 (1979).  As the U.S. Court of Appeals for the Federal Circuit has explained, the Commission need not isolate the injury caused by other factors from injury caused by subject imports, weigh injury from other factors against injury from

---

[8] As OCP acknowledges, in 2020, "foreign producers and importers knew the risk of high tariffs once the Petition was filed, and mutually agreed to suspend subject imports."  OCP Comments at 33.

subject imports, or demonstrate that subject imports are the "principal" cause of injury.  *Nippon Steel Corp.*, 345 F.3d at 1381 ("{A}n affirmative material-injury determination under the statute requires no more than a substantial-factor showing.  That is, the 'dumping' need not be the sole or principal cause of injury."); SAA at 851 (Commission "need not isolate the injury caused by other factors from injury caused by unfair imports").  "As long as its effects are not merely incidental, tangential, or trivial, the foreign product sold at less than fair value meets the causation requirement."  *Nippon Steel Corp.,* 345 F.3d at 1381.

The Commission considered all other factors and accounted for respondents' arguments that the domestic industry's poor performance was not caused by subject imports, but rather adverse weather conditions, Mosaic's decision to idle its Plant City facility in December 2017, and Mosaic's alleged refusal to supply U.S. customers.  The Commission found that no other factor rebutted its findings regarding the causal link between subject imports and the domestic industry.  Indeed, none of these other factors addressed the Commission's key finding that the domestic industry's performance would have been stronger in the absence of unfairly traded subject imports, given that these subject imports and their increase were significant and caused oversupply conditions that exerted significant downward pricing pressure on the domestic prices.  APPX0100009-0100017.

Plaintiffs continue to insist that bad weather was the true cause of the "oversupply" conditions and the domestic industry's consequent injury.  OCP Comments at 34; *see also* Koch Comments at 8; PhosAgro Comments at 5, 12-13.  In Plaintiffs' view, the abnormal and unforeseeable weather was a superseding cause, severing the chain of causation between subject imports and any injury to the domestic industry.  OCP Comments at 34-36.  The Commission, however, explained, with citation to findings supported by substantial evidence on the record that

subject imports, in fact, *exceeded* any needs in the declining market or any need to serve areas unaffected by the bad weather conditions.  Thus, contrary to Plaintiffs' claim, bad weather fails to sever the causal link between the subject imports and the domestic industry's injury.

The Commission here recognized that bad weather conditions that caused demand to decline in 2019 "may have exerted some degree of downward force on the domestic industry's condition."  APPX0100011.  The Commission found that notwithstanding bad weather as a contributing factor, subject imports had an impact that was "distinct" from the declining demand. It explained that the volume of subject imports and inventories of such merchandise increased significantly from 2017 to 2018, and remained significant in 2019 despite decreased apparent U.S. consumption.  In the latter half of 2019, as demand remained low due to further adverse weather conditions, U.S. importers continued to maintain elevated levels of inventories and continued to import more subject merchandise than was necessary to replenish any depletion of these inventories.  APPX0100011.  As the Commission emphasized, the extensive and detailed data collected from U.S. importers supported this point, and was also consistent with the widespread and contemporaneous reporting by trade publications and U.S. purchaser questionnaire responses, both of which documented the adverse effects of subject imports on U.S. prices.  APPX0100011.  Moreover, as the Commission also found, the domestic industry possessed excess capacity throughout the period of investigation and substantial inventories in 2019, extensive inventory locations, expansive multi-modal distribution network, and ability to move and relocate product where it was needed, which further demonstrated that subject imports were not pulled into the U.S. market due to any practical unavailability from U.S. sources. Rather, subject imports flooded an already well-supplied market, taking sales from the domestic industry.  APPX0099972-0099978.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Plaintiffs' claim that "importers {do not} have foresight into unpredictable future weather" (OCP Comments at 36) misses the point emphasized by the Commission that regardless of weather conditions, subject imports had already surpassed any need in the U.S. market, as discussed above. Indeed, subject import inventories were already high and rising in early 2019 as demand remained low, and the domestic industry also had ample excess capacity and substantial inventories with which it could have supplied much more of the U.S. market. Notwithstanding this, subject imports entered at substantial volumes through 2019. That subject imports purportedly could not have been reduced due to the "timing" of the weather events as Plaintiffs argue is undermined by the fact that these weather events spanned three successive planting periods. Notwithstanding this and the elevated levels of inventories, which according to Plaintiffs remain in place until used, substantial volumes of cumulated subject imports continued to enter the U.S. market. That is, until the filing of the petitions after which they abruptly retreated from the U.S. market. APPX0099972 (n.139). Monthly cumulated subject import volume dropped from 229,801 short tons in May 2020 to 62,426 short tons in June 2020, when the petitions were filed, to 57,660 short tons in July 2020 and 14,365 short tons in August 2020. APPX0098456. The actual behavior of the subject imports in the aftermath of the petitions demonstrates that subject imports, in fact, had the ability to quickly withdraw from the U.S. market. Moreover, that importers were purportedly locked into [ ███████████████ ████████ ] does not in any way mitigate or absolve the role subject imports played in creating an oversupply condition in the U.S. market during the period of investigation.

In sum, despite plaintiffs' attempt to point blame elsewhere, substantial record evidence showed that subject imports were more than a tangential cause of material injury to the domestic industry.

## VII.    CONCLUSION

For all of the foregoing reasons, we respectfully request the Court to sustain the

Commission's remand determinations.

Respectfully submitted,

Dominic L. Bianchi
General Counsel

*/s/ Andrea C. Casson*
Andrea C. Casson
Assistant General Counsel for Litigation

*/s/ Courtney S. McNamara*
Courtney S. McNamara
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3095
Facsimile: (202) 205-3111
courtney.mcnamara@usitc.gov

Attorneys for Defendant United States

DATE:  April 15, 2024