## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| OCP S.A., <br>     Plaintiff, <br><br>   and <br><br> EUROCHEM NORTH AMERICA CORPORATION, <br>     Consolidated Plaintiff, <br><br>   and <br><br> PHOSAGRO PJSC, INTERNATIONAL RAW MATERIALS LTD., and KOCH FERTILIZER, LLC, <br>     Plaintiff-Intervenors <br><br>   v. <br><br> UNITED STATES, <br>     Defendant, <br><br>   and <br><br> THE MOSAIC COMPANY and THE J. R. SIMPLOT COMPANY, <br>     Defendant-Intervenors. | Consol. Court No. 21-00219 <br><br> **NON-CONFIDENTIAL VERSION** <br><br> Business proprietary information removed from pages 8-9, 11-13, 18-20. |

### DEFENDANT-INTERVENOR THE J. R. SIMPLOT COMPANY'S COMMENTS ON THE U.S. INTERNATIONAL TRADE COMMISSION'S REMAND DETERMINATION

Jamieson L. Greer
Stephen P. Vaughn
Neal J. Reynolds
Patrick J. McLain
King & Spalding LLP
1700 Pennsylvania Ave., NW
Washington, DC 20006
(202) 737-0500

April 29, 2024

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ........................................................................................................1

II.  THE SUBSTANTIAL EVIDENCE STANDARD OF REVIEW PRESENTS A
HIGH BAR THAT PLAINTIFFS CANNOT CLEAR.......................................................2

III.  SUBSTANTIAL EVIDENCE SUPPORTS THE COMMISSION'S
DETERMINATIONS THAT SIGNIFICANT VOLUMES OF SUBJECT
IMPORTS SIGNIFICANTLY DEPRESSED U.S. PRICES AND MATERIALLY
INJURED THE DOMESTIC INDUSTRY .......................................................................5

IV.  OCP FAILS TO GRAPPLE WITH THE FACT THAT SUBJECT IMPORT
SUPPLY INCREASED IN A DECLINING U.S. MARKET IN 2019 ...........................11

V.  PHOSAGRO FAILS TO UNDERMINE THE COMMISSION'S RELIANCE ON
TRADE PUBLICATIONS ..............................................................................................15

VI.  OCP PROPOSES AN INCORRECT CAUSATION STANDARD AND FAILS
TO UNDERMINE THE COMMISSION'S REMAND DETERMINATION
THAT THE DOMESTIC INDUSTRY IS MATERIALLY INJURED "BY
REASON OF" SUBJECT IMPORTS .............................................................................21

VII.  CONCLUSION...............................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Altx v. United States*,
    370 F.3d 1108 (Fed. Cir. 2004)............................................................................3

*Altx, Inc. v. United States*,
    25 CIT 1100, 167 F. Supp. 2d 1353 (2001) ........................................................15

*Changzhou Trina Solar Energy Co., Ltd.. v. United States Int'l Trade Comm'n*,
    879 F.3d 1377 (Fed. Cir. 2018)....................................................................14, 21

*Cleo Inc. v. United States*,
    501 F.3d 1291 (Fed. Cir. 2007)............................................................................4

*Goss Graphic System, Inc. v. United States*,
    33 F.Supp.2d 1082 (Ct. Int'l Trade 1998) ...........................................................3

*Grupo Industrial Camesa v. United States*,
    85 F.3d 1577 (Fed. Cir. 1996)..........................................................................4, 5

*Matsushita v. United States*,
    750 F.2d 927 (Fed. Cir. 1984)..............................................................................3

*Mittal Steel Point Lisas Ltd. v. United States*,
    542 F.3d 867 (Fed. Cir. 2008)......................................................................21, 22

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006)........................................................................3, 5

*Nippon Steel Corporation v. International Trade Commission*,
    345 F.3d 1379 (Fed. Cir. 2003)..............................................................3, 21, 22

*OCP S.A. v. United States*,
    658 F. Supp. 3d 1297 (Ct. Int'l Trade 2023) ....................................................1, 6

*OCTAL Inc. v. United States*,
    539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) ......................................................16

*Swiff-Train Co. v. United States*,
    793 F.3d 1355 (Fed. Cir. 2015)...................................................................6, 7, 22

*U.S. Steel Group v. United States*,
    96 F.3d 1352 (Fed. Cir. 1996).........................................................................3, 4

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951) .............................................................................................2, 3

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ...............................................................................2, 3

19 U.S.C. § 1516a(b)(1)(B)(ii) .................................................................................2

19 U.S.C. § 1671d(b)(1) ...........................................................................................5

19 U.S.C. § 1677(7)(B)(i) .........................................................................................5

19 U.S.C. § 1677(7)(B)(ii) ........................................................................................5

19 U.S.C. § 1677(7)(C)(ii) ...............................................................................15, 16

28 U.S.C. § 1582 ......................................................................................................2

28 U.S.C. § 2639(a)(1) .............................................................................................2

**Administrative Materials**

*Hot-Rolled Steel Prod. From Kazakhstan, Romania, & South Africa*,
  Inv. No. 701-TA-407, USITC Pub. 4088 (July 2009) ..........................................18

*Large Power Transformers from Korea*,
  Inv. No. 731-TA-1189 (Review), USITC Pub. 4826 (Sept. 2018) ........................18

*Stainless Steel Sheet & Strip from Germany, Italy, Japan, Korea, Mexico, &
  Taiwan*, Inv. No. 701-TA-382 (Second Review), USITC Pub. 4244 (July
  2011) ....................................................................................................................18

*UAN Solutions from Russia and Trinidad & Tobago*, Inv. No. 701-TA-668,
  USITC Pub.5338 (Aug. 2022) ........................................................................17, 18

**Other Authorities**

Statement of Administrative Action for the Uruguay Round Agreements Act
  (URAA), H.R. Rep. No. 103- 316, (1994).......................................................6, 22

## I.    INTRODUCTION

On behalf of Defendant-Intervenor The J. R. Simplot Company ("Simplot"), we respectfully submit the following comments on the U.S. International Trade Commission's ("Commission") Remand Determination responding to the Court's opinion and order of September 19, 2023.  *See* Remand Views, APPX0021212-0021277, APPX0099948-0100018 ("Remand Views");[1] *see also OCP S.A. v. United States*, 658 F. Supp. 3d 1297 (Ct. Int'l Trade 2023) ("Remand Order").

Simplot fully supports and incorporates by reference the arguments previously made in the Commission's remand comments, Def. United States Int'l Trade Comm'n Corrected Cmts. On Remand Views (Apr. 29, 2024), ECF No. 182 ("Commission Comments"), as well as those being filed today by Defendant-Intervenor The Mosaic Company ("Mosaic").  As the Commission and Mosaic demonstrate, claims of the Plaintiff, Consolidated Plaintiff, and Plaintiff-Intervenors (collectively, "Plaintiffs") would require the Court to unlawfully usurp the Commission's role as factfinder by re-weighing the record evidence.  *See*, *e.g.*, Commission Comments at 30, 33-36.

Below, Simplot complements those submissions by discussing the substantial evidence standard of review that governs this case (**Section II**), the substantial evidence supporting the Remand Determination (**Section III**), and three key flaws in Plaintiffs' attempts to blame the weather and absolve subject imports for the material injury suffered by the domestic industry (**Sections IV-VI**).  Those three flaws consist of:

- Plaintiffs' inability to overcome the fact that U.S. shipments of subject imports increased in absolute terms and gained market share in a declining market, which the Commission reasonably found to constitute a downward force on U.S. prices distinct from weather-related demand effects;

---

[1] Unless otherwise indicated, citations to the Remand Views are to the confidential version.

- Plaintiffs' failure to show that the Commission unreasonably relied on an abundance of reports from trade publications that corroborated other evidence of subject imports' oversupply and adverse price effects; and

- OCP's reliance on an erroneous "but for the weather" causation test that is in any event refuted by the evidence, including the fact that U.S. prices and the domestic industry's performance improved after the petition was filed and subject imports declined suddenly and substantially.

## II.    THE SUBSTANTIAL EVIDENCE STANDARD OF REVIEW PRESENTS A HIGH BAR THAT PLAINTIFFS CANNOT CLEAR

Like all of its material injury determinations, the Commission's remand determination in this action is reviewed under the standard of review established by Congress in 19 U.S.C. § 1516a(b)(1)(B)(i).  Under that statute, the Court must assess whether the Commission's remand determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1(B)(i).  Importantly, Congress has made clear that the "decision of the International Trade Commission . . . is presumed to be correct" and that the burden is on the party challenging the decision to demonstrate otherwise.  28 U.S.C. § 2639(a)(1).[2]

In this case, Plaintiffs challenge the Commission's remand determination on the ground that it is not supported by substantial evidence.  Accordingly, when reviewing the Commission's remand determination, the Court should keep in mind that the Supreme Court has defined substantial evidence as being "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (citation omitted), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 607, 619-20.  Substantial evidence is:

---

[2] An exception to this burden exists for civil actions commenced by the United States under 28 U.S.C. § 1582, but that exception does not apply here.  *See* 19 U.S.C. § 1516a(b)(1)(B)(ii).

2

{S}omething less than the weight of the evidence, and *the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.*

*Matsushita v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 619-620 (1966)); *see also Altx v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (same).  Under the substantial evidence standard, the Supreme Court has explained, a Court may not, "even as to matters not requiring expertise…displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter come before it de novo." *Universal Camera*, 340 U.S. at 488.

A critical aspect of the standard of review set forth in section 1516a(b)(1)(B)(i) is that the Commission is the trier of fact in its injury investigations.  *Nippon Steel Corporation v. International Trade Commission*, 345 F.3d 1379, 1381 (Fed. Cir. 2003).  As the fact-finder, "the Commission's task {is} to evaluate the evidence it collects during its investigation." *U.S. Steel Group v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996).  Accordingly, "certain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350 (Fed. Cir. 2006); *U.S. Steel Group*, 96 F.3d at 1357 (Fed. Cir. 1996).  As a result, "{t}he Commission has the discretion to assess the probative nature of the evidence obtained in its investigation and to determine whether to discount the evidence or to rely on it." *Goss Graphic System, Inc. v. United States*, 33 F.Supp.2d 1082, 1100 (Ct. Int'l Trade 1998); *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000).  Indeed, "{u}under the substantial evidence standard, when adequate evidence exists on both sides of an issue, assigning evidentiary weight falls *exclusively* within the authority of the Commission." *Nippon Steel Corp.*, 458 F.3d  at 1358 (emphasis added).

Moreover, although the Court can consider any record evidence that conflicts with the Commission's findings when assessing the "substantiality" of the evidence cited by the Commission,[3] the Federal Circuit has made clear that the Courts have a limited role when reviewing the Commission's fact-finding. As the Federal Circuit has stated, "{a}n appellate court is not the initial decision-maker" when reviewing the Commission's decisions and "cannot substitute its judgment for that of the fact finder if it is supported by substantial evidence." *Grupo Industrial Camesa v. United States,* 85 F.3d 1577, 1582 (Fed. Cir. 1996). As a result, in these appeals:

> {T}he question in this case is not whether we agree with the Commission's decision, nor whether we would have reached the same result as the Commission had the matter come before us for decision in the first instance. By statute, Congress has allocated to the Commission the task of making these complex determinations. Ours is only to review those decisions for reasonableness.

*U.S. Steel Group*, 96 F.3d at 1357; *see also Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) ("the substantial evidence test does not require that there be an absence of evidence detracting from the agency's conclusion, nor is there an absence of substantial evidence simply because the reviewing court would have reached a different conclusion based on the same record.").

In sum, as the Federal Circuit has explained, "{w}hen the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert factfinder

---

[3] Importantly, the Commission need not discuss all "contradictory evidence" on the record in its analysis. As the Statement of Administrative Action for the Uruguay Round Agreements Act ("SAA") states, "neither existing law nor the {amendments to the statute} require …the Commission in every case to…discuss each argument or fact presented by a party, regardless of how irrelevant or trivial." SAA, H.R. Doc. 103-316, Uruguay Round Agreements Act, at 892 (1994). Instead, the Commission must only address "material and relevant" factors in its analysis, or provide an explanation that "renders evident the agency's treatment of a factor or argument." *Id.*

– here the majority of the Presidentially-appointed, Senate-approved Commissioners – to decide which side's evidence to believe." *Nippon Steel Corp.*, 458 F.3d at 1358-1359.[4]  "So long as there is adequate basis in support of the Commission's choice of evidentiary weight, *the Court of International Trade, and this court, reviewing under the substantial evidence standard, must defer to the Commission*." *Id.* at 1359 (emphasis added).

Keeping these principles in mind, we turn to our arguments rebutting Plaintiffs' untenable claims that the Commission's remand determination – which is filled with detailed factual analysis – is somehow not supported by substantial evidence.

III.  **SUBSTANTIAL EVIDENCE SUPPORTS THE COMMISSION'S DETERMINATIONS THAT SIGNIFICANT VOLUMES OF SUBJECT IMPORTS SIGNIFICANTLY DEPRESSED U.S. PRICES AND MATERIALLY INJURED THE DOMESTIC INDUSTRY**

In a final phase injury determination, the Commission is required to determine whether a domestic industry is materially injured by reason of subject imports.  *See* 19 U.S.C. § 1671d(b)(1).  In making this determination, the Commission must consider the volume of subject imports, the price effects of subject imports, and the impact of subject imports on domestic producers.  19 U.S.C. § 1677(7)(B)(i).  In addition, the Commission "may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports." 19 U.S.C. § 1677(7)(B)(ii).   In evaluating whether the domestic industry is materially injured "by reason of subject imports," the Commission "must examine other

_____

[4] Furthermore, on this score, it is not significant that one or more Commissioners may dissent from the Commission's determination.  As the Federal Circuit stated in *Grupo Industrial Camesa*, "{a}lthough {a party} points to evidence supporting the dissenting commissioners' decision that the domestic industry was not materially injured, this does not mean that the Commission's affirmative determination is unsupported by substantial evidence."  85 F.3d at 1582.

factors to ensure that it is not attributing injury from other sources to the subject imports," but it "need not isolate the injury caused by other factors from injury caused by unfairly traded imports."  Statement of Administrative Action (SAA) to the Uruguay Round Agreements Act (URAA), H.R. Rep. No. 103- 316, Vol. I at 851-52 (1994).  Indeed, the Commission is not required to determine that subject imports are the only, or even the principal, cause of the domestic industry's material injury.  *Swiff-Train Co. v. United States*, 793 F.3d 1355, 1363 (Fed. Cir. 2015) ("the Commission need not isolate the injury caused by other factors from injury caused by unfair imports, nor demonstrate the subject imports are the 'principal' cause of injury.").

In the Remand Determination, the Commission complied with the statute and the Court's Remand Order.  The Commission considered the statutory factors, *see* Remand Views at 27-33 (volume), APPX0021234-0021240, APPX0099972- APPX0099978; *id.* at 33-58 (price effects), APPX0021240-0021263, APPX0099978-0100003; *id.* at 58-72 (impact), APPX0021263-0021276, APPX0100003-0100017; relied on substantial evidence that supports its findings, *see, e.g., id.* at 37-44, APPX0021243-0021250, APPX0099982-0099989 (discussing the record evidence in the context of the price depression analysis); and addressed at length the parties' arguments, including the Plaintiffs' arguments regarding alleged causal factors other than subject imports.  *See, e.g, id.* at 65-72, APPX0021270-0021276, APPX0100010-0100017 (addressing arguments regarding other factors).  The Commission also evaluated the domestic reshipment issue at length in the context of the conditions of competition and the statutory factors.  *See, e.g., id.* at 21-25, APPX0021230-0021233, APPX0099966-0099970; *id.* at 29-33, APPX0021236-0021240, APPX0099974-0099978; *id.* at 39-50, APPX0021245-0021256, APPX0099984-APPX009995; *id.* at 69, APPX0021273, APPX0100014.  Ultimately, the Commission found that

significant volumes of subject imports significantly depressed U.S. producers' prices by oversupplying the market and selling at low prices during a time of declining demand, and that this significant price suppression resulted in a material adverse impact to the domestic industry. *See, e.g., id.* at 63-64, APPX0021267-0021268, APPX0100008-0100009.  In making this determination, the Commission analyzed the parties' causation arguments and found that the material injury was not attributable to other factors, such as alleged weather-related effects on U.S. demand, domestic industry supply gaps, domestic industry refusals to supply, domestic industry cost challenges, and nonsubject imports.  Remand Views at 65-72, APPX0021270-0021276, APPX0100010-0100017.

In their comments, Plaintiffs' core argument is that a decline in U.S. demand resulting from a prolonged period of "unprecedented" adverse weather from late 2018 through 2019 is solely to blame for the deterioration in the domestic industry's condition during the period of investigation ("POI").  *See, e.g.,* Pl.'s Comments in Opp. to ITC Final Remand Determ. (Feb. 16, 2024) at 12, 35, ECF No. 156 ("OCP Comments"); Pl.-Int. PhosAgro Comments on ITC Remand Determ. (Mar. 1, 2024) at 3, 5, ECF No. 160 ("PhosAgro Comments").  According to OCP, "weather is the true and only culprit."  OCP Comments at 36.  To the contrary, the Commission considered the impact of the weather on market conditions and relied on substantial evidence in finding that subject imports had significant adverse effects on domestic producers' prices and performance that were distinct from weather-related demand effects.  *See* Remand Views at 38-54, APPX0021244-APPX0021259, APPX0099983-0099999; *id.* at 65-66, APPX0021270-0021271, APPX0100010-0100011.  This means the Commission's determination cannot be overturned.  As noted above, the causation standard does not require that subject imports be the only cause or a principal cause of injury, and the Commission is not required to

isolate the injury caused by subject imports from injury resulting from other factors. *Swiff-Train*, 793 F.3d at 1363.

Indeed, a vast body of evidence, from a diverse array of sources, supports the Commission's conclusion that, aside from the weather, subject imports were a substantial cause of the declines in U.S. prices and the domestic industry's condition during the POI. Specifically, the Remand Determination is supported by substantial record evidence that includes the following:

- Questionnaire data showing that subject import entries increased from 2.0 million short tons in 2017 to 3.0 million short tons in 2018, before decreasing to 2.7 million short tons in 2019, representing an overall increase of 36.8 percent from 2017 to 2019. APPX0020434, APPX0098445, *cited in* Remand Views at 27, APPX0021234, APPX0099972.

- Questionnaire data showing that (i) U.S. shipments of subject imports increased from 1.8 million short tons in 2017 to 2.4 million short tons in 2018 and then increased again to 2.5 million short tons in 2019; and that (ii) subject imports gained [    ] percentage points of market share from 2017 to 2019, while the domestic industry lost [    ] percentage points of market share over the same period. APPX0020532, APPX0098547, *cited in* Remand Views at 27-28, APPX0021234-0021235, APPX0099972-0099973. These data also show that subject imports gained [    ] points of market share from 2018 to 2019, while demand was declining. APPX0020532, APPX0098547, *cited in* Remand Views at 39, APPX0021245, APPX0099984; *id.* at 51 n.227, APPX0021257, APPX0099996.

- Questionnaire data showing that a majority of purchasers ranked the domestic like product as superior to subject imports in terms of U.S. distribution network, and that majorities of purchasers rated the domestic like product as comparable or superior to subject imports in terms of availability and reliability of supply. APPX0020411, APPX0098422, *cited in* Remand Views at 20, APPX0021228-0021229, APPX0099965; *id.* at 70, APPX0021274, APPX0100015.

- Questionnaire data showing U.S. importers' ending inventories of subject imports in 2018 and 2019 were [    ] percent and [    ] percent higher, respectively, compared to inventories in 2017. APPX0020532, APPX0098547, *cited in* Remand Views at 50 n.221, APPX0021256, APPX0099995.

- Respondent witness testimony conceding that that there was a "temporary oversupply" in the U.S. market, APPX0017679 (Dougan), and a "hangover of phosphate inventories after the 2019 spring season," APPX0017656 (Rahm).

- Questionnaire data showing that prices for both the domestic like product and subject imports declined sharply from late 2018 through 2019. APPX0020467; *see also*

APPX0020460-0020463, APPX0098473-0098476, *cited in* Remand Views at 37, APPX0021243, APPX0099982.

- Data showing that "market prices for phosphate fertilizer DAP decreased in 2019 [          ] for non-phosphate fertilizers potash and urea, such that DAP prices [                           ]. Remand Views at 51, APPX0021257, APPX0099996 (citing APPX0020468, APPX0098481).

- U.S. purchaser questionnaire responses attesting to subject imports' adverse price effects. These include [    ] reporting that [              ], APPX0020598, APPX0099614-0099615; [        ] reporting that [               ], Remand Views at 52 n.231, APPX0021258, APPX0099997; and [      ] stating that [           ] APPX0020598, APPX0099614, *cited in* Remand Views at 52 n.230, APPX0021258, APPX0099997.

- U.S. purchaser questionnaire responses confirming that the domestic industry lost sales totaling 733,895 short tons to subject imports, APPX0020473, APPX0098486, *cited in* Remand Views at 36, APPX0021242-0021243, APPX0099981, and was forced to reduce prices under pressure from subject imports. APPX0020474, APPX0098488, *cited in* Remand Views at 52, APPX0021258, APPX0099997.

- [                        ] that show subject imports' adverse price effects. *See* Remand Views at 53, APPX0021258, APPX0099998. These include documents appended to a sworn declaration provided by Simplot's Vice President of Wholesale Sales, one of which is [                                 ] APPX0016352, APPX0095953, *cited in* Remand Views at 53, APPX0021258, APPX0099998.

- Questionnaire data showing a material rise in U.S. prices from June-September 2020, after the petition was filed and subsidized imports from Russia and Morocco declined substantially. APPX0020467; *see also* APPX0020460-0020463, APPX0098473-0098476, *cited in* Remand Views at 37, APPX0021243, APPX0099982.

- Questionnaire information showing that the domestic industry's performance improved after subject imports' post-petition pullback. *See* Remand Views at 59 n.260, APPX0021264, APPX0100004.

Relying on the extensive evidence discussed above, the Commission properly conducted

its causation analysis to determine whether the domestic industry is materially injured "by reason

of" subject imports.  This analysis established and explained the causal link and ensured that

weather-related effects were not attributed to subject imports:

> As described above, the volume of cumulated subject imports and inventories
> of such merchandise increased significantly from 2017 to 2018, and remained
> significant in 2019 despite decreased apparent U.S. consumption. In the latter
> half of 2019, as demand remained low due to further adverse weather
> conditions, U.S. importers continued to maintain elevated levels of inventories
> and continued to import more subject merchandise than was needed to
> replenish any depletion of these inventories. Moreover, as previously
> discussed, contemporaneous trade publications and U.S. purchaser
> questionnaire responses documented the adverse impact of imports on U.S.
> prices. Therefore, ***the adverse weather conditions that affected the U.S.
> market and prompted a decline in demand do not rebut the fact that the
> industry's performance would have been stronger in the absence of the
> significant volume of subject imports from Morocco and Russia that exerted
> downward pricing pressure on the domestic industry***. In other words, we
> have observed material injury to the domestic industry by reason of subject
> imports that is distinct from the declining demand so as to ensure that we are
> not attributing injury from declining demand to the subject imports.

Remand Views at 66 (emphasis added), APPX0021270-0021271, APPX0100011; *see also id.* at

63, APPX0021268, APPX0100008 ("The downward pricing pressure exerted by subject imports

forced the domestic industry to reduce prices, which in turn caused its revenues to be lower than

they would have been otherwise.").

Under the standard of review, it is simply impossible to maintain that a reasonable mind

could not conclude from the evidence, as the Commission did, that subject imports were a

substantial cause of U.S. price declines and deteriorations in the domestic industry's

performance, distinct from weather-related declining demand.  *See* Remand Views at 66,

APPX0021270-0021271, APPX0100011.  Thus, Plaintiffs cannot possibly meet their burden of

establishing that the Commission's determination is unsupported by substantial evidence.  This is

clear from the Commission's and Mosaic's remand comments. *See, e.g.,* Commission Comments at 12-19, 21-43. In the sections below, Simplot elaborates on three ways in which Plaintiffs fail to meet their burden of demonstrating that the Remand Determination is unsupported by substantial evidence.

## IV.    OCP FAILS TO GRAPPLE WITH THE FACT THAT SUBJECT IMPORT SUPPLY INCREASED IN A DECLINING U.S. MARKET IN 2019

A key flaw in OCP's attempt to cast the weather as the "true and only culprit," which the Commission correctly recognized in the Original Views and the Remand Determination, is that U.S. shipments of subject imports – *i.e.*, the supply of subject imports to U.S. purchasers – actually *increased* in 2019, despite the weather-related decline in demand in that year. *See* Remand Views at 16 n.72, APPX0021148, APPX0099961; *id.* at 50, APPX0021179, APPX0099995; *id.* at 69 n.299, APPX0021273, APPX0100014. Specifically, the large surge in subject import entries from 2017 to 2018 resulted in a [       ] percent increase in the volume of subject imports in U.S. importer ending inventories from 2017 to 2018. APPX0020532, APPX0098547, *cited in* Remand Views at 50 n.221, APPX0021256, APPX0099995. In 2019, the volume of subject import entries was lower than in 2018 but still greater than in 2017. APPX0020434, APPX0098445, *cited in* Remand Views at 27, APPX0021234, APPX0099972. However, the elevated volume of subject import entries combined with existing subject import inventories to result in U.S. shipments of subject imports increasing in absolute terms and gaining market share from 2018 to 2019. APPX0020532, APPX0098547, *cited in* Remand Views at 50, APPX0021256, APPX0099995.

OCP argues that the Commission "overstates the increased presence of subject imports," but its contentions regarding projected demand, exports to Canada, subject import and domestic inventory ratios, and declining subject import entries fail to engage with the U.S. apparent

consumption data that the Commission collected from questionnaires.  *See* OCP Comments at

11-19.  The Commission appropriately relied on U.S. shipment data for domestic product,

subject imports, and nonsubject imports to calculate apparent domestic consumption and market

shares.  *See* APPX0020532, APPX0098547, *cited in* Remand Views at 27-28, APPX0021157-

21158, APPX0099972-0099973.  OCP does not object to such uses of U.S. shipment data, and it

does not contend that the U.S. shipment data include subject imports that were re-exported to

Canada or were otherwise inaccurate.  *See* OCP Comments at 13-14 (discussing import entry

data, rather than comprehensive U.S. shipment data).  U.S. shipment data are particularly useful

because they capture any supply provided by a U.S. producer or U.S. importer to the U.S. market

in a given time period, regardless of whether the shipped product was produced or imported in

the year of shipment or, alternatively, came from inventory build-up from the prior year.  These

data constitute substantial evidence supporting the Commission's findings that subject imports

oversupplied the market in 2019 and refute Plaintiffs' assertions that any injury is solely

attributable to weather-induced demand declines.

Measured by apparent domestic consumption, demand declined by [      ] short tons,

or by [    ] percent, between 2018 and 2019, and by [       ] short tons, or by [    ] percent,

from 2017 to 2019.  APPX0020532, APPX0098547; Remand Views at 69 n.299,

APPX0021273, APPX0100014.  In contrast to this decline in demand, however, U.S. shipments

of subject imports actually increased to their highest levels of the POI in 2019, rising by 148,957

short tons, or by 6.2 percent, from 2018 to 2019, and by 725,000 short tons, or by 42.3 percent,

from 2017 to 2019.  APPX0020532; APPX0098547; Remand Views at 50, APPX0021256,

APPX0099995.  Indeed, subject imports were the only category of U.S. shipments that *increased*

during 2019.  *See* APPX0020532-0020533, APPX0098547-0098548.  In contrast, U.S.

producers' U.S. shipments *declined* by [     ] percent from 2018 to 2019, and U.S. shipments of nonsubject imports *declined* by 11.8 percent over the same period.  *Id.*

      Given the fact that shipments of subject imports to U.S. customers increased during a decline in demand, the Commission reasonably found that subject imports exerted downward pricing pressure, and consequent harm to the domestic industry, that cannot be attributed to declining demand.  *See* Remand Views at 66, 68-69.  As the Commission recognized in the Remand Determination,

> the fact that cumulated subject imports continued to gain market share in 2019 as demand declined and the U.S. market contracted further demonstrates that they were not merely replenishing depleted inventories.  As we observed in our Original Views, U.S. shipments of subject imports increased by 148,957 short tons (6.2 percent) between 2018 and 2019, and subject imports increased their share of the market at the expense of the domestic industry and nonsubject imports.

Remand Views at 50, APPX0021256, APPX009995.

      Plaintiffs have no answer for this.  OCP's reliance on the decline in subject import entries from 2018 to 2019 – as opposed to all U.S. shipments of subject imports – does not detract from or undermine the substantial evidence supporting the Commission's finding that subject imports "continued to enter the U.S. market" "beyond levels demanded."  *See* OCP Comments at 19 (citing Remand Views at 63, 69).  As the Commission recognized, the combination of significantly increased subject import inventories from 2018 and significant additional import entries in 2019 resulted in increased total U.S. shipments of subject imports and subject import market share gains in 2019, as well as a "substantial buildup" of U.S. import inventories and "an oversupply condition" in a U.S. market with declining demand.  *See* Remand Views at at 68-69, APPX0021272-0021273, APPX0100013-0100014; *see also id.* at 66, APPX0021270-0021271, APPX0100011; APPX0020434, APPX0098445; APPX0020532, APPX0098547.  OCP's

reference to the decline in subject import entry volumes from 2018 to 2019, *see* OCP Comments at 18, does nothing to undermine the reasonableness of the Commission's finding that subject imports contributed to an oversupply in the U.S. market.

Faced with incontrovertible evidence that subject imports boosted supply amidst declining demand in 2019, OCP criticizes the Commission for supposedly holding market participants to what it calls a "decision-making standard that requires the benefit of 20/20 hindsight" and an "expectation of clairvoyance." OCP Comments at 12. According to OCP, the Commission "assumes without evidence that subject importers had the foresight and ability to stop imports in 2019 by predicting the weather." OCP Comments at 30. However, as the Court correctly recognized at oral argument in 2022, "{i}ntent doesn't matter" for purposes of the Commission's material injury determination. Oral Argument Tr. (June 28, 2022) at 162:11-12 (the Court), ECF No. 129. If substantial evidence supports the Commission's determination that the domestic industry is materially injured by reason of subject imports – and it does – then that determination cannot lawfully be overturned, regardless of the asserted intentions or erroneous forecasting of those trading in subsidized imports. In other words, the issue here is not whether foreign producers and U.S. importers intended to hurt domestic producers, or even whether subject imports are the only cause of harm, but whether subject imports made the domestic industry materially worse off than it would have been otherwise. *See Changzhou Trina Solar Energy Co., Ltd.. v. United States Int'l Trade Comm'n*, 879 F.3d 1377, 1384-1385 (Fed. Cir. 2018) ("the question is whether the Commission found, with adequate reasons and substantial-evidence support, that the difference between the state of the domestic industry as it actually was in the POI and the state of the domestic industry as it would have been without the subject imports was more than inconsequential, immaterial, or unimportant"). Substantial record

evidence shows that subject imports certainly did so.  *See* Remand Views at 66, APPX0021270-0021271, APPX0100011.

Thus, the Commission appropriately addressed repondents' arguments blaming "oversupply conditions on demand conditions that failed to materialize" by finding that "cumulated subject imports entered the U.S. market in significant volumes, contributed to oversupply conditions, and depressed U.S. prices to a significant degree, regardless of how they were ordered."  Remand Views at 43 n.195, APPX0021249-0021250, APPX0099988; *see also id.* ("{r}egardless of why or when they were ordered . . . the record shows that subject imports had depressing effects on U.S. prices in 2019.").

## V.    PHOSAGRO FAILS TO UNDERMINE THE COMMISSION'S RELIANCE ON TRADE PUBLICATIONS

PhosAgro argues that the Commission improperly relied on "hearsay trade publications over contradictory sworn questionnaire data," contending that such reliance is contrary to a supposed Commission "practice to not rely on trade publication reports, particularly one source of reports, to support an affirmative finding when those reports contradict data gathered through questionnaire responses."  PhosAgro Comments at 22.  This argument has no basis in law or fact.

First, PhosAgro proceeds from a false premise when it claims that there is a contradiction between the trade publication reports of import oversupply and downward price pressure and what it calls "the sworn questionnaire data" – *i.e.,* the questionnaire price comparison data showing small margins of overselling more frequently than instances of underselling.  *See* PhosAgro Comments at 23-24; *see also* Remand Views at 34-35, APPX0021241-0021242, APPX0099979-0099980.  This is one of many instances where the Plaintiffs commit the basic error of presuming that, if the questionnaire price comparisons show more instances of overselling than underselling, then the Commission cannot find significant price depression.  *See*

15

OCP Comments at 22-23; PhosAgro Comments at 17-21; IRM Comments in Opp. to Remand

Determ. (Mar. 1, 2024) at 10-12, ECF No. 219; Pl.-Int. Koch Comments in Opp. to ITC Final

Remand Determ. (Mar. 1, 2024) at 7, ECF No. 164.  Rather, underselling and price depression

are separate and distinct concepts, as provided by the statute and confirmed by judicial

precedent.  *See* 19 U.S.C. § 1677(7)(C)(ii); *Altx, Inc. v. United States*, 25 CIT 1100, 1110, 167 F.

Supp. 2d 1353, 1366 (2001) (stating that the Commission's underselling and depression analyses

are "discrete" and must not be "collapse{d}"); *OCTAL Inc. v. United States*, 539 F. Supp. 3d

1291, 1302 (Ct. Int'l Trade 2021) ("{T}he…Federal Circuit…and this Court have made clear

that the Commission may rely on evidence *either* of significant underselling *or* significant price

suppression or depression to support a finding for adverse price effects."); Commission

Comments at 28-29.  The statute itself reflects that subject imports may significantly depress

prices despite an absence of underselling, as is evident from the language of section

1677(7)(C)(ii)(II) that follows the underselling provision: "the effect of imports of such

merchandise *otherwise* depresses prices to a significant degree . . . ."  19 U.S.C. § 1677(7)(C)(ii)

(emphasis added).

Thus, no contradiction exists between the questionnaire price comparison data and the

trade publication reports of import oversupply and downward price pressure.  In its price

depression analysis, moreover, the Commission relied on the questionnaire pricing data, as well

as other questionnaire information, as it assessed price trends and subject import pricing

pressure.  *See, e.g.,* Remand Views at 37, APPX0021243, APPX0099982; *id.* at 40,

APPX0021245, APPX0099985; *id.* at 44-46, APPX0021250-0021253, APPX0099989-0099991;

*id.* at 52-53, APPX0021257-0021259, APPX0099997-0099998.  Accordingly, PhosAgro errs in

characterizing the Commission as having "override{n}" or "discarded" questionnaire data when

it relied on trade publications (in addition to multiple other types of evidence).  *See* PhosAgro

Comments at 21.

Second, the supposed agency "practice" asserted by PhosAgro does not exist, and in any

event, the Commission determinations it cites do nothing to advance its position.  As the

Commission notes in its comments to the Court, the Commission does not have "a practice as to

how it weighs evidence" because "every investigation 'is *sui generis*, involving a unique

combination and interaction of many economic variables.'"  Commission Comments at 29

(quoting *Hitachi Metals, Ltd. v. United States*, 949 F.3d 710, 718 (Fed. Cir. 2020), which in turn

quotes *Nucor Corp. v. United States*, 414 F.3d 1331, 1340 (Fed. Cir. 2005)).  Indeed, the

determinations cited by PhosAgro reflect the Commission's case-specific weighing of the

evidence, and doing so in circumstances that differ significantly from the underlying record.

PhosAgro cites *UAN Solutions from Russia and Trinidad & Tobago*, in which

questionnaire data and data from a single trade publication squarely contradicted each other –

which is not the case here.  Specifically, in *UAN Solutions from Russia and Trinidad & Tobago*,

the Commission declined to use inventory data from Argus North American Fertilizer, which

showed a carryover of inventory from one fertilizer season to another, rather than inventory data

compiled from questionnaires, which showed "no build-up in inventories of subject imports."

Inv. No. 701-TA-668, USITC Pub.5338 (Aug. 2022), Views at 31.  The Commission declined to

use the Argus inventory data in part because those data did not differentiate between domestic

product and import inventories, and because the underlying Argus data did not match public

import statistics or domestic production data collected from Commission questionnaires.  *Id.* at

31.  Here, by contrast, the Commission has not relied upon trade publication reports as a

substitute for contradictory questionnaire data.  Rather, these reports complement and

corroborate information from Commission questionnaires supporting the Commission's finding that subject imports contributed to price depression, including data showing: (i) significant price declines from late 2018, APPX0020467; *see also* APPX0020460-0020463, APPX0098473-0098476, *cited in* Remand Views at 37, APPX0021243, APPX0099982; (ii) a "substantial buildup" in subject import inventories, Remand Views at 69, APPX0021273, APPX0100014; *see also* APPX0020532, APPX0098547; (iii) U.S. purchasers reporting on the adverse price effects of subject imports in 2019, Remand Views at 52, APPX0021258, APPX0099997; (iv) U.S. purchasers reporting that U.S. producers reduced prices to compete with lower-priced subject imports, *id.* at 53, APPX0021258-0021258, APPX0099998; and (v) questionnaire data showing that [                                                  ] was the lowest-priced in the U.S. market [

             ]. *Id.* at 53 n.234, APPX0021258, APPX0099998. Thus, *UAN Solutions from Russia and Trinidad & Tobago* is inapposite to the facts here.

The same is true for the other determinations PhosAgro cites. *See* PhosAgro Comments at 23 (discussing *Large Power Transformers from Korea*, Inv. No. 731-TA-1189 (Review), USITC Pub. 4826 (Sept. 2018); *Stainless Steel Sheet & Strip from Germany, Italy, Japan, Korea, Mexico, & Taiwan*, Inv. No. 701-TA-382 (Second Review), USITC Pub. 4244 (July 2011); and *Hot-Rolled Steel Prod. From Kazakhstan, Romania, & South Africa*, Inv. No. 701-TA-407, USITC Pub. 4088 (July 2009) (Review) (Remand)). Each of these cases involves isolated press accounts that, according to the Commission, were outweighed by other record evidence. In *Large Power Transformers from Korea*, the Commission was "unpersuaded" by a single news article about restrictions on working hours in Korea, which a respondent cited to claim that the Korean industry's production capacity was likely to decline. In those circumstances, the

Commission found the questionnaire data showing substantial excess capacity to be more persuasive than the isolated news article. USITC Pub. 4826, Views at 23 n.174. Similarly, in *Stainless Steel Sheet & Strip from Germany, Italy, Japan, Korea, Mexico, & Taiwan*, the Commission was presented with a single news article by domestic interested parties claiming that a foreign producer planned to increase production capacity, but this article was contradicted by the foreign producer's questionnaire response. USITC Pub. 4244, Views at 35 n.267. Likewise, in *Hot-Rolled Steel Prod. from Kazakhstan, Romania, & South Africa*, the "only evidence" of a hot-rolled steel export shipment from a U.S. producer to a European country was a single press report of a 12,000 ton shipment to Belgium, and the Commission found that even a 180,000 ton export volume figure mentioned in hearing testimony "pale{d}" in comparison to the U.S. producer's domestic shipment data reported in its questionnaire. USITC Pub. 4088, Views at 14.

The circumstances in those determinations bear no resemblance to those in the underlying *Phosphate Fertilizers* investigation here. Unlike in those proceedings, the Commission in this case was not presented with a single news report that was directly contradicted by questionnaire data. Rather, the Commission relied upon at least 20 reports, from [                    ], addressing the issue of oversupply and downward price pressure, and which were consistent with the evidence collected through questionnaires, as noted above.

Third, PhosAgro focuses its critique on reports published by *Argus Media*, *see* PhosAgro Comments at 22, but it fails to acknowledge that, when it comes to trade press, the Commission actually relied on reports from [            ] publications – *i.e.*, Argus, [

        ] Remand Views at 41-43, APPX0021247-0021249, APPX0099986-0099988, and 47-49, APPX0021253-0021255, APPX0099992-0099994. Moreover, reports from [

] attributed downward price pressure to imports.  *See id*.  For example, as the Commission observed, "in April 2019, [      ] also reported on the oversupply condition in the U.S. market due to a poor application season in the fall of 2018 and a "surge in imports in recent months."  Remand Views at 43, APPX0021249, APPX0099988 .  In addition, [          ] reported that [

          ]  Remand Views at 49 n.220, APPX0021255, APPX0099994.  The fact that [          ] trade publications agree on the adverse price effects of imports confirms the reasonableness of the Commission's reliance on them.

Fourth, PhosAgro ignores the important role that trade publications play in the U.S. phosphate fertilizer market.  It is uncontroverted that trade publications are used by market participants in price negotiations and play an important role in transmitting price information throughout the U.S. market, as the Commission found:

> Phosphate fertilizer prices are reported in trade publications such as Argus Phosphates ("Argus"), CRU Phosphate Fertilizer Market Outlook ("CRU"), and Green Markets.  These trade publications gather market intelligence for sales transactions, including in the NOLA region, and publish the collected range of prices on a daily or weekly basis.  This price information is then quickly transmitted throughout the U.S. market.  Two of three U.S. producers ([                    ]), two of nine U.S. importers ([              ]), and 16 of 28 purchasers reported that they refer to and use prices published in trade publications when negotiating prices.

Remand Views at 20-21, APPX0021229, APPX0099965-0099966.  PhosAgro does not – indeed it cannot – refute these findings on the important role of trade publications in the market.  Thus, the reports that PhosAgro maligns as "hearsay accounts of transactions in the market," PhosAgro Comments at 21, [                    ] trade publications that the market participants themselves rely upon in negotiating prices.  This further confirms that the Commission reasonably relied on evidence from trade publications.

Thus, PhosAgro fails to show the existence of a Commission practice, or that the Commission acted differently in the Remand Determination as compared to similar situations in other cases.

## VI.    OCP PROPOSES AN INCORRECT CAUSATION STANDARD AND FAILS TO UNDERMINE THE COMMISSION'S REMAND DETERMINATION THAT THE DOMESTIC INDUSTRY IS MATERIALLY INJURED "BY REASON OF" SUBJECT IMPORTS

OCP proposes that the Court ignore the Federal Circuit's jurisprudence regarding causation in Commission material injury investigations and adopt the wrong causation standard. *See* OCP Comments at 34-35.  Specifically, OCP argues that, instead of reviewing the Commission's application of the "by reason of subject imports" standard, the agency's determination should be judged against a counterfactual "'but for' the weather" standard that asks if "weather-related demand shocks were a superseding cause."  *See id.* at 36 ("Had the weather been normal, there would have been no 'oversupply conditions' and no injury to the domestic industry.")

This is plainly incorrect.  Binding Federal Circuit precedents make clear that subject imports are the focal point of the causation inquiry under the statutory "by reason of" standard. *Changzhou Trina Solar Energy*, 879 F.3d at 1383-1385; *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 876 (Fed. Cir. 2008).  Under this standard, the injurious effects of subject imports satisfy the causation standard where they are more than "merely incidental, tangential, or trivial."  *Nippon Steel*, 345 F.3d at 1384 ("As long as its effects are not merely incidental, tangential, or trivial, the foreign product sold at less than fair value meets the causation requirement."); *see also Mittal Steel*, 542 F.3d at 873 (Fed. Cir. 2008) (quoting *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 722 (Fed. Cir. 1997), for the proposition that "this court

requires evidence in the record 'to show that the harm occurred 'by reason of' the LTFV imports, not by reason of a minimal or tangential contribution to material harm caused by LTFV goods.'").

In analyzing causation under this standard, the Commission "must examine other factors to ensure that it is not attributing injury from other sources to the subject imports," but it "need not isolate the injury caused by other factors from injury caused by unfairly traded imports." Statement of Administrative Action (SAA) to the Uruguay Round Agreements Act (URAA), H.R. Rep. No. 103- 316, Vol. I at 851-52 (1994); *Swiff-Train*, 793 F.3d at 1363; *Nippon Steel*, 345 F.3d at 1384 ("an affirmative material-injury determination under the statute requires no more than a substantial-factor showing.  That is, the 'dumping' need not be the sole or principal cause of injury.").  Nor is the Commission required to conduct an explicit counterfactual test in analyzing causation.  *Swiff-Train Co.*, 793 F.3d at 1361-1362.  Indeed, the "by reason of" standard "does not require the Commission to address the causation issue in any particular way," provided that "the injury to the domestic industry can reasonably be attributed to the subject imports."  *Mittal Steel*, 542 F.3d at 876 & 878 (Fed. Cir. 2008).  In light of these precedents, OCP is plainly incorrect in arguing that the Commission erred by failing to conduct a "'but for' the weather" test to determine if the weather was a "superseding cause."  *See* OCP Comments at 34-35.

Moreover, OCP's claim regarding weather as an alternative cause is refuted by post-petition developments in the U.S. market.   The Commission further supported its price depression finding by citing evidence related to the natural experiment that subject foreign producers and U.S. importers provided when subject imports largely pulled out of the U.S. market following the filing of the petition.[5]  In 2019, prior to the subject import pullback, "U.S.

---

[5] Notably, the sudden exit of subject imports from the market demonstrates that respondent producers could, in fact, quickly and decisively stop shipments bound for the United

prices were lower than and decreased by more than global phosphate fertilizer prices." Remand Views at 55, APPX0021261, APPX00100000. The situation changed dramatically after the U.S. industry petitioned for relief: "Cumulated subject imports declined substantially after the filing of the petitions, and subject imports from Morocco ceased entirely beginning in August 2020. Total import volumes of phosphate fertilizers were lower in the third quarter of 2020 than in the third quarters of every other year in the POI." Remand Views at 56 n.247 (citations omitted), APPX0021261, APPX0100001. The decline in subject imports was followed by a corresponding increase in U.S. prices, to the extent that the U.S. discount to other global markets turned into a U.S. premium: "Although U.S. prices began to increase in the beginning of 2020 as weather conditions improved, they remained at levels lower than those that existed in 2017 and 2018 until after the filing of the petitions at the end of June 2020, at which point they sharply increased to levels above other global markets." Remand Views at 55-56, APPX0021261, APPX0100000-0100001 (citing APPX0020460-0020463, APPX0098473-0098476); *see also* Remand Views at 37, APPX0021243, APPX0099982 ("Prices in interim 2020 increased, but remained below levels in January 2017 until after the filing of the petitions at the end of June 2020, after which prices experienced dramatic increases as subject import volumes to the U.S. market decreased and subject import end-of-period inventory levels decreased."). The Commission also cited record evidence showing that the domestic industry's market share, capacity, production and U.S. shipments improved after the post-petition decline in subject imports' presence in the U.S. market. *Id.* at 59 n.260, APPX0021264, APPX0100004.

---

States in response to market conditions, contrary to respondents' assertions that they were unable to sufficiently curtail subject imports during successive periods of low demand. *See* Remand Views at 27 n.139, APPX0021234, APPX0099972; *id.* at 43 n.195, APPX0021249-0021250, APPX0099988; *id.* at 56 n. 247, APPX0021261, APPX0100001; Commission Comments at 43.

NON-CONFIDENTIAL VERSION

This evidence, and the other evidence underlying the Commission's remand determination, *see* Section III *supra*, is not just substantial, it is overwhelming. Under the standard of review, it is simply impossible to maintain that a reasonable mind could not conclude from this evidence, as the Commission did, that subject imports were a substantial cause of U.S. price declines and deteriorations in the domestic industry's performance that is distinct from weather-related declining demand. *See* Remand Views at 66, APPX0021270-0021271, APPX0100011. Plaintiffs' claims to the contrary must therefore be rejected.

## VII.    CONCLUSION

For the foregoing reasons, we respectfully request that the Court sustain the Commission's Remand Determination.

Respectfully submitted,

*/s/ Jamieson L. Greer*
Jamieson L. Greer
Stephen P. Vaughn
Neal J. Reynolds
Patrick J. McLain

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500
jgreer@kslaw.com

Counsel For Defendant-Intervenor The J. R. Simplot Company

April 29, 2024

NON-CONFIDENTIAL VERSION

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedures 2(B)(1) and (2), I hereby certify that the attached

**DEFENDANT-INTERVENOR THE J. R. SIMPLOT COMPANY'S COMMENTS ON**

**THE U.S. INTERNATIONAL TRADE COMMISSION'S REMAND DETERMINATION**

contains 7,023 words, according to the word-count function of the word processing system used

to prepare this submission (Microsoft Word) and including headings, footnotes, and quotations,

and excluding the cover page, table of contents, table of authorities, counsel's signature block,

and this certificate.

*s/ Jamieson L. Greer*
Jamieson L. Greer
jgreer@kslaw.com

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500
jgreer@kslaw.com

Dated: April 29, 2024