**UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| OCP S.A.,<br><br>    Plaintiff,<br><br>    and<br><br>EUROCHEM NORTH AMERICA CORPORATION,<br>    Consolidated Plaintiff,<br><br>    and<br><br>PHOSAGRO PJSC, INTERNATIONAL RAW<br>MATERIALS LTD., and KOCH FERTILIZER, LLC,<br>    Plaintiff-Intervenors,<br><br>    v.<br><br>UNITED STATES,<br>    Defendant,<br><br>    and<br><br>THE MOSAIC COMPANY and J.R. SIMPLOT<br>COMPANY,<br>    Defendant-Intervenors. | Consol. Court No. 21-00219<br><br>**<u>NON-CONFIDENTIAL VERSION</u>**<br><br>Business Proprietary<br>Information Deleted from Pages<br>2-5, 7-9, 12-20, 22-23, 28-29 |

<u>**DEFENDANT-INTERVENOR THE MOSAIC COMPANY'S RESPONSE COMMENTS
ON THE U.S. INTERNATIONAL TRADE COMMISSION'S REMAND
DETERMINATION**</u>

David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann
Alexandra Maurer
WILMER CUTLER PICKERING HALE AND
    DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

Dated: April 29, 2024

Consol. Court No. 21-00219                                NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................... 1

II.  STANDARD OF REVIEW ............................................................................ 1

III. ARGUMENT .................................................................................................. 1

    A.  **The Commission's Volume Findings Are Supported by Substantial Evidence and Otherwise in Accordance with Law** ................................... 1

        1.  **The remand questionnaire responses confirm that domestic product was available throughout the POI and that Mosaic routinely shipped inventories between locations to meet demand.** ........................................... 2

        2.  **Plaintiffs improperly ask the Court to re-weigh the credibility of Mosaic's evidence regarding Plant City.** ........................................... 5

        3.  **The Commission reasonably considered and rejected Plaintiffs' arguments about Mosaic's alleged refusals to sell to U.S. purchasers.** ........................................... 7

    B.  **The Commission's Price Effects Findings are Supported by Substantial Evidence and Otherwise in Accordance with Law** ................................... 10

        1.  **The Commission's finding of significant price depression was reasonable and supported by substantial evidence** ........................................... 10

        2.  **The Commission's underselling analysis is in accordance with law** ............... 21

    C.  **The Commission's Impact Findings are Supported by Substantial Evidence and Otherwise in Accordance with Law** ................................... 23

        1.  **Plaintiffs are incorrect that the ITC misapplied the "by reason of" standard under the statute.** ........................................... 24

        2.  **OCP fails to show that subject imports and inventories would have been non-injurious absent the adverse weather conditions.** ........................................... 27

IV.  CONCLUSION .............................................................................................. 29

Consol. Court No. 21-00219                                    NON-CONFIDENTIAL VERSION

## TABLE OF AUTHORITIES

Page(s)

**Statutes**

19 U.S.C. § 1677(7)(C)(ii)..................................................................................21

19 U.S.C. § 1677(7)(C)(ii)(I).............................................................................21

**Cases**

*Arlanxeo USA LLC v. United States*,
    389 F. Supp. 3d 1330 (Ct. Int'l Trade 2019), *aff'd*, 819 F. App'x 925
    (Fed. Cir. 2020)............................................................................................15

*Cemex, S.A. v. United States*,
    790 F. Supp. 290 (Ct. Int'l Trade 1992) ....................................................21

*Chr. Bjelland Seafoods A/S v. United States*,
    19 CIT 35 (1995) .........................................................................................17

*Changzhou Trina Solar Energy Co.*,
    879 F.3d 1377, 1383 (Fed. Cir. 2018)........................................................25

*Gerald Metals v. Unites States*,
    132 F.3d 716 (Fed. Cir. 1997)....................................................................27

*Mittal Steel Point Lisas Ltd. v. United States*,
    542 F.3d 867 (Fed. Cir. 2008)..............................................................25, 27

*Nippon Steel v. ITC*,
    345 F.3d 1379 (Fed. Cir. 2003)..................................................................25

*Swiff-Train Co. v. United States*,
    793 F.3d 1355 (Fed. Cir. 2015)..................................................................24

*Swiff-Train Co. v. United States*,
    999 F. Supp. 2d 1334 (Ct. Int'l Trade 2014) .......................................23, 24

*USX Corp. v. United States*,
    682 F. Supp. 60 (Ct. Int'l Trade 1988) ......................................................17

Consol. Court No. 21-00219                      NON-CONFIDENTIAL VERSION

**Administrative Decisions**

*Hydrofluorocarbon Blends and Components from China*, Inv. No. 731-TA-1279,
    USITC Pub. 4629 (Aug. 2016) ........................................................................14

*Tapered Roller Bearings from Korea*, Inv. No. 731-TA-1380, USITC Pub. 4806
    (Aug. 2018) .................................................................................................21, 22

*Urea Ammonium Nitrate Solutions from Russia and Trinidad & Tobago*, Inv.
    Nos. 701-TA-668-669 and 731-TA-1565-1566 (Final), USITC Pub. 5338
    (Aug. 2022) .......................................................................................................21

Consol. Court No. 21-00219                                    NON-CONFIDENTIAL VERSION

## I.    <u>INTRODUCTION</u>

Defendant-Intervenor The Mosaic Company ("Mosaic") hereby responds to comments on

the U.S. International Trade Commission's ("ITC") remand determination filed by Plaintiff OCP

S.A. ("OCP"), Consolidate Plaintiff EuroChem North America Corporation ("EuroChem"), and

Plaintiff-Intervenor PhosAgro PJSC ("PhosAgro"), International Raw Materials Ltd. ("IRM"),

and Koch Fertilizer, LLC ("Koch") (collectively, "Plaintiffs").[1]

Mosaic supports and hereby adopts by reference the arguments made by the ITC in its

comments in response to Plaintiffs' comments, as well as those provided in the comments of

Defendant-Intervenor J.R. Simplot Company ("Simplot") filed today.  USITC Comments on

Remand Determ. (Apr. 15, 2024), ECF No. 177 ("ITC Remand Comments").  Mosaic's

comments set forth below are intended to supplement these arguments while avoiding

unnecessary repetition.

## II.    <u>STANDARD OF REVIEW</u>

Mosaic agrees with and adopts the discussions of the standard of review in the

Commission's comments, *see* ITC Remand Comments at 1-3, and in Simplot's comments.

## III.    <u>ARGUMENT</u>

### A.    **The Commission's Volume Findings Are Supported by Substantial Evidence and Otherwise in Accordance with Law**

Mosaic agrees with and adopts the Commission's comments demonstrating that the

Commission's volume findings are supported by substantial evidence and otherwise in

accordance with law.  *See* ITC Remand Comments at 12-19.  Below, Mosaic addresses the new

---

[1] *See* ECF No. 156 ("OCP Remand Comments"); ECF No. 154 ("EuroChem Remand Comments"); ECF No. 160 ("PhosAgro Remand Comments"); ECF No. 162 ("IRM Remand Comments"); ECF No. 164 ("Koch Remand Comments").

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 21-00219

evidence submitted in the remand proceeding that confirms domestic product was available to meet U.S. demand throughout the POI and rebuts Plaintiffs' arguments concerning Mosaic and the alleged "supply gap" and alleged refusals to supply.

> **1.    The remand questionnaire responses confirm that domestic product was available throughout the POI and that Mosaic routinely shipped inventories between locations to meet demand.**

As the Commission explained in its comments, the additional evidence submitted in the remand questionnaire responses "demonstrate{d} the breadth and superiority of U.S. producers' 'distribution networks,'" which enable them to move inventory between locations.  ITC Remand Comments at 4-5.  The Commission found that, "contrary to respondents' arguments of a supply gap, domestic producers maintained excess capacity throughout the {POI} and held substantial inventories in 2019."  *Id.* at 5; APPX0099977, APPX0021239.  The Commission also found that the evidence "demonstrated that domestic producers were well-positioned to supply the U.S. market," such that "subject imports were not pulled into the U.S. market due to any practical unavailability from U.S. sources."  ITC Remand Comments at 5; APPX0099977, APPX0021239.

Substantial record evidence supports these findings.  As Mosaic explained in its remand U.S. producer's questionnaire response and remand comments, Mosaic has an extensive distribution network of nearly [      ] facilities in [      ] states with approximately [            ] short tons ("ST") of storage capacity that allows it to reach customers located throughout the United States via barge, rail, or truck.  *See* APPX0087442-0087443.  The [          ] of Mosaic's U.S. storage capacity – [                              ] – is in

[                              ].  *See id.*  Under [

- 2 -

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 21-00219                                     NON-CONFIDENTIAL VERSION

]. *Id.* Mosaic also stores

product at [                        ] warehouses.  In 2019, Mosaic utilized [                        ]

warehouses. *Id.*

Because Mosaic's distribution network includes [                        ] Mosaic has the

ability to [

].  *See* APPX0087442-0087443.  OCP asserts

that "there is no record evidence indicating that such reshipment at scale is even possible, let

alone standard practice."  OCP Remand Comments at 5.  To the contrary, Mosaic's U.S.

producer's questionnaire response documented that, during the POI, Mosaic moved [          ]

of tons of phosphate fertilizer between its inventory locations, including [


].  *See* APPX0087442-0087443.

OCP attempts to characterize Mosaic's description of its distribution network as

exhibiting a "one-way pattern," *see* OCP Remand Comments at 4-5, but OCP misleadingly omits

key facts from Mosaic's response that contradict its assertion.  In actuality, the record

demonstrates that Mosaic routinely moves inventories [


].  *See* APPX0087442-0087443, APPX0087504-0087512.  Unlike the

responding importers' [                              ], *see* APPX0099970,

APPX0021232-0021233, Mosaic's distribution system allows it to serve customers from

multiple inventory points, to change shipment or delivery points, and to re-direct shipments in

transit – including by changing mode of transportation – when there is a supply chain disruption.

[

**BUSINESS PROPRIETARY**
**FORMATION DELETED**

Consol. Court No. 21-00219                                   NON-CONFIDENTIAL VERSION

**]** APPX0087506.

      Mosaic continuously tracks the movement of inventories through its storage and

distribution network and makes adjustments to meet changes in demand.  APPX0087442-

0087443, APPX0087504-0087512.  For example, if a warehouse is scheduled for re-supply but

another warehouse develops a more acute need for product, Mosaic will divert tons in transit to

meet that demand.  This may include changing transit points and/or modes of transportation,

such as shipping by rail or truck instead of barge.  For example, in spring 2019, when widespread

flooding caused transportation delays and river closures along the Mississippi River system,

Mosaic **[**

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 21-00219

NON-CONFIDENTIAL VERSION

].

APPX0099769-0099771.

Thus, the record, as supplemented in the remand proceeding, confirms that phosphate fertilizer was not practically unavailable from U.S. sources in spring 2019 or any other point in the POI, and it supports the Commission's finding that there was no domestic industry "supply gap." APPX0099963, APPX0021227.

> **2.** **Plaintiffs improperly ask the Court to re-weigh the credibility of Mosaic's evidence regarding Plant City.**

Plaintiffs argue that the Commission "improperly minimizes or ignores" a purported "supply shortfall." OCP Remand Comments at 8 (decapitalized). To the contrary, the Commission discussed Plaintiffs' supply gap arguments at length and reasonably and correctly rejected them as unsupported by the record. *See* APPX0099962-0099963, APPX0021226-0021227; APPX0100012-0100015, APPX0021271-0021274; *see also* APPX0099595-0099597, APPX0020584-0020585; APPX0099624-0099625, APPX0020604-0020605.

OCP claims that the Commission did not "meaningfully address" its argument regarding the effect of Mosaic's decision to idle and close Plant City, and it criticizes the Commission for "crediting Mosaic's *post hoc* claim that closing Plant City resulted in a supply shortfall of only 700,000 ST." OCP Remand Comments at 8. OCP claims that the "real impact" was "far more significant," *i.e.*, 1.1 million ST, and that "{a}t the time, Mosaic understood and communicated to the market what impact Plant City's closure would have on domestic supply." *Id.* at 8-9. However, the only evidence that Plaintiffs cite in support of this argument are two statements by Mosaic, one from Mr. Rahm (who later testified on behalf of OCP) during a February 2018 analyst call and one from Mosaic's CEO during a March 2019 analyst call. *See id.* at 8-9; *see*

NON-CONFIDENTIAL VERSION

*also* PhosAgro Remand Comments at 7-8.  Both of these statements reflect extemporaneous

estimates of Plant City's production and/or supply into the market that are less accurate than the

actual capacity, production, and shipment data that Mosaic reported to the Commission in its

U.S. producer questionnaire based on its audited financial statements and internal accounting

records.

In the first instance, the February 2018 analyst call, OCP claims that "Mosaic noted that

closing Plant City would take '1.5 million tonnes out of the equation.'"  OCP Remand

Comments at 9.  What Mr. Rahm actually said was that, "in the context of what's going on in the

global phosphate market," *i.e.*, not the U.S. market, "the closure of Plant City {} takes another

1.7 million – or 1.5 million tonnes out of the equation…"  APPX0092614, APPX0012705.  OCP

credits Mr. Rahm's second estimation (1.5 million tonnes or 1.65 million ST), but in fact both

figures were incorrect, as Plant City's total production at the time was only 1.4 million ST.  *See*

APPX0017503.  In the second instance, Mosaic's CEO stated in March 2019 that Mosaic "gave

up 1 million tonnes" (*i.e.*, 1.1 million ST) of the U.S. market.  *See* APPX0012655-0012656.

However, because this analyst call occurred over a year after Mosaic's decision to idle Plant City

was announced, it could not possibly have informed market participants' expectations of how

much additional supply would be needed in the market in 2018.[2]  The Commission reasonably

gave greater weight to other evidence of the more precise impact of Plant City's idling in 2018.

In particular, as Mosaic testified at the hearing, Plant City had a nameplate capacity to

produce 2.2 million ST of phosphate fertilizer per year, but it was operating well below capacity

---

[2] In addition, because the analyst call post-dated the relevant market developments by 15 months, or nearly half of the POI, the statement did not constitute an "authentic demand signal," contrary to PhosAgro's arguments.  *See* PhosAgro Remand Comments at 7-8.

**BUSINESS PROPRIETARY
INFORMATION DELETED**

Consol. Court No. 21-00219                                    NON-CONFIDENTIAL VERSION

and only producing 1.4 million ST when Mosaic idled the facility in December 2017.  *See*

APPX0017503.  Of that amount, Mosaic sold approximately half in the U.S. market and half in

export markets.  *See id.*; *see also* APPX0017575 ("We shipped into the U.S. market from Plant

City approximately 700,000 short tons."); *see also* ITC Remand Comments at 18 (citing

APPX0099959-0099960).  Mosaic's U.S. producer's questionnaire response corroborates this

evidence.  *See* APPX0087450 (showing [

                                        ]).  OCP criticizes the Commission for "accept{ing}"

Mosaic's *post hoc* and self-serving 700,000 ST figure," *see* OCP Remand Comments at 9, but it

ignores that the figure is based on Mosaic's actual audited sales records for 2017 and 2018.[3]  The

Commission properly weighed this certified evidence against the isolated (and inaccurate)

extemporaneous statements that respondents proffered and reasonably accorded greater weight to

the former.

> **3.     The Commission reasonably considered and rejected Plaintiffs'
> arguments about Mosaic's alleged refusals to sell to U.S. purchasers.**

Plaintiffs contend that the Commission "continues to discount" or failed to give "due

weight" to their argument that the domestic industry's alleged refusals to supply U.S. customers

explain its material injury.  OCP Remand Comments at 10-11; PhosAgro Remand Comments at

10; IRM Remand Comments at 7-8; Koch Remand Comments at 3.  The Commission fully

considered – and reasonably rejected – Plaintiffs arguments on this point.  ITC Remand

Comments at 18-19; *see also* APPX0099626-0099627, APPX002605-002606.

---

[3] As Mosaic explained in its posthearing brief, it had acquired Plant City in 2014 as part of a transaction worth more than one billion dollars, anticipating that the facility would be a long-lived production asset.  The market did not develop as Mosaic had anticipated, however, due in large part to the surge in subject imports.  APPX0097181-0097182, APPX0017127-0017128.

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 21-00219                              NON-CONFIDENTIAL VERSION

As an initial matter, many of Plaintiffs' allegations of refusal to supply involve

complaints from fertilizer brokers or traders.  U.S. producers like Mosaic have legitimate

business reasons to prioritize sales to loyal customers over trading companies that merely act as

middlemen, particularly when those trading companies turn around and compete with Mosaic for

sales to the same downstream retailers.  *See* APPX0099513, APPX0020274.

Further, many of Plaintiffs' examples of the domestic industry's alleged "refusals to sell,"

particularly with respect to [                                                                                    ].  As Mosaic

explained in its posthearing brief, [


].  APPX0097252-0097253, APPX0017198-

0017199.  ADM's posthearing case brief reflects this fact, as the examples it provides [


].  APPX0095797, APPX0015866.  However, this pattern

changed significantly post-Petition, when [


].  *See* APPX0095797-

0095799, APPX0015866-0015868.  That the purpose of these requests was to generate

compromising evidence for this case can be seen in [


].

APPX0095816, APPX0015875-0015876.

Many of the Plaintiffs' examples of Mosaic's alleged refusal to supply are from the post-

petition period, when OCP and the Russian producers abruptly withdrew from the market,

- 8 -

Consol. Court No. 21-00219                                    NON-CONFIDENTIAL VERSION

creating a short-term supply shock.  *Compare* OCP Remand Comments at 11; APPX0097695-

0097700, APPX0016486-0016491 *with* APPX0099625, APPX0020605.  Other examples reflect

[                                                                                    ].  For

example, the Commission highlights Koch's claims that Mosaic has declined its requests to sell

barges of phosphate fertilizers at "market prices."  *See* Koch Remand Comments at 3; ITC

Remand Comments at 19.  As the Commission correctly stated, evidence "{t}hat Mosaic refused

to sell fertilizers at Koch's preferred pricing offers no support to its or the other plaintiffs'

arguments."  *Id.*

    The record evidence similarly contradicts other parties' claims regarding Mosaic's

alleged refusal to supply.  For example, Gavilon complained at the hearing that Mosaic cut its

supply during the POI by 100,000 tons, *see* APPX0098405, APPX0018642, but it failed to note

that [

                ].  APPX0097251, APPX0017197.  Mosaic also explained that [


                ] and that IRM is a trading company that has never had a sales

relationship with Mosaic, as it only purchases from foreign producers such as OCP, PhosAgro

and EuroChem.  *See* APPX0097251-0097253, APPX0017197-0017199.[4]

---

[4] Mosaic also explained that it exports phosphate fertilizers to counter-seasonal markets like India and Brazil
because doing so helps support year-round capacity utilization during "off-season" periods in the United States and
helps mitigate risk when U.S. demand is low.  APPX0099626, APPX002605-002606.  For example, during the
oversupply conditions during the POI, Mosaic increased exports because the U.S. market could not absorb
additional volumes.  APPX0097162, APPX0017108; APPX0099618, APPX0020600.  When OCP and the Russian
producers abruptly exited the U.S. market post-petitions, Mosaic increased its U.S. production and U.S. shipments,
and even diverted shipments intended for export markets to make additional product available to its U.S. customers.
APPX0099626, APPX002605-002606.

The Commission's original Views and Remand Determination discuss these issues at length.  *See* APPX0099626, APPX002605-002606; APPX0100013-0100014, APPX0021272-0021273.  For example, the majority of purchasers reported that domestic product was either comparable or superior to subject imports in terms of availability and reliability of supply.  APPX0100015, APPX0021274.  Moreover, as discussed above in Section III.A.1., the record as supplemented in this remand proceeding demonstrates that domestic producers have superior distribution networks compared to importers.  *Id.*  This evidence provided the Commission with a reasonable basis to conclude that the domestic industry's injury was not attributable to a refusal or inability to supply, but rather to the effects of subject imports.

**B.    The Commission's Price Effects Findings are Supported by Substantial Evidence and Otherwise in Accordance with Law**

Mosaic agrees with and adopts the Commission's arguments with respect to its price effects findings.  *See* ITC Remand Comments at 19-36.  As the Commission's comments demonstrate, and as Mosaic supplements below, the Commission's findings were reasonable, supported by substantial evidence, and otherwise in accordance with law.

**1.    The Commission's finding of significant price depression was reasonable and supported by substantial evidence**

As the Commission explained in its comments, the Commission "performed a comprehensive analysis of the role that subject imports played on price declines for the domestic product."  ITC Remand Comments at 21.  The Commission discussed numerous pieces of evidence that pointed to subject imports as a substantial cause of the price declines over the latter part of the POI, including:

- a high degree of substitutability, with all three responding U.S. producers and most purchasers and importers reporting that subject imports and domestically produced

fertilizers were always or frequently interchangeable, APPX0099963-0099964, APPX0021150-0021151;

- the importance of price in customer purchasing decisions, with purchasers most often citing price as the top factor and the majority of purchasers reporting they usually purchase the lowest-priced product, APPX0099964, APPX0021151;

- the transparency of U.S. phosphate fertilizer prices, with trade publications gathering market intelligence and publishing collected prices on a daily or weekly basis, and published prices (including the New Orleans or "NOLA" price) being quickly transmitted through the market and referred to in price negotiations, APPX0099965-0099966, APPX0021151-0021152;

- evidence that subject import and domestic prices followed similar trends over the POI, increasing between 2017 and most of 2018, and then declining between 2018 and 2019, APPX0099982, APPX0021243;

- significant volumes and inventories of subject imports that continued to enter the market in 2019 despite a "substantial demand decline" due to adverse weather conditions and in excess of any purported need to restock inventory in regions that were unaffected by the weather, APPX0099983-0099984, APPX0021167-0021168;

- contemporaneous reporting in trade publications evidencing oversupply conditions and price declines in 2019 amid a glut of subject imports, APPX0099986-0099988, APPX0021170-0021172; APPX0099993-0099994, APPX0021177-0021178;

- purchaser questionnaire responses confirming the adverse price effects of subject imports, APPX0099997, APPX0021180-0021181;

- evidence of subject imports offered at low prices and domestic producers being forced to lower prices to compete, APPX0099998, APPX0021181; and

- the sharp increase in U.S. prices after Mosaic filed its petitions and subject imports abruptly exited the U.S. market, APPX00100000, APPX0021183.

This extensive record evidence from a multitude of sources more than satisfies the

substantial evidence standard, and Plaintiffs fail to show otherwise.

                 a)     <u>Mosaic customer emails support the Commission's finding that subject imports depressed domestic prices</u>

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

Consol. Court No. 21-00219                                        NON-CONFIDENTIAL VERSION

OCP continues to contest the Commission's reliance on Mosaic customer emails and

Simplot lost sales/lost revenue evidence in finding price depression on the grounds that they are

"unreliable" and outweighed by allegedly contradictory evidence from purchaser questionnaire

responses.  OCP Remand Comments at 27-28.  However, as the Commission correctly notes, it is

the Commission's direct role to determine the weight and credibility of the submitted evidence.

ITC Remand Comments at 33.  The Commission is also correct that the purchaser questionnaire

responses that OCP cites are not inconsistent with the Mosaic emails, and the [          ] response

actually corroborates them.  *Id*. at 33-34.

The Commission relied upon the Mosaic emails (in addition to other record evidence) to

support its finding that "subject imports were being offered at low prices" in 2019.  *See*

APPX0099997-0099998, APPX0021257-0021258.  In response to a request from Commissioner

Karpel, Mosaic submitted documentation of price negotiations from 2018-2020 showing that

Mosaic's customers [

                                                ].  *See* APPX0097192, APPX0017138.  This

evidence included an email from January 2019 in which [




                                                ].  APPX0097203, APPX0017149 (cited in

APPX0099613, APPX0020597); *see also* APPX0097497-APPX0097509, APPX0017385-

0017392.  This evidence of [

                                         ] supports the Commission's finding that "subject

imports were being offered at low prices during this time."  *See* APPX0099613, APPX0020597.

- 12 -

Consol. Court No. 21-00219                              NON-CONFIDENTIAL VERSION

Moreover, and contrary to OCP's argument, [                    ] purchaser questionnaire response –

where [

                                                        ] – does not contradict this

evidence or fairly detract from the Commission's finding that subject imports were being offered

at low prices.  *See* OCP Remand Comments at 28.

    OCP's other complaints about the Commission allegedly relying on purportedly "cherry-

picked" evidence are similarly misplaced.  *See, e.g.*, OCP Remand Comments at 23-25.  In

particular, OCP contends that the purchaser responses of [                    ] contradict

Mosaic's emails with these customers.  *Id.* at 28.  In actuality, although [                    ]

reported that they [                                                    ], this does

nothing to undermine the Mosaic emails showing that these customers [

            ].  APPX0097192, APPX0017138; APPX0097491-0097496,

APPX0017381-0017384.  And while [

                                            ], *see* APPX0098486, APPX0018723 [


                                ] *See id.*

    OCP also ignores that the Commission cited other evidence in addition to Mosaic's

customer emails in support of its finding that subject imports were being offered at low prices.

This includes a sworn declaration from a Simplot executive (with supporting documentation)

discussing [                                                    ].  APPX0095936-

0095939, APPX0016345-0016348 (cited in APPX0099613, APPX0020597).  It also includes

information from U.S. purchaser [                    ], which reported that its [

- 13 -

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 21-00219                    NON-CONFIDENTIAL VERSION

                            **]** APPX0099613, APPX0020597.  Moreover, **[**

        **].**[5] *Id.*[6]

Given these multiple sources of evidence, including contemporaneous documentation, a reasonable mind could conclude as the Commission did that "subject imports were being offered at low prices during this time." *See* APPX0099613, APPX0020597.  The Court should reject Plaintiffs' invitation to re-weigh the record evidence.

                      b)      <u>Trade publications support the Commission's finding that subject imports depressed prices</u>

The Commission cited several contemporaneous trade publications in support of its findings that subject imports continued to enter the market in large volumes in 2019, despite declining demand and in excess of any purported depletion of inventories, thereby contributing to oversupply conditions and having a depressing effect on U.S. prices.  APPX0099986-0099988, APPX0021247-0021249; APPX0099992-0099994, APPX0021253-0021255.

---

[5] OCP criticizes Mosaic's analysis of the lowest-priced sale per month on the grounds that "statistics dictate that the odds of being the lowest-priced firm in a given month are 7/8 (87.5%) for importers," OCP Remand Comments at 25 n.7, but this argument assumes that each company sets prices independently, whereas the record shows that prices "tracked each other closely" in a highly transparent market, with firms frequently referring to published price indices and even **[**                 **]** in negotiations.  APPX0099999, APPX0021259.

[6] OCP also argues that the Commission failed to address contrary record evidence from the price comparison data allegedly showing that "any price decline was **[**                   **]**, as Mosaic is the 'price leader.'"  OCP Remand Comments at 31.  As an initial matter, purchaser responses about price leadership do not dictate the Commission's price effects findings.  A "price leader" can be a firm that leads market prices lower, or higher.  Indeed, the Commission has previously found significant price depression by subject imports despite a majority of purchasers identifying domestic producers as the price leaders in the U.S. market.  *See Hydrofluorocarbon Blends and Components from China*, Inv. No. 731-TA-1279, USITC Pub. 4629 (Aug. 2016), Views at 25 (finding price depression), Staff Report at V-3 (11 of 17 purchasers identifying domestic producers as price leaders).  Thus, evidence of Mosaic's alleged "price leadership" does not contradict the Commission's finding that subject imports oversupplied the market and contributed to price declines, and there is no legal flaw in the Commission's analysis.

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 21-00219                                    NON-CONFIDENTIAL VERSION

Specifically, the Commission cited 20 contemporaneous, published reports from [                    ]

sources – Argus, [                                        ] – that described "oversupply amid heavy

imports" weighing on the market and forcing prices down.  *See id*.

       OCP argues that the Commission erred in relying on these industry publications – which

it describes as "anecdotes – planted in industry publications by unnamed sources" – and

complains that the Commission "makes no attempt to justify its reliance on these soundbites,

which are contradicted by its own pricing data."  OCP Remand Comments at 28-29.  OCP's

rhetoric is nothing more than an invitation to the Court to improperly reweigh the record

evidence.  OCP's characterization of the industry publications as consisting of "anecdotes" and

"soundbites" is also incorrect.  Mosaic explained that industry publications like Argus obtain

information about phosphate fertilizer prices – a process that involves trade press reporters

communicating with buyers and sellers in the market and confirming prices on both the buy and

the sell side of the transaction before publishing a price.  APPX0097201, APPX0017147.

Argus' published prices are also used to settle swaps contracts and therefore fall under the

purview of federal agencies such as the Commodities Futures Trading Commission, further

demonstrating their reliability.  *Id*.  Most responding U.S. producers ([        ]), importers (6 of

10), and purchasers (12 of 27) told the Commission they report prices to trade publications.  *See*

APPX0098468, APPX0018705.  OCP also fails to note that it cited the very same industry

publications in its own submissions to the Commission, undermining its claims that they are

unreliable.  *See* APPX0091863, APPX0011955 (citing Exhibits 92, 93).

       Further, OCP's repeated references to imports "overselling" the domestic like product are

misplaced.  Underselling and price depression are distinct concepts, *see Arlanxeo USA LLC v.

United States*, 389 F. Supp. 3d 1330, 1339 (Ct. Int'l Trade 2019), *aff'd*, 819 F. App'x 925 (Fed.

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 21-00219                    NON-CONFIDENTIAL VERSION

Cir. 2020), and the Commission found that U.S. prices declined over the course of 2019.

APPX0021256.  Further, the Commission's price comparison data [

                          ], *see* APPX0098475, APPX0018712, contrary to OCP's claims

that these data contradict the Commission's findings.  The relevant question for the Commission

was whether subject imports contributed to this decline, and the Commission reasonably relied

on the trade publications as one of many sources in finding that they did.  *See id*.

        OCP also ignores other record evidence that corroborates the industry publications and

confirms that low-priced subject merchandise oversupplied the market during the POI.  For

example:

- As the Commission noted, OCP's own witness conceded at the Commission's hearing that "NOLA {*i.e.*, New Orleans, Louisiana} prices were lower than prices in Brazil due to a market imbalance."  APPX0099613, APPX0020597.

- U.S. importers admitted that [

                                    ].  In particular [


                          ] APPX0099988, APPX0021172-0021173.


- EuroChem testified at the Commission's hearing that it continued importing new volumes into the declining U.S. market in 2019 because "those vessels were coming. And once they're on their way, they're coming here."  APPX0099988, APPX0021172-0021173.

- Purchaser [                ] reported that [




                                                    ].  APPX0099614, APPX0020598.

- 16 -

- Purchaser [                                ] reported that [

                                                              ]. APPX0099614, APPX0020598.

- Purchaser [                ] reported that [

                                                      ]. APPX0099614-0099615,
APPX0020598.

Thus, this case is very different from the case OCP cites, *Chr. Bjelland Seafoods A/S v. United States*, 19 CIT 35 (1995),  Court criticized the ITC's reliance on one sentence in a solitary press report, which was "unsubstantiated by *any* corroborating evidence in the record."  *Id.* at 41 (emphasis in original).  Here, by contrast, the Commission relied on numerous reports from multiple trade publications as just one of several different types of mutually reinforcing evidence in support of its conclusion:  subject imports significantly depressed prices for the domestic like product.

         c)    <u>The Commission's price depression finding does not rest on an unsupported assumption about importers' foresight or ability to stop deliveries.</u>

OCP criticizes the Commission's finding that subject import volumes in 2019 depressed prices "regardless of why or when they were ordered," arguing that it "requires an unfounded and absurd assumption: that importers had the foresight and the ability to stop subject imports from arriving at NOLA *before* more rainfall occurred in Spring 2019 and Fall 2019."  OCP Remand Comments at 32.  OCP's argument misses the mark.  There is no intent requirement under the statute, *see USX Corp. v. United States*, 682 F. Supp. 60, 68 (Ct. Int'l Trade 1988), nor a "reasonableness" safe harbor.  The reasons why, and the timing of when, importers placed their orders for the [            ] volumes of subject imports that entered the market throughout 2019 are ultimately irrelevant.  *See* APPX0099988, APPX0021249.

Nonetheless, Plaintiffs fail to undermine the reasonableness of the Commission's finding that foreign producers and importers did, in fact, have the ability to respond to market conditions

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 21-00219                           NON-CONFIDENTIAL VERSION

in real time.  *See* APPX0099988, APPX0021249.  Plaintiffs repeatedly assert that "distributors"

purchase fertilizer six months or more in advance of the spring and fall application seasons, *see*

*e.g.*, OCP Remand Comments at 32, and therefore that "subject imports that arrived in Q1 2019

were actually ordered in Q4 2018 or earlier based on application projections for Q2 2019," and

"{w}hen flooding commenced in certain regions in Q2 2019, subject imports had already been

staged in inventory, having been ordered and shipped when no one could foresee that anticipated

demand would again be disrupted by weather."  *See id.*  OCP criticizes the Commission for

supposedly "suggest{ing} importers should have been able to predict the weather six months out

and adjust subject import volumes to prevent oversupply."  *Id.*  Yet OCP's own submissions to

the Commission contradict this narrative.  OCP told the Commission that it:

[

] Then, [

].

APPX0097727, APPX0016518.

Thus, [                                                                                    ]

imported product arrives in the United States, not six months in advance as Plaintiffs allege, and

ocean shipping from Morocco to NOLA only takes about two weeks.  *See* APPX0084700,

APPX0004136.  Accordingly, the Commission was correct that importers have the ability to

adjust to market conditions – as they demonstrated by abruptly halting shipments post-petitions –

and given the significant levels of existing inventories at the end of Q3 2018 and Q4 2018,

importers could have reduced their purchases for Q1 2019.  *See* APPX0099988, APPX0021249.

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 21-00219                          NON-CONFIDENTIAL VERSION

Instead, importers brought in another record 720,728 ST in January 2019.  As the

Commission correctly noted, this volume of imports in the month of January alone, combined

with the **[          ]** in inventories that importers had accumulated as of the end of Q4 2019,

exceeded the alleged 1.1 million ST "supply gap" that supposedly existed during the POI.

APPX0099962, APPX0021148.  In other words, by January 2019, importers had more than

enough supply to cover the total volume of allegedly unmet demand in the U.S. market on an

annual basis, but they nonetheless continued to import hundreds of thousands of additional tons

each month over the course of 2019.  *See* APPX0098456, APPX0018693.  The Commission

reasonably found that the substantial volumes of cumulated subject imports continuing to enter

the U.S. market over the course of 2019 contributed to oversupply conditions and adversely

impacted U.S. prices.  *See* APPX0099988, APPX0021172-0021173.

Plaintiffs argue the additional imports in spring and fall 2019 were needed to supply

farmers in areas where inventories had been depleted.  *See* PhosAgro Comments at 6.  However,

as the Commission observed, the inventory data show that importers had **[          ]** inventories

already in place in upcountry warehouses that were available to serve areas of the Cornbelt

unaffected by the river flooding.  *See* APPX0099867-0099868, APPX0021040-0021041.  The

Commission also provided a detailed analysis of the inventory data that demonstrates the

continued high levels of imports in spring and fall 2019 were not needed to restore depleted

inventories.  *See* APPX0099989-0099992, APPX0021173-0021176.

Moreover, the record as supplemented in this remand proceeding disproves Plaintiffs'

theory that additional imports were needed to serve customer demand in areas unaffected by the

widespread flooding of the Mississippi River system, such as in the Delta.  *See* OCP Remand

Comments at 29 (referencing a USDA article reporting that the Deep South had favorable

- 19 -

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 21-00219                                   NON-CONFIDENTIAL VERSION

planting conditions at various points in 2019); PhosAgro Comments at 6 (citing this Court's

order, which referred to "uncontroverted record evidence that additional imports were needed in

2019 to supply regions unaffected by bad weather…").  Plaintiffs cite to no evidence that

importers' inventories in the Delta region were depleted, or that importers could not have

supplied customers in the Delta region from existing inventories in and around NOLA.[7]  The

record shows that "in spring 2019, U.S. importers had inventories sitting on barges at NOLA and

in the Gulf, *i.e.*, proximate to Delta farmers."[8]  *See* APPX0099867, APPX0021040.

Respondents' own witnesses testified at the Hearing that product was sitting on barges waiting

for river open.  APPX0015723.  [


        ].  APPX0099772-0099774.  Further, demand in the Delta region (*i.e.*, Alabama,

Louisiana, Mississippi, Arkansas) is not particularly high compared to the Cornbelt states.  *See*

APPX0089500-0089522, APPX0015184-0015206.  Thus, the Delta region could not have

---

[7] The Commission on remand collected detailed information from both U.S. producers and U.S. importers about
their inventory operations and locations, which shows that [



      ]  *See* APPX0099699-00996700, APPX0021306-0021307; APPX0099673, APPX0021290;
APPX0099709, APPX0021306; APPX0099791, APPX0021408.

[8] [

                                                      ]  *See, e.g.*, APPX0099735-0099736, APPX0021352-0021353;
APPX0099699-00996700, APPX0021306-0021307.  [


                                                      ]  *See* APPX0099772-0099774, APPX0021364.  At least [
          ] also reported [
                          ].  *See* APPX0099709, APPX0021306 [
                                                      ].

NON-CONFIDENTIAL VERSION

absorbed the hundreds of thousands of tons of subject imports that continued to arrive at NOLA on a monthly basis in spring and fall 2019.  APPX0098567-0098568, APPX0018804-0018805.

In sum, Plaintiffs fail to point to any contradictory evidence that undermines the Commission's conclusion that additional volumes of subject imports merely replenished depleted inventories in areas unaffected by flooding.  Thus, there is no legal error in the Commission's analysis.

### 2.    The Commission's underselling analysis is in accordance with law

PhosAgro argues that "{t}he Commission majority recognizes that the statute requires the Commission to make a finding on underselling."  PhosAgro Remand Comments at 20 (citing 19 U.S.C. § 1677(7)(C)(ii)(I)).  As the Commission explains, however, PhosAgro is incorrect, as the statute states only that the Commission shall "consider" whether subject imports are underselling the domestic like product.  ITC Remand Comments at 20-21; *see also Cemex, S.A. v. United States*, 790 F. Supp. 290, 298-99 (Ct. Int'l Trade 1992).  The Commission fulfilled the statutory requirements to "consider" whether the subject imports significantly undersold the domestic like product, and whether they otherwise depressed or suppressed prices to a significant degree.  *See* APPX0099979-0099981, APPX0021241-0021243; *see also* 19 U.S.C. § 1677(7)(C)(ii).

PhosAgro cites two recent cases where there was predominant overselling and the Commission found no price depression.  *See* PhosAgro Remand Comments at 20.  However, neither case has a similar fact pattern to this one.  In *Urea Ammonium Nitrate Solutions from Russia and Trinidad & Tobago*, the Commission found no evidence of price depression because prices for both the domestic like product and subject imports "increased sharply" in the final year of the POI.  Furthermore, although the domestic industry's prices declined in 2019 and 2020, the domestic industry was able to raise prices "substantially" in 2021, despite the significant

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 21-00219                                    NON-CONFIDENTIAL VERSION

presence of subject imports in the market.  Inv. Nos. 701-TA-668-669 and 731-TA-1565-1566

(Final), USITC Pub. 5338 (Aug. 2022), Views at 28-29.  Similarly, the record in *Tapered Roller*

*Bearings from Korea* showed a mix of price increases and price decreases, with prices increasing

for some domestically-produced products notwithstanding the presence of cheaper subject

imports in the market.  Inv. No. 731-TA-1380 (Final), USITC Pub. 4806 (Aug. 2018), Views at

30-31.

    Here, by contrast, there were significant price declines in 2019 that coincided with large

and increasing volumes and inventories of subject imports and loss of market share for the

domestic industry.  *See* APPX0099983-0099986, APPX0021167-0021170.  The Commission

properly focused its analysis on the uncontroverted evidence of what happened between Q4 2018

and 2019.  As the Commission explained in detail, subject import volumes increased from 2.0

million ST in 2017 to 3.0 million ST in 2018.  APPX0099984, APPX0021168-0021169.

Because of a wet fall 2018 application season and the polar vortex in winter of 2018, importers

had already accumulated substantial inventories of **[      ]** ST at the end of December 2018,

almost **[     ]** the level in December 2017.  APPX0098551-0098552, APPX0018788-0018789

Nevertheless, importers brought in another 720,728 ST in subject imports in January 2019 –

almost double the level of cumulated imports in January 2018 (312,960 ST) and triple the level

in January 2017 (202,768 ST), *see* APPX0099985, APPX0021169 – providing importers enough

inventory-in-warehouse to supply **[      ]** of apparent U.S. consumption in Q1 2019.  *See*

APPX0084708, APPX0004192 (showing apparent U.S. consumption of **[        ]** in Q1

2019).

    Importers' inventories of subject imports peaked at **[      ]** in March 2019, their

highest level of the entire POI.  *See* APPX0099986, APPX0021170.  This means that importers

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 21-00219                                    NON-CONFIDENTIAL VERSION

already had **[              ]** inventories in place in their upcountry warehouses, available to

distribute to purchasers (*i.e.*, retailers/end-users), before the widespread flooding that caused

river shutdowns and disrupted supply chains in spring 2019.  *See* APPX0099989-0099990,

APPX0021173-0021174.  The sustained high levels of imports throughout 2019 and 1H 2020

cannot therefore be attributed to existing inventories being trapped in flooded areas or the

purported infeasibility of "domestic reshipment."  Nonetheless, subject imports continued to

enter the market in high volumes throughout 2019, well in excess of levels necessary to replace

depleted inventories and despite adverse weather conditions continuing to dampen demand in the

spring and fall 2019 application seasons.  APPX0099985-0099986, APPX0021169-0021170.

This record bears no resemblance to the facts that led the Commission to reach a negative price

effects determination in the cases cited by PhosAgro.

### C.    The Commission's Impact Findings are Supported by Substantial Evidence and Otherwise in Accordance with Law

Mosaic agrees with and adopts the Commission's arguments with respect to its finding

that the domestic industry was materially injured "by reason of" subject imports.  *See* ITC

Remand Comments at 37-44.  The ITC explained in detail the causal nexus between subject

imports and the material injury to the domestic industry and it fully considered the other factors

Plaintiffs identified and provided a meaningful explanation, with substantial evidentiary support,

of the reasons why it did not attribute injury to subject imports that could be explained by those

factors.  *See id.*  Mosaic presents below additional reasons why the Court should find that the

Commission's remand determination is lawful.

> **1.** **Plaintiffs are incorrect that the ITC misapplied the "by reason of" standard under the statute.**

OCP argues that the Commission misapplied the "by reason of" standard under 19 U.S.C.

§1673(b).  *See* OCP Remand Comments at 34.  OCP cites to this court's decision in *Swiff-Train*

*Co. v. United States* ("*Swiff-Train I*"), 999 F. Supp. 2d 1334 (Ct. Int'l Trade 2014) for the

proposition that the "by reason of" standard in section 1673(b) encompasses a "legal or

proximate cause" standard, and states that the Supreme Court has recognized in other statutory

contexts, namely RICO cases, that "proximate cause is severed by a superseding cause – or a

'cause of independent origin that was not foreseeable.'"  *See* OCP Remand Comments at 34.

OCP faults the Commission for failing to examine whether adverse weather conditions that

occurred during the POI are a "superseding cause" that severs the chain of causation between

subject imports and injury to the domestic injury.  *See id.* at 34-35.

However, neither the Federal Circuit nor this Court has interpreted the "by reason of"

standard in section 1673(b) as requiring a two-fold showing of both cause-in-fact (*i.e.*, "but for")

and legal or proximate cause, as in the RICO context.  In *Swiff-Train I*, which OCP cites, this

Court described the "substantial factor" analysis under section 1673(b) as "effectively

meld{ing}" the two and reasoned that "if the Commission undertakes a proper 'substantial

factor' analysis and finds subject imports the legal cause of material injury, then the Commission

has, perforce, necessarily determined that the subject imports are the 'but for' cause of injury."

999 F. Supp. 2d at 1343.  On appeal, the Federal Circuit rejected appellants' argument that the

CIT had improperly "introduce{d} the substantial factor test of causation" as the second prong of

a two-step analysis of causation.  Rather, the Federal Circuit found that the CIT's decision in

*Swiff-Train I* had merely described Federal Circuit cases interpreting section 1673(b) "to

illustrate the interplay between but-for causation and the substantial-factor analysis to support its

observation that "'{s}ubstantial factor" analysis subsumes {the} "but-for" causation analysis,

albeit with multiple acts and effects for consideration.'" *Swiff-Train Co. v. United States*, 793

F.3d 1355, 1365 (Fed. Cir. 2015).

　　　Although the Federal Circuit has discussed the "by reason of" standard under section

1673(b) in terms of either a "substantial factor" or a "but for" analysis in various cases, *see, e.g.*,

*Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 876 (Fed. Cir. 2008); *Nippon Steel v.*

*ITC*, 345 F.3d 1379, 1381 (Fed. Cir. 2003), the court clarified in *Changzhou Trina Solar Energy*

*Co.* that: "but-for causation is required under the 'by reason of' standards of 19 U.S.C. §§

1673d(b)(1) and 1671d(b)(1), while how the standard is best applied in particular circumstances

may vary with the facts.  The Commission may use a variety of methods of analysis for applying

the standard to the myriad factual situations that may be presented." 879 F.3d 1377, 1383 (Fed.

Cir. 2018).  The Federal Circuit has also stated that the statute does not prescribe any

"Procrustean formula for determining whether a domestic injury was 'by reason of' subject

imports." *Mittal Steel*, 542 F.3d at 879.  Thus, Section 1673(b) "does not require the

Commission to address the causation issue in any particular way . . . .  The Commission is

simply required to give full consideration to the causation issue and to provide a meaningful

explanation of its conclusions." *Id.* at 878; *see also* S. Rep. 96-249 at 75 ("The determination of

the {Commission} with respect to causation is . . . . complex and difficult, and is a matter for the

judgment of the {Commission}.").

　　　Here, the Commission provided a meaningful explanation of the causal link between

subject imports and the domestic industry's injury and fully considered whether that injury was

attributable to other factors, including adverse weather conditions.  *See* APPX0100009-0100018,

APPX0021191-0021200; APPX0099984, APPX0021168.  The Commission stated that it

"considered the role of declining U.S. demand due to unusually wet weather conditions," *i.e.*, in

fall 2018, spring 2019, and fall 2019, and noted that "demand declines in 2019 may have exerted

some degree of downward force on the domestic industry's condition."  APPX0100010,

APPX0021192.  However, the Commission found: "the adverse weather conditions that affected

the U.S. market and prompted a decline in demand do not rebut the fact that the industry's

performance would have been stronger in the absence of the significant volume of subject

imports from Morocco and Russia that exerted downward pricing pressure on the domestic

industry."  APPX0100011, APPX0021271.  Thus, OCP's claim that the Commission "fail{ed} to

consider how {the} weather-related demand decline directly caused the 'oversupply

conditions,'" OCP Remand Comments at 34, is simply wrong.

      The Commission went on to state that it "observed material injury to the domestic

industry by reason of subject imports that is distinct from declining demand."  APPX0100011,

APPX0021271.  The supporting evidence included the significant increase in cumulated subject

import volumes and inventories from 2017 to 2018 (*i.e.*, prior to the adverse weather events);

continued high volumes of subject imports in 2019 that exceeded the levels necessary to

replenish depleted inventories; and contemporaneous documentation of the adverse effects of

import volumes on U.S. prices.  APPX0100010, APPX0021270.  The Commission's analysis

under the "by reason of" standard is thus in accordance with the Federal Circuit's instruction in

*Mittal Steel* to "give full consideration to the causation issue and to provide a meaningful

explanation of its conclusions," and the Commission's finding that adverse weather events

cannot explain the material injury to the domestic industry is supported by substantial evidence.

NON-CONFIDENTIAL VERSION

2.    **OCP fails to show that subject imports and inventories would have been non-injurious absent the adverse weather conditions.**

OCP also argues that there would have been no oversupply of subject imports absent the adverse weather conditions in fall 2018 and 2019, because U.S. importers' inventories purportedly "would have been consumed in the ordinary course." OCP Remand Comments at 35. This "but-for" hypothetical turns the "by reason of" standard on its head: the proper analysis under the Federal Circuit's holdings in *Gerald Metals* and *Mittal Steel* is whether the domestic industry would have suffered injury in the absence of unfairly traded subject imports. *See Mittal Steel*, 542 F.3d at 876; *Gerald Metals v. Unites States*, 132 F.3d 716, 722 (Fed. Cir. 1997). Having reached an affirmative finding, the Commission was not required to conduct an additional counterfactual analysis of whether the domestic industry would have been injured in the absence of other factors, such as the adverse weather events in fall 2018 and 2019. Rather, it was sufficient under Federal Circuit precedent that the Commission identify evidence of material injury that could not be attributed to the adverse weather events, which it did. *See* APPX0100009-0100017, APPX0021269-0021276.

Moreover, the record does not support OCP's argument. As the Commission observed, subject import volumes and inventories increased significantly from 2017 to 2018, remained at elevated levels throughout 2019 and 1H 2020, and only abated in Q3 2020 after the petitions were filed. APPX0100010-0100011, APPX0021270-0021271. In its comments, OCP presents a very misleading comparison of U.S. importers' and U.S. producers' share of quarterly inventories that starts in Q1 2018, which it claims is appropriate "because any ratios from 2017 (*i.e.*, prior to the closing of Plant City) would not be comparable to 2018-2020, when import inventories necessarily increased after significant reductions in domestic supply." OCP Remand

Consol. Court No. 21-00219                              NON-CONFIDENTIAL VERSION

Comments at 15-16 & n.3.  However, as OCP acknowledges, "{f}or inventory analyses, import

entries and domestic production are the starting point, as both move into inventory." *Id.* at 16.

Thus, inventory levels in 2017 were relevant to the Commission's causation and non-attribution

analysis and should be evaluated by reference to import volumes and production levels.

 The record supports the Commission's finding that subject import inventories increased

significantly from 2017 to 2018 and remained elevated in 2019 and 1H 2020.  Indeed, the record

shows that the ratio of U.S. importers' inventories of subject imports to subject import volumes

(the proper starting point of an inventory analysis, according to OCP) [  ] over the POI.

According to the Posthearing Report, U.S. importers' ratio of inventories to import volumes

stood at [ ] percent at the end of Q1 2017 but [  ] to [ ] percent by the end of Q4

2017.  *See* APPX0098551-0098552, APPX0018788-0018789.  Accordingly, importers had

already built-up significant inventories heading into 2018, *i.e.*, well before the adverse weather

events that OCP claims are the "sole culprit" of the domestic industry's injury.

 Importers failed to draw down their inventories in the spring 2018 application season,

which was not affected by any adverse weather events, and maintained persistently high

inventory levels for the remainder of 2018 and 2019, fluctuating between [

 ] of quarterly import volumes.  *See id.*  OCP fails to posit any credible, non-injurious

theory for why importers would require such high ratios of inventories to import volumes.  By

comparison, the domestic industry's ratio of inventories to domestic production – which,

according to OCP, is the proper comparison – was between [    ] throughout the

POI.

 The spring 2020 application season saw "a return to normal demand," unaffected by any

adverse weather events, but importers once again failed to draw down their inventories to normal

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 21-00219                    NON-CONFIDENTIAL VERSION

levels because new subject imports continued to arrive and outpace demand.  Importers' ratio of

inventories to import volumes stood at [      ] percent at the end of Q1 2020 and [      ] percent at

the end of Q2 2020, approximately [      ] the levels in the respective quarters of 2017, prior to

the [      ] inventory build-up.  *See* APPX0098551-0098552, APPX0018788-0018789.  As

the Commission stated, OCP's own witness conceded at the Commission's hearing that

"inventory build-up was not worked down 'until the end of the strong fall 2020 application

season.'"  APPX0099613, APPX0020597.

Thus, OCP's argument that U.S. importers' inventories "would have been consumed in

the ordinary course" absent the unusual weather events in fall 2018 and 2019 is unavailing.

Plaintiffs have failed to show that the Commission erred in its interpretation or application of the

"by reason of" standard or failed to account for evidence that fairly detracts from its finding of a

causal nexus between subject imports and the domestic industry's injury.

## IV.  <u>CONCLUSION</u>

For the reasons discussed above, Mosaic respectfully requests that this Court reject all

arguments made by Plaintiffs and affirm the Commission's remand determination.

Respectfully submitted,

<u>/s/ Jeffrey I. Kessler</u>
David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann
Alexandra Maurer
WILMER CUTLER PICKERING HALE AND
    DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
Jeffrey.Kessler@wilmerhale.com

Dated April 29, 2024                    *Counsel for The Mosaic Company*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this submission complies with the Standard Chambers' Procedure 10,000-word limitation requirement for comments on remand determinations.  The word count for this submission, as computed by Wilmer Cutler Pickering Hale and Dorr LLP's word processing system, is 8,669 words, including headings, footnotes, and quotations, and excluding the cover page, table of contents, table of authorities, counsel's signature block, and this certificate.

<u>/s/ Jeffrey I. Kessler</u>
(Signature of Attorney)

<u>Jeffrey I. Kessler</u>
(Name of Attorney)

<u>The Mosaic Company</u>
(Representative Of)

<u>April 29, 2024</u>
(Date)