Consol. Ct. No. 21-00219  **Business Proprietary Information Has Been Deleted**  NON-CONFIDENTIAL VERSION

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| OCP S.A.,<br>    Plaintiff,<br><br>EUROCHEM NORTH AMERICA CORPORATION,<br>    Consolidated Plaintiff,<br><br> and<br><br>PHOSAGRO PJSC, INTERNATIONAL RAW MATERIALS LTD., and KOCH FERTILIZER, LLC,<br>    Plaintiff-Intervenors,<br><br>  v.<br><br>UNITED STATES,<br>    Defendant,<br><br> and<br><br>THE MOSAIC COMPANY and J. R. SIMPLOT COMPANY,<br>    Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Consol. Court No. 21-00219<br><br>**<u>NON-CONFIDENTIAL VERSION</u>**<br><br>Business Proprietary Information removed from Pages i, 5-8, 13, 16-17, 19-20 |

## PLAINTIFF'S REPLY TO DEFENDANT'S AND DEFENDANT-INTERVENORS' COMMENTS ON REMAND DETERMINATION

Shara L. Aranoff
James M. Smith
Sooan (Vivian) Choi
Paula Ortiz Cardona
John J. Catalfamo
Julia Shults

**COVINGTON & BURLING LLP**
850 10th Street, NW
Washington, D.C. 20001
(202) 662-5997
saranoff@cov.com

Dated: May 29, 2024        *Counsel to Plaintiff OCP S.A.*

**Business Proprietary Information Has Been Deleted**

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ........................................................................................... 1

II.    THE COMMISSION FAILS TO COMPLY WITH THE COURT'S ORDER, CONCLUDING THAT BECAUSE DOMESTIC PRODUCERS HAD THE "ABILITY" TO MOVE AND RELOCATE PRODUCT IT FOLLOWS THAT SUBJECT IMPORTS "OVERSUPPLIED" THE U.S. MARKET IN 2019 ..................... 3

III.    THE COMMISSION CHERRY-PICKED EVIDENCE IN AN ATTEMPT TO SHOW THAT SUBJECT IMPORTS WERE LOWER PRICED, CONTRARY TO WHAT THE RECORD AS A WHOLE DEMONSTRATES ..................................... 6

IV.    THE COMMISSION LACKS SUBSTANTIAL EVIDENCE TO FIND THAT AN "OVERSUPPLY" OF SUBJECT IMPORTS HAD SIGNIFICANT VOLUME EFFECTS, CAUSED PRICE DEPRESSION, AND INJURED THE DOMESTIC INDUSTRY ................................................................................. 9

    A.    Any Temporary "Oversupply" in the U.S. Market Was the Product of Under-Demand Caused by Superseding Weather Events, Not by Subject Imports ................................................................................. 10

    B.    The Commission Fails to Analyze Inventory Data in the Context of the Domestic Supply Reductions and Superseding Weather Events ......................... 12

        1.    The Commission ignores its own remand findings on reshipment, which demonstrated that a portion of subject import inventories were stuck in low-demand regions and thus were not injurious. .............. 13

        2.    The Commission did not consider inventory data trends over the POI in the context of year-over-year domestic supply reductions. ........... 14

        3.    The Commission analyzes inventory data in isolation from the "Black Swan" rainfalls that prevented normal inventory drawdowns. ............................................................................. 15

        4.    The [        ] ratios of subject import inventories to domestic product inventories over the POI contradict the Commission's finding that subject import inventories were injuriously "elevated" and confirms that the weather caused [                    ] ................. 16

    C.    The Commission Ignored the Only Analyses that Holistically Considered U.S. Market Conditions and Found No Oversupply of Subject Imports ............. 17

        1.    The Commission acknowledges that it failed to address the analyses by Mr. Rahm and Mr. Dougan. ................................................. 18

**Business Proprietary Information
Has Been Deleted**

    2.    The analyses by Mr. Rahm and Mr. Dougan demonstrate that subject imports did not oversupply the U.S. phosphate fertilizer market, directly contradicting the Commission's key finding.................. 19

V.    THE COMMISSION CONTINUES TO MISCHARACTERIZE AND MISAPPLY THE "BY REASON OF STANDARD" .................................................... 20

VI.    CONCLUSION .............................................................................................. 23

**Business Proprietary Information
Has Been Deleted**

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                      **Page(s)**

*Changzhou Trina Solar Energy Co., Ltd. v. Int'l Trade Comm'n,*
   879 F.3d 1377, FN1 (Fed. Cir. 2018) …………… ...................................................21

*Nippon Steel Corp. v. Int'l Trade Comm'n,*
   345 F.3d 1379, 1381 (Fed. Cir. 2003) …………….....................................................21

*Siemens Energy, Inc. v. United States,*
   38 CIT 879, 885, 992 F. Supp. 2d 1315, 1315 (2014) ...........................................18

**Administrative Materials**

*Emulsion Styrene-Butadiene Rubber from Czech Republic, Italy, and Russia*, Inv. Nos.
   731-TA-1575-1577 (Final), USITC Pub. 1577 (Jan. 2023) ....................................22

*Magnesium From Israel*, Inv. Nos. 701-TA-614 and 731-TA-1431 (Final), USITC Pub.
   5009 (Jan. 2020) ....................................................................................................22

*Steel Nails from India, Oman, Sri Lanka, Thailand, and Turkey*, Inv. Nos. 701-TA-673-
   677 and 731-TA-1580-1583 (Final), USITC Pub. 5370 (Oct. 2022)  ....................21

*Uncoated Groundwood Paper from Canada*, Inv Nos. 701-TA-584 and 731-1382 (Final),
   USITC Pub. 4822 (Sept. 2018)................................................................................22

Business Proprietary Information
Has Been Deleted

## I.    INTRODUCTION

The Commission appears to believe that its remand investigation uncovered a silver bullet that renders its defective injury determination in compliance with the Court's order: that the domestic industry's "extensive inventory locations, expansive multi-modal distribution network, and demonstrated ability to move and relocate product to where it was needed" proves that "domestic producers were well-positioned to supply the U.S. market in 2019." APPX0099978; ITCCmts5, 11, 14, 17 (ECF 182). The Commission relied on this finding— based on the agency's opportunistic design and misinterpretation of remand questionnaires—to conclude that subject import volumes exceeded the need to restock inventories in 2019. APPX0099976-0099978, APPX0099984-0099996, APPX0100008; ITCCmts13, 26, 38. However, this flawed reasoning falls short of substantial evidence that subject imports injuriously "oversupplied" the U.S. market in excess of demand in 2019, a finding that undergirds the agency's entire analysis. APPX0000003, APPX0000029. In short, the Commission's remand determination utterly missed the mark.

The remand determination continues to hinge on the following finding of price depression: that the "oversupply of subject imports and their low prices exerted downward pricing pressure on the domestic like product and significantly depressed U.S. prices in 2019." APPX0099989. U.S. prices may decline when (1) subject imports are sold at prices lower than domestic product prices, which may prompt domestic producers to lower their own prices to defend their market share; or when (2) total market supply is in excess of demand, such that the laws of supply and demand would typically cause the equilibrium market price to go down. In the second scenario, where the market is oversupplied, any price decline is not necessarily caused by subject imports. Thus, in its price effects analyses, the Commission contorted itself in

Business Proprietary Information
Has Been Deleted

an attempt to show that the first scenario—lower-priced subject imports—was present in this case. However, given the mountain of record evidence showing that subject imports were predominantly priced *higher* than domestic fertilizers, the Commission could not plausibly defend a price depression finding based on "lower-priced" subject imports.

Given the lack of evidence that subject imports were lower priced, the Commission had to lean on the second scenario—supply in excess of demand—to argue that subject imports caused price depression. Essentially, the Commission's injury analysis can be summed up as follows: subject imports caused oversupply; oversupply caused price depression and loss of domestic market share; which in turn caused injury to the domestic industry. This causal chain underpins the Commission's entire determination, and without the predicate "oversupply" of subject imports, the causal chain breaks. If the Commission lacks substantial evidence to find that subject imports caused the oversupply in 2019, or that linchpin finding is otherwise not in accordance with law, the Commission's injury determination cannot hold.

Thus, this entire case boils down to a simple question: what was the cause of the oversupply in 2019? Record evidence makes clear that it was the weather, not subject imports. Fertilizer distributors typically order fertilizer *months in advance* of the next application season based on *projected* farmer demand; if rainfall prevents application in one season, distributors often order extra fertilizer for the next season in anticipation of "catch-up" application by farmers. Subject imports in this case were ordered in the necessary quantities to meet bona fide demand from distributors, who knew that North American production facilities were being shuttered and who could not have predicted at the time of purchase that the subsequent application season would be disrupted by the weather. When unexpected rainfall prevented farmers from applying fertilizer in certain regions for three consecutive application seasons

**Business Proprietary Information Has Been Deleted**

between late 2018 and late 2019, the temporary "oversupply" in the U.S. fertilizer market was not the result of subject imports being supplied in excess of demand at the time they were ordered, but the result of distributor demand (*i.e.*, projections) being in excess of farmer demand (*i.e.*, applications) due to the weather.

In this brief, Part II summarizes how the remand determination fails to comply with the Court's order, as the Commission relied on flawed and irrelevant findings to prop up its original determination without actually curing the defect identified by the Court. Part III revisits the Commission's problematic price effects analysis, in which the Commission cherry-picked unrepresentative and unreliable evidence in an attempt to show that subject imports were lower priced, contrary to the record as a whole. Part IV describes how the Commission similarly dismissed significant record evidence clearly demonstrating that the weather, not subject imports, was the cause of "oversupply" in 2019—a key error that contaminates the agency's volume, price, and impact analyses in their entirety. Part V reiterates the legal standard for an affirmative injury determination, which requires subject imports to constitute a cause of injury that is more than *de minimis*. In the present case, the weather constitutes a superseding cause of injury, such that the Commission's finding of injury "by reason of" subject imports is unsupported by substantial evidence and not in accordance with law.

## II. THE COMMISSION FAILS TO COMPLY WITH THE COURT'S ORDER, CONCLUDING THAT BECAUSE DOMESTIC PRODUCERS HAD THE "ABILITY" TO MOVE AND RELOCATE PRODUCT IT FOLLOWS THAT SUBJECT IMPORTS "OVERSUPPLIED" THE U.S. MARKET IN 2019

The Court instructed the Commission to "conduct a new analysis of the conditions of competition with respect to domestic reshipment," holding that the Commission's finding that it was "possible" to reship fertilizer that had been delivered was key to the Commission's final determination. APPX0000029, APPX0000036. On remand, the Commission at first disclaimed

Business Proprietary Information
Has Been Deleted

reliance on its domestic reshipment finding, saying it was "not central" to its injury analysis in this case. APPX0099952-0099953. Now, the Commission acknowledges that reshipment was in fact central to its injury analysis, asserting that the domestic industry's "extensive inventory locations, expansive multi-modal distribution network, and ability to move and relocate product" enabled domestic producers to reship inventory to areas unaffected by weather, which they were prevented from doing because subject imports flooded the market. ITCCmts5, 42; APPX0099972-0099978. This claim is unsupported by the remand record. New evidence fails to demonstrate that the domestic industry relocated delivered inventories during the period of review, much less that redelivery is a normal industry practice. To the extent the Commission now relies on the domestic industry's hypothetical capability to reship and *not actual* reshipment, the agency fails to comply with the Court's remand order, which instructed the Commission to focus on evidence demonstrating that "domestic reshipment of fertilizer from inventories had occurred" as a normal business practice. APPX0000035-0000036.

Importantly, the Commission now disclaims its prior finding that *importers* could reship delivered inventories from their original intended destination to another destination in a different geographic region. APPX0000032; APPX0099952-0099953. This is unsurprising given a record that overwhelmingly demonstrates that importers do not have the infrastructure to reship delivered inventories, and that imports were not reshipped in any significant quantities during the period of investigation.[1] The Commission accepts that for importers, "once delivered to an inventory or customer location, product was not subsequently relocated but rather remained at that location." ITCCmts5 (citing APPX0099968-0099970). The Commission thus concedes that

---

[1] Limitations such as "prohibitive costs, shipping logistics, and lack of infrastructure" prevent U.S. importers from reshipping fertilizer inventories. OCPCmts3.

Business Proprietary Information
Has Been Deleted    NON-CONFIDENTIAL VERSION

subject imports in flooded regions were effectively sidelined by weather conditions, pulled out of the market until demand in those regions returned. The necessary implication of this concession is that any and all subject imports held in inventory or at customer locations in flood-affected regions could not have caused injury to the domestic industry because those imports were not available to deprive the domestic industry of sales or depress prices. OCPOpeningBr16-18 (ECF 56). At no point has the Commission acknowledged the logical repercussions of its admission that importers could not and did not reship subject import inventories.

Moreover, new record evidence fails to demonstrate that domestic reshipment occurred in any material quantities, much less that it is a standard industry practice. OCPCmts3-5 (ECF 156). The Commission claims that its remand determination relied upon "*actual* reshipments as reported by domestic producers to conclude that U.S. producers had a 'demonstrated ability to move and relocate product where it was needed.'" ITCCmts17 (citingAPPX0099977-0099978). In reality, the Commission collected and relied on information irrelevant to the Court's order, such as examples of intermodal and customary unidirectional deliveries—not reshipments of inventories already delivered to an original intended destination.[2] OCPCmts3,5-7; ITCCmts8.

For example, Mosaic reiterated that it moves inventories [

]. MosaicCmts3 (ECF 188). Mosaic also claims it [

]. MosaicCmts4. Mosaic's

---

[2] Unidirectional movement refers to the movement of fertilizer "from a port of entry or production facility to inventory terminals, usually upriver by barge or overland by rail," and then to retailers or [                              ] for distribution. OCPCmts3-5 (citing APPX0099913, APPX0099770).

Business Proprietary Information
Has Been Deleted

response, relied on by the Commission, cites to [                                    ] that

is not responsive to the Court's inquiry.  OCPCmts5-7.

Despite an overwhelming amount of record evidence from importer responses

demonstrating that the reshipment of delivered inventory is [                      ], *id.*

at 4, and the Commission's own admission that subject importers do not and cannot reship, the

Commission chooses to rely on a handful of dubious examples that purportedly demonstrate the

domestic industry's hypothetical "ability to move and relocate product."  ITCCmts5.  Even if all

of these examples were bona fide reshipments of delivered inventories, which nothing in the

record indicates, the frequency and volumes would not rise to the level of establishing a normal

industry practice.  The Commission's finding that the reshipment of domestic producer

inventories is a normal industry practice is unreasonable and unsupported by the record, and

cannot support the Commission's further conclusion, addressed below in Part IV.B.1, that

domestic producer inventories from flooded regions were available to resupply non-flooded

regions in 2019.

**III.    THE COMMISSION CHERRY-PICKED EVIDENCE IN AN ATTEMPT TO
SHOW THAT SUBJECT IMPORTS WERE LOWER PRICED, CONTRARY TO
WHAT THE RECORD AS A WHOLE DEMONSTRATES**

In finding that "low prices" and an "oversupply" of subject imports depressed U.S. prices

in 2019, the Commission willfully ignored the mountain of record evidence depicting what was

actually going on in the market at that time, and instead relied on cherry-picked evidence to

construct a story of injury caused by subject imports.  As detailed in OCP's prior submissions

and summarized below, the Commission's price effects analysis relied on isolated anecdotes

purportedly showing that subject imports' "low prices" caused price depression.  Recognizing

the dubious nature of an injury determination based solely on "oversupply," the Commission

**Business Proprietary Information
Has Been Deleted**

offered these anecdotes and a lengthy discussion of price depression in an attempt to show that its injury finding rested on more than "oversupply"—but this is a smokescreen. With each cherry-picked example, the Commission set aside what the record evidence *as a whole* says about subject import prices, and instead chose to give decisive weight to unrepresentative and isolated instances where subject imports may have been offered at lower prices than domestic product. In sum, nothing in the Commission's price effects analysis demonstrates that its injury finding rests on more than "oversupply."

As an initial matter, the Commission's pricing data showed that subject imports were priced higher than domestic product 80% of the time during the POI, yet the Commission gave decisive weight to the atypical 20% of instances when subject imports were priced lower. APPX0099980-0099982. The pricing data further showed that, on a volume basis, subject import overselling was [                    ] ([

]). OCPCmts25. Yet the Commission chose to give more weight to a mathematical obfuscation proffered by the Petitioner, which noted that [

].

APPX0099981-0099982, APPX0099998. What makes this reliance on isolated instances of lower prices even more dubious is that the Commission itself acknowledged that "prices of the domestic product and subject imports tracked each other closely and were generally comparable with small margins of underselling and overselling." APPX0099982. The Commission's reasoning is at odds not just with the record, but with itself.

One of the more laborious defenses offered by the Commission relates to its finding that "the domestic industry lost sales to subject imports because of lower prices." APPX0099980-0099982. To reach this finding, the Commission relied on just four purchasers (among the 28

Business Proprietary Information
Has Been Deleted

total responding purchasers) that reported a miniscule volume of lost sales, accounting for just 2.7% of the reported purchases and imports during the POI.  APPX0098484-0098485; OCPCmts25-27.  While the continued reliance on [          ] reported lost sales remains questionable, the Commission also completely sidestepped the fact that 24 of 28 responding purchasers reported they did *not* purchase subject imports instead of domestic product based on price, and that 97.3% of the reported purchases and imports during the POI were *not* sales the domestic industry lost because of price.  *Id.*

With no material lost sales, the Commission relied on customer emails and self-serving declarations submitted by the domestic producers to find that "subject imports were being offered at low prices during {2019}."  APPX0099997-0099998.  But those emails and allegations were unverified, contradicted by the sworn questionnaire responses of the same customers, and/or lacked the factual details necessary to support the Commission's proposition. OCPCmts27-28; APPX0099554-0099556.  Yet perhaps the most egregious display of cherry-picked anecdotes was the Commission's regurgitation of trade press quotes copied and pasted verbatim from Mosaic's Petition: how, precisely, does quoting from unverified complaint allegations fulfill the Commission's statutory obligation to *investigate* a petitioner's allegations and reach an injury determination supported by substantial evidence?  APPX0099986-0099988, APPX0099992-0099994.

None of these anecdotes is representative of what was going on in the U.S. market in 2019; stringing them together does not amount to substantial evidence that subject import prices caused price depression.  The question the Commission must answer in its price effects inquiry is not whether subject imports were lower priced in a few instances, but what accounted for the decline in prices across the U.S. market as a whole.  In this case, record evidence

overwhelmingly showed that subject imports were *not* lower priced, and that subject import prices thus did *not* cause U.S. prices to decline in 2019.  Consequently, the Commission's finding of price effects based on lower-priced imports is not supported by substantial evidence or in accordance with law.

## IV.    THE COMMISSION LACKS SUBSTANTIAL EVIDENCE TO FIND THAT AN "OVERSUPPLY" OF SUBJECT IMPORTS HAD SIGNIFICANT VOLUME EFFECTS, CAUSED PRICE DEPRESSION, AND INJURED THE DOMESTIC INDUSTRY

Absent substantial evidence that subject imports' lower prices caused U.S. market prices to decline in 2019, it is clear that the Commission's affirmative injury determination rests squarely and exclusively on a theory of oversupply by subject imports.  That conclusion, however, is likewise unsupported by substantial evidence.  The Commission fails to account for the central role that superseding weather events played in any short-lived oversupply conditions in the U.S. market, which the Commission and Defendant-Intervenors instead erroneously attribute to subject imports.  All the while, they strenuously emphasize elevated subject import inventory levels, ignoring the simple but key fact that many of these inventories were out of the market—located in low-demand regions where inventories were not being drawn down and could not be reshipped to other regions.  Ignoring the actual conditions of the U.S. phosphate fertilizer market, the Commission makes inconsistent and unsupported findings on the supply gap, inventories, and distribution networks, thereby understating demand for imports and overstating available domestic supply.  At the same time, the Commission still refuses to acknowledge, let alone address, two economic analyses that looked at overall market dynamics and demonstrated both that subject imports did not exceed projected market needs and that imports adjusted quickly after weather temporarily disrupted demand.

Business Proprietary Information
Has Been Deleted

A.    **Any Temporary "Oversupply" in the U.S. Market Was the Product of Under-Demand Caused by Superseding Weather Events, Not by Subject Imports**

Purchasers in the U.S. phosphate fertilizer market indisputably make buying decisions for each semi-annual application season based on anticipated demand.  The record shows purchasers—three seasons in a row—got it wrong, each time stockpiling for pent-up demand that did not materialize due to multiple cycles of unanticipated wet weather.  While paying lip service to these market conditions, the Commission concludes that as long as supply exceeded demand on a national level at any point in the POI, the reason why does not matter.  This unprecedented theory of strict liability for subject imports impermissibly writes the "by reason of" standard out of the statute.  The Commission's conclusion also disregards the necessary implications of the industry practices that it identified as conditions of competition.

In its Remand Views, the Commission recognized that distributors "rely on demand projections in obtaining product" before concluding that "cumulated subject imports entered the U.S. market in significant volumes, contributed to oversupply conditions, and depressed U.S. prices to a significant degree, regardless of how they were ordered."  APPX0099953-0099954; APPX0099988.  OCP at length explained how the "Black Swan" weather events from fall 2018 through fall 2019 repeatedly undercut anticipated demand for each successive application season. OCPCmts12-13.  Time and again, the market expected a rebound in the next season, and market participants acted accordingly.  Rather than account for the impact of these weather events on market behavior in its volume analysis, the Commission instead holds importers and purchasers of subject imports strictly liable for their lack of clairvoyance: in the Commission's view, any ton of imports that arrived on U.S. shores at a time when the domestic industry could point to a

Business Proprietary Information
                                              Has Been Deleted

ton of purportedly available capacity (or extra-regional inventory) is "oversupply" causing

injury.  OCPCmts13 (citing APPX0094146; APPX0093825; APPX0094296).

The Commission claims its Remand Determination addressed the interplay of weather

events and market reliance on projected demand in its volume and inventory analysis.

ITCCmts31.  But the ITC's rebuttal is unavailing for at least two reasons.  First, as discussed

below, the Commission's inventory analysis fails to address the concern at the heart of the

Court's remand instructions: namely, because inventories are not reshipped and thus could not be

drawn down in low-demand regions, the market needed additional subject imports to resupply

regions where the weather did not disrupt demand.  APPX0000036-0000037.  Second, the

Commission completely fails to respond to uncontroverted record evidence that market

participants kept buying phosphate fertilizers in 2019—albeit in much reduced volumes—

because they were expecting rebounds in demand in both spring and fall 2019.  That behavior is

consistent with common industry practice, particularly where the domestic industry admitted

refusing to supply certain customers even while claiming to have available capacity.

OCPCmts10-13; ITCCmts43.  In sum, the Commission acknowledged that phosphate orders are

regularly placed in advance based on bona fide demand projections, but failed to explain how

demand projections nullified by unforeseeable weather events support rather than undermine its

finding of material injury by reason of subject imports.

For their part, Defendant-Intervenors agree with OCP that the Commission did not

consider advanced purchasing decisions by market participants, but incorrectly frame the

argument as whether material injury requires intent.  Mosaic argues that "{t}here is no intent

requirement under the statute," and there is no "'reasonableness' safe harbor," claiming that the

"{t}he reasons why, and the timing of when, importers placed their orders . . . are ultimately

Business Proprietary Information
Has Been Deleted

irrelevant." MosaicCmts17.  Similarly, Simplot states that "the asserted intentions or erroneous

forecasting of those trading in subsidized imports" cannot be the basis for overturning a

determination of material injury by reason of subject imports.  SimplotCmts14 (ECF 186).

Defendant-Intervenors' claim—that OCP's argument would mandate an intent

requirement—misses the mark.  OCP is not arguing for a different or new injury standard, but

rather merely emphasizing that the Commission's findings are arbitrary and self-contradictory,

given its recognition that purchasers buy phosphate fertilizer based on anticipated demand.

Treating this fundamental condition of competition as irrelevant is arbitrary and capricious.  As

OCP explained in its Remand Comments, if not for the superseding weather events that

interrupted anticipated demand, there would not have been any period of under-demand in the

U.S. market allowing the Commission to characterize subject imports as being in "oversupply."

OCPCmts12-13.  Subject imports were ordered in advance based on bona fide market demand,

reflecting intentional and strategic reductions in domestic supply.

What the Commission characterizes as oversupply is instead the supply and demand

mismatch that naturally occurs when actual demand does not meet the demand anticipated by

market participants due to an intervening cause—here, historic weather events.  Thus, it was not

subject imports, but unexpected adverse weather, that temporarily drove demand far below what

market participants anticipated, thereby causing injury to the domestic industry.

### B.     The Commission Fails to Analyze Inventory Data in the Context of the Domestic Supply Reductions and Superseding Weather Events

The Commission's inventory analysis similarly fails to account for the impact of the

superseding weather events, while also ignoring the implications of domestic supply reductions

for subject import inventory levels.  First, the Commission does not consider the simple yet

crucial fact that because import inventories are not and cannot be reshipped once they reach their

**Business Proprietary Information**
**Has Been Deleted**

original intended destinations, unused inventories stranded in low-demand regions in 2019 could

not have any effect on the prices domestic producers received or the volumes they sold in regions

unaffected by bad weather.  Second, while the Commission claims it did not conduct its

inventory analysis in a "vacuum," it refuses to consider the impact that the idling of Plant City

and the closure of Redwater had on subject import inventory levels.  Finally, both the

Commission and Defendant-Intervenors also fail to grapple with the fact that the ratios of subject

import inventories to total inventories [            ] across the POI, which directly contradicts

their theory of atypically high subject import inventories causing material injury.

> **1.    The Commission ignores its own remand findings on reshipment,
> which demonstrated that a portion of subject import inventories were
> stuck in low-demand regions and thus were not injurious.**

In its analysis of overall import inventory levels, the Commission fails to consider the

impact of its finding that subject import inventories are not and cannot be reshipped from low-

demand regions to other parts of the country.  In its Remand Views, the Commission emphasized

the "breadth and superiority of U.S. producers' distribution networks," compared with the "less

extensive inventory networks, and less movement of inventories" by importers.  APPX0099968-

0099970 (internal citations omitted).  In its Remand Comments, the Commission highlights these

findings and emphasizes that the domestic industry could "move inventory between locations,

while, on the other hand, importers 'report{ed} less extensive inventory networks, and less

movement of inventories,' and a 'unidirectional' movement, such that 'once delivered to an

inventory or customer location, product was not subsequently relocated but rather remained at

that location.'"  ITCCmts4-5 (quoting APPX0099968-0099970).  Thus, the Commission's own

analysis reveals that importers could not reship inventories that had already reached their original

intended destination to serve other, higher-demand regions.

**Business Proprietary Information Has Been Deleted**

Absent from the Commission's inventory analysis is any consideration of the logical implication of its finding on import inventory reshipment. Because in the Commission's own view a portion of subject import inventories were stuck in low-demand regions and could not be reshipped to serve high-demand regions, these inventories could not materially affect pricing and sales for the national market as a whole. In addition, contrary to the Commission's view, delivered inventories of domestically produced fertilizers in weather-affected areas were likewise sidelined pending an upturn in demand and thus unavailable to resupply high-demand regions. OCPOpeningBr16-18; OCPReplyBr8-9 (ECF 105); OCPCmts15. These regional patterns help explain why additional volumes of subject imports were needed. However, the Commission did not collect or analyze regional inventory data. Instead the Commission looked only at national inventory levels, without differentiating between inventories stranded in low-demand regions and inventories in regions where refill demand existed. By lumping unquantified volumes of subject import inventories in low-demand regions into its overall inventory analysis, the Commission erroneously attributed injury to inventories that its own findings on reshipment and record evidence regarding inventory management make clear were non-injurious.

**2.    The Commission did not consider inventory data trends over the POI in the context of year-over-year domestic supply reductions.**

The Commission continues to underestimate the impact of the idling of Mosaic's Plant City facility and closure of Nutrien's Redwater facility, *see* OCPCmts8-10. At the same time, the Commission also fails to acknowledge that these supply reductions required an increase in import inventory levels over the POI. As OCP explained in its Remand Comments, the Commission's analysis of the idling and closure of these facilities undercounted the resulting reductions in domestic supply, as evidenced by contemporaneous pre-petition statements from Mosaic executives and by Redwater's annual capacity. *Id.* The loss of these facilities in turn

**Business Proprietary Information Has Been Deleted**

necessitated more imports to satisfy the demand previously served by the closed facilities. *Id.* The impact that these closures had on the level of imports, and in turn on the level of import inventories, is completely absent from the Commission's analysis. For example, the Commission emphasizes that "subject import inventories reached their highest level of the POI at the end of the first quarter of 2019," ITCCmts31-32, but completely ignores the fact that higher subject imports and higher subject import inventories were *required* in 2019, after the loss of Plant City's production and in anticipation of the closure of Redwater, especially given the domestic industry's conceded refusals to sell to certain purchasers.

### 3. The Commission analyzes inventory data in isolation from the "Black Swan" rainfalls that prevented normal inventory drawdowns.

The Commission maintains that it considered the impact of the "Black Swan" rainfall events on the U.S. phosphate fertilizer market, but it entirely failed to account for the effect that weather had on normal inventory drawdowns. Throughout its Remand Views and Remand Comments, the Commission repeatedly emphasizes the "elevated" inventories held by importers in late 2018 and into 2019. APPX0099985-0099986, APPX0100011; ITCCmts22-23, 32. Indeed, the Commission continues to highlight that "U.S. importers' end-of-period inventories were at their highest level for the years 2017 and 2018 in December 2018," and that inventories increased from December 2018 to March 2019, as evidence of the injurious impact of subject imports over the POI. ITCCmts23.

In addition to reflecting the strategic reductions in domestic supply, these import inventory trends over the POI were a direct result of the "Black Swan" weather events, as U.S. importers' inventories in affected regions were not drawn down as anticipated. As OCP detailed extensively in its Remand Comments, market participants expected demand to rebound in each successive application season, only for fertilizer applications again to fall far short of what had

Business Proprietary Information
Has Been Deleted

been anticipated.  OCPCmts12-13.  Accordingly, in the regions impacted by this historic

weather, fertilizer applications did not occur, and fertilizer stayed in inventory, available for use

in the next season.  Despite testimony and other evidence that inventories remained in place in

flooded regions and were drawn down at typical rates in other regions, the Commission chose to

focus its analysis on national inventory data, improperly treating the irrelevant/non-transferable

import inventories in flooded regions as a cause of injury in regions unaffected by bad weather.

This national approach to regional weather phenomena allowed the Commission to dismiss the

significance of the weather in its analysis of inventories.

> **4.    The [        ] ratios of subject import inventories to domestic product inventories over the POI contradict the Commission's finding that subject import inventories were injuriously "elevated" and confirms that the weather caused [                       ].**

Although the Commission and Defendant-Intervenors make much of the supposedly

elevated and injurious levels of subject import inventories, neither the Commission nor

Defendant-Intervenors address the fact that subject import inventories and domestic fertilizer

inventories [          ] over the POI as a share of total inventories.  OCPCmts14-17;

PhosAgroCmts6-8 (ECF 160); APPX0098551-0098552.  This fact directly contradicts the

Commission's depiction of subject import inventories as uniquely "elevated."  ITCCmts32.  The

Commission has focused erroneously on the absolute quantity of subject import inventories

without addressing the [                      ] domestic producer inventories at key

points of the POI, when their [              ] reveal the impact of adverse weather events

on market-wide demand.  ITCCmts22-26.

As OCP explained in its Remand Comments, "inventories vary seasonally and remain in

place until sold," and the remand investigation confirms that inventories are not reshipped from

low-demand geographic areas to higher-demand regions.  OCPCmts15.  During the POI, the

ratio of subject imports' share of total U.S. inventories [                    ] relative to the domestic

products' share of total U.S. inventories, directly contradicting the Commission's conclusion that

subject import inventories alone created "oversupply" conditions.  Indeed, from the first quarter

of 2018 to the first quarter of 2020, a period that spans the historic weather events, the ratio of

subject import inventories to total inventories [                    ] and [

        ] if the Commission's theory of subject import oversupply were correct.  Rather,

these inventory ratios [                                                        ], in line

with market trends, proving (1) that there was no [            ] build up in subject import

inventories and (2) that *all* inventories [                                    ].  OCPCmts14-

16, Fig. 1.  Notably, neither Mosaic nor Simplot addresses the fact that domestic product

inventories [                ] with subject import inventories.

### C.    The Commission Ignored the Only Analyses that Holistically Considered U.S. Market Conditions and Found No Oversupply of Subject Imports

The record evidence most obviously contradicting the Commission's affirmative injury

determination can be found in the economic analyses conducted by Michael Rahm, a former

senior Mosaic executive, and by economist James Dougan.  While offhandedly suggesting that it

considered these reports, it is obvious in both the Original and Remand Determinations that the

Commission never engaged these analyses at all, much less explained how or why they deserve

no weight.  Indeed, the Commission could not have considered these comprehensive analyses,

because their data-based conclusions about whether the phosphate fertilizer market was

"oversupplied" over the full POI directly contradict those of the Commission and reveal that the

Commission relied on a blinkered analysis, divorced from overall market conditions.

Business Proprietary Information
Has Been Deleted

### 1.    The Commission acknowledges that it failed to address the analyses by Mr. Rahm and Mr. Dougan.

In its Remand Comments, the Commission openly acknowledges that it did not address the economic analyses conducted by Mr. Rahm and Mr. Dougan at all when reaching its affirmative injury determination.  The Commission dismisses these analyses as mere "reports that {Plaintiffs} submitted."  ITCCmts16.  The Commission seeks safe harbor in the blanket statement that just because it "may not have explicitly discussed each piece of evidence does not establish that it 'ignored' such evidence."  *Id.* (citing *Siemens Energy, Inc. v. United States*, 38 CIT 879, 885, 992 F. Supp. 2d 1315, 1315 (2014)).  In a footnote, counsel to the Commission briefly claim that "OCP conveniently omits that the witnesses upon whose reports they rely conceded that there was a 'temporary oversupply' in the U.S. market, APPX0017679 (Dougan), and a 'hangover of phosphate inventories after the 2019 spring season,' APPX0017656 (Rahm)."  *Id.* & n.3.

This post hoc rebuttal falls well short of the statutory standard.  All parties agree there was a temporary oversupply in the U.S. phosphate fertilizer market.  The only dispute is what caused it.  Like Plaintiffs, Mr. Dougan and Mr. Rahm attribute this temporary oversupply to the superseding weather events that caused a temporary drop in demand and thereby interrupted normal inventory drawdowns.  APPX0097709-0097710; APPX0097832.  Their analyses of the full POI demonstrate that subject imports adjusted fully to those demand shocks, entering at levels consistent with both forecasted and actual demand from mid-2019 into early 2020.

Although the Commission offers vague assurances that it considered these analyses even if it did not explicitly discuss them, the Commission's injury finding contradicts these analyses without ever explaining why they are wrong.  Indeed, the Commission arguably *had* to ignore these analyses because they directly contradict the key oversupply finding on which the

erroneous injury determination was based. These complementary analyses are the only pieces of record evidence that pull together all relevant market trends.

> **2.** **The analyses by Mr. Rahm and Mr. Dougan demonstrate that subject imports did not oversupply the U.S. phosphate fertilizer market, directly contradicting the Commission's key finding.**

The economic analyses of both Mr. Rahm and Mr. Dougan adopt a holistic approach to key conditions of competition in the U.S. phosphate fertilizer market, and both contradict the Commission's oversupply finding. As OCP explained in its Remand Comments, the analyses of Mr. Rahm and Mr. Dougan "rely on different data sources, different measurements of subject imports, and different time periods, yet they both reach the same conclusion: increases in subject imports year-over-year did not exceed market needs and cumulatively were smaller than the supply gap across the POI." OCPCmts19-20 (citing APPX0097705).

Mr. Rahm's analysis of fertilizer years showed that the cumulative loss in domestic supply exceeded the increase in subject imports from July 1, 2016 to June 30, 2020 by more than 1 million ST, and "that subject imports filled only 40% of the domestic supply gap." OCPCmts20-21 (citing APPX0097831-0097833). Meanwhile, Mr. Dougan's analysis examined the increase in U.S. shipments of subject imports against changes in supply and U.S. demand, tracking the supply reductions following the idling of Plant City and the reduction in Canadian imports with Redwater's closure against apparent U.S. consumption. As OCP previously explained, Mr. Dougan concluded that "accounting for the reduction in U.S. demand and the closures of Plant City and Redwater (including reduced imports from Canada, which the Commission never addressed), the market need [          ] the increase in U.S. shipments of subject imports by [          ] ST, equal to [      ] of apparent U.S. consumption in 2019." OCPCmts21-22 (citing APPX0097709-0097710).

**Business Proprietary Information<br>Has Been Deleted**

Both studies conclude that subject imports did not oversupply market needs despite the occurrence in 2018 and 2019 of "Black Swan events unrelated to the presence of subject imports." APPX0097836. The reason, according to Mr. Rahm, is that overall "U.S. imports adjusted quickly in response to the 2019 demand shocks," declining by 746,000 tons between the 2018/19 and 2019/20 fertilizer years. APPX0097832; APPX0097837. Indeed, subject import entries declined by [                    ] than domestic production, as both importers and the domestic industry took steps to reduce inventories that had risen when weather disrupted demand. OCPOpeningBr19-21; OCPReplyBr9; OCPCmts18-19.

The Commission clearly did not consider the analyses of Mr. Rahm and Mr. Dougan because doing so would have required it to reach a negative injury determination. Instead, the Commission and Defendant-Intervenors incorrectly attribute the domestic industry's performance to an "oversupply" of subject imports during a limited part of the POI. There is no substantial evidence to support the conclusion that subject imports oversupplied the U.S. market. Over the full POI, subject imports entered in volumes that were more than fully justified by the reductions in domestic supply and bona fide market needs.

## V.    THE COMMISSION CONTINUES TO MISCHARACTERIZE AND MISAPPLY THE "BY REASON OF STANDARD"

The only cause of temporary oversupply and thus injury to the domestic industry in this case is the stretch of three consecutive seasons of unanticipated bad weather. *See* Part IV. The Commission correctly recites that it is not required to demonstrate that subject imports are a "principal" cause of injury. ITCCmts40-41. However, the statute still requires that subject imports constitute a cause of injury that is more than *de minimis*. Subject imports cannot be more than a *de minimis* cause of injury where another factor—in this case unprecedented rainfall over three consecutive seasons—constitutes a superseding cause of injury.

Business Proprietary Information
Has Been Deleted

Further, Defendant-Intervenors grossly mischaracterize OCP's argument. *See*

SimplotCmts21-22; MosaicCmts24-25, 31. OCP did not assert that the Commission must follow

a certain methodology or conduct a "counterfactual" or "substantial factor" analysis. Rather than

advocating for a specific test, OCP merely emphasized—as the Federal Circuit has explained in

examining applications of the "by reason of" standard in the AD/CVD context—that "{o}ften,

'proximate causation' is also required, over and above but-for causation." *Changzhou Trina*

*Solar Energy Co., Ltd. v. Int'l Trade Comm'n*, 879 F.3d 1377, n.1 (Fed. Cir. 2018). This

proximate cause principle is reflected in the AD/CVD "by reason of" test: the Commission must

show that subject imports are more than a "merely incidental, tangential{,} or trivial" cause of

injury. *Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1381 (Fed. Cir. 2003).

OCP is not asking for a causation standard that is new or different. Previous ITC cases

have routinely found that subject imports cannot meet the more than *de minimis* cause threshold

in cases where one or more other factors fully explain any observed poor performance by the

domestic industry. In particular, the Commission has repeatedly recognized that an injury to a

domestic industry is not "by reason of" subject imports where supply shocks or shifts in demand

constitute the true underlying cause of the domestic industry's performance. For example, in

*Steel Nails*, the ITC found that, although subject imports undersold domestic products, subject

imports still had not caused the market share shift away from the domestic industry and had not

had a significant impact on the domestic industry. Instead, the market share shift to subject

imports and poor performance of the domestic industry were caused by "labor shortages,

production shutdowns, and supply chain disruptions caused by the COVID-19 pandemic." *Steel*

*Nails from India, Oman, Sri Lanka, Thailand, and Turkey*, Inv. Nos. 701-TA-673-677 and 731-

Business Proprietary Information
Has Been Deleted

TA-1580-1583 (Final), USITC Pub. 5370 at 34, 49, 56 (Oct. 2022).  This type of causation

analysis is routine for the Commission, and it applies with equal force here.[3]

 This case is no different from the other ITC cases in which one or more other factors

caused any observed poor performance by the domestic industry.  This case is not about multiple

"distinct" causes, each of which is independently a more than *de minimis* cause of injury to the

domestic industry, as the ITC suggests.  ITCCmts31.  Instead, by temporarily depressing actual

demand below projected levels, the unforeseeable weather constitutes the sole cause of injury: in

2018 and 2019, extreme rainfall threw off the equilibrium between supply and demand in ways

that no one could have predicted or planned for.  *See* Part IV.A.  Moreover, the Commission

continues to erroneously claim that subject that importers had ample time to adjust to the adverse

weather.  ITCCmts43.  This view is at odds with the record in three respects.  First, the

Commission disregarded evidence that market participants reasonably expected demand to

rebound in each successive application season, requiring continued subject imports.  *See* Part

IV.B.3; OCPCmts12-13.  Second, the Commission ignored evidence that subject imports did in

fact adjust to the weather-related decline in demand, adjusting more than the domestic industry.

---

[3] *See, e.g.*, *Magnesium From Israel*, Inv. Nos. 701-TA-614 and 731-TA-1431 (Final), USITC Pub. 5009 (Jan. 2020) (finding that "{w}hile the record does not support a finding that subject imports had a significant adverse impact on the domestic industry, it does indicate that other factors, mainly declining demand, low-priced nonsubject import competition, and intra-industry competition led to the industry's declining performance"); *Emulsion Styrene-Butadiene Rubber from Czech Republic, Italy, and Russia*, Inv. Nos. 731-TA-1575-1577 (Final), USITC Pub. 5392 at 42-43 (Jan. 2023) (declining to find that subject imports had a significant adverse impact on the domestic industry where the "record show{ed}…producers… placed customers on allocation…after Winter Storm Uri hit," and the domestic industry's poor performance "generally correlate{d} with trends in apparent U.S. consumption due to the COVID-19 Pandemic"); *Uncoated Groundwood Paper from Canada*, Inv Nos. 701-TA-584 and 731-1382 (Final), USITC Pub. 4822 at 36 (Sept. 2018) (finding that "the domestic industry's poor operating and financial performance during the POI was not a result of subject imports" because the "decline in demand, as well as the decline in the domestic industry's market share during the POI, led to the industry's declines in output during the POI").

Business Proprietary Information
Has Been Deleted

*See* Parts IV.B.4-C.2; OCPCmts18-19.  Third, the Commission failed to consider that each

season of catastrophic rains was independent of the others, and equally unanticipated.

OCPCmts18-19.  Expecting importers to react to weather events that have not yet happened

unreasonably requires importers to be clairvoyant.  *See* Part IV.A.

The Court explained in its order that "Section 1677(7) requires that any material injury be

'by reason of' subject imports, and unprecedented weather events that frustrated demand

projections were a potential intervening cause."  APPX0000043.  On remand, the Commission

again failed to adequately consider the weather events as an intervening cause, summarily

concluding that the mere presence of subject imports caused injury "distinct" from the

catastrophic weather events.  By not analyzing weather-related demand shocks as a superseding

cause of injury that severed any causal relationship between subject imports and the domestic

industry's injury, the Commission failed to comply with the Court's order, and its finding of

injury "by reason of" subject imports is unsupported by substantial evidence and not in

accordance with law.

## VI.    CONCLUSION

For the reasons explained above, Plaintiff respectfully urges this Court once again to

remand the Commission's affirmative injury determination with instructions to correct the

fundamental and continuing deficiencies identified in OCP's comments on the remand and

original determinations.

Dated: May 29, 2024                    Respectfully submitted,

Shara L. Aranoff
James M. Smith
Sooan (Vivian) Choi
Paula Ortiz Cardona
John J. Catalfamo
Julia Shults

**COVINGTON & BURLING LLP**
850 10th Street, NW
Washington, D.C. 20001
(202) 662-5997
saranoff@cov.com

*Counsel to Plaintiff OCP S.A.*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the attached Plaintiffs' Reply to Defendant and Defendant's-Intervenors' Comments on the Remand Determination, filed May 29, 2024, contains 6,829 words, including headings, footnotes, and quotations, and excluding the cover page, table of contents, table of authorities, counsel's signature block, and this certificate, according to the word count function of the word-processing system used to prepare this brief, and therefore complies with the maximum 7,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

Dated: May 29, 2024

Respectfully submitted,

Shara L. Aranoff

Shara L. Aranoff
James M. Smith
Sooan (Vivian) Choi
Paula Ortiz Cardona
John J. Catalfamo
Julia Shults

**COVINGTON & BURLING LLP**
850 10th Street, NW
Washington, D.C. 20001
(202) 662-5997
saranoff@cov.com

*Counsel to Plaintiff OCP S.A.*