BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

# Views of the Commission

By opinion and order dated April 22, 2025, the U.S. Court of International Trade, remanded the Commission's affirmative first remand determinations in *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final) (Remand), USITC Pub. 5490 (January 2024).[1] Upon consideration of the Second Remand Order and evidence in the record of these investigations,[2] the Commission determines again that an industry in the United States is materially injured by reason of phosphate fertilizers from Morocco and Russia found by the U.S. Department of Commerce ("Commerce") to be subsidized by the governments of Morocco and Russia.[3]

## I. Background

### A. Procedural History

In March 2021, the Commission determined that an industry in the United States was materially injured by reason of subject imports from Morocco and Russia.[4] The Commission found that the volume of cumulated subject imports and the increase in the volume were significant during the period of investigation ("POI"). Subject imports poured into the U.S. market over the POI and gained [ █ ] percentage points in market share from the domestic

---

[1] *OCP S.A. v. United States*, Consolidated Ct No. 21-00219, Slip Op. 25-51 (April 22, 2024) ("Second Remand Order"). In the first remand determinations, the Commission addressed the issues remanded by the Court as set out in *OCP S.A. v. United States*, Consolidated Ct No. 21-00219, Slip Op. 23-136 (Sept. 19, 2023) ("First Remand Order").

[2] The Commission did not find it necessary to reopen the record for additional information in order to address the Second Remand instructions.

[3] Commissioner Johanson again determines that an industry in the United States is not materially injured or threatened with material injury by reason of subject imports from Morocco and Russia. *See* Dissenting Views of Commissioner David S. Johanson.

[4] *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final), USITC Pub. 5172 (March 2021) and accompanying Confidential Views ("Original Views"). Citations to the page numbers of the Original Views herein refer to the Confidential Views.

*Public Version*

industry.  Subject imports continued to enter the U.S. market at elevated levels in 2019 while

demand declined in the second half of 2018 through 2019, causing an oversupply in the U.S.

market and significantly depressing U.S. prices.  Due to the downward pricing pressure exerted

by the oversupply of subject imports on U.S. prices, the domestic industry was forced to reduce

prices, which in turn, caused its revenues to be lower than they would have been otherwise.  As

a consequence, the Commission found that subject imports had a significant impact on the

domestic industry.[5]

Plaintiffs OCP S.A. ("OCP"), a producer and exporter of phosphate fertilizers in Morocco,

and EuroChem North America Corporation ("EuroChem"), a U.S. importer of subject

merchandise from Morocco and Russia, appealed the Commission's final affirmative

determinations.  Several respondent interested parties participated as plaintiff-intervenors:

PhosAgro PJSC ("PhosAgro"), a producer and exporter of phosphate fertilizers in Russia, and

International Raw Materials Ltd. ("IRM") and Koch Fertilizer ("Koch"), U.S. importers of subject

merchandise.  Petitioner the Mosaic Company ("Mosaic") and J. R. Simplot Company

("Simplot"), another domestic producer, also participated in the litigation as defendant-

intervenors.

In its First Remand Order, the Court found that the Commission's finding that importers

could reship fertilizer from one destination to another to meet existing demand, was

---

[5] Original Views at 52-53.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

unsupported by the record evidence.[6]  Further, the court opined that this Commission finding

"undergirds the Commission's determination across all statutory factors."[7]

On October 27, 2023, the Commission published notice of its remand proceedings in the

Federal Register.[8]  In the notice, the Commission explained that it was reopening the record in

these proceedings for the limited purpose of issuing a short supplemental questionnaire to U.S.

producers and U.S. importers.[9]

In January 2024, the Commission determined again that an industry in the United States

was materially injured by reason of subject imports from Morocco and Russia.[10]  In its First

Remand Views, the Commission continued to find that the volume of cumulated subject

imports and the increase in the volume were significant in absolute terms and relative to U.S.

consumption during the period of investigation, and subject imports gained [ ▮ ] percentage

points in market share at the expense of the domestic industry from 2017 to 2019.[11]  The

record also showed that the volume of cumulated subject imports increased by one million

short tons between 2017 and 2018, and as demand began to decline in the fall of 2018, U.S.

---

[6] *OCP S.A. v. United States*, Consolidated court No. 21-00219, Slip Op. 23-136 (Sept. 19, 2023) ("First Remand Order") at 49.

[7] First Remand Order at 3.

[8] *Phosphate Fertilizers from Morocco and Russia*, 88 Fed. Reg. 73873 (Oct. 27, 2023).  The Commission subsequently issued a correction to the notice of remand proceedings correcting the effective date of the notice to October 23, 2023.  *Phosphate Fertilizers from Morocco and Russia; Notice of Remand Proceedings; Correction,* 88 Fed. Reg. 75308 (Nov. 2, 2023).

[9] 88 Fed. Reg. 73873.  In the First Remand Order, the court indicated that on remand, the "Commission may take new evidence, reconsider existing evidence, or take any other action allowed by its procedures" to arrive at a conclusion supported by substantial evidence.  First Remand Order at 49.

[10] *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final) (Remand), USITC Pub. 5490 (Jan. 2024) and accompanying Confidential Views ("First Remand Views").  Citations to the page numbers of the First Remand Views herein refer to the Confidential Views.

[11] First Remand Views at 28-29.

*Public Version*

importers' inventories reached their highest level of those two years.[12]  Notwithstanding these

substantial inventories and declining demand, subject imports surged into the U.S. market in

January 2019 and continued to flow into the U.S. market in substantial quantities, reaching 2.7

million short tons that year, even as demand declined in 2019.  U.S. importers' quarterly

inventories reached their highest level in March 2019, but subject imports nonetheless

continued to enter the U.S. market in the latter part of 2019 in excess of any purported need to

replenish depleted inventories in the latter part of 2019.  Moreover, the record showed that

regardless of the "unidirectional" movement of subject importers' inventories, the volumes of

subject imports entering the U.S. market had significant depressing effects on U.S. prices.[13]

Record evidence showed subject imports being offered and sold at lower prices, domestic

producers lowering prices to compete with subject imports, and certain purchasers purchasing

subject imports rather than the domestic like product for price reasons.  Consequently, subject

imports – through their significant volumes that contributed to the oversupply conditions in the

U.S. market during the POI at competitive and low prices – depressed prices in the U.S. market

to a significant degree.  The downward pricing pressure exerted by subject imports forced the

domestic industry to reduce prices, which in turn caused its revenues to be lower than they

would have been otherwise.  As a consequence, the Commission found that subject imports

had a significant impact on the domestic industry.[14]

From February-June 2024, the parties filed comments addressing the Commission's First

---

[12] First Remand Views at 38-39; 62-63.

[13] First Remand Views at 62-63.

[14] First Remand Views at 63-64.  The Commission also addressed other asserted causes of injury so as to ensure it was not attributing injury from other factors to the subject imports.  First Remand Views at 65-72.

*Public Version*

Remand Views.  On April 22, 2025, the Court issued its Second Remand Order, finding certain

aspects of the Commission's analysis of conditions of competition, volume, and price effects to

be deficient, as discussed below.  On June 4, 2025, the Commission published notice in the

Federal Register of how it would proceed with second remand proceedings.[15]  The Commission

did not reopen the record, but the notice "permit{ted} the parties entitled to participate in the

remand proceedings to file comments concerning how the Commission could best comply with

the court's remand instructions."[16]  Accordingly, domestic interested parties Mosaic and

Simplot filed comments as did respondent interested parties, OCP, PhosAgro, IRM, Koch.

Eurochem did not file comments.

### B.  Parties' Arguments

Mosaic and Simplot argue that the Commission should continue to reach affirmative

determinations.[17]  Mosaic further argues that the Commission should continue to find that the

U.S. market was oversupplied, noting that the inventory buildup was well-documented by the

trade press.[18]  Mosaic also claims that the record does not support importers' claim that

additional imports were needed to meet demand in areas unaffected by flooding.[19]  Mosaic and

Simplot further argue that the Commission should again find that the volume of cumulated

subject imports, and the increase in that volume, is significant.[20]  Mosaic and Simplot also argue

that the Commission should again find that cumulated subject imports had significant price

---

[15] *Phosphate Fertilizers from Morocco and Russia*, 90 Fed. Reg. 24411 (June 10, 2025).
[16] 90 Fed. Reg. 24411.
[17] *See generally* Mosaic Second Remand Comments; Simplot Second Remand Comments.
[18] Mosaic Second Remand Comments at 5-15.
[19] Mosaic Second Remand Comments at 7-8.
[20] Mosaic Second Remand Comments at 3-5; Simplot Second Remand Comments at 1-7.

*Public Version*

effects on the domestic industry, asserting that the Commission's finding that subject imports depressed prices to a significant degree is supported by substantial evidence. Both Mosaic and Simplot observe that the court did not specifically remand the Commission's impact finding and argue that the Commission should reaffirm its finding that cumulated subject imports had a significant impact on the domestic industry.[21]

Respondent interested parties repeat the court's findings that substantial evidence does not support the Commission's finding that fertilizer inventories can be reshipped, contending that absent such evidence, there is not substantial evidence that the U.S. market was oversupplied by increased volumes of subject imports, which were needed, in their view, to supply areas unaffected by flooding where demand was up in 2019.[22] Respondent interested parties also argue that the Commission improperly analyzed subject import volumes inflated by the inclusion of imports that were re-exported to Canada. In their view, such imports could not be injurious to the domestic industry.[23] Respondent interested parties assert that, per the court's instruction, the Commission must address Mosaic's refusals to supply the U.S. market in assessing the significance of the volume of cumulated subject imports.[24]

Respondent interested parties further argue that the Commission should find that there were no significant price effects.[25] They argue that the Commission should find that there was

---

[21] Mosaic Second Remand Comments at 25; Simplot Second Remand Comments at 17-18.
[22] OCP Remand Second Remand Comments at 1-7; IRM Second Remand Comments at 2-6; Koch Second Remand Comments at 3-4; PhosAgro 2-3, 6-8.
[23] OCP Remand Second Remand Comments at 7-8; IRM Second Remand Comments at 8-9; Koch Second Remand Comments at 4-5; PhosAgro 2-3, 6-7.
[24] OCP Remand Second Remand Comments at 1-3; IRM Second Remand Comments at 2-6; Koch Second Remand Comments at 3-4; PhosAgro 2-3, 6-7.
[25] OCP Second Remand Comments at 16-25; IRM Second Remand Comments at 7-9; Koch Second Remand Comments at 5-7; PhosAgro Second Comments at 10-12.

*Public Version*

not significant underselling and that the lack of underselling undermines the Commission's

price depression finding.[26]  Respondent interested parties also argue that the fact that Mosaic

was most frequently identified as a "price leader" shows that Mosaic drives market prices,

directly contradicting the Commission's finding that subject imports depressed domestic

prices.[27]  OCP and PhosAgro also argue that the Commission's reliance on lost sales information

was not reasonable or supported by substantial evidence.[28]

## II.    Material Injury By Reason of Subject Imports

In responding to the court's Second Remand Order, we have considered the factual

record as a whole, as well as arguments made by the parties in their submissions in both the

proceedings of the original investigations and the first and second remand proceedings.  We

have adopted in their entirety the Commission's findings, analysis, and conclusions in its

Original Views and First Remand Views regarding issues not raised on appeal:  the legal

standards, domestic like product, domestic industry, negligibility, and cumulation.[29]

In the First Remand Views, we addressed as an initial matter the court's characterization

of our observation in the Original Views that importers conceded that it was possible albeit not

economical to reship product from existing inventories to other locations.[30]  The court

understood this to be an "important" finding upon which the Commission's "theory" that

---

[26] OCP Second Remand Comments at 16-25; IRM Second Remand Comments at 7-9; Koch Second Remand Comments at 5-7; PhosAgro Second Remand Comments at 10-12.
[27] OCP Second Remand Comments at 18-19; IRM Second Remand Comments at 9; Koch Second Remand Comments at 7; PhosAgro Second Remand Comments at 10.
[28] OCP Second Remand Comments at 20-24; PhosAgro Second Remand Comments at 10-11.
[29] Additionally, in our analysis below, we do not readdress several arguments raised by the parties in the original investigations that pertain to issues that were not challenged on appeal, but we adopt and incorporate our discussions and conclusions regarding those issues here.
[30] Original Views at 43 n.161, 56 n.217.

*Public Version*

imports contributed to the oversupply conditions in the U.S. market "rests like an inverted pyramid on an unsupported finding regarding what might be possible if economics did not matter."[31]  In our First Remand Views, we clarified that this observation was not central to our material injury analysis, and we continued to find that an industry in the United States was materially injured by reason of phosphate fertilizers from Morocco and Russia that Commerce has found to be subsidized by the governments of Morocco and Russia, without reliance upon that original finding.[32]

We also addressed domestic producers' reshipment capabilities in response to the court's instructions directing the Commission to assess in its volume analysis whether "fertilizer was 'practically unavailable from U.S. sources' to supply high-demand regions in 2019 because doing so would not have been economically viable."[33]  In this regard, we noted that, in context, we understood the court's reference to "U.S. sources" to refer to domestically produced fertilizers.[34]  We concluded that "the record from the original investigations and as supplemented in these remand proceedings indicates that the domestic industry's excess capacity, substantial inventories, extensive inventory locations, expansive multi-modal distribution network, and demonstrated ability to move and relocate product where it was needed shows that domestic producers were well-positioned to supply the U.S. market in 2019."[35]

---

[31] First Remand Order at 29, 35.
[32] First Remand Views at 7-8.
[33] First Remand Views at 31-33.
[34] First Remand Views at 31-32 & n.152.  We further observed that our understanding appeared to be consistent with the court's citation to *Altx v. United States*, 26 CIT 709 (2002).
[35] First Remand Views at 33.

*Public Version*

We again respectfully address the court's characterization of our findings in the Original Views and First Remand Views. In the Second Remand Order, the court cited the First Remand Order as "focus{ing} on domestic industry reshipment because the Commission's unsupported assumptions undergirded its material injury finding" and as holding that "{i}f domestic producers could not – technically or economically – reship existing inventory domestically, these inventories could not contribute to the supply of phosphate fertilizer available to meet new demand."[36] In our Original Views, however, we observed that importers, not domestic producers, reported an inability to serve the U.S. market from existing inventories, while conceding that reshipment was possible but cost prohibitive, which is why they chose to import more product. Specifically, in responding to respondents' arguments, we stated:

> Respondents argue that product was necessary to serve demand in U.S. regions unaffected by the poor weather conditions. However, this argument fails to explain why U.S. importers could not supply U.S. customers from its building inventories or from product that sat on barges on the Mississippi River system. Indeed, as U.S. importers acknowledged, it was possible for the U.S. importers to do so, but that it was costly to move product by rail or back down the Mississippi River. Consequently, they chose to import more product.[37]

Thus, our original finding related to importers' representations that they could not – technically or economically – serve the U.S. market from existing inventories or product that sat on barges, choosing instead to import more product. Unlike importers, however, domestic producers did

---

[36] Second Remand Order at 4, 7, citing First Remand Order, 658 F. Supp. 3d at 1318-19.

[37] Original Views at 56 n.237. We also note that this observation did not involve "reshipping fertilizer that had already been delivered to flooded, low demand regions," as the court indicated. First Remand Order at 5-6. Rather, our original finding referred to the possibility of importers drawing from building inventories <u>or</u> from product that sat on barges on the Mississippi River system. Original Views at 56 n.237 (emphasis added).

*Public Version*

not represent that they were unable to serve the U.S. market from their substantial existing inventories or product that sat on barges, or that it was cost prohibitive to do so.

Although the observation in the Original Views related to importers, we nonetheless addressed domestic producers' ability to reship inventories in the First Remand Views to address the court's remand instructions.[38]  Again, we respectfully disagree with the court's repeated characterization in the Second Remand Order that this finding was central to the First Remand Views such that without it, "the Commission's oversupply-based material injury finding collapses like a house of cards."[39]  In responding as required to the First Remand Order, domestic producers ability to reship inventories was only one factor, along with their excess capacity, substantial inventories, extensive inventory locations, and expansive multi-modal distribution network, that the Commission discussed in finding that fertilizer was not practically unavailable from U.S. sources in 2019, as directed by the First Remand Order.[40]  In other words, it was not central to the Commission's finding that fertilizer was not unavailable from U.S. sources in 2019, but rather discussed as one factor among several others.

Indeed, unlike importers, the domestic industry has not stated that they were unable to serve the U.S. market from their substantial existing inventories or product that sat on barges, or that it was cost prohibitive to do so, and they also had available excess capacity from which they could have shipped additional volumes.[41]  Thus, we respectfully disagree with the court's assumption that domestic producers could not reship their inventories and therefore "would be

---

[38] First Remand Views at 31-33.
[39] Second Remand Order at 10.
[40] First Remand Views at 31-33.
[41] *See, e.g.,* CR/PR at Tables III-4, C-1.

*Public Version*

poorly positioned to supply the U.S. market so that imports would not have contributed to oversupply conditions."[42]  As explained below, we continue to find, in response to the Court's remand first and second remand instructions, that during the POI the domestic industry possessed the capability to reship fertilizer if relocation was needed.  However, even if that ability were limited, domestic producers also possessed excess capacity, substantial inventories (that unlike for importers were not reportedly stranded), extensive inventory locations, and expansive multi-modal distribution network, demonstrating that the domestic industry was well positioned to supply the U.S. market in 2019.

### A.    Conditions of Competition and the Business Cycle

#### 1.    Demand Conditions

As explained in the Original Views and First Remand Views,[43] U.S. demand for phosphate fertilizers is primarily driven by agricultural plantings, particularly for crops that consume the most fertilizer (*i.e.*, corn, soybeans, and wheat).  Weather volatility, cropping practices and crop rotation, and agricultural commodity prices also affect U.S. demand.[44]

Due to its relationship to agricultural plantings, U.S. demand for phosphate fertilizers is subject to seasonal business cycles, with most market participants reporting peak demand in the spring (second quarter, prior to planting) and fall (fourth quarter, after harvest).[45]  Mosaic stated that to meet the two seasonal surges in demand, producers manufacture phosphate fertilizers throughout the year, and the supply chain, including wholesalers and retailers, moves

---

[42] Second Remand Order at 27.
[43] Original Views at 20-22; First Remand Views at 8.
[44] CR/PR at II-11; Mosaic Prehearing Br. at 20; OCP Prehearing Br. at 6, 33; Gavilon Prehearing Br. at 10; PhosAgro Prehearing Br. at 6; PhosAgro Posthearing Br. at 3, 6.
[45] CR/PR at II-15.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

product into position during the off seasons.[46]  According to respondents, it takes time for

distributors to obtain fertilizer and move it through the supply chain into warehouses in the off

seasons for use by farmers, and distributors therefore rely on demand projections in obtaining

product.[47]  We note however that, notwithstanding this, the record shows that foreign

producers and/or importers are able to move quickly to respond to changes in the market.

Specifically, as we noted in the Original Views and First Remand Views, the parties agreed that

the filing of the petitions on June 26, 2020, resulted in a large decrease in the volume of

cumulated subject imports.[48]  Indeed, the monthly volume of subject imports decreased from

62,426 short tons in June 2020 to 57,660 short tons in July 2020, 14,365 short tons in August

2020, and 10,599 in September 2020.[49]

---

[46] Mosaic Prehearing Br. at 24.  U.S. producers reported that [ ██ ] percent of their commercial shipments in 2019 came from inventory with lead times averaging [ █ ] days.  CR/PR at II-17.

[47] OCP Prehearing Br. at 6, 37-39; Koch Prehearing Br. at 6-7; OCP Posthearing Br. at Responses to Questions pp. 27-28, 39; IRM Posthearing Br. at 7; Koch Posthearing Br. at 11-12; EuroChem Posthearing Br. at 8.  U.S. importers reported that [ ██ ] percent of their commercial shipments in 2019 came from inventory with lead times averaging [ █ ] days.  Importers also reported [ ██ ] percent of their commercial shipments came from foreign producers' inventories, with lead times averaging [ ██ ] days.  CR/PR at II-17.

[48] Original Views at 34 n. & n.134 and First Remand Views at 9 & n.31, citing  Mosaic Prehearing Br. at 43-44, 91; Simplot Prehearing Br. at 29-30, 34; Simplot Posthearing Br. at Responses to Questions pp. 53-54; Mosaic Posthearing Br. at Responses to Questions pp. 69-70; OCP Posthearing Br. at 12, Responses to Questions pp. 33, 67-73; EuroChem Posthearing Br. at 11; IRM Posthearing Br. at 8-9; PhosAgro Posthearing Br. at 12-13, Responses to Questions.  Some U.S. importers indicated that they stopped bringing in subject imports "because the buyers and the sellers agreed that the risk of 75 percent countervailing duties was higher than either of them wanted to take."  Hearing Tr. at 337 (Aranoff); see also EuroChem Posthearing Br. at 11 (stating that as a result of the filing of the petitions, it shifted its purchases of phosphate fertilizers from Morocco and Russia to other global sources); [ ████ ██ ] U.S. Purchaser Questionnaire Response at III-11 (reporting that Koch and IRM will not quote or import material until the countervailing duty decision is issued); [ ██████ ] U.S. Purchaser Questionnaire Response at III-11 (reporting that Helm, Koch, and OCP "cut off" supplying imported product to the U.S. market in the summer of 2020).

[49] CR/PR at Table IV-6.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

As we discussed in our Original Views and First Remand Views, the parties agree that while U.S. demand increased between 2017 and 2018, the U.S. market experienced unusually wet weather conditions that impacted three consecutive planting seasons beginning in the fall of 2018 and continuing into the spring of 2019 and fall of 2019.[50]  Consequently, crop plantings fell and U.S. demand for phosphate fertilizers declined in 2019.  U.S. demand, however, rebounded in January to September ("interim") 2020 with increased crop plantings.[51]  Most responding U.S. producers, importers, and purchasers reported that U.S. demand for phosphate fertilizers either fluctuated or did not change during the period of investigation.[52]

As we previously explained, data from the U.S. Department of Agriculture's ("USDA") Farm Service Agency confirm that total planted acres increased from 2017 and 2018, decreased between 2018 and 2019, then increased again between 2019 and 2020.[53]  Overall, total acres planted was 3.6 percent lower in 2019 compared to 2017 and 0.6 percent lower in 2020 compared to 2017.[54]  Apparent U.S. consumption for phosphate fertilizers increased from [ ███ ██████ ] short tons in 2017 to [ █████████ ] short tons in 2018, then decreased to [ ████ ██████ ] short tons in 2019 for an overall decline of [ ███ ] percent between 2017 and 2019; it

---

[50] Original Views at 21-22; First Remand Views at 9-10.

[51] CR/PR at II-11, Figure II-1; Mosaic Prehearing Br. at 20-21; OCP Prehearing Br. at 6, 34-36, 43-51; IRM Prehearing Br. at 15-17; Gavilon Prehearing Br. at 11-12, 14-16; PhosAgro Prehearing Br. at 6-7.

[52] CR/PR at Table II-4.  Specifically, two of three responding domestic producers, seven of 10 U.S. importers, and 14 of 28 U.S. purchasers indicated that U.S. demand fluctuated since January 1, 2017, while one domestic producer, two U.S. importers, and eight purchasers reported that demand did not change.  *See id.*

[53] The USDA reported that acres planted for corn, soybeans, and wheat were 226.4 million in 2017, 225.9 million in 2018, 211.3 million in 2019, and 218.4 million in 2020.  It projected the acres planted for these crops to be 227.0 million in 2021.  CR/PR at II-11 n.23.

[54] CR/PR at II-11, Figure II-1.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

was [ ██ ] percent lower in interim 2020, at [ ████████ ] short tons, than in interim 2019, at [ ████████ ] short tons.[55]

## 2. Supply Conditions

The domestic industry was the largest supplier of phosphate fertilizers to the U.S. market throughout the POI. Its share of apparent U.S. consumption declined from [ ████ ] percent in 2017 to [ ████ ] percent in 2018 and [ ████ ] percent in 2019, representing an overall decrease of [ ████ ] percentage points between 2017 and 2019.[56] The domestic industry's share of apparent U.S. consumption was [ ████ ] percent in interim 2019 and [ ████ ] percent in interim 2020.[57]

In addition to supplying the majority of the U.S. market, the domestic industry also exported substantial volumes of phosphate fertilizers to third country markets, although these volumes declined after the petitions were filed. The domestic industry's export shipments accounted for [ ████ ] percent of its total shipments in 2017, [ ████ ] percent in 2018, and [ ████ ] percent in 2019; its export shipments accounted for a lower share of its total shipments in interim 2020 at [ ████ ] percent than in interim 2019 at [ ████ ] percent.[58] [ ████████ ] largest export market was [ ████ ], while [ ████████████ ] largest export market was

---

[55] CR/PR at Tables IV-7, C-1.

[56] CR/PR at Tables IV-8, C-1.

[57] CR/PR at Tables IV-8, C-1.

[58] CR/PR at Table III-6. U.S. producers' export shipments declined from [ ████████ ] short tons in 2017 to [ ████████ ] short tons in 2018, before increasing in 2019 to [ ████████ ] short tons. Their export shipments were lower in interim 2020, at [ ████████ ] short tons, than in interim 2019, at [ ████████ ] short tons. *See id.*

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

Canada.[59]

During the POI, three firms – Mosaic, Nutrien, and Simplot – accounted for the vast majority of all known U.S. production of phosphate fertilizers, with Mosaic as the leading producer.[60]  Mosaic reported several changes in operations during the POI.  In December 2017, Mosaic idled its 2 million ton production facility in Plant City, Florida for 18 months and then permanently shuttered the facility in June 2019.[61]  In March 2019, Mosaic announced a 300,000 short ton curtailment in production, and in September 2019, Mosaic temporarily idled operations at its facilities in Saint James (Faustina) and Uncle Sam, Louisiana, curtailing production by 500,000 short tons.  It restarted operations at these facilities in December 2019, but idled its plant in Barstow, Florida that same month, curtailing production by 165,000 tons per month.  Mosaic resumed production at its Barstow facility in February 2020.[62]

From 2017 to 2018, Nutrien increased its capacity and production at its Aurora, North

---

[59] CR/PR at III-11 n.26.  [    ] accounted for [    ] percent of [        ] export shipments between 2017 and 2019.  [    ] also shipped product to [        ].  At least [    ] percent of [        ] exports and [        ] percent of [        ] exports went to Canada during 2017-2019 and interim 2020.  They also exported product to [    ].  *See id.*

[60] CR/PR at I-3, Table III-1.  In 2019, Mosaic accounted for [    ] percent of domestic production.  CR/PR at Table III-1.  Over the past several decades, the domestic industry experienced significant contraction in the number of producers and production facilities.  Mosaic Prehearing Br. at 22; OCP Prehearing Br. at 6-16; Gavilon Prehearing Br. at 17-19; IRM Prehearing Br. at 4-6.  According to respondents, depleted U.S. phosphate ore reserves (from which the primary raw material phosphate rock is refined), caused this consolidation of the domestic industry.  OCP Prehearing Br. at 6-16; Gavilon Prehearing Br. at 17-19; IRM Prehearing Br. at 4-6.  Mosaic and Simplot maintain, however, that the United States has plenty of remaining and untapped phosphate rock reserves and that mining capacity currently exceeds production capacity.  Hearing Tr. at 139-143 (Stone, O'Rourke).  Indeed, Mosaic reports that its phosphate rock production and quality have remained consistent over the POI.  Mosaic Prehearing Br. at 92-93; Mosaic Postconference Br. at Exhibit 31.  OCP itself acknowledges that U.S. annual phosphate rock production represents nearly 15 percent of global production, rendering the United States the world's third largest producer.  OCP Prehearing Br. at 11.

[61] CR/PR at III-3.

[62] Mosaic Prehearing Br. at 2; Mosaic Posthearing Br. at Responses to Questions pp. 22-23.

17

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

Carolina and White Springs, Florida phosphate facilities.[63]  In May 2019, Nutrien converted its

phosphate operation in Redwater, Canada to an ammonium sulfate plant.[64]  Nutrien's CEO

stated at the time that the increase in production in North Carolina and Florida was expected to

offset the reduction in supply from its Redwater facility.[65]  Nutrien's U.S. production increased

by [ ██ ] percent from 2018 to 2019 and its production and production capacity increased [ ██ ]

[ ████ ] of the POI.[66]

As a result of these operational changes and curtailments, and notwithstanding that

[ ████ ] increased its production capacity by [ ████ ] short tons from 2017 to 2018, the

domestic industry's capacity decreased from [ ████ ] short tons in 2017 to [ ████ ]

short tons in 2018 and [ ████ ] short tons in 2019.[67]  The domestic industry's capacity

was higher in interim 2020 at [ ████ ] short tons than in interim 2019 at [ ████ ]

short tons.[68]  The domestic industry's production and U.S. shipments also decreased each full

year of the POI, and the domestic industry consequently had available excess capacity

throughout the POI.[69]

Subject imports accounted for the second largest source of supply to the U.S. market.

Their share of apparent U.S. consumption rose from [ ██ ] percent in 2017 to [ ██ ] percent

---

[63] CR/PR at III-3 and Table III-3.  [ ████ ] production capacity increased by [ ████ ] short tons, from [ ████ ] short tons in 2017 to [ ████ ] short tons in 2018, due to [ ████████ ].  CR/PR at III-5 n.18.

[64] CR/PR at Table III-3.

[65] CR/PR at III-3.

[66] CR/PR at Table III-3.

[67] CR/PR at Table III-3.

[68] CR/PR at Tables III-4, C-1.

[69] The domestic industry's capacity utilization rate was [ ██ ] percent in 2017, [ ██ ] percent in 2018, and [ ██ ] percent in 2019; it was lower in interim 2020, at [ ██ ] percent, than in interim 2019, at [ ██ ] percent.  CR/PR at Tables III-5, C-1.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

in 2018 and [ ▮ ] percent in 2019, an increase of [ ▮ ] percentage points over the POI.[70]

Subject imports' share of apparent U.S. consumption was [ ▮ ] percent in interim 2019 and

[ ▮ ] percent in interim 2020.[71]

    Nonsubject imports were the smallest source of supply to the U.S. phosphate fertilizer

market.  Their share of apparent U.S. consumption increased from [ ▮ ] percent in 2017 to

[ ▮ ] percent in 2018, before declining to [ ▮ ] percent in 2019.[72]  Nonsubject imports' share

of apparent U.S. consumption was [ ▮ ] percent in interim 2019 and [ ▮ ] percent in interim

2020.[73]  According to questionnaire data, the largest nonsubject source of phosphate fertilizers

to the U.S. market in 2019 was Saudi Arabia, which accounted for [ ▮ ] percent of total

phosphate fertilizer imports.[74]

    As we discussed in our Original Views and First Remand Views, [ ▮▮▮▮ ] U.S.

producers, five of ten importers, and 16 of 28 purchasers reported experiencing supply

constraints during the POI.[75]  However, the parties disagree on the extent of any supply

shortages.  Respondents generally argued that the shuttering of Mosaic's Plant City facility in

2017 and Nutrien's announcement and subsequent closure of its Redwater, Canada facility in

---

[70] CR/PR at Tables IV-8, C-1.

[71] CR/PR at Tables IV-8, C-1.

[72] CR/PR at Tables IV-8, C-1.

[73] CR/PR at Tables IV-8, C-1.

[74] CR/PR at IV-2, Table IV-2.  Nonsubject imports from Saudi Arabia increased from [ ▮▮▮ ] short tons in 2017 to [ ▮▮▮ ] short tons in 2018 and [ ▮▮▮ ] short tons in 2019; they were [ ▮▮▮ ] short tons in interim 2019 and [ ▮▮▮ ] short tons in interim 2020.  In 2014, Mosaic acquired a 25 percent equity interest in Ma'aden Wa'ad Al Shamal Phosphate Company ("MWSPC"), a joint venture that began to produce phosphate fertilizers in Saudi Arabia in 2017.  MWSPC currently has an annual capacity of 3.3 million short tons.  CR/PR at VII-21; Mosaic Prehearing Br. at Exhibit 7 p.3.

[75] Original Views at 25-27 and First Remand Views at 14, citing CR/PR at II-8 – II-9.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

2019 left a "gaping hole in supply," and that imports were "pulled into" the market as a result.[76]

Ten purchasers reported experiencing delays, shortages, and/or allocations from Mosaic, and

[ ▮ ] elaborated that Mosaic has refused to supply the firm [ ▮▮▮▮ ] and that this

caused delays in its ability to supply its customers.[77]  U.S. producer [ ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ],[78] while Mosaic acknowledged that after

its decision to idle its Plant City facility in December 2017, it reduced its phosphate sales volume

targets with certain larger customers – specifically, with CHS by 200,000 tons and with Gavilon

by 100,000 tons relative to the prior year.[79]  Mosaic reported that [ ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ].[80]

In the First Remand Views,[81] we clarified that to the extent that we referenced any

"supply gap" in our Original Views,[82] we did so in the context of discussing party argument

regarding respondents' assertions that subject imports were "pulled" into the U.S. market to fill

an alleged domestic industry supply gap.  As detailed below, we continue to find that the record

does not support respondents' assertions that the imports were "pulled into" the U.S. market

to fill a "gaping hole in supply" of 1.1 million short tons that was filled by the over 1 million

---

[76] *See e.g.*, OCP Posthearing Brief at 2-8 and Responses to Questions pp. 7-26, 29-32, and 74-82;
PhosAgro Posthearing Brief at 3; Koch's Posthearing Brief at 14; IRM Posthearing Brief at 4-7, and 9-11.
[77] CR/PR at II-8-9.
[78] CR/PR at II-8.
[79] Mosaic Posthearing Br. at Responses to Questions p. 83.
[80] Mosaic U.S. Producer Questionnaire Response at IV-16.
[81] First Remand Views at 15.
[82] Original Views at 26-27.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

short ton increase in subject imports in 2018.[83]

As we noted in our Original Views and First Remand Views,[84] Mosaic asserted that idling the Plant City facility resulted in approximately 700,000 short tons of reduced supply to the U.S. market between 2017 and 2018.[85]  We continue to find Mosaic's estimate to be credible and consistent with other record evidence.[86]  We also note that, notwithstanding this estimate, the record shows that Mosaic's U.S. shipments only decreased from 2017 to 2018 by [ ▮ ] short tons.[87]  The volume of cumulated subject imports, however, increased by a greater amount – more than one million short tons – during this time, and importers' U.S. shipments of

---

[83] *See e.g.*, OCP Posthearing Brief at 2-8 and Responses to Questions pp. 7-26, 29-32, and 74-82; PhosAgro Posthearing Brief at 3; Koch's Posthearing Brief at 14; IRM Posthearing Brief at 4-7, and 9-11.

[84] Original Views at 26-27; First Remand Views at 15-17.

[85] Hearing Tr. at 39 (McLellan) ("Plant City…produced about 1.4 million short tons when it was idled in 2017.  We sold about 700,000 short tons of that production into the U.S. market.").

[86] Original Views at 26, CR/PR at III-11, Mosaic Revised Domestic Producer Questionnaire at II-7. Specifically, a representative from Mosaic testified that Plant City produced about 1.4 million short tons at the time it was idled in 2017.  Mosaic exported [ ▮ ] percent of its total shipments in 2017, with U.S. shipments accounting for [ ▮ ] percent of total shipments that year, which would be consistent with the estimate that the idling of Plant City reduced domestic supply by only 700,000 short tons rather than the full 1.4 million short tons produced at the Plant City facility.  CR/PR at III-11 n.26.  In contrast, export shipments accounted for a [ ▮ ] during 2017-2019 and in both interim periods, accounting for no more than [ ▮ ] percent in any period.  *Id.*

[87] Mosaic Revised Domestic Producer Questionnaire at II-7.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

subject imports increased by 604,000 short tons.[88] [89]  We therefore find that the volume of

cumulated subject imports far exceeded either the Mosaic's reasonable estimate of its reduced

supply or the amount by which it actually reduced its U.S. shipments, following the idling of its

Plant City facility.[90]  As such, we find respondents' argument that cumulated subject imports

---

[88] Subject imports increased from 1,971,222 short tons in 2017 to 2,978,803 short tons in 2018. CR/PR at Table IV-2.  Mosaic indicated that when it idled Plant City, it anticipated that "there would be some new imports coming in to satisfy the short-term need" because it "takes time for us to adjust." However, it further stated that "{w}e shipped into the U.S. market from Plant City approximately 700,000 short tons.  What came in was a million short tons of imports.").  Mosaic Posthearing Br. at 2-3, 13, Responses to Questions pp. 19-20; Hearing Tr. at 111 (McLellan), 127-28 (O'Rourke).  Mosaic added that following a reduction in subject imports resulting from filing of the CVD petition, some [ ███████

█████████████████████████████████████████████████████████

██████████████ ].  CR/PR at II-8-9.  As evidence that subject imports exceeded the decrease in volume to the U.S. market from Plant City, although apparent U.S. consumption was [ ███████████ ] short tons ([ ███ ] percent) lower in 2019 than in 2017, the volume of cumulated subject imports was 725 thousand short tons higher and importers' U.S. shipments of subject imports were 735 thousand short tons higher in 2019 than in 2017.  CR/PR at Tables IV-2, C-1.

[89] Moreover, from 2017 to 2018, while Mosaic's U.S. shipments declined by [ ████████ ] short tons, U.S. shipments of total imports (subject and nonsubject imports) increased by 967,904 short tons, with cumulated subject imports accounting for 604,981 short tons (62.5 percent of the increase in shipments of total imports). CR/PR at Table C-1.  Thus, the decrease in Mosaic's supply was offset by increased nonsubject imports as well as the larger increase in subject imports, in addition to the increased production from [ ██████ ].  CR/PR at Table III-4.  From 2018 to 2019, when demand decreased, U.S. shipments of nonsubject imports decreased by 65,262 short tons while U.S. shipments of subject imports increased by 148,957 short tons.  CR/PR at Table C-1.  Importers' U.S. shipments of total imports increased by 1.05 million short tons from 2017 to 2019, with subject imports accounting for 71.7 percent of the increase. CR/PR at Table IV-7.  In terms of import volumes (rather than importers' U.S. shipments of imports) total imports increased by 1.4 million short tons from 2017 to 2018, with cumulated subject imports accounting for 1.0 million short tons (70.1 percent) of the increase in total import volume.  CR/PR at Table IV-2.  Between 2018 and 2019, the volume of cumulated subject imports was higher 725,044 short tons higher in 2019 than in 2017 and total imports were 1.05 million short tons higher, with subject imports accounting for 68.9 percent of the increase in total import volume.  CR/PR at Table IV-7.

[90] We also observe that, as discussed below, combining U.S. importers' December 2018 end-of-period inventories of [ █████████ ] short tons with the volume of imports in January 2019 of 720,728 short tons totals approximately [ ████████ ] short tons, which exceeds even the 1.1 million short ton "supply gap" alleged by respondents in the month of January alone.  CR/PR at Tables IV-6, D-1.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

were merely "pulled into" the market as a result to be unavailing.[91]

In the First Remand Views, we likewise found unavailing respondents' argument that Nutrien's closure of its Redwater facility in Canada in May 2019 contributed to a reduction in the supply of fertilizers in the United States.[92]  As the Commission explained in its Original Views, at the time that the closure was announced, Nutrien's CEO stated that it would increase production at its U.S. facilities to offset the reduction in supply from its Canadian facility and ensure a continued supply of phosphate fertilizers to customers in Canada.[93]  Nutrien did, in fact, increase production as well as capacity in the United States.[94]  Specifically, between 2018 and 2019, Nutrien increased its U.S. production by [     ] short tons, which was more than sufficient to cover its [     ] short ton increase in exports during that time, and Nutrien reported [     ] short tons in unused capacity in 2019.[95]

As the Commission also noted in its Original Views, the domestic industry had available excess capacity throughout the POI.[96]  In 2018, Nutrien and Simplot alone had a combined [     ] short tons of excess capacity, which was more than sufficient to cover either Mosaic's estimated 700,000 short ton reduction in supply or its actual reduction of U.S.

---

[91] We observe that U.S. importers' end-of-period inventories of subject imports increased from [     ] short tons in 2017, which was equivalent to [     ] percent of their U.S. shipments of subject imports, to [     ] short tons in 2018 (equivalent to [     ] percent of their U.S. shipments of subject imports) and were [     ] short tons in 2019 (equivalent to [     ] percent of their U.S. shipments.  CR/PR at Table VII-11.

[92] First Remand Views at 17, discussing, *e.g.*, OCP Posthearing Brief at 2-8 and Responses to Questions pp. 7-26, 29-32, and 74-82; PhosAgro Posthearing Brief at 3; Koch's Posthearing Brief at 14; IRM Posthearing Brief at 4-7, and 9-11.

[93] Original Views at 24, 54; CR/PR at III-3.

[94] Original Views at 24, 54; CR/PR at Table III-4.

[95] CR/PR at Table III-4; PCS/Nutrien Domestic Producer Questionnaire at II-7.

[96] Original Views at 24.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

shipments in the amount of [      ] short tons from 2017 to 2018.[97]  Likewise, Nutrien and

Simplot had a combined excess capacity of [      ] short tons in 2019, which more than

would have covered the reduction in supply due to the idling of Mosaic's Plant City facility as

well as the [      ] short ton increase in Nutrien's exports during that time.[98]  Moreover, the

domestic industry maintained substantial and increasing inventories throughout the POI.[99]

      Thus, as in the First Remand Views,[100] we do not find that the record indicates that there

was a domestic industry supply gap and, to the extent that there was a reduction in supply

related to Mosaic's idling of its Plant City facility, the increase in volume of cumulated subject

imports eclipsed any such reduction, as further discussed below.

      Similarly, we respectfully disagree with the court's conclusion in the Second Remand

Order that "{q}uestionnaire responses suggest that domestic producers were unable to relocate

their phosphate fertilizer inventories to meet new market demand; and reports from

phosphate fertilizer trading companies indicate that the largest domestic producer — Mosaic —

refused to sell to these companies," purportedly resulting in "a supply gap."[101]  As discussed

below, in assessing the evidence in the record we disagree with the court's view that the

questionnaire responses indicate an inability to relocate inventories.  More importantly,

however, as discussed throughout these and our prior Views, the ability to relocate inventories

---

[97] CR/PR at Table III-4; Mosaic Revised Domestic Producer Questionnaire at II-7; Hearing Tr. at 39 (McLellan).

[98] CR/PR at Table III-4.

[99] The domestic industry's ending inventory quantities were [      ] short tons in 2017 and [      ] short tons in 2018 and 2019; they were [      ] short tons in interim 2019 and [      ] short tons in interim 2020.  CR/PR at Table C-1.

[100] First Remand Views at 18.

[101] Second Remand Order at 48.

24

*Public Version*

was only one factor, along with excess capacity, substantial inventories, extensive inventory locations, and expansive multi-modal distribution network, that we relied upon to find that fertilizer was not practically unavailable from U.S. sources in 2019, as directed by the court's first remand. Accordingly, we respectfully disagree with the court's conclusion that there was a "supply gap" related to an alleged inability of domestic producers to relocate inventories. We likewise disagree that the record in these investigations indicates that there was "supply gap" related to Mosaic's alleged refusal to sell to trading companies, which we address in detail below in our discussion of impact.

### 3. Substitutability and Other Conditions

We continue to find that there is a high degree of substitutability between the domestic like product and phosphate fertilizers from subject sources that are of the same chemical formulations,[102] and that phosphate fertilizers with different chemical formulations are broadly interchangeable, particularly when used in blends.[103] As we previously observed, the record shows the vast majority of the domestic industry's U.S. shipments and U.S. importers' U.S. shipments of subject imports were of the same types of phosphate fertilizers – specifically, MAP and DAP.[104] Moreover, all three responding U.S. producers and most purchasers (17 of 25 firms) reported that the domestic like product and phosphate fertilizers from Morocco and Russia were always interchangeable; most U.S. importers (8 of 10 firms regarding Morocco and 8 of 9 firms regarding Russia) reported that the domestic like product and phosphate fertilizers

---

[102] CR/PR at II-17.
[103] CR/PR at I-8-10; Mosaic Prehearing Br. at 30-31; Hearing Tr. at 32-33 (Jung).
[104] CR/PR at Table IV-4.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

from each subject country were always or frequently interchangeable.[105]  The vast majority of responding purchasers also indicated that both domestically produced and subject imports always or usually met minimum quality specifications,[106] and only one of 27 responding purchasers reported that a domestic or foreign supplier had failed in its attempt to qualify phosphate fertilizers or had lost its approved status since 2017.[107]

As discussed in the Original Views and First Remand Views,[108] price, along with availability and quality, are important considerations in purchasing decisions.  When asked to report the top three factors considered in their purchasing decisions, U.S. purchasers most often cited price (23 firms) and availability and quality (17 firms each) as their top three factors. Purchasers most frequently cited price (11 firms) as their first-most important factor, followed by availability (9 firms),[109] and the majority of purchasers (17 of 28 firms) reported that they usually purchased the lowest-priced product.[110]  When asked to rate the importance of 16 factors in their purchasing decisions, U.S. purchasers most frequently cited availability and quality meets industry standards (27 firms each), followed by price and reliability of supply (26 firms).[111]  Pluralities of U.S. producers, importers, and purchasers reported that differences other than price between the domestic like product and subject imports from Morocco were

---

[105] CR/PR at Table II-10.

[106] CR/PR at Table II-11.

[107] CR/PR at II-20.  Specifically, [ ███ ] reported that it "typically do{es} not handle Moroccan or [ ████████████ ] fertilizer because it does not meet {its} product specifications in available Sulfur, and water solubility."  It also added that "[ ████████████████████████████████████████████ ]."  [ ███ ] U.S. Purchaser Questionnaire Response at III-20; CR/PR at II-20.

[108] Original Views at 29; First Remand Views at 19-20.

[109] CR/PR at Table II-6.

[110] CR/PR at II-19.

[111] CR/PR at Table II-7.

*Public Version*

sometimes significant and pluralities of U.S. importers and purchasers also reported that differences other than price between the domestic like product and subject imports from Russia were sometimes significant, while two of three U.S. producers reported that they were never significant.[112]  In addition, majorities or pluralities of purchasers reported that the domestic like product and subject imports from each subject country were comparable on all factors (including price, availability, quality, and reliability of supply) except for one – U.S. distribution network – for which the majority of which reported that the U.S. product was superior.[113]

As also discussed in the Original Views and First Remand Views,[114] U.S. prices of phosphate fertilizers are highly transparent.  Phosphate fertilizer prices are reported in trade publications such as Argus Phosphates ("Argus"), CRU Phosphate Fertilizer Market Outlook ("CRU"), and Green Markets.[115]  These trade publications gather market intelligence for sales transactions, including in the New Orleans, Louisiana ("NOLA") region and publish the collected range of prices on a daily or weekly basis.[116]  This price information is then quickly transmitted throughout the U.S. market.[117]  [ ▮ ] of three U.S. producers ([ ▮▮▮▮▮▮▮ ]), two of

---

[112] CR/PR at Table II-12.

[113] CR/PR at Table II-9.  Twenty of 24 responding purchasers reported that domestically manufactured phosphate fertilizers and subject imports from Morocco were comparable on price, as did 20 of 23 responding purchasers with respect to subject imports from Russia.  No purchaser reported that the U.S. product was superior on price (*i.e.*, lower priced) to subject imports from Morocco or Russia.  Sixteen of 24 responding purchasers reported that the U.S. product was superior or comparable on availability and reliability of supply to subject imports from Morocco, as did 20 of 23 responding purchasers with respect to subject imports from Russia.  *Id.*

[114] Original Views at 30; First Remand Views at 20-21.

[115] CR/PR at V-5-6; Mosaic Prehearing Br. at 29; OCP Posthearing Br. at 6; Koch Prehearing Br. at 2; Koch Posthearing Br. at 1; Hearing Tr. at 195-196 (McGinn).

[116] CR/PR at V-5; Hearing Tr. at 147 (O'Rourke).  Two of three U.S. producers, six of ten importers, and 12 of 27 purchasers reported their own prices to trade publications.  CR/PR at V-6.

[117] Simplot Posthearing Br. at Responses to Questions pp. 60-61.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

nine U.S. importers ([█████████]), and 16 of 28 purchasers reported that they refer to and use prices published in trade publications when negotiating prices.[118]  Additionally, most purchasers reported contacting up to four, five, or six suppliers before making a purchase.[119]

As noted above and in our previous Views, both domestically produced and imported phosphate fertilizers are primarily sold from inventories.[120]  U.S. producers reported that [████] percent of their commercial shipments in 2019 came from inventory, with lead times averaging [██] days, and importers reported that [███] percent of their commercial shipments in 2019 came from inventory, with lead times averaging [██] days.[121]  The [████ ████] of U.S. producers' U.S. commercial shipments and [█████] half of U.S. importers' U.S. commercial shipments were made on a spot sale basis in 2019.[122]

During the POI, phosphate fertilizers from all sources were shipped through the same channels of distribution (mainly to retailers, followed by distributors)[123] primarily by either barge, rail, or truck.[124]  Specifically, U.S. importers reported that 61.6 percent of their 2019 sales

---

[118] Purchasers reported using Green Markets (9 firms); Profercy (6 firms); Argus and Fertecon (3 firms); ICIS (2 firms); and CRU, FIS Index, and FMB (1 firm each).  Several reported using NOLA barge or NOLA f.o.b. prices, but did not specify a particular publication.  CR/PR at V-6.

[119] CR/PR at V-8.  Two purchasers reported contacting 1 to 2 suppliers before making a purchase, three reported contacting up to 3, five contact up to 4, nine contact up to 5, four contact up to 6, two contact up to 7, and one firm each reported contacting up to 8, 10, and 15 firms.  *Id.*

[120] CR/PR at II-17.

[121] CR/PR at II-17.  Importers also reported that [██] percent of their commercial shipments in 2019 came from the foreign manufacturers' inventories, with lead times averaging [██] days, and [██] percent were produced-to-order, with lead times averaging [███] days.

[122] CR/PR at Table V-3.  U.S. producers reported that [███] percent of their U.S. sales were made on a spot basis, [███] percent on a short-term contract basis, and [██] percent on a long-term contract basis.  U.S. importers reported that [███] percent of their U.S. sales were made on a spot basis, [███] percent on a short-term contract basis, and [███] percent on an annual contract basis. *See id.*  Furthermore, more than half of the responding purchasers (15 of 29 firms) reported that they purchase phosphate fertilizers on a daily or weekly basis.  CR/PR at V-7.

[123] CR/PR at Table II-1.

[124] CR/PR at V-4.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

of subject fertilizers were shipped by barge, 10.8 percent by rail, and 27.7 percent by truck.[125]

U.S. producers reported that 12.4 percent of their U.S. shipments were by barge, 47.1 percent

by rail, 24.7 percent by truck, and 15.8 percent by another method (including by vessel or title

transfer).[126]  U.S. producers and importers responding to the questionnaires in the remand

proceedings reported using a variety of modes of transportation (including barge, rail, truck,

and intermodal) to ship phosphate fertilizer during the POI.[127]

As discussed above and in our previous Views, most U.S. purchasers reported that the

domestic like product's U.S. distribution network was superior to that of subject imports.[128]

Respondents stated that most imports of phosphate fertilizers from Morocco and Russia were

shipped to NOLA, loaded on barges, and transported up the Mississippi River and its

tributaries.[129]  Mosaic reported that like subject imports, it transloads product onto river barges

at NOLA that are moved up the Mississippi River to warehouse positions located on the inland

U.S. waterways.[130]  Mosaic explained that its U.S. distribution network is expansive, comprising

nearly [          ] with approximately [          ] short tons in storage capacity, which

allows it to reach customers located throughout the United States.  Specifically, its network

includes:  [

]

---

[125] CR/PR at V-4.
[126] CR/PR at V-4.
[127] *See* Remand Questionnaire Responses at 2(d).
[128] First Remand Views at 22; CR/PR at Table II-9.
[129] CR/PR at IV-11 n.16, V-4; Gavilon Prehearing Br. at 28-29; PhosAgro Prehearing Br. at 3; IRM Prehearing Br. at 14-15; Koch Posthearing Br. at 3-4.
[130] Mosaic Prehearing Br. at 32; Mosaic Posthearing Br. at Responses to Questions, pp. 91-93.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

███████████████████████████████████████████████

██████████████████████████████████████

████████ ].[131] In addition, Simplot, whose production facilities are located in Pocatello, Idaho and Rock Spring Wyoming, stated that it ships product to and has warehouses in the West and Midwest regions of the United States.[132]

As we explained in the First Remand Views, the additional questionnaire information gathered in those remand proceedings further demonstrated the breadth and superiority of U.S. producers' distribution networks.[133]  For example, Mosaic reiterated that [ ██████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████ ].[134]

Mosaic described that [ ███████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████ ].[135]  According to Mosaic, [ ██████

███████████████████████████████████████████████

---

[131] Mosaic Posthearing Br. at Responses to Questions pp. 91-93.
[132] CR/PR at Table III-1; Simplot Posthearing Br. at Responses to Question pp. 24-25, Exhibits 4, 20.  Simplot explains that it has supply chain operations and warehouses [ ████████████████████
████████ ] and that it has sold product not only to the West, but also Midwest, regions of the United States for years.  Simplot Posthearing Br. at Responses to Question pp. 24-25, Exhibits 4, 20.
[133] First Remand Views at 23-24.
[134] Mosaic Domestic Producer Remand Questionnaire at 2(a) – 2(d).
[135] Mosaic Domestic Producer Remand Questionnaire at 2(a).

30

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

██████████████████████████████████████████████████████

████████ ].[136]  For example, Mosaic reported that [ ██████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████ ].[137]

Simplot reported that [ i███████████████████████████████████████████

██████████████████████████████████████████████████

████████████ ].[138]  Simplot also stated  that [ ███████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

████████ ].[139]  Simplot further reported that [ ██████████████████████████

██████████████████████████████████████████████████████

████████████████████████████ ].[140]  In addition, PCS Phosphate Company, Inc. (Nutrien)

reported that [ ██████████████████████████████████ ].[141]  PCS (Nutrien)

reported that [ ████████████████████████████████████████████████████

██████████████████████████████████████████████ ].[142]

---

[136] Mosaic Domestic Producer Remand Questionnaire at 2(a) – 2(c).
[137] Mosaic Domestic Producer Remand Questionnaire at 2(c).
[138] Simplot Domestic Producer Remand Questionnaire at 2(a) – 2(c).
[139] Simplot Domestic Producer Remand Questionnaire at 2(a).
[140] Simplot Domestic Producer Remand Questionnaire at 2(b)-2(c).  Simplot further explains that
[ ███████████████████████████████████████████████████████████
████████████████████████████████ ].  *Id.* at 2(c).
[141] PCS (Nutrien) Domestic Producer Remand Questionnaire at 2(a).
[142] PCS (Nutrien) Domestic Producer Remand Questionnaire at 2(b).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

Importers, on the other hand, reported less extensive inventory networks,[143] and less movement of inventories, although one importer did report relocating [ ▮▮▮ ] short tons of product in 2019 due to [ ▮▮▮▮▮▮▮ ].[144]  The remaining importers reported that their distribution networks were "unidirectional" and that once delivered to an inventory or customer location, product was not subsequently relocated but rather remained at that location.[145]  OCP also claimed that, unlike [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ], importers do not retain title to product that is delivered to its intended destination, meaning that [ ▮▮▮▮▮▮▮▮▮ ].[146]  Thus, we found in the First Remand Views and continue to find that the record shows that domestic producers possess superior distribution capabilities compared to importers of subject merchandise.  Further, the record shows that domestic producers reported moving appreciable quantities of inventory between inventory locations and that importers did not do so for subject imports.[147]

---

[143] *See, e.g.*, EuroChem Importer Remand Questionnaire at 2(a) (reporting [ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ]; Koch Importer Remand Questionnaire at 2(a) (reporting [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ]; Macrosource (formally Gavilon) Importer Remand Questionnaire at 2(a) (reporting [ ▮▮▮▮▮▮▮▮▮▮▮▮▮ ]; ADM Importer Remand Questionnaire at 2(a) (reporting [ ▮▮▮▮▮▮▮▮▮▮ ]; ADM Importer Remand Questionnaire at 2(a) (reporting [ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ]. [ ▮▮▮ ] did not report any inventories of subject imports during the POI and importers [ ▮▮▮ ] did not specify the locations of any inventories that they maintained during the POI.  *See* Importer Remand Questionnaires of [ ▮▮▮▮▮▮▮ ].

[144] [ ▮▮ ] Importer Remand Questionnaire at 2(b).

[145] *See* Importer Remand Questionnaires of [ ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ ].

[146] OCP Comments at 11.

[147] *See* Remand Questionnaires at 2(b).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

In the Second Remand Order, the court held that {i}f the Commission wishes to continue finding that domestic inventory reshipment was part of the conditions of competition in the phosphate fertilizer industry, it must use record evidence to explain why — despite low volumes of inventory reshipment — domestic producers nonetheless had the capability to place their large inventories back into supply in the domestic phosphate fertilizer market.[148]

As a factual matter, we respectfully disagree that "there were low volumes of inventory reshipment." Nor, as a factual matter, do we agree that reshipment was a "rare practice" that was "commercially insignificant."[149] As explained above, in the First Remand Views we discussed [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ] as only one example of reshipment capability. The record shows, however, that Mosaic's reshipment of inventories was not limited to only this type of [ ▮▮▮▮▮▮▮▮ ]. For example, Mosaic also described other [ ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ].[150] The court's conclusions in the Second Remand Views, and its comparison of "the volume of reported reshipped inventory with domestic producers' overall shipment volume," appears to stem from reliance not on the totality of the evidence, but on the example that we discussed in our First Remand Views regarding [ ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ ]. Looking at the record as a whole, on the other hand, we note that the total reshipment quantities with the additional quantities from Mosaic's other [ ▮▮▮ ] transfers equates to approximately [ ▮▮ ] percent of the domestic industry's total U.S.

---

[148] Second Remand Order at 27.
[149] Second Remand Order at 24-25.
[150] Mosaic Domestic Producer Remand Questionnaire at 2(b) – (c).

*Public Version*

shipments during the POI,[151] which we respectfully disagree is "commercially insignificant."

Further, we consider a comparison of the volume of inventories relocated to the total

volume of inventories to be more probative as to whether such relocation is a regular or rare

occurrence. The domestic industry's total inventory reshipments during the POI were

equivalent to approximately [ ███ ] percent of the industry's total end-of-year inventories

during the period,[152] indicating that the movement of such inventories is a regular business

practice and not a rare occurrence or just a theoretical possibility. Likewise, the record as a

whole, in our assessment, demonstrates that domestic producers did not lack reshipment

capability. We also reiterate that the domestic industry's reshipment of inventories was only

one of several factors that the Commission relied on to find that the domestic industry was

well-positioned to serve the U.S. market in 2019 and, unlike importers, domestic producers did

not report that they were unable – technically or economically – to reship existing inventory.

Indeed, in its remand questionnaire response, Mosaic explained that it had [ ███████

████████████████████████████████████████████████████████████████

██████████ ].[153] Specifically, Mosaic reported:



---

[151] *Calculated from* Mosaic Domestic Producer Remand Questionnaire (adding its reported
[████████████████████████████████████████████████████████
███████████████████████████████████ ]); Simplot Domestic Producer
Remand Questionnaire (adding [ ███████████████████
██████████████████████████████████████ ]), CR/PR at Table C-1 (total U.S.
shipments).
[152] *Calculated from* Mosaic Domestic Producer Remand Questionnaire (adding its reported
[████████████████████████████████████████████████████████
███████████████████████████████████ ]); Simplot Domestic Producer
Remand Questionnaire (adding [ ███████████████████
██████████████████████████████████████ ]), CR/PR at Table C-1 (total U.S.
end-of-period inventories).
[153] Mosaic Remand Domestic Producer Questionnaire at 2(c).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*



]154

This shows how, unlike importers, the domestic industry was able to use alternate

shipping methods to reach customers and to draw upon its extensive distribution network,

which was confirmed by purchasers to be superior compared to that of subject importers.[155]

The court seemingly did not appreciate the relevance of this evidence, indicating that "tons in

transit" are tons that are not yet in inventory.[156]  However, as discussed above, our original

finding related to the possibility of importers drawing from building inventories or product on

barges.

We next turn to the court's direction to explain how if importers did not move

"substantial quantities of inventory between locations," why the same is not true for domestic

producers "that similarly reported limited instances of inventory reshipment."[157]  As discussed

above, unlike importers, domestic producers did not report that they were unable to serve the

U.S. market from existing inventories.  Moreover, the evidence shows that the domestic

industry had excess capacity, substantial inventories, a demonstrated ability to move

---

[154] Mosaic Remand Domestic Producer Questionnaire at 2(c).
[155] CR/PR at Table II-9.
[156] Second Remand Order at 26.
[157] Second Remand Order at 25.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

appreciable quantities of product between downstream inventory locations, and superior

distribution networks, which enabled them to employ alternative means to ship products that

were unable to be moved via barge.  Importers, by contrast, reported less extensive inventory

networks and less movement of inventories.[158]  Only one importer reported relocating [ ███ ]

short tons of product in 2019 due to [ ████████ ],[159] equivalent to only [ ██ ]

percent of total subject import end-of-year inventories during the POI.[160]  The remaining

importers reported that their distribution networks were "unidirectional," such that once

delivered to an inventory or customer location, subject merchandise was not subsequently

relocated but rather remained at that location.[161]  Indeed, OCP specifically noted that [ ████

████████████████████████████████████████

███ ], while importers do not retain title to product that is delivered to its intended

destination, meaning that [ ██████████████████████████

████████████████ ].[162]  Accordingly, the record shows that, while importers

reported stranded inventories and did not move substantial quantities of inventory between

---

[158] *See, e.g.*, EuroChem Importer Remand Questionnaire at 2(a) (reporting [ ███████ ███████████████████████ ]; Koch Importer Remand Questionnaire at 2(a) (reporting [ ████████████████ ]; Macrosource (formally Gavilon) Importer Remand Questionnaire at 2(a) (reporting [ ████████████ ]; ADM Importer Remand Questionnaire at 2(a) (reporting [ ████████████ ]; ADM Importer Remand Questionnaire at 2(a) (reporting [ ████████ ███████████████████████████ ]. [ ████ ] did not report any inventories of subject imports during the POI and importers [ ███████ ] did not specify the locations of any inventories that they maintained during the POI.  *See* Importer Remand Questionnaires of [ ████████████ ].

[159] [ ████ ] Importer Remand Questionnaire at 2(b).

[160] Calculated from [ ████ ] Importer Remand Questionnaire at 2(b); CR/PR at Table C-1.

[161] *See* Importer Remand Questionnaires of [ ████████████████ ].

[162] OCP First Remand Comments at 11.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

locations, the same is not true for the domestic industry.

As we further found in the Original Views and First Remand Views, in addition to possessing an extensive distribution network, the domestic industry is vertically integrated with respect to the main raw material inputs used to produce phosphate fertilizers – sulfur, ammonia, and phosphate rock.[163] [ ████████████ ] produce sulfur and mine and beneficiate phosphate rock, although these raw materials are sometimes purchased.[164] Moreover, [ ███████████████ ] and Mosaic produces and purchases ammonia.[165] During the period of investigation, prices of phosphate rock reported in CRU were relatively stable, while prices of ammonia fluctuated widely from January 2017 to January 2020, stabilized, then decreased between April and July 2020.[166] Prices for sulfur increased from January 2017 to the end of 2018, decreased through January 2020, stabilized, then increased and remained stable through July 2020.[167] Consistent with this, [ ███████████ ] and five of nine importers reported that raw material costs fluctuated with no clear trend over the POI.[168] Domestic producers' raw material costs as a share of cost of goods sold ("COGS") increased by [ ██ ] percentage points from [ ███ ] percent in 2017 to [ ███ ] percent 2019 and

---

[163] Original Views at 31-33 and First Remand Views at 26, citing CR/PR at V-1.  U.S. producers reported that sulfur comprised approximately [ ███ ] percent of their total raw material costs in 2019, ammonia [ ███ ] percent, phosphate rock [ ███ ] percent, and other raw material inputs [ ██ ] percent. *See id.*
[164] CR/PR at V-1.  [ ████ ] reported purchasing sulfur, and respondent OCP stated that [ ████████████████████████████████████ ].  CR/PR at V-1; OCP Prehearing Br. at 14-15.
[165] CR/PR at V-1.  Mosaic stated that it produces one-third of its ammonia, purchases another third on the open market, and acquires a third through a long-term contract with CF Industries.  Mosaic Posthearing Br. at Responses to Questions p. 95.
[166] CR/PR at Figure V-1.
[167] CR/PR at Figure V-1.
[168] CR/PR at Table V-1.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

was [ ▮ ] percent in interim 2020.[169]

## B.    Volume of Subject Imports

Section 771(7)(C)(i) of the Tariff Act provides that the "Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."[170]

As in the Original Views and First Remand Views, we continue to find that the volume of cumulated subject imports and the increase in that volume were significant in absolute terms and relative to apparent consumption in the United States during the POI.[171]  In this regard, we reiterate that the volume of cumulated subject imports increased from 2.0 million short tons in 2017 to 3.0 million short tons in 2018, before decreasing to 2.7 million short tons in 2019, for an overall increase of 36.8 percent between 2017 and 2019.[172]  Cumulated subject imports were lower in interim 2020 at 1.2 million short tons than in interim 2019, at 2.0 million short tons.[173]

---

[169] CR/PR at V-1.

[170] 19 U.S.C. § 1677(7)(C)(i).

[171] Original Views at 33-35; First Remand Views at 27-29.

[172] CR/PR at IV-3, Table IV-2.

[173] CR/PR at Table IV-2.  As previously discussed, the parties acknowledge that the filing of the petitions at the end of June 2020 resulted in a large decrease of subject imports to the U.S. market. Mosaic Prehearing Br. at 43-44, 91; Simplot Prehearing Br. at 29-30, 34; Simplot Posthearing Br. at Responses to Questions pp. 53-54; Mosaic Posthearing Br. at Responses to Questions pp. 69-70; OCP Posthearing Br. at 12, Responses to Questions p. 33, 67-73; EuroChem Posthearing Br. at 11; IRM Posthearing Br. at 8-9; PhosAgro Posthearing Br. at 12-13, Responses to Questions.  Some U.S. importers indicated that they stopped bringing in subject imports "because the buyers and the sellers agreed that the risk of 75 percent countervailing duties was higher than either of them wanted to take."  Hearing Tr. at 337 (Aranoff); *see also* EuroChem Posthearing Br. at 11 (stating that as a result of the filing of the petitions, it shifted its purchases of phosphate fertilizers from Morocco and Russia to other global sources); [ ▮ ] U.S. Purchaser Questionnaire Response at III-11 (reporting that Koch and IRM will not quote or import material until the countervailing duty decision is issued); [ ▮ ] U.S. Purchaser Questionnaire Response at III-11 (reporting that Helm, Koch, and OCP "cut off" supplying imported product to the U.S. market in the summer of 2020).  Monthly import data also confirm that subject import volume from Morocco and Russia showed notable declines after the petitions were filed at the end of June 2020, and subject import end-of-quarter inventories also declined.  CR/PR at Tables IV-6 and D-1.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

U.S. importers' U.S. shipments of subject imports increased from 1.8 million short tons in 2017 to 2.4 million short tons in 2018, and increased again to 2.5 million short tons in 2019.  U.S. shipments of subject imports declined between the interim periods, from 1.9 to 1.3 million short tons.[174]

Cumulated subject imports' market share also increased from 2017 to 2019.  U.S. shipments of subject imports increased from [ ▉ ] percent of apparent U.S. consumption in 2017 to [ ▉ ] percent in 2018.  Although the volume of cumulated imports of subject phosphate fertilizers decreased between 2018 and 2019, the volume of U.S. shipments of subject imports increased by 6.2 percent while apparent U.S. consumption declined by [ ▉ ] percent during the same period.[175]  Consequently, cumulated subject imports continued to gain market share, which increased from [ ▉ ] percent in 2018 to [ ▉ ] percent in 2019, for an overall [ ▉ ] percentage point increase in market share between 2017 and 2019 as the domestic industry lost [ ▉ ] percentage points of market share over the same period.[176] [177]

---

[174] CR/PR at Table C-1.  End-of-period inventories of subject imports held by U.S. importers [ ▉▉▉▉▉▉ ] percent between 2017 and 2018, from [ ▉▉▉ ] short tons to [ ▉▉▉ ] short tons, before a decline to [ ▉▉▉ ] short tons in 2019.

[175] CR/PR at Tables IV-2, IV-7-8, C-1.

[176] CR/PR at Tables IV-8, C-1.  The domestic industry's market share declined from [ ▉▉ ] percent in 2017 to [ ▉▉ ] percent in 2018 and [ ▉▉ ] percent in 2019.  *See id.*

[177] Subject imports decreased substantially after the filing of the petitions at the end of June 2020.  CR/PR at Table IV-6.  As a result, subject imports' market share was lower in interim 2020, at [ ▉▉ ] percent, than in interim 2019, at [ ▉▉ ] percent.  CR/PR at Tables IV-8, C-1.  At the same time, the domestic industry's U.S. shipments and market share increased.  Mosaic diverted shipments that had been destined for export markets and drew down inventories, for a total of [ ▉▉▉ ] short tons in additional sales in interim 2020 compared to interim 2019.  Mosaic Posthearing Br. at Responses to Questions p. 84; Mosaic U.S. Producer Questionnaire Response at IV-16.  [ ▉▉▉▉▉▉▉ ] also reported more U.S. shipments in interim 2020 than in interim 2019.  [ ▉▉▉ ] U.S. Producer Questionnaire Responses at II-7; [ ▉▉▉ ] U.S. Producer Questionnaire Responses at II-7.  Consequently, the domestic industry's market share was higher in interim 2020, at [ ▉▉ ] percent than in interim 2019 at [ ▉▉ ] percent.

*Public Version*

We therefore continue to find that the volume of cumulated subject imports and the increase in that volume were significant in absolute terms and relative to apparent consumption in the United States during the period of investigation.

We respectfully disagree with the court that the import data that the Commission relied upon is "inaccurate" or "artificially inflated."[178]  The Commission's questionnaires, for both the preliminary and final phases of the investigations, directed importers to report as "imports" only "{t}hose products identified for Customs purposes as imports for consumption."[179] Although the issue of reexports was raised during the preliminary phase, no respondent raised any objection to that question or suggested that the Commission collect data differently with respect to reexports in the final phase in any comments on the draft questionnaires. Accordingly, the Commission reasonably compiled the cumulated import data based on the volumes of imports reported by importers in their responses to Commission questionnaires.[180] Moreover, because importers reported these imports as entering the United States for the intended purpose of consumption, these data were an accurate representation of the volume of cumulated subject imports, even if such imports were at some later, unspecified point in time reexported to Canada.

In any event, the Commission, in fact, gathered information regarding importers' reported exports in its importer questionnaires.[181]  Even if we were to rely on the volume of

---

[178] Second Remand Order at 35-37.

[179] Importer Questionnaire, Definitions, EDIS Doc. Nos. 713651 (Preliminary), 727451 (Final).

[180] CR/PR at Table IV-2.

[181] Importers Questionnaire at II-5a, II-5b.  We note, however, that because these questions also included the carryover of inventories, product may have been exported in a later period than when it was imported.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

cumulated subject imports adjusted to deduct importers' reported exports, we would continue to find the volume of cumulated subject imports and the increase in that volume to be significant in absolute terms.  Based on these adjusted data, the volume of cumulated subject imports increased from 1.8 million short tons in 2017 to 2.9 million short tons in 2018, before decreasing to 2.4 million short tons in 2019, for an overall increase of 33.2 percent; the volume of cumulated subject imports was 1.0 million short tons in interim 2020 compared to 1.9 million short tons in interim 2019.[182]  Accordingly, even these adjusted data show cumulated subject import volumes and increases in volume that are comparable to those shown by the unadjusted data.[183]

---

[182] *Calculated from* Importers Questionnaire Responses at II-5a, II-5b.

[183] We therefore reject PhosAgro's arguments that the Commission's "disingenuous" finding of a more than one million ton increase in subject import volume must be "stricken" as based on inaccurate data.  PhosAgro Second Remand Comments at 2, 9.  Based on these adjusted data, the 1.1 million short ton increase in the volume of cumulated subject imports from 2017 to 2018 was more than all of the proffered alternative calculations of the amount that Mosaic reduced its supply to the U.S. market with the idling of Plant City, including PhosAgro's preferred one million ton figure as well as Mosaic's reasonable estimated 700,000 short ton reduction in supply.  Moreover, as discussed above, the domestic industry as a whole had excess capacity and substantial inventories throughout the POI.  We likewise reject PhosAgro's argument that the Commission's allegedly selective and inconsistent citations to subject import volume and subject import U.S. shipments was "unlawful cherry-picking," and that the Commission must consider that the approximately 600,000 short ton increase in U.S. shipments of cumulated subject imports, which it contends fell short of satisfying either the 1 million ton domestic supply gap that Mosaic contemporaneously announced in 2017 or the 700,000 short ton estimated domestic supply reduction with the idling of Plant City.  PhosAgro Second Remand Comments at 2, 9.  The Commission did not engage in "cherry-picking" by considering the total volume and U.S. shipments of cumulated subject imports as reported by the importers themselves.  To the contrary, the Commission complied with the statutory provision in considering both the volume of cumulated subject imports as well as U.S. shipments to measure U.S. consumption.  Moreover, irrespective of any imports that may have been re-exported, as discussed above, the data comparing U.S. shipments of imports to domestic producers' U.S. shipments of phosphate fertilizers also supports our volume analysis.  Thus, a comparison of U.S. shipments shows that while Mosaic reduced its U.S. shipments from 2017 to 2018, [     ] short tons, importers' U.S. shipments of subject imports increased by 604,981 short tons in 2018, and were 753,938 short tons higher in 2019 than in 2017.  CR/PR at Table C-1; Mosaic Revised Domestic Producer Questionnaire at II-7.

(*continued*...)

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

We next address the court's question as to whether the Commission's volume findings can be sustained based solely on the data regarding U.S. shipments.[184]  Although we did not rely solely on U.S. shipments, we note that the statute provides that the "Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms **or** relative to production **or** consumption in the United States, is significant."[185]  Accordingly, although we relied here both on the volume of cumulated subject imports in absolute terms as well as on U.S. shipment data--which are used to calculate apparent U.S. consumption--reliance solely on U.S. shipment data to consider the significance of the volume of cumulated subject imports relative to U.S. consumption would be permissible under the statute.

In the First Remand Views, as directed by the court, we added to our volume analysis an explanation of how our volume findings are consistent with our findings on conditions of

---

We likewise reject OCP's challenges to our volume analysis.  OCP Second Remand Comments at 12-15.  First, we note that in contending that the import data adjusted for reexports shows that the increase in the volume of cumulated subject imports was only 592,154 short tons, OCP is only comparing 2017 to 2019, overlooking the 1.1 million short ton increase that occurred from 2017 to 2018, as discussed above.  Next, we also do not find it appropriate to reduce the volume of subject imports by [          ] or [          ] total purchases, given that the record does not show that the domestic industry categorically refused to supply them but rather that Mosaic would not sell to them at their preferred prices, as discussed below in the Price Effects discussion.  We also reject OCP's contention that the increase in the volume of cumulated subject imports was [                    ] than the alleged reductions in supply by the domestic industry.  As we explained in the First Remand Views as well as above, we find that Mosaic's idling of Plant City in 2017 did not create a "supply gap."  To summarize what is set out above: the volume of cumulated imports exceeded Mosaic's reasonable estimate of the amount by which it reduced its supply to the U.S. market in 2017; the increase in subject import U.S. shipments also exceeded Mosaic's reduction in its U.S. shipments from 2017 to 2018; the domestic industry as a whole had excess capacity throughout the POI; and in 2019, Nutrien increased its capacity and production in the U.S., which covered its increased exports that year.

[184] Second Remand Order at 37-38.

[185] 19 U.S.C. § 1677(7)(C)(i) (emphasis added).

*Public Version*

competition in the U.S. phosphate fertilizer market.[186]  Nonetheless, we respectfully

maintained, and continue to maintain, that our original determinations were consistent with

our statutory mandate, and that, while the statute permits the Commission to look beyond the

quantitative volume data for purposes of its volume findings, the statute nowhere mandates

that the Commission perform such an analysis.

As we further explained in the First Remand Views, the court in its First Remand Order

appears to have misconstrued the statute on its face in stating that 19 U.S.C. § 1677(7)(C)(iii)

requires that the Commission "apply its findings regarding the conditions of competition to its

analysis of the three statutory factors: subject import volume, price effects, and impact on the

domestic industry."[187]  The specific clause cited by the court actually applies only to the

Commission's impact analysis.[188]  Section 1677(7)(C) is divided into four clauses:  (i) Volume; (ii)

Price; (iii) Impact on affected domestic industry; and (iv) Captive production.  The requirement

to consider the conditions of competition follows directly after, and specifically refers to the

impact clause (clause (iii)):  "The Commission shall evaluate all relevant economic factors

described **in this clause** within the context of the business cycle and conditions of competition

that are distinctive to the affected industry."[189]  Lest there be any doubt that each of the four

---

[186] First Remand Views at 30-33.

[187] Remand Order at 26 (citing *Altx, Inc. v. United States*, 26 CIT 709, 719 (2002); *Nucor Corp. v. United States*, 28 CIT 188, 207 (2004), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005); *Nippon Steel Corp. v. United States*, 25 CIT 1415, 1420 (2001); *Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1222 (2006)). We note that the finding in *Hynix Semiconductor* is consistent with what we view to be the plain language of the statute, as the issue in that case concerned the Commission's impact analysis.  *See* 30 CIT at 1220.  Likewise, in affirming the trial court in *Nucor*, the Federal Circuit held that "Section 1677(7)(C)(iii) in turn requires the Commission, in determining the *impact* of the subject imports on domestic producers, to 'evaluate all relevant economic factors which have a bearing on the state of the industry in the United States.'"  414 F.3d at 1336-37 (emphasis added).

[188] 19 U.S.C. § 1677(7)(C)(iii).

[189] *Id.* (emphasis added).

*Public Version*

roman numerals constitutes a "clause," this is made clear in the captive production clause

(clause (iv)), wherein the statute explicitly refers to elements of the impact analysis as falling

within "clause (iii)": "{T}he Commission, in determining market share and the factors affecting

financial performance set forth in **clause (iii)**, shall focus primarily on the merchant market for

the domestic like product."[190]  Thus, on its face, section 1677(7)(C)(iii) requires that the

Commission consider the relevant economic factors described in the impact clause, clause (iii),

within the context of business cycle and conditions of competition but does not impose such a

requirement with respect to its analysis of volume, clause (i), and price effects, clause (ii).[191] [192]

Although we complied with the court's remand instructions, we explained that this statutory

framework informs our analysis.

In the Second Remand Order, the court again contends that the Commission "must

consider the general 'conditions of competition' within the affected industry, 19 U.S.C. §

1677(7)(C)(iii) (flush language) and apply its 'conditions of competition findings to its analysis of

the three statutory factors" as well as claiming that "{t}he Tariff Act requires the Commission to

ground its material injury determination 'within the context of the business cycle and {the}

---

[190] 19 U.S.C. § 1677(7)(C)(iv) (emphasis added).

[191] We note that, although 19 U.S.C. § 1677(7)(C)(iii) is not applicable to the Commission's volume and price effects analyses, the statute does not preclude the Commission from considering conditions of competition or other relevant factors in its volume and price effects analyses, if the Commission finds it appropriate to do so, as it did here, for example, in considering the weather events and demand conditions in its price effects analysis.  *See* 19 U.S.C. § 1677(7)(B)(ii).

[192] The interrelationship between the conditions of competition requirement and the impact analysis is further supported by the reference in that paragraph to conditions "that are distinctive to the affected industry."  19 U.S.C. § 1677(7)(C)(iii).  Without question "the affected industry" refers to the domestic producers of the domestic like product, as reflected in the statute's definition of "industry." 19 U.S.C. § 1677(4).  In turn, clause (iii) of section 1677(7)(C) (Impact) requires an evaluation of "all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry" – an evaluation that is logically connected to the conditions of competition distinctive to that industry.

conditions of competition that are distinctive to the affected injury {sic.}.'"[193]  The court also

states that "{b}y requiring the Commission to consider the conditions of competition that shape

the domestic market, the Tariff Act 'prevents the {Commission} from attributing to subject

imports an injury whose cause lies elsewhere.'"[194]  We note as an initial matter that the case

upon which the court relies for this proposition, *Hynix Semiconductor,* confirms that the

statutory mandate to consider "conditions of competition" is in the context of the

Commission's impact analysis, in explaining that "the ITC's **impact** analysis 'shall evaluate all

relevant economic factors which have a bearing on the state of the industry in the United

States{.}'"[195]  In the Second Remand Order, the court continued "{b}y mandating consideration

of 'all relevant economic factors,' the statute prevents the ITC from attributing to subject

imports an injury whose cause lies elsewhere" further stating that "{t}he requirement to look to

'all relevant economic factors' is inextricably intertwined with the ITC's causation inquiry."[196]

We note that, as set forth in the legal standards sections of the Original Views, the assessment

of whether material injury to the domestic industry is "by reason of" subject imports "does not

require the Commission to address the causation issue in any particular way" as long as "the

---

[193] Second Remand Order at 4 (citing *Altx, Inc. v. United States*, 26 CIT 709, 719 (2002); *Nucor Corp. v. United States*, 28 CIT 188, 207 (2004), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005)).  As we explained in the First Remand Views, in affirming the trial court in *Nucor*, the Federal Circuit held that "Section 1677(7)(C)(iii) in turn requires the Commission, in determining the impact of the subject imports on domestic producers, to 'evaluate all relevant economic factors which have a bearing on the state of the industry in the United States.'"  First Remand Views at 29 (citing *Nucor*, 414 F.3d at 1336-37 (emphasis added)).  We further pointed out that, in *Altx,* the Federal Circuit ultimately held that the court should not "ask more of the Commission than required by the statute."  First Remand Views at 30 (citing *Altx, Inc. v. United States*, 370 F. 3d 1108, 1123 (Fed. Cir. 2004)).

[194] Second Remand Order at 4 (citing *Hynix Semiconductor, Inc. v. United States,* 30 CIT 1208, 1222 (2006)).

[195] *Hynix Semiconductor*, 30 CIT at 2222.

[196] *Hynix Semiconductor*, 30 CIT at 2222.

*Public Version*

injury to the domestic industry can reasonably be attributed to the subject imports" and the

Commission "ensure{s} that it is not attributing injury from other sources to the subject

imports."[197]  Thus, we continue to respectfully maintain that our original determinations are

consistent with our statutory mandate, and that, while the statute permits the Commission to

look beyond the quantitative volume data for purposes of its volume findings, the statute

nowhere mandates that the Commission perform such an analysis.  Moreover, consistent with

the cases cited in the Second Remand Order, we have considered issues regarding conditions of

competition, causation, and nonattribution in the impact section, including incorporating our

discussion from the First Remand Views regarding whether "fertilizer was 'practically

unavailable from U.S. sources' to supply high-demand regions in 2019 because doing so would

not have been economically viable."[198]

### C.    Price Effects of the Subject Imports

Section 771(7)(C)(ii) of the Tariff Act provides that, in evaluating the price effects of

subject imports, the Commission shall consider whether –

(I)    there has been significant price underselling by the imported merchandise
as compared with the price of domestic like products of the United States,
and

(II)    the effect of imports of such merchandise otherwise depresses prices to a
significant degree or prevents price increases, which otherwise would have
occurred, to a significant degree.[199]

As previously discussed, we continue to find that there is a high degree of

substitutability between subject imports and the domestic like product that are of the same

---

[197] Original Views at 17-20.
[198] First Remand Views at 31-33.
[199] 19 U.S.C. § 1677(7)(C)(ii).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

chemical formulation, and price is an important consideration in purchasing decisions, along with availability and quality.

As discussed in the Original Views,[200] the Commission in the final phase of these investigations collected monthly pricing data from U.S. producers and importers for the total quantity and f.o.b. value of two phosphate fertilizer products shipped in bulk (*i.e.*, barge-load) from NOLA to unrelated U.S. agricultural customers.[201] [202]  One U.S. producer ([ █████ ]) and seven importers provided usable pricing data, although not all firms reported pricing for both products for all months of the POI.[203]  Pricing data reported by these firms accounted for approximately [ ███ ] percent of U.S. producers' U.S. shipments, [ ███ ] percent of U.S. shipments of subject imports from Morocco, and [ ████ ] percent of U.S. shipments of subject imports from Russia in 2019.[204]

The pricing data show that cumulated subject imports undersold the domestic like

---

[200] Original Views at 35-39.

[201] CR/PR at V-9.  The two pricing products were:  (1) Standard-grade monoammonium phosphate (MAP), chemical formula $NH_4H_2PO_4$, granular, excluding high-purity MAP; and (2) Standard-grade diammonium phosphate (DAP), chemical formula $(NH_4)_2(HPO_4)$, granular.  *See id.*

[202] The record indicates that the "f.o.b. NOLA price" is a universal price benchmark denoting a loaded barge at a dock/fleeting point in New Orleans irrespective of where the product originated, and is used as a primary point of reference in price negotiations in the U.S. market.  Mosaic Posthearing Br. at Responses to Questions pp. 28-32; Simplot Posthearing Br. at Responses to Questions pp. 60-62; Hearing Tr. at 33-34 (Jung), 287 (Groden).  In their daily or weekly price listings, trade publications Argus and Green Markets include "f.o.b. from NOLA" or "NOLA Barge" phosphate fertilizer prices.  CR/PR at V-5 n.5.  Domestic producers, therefore, compete with subject imports upon the f.o.b. NOLA price in selling product, and Mosaic states that to compete against subject imports at NOLA from its plants in Florida, it has to absorb the $20 per short ton cross-Gulf freight costs.  Mosaic Posthearing Br. at Responses to Questions pp. 29-32; Simplot Posthearing Br. at Responses to Questions pp. 60-62.  Thus, "for a selling price of $300/ST fob NOLA to be competitive with subject imports, it would have to be priced at $280/ST fob Florida plant."  Mosaic Posthearing Br. at Responses to Questions p.30.

[203] CR/PR at V-9.  [ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████ ].  CR/PR at V-9 n.12.

[204] CR/PR at V-9.

*Public Version*

product in 34 of 170 instances (involving 381,132 short tons) at underselling margins ranging from 0.02 to 4.4 percent and an average underselling margin of 1.7 percent.  Subject imports oversold the domestic like product in the remaining 136 instances (involving 2.0 million short tons) at overselling margins between 0.02 and 17.6 percent with an average overselling margin of 3.7 percent.[205]

We observe that underselling and overselling margins were small and prices of the domestic like product and subject imports tracked each other closely over the POI.[206]  That subject imports and the domestic like product were similarly priced is consistent with the high degree of substitutability between the domestic like product and subject imports, as well as the price transparency that existed in the U.S. phosphate fertilizer market.[207]  Most purchasers reported that prices of the domestic like product were comparable to prices of subject imports from Morocco and Russia (the remaining purchasers reported that prices for the domestic like product were inferior, *i.e.*, higher priced).[208]  Some purchasers also confirmed purchasing

---

[205] CR/PR at Table V-7.

[206] CR/PR at Tables V-4-5, V-7.  On average, the underselling margin was [ ▮ ] percent for product 1 and [ ▮ ] percent for product 2 while the overselling margin was [ ▮ ] percent for product 1 and [ ▮ ] percent for product 2.  CR/PR at Table V-7.  A Mosaic representative testified at the hearing that "{t}he Commission's price data show more instances of overselling than underselling.  The Commission should not construe this as evidence of the absence of adverse price effects to the domestic industry.  First, prices are close, with average over- or underselling margins within {what} one would expect for a commodity industry with transparent pricing.  But the price trends between U.S. producers and importers were very highly correlated over time."  Hearing Tr. at 51 (Klett).

[207] *See Comm. of Domestic Steel Wire Rope and Specialty Cable Mfg. v. United States*, 24 F. Supp. 2d 1287, 1299 (Ct. Int'l Trade 2002) (stating that "'the more fungible two products are, the more likely underselling by one will affect the price of the other'") (quoting *BIC Corp. v. United States*, 964 F. Supp. 391, 400 (Ct. Int'l Trade 1997)).

[208] CR/PR at Table II-9.  Twenty of 24 firms reported that the domestic like product and subject imports from Morocco were comparable on price; 20 of 23 did so for the domestic like product and subject imports from Russia.  Four and three purchasers reported prices of the domestic like product to

(*continued*...)

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

subject imports instead of the domestic like product due to their lower prices.  Seventeen of 28

U.S. purchasers reported that they had purchased imported phosphate fertilizers from Morocco

and/or Russia instead of the domestic like product.  Nine of these 17 purchasers reported that

subject imports were lower priced than the domestic product, and 5 of these 9 purchasers

reported that price was a primary reason for purchasing subject imports rather than the

domestic like product.[209]  Four U.S. purchasers confirmed lost sales totaling 733,895 short tons

over the POI.[210]  In addition, as discussed further below, the record indicates that importers of

---

be inferior (*i.e.*, higher priced) to prices of subject imports from Morocco and Russia, respectively, while no purchaser reported prices of the domestic like product to be superior (*i.e.*, lower priced) to prices of subject imports from Morocco or Russia.  *Id.*

     OCP's argument that the fact that 20 out of 24 purchasers reported prices of the domestic like product and subject imports to be comparable "confirm{s} that subject imports were not lower priced and did not cause adverse price effects, OCP Second Remand Comments at 18, overlooks that while 20 purchasers indicated that prices for the domestic like product were comparable, the remaining four reported that the domestic like product was inferior (*i.e.*, higher priced) compared subject imports; notably, no responding purchaser reported that the domestic like product was superior (*i.e.*, lower priced) compared to subject imports.  Thus, rather than confirm that subject imports were not lower priced, these purchaser responses corroborate other record evidence showing that prices for subject imports and the domestic like product closely track each other and that subject imports are at times lower priced.

    [209] CR/PR at Table V-9.

    [210] CR/PR at Table V-9.  Respondents argued that [       ], which accounted for [  ] percent of the total quantity of reported lost sales, directly contradicted its lost revenue response submitted in the preliminary phase of the investigations, and upon this basis, request that [      ] reported amount be discounted.  OCP Prehearing Br. at 96-97; Gavilon Prehearing Br. at 50.  We continue to find, however, that the record does not support disregarding the [    ] short tons of subject imports that [    ] reported purchasing instead of the domestic like product due at least in significant part to the lower price of subject imports.  In these final phase investigations, Growmark reported that subject imports were priced lower than the domestic product, and that price was a primary reason for purchasing subject imports instead of domestic product.  [

*(continued...)*

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

subject merchandise in instances offered lower prices than domestic producers during 2019 in a declining market.[211]  Thus, while we recognize the prevalence of overselling in the pricing data, we continue to find that the record demonstrates that, consistent with the high degree of price transparency in this market, the prices of the domestic product and subject imports tracked



CR/PR at V-23 n.14 (emphasis provided).  Thus, while some portion of the reported quantity of lost sales may also have been influenced by non-price reasons, [          ] clarified that [                    ] and that [                    ].

We also note that [              ] response regarding U.S. producers' price reductions further supports that it increased its purchases of subject imports for price reasons.  In reporting that U.S. producers [

].

CR/PR at V-26.

[211] *See, e.g.,* Mosaic Posthearing Brief at 36-37, Responses to Questions, pp. 44-46 and Exhibits 41-46; 50 and 51; Simplot Posthearing Br. at Responses to Questions pp. 35-37, Exhibit 4.  We are not persuaded by OCP's assertion that that Mosaic's pricing data analysis, which [

], is "misleading" because [

].  OCP Second Remand Comments at 20.  As discussed above in Section II.A.3, there is a high degree of transparency in the U.S. market, which includes phosphate fertilizer prices reported in various trade publications, published on a daily or weekly basis, along with the fact that the majority of U.S. producers and purchasers, and some importers report they rely upon these publications in setting or negotiating prices, as well as the fact that purchasers report contacting multiple suppliers before making a purchase.  Given the importance of price coupled with the high degree of transparency in the U.S. market, low prices from even a single importer are capable of being quickly transmitted throughout the U.S. market.  We therefore find that, based on these considerations, OCP's argument unpersuasive and belied by the record.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

each other closely and were generally comparable with small margins of underselling and overselling, that subject imports were in some instances lower priced, and the domestic industry lost sales to subject imports because of lower prices.[212]

In the Second Remand Order, the court held that "the Commission also fails to support its continued reliance on the lost sales figure" with substantial evidence and instructed the Commission that if it "wishes to credit some portion of the reported lost sales on remand, it must adequately explain this decision, including by addressing detracting evidence."[213] We start by clarifying that neither in the previous Views nor in these Views have we "rubber stamped" [ ███████ ] response.[214] To the contrary, the Commission staff took strides to assure the accuracy of that information. As explained above in note 210, [ ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ ]. Having undertaken this step to further investigate and verify the information, we found and continue to find it appropriate to rely on [ ████████ ] response because "while some portion of the reported quantity of lost sales may also have been influenced by non-price reasons, [ ███████ ] clarified that [ ████████████████████

---

[212] Accordingly, as in the Original and First Remand Views, we examined other record evidence relevant to whether there was significant subject import underselling as well as the pricing data, finding that the pricing data showed that subject imports predominantly oversold the domestic like product during the POI. Original Views at 37-39; First Remand Views at 34-36. We thus *considered* whether subject imports significantly undersold the domestic like product. We respectfully disagree with the court that the Commission "must answer" whether there was significant underselling. Second Remand Order at 40. On its face, the statutory provision requires only that the Commission consider whether there has been significant underselling. See 19 U.S.C. § 1677(7)(C)(ii) ("the Commission shall consider whether –"). As the Federal Circuit has explained, the Commission's "consideration" of a statutory factor does not encompass an obligation to come to any conclusion regarding that factor. *See Altx*, 370 F.3d at 1123 (discussing "consideration" of the magnitude of the margin of dumping); *see also Nucor Corp.*, 414 F.3d at 1339.
[213] Second Remand Order at 43-44.
[214] Second Remand Order at 47.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

███████████████ ] and that [ ███████████████████████████████████████████

███████████████████████████ ].[215]

   Turning to the court's instruction that if the Commission "wishes to credit some portion of the reported lost sales on remand, it must adequately explain this decision, including by addressing detracting evidence,"[216] we note, as confirmed by the Court of International Trade, that "purchasers have little incentive to confirm allegations."[217]  Accordingly, we find [ █████████ ] response to be credible and forthcoming such that it is appropriate to continue to consider the entirety of its reported confirmed lost sales.

   In any event, even if we were to attempt to identify a portion of [ █████████ ] reported lost sales and provide a basis for crediting that portion consistent with other record evidence, we would still find its response to show a significant volume of confirmed lost sales.  As discussed above, [ █████████ ] reported that [ ████████████████████████████ ████████████████████████████████████ ].  Accordingly, a conservative estimate based on this representation would be a bare majority of [ ██████████ ] reported lost sales or [ ████████ ] short tons, which remains a significant quantity of lost sales.  Although we recognize that other purchasers may not have similarly confirmed any lost sales allegations, that does not "detract" from the reality of the confirmed loss of sales to a customer [ ████████ ], who instead purchased subject imports primarily due to their lower prices.  Other evidence corroborates that the domestic industry lost sales to cumulated subject imports, including but not limited to the fact that cumulated subject imports gained market share at the

---

[215] First Remand Views, 25-51 at 36 n.168.
[216] Second Remand Order at 43-44.
[217] *Acciai Speciali Terni, S.p.A. v. United States*, 19 CIT 1051, 1056 (1995).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

direct expense of the domestic industry during the POI as well as other examples given by the domestic industry and other market participants.[218]

Moreover, because our price effects finding is based on price depression, the actual volume of [ ███████ ] lost sales is less probative than its narrative responses that directly corroborate the Commission's findings that subject imports were at times lower priced and exerted competitive pressure on prices for the domestic like product.  In addition to [ ██████████████████████████████████████████████████████ ██████████████ ], it was [ ████████████████████████ ████████████████████████████████████████████ ], which is cited below in our discussion of price depression.  Specifically, as discussed above, [ ██████████ ] reported that U.S. producers [ ███████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████ ].[219]  Thus, [ ██████████████ ] confirmed lost revenues and explanation for how they came about directly corroborate our finding that subject imports depressed prices for the domestic like product to a significant degree based on the totality of the evidence discussed above and in the Commission's price analysis.  Indeed, in reporting that subject imports placed downward pressure on domestic prices, [ ██████████ ] could hardly be

---

[218] *See, e.g.*, CR/PR at II-21 (certain purchasers reporting decreasing purchases of domestic product due to a "decrease in price competitiveness" and increasing purchases of subject imports due to the latter being more competitive), Tables V-9, C-1; Mosaic Posthearing Brief at 36-37, Responses to Questions, pp. 44-46 and Exhibits 41-46; 50 and 51; Simplot Posthearing Br. at Responses to Questions pp. 35-37, Exhibit 4.

[219] CR/PR at V-26.

*Public Version*

characterized as an "outlier" when numerous trade publications that play an integral role in the U.S. fertilizers market were reporting similar observations and widely shared experiences.

Indeed, as discussed above, we have also cited other record evidence corroborating that the domestic like product and subject imports were closely priced, with subject imports priced lower in some instances. All responding purchasers (*i.e.*, purchasers who responded to the Commission's questionnaire) indicated that prices for the domestic like product were comparable or inferior (*i.e.*, higher priced) to prices for subject imports.[220] Additionally, a number of purchasers reported that subject imports were priced lower than the domestic like product and several further reported that the lower price was a primary reason for purchasing subject imports instead of the domestic like product.[221] Furthermore, as the market declined in 2019, the record indicated that there were other instances in which importers of subject imports offered prices below those of the domestic industry.[222]

Thus, although we have not made a finding of significant underselling, we continue to find that the record demonstrates that, consistent with the high degree of price transparency in this market, the prices of the domestic product and subject imports tracked each other closely and were generally comparable with small margins of underselling and overselling, that subject imports were in some instances lower priced, and the domestic industry lost sales to subject imports because of lower prices.

---

[220] First Remand Views at 35-36.
[221] First Remand Views at 35-36.
[222] First Remand Views at 36-37, citing Mosaic Posthearing Brief at Responses to Questions, pp. 44-46 and Exhibits 50 and 51; *see also* Mosaic Posthearing Brief at 36-37, Responses to Questions, pp. 44-46 and Exhibits 41-46; 50 and 51; Simplot Posthearing Br. at Responses to Questions pp. 35-37, Exhibit 4.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

We also considered price trends for the domestic like product and subject imports. During the POI, prices for both the domestic like product and subject imports increased between 2017 and most of 2018, and then declined between 2018 and 2019.[223] Prices in interim 2020 increased, but remained below levels in January 2017 until after the filing of the petitions at the end of June 2020, after which prices experienced dramatic increases as subject import volumes to the U.S. market decreased and subject import end-of-period inventory levels decreased.[224]

The record shows that significant and increasing volumes of subject imports entered the U.S. market between 2017 and 2018 and remained at significant levels in 2019 despite a substantial demand decline due to what an OCP witness characterized as a "Black Swan" level of rainfall beginning in the fall of 2018 and lasting through 2019.[225] [226]  As respondents acknowledge, heavy precipitation in the fall of 2018, a polar vortex in the winter of 2018-2019, and record setting precipitation in the spring of 2019 caused massive flooding and prolonged river closures along the Mississippi River system that stranded fertilizer barges and resulted in delayed, destroyed, or abandoned plantings, especially in the Midwest and Great Plains

---

[223] CR/PR at Tables V-4-5.

[224] CR/PR at Tables V-4-5, Figure V-4.  Between 2017 to 2019, prices for the domestic like product decreased overall by [ ▮ ] percent for pricing product 1 and by [ ▮ ] percent for pricing product 2.  Prices for subject imports decreased overall by [ ▮ ] percent for pricing product 1 and by [ ▮ ] percent for pricing product 2.  Derived from CR/PR at Tables V-4-5.  U.S. importers' inventories of subject imports declined from [ ▮▮▮▮ ] short tons at the end of the interim 2019 period to [ ▮▮▮▮ ] short tons at the end of the interim 2020 period.  CR/PR at Table C-1.

[225] Hearing Tr. at 191-93 (Rahm); *see also* Mosaic Prehearing Br. at 88-91; Mosaic Posthearing Br. at 3, 13, Responses to Questions pp. 20-21.

[226] We note that, although the statute does not require us to consider conditions of competition and business cycles in our price effects analysis, we have considered certain pertinent conditions of competition and business cycles here.

*Public Version*

regions.[227]  Accordingly, while U.S. demand increased overall between 2017 and 2018, demand

began to decline in the latter part of 2018 and continued into 2019, as the unusual weather

conditions impacted three consecutive planting seasons - fall of 2018, spring of 2019, and fall of

2019.  OCP observed that the USDA's Farm Service Agency, which tracks agricultural acreage

that farmers did not use in a particular season, reported that the volume of "prevented planting

acreage" in 2019 set a U.S. record – by a wide margin – at 19.6 million acres.[228]  Apparent U.S.

consumption of phosphate fertilizers declined by [ ▮ ] percent from 2018 to 2019, by more

than [ ▮▮▮▮ ] short tons, to below the level of apparent U.S. consumption in 2017.[229] [230]

---

[227] *See, e.g.*, OCP Prehearing Br. at 35-36, 46-48; Gavilon Prehearing Br. at 11-12; PhosAgro Prehearing Br. at 6-7; IRM Prehearing Br. at 15-16; PhosAgro Posthearing Br. at 3-4.  As further detailed below, the trade publication Argus repeatedly referenced oversupply conditions in early 2019, as follows: "The 'polar vortex' in the US midwest saw temperatures plummet.  The US domestic market followed suit.  Put simply, the US market 'tanked' on cold weather, a full pipeline and heavy imports (January 31, 2019); "{T}he US is awash with imports . . .  Pushing so much DAP/MAP to the US has led to oversupply" (February 7, 2019); "The US has a record surplus of phosphates entering the spring season, boosted by weak sales, terrible weather conditions and heavy 1Q imports, which reached a record 1.2mn t of DAP/MAP, up 27pc yoy" (March 28, 2019).  Petition, Volume I, Exhibits I-29, I-30, I-33.

[228] OCP Prehearing Br. at 47-48.

[229] U.S. apparent consumption declined by [ ▮ ] percent from 2018 to 2019, reflecting a [ ▮ ] percent decline in U.S. producers' U.S. shipments, an 11.8 percent decline in U.S. shipments of nonsubject imports, and a 6.2 percent *increase* in U.S. shipments of cumulated subject imports.  CR/PR at Table C-1.  As a result, from 2018 to 2019, cumulated subject imports' market share increased by [ ▮ ] percentage points; the domestic industry's market share decreased by [ ▮ ] percentage points; and nonsubject imports' market share decreased by [ ▮ ] percentage points.  *Id.*

[230] In its First Remand Order, the court addressed the Commission's finding that subject imports exceeded demand, contributing to oversupply conditions that resulted in price depression.  The court stated that this finding "was vulnerable to the Plaintiffs' rebuttal that bad weather, not imports, was responsible for declining demand.  Section 1677(7) requires that any material injury 'by reason of' subject imports, and unprecedented weather events that frustrated demand projections were a potential intervening cause."  First Remand order at 42-43.  As we clarified in the First Remand Views, we did not and do not find that subject imports were responsible for declining demand.  Rather, we explained that previously found and continue to find that weather events beginning in 2018 and continuing into 2019, caused demand to decline.  We also previously found and continue to find that, although cumulated subject imports did not cause the decline in demand, they increased from 2017 and to 2018, and remained at elevated levels in 2019, despite declining demand.  Indeed, cumulated subject

(*continued*...)

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

Despite these market conditions, subject imports continued to enter the market in large volumes in 2019 and in excess of any purported need to restock inventory in regions that were unaffected by weather.[231]  It is uncontroverted that the volume of cumulated subject imports increased 1.0 million short tons from 2017 to 2018.[232]  It is likewise uncontroverted that demand for fertilizers in the U.S. market began to decline in 2018 due to heavy precipitation in the fall of 2018 as well as a polar vortex in the winter of 2018 to 2019.[233]  In the context of the increased volume of cumulated subject imports in 2018 along with declining demand towards the latter part of that year, U.S. importers' end-of-period inventories were [      ] short tons in December 2018, which was their highest level of the POI at that time.[234]

Notwithstanding end-of-period inventories that were higher than the levels earlier in the POI and the decline in demand, cumulated subject imports nonetheless surged into the U.S.

---

imports further increased their market share from 2018 to 2019 with the quantity of importers' U.S. shipments of subject imports increasing by 6.2 percent between 2018 and 2019 despite the [  ] percent decrease in apparent U.S. consumption.  CR/PR at Table C-1.  As further discussed below, other record evidence (including from purchaser questionnaire responses and contemporaneous trade publications) corroborates that cumulated subject imports had significant depressing effects on U.S. prices.  As also discussed below, we have examined other factors, including declining demand, to ensure that we are not attributing injury from any such factors to subject imports.

[231] OCP Comments at 1, 15-16; PhosAgro Comments at 15; Koch Comments at 2-3.

[232] CR/PR at Table IV-2.  As discussed above in Section II.B, both the unadjusted data and adjusted data show comparable increases in the volume of cumulated subject imports.  We again note that this one million short ton increase in the volume of cumulated subject imports in 2018 was not due to a "supply gap" in domestic supply.  As discussed above, although Mosaic reduced its production capacity in 2018, it reduced its U.S. shipments of fertilizers by only [      ] short tons from 2017 to 2018, while importers' U.S. shipments of subject imports increased by 604,901 short tons from 2017 to 2018, and were 753,638 short tons higher in 2019 than in 2017.  CR/PR at Table C-1; Mosaic Revised Domestic Producer Questionnaire at II-7.  Moreover, during that time, Mosaic as well as Simplot and Nutrien possessed excess capacity and inventories.  CR/PR at Table III-4.

[233] Original Views at 40 (citing OCP Prehearing Br. at 35-36, 46-48; Gavilon Prehearing Br. at 11-12; PhosAgro Prehearing Br. at 6-7; IRM Prehearing Br. at 15-16; PhosAgro Posthearing Br. at 3-4).

[234] CR/PR at Table D-1.  We also note that importers' ending inventories of subject imports in each quarter in 2018 and 2019 [            ] exceeded their 2017 volumes, and their ending inventories in March, June, and September 2019 were larger than their ending inventories for those months in 2018.  CR/PR at Table D-1.

market as 2019 began.  In January 2019, the volume of cumulated subject imports reached its

highest monthly level of the entire POI at 720,728 short tons, a level that was almost double

the level of monthly imports in January 2018 (312,960 short tons) and more than triple the level

of monthly imports in January 2017 (202,768 short tons).[235]  Thus, in the context of phosphate

fertilizers consumption beginning in the fall of 2018, which precipitated the high levels of end-

of-period inventories in December 2018, subject imports surged into the market in January

2019 and remained substantial (relative to other monthly import volumes) in February and

March 2019.  That cumulated subject imports exceeded demand at the beginning of 2019 is

further supported by the fact that U.S. importers' end-of-period inventories increased from

[          ] short tons in December 2018, which had been their highest level at that point in the

POI, to [          ] short tons in March 2019, their highest level of the entire POI, which

contradicts respondents' arguments that subject imports were continuing to be imported to

serve regions unaffected by severe weather.[236] [237]  Notwithstanding this high level of

---

[235] CR/PR at Table IV-6.

[236] CR/PR at Table D-1.  We further note that U.S. importers' quarterly ending inventories in March, June, and September 2019 were larger than their ending inventories for those months in 2018. *Id.*

[237] OCP contends that domestic and subject import inventories both [          ] in March 2019 before returning to [          ] after Spring 2020 and that the ratios of subject import to domestic inventories [          ] over the POI, showing that there was no [          ] in subject import inventories.  OCP Remand Second Remand Comments at 6-7.  OCP overlooks that subject import end-of-period inventories increased [          ] percent from 2017 to 2018 and remained at elevated levels that were [          ] percent higher in 2019 than 2017.  CR/PR at Table C-1.  In contrast, domestic end-of-period inventories increased by only [          ] percent from 2017 to 2018 and were only [          ] percent higher in 2019 compared to 2017.  CR/PR at Table C-1.  By the same token, in describing domestic inventory levels of [          ] short tons and subject import inventory levels of [          ] short tons in the second quarter of 2020 as "return{ing} to [          ]", OCP ignores that in the second quarter of 2017 inventories of domestic producers were indeed a relatively comparable [          ] short tons, while subject import inventory levels were substantially lower at only [          ]

(*continued*...)

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

inventories, which according to respondents remained in place after delivery and were not

otherwise relocated, substantial volumes of cumulated subject imports still continued to enter

the market even as demand remained low due to flooding that occurred in the spring and fall of

2019.[238]

As we previously noted in our Original Views, several contemporaneous industry

publications were reporting on oversupply conditions and price declines in the earlier part of

2019.[239]  Specifically, trade publication *Argus* reported:[240]

- January 10, 2019:  "US remains an outlet for 1Q....  With OCP also shipping
  considerably more this quarter, producers remain set on offloading tonnage in
  the only market that can absorb such volumes without pricing....  The US
  phosphate market continues to feel the pressure of a full supply chain and
  steady import lineup as both DAP and MAP barges declined this week.  Limited
  buying activity caused DAP Nola to drop by nearly $1/st from the previous week
  to $383-386/st fob Nola on confirmed trades.  MAP barge values fell by nearly
  $5/st from last week's midpoint to $388-395/st fob Nola."[241]

- January 17, 2019:  "US phosphate prices continue to wilt as heavy supply
  pressures suffocate buyer demand."[242]

- January 31, 2019:  "The cold weather and full pipeline makes the US a less likely

---

short tons.  CR/PR at Table D-1.  The record also does not support OCP's assertion that the ratios of
subject import to domestic inventories [ ███████ ] over the POI.  The ratios of subject import
inventories to U.S. inventories ranged from [ █████ ] percent in 2018 and 2019, which far exceeds
those from the beginning of the POI, which ranged from [ █████ ] percent in 2017.  *Calculated from*
CR/PR at Table D-1.

[238] CR/PR at Table IV-6.

[239] Original Views at 41-42, citing Petition, Volume I, Exhibits I-29 – I-35; *see also* Mosaic
Prehearing Br. at 59-63; Mosaic Posthearing Br. at 10-11; Simplot Prehearing Br. at 27-28; Simplot
Posthearing Br., Responses to Questions pp. 16, 50-51.

[240] We note that subject imports from Morocco and Russia accounted for 84.1 percent of total
import volume in 2019, up from 83.0 percent in 2018.  CR/PR at Table IV-2.  The volume of cumulated
subject imports declined by 9.5 percent between 2018 and 2019, while the volume of nonsubject
imports declined by 16.0 percent.  CR/PR at Table IV-2.  U.S. shipments of subject imports increased by
6.2 percent between 2018 and 2019, while shipments of nonsubject imports decreased by 11.8 percent.
CR/PR at Table C-1.

[241] Petition Volume 1, Exhibit I-31.

[242] Petition Volume 1, Exhibit I-32.

*Public Version*

export for 1Q.  There is no chance of an early application season in the south and the weather forecast is poor to March.... The 'polar vortex' in the US midwest saw temperatures plummet.  The US domestic market followed suit.  Put simply, the US market 'tanked' on cold weather, a full pipeline and heavy imports.  US DAP barges fell $10/st in a week.  MAP prices are now in the mid/high-$360s/st fob Nola ....  Firstly, with the US having covered 60pc of its 1Q 2018 total import requirements already, and with reports of heavy congestion at Nola on high water in the river system, the strategy of pushing more product into the US looks risky, at least in the short term."[243]

- February 7, 2019:  "{T}he US is awash with imports ...  Pushing so much DAP/MAP to the US has led to oversupply ...  US phosphate prices dipped again this week as wholesalers try to incentivize buying during this period of low demand."[244]

- February 28, 2019:  "{T}he US market fell dramatically with DAP into the $300s/st fob Nola, down around $15/st in a single week....  The heavy import line-up and 'polar vortex' in the US has resulted in Nola DAP barges trading at $330-338/st – down by $14/st this week....  US phosphate prices moved sharply lower this week as the market continues to be plagued by ample supplies and absent demand."[245]

- March 28, 2019:  "OCP, in its 2018 financial results, projected softer prices in the first half of this year, driven by a drop in the cost of raw materials and higher inventories in the cost of raw materials and higher inventories in the US and India.  It is a fair assessment.  The US has a record surplus of phosphates entering the spring season, boosted by weak sales, terrible weather conditions and heavy 1Q imports, which reached a record 1.2mn t of DAP/MAP, up 27pc yoy....  The US DAP market softened this week as buyers were again put off by the combination of heavy supplies and a probably limited spring application season....  Heavy January commitments by foreign producers lifted first quarter US phosphate imports past previous expectations."[246]

- April 18, 2019:  "DAP/MAP supply for 1Q is estimated at 2.3mn t.  The US DAP barge price fell again by $5/st on oversupply amid heavy imports....  Heavy supplies and light demand continue to weigh heavily on the domestic phosphate market as DAP values continue to trickle downward.  Nola DAP barges were assessed down by $5/st from the midpoint last week to $320-325/st as buyers remain off put by limited field activity and prolonged closure of the upper

---

[243] Petition, Volume I, Exhibit I-33.
[244] Petition, Volume I, Exhibit I-29.
[245] Petition, Volume I, Exhibit I-34.
[246] Petition, Volume I, Exhibit I-30.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

Mississippi river.  {also noting} Record import levels."[247]

Additionally, in April 2019, [ ███ ] also reported on the oversupply condition in the U.S.

market due to a poor application season in the fall of 2018 and a "surge in imports in recent

months."[248]  Notably, these articles discuss demand in the U.S. market as a whole and do not

mention anywhere that there were areas of the U.S. market where demand was increasing.

Nor do they indicate that inventories that may have been located in different locations or any

that may have been subsequently exported did not contribute to the oversupply conditions

affecting prices in the U.S. market.  Rather, consistent with our discussion above, these

publications confirm the importance of NOLA pricing as a benchmark in the broader market.

Thus, the record shows that regardless of whether subject import inventories were

being reshipped once they reached their destination, the substantial volume of cumulated

subject imports continuing to enter the United States in 2019 was adversely impacting U.S.

prices as demand remained low due to weather events and flood in the spring of 2019.[249]  As

---

[247] Petition, Volume I, Exhibit I-35.

[248] Mosaic Posthearing Br. at Exhibit 3.

[249] As we noted in our Original Views, respondents blamed the oversupply conditions on demand projections that failed to materialize.  OCP Prehearing Br. at 70-73; Koch Prehearing Br. at 6-7; EuroChem Prehearing Br. at 8-9; EuroChem Posthearing Br. at 8-9; OCP Posthearing Br. at Responses to Questions pp. 27-30; Gavilon Posthearing Br. at Responses to Questions pp. 5-6; IRM Posthearing Br. at 7.  OCP further argues that in finding that subject imports contributed to oversupply conditions "regardless of the reasonableness of any demand projections," the Commission "ignored" that phosphate fertilizer is procured in advance based on forecasted demand.  OCP Comments at 24.  Contrary to OCP's argument, we recognize that distributors rely on demand projections in obtaining product.  First, we note that, in 2019, [ ████████████ ] percent of U.S. importers' U.S. commercial shipments were spot sales.  CR/PR at Table V-3.  Further as discussed above, cumulated subject imports entered the U.S. market in significant volumes, contributed to oversupply conditions, and depressed U.S. prices to a significant degree, regardless of how they were ordered.  U.S. importers claimed that they were [ ██████████████████████████████████████████████████████████

████████████████████████████████████████ ].  *See, e.g.*, ADM Posthearing Br. at 8-9 (stating that

[ ████████████████████████████████████████████████████████████████████████████████

(*continued...*)

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

explained in the Original Views and First Remand Views,[250] this oversupply of subject imports and their competitive and lower prices, including instances of being lower-priced, exerted downward pricing pressure on the domestic like product and significantly depressed U.S. prices in 2019.

Further, the record, including as supplemented by the remand questionnaires, does not support respondents' assertions that additional volumes of subject imports in the latter half of 2019 merely replenished depleted inventories in areas unaffected by flooding. As detailed above, U.S. importers' end-of-period inventories of cumulated subject imports reached their highest level of the POI in March 2019.[251] Yet, according to respondents themselves, subject imports that arrived in 2019 had been delivered "by the time record precipitation thwarted fertilizer application in certain regions."[252] Moreover, the supplementary questionnaire information obtained in the first remand proceedings suggests that the vast majority of subject

---

██████████████████████████████ ]); Hearing Tr. at 227 (Lambert) (stating that "{t}hose vessels were coming. And once they're on their way, they're coming here"); 223-224 (Niederer). Regardless of why or when they were ordered, however, the record shows that the subject imports had depressing effects on U.S. prices during 2019. We also observe, as discussed above, that notwithstanding these assertions, foreign producers and importers of subject merchandise were able to respond to market changes after the petitions were filed by decreasing the volume of imports entering the U.S. market.

[250] Original Views at 39-46; First Remand Views at 37-44.

[251] CR/PR at Table D-1.

[252] OCP Comments at 15. Respondents maintain that most subject imports of phosphate fertilizer enter through the port at NOLA, where they are loaded from vessels onto barges, barged up the Mississippi River and its tributaries, and then shipped north, west, and east by rail and truck to meet demand from farmers, which apply phosphate fertilizer twice a year in two limited windows of time. They claim that distributors and retailers store phosphate fertilizer in warehouses close to farmers and that such fertilizer stays there until it is used in those narrow application windows. They assert that in the event of unexpected reductions in demand, such as weather or other unpredictable events, inventories are not returned or moved to other regions but instead are held and sold to farmers during the next application season. OCP Comments at 5; PhosAgro Comments at 8-12; Koch Comments at 3-4; IRM Comments at 3-4; Eurochem Comments at 1-2.

*Public Version*

imports, once delivered, are not relocated or otherwise moved, but rather remain in regional inventories until used in a subsequent application period.[253]  Consequently, we find that the record indicates that substantial quantities of subject imports were in place in regional inventories by December 2018 and March of 2019, prior to the flooding that occurred in spring 2019, and such imports remained in those locations, available for subsequent application in the latter part of 2019.  Thus, the POI-high level of inventories of cumulated subject imports in March 2019 exceeded the levels maintained in prior years and according to respondents were already in place in regional locations prior to flooding.  Yet, despite the substantial inventories of cumulated subject imports in place in December 2018, monthly cumulated subject import volume peaked in January 2019, and despite the POI-high level of inventories of cumulated subject imports in March 2019, monthly cumulated subject import data show them continuing to enter at substantial volumes.[254]  Taken together with the lower demand in three consecutive application periods, the record does not support a conclusion that inventories of U.S. imports were depleted such that the observed volumes of subject imports were needed.[255]  This is particularly so in light of the substantial inventories, expansive network of inventories, and extensive multi-modal distribution capabilities of the domestic industry.

Even if, as respondents assert, importers of merchandise did deplete some portion of

---

[253] *See generally* Importers Remand Questionnaires.  Additionally, OCP also claims that the new questionnaire evidence "makes clear that even as inventories built up in flooded regions, it was normal practice to keep inventories at their original intended destinations in preparation for the next application window."  OCP Comments at 18.

[254] CR/PR at Table IV-6.

[255] Indeed, importers' end-of-period inventories of cumulated subject imports increased from June 2019 to September 2019, with both months' inventory volumes larger than in the respective months in 2018.  CR/PR at Table D-1.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

these inventories to serve areas that were unaffected by flooding, we find that the record shows that the volume of cumulated subject imports continued to exceed any demand created by alleged restocking needs.  As discussed above, U.S. importers' end-of-period inventories of cumulated subject imports reached their highest level of the POI in March 2019 at [ ▮ ] short tons.[256]  U.S. importers' next reported end-of-period inventories in June 2019 were [ ▮ ] short tons.[257]  Accordingly, U.S. importers' end-of-period inventories of cumulated subject imports from March 2019 to June 2019 were reduced by [ ▮ ] short tons.  Cumulated subject imports, however, far exceeded this amount in those months and the months that followed.  Indeed, over 329,000 short tons of subject imports entered from April to June 2019.[258]  Moreover, whereas the difference between end-of-period inventories from March 2019 to June 2019 was only [ ▮ ] short tons, in July 2019 alone, the volume of cumulated subject imports was 281,132 short tons, and cumulated subject imports continued to enter the U.S. market at elevated levels – 264,191 short tons in August 2019 and 178,304 short tons in September 2019 – for a three-month total of 723,627 short tons.[259]

This pattern continued later in 2019.  U.S. importers' end-of-period inventories of cumulated subject imports in September 2019 were [ ▮ ] short tons, higher than in June of 2019 but lower, by [ ▮ ] short tons, than in March 2019.[260]  Even assuming that this represents a depletion of inventories to serve areas unaffected by flooding, the record shows

---

[256] CR/PR at Table D-1.  As discussed above, this was up from [ ▮ ] short tons in 2018.  *Id.*
[257] CR/PR at Table D-1.  We note that this was higher than the quarterly inventories in June 2018 of [ ▮ ] short tons.  *Id.*
[258] CR/PR at Table IV-6.
[259] CR/PR at Table IV-6.
[260] CR/PR at Table D-1.

*Public Version*

that the volume of cumulated subject imports far exceeded this amount in the months that

followed.  Indeed, in October 2019 alone, the volume of cumulated subject imports was

244,672 short tons, and cumulated subject imports continued to enter the U.S. market at

elevated levels – 164,187 short tons in November 2019 and 227,543 short tons in December

2019 – for a three-month total of 636,402 short tons.[261]  Thus, whether or not U.S. importers

depleted inventories to serve areas that were unaffected by flooding in 2019, the record shows

that cumulated subject imports nonetheless continued to enter the U.S. market in excess of any

purported need to replenish inventories, further contributing to the oversupply conditions.[262]

As we previously noted in our Original Views and First Remand Views, several

contemporaneous industry publications continued to report that oversupply conditions and

price declines also persisted in the latter part of 2019.[263]  For example, trade publication *Argus*

reported:

- July 18, 2019:  "The US is looking fragile due to import length.  Widespread estimates of substantial carryover from spring are also hurting prices....  Ample spot availability has driven US phosphate values down this week to $304-310/st fob Nola DAP/MAP on confirmed trade....  Price pressure is poised to persist in the near-term with continued imports scheduled for July discharge."[264]

- August 4, 2019:  "Rather than maintain prices, OCP appears to be gunning for volume. . . .  Downward price pressure persisted along the US Gulf coast this week, with DAP barge values assessed at $298-300/st fob Nola – the lowest price

---

[261] CR/PR at Table IV-6.

[262] We again note that subject imports from Morocco and Russia accounted for 84.1 percent of total import volume in 2019, up from 83.0 percent in 2018.  CR/PR at Table IV-2.  The volume of cumulated subject imports declined by 9.5 percent between 2018 and 2019, while the volume of nonsubject imports declined by 16.0 percent.  CR/PR at Table IV-2.  U.S. shipments of subject imports increased by 6.2 percent between 2018 and 2019, while shipments of nonsubject imports decreased by 11.8 percent.  CR/PR at Table C-1.

[263] Original Views at 41-42 and First Remand Views at 47-49, citing Petition, Volume I, Exhibits I-36 – I-44; *see also* Mosaic Prehearing Br. at 59-63; Mosaic Posthearing Br. at 10-11; Simplot Prehearing Br. at 27-28; Simplot Posthearing Br., Responses to Questions pp. 16, 50-51.

[264] Petition, Volume I, Exhibit I-36.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

level in nearly two years on a midpoint basis, according to Argus data....  A slate of three additional cargoes from Morocco for August arrival is anticipated to keep a lid on near-term prices, which have been steered by imports following spring applications.  DAP imports during the 2018-19 fertilizer year reached an all-time high of 1.26mn/t on increased shipments from Morocco and Russia, according to customs data."[265]

- August 15, 2019:  "In the US, DAP barge prices fell to the equivalent of $315/t cfr amid fears over more imports and large carryover....  In the US, two DAP barges traded in a $288-294/st fob range for September – a 10-year low.  The paper market was even more aggressive.  The driver is a substantial domestic carryover from spring, plus heavy imports and lower grain prices....  DAP barges traded at a 10-year low early this week at $288/st fob Nola for September shipment – pressuring the low end of this week's assessment....  Prices at Nola are poised to face ongoing headwinds as offshore volumes continue to trickle to port....  Downstream demand is expected to remain suppressed until the fourth quarter, when post-harvest applications resumes.  In-season consumption will be key to draw down carryover inventories, and help bring the market closer to balanced."[266]

- September 26, 2019:  "Mosaic has sold three October-loading DAP barges at $288/st fob Nola.  But the slight firmness in the US DAP market exhibited after the Mosaic production cut subsided this week as barge values slipped below $290/st fob Nola for October shipment.  DAP traded at $286-288/st fob Nola – the lowest price level since early-September.  Market sentiment ... remained bearish for near-term price movement, especially as imports continue to discharge at the US Gulf coast at the current pace.  The 500,000t of lost production at Mosaic's Faustina plant during the fourth quarter is poised to be replaced by offshore volumes, likely minimizing upward momentum to Nola values."[267]

- October 10, 2019:  "In the U.S., DAP trade reached a new decade low of $275/st fob Nola for October shipment, a further decrease from the $280-$290/st fob assessed last week, although Mosaic did report a single DAP barge at $285/st

---

[265] Petition, Volume I, Exhibit I-37.

[266] Petition, Volume I, Exhibit I-38.

[267] Petition, Volume I, Exhibit I-39.  We note that, as discussed above, the volume of cumulated subject imports in October 2019 alone was 244,672 short tons, and cumulated subject imports continued to enter the U.S. market at elevated levels, 164,187 short tons in November 2019 and 227,543 short tons in December 2019, for a three-month total of 636,402 short tons.  CR/PR at Table IV-6.  Quarterly inventories of cumulated subject imports were lower in December 2019, at [        ] short tons compared to December 2018, at [        ] short tons; however, they remained at substantially elevated levels compared to December 2017 when they were [        ] short tons.  CR/PR at Table D-1.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

fob.  Bearish sentiment persists even after Mosaic idled its Faustina phosphate complex on 1 October which reduces total domestic production by 500,000t through the fourth quarter.  Inventories are estimated to be higher than usual as the spring application season was weak this year, and the window for fall application is narrowing."[268]

- October 14, 2019:  "In the US, DAP barges traded at a new decade low of $265/st fob Nola for October shipment, the lowest price since November 2009 ...  total with few imports and a healthy export lineup, sources said it could be enough to draw inventories down to a normal level and support prices later this quarter or in early 2020."[269]

- October 31, 2019:  "There was scant good news for phosphate producers this week – the US continued its inexorable slide with DAP a fresh decade low of $253/st fob Nola."[270]

- November 7, 2019:  "US producer Nutrien called further US production cuts a 'futile game' this week.  Nutrien argues that the market is weak because of fundamental structural oversupply and that further cuts simply signal to OCP, Russian and other producers to ship more to the US....  Phosphate barge values continued to fall this week as high buyer inventories and delays to fall application season weighed on market sentiment....  With inventories still full from two lackluster application seasons and more phosphate fertilizer shipments on the way, many doubt fall demand will be enough to rebalance the domestic phosphates market.... But buyer inventories are full following two lacklustre application seasons and high first-quarter imports."[271]

- December 12, 2019:  "Nola barge prices fell to new lows this week in the first DAP trades for nearly a month....  Price support is doubted into early-2020 as additional imports and the expectation that production will resume at Mosaic's plant in Faustina, Louisiana, loom ahead."[272] [273]

---

[268] Petition, Volume I, Exhibit I-40.

[269] Petition, Volume I, Exhibit I-41.  We note that Mosaic indicated in September 2019 that it was idling its Louisiana operations "as imports into the country have pushed down prices."  Petition, Volume 1, I-46 "'Phosphate prices have declined further through the summer, with excess imports continuing to enter the U.S. on top of high channel inventories,' President and CEO Joc O'Rourke said in a statement. 'We expect our move to idle production to tighten supply and rebalance the market.'"  *Id.*

[270] Petition, Volume I, Exhibit I-42.

[271] Petition, Volume I, Exhibit I-43.

[272] Petition, Volume 1, Exhibit I-44.

[273] Other publications, including [ ███████████████ ], discussed the [ ███████ ███████████████████████████ ].  Simplot Posthearing Br. at Exhibits

*(continued...)*

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

Again, as discussed above, these articles discuss demand in the U.S. market as a whole and do not mention anywhere that there were areas of the U.S. market where demand was increasing.  Nor do they indicate that inventories that may have been located in different locations or any that may have been subsequently exported did not contribute to the oversupply conditions affecting prices in the U.S. market.  Rather, consistent with our discussion above, these publications confirm the importance of NOLA pricing as a benchmark in the broader market.

Importers also reported carrying higher than usual levels of inventories.  In describing trends in its reported quarterly inventories of subject imports from Morocco, [ ███ ] reported



[ ]274

Similarly, in describing trends in its reported quarterly inventories of subject imports from

---



6 ([ ███ ] reporting [ ███ ]), 18 ([ ███ ]), 19 [ ███ ] reporting [ ███ ]).

Moreover, respondents' witness even testified that NOLA prices were lower than prices in Brazil due to a market imbalance, and that inventory build-up was due to excessive rainfall and was not worked down "until the end of the strong fall 2020 application season."  Hearing Tr. at 192-193 (Rahm).

274 [ ███ ] Importer Questionnaire Response at II-5c.

*Public Version*

Morocco, [ ▮ ] reported



And in describing trends in its reported quarterly inventories of subject imports from Russia,

[ ▮ ] reported



Thus, the record shows that cumulated subject imports entered the U.S. market in the latter part of 2019 in excess of any purported depletion of inventories, contributing to oversupply conditions, and having a depressing effect on domestic prices as demand remained low through 2019.[277]

The fact that the end-of-period inventories of cumulated subject imports in 2019 remained at elevated levels ([ ▮ ] short tons) compared to 2017 ([ ▮ ] short tons)[278] further demonstrates that cumulated subject imports were contributing to oversupply conditions and not merely replenishing depleted inventories, and again, these do not include

---

[275] [ ▮ ] Importer Questionnaire Response at II-5c.
[276] [ ▮ ] Importer Questionnaire Response at II-6c.
[277] As we noted in our previous Views, U.S. importers' ending inventories of subject imports in 2018 and 2019 were [ ▮ ] percent and [ ▮ ] percent higher, respectively, than ending inventories in 2017.  CR/PR at Table C-1.  Subject import inventory levels remained at elevated levels at the end of the first and second quarters of 2020, but dropped at the end of the third quarter of 2020 as subject imports decreased after the petitions were filed at the end of June 2020.  CR/PR at Table D-1.
[278] CR/PR at Table D-1.

*Public Version*

any product that may have been reexported.  Additionally, the fact that cumulated subject imports continued to gain market share in 2019 as demand declined and the U.S. market contracted likewise demonstrates that they were not merely replenishing depleted inventories. As we observed in our Original Views and First Remand Views, U.S. shipments of subject imports increased by 148,957 short tons (6.2 percent) between 2018 and 2019, and subject imports increased their share of the market at the expense of the domestic industry and nonsubject imports.[279]

In sum, the record shows that significant volumes of subject imports entered the U.S. market between 2017 and 2018, and as demand began to decline in the fall of 2018, U.S. importers' inventories reached their highest level of those two years.  Notwithstanding these substantial inventories and declining demand in late 2018, subject imports surged into the U.S. market in January 2019, and continued to enter the U.S. market in large quantities, even as demand remained low in 2019.  That the continued flow of subject imports exceeded demand in the contracting U.S. market is further demonstrated by the fact that U.S. importers' quarterly inventories reached their highest level in March 2019.  Consequently, the record shows that cumulated subject imports were contributing to oversupply conditions in the beginning of 2019.  Subject imports nonetheless continued to enter the U.S. market in the latter part of 2019 in excess of any purported need to replenish depleted inventories, thereby further contributing to the oversupply conditions that continued to plague the U.S. market in the latter half of 2019.  At the same time, cumulated subject imports increased their market share at the expense of

---

[279] Original Views at 41-43, First Remand Views at 50, CR/PR at Table C-1.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

both the domestic industry as well as nonsubject imports.[280]  Contemporaneous trade

publications documented the oversupply conditions throughout 2019, with several noting that

high levels of imports contributed to these conditions, as well as the effect that these

conditions had on prices in the U.S. market.[281]  Indeed, market prices for phosphate fertilizer

DAP decreased in 2019 [ ███████████████ ] for non-phosphate fertilizers potash and

urea, such that DAP prices [ ████████████████████████████████████████

████████████████████████████████████████████████████ ].[282]

    Moreover, as we observed in the Original Views and First Remand Views, U.S.

purchasers also reported on the adverse effects caused by subject imports, particularly during

2019.[283]  For instance, U.S. purchaser [ ██████ ] informed how [ ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ ] and that

"more cargo containers appear to be arriving to the U.S. on consignment with no price point

---

[280] From 2018 to 2019, cumulated subject import market share increased [ ██ ] percentage
points, while the market shares of the domestic industry and nonsubject imports decreased [ ██ ] and
[ ██ ] percentage points, respectively.  CR/PR at Table C-1.

[281] OCP challenges our reliance on the numerous trade publications that corroborated that the
significant volume of cumulated subject imports was flooding the U.S. market and contributing to the
oversupply conditions that were depressing U.S. prices to a significant degree.  OCP Second Remand
Comments at 10. These publications corroborate the undisputed facts discussed above: that prices in
the U.S. phosphate fertilizer market are highly transparent, with multiple market participants specifically
reporting their reliance upon these publications in setting or negotiating prices.  Moreover, these are
contemporaneous descriptions of the U.S. fertilizers market.  OCP's attempts to dismiss these trade
publications as "mere snippets" that "use sensational words to catch the attention of subscribers"
ignores the vital role that they played in the U.S. market.

[282] CR/PR at Figure V-5; *see also* CR/PR at Figure V-6 (public prices for DAP and MAP [ ██████
█████████████ ]).

[283] Original Views at 44-45; First Remand Views at 52.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

established up front … {which} can lead to larger drops in price with weak demand."[284]  U.S.

purchaser [⬛⬛⬛⬛⬛] reported that [⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛].[285]  In reporting that domestic producers had reduced

prices in order to compete with low-priced subject imports from Morocco, U.S. purchaser

[⬛⬛] explained that [⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛].[286]

        In addition to this record evidence of oversupply and imports' exertion of downward

pressure on prices in the U.S. market, we also continue to find record evidence of subject

imports being offered at low prices during this time.  For instance, in January 2019, [⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛].

---

[284] Original Views at 44-45 and First Remand Views at 50, citing CR/PR at II-2; [⬛⬛⬛⬛] U.S. Purchaser Questionnaire Response at III-8(b).  As we noted above, [⬛⬛⬛⬛] also reported that [⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛] CR/PR at Table V-11.
[285] [⬛⬛⬛⬛⬛⬛] U.S. Purchaser Questionnaire Response at II-2.  In reporting that U.S. producers lowered prices by an estimated [⬛⬛] percent in order to compete with lower-priced subject imports, [⬛⬛⬛⬛⬛] stated that [⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛] CR/PR at Table V-11.
[286] CR/PR at Table V-11.

██████████████████████████████████████████████ ].[287] [288]  Record evidence also indicates

that domestic producers reduced prices to compete with subject imports.  Of the 28 responding

purchasers, seven reported that U.S. producers had reduced prices in order to compete with

lower-priced imports from the subject countries.[289]  Five purchasers estimated domestic price

reductions to compete with product imported from Morocco, and four estimated domestic

price reductions to compete with product imported from Russia.  The reported estimated price

reductions ranged from [ ███ ] percent to [ ███ ] percent, for an average of 16.0 percent.[290]

In light of the foregoing, we continue to find that the record demonstrates that

significant and increasing volumes of cumulated subject imports entered the U.S. market

between 2017 and 2018 and continued at elevated levels in 2019, even as demand began to

decline in the latter part of 2018, and unusual weather conditions impacted three consecutive

planting seasons - fall of 2018, spring of 2019, and fall of 2019.  Despite these market

conditions, cumulated subject imports continued to enter the market in large volumes in 2019

and in excess of any purported need to restock inventory in regions that were unaffected by

weather, contributing to oversupply conditions in the U.S. market as corroborated by numerous

---

[287] Mosaic Posthearing Br. at Responses to Questions pp. 36-37, Exhibits 41-46.  U.S. purchaser [ ████████ ] reported that [ ████████████████████████████████████████████████ ].  [ ████████████████ ] U.S. Purchaser Questionnaire Response at III-29(b).  Simplot also stated that lower-priced imports forced it to lower its prices.  Simplot Posthearing Br. at Responses to Questions pp. 35-37, Exhibit 4.

[288] We also note that record information shows that [ ████████████████████████████████ ████████████████████████████ ] was the lowest priced in the U.S. market [ ████████████████ ████████████████████ ].  Mosaic Posthearing Br. at Responses to Questions pp. 45-46, Exhibit 51 (exhibit data sourced from responses to Commission questionnaires).

[289] CR/PR at Table V-11.  Seven purchasers reported that U.S. producers had not reduced prices in order to compete with lower-priced imports from the subject countries, and 14 reported that they did not know.  CR/PR at V-25.

[290] CR/PR at V-25.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

contemporaneous trade publications.  Record evidence also shows subject imports being

offered at low prices in some instances during this time.  Cumulated subject imports thus, by

contributing to oversupply conditions and being offered at competitive and low prices in a

highly transparent market, exerted downward pricing pressure on the domestic like product

and significantly depressed U.S. prices during the POI.  Although we acknowledge that some

purchasers reported being unable to obtain supply from Mosaic at times during the POI,[291] we

find that the record as a whole shows that the significant volume of cumulated subject imports

contributed to oversupply conditions in a declining market and had significant price-depressing

effects on prices in the U.S. market in 2019.[292]  Additionally, as discussed in greater detail

below, these prices remained at depressed levels in 2020 before the petitions were filed and

increased sharply as subject imports exited the market.

     Respondents argue that the price declines were attributable to declines in global prices

and U.S. demand, rather than subject imports.[293]  Although those factors may have affected

---

[291] *See, e.g.*, Gavilon Prehearing Br. at 20-24, Exhibit 7; IRM Prehearing Br. at 12-15, 18-19; IRM Posthearing Br. at Exhibit 4; ADM Posthearing Br. at Exhibit 1; Hearing Tr. at 205-206 (Coppess); Response of [             ], CR/PR at Table V-11.

[292] OCP contends that the lack of injurious oversupply of subject imports is documented by the analyses of Mr. Dougan and Mr. Rahm.  OCP Second Remand Comments at 14.  We disagree.  With respect to Mr. Dougan's analysis cited by OCP, it does not include subject import volumes or inventories and actually appears to corroborate our findings that [                                              ] and that [       ].  OCP Posthearing Br., Response to Questions at 22-23.  OCP also omits that both witnesses conceded that there was a "temporary oversupply" in the U.S. market, Hearing Tr. at 215 (Dougan), and a "hangover of phosphate inventories after the 2019 spring season," Hearing Tr. at 192 (Rahm).  Indeed, Mr. Rahm continued "{t}he New Orleans price traded at a large discount to the Brazilian price, reflecting this imbalance.  *Id.*

[293] OCP Prehearing Br. at 77, 88; PhosAgro Prehearing Br. at 26; Koch Prehearing Br. at 2; EuroChem Prehearing Br. at 2; OCP Posthearing Br. at 9-11; PhosAgro Posthearing Br. at 12-13; Koch Posthearing Br. at 1, 4-7.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

price movements in the U.S. market, we continue to find that they do not negate the significant

role that subject imports played in depressing domestic prices.  As shown by the evidence

previously discussed, notwithstanding that demand in the U.S. market began to decline in the

fall of 2018 and remained low throughout 2019, cumulated subject imports continued to enter

the U.S. market at elevated levels, contributing to oversupply conditions, and having depressing

effects on U.S. prices.  Respondents' arguments also fail to account for the fact that prices in

other global markets were also affected by exports from subject producers in Morocco and

Russia, collectively the world's largest exporters of phosphate fertilizers.[294]  Moreover, in 2019,

U.S. prices were lower than and decreased by more than global phosphate fertilizer prices.[295]

Although U.S. prices began to increase in the beginning of 2020 as weather conditions

improved, they remained at levels lower than those that existed in 2017 and 2018 until after

the filing of the petitions at the end of June 2020, at which point they sharply increased to

levels above other global markets.[296]

       Thus, for the foregoing reasons, we find that subject imports from Morocco and Russia

depressed prices to a significant degree.

       We next turn to the court's conclusion, as well as respondent interested parties'

---

[294] CR/PR at Table VII-14.

[295] Derived from CR/PR at Tables V-4-5 and Figure V-7; *see also* OCP Posthearing Br. at 11,
Responses to Questions pp. 67-69; *see also* CR/PR at Table V-11 (response of U.S. purchaser
[        ], reporting that U.S. producers reduced prices by an estimated [     ] percent due to
competition from subject imports:  [

                         ]).

[296] CR/PR at Tables V-4-5.  Cumulated subject imports declined substantially after the filing of
the petitions, and subject imports from Morocco ceased entirely beginning in August 2020.  CR/PR at
Table IV-6.  Total import volumes of phosphate fertilizers were lower in the third quarter of 2020 than in
the third quarters of every other year in the POI.  *See id.*

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

arguments, that the Commission's finding of significant price depression is undermined by the fact that Mosaic is most frequently identified by parties to be the price leader.[297]  As an initial matter, we note that the Commission questionnaires define "price leader" as "as (1) one or more firms that initiate a price change, either upward or downward, that is followed by other firms, or (2) one or more firms that have a significant impact on prices.  *A price leader is not necessarily the lowest-priced supplier*."[298]  Accordingly, a price leader may not be the lowest priced supplier.  More importantly, the fact that a firm might be identified as a price leader does not mean that its pricing decisions are insulated from competition from other market suppliers or from pricing pressure caused by an oversupplied market.[299]  Indeed, reviewing some of the responses of purchasers that identified Mosaic as a price leader, including those identified by OCP,[300] makes this abundantly clear.  For example, OCP identified [ █████ ] and [ █████ ] as purchasers that identified Mosaic as a price leader.  Notwithstanding that, [ █████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ].[301]  OCP also identified [ █████████ ] as a purchaser that identified Mosaic as a price leader; [ ████████████ ████████████████████████████████████████████████████████████████ ]

---

[297] *OCP III*, Slip Op. 25-51 at 43-44.

[298] Purchaser Questionnaire at III-26.

[299] *See, e.g.,* CR/PR at V-6.  The Court of International Trade has acknowledged that that the presence or absence of price leadership is not of itself decisive or determinative.  *See Nucor Corp. v. United States*, 318 F. Supp. 2d 1207, 1257 (Ct. Int'l Trade 2004) (Commission "not required to evaluate if price leadership was the reason why underselling may have decreased or increased in its consideration of underselling.").

[300] OCP Second Remand Views at 19.

[301] [ █████ ] Purchaser Questionnaire Response at II-4, III-26, III-29; [ █████ ] Purchaser Questionnaire Response at II-4, III-26, III-29.

*Public Version*

██████████████████████████████████████████ ].[302]  Similarly, [ ████████ ]

reported that [ ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████ ][303]  Furthermore, as discussed above, the record indicates that Mosaic

experienced competitive pressure from substantial volumes of cumulated subject imports,

which contributed to the conditions of oversupply and placed downward pressure on prices.

Additionally, to the extent that the court has found that the Commission's price

depression analysis is undermined because it "does not grapple with the fact that imports only

undersold the domestic product in twenty percent of instances,"[304] the court appears to have

overlooked that the Commission's underselling and price depression analyses are separate and

distinct.  *See Altx, Inc. v. United States*, 25 CIT 1100, 1109, 167 F. Supp. 2d 1353, 1365 (2001)

(stating that the Commission's underselling and depression analyses are "discrete" and must

not be "collapse{d}").  Indeed, a finding of significant underselling is not required for the

Commission to find significant price effects or make an affirmative injury determination.  *See,*

*e.g.*, *OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291, 1302 (Ct. Int'l Trade 2021) ("{T}he …

Federal Circuit … and this Court have made clear that the Commission may rely on evidence

*either* of significant underselling *or* significant price suppression or depression to support a

finding for adverse price effects."); *Siemens Energy*, 38 CIT at 898, 992 F. Supp. 2d at 1334-35

(sustaining the Commission's significant price effects finding based solely on price suppression,

---

[302] [ ████████ ] Purchaser Questionnaire Response at II-4, III-26, IV-3.
[303] [ ████████ ] Purchaser Questionnaire Response at III-26.
[304] Second Remand Order at 48-49; see also Koch Second Remand Comments at 6.

*Public Version*

and holding that the Commission "did not need to find" underselling in these circumstances), *aff'd*, 806 F.3d 1367 (Fed. Cir. 2015); *Cemex, S.A. v. United States*, 16 CIT 251, 260–61, 790 F. Supp. 290, 299 (1992) ("To require findings of underselling would be inconsistent with the proposition that price suppression or depression is sufficient."), *aff'd*, 989 F.2d 1202 (Fed. Cir. 1993).  Thus, neither the prevalence of overselling nor the fact that we did not make a finding of significant underselling undermines our finding that subject imports depressed prices to a significant degree.

In the same vein, the fact that we did not make a finding of significant underselling does not undermine our finding that record evidence demonstrated that subject imports were at times priced lower, as OCP claims.[305]  Our finding that subject imports were at times low priced was not based solely on the instances of underselling shown by the pricing comparisons. Rather, we have performed a comprehensive analysis of the role of subject import prices on prices for the domestic product, based on the totality of record evidence.[306]  We have found the close comparability of subject and domestic prices to be consistent with the high degree of substitutability and price transparency that existed in the U.S. market.[307]  As discussed above, phosphate fertilizer prices are reported in various trade publications, which gather market intelligence, including from market participants, many of which reported providing their prices to these publications.  This price information is published on a daily or weekly basis, and quickly transmitted throughout the U.S. market, with the majority of U.S. producers and purchasers, as well as some importers, reporting that they rely upon these publications in setting or

---

[305] OCP Second Remand Comments at 16-17.
[306] First Remand Views at 20-21, 35-36.
[307] First Remand Views at 20-21, 35-36.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

negotiating prices.[308]

We have also considered whether subject imports prevented price increases of the domestic like product, which otherwise would have occurred to a significant degree. The record indicates the domestic industry's ratio of COGS to net sales decreased from [ ▮ ] percent in 2017 to [ ▮ ] percent in 2018 and then increased to [ ▮ ] percent in 2019; it was higher in interim 2020 at [ ▮ ] percent than in interim 2019 at [ ▮ ] percent.[309]

Between 2017 and 2018, the domestic industry's total COGS decreased by [ ▮ ] percent. The domestic industry's net sales volume, however, also decreased, contributing to the industry's unit COGS increasing from $[ ▮ ] per short ton in 2017 to $[ ▮ ] per short ton in 2018. Specifically, the domestic industry's unit raw material costs increased from $[ ▮ ] per short ton in 2017 to $[ ▮ ] per short ton in 2018, and the industry's unit other factory costs increased from $[ ▮ ] per short ton in 2017 to $[ ▮ ] per short ton in 2018, while the industry's unit direct labor costs remained the same at $[ ▮ ] per short ton in 2017 and 2018.[310] Notwithstanding this, the domestic industry's COGS to net sales ratio declined because the domestic industry's unit net sales value, which increased from $[ ▮ ] per short ton in 2017 to $[ ▮ ] per short ton in 2018, exceeded the increase in the domestic industry's unit COGS.[311]

Between 2018 and 2019, the domestic industry's total COGS decreased by another [ ▮ ] percent, while the domestic industry's net sales volume declined by [ ▮ ] percent and net sales value declined by [ ▮ ] percent, resulting in an increase in the industry's COGS to

---

[308] First Remand Views at 35-36.
[309] CR/PR at Tables IV-2, VI-1, and C-1.
[310] CR/PR at Table VI-1.
[311] CR/PR at Table VI-1.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

net sales ratio.[312]  The domestic industry's unit COGS increased from $[ ▇ ] per short ton in 2018 to $[ ▇ ] per short ton in 2019, with its unit raw material costs increasing from $[ ▇ ] per short ton in 2018 to $[ ▇ ] per short ton in 2019, and the industry's unit other factory costs increasing from $[ ▇ ] per short ton in 2018 to $[ ▇ ] per short ton in 2019, while the industry's unit direct labor costs decreased from $[ ▇ ] per short ton in 2017 and 2018 to $[ ▇ ] per short ton in 2019.[313]  Thus, while unit COGS increased slightly by $[ ▇ ] per short ton ([ ▇ ]) percent) from 2018 to 2019, the domestic industry's net sales unit value declined substantially, by $[ ▇ ] per short ton ([ ▇ ] percent), from $[ ▇ ] per short ton in 2018 to $[ ▇ ] per short ton in 2019,[314] resulting in a substantial [ ▇ ] percentage point increase in the domestic industry's COGS to net sales ratio.[315]  This occurred as poor weather conditions led to a decline in U.S. demand in 2019, U.S. importers further increased the share of subject imports in the U.S. market (up [ ▇ ] percentage points from 2018), and a significant volume of cumulated subject imports continued to enter the U.S. market at competitive and lower prices, putting additional pressure on domestic prices, and substantially contributing to oversupply conditions.  Although the domestic industry attempted to offset the collapse in U.S. prices by idling capacity and curtailing production,[316] the record as a whole indicates that in a highly transparent market, competitively and lower priced subject imports contributed to the market

---

[312] CR/PR at Table VI-1.
[313] CR/PR at Table VI-1.
[314] CR/PR at Table VI-1.
[315] CR/PR at Table C-1.
[316] CR/PR at Table III-3; Mosaic Prehearing Br. at 2, Mosaic Posthearing Br. at Responses to Questions pp. 10-23, Exhibits 17-19.

*Public Version*

imbalance between supply and demand and, as found above, depressed prices to a significant

degree.[317]

    In sum, for the foregoing reasons, we find that subject imports from Morocco and

Russia depressed prices to a significant degree.  We thus continue to conclude that subject

imports had significant price effects.

    **D.    Impact of the Subject Imports**

    Section 771(7)(C)(iii) of the Tariff Act provides that the Commission, in examining the

impact of the subject imports on the domestic industry, "shall evaluate all relevant economic

factors which have a bearing on the state of the industry."[318]  These factors include output,

sales, inventories, capacity utilization, market share, employment, wages, productivity, profits,

cash flow, return on investment, ability to raise capital, research and development, and factors

affecting domestic prices.  No single factor is dispositive and all relevant factors are considered

"within the context of the business cycle and conditions of competition that are distinctive to

the affected industry."[319]

    As we observed in our Original Views and First Remand Views, the domestic industry's

output indicators declined from 2017 to 2019, but were higher in interim 2020 than in interim

---

[317] Mosaic Prehearing Br. at 59-63; Mosaic Posthearing Br. at 10-11.  Mosaic states that in addition to idling facilities and curtailing production, it also increased exports because the U.S. market could not absorb additional supply.  Mosaic Posthearing Br. at 11.

[318] 19 U.S.C. § 1677(7)(C)(iii); *see also* SAA at 851 and 885 ("In material injury determinations, the Commission considers, in addition to imports, other factors that may be contributing to overall injury.  While these factors, in some cases, may account for the injury to the domestic industry, they also may demonstrate that an industry is facing difficulties from a variety of sources and is vulnerable to dumped or subsidized imports.").

[319] 19 U.S.C. § 1677(7)(C)(iii).  This provision was amended by the Trade Preferences Extension Act of 2015, Pub. L. 114-27.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

***Public Version***

2019.[320]  Specifically, the domestic industry's share of apparent U.S. consumption declined from

[ ■ ] percent in 2017 to [ ■ ] percent in 2018 and [ ■ ] percent in 2019; its market share

was higher in interim 2020, at [ ■ ] percent than in interim 2019, at [ ■ ] percent.[321]  Its

production decreased by [ ■ ] percent between 2017 and 2019 from [ ■ ] short

tons in 2017 to [ ■ ] short tons in 2018 to [ ■ ] short tons in 2019; its

production was higher in interim 2020, at [ ■ ] short tons, than in interim 2019, at [ ■

■ ] short tons.[322]  Its capacity declined by [ ■ ] percent from 2017 to 2019, from [ ■

■ ] short tons in 2017 to [ ■ ] short tons in 2018 and [ ■ ] short tons in

2019,[323] and its capacity utilization increased by [ ■ ] percentage points from [ ■ ] percent

in 2017 to [ ■ ] percent in 2018 to [ ■ ] percent in 2019.[324]  The domestic industry's

capacity was higher in interim 2020, at [ ■ ] short tons, than in interim 2019, at [ ■

■ ] short tons, while its capacity utilization was lower in interim 2020, at [ ■ ] percent,

than in interim 2019, at [ ■ ] percent.[325]

     The domestic industry's U.S. shipments declined by [ ■ ] percent between 2017 and

2019, from [ ■ ] short tons in 2017 to [ ■ ] short tons in 2018 and [ ■ ]

---

[320] Original Views at 49-53; First Remand Views at 59-60.  As previously noted, after the petitions were filed at the end of June 2020, subject imports decreased in the U.S. market.  Mosaic restarted production at previously idled facilities, diverted shipments that had been destined for export markets, and drew down inventories, for a total of [ ■ ] short tons in additional sales in interim 2020 compared to interim 2019.  Mosaic U.S. Producer Questionnaire Response at IV-16.  [ ■
■ ] also reported more U.S. shipments in interim 2020 than in interim 2019.  [ ■ ] U.S. Producer Questionnaire Responses at II-7; [ ■ ] U.S. Producer Questionnaire Responses at II-7. Consequently, the domestic industry's market share, capacity, production, and U.S. shipments were higher in interim 2020 than in interim 2019.  CR/PR at Table C-1.
[321] CR/PR at Tables IV-8, C-1.
[322] CR/PR at Tables III-4, C-1.
[323] CR/PR at Tables III-4, C-1.
[324] CR/PR at Tables III-4, C-1.
[325] CR/PR at Tables III-4, C-1.



[     ] short tons in 2019; its U.S. shipments were higher in interim 2020, at [     ] short tons, than in interim 2019, at [     ] short tons.[326]  The domestic industry's end-of-period inventories increased by [  ] percent from 2017 to 2019, from [     ] short tons in 2017 to [     ] short tons in 2018 and 2019; its end-of-period inventories were lower in interim 2020, at [     ] short tons, than in interim 2019, at [     ] short tons.[327]  The domestic industry's ratio of end-of-period inventories to total shipments increased steadily from 2017 to 2019 but was lower in interim 2020 than in interim 2019.[328]

Employment indicators for the domestic industry also declined between 2017 and 2019.  The domestic industry's number of production and related workers ("PRWs") fell from [     ] in 2017 to [     ] in 2018 and [     ] in 2019; its number of PRWs was lower in interim 2020, at [     ], than in interim 2019, at [     ].[329]  Total hours worked,[330] wages paid,[331] and productivity[332] also fell from 2017 to 2019.  Total hours worked and wages paid were lower in interim 2020 than in interim 2019 while productivity was higher between the interim periods.[333]

The domestic industry's net sales, gross profit, operating income, and net income

---

[326] CR/PR at Tables III-6, C-1.
[327] CR/PR at Tables III-7, C-1.
[328] CR/PR at Tables III-7, C-1.  The ratio of end-of-period inventories to U.S. shipments was [  ] percent in 2017, [  ] percent in 2018, and [  ] percent in 2019.  It was lower in interim 2020 at [  ] percent than in interim 2019 at [  ] percent.  *Id.*
[329] CR/PR at Tables III-9; C-1.
[330] CR/PR at Tables III-9; C-1.  Total hours worked decreased from [     ] hours in 2017 to [     ] hours in 2018 and [     ] hours in 2019.  *See id.*
[331] CR/PR at Tables III-9; C-1.  Wages paid decreased from $[     ] in 2017 to $[     ] in 2018 to $[     ] in 2019.  *See id.*
[332] CR/PR at Tables III-9; C-1.  Productivity per 1,000 hours decreased from [     ] short tons in 2017 to [  ] short tons in 2018 and [  ] short tons in 2019.  *See id.*
[333] Total hours worked were [     ] hours in interim 2019 and [     ] hours in interim 2020.  Wages paid were $[     ] in interim 2019 and $[     ] in interim 2020.  Productivity was [     ] short tons in interim 2019 and [     ] short tons in interim 2020.  CR/PR at Tables III-9; C-1.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

increased between 2017 and 2018, but deteriorated in 2019.  Most of the industry's financial indicators were lower in interim 2020 than in interim 2019.[334]  Specifically, the domestic industry's net sales by value increased from $[          ] in 2017 to $[          ] in 2018, then declined to $[          ] in 2019; its net sales by value was lower in interim 2020, at $[          ], than in interim 2019, at $[          ].[335]  Its gross profit increased from $[          ] in 2017 to $[          ] in 2018, then declined to [          ]; its gross profit was lower in interim 2020, at [          ], than in interim 2019, at [          ].[336]  The industry's operating income increased from $[          ] in 2017 to $[          ] in 2018, then declined to [          ] in 2019; its operating income was lower in interim 2020, at [          ], than in interim 2019, at [          ].[337]  The ratio of operating income to net sales increased from [    ] percent in 2017 to [    ] percent in 2018, then declined to [          ] percent in 2019; it was lower in interim 2020, at [          ] percent, than in interim 2019, at [          ] percent.[338]  The domestic industry's net income increased from $[          ] in 2017 to $[          ] in 2018, then declined to [          ]; its net income was higher in interim 2020, at [          ], than in interim 2019, at [          ].[339]

---

[334] U.S. prices at the beginning of 2019 were higher than later in the year.  Consequently, interim 2020 prices, although increasing substantially in the last three months of the POI after the petitions were filed, remained at lower levels than in interim 2019, which, in turn resulted in lower gross profit levels despite increasing net sales quantity and lower COGS.  CR/PR at VI-9, Tables V-4-5, VI-1-2.

[335] CR/PR at Tables VI-1, C-1.

[336] CR/PR at Tables VI-1, C-1.

[337] CR/PR at Tables VI-1, C-1.

[338] CR/PR at Tables VI-1, C-1.

[339] CR/PR at Tables VI-1, C-1.  The ratio of net income to net sales increased from [    ] percent in 2017 to [    ] percent in 2018, then declined to [          ] percent in 2019; it was slightly higher in interim 2020 at [          ] percent than in interim 2019, at [          ] percent.  *Id.*

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

Domestic producers' capital expenditures increased from $[███████] in 2017 to $[███████] in 2018 and $[███████] in 2019,[340] [341] while research and development expenses decreased each year, from $[██████] in 2017 to $[██████] in 2018 and $[██ ██████] in 2019.[342] [████████████████████████████] also reported negative effects on investment and growth and development that [████] attributed to subject imports.[343]

As discussed above, we have found that the volume of cumulated subject imports and the increase in the volume were significant during the period of investigation, and subject imports gained [████] percentage points in market share at the expense of the domestic industry from 2017 to 2019 ([███] percentage points from 2017-2018 and [███] percentage points from 2018-2019).[344] The record also shows that the volume of cumulated subject imports increased by one million short tons between 2017 and 2018, and as demand began to decline in the fall of 2018, U.S. importers' inventories reached their highest level of those two years. Notwithstanding these substantial inventories and declining demand, subject imports surged into the U.S. market in January 2019 and continued to flow into the U.S. market in

---

[340] CR/PR at Tables VI-6, C-1. The domestic producers' capital expenditures were higher in interim 2020, at $[███████], than in interim 2019, at $[███████]. *See id.*

[341] All three U.S. producers reported [████████████████████████████████████████████████████████████████]. Specifically, Mosaic explained that [███████████████████████████████████████████████████████████████████████████████████████████████████]. Nutrien reported that its capital expenditures related to [███████████████████████]. Simplot reported that [███████████████████████████]. CR/PR at Table VI-7.

[342] CR/PR at Tables VI-6, C-1. The domestic producers' research and development expenses were lower in interim 2020, at $[██████], than in interim 2019, at $[██████]. *See id.*

[343] CR/PR at Tables VI-9-10.

[344] CR/PR at Table C-1.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

substantial quantities, reaching 2.7 million short tons that year, even as demand declined in

2019.[345]  U.S. importers' quarterly inventories reached their highest level in March 2019, but

subject imports nonetheless continued to enter the U.S. market in the latter part of 2019 in

excess of any purported need to replenish depleted inventories in the latter part of 2019.

Moreover, as previously discussed, the record shows that regardless of the "unidirectional"

movement of subject importers' inventories, the volumes of subject imports entering the U.S.

market had significant depressing effects on U.S. prices.  Record evidence shows subject

imports being offered and sold at lower prices, domestic producers lowering prices to compete

with subject imports, and certain purchasers purchasing subject imports rather than the

domestic like product for price reasons.  Consequently, cumulated subject imports – including

through their significant volumes that contributed to the oversupply conditions in the U.S.

market during the POI at competitive and lower prices – depressed prices in the U.S. market to

a significant degree.

    The downward pricing pressure exerted by subject imports caused the domestic

industry's revenues to be lower than they would have been otherwise.  The domestic industry's

U.S. shipment average unit value declined to $[ ▮ ] per short ton in 2019, down from $[ ▮ ]

per short ton in 2018 and $[ ▮ ] per short ton in 2017.[346]  The domestic industry's sales

revenues declined considerably in 2019 (down from 2018 [ ▮ ] percent by quantity and [ ▮ ]

percent by value) along with its profitability as its COGS to net sales ratio rose above [ ▮ ]

percent.[347]  Sales revenues and profitability continued to be weak and the industry's COGS to

---

[345] CR/PR at Tables IV-2, IV-6.
[346] CR/PR at Table C-1.
[347] CR/PR at Tables VI-1, C-1.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

net sales ratio remained above [ █ ] percent into interim 2020.[348]  As a consequence, we find that subject imports had a significant impact on the domestic industry.

We have evaluated the above factors within the context of the business cycle and conditions of competition distinctive to the industry.  In doing so, we note that, in many investigations, there are other economic factors at work, some or all of which may also be having adverse effects on the domestic industry.  Such economic factors might include nonsubject imports; changes in technology, demand, or consumer tastes; competition among domestic producers; or management decisions by domestic producers.  The legislative history explains that the Commission must examine factors other than subject imports to ensure that it is not attributing injury from other factors to the subject imports, thereby inflating an otherwise tangential cause of injury into one that satisfies the statutory material injury threshold.[349]  In performing its examination, however, the Commission need not isolate the injury caused by other factors from injury caused by unfairly traded imports.[350]  Nor does the "by reason of"

---

[348] CR/PR at Table VI-1, C-1.

[349] The Statement of Administrative Action for the Uruguay Round Agreements Act ("SAA") at 851-52 ("{T}he Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports."); S. Rep. 96-249 at 75 (1979) (the Commission "will consider information which indicates that harm is caused by factors other than less-than-fair-value imports."); H.R. Rep. 96-317 at 47 (1979) ("in examining the overall injury being experienced by a domestic industry, the ITC will take into account evidence presented to it which demonstrates that the harm attributed by the petitioner to the subsidized or dumped imports is attributable to such other factors;" those factors include "the volume and prices of nonsubsidized imports or imports sold at fair value, contraction in demand or changes in patterns of consumption, trade restrictive practices of and competition between the foreign and domestic producers, developments in technology and the export performance and productivity of the domestic industry"); *accord Mittal Steel*, 542 F.3d at 877.

[350] SAA at 851-52 ("{T}he Commission need not isolate the injury caused by other factors from injury caused by unfair imports."); *Taiwan Semiconductor Industry Ass'n*, 266 F.3d at 1345 ("{T}he Commission need not isolate the injury caused by other factors from injury caused by unfair imports ... . Rather, the Commission must examine other factors to ensure that it is not attributing injury from other

(*continued*...)

*Public Version*

standard require that unfairly traded imports be the "principal" cause of injury or contemplate

that injury from unfairly traded imports be weighed against other factors, which may be

contributing to overall injury to an industry.[351]  It is clear from the statute and decisions of the

Federal Circuit and court of International Trade that the existence of injury caused by other

factors does not compel a negative determination.[352]

Within this framework, we have considered respondents' arguments that the domestic

industry's poor performance was not caused by subject imports, but rather was the result of

other factors.  Specifically, we considered the role of declining U.S. demand due to unusually

poor weather conditions, which began in the latter part of 2018 and affected three consecutive

application sessions – fall 2018, spring 2019, and fall 2019.[353]  Although demand declines in

2019 may have exerted some degree of downward force on the domestic industry's prices, we

again note that the Commission need not isolate the injury caused by other factors from injury

caused by subject imports and that the "by reason of" standard does not require that unfairly

traded imports be the "principal" cause of injury or contemplate that injury from unfairly

---

sources to the subject imports."); *Asociacion de Productores de Salmon y Trucha de Chile AG v. United States*, 180 F. Supp. 2d 1360, 1375 (Ct. Int'l Trade 2002) ("{t}he Commission is not required to isolate the effects of subject imports from other factors contributing to injury" or make "bright-line distinctions" between the effects of subject imports and other causes.); *see also Softwood Lumber from Canada*, Inv. Nos. 701-TA-414 and 731-TA-928 (Remand), USITC Pub. 3658 at 100-01 (Dec. 2003) (Commission recognized that "{i}f an alleged other factor is found not to have or threaten to have injurious effects to the domestic industry, *i.e.*, it is not an 'other causal factor,' then there is nothing to further examine regarding attribution to injury"), *citing Gerald Metals,* 132 F.3d at 722 (the statute "does not suggest that an importer of LTFV goods can escape countervailing duties by finding some tangential or minor cause unrelated to the LTFV goods that contributed to the harmful effects on domestic market prices.").

[351] S. Rep. 96-249 at 74-75; H.R. Rep. 96-317 at 47.

[352] *See Nippon Steel Corp.*, 345 F.3d at 1381 ("an affirmative material-injury determination under the statute requires no more than a substantial-factor showing.  That is, the 'dumping' need not be the sole or principal cause of injury.").

[353] OCP Prehearing Br. at 108-116; Gavilon Prehearing Br. at 10-11, 64-65; PhosAgro Prehearing Br. at 21-22; IRM Prehearing Br. at 31; PhosAgro Posthearing Br. at 9-10.

traded imports be weighed against other factors, which may be contributing to overall injury to an industry. As described above, the volume of cumulated subject imports and inventories of such merchandise increased significantly from 2017 to 2018, and remained significant in 2019 despite decreased apparent U.S. consumption. In the latter half of 2019, as demand remained low due to further adverse weather conditions, U.S. importers continued to maintain elevated levels of inventories and continued to import more subject merchandise than was needed to replenish any depletion of these inventories. Moreover, as previously discussed, contemporaneous trade publications and U.S. purchaser questionnaire responses documented the adverse impact of imports on U.S. prices. Therefore, the adverse weather conditions that affected the U.S. market and prompted a decline in demand do not rebut the fact that the industry's performance would have been stronger in the absence of the significant volume of subject imports from Morocco and Russia that exerted downward pricing pressure on the domestic industry. In other words, we have observed material injury to the domestic industry by reason of subject imports that is distinct from the declining demand so as to ensure that we are not attributing injury from declining demand to the subject imports.[354]

     To comply with the court's first remand instructions, we assessed whether "fertilizer was 'practically unavailable from U.S. sources' to supply high-demand regions in 2019 because

---

[354] We also find unpersuasive PhosAgro's assertions that public statements by Mosaic indicate a lack of causation by subject imports. PhosAgro Second Remand Comments at 4-5. Any such statements are outweighed by the record evidence establishing that the domestic industry was materially injured by reason of subject imports, including public and internal statements by Mosaic, discussed below. Mosaic Posthearing Br., Response to Commission Questions at 10-20, Exhibits 11-22. Additionally, Mosaic offered reasonable and credible explanations regarding sensitivities and concerns relating to its public statements. Mosaic Posthearing Br., Response to Commission Questions at 12-13.

*Public Version*

doing so would not have been economically viable."[355]  As discussed above, although we did so

in the context of our volume analysis there, we repeat and incorporate that discussion in the

proper context of our impact analysis here to ensure that we are not attributing injury from

other factors to the subject imports.  Despite declines in the domestic industry's capacity during

the POI,[356] the domestic industry had excess capacity throughout the POI, and in 2019, its

capacity utilization was [ ██ ] percent, meaning that the domestic industry had [ ████████ ]

short tons of excess capacity in 2019.[357]

    We also note that, in addition to this excess capacity, domestic producers maintained

---

[355] *See* Remand Order at 41.

[356]  As described in our Original Views, the domestic industry's capacity decreased from [ ████
████ ] short tons in 2017 to [ ████████ ] short tons in 2018 and [ ████████ ] short tons in 2019,
and the declines in the domestic industry's capacity were attributed to Mosaic.  Original Views at 23, 49;
CR/PR at Table III-4.  The larger decline from 2017 to 2018 coincided with its idling of the Plant City
facility in December 2017.  Additionally, we note that, contrary to respondents' claims, this did not
cause a "supply gap" that explains the increase subject import volume, as discussed above.  The
domestic industry's capacity declined to a lesser extent from 2018 to 2019, but as described above, even
with these reductions in capacity, the domestic industry maintained excess capacity.  We further note
that Simplot maintained the same level of capacity throughout the POI, while Nutrien increased capacity
from 2017 to 2018 and maintained the same level of capacity from 2018 to 2019.  CR/PR at Table III-4.
Moreover, we observe that in 2019, Nutrien was reported in an *Argus* article as "refer{ing} to potential
further US production cuts as 'a futile game' . . ., stating that any cut would simply result in greater
imports."  Petitions, Exhibit I-43.  The article continues –

> Nutrien argues that the market is weak because of fundamental
> structural oversupply and that further cuts simply signal to OCP, Russian
> and other producers to ship to the US.  It is a clear message to its
> competitor, Mosaic, which accounts for around three-quarters of US
> phosphates production.  It is rare for any producer to speak in such
> plain language, but the assessment is spot on....  Nutrien's view that
> supply cuts in the US will not deter shipments from competitors is
> correct but Mosaic has little choice....  The supplier is now left with the
> uncomfortable decision of whether to cut production in a bid to stop
> losing money and eroding shareholder value, or cede domestic market
> share to foreign lower-cost producers.

*Id.*

[357] CR/PR at Tables III-4, C-1.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

substantial inventories in 2019. Domestic producers' end-of-period inventories by quarter were [          ] short tons in March 2019, [          ] short tons in June 2019, and [          ] short tons in September and December 2019.[358] Furthermore, the supplementary questionnaire information obtained in the first remand proceedings indicates that domestic producers maintain these inventories [                                        ].[359] We observe that the record both in the original investigations and as supplemented on remand shows that domestic producers rely upon [                                        ], and confirms that domestic producers [                                        ].[360] Further, as shown above, Mosaic's reshipment of inventories was not limited to only the type of [                ] observed in the First Remand Views, but rather also included other [                                        ].[361] The total reshipment quantities of domestic producers equated to approximately [     ] percent of the domestic industry's total U.S.

---

[358] CR/PR at Table D-1.
[359] *See* [                                        ].
[360] *See* [                                        ]. Although we note that Mosaic reports that [                                        ]. Mosaic Domestic Producer Remand Questionnaire at 2(c). Likewise, Simplot reports that [                                        ]. Simplot Domestic Producer Remand Questionnaire at 2(a) – 2(c).
[361] Mosaic Domestic Producer Remand Questionnaire at 2(b) – (c).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

shipments during the POI,[362] and the domestic industry's total inventory reshipments during the POI were equivalent to approximately [ ▮ ] percent of the industry's total end-of-year inventories during the period, indicating that the movement of such inventories is a regular business practice and not a rare occurrence or just a theoretical possibility.  Furthermore, Mosaic [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ],[363] which shows how, unlike importers, the domestic industry was able to use alternate shipping methods and to draw upon its extensive distribution network to reach customers.

In sum, we find that the record from the original investigations and as supplemented in the first remand proceedings indicates that the domestic industry's excess capacity, substantial inventories, extensive inventory locations, expansive multi-modal distribution network, and demonstrated ability to move and relocate product where it was needed shows that domestic producers were well-positioned to supply the U.S. market in 2019.  Accordingly, having considered the conditions of competition as directed by the court, we find that the record does not indicate that fertilizer was "practically unavailable from U.S. sources."

We next address the court's remand order that the Commission "failed to account for {} detracting evidence" regarding Mosaic's alleged refusal to supply the U.S. market and only summarized Mosaic's arguments that "some of the supply issues identified . . . are with brokers/traders such as ADM and Koch that compete with the domestic industry for sales."[364]

---

[362] *Calculated from* Mosaic Domestic Producer Remand Questionnaire, Simplot Domestic Producer Remand Questionnaire, CR/PR at Table C-1.
[363] Mosaic Remand Domestic Producer Questionnaire at 2(c).
[364] Second Remand Order at 31-32.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

As an initial matter, we find that any decisions by Mosaic to prioritize its "loyal customers" over supplying trading companies that compete with it for the same customers as well as its decision to sell directly to customers, rather than selling through a "middleman," does not constitute a "refusal{} to supply the domestic market."  Moreover, the record does not show that Mosaic systematically refused to sell to these purchasers at all, as discussed in more detail below.

*ADM.*  The record does not indicate that Mosaic refused to supply fertilizers to ADM on a widespread basis consistently throughout the POI.[365]  As discussed in the Original and First Remand Views and repeated above, Mosaic disputes ADM's testimony that Mosaic "categorically refuses to sell to us," and Mosaic asserts that [ ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ ].[366]  Indeed, ADM's own evidence supports Mosaic's claims.  At the hearing, the Director of Sales and Marketing for ADM testified that ADM "predominantly uses annual supply contracts so that we can effectively and cost-effectively manage deliveries throughout our distribution network.  However, Mosaic refuses to sell to us on this basis."[367]  Additionally, although the witness contended that "spot tons have never been available,"[368] ADM submitted an email exchange in May 2019, in which a Mosaic representative twice offered to supply ADM with fertilizer, but ADM complained that the price was "$10/ton

---

[365] Second Remand Order at 31-32; OCP Remand Comments at 10-11.
[366] First Remand Views at 70-71 n.296 (citing Mosaic Posthearing Br. at Responses to Questions pp. 86-87, Exhibits 53, 54).
[367] Hearing Tr. at 208-9 (Niederer).
[368] Hearing Tr. at 209 (Niederer).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

above the market price at that time."[369]  This is consistent with the company's testimony that "if {Mosaic} were willing to sell to us <u>at market level prices</u>, we would buy up to 400,000 tons annually from them."[370]  That Mosaic may have declined to sell product on ADM's preferred terms or at ADM's preferred prices does not constitute at a "categorical refusal to sell."  ADM also submitted several unsupported claims, one email from 2017, one email from 2018, and several exchanges that occurred after the petitions were filed.[371]  Given that the parties agree that following the filing of the petitions, cumulated subject imports began exiting the U.S. market,[372] which caused a supply shock, we find it appropriate to accord less weight to post-petition indications of tight or restricted supply, which Mosaic acknowledged to have occurred.[373]  Accordingly, we find that Mosaic's claims that it did not "categorically refuse" to supply ADM are more credible and consistent with record evidence.

　　*Gavilon.*  The record does not support a finding that Mosaic "generally declined

---

[369] ADM Posthearing Br. at 3, Exhibit 1.

[370] Hearing Tr. at 209 (emphasis added).

[371] ADM Posthearing Br. at 3, Exhibit 1.

[372] As explained in the Original and First Remand Views, the parties agreed that the filing of the petitions in June 2020, resulted in a large decrease in the volume of cumulated subject imports.  Original Views at 34 n.134; First Remand Views at 9 n.31; Mosaic Prehearing Br. at 43-44, 91; Simplot Prehearing Br. at 29-30, 34; Simplot Posthearing Br. at Responses to Questions pp. 53-54; Mosaic Posthearing Br. at Responses to Questions pp. 69-70; OCP Posthearing Br. at 12, Responses to Questions pp. 33, 67-73; EuroChem Posthearing Br. at 11; IRM Posthearing Br. at 8-9; PhosAgro Posthearing Br. at 12-13, Responses to Questions.  Some U.S. importers indicated that they stopped bringing in subject imports "because the buyers and the sellers agreed that the risk of 75 percent countervailing duties was higher than either of them wanted to take."  Hearing Tr. at 337 (Aranoff); see also EuroChem Posthearing Br. at 11 (stating that as a result of the filing of the petitions, it shifted its purchases of phosphate fertilizers from Morocco and Russia to other global sources); [ ██████ ] U.S. Purchaser Questionnaire Response at III-11 (reporting that Koch and IRM will not quote or import material until the countervailing duty decision is issued); [ █████ ] U.S. Purchaser Questionnaire Response at III-11 (reporting that Helm, Koch, and OCP "cut off" supplying imported product to the U.S. market in the summer of 2020).

[373] First Remand Views at 16, 28, 61, 71-72.

*Public Version*

{Gavilon's} sales inquiries."[374] [███████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████].[375]  Notwithstanding this, [███████████

███████████████████████████].[376]

    *Koch*.  Similar to ADM, Scott McGinn, Executive Vice President for Koch Fertilizer,

testified at the hearing that "{i}n the last few years, we've frequently asked Mosaic if it would

sell us barges of phosphate fertilizers <u>at market prices</u>.  Mosaic has generally declined our

inquiries."[377]  Additionally, the contemporaneous documentation that Koch submitted

consisted of only one email from 2018, one from 2020 post-petition, and one from 2021.[378]

Based on the limited evidence that Koch presented, we find that the fact that Mosaic "generally

declined" to sell to Koch at Koch's preferred prices does not establish that Mosaic refused to

sell to it or to supply the U.S. market.  We likewise find unavailing OCP's argument that Koch's

[████████████████] from Mosaic demonstrate Mosaic's general and consistent unwillingness

to supply Koch as opposed to Koch's unwillingness to purchase fertilizers from Mosaic unless it

is at Koch's preferred prices.[379]

    *Heartland.*  As the court noted, Mr. Coppess, the retired Executive Vice President of

Heartland, testified that in May 2020, Mosaic refused to offer Heartland product . . . saying that

---

[374] Second Remand Views at 30.
[375] Mosaic Posthearing Br. at Responses to Questions, p. 85; [█████████████████████
█████████████]; Staff Conference Testimony of Brian Harlander President, Gavilon Fertilizer, LLC.
[376] [████████████████████████████████████████████████████████████████████████].
[377] Hearing Tr. at 196; *see also* OCP Second Remand Comments at 10; Koch Second Remand
Comments at 4-5.
[378] Koch Posthearing Br. at 4.
[379] OCP Second Remand Comments at 10-11.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

it was "out of the market at the present time."[380]  We note that Mr. Coppess appears to be

discussing a specialty product, MES, and notwithstanding that statement as well as his

reference to "some spot outages of MES," Mr. Coppess's testimony suggests that Mosaic

continued to supply this product to Heartland.  Specifically, Mr. Coppess testified that

"{a}lthough some importers offer homogeneous products like MES, . . . they're only available in

quantities too large for us to take on top of our commitments to Mosaic."[381]  We further note

that Heartland does not appear to be a significant purchaser in the U.S. market, as it was not

listed as such by domestic producers or importers and did not submit a purchaser questioner.

As discussed above, although some purchasers reported being unable to obtain supply

from Mosaic at times during the POI,[382] we find that the record as a whole indicates that subject

imports contributed significantly to oversupply conditions in a declining market and had

significant price-depressing effects on prices in the U.S. market in 2019, and these prices

remained at depressed levels in 2020 before the petitions were filed and increased sharply as

subject imports exited the market.  Given the details set out above regarding Mosaic's alleged

refusals to supply the U.S. market, we find that we are not attributing to subject imports the

injury caused by such alleged refusal.[383]

Nor have we misattributed to imports any alleged injury resulting from alleged supply

issues.  Undermining assertions of widespread or problematic issues with supply from domestic

---

[380] Hearing Tr. at 205.
[381] Hearing Tr. at 206.
[382] *See, e.g.*, Gavilon Prehearing Br. at 20-24, Exhibit 7; IRM Prehearing Br. at 12-15, 18-19; IRM Posthearing Br. at Exhibit 4; ADM Posthearing Br. at Exhibit 1; Hearing Tr. at 205-206 (Coppess); Response of [ ▮▮▮▮▮▮▮ ], CR/PR at Table V-11.
[383] We also note that Mosaic is not the only domestic producer.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

sources compared to subject sources, is the fact that the majority of purchasers reported that

the domestically produced product was either comparable or superior to product from

Morocco (16 of 24 firms) and Russia (20 of 23 firms) in availability and reliability of supply.[384]  As

previously discussed, most U.S. purchasers reported that the domestic product's U.S.

distribution network was superior to that of subject imports.[385]  The additional questionnaire

responses gathered in the first remand proceedings demonstrate the breadth and superiority of

U.S. producers' distribution networks, and that the domestic industry reported moving

inventories between locations while importers generally did not.[386]

Respondents argue that subject imports merely filled a supply gap created by Mosaic's

decision to idle its Plant City facility in December 2017,[387] which was exacerbated by Nutrien's

---

[384] CR/PR at Table II-9.  Although 16 of 28 purchasers reported experiencing supply constraints, we note that three of those purchasers ([                              ], [                              ], and [            ]) specifically implicated U.S. importers only.  Moreover, three other purchasers ([          ], [          ], and [        ]) pointed to experiencing constraints from both U.S. importers and domestic producers. And one purchaser ([          ]) pointed to [                                                          
                              ].  [                    ], [                              ], [              ], [              ], [          ], [            ], and [              ] U.S. Purchaser Questionnaire Responses at III-11.  Consequently, only nine of 28 responding purchasers – three of which were U.S. importers ([        ], [          ], and [        ]) of subject phosphate fertilizers and [                                        
              ] – reported supply constraints with respect to the domestic like product only.

[385] CR/PR at Table II-9.

[386] *See* above Section II.A.3; Remand Questionnaire Responses at 2(a)-(c).

[387] OCP Prehearing Br. at 7, 24-32, 62-63; Gavilon Prehearing Br. at 20, 34, 60-63; IRM Prehearing Br. at 6-9, 19-20, 24-25; OCP Posthearing Br. at 2, 4, Responses to Questions pp. 14-15, 77-78; IRM Posthearing Br. at 5.  Respondents, referring to Mosaic's public statements regarding giving up "1 million tonnes of market here in the U.S. intentionally," argue that idling the facility was part of Mosaic's global strategy to invest in lower-cost production facilities overseas and bring in product from its joint venture in Saudi Arabia.  Mosaic firmly denies that it deliberately idled Plant City – which it states had accounted for 700,000 short tons of phosphate fertilizer sold into the U.S. market in 2017 – for this purpose, and we observe that Mosaic [              ] import from its joint venture in Saudi Arabia during the POI, and that imports from Saudi Arabia remained at much lower levels than subject imports and increased by substantially less than subject imports did during the POI.  CR/PR at IV-6 & Tables IV-2, C-1.  Mosaic claims that the increasing volumes of subject imports played a significant role

(*continued*...)

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

announcement in February 2018 that it would close its Redwater facility in Canada.[388]  Mosaic

concedes that after it had idled Plant City, it reduced its phosphate sales volume targets with

certain larger customers – specifically, with CHS by 200,000 tons and with Gavilon by 100,000

tons relative to the prior year – as well as to some [ ███████████ ],[389] we find that the

---

in driving prices to levels that made it uneconomical for it to operate its Plant City facility in 2017 in the first instance, and that its decision to idle Plant City ultimately helped balance global phosphate supply and demand, and tightened U.S. supply, which caused U.S. prices to increase in 2018.  This price increase, Mosaic asserts, was temporary as subject imports increased, causing a supply glut and declining prices.  Mosaic Prehearing Br. at 58-59; Mosaic Posthearing Br. at Responses to Questions pp. 10-17, Exhibit 14.  Incurring tens of millions of dollars in costs to idle Plant City, Mosaic states that it preserved the option of reopening the facility in the event of a significant, sustained improvement in market conditions, which did not occur due to subject imports.  It ultimately was forced to close the facility in June 2019.  Mosaic Posthearing Br. at Responses to Questions pp. 22-23.

[388] OCP Posthearing Br. at 3, Responses to Questions pp. 15-16; IRM Posthearing Br. at 3; Koch Posthearing Br. at 2.  In May 2019, Nutrien converted its phosphate operation in Redwater, Canada ([ ███████████████████████ ]) to an ammonium sulfate plant.  CR/PR at III-3 and Table III-3.  As discussed above, Nutrien announced at the time that it was increasing production at its U.S. facilities in Aurora, North Carolina and White Springs, Florida in order to offset any reduction in supply from Redwater and ensure a continued supply of phosphate fertilizers to customers in Canada.  CR/PR at III-3; Mosaic Prehearing Br. at Exhibit 13. Indeed, [ ███████████████████████ ], Nutrien [ ████████ ] its U.S. production between 2018 and 2019 and this increase was more than sufficient to cover its increase in exports that year. CR/PR at Table III-4; PCS/Nutrien Domestic Producer Questionnaire at II-7.  The record also shows that between 2017 and 2018, Nutrien had increased its capacity by 400,000 short tons due to [ ███████████ ██████████████████████ ].  CR/PR at Table III-4 and III-5, n.18.

[389] [ ██████ ] U.S. Producer Questionnaire Response at IV-16.  Mosaic further states that [ ████████████████████████████████████████████████████████ ].  Moreover, Mosaic states that it [ ████████████████████████████████████████████████████████ ].  Mosaic Posthearing Br. at Responses to Questions, p. 85.  Mosaic also disputes other allegations of its refusal or inability to supply product during the POI.  Specifically, Mosaic disputes ADM's testimony that Mosaic "categorically refuses to sell to us."  Mosaic asserts that [ ████ ████████████████████████████████████████████ ].  Mosaic Posthearing Br. at Responses to Questions pp. 86-87.  Mosaic also contends that some of the supply issues identified by respondent parties are with broker/traders such as ADM and Koch that compete with the domestic

*(continued...)*

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

volume of cumulated subject imports eclipsed any reduction in U.S. production as a result of

Mosaic's idling of its facility in 2017.  As discussed above, we find Mosaic's estimate that the

idling of the Plant City facility reduced its supply to the U.S. market by approximately 700,000

tons to be credible and consistent with other record evidence.  Additionally, notwithstanding

this estimate, the record shows that Mosaic's U.S. shipments decreased by only [        ]

short tons from 2017 to 2018.  Subject imports, however, increased by 1 million short tons from

2017 to 2018, and U.S. shipments of subject imports increased by 604,981 short tons from 2017

to 2018 and by 753,638 short tons from 2017 to 2019.[390]  Moreover, as record-setting

precipitation impacted three planting seasons in a row beginning in the fall of 2018, the volume

of subject imports persisted beyond levels demanded, resulting in a substantial buildup of U.S.

importer inventories of subject imports and an oversupply condition in the U.S. market.[391] [392]

In the Second Remand Order, the court also indicated that the Commission should

---

industry for sales and rely on a small margin, high volume business model.  Mosaic Final Comments at 6; *see also* Simplot Posthearing Br. at Responses to Questions pp. 9-10, 21, 64 and Exhibit 5.  Mosaic further contends that it has never had a sales relationship with IRM, and that it [                                           ].  Mosaic Posthearing Br. at Responses to Questions, pp. 87-88.  Mosaic argues that many of the other alleged instances identified by respondents dealt with post-petition supply issues experienced by U.S. importers after their Moroccan and Russian suppliers largely and abruptly exited the U.S. market.  Mosaic asserts that there was a supply shock, and Mosaic responded by diverting shipments headed to export markets and drawing down inventories.  Mosaic Posthearing Br. at Responses to Questions p. 84; Mosaic Final Comments at 6.

[390] CR/PR at Tables IV-2, IV-7.

[391] CR/PR at Tables IV-2, IV-7.  Respondents argue that imported product was necessary to serve demand in U.S. regions unaffected by the poor weather conditions.  However, as discussed above, the record shows that the volume of cumulated subject imports in 2019 exceeded what was necessary to replenish any depleted inventories.

[392] Moreover, while demand as measured by apparent U.S. consumption declined by [        ] short tons between 2018 and 2019, U.S. shipments of subject imports increased by [        ] short tons.  CR/PR at Table C-1.  Although apparent U.S. consumption was [        ] short tons lower in 2019 than in 2017, the volume of cumulated subject imports was 725 thousand short tons higher and importers' U.S. shipments of subject imports 743 thousand short tons higher in 2019 than in 2017.  CR/PR at Tables IV-2, C-1.

*Public Version*

address whether Mosaic had adopted a strategy of decreasing or forgoing business in the United States in favor of increasing its business in Brazil.[393]  As discussed in the Original Views and First Remand Views, Respondents claimed that Mosaic deliberately refused to supply U.S. customers in favor of exporting product.[394]  The record, however, does not support respondents' contention that domestic producers prioritized export shipments over U.S. shipments.  To the contrary, after subject imports declined in the U.S. market following the filing of the petitions, the domestic industry increased production and U.S. shipments, and also diverted export shipments to make additional product available to U.S. customers.[395]  Mosaic explains that its export markets, such as India and Brazil, help support year-round capacity utilization rates during the "off-season" periods in the United States[396] and are also used for "risk management" and to retain flexibility to ship product to third country markets during times when U.S. demand is low, such as in 2019.[397]  We likewise find that the evidence cited by the court also does not establish that Mosaic was decreasing business in the United States in favor of increasing business in Brazil.[398]  In both public statements as well as internal

---

[393] Second Remand Order at 32.

[394] Original Views at 69-70; First Remand Views at 68-69, citing Koch Prehearing Br. at 3-5; PhosAgro Prehearing Br. at 3; Koch Prehearing Br. at 2; EuroChem Prehearing Br. at 5; OCP Posthearing Br. at 6-7.

[395] CR/PR Tables III-5, IV-7; Mosaic Posthearing Br. at Responses to Questions p. 84; Mosaic Final Comments at 6.  Mosaic states that due to the abrupt departure of subject imports after the filing of the petitions and because facilities need time to ramp up production, it also had to import product from Saudi Arabia for the first time in late 2020.  Hearing Tr. at 103-104 (Jung); Mosaic Posthearing Br. at Response to Questions p. 17 n.165.

[396] Mosaic Prehearing Br. at 54.

[397] Mosaic Posthearing Br. at 14; Hearing Tr. at 118-120 (O'Rourke).

[398] Specifically, the court cites a statement by Gavilon's counsel regarding the 100,000 short ton reduction in supply from Mosaic to Gavilon after Plant City closed, as well as Mr. O'Rourke's statement in a 2019 analyst call stating that when Mosaic idled Plant City "that opened up a hole for some imports

(*continued*...)

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

communications Mosaic company officials referenced the connection between subject imports and Mosaic's various plant idlings and closures, including Plant City.  Consistent with those statements, Mosaic has rebutted claims that attempted to connect the Plant City idling to a strategic decision to shift production to Brazil.[399]  With respect to the news article cited by the court in which a Mosaic representative stated "I am excited at the prospect of Leading Mosaic's vastly expanding business in Brazil ….  This will be an ideal time for us to grow in the region…."[400] we note that the article goes on to say that "Mosaic expects that its U.S. phosphate production facilities will continue to operate at high rates in order to meet strong and growing global demand."[401]  Accordingly, we find that the evidence cited by the court does not establish that Mosaic was focusing on Brazil at the expense of its U.S. operations.  Nor does this article demonstrate that Mosaic intended to prioritize exports to Brazil over supplying the U.S. market given the record evidence discussed above showing that Mosaic diverted export shipments to supply the U.S. market when subject imports exited after the petitions were filed.  In any case, the domestic industry's exports do not explain the behavior of cumulated subject imports, which continued to enter the U.S. market at significant volumes oversupplying the

---

to increase. . . .  We went from 55%, 60% market share to a more sustainable 50-ish percent market share.  So we gave up 1 million tonnes of market share here in the U.S. intentionally."  Second Remand Order at 32-33 (citing Hearing Tr. at 270-71 (Wessel) and Gavilon Prehearing Br., 2019 Analyst Day Transcript)).  We note that, as discussed above in Section II.A.2, Mosaic explained in more detail that it estimated that the idling of Plant City in 2017 reduced the supply to the U.S. market by approximately 700,000 short tons, which is a reasonable estimate that is consistent with other record evidence.  Furthermore, we found that, notwithstanding the reasonableness of that estimate, Mosaic only reduced its U.S. shipments by [ ▮▮▮▮▮ ] short tons from 2017 to 2018.  PhosAgro cites the same earnings call and several others, characterizing them as "contemporaneous statements".  PhosAgro Second Remand Comments at 1-5.  We note, however, that these statements occurred in 2018, 2019, and 2020, and therefore were not contemporaneous with Mosaic idling of Plant City in 2017.

[399] Mosaic Posthearing Br., Response to Commission Questions at 10-20, Exhibits 11-22.
[400] Second Remand Order at 23 (citing Koch Prehearing Br., Exhibit 2).
[401] Koch Prehearing Br., Exhibit 2.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

market and exerting downward pressure on domestic prices.

We also find that the record does not support respondents' arguments that the domestic industry's financial declines were due to its cost challenges.[402] As previously discussed, all major U.S. producers are vertically integrated with respect to the main raw material inputs used to produce phosphate fertilizers – sulfur, ammonia, and phosphate rock.[403] To the extent domestic producers purchased certain quantities of raw materials,[404] this did not adversely impact the domestic industry's total COGS, which declined over the POI and was lower in interim 2020 than in interim 2019.[405]

Finally, we have also examined the role of nonsubject imports. Nonsubject imports increased over the POI,[406] but they had a small presence in the U.S. phosphate fertilizer market. Their market share fluctuated, increasing from [ ██ ] percent in 2017 to [ ██ ] percent in 2018, before declining to [ ██ ] percent in 2019, for an overall increase of [ ██ ] percentage points between 2017 and 2019.[407] Subject imports, however, gained a larger amount, [ ██ ] percentage points of market share, as [ ██ ] percentage points of market share shifted from

---

[402] OCP Prehearing Br. at 113-115; EuroChem Prehearing Br. at 3-4.

[403] CR/PR at V-1.

[404] For instance, Mosaic states that it produces one-third of its ammonia, purchases another third on the open market, and acquires a third through a long-term contract with CF Industries. Mosaic Posthearing Br. at Responses to Questions p. 95.

[405] CR/PR at VI-1. Raw material costs increased from $[ ████ ] in 2017 to $[ ████ ] in 2018, then decreased to $[ ████ ] in 2018 and were lower in interim 2020, at $[ ████ ], than in interim 2019, at $[ ████ ], even as production and sales were higher. *See id.*

[406] CR/PR at Tables IV-2. Nonsubject imports increased from 184,104 short tons in 2017 to 608,805 short tons in 2018, then declined to 511,245 short tons in 2019; they were higher in interim 2020, at 581,585 short tons, than in interim 2019, at 380,491 short tons. *See id.*

[407] CR/PR at Tables IV-8, C-1. Nonsubject imports' market share was lower in interim 2020, at [ ██ ] percent, than in interim 2019, at [ ██ ] percent. *See id.* Nonsubject imports did not fill the supply vacated when subject imports decreased following the filing of the petitions, as total import volumes of phosphate fertilizers were lower in the third quarter of 2020 than in the third quarters of every other year of the POI. CR/PR at Table IV-6.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

domestic to import sources from 2017-2019 ([ ▇ ] percentage points from 2018-2019).[408]

Moreover, between 2018 and 2019 when demand and prices declined, subject import market

share increased by [ ▇ ] percentage points (from 29.0 percent to 33.3 percent), while

nonsubject import market share decreased by [ ▇ ] percentage points (from [ ▇ ] percent to

[ ▇ ] percent).[409]  As discussed above, the record, including the volume of subject imports,

information from purchaser questionnaire responses, and contemporaneous trade

publications, indicates that subject imports contributed to oversupply conditions in the U.S.

market and had significant depressing effects on U.S. prices.[410]  Thus, based on the available

evidence, nonsubject imports cannot explain the magnitude of the adverse impact on the

domestic industry.[411]

---

[408] CR/PR at Table C-1.

[409] CR/PR at Table C-1.  Subject and nonsubject import market shares were both lower in interim 2020 than in interim 2019, by [ ▇ ] percentage points and [ ▇ ] percentage points, respectively.  *Id.*

[410] *See, e.g.*, CR/PR at Table V-11.  Responding purchasers specifically discussed imports from Morocco and Russia and their impact on the U.S. market.  As previously discussed, subject imports from Morocco and Russia accounted for 84.1 percent of total import volume in 2019, up from 83.0 percent in 2018.  CR/PR at Table IV-2.  The volume of cumulated subject imports declined by 9.5 percent between 2018 and 2019, while the volume of nonsubject imports declined by 16.0 percent.  CR/PR at Table IV-2.  U.S. shipments of subject imports increased by 148,957 short tons, 6.2 percent, between 2018 and 2019, while U.S. shipments of nonsubject imports decreased by 11.8 percent during that time.  CR/PR at Table C-1.

[411] As noted above, nonsubject imports from Saudi Arabia increased each year of the POI until Saudi Arabia was the largest source of nonsubject imports by 2019.  CR/PR at IV-2.  While Mosaic has a 25 percent equity interest in MWSPC, a producer of phosphate fertilizers in Saudi Arabia, it was not the U.S. importer of nonsubject imports from Saudi Arabia until the last quarter of 2020.  CR/PR at IV-6; *see* Mosaic U.S. Importer Questionnaire Response at I-2a, II-2a.  It maintains that it had invested in the Saudi facility to serve India and other parts of Asia, not the U.S. market, as evidenced by the fact that after it had idled Plant City, it "imported *zero* phosphate fertilizer from Saudi Arabia," but rather "sold [ ▇ ] percent of its offtake from MWSPC in India."  Mosaic Posthearing Br. at Responses to Questions pp. 16-17.  The record indicates that India was the largest destination for exports from Saudi Arabia during the POI.  CR/PR at Table VII-13.  Mosaic's [ ███████████████████████████████████████████████████████████████████████████████████ ].  *See id.* at Responses to Questions p. 17 n.165.  Mosaic did so, rather than utilize its excess capacity because the "nature of phosphate fertilizer production makes it difficult to ramp up production quickly."  *See id.* at Responses to Questions pp. 24-26.

*Public Version*

Accordingly, we continue to find that cumulated subject imports had a significant impact on the domestic industry.

## III.    Conclusion

For the foregoing reasons, we again determine that an industry in the United States is materially injured by reason of subject imports of phosphate fertilizers from Morocco and Russia that are subsidized by the governments of Morocco and Russia.