IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| OCP S.A., | ) |
|      Plaintiff, | ) |
| | ) |
| EUROCHEM NORTH AMERICA CORPORATION, | ) |
|      Consolidated Plaintiff, | ) |
|   and | ) |
| | ) |
| PHOSAGRO PJSC, INTERNATIONAL RAW MATERIALS LTD., and KOCH FERTILIZER, LLC, | ) Consol. Ct. No. 21-00219 |
| | ) |
|      Plaintiff-Intervenors, | ) NON-CONFIDENTIAL VERSION |
| | ) |
|   v. | ) |
| | ) |
| UNITED STATES, | ) |
|      Defendant, | ) |
|   and | ) |
| | ) |
| THE MOSAIC COMPANY and J. R. SIMPLOT COMPANY, | ) |
|      Defendant-Intervenors. | ) |

PLAINTIFF'S COMMENTS OPPOSING REMAND DETERMINATION

Shara L. Aranoff
James M. Smith
Sooan (Vivian) Choi
Wanyu Zhang
John J. Catalfamo
Julia Shults

COVINGTON & BURLING LLP
*Counsel to Plaintiff OCP S.A.*

October 27, 2025

# Table of Contents

SUMMARY OF ARGUMENT ....................................................................1

BACKGROUND .........................................................................................2

LEGAL STANDARD ..................................................................................5

ARGUMENT ..............................................................................................8

I.  The Commission's Inventory Analysis Did Not Comply With the Court's Remand Order and Is Unsupported by Substantial Evidence ........................................................................8

    A.  The Commission continues to rely on an unsupported finding that the domestic producers were "well-positioned" to supply the U.S. market by reshipping inventories ................................................................................8

    B.  The Commission fails to explain why, despite no evidence of routine inventory reshipments, domestic producer inventories could be treated as available to meet demand ......................................................................11

II.  The Commission's Volume Analysis Is Not Supported by Substantial Evidence and Does Not Comply With the Order .......18

    A.  The ITC's findings regarding domestic producers' refusals to supply domestic distributors are not supported by substantial evidence or sufficiently explained ..............................................................................19

        1.  The Commission's finding that sales refused by domestic producers were sales lost for price reasons is unsupported by substantial evidence .........20

        2.  The Commission does not otherwise articulate how market-price sales that domestic producers were offered but rejected were injurious ....................23

i

B.    The Commission's findings regarding inflated import volume data due to reshipments to Canada do not comply with the Court's order .................................................24

       1.    The Commission fails to disentangle import and U.S. shipment data .......................................25

       2.    The Commission has no basis to blame importers for the erroneous data on which it relied....................26

C.    The Commission's ultimate finding that subject imports caused injury by creating "oversupply conditions" is unsupported by substantial evidence ...........28

       1.    The Commission's findings about the extent of available domestic supply are unsupported by substantial evidence ...................................................28

       2.    Additional record evidence undermines the Commission's oversupply conclusion ..........................32

       3.    Record evidence does not support the Commission's finding of injurious oversupply by subject imports..............................................................36

III.    The Price Effects Analysis Fails to Comply With the Order.........38

A.    The Commission's analysis of underselling data remains inadequate ..............................................................38

       1.    The Commission claims that it sufficiently "considered" the underselling data, but fails to explain how imports that were predominantly oversold caused price depression and lost sales..........39

       2.    The Commission finds that subject imports were lower priced by dismissing its comprehensive questionnaire pricing data and relying on unverified trade publications, rather than reconciling the contradictory evidence........................42

ii

B. The Commission fails to justify its disregard of Mosaic's price leadership ........................................45

 1. The Commission's attempt to explain that a price leader may not be the lowest-priced supplier misses the mark ..............................................45

 2. Purchaser responses cited by the Commission do not help reconcile its price depression finding with Mosaic's price leadership ....................................47

C. The Commission's lost sales finding remains unsupported by substantial evidence....................................48

 1. The Commission fails to address the much larger number of purchaser responses that undermine any finding of lost sales ..................................................49

 2. The Commission continues to rely on one outlier purchaser's lost sales response without adequately addressing the contradictions identified by the Court....................................................51

 3. The Commission's finding of price depression relies on lost sales, even though the Commission now argues that the volume of lost sales is "less probative" to that price effects finding ........................55

IV. The Commission's Redetermination Fails to Establish Injury "by Reason of" Subject Imports.......................................57

CONCLUSION .........................................................................59

# Table of Contents (Continued)

Pursuant to the Court's rules, and consistent with Federal Circuit Rule 25.1(e)(1)(B), this brief contains confidential material that has been omitted on pages vii, viii, 13-16, 19, 23-24, 30, 32, 35, 37, 43, 48, and 50-56. The material omitted on pages 13-16 describes distribution and inventory management practices of participants in the phosphate fertilizer industry; the material omitted on pages 19, 23-24, 30, 32, 35, and 37 describes the volumes that various actors in the phosphate fertilizer industry produced or sold in the U.S. market; and the material omitted on pages vii, viii, 43, 48, and 50-56 describes questionnaire responses regarding pricing practices and purchasing decisions of U.S. phosphate fertilizer market participants, and the names of companies submitting such responses. All of the omitted information was treated as business confidential and subject to an administrative protective order by the U.S. International Trade Commission in the underlying proceedings.

# Table of Authorities

**Cases**                                                                               **Page(s)**

*Arizona v. California,*
460 U.S. 605 (1983) ...............................................................5

*Atl. Sugar, Ltd. v. United States,*
744 F.2d 1556 (Fed. Cir. 1984) ..............................................5

*Borlem S.A. v. United States,*
913 F.2d 933 (Fed. Cir. 1990) ..............................................26

*Branning v. United States,*
784 F.2d 361 (Fed. Cir. 1986) .........................................5-6, 7

*C.J. Tower & Sons of Buffalo, Inc. v. United States,*
381 F. Supp. 979 (U.S. Customs Ct. 1974) ...........................7

*Chemours Co. v. United States,*
393 F. Supp. 3d 1186 (Ct. Int'l Trade 2019) .......................26

*Chemours Company FC, LLC v. United States,*
443 F. Supp. 3d 1315 (Ct. Int'l Trade 2020) .........................5

*Corus Staal BV v. Dep't of Commerce,*
27 CIT 1180, 279 F. Supp. 2d 1363 ....................................6-7

*CS Wind Vietnam Co., Ltd. v. United States,*
219 F. Supp. 3d 1273 (Ct. Int'l Trade 2017) ..................6, 7, 8

*Etchegoinberry v. United States,*
132 F.4th 1374 (Fed. Cir. 2025) .............................................5

*Exxon Corp. v. United States,*
931 F.2d 874 (Fed. Cir. 1991) ............................................6, 7

*Gerald Metals, Inc. v. United States,*
132 F.3d 716 (Fed. Cir. 1997) .........................................57-58

*J.E.T.S., Inc. v. U.S.*,
   838 F.2d 1196 (Fed. Cir. 1988) .......................................................... 7, 8

*Logan v. Original Honey Baked Ham Co. of Georgia, Inc.*,
   44 Fed. App'x 484 (Fed. Cir. 2002) ........................................................ 8

*Nucor Corp. v. United States*,
   414 F.3d 1331 (Fed. Cir. 2005) ............................................................ 41

*In re NuVasive, Inc.*,
   842 F.3d 1376 (Fed. Cir. 2016) ....................................................... 5, 40

*PAO TMK v. United States*,
   CIT Ct. No. 21-00532, Slip Op. 23-150 (CIT 2023) ............................ 51

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk*
   *Drilling USA, Inc.*,
   699 F.3d 1340 (Fed. Cir. 2012) ............................................................. 6

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ...................................................... 5, 40

**Administrative Materials**

*Steel Nails from India, Oman, Sri Lanka, Thailand, and Turkey*,
   Inv. Nos. 701-TA-673-677 and 731- TA-1580-1583 (Final),
   USITC Pub. 5370 (Oct. 2022) ............................................................. 58

Confidential Material Removed From Brackets

# Glossary of Acronyms, Abbreviations, and Defined Terms

| Acronym or Abbreviation | Full Name |
|---|---|
| AUV | Average unit value |
| [ company ] | [ company ] |
| Koch | Koch Fertilizer LLC |
| MAP | Monoammonium phosphate |
| Mosaic | The Mosaic Company |
| NOLA | Port of New Orleans, Louisiana |
| OCP, *or* Plaintiff | OCP S.A. |
| Order | *OCP S.A. v. United States*, Slip Op. No. 25-51 (July 3, 2025) |
| POI | Period of investigation |
| Redetermination | *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final) (Second Remand) |
| Simplot | J.R. Simplot Company |
| ST | Short ton |

Confidential Material Removed From Brackets

| Acronym or Abbreviation | Full Name |
|---|---|
| [ company] | [        company        ] |
| [        company        ] | [                company                ] |

On behalf of Plaintiff OCP S.A. ("OCP"), we hereby submit comments opposing the second remand determination of the U.S. International Trade Commission ("ITC" or "Commission") dated July 28, 2025 in *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651, APPX0100026-0100128, APPX0021942-0022044 ("Redetermination"), which was issued pursuant to this Court's second remand order dated April 22, 2025 in *OCP S.A. v. United States*, Slip Op. 25-51, APPX0000051-0000100, APPX0000101-0000150 ("Order").

## SUMMARY OF ARGUMENT

This Court found that the Commission's first remand determination made the following findings without substantial evidence or adequate explanation: (i) that reshipment of domestic producer inventories was possible, reducing the U.S. market's need for imports; (ii) that subject import volumes, including volumes sold to purchasers denied domestic supply or exported to Canada, caused the U.S. market to be oversupplied; and (iii) that low-priced subject imports depressed U.S. prices. Upon remand, the Commission chose not to reopen the record, and instead relies on both the same facts and the same reasoning as its prior determinations, thereby failing to establish that any injury

experienced by the domestic industry was "by reason of" subject imports. The Redetermination fails to comply with the Court's Order and must be remanded a third time.

## BACKGROUND

Phosphate fertilizers are vital to crop production in the United States. APPX0098388; APPX0020642. Farmers have two short windows for fertilizer application each year, before spring planting and after fall harvest. APPX0098390; APPX0020644. It takes significant time for distributors to obtain fertilizer and move it through the supply chain into warehouses near farmers. APPX0017668. Distributors make purchasing decisions months in advance to ensure they have fertilizer in their warehouses when farmers need it, because running out of product in the middle of the application window is a "mortal sin." APPX0017668-0017669, APPX0017755. Inventories are restocked during the off-season based on projected farmer demand for the next application season, which reflects weather forecasts and planted acreage estimates. APPX0098411; APPX0020664. But demand projections cannot account for unforeseeable events—and did not

2

account for the extreme weather events that transpired during this period of investigation ("POI").

Beginning in fall 2018, record-setting levels of precipitation over three consecutive application seasons caused fertilizer consumption to plummet in certain U.S. regions. APPX0100039; APPX0021955. Domestic shipments, imports, and prices fell in 2019. APPX0098547-0098548; APPX0020795-0020796. Once the weather normalized in spring 2020, demand increased, and prices began to recover. APPX0100039; APPX0021955; *see also* APPX0098477-0098478; APPX0020727-0020728. This petition was filed in June 2020. APPX0098381; APPX0020635.

These undisputed facts regarding conditions of competition in the U.S. fertilizer market point to weather-related demand shocks as the sole cause of any injury to the domestic industry. *See* APPX0000047. Yet the Commission found, and continues to find, that subject imports were to blame, on the basis that "the significant volume of cumulated subject imports contributed to oversupply conditions in a declining market and had significant price-depressing effects on prices in the U.S. market in 2019." APPX0100098; APPX0022014. As this Court observed,

the Commission's entire injury determination rested on the notion that subject imports oversupplied the U.S. market in excess of demand. APPX0000029.

This Court has twice rejected the Commission's version of events as failing the substantial evidence standard. In its first remand order, the Court found that the Commission's "oversupply" theory of injury relied on an "unsupported assumption" that imports used to resupply normal-weather regions deprived domestic producers of the opportunity to reship inventories in flooded regions to meet demand in other regions, despite the lack of evidence that inter-regional reshipments on this scale were technically feasible or ever occurred. APPX0000034-0000035, APPX0000049. When the Commission doubled down in its first remand determination, the Court ordered this second remand, finding that the ITC's assumption of inventory reshipment remained unsupported by substantial evidence, and identifying additional serious flaws in the Commission's volume and price effects analyses. As detailed in these comments, the Redetermination fails to comply with the Order in all respects.

## LEGAL STANDARD

The Court must "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). To satisfy the "substantial evidence" standard, the Commission must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," and must take into account "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Chemours Co. FC, LLC v. United States*, 443 F. Supp. 3d 1315, 1321 (Ct. Int'l Trade 2020) (citing *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016)); *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

In addition, as applied in the Federal Circuit, the law of the case doctrine instructs that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the case." *Etchegoinberry v. United States*, 132 F.4th 1374, 1378 (Fed. Cir. 2025) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)); *Branning v. United States*, 784 F.2d 361, 363 (Fed. Cir. 1986) ("the rule

adopted is to be applied, right or wrong, absent exceptional circumstances, in the disposition of the lawsuit") (internal quotations omitted). This Court and the Federal Circuit have applied the law of the case to rulings arising from issues of mixed law and fact, which in this case includes prior applications of the substantial evidence test. *See CS Wind Vietnam Co., Ltd. v. United States*, 219 F. Supp. 3d 1273, 1281 (Ct. Int'l Trade 2017) (applying the law of the case where the Federal Circuit had previously found the Department of Commerce's prior calculation was unsupported by substantial evidence); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1347-48 (Fed. Cir. 2012) (applying the law of the case to the court's prior obviousness finding). This approach rests upon an understanding "that questions once decided {should} not be subject to continued argument." *Exxon Corp. v. United States*, 931 F.2d 874, 877 (Fed. Cir. 1991).

Accordingly, once the Court of International Trade ("CIT") has made a ruling with respect to aspects of an agency's determination, that ruling is the law of the case. *Corus Staal BV v. Dep't of Commerce*, 27 CIT 1180, 1184 n. 9, 279 F. Supp. 2d 1363, 1368 n.9 (explaining "the

law of the case doctrine . . . appl{ies} to judicial review of administrative decisions") (internal quotations omitted). In other words, if the CIT remands the case for reconsideration, both the agency on remand, *as well as the CIT during any subsequent reviews*, are bound by the CIT's initial ruling. *See id.* at 1368; *see also CS Wind Vietnam*, 219 F. Supp. 3d at 1281; *J.E.T.S., Inc. v. U.S.*, 838 F.2d 1196, 1200 (Fed. Cir. 1988).

This principle continues to apply even when a new judge is appointed and takes over an ongoing case. A successor judge is understood to be "step{ping} into the shoes of his or her predecessor, and is thus bound by the same rulings and given the same freedom, as the first judge." *Exxon*, 931 F.2d at 878. Therefore, "{w}hen one judge sitting in a case establishes the law of the case, a second judge subsequently sitting in the case should normally follow the ruling of the first judge." *C.J. Tower & Sons of Buffalo, Inc. v. United States*, 381 F. Supp. 979, 981 (U.S. Customs Ct. 1974).

To become law of the case, an issue must have been considered, either "explicitly or implicitly," by the court. *Exxon*, 931 F.2d at 876. A party arguing against law of the case "is charged with {a} heavy burden." *Branning*, 784 F.2d at 363. They must show that one of three

7

"exceptional circumstances" is present: "{T}he evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice." *J.E.T.S., Inc.*, 838 F.2d at 1200; *see also CS Wind*, 219 F. Supp. at 1281. None of these circumstances exist here. Absent such a showing, a court is "precluded from reconsidering the {prior court's} decision." *Logan v. Original Honey Baked Ham Co. of Georgia, Inc.*, 44 Fed. App'x 484, 485 (Fed. Cir. 2002).

## ARGUMENT

### I.    The Commission's Inventory Analysis Did Not Comply With the Court's Remand Order and Is Unsupported by Substantial Evidence

#### A.    The Commission continues to rely on an unsupported finding that the domestic producers were "well-positioned" to supply the U.S. market by reshipping inventories

In both the original investigation and the first redetermination, the Commission made a "key finding" that "undergird{ed} the Commission's determination" and was unsupported by substantial evidence: that inventories, which had already been delivered to regions affected by bad

8

weather and low fertilizer demand in 2018-2019, were available to the rest of the market through reshipment, such that additional imports were not necessary. APPX0000003, APPX0000029; *see also* APPX0000067-0000068; APPX0000117-0000118. In its Redetermination, despite an attempt to split its reshipment finding into separate "factors," the Commission continues to base its injury determination on the ability of domestic producers to reship inventories.

In both the original determination and first redetermination, the Commission relied on domestic producers' purported ability to reship inventories already delivered to low-demand regions to conclude that those producers were "well-positioned to supply" seasonal restocking demand in regions of the country unaffected by 2019's bad weather. APPX0099625-009626; APPX0020605; *see also* APPX0099978; APPX0021239-0021240. The Commission found that subject fertilizer imported to restock inventories in normal-demand regions deprived domestic producers of the opportunity to sell off unneeded inventories from low-demand regions, causing an oversupply in the U.S. market and thereby injuring the domestic industry. *See* APPX0099597, APPX0099625-0099626; APPX0020585, APPX0020605; *see also*

9

APPX0099978; APPX0021239-0021240. In both cases, the Court found the Commission's material injury determination rested on this "critical finding" regarding domestic producers' ability to reship delivered inventories, and held that finding was unsupported by substantial evidence. APPX0000035-0000036; *see also* APPX0000077; APPX0000127.

In its Redetermination, the Commission attempts to disclaim its reliance on reshipments by converting its unsupported inventory reshipment finding into a list of factors and claiming that the domestic producers' "ability to relocate inventories was only one factor" in support of its finding that that inventories in low-demand regions should be counted as supply available from U.S. sources in 2019. APPX0100048-0100049; APPX0021964-0021965. The Commission now purports to rely on four factors: the domestic industry's "excess capacity, substantial inventories, extensive inventory locations, and expansive multi-modal distribution network." APPX0100049, APPX0100116; APPX0021965, APPX0022032. But three "factors" are just facets of the same inventory reshipment finding: "substantial" inventories, "extensive" inventory locations, and an "expansive"

distribution network are *relevant only* if the domestic industry can reship inventories to different regions.[1] As the Order emphasized, no such ability was demonstrated, and the Commission's assumption that the domestic industry's distribution networks are *multidirectional* and can "relocate" fertilizer remains unsupported by the record. *See infra* Part I.B.

As this Court explained, "if domestic producers could not reship their inventories, the Commissions' oversupply-based material injury finding collapses like a house of cards." APPX0000076-0000077; APPX0000126-0000127. Breaking reshipment capability into its components does not alter the Commission's flawed finding, nor does it support the resulting oversupply determination.

###    B.    The Commission fails to explain why, despite no evidence of routine inventory reshipments, domestic producer inventories could be treated as available to meet demand

In the Order, this Court held that for the Commission to maintain its conclusion that the domestic industry had a broad capacity to reship

---

[1] The sole distinct factor referenced by the Commission, excess capacity, also does not support the Commission's determination, as explained in Part II.C.1.c, *infra*.

inventories as needed to meet U.S. market demand, the agency would need "additional evidence," as "{n}o such evidence exists on this record." APPX0000074-0000075; APPX0000124-0000125.

The Commission's Redetermination fails to comply with this Court's order. The Commission declined to reopen the record and did not obtain additional evidence. APPX0022146. Despite leaving the record unchanged, the Commission "continue{s} to find . . . that during the POI the domestic industry possessed the capability to reship fertilizer if relocation was needed." APPX0100037, APPX0100057; APPX0021953, APPX0021973. This defies the Court's previous holding that the Commission would need "additional evidence" to maintain its reshipment finding.

The Commission also fails to comply with the Court's order to explain why, despite *de minimis* documented inventory reshipments, domestic producers nonetheless could meet U.S. demand by reshipping previously delivered inventories. APPX0000077; APPX0000127. While conceding that *subject import* inventories could not be relocated to geographic regions needing resupply, APPX0100036; APPX0021952, the Commission "respectfully disagrees with the court's conclusion . . . that

Confidential Material Removed From Brackets

'{q}uestionnaire responses suggest that domestic producers were unable to relocate their phosphate fertilizer inventories to meet new market demand." APPX0100048; APPX0021964. Yet in disagreeing with this Court, the Commission cites the very same categories of evidence that the Court already held to be irrelevant and/or insufficient to support the Commission's reshipment finding. APPX0000074-0000075; APPX0000124-0000125.

First, this Court explained that the presence of robust intermodal distribution networks "sheds no light" on whether these "superior" distribution networks are actually used for reshipment of already delivered inventories. APPX0000073; APPX0000123. Typically, fertilizer distribution networks involve unidirectional movement of fertilizer from "a port of entry or production facility to inventory terminals, usually upriver by barge or overland by rail," and then to retailers or [ description ] warehouses for distribution. OCP First Remand Comments at 3-5 (ECF 156) (citing APPX0099913; APPX0021088; APPX0099770; APPX0021387). "While theoretically a robust intermodal distribution network could be multidirectional and allow for reshipment of delivered inventories," the Court held that the Commission must

13

Confidential Material Removed From Brackets

ground its finding in "evidence of actual reshipment by domestic producers" rather than "theoretical possibilities." APPX0000068, APPX0000073; APPX0000118, APPX0000123. Yet the Redetermination continues to rely on these same conjectures, highlighting the "breadth and superiority of U.S. producers' distribution networks" as well as the domestic industry's ability "to use alternate shipping methods to reach customers." APPX0100054, APPX0100058-0100059; APPX0021970, APPX0021974-0021975.

Many of the Commission's specific examples reflect the same flaw, with no evidence of actual multidirectional reshipment. In particular, the Commission cites movement between [ description ] locations and [description] warehouses, or between [ description ] locations and [ description ] warehouses. APPX0100054-0100055, APPX0100057-0100058, APPX0100115; APPX0021970-0021971, APPX0021973-0021974, APPX0022031. But such shipments are steps in the typical unidirectional distribution chain from factory to farmer, and do not show that the domestic industry reships from one farming region to another, at commercial scale, inventories that *already reached* their intended destination. APPX0099770; APPX0021387; *see*

Confidential Material Removed From Brackets

APPX0099785; APPX0021402; *see also* OCP First Remand Comments at 3-5 (ECF 156).

Second, this Court already considered the "meager" examples of alleged reshipments on the record, and found that "instances of low volume reshipment alone cannot rationally connect to the Commission's broad reshipment finding." APPX0000075-0000076; APPX0000125-0000126. The Court explained that even for the [     company     ] with the [ description ] reported inventory reshipment volume, reshipments did not [     ] a [ description ] percentage of total shipments. characterization of data
APPX0000074-0000075; APPX0000124-0000125. Yet the Redetermination identifies the same "meager" examples of *possible* reshipments, including [ description ] transfers—including, [ number ] tons from [company] and [number] tons from [company] purportedly "relocated" between [description] locations or [description ] warehouses. APPX0100055-0100056; APPX0021971-0021972. The Commission then attempts to boost these numbers above [description] levels by adding other [description] transfers between [description ] locations, between [ description ] warehouses, or between [     ] description
locations. APPX0100057-0100058; APPX0021973-0021974.

15

Confidential Material Removed From Brackets

The Commission's emphasis on [        description        ] transfers is irrelevant. By [   company   ] description, transfers between [description

] locations are part of the *very same* unidirectional distribution systems that "shed no light" on reshipment, and these shipments represent over [   ] percent of the total "relocation" volume relied on by the Commission and [   ] percent of the "relocation" shipments from [company]. APPX0087510; *see also* APPX0100058; APPX0021974. In addition, none of the Commission's examples indicate whether these "relocations" involved inter-regional shipment. *See* OCP First Remand Comments at 6-7 (ECF 156). Thus, contrary to this Court's order, the Commission continues to rely on "meager" volumes of unproven "relocations" to find that the domestic industry had a broad capacity to reship, none of which actually prove that the domestic industry could have served *other* U.S. regions from inventories previously delivered to weather-affected areas. APPX0000077; APPX0000127.

Third, the Court found that the Commission's first redetermination was "{f}urther taint{ed}" because it failed to consider "conflicting inferences" that could be drawn from the domestic industry's limited reshipment volumes. APPX0000075; APPX0000125. The Court noted

that "when reviewing *importers'* data showing limited 'movement of inventories' during the period of investigation," the Commission concluded that importers did not move substantial inventories between locations. APPX0000075-0000076; APPX0000125-0000126. The Court held that the Commission, at a minimum, "needs to explain why the same is not true for domestic producers that similarly reported limited instances of inventory reshipment." *Id.*

In response, the Commission still refuses to grapple with the lack of evidence of meaningful inter-regional inventory reshipment by domestic producers. Instead, the Commission dodges the issue by noting that "domestic producers did not report that they were unable to serve the U.S. market from existing inventories." APPX0100036, APPX0100059; APPX0021952, APPX0021975. This is far from evidence *affirmatively* demonstrating that domestic producers could serve the domestic market from existing inventories located in low-demand regions. As this Court has held, there is no such evidence, and the Commission's determination remains impermissibly based on "theoretical possibilities." APPX0000073; APPX0000123 (quoting APPX0000035).

17

## II. The Commission's Volume Analysis Is Not Supported by Substantial Evidence and Does Not Comply With the Order

As the Court explained, "{i}f domestic producers were unable or unwilling to meet the needs of U.S. consumers, . . . {a}ny imports filling this gap would not materially injure domestic producers because those imports would be making sales that U.S. producers otherwise could not, or would not, make." APPX0000098; APPX0000148. The Court therefore directed the Commission to "arrive at a reasonable conclusion" about the U.S. market, including by adequately addressing domestic producers' refusals to sell to large domestic fertilizer distributors and the volumes of imports that were exported to Canada. *Id.*

On remand, the Commission continues to find that when demand declined in 2019 due to unusually poor weather conditions, "subject imports exceeded demand in the contracting U.S. market . . . , contributing to oversupply conditions." APPX0100094; APPX0022010. The oversupply finding is unsupported by substantial evidence and insufficiently explained by the Commission, and thus does not comply with the Order.

Confidential Material Removed From Brackets

**A.    The ITC's findings regarding domestic producers' refusals to supply domestic distributors are not supported by substantial evidence or sufficiently explained**

The Court found that the Commission failed to account for evidence demonstrating that Mosaic refused to sell to certain large domestic fertilizer distributors as a matter of "business strategy" and directed the Commission to explain "how the domestic industry could be harmed by sales that it refused to make." APPX0000079-0000082; APPX0000129-0000132. On remand, the Commission concludes that domestic producers did not "categorically" refuse to supply these distributors, but rather sold [    ] volumes to them while declining to make other sales based not on business strategy but on price. APPX0100117-0100119; APPX0022033-0022035; see also APPX0100066; APPX0021982. These findings directly contradict the Commission's earlier recognition that domestic producers refused to sell to distributors they consider competitors, are unsupported by substantial evidence, and do not comply with the Order.

### 1. The Commission's finding that sales refused by domestic producers were sales lost for price reasons is unsupported by substantial evidence

The Court directed the Commission to explain "how the domestic industry could be harmed by sales that it refused to make," as "{a} reasonable observer would not consider a sale 'lost' to importers—much less evidencing harm to the domestic companies—if that sale was first offered to and rejected by Mosaic." APPX0000082; APPX0000132.

As the Commission initially acknowledged, domestic producers admitted that, as a business strategy, they chose not to serve large domestic distributors who compete for sales to downstream customers. APPX0099625; APPX0020605; *see also* APPX0017562. On remand, however, the Commission proposes an entirely new and unsupported justification for its refusal to "reduce the volume of subject imports by {certain domestic distributors'} total purchases": specifically, "the record does not show that the domestic industry categorically refused to supply them but rather that Mosaic would not sell to them at their preferred prices." APPX0100066; APPX0021982.

The Commission thus recasts the sales that domestic producers deliberately refused as sales lost for price reasons. *Id.* This new finding

is not supported. The record instead demonstrates that large domestic distributors offered to purchase domestic fertilizers at "market prices," not at allegedly lower prices offered by subject imports. APPX0100117-0100119; APPX0022033-0022035. In fact, the Commission itself concedes that subject imports were higher priced than the domestic product 80% of the time, and that domestic and import prices "tracked each other closely over the POI." APPX0100071-0100072; APPX0021987-0021988; *see infra* Part III.

The Commission rests its new finding on an unsubstantiated claim by Mosaic and a single piece of evidence—from years before the POI— that does not show fertilizer distributors substituting domestic products with lower-priced subject imports. APPX0100117 & n.366 (citing APPX0097584-0097587); APPX0022033 & n.366 (citing APPX0017452-0017453). By contrast, abundant record evidence demonstrates that domestic producers refused to supply domestic distributors with stable volumes because they are perceived competitors. As they testified, domestic distributors "strongly favor{ed}" and "predominantly" used supply contracts to ensure availability during short fertilizer application windows. APPX0017672-0017673; *see also* APPX0097715-

0097716; APPX0016506-0016507. However, domestic producers refused to enter annual contracts or otherwise provide a stable supply (APPX0095796-0095799; APPX0015865-0015868; *see also* APPX0017669-0017670) to perceived competitors (APPX0017562; *see* APPX0100117; APPX0022033; *see also* APPX0100122-0100123; APPX0022038-0022039).

Domestic distributors provided numerous emails from the POI demonstrating Mosaic's repeated refusals to sell to them—none based on price. *See* APPX0095806-0095828; APPX0015875-0015876; *see also* APPX0096135-0096138; APPX0016194-0016195. But these detailed, contemporaneous emails are dismissed by the Commission—without explanation—as "unsupported claims." APPX0100118-0100119; APPX0022034-0022035. The Commission meanwhile gives "less weight" to evidence showing Mosaic's refusals to sell post-petition, citing "a supply shock." APPX0100118; APPX0022034. The Commission cannot reasonably cite a supply shortage post-petition to justify Mosaic refusing to sell to domestic customers and *at the same time* rely on alleged domestic excess capacity—including post-petition—as evidence of injury. APPX0100042; APPX0021958.

Confidential Material Removed From Brackets

In sum, no "reasonable mind" would accept the Commission's reliance on thin, pre-POI evidence as supporting the conclusion that sales refused by domestic producers were based on price. The Redetermination thus fails to comply with the Order.

> ### 2. The Commission does not otherwise articulate how market-price sales that domestic producers were offered but rejected were injurious

Aside from its unsubstantiated attempt to link refusals to sell to subject import pricing, the Commission has no explanation for how sales that domestic producers refused *for multiple reasons unrelated to subject imports* somehow demonstrate injury by reason of subject imports. *Supra* Part II.A.1.

Instead, the Commission observes that any refusal to sell was not "categorical" because Mosaic sold [      ] volumes to domestic distributors. APPX0100117-0100119; APPX0022033-0022035. Over the POI, Koch was able to obtain only [    ] percent of its overall purchases from domestic producers, and ADM only [    ] percent. *See* APPX0100179-0100180, APPX0022306-0022307. These very [      ] volumes confirm that domestic producers viewed fertilizer distributors as competitors, offering only [      ] spot tonnage now and then. The

Confidential Material Removed From Brackets

Commission offers no explanation of how these [    ] sales show that
<span style="color:red">description</span>
the much larger quantities of sales refused by the domestic industry

were injurious. They show no such thing.

### B. The Commission's findings regarding inflated import volume data due to reshipments to Canada do not comply with the Court's order

The Court instructed the Commission to limit its analysis to the

economic impact of imports *in the U.S. market*, finding that the ITC

inflated the volume of subject imports by including 400,000 ST of

products destined for Canada. Specifically, the Court found: (1) the

ITC's occasional reliance on U.S. shipment data (which excluded

exported products) was interwoven with citations to inaccurate import

data, making it impossible for the Court to discern if the findings could

be sustained solely based on U.S. shipment data; and (2) the ITC had a

duty to ensure data accuracy and could not blame errors on importers

who followed the ITC's incorrect instructions. APPX0000084-0000088;

APPX0000134-0000138. The Redetermination fails to address these

errors.

### 1. The Commission fails to disentangle import and U.S. shipment data

The Redetermination makes no attempt to follow the Order, offering no clarification as to the Commission's reliance on import versus U.S. shipment data. The Court emphasized that because any citations to U.S. shipment data were "interwoven with" the "potentially inaccurate" import data, it was "impossible for the Court to discern if the Commission's volume findings can be sustained based solely on references to uncontested 'U.S. shipments data.'" APPX0000088; APPX0000138. Instead of complying, the Commission merely observes that that "these data were an accurate representation of the volume of cumulated subject imports" physically delivered to U.S. ports—as though arrival at a port excuses the Commission from assessing where those fertilizers were intended and delivered for sale. APPX0100064; APPX0021980.

The inclusion of subject import volumes reexported to Canada was ruled erroneous by the Court. Such volumes were plainly not injurious to the domestic industry, yet the Commission did not follow the Court's directive to consider only imports consumed in the United States.

25

### 2. The Commission has no basis to blame importers for the erroneous data on which it relied

The Order emphasized that the Commission "has a *duty* to investigate" when it "becomes aware of a possible {data} flaw in a timely manner." APPX0000087; APPX0000137 (citing *Chemours Co. v. United States*, 393 F. Supp. 3d 1186, 1194 (2019); *Borlem S.A. v. United States*, 913 F.2d 933, 941 (Fed. Cir. 1990)) (emphasis added). In this case, the Commission was notified early in the underlying investigation that its importer questionnaire instructions would capture imports ultimately destined for sale in Canada, but it took no action to identify and remove such imports from its volume data. APPX0000087-0000088; APPX0000137-0000138.

Record evidence demonstrates that importers filed "entries for consumption"—the most common type of U.S. customs entries—while intending to export the products. APPX0003676-0003677; *see also* APPX0006017-0006018; APPX0085043-0085044. Several OCP customers made consumption entries in New Orleans of OCP fertilizers ultimately destined for Canada. APPX0003699; APPX0087660. Plaintiffs explained that reexported imports could not injure the

domestic industry, and that the Commission had received "repeated warnings that some consumption entries of fertilizer at NOLA are destined for through-shipment to Canada," but the Commission relied on this erroneous data to support its determination. APPX0100177; APPX0022304.

The Commission notes that its questionnaires "directed importers to report as 'imports' only '{t}hose products identified for Customs purposes as imports for consumption,'" APPX0100064; APPX0021980 (quoting Importer Questionnaire, Definitions, EDIS Doc. Nos. 713651 (Preliminary), 727451 (Final)), and contends that it "reasonably compiled the cumulated import data" as reported by importers in their responses. APPX0100064; APPX0021980. But as the Commission well knows, the imports at issue *were* consumption entries for Customs purposes—and thus properly reported in questionnaires—even though intended for Canada. The problem is the Commission's instruction, not importers' responses.

### C. The Commission's ultimate finding that subject imports caused injury by creating "oversupply conditions" is unsupported by substantial evidence

The Order pointed out the many ways the Commission "talked past" evidentiary and logical flaws in its finding that the U.S. market was oversupplied with subject imports in 2019. APPX0000098; APPX0000148. Because fertilizer inventories in low-demand regions could not be relocated to normal-demand regions, the Commission cannot sustain a finding that import inventories created oversupply conditions in 2019. *See supra* Part I. Meanwhile, evidence on the limited availability of domestic fertilizers and needed import volumes contradicts any finding that subject imports caused injurious oversupply conditions in 2019.

#### 1. The Commission's findings about the extent of available domestic supply are unsupported by substantial evidence

The Commission continues to exaggerate the availability of domestic supply during the POI, principally by understating the impact of the shuttering of Mosaic's Plant City facility in 2017 and Nutrien's Redwater, Canada facility in 2019. APPX0100043-0100044; APPX0021959-0021960. The Commission's findings regarding the

domestic industry's available supply are not supported by substantial evidence and do not support the Commission's ultimate conclusion that subject imports caused injurious "oversupply conditions" in 2019. APPX0100127; APPX0022043.

### a) Plant City Closure

The Commission credits Mosaic's statement that the Plant City closure in December 2017 resulted in only 700,000 ST of reduced U.S. supply in 2018—despite Plant City producing *1.4 million* ST in 2017—finding this estimate "reasonable." APPX0100045-0100046; APPX0021961-0021962. Mosaic's CEO stated on a 2019 earnings call that Mosaic "gave up 1 million tonnes {*i.e.*, 1.1 million ST} of market here in the U.S. intentionally" when Plant City was closed in 2018, and the Commission fails to explain why this contemporaneous 2019 report is less probative than Mosaic's post-petition 2021 estimate of 700,000 ST. APPX0092564-0092565; APPX0012655-0012656.[2]

---

[2] The Commission says statements in Mosaic's 2018-2020 earnings calls "were not contemporaneous with Mosaic idling of Plant City in 2017." APPX0100124-0100125; APPX0022040-0022041. These statements, however, were more contemporaneous than the 700,000 ST estimate offered in 2021.

Confidential Material Removed From Brackets

The Commission finds that Mosaic reduced U.S. shipments by only [ number ] ST from 2017 to 2018, when U.S. shipments of subject imports increased by just 604,981 ST. APPX0100046; APPX0021962. The Commission does not explain how this mere difference of [number] ST constituted injurious oversupply. The Commission also concedes that U.S. shipments of subject imports increased by 753,638 ST from 2017 to 2019, which again tracks the Commission's own estimate for Plant City's lost output. APPX0100081; APPX0021997. This increase over three years is modest even before taking into account the reductions in capacity and availability associated with the Redwater closure. *See* APPX0097709-0097710 (U.S. market demand [            ] increases in characterization of data U.S. shipments of subject imports); APPX0016500-0016501.

### b)  Redwater Closure

The Commission finds that the closure of Nutrien's Redwater facility in Canada, announced in 2018 and completed in 2019, did not reduce availability in the U.S. market, because Nutrien increased U.S. production by [ number ] ST between 2018 and 2019 to offset any impact. APPX0100047-0100048; APPX0021963-0021964. However, this boost in Nutrien's U.S. production was [            ] the loss of Redwater's comparison of data

730,000 ST capacity and 600,000 ST annual production. APPX0097830; APPX0016606. The Commission also fails to address the increased diversion of U.S. fertilizers to Canada due to Redwater's closure. For example, MAP exports from the U.S. to Canada increased sharply from 2016-17 to 2019-20, reducing domestic supply by 740,000 ST. *Id.* Reduced supply in Canada also meant fewer Canadian imports to satisfy U.S. demand. *Id.* The Commission's blinkered focus on shifts in Nutrien's U.S. production misses these broader, and far more consequential, market dynamics, all of which help explain increases in imports.

### c)    "Excess" Capacity

The Commission finds that the domestic industry had excess capacity throughout the POI, notwithstanding the Plant City and Redwater closures. APPX0100047-0100048; APPX0021963-0021964. The Commission fails to address evidence demonstrating that the excess capacity claimed by domestic producers was exaggerated or simply false. As the Commission concedes, Mosaic turned away large domestic customers beginning in 2020 due to tight supplies. APPX0100118; APPX0022034. Mosaic admitted needing imports in

Confidential Material Removed From Brackets

2018 to fill the hole left by Plant City. APPX0017574. Despite claiming

excess capacity, Mosaic produced [      ] in interim 2020 when the U.S.
characterization of data

market needed supply than it did in interim 2019. APPX0098434;

APPX0020686. The entire domestic industry reported [         ]
characterization of activities

production of only [number] ST between interim 2019 and interim 2020,

while claiming excess capacity of [  number  ] ST in 2019. *See id.* In

addition, most purchasers reported supply constraints during the POI,

with several highlighting that domestic producers were unable to

supply their requested volumes. APPX0098404-0098405;

APPX0020658-0020659. The record thus confirms that domestic

producers lacked practical capacity to meet market demand,

necessitating subject imports and rebutting the Commission's finding of

injurious "oversupply conditions."

### 2. Additional record evidence undermines the Commission's oversupply conclusion

Beyond errors in the Commission's analysis, additional record

evidence detracts from the Commission's conclusion, yet receives

limited or no attention in the Redetermination. These additional

sources further demonstrate that the Commission's finding of injurious oversupply is not supported by substantial evidence.

### a)    Subject Import Adjustments in 2019-20

First, the Commission claims that subject imports materially injured the domestic industry by exceeding demand in 2019-20, but this finding is not supported by substantial evidence. Indeed, record evidence demonstrates that subject importers responded more quickly than the domestic industry to changes in demand due to unexpected weather events across three planting seasons from fall 2018 through fall 2019. Entering 2019, distributors stockpiled inventories in anticipation of strong demand in spring 2019, leading to peaks in both domestic and subject inventories in Q1 2019. APPX0097714-0097721; APPX0016505-0016512. But bad weather during the spring 2019 fertilizer application season sharply reduced subject imports and limited out-of-season restocking to areas unaffected by the bad weather. APPX0096290-0096299; APPX0016144-0016153. Overall, subject imports made larger adjustments than the domestic industry to shifting U.S. demand conditions, thereby avoiding any injurious oversupply. OCP First Remand Comments at 18-19 (ECF 156).

33

### b) Expert Analyses

Second, the Commission misinterprets the economic analyses of James Dougan and Michael Rahm, who demonstrate that subject imports increased by much less than domestic supply decreased. In particular, the Commission maintains that OCP "omits that both witnesses conceded that there was a 'temporary oversupply' in the U.S. market." APPX0100098; APPX0022014. This is false. According to both expert analyses, any small and transient imbalance between supply and demand was not caused by an oversupply of subject imports but rather by an unanticipated drop in domestic demand due to once-in-a-century weather events. And as OCP acknowledged, Mr. Dougan attributed the temporary oversupply in the overall market to the repeated weather-related demand shocks in 2018 and 2019, not to unjustified or injurious imports. APPX0017679; OCP First Remand Comments at 21 (ECF 156). Mr. Rahm reached the same conclusion, attributing the "inventory hangover" cited in the Redetermination as "in anticipation of a big spring application season," and attributing the collapse of the "NOLA-Brazil spread" to "the spring planting disaster and large build of

34

Confidential Material Removed From Brackets

channel inventories"—across all sources. APPX0097832; APPX0016608; *see also* APPX0100098; APPX0022014.

Beyond weather-driven demand shocks that temporarily created an imbalance between supply and demand, the experts agreed that subject imports did not oversupply the U.S. market. In fact, every other comparison by Mr. Dougan across the full POI demonstrated that total U.S. demand consistently [          ] the increase in U.S. shipments of subject imports. APPX0097709-0097710; APPX0016500-0016501. Meanwhile, Mr. Rahm—a former senior executive at Mosaic— calculated that the total increase in subject imports from July 1, 2016 to June 30, 2020 was more than 1 million ST smaller than the cumulative loss in domestic supply. According to Mr. Rahm, over the POI subject imports increased by 761,000 ST while the combination of Plant City, Redwater, and Hurricane Irma reduced domestic supply by 1.92 million ST. APPX0097832-0097833; APPX0016608-0016609. His analysis rests on public and subscription data and focuses on fertilizer years (*i.e.*, July 1 to June 30), the timeframe traditionally used in the industry. APPX0097824; APPX0016600.

The Redetermination's perfunctory treatment of these analyses in a single footnote conceals that across the POI, the decline in domestic supply—for reasons unrelated to subject import competition—far exceeded the increase in subject imports. APPX0100098; APPX0022014. This evidence contradicts the Commission's finding that an oversupply of subject imports caused material injury to domestic producers.

### 3.   Record evidence does not support the Commission's finding of injurious oversupply by subject imports

Even the Commission's own volume data—which are erroneous for myriad reasons, as described above—do not support a finding that subject imports injuriously oversupplied the U.S. market.

The Commission begins its analysis by calculating the increase in subject imports from 2017 to 2019 as roughly 700,000 ST, which it contends is neither "inaccurate" nor "artificially inflated," even though the Commission admits that a portion of "such imports were at some later, unspecified point in time reexported to Canada." APPX0100064; APPX0021980. The Commission then appears to acknowledge that the increase in subject imports is only 592,154 ST when reexports to Canada are deducted, in line with OCP's own calculation, before

Confidential Material Removed From Brackets

claiming that this figure "overlook{s} the 1.1 million short ton increase that occurred from 2017 to 2018." APPX0100065-0100066; APPX0021981-0021982. However, the Commission's entire theory of oversupply rests on subject imports contributing "to oversupply conditions in the beginning of 2019"—making *2019* the critical year for the Commission's injury determination, not 2018. APPX0100094; APPX0022010.

The increase of 592,154 ST in subject imports from 2017 to 2019 is significantly less than the decreases in U.S. supply described above. Crucially, even the Commission's lowball estimate of a 700,000 ST reduction in supply from Plant City *by itself* outstrips the full 2017-19 increase in subject imports destined for the U.S. market. This comparison, utilizing the Commission's own chosen numbers, demonstrates that subject imports did not oversupply the U.S. market even without accounting for: (1) the Mosaic CEO's report of a 1.1 million ST reduction in domestic supply from Plant City, APPX0092564-009256; APPX0012655-0012656; (2) over [ number ] ST in net reduced supply from Nutrien, after its closure of Redwater and [     ] increase in U.S. production, *supra* Part II.C.1.b; and (3) 740,000 ST in reduced

domestic MAP supply, given increased exports to Canada following Redwater's closure. APPX0097830; APPX0016606.

Taken together, these numbers dwarf any increase in subject imports and disprove the notion that subject imports created "oversupply conditions" in the market in 2019—or any other year. Without "oversupply conditions," there is no support for the Commission's finding that the domestic industry was materially injured by reason of subject imports, and "the Commission's oversupply-based material injury finding collapses like a house of cards." APPX0000077; APPX0000127.

## III.   The Price Effects Analysis Fails to Comply With the Order

### A.   The Commission's analysis of underselling data remains inadequate

First, the Commission fails to comply with the Court's order to account for its finding of "lower priced" imports in the face of contradictory data. In the first remand determination, the Commission had concluded:

> Thus, while we recognize the prevalence of overselling in the pricing data, we continue to find that the record demonstrates that, consistent with the high degree of price transparency in this

> market, the prices of the domestic product and
> subject imports tracked each other closely and
> were generally comparable with small margins of
> underselling and overselling, that subject imports
> were in some instances lower priced, and the
> domestic industry lost sales to subject imports
> because of lower prices.

APPX0099982; APPX0021243 (repeating its original determination,

APPX0099609, APPX0020594). The Court found this analysis to be

"inadequate" in light of record evidence showing that subject imports

were higher priced than their domestic counterparts 80 percent of the

time, that the actual difference between prices of imported and domestic

product was small in nearly all instances, and that the vast majority of

purchasers reported that domestic product prices were "comparable" to

subject import prices (*i.e.*, not lower priced). APPX0000090-0000091;

APPX0000140-0000141. The Court thus ordered the Commission to

"further explain or reconsider its underselling finding" in light of such

contradictory data. APPX0000092-0000093; APPX0000142-0000143. On

remand, the Commission does neither.

      **1.**   **The Commission claims that it sufficiently "considered" the underselling data, but fails to explain how imports that were predominantly oversold caused price depression and lost sales**

In its Redetermination, the Commission repeats the same conclusion as before, "recogniz{ing} the prevalence of overselling" while going on to find that the minority instances of underselling were somehow significant enough to cause the domestic industry to lose sales and to significantly depress U.S. prices in 2019. APPX0100075, APPX0100086; APPX0021991, APPX0022002. The Commission contends that it is only required to "consider" whether subject imports significantly undersold the domestic like product in evaluating the price effects of subject imports, and that it satisfied the "consideration" requirement by acknowledging what the record evidence shows. APPX0100075; APPX0021991. Regardless of whether the obligation to "consider" a factor encompasses an obligation to make a finding regarding that factor, the Commission has an indisputable obligation to make determinations, findings, and conclusions that are supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i). To meet the "substantial evidence" standard, the Commission must provide "a rational connection between the facts found and the choice made." *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016). Here, the Commission fails to provide a rational connection between its

40

recognition of the "prevalence of overselling" and its finding that subject imports were lower priced and caused lost sales and price depression.

The Commission cites to *Nucor Corp.* in support of its position that the statutory directive to "consider" a factor is a low bar—but that case only exposes additional flaws in the Commission's position. In *Nucor Corp.*, the Court found that "{w}here an agency has not made a particular determination explicitly, the agency's ruling nonetheless may be sustained as long as 'the path of the agency may be reasonably discerned.'" *Nucor Corp. v. United States*, 414 F.3d 1331, 1339 (Fed. Cir. 2005). In the present case, the agency's path *cannot* be reasonably discerned, because the Commission "recognize{s} the prevalence of overselling in the pricing data"—and even finds the overselling to be "predominant" and "consistent" over the entire POI—and yet conducts its price effects analysis *as if there were* significant underselling. APPX0100074-0100075; APPX0021990-0021991; APPX0017536-0017537. In other words, the Commission's price effects determination rests on the irrational logic that the domestic industry's success in making a large majority of its sales at higher prices than subject

imports—and the rest of its sales at prices that were barely lower[3]—has no bearing on whether the industry has suffered adverse price effects by reason of subject imports.

Thus, the Commission must still explain its analysis of the underselling data so that their role in the path to the agency's price effects determination is reasonably discernable. Because the Commission fails to provide any such explanation, its "consideration" of underselling fails to comply with the Court's order and remains unsupported by substantial evidence.

> **2.    The Commission finds that subject imports were lower priced by dismissing its comprehensive questionnaire pricing data and relying on unverified trade publications, rather than reconciling the contradictory evidence**

According to the Commission, the lack of support in its underselling data for finding that any meaningful quantity of subject imports was

---

[3] The Commission seems to dismiss the pervasive overselling because the underselling and overselling margins were "small" and prices of domestic product and subject imports "tracked each other closely." APPX0100072; APPX0021988. However, not only was the overselling margin higher than the underselling margin on average (3.7% vs. 1.7%), but the maximum overselling margin was *quadruple* the maximum underselling margin (17.6% vs. 4.4%). *Id.* The Commission never explains how the few instances of underselling by such small margins could significantly depress domestic prices.

Confidential Material Removed From Brackets

"lower priced" is not fatal to its conclusion that lower-priced subject imports depressed domestic prices, because it also relies on trade publications to reach that conclusion. APPX0100102; APPX0022018. In other words, the Commission effectively gives decisive weight to trade publications suggesting that subject imports were priced lower and caused lost sales and price depression, and little or no weight to its own questionnaire data resoundingly contradicting that conclusion.

The Commission argues that the trade publications deserve weight because of "the vital role that they played in the U.S. market." APPX0100095; APPX0022011. The Commission makes this bold characterization based on [ ] of [ ] U.S. producers, 2 of 9 importers, and 16 of 28 purchasers reporting that they "refer to prices published in trade publications." APPX0098467-0098468; APPX0020719; *see also* APPX0100102-0100103; APPX0022018-0022019. When only [share] of responding firms reported referring to trade publications, their role can hardly be described as "vital."

Moreover, the Commission is not relying on the price indexes in the trade publications, which is what certain firms reported referencing; rather, the Commission is relying on their sensationalized narratives

43

about supposed "oversupply conditions and price declines." *See* APPX0100083-0100084, APPX0100089-0100091; APPX0021999-0022000, APPX0022005-0022007. The Commission never explains why these unverified, anonymous, and anecdotal trade press quotes are more probative than the Commission's own quarterly pricing data, which are submitted under oath and show predominant and consistent overselling by subject imports. Indeed, the Commission had previously confirmed in its original determination that its pricing data were both "comprehensive" and "corroborate{d}" by monthly import data entry AUVs and supplemental pricing data proposed by Mosaic, APPX0099607, APPX0020592—facts conveniently omitted from the Redetermination.

Because the Commission fails to account for contradictory evidence— its own questionnaire pricing data—undermining its conclusion that subject imports were lower priced than domestic product and caused price depression, the Commission's underselling analysis and broader price effects analysis are unsupported by substantial evidence and fail to comply with the Court's order.

44

### B.    The Commission fails to justify its disregard of Mosaic's price leadership

In addition, the Commission fails to comply with the Court's order to address evidence of Mosaic's price leadership in the U.S. phosphate fertilizer market, which in the Court's view "directly contradict{s}" the Commission's finding that low-priced imports depressed U.S. prices. APPX0000094; APPX0000144. As the Court noted, Mosaic accounts for the large majority of North American phosphate production, and the vast majority of purchasers reported that Mosaic's position in the market is "so strong that other firms follow the prices it sets." *Id.* Given that "{s}ellers in the market that are tracking Mosaic's prices cannot simultaneously be lowering their prices to compete with cheaper imports," the Court ordered the Commission to provide a satisfactory explanation for how it can find that subject imports caused price depression. *Id.* The Redetermination lacks any adequate explanation.

### 1.    The Commission's attempt to explain that a price leader may not be the lowest-priced supplier misses the mark

The Commission's finding of price depression rests on the premise that subject import prices drove domestic producers' prices down. If that

45

were the case, when purchasers were asked to identify firms that

"initiate a price change, either upward or downward, that is followed by

other firms," APPX0008801, they would have identified importers and

distributors of subject merchandise or foreign producers as price leaders

in the U.S. market. But that is not what the record shows: *eighteen*

purchasers reported that Mosaic was the industry price leader, while

only one to three purchasers identified importers or subject producers

as price leaders. APPX0098470-0098471; APPX0020721.

In its Redetermination, instead of complying with the Court's order

to explain the price depression determination in light of the evidence of

Mosaic's price leadership, the Commission undertakes to educate the

Court on the definition of "price leader." The Commission notes that "a

price leader may not be the lowest-priced supplier," suggesting that

Mosaic's price leadership does not undermine the finding of price

depression unless Mosaic is also the lowest-priced supplier.

APPX0100100; APPX0022016. However, the Court never stated that

Mosaic was the lowest-priced supplier, nor does its remand directive

hinge on such a finding. Rather, the Court appropriately observed that

Mosaic set prices in the market followed by other firms, based on

market participants overwhelmingly responding that Mosaic is the first
mover on prices, whether up or down—which refutes the notion that
subject import prices forced Mosaic, the largest domestic producer, to
lower its prices. APPX0000093-0000094; APPX0000143-0000144.

Thus, evidence of Mosaic's price leadership directly contradicts the
Commission's finding that lower-priced imports exerted downward
pricing pressure on domestic product and significantly depressed U.S.
prices in 2019. The Court's directive cannot be avoided simply by
stating that a price leader may not be the lowest-priced supplier.

> **2.    Purchaser responses cited by the Commission do
> not help reconcile its price depression finding
> with Mosaic's price leadership**

The Commission cites to a few purchaser responses as supposed
evidence that, despite Mosaic's undisputed price leadership in the
market, subject import prices caused the domestic industry to lower its
prices in 2019. APPX0100100-0100101; APPX0022016-0022017.
However, those same purchasers also indicated in their questionnaire
responses that they bought subject imports because domestic product
was not available—directly contradicting the Commission's conclusion
that domestic producers lowered their prices due to pressure from an

Confidential Material Removed From Brackets

"oversupply" of lower-priced subject imports. For example, [company],

[  company  ], and [  company  ] were among the many purchasers who

explained that limited availability of domestic product was their reason

for purchasing subject imports. APPX0098485-0098486; APPX0020735-

0020736. Such responses corroborate other evidence that Mosaic, given

its dominant position in the industry, was a price maker and not a price

taker.

Because the Commission fails to explain how evidence of Mosaic's

price leadership fits with its finding of price depression, its price effects

determination remains unsupported by substantial evidence.

### C.    The Commission's lost sales finding remains unsupported by substantial evidence

Lastly, the Commission fails to comply with the Court's order

regarding its lost sales finding. This Court found that the record

evidence "do{es} not allow a reasonable person to conclude that the

domestic industry lost any significant amount of sales because of low-

priced imports." APPX0000095; APPX0000145. According to the Court,

the finding of lost sales rested on one "outlier" purchaser whose

responses were riddled with inconsistencies, such that the Commission

could not simply "rubber stamp" the entirety of that purchaser's reported lost sales. APPX0000097; APPX0000147. The Court thus ordered that "{i}f the Commission wishes to credit some portion of the reported lost sales on remand, it must adequately explain this decision." *Id.*

The Redetermination continues to rely on the entirety of the outlier purchaser's reported lost sales to find that "the domestic industry lost sales to subject imports because of lower prices." APPX0100075-0100076; APPX0021991-0021992. This finding is key to the Commission's decision to dismiss the predominant overselling and conclude that subject imports caused price depression in 2019. *See* APPX0100074-0100075, APPX0100078; APPX0021990-0021991, APPX0021994. The Commission's unchanged finding on remand fails to comply with the Court's order in at least three respects.

**1.    The Commission fails to address the much larger number of purchaser responses that undermine any finding of lost sales**

The Court noted a significant number of purchaser responses undermining the finding that the domestic industry lost sales to subject imports because of lower prices. The Redetermination continues to offer

49

Confidential Material Removed From Brackets

no explanation of how its lost sales finding can be squared with this contrary evidence.

The Court observed that, among the twenty-eight firms that answered the Commission's questions on lost sales, only five indicated that a primary reason for their purchase was that subject imports were lower priced; of those five, [   ] are themselves domestic producers, and

number

one did not report any quantity of alleged lost sales. APPX0000095-0000096; APPX0000145-0000146. Meanwhile, at least six firms indicated that they purchased subject imports not because of price, but because domestic product was unavailable, APPX0000096, APPX0000146—echoing evidence of domestic supply constraints elsewhere on the record, *see supra* Part II.A. The Court thus found that the Commission's first redetermination failed to explain how it found that the domestic industry lost sales to subject imports because of lower prices given the "small portion of firms that provided responses supporting this conclusion and the greater portion that provided contradictory responses." APPX0000096; APPX0000146.

The Redetermination contains no explanation of why the Commission dismissed that greater portion of responses yet gave

50

Confidential Material Removed From Brackets

significant weight to the minority of responses. *See* APPX0100073-0100077; APPX0021989-0021993. The Commission merely states that it "recognize{s}" that other purchasers did not report lost sales, but claims that this fact does not "detract" from the responses of purchasers that did. APPX0100076; APPX0021992. However, this Court has found that "{a} mere acknowledgement that there is contradictory evidence does not suffice." APPX0000092-0000093; APPX0000142-0000143 (citing *PAO TMK v. United States*, CIT Ct. No. 21-00532, Slip Op. 23-150 (2023)). The Commission's failure to address this contrary evidence on remand renders its lost sales finding unsupported by substantial evidence and non-compliant with the Court's order.

> **2.    The Commission continues to rely on one outlier purchaser's lost sales response without adequately addressing the contradictions identified by the Court**

The Commission's reliance on a minority of purchaser responses to its lost sales question is even more problematic because one outlier purchaser, [ company ], accounts for the vast majority of the alleged lost sales. This Court identified numerous inconsistencies and contradictions surrounding [ company ] responses that undermine the

Confidential Material Removed From Brackets

finding of lost sales. The Commission again fails to address this evidence.

The Commission relies on a lost sales figure of 733,895 ST to support its conclusion that the domestic industry lost sales because of lower-priced imports. APPX0000096; APPX0000146. No less than [ number ] ST of that lost sales figure comes from [ company ]. *Id.*; APPX0098485; APPX0020735. This Court observed that [ company ] reported lost sales are "more than [  ] times those of any of the other firms that reported a lost sales quantity," and that it is "the only firm to designate all its subject import purchases as lost sales for the domestic industry," concluding that "{t}hese discrepancies alone are enough to call into question the accuracy of the outlier purchaser's response." APPX0000096-0000097; APPX0000146-0000147. [ company ] "gave further cause to believe its response was not accurate" when it reported purchasing imports at a higher price at times because not enough available domestic product was available—which is consistent with the greater number of purchasers reporting that they purchased subject imports because of availability, not price. APPX0000097; APPX0000147; *see supra* Part III.B.2. The Court thus found that the

52

Confidential Material Removed From Brackets

record does not support crediting the entirety of [   company   ] reported

lost sales, and ordered the Commission to address such detracting

evidence if it "wishes to credit some portion" of [   company   ] reported

lost sales on remand. *Id.*

    In its Redetermination, the Commission continues to rely on the

entirety of [   company   ] reported lost sales to find that the domestic

industry lost sales to subject imports because they were lower priced,

while failing to address any of the detracting evidence identified by the

Court. APPX0100075-0100076; APPX0021991-0021992. The

Commission claims that it fulfilled its duties by contacting [   company   ]

about major contradictions between the purchaser's preliminary and

final phase responses, and then deemed [   company   ] responses to be

"credible and forthcoming." *Id.*; *see also* APPX0098485; APPX0020735.

However, [   company   ] flip-flopping between investigation phases was

not even on the list of red flags identified by the Court, as the Order

raised a number of issues specific to [   company   ] final phase responses

that have not been addressed by the Commission.

    The Commission further states that it would still find [   company   ]

responses to show a significant volume of confirmed lost sales even if it

Confidential Material Removed From Brackets

were to credit just a portion of the reported quantity. The Commission attempts to make a "conservative estimate" of the portion to be credited and lands on [ number ] ST, which represents [    ] percent of [ company ] reported quantity. APPX0100076; APPX0021992. The Commission provides no basis for selecting this arbitrary percentage. Without reopening the record to further clarify [ company ] responses, the Commission cannot know what if any portion of the reported quantity actually constitutes lost sales.

Furthermore, even with the Commission counting the entirety of [ company ] subject import purchases as "lost sales," the total lost sales quantity (733,895 ST) is less than 3 percent of the total purchases and imports reported by purchasers during the POI (27,468,899 ST)— and that share goes down to [ ] percent when only the alternative [    ] percent of [ company ] reported quantity is credited. *See* APPX0098484; APPX0020734. This negligible amount can hardly constitute a "significant" quantity of lost sales. Indeed, this trivial quantity of lost sales is consistent with other record evidence that subject imports predominantly oversold domestic product throughout the POI.

Confidential Material Removed From Brackets

Thus, given the Commission's continued failures to address the multitude of issues regarding the outlier purchaser's responses, the lost sales finding remains unsupported by substantial evidence and fails to comply with the Court's order.

>    **3.    The Commission's finding of price depression relies on lost sales, even though the Commission now argues that the volume of lost sales is "less probative" to that price effects finding**

In its Redetermination, the Commission partially retreats from its finding that the domestic industry lost sales due to lower subject import pricing, emphasizing instead that its ultimate price effects finding is based on price depression. APPX0100077; APPX0021993. The Commission then argues that the actual volume of lost sales is "less probative" than the narrative responses that support its finding of price depression. Those narrative responses, however, are nothing but a string of cherry-picked quotes from a single purchaser, [ company ]. *Id.* There are at least two problems with the Commission's revised reasoning.

First, [ company ] narrative responses, like its reported lost sales quantity, are undermined both by the purchaser's own inconsistencies

Confidential Material Removed From Brackets

and by other contradictory evidence on the record, as discussed above. The Commission cannot rely on [ company ] claim that subject imports exerted pressure on domestic prices without addressing other record evidence demonstrating that subject imports oversold domestic product and that a domestic producer was the price leader in the U.S. market.

Second, it is clear in the Redetermination that the lost sales finding is key to the Commission's decision to dismiss the predominant overselling and conclude that subject imports' "lower" prices caused price depression in 2019. APPX0100074-0100075, APPX0100078; APPX0021990-0021991, APPX0021994. If the lost sales volume is now regarded as "less probative," then so is the lost sales finding, making the Commission's price depression finding even less tenable.

Consequently, the Commission's stated reliance on [ company ] narrative responses does nothing to cure the deficiencies in its lost sales finding, which fails to comply with the Court's order and remains unsupported by substantial evidence.

## IV.    The Commission's Redetermination Fails to Establish Injury "by Reason of" Subject Imports

Each step of the Commission's material injury determination—from volume to price to impact—continues to rest on the finding that subject imports caused oversupply conditions. This Court has already explained the numerous ways in which the record fails to provide substantial evidence or a clearly reasoned path in support of the Commission's oversupply finding. The Commission's Redetermination, which relies on the same record as the first redetermination, never resolves these numerous deficiencies. *See supra* Parts I-III. Absent the predicate finding of "oversupply," any injury to the domestic injury was clearly not "by reason of" subject imports. Instead, there was only one culprit: three consecutive seasons of unprecedented and unforeseeable rainfall. *See* OCP First Remand Reply at 20-23 (ECF 200).

To find material injury is "by reason of" subject imports, the Commission must ensure that subject imports are more than a minimal or tangential cause of injury and that there is a sufficient causal, not merely temporal, nexus between subject imports and injury. *See, e.g.*, *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 719-20, 722 (Fed.

Cir. 1997). Previous ITC cases have routinely found that subject imports cannot meet the more than *de minimis* cause threshold in cases where one or more other factors fully explain any observed poor performance. *See, e.g.*, *Steel Nails from India, Oman, Sri Lanka, Thailand, and Turkey*, Inv. Nos. 701-TA-673-677 and 731- TA-1580-1583 (Final), USITC Pub. 5370 at 34, 49, 56 (Oct. 2022); *see also* OCP First Remand Reply at 21-22 (ECF 200).

Here, the Commission has failed to establish that subject imports are more than a *de minimis* cause of injury. Contrary to the Commission's assertion, APPX0100113, APPX0022029, this case is not about multiple "distinct" causes, each of which is independently a more than *de minimis* cause of injury to the domestic industry. Instead, by temporarily depressing actual demand below projected levels, the unforeseeable weather constituted the sole cause of injury: in 2018 and 2019, extreme rainfall threw off the equilibrium between supply and demand in ways no one could have predicted or planned for, but the market adjusted. *See supra* Parts I, II.C. Subject import volumes declined with falling demand, stranded inventories stayed off the market, and prices recovered with the arrival of better weather and

more accurate demand projections in early 2020. *Supra* Parts I, II.C.2;
*see* APPX0100039; APPX0021955; *see also* APPX0098477-0098478;
APPX0020727-0020728.

Because the Commission fails to support its findings that
"oversupplied" or lower-priced subject imports took sales from or
depressed prices for the domestic industry, the Commission's
oversupply-based injury determination is unsupported by substantial
evidence and not in accordance with law. Instead, weather-related
demand shocks remain the sole cause of injury.

## CONCLUSION

For the reasons explained above, OCP respectfully urges this Court
once again to remand the Commission's affirmative injury
determination.

Dated: October 27, 2025

Respectfully submitted,

*Shara L. Aranoff*
_____

Shara L. Aranoff
James M. Smith
Sooan (Vivian) Choi
Wanyu Zhang
John J. Catalfamo
Julia Shults

COVINGTON & BURLING LLP
850 10th Street, NW
Washington, D.C. 20001
(202) 662-5997
saranoff@cov.com

*Counsel to Plaintiff OCP S.A.*

## CERTIFICATE OF COMPLIANCE

Pursuant to this Court's Order dated October 2, 2025 (ECF No. 251), setting the word limitation to Plaintiff OCP S.A.'s Comments Opposing Remand Determination to 10,000 words, the undersigned hereby certifies that these Comments contain 9,952 words, including headings, footnotes, and quotations. The word count certification is made in reliance on the word count function of the word-processing system used to prepare these Comments.

Dated: October 27, 2025

_Shara L. Aranoff_
_____

Shara L. Aranoff
James M. Smith
Sooan (Vivian) Choi
Wanyu Zhang
John J. Catalfamo
Julia Shults

COVINGTON & BURLING LLP
850 10th Street, NW
Washington, D.C. 20001
(202) 662-5997
saranoff@cov.com

*Counsel to Plaintiff OCP S.A.*

## CERTIFICATE OF CONFIDENTIAL MATERIAL

The foregoing document contains 50 unique words (including numbers) marked confidential. This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

Dated: October 27, 2025

_Shara L. Aranoff_
_____

Shara L. Aranoff
James M. Smith
Sooan (Vivian) Choi
Wanyu Zhang
John J. Catalfamo
Julia Shults

COVINGTON & BURLING LLP
850 10th Street, NW
Washington, D.C. 20001
(202) 662-5997
saranoff@cov.com

*Counsel to Plaintiff OCP S.A.*

## CERTIFICATE OF COMPLIANCE REGARDING
## NON-USE OF GENERATIVE ARTIFICIAL INTELLIGENCE

Pursuant to this Court's Order dated October 2, 2025 (ECF No. 251), the undersigned hereby certifies that these Comments were not prepared with the assistance of a generative artificial intelligence program based on natural language prompts—such as, but not limited to, ChatGPT or Google Bard.

Dated: October 27, 2025

_____
Shara L. Aranoff
James M. Smith
Sooan (Vivian) Choi
Wanyu Zhang
John J. Catalfamo
Julia Shults

COVINGTON & BURLING LLP
850 10th Street, NW
Washington, D.C. 20001
(202) 662-5997
saranoff@cov.com

*Counsel to Plaintiff OCP S.A.*