**NONCONFIDENTIAL
VERSION**

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |  |
|---|---|---|
| OCP S.A., | ) | |
| Plaintiff, | ) | |
| EUROCHEM NORTH AMERICA CORPORATION, | ) | |
| Consolidated Plaintiff, | ) | |
| and | ) | |
| PHOSAGRO PJSC, INTERNATIONAL RAW MATERIALS LTD., and KOCH FERTILIZER, LLC, | ) | |
| Plaintiff-Intervenors, | ) | |
| v. | ) | Consol. Ct. No. 21-00219 |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| THE MOSAIC COMPANY, and J.R. SIMPLOT COMPANY, | ) | |
| Defendant-Intervenors. | ) | |

NONCONFIDENTIAL
VERSION

**PLAINTIFF-INTERVENORS' JOINT COMMENTS OPPOSING
SECOND REMAND REDETERMINATION**

Paul C. Rosenthal
Melissa M. Brewer
Kelley Drye & Warren LLP
Washington Harbour
3050 K Street N.W.
Suite 400
Washington, DC 20007

Counsel to International Raw
Materials Ltd.


Peter Koenig
Jeremy W. Dutra
Squire Patton Boggs (US) LLP
2550 M St N.W.
Washington, DC 20037

Counsel to Eurochem North
America Corporation


H. Deen Kaplan
Jared R. Wessel
Michael G. Jacobson
Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, N.W.
Washington D.C., 20004-1109

Counsel to Phosagro PJSC


Kenneth G. Weigel
Lian Yang
Alston & Bird
950 F Street, N.W.
Washington, DC 20004

Counsel to Koch Fertilizer, LLC

Dated:  November 7, 2025

# <u>Table of Contents</u>

**Page**

I.     Introduction ........................................................................ 2

II.    The Commission Majority's Redetermination
       Impermissibly Ignores the Court's Findings and
       Instructions from the Second Remand Order ....................... 7

III.   The Commission Majority's Redetermination
       Continues to Disregard Commissioner Johanson's
       Well-Reasoned Dissent, Most of Which is Now the Law
       of the Case .......................................................................... 12

IV.    Numerous Public Statements by Mosaic Demonstrate
       That Ceding U.S. Market Share Was an Intentional
       Business Strategy, Which Proved to Be Successful ........... 19

V.     Conditions of Competition in the Phosphate Fertilizer
       Industry Demonstrate the Commission Majority's
       Material Injury Finding Is Unsupported by Substantial
       Record Evidence ................................................................ 24

       A.     Phosphate Fertilizer Must Be in the Right Place
              at the Right Time for Application to Meet
              Farmers' Needs ......................................................... 24

       B.     Once Delivered to the Intended Destination,
              Phosphate Fertilizer Cannot Be and Is Not
              Reshipped ................................................................. 26

       C.     Domestic Producers Refused to Supply U.S.
              Customers During the Investigation Period
              Necessitating the Purchase of Subject Iports............ 29

VI.    The Record Does Not Support a Finding of Material
       Injury by Reason of Subject Imports ................................. 32

## Table of Contents (continued)

**Page**

A. The Commission Majority's Redetermination Still Fails to Evidence a Causal Link Between Subject Imports and Domestic Performance ............................ 32

B. The Commission Majority Still Lacks Substantial Evidence of Excess Subject Import Inventories to Overcome the Lack of a Causal Link ......................... 35

VII. Conclusion ........................................................................ 40

Pursuant to the Court's rules, and consistent with Federal Circuit Rule 25.1(e)(1)(B), this brief contains confidential material that has been omitted on pages 28, 29-30, and 37. The material omitted on page 29-30 includes information regarding suppliers and purchasing decisions and reporting contained in confidential questionnaire responses. The material omitted on pages 28 and 37 includes specific data regarding inventory levels compiled from confidential questionnaire responses. All of the omitted information was treated as business confidential and subject to an administrative protective order by the U.S. International Trade Commission in the underlying proceedings.

# Table of Authorities

**Page(s)**

## Cases

*Branning v. United States*,
   784 F.2d 361 (Fed. Cir. 1986) ................................................................. 7

*Etchegoinberry v. United States*,
   132 F.4th 1374 (Fed. Cir. 2025) ............................................................. 7

*Exxon Corp. v. United States*,
   931 F.2d 874 (Fed. Cir. 1991) ............................................................... 7

*Int'l Imaging Materials, Inc. v. United States ITC*,
   30 C.I.T. 1181 (2006) .......................................................................... 22

## Administrative Determinations

*Durum and Hard Red Spring Wheat From Canada*,
   USITC Pub. 3639 (Final) (Oct. 2003) ..................................................... 22

*Polytetrafluoroethylene (PTFE) Resin from China and India*,
   USITC Pub. 4801 (Final) (July 2018), *aff'd Chemours Co.
   FC, LLC v. United States*, 443 F. Supp. 3d 1315 (Ct. Int'l
   Trade 2020) ....................................................................................... 31

**Glossary**

| Acronym | Item |
|---|---|
| Eurochem | Eurochem North America Corporation |
| IRM | International Raw Materials Ltd. |
| ITC or Commission | U.S. International Trade Commission |
| Koch | Plaintiff-Intervenor Koch Fertilizer, LLC |
| Mosaic | The Mosaic Company |
| OCP or Plaintiff | OCP S.A. |
| OCP's Comments | Comments on Second Remand Redetermination (ECF Nos. 254-55) |
| *Order* | *OCP S.A. v. United States*, Consol. Ct. No. 20-00219, Slip Op. 25-51 (Apr. 22, 2025) |
| POI | Period of Investigation |
| *Redetermination* | *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final) (Second Remand) |

## Plaintiff-Intervenors' Joint Comments Opposing Second Remand Redetermination

On behalf of Consolidated Plaintiff Eurochem North America Corporation ("Eurochem") and Plaintiff-Intervenors International Raw Materials Ltd. ("IRM"), Phosagro PJSC ("Phosagro"), and Koch Fertilizer, LLC ("Koch") (hereinafter "Plaintiff-Intervenors"), we hereby submit joint comments opposing the second remand determination of the U.S. International Trade Commission ("ITC" or "Commission") dated July 28, 2025, in *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651, APPX0100026-0100128, APPX0021942-0022044 ("*Second Remand Redetermination*"), which was issued pursuant to this Court's second remand order dated April 22, 2025 in *OCP S.A. v. United States*, Slip Op. 25-51, APPX0000051-0000100, APPX0000101-0000150 ("*Order*").

Plaintiff-Intervenors support and incorporate by reference Plaintiff's Comments Opposing Remand Redetermination filed on behalf of OCP S.A. on October 27, 2025 (hereinafter "OCP's Comments"). Plaintiff-Intervenors' joint comments are intended to supplement OCP's Comments. Eurochem, Koch, and IRM are importers

of subject phosphate fertilizer, Phosagro is a producer of subject

phosphate fertilizer, and Koch is also a U.S. distributor of subject

phosphate fertilizer.

## I.    Introduction

> "{W}hen we shut down -- sorry, *idled Plant City,*
> *that opened a hole for some imports to increase,*
> and I think part of the increase you've seen has
> been just a response to that. We went from 55%,
> 60% market share to a more sustainable 50-ish
> percent market share. *So we gave up 1 million*
> *tonnes of market here in the U.S. intentionally."*
> *Mosaic's Chief Executive Officer, Analyst Day*
> (Mar. 28, 2019) (APPX0096279) (emphases added).

> "It's a mortal sin to run out of {fertilizer} in the
> middle of a season." William P. O'Neill, Jr.,
> President of IRM, at the Commission's Final
> Hearing (APPX0017755).

> Barges don't have backup lights. Counsel to IRM,
> CIT Hearing Transcript at 139 (June 28, 2022).

Pursuant to this Court's order, the Commission has now issued a

second remand redetermination and has found three times that subject

imports of phosphate fertilizer caused material injury to the U.S.

industry, despite two findings of this Court and overwhelming record

evidence to the contrary. In the *Second Remand Redetermination*, the

Commission majority (with two Commissioners voting in the

affirmative and Commissioner Johanson again voting in the negative) impermissibly "respectfully disagrees" with ten of the Court's findings and instructions, and again relies on minimal and selective record evidence to support its determination. In doing so, the Commission majority either ignores or glosses over unassailable evidence that the domestic industry (1) intentionally decreased U.S. production and U.S. market share during the period of investigation ("POI") as part of its U.S. business strategy, (2) told its U.S. customers to purchase imports instead of domestic fertilizer, and (3) refused to supply certain U.S. customers. As the quotation from leading domestic producer and Petitioner Mosaic above shows, Mosaic as a matter of intentional business strategy reduced its market share and invited customers to purchase imports to fill the gap the domestic industry created. Yet when imports supplied the farmers' needs (although at lower levels than projected by Mosaic) and market demand declined due to unforeseen weather conditions, Petitioner had seller's remorse. Through this very case, Mosaic then tried to punish importers and their customers—the American farming community—for acting upon its own representations.

The Commission's findings fail to recognize that these conditions of competition are critical in the context of the U.S. phosphate fertilizer market. U.S. distributors and farmers must have fertilizer in place and ready when the narrow fertilizer application window opens. Timing is everything. There are two annual fertilizer application seasons in the United States -- one in the Spring and one in the Fall. The application window is narrow and depends on weather. As a long-time supplier to the farm distribution network, IRM's president testified at the Commission's hearing (as quoted above) that running out of fertilizer in the midst of application is a "mortal sin" in this industry. APPX0017755. The fertilizer simply must be at the right location at the right time ahead of growing season, without fail.

The Commission's findings again rest on a fundamental misunderstanding that distribution networks in the U.S. market function unilaterally, such that once fertilizer is delivered to and off loaded at its intended warehouse or distribution location, it cannot be and is not subsequently re-loaded, re-shipped, and re-delivered to a different destination for both logistical and economic reasons. This market condition was highly relevant in 2018 and 2019, when a "black

swan" weather event caused historical rainfall levels to parts of the
Midwest that prevented fertilizer application, dampened (literally)
fertilizer demand in those regions, and caused higher inventory levels
at some locations. Despite testimony to the contrary, the Commission
fundamentally misunderstood that fertilizer in inventory in those
regions could be redelivered to other U.S. regions with stable demand,
when in reality already-ordered incoming fertilizer had to be delivered
to its intended warehouse or distribution center even though farmers
could not apply it due to weather. The Commission majority's volume
analysis rests on the mistaken conclusion that this dynamic created an
"oversupply" of fertilizer mid-POI that injured the domestic industry.
The record demonstrates that barges were not backing up or turning
around from original destinations because it was unfeasible and
contrary to industry practices. This evidence was strengthened during
the Commission's first remand proceeding.

Fatal to the Commission's findings, and the domestic industry's
case, is the total lack of a causal nexus between subject imports and the
domestic producers' performance during the POI. As discussed below,
when subject imports increased in 2018 in response to Mosaic's

signaling to the market that greater volumes of imports were needed to fill the supply gap it created, the domestic industry's operating income peaked. And imports were overwhelmingly priced higher than domestic product. The short period of weakening domestic performance in 2019 was caused by the black swan weather event and resulting declining demand—amidst declining subject imports and ordinary inventorying behavior.

Considering the overwhelming record evidence that there is no correlation between subject imports and the domestic industry's condition, a negative injury determination was warranted. The Commission majority continues to defy the Court's clear findings of a lack of a legal basis and substantial evidence to underpin the Commission majority's incorrect findings. The Court should (again) remand, with strong and clear instructions to the Commission to make lawful findings. The only possible result based on the record is a negative determination.

II. <u>**The Commission Majority's Redetermination Impermissibly Ignores the Court's Findings and Instructions from the Second Remand Order**</u>

The Commission majority in its second remand redetermination has repeatedly and egregiously chosen to openly disregard the Court's orders. This is unlawful and compels another remand.

As OCP correctly explains in its brief, the Law of the Case doctrine instructs that "'when a Court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the case.'" *Etchegoinberry v. United States*, 132 F.4th 1374, 1378 (Fed. Cir. 2025) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)); *Branning v. United States*, 784 F.2d 361, 363 (Fed. Cir. 1986) ("the rule adopted is to be applied, right or wrong, absent exceptional circumstances, in the disposition of the lawsuit") (internal quotations omitted). This doctrine rests upon an understanding "that questions once decided {should} not be subject to continued argument." *Exxon Corp. v. United States,* 931 F.2d 874, 877 (Fed. Cir. 1991).

The Court has already decided several major issues in this case. The Commission majority must apply the Court's directives. However, the Commission majority has chosen to openly defy this Court's order.

-7-

*On no less than ten separate occasions*, the Commission majority states in its remand results that it "respectfully disagrees" with the Court, as detailed below.  However, the Commission majority cannot defy the Court's directives, no matter how respectful the disagreement underlying the defiance.

First, the Commission majority defies the Court's directives that it must demonstrate with substantial evidence that domestic producers could reship inventory. APPX00000148 (finding that the Commission's conclusion that domestic producers can reship inventories at whatever quantities are needed "rests entirely on small-scale instances of reshipment that no reasonable observer would believe proves the existence of a reship-at-will capability"). The Commission majority's response is that it "respectfully disagree{s} with the Court's repeated characterization in the Second Remand Order that this finding {of domestic producers' ability to reship inventories} was central to the First Remand Views such that without it, 'the Commission's oversupply-based material injury finding collapses like a house of cards.'" APPX0022059. The Commission majority then doubles-down on its defiance of the Court's orders, stating: "we respectfully disagree with

the Court's assumption that domestic producers could not reship their inventories and therefore "would be poorly positioned to supply the U.S. market so that imports would not have contributed to oversupply conditions." APPX0022059-APPX0022060. The Commission majority cannot simply "disagree" with the Court's conclusions about the lack of substantial evidence to support the Commission majority's findings, as it does here.

These are not the only instances in the *Second Remand Redetermination* where the Commission majority unlawfully "disagrees" with the Court. The Court concluded that "questionnaire responses suggest that domestic producers were unable to relocate their phosphate fertilizer inventories to meet new market demand," with which the Commission again "respectfully disagree{d}." APPX0022070. The Commission majority also further "disagree{d} with the Court's view that the questionnaire responses indicate an inability to relocate inventories" and that there were low volumes of inventory reshipment or that the total reshipment quantities as a ratio to domestic industry shipments are "commercially insignificant." *Id.*

The Court also concludes that Mosaic's refusal to sell to customers "would create a supply gap" and directed the Commission to "account for how Mosaic's refusals to sell to domestic customers may have impacted import flows." APPX0000148. Again, the Commission majority digs in its heels, voicing its "respectful{} disagree{ment} with the Court's conclusion that there was a 'supply gap' related to an alleged inability of domestic producers to relocate inventories" and that it "disagree{s} that the record in these investigations indicates that there was a 'supply gap' related to Mosaic's alleged refusal to sell trading companies…" APPX0022070-APPX0022071 (trading companies include major U.S. distributors).

The Court also ordered the Commission to consider "evidence showing some imports were exported to Canada rather than sold to U.S. consumers," APPX00000148, and that the Commission used "inaccurate data" by considering import volumes that include these re-exported volumes. APPX00000137. The Commission majority's response: it "respectfully disagree{s} with the Court that the import data that the Commission majority relied upon is 'inaccurate' or 'artificially inflated.'"

-10-

APPX0022082. The Court has made clear findings on this matter—the Commission majority cannot ignore them.

Finally, the Court found that the Commission majority failed to "grapple with the fact that imports only undersold domestic product in twenty percent of instances…" and the Commission's response was simply to "respectfully disagree{s} with the Court that the Commission 'must answer' whether there was significant underselling." APPX0022094. The extent of underselling is an important element of the Commission's injury analysis; the agency cannot simply ignore the Court's directive.

The Commission majority therefore has failed to implement the Court's remand instructions and instead openly flaunts the Court's orders by simply voicing its "respectful disagreement" with the Court— *ten times*. This is unlawful and compels a remand for the Commission majority to apply the Court's findings in each instance. The CIT should remand *for the third time* to the Commission with unambiguous instructions to apply the CIT's findings, which necessitate an overturning of the Commission majority's findings.

III. **The Commission Majority's Redetermination Continues to Disregard Commissioner Johanson's Well-Reasoned Dissent, Most of Which is Now the Law of the Case**

The Court has consistently agreed with Commissioner Johanson's dissenting arguments, making most of the dissent now the Law of the Case. The evidence relied upon and the conclusions contained in Commissioner Johanson's original dissent remain unchanged through two remand proceedings. The Commission majority's remand results continue to fail to address several aspects of the well-reasoned views put forth in Commissioner Johanson's dissent, which highlight the lack of substantial evidence underpinning the Commission majority's second remand views.

Commissioner Johanson's dissent in the original determination views was premised on four main points, as substantiated by the record evidence: (1) on volume, subject imports were pulled into the market by demand that the domestic industry could not or would not meet, evidenced by testimonial evidence and the 80 percent overselling; (2) on price, the record lacked evidence that oversold subject imports caused price depression or price suppression; (3) on impact, any injury experienced by the domestic industry was uncorrelated with subject

imports; and (4) on threat, the lack of evidence of threat of material injury by reason of subject imports. APPX0020346. The Court has addressed and agreed with each of the first three dissenting findings. (The Commission majority did not reach the issue of threat in this case, so the Court has not addressed the fourth finding, and we have not addressed it here.) We take each dissenting view in turn.

### A.   Volume

First, on volume. Commissioner Johanson found based on record evidence that imports "were not simply pulled into the U.S. market but were invited in by the domestic industry." *Id.* Commissioner Johanson pointed specifically to Mosaic's closure of their production facilities, refusal to supply major U.S. purchasers, and prioritizing export markets as reasons that increased imports were necessary. Indeed, Commissioner Johanson points to record evidence that the Commission majority continues to disregard, including statements from Mosaic's CEO explaining that it closed Plant City for strategic reasons and invited imports to fill the gap: "When we shut down – sorry, idled Plant City, that opened a hole for some imports to increase…. So we gave up 1 million tonnes of market here in the U.S. intentionally." APPX0020347.

Commissioner Johanson also cites to Mosaic's contemporaneous statements on an earnings call that the Redwater closure added another supply gap that necessitated increased imports: "Clearly the import requirements into the US are increasing by {the closings of} both Red Water and Plant City there's no question of that . . . it certainly indicates that there will be a need for more imports . . ." APPX0020348.

Furthermore, Commissioner Johanson points to the ample record evidence that the domestic industry declined to supply U.S. customers, forcing them and their downstream farmer customers to rely on imports. *Id.* Mosaic testified that it does not "leave *good* sales opportunities on the table," instead picking and choosing customers as it pleases for non-price reasons, and thereby leaving customers with just one alternative source of fertilizer imports. *Id.*

Commissioner Johanson also identifies that the domestic industry's export shipment volumes throughout the POI were significant and increasing, leaving less product available for the U.S. market—yet another part of the evidentiary record largely ignored by the Commission majority. APPX0020349.

Commissioner Johanson correctly concluded, as did the Court, that based on the totality of the record evidence subject import volumes "did not exceed the supply deficit they were pulled into the U.S. market to fill." APPX0020350. As Commissioner Johanson correctly pointed out, and as the Court has agreed, subject import shipments increased by just 753,938 short tons, substantially less than the 1.1 million short tons in U.S. sales that Mosaic announced to the market that it intentionally ceded through its closure of Plant City alone. *Id.*

The Court has consistently and correctly agreed with Commissioner Johanson's dissent, but the Commission majority nevertheless continues to ignore the Court's clear remand instructions. In its first remand to the Commission, the Court rejected the Commission majority's finding that subject imports oversupplied the U.S. market in excess of demand, concluding that "the Commission's theory that the U.S. market was oversupplied by imports that exceeded demand rests like an inverted pyramid on an unsupported finding regarding what might be possible if economics did not matter." APPX0000035. Specifically, the Court focused on the Commission's unsupported assumption that fertilizer could be reshipped from one

destination to another to meet existing demand, rejecting this conclusion and remanding to the Commission given the ample evidence to the contrary. APPX0000049-APPX000050.

Upon remand, the Commission again failed to correctly address this issue, leading the Court to issue a second remand opinion, in which it required the Commission to reassess whether domestic producers were able and willing to supply customers during the period of review. APPX00000148-APPX0000149. Specifically, the Court stated (1) that the Commission's conclusion that domestic producers can reship inventories is not reasonable; and (2) that the Commission's finding that significant volumes of imports entered the U.S. market failed to adequately account for Mosaic's refusal to sell to customers and evidence that imports were re-exported to Canada. *Id.*

## B.  <u>Price</u>

Second, on price. Commissioner Johanson concludes that oversold subject imports did not depress or suppress domestic prices to a significant degree. APPX0020350-APPX0020351. In particular, Commissioner Johanson correctly considered the 80 percent overselling (and indeed overselling by greater margins than the underselling) of

subject imports compared to the domestic product in his consideration
of price depression and price suppression—something that the
Commission majority has consistently failed to do. APPX0020352.
Furthermore, Commissioner Johanson concluded based on the evidence
that declines in market prices in 2019 are not indicative of price
depression, but instead are attributable to historically bad weather and
resulting demand declines. APPX0020355. Finally, Commissioner
Johanson correctly relied upon the comprehensive pricing data gathered
in the course of these investigations for his conclusions, rather than
looking to selected press reports submitted by the domestic producers,
which the Commission majority still is relying upon to make findings on
price-based injury that cannot be found in the data. Moreover,
Commissioner Johanson correctly assessed that there was no price
suppression, citing in part to the clear lack of credibility of the single
purchaser reporting the vast majority of lost sales. APPX0020356.

    In its second remand opinion, the Court similarly found that the
Commission's conclusion that imports significantly depressed U.S.
prices and took sales from U.S. firms did not grapple with the fact that
imports oversold the domestic product in 80 percent of instances, that

Mosaic was a price leader, and that the lost sales evidence is potentially flawed. APPX00000148-APPX0000149.

### C.    Impact

Third, on impact. Commissioner Johanson's dissent found that there was no significant adverse impact on the domestic industry caused by imports. Commissioner Johanson properly puts domestic performance in its appropriate context, in particular that "any increases in subject imports were the direct result of the domestic industry's own actions in closing production facilities, in declining to supply major U.S. purchasers, and in prioritizing export markets." APPX0020360. Finally, Commissioner Johanson also pointed out that there is a disconnect between the domestic industry's performance and subject import volume trends, further supporting a finding of lack of causation on this record. APPX0020362. Commissioner Johanson examined the domestic industry's operating income and operating income margins throughout the POI and explained that "fluctuations in the domestic industry's financial performance during the POI do not correlate with changes in subject import volumes." *Id.*

As Commissioner Johanson points out, the domestic industry's own actions caused any increase in subject imports—and the Court in its second remand opinion expresses the same exact doubts, requiring the Commission on remand to reassess whether domestic producers were able and willing to supply customers during the period of investigation. APPX00000148-APPX0000149.

Despite the Court's clear instructions, the Commission majority again fails to address the Court's clearly expressed view in the *Second Remand Redetermination* regarding the lack of substantial evidence to support the Commission majority's findings—views that have been voiced now since Commissioner Johanson's original dissent. The Court should order the Commission majority to do so in a third remand proceeding.

## IV. Numerous Public Statements by Mosaic Demonstrate That Ceding U.S. Market Share Was an Intentional Business Strategy, Which Proved to Be Successful

The Commission's material injury determination hinges on its finding that subject imports oversupplied the U.S. market during the POI exceeding demand and taking market share from the domestic industry. APPX0000029. To the contrary, the record shows that the

domestic industry's reduction in production and U.S. market share was intentional, and that this business move led directly to the domestic producers' peak performance during the POI.

The record is replete with statements by domestic producers demonstrating that the industry's reductions in U.S. production and market share resulted from *intentional business decisions* rather than injury caused by subject imports. During the original investigation and throughout this appeal, the Commission majority's analysis has failed to consider adequately the impact of these public statements in its injury analysis. The *Second Remand Redetermination's* volume analysis again fails to even acknowledge that the increase in subject imports' market share during the POI *is the direct result* of the domestic industry's intentional and planned reduction of its U.S. footprint.

In particular, the record contains the following admissions by domestic producers that undermine the claim that subject imports caused material injury by increasing their volumes and taking market share:

- 2017 (first year of the POI): Mosaic announced the "intentional" idling of its phosphate fertilizer production facility in Plant City, Florida, thereby sending a message to the U.S. market

that a significant volume of phosphate fertilizer would be pulled from the U.S. market. APPX0096277-0096279.

- 2018 and 2019: Mosaic publicly discussed the idling of Plant City and stated that the idling created a supply hole of *1.1 million short tons* (1 million "tonnes") in the U.S. marketplace, and confirmed that imports were necessary to fill that supply gap:

  o "{C}learly the import requirements into the US are increasing by {the closings of} both Red Water and Plant City there's no question of that . . . *it certainly indicates that there will be a need for more imports . . . .*" APPX0096280 (emphasis added).

  o "{W}hen we shut down -- sorry, *idled Plant City, that opened a hole for some imports to increase,* and I think part of the increase you've seen has been just a response to that. We went from 55%, 60% market share to a more sustainable 50-ish percent market share. So we gave up 1 million tonnes of market here in the U.S. *intentionally."* APPX0096279 (emphasis added).

- April 2018: Nutrien announced the closure of its 600,000 ton phosphate fertilizer operations in Redwater, Alberta, Canada, a major source of supply in the western U.S., as a "business decision," thereby increasing the perceived supply gap in the U.S. market to about 1.7 million tons. APPX0091717-0091718.

These statements signaled to the U.S. market *in real time* to expect a supply gap far greater in volume than the later-in-time volume the domestic industry reported to the Commission and explicitly invited imports to fill that supply gap for U.S. customers. The publicly perceived supply gap of 1.7 million short tons well exceeded the increase

in subject import volume of 725,044 short tons from 2017 to 2019.
APPX0098445. Even the 1 million short ton increase in subject import
volume from 2018 to 2019 was notably less than the total volume of
fertilizer that was understood to be pulled from the U.S. market. In
2019, prior to the filing of the Petition in June 2020, Mosaic went so far
as to admit that its loss of U.S. market share " to a more sustainable 50-
ish percent" was "intentional" and that giving up " 1 million tonnes" of
U.S. production "opened a hole for some imports to increase."
APPX0096279. Indeed, the record contains over 40 contemporaneous
quotations from Mosaic that either contradict or undermine the
arguments Mosaic put forward during the underlying investigations
that subject import volumes were injurious. APPX0096277-0096284.

In past cases, the Commission has given due weight to public,
contemporaneous statements of interested parties. *See Int'l Imaging
Materials, Inc. v. United States ITC*, 30 C.I.T. 1181, 1197 (2006)
(affirming the Commission's reliance on public statements by Sony
during the investigation period, explained that the Commission
"provided *substantial evidence* showing that Sony was the downward
price leader during the period of investigation" based on "*public*

*statements . . .* corroborating that Sony was at the front of an intra-industry price war" as well as "*the statement* of a Sony consultant who later became an executive.") (emphases added); *see also Durum and Hard Red Spring Wheat From Canada*, USITC Pub. 3639 (Final) (Oct. 2003) at 22 n.203 ("The record contains information from the MGE both in the form of *public statements* not made in connection with our investigations, and in testimony by a representative of the MGE at the Commission's hearing. In the event that the two sources of information differ, we give more weight to the *public statements* not made in connection with our investigations.") (emphases added). Here, the Commission majority, in contravention of past practice, seemingly continues to ignore these public and contemporaneous statements when considering the supply gap in its analysis of subject import volumes. Indeed, the public statements are substantial evidence that subject import volumes were not injurious insofar as they were invited into the U.S. market and expected to serve U.S. farmers in the midst of an intentional reduction of domestic producers' footprint.

In the phosphate fertilizer industry, downstream customers, like distributors and farmers, must plan ahead based on projections and

forecasts so that the fertilizer is in place at the precise time it is needed by farmers for the planting season. As noted below, purchasing decisions are made up to six months prior to the application season so that product is in warehouse and available for the narrow application window. *See infra* Section V.A. In this case, a correct understanding of the supply gap volume is critical to the Commission's analysis because it indicates whether or not the volumes of subject imports undershot or overshot the perceived supply gap that Mosaic anticipated and announced publicly. The Commission's failure to reconcile the public and contemporaneous statements of the domestic producers and to consider the impact of those statements on farmers' and customers' purchasing decisions renders the Commission's determination unsupported by substantial evidence.

V.  **Conditions of Competition in the Phosphate Fertilizer Industry Demonstrate the Commission Majority's Material Injury Finding Is Unsupported by Substantial Record Evidence**

   A.  **Phosphate Fertilizer Must Be in the Right Place at the Right Time for Application to Meet Farmers' Needs**

The Commission's determination that subject import volumes were significant and caused material injury to the domestic industry

producing phosphate fertilizer continues to lack evidence grounded in actual U.S. market dynamics. Extensive record evidence reflects the realities of purchasing phosphate fertilizer in the U.S. market, including the need to make purchasing decisions *in real time* based on projected future demand with the expectation of normal weather conditions for fertilizer application from season-to-season.

In the United States, there are two application seasons each year -- one in the Spring before planting and one in the Fall after the harvest. APPX0098390; APPX0020644. Distributors must plan each year for these application seasons by having their warehouses full as the exact timing of fertilizer application by farmers depends on weather and timing factors. For that reason, fertilizer must be delivered and in place in the warehouse near the farmers for delivery in advance of each season. As soon as the timing is right, suppliers immediately deliver the fertilizer to farmers during the short window for application. Running out of fertilizer in the middle of the application window is a "mortal sin." APPX0017668-0017669, APPX0017755. Given the nature of fertilizer application each Spring and Fall, supply chains rely on demand forecasting to plan ahead so that the fertilizer is in the right

place at the right time. All factors considered, distributors and farmers must plan many months in advance of each application season. APPX0020666 (Importers Eurochem, Koch, and IRM, for example, make import decisions three to six months in advance of importation for product that must then be delivered to the U.S. customer). Inventories at each location are then re-assessed and re-stocked during offseason to plan ahead for the next application season.

## B. Once Delivered to the Intended Destination, Phosphate Fertilizer Cannot Be and Is Not Reshipped

The Commission majority continues to find it possible that domestic producers' inventories of phosphate fertilizer that have been delivered to their intended destination may be reshipped to another destination to meet demand needs such that additional subject imports were not needed during the POI and oversupplied the U.S. market causing injury. APPX0000003, APPX0000029, APPX0000067-0000068, APPX0000117-0000118. According to the Commission majority, the ability to reship should have allowed for redistribution of delivered fertilizer from lower demand regions to higher demand regions during the "black swan" weather events in 2018 and 2019, rather than require

the importation of new fertilizer inventories to the higher demand regions. *Id.*

Record evidence, however, continues to demonstrate that the shipment of phosphate fertilizer in the U.S. market is a unidirectional process -- once delivered to its intended location fertilizer is not re-shipped to another warehouse, nor is it re-shipped once it arrives at the customer destination. Given the physical properties of phosphate fertilizer and the shipment and distribution process, it is cost prohibitive and logistically impossible to re-load, re-ship, and re-deliver it to a new destination. *See* APPX0099673, APPX0099681-0099682, APPX0099691, APPX99700-0099702, APPX0099717-0099719, APPX0099735-0099737. Inland warehouses are equipped to handle fertilizer delivery via rail or barge, but are not outfitted to re-load fertilizer via rail or barge for out-shipment. *See id.*

Conceding the record demonstrates that subject imports inventories could not be relocated to other U.S. regions (APPX0100036, APPX0021952), the Commission majority instead relies on domestic producers' claimed ability to reship fertilizer already delivered to its intended destination to different regions of the country. APPX0099625-

**CONFIDENTIAL MATERIAL
REMOVED FROM BRACKETS**

NONCONFIDENTIAL
VERSION

009626, APPX0020605, APPX0099978, APPX0021239-0021240. This
finding that the domestic industry's distribution network is
"multidirectional" is unsupported by record evidence. Indeed, this Court
already held that the inventory reshipments documented by domestic
producers in questionnaire responses were "meager," accounting for a
[ *number* ] percentage of total shipments. APPX0100055-0100056,
APPX0021971-0021972; APPX0000074-0000075, APPX0000124-
0000125. Furthermore, the examples the Commission cites of purported
multidirectional shipment by domestic producers are actually just steps
in the typical unidirectional supply chain. *See* OCP Comments at 14-16;
*see also* APPX0100054-0100055, APPX0100057-0100058,
APPX0100115; APPX0021970-0021971, APPX0021973-0021974,
APPX0022031.

The lack of substantial evidence supporting the Commission's
claim that the domestic producers' distribution networks are
multidirectional, coupled with the agency's admission that subject
imports could not be relocated to different U.S. regions (APPX0100036,
APPX0021952), demonstrates that once delivered to its intended
destination phosphate fertilizer cannot be and is not reshipped to a new

**CONFIDENTIAL MATERIAL
REMOVED FROM BRACKETS**

NONCONFIDENTIAL
VERSION

geographic region. The Commission majority's injury finding again

renders the *Redetermination* unsupported by substantial evidence.

C.    Domestic Producers Refused to Supply U.S. Customers
      During the Investigation Period Necessitating the Purchase
      of Subject Imports

Despite the prior acknowledgement that domestic producers

admitted refusing to supply U.S. distributors with which they compete

for downstream customer sales (APPX0099625, APPX0020605), the

Commission now claims that "the record does not show that the

domestic industry categorically refused to supply them but rather than

Mosaic would not sell to them at their preferred prices." APPX0100066,

APPX0021982. This finding is contradicted by extensive record

evidence.

The record reflects domestic producers' numerous refusals to

supply U.S. customers throughout the POI *while* subject imports

*oversold* U.S. product. APPX0015767, APPX0015701, APPX0015784,

APPX0088836, APPX0088865, APPX0096301, [ *supplier reference*

]. Even more egregious in the context of this case is that

domestic producers told some customers directly to purchase imports

instead of domestic phosphate fertilizer shortly before the filing of this

**CONFIDENTIAL MATERIAL
REMOVED FROM BRACKETS**

NONCONFIDENTIAL
VERSION

Petition. APPX0015767, APPX0015701, APPX0015784, APPX0096279,

[        *supplier reference*        ].

    The record contains purchaser questionnaires detailing numerous

supply issues, including denials to supply by [        *company*

                                                    ]. APPX0015701,

APPX0096304-0096306 (confidential declaration detailing refusals to

supply). Plaintiff-Intervenor Koch, a major U.S. distributor of fertilizer,

must also rely on imports to supply its customers because Mosaic

repeatedly declined to sell meaningful amounts of fertilizer to Koch.

APPX0009866, APPX0015350. Record evidence does not support the

Commission's "preferred prices" finding; indeed, Koch's Vice President

explained at the Commission's final hearing:

> Scott McGinn: As mentioned, Koch does not
> produce phosphate fertilizers, so it must purchase
> its needs. In the last few years, we've frequently
> asked Mosaic if it would sell us barges of
> phosphate fertilizers at market prices. Mosaic has
> generally declined our inquiries. As a result, Koch
> has been able to purchase less than 1 percent of its
> North American needs from Mosaic. Thus, in the
> last three years, we've had to rely on imports for
> over 99 percent of our supply. We understand Koch
> is not alone. Mosaic has limited its supply to a
> number of U.S. customers and former customers.

APPX0015692-0015693. As further confirmation of the domestic
industry's pervasive supply issues, the majority (16 of 28) of responding
purchasers described extensive and widespread supply constraints
during the POI. APPX0098404.

As noted above in Section V.A, having fertilizer in the right place
at the right time is crucial. If a U.S. customer or market participant is
refused domestic supply, there is no choice but to source from imports.
Refusals to supply by the domestic industry are an important condition
of competition that must be considered in the Commission's injury
analysis. *See, e.g., Polytetrafluoroethylene (PTFE) Resin from China
and India*, USITC Pub. 4801 (Final) (July 2018) at 26 ("{R}esponding
U.S. producers reported having to refuse, decline, or being unable to
supply orders of PTFE during the POI. The majority of purchasers
reported that supply constraints have been present in the PTFE market
since the beginning of the POI.") (citations omitted), *aff'd Chemours Co.
FC, LLC v. United States*, 443 F. Supp. 3d 1315, 1331-32 (Ct. Int'l
Trade 2020). The Commission's new findings regarding supply refusals
by domestic producers (APPX0100066, APPX0021982) are undermined

by extensive record evidence and contradict the agency's, and the

Court's, prior findings.

## VI. <u>The Record Does Not Support a Finding of Material Injury by Reason of Subject Imports</u>

### A. <u>The Commission Majority's Redetermination Still Fails to Evidence a Causal Link Between Subject Imports and Domestic Performance</u>

The Court has found that the linchpin of the Commission's

material injury determination is that subject import volumes created an

oversupply of phosphate fertilizer in the U.S. market. However, the

Commission majority's insistence that there was an import oversupply

problem that caused material injury to the domestic industry is still

unsupported by the record. Rather, the record continues to demonstrate

what the Court has already determined — that domestic producers

made the strategic decision to reduce their U.S. market share

intentionally, invited their U.S. customers to purchase subject imports

instead, and repeatedly refused to supply U.S. market participants that

sought to purchase domestic fertilizer. *See supra* Sections IV and V.C;

*see generally* OCP's Comments. These intentional acts, coupled with

exceptional weather events that caused a decrease in demand for

phosphate fertilizers, correlate with the domestic industry's performance during the POI.

The record reveals a complete lack of causation between subject imports' presence in the U.S. market and the domestic industry's performance. Indeed, record data show an inverse correlation between subject imports and the domestic industry's financial condition, warranting a negative injury finding. As subject import shipments increased from 2017 to 2018, and *oversold* domestic fertilizer, the domestic industry's performance as measured by its operating income was strong and improved further into 2018. APPX0098547–0098548, APPX0020532–0020533. At the same time, the domestic industry's shipments and market share declined because Mosaic idled its Plant City facility in late 2017 thereby reducing its U.S. footprint. Thus, while subject import shipments increased, Mosaic's financial performance was stellar amidst its intentional business strategy to reduce its U.S. production and market share. Mosaic itself viewed the closure of Plaint City and the resulting market share loss as "intentional" and celebrated that the decision would reduce the company's U.S. market share by 5 to

10 percentage points. *Id.* This admission completely undermines the domestic industry's claim of injury by subject imports.

Furthermore, there can be no question that the domestic industry's performance was tied to demand and unexpected weather trends during the POI. When demand increased, the domestic industry's financial condition improved; when demand decreased, the domestic industry's condition worsened. APPX0098547-0098548. Mosaic recognized the impact of the weather on demand *at the time*, stating that "{s}ales prices and margins have declined throughout 2019, *primarily attributable to a weather-related demand decline* in North America." APPX0096282 (emphasis added). In fact, in December 2019, Mosaic's CEO stated that import volumes had "slowed modestly" by the Fall 2019 and cited the poor weather of 2018 and 2019 as hampering fertilizer application. APPX0097178. Mosaic only began to take a different position once it brought this trade case. Thus, weather-related demand declines were the reason for any financial downturn for the domestic industry during 2019 – not subject imports.

B. **<u>The Commission Majority Still Lacks Substantial Evidence of Excess Subject Import Inventories to Overcome the Lack of a Causal Link</u>**

The Commission majority still does not (and cannot) identify any material causal link between subject imports and domestic performance, namely: (A) that subject imports increased from 2017 to 2018 amidst strong and improving domestic performance; (B) the decline in imports from 2018 to 2019 amidst weakening domestic performance; and (C) the steep decline in imports in interim 2020 amidst improving domestic performance.[1] That is because the simple, obvious explanation is true in this case—undersupply caused by Mosaic's closure of Plant City and Mosaic's exporting behavior boosted domestic profitability in 2018; historically bad and unexpected weather caused the decline in domestic producers' performance in 2019; and the

---

[1]    For avoidance of doubt, our position remains that the Commission should be assessing shipment data, not import data, when determining how imports filled the supply gap that Mosaic purposefully created by closing Plant City. This is particularly important due to the large volume of imports that never entered the U.S. stream of commerce as they were ultimately destined to travel up the Mississippi River system into Canada—in particular during 2018-2020 due to Nutrien's closure of its Redwater facility in Canada. We address import data rather than shipment data here to put in their proper context the import and inventory data to show that the Commission has not substantiated an injurious subject import inventory overhang with substantial evidence.

improvement in demand coming out of the extended period of poor weather led to an improvement in domestic producers' performance in interim 2020.  Import volumes and import shipments were a reaction to Mosaic's public signaling and the needs of the market—increasing in 2018 because Mosaic openly welcomed the gap filling imports into the market as it short-supplied its customers who were forced to turn to imports to guarantee farmers on-time supply.

Without record evidence to link subject imports to the very short-lived decline in domestic performance in 2019, the Commission majority continues to fall back on a story around alleged excess inventories from 2018 to 2019 as the cause of domestic industry problems. APPX0022099-APPX0022101. However, the Commission's reasoning around import inventories remains unsubstantiated by the evidence on the record.

First, the Commission majority's story around inventories continues to omit the appropriate context. In its original determination, the Commission majority described inventory levels as "elevated" and that they "increased steadily."  APPX0020322, APPX0020331, APPX0020332, APPX0020339, APPX0020359. In its *Second Remand*

**CONFIDENTIAL MATERIAL
REMOVED FROM BRACKETS**

NONCONFIDENTIAL
VERSION

*Redetermination*, the Commission states in multiple places that import

inventories "reached their highest level of the POI in March 2019" when

finding that elevated import inventories caused harm at this time.

APPX0022104. However, the Commission still fails to acknowledge that

the inventorying behavior of imports in 2019 is virtually the same in

2018 (during a period of domestic prosperity and high prices), when

measured as a ratio to U.S. inventories. *Id.*, APPX0020800,

APPX0098552, APPX0016208, APPX0096152.

| Ratio of Subject Import Inventories to U.S. Inventories | | | | |
|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 |
| 2018 | [ # ] | [ # ] | [ # ] | [ # ] |
| 2019 | [ # ] | [ # ] | [ # ] | [ # ] |

The Commission majority continues to fail to address the evidence that

Q1 is typically a period of higher import inventories in this industry,

because distributors need to ensure that product is in the right location

ahead of the spring planting season, which is exactly what happened

per usual in Q1 2019 when the entire industry *expected* strong demand.

As discussed by the Commission, it "takes time for distributors to

obtain fertilizers and move it through the supply chain into warehouses

in the off seasons for use by farmers, and that distributors therefore

rely on demand projections in obtaining production." APPX0022061.
The Commission thus does not, and cannot, point to substantial
evidence that ordinary import inventories are the cause of price-based
harm.

This issue is not a new one in this case's five-year saga.
Commissioner Johanson's original dissent points this out. Unlike the
Commission majority which focused on the increase in *absolute
quantities* of import inventories to construct a story around import
pricing, Commissioner Johanson compared the *relative* inventory level
movement and concluded: "Moreover, the ratio of subject import
inventories to U.S. producers' inventories in 2019 was consistent with
the ratios in 2018 for Q1 and Q2 and declined relative to 2018 ratios for
Q3 and Q4." APPX0020354. In considering all of the evidence on the
record, Commissioner Johanson correctly states that, "if there was any
supply/demand mismatch for subject imports in 2019, the imbalance
was temporary, it was comparable for domestic production and subject
imports, and it was caused by adverse weather, not aggressive selling or
low prices." APPX0020355. These dissenting reviews remain
unrebutted with substantial evidence.

In sum, it is clear that subject import inventories did not cause material injury — as the ratio between the two was consistent over the POI including during stronger and weaker periods of performance for the domestic industry. For these reasons, the Commission majority's uncontextualized finding on the issue of subject import inventories continues to be unsupported by substantial evidence and contrary to law.

## VII.  Conclusion

For the reasons provided above, Plaintiff-Intervenors urge this Court to remand the Commission's affirmative injury determination in the *Second Remand Redetermination* with unambiguous instructions that the Commission must faithfully apply the Court's findings, and absent new, substantial evidence, must make a negative determination.

Respectfully submitted,

/s/ Paul C. Rosenthal
Paul C. Rosenthal
Melissa M. Brewer
Kelley Drye & Warren LLP
Washington Harbour
3050 K Street N.W.
Suite 400
Washington, DC 20007

Counsel to International Raw
Materials Ltd.

/s/ Jared R. Wessel
H. Deen Kaplan
Jared R. Wessel
Michael G. Jacobson
Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, N.W.
Washington D.C., 20004-1109

Counsel to Phosagro PJSC

/s/ Jeremy W. Dutra
Peter Koenig
Jeremy W. Dutra
Squire Patton Boggs (US) LLP
2550 M St N.W.
Washington, DC 20037

Counsel to Eurochem North
America Corporation

/s/ Kenneth G. Weigel
Kenneth G. Weigel
Lian Yang
Alston & Bird
950 F Street, N.W.
Washington, DC 20004

Counsel to Koch Fertilizer, LLC

**Certificate of Compliance with
Court of International Trade
Standard Chambers Procedures**

Pursuant to this Court's Briefing Schedule dated July 9, 2025 (ECF No. 237), setting the word limitation to the joint set of comments of Plaintiffs-Intervenors to 10,000 words, counsel for Plaintiffs-Intervenors certify that the attached comments contain 7,080 words, including footnotes. The word count certification is made in reliance on the word-count feature contained in Microsoft Enterprise – 365.

Respectfully submitted,

/s/ Paul C. Rosenthal
Paul C. Rosenthal
Melissa M. Brewer
Kelley Drye & Warren LLP
Washington Harbour
3050 K Street N.W.
Suite 400
Washington, DC 20007

Counsel to International Raw Materials Ltd.

/s/ Jeremy W. Dutra
Peter Koenig
Jeremy W. Dutra
Squire Patton Boggs (US) LLP
2550 M St N.W.
Washington, DC 20037

Counsel to Eurochem North America Corporation

/s/ Jared R. Wessel
H. Deen Kaplan
Jared R. Wessel
Michael G. Jacobson
Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, N.W.
Washington D.C., 20004-1109

Counsel to Phosagro PJSC

/s/ Kenneth G. Weigel
Kenneth G. Weigel
Lian Yang
Alston & Bird
950 F Street, N.W.
Washington, DC 20004

Counsel to Koch Fertilizer, LLC

## Certificate of Compliance Regarding
## Non-Use of Generative Artificial Intelligence

Pursuant to this Court's instructions for *Document Formatting and ECF Filing* (Sept. 19, 2025), counsel for Consolidated Plaintiff Eurochem North America Corporation and Plaintiff-Intervenors Phosagro PJSC, International Raw Materials Ltd., and Koch Fertilizer, LLC certify that these Comments were not prepared with the assistance of a generative artificial intelligence program based on natural language prompts -- such as, but not limited to, ChatGPT or Google Bard.

Respectfully submitted,

/s/ Paul C. Rosenthal
Paul C. Rosenthal
Melissa M. Brewer
Kelley Drye & Warren LLP
Washington Harbour
3050 K Street N.W.
Suite 400
Washington, DC 20007

Counsel to International Raw
Materials Ltd.

/s/ Jared R. Wessel
H. Deen Kaplan
Jared R. Wessel
Michael G. Jacobson
Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, N.W.
Washington D.C., 20004-1109

Counsel to Phosagro PJSC

/s/ Jeremy W. Dutra
Peter Koenig
Jeremy W. Dutra
Squire Patton Boggs (US) LLP
2550 M St N.W.
Washington, DC 20037

Counsel to Eurochem North
America Corporation

/s/ Kenneth G. Weigel
Kenneth G. Weigel
Lian Yang
Alston & Bird
950 F Street, N.W.
Washington, DC 20004

Counsel to Koch Fertilizer, LLC