*NONCONFIDENTIAL VERSION*

---

### UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

————————————————

Consol. Court No. 21-00219

————————————————

### OCP S.A.,

*Plaintiff,*

### EUROCHEM NORTH AMERICA CORPORATION,

*Consolidated Plaintiff,*

### and

### PHOSAGRO PJSC, INTERNATIONAL RAW
### MATERIALS LTD., and KOCH FERTILIZER, LLC,

*Plaintiff-Intervenors,*

### v.

### UNITED STATES,

*Defendant,*

### and

### THE MOSAIC COMPANY and J. R. SIMPLOT COMPANY,

*Defendant-Intervenors.*

---

### DEFENDANT UNITED STATES INTERNATIONAL TRADE
### COMMISSION'S NONCONFIDENTIAL COMMENTS
### ON SECOND REMAND DETERMINATION

**COURTNEY S. McNAMARA**
Attorney for Defendant
Office of the General Counsel
U.S. International Trade
Commission
500 E Street, SW
Washington, DC  20436
Telephone (202) 205-3095
Fax (202) 205-3111

**MARGARET MACDONALD**
General Counsel
Telephone (202) 205-2561

**KARL VON SCHRILTZ**
Assistant General Counsel
for Litigation
Telephone (202) 205-3096

**DATED:  JANUARY 21, 2025**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ vi

GLOSSARY ............................................................................................... ix

SUMMARY OF THE ARGUMENT ............................................................ 1

ARGUMENT ............................................................................................. 3

I.  LEGAL STANDARDS ...................................................................... 3

II.  THE COURT'S SECOND REMAND INSTRUCTIONS .................. 6

III.  PLAINTIFF'S AND PLAINTIFF-INTERVENORS'
    ARGUMENTS THAT THE LAW OF THE CASE
    DOCTRINE CONSTRAINS THIS COURT'S REVIEW
    FAIL ................................................................................................. 8

IV.  THE COMMISSION'S VOLUME FINDING IS IN
    ACCORDANCE WITH LAW AND SUPPORTED BY
    SUBSTANTIAL EVIDENCE .......................................................... 15

    A.  The Commission's Volume Analysis Is in
        Accordance with Law ............................................................. 15

    B.  The Commission's Volume Analysis Is Supported
        by Substantial Evidence ......................................................... 19

V.  THE COMMISSION'S PRICE FINDING IS
    SUPPORTED BY SUBSTANTIAL EVIDENCE AND
    IN ACCORDANCE WITH LAW ..................................................... 21

    A.  The Commission's Price Effects Finding Is in
        Accordance with Law ............................................................. 21

    B.  The Commission's Price Effects Finding Is
        Supported by Substantial Evidence ....................................... 24

    C.  Plaintiffs' Challenges to the Commission's Price
        Effects Analysis Are Unavailing ........................................... 28

## TABLE OF CONTENTS (cont'd)

i.    The Commission Reasonably Relied on Trade Publications ................................................... 28

ii.    The Commission Reasonably Relied on Confirmed Lost Sales .................................................. 31

iii.    The Commission Reasonably Considered Subject Import Inventories and Oversupply Conditions ...................................................... 35

iv.    The Commission Reasonably Found that Being Identified as a Price Leader Did Not Insulate Mosaic from Subject Import Pricing Pressure ........................................................... 39

VI.    THE COMMISSION'S IMPACT ANALYSIS IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW ...................................................... 40

A.    The Commission's Impact Finding Is Supported by Substantial Evidence and in Accordance with Law ...................................................... 40

B.    Plaintiffs' Challenges to the Commission's Impact Analysis Are Unavailing .......................................................... 41

i.    The Commission's Non-Attribution Analysis of Weather Was Reasonable ........................................ 41

ii.    The Commission Reasonably Found that Fertilizer Was Available from U.S. Sources in 2019 ...................................................... 44

iii.    The Commission Reasonably Found that Domestic Plant Closures Fail to Explain the Magnitude of Subject Import Volumes and Inventories ...................................................... 49

## TABLE OF CONTENTS (cont'd)

iv.  Mosaic's Public Statements and Other Pieces of Record Evidence Do Not Render the Commission's Findings Unsupported by Substantial Evidence ..................................................... 54

v.  The Commission Reasonably Found that Mosaic Was Not Systemically Refusing to Sell to Distributors ......................................................... 55

VII.  CONCLUSION .................................................................. 58

## CONFIDENTIAL MATERIAL OMITTED

The material bracketed within the text on pages x, 31-35, 38-39, 47-48, and 50-51 describes sensitive nonpublic information regarding the name of a U.S. purchaser questionnaire respondent related to nonpublic purchasing decisions; volume and pricing information regarding lost sales and lost revenue provided by an individual U.S. purchaser; information regarding domestic and subject import inventories provided by, and derived from information provided by, individual U.S. producers and importers; and information related to U.S. producers' reshipment capabilities as well as information regarding inventories and U.S. shipments of phosphate fertilizer provided by, and derived from information provided by, individual U.S. producers.  This information was granted confidential treatment by the Commission.  *See* 19 U.S.C. § 1677f(b)(1)(A); 19 C.F.R. § 201.6(a).

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Altx, Inc. v. United States,*
    25 CIT 1100, 167 F. Supp. 2d 1353 (2001).........................23

*Altx, Inc. v. United States,*
    370 F.3d 1108 (Fed. Cir. 2004) .......................................5, 23

*Arizona v. California,*
    460 U.S. 605 (1983) .........................................................8

*AWP Indus., Inc. v. United States,*
    35 CIT 774, 783 F. Supp. 2d 1266 (2011)...........................32

*Cemex, S.A. v. United States,*
    16 CIT 251, 790 F. Supp. 290 (1992), *aff'd*, 989 F.2d 1202
    (Fed. Cir. 1993)..............................................................23

*Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade
    Comm'n,*
    100 F. Supp. 3d 1314 (Ct. Int'l Trade 2015) ......................30

*Cleo Inc. v. United States,*
    501 F.3d 1291 (Fed. Cir. 2007) ........................................55

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966) ..................................................4, 5, 15

*Etchegoinberry v. United States,*
    132 F.4th 1374 (Fed. Cir. 2025).......................................8, 9

*Exxon Corp. v. United States,*
    931 F.2d 874 (Fed. Cir. 1991) ...........................................9

*Grupo Industrial Camesa v. United States,*
    85 F.3d 1577 (Fed. Cir. 1996) .......................................4, 15

*Hitachi Metals, Ltd. v. United States,*
    949 F.3d 710 (Fed. Cir. 2020) ......................................5, 55

# TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**　　　　　　　　　　　　　　　　　　　　　　　　**Page(s)**

*Nevinnomysskiy Azot v. United States,*
　　32 CIT 642, 565 F. Supp. 2d 1357 (2008)...................................... 30, 31

*Nippon Steel Corp. v. United States,*
　　458 F.3d 1345 (Fed. Cir. 2006) ........................................... 3, 4, 5, 6, 29

*Nucor Corp. v. United States,*
　　28 CIT 188, 318 F. Supp. 2d 1207 (2004).............................................. 6

*Nucor Corp. v. United States,*
　　414 F.3d 1331 (Fed. Cir. 2005) .................................................. 6, 23, 55

*OCTAL Inc. v. United States,*
　　539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) ...................................... 23

*Siemens Energy* v. *United States,*
　　992 F. Supp. 2d 1315 (Ct. Int'l Trade 2014), *aff'd*, 806 F.3d
　　1367 (Fed. Cir. 2015)................................................................. 23

*Siemens Energy, Inc. v. United States,*
　　806 F.3d 1367 (Fed. Cir. 2015) .................................................. 4, 15, 23

*Tenaris Bay City, Inc. v. United States,*
　　789 F. Supp. 3d 1352 (Ct. Int'l Trade 2025) ...................................... 17

*Timken U.S. Corp. v. United States,*
　　421 F.3d 1350 (Fed. Cir. 2005) ........................................................... 6

*Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik
　　Tube AB,*
　　975 F.2d 807 (Fed. Cir. 1992) ....................................................... 14, 15

*U.S. Steel Grp. v. United States,*
　　96 F.3d 1352 (Fed. Cir. 1996) .............................................. 5, 29, 31, 32

# TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                    **Page(s)**

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951) ............................................................... 3, 5

*USEC Inc. v. United States,*
    34 F. App'x 725 (Fed. Cir. 2002), *aff'd*, 414 F.3d 1331
    (Fed. Cir. 2005) ...................................................................... 6

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ...................................................... 3

19 U.S.C. § 1677(4) .................................................................. 17

19 U.S.C. § 1677(7)(B)(ii) ......................................................... 18

19 U.S.C. § 1677(7)(C)(i) .......................................................... 15

19 U.S.C. § 1677(7)(C)(ii) ......................................................... 21

19 U.S.C. § 1677(7)(C)(iii) .............................................. 16, 17, 18

28 U.S.C. § 2639(a)(1) ............................................................... 3

**Legislative History**

Statement of Administrative Action to Uruguay Round
    Agreements Act, H.R. Rep. No. 103-316, vol. I (1994) ..................... 6

# GLOSSARY

| Term | Definition |
| --- | --- |
| Commission | Defendant U.S. International Trade Commission |
| OCP | Plaintiff OCP S.A. |
| Plaintiff-Intervenors | Consolidated Plaintiff EuroChem North America Corporation, and Plaintiff-Intervenors Phosagro PJSC, International Raw Materials, Ltd., and Koch Fertilizer, LLC |
| Mosaic | Defendant-Intervenor, The Mosaic Company |
| Simplot | Defendant-Intervenor, J.R. Simplot Company |
| First Remand Order | *OCP S.A. v. United States*, Slip Op. 23-136 (Sept. 9, 2023) (Dkt. 141) |
| Second Remand Order | *OCP S.A. v. United States,* Slip Op. 25-51 (July 3, 2025) (Dkt. 234) |
| Original Determinations | Phosphate Fertilizers from Morocco and Russia, Inv. Nos. 701-TA-650-651 (Final), USITC Pub. 5172 (March 2021), confidential views. |
| First Remand Determinations or First Remand Views | *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final) (Remand), USITC Pub. 5490 (January 2024), confidential views (Dkt. 146). |
| POI | Period of Investigation |
| ST | Short Ton |

*PROPRIETARY INFORMATION SUBJECT*
*TO PROTECTIVE ORDER REDACTED*

## GLOSSARY

| Term | Definition |
|------|------------|
| OCPCmmnts | Plaintiff's Confidential Comments Opposing Remand Determination (Dkt 254) |
| JointCmmnts | Consolidated Plaintiff's and Plaintiff-Intervenors' Joint Confidential Comments Opposing Second Remand Determination (Dkt 256) |
| [ Purchaser ] | [ Purchaser ] |
| Plant City | Mosaic's production facility located in Plant City, Florida |
| Koch | Koch Fertilizer, LLC |
| ADM | Archer Daniels Midland Company |

Defendant U.S. International Trade Commission ("Commission") hereby responds to the comments filed by Plaintiff OCP S.A. ("OCP") and joint comments filed by Consolidated Plaintiff EuroChem North America Corporation, and Plaintiff-Intervenors Phosagro PJSC, International Raw Materials, Ltd., and Koch Fertilizer, LLC (collectively, "Plaintiff-Intervenors"), which challenge the Commission's second remand determinations regarding phosphate fertilizers from Morocco and Russia.

## SUMMARY OF THE ARGUMENT

As an initial matter, the core issue in this remand, like the prior remand, is the Court's conclusion that the Commission's affirmative determinations hinged on its findings regarding the feasibility of domestic producers reshipping inventories, which the Court found unsupported by substantial evidence. The Commission, however, never made such a finding in the original determinations, and its subsequent findings in the First Remand Determinations concerning the domestic industry's inventory reshipment capabilities, in response to the Court's remand instructions, were not central to the Commission's affirmative determinations. Contrary to OCP's and Plaintiff-Intervenors'

arguments, the law of the case doctrine does not require this Court to adopt clearly erroneous conclusions or preclude the Court from independently evaluating the Commission's second remand determinations. As discussed below, the second remand determinations should be affirmed because they are lawful and reasonable.

The Commission lawfully and reasonably found that the increasing volume of cumulated subject imports, which took market share from the domestic industry, was significant in absolute terms and relative to apparent U.S. consumption. The Commission likewise lawfully and reasonably found that significant and increasing volumes of competitive and low-priced subject imports that entered the U.S. market, despite persistently weak demand and in excess of any purported need to restock inventory, contributed to oversupply conditions that exerted downward pricing pressure and significantly depressed domestic industry prices during the POI. The Commission also lawfully and reasonably found that by capturing market share and depressing domestic prices, cumulated subject imports adversely affected the domestic industry's performance, ensuring that it was not attributing injury from other factors to subject imports, including

declining U.S. demand and domestic producers' alleged inability or unwillingness to supply the U.S. market.

OCP and Plaintiff-Intervenors provide no legitimate basis for disturbing the Commission's determinations, relying instead on misinterpretations of the statute, mischaracterizations of the Commission's findings, and improper invitations for the Court to reweigh evidence.

## ARGUMENT

### I.    LEGAL STANDARDS

This Court reviews the Commission's final determinations by assessing whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  The Commission's determinations are presumed to be correct, and the burden is on the party challenging the determination to demonstrate otherwise.  28 U.S.C. § 2639(a)(1).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).  The Federal Circuit has explained, "in the hierarchy of the four most common standards of

review, substantial evidence is the second most deferential, and can be translated roughly to mean, 'is {the determination} unreasonable?'" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Even if "individual Commissioners reach{} divergent conclusions, '{t}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Siemens Energy, Inc. v. United States,* 806 F.3d 1367, 1372 (Fed. Cir. 2015) (quoting *Consolo*, 383 U.S. at 620); *see also Grupo Industrial Camesa v. United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996) ("Although {a party} points to evidence supporting the dissenting commissioners' decision that the domestic industry was not materially injured, this does not mean that the Commission's affirmative determination is unsupported by substantial evidence.") (citing *Consolo*,

4

383 U.S. at 619-20).  Thus, under the substantial evidence standard, a court may not, "even as to matters not requiring expertise … displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*."  *Universal Camera*, 340 U.S. at 488.  Rather, a court "'must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion.'"  *Hitachi Metals, Ltd. v. United States*, 949 F.3d 710, 716 (Fed. Cir. 2020) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004)).

In injury investigations, the Commission is the trier of fact.  As such, "{i}t is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process."  *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996); *Nippon Steel Corp.*, 458 F.3d at 1350.  As the Federal Circuit has stated, if "the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert fact-finder – here the majority of the Presidentially-

appointed, Senate-approved Commissioners – to decide which side's evidence to believe." *Nippon Steel Corp.*, 458 F.3d at 1359.

Furthermore, since the Commission "'is presumed to have considered all of the evidence on the record,'" it is "'not required to explicitly address every piece of evidence presented by the parties'" during an investigation. *Nucor Corp. v. United States*, 28 CIT 188, 234, 318 F. Supp. 2d 1207, 1247 (2004) (quoting *USEC Inc. v. United States*, 34 F. App'x 725, 731 (Fed. Cir. 2002)), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005). Instead, the Commission need only address the "issues material to {its} determination" so that the "path of the agency may reasonably be discerned." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103- 316, vol. I at 892 (1994); *see also Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354–57 (Fed. Cir. 2005).

## II.    THE COURT'S SECOND REMAND INSTRUCTIONS

In its opinion and order of April 22, 2024, the Court remanded the Commission's First Remand Determinations in *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final) (Remand), USITC Pub. 5490 (January 2024). *See* Slip Op. 25-51 (July 3, 2025)

(Dkt. 234) ("Second Remand Order").  As in the First Remand Order,
the core issue in the Second Remand Order was the Court's conclusion
that the Commission's determinations rested upon a factual finding
regarding whether it was feasible for domestic producers to reship
inventories, which the Court held to be unsupported by the record.
APPX000077.  The Court further held that the Commission's
conclusions regarding the significance of the volume, price effects, and
impact of subject imports were also unsupported by substantial
evidence because, in the Court's view, the Commission did not
adequately address detracting evidence.  APPX000098-000099.  The
Court remanded the matter to the Commission "for new action
consistent with {the Court's} opinion" and permitted the Commission to
"take new evidence, reconsider existing evidence, or take any other
action allowed by its procedures on remand to come to a conclusion
supported by substantial evidence."  APPX000099.

On remand, the Commission fully complied with the Court's
instructions.  Although it respectfully disagreed with some aspects of
the Court's Second Remand, and fully explained the legal and factual

bases for these disagreements, the Commission took care to address each purported error with substantial supporting evidence.

## III. PLAINTIFF'S AND PLAINTIFF-INTERVENORS' ARGUMENTS THAT THE LAW OF THE CASE DOCTRINE CONSTRAINS THIS COURT'S REVIEW FAIL

As a threshold matter, Plaintiff's and Plaintiff-Intervenors' arguments that the law of the case doctrine precludes this Court from independently evaluating whether the Commission's second remand determinations are in accordance with law and supported by substantial evidence are without merit. OCPCmmnts 5-7, JointCmmnts 12-17.

The Federal Circuit explained that application of the law of the case doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." *Etchegoinberry v. United States*, 132 F.4th 1374, 1378 (Fed. Cir. 2025) (citations omitted); *see also Arizona v. California*, 460 U.S. 605, 618 (1983) ("Law of the case directs a court's discretion, it does not limit the tribunal's power."). The Federal Circuit rejected appellants' argument that the doctrine "allows a court to revisit a decided issue *only* when there '(1) is new and material evidence; (2) the controlling law changed;

or (3) the earlier decision is 'clearly erroneous and would lead to manifest injustice.'" *Etchegoinberry*, 132 F.4th at 1378 (citations omitted, emphasis added). The court held that "the law-of-the-case doctrine is not so rigid." *Id.* at 1378-79 (holding that "{a} court has the power to revisit prior decisions of its own," but "courts should be loathe {sic} to do so in the absence of extraordinary circumstances *such as* where the initial decision was 'clearly erroneous and would work a manifest injustice'") (citations omitted). The Federal Circuit found that a court did not err in revisiting the earlier court's erroneous decision and that "continuing this litigation would work a manifest injustice on the parties." *Id.* at 1379.

The Federal Circuit has also made clear that "{t}o the extent that a trial judge can alter a previous ruling, so too can a successor judge," explaining that the "first judge always has the power to change a ruling; further reflection may allow a better informed ruling" and "if the first judge can ... change his ruling, a second judge should have and does have the power to do so as well." *Exxon Corp. v. United States*, 931 F.2d 874, 878 (Fed. Cir. 1991) (citations omitted).

9

Plaintiff-Intervenors make much of the fact that the Commission respectfully disagreed with certain aspects of the earlier Court's Second Remand Order.  JointCmmnts 8-11.  The Commission, however, thoroughly explained the bases for those disagreements, as discussed below.  Just as the earlier Court could reconsider those issues, this Court is free to do so and should do so when the earlier Court's decisions were clearly erroneous.  As also discussed below, Plaintiff-Intervenors' assertions that this Court and the Commission are bound by law of the case to adopt the dissenting views are likewise clearly erroneous in that their position conflicts with the substantial evidence standard.  JointCmmnts 12-17.

The Court should reconsider the earlier decisions by the Court that were clearly erroneous in relying on a fundamental misunderstanding of the Commission's Original and First Remand Views.  In the Second Remand Views, the Commission addressed the Court's characterization of the Commission's observations regarding inventory reshipment in its Original and First Remand Views.  APPX0100035.  Specifically, the Court described the First Remand as "focus{ing} on domestic industry reshipment because the Commission's

unsupported assumptions undergirded its material injury finding" in its original determinations.  APPX000054.  The Court further described the First Remand Order as holding that "{i}f domestic producers could not – technically or economically – reship existing inventory domestically, these inventories could not contribute to the supply of phosphate fertilizer available to meet new demand."  APPX000057.

The Commission explained, however, that in its Original Determinations, the Commission stated:

> Respondents argue that product was necessary to serve demand in U.S. regions unaffected by the poor weather conditions.  However, this argument fails to explain why U.S. importers could not supply U.S. customers from its building inventories or from product that sat on barges on the Mississippi River system.  Indeed, as U.S. importers acknowledged, it was possible for the U.S. importers to do so, but that it was costly to move product by rail or back down the Mississippi River.  Consequently, they chose to import more product.[1]

APPX0100035.

---

[1] The Commission also noted that this observation did not involve "reshipping fertilizer that had already been delivered to flooded, low demand regions," as the Court indicated.  Rather, the Commission's original finding referred to the possibility of importers drawing from building inventories or from product that sat on barges on the Mississippi River system.  APPX0100035.

Thus, the Commission clarified that this original observation related solely to importers' representations that they could not – technically or economically – serve the U.S. market from existing inventories or product that sat on barges, choosing instead to import more product.

Although the original observation involved importers' reshipment capabilities, the Commission nonetheless addressed domestic producers' reshipment capabilities to comply with the Court's instructions in the First Remand Order. Specifically, the Court's instructions directed the Commission to assess in its volume analysis whether "fertilizer was 'practically unavailable from U.S. sources' to supply high-demand regions in 2019 because doing so would not have been economically viable." APPX0100113-0100114. The Commission explained that it understood the Court's reference to "U.S. sources" in this context to refer to domestically produced fertilizer. APPX0100114. The Commission concluded that the record from the original investigations, as supplemented in the first remand proceedings, "indicates that the domestic industry's excess capacity, substantial inventories, extensive inventory locations, expansive multi-modal distribution network, and demonstrated ability to move and relocate product where it was needed

12

shows that domestic producers were well-positioned to supply the U.S. market in 2019." APPX0100116.

The Commission again respectfully disagreed with the Court's repeated characterization in the Second Remand Order that its finding regarding domestic producers' reshipment capabilities was central to its material injury determinations. The Commission clarified that, even if their ability to reship was limited, U.S. producers also possessed excess capacity, substantial inventories, extensive inventory locations, and expansive multi-modal distribution network, all of which showed that the domestic industry was, in fact, well positioned to supply the U.S. market in 2019, independent of its reshipment capabilities. APPX0100036. The Court, however, again misconstrued the Commission's analysis, rejecting these independent findings as not providing substantial evidence to support the Commission's reshipment finding and concluding that if domestic producers could not reship their inventories, they "would be poorly positioned to supply the U.S. market so that imports would not have created oversupply conditions." APPX000077.

The law of the case doctrine does not preclude this Court from considering the Commission's actual grounds for finding the domestic industry capable of supplying the U.S. market and this Court is not obligated to adopt the earlier Court's misapprehension of the Commission's determinations.  Instead, this Court can and should independently assess whether the Commission's remand determinations are in accordance with law and supported by substantial evidence.  Moreover, it would be manifestly unjust to require the Commission to continue to litigate and defend findings that it did not make.

Equally unavailing is Plaintiff-Intervenors' argument that law of the case requires this Court or the Commission to adopt Commissioner Johanson's dissenting views.  JointCmmnts 12-17.  This argument is clearly erroneous because it conflicts with the substantial evidence standard.  The Federal Circuit has explained that the law of the case doctrine is "inapposite" to a court's application of the standard of review, explaining that a holding that a particular determination is supported by substantial evidence and in accordance with law is not necessarily inconsistent with holding that the opposite conclusion was

also supported by substantial evidence and otherwise in accord with law.  *See Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB,* 975 F.2d 807, 814 (Fed. Cir. 1992); *see also Siemens Energy, Inc.,* 806 F.3d at 1372; *Grupo Industrial Camesa*, 85 F.3d at 1582; *Consolo*, 383 U.S. at 619-20.

Thus, the law of the case doctrine in no way constrains this Court from independently reviewing the Commission's determinations under the appropriate standard of review.

## IV.  THE COMMISSION'S VOLUME FINDING IS IN ACCORDANCE WITH LAW AND SUPPORTED BY SUBSTANTIAL EVIDENCE

### A.    The Commission's Volume Analysis Is in Accordance with Law

The statute provides that the "Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."  19 U.S.C. § 1677(7)(C)(i).  In accordance with this statutory mandate, the Commission considered the volume of subject imports which increased overall from 2017 to 2019.  The Commission also considered the volume of cumulated subject imports relative to apparent U.S. consumption,

finding that U.S. shipments of subject imports increased steadily from 2017 to 2019 causing cumulated subject imports to gain market share during that time.  Based on these data, the Commission found that cumulated subject import volume and the increase in that volume were significant in absolute terms and relative to apparent U.S. consumption.  APPX0100063-0100065.

The Commission also explained, as it had in its First Remand Views, that the Court appeared to have misconstrued the statute in stating that 19 U.S.C. § 1677(7)(C)(iii) requires that the Commission "apply its findings regarding the conditions of competition to its analysis of the three statutory factors: subject import volume, price effects, and impact on the domestic industry."  APPX0100067-0100069. The Commission observed, on its face, § 1677(7)(C)(iii) requires that the Commission consider the relevant economic factors described in the impact clause, clause (iii), within the context of business cycle and conditions of competition but does not impose such a requirement with respect to its analysis of volume, clause (i), and price effects, clause (ii).[2]

_____

[2] The interrelationship between the conditions of competition requirement and the impact analysis is further supported by the reference in that paragraph to conditions "that are distinctive to the

*Id.* Indeed, this court so held in *Tenaris Bay City, Inc. v. United States,*
789 F. Supp. 3d 1352, 1373 (Ct. Int'l Trade 2025).

Notwithstanding the plain language of the statute, the Court
again stated in the Second Remand Order that the Commission "must
consider the general 'conditions of competition' within the affected
industry, 19 U.S.C. § 1677(7)(C)(iii) (flush language) and apply its
'conditions of competition findings to its analysis of the three statutory
factors,'" although it cited cases that supported the Commission's
reading of the statute. APPX00067-0100069. Thus, consistent with the
statute and the cases cited by the Court in the Second Remand Order,
the Commission in its Second Remand Views lawfully considered issues
regarding conditions of competition, causation, and non-attribution in
the impact section, including incorporating its discussion from the First
Remand Views regarding whether "fertilizer was 'practically
unavailable from U.S. sources' to supply high-demand regions in 2019

---

affected industry." 19 U.S.C. § 1677(7)(C)(iii). Without question "the
affected industry" refers to the domestic producers of the domestic like
product, as reflected in the statute's definition of "industry." 19 U.S.C.
§ 1677(4). Furthermore, the "relevant economic factors" that must be
evaluated "within the context of the business cycle and conditions of
competition" are the "relevant economic factors" enumerated under
§ 1677(7)(C)(iii).

because doing so would not have been economically viable."

APPX0100111-0100128.  Even if this Court were to disagree with the

Commission's approach, however, the path of the Commission's

decision-making is readily discernible regardless of where the

Commission addressed the issues.

Notably, neither OCP nor Plaintiff-Intervenors argue that the

Commission erred in its reading of the plain language of the statute as

it pertains to the Commission's obligations regarding its analysis of the

volume of subject imports.  Accordingly, we address their arguments

challenging the Commission's finding that cumulated subject imports

contributed to oversupply conditions in price effects and their

arguments related to causation and nonattribution in impact, below,

consistent with the context in which these issues were analyzed by the

Commission.[3]

---

[3] We note that, although 19 U.S.C. § 1677(7)(C)(iii) is not
applicable to the Commission's volume and price effects analyses, the
statute does not preclude the Commission from considering conditions
of competition or other relevant economic factors in its volume and price
effects analyses, if the Commission finds it appropriate to do so, as it
did here, for example, in considering the weather events and demand
conditions in its price effects analysis.  *See* 19 U.S.C. § 1677(7)(B)(ii).

**B.    The Commission's Volume Analysis Is Supported by Substantial Evidence**

The Commission's finding that the volume of cumulated subject imports and increase in that volume were significant in absolute terms and relative to U.S. consumption is supported by substantial evidence. APPX0100066-0100069, APPX0098445-0098446, APPX0098459-0098461, APPX0098547. OCP and Plaintiff-Intervenors have failed to show otherwise.

OCP's argument that the Commission "fails to disentangle import and U.S. shipment data," is unavailing because these data were never entangled to begin with. OCPCmmnts 25-26. OCP fails to explain how the Commission could have "entangled" these two sets of data when one, data concerning imports of subject merchandise, was used to consider cumulated subject import volume in absolute terms and the other, data concerning U.S. shipments of subject imports, was used to consider cumulated subject import volume relative to consumption in the United States.

OCP's argument that the Commission erred in "blam{ing} importers for the erroneous data on which it relied" is equally unavailing. The Commission explained that it reasonably relied upon

19

importers to accurately report their import quantities that were entering the United States for purposes of consumption, in accordance with the explicit instructions in the questionnaires. OCPCmmnts 26-27. Further supporting the reasonableness of the Commission's reliance on these data is the fact no respondent, including OCP, availed itself of the opportunity to raise any objection in their comments on the draft questionnaires regarding this issue. APPX0100064-0100065. Having failed to raise any concerns over these questionnaire instructions before the Commission at the appropriate time, OCP is precluded from now complaining that the questionnaire instructions were unclear or that the data as reported were inaccurate.

In any event, even assuming *arguendo* that the importers did not comply with the questionnaire instructions and inaccurately reported subject imports that were not entering the U.S. market for consumption purposes, OCP's and Plaintiff-Intervenors' arguments that the Commission erred by including reexports in its volume analysis fail. Such assertions overlook that, even though the Commission reasonably relied upon the unadjusted data, it also explained that the adjusted

data supported its finding that the volume and increase in volume of

cumulated subject imports were significant.  APPX0100063-0100065.

## V.    THE COMMISSION'S PRICE FINDING IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW

### A.    The Commission's Price Effects Finding Is in Accordance with Law

The statutory provision regarding the Commission's price effects

analysis provides as follows:

> In evaluating the effect of imports of such merchandise on prices, the Commission shall *consider* whether –
>
> (I)    there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and
>
> (II)   the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii) (emphasis added).

The Commission's price effects analysis fully complied with the

statute.  The Commission considered whether subject imports

significantly undersold the domestic like product as well as whether

21

subject imports depressed or suppressed prices to a significant degree.

After thoroughly examining the record evidence, the Commission found

cumulated subject imports depressed prices to a significant degree.

Thus, the Commission reasonably and lawfully found that subject

imports had significant price effects on the domestic industry.

APPX0100070-0100101.

In arguing that the Commission's underselling analysis is

"inadequate," OCP misapprehends the Commission's statutory

obligations and mischaracterizes the Commission's analysis.

OCPCmmnts 38-42.  Specifically, OCP contends that the Commission

"conduct{ed} its price effects analysis *as if there were* significant

underselling."  OCPCmmnts 41.  The Commission, however, did not find

significant underselling, either explicitly or implicitly.  APPX0100078.

Nor is it required to make such a finding, and Plaintiff-Intervenors'

reliance on the Court's Second Remand Order as imposing such a

requirement conflicts with the plain language of the statute.

JointCmmnts 11.  The statute requires only that the Commission

*consider* whether there has been significant underselling, which does

not encompass an obligation to come to any conclusion regarding that factor. *See Altx*, 370 F.3d at 1123; *Nucor Corp.*, 414 F.3d at 1339.

In arguing that the Commission must explain the role that its underselling analysis played in its finding of significant price depression, OCP and Plaintiff-Intervenors conflate two different statutory provisions. OCPCmmnts 42, JointCmmnts 11. As the Commission explained, the Commission's underselling and price depression analyses are separate and distinct under the statute and a finding of significant underselling is not required for the Commission to find significant price depression. APPX0100101-0100102 (citing *Altx, Inc. v. United States*, 25 CIT 1100, 1109, 167 F. Supp. 2d 1353, 1365 (2001), *OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291, 1302 (Ct. Int'l Trade 2021); *Siemens Energy v. United States*, 992 F. Supp. 2d 1315 (Ct. Int'l Trade 2014), *aff'd*, 806 F.3d 1367 (Fed. Cir. 2015); *Cemex, S.A. v. United States*, 16 CIT 251, 260–61, 790 F. Supp. 290, 299 (1992)). In any event, the Commission fully explained that, notwithstanding the prevalence of overselling by subject imports in the pricing data, a comprehensive analysis of the totality of the record

evidence supported a finding that subject imports significantly depressed domestic prices.  APPX0100071-APPX0100098.

## B. The Commission's Price Effects Finding Is Supported by Substantial Evidence

The Commission's finding that cumulated subject imports depressed prices to a significant degree and therefore had significant price effects on the domestic industry was supported by substantial evidence.  APPX0100070-0100101.

In addressing price effects, the Commission first considered whether there had been significant underselling by subject imports. While recognizing the prevalence of overselling in the pricing data, it continued to find, consistent with the high degree of price transparency in the market, that the prices of the domestic product and subject imports tracked each other closely and were generally comparable, with small margins of underselling and overselling; that subject imports were in some instances lower priced; and that the domestic industry lost sales to subject imports because of lower prices.  APPX0100072-0100075, APPX0098417, APPX0098422, APPX0098473-0098476, APPX0098483, APPX0098485-0098489, APPX0097202-0097203, APPX0097209-0097212, APPX97541-0097554, APPX0097567-0097578,

APPX0095894-0095896, APPX0095935-0095939, APPX0095952-0095953.  The Commission also complied with the Court's instructions in the Second Remand Order that if the Commission "wishes to credit some portion of the reported lost sales on remand, it must adequately explain this decision, including by addressing detracting evidence." After explaining why it found the purchasers' confirmed lost sales credible, the Commission reasonably relied upon them, along with other record evidence that subject imports exerted downward pressure on domestic prices, discussed above.  APPX0100075-0100078, APPX0098486, APPX0098486-0098488.

The Commission next performed a comprehensive analysis of the role that subject imports played on price declines for the domestic product, based on the totality of the record evidence.  The Commission found that significant and increasing volumes of subject imports entered the U.S. market between 2017 and 2018 and remained at significant levels in 2019 despite a substantial demand decline in the latter part of 2018 that continued into 2019, as unusual weather conditions impacted three consecutive planting seasons - fall of 2018, spring of 2019, and fall of 2019.  APPX0100071-0100083.  Despite these

market conditions, cumulated subject imports continued to enter the
market in large volumes in 2019, in excess of any purported need to
restock inventory in regions that were unaffected by weather,
contributing to oversupply conditions in the U.S. market as
corroborated by numerous contemporaneous trade publications and
certain importers' questionnaire responses.  APPX0100070-0100101,
APPX0098455-APPX0098547, APPX0098551-0098552, APPX0001231-
0001300, APPX0097271-0097280; APPX0096030-0096034,
APPX0096092-0096096, APPX0087997, APPX0088001, APPX0087690.
The Commission also cited the fact that cumulated subject imports
continued to gain market share in 2019, as demand contracted, as
further evidence that they were not merely replenishing depleted
inventories.  APPX0100094.  Record evidence also showed subject
imports being offered at low prices in some instances during this time
and exerting downward pressure on U.S. prices.  APPX0100086-
0100101 APPX0098485-0098489, APPX0088543, APPX0088551,
APPX0088354, APPX0088365, APPX0088577, APPX0097202-0097203,
APPX0097541-0097554, APPX0095894-0095896, APPX0095935-

0095939, APPX0095952-0095953, APPX0097210-0097212,

APPX0097570-0097578.

The Commission thus reasonably concluded that, by contributing to oversupply conditions and being offered at competitive and low prices in a highly transparent market, cumulated subject imports exerted downward pricing pressure and significantly depressed U.S. prices during the POI.  APPX0100097-0100098.  While acknowledging that some purchasers reported being unable to obtain supply from Mosaic at times during the POI, the Commission reasonably found that the record as a whole showed that the significant volume of cumulated subject imports contributed to oversupply conditions in a declining market and had significantly depressed domestic prices in 2019.  APPX0100097-0100098.

The Commission also addressed respondents' arguments that price declines were attributable to global prices and U.S. demand. While recognizing that these factors may have contributed to price movements, the Commission reasonably found that they did not negate the record evidence showing the significant role that subject imports played in depressing prices in the U.S. market.  The Commission

27

emphasized that, although U.S. prices began to increase in the beginning of 2020 as weather conditions improved, they remained at lower levels compared to 2017 and 2018 until after the filing of the petitions in June 2020, at which point they sharply increased to levels above other global markets as the volume of subject imports declined substantially. As the Commission explained, this further supported a finding that subject imports depressed U.S. prices during the POI. APPX0100098-0100099, APPX0098473-0098476, APPX0098482.

## C.    Plaintiffs' Challenges to the Commission's Price Effects Analysis Are Unavailing

### i.    The Commission Reasonably Relied on Trade Publications

In alleging that the Commission relied exclusively on "trade publications suggesting that subject imports were priced lower and caused lost sales and price depression," OCP mischaracterizes the Commission's analysis and findings. OCPCmmnts 43. In fact, the trade publications cited by the Commission, while numerous, were by no means the only evidence relied upon by the Commission for those findings. Instead, as discussed above, the Commission thoroughly examined the record evidence and relied, among other things, on the pricing data, purchasers' responses regarding lost sales and lost

revenue, importers' questionnaire responses, and evidence submitted by
domestic producers, along with the overwhelming record evidence that
cumulated subject imports contributed to oversupply conditions while
being offered at prices that were competitive with as well as lower than
those for the domestic like product.  APPX0100079-0100099.

Further, in claiming that the Commission gave "decisive weight to
trade publications" and "little to no weight to its own questionnaire
data," OCP is merely inviting the Court to reweigh evidence that, in its
view, supports its desired result.  OCPCmmnts 43.  In doing so, OCP
overlooks that "{i}t is the Commission's task to evaluate the evidence it
collects during its investigation" and "{c}ertain decisions, such as the
weight to be assigned a particular piece of evidence, lie at the core of
that evaluative process."  *U.S. Steel Grp.*, 96 F.3d at 1357; *Nippon Steel
Corp.*, 458 F.3d at 1350.

Moreover, contrary to OCP's claims that the questionnaire data
contradicted the information in the trade publications, OCPCmmnts 42-
44, questionnaire data and other evidence corroborated trade reports
that increased imports had created oversupply and depressed prices,
including purchasers' questionnaire responses reporting that subject

imports contributed to oversupply conditions, were sometimes offered at lower prices than the domestic like product, took sales from the domestic industry on that basis, and exerted downward pressure on U.S. prices as discussed above.  APPX010079-0100099.

OCP further quibbles with the Commission's characterization of these trade publications as playing a "vital role" in the U.S. market, again inviting the Court to reweigh this evidence.  OCPCmmnts 43. OCP's claim that the Commission relied only on "sensationalized narratives" instead of "price indexes in the trade publications," OCPCmmnts 43-44, is belied by the quotations from the trade reports cited by the Commission, many of which specifically discuss prices. APPX0100083-0100092.  Finally, OCP's attempts to dismiss these trade publications as "unverified, anonymous, and anecdotal," OCPCmmnts 43-44, ignores that industry trade publications often are submitted onto the record by parties and relied upon by the Commission.  *See Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n*, 100 F. Supp. 3d 1314, 1344-49 (Ct. Int'l Trade 2015); *Nevinnomysskiy Azot v. United States*, 32 CIT 642, 657, 565 F. Supp. 2d 1357, 1371 (2008) (upholding the Commission's reliance upon pricing data as well as

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

prices reported in the industry publication *Green Markets* in analyzing

price effects because the Court "lacks authority to interfere with the

Commission's discretion as trier of fact to interpret reasonably evidence

collected in the investigation") (quotation omitted).

### ii.   The Commission Reasonably Relied on Confirmed Lost Sales

OCP again improperly asks this Court to reweigh evidence

regarding confirmed lost sales.  OCPCmmnts 36.  After detailing the

efforts that Commission staff undertook to verify the accuracy of

[ purchaser ] reported lost sales and noting that "purchasers have

little incentive to confirm allegations," the Commission found

[ purchaser's ] confirmation that [ description

] to be credible.  Based on these

considerations, along with the candor of [ purchaser's ] response, which

was arguably tantamount to an admission against its own interest, the

Commission reasonably found that it was appropriate to continue to

consider the entirety of its reported confirmed lost sales.

APPX0100073, APPX0100152-0100153, APPX0098485, APPX0098486-

0098488.  In crediting these statements, the Commission was acting

within its authority to determine the weight assigned to particular

*PROPRIETARY INFORMATION SUBJECT*
*TO PROTECTIVE ORDER REDACTED*

evidence on the record.  *See, e.g.*, *U.S. Steel Grp.*, 96 F.3d at 1357; *AWP Indus., Inc. v. United States*, 35 CIT 774, 794, 783 F. Supp. 2d 1266, 1285 (2011).  That OCP would prefer that the Commission weigh [ purchaser's ] lost sales information differently in no way establishes that the Commission acted unreasonably in finding it credible.

The Commission further complied with the Second Remand Order by adjusting the volume of [ purchaser's ] confirmed lost sales in accordance with other evidence.  Specifically, given that [ purchaser ] reported that [ description ] it purchased subject imports instead of the domestic like product because the [                    description                    ], the Commission reasoned that [ purchaser ] would have shifted sales of at least [ # ] ST, a bare majority of its total reported lost sales, from the domestic industry to subject imports due to price.  APPX0100076-0100077.  OCP's claim that the Commission provided no basis for arriving at this portion is without merit.  OCPCmmnts 54.  Equally baseless is OCP's characterization of this figure as "arbitrary," claiming that it represented [ % ] percent of [ purchaser's ] confirmed lost sales.  *Id.*  [ purchaser ] reported lost sales of [ # ] ST, which divided by half is [ # ] ST,

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

confirming that the Commission was, in fact, conservative by rounding down.  APPX0100073-0100076.  OCP's opinion that this adjusted volume of confirmed lost sales was "negligible" merely reflects its preferred reweighing of the evidence.

Equally unavailing is OCP's assertion that the Commission somehow "retreat{ed}" from its lost sales finding in explaining that it found [ purchaser's ] narrative responses to be more probative than its volume of confirmed lost sales.  OCPCmmnts 55.  The Commission continued to find this volume of lost sales significant, as discussed above.  As the Commission explained, however, [ purchaser's ] narrative responses, in which it candidly reported that U.S. producers [ description ] to compete with subject imports and that [ description ] but eventually lowered them in order to compete with lower priced imports, corroborated the Commission's finding of price depression, which was the basis of its price effects finding.  APPX0100077-0100079, APPX00100096.  Although OCP attempts to dismiss these narrative

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

responses as "cherry-picked," the Commission reasonably found them to be credible for the reasons discussed above.

Moreover, in attempting to dismiss [ purchaser ] as an "outlier," OCPCmmnts 54-55, OCP overlooks the other record evidence that the Commission cited as corroborating [ purchaser's ] responses. Indeed, the Commission observed that [ purchaser ] was hardly an "outlier" in reporting that subject imports put downward pressure on domestic prices given the numerous trade publications that were reporting similar observations and widely shared experiences. APPX010078. The totality of this record evidence demonstrates that, while the Commission reasonably credited [ purchaser's ] total confirmed lost sales volume, its finding that subject imports significantly depressed domestic prices was supported by a range of other evidence, including [ purchaser's ] narrative responses. That OCP would prefer the Commission weigh purchaser responses differently fails to establish that the Commission's analysis was unreasonable or unsupported by substantial evidence.

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

### iii. The Commission Reasonably Considered Subject Import Inventories and Oversupply Conditions

Equally unavailing is OCP's argument that subject import volumes and inventories somehow aligned with market trends. While conceding that distributors stockpiled inventories at the beginning of 2019, OCP claims that "{b}ad weather events during the spring 2019 fertilizer application season sharply reduced subject imports and limited out-of-season restocking to areas unaffected by bad weather." OCPCmmnts 33. As the Commission explained, however, the volume of cumulated subject imports increased 1.0 million ST from 2017 to 2018, and year-end inventories of cumulated subject imports increased [ %  ] percent during that time, even as demand had begun to decline. Notwithstanding these already substantial inventories, cumulated subject imports surged into to U.S. market in January 2019 and continued to enter the U.S. market in elevated quantities throughout 2019, even as demand remained low, at levels that exceeded any purported need to replenish depleted inventories.[4] Cumulated

---

[4] The Commission acknowledged that annual volume and shipment data for subject imports were based upon questionnaire responses, whereas monthly import levels were based upon official import statistics, which may have included product that was

subject imports' increased U.S. shipments and market share in 2019, at the direct expense of the domestic industry, belies OCP's assertion that subject imports were limited to restocking areas unaffected by bad weather.  Thus, contrary to OCP's claim that subject imports adjusted to changing demand conditions "avoiding any injurious oversupply," the Commission explained that cumulated subject imports contributed significantly to conditions of oversupply by continuing to flood the U.S. market, despite declining demand and already substantial inventories, at levels that exceeded any purported need to replenish depleted inventories.  APPX0100079-01000101.

OCP undercuts its own argument that the Commission somehow "misinterprets" its experts' analyses in maintaining that these witnesses conceded that there was a "temporary oversupply" in the U.S.

---

subsequently re-exported.  That these import statistics may overstate the volume of monthly subject imports that remained in the United States does not detract from the Commission's findings and does not undermine the Commission's comprehensive analysis rebutting OCP's claims that subject imports were needed to replenish depleted inventories.  Indeed, the surge in subject imports in January 2019 of 720,728 ST alone was equivalent to over twice the small volume of re-exports for all of 2019.  APPX0098854-0098856.  In any event, these re-exports cannot explain the elevated U.S. inventories and continuing influx of subject imports that contributed to the oversupply conditions that existed in the U.S. market.

market by confirming that these witnesses did, in fact, concede that

there was a "temporary oversupply" and "inventory hangover."

OCPCmmnts 34-35.  What OCP takes issue with is the cause of the

oversupply and inventory overhang, claiming that weather events,

rather than subject imports, were to blame.  As discussed below,

however, the Commission fully explained that cumulated subject

imports had an adverse impact on the domestic industry that was

distinct from any impact from weather events.  Moreover, the

Commission explained that Mr. Dougan's analysis not only overlooked

important aspects of the U.S. market by failing to include subject

import volumes or inventories but also appeared to corroborate the

Commission's findings.  Similarly, Mr. Rahm's testimony that "{t}he

New Orleans price traded at a large discount to the Brazilian price" was

consistent with the Commission's findings that an oversupply and

inventory overhang adversely affected U.S. prices.  APPX0100098,

APPX0017679, APPX0017656.

Equally unavailing is OCP's argument that the Commission

should have focused its analysis on cumulated subject import volume

adjusted to exclude reexports for a single year, 2019, which in its view

*PROPRIETARY INFORMATION SUBJECT*
*TO PROTECTIVE ORDER REDACTED*

shows that subject imports did not contribute to oversupply.

OCPCmmnts 36. The Commission appropriately analyzed subject

import price effects over the entire POI, however, and noted the

significant increase in subject imports from 2017 to 2018 that resulted

in a substantial buildup in subject import inventories at the end of

2018. Considering these inventories, the Commission reasonably found

that continued entries of subject imports, even at levels lower than in

2018, combined with increasing shipments and continuing high levels of

inventories, exceeded declining demand and contributed substantially

to the oversupply conditions in 2019 that depressed domestic prices.

APPX0100077-0100079.

Likewise unavailing is Plaintiff-Intervenors' assertion that subject

import inventories were not unusually large given that the ratios of

subject import inventories to U.S. inventories were "virtually the same"

in 2018 and 2019. JointCmmnts 37. Plaintiff-Intervenors ignore that

these ratios were far higher in 2018 and 2019, ranging from [ █ ]

percent, than in 2017, when they ranged from [ █ ] percent,

*calculated from* APPX0098551, reflecting that subject import end-of-

period inventories increased [ █ ] percent from 2017 to 2018 and

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

remained [ █% ] percent higher in 2019 than in 2017.  In contrast,

domestic end-of-period inventories increased by only [ █% ] percent from

2017 to 2018 and were only [ █% ] percent higher in 2019 compared to

2017.  APPX0098547.

### iv.    The Commission Reasonably Found that Being Identified as a Price Leader Did Not Insulate Mosaic from Subject Import Pricing Pressure

OCP's assertion that the Commission somehow "disregard{ed }

Mosaic's price leadership," is yet another invitation for this Court to

reweigh the evidence.  OCPCmmnts 45.  As the Commission explained,

Mosaic's price leadership did not insulate it from competition from other

market suppliers or from pricing pressure caused by an oversupplied

market.  Indeed, the Commission observed that several purchasers that

identified Mosaic as a price leader also confirmed that subject imports

were lower priced and/or exerted downward pressures on its pricing.

APPX00100100-00100101, APPX0088549, APPX0088143,

APPX0088151, APPX0088156, APPX0088305, APPX0088313-0088315,

APPX0088690, APPX0088699-0088701.

OCP attempts to dismiss these responses, claiming these

purchasers "were among the many purchasers who explained that

limited availability of domestic product was their reason for purchasing subject imports." OCPCmmnts 47-48. However, several of these purchasers specifically confirmed that the domestic industry lost sales and revenue to lower priced subject imports, demonstrating that price leadership in no way insulated Mosaic from competitive pressure from subject imports. APPX0098545-0098489. Even if these purchasers elsewhere mentioned supply constraints, that would not "directly contradict" this record evidence, contrary to OCP's claim. OCPCmmnts 47-48.

## VI.  THE COMMISSION'S IMPACT ANALYSIS IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW

### A.  The Commission's Impact Finding Is Supported by Substantial Evidence and in Accordance With Law

In accordance with the statutory mandate, the Commission considered all relevant economic factors of the domestic industry, explained the causal nexus between the domestic industry's performance and cumulated subject imports, and considered all other factors to ensure that it was not attributing injury from those factors to subject imports, including declining U.S. demand due to unusually poor

weather conditions and domestic producers' alleged inability or

unwillingness to supply the U.S. market.  APPX0100105-APPX0100126.

## B.    Plaintiffs' Challenges to the Commission's Impact Analysis Are Unavailing

### i.    The Commission's Non-Attribution Analysis of Weather Was Reasonable

Plaintiffs argue that bad weather caused the "oversupply"

conditions that injured the domestic industry.  OCPCmmnts 58-60; *see*

*also* JointCmmnts 35-36.  OCP contends that "the unforeseeable

weather constituted the sole cause of injury" by "temporarily depressing

actual demand below projected levels" and "extreme rainfall threw off

the equilibrium between supply and demand in ways no one could have

predicted or planned for."  OCPCmmnts 58.  OCP's characterization of

the weather events as "temporary" is undermined by the fact that they

spanned three successive planting periods, from fall 2018 through fall

2019, and its characterization of them as "unforeseeable" is beside the

point.  As the Commission explained, despite the significantly increased

volume and inventories of cumulated subject imports from 2017 to 2018,

substantial volumes of cumulated subject imports continued to enter

the U.S. market in elevated quantities throughout 2019, even as

41

demand remained low due to further adverse weather conditions. These subject imports in excess of any inventory replenishment requirements contributed to oversupply conditions and depressed domestic prices, as documented by contemporaneous trade publications and responding purchasers. Because the industry's performance would have been stronger but for the subject imports that oversupplied the U.S. market, the Commission concluded that their impact on the domestic industry was distinct from that of declining demand. APPX0100109-APPX0100111.

Indeed, consistent with the Commission's analysis, the domestic industry's performance improved dramatically after the filing of the petitions caused subject imports to exit the U.S. market. The Commission found that, although U.S. prices began to increase in the beginning of 2020 as weather conditions improved, they remained at lower levels compared to 2017 and 2018, until after the filing of the petitions in June 2020, at which point they sharply increased to levels above other global markets as the volume of subject imports declined substantially. Thus, this evidence further supports that subject imports depressed U.S. prices during the POI, causing material injury to the

domestic industry that was distinct from weather events.

APPX0100112-APPX0100113.

Equally unavailing is Plaintiff-Intervenors' claim that the domestic industry's performance correlates with weather events and not subject imports because subject imports increased when the industry's performance improved (2017-2018) and declined when the industry's performance weakened (2018-2019). Plaintiff-Intervenors overlook that the industry's improved performance was spurred by strong demand growth. Further, the Commission recognized that cumulated subject import volume declined from 2018 to 2019, APPX0100062, but reasonably found a causal link between subject imports and the industry's declining performance over the period. As the Commission explained, cumulated subject imports increased substantially from 2017 to 2018 and continued to flow into the U.S. market during 2019 in excess of any purported need to replenish depleted inventories, despite the POI-high subject import inventories in the first quarter of 2019 and declining demand, thereby contributing to conditions of oversupply and depressing domestic prices to a significant degree.

### ii.    The Commission Reasonably Found that Fertilizer Was Available from U.S. Sources in 2019

OCP's challenge to the Commission's finding that domestic producers were well-positioned to supply the U.S. market relies on a mischaracterization of the Commission's analysis.  OCPCmmnts 9-10.  Specifically, OCP claims that the Commission's original determinations "relied on domestic producers' purported ability to reship inventories already delivered to low-demand regions."  *Id.*  As discussed above, the Commission's original determinations found only that importers were incapable of reshipping such inventories, without addressing the domestic producers' ability to reship.  Equally inaccurate is OCP's claim that "the Commission found that subject fertilizer imported to restock inventories in normal-demand regions deprived domestic producers of the opportunity to sell off unneeded inventories from low-demand regions, causing an oversupply in the U.S. market and thereby injuring the domestic industry."  OCPCmmnts 9.  The Commission has never found that "subject fertilizer was imported to restock inventories in normal-demand regions."  Rather, as discussed above, the Commission found that cumulated subject imports continued to be imported at levels

44

that exceeded any alleged need to replenish inventories, despite high levels of existing inventories and persistently low demand. APPX00100081-00100097.  Nor did the Commission make any finding about domestic producers being "deprived . . . of the opportunity to sell off unneeded inventories from low-demand regions," let alone conclude that this caused an oversupply in the U.S. market.  OCPCmmnts 9. Instead, as discussed above, the Commission found that in maintaining substantial inventory levels while continuing to import subject merchandise into the already oversaturated and declining U.S. market, subject imports contributed significantly to the oversupply conditions. By contributing to conditions of oversupply and selling at competitive and lower prices, the Commission found, cumulated subject imports exerted downward pressure on domestic prices in the highly transparent U.S. market, as confirmed by certain purchasers as well as contemporaneous trade publications.  APPX00100081-00100098.

OCP further mischaracterizes the Commission's findings by claiming that the Commission is now "disclaim{ing} its reliance on reshipments by converting its unsupported inventory reshipment finding into a list of factors" while also arguing that these other factors

are "just facets of the same inventory reshipment finding."

OCPCmmnts 10-11.  The Commission explained that the domestic

producers' ability to reship inventories was only one factor supporting

its finding that fertilizer was not practically unavailable from U.S.

sources in 2019.  Indeed, the Commission clarified that the U.S.

producers' excess capacity, substantial inventories, extensive inventory

locations, and expansive multi-modal distribution network showed that

they were well positioned to supply the U.S. market in 2019,

independent of any reshipment capabilities.  APPX0100034-0100037;

APPX0100113-0100116.  OCP argues that these factors "*are relevant*

*only* if the domestic industry can reship inventories to different

regions."  OCPCmmnts 10-11.  But OCP has it backwards – reshipment

is only relevant if a company cannot supply the market by these other

means.

In any event, OCP's and Plaintiff-Intervenors' further attacks

amount to nothing more than an invitation for the Court to reweigh the

evidence.  Contrary to OCP's assertion that the record shows only "*de*

*minimis*" and "meager" inventory reshipments, OCPCmmnts 12-15; *see*

*also* JointCmmnts 27-28, the Commission explained that it respectfully

46

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

disagreed, as a factual matter, with the Court's findings that reshipment was a "rare practice" that was "commercially insignificant." APPX0000074. Noting that these findings appeared to be based on the Commission's discussion of Mosaic's transfers between [ description ] locations in the First Remand Views, the Commission clarified that these transfers were only one example of its reshipment capabilities, which were also demonstrated by Mosaic's description of [ █████ ] description ] transfers, including between [ description ] locations and between [ description ] warehouses. APPX0100056-0100058. Although OCP attempts to dismiss these examples of reshipments because they involve the [ description ] movement of inventories, OCPCmmnts 14-15, these reshipments are directly responsive to the Court's instruction to consider the domestic producers' ability to place their large inventories back into supply in the domestic phosphate fertilizer market.

The Commission also explained the basis for its disagreement that reshipments were "commercially insignificant," pointing out that total reshipment quantities were equivalent to approximately [ % ] percent of the domestic industry's total U.S. shipments during the POI. The

*PROPRIETARY INFORMATION SUBJECT*
*TO PROTECTIVE ORDER REDACTED*

Commission further found that the domestic industry's total inventory reshipments during the POI were equivalent to approximately [ %  ] percent of the industry's total end-of-year inventories during the period, indicating that the movement of such inventories was a regular business practice and not a rare occurrence or theoretical possibility. APPX0100056-0100058.  That OCP would prefer the Commission to weigh the evidence differently does not render the Commission's findings unreasonable.

The Commission also cited other record evidence showing how, unlike importers, the domestic industry was able to use alternate shipping methods and draw upon its extensive distribution network to reach customers with product that was held on barges.  The Commission explained that, as its original finding related to the feasibility of importers drawing from building inventories or product on barges, the fact that Mosaic could use alternate means of shipping product that had been on barges was relevant to the issue of whether fertilizer was available from U.S. sources.  APPX0100058-0100059.

The Commission also responded to the Court's instruction to explain how if importers did not move "substantial quantities of

inventory between locations," why the same was not true for domestic producers "that similarly reported limited instances of inventory reshipment." APPX0000075. The Commission reiterated that, unlike importers, domestic producers did not report that they were unable to serve the U.S. market from existing inventories and that the record showed that the domestic industry had excess capacity, substantial inventories, a demonstrated ability to move appreciable quantities of product between downstream inventory locations, and superior distribution networks, which enabled them to employ alternative means to ship products that were unable to be moved via barge. Importers, by contrast, reported less extensive inventory networks and less movement of inventories. APPX0100059-0100060. The Court should reject OCP's invitation to reweigh evidence the Commission reasonably considered.

### iii. The Commission Reasonably Found that Domestic Plant Closures Fail to Explain the Magnitude of Subject Import Volumes and Inventories

OCP and Plaintiff-Intervenors challenge the Commission's finding that Mosaic's and Nutrien's plant closures did not create a "supply gap" that necessitated increased subject imports. OCPCmmnts 28-31; JointCmmnts 35. Relying on a statement made by Mosaic's CEO in

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

2019, OCP argues that Mosaic's 2017 idling of Plant City created a gap in domestic supply of 1.1 million ST. OCPCmmnts 29. Plaintiff-Intervenors claim that the publicly perceived gap was 1.7 million ST. Mosaic, however, estimated that the idling of Plant City reduced domestic supply by about 700,000 ST, and the Commission found this to be credible. APPX0100045-APPX0100046, APPX0100122-APPX0100124, APPX0017503, APPX0017575. As discussed above, decisions about credibility and the weight assigned to a particular piece of evidence are at the core of the Commission's evaluative process.

Moreover, contrary to OCP's argument, the Commission explained that it found Mosaic's 700,000 ST estimate to be more probative than the 2019 statement by its CEO because it was consistent with other evidence that was contemporaneous with the idling of Plant City. Specifically, a representative from Mosaic testified that Plant City produced about 1.4 million ST at the time it was idled in 2017. APPX0100045, APPX0017503. Given that Mosaic exported [ % ] percent of its total shipments in 2017, the [ % ] percent share of its production that year that was shipped domestically would have

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

amounted to approximately 606,200 ST, consistent with the 700,000 ST estimate. APPX0100045, APPX0098439, APPX0087812.

The Commission reasonably concluded that the 1.1 million ST increase in cumulated subject imports from 2017 to 2018 following the idling of Mosaic's Plant City facility far exceeded either Mosaic's reasonable estimate of its reduced supply to the U.S. market (700,000 ST) or the amount by which it actually reduced its U.S. shipments ([ # ] ST) and thus contributed to the oversupply conditions in the U.S. market. APPX0100122-0100123. OCP concedes that U.S. shipments of cumulated subject imports increased by more than Mosaic's reduced U.S. shipments from 2017 to 2018, but argues that the Commission failed to explain how the difference between the two was injurious. However, as discussed above, the increase in U.S. shipments of cumulated subject imports from 2017 to 2018 is only one part of the broader picture that included the increased volume in cumulated subject imports from 2017 to 2018, the substantial inventories in 2018 and 2019, and the continued volumes of cumulated subject imports in 2019 in excess of any need to replenish inventories, all of which contributed to oversupply conditions.

51

Equally unavailing is OCP's arguments that Nutrien's closure of its Redwater facility in Canada in May 2019 contributed to a reduction in the supply of fertilizers in the United States. OCPCmmnts 30-31. As the Commission explained, Nutrien's CEO stated that it would increase production at its U.S. facilities to offset the reduction in supply from its Canadian facility and ensure a continued supply of phosphate fertilizers to customers in Canada. APPX0100047, APPX0098431. Nutrien did, in fact, increase production in the United States, by an amount more than sufficient to cover its increased exports during that time, and Nutrien had excess capacity in 2019. APPX0100047, APPX0098434. Indeed, the fact that Nutrien, as well as the domestic industry as a whole, possessed excess capacity and available inventories belies Plaintiff's claims that there was a need for additional imports from Canada or an unmet need for exports to Canada. OCPCmmnts 30-31.

OCP's challenges to the Commission's finding that the domestic industry possessed excess capacity also fail. OCPCmmnts 31-32. The Commission reasonably relied on the domestic producers' reported capacity, which was certified as accurate by the domestic producers,

and acted within its role as factfinder to find these data credible.
Moreover, in emphasizing that the domestic industry's production was
only slightly higher in interim 2020 compared to interim 2019,
OCPCmmnts 32, OCP overlooks that the record also shows that, after
subject imports began to exit the market following the filing of the
petitions, the domestic industry was also able to increase U.S.
shipments by drawing down inventories. APPX0099619. Thus, these
data do not undermine the Commission's conclusion that the domestic
industry had excess capacity during the POI.

Also unpersuasive is OCP's claim that Mosaic may have
experienced temporary supply constraints beginning in 2020.
OCPCmmnts 31-32. Given the abrupt decline in subject imports after
the petitions were filed, APPX0098456, it was reasonable for Mosaic to
need time to adjust and ramp up production. APPX0100046,
APPX0100127, APPX0097190-0097192. The fact that it relied on
imports or inventories during the three months following the filing of
the petitions does not establish that it did not have available capacity
during the full three years of the POI, as reported in its questionnaire
response. APPX0099625-0099626, APPX0098434, APPX0017567-

0017568.  Indeed, Mosaic's temporary increased need for imports in 2020 was consistent with its expectation that additional imports would be needed on a short-term basis following the idling of Plant City to give it "time to adjust."  APPX0100046, APPX0100127, APPX0017574.

> ### iv. Mosaic's Public Statements and Other Pieces of Record Evidence Do Not Render the Commission's Findings Unsupported by Substantial Evidence

Plaintiff-Intervenors further claim, unpersuasively, that the Commission's alleged failure to reconcile various public statements made by Mosaic representatives renders its determinations unsupported by substantial evidence.  JointCmmnts 23-24.  Contrary to this argument, the Commission did, in fact, address these statements and found them "outweighed by the record evidence establishing that the domestic industry was materially injured by reason of subject imports," including public and internal statements by Mosaic company officials referencing the connection between subject imports and Mosaic's various plant idlings and closures, including Plant City. Indeed, the Commission found that Mosaic offered reasonable and credible explanations for the statements highlighted by Plaintiff-Intervenors, regarding sensitivities and concerns relating to its public

statements APPX0100112, APPX0100121-0100122.  In advocating their own preferred interpretation of these statements and their supposed effects on the market, Plaintiffs invite the Court to reweigh this evidence.

Further, neither the court cases nor Commission opinions cited by Plaintiff-Intervenors support the proposition that the Commission must assign decisive weight to certain pieces of evidence in these investigations.  JointCmmnts 21-22.  Plaintiff-Intervenors overlook that each case "'is *sui generis*, involving a unique combination and interaction of many economic variables.'"  *Hitachi Metals*, 949 F.3d at 718 (quoting *Nucor Corp.*, 414 F.3d at 1340 and *Cleo Inc. v. United States*, 501 F.3d 1291, 1299 (Fed. Cir. 2007)).  That the Commission might have in one set of circumstances weighed a type of evidence one way in no way constitutes a practice nor dictates the same result in this case, involving an entirely different industry and record.

### v.  The Commission Reasonably Found that Mosaic Was Not Systemically Refusing to Sell to Distributors

The Commission fully explained its consideration of alleged refusals by Mosaic to supply distributors, contrary to OCP's argument.

55

OCPCmmnts 11.  As an initial matter, the Commission reasonably found that any decisions by Mosaic to prioritize its "loyal customers" over supplying trading companies that compete with it for the same customers, or to sell directly to customers rather than through a "middleman," do not constitute a "refusal{} to supply the domestic market."  APPX0100117.

The Commission then went on to discuss at length record evidence regarding each of the distributors, finding that the record did not show any systemic refusal by Mosaic to sell to them.  Moreover, the Commission noted that Koch and ADM both reported that Mosaic would not sell to them <u>at market prices</u>, with ADM submitting an email from May 2019 in which a Mosaic representative twice offered to supply ADM with fertilizer only to have ADM complain that the price was "$10/ton above the market price at that time."  APPX0100117-0100120, APPX0095795, APPX0095797, APPX00958098, APPX0015350.  That Mosaic refused to sell fertilizers at ADM's and Koch's preferred pricing offers no support to OCP's arguments.  To the contrary, this evidence, and particularly ADM's e-mail, corroborates the Commission's findings of price depression in 2019 and thereby shows how the domestic

industry can, in fact, "be harmed by sales that it refused to make." APPX0000082. In arguing otherwise, OCP overlooks the high degree of transparency in the U.S. market, as epitomized by ADM's rejection of Mosaic's repeated offers with reference to precisely how much higher its price was compared to the "market price." OCP's remaining challenges to the Commission's analysis of this issue are merely improper attempts to reweigh the evidence.

Plaintiff-Intervenors argue that the Commission's findings conflict with purchaser questionnaires detailing numerous supply issues and the hearing testimony of a Koch official. JointCmmnts 30-32. The Commission, however, fully addressed respondents' assertions of widespread or problematic issues with supply from domestic sources compared to subject sources, including the Koch testimony, and reasonably explained that the record did not support this position. APPX0100015, APPX0098422. That Plaintiff-Intervenor would prefer that the Commission weigh the evidence differently to reach their preferred conclusion does not render the Commission's findings unsupported by substantial evidence.

## VII. CONCLUSION

For the foregoing reasons, we respectfully request the Court to sustain the Commission's second remand determinations.

Respectfully submitted,

Margaret Macdonald
General Counsel

*/s/ Karl von Schriltz*
Karl von Schriltz
Assistant General Counsel for Litigation

*/s/ Courtney S. McNamara*
Courtney S. McNamara
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3095
Facsimile: (202) 205-3111
courtney.mcnamara@usitc.gov

Attorneys for Defendant United States

DATE: January 21, 2026

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-STYLE REQUIREMENTS AND WORD COUNT LIMITATIONS</u>

Pursuant to Chambers Procedures 2(B)(1) and (2) and with the Scheduling Order issued in the above-captioned cases, I hereby certify that the attached **DEFENDANT U.S. INTERNATIONAL TRADE COMMISSION'S NONCONFIDENTIAL COMMENTS ON SECOND REMAND DETERMINATION** contains 9,984 words, according to the word-count function of the word processing system used to prepare this brief (Microsoft Word 2010).  This brief was prepared according to the type setting requirements as set forth in the CIT Rules, Chambers Procedures, as well as Judge Baker's Individual Practice Rules for preparation of briefs.

*/s/  Courtney S. McNamara*
Courtney S. McNamara
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
Telephone: (202) 205-3095
Facsimile: (202) 205-3111
courtney.mcnamara@usitc.gov

Dated:  January 21, 2026

59

## <u>CERTIFICATION OF COMPLIANCE WITH CONFIDENTIALITY<br>AND ARTIFICAL INTELLIGENCE RULES</u>

I hereby certify that **DEFENDANT U.S. INTERNATIONAL TRADE COMMISSION'S NONCONFIDENTIAL COMMENTS ON SECOND REMAND DETERMINATION** contains 50 unique words (including numbers) designated as confidential, and complies with the requirements of paragraph 5 of Judge Baker's Document Formatting and ECF Filing procedures (including Fed. Cir. Rule 25.1(d)(1)(A), (B), and (C)).

This brief was not prepared with the assistance of a generative artificial intelligence program.

*/s/  Courtney S. McNamara*
Courtney S. McNamara
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
Telephone: (202) 205-3095
Facsimile: (202) 205-3111
courtney.mcnamara@usitc.gov

Dated:  January 21, 2026

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 21st day of January 2026, I provided

true and correct electronic copies of the foregoing **DEFENDANT U.S.**

**INTERNATIONAL TRADE COMMISSION'S**

**NONCONFIDENTIAL COMMENTS ON SECOND REMAND**

**DETERMINATION** to all counsel of record by filing it through the

Court's CM/ECF system.

*/s/  Courtney S. McNamara*
Courtney S. McNamara
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
Telephone: (202) 205-3095
Facsimile: (202) 205-3111
courtney.mcnamara@usitc.gov

61