# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| **OCP, S.A.**<br><br>    **Plaintiff,**<br><br>  **and**<br><br>**EUROCHEM NORTH AMERICA CORPORATION,**<br><br>    **Consolidated Plaintiff,**<br><br>  **and**<br>**PHOSAGRO PJSC, INTERNATIONAL RAW MATERIALS LTD., and KOCH FERTILIZER, LLC,**<br><br>    **Plaintiff-Intervenors,**<br><br>  **v.**<br><br>**UNITED STATES**<br><br>    **Defendant,**<br><br>  **and**<br><br>**THE MOSAIC COMPANY, and J. R. SIMPLOT COMPANY,**<br><br>    **Defendant-Intervenors.** | **Consol. Court No. 21-00219**<br><br><br><br>**NON-CONFIDENTIAL VERSION**<br><br>Business proprietary information removed from pages 25, 26, 27, 42, 46, 47, 50, 51. |

## DEFENDANT-INTERVENORS' JOINT COMMENTS ON THE U.S. INTERNATIONAL TRADE COMMISSION'S SECOND REMAND DETERMINATION

David J. Ross
Stephanie E. Hartmann
Alexandra Maurer
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue, NW.
Washington, DC 20037
(202) 663-6564
stephanie.hartmann@wilmerhale
.com
*Counsel for Defendant-Intervenor*
*The Mosaic Company*

Stephen P. Vaughn
Patrick J. McLain
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500
svaughn@kslaw.com
*Counsel for Defendant-Intervenor*
*J.R. Simplot Company, LLC*
*(formerly J. R. Simplot Company)*

Date: February 13, 2026

# TABLE OF CONTENTS

INTRODUCTION ....................................................................... 1

SUMMARY OF ARGUMENT ................................................... 2

ARGUMENT ............................................................................. 4

I.    Plaintiffs Cannot Use Law-Of-The-Case Doctrine As a
Straitjacket To Block Substantial Evidence Review. .......................... 4

   A.   The Commission Fully Complied With The Court's Broad
Mandate. ....................................................................... 9

   B.   The Law-of-the-Case Doctrine Does Not Apply, Given the
Court's Broad Mandate............................................... 19

II.   The Commission's Analysis of Conditions of Competition Is
Supported by Substantial Evidence.................................................... 23

III.  The Commission's Volume Findings are Supported by
Substantial Evidence.......................................................................... 27

   A.   OCP's Arguments for Adjustments to the Import Data Fail. .... 30

   B.   OCP's Challenge to the Commission's Oversupply Finding Fails.
................................................................................. 31

   C.   OCP's Arguments on Availability of Domestic Supply Fail....... 35

IV.   The Commission's Price Effects Findings Are Supported By
Substantial Evidence.......................................................................... 38

   A.   OCP's Underselling Arguments Fail. ....................................... 39

   B.   OCP's Price Leadership Arguments Fail................................... 43

   C.   OCP's Lost Sales Arguments Fail............................................. 46

V.    The Commission's Impact And Causation Findings Are
Supported By Substantial Evidence. ................................................. 48

CONCLUSION ...................................................................... 54

Pursuant to the Court's rules, and consistent with Federal Circuit Rule 25.1(e)(1)(B), this brief contains confidential material that has been omitted on pages 25, 26, 27, 42, 46, 47, 50, and 51. The material omitted on page 25-27 includes information regarding domestic producers' distribution networks and terms of sale and reporting contained in confidential questionnaire responses. The material omitted on page 42 includes specific data regarding prices compiled from confidential questionnaire responses. The material omitted on pages 46 and 47 includes specific data regarding lost sales compiled from confidential questionnaire responses. The material omitted on pages 50 and 51 includes specific data regarding inventory levels and demand compiled from confidential questionnaire responses. All of the omitted information was treated as business confidential and subject to an administrative protective order by the U.S. International Trade Commission in the underlying proceedings.

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Applegate v. United States*, 52 Fed. Cl. 751 (2002)....................................5

*Biltmore Forest Broadcasting FM, Inc. v. F.C.C.*, 321 F.3d
155 (D.C. Cir. 2003) ...............................................................................7

*Briggs v. Pennsylvania  R. Co.,* 334 U.S. 304 (1948) ................................6

*Canning v. NLRB*, 823 F.3d 76 (D.C. Cir. 2016) ................................ 6, 18

*Central Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573
(Fed. Cir. 1983) .....................................................................................5

*Christianson v. Colt Industries Operating Corp.*, 486 U.S.
800, 817 (1988)), *aff'd*, 70 F. App'x 582 (Fed. Cir. 2003) ....................5

*Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197
(1938)...................................................................................................35

*Containerfreight Transportation Co. v. ICC*, 651 F.2d 668
(9th Cir. 1981).......................................................................................7

*Corus Staal BV v. U.S. Department of Commerce*, 27 CIT
1180, 279 F. Supp. 2d 1363 (2003), *aff'd sub nom. Corus
Staal BV v. Department of Commerce*, 395 F.3d 1343 (Fed.
Cir. 2005)............................................................................. 6, 9, 19-21

*CS Wind Vietnam Co. v. United States*, 219 F. Supp. 3d 1273
(CIT 2017), *aff'd*, 721 F. App'x 993 (Fed. Cir. 2018) ................. 6, 19-21

*CS Wind Vietnam. Co. v. United States*, 832 F.3d 1367 (Fed.
Cir. 2016)............................................................................................33

*Downhole Pipe & Equipment, L.P. v. United States*, 776 F.3d
1369 (Fed. Cir. 2015) .................................................................. 26, 35

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ................................................................................................. 32

*In re NuVasive, Inc.*, 842 F.3d 1376 (Fed. Cir. 2016) ................................ 9

*In re Roberts*, 846 F.2d 1360 (Fed. Cir. 1988) ............................................. 5

*J.E.T.S., Inc. v. U.S.*, 838 F.2d 1196 (Fed. Cir. 1988) ...................... 19, 21

*Lockert v. U.S. Deparment of Labor*, 867 F.2d 513 (9th Cir. 1989) ................................................................................................... 7

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ............. 8, 11

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ................................................................................................... 22

*Nippon Steel Corp. v. International Trade Commission*, 345 F.3d 1379 (Fed. Cir. 2003) ................................................................. 48

*Nucor Corp. v. United States*, 28 CIT 188, 318 F. Supp. 2d 1207 (2004) ............................................................................................. 45

*Nucor Corp. v. United States*, 414 F.3d 1331 (Fed. Cir. 2005) ............... 40

*Princeton Vanguard, LLC v. Frito-Lay North America., Inc.*, 786 F.3d 960 (Fed. Cir. 2015) ............................................................. 10

*PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751 (Fed. Cir. 2012) .................................................................................... 11

*Swiff-Train Co. v. United States*, 793 F.3d 1355 (Fed. Cir. 2015) ................................................................................................... 48

*Trent Tube Division, Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807 (Fed. Cir. 1992) ................................. 7

*Viraj Group v. United States*, 476 F.3d 1349 (Fed. Cir. 2007) ... 10, 17, 18

*Worldwide Door Components, Inc. v. United States*, 119 F.4th 959 (Fed. Cir. 2024) ................................................................. 11

## STATUTES, RULES, AND REGULATIONS

19 U.S.C. § 1671d(b) .................................................................................. 48

19 U.S.C. § 1677(7)(B) ............................................................................... 48

19 U.S.C. § 1677(7)(C) ................................................................... 34, 40, 46

## Glossary of Acronyms and Abbreviatons

| | |
|---|---|
| CVD | Countervailing Duty |
| Commission | United States International Trade Commission |
| Defendant-Intervenors | The Mosaic Company; and J. R. Simplot Company, LLC |
| ITC | United States International Trade Commission |
| ITC Cmts. | Commission's Comments, filed on January 21, 2026 (ECF Nos. 263, 262) |
| Mosaic | The Mosaic Company |
| OCP | OCP S.A. |
| OCP Cmts. | Comments filed by Plaintiff OCP S.A. ("OCP") on October 27, 2025 (ECF Nos. 254, 255) |
| Plaintiffs | OCP S.A.; EuroChem North America Corporation; Phosagro PJSC; International Raw Materials, Ltd.; and Koch Fertilizer, LLC |
| Plaintiff-Intervenors | EuroChem North America Corporation; Phosagro PJSC; International Raw Materials, Ltd.; and Koch Fertilizer, LLC |
| Pl.-Ints. Cmts. | Joint comments filed by Consolidated Plaintiff EuroChem North America Corporation, and Plaintiff-Intervenors Phosagro PJSC, International Raw Materials, Ltd., and Koch Fertilizer, LLC (collectively, "Plaintiff-Intervenors" or "Plaintiffs" if also including OCP) on November 7, 2025 (ECF Nos. 256, 257) |
| POI | Period of Investigation |

| Second Remand Order | Slip Op. 25-51 (Apr. 22, 2025) |
|---|---|
| Second Remand Determination | *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final) (Second Remand) |
| Second Remand Views | Views of the Commission (July 28, 2025) |
| Simplot | J. R. Simplot Company, LLC (formerly J. R. Simplot Company) |

## INTRODUCTION

On behalf of Defendant-Intervenor The Mosaic Company ("Mosaic") and Defendant-Intervenor J.R. Simplot Company, LLC ("Simplot")[1] (collectively, "Defendant-Intervenors"), we hereby submit these joint comments in support of the Second Remand Determination of the U.S. International Trade Commission ("Commission" or "ITC"), dated July 28, 2025, in *Phosphate Fertilizers from Morocco and Russia*, USITC Inv. Nos. 701-TA-650-651 ("Second Remand Views"), APPX0100026-0100128, APPX0021942-0022044.

Defendant-Intervenors support and incorporate by reference the Commission's comments, filed on January 21, 2026 ("ITC Cmts."), ECF Nos. 263, 262. The Commission's comments respond to the comments filed by Plaintiff OCP S.A. ("OCP") on October 27, 2025 ("OCP Cmts."), ECF Nos. 254, 255, and the joint comments filed by Consolidated Plaintiff EuroChem North America Corporation, and Plaintiff-Intervenors Phosagro PJSC, International Raw Materials, Ltd., and

---

[1] In a consent motion filed on February 13, 2026, Simplot notified the court that its name has changed from J. R. Simplot Company to J. R. Simplot Company, LLC, and requested that the caption for this case be amended to reflect this name change.

Koch Fertilizer, LLC (collectively, "Plaintiff-Intervenors" or "Plaintiffs"
if also including OCP) on November 7, 2025 ("Pl.-Ints. Cmts."), ECF
Nos. 256, 257. Defendant-Intervenors' comments seek to complement
the Commission's comments by focusing on certain key issues in this
case.

## SUMMARY OF ARGUMENT

The Second Remand Determination is amply supported by record
evidence and thoroughly explained by the Commission, including with
respect to the issues remanded by the Court and the Plaintiffs'
arguments on remand. This case turns on one simple question: whether
substantial evidence supports the Commission's findings that, by
contributing to oversupply conditions in the U.S. market and offering
competitive and at times lower prices, significant volumes of subsidized
imports from Morocco and Russia were more than a trivial cause of the
price depression and consequent operational harm experienced by the
U.S. phosphate fertilizer industry. The answer to this question is surely
"yes."

In the Second Remand Views, the Commission, as the trier of fact,
cited a wide array of record evidence, in multiple forms and from

2

multiple sources, that allow a reasonable mind to conclude that subject imports contributed in a more than trivial way to the adverse price effects, and thus the adverse impact, experienced by the domestic industry. This evidence includes U.S. producer and importer questionnaire data on shipment volumes, inventories, and prices; U.S. purchaser questionnaire responses; contemporaneous trade publications; the relatively low U.S. prices, compared to global prices, during the subject import oversupply period; and the increase in U.S. prices after subject imports' post-petition withdrawal from the U.S. market. The evidence also includes sworn testimony by OCP's own witnesses that there was a "temporary oversupply" in the U.S. market, APPX0100098 (quoting Mr. Dugan), and that there was "a hangover of phosphate inventories after the 2019 spring season," whereby "{t}he New Orleans price traded at a large discount to the Brazilian price, reflecting this imbalance." *Id.* (quoting Mr. Rahm). The Commission also provided reasonable explanations for its findings.

Given this record, it is not credible to claim that a reasonable mind could not find that subject imports contributed to the domestic industry's injury. Plaintiffs resist this conclusion in two main ways.

3

First, they seek to circumscribe the Court's substantial evidence review with misplaced invocations of the law-of-the-case doctrine. Second, on issue after issue, they ask the Court to re-weigh the evidence despite binding precedents leaving no doubt that it would be improper for the Court to usurp the Commission's role as the trier of fact. The Court should reject Plaintiffs' arguments accordingly.

Below, Defendant-Intervenors confirm that Plaintiffs' claims lack merit with respect to the law-of-the case issue as well as the elements of the Commission's material injury analysis: the conditions of competition, the volume of subject imports, the price effects of subject imports, and the impact of subject imports.

## ARGUMENT

## I.   Plaintiffs Cannot Use Law-Of-The-Case Doctrine As a Straitjacket To Block Substantial Evidence Review.

This Court's task is straightforward: decide whether the Commission's determination that the domestic phosphate industry was materially injured by reason of subject imports between January 2017 and September 2020 is supported by substantial evidence. Unhappy with repeated losses before the Commission and seeking to avoid this Court's fresh evaluation of the record under the substantial evidence

standard, Plaintiffs urge the Court to tie its own hands, insisting that it is bound as matter of law by prior interpretations of the record by a different Judge. OCP Cmts. at 14-17; Pl.-Ints. Cmts. at 12-17. That is wrong. As the Commission properly explains, the question before the Court is whether *this* determination is supported by substantial evidence. *See* ITC Cmts. at 3-6.

The purported basis for tying the Court's hands—the "law of the case" doctrine—is inapplicable and, even if it were properly invoked, is not the straitjacket Plaintiffs suppose. The Federal Circuit recognizes that while a lower "court is without choice in obeying the mandate of the appellate court," it always retains the inherent "authority to reconsider its *own* rulings." *In re Roberts,* 846 F.2d 1360, 1363 (Fed. Cir. 1988). And, in any event, the law-of-the-case doctrine is "more normative than binding," as it "'merely expresses the practice of courts generally to refuse to reopen what has been decided,' but does not 'limit {} their power'" to do so. *Applegate v. United States*, 52 Fed. Cl. 751, 765 (2002) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988)), *aff'd*, 70 F. App'x 582 (Fed. Cir. 2003). In other words, far from "an inexorable command," *Cent. Soya Co. v. Geo. A. Hormel &*

5

*Co.*, 723 F.2d 1573, 1580 (Fed. Cir. 1983), the doctrine need not apply to consideration of a new, more thorough rationale that explains the evidence more clearly and addresses the deficiencies identified previously by the Court—even through explaining why the Court's concerns were misplaced.[2]

Especially in administrative remand contexts, the law-of-the-case doctrine is tempered by "the principle that a 'mandate is to be interpreted reasonably and not in a manner to do injustice.'" *Canning v. NLRB*, 823 F.3d 76, 80 (D.C. Cir. 2016) (citation omitted). Courts have further recognized that "an administrative decision supported by substantial evidence should not be set aside on the ground that a

---

[2] As part of the doctrine, the "mandate rule" dictates that "an inferior court has no power or authority to deviate from the mandate issued by an appellate court." *Briggs v. Pa. R. Co.,* 334 U.S. 304, 306 (1948). While the law-of-the-case doctrine and mandate rule apply "primarily" between "courts of different levels," this Court has recognized that an "administrative agency, on remand from a court, {must} conform its further proceedings in the case to the principles set forth in the judicial decision, unless there is a compelling reason to depart." *Corus Staal BV v. U.S. Dep't of Com.*, 27 CIT 1180, 1184 n.9, 279 F. Supp. 2d 1363, 1368 (2003), *aff'd sub nom. Corus Staal BV v. Dep't of Com.*, 395 F.3d 1343 (Fed. Cir. 2005) (quotations omitted). When interpreting this court's mandate, "'both the letter and the spirit of the mandate must be considered.'" *CS Wind Viet. Co. v. United States*, 219 F. Supp. 3d at 1281 (CIT 2017), *aff'd*, 721 F. App'x 993 (Fed. Cir. 2018) (citation omitted).

decision following a first administrative remand to the {agency} is somehow inconsistent with the law of the case established on the first administrative appeal." *Lockert v. U.S. Dept. of Lab.*, 867 F.2d 513, 517–18 (9th Cir. 1989); *see also Biltmore Forest Broad. FM, Inc. v. F.C.C.*, 321 F.3d 155, 163 (D.C. Cir. 2003) (recognizing the doctrine's "uncertain force in the context of administrative litigation").

Applying those principles here readily supports the conclusion that the Commission on remand was not "obliged to make its final disposition on the basis of the issues framed in the remand order" so long as it complied with the directives of the remand order, which it did. *Containerfreight Transp. Co. v. ICC*, 651 F.2d 668, 671 (9th Cir. 1981). Nor would a different result, even if based on the same evidence, violate the law of the case—the question is only whether the Court, at this time, is satisfied by the Commission's substantial evidence supporting its conclusions. *E.g.*, *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 814 (Fed. Cir. 1992).

Indeed, Plaintiffs' distorted version of the law-of-the-case doctrine would defeat the very purpose of remand: allowing the agency an opportunity to better explain and support its decision. Plaintiffs'

7

argument would transform the law-of-the-case doctrine from a flexible tool into a straitjacket, contrary to both precedent and the purpose of remand. The Court's order expressly authorized the Commission to "take new evidence, reconsider existing evidence, or take any other action allowed by its procedures." Slip Op. 25-51 (Apr. 22, 2025) ("Second Remand Order"), at 49, APPX0000149. And that is precisely what the Commission did: it reevaluated the record in light of the Court's observations and explained its reasoning more fully.

Ultimately, Plaintiffs' extended discussion of the law of the case doctrine should not distract from this Court's core task: determining whether the Commission's Second Remand Determination is supported by substantial evidence—which it is. Properly understood, this Court's role is not to supplant the Commission's task in fact-finding; it is simply to ensure that the Commission's conclusions from those facts are sufficiently explained and supported. *E.g., Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 387 (2024) (noting, with approval, that courts "treat{} agency determinations of fact as binding on the courts, provided that there was 'evidence to support the findings'" (citation omitted)). That is the review Congress intended, and that is what the law

8

requires, as the Commission itself persuasively explains. ITC Cmts. at 3-6.

## A. The Commission Fully Complied With The Court's Broad Mandate.

Plaintiffs' central claim that the Commission "defi{ed}" the Court's instructions is unfounded. Pl.-Ints. Cmts. at 8. No one disputes that the Commission was obligated to follow judicial remand instructions. *See Corus Staal*, 27 CIT at 1184 n.9. The question is whether the Commission somehow violated the prior mandate by doing exactly what substantial evidence review contemplates, and the Court ordered it to do: "examine the relevant data{,} articulate a satisfactory explanation for its action," and provide "a rational connection between the facts found and the choice made." *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016) (internal citations omitted); *see also* APPX0000149 (directing the Commission to "come to a conclusion supported by substantial evidence").

The Court (Judge Vaden) remanded this case to the Commission because it found the First Remand Results "unsupported by substantial evidence" and therefore "not in compliance" with the Court's original remand order. APPX0000149. The principal command of the remand

order was for the Commission to "take care to address each error

identified by the Court and remedy each error in a manner supported by

substantial evidence," APPX0000149—in other words, to remedy each

identified error by "explain{ing} its decisions with sufficient precision,

including the underlying factfindings and the agency's rationale."

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 970

(Fed. Cir. 2015). Critically, Judge Vaden did not purport to

micromanage how the Commission would remedy the identified errors.

To the contrary, the Court provided the flexible instruction that the

Commission could "take new evidence, reconsider existing evidence, *or*

*take any other action allowed by its procedures to come to a conclusion*

*supported by substantial evidence*." APPX0000149 (emphasis added).

The Commission did just that, as explained below and in the

Commission's Comments.

Disagreement with the Court's prior characterizations is not

defiance, but an expected and valuable part of the iterative process of

administrative review. Indeed, the Federal Circuit has repeatedly

recognized that agencies may respectfully disagree with the Court's

prior reasoning on remand. *E.g.*, *Viraj Grp. v. United States*, 476 F.3d

10

1349, 1354 (Fed. Cir. 2007) (Federal Circuit noting—and ultimately upholding—the Commission's "respectful{} disagree{ment}" with the Court of International Trade's rulings on remand); *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 754 n. 2 (Fed. Cir. 2012) (same); *see also Worldwide Door Components, Inc. v. United States*, 119 F.4th 959, 965 (Fed. Cir. 2024) (same, regarding Department of Commerce remand decisions).

The reason for that is simple but fundamental: Congress has assigned the Commission, not the Court, with the task of making factual findings and explaining the underlying determination; the Court's statutory role is limited to ensuring the Commission's findings are supported by substantial evidence. *E.g.*, *PSC VSMPO-Avisma*, 688 F.3d at 761 ("The role of judicial review is limited to determining whether the record is adequate to support the administrative action."); *see also Loper Bright*, 603 U.S. at 392 (discussing the APA and noting requirement that substantial evidence review "of agency policymaking and factfinding be deferential"). If the Court says—as it did here—that the Commission erred in failing to explain itself properly, and the Commission believes that the Court misunderstood its reasoning, the

11

Commission necessarily must explain itself more clearly, which includes correcting the Court's incomplete or incorrect assessment of the record.

What is more, none of the ten instances of alleged "def{iance}" identified by Plaintiffs show anything other than compliance with the Court's flexible remand order. *See* Pl.-Ints. Cmts. at 8-11. In each case, the Commission outlines its points of disagreement generally and then explains that disagreement in depth so as to justify its conclusions more clearly. Whether or not this Court finds that reasoning persuasive under the applicable standard of review is now the question before the Court; nothing in the law-of-the-case doctrine renders the Commission's good faith attempt to explain itself and the record unlawful.

For example, Plaintiff-Intervenors first point to the Commission's disagreement with (1) the Court's characterization that the Commission's "oversupply-based material injury finding collapses like a house of cards" if "domestic producers could not reship their inventories" and (2) the Court's assumption that domestic producers were "poorly positioned to supply the U.S. market." *See* Pl.-Ints. Cmts. at 8-9 (quoting APPX0022059-0022060 (quoting APPX0000127)).

12

In making those statements, the Court also explained that "{i}f the Commission wishes to continue finding that domestic inventory reshipment was part of the conditions of competition in the phosphate fertilizer industry, *it must use record evidence to explain why—despite low volumes of inventory reshipment—domestic producers nonetheless had the capability to place their large inventories back into supply in the domestic phosphate fertilizer market*" and "must *address whatever in the record fairly detracts from its conclusion*." APPX0000127 (emphasis added). In other words, the Court identified how the Commission could remedy its reasoning in order to meet substantial evidence review.

That is exactly what happened here (and what the Plaintiff-Intervenors wrongly characterize as three additional disagreements). In its Second Remand Views, the Commission explained why it "disagreed" as "factual matter{s}," *see* APPX0100057, both that "there were low volumes of inventory reshipment" and that reshipment was a "rare practice" or "commercially insignificant." APPX0000124-0000125. It explained that the totality of the record evidence was more comprehensive regarding reshipment capability and significance than

13

the Court appeared to recognize,[3] and it explained why its methodology

for comparing volume inventories is more reliable than the Court's.

APPX0100053-0100058. Both are consistent with the Court's direction

to "use record evidence to explain" its conclusions regarding low

volumes and reshipment capacities, including by addressing detracting

evidence. APPX0000127.

As Plaintiff-Intervenors next highlight, Pl.-Ints. Cmts. at 9, the

Commission also noted that it generally disagreed with the Court's

assessment that the questionnaire responses indicate an inability to

relocate inventories and that domestic producers' ability to relocate

inventories already shipped to the ultimate destination was central to

its injury analysis. APPX0100053-0100057. Here again, the Commission

did exactly what the Court directed. It explained, citing record evidence

derived from the questionnaire data, that "the evidence shows that the

domestic industry had excess capacity, substantial inventories, a

demonstrated ability to move appreciable quantities of product between

downstream inventory locations, and superior distribution networks,

---

[3] While the Court is required to consider the totality of the evidence, its opinion apparently considered only the cited examples provided by the Commission.  APPX0100057 (citing APPX0000124-0000125).

which enabled them to employ alternative means to ship products that were unable to be moved via barge." APPX0100059-0100060. The question is not whether the Commission disagreed with the Court, it is whether—as the Court mandated—its explanation of domestic reshipment capacity was supported by the "substantial evidence" it cited. APPX0000149.

Additionally, regarding the alleged supply gap and the volumes of imports, the Commission noted that it disagreed with the Court's assumption that a "supply gap" existed, even accounting for Mosaic's "alleged refusal to sell." APPX0100048-0100049. Moreover, the Court did not, as Plaintiff-Intervenors posit, "ma{ke} clear findings on this matter." Rather, the Court stated that it "ha{d} no way of knowing" whether the Commission analyzed possible flaws in the questionnaire data it relied upon and whether the import volumes examined included re-exported volumes. APPX0000137. In other words, the Court did not hold that the questionnaire responses were inherently unreliable; it merely held that the Commission had not adequately explained why it found them reliable, including by considering the flaws alleged by Plaintiffs. APPX0000109. And on remand, the Commission specifically

15

explained why it disagreed that the questionnaire data was "inaccurate"
or "artificially inflated," providing a coherent explanation for why the
questionnaire data was reliable and answering the Court's related
questions. APPX0100062-0100065. And keeping with the Court's
remand order, the Commission discussed specifically Mosaic's alleged
refusal to sell in relation to a purported supply gap. *See* APPX0000148;
APPX0100116-0100125. As for the so-called "supply gap," the
Commission again explained why no such gap existed, citing extensive
record evidence. *See* APPX0100044-0100049, APPX0100065,
APPX0100081, APPX0100114, APPX0100121. The Commission also
explained more clearly that the Court misapprehended the relevance of
the reshipment and supply gap issues to its analysis, and that this issue
was only one of several factors underpinning its determination.
APPX0100036 ("domestic producers' ability to reship inventories was
only one factor, along with their excess capacity, substantial
inventories, extensive inventory locations, and expansive multi-modal
distribution network"). Such an explanation does not violate any
mandate—it is "us{ing} record evidence" to "continue finding that
domestic inventory reshipment was part of the conditions of competition

16

in the phosphate fertilizer industry," APPX0000127—exactly what the Court directed in its mandate that the Commission "come to a conclusion supported by substantial evidence." APPX0000149.

And far from "ignor{ing}" the Court's directive to "grapple with the fact that imports only undersold domestic product in twenty percent of instances," *see* Pl.-Ints. Cmts. at 11 (quoting APPX0000149), the Commission specifically explained why it disagreed with the Court's inferences and how it did grapple with those very considerations. *See* APPX0100070, APPX0100075.

It is completely legitimate for the Commission to voice its disagreement with the Court's interpretation of its statutory and regulatory mandate in analyzing this issue. In *Viraj*, the Commerce Department noted its "respectful disagreement" with the Court of International Trade's order that it not "collapse" certain business units of the Viraj Group parent-entity in calculating "antidumping" fees, and voiced its disagreement regarding whether it had a "prior practice" of not collapsing the Viraj Group for these purposes. *Viraj*, 476 F.3d at 1354. The Federal Circuit had no issue with the agency voicing its disagreement. In fact, it ultimately reversed the Court of International

17

Trade and agreed with the agency—not the Court of International

Trade—regarding the interpretation of the regulation at issue. *Viraj*,

476 F.3d at 1356-59. So too here, there is simply no impropriety in the

Commission voicing its disagreement with the Court's mistaken

understanding of the both the record and the Commission's obligations.

In sum, the Court ordered reconsideration of certain evidence and

factors—which the Commission did—but it did not order a narrow

remand to produce a specific outcome. It broadly left it to the

Commission to justify its second remand determination with substantial

evidence. *See* APPX0000149 (mandate to "take new evidence, reconsider

existing evidence, or take any other action allowed by its procedures to

come to a conclusion supported by substantial evidence."). It would

violate "the principle that a mandate is to be interpreted reasonably and

not in a manner to do injustice" to suggest that the Commission was

forbidden from better explaining the record evidence and why, in its

view, the Court misunderstood its analysis. *Canning*, 823 F.3d at 80

(quotation omitted).

## B.    The Law-of-the-Case Doctrine Does Not Apply, Given the Court's Broad Mandate.

Even if the law-of-the-case were relevant, Plaintiffs rely on inapposite caselaw in an attempt to bind this Court (Judge Miller Baker) to the Court's (Judge Vaden's) previous assumptions and interpretations in its previous substantial evidence assessments. *See* OCP Cmts. at 15-16. The cases they cite all involved narrow, outcome-determinative remand orders, not the broad, open-ended mandate issued here. *Id.* (citing *Corus Staal*, 27 CIT at 1184; *CS Wind Vietnam Co. v. United States*, 219 F. Supp. 3d at 1281; *J.E.T.S., Inc. v. U.S.*, 838 F.2d 1196, 1200 (Fed. Cir. 1988).

The Second Remand Order here specifically contemplated that the new Views would "remedy each error in a manner supported by substantial evidence." APPX0000149. The broad mandate expressly directed the Commission to "take new evidence, reconsider existing evidence, or take any other action allowed by its procedures to come to *a* conclusion"—not a specific conclusion—"supported by substantial evidence." *Id.* (emphasis added). Given that broad mandate, the Court is not now bound by assessments of the Commission's previous marshaling of evidence. As discussed, the Commission complied entirely with the

mandate: it reconsidered the evidence in light of the Court's observations and provided fuller explanations of its reasoning, as it is allowed.

Nor do the cases Plaintiffs rely upon suggest differently. In *Corus Staal*, the remand was limited to a single question: when to calculate a certain *start* date. The Commerce Department violated the "limited remand instruction" by examining a "new issue"—when to calculate an *end* date—on remand. *Corus Staal*, 27 CIT at 1184.

Similarly, in *CS Wind Vietnam*, the court explained that the Federal Circuit mandated that the Commerce Department use a specific dataset on remand. The court noted that the Federal Circuit had found that only one of two datasets was supported by substantial evidence and thus ordered the use of the supported dataset. While the Court noted the "unusual" nature of the narrow remand direction and that the Federal Circuit could have ordered a "more open remand to let Commerce further consider its choice or even reopen the record," it explained that Commerce was bound by the very specific remand instructions from the Federal Circuit to use the specific dataset in question. *CS Wind Vietnam*, 219 F. Supp. 3d at 1282. Notably, the

20

"more open remand" referenced by the Federal Circuit is exactly what the Court issued here in its Second Remand Order. *See* APPX0000149.

The third case on which Plaintiffs rely is inapposite both because of the narrow remand order at issue there and the distinct factual circumstances of the case. In *J.E.T.S.* the Armed Services Board of Contract Appeals denied a contractor's claim for an equitable adjustment in a contract price after previously holding that the contractor *was* entitled to such an adjustment and remanding to the contracting officer to determine the appropriate amount. *J.E.T.S.*, 838 F.2d at 1197. After the contracting officer then denied any award, the contractor's parent corporation was convicted of fraud against the government and the contract at issue was resultingly set aside. *Id.* On the basis of those fraud convictions, the court held that the contractor was not entitled to recover after all—contradicting its original mandate—because the contract had been "permeated with fraud" and to adhere to the original mandate would work a manifest injustice. *Id.* at 1200. As with *Corus Staal* and *CS Wind Vietnam*, the mandate at issue was exceedingly narrow: ordering a calculation to produce a specific

outcome. Moreover, the Federal Circuit ultimately found that an exception to the general law-of-the-case principles applied.

Here, by contrast, the Court's Second Remand Order was broad and flexible. It did not require any outcome, and to the extent it directed the Commission to consider certain evidence or explain its reasoning and methodology more clearly, the Commission did so (as discussed *supra*). *See* APPX0000149. The law-of-the-case doctrine does not—and cannot—override the statutory requirement for substantial evidence review. The Commission's Second Remand Determination is supported by substantial evidence, including its analysis of the issues identified in the Second Remand Order. Thus, the only question before the Court is whether the *current* explanations in the *current* Views are "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quotation omitted). The law-of-the-case doctrine is simply a sideshow.

For these reasons, the Court should reject Plaintiff's invitation to abdicate its review function and blindly apply Judge Vaden's findings as

the "law of the case," and instead evaluate the Commission's Second Remand Determination for substantial evidence, as the law requires.

## II.    The Commission's Analysis of Conditions of Competition Is Supported by Substantial Evidence

Plaintiff OCP argues that "the Commission made a 'key finding' that 'undergird{s} the Commission's determination' and was unsupported by substantial evidence: that inventories, which had already been delivered to regions affected by bad weather and low fertilizer demand in 2018-2019, were available to the rest of the market through reshipment, such that additional imports were not necessary." OCP Cmts. at 8-9. But the Commission made no such finding. Rather, Plaintiff OCP cites Judge Vaden's opinions that this was a "key finding" that "undergird{s} the Commission's determination." APPX0000003. *See also* APPX0000029, APPX0000117-0000118.

The Commission explained why it disagreed, APPX0100035, and specifically addressed the central premise of this so-called "key finding" – *i.e.*, that domestic producers would have had to "reship" inventories of fertilizer *that had already been delivered* to regions affected by widespread flooding in order to meet customer demand elsewhere in the market. APPX0100035-0100036. The Commission clarified that its

23

original finding pertained to testimony from certain U.S. importers that they could not serve their U.S. customers from existing, built-up inventories or from product that sat on barges on the Mississippi River system. *Id.* The Commission noted that the domestic industry did not report the same constraints. *Id.* The Commission then rejected the flawed premise that domestic producers could only meet new market demand by reshipping inventories of *already delivered fertilizer*,[4] APPX0100048, and identified several other factors and numerous pieces of record evidence in support of its conclusion that the domestic industry was well-positioned to meet demand. APPX0100036, APPX0100048-0100049, APPX0100053-0100056.

Plaintiff OCP criticizes the Commission for "attempt{ing} to split its reshipment finding into {four} separate 'factors." OCP Cmts. at 9. However, providing this more fulsome explanation of the record evidence is exactly what the Commission was tasked on remand. *See* discussion *supra*, section I.A. Plaintiff OCP asserts the Commission's consideration of the four separate factors – (1) excess capacity; (2)

---

4 Plaintiff OCP later describes these inventories as "inventories that already reached their intended destination." OCP Cmts. at 14 (emphasis original).

24

*PROPRIETARY INFORMATION SUBJECT TO PROTECTIVE ORDER REMOVED*

substantial inventories; (3) extensive inventory locations; and (4) an expansive multi-modal distribution network – are "just facets of the same inventory reshipment finding." OCP Cmts. at 10. But this criticism assumes the same flawed premise—that only inventories *which had already been delivered to customers* are relevant to the Commission's analysis. The Commission explained why this is not so. APPX0100057.

Plaintiff OCP argues further that the Commission's "assumption that the domestic industry's distribution networks are *multidirectional* and can 'relocate' fertilizer remains unsupported by the record." OCP Cmts. at 11. But the Commission made no such unsupported assumption. Rather, the Commission explained over eight pages with more than 40 citations how domestic producers have expansive multi-modal distribution networks that are multidirectional and can move inventories between inventory locations throughout the United States. APPX0100052-0100061.

Plaintiff OCP claims "there is no evidence of actual multidirectional shipment" because "the Commission cites movement between [ description ] locations and [ description] warehouses, or

25

between [ description ] locations and [ description ] warehouses." OCP Cmts. at 14. Plaintiff OCP characterizes these types of movements as "steps in the typical unidirectional distribution chain." *Id.* However, Mosaic—whose questionnaire responses the Commission cited—itself described the movements as multidirectional. APPX0100054-0100055. The Commission reasonably accorded greater weight to Mosaic's descriptions of its own distribution network and dismissed Plaintiffs' arguments based on the unidirectional nature of *importers*' distribution networks.[5] APPX0100054-0100060. The Court should reject Plaintiffs' invitation to reweigh the evidence. *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015).

Plaintiff OCP criticizes the Commission's reliance on evidence of so-called [description] inventory movements because it asserts that "none

---

5 Another key distinction between [ name ] distribution network and importers' distribution networks is the fact that [ description of terms of sale ]. APPX0100060. By contrast, OCP and other importers reported that they [ same ], *see id.*, which constrains importers from moving inventories. This helps explain why importers reported that their distribution networks are "'unidirectional,' such that once delivered to an inventory or customer location, subject merchandise was not subsequently relocated but rather remained at that location." *Id.*

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REMOVED

of the Commission's examples indicate whether these 'relocations' involved inter-regional shipment." OCP Cmts. at 16. Plaintiff OCP also claims there is no evidence "*affirmatively* demonstrating that domestic producers could serve the domestic market from existing inventories located in low-demand regions." OCP Cmts. at 17. This is false. The Commission cited evidence from Mosaic's questionnaire response describing how Mosaic moved existing inventories between locations in different regions to meet customer demand. APPX0100058-0100059. Mosaic's questionnaire response also provided **[** description of questionnaire response

**]**. APPX0099776.

In sum, the Commission's Second Remand Views provide a reasoned explanation supported by substantial evidence for the Commission's conclusion that the domestic industry was well-positioned to meet market demand and capable of moving inventories as needed. The Court should affirm these findings.

## III.   The Commission's Volume Findings are Supported by Substantial Evidence.

Plaintiff OCP argues that the Commission's volume analysis is unsupported by substantial evidence and does not comply with the

Court's remand order because the Commission "continues to find that when demand declined in 2019 due to unusually poor weather conditions, 'subject imports exceeded demand in the contracting U.S. market . . . contributing to oversupply conditions." OCP Cmts. at 18 (citing APPX0100094). Plaintiff OCP mischaracterizes the Commission's volume findings. The quoted language is from the Commission's analysis of price effects, not volume. *See* APPX0100094. Further, Plaintiffs' arguments pertaining to Mosaic's alleged refusal to sell – which OCP characterized as part of the volume analysis – are addressed in the Commission's impact analysis and consideration of non-attribution factors. *See* APPX0100067-0100068, APPX0100116-0100117.

The Commission's volume analysis properly focused on the actual volume of cumulated subject imports – which was significant in each full year of the period of investigation ("POI") and interim periods – and subject imports' increase in market share at the expense of the domestic industry. APPX0100062-0100063. The Commission considered both the official U.S. import statistics and the U.S. shipment data reported in the U.S. importer questionnaire responses. *See id.*

The Court directed the Commission to reconsider its reliance on the questionnaire data, which it found to be "inaccurate" or "artificially inflated" because of Plaintiffs' concerns about potential re-exports to Canada. APPX0000135-0000137. The Commission explained that it disagreed that the questionnaire data are inaccurate, APPX0100064, and further explained that the questionnaires also collected data on U.S. importers' export shipments. APPX0100065. Even adjusting the shipment data for U.S. importers' reported export shipments (*i.e.*, the volumes re-exported to Canada), the Commission continued to find the volume of cumulated subject imports was significant and increased over the POI. *Id.* The Commission thus followed the Court's direction to assess the volume of imports actually consumed in the United States, and its findings are supported by substantial evidence.[6]

_____

6 Plaintiff OCP criticizes the Commission for "fail{ing} to disentangle import and U.S. shipment data" and "blam{ing} importers for the erroneous data on which it relied," OCP Cmts. at 25-26, but fails to acknowledge that the Commission explicitly addressed the Court's concerns and considered the U.S. shipment data adjusted for reported re-exports, and still found cumulated subject import volumes to be significant. APPX0100065.

## A.    OCP's Arguments for Adjustments to the Import Data Fail.

The Commission properly rejected Plaintiff OCP's argument that it should reduce the volume of cumulated subject imports by certain distributors' total purchases, because it found "the record does not show that the domestic industry categorically refused to supply them but rather that Mosaic would not sell to them at their preferred prices." APPX0100066.

Plaintiff OCP complains that this is "an entirely new and unsupported justification," OCP Cmts. at 20, but once again ignores that the very purpose of a remand is for the agency to provide more fulsome explanation of its decisionmaking. Plaintiff OCP also criticizes the Commission for crediting "an unsubstantiated claim by Mosaic" and "a single piece of evidence—from years before the POI," OCP Cmts. at 21, and claims "abundant record evidence demonstrates that domestic producers refused to supply domestic distributors." *Id.* But the Commission addressed Plaintiffs' allegations regarding Mosaic's alleged refusal to supply at length in its price effects analysis, providing detailed explanations on a customer-by-customer basis over five pages

30

with dozens of citations. APPX0100116-0100121. The Court should reject Plaintiffs' invitation to reweigh the evidence.

## B. OCP's Challenge to the Commission's Oversupply Finding Fails.

Plaintiffs also take issue with the Commission's "ultimate finding that subject imports caused injury by creating 'oversupply conditions.'" OCP Cmts. at 28. As a threshold matter, the Commission made findings on oversupply conditions in its price effects analysis, not in its volume analysis, and thus this is not a basis for concluding the latter is unsupported by substantial evidence. Nonetheless, Plaintiffs once again mischaracterize the Commission's findings and the relevance of those findings to the volume analysis.

In the first remand, the Commission found that "subject imports – through their significant volumes . . . *contributed* to the oversupply conditions in the U.S. market during the POI . . . ." APPX0100030 (emphasis added). In the second remand, the Commission re-affirmed this finding, APPX0100085 ("cumulated subject imports entered the U.S. market in significant volumes, contributed to oversupply conditions, and depressed U.S. prices to a significant degree"), and also stated that the "oversupply of subject imports and their competitive and

31

lower prices . . . exerted downward pricing pressure . . . in 2019."
APPX0100086.

The Commission detailed over three pages with multiple footnotes
the numerous pieces of record evidence showing oversupply conditions
in the market. APPX0100083-0100085. The Commission also cited
respondent witness testimony conceding that there was a "temporary
oversupply" in the U.S. market and a "hangover of phosphate
inventories after the 2019 spring season." APPX0100098. Under the
Commission's causation standard, there may be more than one causal
factor of injury; subject imports need only be more than a "tangential" or
"immaterial" cause. *See, e.g., Gerald Metals, Inc. v. United States*, 132
F.3d 716, 719-20 (Fed. Cir. 1997). Here, the Commission supported its
finding that subject imports *contributed* to oversupply conditions with
substantial record evidence, including confidential data on import
volumes and inventories; contemporaneous industry reports; and
importers' testimony. APPX0100083-0100085. Plaintiffs fail to point to
any evidence that fairly detracts from the Commission's findings that

subject import volumes were significant and contributed to oversupply

conditions in the market.[7]

Moreover, Plaintiff OCP effectively agrees with the Commission's

ultimate findings that U.S. shipments of subject imports increased by

753,638 ST from 2017 to 2019, and that subject imports increased by

592,154 ST from 2017 to 2019, when adjusted for importers' reported re-

exports. OCP Cmts. at 30, 36.[8] While Plaintiff OCP characterizes this as

_____

7 Plaintiff OCP asserts the Commission's statement that respondent witnesses conceded that there was a "temporary oversupply" in the U.S. market is "false." OCP Cmts. at 34. Plaintiff OCP is wrong. The Commission provided citations to the hearing transcript and quoted their testimony verbatim. APPX0100098. Plaintiff OCP's efforts to rehabilitate its witnesses' testimony fall short of identifying contradictory evidence that could detract from the substantiality of the evidence the Commission relied on. *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (citation omitted).

8 Importers' relatively higher shipments of subject imports into the U.S. market as compared to their net U.S. imports is due to U.S. importers' having built up substantial inventories between 2017 and 2019. *See* APPX0100029-0100030; APPX0100080-0100081. The Commission found that, as demand began to decline in the fall of 2018, U.S. importers' inventories were at a high point, and "{n}otwithstanding these substantial inventories and declining demand, subject imports surged into the U.S. market in January 2019 and continued to flow into the U.S. market in substantial quantities" in 2019, even as demand continued to decline. *Id.* U.S. importers' quarterly inventories reached their highest level in March 2019, and subject imports continued to enter the market "in excess of any purported need to replenish depleted inventories in the latter part of 2019." APPX0100030. These findings are supported by substantial record evidence.

only a "modest" increase, *see id.*, this does not contradict the

Commission's finding that subject import volumes were significant, and

increased significantly over the POI, and *contributed* to oversupply

conditions in 2019.

Plaintiff OCP also argues that a 592,154 ST increase in subject

imports between 2017 and 2019 is "significantly less" than what it

alleges as a decrease in U.S. supply related to Mosaic's Plant City

facility and Nutrien's Redwater, Canada facility. OCP Cmts. at 37.

Plaintiff OCP also argues that subject imports adjusted "more quickly"

to market conditions in 2019-2020 or made "larger" adjustments than

the domestic industry. OCP Cmts. at 33. However, as the Commission

noted, the statute directs the Commission to consider "whether the

volume of imports of the merchandise, or any increase in that volume,

either in absolute terms or relative to production or consumption in the

United States, is significant." 19 U.S.C. § 1677(7)(C)(i). The statute does

not require the Commission to assess the significance of subject import

volumes relative to the U.S. supply-demand balance (*i.e.*, the so-called

"supply gap"). Thus, Plaintiff OCP fails to show that the Commission's

volume analysis was inconsistent with the statute.

34

Rather, Plaintiff OCP merely argues the Commission's finding that subject imports contributed to oversupply conditions is unsupported. OCP Cmts. at 37-38. But Plaintiff OCP fails to account for other evidence the Commission relied upon, including the relatively larger increase in U.S. importers' *shipments* of subject imports between 2017 and 2019 and high levels of inventories in a period of declining demand. APPX0100029-0100030, APPX0100080-0100081, APPX0100082-0100083. This evidence is more than "more than a mere scintilla" and amounts to what a "reasonable mind might accept as adequate to support" the Commission's conclusion that subject imports contributed to oversupply conditions. *Downhole Pipe*, 776 F.3d at 1374 (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).

## C.    OCP's Arguments on Availability of Domestic Supply Fail.

Plaintiff OCP argues the Commission's findings on the availability of domestic supply – including with respect to Mosaic's idling and closure of Plant City in 2017; Nutrien's announced closure of a facility in Redwater, Ontario, Canada in 2018; and the domestic industry's reported available excess capacity – are unsupported. OCP Cmts. at 28-32. OCP is wrong, as the Commission explained. ITC Cmts. at 50-54.

But in any event, none of the evidence Plaintiff OCP cites contradicts the Commission's findings that subject import volumes were significant throughout the POI and contributed to oversupply conditions in 2019.

For example, Plaintiff OCP takes issue with the Commission's decision to accord less weight to a statement made by Mosaic's CEO on a 2019 earnings call about the decision to idle Plant City in 2017, as compared to Mosaic's certified U.S. producer questionnaire response, which was prepared based on its audited financial reports. OCP Cmts. at 29-30. It is not the Court's role to second-guess the Commission's weighing of these facts.

Plaintiff OCP also criticizes the Commission for giving greater weight to evidence of Nutrien's plans to increase U.S. production to offset the impact of closure of its Redwater, Ontario, Canada facility, as compared to other evidence of purportedly "broader" "market dynamics" between the United States and Canada. OCP Cmts. at 30-31. But once again, the facts OCP points to do not contradict the Commission's finding that subject import volumes were significant and *contributed* to oversupply conditions in 2019, and it is not the Court's role to reweigh the evidence.

Plaintiff OCP also claims the Commission "fails to address evidence demonstrating that the excess capacity claimed by domestic producers was exaggerated or simply false." OCP Cmts. at 31. The Commission reasonably relied on U.S. producers' capacity and production data reported in the certified questionnaire responses as evidence of the domestic industry's excess capacity throughout the POI. *See* APPX0100114. Plaintiff OCP argues that the Commission acknowledged "Mosaic turned away large domestic customers beginning in 2020 due to tight supplies," OCP Cmts. at 31, referring to evidence of the "supply shock" that occurred post-petition, *i.e.*, starting in June 2020, when subject imports abruptly withdrew from the market. *See* APPX0100118. Plaintiff OCP also points to Mosaic's somewhat lower production in interim 2020 as compared to interim 2019, OCP Cmts. at 32, but ignores that the interim period spanned January through September 2020 and thus largely reflects market conditions prior to subject imports' abrupt departure from the market in June 2020. *See* APPX0098434.

Mosaic explained that it could not immediately increase production in response to this unexpected market development late in

the POI and it instead responded by diverting shipments intended for export markets and drawing down inventories. APPX0100123. The evidence Plaintiff OCP points to thus does not "fairly detract" from the substantiality of the evidence the Commission relied on, *i.e.*, the domestic industry's reported excess capacity throughout the POI, and particularly in 2019 when the Commission found evidence of oversupply conditions.

In sum, Plaintiffs fail to demonstrate that the Commission's volume analysis is unsupported by substantial evidence or otherwise not in accordance with law. The Court should therefore affirm the Commission's findings in the Second Remand Determination.

## IV. The Commission's Price Effects Findings Are Supported By Substantial Evidence.

Plaintiffs' various criticisms of the Commission's price effects findings fail to undermine the overwhelming and multi-faceted record evidence supporting the conclusion that subject imports had adverse price effects in the form of significant price depression. As the Commission found, significant volumes of subject imports significantly depressed U.S. producers' prices by "contributing to oversupply conditions and being offered at competitive and low prices in a highly

38

transparent market." APPX0100098. This finding rests on a broad range of mutually-reinforcing evidence from a variety of sources, as detailed below. Given this evidence and the Commission's thorough and well-reasoned explanation of the findings based on it, Plaintiffs cannot credibly claim that it was unreasonable for the Commission to find that subject imports significantly depressed U.S. prices. Below, we confirm this with respect to Plaintiffs' claims regarding underselling, price leadership, and lost sales.

### A.    OCP's Underselling Arguments Fail.

OCP makes two arguments regarding "underselling data," both of which lack merit. OCP Cmts. at 39-44.

*First*, OCP contends that the Commission "fails to provide a rational connection between its recognition of the 'prevalence of overselling' and its finding that subject imports were lower priced and caused lost sales and price depression." OCP Cmts. at 40-41. No such failing exists.

The Commission clearly explained that, under the statute and court precedents, the underselling analysis is "separate and distinct" from the price depression analysis. APPX0100101. Given this

39

distinction, the Commission reasonably explained – after thoroughly analyzing voluminous evidence from myriad sources – that subject imports significantly depressed prices, notwithstanding the prevalence of overselling and the absence of an underselling finding. APPX0100102.

Contrary to OCP's claim, the "path of the agency" is easy to discern here. *Cf.* OCP Cmts. at 41 (quoting *Nucor Corp. v. United States*, 414 F.3d 1331, 1339 (Fed. Cir. 2005)). Indeed, given that subject imports contributed to oversupply conditions in the U.S. market as demand fell from late 2018, and given that subject imports were "competitively and lower priced" in this declining market, those imports exerted downward pressure on U.S. producers' prices regardless of whether the price comparisons indicate underselling. *See, e.g.,* APPX0100098; APPX0100104. This conclusion is plainly consistent with the statute's instruction that the Commission consider, in addition to underselling, whether the effect of subject imports "*otherwise* depresses prices to a significant degree . . . ." 19 U.S.C. § 1677(7)(C)(ii)(II) (emphasis added).

*Second*, OCP criticizes the Commission for supposedly giving "decisive weight" to trade publications over the "underselling data" in

finding that subject imports were lower priced, but this argument is misplaced. *See* OCP Cmts. at 42-44. In fact, the Commission explained that its finding that "subject imports were at times priced lower" is the result of "a comprehensive analysis of the role of subject import prices on prices for the domestic product, based on the totality of record evidence." APPX0100102.

The totality of the record evidence includes the following:

(i)     information establishing that the U.S. phosphate fertilizer market is nationwide and highly transparent in terms of pricing, where the f.o.b. NOLA price serves as a universal price benchmark for phosphate fertilizer prices across the U.S. market and market participants refer to NOLA pricing that trade publications publish on a daily or weekly basis, APPX0100071; APPX0100074; APPX0100095;

(ii)    price comparison data (what OCP refers to as the "underselling data") showing that subject import prices and domestic prices tracked each other closely, with small margins between the two, APPX0100072;

41

*PROPRIETARY INFORMATION SUBJECT*
*TO PROTECTIVE ORDER REMOVED*

(iii)    contemporaneous documentation showing that U.S.
importers were **[**   importer behavior

**]** in January 2019, APPX0100096-0100097;

(iv)    individual U.S. purchaser questionnaire reporting,
APPX0100097;

(v)    a sworn declaration from Simplot's Vice President of
Wholesale Sales with supporting documentation, *id.*;

(vi)    seven U.S. purchasers reporting that U.S. producers lowered
prices to compete with lower-priced subject imports, *id.*; and

(vii)    data showing that **[**   identity   **]** "was the lowest priced in
the U.S. market" in **[**   pricing reference   **]**.
APPX0100097.

Given this evidence, the Commission has an ample evidentiary
basis to support its conclusion that subject import and domestic prices
were closely comparable – as would be expected in such a transparent,
nationwide commodity market – and that subject import prices were at
times low priced as the market declined from 2018 to 2019. *See*
APPX0100102. Accordingly, when the Commission referred to trade
publications in addressing OCP's claim regarding underselling, the

agency did not give decisive weight to trade publications. Rather, the

Commission explained that trade publications are a mechanism for

transmitting pricing information throughout the U.S. market, which

helps to explain why instances of low pricing by subject imports during

the critical 2018-2019 period contributed to their overall price-

depressing effects. *See id.* The prevalence of overselling in the price

comparison data does nothing to undermine this reasoning or the

evidence on which it is based. Thus, OCP's claims regarding the so-

called underselling data fail to show that the Commission's price effects

findings are unsupported by substantial evidence.

## B.    OCP's Price Leadership Arguments Fail.

OCP contends that the Commission failed to adequately address

purchaser responses identifying Mosaic as the price leader. OCP Cmts.

at 45-48. To the contrary, the Commission engaged with the record

evidence and reasonably explained that Mosaic being the most-

frequently cited price leader is not incompatible with its finding that

subject imports significantly depressed prices. APPX0100099-0100101.

Indeed, OCP has misconstrued both the Commission's price depression

43

finding and the meaning of price leadership in the Commission's analysis. As a result, its argument collapses.

OCP characterizes price leadership responses as establishing that Mosaic sets prices in the market – "that Mosaic is the first mover on prices, whether up or down" – and that other firms follow. OCP Cmts. at 46-47. According to OCP, the price leadership responses mean that subject import prices could not have forced Mosaic to lower its prices. *Id.* at 47. In other words, OCP asks the Court to treat the price leadership information as determinative in the price depression analysis. OCP is mistaken for the reasons explained below.

As an initial matter, subject import prices may exert downward pressure on prices by oversupplying the market, as they did here, regardless of whether subject imports are also priced lower than the domestic like product in one or more instances (which was also the case here). *See* APPX0100097-0100098 (summarizing subject imports' oversupply effects on prices and then explaining that the record "also shows" subject imports were offered at low prices in some instances). Thus, OCP's entire claim on price leadership proceeds from a false premise.

OCP also bases its claim on an incomplete, and logically faulty, understanding of what it means to be a price leader. As the Commission explained, its questionnaires define "price leader" to include "one or more firms that have a significant impact on price," and the definition plainly states that *"{a} price leader is not necessarily the lowest priced supplier.*" APPX0100100. In other words, a firm may have a significant impact on price – and thus fall within the definition of "price leader" – without necessarily leading prices upward or downward, and without being the lowest priced supplier.

Thus, no contradiction exists between the price leadership reporting and the Commission's finding that subject imports depressed prices – including by being low priced in some instances. Accordingly, the Commission reasonably rejected the premise underlying OCP's claim – that a firm identified as a price leader cannot suffer adverse price effects from competitors or an oversupplied market. *Id.* Indeed, this Court has similarly rejected arguments according greater weight to price leadership, as the Commission noted. *Id.* (citing *Nucor Corp. v. United States*, 28 CIT 188, 246, 318 F. Supp. 2d 1207, 1257 (2004)).

45

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REMOVED

For these reasons and those in the Commission's comments, the Court should reject OCP's claim regarding price leadership.

### C.    OCP's Lost Sales Arguments Fail.

OCP claims that the Commission's lost sales finding regarding [ name ] is unsupported by substantial evidence. OCP Cmts. at 47-56. The Commission's comments demonstrate that this claim fails because it represents an invitation to improperly re-weigh the evidence. ITC Cmts. at 31-34. Accordingly, Defendant-Intervenors will only underscore two important points on this issue.

In an apparent attempt to overstate the implications of its claim, OCP incorrectly characterizes the Commission's lost sales finding as "key" to its conclusion "that subject imports caused price depression in 2019" and as a partial "retreat" from its prior lost sales finding. *See* OCP Cmts. at 49, 55-56. In fact, the Commission's price depression finding does not depend on its lost sales finding.

The statute does not require the consideration, or a finding, of lost sales for purposes of a price depression finding. *Cf.* 19 U.S.C. § 1677(7)(C)(ii). Furthermore, the Commission's reasoning regarding price depression is not predicated on the existence of lost sales *per se*. Rather,

46

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REMOVED

the Commission explained that subject imports depressed domestic

producers' prices in two main ways: (1) by contributing to oversupply

conditions, and (2) by being offered at prices that were competitive and,

in some instances, lower than the domestic industry's prices, which

added to the downward price pressure from oversupply. *See, e.g.,*

APPX0100098; APPX0100102; APPX0100104. Those same findings are

supported by multiple sources of substantial evidence apart from

[ name ] lost sales. APPX0100077-0100078. Nevertheless, the

record evidence of [ name ] reporting of lost sales and lost

revenues also supports these findings – particularly with respect to the

added pressure imposed by lower-priced subject imports – by

corroborating what the other evidence shows, as the Commission

explained. APPX0100077. Moreover, the other evidence corroborates

[ name ] reporting, including purchaser surveys on relative prices

and documentation of "other instances in which importers of subject

imports offered prices below those of the domestic industry."

APPX0100078.

Thus, contrary to OCP's claim, the Commission's lost sales finding

is but one of many elements supporting its price depression finding, and

47

rather than "retreat" from its prior findings, the Commission further explained how the lost sales finding relates to those other elements. These considerations serve to confirm what the Commission's brief shows: that the lost sales finding is supported by substantial evidence.

## V.    The Commission's Impact And Causation Findings Are Supported By Substantial Evidence.

Plaintiffs contend that the Commission lacked substantial evidence for its conclusion that the domestic industry is materially injured "by reason of" subject imports. *See* OCP Cmts. at 57-59; Pl.-Ints. Cmts. at 32-39. Under the statute's "by reason of" causation standard, 19 U.S.C. §§ 1671d(b), 1677(7)(B)(i)-(ii), the injurious effects of subject imports satisfy the standard where they are more than "merely incidental, tangential, or trivial," and the unfair trade "need not be the sole or principal cause of injury." *Nippon Steel Corporation v. Int'l Trade Comm'n*, 345 F.3d 1379, 1384 (Fed. Cir. 2003); *see also Swiff-Train Co. v. United States*, 793 F.3d 1355 (Fed. Cir. 2015). To its credit, OCP acknowledges this standard and prior Commission determinations finding no injury where non-import factors "fully explain any observed poor performance." OCP Cmts. at 58. But under this causation standard, and the substantial evidence standard of review that the

Court must apply, OCP has undertaken an impossible task in claiming that "the unforeseeable weather constituted the sole cause of injury." OCP Cmts. at 58.

Plaintiffs simply cannot show that the Commission lacked substantial evidence to conclude that subject imports contributed in a more-than-trivial way to the domestic industry's injury. In short, even as it recognized the effects of bad weather on demand, the Commission reasonably found that "{t}he downward pricing pressure exerted by subject imports caused the domestic industry's revenues to be lower than they would have been otherwise." APPX0100110. The Commission's brief confirms this with respect to the full array of Plaintiffs' causation arguments. ITC Cmts. at 41-57. We focus below on Plaintiffs' core theory of causation – *i.e.*, blame it on the weather – which they would have the Court substitute for the findings that the Commission made as the trier of fact.

According to Plaintiff-Intervenors, an increase in subject imports from 2017 to 2018 did not prevent the domestic industry from performing well; poor weather caused the domestic industry's poor performance in 2019; and improved demand led to improved domestic

*PROPRIETARY INFORMATION SUBJECT*
*TO PROTECTIVE ORDER REMOVED*

industry performance in interim 2020. Pl.-Ints. Cmts. at 35-38. At each step in this account, however, Plaintiff-Intervenors ignore the substantial record evidence supporting the Commission's analysis.

*First*, a significant portion of the 2017-2018 increase in subject imports was not sold into the U.S. market in 2018 but instead accumulated in what would become importers' "substantial" inventories. *See* APPX0100109 ("as demand began to decline in the fall of 2018, U.S. importers' inventories reached their highest level of those two years."); APPX0098547 (showing that subject import ending inventories increased by [ # ] percent from 2017-2018). In other words, a significant portion of the increase in subject import volumes from 2017 to 2018 impacted the market, and U.S. producers, in 2019. *See* APPX0100080.

*Second*, despite the "substantial" subject inventories and the downturn in demand that began in the fall of 2018, subject imports continued to enter in substantial quantities in 2019, "even as demand declined in 2019." APPX0100109-0100110; APPX0100113; APPX0098445; APPX0098455-0098456. In fact, the combination of built-up inventories from 2018 and continued substantial volumes of

*PROPRIETARY INFORMATION SUBJECT*
*TO PROTECTIVE ORDER REMOVED*

additional imports in 2019 led to subject import shipment volumes increasing by 6.2 percent from 2018 to 2019, even as apparent domestic consumption declined by **[ # ]** percent over the same period. *See* APPX0100080; APPX0098547.

As the Commission recognized, subject imports were the outlier in this respect: amidst declining demand from 2018 to 2019, subject import shipment volumes increased in absolute terms and gained market share while shipments of both U.S. producers and non-subject imports declined by both measures. APPX0100080-0100081; APPX0100080; APPX0100089; APPX0100094. In short, subject imports were the only one of the three sources of supply to increase in the declining U.S. market, and they did so in both absolute and relative terms.

Furthermore, the record contains many other indicators of subject imports' oversupply, low pricing, and the downward pressure on U.S. producers' prices (and thus revenues) in 2019. As the Commission explained in addressing Plaintiffs' weather-related arguments, "contemporaneous trade publications and U.S. purchaser questionnaire responses documented the adverse impact of imports on U.S. prices" in 2019. APPX0100113; *see also, e.g.*, APPX0100083-0100085 (numerous

51

contemporaneous trade publications documenting subject imports'
oversupply and downward price pressure in the first half of 2019);
APPX0100089-0100092 (numerous contemporaneous trade publications
documenting subject imports' oversupply and downward price pressure
in the second half of 2019); APPX0100095-010096 (purchasers reporting
on subject imports' adverse effects during 2019); APPX0100092-0100093
(importers reporting on carrying higher than usual levels of
inventories). Furthermore, OCP's own witnesses conceded in sworn
testimony that there was a "temporary oversupply" in the U.S. market,
APPX0100098 (quoting Mr. Dugan), and that there was a "hangover of
phosphate inventories after the 2019 spring season," whereby "{t}he
New Orleans price traded at a large discount to the Brazilian price,
reflecting this imbalance." *Id.* (quoting Mr. Rahm).

Based on this evidence, a reasonable mind could certainly conclude
that subject imports had a more than trivial role in depressing the
domestic industry's prices, with consequent effects on its financial
performance, in 2019.

*Third*, Plaintiff-Intervenors assert that improved demand led to
improved domestic industry performance in interim 2020, but this is

grossly misleading. In fact, the post-petition withdrawal of subject imports from the U.S. market in interim 2020 constitutes a natural experiment that confirms subject imports' adverse price effects and impact on the domestic industry. As the Commission correctly found,

> {I}n 2019, U.S. prices were lower than and decreased by more than global phosphate fertilizer prices. Although U.S. prices began to increase in the beginning of 2020 as weather conditions improved, they remained at levels lower than those that existed in 2017 and 2018 until after the filing of the petitions at the end of June 2020, at which point they sharply increased to levels above other global markets.

APPX0100099 (footnotes omitted); *see also* APPX0100118 ("the parties agreed that the filing of the petitions in June 2020, resulted in a large decrease in the volume of cumulated subject imports"); APPX0100120.

In sum, the record contains voluminous evidence of subject imports' adverse effects that cannot be attributed to the weather, and the Commission reasonably relied on this evidence in finding material injury "by reason of" subject imports. Plaintiffs do not have a reasonable basis for claiming that the domestic industry's poor performance is wholly explained by bad weather, and they certainly cannot show that the Commission unreasonably reached a contrary conclusion. The Court

should therefore sustain the Commission's impact and causation findings.

## CONCLUSION

For the foregoing reasons and those provided in the Commission's comments, the Court should reject Plaintiffs' arguments and sustain the Commission's Second Remand Determination.

Respectfully submitted,

*/s/* Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Alexandra Maurer
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue, NW.
Washington, DC 20037
(202) 663-6564
stephanie.hartmann@wilmerhale.com

*Counsel for Defendant-Intervenor*
*The Mosaic Company*

*/s/* Stephen P. Vaughn
Stephen P. Vaughn
Patrick J. McLain
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500
svaughn@kslaw.com

*Counsel for Defendant-Intervenor*
*J. R. Simplot Company, LLC*
*(formerly J. R. Simplot Company)*

Date: February 13, 2026

## **Certificate of Compliance with Court of International Trade Standard Chambers Procedures**

Pursuant to Court of International Trade Standard Chambers Procedures and this Court's October 2, 2025, Amended Scheduling Order (ECF No. 251), setting the word limitation of Defendant-Intervenors' joint comments to 10,000 words, counsel for Defendant-Intervenors certify that the attached joint comments contain 9,801 words, including headers and footnotes. This word count certification is made in reliance on the word-count feature contained in Microsoft Word.

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Alexandra Maurer
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue, NW.
Washington, DC 20037
(202) 663-6564
stephanie.hartmann@wilmerhale.com

*Counsel for Defendant-Intervenor The Mosaic Company*

/s/ Stephen P. Vaughn
Stephen P. Vaughn
Patrick J. McLain

KING & SPALDING LLP

1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500
svaughn@kslaw.com

*Counsel for Defendant-Intervenor J. R. Simplot Company, LLC (formerly J. R. Simplot Company)*

## <u>Certificate of Compliance Regarding Non-Use of Generative Artificial Intelligence</u>

Pursuant to this Court's instructions for *Document Formatting and ECF Filing* (Sept. 19, 2025), counsel for Defendant-Intervenors certify that these Comments were not prepared with the assistance of a generative artificial intelligence program based on natural language prompts – such as, but not limited to, ChatGPT or Google Bard.

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Alexandra Maurer
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue, NW.
Washington, DC 20037
(202) 663-6564
stephanie.hartmann@wilmerhale.com

*Counsel for Defendant-Intervenor The Mosaic Company*

/s/ Stephen P. Vaughn
Stephen P. Vaughn
Patrick J. McLain

KING & SPALDING LLP

1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500
svaughn@kslaw.com

*Counsel for Defendant-Intervenor J. R. Simplot Company, LLC (formerly J. R. Simplot Company)*

## <u>CERTIFICATE OF CONFIDENTIAL MATERIAL</u>

Pursuant to this Court's instructions for *Document Formatting and ECF Filing* (Sept. 19, 2025), counsel for Defendant-Intervenors certify that these Comments contains 48 unique words marked confidential, excluding material previously marked confidential in the comments to which these Comments respond. This number is below the maximum permitted by Federal Circuit Rule 25.1(d)(1)(B).

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Alexandra Maurer
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue, NW.
Washington, DC 20037
(202) 663-6564
stephanie.hartmann@wilmerhale.com

*Counsel for Defendant-Intervenor The Mosaic Company*

/s/ Stephen P. Vaughn
Stephen P. Vaughn
Patrick J. McLain

KING & SPALDING LLP

1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500
svaughn@kslaw.com

*Counsel for Defendant-Intervenor J. R. Simplot Company, LLC (formerly J. R. Simplot Company)*