IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| OCP S.A., <br>       Plaintiff, <br><br> EUROCHEM NORTH AMERICA CORPORATION, <br>       Consolidated Plaintiff, <br>   and <br><br> PHOSAGRO PJSC, INTERNATIONAL RAW MATERIALS LTD., and KOCH FERTILIZER, LLC, <br>       Plaintiff-Intervenors, <br><br>   v. <br><br> UNITED STATES, <br>       Defendant, <br>   and <br><br> THE MOSAIC COMPANY and J. R. SIMPLOT COMPANY, LLC, <br>       Defendant-Intervenors. | Consol. Ct. No. 21-00219 <br><br> NON-CONFIDENTIAL |

PUBLIC SECOND REMAND APPENDIX

Shara L. Aranoff
James M. Smith
Sooan (Vivian) Choi
Wanyu Zhang
John J. Catalfamo
Julia Shults

COVINGTON & BURLING LLP
*Counsel to Plaintiff OCP S.A.*

March 2, 2026

Pursuant to the Court's Order dated July 9, 2025 (ECF 237), the Court's Second Amended Scheduling Order dated December 16, 2025 (ECF 259), Rule 56.2(h)(4) of the U.S. Court of International Trade, and the Instructions to Counsel in § 1581(c) Cases assigned to Judge Baker (Revised January 16, 2026), Plaintiff OCP S.A. ("OCP") respectfully submits the public second remand appendix containing the entirety of the public versions of the Court's second remand opinion and order, the administrative agency's second remand decision, and all briefing submitted by the parties to the agency on second remand, and the public administrative record documents cited by the parties in their comments on the second remand determination that were not previously included in the prior appendices.  The table of contents of this public second remand appendix is attached hereto.

Dated: March 2, 2026

Respectfully submitted,

*Shara L. Aranoff*

_____

Shara L. Aranoff
James M. Smith
Sooan (Vivian) Choi
Wanyu Zhang
John J. Catalfamo
Julia H. Shults

**COVINGTON & BURLING LLP**
850 10th Street, NW
Washington, D.C. 20001
(202) 662-5997
saranoff@cov.com

*Counsel to Plaintiff OCP S.A.*

OCP S.A., et al. v. United States, No. 21-219

## PUBLIC SECOND REMAND APPENDIX - TABLE OF CONTENTS*

| Document Description | PR # | CR # Cross-Ref | APPX Page Range |
|---|---|---|---|
| **Court Opinions** | | | |
| OCP S.A. v. United States, Slip Opinion, Public Version (April 22, 2025) | --- | --- | APPX0000101-APPX0000150 |
| **First Remand Record** | | | |
| USITC Pub. 5490: Phosphate Fertilizers from Morocco and Russia, Inv. Nos. 701-TA-650-651 (Final) (Remand) (Jan. 2024) (Views and Dissenting Views) | 296R*** | 243R/244R** | APPX0021207-APPX0021283 |
| **Second Remand Record** | | | |
| Views of the Commission, Public Version (July 28, 2025) | 313R | 254R | APPX0021942-APPX0022044 |
| USITC Pub. 5658: Phosphate Fertilizers from Morocco and Russia, Inv. Nos. 701-TA-650-651 (Final) (Second Remand) (Aug. 2025) (Views and Dissenting Views) | 314R | 253R/254R** | APPX0022045-APPX0022143 |
| ITC's Notice of Remand Proceedings (June 4, 2025) | 297R | --- | APPX0022144-APPX0022147 |

\*    In accordance with Judge Baker's Instructions to Counsel in 1581(c) Cases, the Second Remand Appendix does not include any record material previously included in the Original Joint Appendix or First Remand Appendix.

\*\*   Public Versions of the Commission's Views and Dissenting Views are consolidated in the USITC Publications.

\*\*\* USITC Publication 5490 appeared twice in the first remand administrative record filed with the Court. One copy of USITC Publication 5490, located at P.R. 295R, APPX0021130-APPX0021206, was previously provided in the First Remand Appendix. Because certain parties cited the duplicate copy of USITC Publication 5490 in their second remand comments, the entirety of the second duplicate copy, located at P.R. 296R, is provided in the Second Remand Appendix for the Court's reference.

OCP S.A., et al. v. United States, No. 21-219

**PUBLIC SECOND REMAND APPENDIX - TABLE OF CONTENTS\***

| Document Description | PR # | CR #<br>Cross-Ref | APPX Page Range |
|---|---|---|---|
| Second Remand Comments of The Mosaic Company, Public Version (June 30, 2025) | 304R | 250R | APPX0022183-APPX0022214 |
| Second Remand Comments of Koch Fertilizer, LLC, Public Version (June 30, 2025) | 305R | 248R | APPX0022215-APPX0022223 |
| Second Remand Comments of International Raw Materials Ltd., Public Version (June 30, 2025) | 306R | 247R | APPX0022224-APPX0022236 |
| Second Remand Comments of PhosAgro PJSC, Public Version (June 30, 2025) | 307R | 249R | APPX0022237-APPX0022257 |
| Second Remand Comments of J.R. Simplot Company, Public Version (June 30, 2025) | 308R | 245R | APPX0022258-APPX0022289 |
| Second Remand Comments of OCP S.A., Public Version (June 30, 2025) | 309R | 246R | APPX0022290-APPX0022321 |

Slip Op. No. 25-51

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| OCP S.A.,<br><br> *Plaintiff*,<br><br>EUROCHEM NORTH AMERICA CORPORATION,<br><br> *Consolidated Plaintiff*,<br><br> and<br><br>PHOSAGRO PJSC, INTERNATIONAL RAW MATERIALS LTD., and KOCH FERTILIZER, LLC,<br><br> *Plaintiff-Intervenors*,<br>v.<br><br>UNITED STATES,<br><br> *Defendant*,<br><br> and<br><br>THE MOSAIC COMPANY and J.R. SIMPLOT COMPANY,<br><br> *Defendant-Intervenors*. | Before: Stephen Alexander Vaden,<br>Judge<br><br>Consol. Court No. 1:21-cv-00219 (SAV) |

### <u>OPINION</u>

[The Determination of the United States International Trade Commission is remanded in conformity with this opinion.]

Dated: April 22, 2025

Consol. Court No. 1:21-cv-00219 (SAV)                                    Page 2

*Shara L. Aranoff*, Covington & Burling LLP, of Washington, DC, for Plaintiff OCP S.A.  With her on the brief are *James M. Smith*, *Sooan (Vivian) Choi*, *Paula O. Cardona*, *John J. Catalfamo*, and *Julia Shults*.

*Jeremy W. Dutra*, Squire Patton Boggs LLP, of Washington, DC, for Consolidated Plaintiff EuroChem North America Corporation.  With him on the brief is *Peter Koenig*.

*Paul C. Rosenthal*, Kelley Drye & Warren LLP, of Washington, DC, for Plaintiff-Intervenor International Raw Material Ltd.  With him on the brief is *Melissa M. Brewer*.

*Jared R. Wessel*, Hogan Lovells US LLP, of Washington, DC, for Plaintiff-Intervenor Phosagro PJSC.  With him on the brief are *H. Deen Kaplan*, *Michael G. Jacobson*, and *Cayla D. Ebert*.

*Kenneth G. Weigel*, Alston & Bird LLP, of Washington, DC, for Plaintiff-Intervenor Koch Fertilizer LLC.  With him on the brief is *Lian Yang*.

*Courtney S. McNamara*, Attorney-Advisor, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, for the Defendant United States.  With her on the brief are *Dominic L. Bianchi*, General Counsel, and *Andrea C. Casson*, Assistant General Counsel for Litigation of the International Trade Commission.

*Jeffrey I. Kessler*, Wilmer Cutler Pickering Hale and Dorr LLP, of Washington, DC, for Defendant-Intervenor Mosaic Company.  With him on the brief are *David J. Ross*, *Stephanie E. Hartmann*, and *Alexandra Maurer*.

*Jamieson L. Greer*, King & Spalding LLP, of Washington, DC, for Defendant-Intervenor the J. R. Simplot Company.  With him on the brief are *Stephen P. Vaughn*, *Neal J. Reynolds*, and *Patrick J. McLain*.

**Vaden, Judge:**  For almost a century, the federal courts have reviewed the Government's efforts to regulate unfair phosphate imports.  *See, e.g.*, *J.H. Cottman & Co. v. United States*, 20 C.C.P.A. (Customs) 344 (1932) (reviewing an antidumping duty imposed on rock phosphate from French Morocco).  The tradition continues. OCP S.A. (OCP) — a Moroccan fertilizer producer — challenges the remand determination the United States International Trade Commission (Commission) filed

in its investigation of phosphate fertilizer imports from Morocco and Russia. The Commission made that determination pursuant to the Court's opinion in *OCP S.A. v. United States* (*OCP I*), 47 CIT __, 658 F. Supp. 3d 1297 (2023). In *OCP I*, the Court ordered the Commission to further explain its determination that "[phosphate] fertilizer could be reshipped from one destination to another to meet existing demand[.]" *Id.* at 1324. On remand, the Commission conducted a supplemental investigation to support its original findings on reshipment and material injury. For the following reasons, the Commission's determination is **REMANDED**.

## BACKGROUND

The Court presumes familiarity with this case's facts as described in its previous opinion. *See OCP I*, 47 CIT __, 658 F. Supp. 3d at 1301–12. This opinion will only recount those facts relevant to the Court's review of the Remand Results.

### I.      The Statutory Framework

Countervailing duties exist to protect American producers and workers from subsidized foreign goods sold into the American market. *See* 19 U.S.C. § 1671. To receive a countervailing duty, domestic producers must show that imports (1) benefit from "a countervailable subsidy," and (2) either materially injure or threaten to materially injure the U.S. industry. *Id.* Responsibility for the two inquiries is assigned to two different agencies. The Department of Commerce assesses if imports benefit from a countervailable subsidy. *See id.* § 1671(a)(1). The Commission determines if those imports cause or threaten to cause "material injury." *Id.* § 1671(a)(2).

"Material injury" is "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A). The Commission must consider three factors when making a material injury determination: (1) the volume, (2) price effects, and (3) impact of subject imports. *See* 19 U.S.C. § 1677(7)(B)(i). It also must establish a "causal – not merely temporal – connection between the goods and the material injury" it finds. *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997); *see also* 19 U.S.C. § 1671d(b)(1) (requiring material injury to be by reason of subject imports).

The Commission "does not analyze the statutory factors in a vacuum." *OCP I,* 47 CIT __, 658 F. Supp. 3d at 1312. It also must consider the general "conditions of competition" within the affected industry, 19 U.S.C. § 1677(7)(C)(iii) (flush language), and apply its "conditions of competition" findings to its analysis of the three statutory factors. *See Altx, Inc. v. United States*, 26 CIT 709, 719 (2002); *see also Nucor Corp. v. United States*, 28 CIT 188, 207 (2004) ("The material injury statute directs the [Commission] to evaluate all relevant economic factors (i.e. volume, price effects, and impact) within the context of the business cycle and conditions of competition that are distinctive to the affected industry.") (internal quotation marks omitted), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005). Importantly, the Commission must base any assessment of the "conditions of competition" on "actual industry practices" rather than "speculation about industry conditions." *OCP I*, 47 CIT __, 658 F. Supp. 3d at 1313 (citing *Catfish Farmers of Am. v. United States*, 37 CIT 717, 733 (2013)).

## II.   The Court's Opinion in *OCP I*

On June 26, 2020, domestic producers of phosphate fertilizer, led by the Mosaic Company (Mosaic), submitted a petition asserting that subsidized imports of phosphate fertilizer from Morocco and Russia materially injured U.S. producers. *See* Views of the Commission (Views) at 3, J.A. at 99,573, ECF No. 107. The Commission investigated, held a hearing with interested parties, and accepted written case briefs on the matter. *See OCP I*, 47 CIT __, 658 F. Supp. 3d at 1304. On April 5, 2021, the Commission determined by majority vote that imports materially injured the domestic phosphate fertilizer industry. *See id.*

The Commission found material injury occurred because it believed that "significant volumes [of imports] created oversupply conditions in [the] declining [phosphate fertilizer] market and low prices[.]" Views at 44, J.A. at 99,614, ECF No. 107. During the period of investigation, U.S. consumption of phosphate fertilizer declined because abnormally high levels of rainfall resulted in "massive flooding and prolonged river closures along the Mississippi River system that stranded fertilizer barges and resulted in delayed, destroyed, or abandoned plantings, especially in the Midwest and Great Plains regions." *Id.* at 40, J.A. at 99,610. The Commission found that, despite this declining demand, imports of subject merchandise underwent a significant increase in both absolute terms and relative to consumption in the United States. *Id.* at 33–35, J.A. at 99,603–05. Meanwhile, the Commission found that domestic producers had enough supply to meet consumer demand through two fertilizer sources: (1) newly produced phosphate fertilizer and (2) existing phosphate

fertilizer inventories that had already been delivered to flooded, low demand regions. The Commission assumed these inventories could be reshipped as needed to meet demand. *See id.* at 56 n.217, J.A. at 99,626. An influx of imports — despite declining demand and adequate domestic supply — depressed phosphate fertilizer prices, harming domestic producers. *See id.* at 44, J.A. at 99,614; *see also id.* at 52–53, J.A. at 99,622–23 ("Due to the downward pricing pressure exerted by the oversupply of subject imports on U.S. prices, the domestic industry was forced to reduce prices, which in turn, caused its revenues to be lower than they would have been otherwise.").

OCP — a Moroccan fertilizer producer — challenged the Commission's determination on May 6, 2021, bringing the present suit. *See* Summons, ECF No. 1; Compl. ¶ 15, ECF No. 10. Consolidated Plaintiff EuroChem North America Corporation (EuroChem) and Plaintiff-Intervenors PhosAgro PJSC (PhosAgro), International Raw Materials Ltd. (International Raw Materials), and Koch Fertilizer, LLC (Koch) joined. *See OCP I*, 47 CIT ___, 658 F. Supp. 3d at 1301. These lawsuits argued that the Commission's "findings of significant volume, price effects, impact, and injury causation were unsupported by substantial evidence." *Id.* at 1309. The challengers' briefs also argued that the Commission's assumption that "inventories anywhere in the U.S. should be available to supply other regions, such that imports were not needed, is unsupported by substantial evidence." *Id.*

On September 19, 2023, the Court issued its decision granting in-part OCP's Motion for Judgment on the Agency Record. *Id.* at 1324. The Court remanded the

matter to the Commission to explain why it assumed that "[phosphate] fertilizer [inventories] could be reshipped from one destination to another to meet existing demand[.]" *Id.* The Court's decision was limited to the issue of domestic reshipment and held that "consideration of other issues will come after the Commission's redetermination on remand should they remain relevant." *Id.* at 1301.

The Court focused on domestic inventory reshipment because the Commission's unsupported assumptions undergirded its material injury finding. *See id.* at 1318–19. As the Court explained, the Commission's findings on "[i]ndustry conditions must dwell in the realm of reality and not merely in the realm of the possible." *Id.* at 1313–14 (citing *Altx,* 26 CIT 709). If domestic producers could not — technically or economically — reship existing inventory domestically, these inventories could not contribute to the supply of phosphate fertilizer available to meet new demand. That would undermine the Commission's finding of oversupply conditions, which are "central to [the Commission's] determination[.]" *Id.* at 1318.

The Court held that the Commission's assumption "that fertilizer delivered to one area of the country could be shipped via intermodal delivery to another area of the country to allow its immediate use" was unsupported by substantial evidence. *See id.* at 1317. As the Court noted:

> When asked for record evidence demonstrating that [domestic reshipment] had happened during the period of investigation, no party cited any. Even the most forgiving articulations of the substantial evidence standard do not allow for the Commission to make findings based on evidence not present in the record.

*Id.* at 1317–18 (citations omitted). As a result, the Court remanded the Commission's determination for further consideration. *See id.* at 1324. If it wanted to continue to advance its oversupply theory of injury, the Commission needed to "conduct a new analysis of the conditions of competition with respect to domestic reshipment…." *Id.* at 1318. This analysis should show evidence of reshipment or relocation of inventory "that has already reached its intended destination" and not evidence of "[i]ntermodal delivery" of fertilizer. *Id.* at 1317.

### III.    The Remand Results

On remand, the Commission decided to seek new evidence by issuing a questionnaire to U.S. producers and importers. *See* Remand Results at 4, ECF No. 145. Question 2 addressed the issue of inventory reshipment. *See* Blank U.S. Producers' Questionnaire at 4, J.A. at 20,834, ECF No. 205. Subpart 2(a) asked the responding firms to describe their "inventory operations and distribution network," including by "identifying each location where your firm held inventories" during the period of investigation and by "describing the modes of transportation used to distribute shipments." *Id.* Subpart 2(b) asked firms if they had shipped "phosphate fertilizer from one inventory location to another inventory location" during the period of review. *Id.* If a firm answered yes, it was asked to "describe the specific quantities" and the "locations to and from which these inventories were shipped." *Id.* If a firm answered no, it could select either "[n]o" or "[n]o, but has capability." Subpart 2(c) asked if the firm "ever moved phosphate fertilizers from one inventory location in the United States to another inventory location." *Id.* at 5, J.A. at 20,835. If a firm

Consol. Court No. 1:21-cv-00219 (SAV)                          Page 9

answered yes, it was asked to explain "the circumstances under which this occurred," the "frequency," and "how this was normally accomplished." *Id.*

The questionnaire did not define key terms like "inventory," "distribution network," and "inventory location." *See generally id.* at 1–6, J.A. at 20,831–36. Plaintiff OCP and Plaintiff-Intervenors International Raw Materials and PhosAgro warned the Commission that "the questionnaires, as written, will elicit extraneous and irrelevant information addressing facts beyond the scope of the court-ordered remand." OCP's Request for Action at 2 (Oct. 31, 2023), J.A. at 20,871, ECF No. 205; *see also* PhosAgro's Request for Action at 2 (Nov. 1, 2023), J.A. at 20,887, ECF No. 205; International Raw Materials' Request for Action at 1–2 (Nov. 1, 2023), J.A. at 20,891–92, ECF No. 205. They requested that the Commission modify its questionnaire so it would better capture if phosphate fertilizer was reshipped once it had reached its intended destination. *See, e.g.*, International Raw Materials' Request for Action at 1–2, J.A. at 20,891–92, ECF No. 205 (requesting that the Commission "revise its questions and clarify its instructions and definitions" in the questionnaire); OCP's Request for Action at 6–7, J.A. at 20,875–76, ECF No. 205. OCP even offered its own suggestions on how to improve the Commission's remand questionnaire, requesting it ask instead: "[W]ere any inventories that were delivered to their originally intended destination subsequently re-shipped to another destination in response to local changes in demand?" OCP's Request for Action at 7, J.A. at 20,876, ECF No. 205. Defendant-Intervenors opposed these modifications. *See generally* Mosaic Company Questionnaire Comments (Nov. 8, 2023), J.A. at 20,915–21, ECF

APPX0000109

No. 205.  The Commission declined the modification requests and chose not to alter its questionnaire.  *See* Commission Letter Regarding Comments at 1–2 (Nov. 9, 2023), J.A. at 20,924–25, ECF No. 205.  In the ensuing month, both U.S. producers and importers responded to the unaltered remand questionnaire.  *See* Remand Results at 4–5, ECF No. 145.

On January 17, 2024, the Commission filed its Remand Results with the Court.  *See generally id.*  The Commission explained that, based on questionnaire responses, it had concluded that domestic producers could readily reship product between inventory locations.  *Id.* at 32.  According to the Commission, this meant "domestic producers were well-positioned to supply the U.S. market in 2019" and fertilizer was not "practically unavailable from U.S. sources."  *Id.* at 33 (internal quotation marks omitted).  The Commission asserted that these findings were "not central to [its] material injury analysis."  *Id.* at 7.  The Commission separately found that importers "report less extensive inventory networks" and "less movement of inventories."[1]  *Id.* at 25.

The Remand Results also reiterate several findings that the Commission made in its original Views.  The Commission continues to find that the volume of imports and the increase in that volume were significant enough to contribute to a material injury to the domestic industry.  *See id.* at 27; *see also* 19 U.S.C. § 1677(7)(C)(i).  Plaintiffs claim this finding was undermined by evidence of domestic companies' refusal to sell merchandise to domestic trading companies that buy and resell

---

[1] No party before the Court contests this finding.

fertilizer, which in turn revealed a need for imports. *See, e.g.*, OCP's Mot. for J. on Agency R. at 13–16, ECF No. 55. The Commission answered by reiterating Mosaic's assertion that the Commission need not account for such evidence because Mosaic had legitimate business reasons for refusing those sales. *See* Remand Results at 68 n.296, ECF No. 145. The Commission's volume analysis also continued to rely on a contested total cumulated imports value, which included phosphate fertilizer imports that were later exported to other nations. *See id.* at 27–29. Plaintiffs claim that the Commission's use of this "inflated" value was improper because fertilizer imported into the United States for later export to other nations did not harm U.S. phosphate fertilizer producers. *See, e.g.*, PhosAgro's Pre-hearing Br. at 15, J.A. at 95,731, ECF No. 107.

The Commission also continued to find that imports had significant price effects on the domestic industry. Remand Results at 33, 43–44, ECF No. 145; *see* 19 U.S.C. § 1677(7)(C)(ii). It recognized that imported fertilizer sold for higher prices than domestic fertilizer in a large majority of instances but found that there were "some instances" where the domestic industry lost sales because imports were priced lower than the domestic like product. Remand Results at 37, ECF No. 145. The Commission also found that an oversupply of low-priced imports caused depressed prices during the period of investigation. *Id.* at 43–44.

## IV.    The Present Dispute

The parties filed comments with the Court addressing the Remand Results. *See generally* Pl.'s Comments in Opp'n to the Int'l Trade Comm'n's Final Remand

Determination (OCP's Comments), ECF No. 156; Cons. Pl. EuroChem North America Corp.'s Comments in Opp'n to Remand Determination (EuroChem's Comments), ECF No. 154; Pl.-Int PhosAgro PJSC Comments on the U.S. Int'l Trade Comm'n Remand Determination (PhosAgro's Comments), ECF No. 160; Pl.-Int. Koch Fertilizer LLC's Comments in Opp'n to the Int'l Trade Comm'n's Final Remand Determination (Koch's Comments), ECF No. 163; Pl.-Int. Int'l Raw Material Ltd.'s Comments in Opp'n to Remand Determination (IRM's Comments), ECF No. 166; Def. United States Int'l Trade Comm'n's Corrected Comments on Remand Determination (Commission's Comments), ECF No. 182; Def.-Int. the J.R. Simplot Co.'s Comments on the U.S. Int'l Trade Comm'n's Remand Determination (Simplot's Comments), ECF No. 186; Def.-Int. the Mosaic Co.'s Comments on the U.S. Int'l Trade Comm'n's Remand Determination (Mosaic's Comments), ECF No. 188; Pl.'s Reply to Def.'s and Def.-Ints.' Comments on Remand Determination (OCP's Reply), ECF No. 200.  In those filings, the challengers raise a variety of arguments against the Remand Results and urge another remand.

First, Plaintiff OCP, Consolidated Plaintiff EuroChem, and Plaintiff-Intervenors PhosAgro, Koch, and International Raw Materials (collectively the Plaintiffs) argue that the Remand Results fail to remedy the error that prompted the remand.  *See* OCP's Comments at 1–7, ECF No. 156; PhosAgro's Comments at 1, 6, ECF No. 160; Koch's Comments at 1, ECF No. 163; EuroChem's Comments at 2, ECF No. 154; IRM's Comments at 2–4, ECF No. 166.  They assert the Commission's determination on the prevalence and feasibility of reshipment remains unsupported

Consol. Court No. 1:21-cv-00219 (SAV)

by substantial evidence because the Commission's questionnaires on the topic were "not worded to elicit information responsive to the Court's directive." OCP's Comments at 1, ECF No. 156; *see also* PhosAgro's Comments at 14, ECF No. 160. The Plaintiffs also argue that, setting aside the questionnaire design, the actual answers the Commission's questionnaires generated "confirm that the distribution of phosphate fertilizer in the United States is unidirectional[.]" OCP's Comments at 3, ECF No. 156; *see also* PhosAgro's Comments at 14, ECF No. 160.

Defendant and Defendant-Intervenors (collectively, the Defendants) dispute this characterization of the Remand Results, insisting there are no legal problems with the Commission's findings on domestic reshipment. They argue that the Commission's questionnaires "were directly targeted to gather complete data regarding the conditions of competition with respect to inventory and distribution operations, including reshipment of fertilizers." Commission's Comments at 7, ECF No. 182; *see also* Mosaic's Comments at 1–2, ECF No. 188. They also contend that the remand questionnaire responses "demonstrate[d] the breadth and superiority of U.S. producers' distribution network," which enabled them to move fertilizer as needed. Commission's Comments at 4–5, ECF No. 182 (internal quotation marks omitted); *see also* Mosaic's Comments at 2, ECF No. 188.

Second, Plaintiffs repeat their arguments about the Commission's volume and price effects analyses. Regarding volume, Plaintiffs argue that the Commission's finding is not supported by substantial evidence because the agency failed to account for domestic producers' refusing to sell product to U.S. trading companies. *See* OCP's

Comments at 10–11, ECF No. 155; Koch's Comments at 3, ECF No. 163; PhosAgro's Comments at 10, ECF No. 160; IRM's Comments at 7–8, ECF No. 166. Plaintiffs further claim the Commission relied on a cumulated subject imports value that improperly includes fertilizer that was later exported to Canada. *See* OCP's Comments at 13–14, ECF No. 155; EuroChem's Comments at 2, ECF No. 154; PhosAgro's Comments at 11, ECF No. 160. Additionally, Plaintiffs argue that the Commission ignored contrary evidence in the record when making its price effects analysis. They point to imports' generally higher sales prices, Mosaic's role as a price leader in the U.S., and a potentially inaccurate questionnaire response the Commission relied on to determine domestic producers' lost sales. OCP's Comments at 22–27, ECF No. 155; EuroChem's Comments at 2, ECF No. 154; PhosAgro's Comments at 17–27, ECF No. 160; Koch's Comments at 7, ECF No. 163; OCP's Reply at 6–9, ECF No. 200.

Defendants ask the Court to sustain the Commission's volume and price effects analyses. They claim the Commission sufficiently addressed the Plaintiffs' refusal-to-sell argument in the Remand Results. Commission's Comment at 41, ECF No. 182; Mosaic's Comments at 7, 10, ECF No. 188; Simplot's Comment at 7, ECF No. 186. In response to Plaintiffs' claims about re-exported product, the Commission notes that the contested value came from the importers' questionnaire responses so that any inaccuracy is the fault of the importers. Commission's Comments at 12–13, ECF No. 182. Finally, regarding the price effects analysis, Defendants argue that the Commission is presumed to have considered all the evidence on the record; and its

Consol. Court No. 1:21-cv-00219 (SAV)                                  Page 15

findings are owed great deference. Commission's Comments at 19–36, ECF No. 182;

Mosaic's Comments at 10–23, ECF No. 188; Simplot's Comments at 8–11, 15–21, ECF

No. 186.

## JURISDICTION AND STANDARD OF REVIEW

As in *OCP I*, the Court has jurisdiction over this action pursuant to 28 U.S.C.

§ 1581(c). The Court must assess the factual and legal findings underpinning the

Commission's determinations and "hold unlawful any determination, finding or

conclusion . . . unsupported by substantial evidence on the record, or otherwise not in

accordance with law[.]" 19 USC § 1516a(b)(1)(B)(i). Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938). It

must be "more than a scintilla, and must do more than create a suspicion of the

existence of the fact to be established." *N.L.R.B. v. Columbian Enameling &*

*Stamping Co.*, 306 U.S. 292, 300 (1939). However, "the possibility of drawing two

inconsistent conclusions from the evidence does not prevent an administrative

agency's finding from being supported by substantial evidence." *Matsushita Elec.*

*Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). The Court additionally

"reviews remand results for compliance with the remand order." *DAK Am. LLC v.*

*United States*, 45 CIT __, 517 F. Supp. 3d 1349, 1355 (2021) (citing *Xinjiamei*

*Furniture (Zhangzhou) Co. v. United States*, 38 CIT 189, 190 (2014)).

This Court's review of the Commission's determination is limited to the

administrative record that was before the agency. 19 U.S.C. § 1516a(b)(2)(A). To

determine if substantial evidence exists, the Court considers "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). The Court assesses whether the Commission succeeded in putting forward a reasoned explanation by "mak[ing] the necessary findings and hav[ing] an adequate evidentiary basis for its findings." *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016) (internal citations omitted). To meet this threshold, the Commission must not only "examine the relevant data and articulate a satisfactory explanation for its action[,]" but also provide "a rational connection between the facts found and the choice made." *Id*. (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## DISCUSSION

In *OCP I*, the Court remanded on the narrow issue of whether adequate record evidence supported the Commission's conclusion that phosphate fertilizer inventories could be reshipped from their original final destinations. *See OCP I,* 47 CIT __, 658 F. Supp. 3d at 1324. The Commission reopened the record, issued new questionnaires, and continued to conclude that domestic reshipment was possible. *See* Remand Results at 4, 32–33, ECF No. 145. Plaintiffs maintain that the Commission's reshipment determination is flawed and renew challenges to portions of the Commission's price effects and volume analyses.[2] The Court holds that the

---

[2] The Commission's actions on remand may moot some of the Plaintiffs' additional claims so that the Court declines to address them at this time. *See OCP I*, 47 CIT __, 658 F. Supp. 3d

Consol. Court No. 1:21-cv-00219 (SAV)                                   Page 17

Commission's determination on reshipment remains unsupported by substantial evidence. The Court further finds that the Commission has not adequately supported certain findings regarding its volume and price effects analyses. Accordingly, the Court is once again remanding this matter to the Commission for further explanation and — if the Commission deems it necessary — additional investigation.

## I.    The Commission's Compliance with the Remand Order

The Tariff Act requires the Commission to ground its material injury determination "within the context of the business cycle and [the] conditions of competition that are distinctive to the affected injury." 19 U.S.C. § 1677(7)(C)(iii) (flush language). "Although the statute does not define the term 'conditions of competition,' the Commission's practice is to perform this analysis by making findings about U.S. market characteristics, U.S. purchasers, the supply chain, geographic distribution, demand trends, substitutability, purchasing patterns, elasticity, and other aspects of the market for the subject merchandise." *OCP I*, 47 CIT __, 658 F. Supp. 3d at 1312. The Commission found as a condition of competition that domestic phosphate fertilizer inventories could be reshipped when needed. Remand Results at 32, ECF No. 145. The parties dispute whether this finding complied with the Court's remand order and is supported by substantial evidence. The record contains only limited examples of inventory reshipment. For that reason, the Court holds that

at 1319 n.7 ("Because the Commission's reconsideration of domestic reshipment may alter these findings, the Court will reserve any review of them until after remand."); *Celanese Chemicals, Ltd. v. United States*, 31 CIT 279, 311 (2007) ("Because each of these findings may be subject to change on remand, judicial review of the Commission's volume and price effects findings would be inappropriate at this time.").

substantial evidence does not demonstrate domestic producers could move inventories when needed. *Id.* Because that finding continues to underpin the Commission's material injury determination, the remand results must be remanded for a second time to cure the Commission's legal errors.

## A.

By requiring the Commission to consider the conditions of competition that shape the domestic market, the Tariff Act "prevents the [Commission] from attributing to subject imports an injury whose cause lies elsewhere." *Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1222 (2006). The Commission's findings regarding competition and market conditions must "dwell in the realm of reality and not merely in the realm of the possible." *OCP I*, 47 CIT __, 658 F. Supp. 3d at 1313–1314 (citing *Altx*, 26 CIT 709). They also must be supported by substantial evidence in the record. *See United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Serv. Workers Int'l Union v. United States*, 42 CIT __, 348 F. Supp. 3d 1328, 1333 (2018).

In its original determination, the Commission made a "key finding regarding a condition of competition" in the U.S. phosphate fertilizer market. *OCP I*, 47 CIT __, 658 F. Supp. 3d at 1314. It found that it was possible to supply phosphate fertilizer to high demand regions of the country by reshipping fertilizer that had already been delivered to flooded, low demand regions so that additional foreign imports were not necessary. *See* Views at 56 n.217, J.A. at 99,626, ECF No. 107; *see also OCP I*, 47 CIT __, 658 F. Supp. 3d at 1314–18. In other words, pre-existing

phosphate fertilizer inventories could be reshipped to meet market demand throughout the country.

This "key finding … ground[ed] the Commission's determination[]" that domestic producers were materially injured by subject imports. *OCP I*, 47 CIT __, 658 F. Supp. 3d at 1314. If phosphate fertilizer inventories could be reshipped, that meant those inventories were part of the U.S. phosphate fertilizer supply. Based on that belief, the Commission found that subject imports "caus[ed] an *oversupply* in the U.S. market and significantly depress[ed] U.S. prices." *Compare* Views at 52–53, J.A. at 99,622–23, ECF No. 107 (emphasis added), *with OCP I*, 47 CIT __, 658 F. Supp. 3d at 1315 ("Plaintiffs' point was that additional imports that arrived in 2019 were not a part of an 'oversupply.' Rather, they filled demand that could not be filled by domestic inventories because those inventories could not feasibly be reshipped[.]").

The Commission did not support its finding with substantial evidence. Record evidence gathered during the Commission's original investigation only contained instances of "[i]ntermodal delivery" where phosphate fertilizer was shipped through "multiple methods [or modes] of transportation" from its source to its original intended destination. *See OCP I*, 47 CIT __, 658 F. Supp. 3d at 1317. These shipments were unidirectional. They were "distinct from *reshipment* of fertilizer that has already reached its intended destination." *Id.* (emphasis added). Such reshipment would inherently be multidirectional: Fertilizer would first be shipped to its original intended destination; then it would be reshipped from that destination to another location to meet new market demand. Although "[i]ntermodal delivery"

Consol. Court No. 1:21-cv-00219 (SAV)                              Page 20

systems could facilitate multidirectional shipment, the record contained no evidence that these systems operated in multiple directions or facilitated inventory reshipment. *Id.* at 1317–18. Instead, the evidence on inventory reshipment before the Commission only indicated that "it is cost-prohibitive to reship fertilizer[.]" *Id.* at 1315. The Court remanded the Commission's material injury determination because of its unsupported inventory reshipment finding. It directed, "On remand, the Commission should conduct a new analysis of the conditions of competition with respect to domestic reshipment and make new findings that are supported by substantial evidence." *Id.* at 1318.

In response, the Commission reopened the record and conducted a new investigation into inventory reshipment by issuing questionnaires. Domestic producers provided information to the Commission about their storage and distribution facilities, including ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ warehouses. Remand Results at 23–24, ECF No. 145. They detailed various port terminals, barge fleeting locations, and other transportation hubs they use to move phosphate fertilizer. *Id.* at 23–24. Domestic producers also reported instances where they ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ and where they moved fertilizer "between [their] forward distribution warehouses." *Id.* at 24. Importers, by contrast, reported "that their distribution networks were unidirectional and that once delivered to an inventory or customer location, product was not subsequently relocated but rather remained at that location." *Id.* at 25 (internal quotation marks omitted).

Consol. Court No. 1:21-cv-00219 (SAV)                                    Page 21

Based on this evidence, the Commission again concluded that domestic producers' ability to reship phosphate fertilizer inventories was a condition of competition in the U.S. phosphate fertilizer market. *See id.* at 22–24. It found that domestic producers had a broad "ability to move and relocate product where it was needed[.]" *Id.* at 33. Domestic producers could reship product from inventory locations based on market "need[]" regardless of the quantity of inventory required to be reshipped. *Id.*

Plaintiffs argue that the Commission's new inventory reshipment finding does not comply with the remand order because it remains unsupported by substantial evidence.[3] They assert that the Commission received responses "confirm[ing] that the distribution of phosphate fertilizer in the United States is unidirectional" so that inventories could not be reshipped. OCP's Comments at 3, ECF No. 156; *see also* PhosAgro's Comments at 14, ECF No. 160 ("[E]ven despite the Commission's faulty [questionnaire design] process, the questionnaire responses overwhelmingly demonstrated that the phosphate supply chain was almost universally unidirectional."); Koch's Comments at 6, ECF No. 163 ("[I]t is now a fact that import inventories at their final destination are not moved to other locations[.]") (emphasis removed); IRM's Comments at 3–4, ECF No. 166. The Commission and Defendant-Intervenors contend that the remand questionnaire responses "demonstrate[d] the

---

[3] Plaintiffs also argue that the Commission did not write its questions to "elicit information responsive to the Court's directive" and thus failed to comply with the Court's remand order. OCP's Comments at 1, ECF No. 156; *see also DAK Americas*, 45 CIT __, 517 F. Supp. 3d at 1355 (noting that the Court "reviews remand results for compliance with the remand order"). Because the Commission's inventory reshipment finding is unsupported by substantial evidence, the Court does not reach this argument.

breadth and superiority of U.S. producers' distribution network," which enabled them to move fertilizer as needed.  Commission's Comments at 4–5, ECF No. 182 (internal quotation marks omitted); *see also* Mosaic's Comments at 2, ECF No. 188.

**B.**

The question is whether the Commission obtained record evidence sufficient for a "reasonable mind" to conclude that domestic inventories actually could be reshipped as needed throughout the country.  *Broadcom Corp. v. Int'l Trade Comm'n*, 28 F.4th 240, 249 (Fed. Cir. 2022) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"); *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) (noting that the substantial evidence standard requires the agency to "articulate [a] rational connection between the facts found and the choice made").  It did not.

Much of the evidence in the record cited by the Commission to support its inventory reshipment finding is evidence of domestic producers' general distribution capabilities.  The Commission's comments on the Remand Results claim that "the breadth and superiority of U.S. producers' distribution networks … enabl[e] domestic producers to move inventory between locations[.]"  Commission's Comments at 8, ECF No. 182 (internal quotation marks omitted).  To support this proposition, it cites to portions of the Remand Results that detail domestic producers' warehousing networks and multiple methods of distribution.  *See* Remand Results at 23–25, ECF No. 145.  Mosaic similarly defends the Commission's reshipment finding by citing to

details about its "extensive distribution network" and "storage capacity." Mosaic's Comments at 2–3, ECF No. 188.

This kind of evidence only shows that domestic producers had robust "distribution networks." Remand Results at 23, ECF No. 145. It sheds no light on whether the distribution networks are unidirectional, as Plaintiffs claim, or multidirectional, as Defendants claim. In *OCP I*, the Court noted that general information about transportation systems was "distinct from reshipment of phosphate fertilizer that has already reached its intended destination." 47 CIT __, 658 F. Supp. 3d at 1317. In theory, a robust intermodal distribution network could be multidirectional; but "the Commission may not ground its determinations in 'theoretical possibilities.'" *Id.* (quoting *Altx*, 26 CIT at 718). Instead, the Commission's inventory reshipment finding must be grounded in evidence of actual inventory reshipment by domestic producers. *See id.* at 1317–18; *see also* Commission's Comments at 9, ECF No. 182 (recognizing that "the Court informed [the Commission] that evidence of inter-modal transportation alone does not demonstrate reshipment to be a normal condition of competition").

The Remand Results and Defendants' Comments only cite to a limited pool of record evidence that demonstrates actual inventory reshipment. Domestic producers replied to the Commission's questionnaire by providing specific volumes of phosphate fertilizer they reshipped from inventory locations to meet new market demand. *See* Remand Results at 23–24, ECF No. 145. The Commission never compared the volume of reported reshipped inventory with domestic producers' overall shipment

Consol. Court No. 1:21-cv-00219 (SAV)                                    Page 24

volumes.  Such a comparison reveals that the reported reshipped inventory volumes

are commercially insignificant.  Indeed, ███████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ during the period of

investigation.[4]  *Compare id.* at 24, *with* Domestic Producer's Questionnaire Resp. at

18, J.A. at 87,812, ECF No. 202.

This evidence suggests reshipment was a rare practice.  Perhaps the evidence

would be sufficient to support a conclusion that domestic producers could reship small

quantities of inventories to meet some new demand.  But that is not what the

Commission found.  Instead, based on this evidence, the Commission went further

and concluded that domestic producers "demonstrated [an] ability to move and

relocate product [from inventories to] where it was needed."  Remand Results at 33,

ECF No. 145.

The record evidence cannot "rational[ly] connect[]" to that conclusion.

*Burlington Truck Lines*, 371 U.S. at 168.  No reasonable observer would conclude that

isolated examples of small-volume inventory reshipment — standing by themselves

— prove the existence of a broad capacity to reship inventories as needed.  Remand

Results at 32, ECF No. 145.  Such a conclusion would require additional evidence to

show that domestic producers could scale up their typically meager inventory

---

[4] The Court only provides a "general characterizations of … [the confidential] information." *See OCP S.A. v. United* States, Consol. Court No. 1:21-cv-00219, 49 CIT ___, 2025 Ct. Intl. Trade LEXIS 32, at *50 (Mar. 27, 2025) (citing 19 C.F.R. § 201.6(a)(1)).  The Commission's own standards recognize that these kinds of generalizations are non-confidential.  *See* 19 C.F.R. § 201.6(a)(1) ("Nonnumerical characterizations of numerical confidential business information (e.g., discussion of trends)" are generally not entitled to confidential treatment).

Consol. Court No. 1:21-cv-00219 (SAV)                                    Page 25

reshipment capabilities to meet the new market conditions created by "'Black Swan'

level rainfall" during the period of review. *Id.* at 38. No such evidence exists on this

record.

Further tainting the Commission's determination, the Remand Results fail to

account for "whatever in the record fairly detracts from" its conclusion, including

"contradictory evidence or evidence from which conflicting inferences could be

drawn." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978,

985 (Fed. Cir. 1994) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–

88 (1951)). After asking domestic producers for evidence of inventory reshipment,

the Commission received limited evidence of it. The Commission seized on this

evidence to justify its conclusion about inventory reshipment. *See* Remand Results

at 23–24, ECF No. 145. The Commission never considered if these minor instances

of reshipment instead demonstrated that domestic producers lacked inventory

reshipment capability. Yet, this is an obvious "conflicting inference" that could be

drawn from the record evidence which "fairly detracts from" the Commission's

conclusion. *Suramerica*, 44 F.3d at 985. Indeed, when reviewing *importers'* data

showing limited "movement of inventories" during the period of investigation, the

Commission concluded that importers did *not* move "substantial quantities of

inventory between locations…." Remand Results at 25, ECF No. 145. At the very

least, the Commission needs to explain why the same is not true for domestic

producers that similarly reported limited instances of inventory reshipment.

*Compare id.* at 23–24 (noting the low volumes of reshipped inventory reported by

Consol. Court No. 1:21-cv-00219 (SAV)                                    Page 26

domestic producers), *and id.* at 33 (finding domestic producers had an "ability to move and relocate product to where it was needed"), *with id.* at 25 (noting importers' data showed limited "movement of inventories" and concluding importers' "distribution networks were unidirectional").

Defendant-Intervenors' make errors that mirror those in the Remand Results. For example, Mosaic argues "the record demonstrates that Mosaic routinely moves inventories," but then only cites to evidence demonstrating different forms of unidirectional shipment. Mosaic's Comments at 3, ECF No. 188. It cites to the diversion of "tons in transit" to meet "more acute need" as evidence of inventory reshipment. *Id.* at 4. Yet, "tons in transit" are tons that are not yet in inventory. *Id.* If the tons had reached their original destination, they would not be in transit. Mosaic does identify instances of actual inventory reshipment at a low volume. *See id.* at 3. But, as explained above, instances of low volume reshipment alone cannot rationally connect to the Commission's broad reshipment finding. *Cf.* Remand Results at 25, ECF No. 145 (finding with regard to importers that similar low volume shipments were not "substantial").

## C.

Legal errors with the Commission's inventory reshipment finding continue to infect the Commission's larger determination that domestic producers were materially injured by subject imports. The Commission insists that its findings on domestic reshipment are "not central to [its] material injury analysis…." Remand Results at 7, ECF No. 145. The Court disagrees.

Consol. Court No. 1:21-cv-00219 (SAV)                                    Page 27

If domestic producers could not reship their inventories, the Commission's oversupply-based material injury finding collapses like a house of cards. Domestic producers' purported ability to reship inventories drove the Commission to conclude those producers were "well-positioned to supply the U.S. market…." *Id.* at 33. This finding led the Commission to conclude that additional imports into the United States created oversupply conditions that "significantly depressed U.S. prices[,]" injuring domestic producers. *See id.* at 44. However, if domestic producers could not reship their inventories, they would be poorly positioned to supply the U.S. market so that imports would not have created oversupply conditions.

The Commission's material injury determination may not rest on a critical finding that is unsupported by substantial evidence. *See OCP I*, 47 CIT __, 658 F. Supp. 3d at 1318 (first citing *Am. Spring Wire Corp v. United States*, 8 CIT 20, 23 (1984); and then citing *Nucor Corp.*, 28 CIT at 207). The Remand Results hinge on an unsupported inventory reshipment finding; therefore, the Commission's determination must be remanded for a second time. If the Commission wishes to continue finding that domestic inventory reshipment was part of the conditions of competition in the phosphate fertilizer industry, it must use record evidence to explain why — despite low volumes of inventory reshipment — domestic producers nonetheless had the capability to place their large inventories back into supply in the domestic phosphate fertilizer market. In the process, it must address "whatever in the record fairly detracts" from its conclusion. *Suramerica*, 44 F.3d at 985.

Consol. Court No. 1:21-cv-00219 (SAV)                                    Page 28

## II.    Volume, Price, and Impact

The Commission is required by law to conduct an analysis of volume, price effects, and impact on the domestic industry.  *See* 19 U.S.C. § 1677(7)(B)(i).  To be sustained, it must support its analysis with substantial evidence.  Here, the Commission's volume analysis fails that standard because it does not explain its treatment of detracting evidence.  Likewise, the Commission's price effects analysis fails to address important evidence in the record.  The Commission also failed to adequately consider potential flaws in a questionnaire response that it relied on to determine its lost sales figure for its price effects analysis.  These errors, independent of the Commission's domestic reshipment errors, render the Remand Results unsupported by substantial evidence.

When the Commission makes a material injury determination, it must consider:

> (I)     the volume of imports of the subject merchandise,
> (II)    the effect of imports of that merchandise on prices in the United
>         States for domestic like products, and
> (III)   the impact of imports of such merchandise on domestic producers
>         of domestic like products, but only in the context of production
>         operations within the United States[.]

19 U.S.C. § 1677(7)(B)(i).  The Commission must "explain its analysis of each factor[.]" *Id.* § 1677(7)(B); *see also Angus Chem. Co. v. United States*, 140 F.3d 1478, 1486 (Fed. Cir. 1998) (finding that the Commission complied with the statute because it considered the three factors and "explain[ed] its analysis of each factor"); *Altx, Inc. v. United States*, 25 CIT 1100, 1101 (2001) ("Only after the consideration and

Consol. Court No. 1:21-cv-00219 (SAV)                                    Page 29

explanation of all three factors may the Commission arrive at a final

determination.").

## A. Volume

First, the Commission fails to support its volume analysis with substantial

evidence because it ignores important, detracting information in the record and fails

to connect the facts found to the choices made.  In conducting its volume analysis, the

Commission must "consider whether the volume of imports of the merchandise, or

any increase in that volume, either in absolute terms or relative to production or

consumption in the United States, is significant."  19 U.S.C. § 1677(7)(C)(i).  Here,

the Commission found that both the volume and the increase in that volume were

significant.  Remand Results at 27, ECF No 145.  Plaintiffs complain that the

Commission erred by failing to address two categories of record evidence — (1)

instances where Mosaic refused to sell to domestic trading companies and (2)

instances where subject merchandise was re-exported.  For the reasons explained

below, the Court agrees with Plaintiffs that it is not clear from the Commission's

original Views or the Remand Results that the Commission considered either

category of evidence.

### i.    Refusal to Supply the Domestic Market

Several domestic trading companies reported they were unable to buy subject

merchandise from Mosaic during the period of investigation.  These reports describe

instances where the U.S. customers asked to purchase fertilizer and Mosaic declined

to make the sale because of supply constraints.  *See, e.g.*, Hr'g Tr. at 205:22–25, J.A.

Consol. Court No. 1:21-cv-00219 (SAV)                                    Page 30

at 15,701, ECF No. 115 (Mr. Coppess, Retired Executive Vice President of Heartland Co-op: "In May of 2020, Mosaic refused to offer us product or even allow us to prepay pricing … telling us that they were 'out of the market at the present time.'").  For example, Koch, a domestic fertilizer trading company, reported that it needed to purchase imports to satisfy domestic demand because Mosaic refused to sell it requested amounts of fertilizer.[5]  Koch's Comments at 3, ECF No. 164; Koch Questionnaire Resp. at 13, J.A. at 88,781, ECF No. 202.  Another trading company reported that Mosaic refused to sell it *any* fertilizer during the period of investigation. Staff Report at II-9, J.A. at 98,405, ECF No 107; H'rg Tr. at 288:15–20; J.A. at 15,784, ECF No. 115.  The record also contains testimony from executives of Koch and Gavilon Fertilizer LLC (Gavilon) — both major U.S. purchasers — that Mosaic has generally declined their sales inquiries.  Sworn Testimony of Koch's Executive Vice President Scott McGinn, J.A. at 15,692–93, ECF No. 115; Sworn Testimony of Gavilon's President Brian Harlander, J.A. at 3,676, ECF No. 109.

These brokers and traders do not produce fertilizer themselves, and Mosaic argues that it has "legitimate business reasons" for refusing to sell to them.  Mosaic's Comments at 8, ECF No. 188.  The companies "act as middlemen" that "compete with Mosaic for sales to the same downstream retailers."  Mosaic's Comments at 8, ECF No. 188; *see also* Mosaic's Post-Hearing Resps. to Commissioner Questions at 87, J.A. at 97,253, ECF No. 107.  Thus, Mosaic claims to "prioritize sales to loyal customers

---

[5] This information is publicly disclosed in Koch's comments on the Remand Results.  *See* Koch's Comments at 3, ECF No. 164.

Consol. Court No. 1:21-cv-00219 (SAV)                                   Page 31

over trading companies…." Mosaic's Comments at 8, ECF No. 188; *see also* Mosaic's Post-Hearing Resps. to Commissioner Questions at 87, J.A. at 97,253, ECF No. 107.

Plaintiffs argue that Mosaic's refusal to sell undermines the Commission's volume analysis by showing that there was not enough domestic supply to meet demand. OCP's Comments at 10–11, ECF No. 155; Koch's Comments at 3, ECF No. 163; PhosAgro's Comments at 10, ECF No. 160; IRM's Comments at 7–8, ECF No. 166. They claim the Commission "ignore[d]" and "brushed aside" reports that Mosaic refused sales and failed to account for this fact in its volume analysis. OCP's Comments at 10–11, ECF No. 155. Conversely, Defendants say "the Commission fully considered — and reasonably rejected — Plaintiffs['] arguments" in the original Views and Remand Results. Mosaic's Comments at 7, 10, ECF No. 188; *see also* Commission's Comments at 7, 41, ECF No. 182; Simplot's Comments at 7, ECF No. 186.

The Court agrees that the Commission failed to account for this detracting evidence. In its original Views, the Commission acknowledged Plaintiffs' arguments generally but did not address Mosaic's categorical refusal to sell to fertilizer trading companies. Views at 56, J.A. at 99,626, ECF No. 107. The closest the Commission comes to discussing the issue is in a footnote in the Remand Results where it lists Mosaic's counterarguments. Remand Results at 68 n.296, ECF No 145. There, it recites: "Mosaic also contends that some of the supply issues identified by respondent parties are with broker/traders such as ADM and Koch that compete with the domestic industry for sales and rely on a small margin, high volume business model."

*Id.* This recitation is not analysis. *See NuVasive*, 842 F.3d at 1382 (quoting *State Farm*, 463 U.S. at 43) (explaining that an agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made"). It does not explain whether the agency found that Mosaic's arguments were convincing or accorded with other evidence in the record.

The Commission also fails to explain how the domestic industry could be harmed by sales that it refused to make. Mosaic is the largest domestic producer and the U.S. price leader. Staff Report at I-3, Table III-1, J.A. at 98,383, 98,429, ECF No. 107; *id.* at V-8–V-9, J.A. at 98,470–71 (majority of purchasers reporting Mosaic as the U.S. price leader). It is not obliged to take every sale opportunity presented, but it cannot cry foul over opportunities it intentionally rejected. A reasonable observer would not consider a sale "lost" to importers — much less evidencing harm to the domestic companies — if that sale was first offered to and rejected by Mosaic. Mosaic can operate according to whatever business strategy it pleases. In fact, the record indicates that part of Mosaic's strategy during the period of review was to decrease business in the United States and increase business in Brazil. *See* H'rg Tr. at 270–71, J.A. at 15,766–67, ECF No. 115 (Mr. Wessel: "[A]fter Plant City closed, [Mosaic] did cut our supply by 100,000 tons …."); Ex. 1A (Transcript from Mosaic's 2019 Analyst Day), Gavilon Prehearing Br., J.A. at 90,470–71, ECF No. 202 (O'Rourke, Mosaic's President and CEO: "[W]hen we … idled Plant City, that opened up a hole for some imports to increase …. We went from 55%, 60% market share to a more sustainable 50-ish percent market share. So we gave up 1 million tonnes of market

Consol. Court No. 1:21-cv-00219 (SAV)                                    Page 33

here in the U.S. intentionally."); Ex. 2 (2016 news article describing Mosaic's acquisition of Brazilian fertilizer business), Koch's Prehearing Br., J.A. at 9,881–82, ECF No. 110 ("'I am excited at the prospect of leading Mosaic's vastly expanding business in Brazil,' said Mr. McLellan. 'This will be an ideal time for us to grow in the region ….'"). Mosaic cannot have its cake and eat it too by complaining about opportunities it abandoned.

The Commission is free to find that other evidence in the record overcomes the weight of reports that Mosaic refused sales. The Commission is also free to explain why the reports are not credible, if it so finds. What the Commission cannot do is ignore evidence in the record that detracts from its injury determination without explanation. *Suramerica*, 44 F.3d at 985 (quoting *Universal Camera Corp.*, 340 U.S. at 487–88). It must explain how the domestic industry suffered material injury because of "the volume of imports of the subject merchandise" in light of reports that Mosaic chose to leave domestic demand unsatisfied. 19 U.S.C. § 1677(7)(B)(i). Listing a party's counterarguments is not analysis. Instead, the Commission must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168). Thus, the Court remands for the Commission to either make a new finding or to provide a rational explanation of how it weighs the contrary evidence.

### ii.   Re-Exports

The parties also dispute whether the Commission's volume analysis accounted for imports that were re-exported to Canada. The Commission pulled data about the total amount of subject imports that entered the United States during the period of investigation directly from importers' questionnaire responses. *See* Views at 33 n.133, J.A. at 99,603, ECF No. 107 (citing Staff Report at IV-3, Table IV-2); Staff Report at IV-3–IV-4, Table IV-2, J.A. at 98,445–46, ECF No. 107 (noting that the table was "[c]ompiled from data submitted in response to Commission questionnaires"). It then relied on this data to find that the volume of imports and the increase in that volume was significant. *See* Views at 33–35, J.A. at 99,603–05, ECF No. 107; Remand Results at 27–29, ECF No. 145. Throughout the proceedings, Plaintiffs argued this was error because the data includes product that was destined for Canada and therefore did not injure U.S. industry. The Commission's failure to address Plaintiffs' concerns was improper.

"The [Commission's] use of importer questionnaire data to calculate subject import volumes is a well-established and accepted practice." *Celanese Chemicals Ltd. v. United States*, 31 CIT 279, 288 (2007). Courts will not typically disturb the Commission's choice. *Id.* ("[T]here is no presumption favoring the use of official government import statistics such as Census data, or – for that matter – any other set of data."). But the Court will consider whether the data chosen is an accurate basis on which to rely. "A decision based on inaccurate data provides a sound reason for a court to order reconsideration to correct a determination based on those data,

whether the Commission knows of the incorrect data or not." *Borlem S.A. v. United States*, 913 F.2d 933, 941 (Fed. Cir. 1990). This is especially true when the Commission has reason to know that other data would be more accurate. *Celanese*, 31 CIT at 291 (ordering the Commission to "explain why the questionnaire responses remained the best information available" where it had been provided other, corrected data "at the time of its decision").

Here, the Plaintiffs raised their concern that the Commission was relying on an inflated value of import entries early in the proceedings. *See, e.g.*, PhosAgro's Pre-hearing Br. at 15, J.A. at 95,731, ECF No. 107; OCP's Responses to Q&A at 19–20, J.A. at 97,707–08, ECF No. 202; Declaration of Michael R. Rahm 7–8, 10, J.A. at 16,606–07, 16,609, ECF No. 116. They claim that approximately 400,000 short tons of fertilizer initially brought into the United States and reported as imports by the domestic industry were later re-exported to Canada. OCP's Br. at 11–12, ECF No. 56; IRM's Br. at 5 n.2, ECF No. 76; Koch's Br. at 4 n.4, ECF No. 75; OCP's Reply Br. at 5 n.1, ECF No. 105; OCP's Comments at 13–14, ECF No. 156; Eurochem's Comments at 2, ECF No. 154; PhosAgro's Comments at 11, ECF No. 160. Plaintiffs argue it is inappropriate to count the Canada-bound fertilizer as part of the total volume of imports impacting the U.S. market because those Canada-bound imports "do not compete with U.S.-made phosphate fertilizer in the U.S. market[.]" PhosAgro's Comments at 11, ECF No. 160 ("The large quantities of subject imports that are destined for Canada do not compete with U.S.-made phosphate fertilizer in the U.S. market at this time and, therefore, cannot serve as a basis for injury."). The

Consol. Court No. 1:21-cv-00219 (SAV)                                    Page 36

Commission's material injury analysis must be limited to the economic impact of imports in the U.S. market.  *Compare* 19 U.S.C. § 1671(a)(2) (flush language) (requiring injury to be "by reason of imports"), *with* 19 U.S.C. § 1677k (establishing a separate remedial scheme to address any injury suffered by U.S. producers from lost sales in foreign markets).  The Commission — Plaintiffs assert — has therefore artificially inflated the volume of imports in the U.S. during the period of investigation.  OCP's Comments at 13–14, ECF No. 156.

The Commission responds that Plaintiffs cannot now be heard to complain about the use of their own data.  It notes that the questionnaire it sent to importers defines "imports" as "[t]hose products identified for Customs purposes as imports for consumption for which your firm was the importer of record (i.e., was responsible for paying any import duty)."  Importers' Blank Questionnaire, J.A. at 8,704, ECF No. 110.  The Commission argues the importers should have understood from the definition that any reported number should exclude fertilizer later exported to Canada.  Commission's Br. at 11–12, ECF No. 102; Commission's Comments at 12–13, ECF No. 182.  The Commission does not deny that the volume number it cited includes re-exported product.  It instead claims that the importers should have known better when answering the agency's questions, and any blame for error lies at the importers' feet.  Commission's Br. at 11–12, ECF No. 102; Commission's Comments at 13, ECF No. 182 ("The Commission reasonably relied on importers properly reporting imports in accordance with the Commission's explicit instructions.").

Regardless of whether the importers were correct to report product destined for re-export to Canada, the Commission used inaccurate data. The Plaintiffs raised their concern months before the Commission issued its final determination so that the agency had time to look into whether the cumulated import volumes were accurate. *Compare* PhosAgro's Prehearing Br., J.A. at 95,721, ECF No. 107 (raising the concern as early as Feb. 3, 2021), *with Phosphate Fertilizers from Morocco and Russia*, 86 Fed. Reg. 17,642 (ITC Apr. 5, 2021) (publishing the Commission's final determination sixty-one days later). Instead, the Commission ignored the Plaintiffs' concerns and issued its Views without any mention or explanation of the issue. Did the Commission consider the Plaintiffs' concerns disingenuous? Did it think product passing through the United States on its way to Canada was injurious? The Court has no way of knowing. *See Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) ("[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record.").

That the Plaintiffs could have been more fastidious when reviewing the Commission's instructions does not moot the issue — particularly when parties draw the flawed data to the Commission's attention before the record closes. *See Chemours Co. v. United States*, 43 CIT __, 393 F. Supp. 3d 1186, 1194 (2019) (suggesting all relevant factual information can be submitted by parties until the record closes). When the Commission becomes aware of a possible flaw in a timely manner, it has a duty to investigate. *Cf. Borlem*, 913 F.2d at 941 (explaining that a court may remand when the Commission relies on inaccurate data "whether the Commission knows of

the incorrect data or not"). Its failure to do so and address Plaintiffs' legitimate objections demands a remand.

The Court is unpersuaded by the Commission's argument that its volume analysis also cited other data sources that "do[] not include any product that was reshipped out of the United States." Commission's Comments at 13, ECF No. 182. The parties agree that portions of the Commission's volume analysis relied on "U.S. shipments data," which do not include re-exported product. Commission's Comments at 12–13, ECF No. 182; *see also* OCP's Br. at 11–12, ECF No. 56. The Commission's citations to this U.S. shipments data, however, are interwoven with its citations to the potentially inaccurate questionnaire data. *See generally* Remand Results at 27–29, ECF No. 145; *see, e.g., id.* at 28 ("Although the *volume of cumulated imports* of subject phosphate fertilizers decreased … the *volume of U.S. shipments* of subject imports increased …."） (emphases added). These blended citations make it impossible for the Court to discern if the Commission's volume findings can be sustained based solely on references to uncontested "U.S. shipments data." *Compare* Commission's Comments at 13, ECF No. 182, *with NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("[W]hile [the agency's] explanations do not have to be perfect, the path of [their] decision must be reasonably discernable to a reviewing court.") (citing *State Farm*, 436 U.S. at 43). Remand is required.

## B. Price

Section 771 of the Tariff Act also requires the Commission to consider "the effect of imports of [subject] merchandise on prices in the United States for domestic

Consol. Court No. 1:21-cv-00219 (SAV)                                    Page 39

like products[.]"  19 U.S.C. § 1677(7)(B)(i)(II).  The Commission found that low-priced subject imports caused price depression during the period of investigation.  Views at 44, J.A. at 99,614, ECF No. 107; Remand Results at 56, ECF No. 145.  In doing so, it ignored contradictory evidence in the record.  First, it overlooked data that reveals domestic producers consistently oversold subject merchandise compared to importers.  Second, the Commission failed to reckon with the fact that Mosaic is an undisputed price leader in the market.  And third, the Commission relied on a lost sales figure that is undermined by questionnaire data.  For these three reasons, the Court finds the price effects analysis is not supported by substantial evidence.

### i.    Overselling

In both the original Views and the Remand Results, the Commission found that an oversupply of low-priced imports in the U.S. market depressed prices.  *See* Views at 44, J.A. at 99,614, ECF No. 107; Remand Results at 44, ECF No. 145 ("[O]versupply of subject imports and their low prices exerted downward pricing pressure on the domestic like product and significantly depressed U.S. prices in 2019.").  Plaintiffs complain that the Commission reached its finding by ignoring evidence of prevalent overselling in the record.  OCP's Comments at 23–25, ECF No. 155; EuroChem's Comments at 2, ECF No. 154; PhosAgro's Comments at 18–21; ECF No. 160; Koch's Comments at 7, ECF No. 163; IRM's Comments at 12, ECF No. 166; OCP's Reply at 6–9, ECF No. 200.  The Commission responds that it adequately considered all of the evidence on the record.  Commission's Comments at 28–29, ECF

No. 182; Simplot's Comments at 15–21, ECF No. 186; Mosaic's Comments at 21–23,

ECF No. 188.

> The statute provides that:
>
> ii) In evaluating the effects of imports of such merchandise on prices,
> the Commission shall consider whether —
>   I) There has been significant price underselling by the imported
>      merchandise as compared with the price of domestic like
>      products of the United States, and
>   II) The effect of imports of such merchandise otherwise depresses
>       prices to a significant degree or prevents price increases, which
>       otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).  In other words, the Commission must answer two distinct

questions when conducting a price effects analysis.  First, whether the subject

imports were sold at lower prices than the domestic like product to a "significant"

extent during the period of review.  *Id.* § 1677(7)(C)(ii)(I).  And second, whether the

subject imports caused "significant" price depression or price suppression.  *Id.* §

1677(7)(C)(ii)(II).  "Price depression occurs when less-than-fair-value imports cause

domestic industry to lower its prices."  *CP Kelco US, Inc. v. United States*, 38 CIT

1511, 1513 n.4 (2014) (citing 19 U.S.C. § 1677(7)(C)(ii)(II)).  In contrast, "Price

suppression occurs when the less-than-fair-value imports prevent domestic industry

from raising prices when it otherwise would."  *Id.*

Here, the Commission found that imports undersold the domestic like product

in 34 instances out of 170 total.  Views at 37, J.A. at 99,607, ECF No. 107.  Imports

oversold domestic like product in the remaining 136 instances.  *Id.*  That means

importers were selling subject merchandise at a *higher* price than their domestic

counterparts eighty percent of the time.  In nearly all instances, the disparity between

prices of imported and domestic merchandise was small. *Id.* (noting that the average underselling margin was 1.7 percent and the average overselling margin was 3.7 percent); *see also* H'rg Tr. at 51:7–10, J.A. at 15,547, ECF No. 115 (Mr. Klett, Capital Trade Economist: "[P]rices are close, with average over- or underselling margins within [what] one would expect for a commodity industry with transparent pricing."). Furthermore, 20 out of 24 purchasers reported that the domestic product was "comparable" to the product imported from Morrocco — as opposed to higher priced or lower priced. Table II-9, Staff Report at II-26, J.A. at 98,422, ECF No. 107. A similar number of purchasers, 20 out of 23, reported the same when comparing domestic product to product from Russia. *Id.*

The Commission acknowledges that the imports were higher-priced eighty percent of the time but finds that the "low prices" of imports nonetheless depressed U.S. prices. *See* Views at 39, 44, J.A. at 99,609, 99,614, ECF No. 107; Remand Results at 44, ECF No. 145. The Commission explains that prices "tracked each other closely" overall and had "small margins of underselling and overselling." Remand Results at 37, ECF No. 145. It emphasizes that subject imports were lower priced "in some instances" — referencing the twenty percent — and states that those instances of underselling caused the domestic industry to lose sales. *Id.*

This analysis is inadequate. The statute directs the Commission to determine whether there has been "*significant* price underselling," and the Court doubts that a reasonable mind would consider twenty percent "significant." 19 U.S.C. § 1677(7)(C)(ii)(II) (emphasis added). The agency seems to agree, as it has not found

Consol. Court No. 1:21-cv-00219 (SAV) Page 42

significant underselling in other investigations with even more evidence of undersold imports. *See Tapered Roller Bearings from Korea*, Inv. No. 731-TA-1380, USITC Pub. 4806 (Aug. 2018) (finding no significant underselling where imports undersold domestic like product in 47 of 84 instances, or in 56 percent of instances); *Urea Ammonium Nitrate Solutions from Russia and Trinidad & Tobago*, Inv. No. 701-TA-668, USITC Pub. 5338 (Aug. 2022) (finding no significant underselling where imports undersold domestic like product in 39 of 108 instances, or in 36 percent of instances). The Commission may "reach[] different outcomes in cases with different circumstances." *Hitachi Metals, Ltd. v. United States*, 949 F.3d 710, 718 (Fed. Cir. 2020). But that flexibility does not allow the Commission to leave out an explanation of how it analyzed a case's particular circumstances and arrived at its chosen outcome. *Burlington Truck Lines*, 371 U.S. at 168 (1962) (noting that the substantial evidence standard requires the agency to "articulate [a] rational connection between the facts found and the choice made").

The Court is not suggesting that the Commission must make a negative price effects finding whenever instances of underselling fail to meet some magic threshold. Such a holding would be contrary to the statute, which directs the Commission to consider both whether there has been significant underselling *and* whether there has been significant price depression or suppression. 19 U.S.C. § 1677(7)(C)(ii). But the Court is directing the Commission to account for its significant underselling finding in the face of contradictory data. A mere acknowledgment that there is contradictory evidence does not suffice. *PAO TMK v. United States*, 47 CIT __, No. 21-00532, 2023

Ct. Int'l Trade LEXIS 158, at *9 (Oct. 12, 2023) (explaining that the Commission "cannot simply avert its gaze from evidence that contradicts its determination"). Thus, the Court remands to the Commission to further explain or reconsider its underselling finding.

### ii.    Price Leadership

The evidence of pervasive overselling is not the only contrary evidence the Commission fails to adequately address. The Commission's affirmative injury determination rests heavily on the notion that the domestic industry suffered from low-priced imports that depressed prices, especially imports entering the country through New Orleans. *See* Remand Results at 53–54, ECF No. 145. Evidence that the domestic industry — and Mosaic in particular — sets market prices tends to strongly refute the notion that imports depressed prices or undersold the domestic industry. To satisfy the substantial evidence standard, the Commission must account for this evidence.

The Commission's data suggest that the domestic industry — and in particular Mosaic — sets phosphate fertilizer prices in the United States. Eighteen purchasers reported that Mosaic is the industry price leader, multiple times more than the next most-cited company. Staff Report at V-8–9, J.A. at 98,470–71, ECF No. 202. Mosaic is the largest domestic producer in an increasingly consolidated domestic industry. Remand Results at 11, ECF No. 145. Purchasers indicated that Mosaic sets prices by "issu[ing] price lists that other firms follow" and "setting the barge market prices for Tampa … and New Orleans … by announcing price changes in those regions."

Consol. Court No. 1:21-cv-00219 (SAV)                                       Page 44

Staff Report at V-9, J.A. at 98,471, ECF No. 202.  Mosaic accounts for the large

majority of North American phosphate production.  Staff Report at I-3, J.A. at 98,383,

ECF No. 202.  In contrast, only two purchasers listed EuroChem as a price leader;

and two listed OCP.  *See id.* at V-9, J.A. at 98,471, ECF No. 202.

By failing to account for this evidence, the Commission falls short of the

substantial evidence standard.  The standard requires an examination of the whole

record, including the portions of the record that contradict the Commission's

conclusion.  *Suramerica*, 44 F.3d at 985 (quoting *Universal Camera Corp.*, 340 U.S.

at 487–88).  Here, there is detracting evidence — claims by numerous purchasers that

Mosaic is a price leader.  In fact, purchasers claim Mosaic's position in the market is

so strong that other firms follow the prices it sets.  *See* Staff Report at V-9, J.A. at

98,471, ECF No. 202.  Such claims directly contradict the Commission's finding that

low-priced imports depressed U.S. prices.  Sellers in the market that are tracking

Mosaic's prices cannot simultaneously be lowering their prices to compete with

cheaper imports.  The agency's failure to consider this important evidence of Mosaic's

role as a price leader in the original Views or Remand Results is therefore a legal

error requiring remand.  On remand, the Commission must consider the evidence,

and if it continues to find imports caused price depression, the Commission must

provide a satisfactory explanation for its conclusion given the record evidence.

*NuVasive*, 842 F.3d at 1382.

### iii.    Lost Sales

The Commission also fails to support its continued reliance on the lost sales figure used in its original Views with substantial evidence. In the Remand Results, as in the original Views, the Commission relies on a lost sales figure of 733,895 short tons to support its conclusion that the domestic industry lost sales because of lower-priced imports. *See* Views at 36, 38–39, J.A. at 99,608, ECF No. 107; Remand Results at 36–37, ECF No. 145. The Commission draws this number from purchasers' responses to questions about purchasing imports instead of domestic fertilizer. *See* Remand Results at 36, ECF No. 145 (citing Table V-9, Staff Report at V-24, J.A. at 98,486, ECF No. 107). The vast majority of the lost sales figure comes from one purchaser's response. *See* Staff Report at V-24, J.A. at 98,486, ECF No. 202. In relying on this figure, the Commission ignores evidence that "fairly detracts from" its conclusion. *Nippon Steel*, 337 F.3d at 1379. This contrary evidence undermines the lost sales figure such that the Commission lacks an "adequate evidentiary basis" for relying on the figure and fails to "examine the relevant data and articulate a satisfactory explanation for its action." *NuVasive*, 842 F.3d at 1382.

The responses to the Commission's questions about purchasing subject imports instead of domestically produced fertilizer do not allow a reasonable person to conclude that the domestic industry lost any significant amount of sales because of lower-priced imports. Twenty-eight firms answered the Commission's questions. Staff Report at V-24, J.A. at 98,486, ECF No. 202. Seventeen of those firms indicated that they purchased subject imports instead of the domestic product at some point

Consol. Court No. 1:21-cv-00219 (SAV)                                    Page 46

during the period of investigation. *Id.* Only five indicated that a primary reason for

their purchase was that subject imports were lower priced. *Id.* Of those five, ███ are

themselves domestic producers and one did not provide the actual quantity of its

alleged lost sales. *Id.*

The Commission asked firms that purchased subject imports for non-price

reasons to indicate the non-price reason for their purchase. *Id.* Nine firms did, and

their responses were relatively consistent: At least six indicated in some manner that

domestic product was unavailable. *Id.* Thus, more purchasers reported availability

as their primary reason for purchasing subject imports than price. From responses

where less than one-fifth of firms indicated purchasing subject imports primarily for

price reasons and more firms indicated purchasing subject imports for availability

reasons, the Commission concludes that "the domestic industry lost sales" because of

lower-priced imports. Remand Results at 37, ECF No. 145. Nowhere in its discussion

does the Commission explain how it draws this conclusion given the small portion of

firms that provided responses supporting this conclusion and the greater portion that

provided contradictory responses. *Cf. State Farm*, 463 U.S. at 43 ("[T]he agency must

examine the relevant data and articulate a satisfactory explanation for its action

including a 'rational connection between the facts found and the choice made.'")

(quoting *Burlington Truck Lines*, 371 U.S. at 168).

The overwhelming majority of the 733,895 short ton lost sales figure is based

on an outlier response from just one purchaser. *See* Staff Report at V-24, J.A. at

98,486, ECF No. 202; Remand Results at 36, ECF No. 145. The outlier purchaser's

APPX0000146

Consol. Court No. 1:21-cv-00219 (SAV)                                    Page 47

reported lost sales are more than ■ times those of any of the other firms that

reported a lost sales quantity.  *See* Staff Report at V-24, J.A. at 98,486, ECF No. 202.

The outlier purchaser is also the only firm to designate all its subject import

purchases as lost sales for the domestic industry.  *See id.* at V-22, 24, J.A. at 98,484,

86, ECF No. 202.  These discrepancies alone are enough to call into question the

accuracy of the outlier purchaser's response.

When asked to clarify the reason for its purchases of subject imports, the

outlier purchaser gave further cause to believe its response was not accurate.  It

reported that a majority of its subject import purchases were for price reasons.

Remand Results at 36 n.168, ECF No. 145.  But it also reported that there is not

enough available domestic product to meet its purchasing needs and it sometimes

purchases imports at a higher price than the going rate for domestic product when

domestic product is unavailable.  *Id.*  Thus, the outlier purchaser admits that it made

some of its import purchases for reasons other than price.  In response to objections

raised by the Plaintiffs, the Commission found that "the record does not support

disregarding" the entirety of the outlier purchaser's reported lost sales.  Remand

Results at 36, ECF No. 145.

This may be true, but it does not follow that the Commission should rubber

stamp the entirety of the outlier purchaser's reported lost sales.  If the Commission

wishes to credit some portion of the reported lost sales on remand, it must adequately

explain this decision, including by addressing detracting evidence.  Its failure to do

Consol. Court No. 1:21-cv-00219 (SAV)                                     Page 48

so in the lost sales portion of the Remand Results renders its lost sales determination unsupported by substantial evidence.

## CONCLUSION

The record before the Commission raises serious questions about whether domestic producers were able and willing to supply consumers during the period of review. Questionnaire responses suggest that domestic producers were unable to relocate their phosphate fertilizer inventories to meet new market demand; and reports from phosphate fertilizer trading companies indicate that the largest domestic producer — Mosaic — refused to sell to these companies. If domestic producers were unable or unwilling to meet the needs of U.S. consumers, that would create a supply gap. Any imports filling this gap would not materially injure domestic producers because those imports would be making sales that U.S. producers otherwise could not, or would not, make.

Rather than address this evidence to arrive at a reasonable conclusion about the U.S. phosphate fertilizer market, the Commission talked past these issues. First, it concluded that domestic producers can reship inventories at whatever quantities are needed. That conclusion rests entirely on small-scale instances of reshipment that no reasonable observer would believe proves the existence of a reship-at-will capability. Second, the Commission found that significant volumes of imports entered the U.S. market. This finding failed to adequately account for how Mosaic's refusals to sell to domestic customers may have impacted import inflows. It also failed to consider evidence showing some imports were exported to Canada rather than sold to U.S. consumers. Third, the Commission concluded that imports

Consol. Court No. 1:21-cv-00219 (SAV)                                    Page 49

significantly depressed U.S. prices and took sales from U.S. firms.  Those conclusions

did not grapple with the fact that imports only undersold domestic product in twenty

percent of instances, that Mosaic was the price leader in the market, and that the

Commission's evidence of lost sales came from a potentially flawed survey response.

These errors render the Remand Results unsupported by substantial evidence

and not in compliance with the Court's remand order in *OCP I*.  47 CIT __, 658 F.

Supp. 3d at 1324.  It is therefore **ORDERED** that the case is **REMANDED** to the

Commission for new action consistent with this opinion. [6]   On remand, the

Commission may take new evidence, reconsider existing evidence, or take any other

action allowed by its procedures to come to a conclusion supported by substantial

evidence.  The Commission should take care to address each error identified by the

Court and remedy each error in a manner supported by substantial evidence.

The Commission is directed to file its remand redetermination within 90 days

of the date of this decision.  Plaintiff shall have 30 days thereafter to file any

---

[6] Before this opinion could be published, the Commission filed a petition for a writ of mandamus at the Federal Circuit.  *See* Notice of Docketing, ECF No. 222.  That petition arises out of the Court's prior opinion in this case, which ordered the disclosure of non-confidential information that the Commission erroneously treated as confidential in the public record.  *See OCP S.A. v. United* States, Consol. Court No. 1:21-cv-00219, Slip Op. No. 25-32 (CIT March 27, 2025).  Unlike an ordinary appeal, a petition for a writ of mandamus does not divest this Court of jurisdiction over the underlying case.  *Compare Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (noting that appeals of final orders "divest[] the district court of its control over those aspects of the case involved in the appeal"), *with Nascimento v. Dummer*, 508 F.3d 905, 910 (9th Cir. 2007) ("Petitions for extraordinary writs do not destroy the district court's jurisdiction in the underlying case."), *Clark v. Taylor*, 627 F.2d 284, 288 (D.C. Cir 1980) ("[T]he trial court had not lost its jurisdiction because the appellate court was entertaining an application for writ of mandamus."), *and Kellogg v. Watts Guerra LLP*, 41 F.4th 1246, 1259 (10th Cir. 2022) ("But the filing of a mandamus petition didn't divest the district court of jurisdiction.").  None of the information in this opinion is properly characterized as confidential.

Consol. Court No. 1:21-cv-00219 (SAV)                                                    Page 50

comments on the remand redetermination. Plaintiff-Intervenors and the Consolidated Plaintiff shall have 14 days after the filing of Plaintiff's comments to file their own comments. The Commission shall file its comments within 30 days of the filing of Plaintiff-Intervenors' and the Consolidated Plaintiff's comments. Defendant-Intervenors shall file their comments within 14 days of the filing of the Commission's comments. Plaintiff shall have the option of filing a reply to these comments, due 30 days from the filing of Defendant-Intervenors' comments. On remand, unless directed otherwise by the Federal Circuit, the Commission must (1) comply with this Court's previous opinion when determining which information deserves confidential treatment and (2) correct the public version of the record to reveal the wrongfully redacted information. *See OCP S.A. v. United States*, Consol. Court No. 1:21-cv-00219, 49 CIT __, 2025 Ct. Intl. Trade LEXIS 32 (Mar. 27, 2025).

**SO ORDERED**.


 /s/ Stephen Alexander Vaden
Stephen Alexander Vaden, Judge


Dated:  April 22, 2025
            New York, New York

**List 1, Doc. No. 296R – EDIS No. 812257**

**USITC Pub. 5490: *Phosphate Fertilizers from Morocco and Russia,* Inv. Nos. 701-TA-650-651 (Final) (Remand) (January 2024)**

APPX0021207

# Phosphate Fertilizers from Morocco and Russia

Investigation Nos. 701-TA-650-651 (Final) (Remand)

**Publication 5490**                                      **January 2024**



**U.S. International Trade Commission**

**Washington, DC, 20436**

APPX0021208

# U.S. International Trade Commission

## COMMISSIONERS

**David S. Johanson, Chairman**
**Rhonda K. Schmidtlein**
**Jason E. Kearns**
**Amy A. Karpel**

Catherine DeFilippo

*Director of Operations*

*Staff assigned*

Calvin Chang, Investigator
Courtney McNamara, Attorney
Nathanael Comly, Supervisory Investigator

Address all communications to
Secretary to the Commission
United States International Trade Commission
Washington, DC 20436

APPX0021209

# U.S. International Trade Commission

Washington, DC 20436
*www.usitc.gov*

# Phosphate Fertilizers from Morocco and Russia

Investigation Nos. 701-TA-650-651 (Final) (Remand)



**Publication 5490** **January 2024**

APPX0021210

APPX0021211

## Views of the Commission

By opinion and order dated September 19, 2023, the U.S. Court of International Trade, remanded the Commission's final affirmative injury determinations in *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final), USITC Pub. 5172 (March 2021).[1] Upon consideration of the remand order and evidence in the record of these investigations, the Commission determines again that an industry in the United States is materially injured by reason of phosphate fertilizers from Morocco and Russia found by the U.S. Department of Commerce ("Commerce") to be subsidized by the governments of Morocco and Russia.[2]

## I.   Background

In March 2021, the Commission determined that an industry in the United States was materially injured by reason of subject imports from Morocco and Russia.[3]  Plaintiffs OCP S.A. ("OCP"), a producer and exporter of phosphate fertilizers in Morocco, and EuroChem North America Corporation ("EuroChem"), a U.S. importer of subject merchandise from Morocco and Russia, appealed the Commission's final affirmative determinations.  Several respondent interested parties participated as plaintiff-intervenors:  PhosAgro PJSC ("PhosAgro"), a producer and exporter of phosphate fertilizers in Russia, and International Raw Materials Ltd. ("IRM") and Koch Fertilizer ("Koch"), U.S. importers of subject merchandise.  Petitioner the Mosaic

---

[1] *OCP S.A. v. United States*, Consolidated Court No. 21-00219, Slip Op. 23-136 (Sept. 19, 2023) ("Remand Order").

[2] Chairman Johanson again determines that an industry in the United States is not materially injured or threatened with material injury by reason of subject imports from Morocco and Russia. *See* Dissenting Views of Chairman David S. Johanson.

[3] *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final), USITC Pub. 5172 (March 2021) and accompanying Confidential Views ("Original Views").  Citations to the page numbers of the Original Views herein refer to the Confidential Views.

1

Company ("Mosaic") and J. R. Simplot Company ("Simplot"), another domestic producer, also participated in the litigation as defendant-intervenors.

In its remand order, the court found that the Commission's finding that fertilizer could be reshipped from one destination to another to meet existing demand, was unsupported by the record evidence.[4]  Further, the court opined that this Commission finding "undergirds the Commission's determination across all statutory factors."[5]  The court indicated that on remand, the "Commission may take new evidence, reconsider existing evidence, or take any other action allowed by its procedures" to arrive at a conclusion supported by substantial evidence.[6]

On October 27, 2023, the Commission published notice of its remand proceedings in the Federal Register.[7]  In the notice, the Commission explained that it was reopening the record in these proceedings for the limited purpose of issuing a short supplemental questionnaire to U.S. producers and U.S. importers.[8]  The Commission did not otherwise reopen the record for the collection of new factual information.[9]  The notice further "permit{ted} the parties to file written comments limited to addressing new factual information obtained during the remand proceedings and how the Commission could best comply with the Court's remand instructions."[10]  Accordingly, domestic interested parties Mosaic and Simplot filed comments as did respondent interested parties, OCP, Eurochem, PhosAgro, IRM, Koch.  The notice provided

---

[4] Remand Order at 49.

[5] Remand Order at 3.

[6] Remand Order at 49.

[7] *Phosphate Fertilizers from Morocco and Russia*, 88 Fed. Reg. 73873 (Oct. 27, 2023).  The Commission subsequently issued a correction to the notice of remand proceedings correcting the effective date of the notice to October 23, 2023.  *Phosphate Fertilizers From Morocco and Russia; Notice of Remand Proceedings; Correction,* 88 Fed. Reg. 75308 (Nov. 2, 2023).

[8] 88 Fed. Reg. 73873.

[9] 88 Fed. Reg. 73873.

[10] 88 Fed. Reg. 73873.

2

that "{t}he Commission will reject submissions containing additional factual information or arguments pertaining to issues other those defined above."  Notwithstanding this, some of the parties included in their remand comments arguments regarding issues outside the scope of the remand request.  We have not rejected those submissions but have disregarded arguments in the remand comments concerning non-remand issues.  Accordingly, we have considered remand comments only insofar as they addressed issues on which the court has remanded this matter.[11]

Domestic interested parties contend that the remand questionnaires demonstrates that reshipment of fertilizers is a normal business practice that occurs routinely as part of the conditions of competition in the fertilizers industry, including during the spring of 2019 when flooding affected the Mississippi River system.[12]  In support, they note that domestic producers reported ***, which means that they are best positioned to deliver product and, if needed, redirect when there are supply chain disruptions, such as flooding and related logistics problems.[13]  They also refer to remand questionnaire responses to show that product was *** as well as that of importer ***.[14]  Domestic interested parties contend that the significant volume of cumulated subject imports that entered the U.S. market were not due to any supply gap or because domestic product was "practically unavailable."[15]  Mosaic argues that new

---

[11] We note, however, that we did have the benefit of arguments on all issues that were made during the original investigations, and as necessary, considered the arguments made in submissions already on the record.

[12] Mosaic Comments at 2-5; Simplot Comments at 2-5.

[13] Mosaic Comments at 3-4; Simplot Comments at 3.

[14] Mosaic Comments at 3-5; Simplot Comments at 4-5.

[15] Mosaic Comments at 7-9; Simplot Comments at 5-8.

3

evidence disproves respondents' claims about weather-related effects.[16] Simplot also argues that NOLA {the Port of New Orleans, Louisiana} benchmark prices "showed no sign of 'high demand' areas with unmet demand as they "plummeted to historically low levels in 2019," belying respondents' assertions that increased U.S. shipments and inventories were "somehow benign responses to weather-related supply misallocations.[17]

Respondents assert that the Commission's original material injury analysis rests on the erroneous finding that subject imports oversupplied the market in 2019 based on the assumption that existing inventories could be re-barged and reshipped to other areas of the United States.[18] They argue that newly obtained information in the remand proceedings demonstrates that the U.S. fertilizer distribution network is unidirectional, not only for importers but also for domestic producers.[19] Respondents further contend that the remand questionnaire responses demonstrate that reshipment of subject import inventories is not possible on a large scale or a "normal business practice," but rather it is cost prohibitive and not economically feasible.[20] Respondents argue that, because the Commission's finding that subject imports were "oversupplied" was "central to {the Commission's} determination that the volume, price effects, and impact of subject imports was significant," the Commission should reach negative determinations on remand.[21] In respondents' view, as explained by OCP, the

---

[16] Mosaic Comments at 10-15.

[17] Simplot Comments at 8-12.

[18] OCP Comments at 1-4; PhosAgro Comments at 1-8.

[19] OCP Comments at 5-13; PhosAgro Comments at 8-12; Koch Comments at 3-4; IRM Comments at 3-4; Eurochem Comments at 1-2.

[20] OCP Comments at 7-13; PhosAgro Comments at 11-14; Koch Comments at 3-4; IRM Comments at 3-4.

[21] OCP Comments at 15-25; PhosAgro Comments at 15-23 Koch Comments at 5-6; IRM Comments at 5-6; Eurochem Comments at 1-2.

4

court's identification of "oversupply" as being "central" to the injury determination means that the Commission's finding of a causal link between imports and material injury is not supported by any record evidence.[22]

## II.   Material Injury By Reason of Subject Imports

In responding to the Court's remand instructions, we have considered the factual record as a whole, as well as arguments made by the parties in their submissions in both the proceedings of the original investigations and the remand proceedings.  We have adopted in their entirety the Commission's original findings, analysis, and conclusions regarding issues not raised on appeal:  the legal standards, domestic like product, domestic industry, negligibility, and cumulation.[23]

As an initial matter, we respectfully address the court's characterization of our observation in the Original Views that importers conceded that it was possible albeit not economical to reship product from existing inventories to other locations.[24]  The court understood this to be an "important" finding upon which the Commission's "theory" that imports contributed to the oversupply conditions in the U.S. market "rests like an inverted pyramid on an unsupported finding regarding what might be possible if economics did not matter."[25]  We clarify that this observation was not central to our material injury analysis and, as described below, continue to find that an industry in the United States is materially injured

---

[22] OCP Comments at 23-24.

[23] Additionally, in our analysis below, we do not readdress several arguments raised by the parties in the original investigations that pertain to issues that were not challenged on appeal, but we adopt and incorporate our discussions and conclusions regarding those issues here.

[24] Original Views at 43 n.161, 56 n.217.

[25] Remand order at 29, 35.

5

by reason of phosphate fertilizers from Morocco and Russia that Commerce has found to be subsidized by the governments of Morocco and Russia, without reliance upon that original finding.

### A.  Conditions of Competition and the Business Cycle

### 1.  Demand Conditions

As explained in the Original Views,[26] U.S. demand for phosphate fertilizers is primarily driven by agricultural plantings, particularly for crops that consume the most fertilizer (*i.e.*, corn, soybeans, and wheat).  Weather volatility, cropping practices and crop rotation, and agricultural commodity prices also affect U.S. demand.[27]

Due to its relationship to agricultural plantings, U.S. demand for phosphate fertilizers is subject to seasonal business cycles, with most market participants reporting peak demand in the spring (second quarter, prior to planting) and fall (fourth quarter, after harvest).[28]  Mosaic states that to meet the two seasonal surges in demand, producers manufacture phosphate fertilizers throughout the year, and the supply chain, including wholesalers and retailers, moves product into position during the off seasons.[29]  According to respondents, it takes time for distributors to obtain fertilizer and move it through the supply chain into warehouses in the off seasons for use by farmers, and distributors therefore rely on demand projections in obtaining

---

[26] Original Views at 20-22.

[27] CR/PR at II-11; Mosaic Prehearing Br. at 20; OCP Prehearing Br. at 6, 33; Gavilon Prehearing Br. at 10; PhosAgro Prehearing Br. at 6; PhosAgro Posthearing Br. at 3, 6.

[28] CR/PR at II-15.

[29] Mosaic Prehearing Br. at 24.  U.S. producers reported that *** percent of their commercial shipments in 2019 came from inventory with lead times averaging *** days.  CR/PR at II-17.

6

product.[30]  We note however that, notwithstanding this, the record shows that foreign

producers and/or importers are able to move quickly to respond to changes in the market.

Specifically, as we noted in the Original Views, the parties agreed that the filing of the petitions

on June 26, 2020 resulted in a large decrease in the volume of cumulated subject imports.[31]

Indeed, the monthly volume of subject imports decreased from 62,426 short tons in June 2020

to 57,660 short tons in July 2020, 14,365 short tons in August 2020, and 10,599 in September

2020.[32]

As we discussed in our Original Views,[33] the parties agree that while U.S. demand

increased between 2017 and 2018, the U.S. market experienced unusually wet weather

conditions that impacted three consecutive planting seasons beginning in the fall of 2018 and

continuing into the spring of 2019 and fall of 2019.  Consequently, crop plantings fell and U.S.

demand for phosphate fertilizers declined in 2019.  U.S. demand, however, rebounded in

---

[30] OCP Prehearing Br. at 6, 37-39; Koch Prehearing Br. at 6-7; OCP Posthearing Br. at Responses to Questions pp. 27-28, 39; IRM Posthearing Br. at 7; Koch Posthearing Br. at 11-12; EuroChem Posthearing Br. at 8.  U.S. importers reported that *** percent of their commercial shipments in 2019 came from inventory with lead times averaging *** days.  Importers also reported *** percent of their commercial shipments came from foreign producers' inventories, with lead times averaging *** days. CR/PR at II-17.

[31] Original Views at 34 n.134; Mosaic Prehearing Br. at 43-44, 91; Simplot Prehearing Br. at 29-30, 34; Simplot Posthearing Br. at Responses to Questions pp. 53-54; Mosaic Posthearing Br. at Responses to Questions pp. 69-70; OCP Posthearing Br. at 12, Responses to Questions pp. 33, 67-73; EuroChem Posthearing Br. at 11; IRM Posthearing Br. at 8-9; PhosAgro Posthearing Br. at 12-13, Responses to Questions.  Some U.S. importers indicated that they stopped bringing in subject imports "because the buyers and the sellers agreed that the risk of 75 percent countervailing duties was higher than either of them wanted to take."  Hearing Tr. at 337 (Aranoff); *see also* EuroChem Posthearing Br. at 11 (stating that as a result of the filing of the petitions, it shifted its purchases of phosphate fertilizers from Morocco and Russia to other global sources); *** U.S. Purchaser Questionnaire Response at III-11 (reporting that Koch and IRM will not quote or import material until the countervailing duty decision is issued); *** U.S. Purchaser Questionnaire Response at III-11 (reporting that Helm, Koch, and OCP "cut off" supplying imported product to the U.S. market in the summer of 2020).

[32] CR/PR at Table IV-6.

[33] Original Views at 21-22.

7

January to September ("interim") 2020 with increased crop plantings.[34]  Most responding U.S.

producers, importers, and purchasers reported that U.S. demand for phosphate fertilizers

either fluctuated or did not change during the period of investigation.[35]

As we previously explained, data from the U.S. Department of Agriculture's ("USDA")

Farm Service Agency confirm that total planted acres increased from 2017 and 2018, decreased

between 2018 and 2019, then increased again between 2019 and 2020.[36]  Overall, total acres

planted was 3.6 percent lower in 2019 compared to 2017 and 0.6 percent lower in 2020

compared to 2017.[37]  Apparent U.S. consumption for phosphate fertilizers increased from ***

short tons in 2017 to *** short tons in 2018, then decreased to *** short tons in 2019 for an

overall decline of *** percent between 2017 and 2019; it was *** percent lower in interim

2020, at *** short tons, than in interim 2019, at *** short tons.[38]

### 2.    Supply Conditions

The domestic industry was the largest supplier of phosphate fertilizers to the U.S.

market throughout the POI.  Its share of apparent U.S. consumption declined from *** percent

in 2017 to *** percent in 2018 and *** percent in 2019, representing an overall decrease of

*** percentage points between 2017 and 2019.[39]  The domestic industry's share of apparent

---

[34] CR/PR at II-11, Figure II-1; Mosaic Prehearing Br. at 20-21; OCP Prehearing Br. at 6, 34-36, 43-51; IRM Prehearing Br. at 15-17; Gavilon Prehearing Br. at 11-12, 14-16; PhosAgro Prehearing Br. at 6-7.

[35] CR/PR at Table II-4.  Specifically, two of three responding domestic producers, seven of 10 U.S. importers, and 14 of 28 U.S. purchasers indicated that U.S. demand fluctuated since January 1, 2017, while one domestic producer, two U.S. importers, and eight purchasers reported that demand did not change. *See id.*

[36] The USDA reported that acres planted for corn, soybeans, and wheat were 226.4 million in 2017, 225.9 million in 2018, 211.3 million in 2019, and 218.4 million in 2020.  It projected the acres planted for these crops to be 227.0 million in 2021.  CR/PR at II-11 n.23.

[37] CR/PR at II-11, Figure II-1.

[38] CR/PR at Tables IV-7, C-1.

[39] CR/PR at Tables IV-8, C-1.

8

U.S. consumption was *** percent in interim 2019 and *** percent in interim 2020.[40]

In addition to supplying the majority of the U.S. market, the domestic industry also exported substantial volumes of phosphate fertilizers to third country markets, although these volumes declined after the petitions were filed. The domestic industry's export shipments accounted for *** percent of its total shipments in 2017, *** percent in 2018, and *** percent in 2019; its export shipments accounted for a lower share of its total shipments in interim 2020 at *** percent than in interim 2019 at *** percent.[41] *** largest export market was ***, while *** largest export market was Canada.[42]

During the POI, three firms – Mosaic, Nutrien, and Simplot – accounted for the vast majority of all known U.S. production of phosphate fertilizers, with Mosaic the leading producer.[43] Mosaic reported several changes in operations during the POI. In December 2017, Mosaic idled its 2 million ton production facility in Plant City, Florida for 18 months and then

---

[40] CR/PR at Tables IV-8, C-1.

[41] CR/PR at Table III-6. U.S. producers' export shipments declined from *** short tons in 2017 to *** short tons in 2018, before increasing in 2019 to *** short tons. Their export shipments were lower in interim 2020, at *** short tons, than in interim 2019, at *** short tons. *See id.*

[42] CR/PR at III-11 n.26. *** accounted for *** percent of *** export shipments between 2017 and 2019. *** also shipped product to ***. At least *** percent of *** exports and *** percent of *** exports went to Canada during 2017-2019 and interim 2020. They also exported product to ***. *See id.*

[43] CR/PR at I-3, Table III-1. In 2019, Mosaic accounted for *** percent of domestic production. CR/PR at Table III-1. Over the past several decades, the domestic industry experienced significant contraction in the number of producers and production facilities. Mosaic Prehearing Br. at 22; OCP Prehearing Br. at 6-16; Gavilon Prehearing Br. at 17-19; IRM Prehearing Br. at 4-6. According to respondents, depleted U.S. phosphate ore reserves (from which the primary raw material phosphate rock is refined), caused this consolidation of the domestic industry. OCP Prehearing Br. at 6-16; Gavilon Prehearing Br. at 17-19; IRM Prehearing Br. at 4-6. Mosaic and Simplot maintain, however, that the United States has plenty of remaining and untapped phosphate rock reserves and that mining capacity currently exceeds production capacity. Hearing Tr. at 139-143 (Stone, O'Rourke). Indeed, Mosaic reports that its phosphate rock production and quality have remained consistent over the POI. Mosaic Prehearing Br. at 92-93; Mosaic Postconference Br. at Exhibit 31. OCP itself acknowledges that U.S. annual phosphate rock production represents nearly 15 percent of global production, rendering the United States the world's third largest producer. OCP Prehearing Br. at 11.

9

permanently shuttered the facility in June 2019.[44]  In March 2019, Mosaic announced a 300,000 short ton curtailment in production, and in September 2019, Mosaic temporarily idled operations at its facilities in Saint James (Faustina) and Uncle Sam, Louisiana, curtailing production by 500,000 short tons.  It restarted operations at these facilities in December 2019, but idled its plant in Barstow, Florida that same month, curtailing production by 165,000 tons per month.  Mosaic resumed production at its Barstow facility in February 2020.[45]

From 2017 to 2018, Nutrien increased its capacity and production at its Aurora, North Carolina and White Springs, Florida phosphate facilities.[46]  In May 2019, Nutrien converted its phosphate operation in Redwater, Canada to an ammonium sulfate plant.[47]  Nutrien's CEO stated at the time that the increase in production in North Carolina and Florida was expected to offset the reduction in supply from its Redwater facility.[48]  Nutrien's U.S. production increased by *** percent from 2018 to 2019 and its production and production capacity increased *** of the POI.[49]

As a result of these operational changes and curtailments, and notwithstanding that *** increased its production capacity by *** short tons from 2017 to 2018, the domestic industry's capacity decreased from *** short tons in 2017 to *** short tons in 2018 and *** short tons in 2019.[50]  The domestic industry's capacity was higher in interim 2020 at *** short tons than in

---

[44] CR/PR at III-3.
[45] Mosaic Prehearing Br. at 2; Mosaic Posthearing Br. at Responses to Questions pp. 22-23.
[46] CR/PR at III-3 and Table III-3.  *** production capacity increased by *** short tons, from *** short tons in 2017 to *** short tons in 2018, due to ***.  CR/PR at III-5 n.18.
[47] CR/PR at Table III-3.
[48] CR/PR at III-3.
[49] CR/PR at Table III-3.
[50] CR/PR at Table III-3.

10

interim 2019 at *** short tons.[51]  The domestic industry's production and U.S. shipments also decreased each full year of the POI, and the domestic industry consequently had available excess capacity throughout the POI.[52]

Subject imports accounted for the second largest source of supply to the U.S. market. Their share of apparent U.S. consumption rose from *** percent in 2017 to *** percent in 2018 and *** percent in 2019, an increase of *** percentage points over the POI.[53]  Subject imports' share of apparent U.S. consumption was *** percent in interim 2019 and *** percent in interim 2020.[54]

Nonsubject imports were the smallest source of supply to the U.S. phosphate fertilizer market.  Their share of apparent U.S. consumption increased from *** percent in 2017 to *** percent in 2018, before declining to *** percent in 2019.[55]  Nonsubject imports' share of apparent U.S. consumption was *** percent in interim 2019 and *** percent in interim 2020.[56] According to questionnaire data, the largest nonsubject source of phosphate fertilizers to the U.S. market in 2019 was Saudi Arabia, which accounted for *** percent of total phosphate fertilizer imports.[57]

---

[51] CR/PR at Tables III-4, C-1.

[52] The domestic industry's capacity utilization rate was *** percent in 2017, *** percent in 2018, and *** percent in 2019; it was lower in interim 2020, at *** percent, than in interim 2019, at *** percent.  CR/PR at Tables III-5, C-1.

[53] CR/PR at Tables IV-8, C-1.

[54] CR/PR at Tables IV-8, C-1.

[55] CR/PR at Tables IV-8, C-1.

[56] CR/PR at Tables IV-8, C-1.

[57] CR/PR at IV-2, Table IV-2.  Nonsubject imports from Saudi Arabia increased from *** short tons in 2017 to *** short tons in 2018 and *** short tons in 2019; they were *** short tons in interim 2019 and *** short tons in interim 2020.  In 2014, Mosaic acquired a 25 percent equity interest in Ma'aden Wa'ad Al Shamal Phosphate Company ("MWSPC"), a joint venture that began to produce phosphate fertilizers in Saudi Arabia in 2017.  MWSPC currently has an annual capacity of 3.3 million short tons.  CR/PR at VII-21; Mosaic Prehearing Br. at Exhibit 7 p.3.

11

As we discussed in our Original Views,[58] *** U.S. producers, five of ten importers, and 16 of 28 purchasers reported experiencing supply constraints during the POI.[59] However, the parties disagree on the extent of any supply shortages.  Respondents generally argued that the shuttering of Mosaic's Plant City facility in 2017 and Nutrien's announcement and subsequent closure of its Redwater, Canada facility in 2019 left a "gaping hole in supply," and that imports were "pulled into" the market as a result.[60] Ten purchasers reported experiencing delays, shortages, and/or allocations from Mosaic, and *** elaborated that Mosaic has refused to supply the firm *** and that this caused delays in its ability to supply its customers.[61] U.S. producer ***,[62] while Mosaic acknowledged that after its decision to idle its Plant City facility in December 2017, it reduced its phosphate sales volume targets with certain larger customers – specifically, with CHS by 200,000 tons and with Gavilon by 100,000 tons relative to the prior year.[63] Mosaic reported that ***.[64]

As an initial matter, we wish to clarify that to the extent that we referenced any "supply gap" in our Original Views,[65] we did so in the context of discussing party argument regarding respondents' assertions that subject imports were "pulled" into the U.S. market to fill an alleged domestic industry supply gap.  As detailed below, we find that the record does not support respondents' assertions that the imports were "pulled into" the U.S. market to fill a

---

[58] Original Views at 25-27.
[59] CR/PR at II-8 – II-9.
[60] *See e.g.*, OCP Posthearing Brief at 2-8 and Responses to Questions pp. 7-26, 29-32, and 74-82; PhosAgro Posthearing Brief at 3; Koch's Posthearing Brief at 14; IRM Posthearing Brief at 4-7, and 9-11.
[61] CR/PR at II-8-9.
[62] CR/PR at II-8.
[63] Mosaic Posthearing Br. at Responses to Questions p. 83.
[64] Mosaic U.S. Producer Questionnaire Response at IV-16.
[65] Original Views at 26-27.

12

"gaping hole in supply" of 1.1 million short tons that was filled by the over 1 million short ton increase in subject imports in 2018.[66]

As we noted in our Original Views,[67] Mosaic asserted that idling the Plant City facility resulted in approximately 700,000 short tons of reduced supply to the U.S. market between 2017 and 2018.[68] We find Mosaic's estimate to be credible and consistent with other record evidence.[69] We also note that, notwithstanding this estimate, the record shows that Mosaic's U.S. shipments actually only decreased from 2017 to 2018 by *** short tons.[70] The volume of cumulated subject imports, however, increased by a greater amount – more than one million short tons – during this time, and importers' U.S. shipments of subject imports increased by

---

[66] *See e.g.*, OCP Posthearing Brief at 2-8 and Responses to Questions pp. 7-26, 29-32, and 74-82; PhosAgro Posthearing Brief at 3; Koch's Posthearing Brief at 14; IRM Posthearing Brief at 4-7, and 9-11.

[67] Original Views at 26-27.

[68] Hearing Tr. at 39 (McLellan) ("Plant City...produced about 1.4 million short tons when it was idled in 2017. We sold about 700,000 short tons of that production into the U.S. market.").

[69] Original Views at 26, CR/PR at III-11, Mosaic Revised Domestic Producer Questionnaire at II-7. Specifically, a representative from Mosaic testified that Plant City produced about 1.4 million short tons at the time it was idled in 2017. Mosaic exported *** percent of its total shipments in 2017, with U.S. shipments accounting for *** percent of total shipments that year, which would be consistent with the estimate that the idling of Plant City reduced domestic supply by only 700,000 short tons rather than the full 1.4 million short tons produced at the Plant City facility. CR/PR at III-11 n.26. In contrast, export shipments accounted for a *** during 2017-2019 and in both interim periods, accounting for no more than *** percent in any period. *Id.*

[70] Mosaic Revised Domestic Producer Questionnaire at II-7.

13

604,000 short tons.[71][72]  We therefore find that the volume of cumulated subject imports far exceeded either the Mosaic's reasonable estimate of its reduced supply or the amount by which it actually reduced its U.S. shipments, following the idling of its Plant City facility.[73]  As such, we find respondents' argument that cumulated subject imports were merely "pulled into" the market as a result to be unavailing.[74]

---

[71] Subject imports increased from 1,971,222 short tons in 2017 to 2,978,803 short tons in 2018. CR/PR at Table IV-2.  Mosaic indicated that when it idled Plant City, it anticipated that "there would be some new imports coming in to satisfy the short-term need" because it "takes time for us to adjust." However, it further stated that "{w}e shipped into the U.S. market from Plant City approximately 700,000 short tons.  What came in was a million short tons of imports.").  Mosaic Posthearing Br. at 2-3, 13, Responses to Questions pp. 19-20; Hearing Tr. at 111 (McLellan), 127-28 (O'Rourke).  Mosaic added that following a reduction in subject imports resulting from filing of the CVD petition, some ***.  CR/PR at II-8-9.  As evidence that subject imports exceeded the decrease in volume to the U.S. market from Plant City, although apparent U.S. consumption was *** short tons (*** percent) lower in 2019 than in 2017, the volume of cumulated subject imports was 725 thousand short sons higher and importers' U.S. shipments of subject imports were 735 thousand short tons higher in 2019 than in 2017.  CR/PR at Tables IV-2, C-1.

[72] Moreover, from 2017 to 2018, while Mosaic's U.S. shipments declined by *** short tons, U.S. shipments of total imports (subject and nonsubject imports) increased by 967,904 short tons, with cumulated subject imports accounting for 604,981 short tons (62.5 percent of the increase in shipments of total imports).  CR/PR at Table C-1.  Thus, the decrease in Mosaic's supply was offset by increased nonsubject imports as well as the larger increase in subject imports, in addition to the increased production from ***.  CR/PR at Table III-4.  From 2018 to 2019, when demand decreased, U.S. shipments of nonsubject imports decreased by 65,262 short tons while U.S. shipments of subject imports increased by 148,957 short tons.  CR/PR at Table C-1.  Importers' U.S. shipments of total imports increased by 1.05 million short tons from 2017 to 2019, with subject imports accounting for 71.7 percent of the increase.  CR/PR at Table IV-7.  In terms of import volumes (rather than importers' U.S. shipments of imports) total imports increased by 1.4 million short tons from 2017 to 2018, with cumulated subject imports accounting for 1.0 million short tons (70.1 percent) of the increase in total import volume.  CR/PR at Table IV-2.  Between 2018 and 2019, the volume of cumulated subject imports was higher 725,044 short tons higher in 2019 than in 2017 and total imports were 1.05 million short tons higher, with subject imports accounting for 68.9 percent of the increase in total import volume. CR/PR at Table IV-7.

[73] We also observe that, as discussed below, combining U.S. importers' December 2018 end-of-period inventories of *** short tons with the volume of imports in January 2019 of 720,728 short tons totals approximately *** short tons, which exceeds even the 1.1 million short ton "supply gap" alleged by respondents in the month of January alone.  CR/PR at Tables IV-6, D-1.

[74] We observe that U.S. importers' end-of-period inventories of subject imports increased from *** short tons in 2017, which was equivalent to *** percent of their U.S. shipments of subject imports, to *** short tons in 2018 (equivalent to *** percent of their U.S. shipments of subject imports) and were *** short tons in 2019 (equivalent to *** percent of their U.S. shipments.  CR/PR at Table VII-11.

14

We likewise find unavailing the argument that Nutrien's closure of its Redwater facility in Canada in May 2019 contribute to a reduction in the supply of fertilizers in the United States.[75] As we previously explained, at the time that the closure was announced, Nutrien's CEO stated that it would increase production at its U.S. facilities to offset the reduction in supply from its Canadian facility and ensure a continued supply of phosphate fertilizers to customers in Canada.[76] Nutrien did, in fact, increase production as well as capacity in the United States.[77] Specifically, between 2018 and 2019, Nutrien increased its U.S. production by *** short tons, which was more than sufficient to cover its *** short ton increase in exports during that time, and Nutrien reported *** short tons in unused capacity in 2019.[78]

As we previously noted, the domestic industry had available excess capacity throughout the POI.[79] Even without Mosaic's data, in 2018, Nutrien and Simplot had a combined *** short tons of excess capacity, which was more than sufficient to cover either Mosaic's estimated 700,000 short ton reduction in supply or its actual reduction of U.S. shipments in the amount of *** short tons from 2017 to 2018.[80] Likewise, Nutrien and Simplot had a combined excess capacity of *** short tons in 2019, which more than would have covered the reduction in supply due to the idling of Mosaic's Plant City facility as well as the *** short ton increase in Nutrien's exports during that time.[81] Moreover, the domestic industry maintained substantial

---

[75] *See e.g.*, OCP Posthearing Brief at 2-8 and Responses to Questions pp. 7-26, 29-32, and 74-82; PhosAgro Posthearing Brief at 3; Koch's Posthearing Brief at 14; IRM Posthearing Brief at 4-7, and 9-11.

[76] Original Views at 24, 54; CR/PR at III-3.

[77] Original Views at 24, 54; CR/PR at Table III-4.

[78] CR/PR at Table III-4; PCS/Nutrien Domestic Producer Questionnaire at II-7.

[79] Original Views at 24.

[80] CR/PR at Table III-4; Mosaic Revised Domestic Producer Questionnaire at II-7; Hearing Tr. at 39 (McLellan).

[81] CR/PR at Table III-4.

15

and increasing inventories throughout the POI.[82]

Thus, we do not find that the record indicates that there was a domestic industry supply gap and, to the extent that there was a reduction in supply related to Mosaic's idling of its Plant City facility, the increase in volume of cumulated subject imports eclipsed any such reduction, as further discussed below.

### 3. Substitutability and Other Conditions

We continue to find that there is a high degree of substitutability between the domestic like product and phosphate fertilizers from subject sources that are of the same chemical formulations,[83] and that phosphate fertilizers with different chemical formulations are broadly interchangeable, particularly when used in blends.[84] As we previously observed, the record shows the vast majority of the domestic industry's U.S. shipments and U.S. importers' U.S. shipments of subject imports were of the same types of phosphate fertilizers – specifically, MAP and DAP.[85] Moreover, all three responding U.S. producers and most purchasers (17 of 25 firms) reported that the domestic like product and phosphate fertilizers from Morocco and Russia were always interchangeable; most U.S. importers (8 of 10 firms regarding Morocco and 8 of 9 firms regarding Russia) reported that the domestic like product and phosphate fertilizers from each subject country were always or frequently interchangeable.[86] The vast majority of responding purchasers also indicated that both domestically produced and subject imports

---

[82] The domestic industry's ending inventory quantities were *** short tons in 2017 and *** short tons in 2018 and 2019; they were *** short tons in interim 2019 and *** short tons in interim 2020.  CR/PR at Table C-1.

[83] CR/PR at II-17.

[84] CR/PR at I-8-10; Mosaic Prehearing Br. at 30-31; Hearing Tr. at 32-33 (Jung).

[85] CR/PR at Table IV-4.

[86] CR/PR at Table II-10.

16

always or usually met minimum quality specifications,[87] and only one of 27 responding purchasers reported that a domestic or foreign supplier had failed in its attempt to qualify phosphate fertilizers or had lost its approved status since 2017.[88]

As discussed in the Original Views,[89] price, along with availability and quality, are important considerations in purchasing decisions.  When asked to report the top three factors considered in their purchasing decisions, U.S. purchasers most often cited price (23 firms) and availability and quality (17 firms each) as their top three factors.  Purchasers most frequently cited price (11 firms) as their first-most important factor, followed by availability (9 firms),[90] and the majority of purchasers (17 of 28 firms) reported that they usually purchased the lowest-priced product.[91]  When asked to rate the importance of 16 factors in their purchasing decisions, U.S. purchasers most frequently cited availability and quality meets industry standards (27 firms each), followed by price and reliability of supply (26 firms).[92]  Pluralities of U.S. producers, importers, and purchasers reported that differences other than price between the domestic like product and subject imports from Morocco were sometimes significant and pluralities of U.S. importers and purchasers also reported that differences other than price between the domestic like product and subject imports from Russia were sometimes significant, while two of three U.S. producers reported that they were never significant.[93]  In

---

[87] CR/PR at Table II-11.

[88] CR/PR at II-20.  Specifically, *** reported that it "typically do{es} not handle Moroccan or *** fertilizer because it does not meet {its} product specifications in available Sulfur, and water solubility."  It also added that "***."  *** U.S. Purchaser Questionnaire Response at III-20; CR/PR at II-20.

[89] Original Views at 29.

[90] CR/PR at Table II-6.

[91] CR/PR at II-19.

[92] CR/PR at Table II-7.

[93] CR/PR at Table II-12.

17

addition, majorities or pluralities of purchasers reported that the domestic like product and subject imports from each subject country were comparable on all factors (including price, availability, quality, and reliability of supply) except for one – U.S. distribution network – for which the majority of which reported that the U.S. product was superior.[94]

As discussed in the Original Views,[95] U.S. prices of phosphate fertilizers are highly transparent. Phosphate fertilizer prices are reported in trade publications such as Argus Phosphates ("Argus"), CRU Phosphate Fertilizer Market Outlook ("CRU"), and Green Markets.[96] These trade publications gather market intelligence for sales transactions, including in the NOLA region, and publish the collected range of prices on a daily or weekly basis.[97] This price information is then quickly transmitted throughout the U.S. market.[98] Two of three U.S. producers (***), two of nine U.S. importers (***), and 16 of 28 purchasers reported that they refer to and use prices published in trade publications when negotiating prices.[99]

As previously noted, both domestically produced and imported phosphate fertilizers are

---

[94] CR/PR at Table II-9. Twenty of 24 responding purchasers reported that domestically manufactured phosphate fertilizers and subject imports from Morocco were comparable on price, as did 20 of 23 responding purchasers with respect to subject imports from Russia. No purchaser reported that the U.S. product was superior on price (*i.e.*, lower priced) to subject imports from Morocco or Russia. Sixteen of 24 responding purchasers reported that the U.S. product was superior or comparable on availability and reliability of supply to subject imports from Morocco, as did 20 of 23 responding purchasers with respect to subject imports from Russia. *Id*.

[95] Original Views at 30.

[96] CR/PR at V-5-6; Mosaic Prehearing Br. at 29; OCP Posthearing Br. at 6; Koch Prehearing Br. at 2; Koch Posthearing Br. at 1; Hearing Tr. at 195-196 (McGinn).

[97] CR/PR at V-5; Hearing Tr. at 147 (O'Rourke). Two of three U.S. producers, six of ten importers, and 12 of 27 purchasers reported their own prices to trade publications. CR/PR at V-6.

[98] Simplot Posthearing Br. at Responses to Questions pp. 60-61.

[99] Purchasers reported using Green Markets (9 firms); Profercy (6 firms); Argus and Fertecon (3 firms); ICIS (2 firms); and CRU, FIS Index, and FMB (1 firm each). Several reported using NOLA barge or NOLA f.o.b. prices, but did not specify a particular publication. CR/PR at V-6.

18

primarily sold from inventories.[100] U.S. producers reported that *** percent of their

commercial shipments in 2019 came from inventory, with lead times averaging *** days, and

importers reported that *** percent of their commercial shipments in 2019 came from

inventory, with lead times averaging *** days.[101] The *** of U.S. producers' U.S. commercial

shipments and *** half of U.S. importers' U.S. commercial shipments were made on a spot sale

basis in 2019.[102]

During the POI, phosphate fertilizers from all sources were shipped through the same

channels of distribution (mainly to retailers, followed by distributors)[103] primarily by either

barge, rail, or truck.[104] Specifically, U.S. importers reported that 61.6 percent of their 2019 sales

of subject fertilizers were shipped by barge, 10.8 percent by rail, and 27.7 percent by truck.[105]

U.S. producers reported that 12.4 percent of their U.S. shipments were by barge, 47.1 percent

by rail, 24.7 percent by truck, and 15.8 percent by another method (including by vessel or title

transfer).[106] U.S. producers and importers responding to the questionnaires in the remand

proceedings reported using a variety of modes of transportation (including barge, rail, truck,

---

[100] CR/PR at II-17.

[101] CR/PR at II-17. Importers also reported that *** percent of their commercial shipments in 2019 came from the foreign manufacturers' inventories, with lead times averaging *** days, and *** percent were produced-to-order, with lead times averaging *** days.

[102] CR/PR at Table V-3. U.S. producers reported that *** percent of their U.S. sales were made on a spot basis, *** percent on a short-term contract basis, and *** percent on a long-term contract basis. U.S. importers reported that *** percent of their U.S. sales were made on a spot basis, *** percent on a short-term contract basis, and *** percent on an annual contract basis. *See id.* Furthermore, more than half of the responding purchasers (15 of 29 firms) reported that they purchase phosphate fertilizers on a daily or weekly basis. CR/PR at V-7.

[103] CR/PR at Table II-1.

[104] CR/PR at V-4.

[105] CR/PR at V-4.

[106] CR/PR at V-4.

19

and intermodal) to ship phosphate fertilizer during the POI.[107]

As discussed above, most U.S. purchasers reported that the domestic like product's U.S. distribution network was superior to that of subject imports.[108]  Respondents state that most imports of phosphate fertilizers from Morocco and Russia were shipped to NOLA, loaded on barges, and transported up the Mississippi River and its tributaries.[109]  Mosaic reports that like subject imports, it transloads product onto river barges at NOLA that are moved up the Mississippi River to warehouse positions located on the inland U.S. waterways.[110]  Mosaic explains that its U.S. distribution network is expansive, comprising nearly *** with approximately *** short tons in storage capacity, which allows it to reach customers located throughout the United States.  Specifically, its network includes:  ***.[111]  In addition, Simplot, whose production facilities are located in Pocatello, Idaho and Rock Spring Wyoming, states that it ships product to and has warehouses in the West and Midwest regions of the United States.[112]

The additional questionnaire information gathered in these remand proceedings further demonstrate the breadth and superiority of U.S. producers' distribution networks.  For example, Mosaic reiterates that ***.[113]  Mosaic describes that ***.[114]  According to Mosaic,

---

[107] *See* Remand Questionnaire Responses at 2(d).

[108] CR/PR at Table II-9.

[109] CR/PR at IV-11 n.16, V-4; Gavilon Prehearing Br. at 28-29; PhosAgro Prehearing Br. at 3; IRM Prehearing Br. at 14-15; Koch Posthearing Br. at 3-4.

[110] Mosaic Prehearing Br. at 32; Mosaic Posthearing Br. at Responses to Questions, pp. 91-93.

[111] Mosaic Posthearing Br. at Responses to Questions pp. 91-93.

[112] CR/PR at Table III-1; Simplot Posthearing Br. at Responses to Question pp. 24-25, Exhibits 4, 20.  Simplot explains that it has supply chain operations and warehouses *** and that it has sold product not only to the West, but also Midwest, regions of the United States for years.  Simplot Posthearing Br. at Responses to Question pp. 24-25, Exhibits 4, 20.

[113] Mosaic Domestic Producer Remand Questionnaire at 2(a) – 2(d).

[114] Mosaic Domestic Producer Remand Questionnaire at 2(a).

20

***.[115]  For example, Mosaic reports that ***.[116]

Simplot reports that ***.[117]  Simplot reports that ***.[118]  Simplot further reports that

***.[119]  In addition, PCS Phosphate Company, Inc. (Nutrien) reports that ***.[120]  PCS (Nutrien)

reports that ***.[121]

Importers, on the other hand, report less extensive inventory networks,[122] and less

movement of inventories, although one importer did report relocating *** short tons of

product in 2019 due to ***.[123]  The remaining importers report that their distribution networks

were "unidirectional" and that once delivered to an inventory or customer location, product

was not subsequently relocated but rather remained at that location.[124]  OCP also claims that,

unlike ***, importers do not retain title to product that is delivered to its intended destination,

meaning that ***.[125]  Thus, we find that the record in the remand proceedings continues to

show that domestic producers possess superior distribution capabilities compared to importers

of subject merchandise.  Further, the remand record shows that domestic producers reported

---

[115] Mosaic Domestic Producer Remand Questionnaire at 2(a) – 2(c).

[116] Mosaic Domestic Producer Remand Questionnaire at 2(c).

[117] Simplot Domestic Producer Remand Questionnaire at 2(a) – 2(c).

[118] Simplot Domestic Producer Remand Questionnaire at 2(a).

[119] Simplot Domestic Producer Remand Questionnaire at 2(b)-2(c).  Simplot further explains that ***.  *Id.* at 2(c).

[120] PCS (Nutrien) Domestic Producer Remand Questionnaire at 2(a).

[121] PCS (Nutrien) Domestic Producer Remand Questionnaire at 2(b).

[122] *See, e.g.*, EuroChem Importer Remand Questionnaire at 2(a) (reporting ***; Koch Importer Remand Questionnaire at 2(a) (reporting ***; Macrosource (formally Gavilon) Importer Remand Questionnaire at 2(a) (reporting ***; ADM Importer Remand Questionnaire at 2(a) (reporting ***; ADM Importer Remand Questionnaire at 2(a) (reporting ***.  *** did not report any inventories of subject imports during the POI and importers *** did not specify the locations of any inventories that they maintained during the POI.  *See* Importer Remand Questionnaires of ***.

[123] *** Importer Remand Questionnaire at 2(b).

[124] *See* Importer Remand Questionnaires of ***.

[125] OCP Comments at 11.

21

moving substantial quantities of inventory between locations and that importers did not do so for subject imports.[126]

As we further found in the Original Views,[127] in addition to possessing an extensive distribution network, the domestic industry is vertically integrated with respect to the main raw material inputs used to produce phosphate fertilizers – sulfur, ammonia, and phosphate rock.[128] *** produce sulfur and mine and beneficiate phosphate rock, although these raw materials are sometimes purchased.[129] Moreover, *** and Mosaic produces and purchases ammonia.[130] During the period of investigation, prices of phosphate rock reported in CRU was relatively stable, while prices of ammonia fluctuated widely from January 2017 to January 2020, stabilized, then decreased between April and July 2020.[131] Prices for sulfur increased from January 2017 to the end of 2018, decreased through January 2020, stabilized, then increased and remained stable through July 2020.[132] Consistent with this, *** and five of nine importers reported that raw material costs fluctuated with no clear trend over the POI.[133] Domestic producers' raw material costs as a share of cost of goods sold ("COGS") increased by *** percentage points from *** percent in 2017 to *** percent 2019 and was *** percent in

---

[126] See Remand Questionnaires at 2(b).

[127] Original Views at 31-33.

[128] CR/PR at V-1. U.S. producers reported that sulfur comprised approximately *** percent of their total raw material costs in 2019, ammonia *** percent, phosphate rock *** percent, and other raw material inputs *** percent. See id.

[129] CR/PR at V-1. *** reported purchasing sulfur, and respondent OCP stated that ***. CR/PR at V-1; OCP Prehearing Br. at 14-15.

[130] CR/PR at V-1. Mosaic stated that it produces one-third of its ammonia, purchases another third on the open market, and acquires a third through a long-term contract with CF Industries. Mosaic Posthearing Br. at Responses to Questions p. 95.

[131] CR/PR at Figure V-1.

[132] CR/PR at Figure V-1.

[133] CR/PR at Table V-1.

22

interim 2020.[134]

## B.   Volume of Subject Imports

Section 771(7)(C)(i) of the Tariff Act provides that the "Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."[135]

As in the Original Views,[136] we continue to find that the volume of cumulated subject imports and the increase in that volume were significant in absolute terms and relative to apparent consumption in the United States during the POI.  As we found in the Original Views,[137] the volume of cumulated subject imports increased from 2.0 million short tons in 2017 to 3.0 million short tons in 2018, before decreasing to 2.7 million short tons in 2019, for an overall increase of 36.8 percent between 2017 and 2019.[138]  Cumulated subject imports were lower in interim 2020 at 1.2 million short tons than in interim 2019, at 2.0 million short tons.[139]  U.S. importers' U.S. shipments of subject imports increased from 1.8 million short tons

---

[134] CR/PR at V-1.

[135] 19 U.S.C. § 1677(7)(C)(i).

[136] Original Views at 33-35.

[137] Original Views at 33-35.

[138] CR/PR at IV-3, Table IV-2.

[139] CR/PR at Table IV-2.  As previously discussed, the parties acknowledge that the filing of the petitions at the end of June 2020 resulted in a large decrease of subject imports to the U.S. market. Mosaic Prehearing Br. at 43-44, 91; Simplot Prehearing Br. at 29-30, 34; Simplot Posthearing Br. at Responses to Questions pp. 53-54; Mosaic Posthearing Br. at Responses to Questions pp. 69-70; OCP Posthearing Br. at 12, Responses to Questions p. 33, 67-73; EuroChem Posthearing Br. at 11; IRM Posthearing Br. at 8-9; PhosAgro Posthearing Br. at 12-13, Responses to Questions.  Some U.S. importers indicated that they stopped bringing in subject imports "because the buyers and the sellers agreed that the risk of 75 percent countervailing duties was higher than either of them wanted to take."  Hearing Tr. at 337 (Aranoff); *see also* EuroChem Posthearing Br. at 11 (stating that as a result of the filing of the petitions, it shifted its purchases of phosphate fertilizers from Morocco and Russia to other global sources); *** U.S. Purchaser Questionnaire Response at III-11 (reporting that Koch and IRM will not quote or import material until the countervailing duty decision is issued); *** U.S. Purchaser

(*continued...*)

23

in 2017 to 2.4 million short tons in 2018, and increased again to 2.5 million short tons in 2019. U.S. shipments of subject imports declined between the interim periods, from 1.9 to 1.3 million short tons.[140]

Cumulated subject imports' market share also increased from 2017 to 2019. U.S. shipments of subject imports increased from *** percent of apparent U.S. consumption in 2017 to *** percent in 2018. Although the volume of cumulated imports of subject phosphate fertilizers decreased between 2018 and 2019, the volume of U.S. shipments of subject imports increased by 6.2 percent while apparent U.S. consumption declined by *** percent during the same period.[141] Consequently, cumulated subject imports continued to gain market share, which increased from *** percent in 2018 to *** percent in 2019, for an overall *** percentage point increase in market share between 2017 and 2019 as the domestic industry lost *** percentage points of market share over the same period.[142] [143]

---

Questionnaire Response at III-11 (reporting that Helm, Koch, and OCP "cut off" supplying imported product to the U.S. market in the summer of 2020). Monthly import data also confirm that subject import volume from Morocco and Russia showed notable declines after the petitions were filed at the end of June 2020, and subject import end-of-quarter inventories also declined. CR/PR at Tables IV-6 and D-1.

[140] CR/PR at Table C-1. End-of-period inventories of subject imports held by U.S. importers *** percent between 2017 and 2018, from *** short tons to *** short tons, before a decline to *** short tons in 2019.

[141] CR/PR at Tables IV-2, IV-7-8, C-1.

[142] CR/PR at Tables IV-8, C-1. The domestic industry's market share declined from *** percent in 2017 to *** percent in 2018 and *** percent in 2019. *See id.*

[143] Subject imports decreased substantially after the filing of the petitions at the end of June 2020. CR/PR at Table IV-6. As a result, subject imports' market share was lower in interim 2020, at *** percent than in interim 2019, at *** percent. CR/PR at Tables IV-8, C-1. At the same time, the domestic industry's U.S. shipments and market share increased. Mosaic diverted shipments that had been destined for export markets and drew down inventories, for a total of *** short tons in additional sales in interim 2020 compared to interim 2019. Mosaic Posthearing Br. at Responses to Questions p. 84; Mosaic U.S. Producer Questionnaire Response at IV-16. *** also reported more U.S. shipments in interim 2020 than in interim 2019. *** U.S. Producer Questionnaire Responses at II-7; *** U.S. Producer Questionnaire Responses at II-7. Consequently, the domestic industry's market share was higher in interim 2020, at *** percent than in interim 2019 at *** percent.

24

We therefore continue to find that the volume of cumulated subject imports and the increase in that volume were significant in absolute terms and relative to apparent consumption in the United States during the period of investigation.

As directed by the court, in this remand determination, we have added to our volume analysis an explanation of how our volume findings are consistent with our findings on conditions of competition in the U.S. phosphate fertilizer market. Nonetheless, we respectfully maintain that our original determinations are consistent with our statutory mandate, and that, while the statute permits the Commission to look beyond the quantitative volume data for purposes of its volume findings, the statute nowhere mandates that the Commission perform such an analysis.

In its opinion, the court stated that 19 U.S.C. § 1677(7)(C)(iii) requires that the Commission "apply its findings regarding the conditions of competition to its analysis of the three statutory factors: subject import volume, price effects, and impact on the domestic industry."[144] The specific clause cited by the court, however, applies only to the Commission's impact analysis.[145] Section 1677(7)(C) is divided into four clauses: (i) Volume; (ii) Price; (iii) Impact on affected domestic industry; and (iv) Captive production. The requirement to consider the conditions of competition follows directly after, and specifically refers to the

---

[144] Remand Order at 26 (citing *Altx, Inc. v. United States*, 26 CIT 709, 719 (2002); *Nucor Corp. v. United States*, 28 CIT 188, 207 (2004), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005); *Nippon Steel Corp. v. United States*, 25 CIT 1415, 1420 (2001); *Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1222 (2006)). We note that the finding in *Hynix Semiconductor* is consistent with what we view to be the plain language of the statute, as the issue in that case concerned the Commission's impact analysis. *See* 30 CIT at 1220. Likewise, in affirming the trial court in *Nucor*, the Federal Circuit held that "Section 1677(7)(C)(iii) in turn requires the Commission, in determining the *impact* of the subject imports on domestic producers, to 'evaluate all relevant economic factors which have a bearing on the state of the industry in the United States.'" 414 F.3d at 1336-37 (emphasis added).

[145] 19 U.S.C. § 1677(7)(C)(iii).

25

impact clause (clause (iii)): "The Commission shall evaluate all relevant economic factors described **in this clause** within the context of the business cycle and conditions of competition that are distinctive to the affected industry."[146] Lest there be any doubt that each of the four roman numerals constitutes a "clause," this is made clear in the captive production clause (clause (iv)), wherein the statute explicitly refers to elements of the impact analysis as falling within "clause (iii)": "{T}he Commission, in determining market share and the factors affecting financial performance set forth in **clause (iii)**, shall focus primarily on the merchant market for the domestic like product."[147] Thus, on its face, section 1677(7)(C)(iii) requires that the Commission consider the relevant economic factors described in the impact clause, clause (iii), within the context of business cycle and conditions of competition but does not impose such a requirement with respect to its analysis of volume, clause (i), and price effects, clause (ii).[148] [149] Although we comply with the court's remand instructions below, this statutory framework informs our analysis.[150]

---

[146] *Id.* (emphasis added).

[147] 19 U.S.C. § 1677(7)(C)(iv) (emphasis added).

[148] We note that, although 19 U.S.C. § 1677(7)(C)(iii) is not applicable to the Commission's volume and price effects analyses, the statute does not preclude the Commission from considering conditions of competition or other relevant economic factors in its volume and price effects analyses, if the Commission finds it appropriate to do so, as it did here, for example, in considering the weather events and demand conditions in its price effects analysis. *See* 19 U.S.C. § 1677(7)(B)(ii).

[149] The interrelationship between the conditions of competition requirement and the impact analysis is further supported by the reference in that paragraph to conditions "that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii). Without question "the affected industry" refers to the domestic producers of the domestic like product, as reflected in the statute's definition of "industry." 19 U.S.C. § 1677(4). In turn, clause (iii) of section 1677(7)(C) (Impact) requires an evaluation of "all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry" – an evaluation that is logically connected to the conditions of competition distinctive to that industry.

[150] As the Federal Circuit ultimately held in *Altx*, the court should not "ask more of the Commission than required by the statute." *Altx, Inc. v. United States*, 370 F. 3d 1108, 1123 (Fed. Cir. 2004).

APPX0021237

To comply with the court's remand instructions, we now assess whether "fertilizer was 'practically unavailable from U.S. sources' to supply high-demand regions in 2019 because doing so would not have been economically viable."[151] [152]  Despite declines in the domestic industry's capacity during the POI,[153] the domestic industry had excess capacity throughout the

---

[151] *See* Remand Order at 41.

[152] We understand the court's reference to "U.S. sources" in its remand order in the context of its review of the Commission's volume discussion to refer to domestically produced fertilizers.  This appears to be consistent with the court's citation to *Altx v. United States*, 26 CIT 709 (2002), in which the court held that "the Commission failed to analyze whether the increase in volume and market share of subject imports corresponds, in whole or in part, to that portion of the market recognized by the Commission as not supplied by the domestic industry (either because of incapability or lack of viability)" and instructed the Commission to "analyze the significance of subject import volume in terms of product types and availability and practically unavailable from U.S. sources during the POI, and to the extent possible, group the data on viability of domestic sources in a manner that reflects the actual limitations."  In any event, even if the court intended "U.S. sources" to include U.S. shipments of subject imports, it would not alter our finding that the volume of cumulated subject imports, and increase in their volume, were significant.  As we found in our original price effects analysis and again explain below in our analysis of price effects, the volume of cumulated subject imports exceeded demand in 2019, irrespective of the reshipment issue.  Accordingly, even assuming that fertilizer was practically unavailable from *subject imported* inventories held by U.S. importers to supply regions not affected by the extreme weather in 2019, we would continue to find the volume of cumulated subject imports, and increase in that volume, to be significant.

[153] As described in our Original Views, the domestic industry's capacity decreased from *** short tons in 2017 to *** short tons in 2018 and *** short tons in 2019, and the declines in the domestic industry's capacity were attributed to Mosaic.  Original Views at 23, 49; CR/PR at Table III-4.  The larger decline from 2017 to 2018 coincided with its idling of the Plant City facility in December 2017.  Additionally, we note that, contrary to respondents' claims, this did not cause a "supply gap" that explains the increase subject import volume, as discussed above.  The domestic industry's capacity declined to a lesser extent from 2018 to 2019, but as described above, even with these reductions in capacity, the domestic industry maintained excess capacity.  We further note that Simplot maintained the same level of capacity throughout the POI, while Nutrien increased capacity from 2017 to 2018 and maintained the same level of capacity from 2018 to 2019.  CR/PR at Table III-4.  Moreover, we observe that in 2019, Nutrien was reported in an *Argus* article as "refer{ing} to potential further US production cuts as 'a futile game' . . ., stating that any cut would simply result in greater imports."  Petitions, Exhibit I-43.  The article continues –

> Nutrien argues that the market is weak because of fundamental
> structural oversupply and that further cuts simply signal to OCP, Russian
> and other producers to ship to the US.  It is a clear message to its
> competitor, Mosaic, which accounts for around three-quarters of US

*(continued...)*

27

POI, and in 2019, its capacity utilization was \*\*\* percent, meaning that the domestic industry had \*\*\* short tons of excess capacity in 2019.[154]

We also note that, in addition to this excess capacity, domestic producers maintained substantial inventories in 2019. Domestic producers' end-of-period inventories by quarter were \*\*\* short tons in March 2019, \*\*\* short tons in June 2019, and \*\*\* short tons in September and December 2019.[155] Furthermore, the supplementary questionnaire information obtained in these remand proceedings indicates that domestic producers maintain these inventories \*\*\*.[156] We observe that the record both in the original investigations and as supplemented on remand show that domestic producers rely upon \*\*\*, and newly obtained information confirms that domestic producers \*\*\*.[157]

In sum, we find that the record from the original investigations and as supplemented in these remand proceedings indicates that the domestic industry's excess capacity, substantial inventories, extensive inventory locations, expansive multi-modal distribution network, and demonstrated ability to move and relocate product where it was needed shows that domestic producers were well-positioned to supply the U.S. market in 2019. Accordingly, having

---

phosphates production. It is rare for any producer to speak in such plain language, but the assessment is spot on.... Nutrien's view that supply cuts in the US will not deter shipments from competitors is correct but Mosaic has little choice.... The supplier is now left with the uncomfortable decision of whether to cut production in a bid to stop losing money and eroding shareholder value, or cede domestic market share to foreign lower-cost producers.

Id.

[154] CR/PR at Tables III-4, C-1.
[155] CR/PR at Table D-1.
[156] See \*\*\*.
[157] See \*\*\*. Although we note that Mosaic reports that \*\*\*. Mosaic Domestic Producer Remand Questionnaire at 2(c). Likewise, Simplot reports that \*\*\*. Simplot Domestic Producer Remand Questionnaire at 2(a) – 2(c).

28

considered the conditions of competition as directed by the court in its remand order, we find

that the record does not indicate that fertilizer was "practically unavailable from U.S. sources"

such that it would alter our finding that that the volume of cumulated subject imports and the

increase in that volume were significant in absolute terms and relative to apparent

consumption in the United States during the POI.

### C.      Price Effects of the Subject Imports

Section 771(7)(C)(ii) of the Tariff Act provides that, in evaluating the price effects of

subject imports, the Commission shall consider whether –

(I)      there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

(II)     the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.[158]

As previously discussed, we continue to find that there is a high degree of

substitutability between subject imports and the domestic like product that are of the same

chemical formulation, and price is an important consideration in purchasing decisions, along

with availability and quality.

As discussed in the Original Views,[159] the Commission in the final phase of these

investigations collected monthly pricing data from U.S. producers and importers for the total

quantity and f.o.b. value of two phosphate fertilizer products shipped in bulk (*i.e.*, barge-load)

---

[158] 19 U.S.C. § 1677(7)(C)(ii).
[159] Original Views at 35-39.

29

from NOLA to unrelated U.S. agricultural customers.[160] [161]  One U.S. producer (***) and seven importers provided usable pricing data, although not all firms reported pricing for both products for all months of the POI.[162]  Pricing data reported by these firms accounted for approximately *** percent of U.S. producers' U.S. shipments, *** percent of U.S. shipments of subject imports from Morocco, and *** percent of U.S. shipments of subject imports from Russia in 2019.[163]

The pricing data show that cumulated subject imports undersold the domestic like product in 34 of 170 instances (involving 381,132 short tons) at underselling margins ranging from 0.02 to 4.4 percent and an average underselling margin of 1.7 percent.  Subject imports oversold the domestic like product in the remaining 136 instances (involving 2.0 million short tons) at overselling margins between 0.02 and 17.6 percent with an average overselling margin of 3.7 percent.[164]

We observe that underselling and overselling margins were small and prices of the

---

[160] CR/PR at V-9.  The two pricing products were:  (1) Standard-grade monoammonium phosphate (MAP), chemical formula $NH_4H_2PO_4$, granular, excluding high-purity MAP; and (2) Standard-grade diammonium phosphate (DAP), chemical formula $(NH_4)_2(HPO_4)$, granular.  *See id.*

[161] The record indicates that the "f.o.b. NOLA price" is a universal price benchmark denoting a loaded barge at a dock/fleeting point in New Orleans irrespective of where the product originated, and is used as a primary point of reference in price negotiations in the U.S. market.  Mosaic Posthearing Br. at Responses to Questions pp. 28-32; Simplot Posthearing Br. at Responses to Questions pp. 60-62; Hearing Tr. at 33-34 (Jung), 287 (Groden).  In their daily or weekly price listings, trade publications Argus and Green Markets include "f.o.b. from NOLA" or "NOLA Barge" phosphate fertilizer prices.  CR/PR at V-5 n.5.  Domestic producers, therefore, compete with subject imports upon the f.o.b. NOLA price in selling product, and Mosaic states that to compete against subject imports at NOLA from its plants in Florida, it has to absorb the $20 per short ton cross-Gulf freight costs.  Mosaic Posthearing Br. at Responses to Questions pp. 29-32; Simplot Posthearing Br. at Responses to Questions pp. 60-62.  Thus, "for a selling price of $300/ST fob NOLA to be competitive with subject imports, it would have to be priced at $280/ST fob Florida plant."  Mosaic Posthearing Br. at Responses to Questions p.30.

[162] CR/PR at V-9.  ***.  CR/PR at V-9 n.12.

[163] CR/PR at V-9.

[164] CR/PR at Table V-7.

30

domestic like product and subject imports tracked each other closely over the POI.[165] That subject imports and the domestic like product were similarly priced is consistent with the high degree of substitutability between the domestic like product and subject imports, as well as the price transparency that existed in the U.S. phosphate fertilizer market. Most purchasers reported that prices of the domestic like product were comparable to prices of subject imports from Morocco and Russia (the remaining purchasers reported that prices for the domestic like product were inferior, *i.e.*, higher priced).[166] Some purchasers also confirmed purchasing subject imports instead of the domestic like product due to their lower prices. Seventeen of 28 U.S. purchasers reported that they had purchased imported phosphate fertilizers from Morocco and/or Russia instead of the domestic like product. Nine of these 17 purchasers reported that subject imports were lower priced than the domestic product, and 5 of these 9 purchasers reported that price was a primary reason for purchasing subject imports rather than the domestic like product.[167] Four U.S. purchasers confirmed lost sales totaling 733,895 short tons

---

[165] CR/PR at Tables V-4-5, V-7. On average, the underselling margin was \*\*\* percent for product 1 and \*\*\* percent for product 2 while the overselling margin was \*\*\* percent for product 1 and \*\*\* percent for product 2. CR/PR at Table V-7. A Mosaic representative testified at the hearing that "{t}he Commission's price data show more instances of overselling than underselling. The Commission should not construe this as evidence of the absence of adverse price effects to the domestic industry. First, prices are close, with average over- or underselling margins within {what} one would expect for a commodity industry with transparent pricing. But the price trends between U.S. producers and importers were very highly correlated over time." Hearing Tr. at 51 (Klett).

[166] CR/PR at Table II-9. Twenty of 24 firms reported that the domestic like product and subject imports from Morocco were comparable on price; 20 of 23 did so for the domestic like product and subject imports from Russia. Four and three purchasers reported prices of the domestic like product to be inferior (*i.e.*, higher priced) to prices of subject imports from Morocco and Russia, respectively, while no purchaser reported prices of the domestic like product to be superior (*i.e.*, lower priced) to prices of subject imports from Morocco or Russia. *Id.*

[167] CR/PR at Table V-9.

31

over the POI.[168] In addition, as discussed further below, the record indicates that importers of subject merchandise in instances offered lower prices than domestic producers during 2019 in a declining market.[169] Thus, while we recognize the prevalence of overselling in the pricing data, we continue to find that the record demonstrates that, consistent with the high degree of price transparency in this market, the prices of the domestic product and subject imports tracked each other closely and were generally comparable with small margins of underselling and overselling, that subject imports were in some instances lower priced, and the domestic industry lost sales to subject imports because of lower prices.

We also considered price trends for the domestic like product and subject imports. During the POI, prices for both the domestic like product and subject imports increased between 2017 and most of 2018, and then declined between 2018 and 2019.[170] Prices in interim 2020 increased, but remained below levels in January 2017 until after the filing of the petitions at the end of June 2020, after which prices experienced dramatic increases as subject import volumes to the U.S. market decreased and subject import end-of-period inventory levels

---

[168] CR/PR at Table V-9.  Respondents argued that ***, which accounted for *** percent of the total quantity of reported lost sales, directly contradicted its lost revenue response submitted in the preliminary phase of the investigations, and upon this basis, request that *** reported amount be discounted.  OCP Prehearing Br. at 96-97; Gavilon Prehearing Br. at 50.  We continue to find, however, that the record does not support disregarding the *** short tons of subject imports that *** reported purchasing instead of the domestic like product due at least in significant part to the lower price of subject imports.  In these final phase investigations, Growmark reported that subject imports were priced lower than the domestic product, and that price was a primary reason for purchasing subject imports instead of domestic product.  ***
CR/PR at V-23 n.14 (emphasis provided).  Thus, while some portion of the reported quantity of lost sales may also have been influenced by non-price reasons, *** clarified that *** and that ***.
   We also note that *** response regarding U.S. producers' price reductions further supports that it increased its purchases of subject imports for price reasons.  In reporting that U.S. producers ***.
CR/PR at V-26.
[169] Mosaic Posthearing Brief at Responses to Questions, pp. 44-46 and Exhibits 50 and 51.
[170] CR/PR at Tables V-4-5.

32

decreased.[171]

The record shows that significant and increasing volumes of subject imports entered the U.S. market between 2017 and 2018 and remained at significant levels in 2019 despite a substantial demand decline due to what an OCP witness characterized as "Black Swan" level of rainfall beginning in the fall of 2018 and lasting through 2019.[172] [173]  As respondents acknowledge, heavy precipitation in the fall of 2018, a polar vortex in the winter of 2018-2019, and record setting precipitation in the spring of 2019 caused massive flooding and prolonged river closures along the Mississippi River system that stranded fertilizer barges and resulted in delayed, destroyed, or abandoned plantings, especially in the Midwest and Great Plains regions.[174]  Accordingly, while U.S. demand increased overall between 2017 and 2018, demand began to decline in the latter part of 2018 and continued into 2019, as the unusual weather conditions impacted three consecutive planting seasons - fall of 2018, spring of 2019, and fall of

---

[171] CR/PR at Tables V-4-5, Figure V-4.  Between 2017 to 2019, prices for the domestic like product decreased overall by *** percent for pricing product 1 and by *** percent for pricing product 2.  Prices for subject imports decreased overall by *** percent for pricing product 1 and by *** percent for pricing product 2.  Derived from CR/PR at Tables V-4-5.  U.S. importers' inventories of subject imports declined from *** short tons at the end of the interim 2019 period to *** short tons at the end of the interim 2020 period.  CR/PR at Table C-1.

[172] Hearing Tr. at 191-93 (Rahm); *see also* Mosaic Prehearing Br. at 88-91; Mosaic Posthearing Br. at 3, 13, Responses to Questions pp. 20-21.

[173] We note that, although the statute does not require us to consider conditions of competition and business cycles in our price effects analysis, we have considered certain pertinent conditions of competition and business cycles here.

[174] *See, e.g.,* OCP Prehearing Br. at 35-36, 46-48; Gavilon Prehearing Br. at 11-12; PhosAgro Prehearing Br. at 6-7; IRM Prehearing Br. at 15-16; PhosAgro Posthearing Br. at 3-4.  As further detailed below, the trade publication Argus repeatedly referenced oversupply conditions in early 2019, as follows: "The 'polar vortex' in the US midwest saw temperatures plummet.  The US domestic market followed suit.  Put simply, the US market 'tanked' on cold weather, a full pipeline and heavy imports (January 31, 2019); "{T}he US is awash with imports . . .  Pushing so much DAP/MAP to the US has led to oversupply" (February 7, 2019); "The US has a record surplus of phosphates entering the spring season, boosted by weak sales, terrible weather conditions and heavy 1Q imports, which reached a record 1.2mn t of DAP/MAP, up 27pc yoy" (March 28, 2019).  Petition, Volume I, Exhibits I-29, I-30, I-33.

33

2019.  OCP observed that the USDA's Farm Service Agency, which tracks agricultural acreage

that farmers did not use in a particular season, reported that the volume of "prevented planting

acreage" in 2019 set a U.S. record – by a wide margin – at 19.6 million acres.[175]  Apparent U.S.

consumption of phosphate fertilizers declined by *** percent from 2018 to 2019, by more than

*** short tons, to below the level of apparent U.S. consumption in 2017.[176] [177]

Yet despite these market conditions, subject imports continued to enter the market in

large volumes in 2019 and in excess of any purported need to restock inventory in regions that

were unaffected by weather.[178]  It is uncontroverted that the volume of cumulated subject

---

[175] OCP Prehearing Br. at 47-48.

[176] U.S. apparent consumption declined by *** percent from 2018 to 2019, reflecting a *** percent decline in U.S. producers' U.S. shipments, an 11.8 percent decline in U.S. shipments of nonsubject imports, and a 6.2 percent *increase* in U.S. shipments of cumulated subject imports.  CR/PR at Table C-1.  As a result, from 2018 to 2019, cumulated subject imports' market share increased by *** percentage points; the domestic industry's market share decreased by *** percentage points; and nonsubject imports' market share decreased by *** percentage points. *Id.*

[177] In its remand order, the court addressed the Commission's finding that subject imports exceeded demand, contributing to oversupply conditions that resulted in price depression.  The court stated that this finding "was vulnerable to the Plaintiffs' rebuttal that bad weather, not imports, was responsible for declining demand.  Section 1677(7) requires that any material injury be 'by reason of' subject imports, and unprecedented weather events that frustrated demand projections were a potential intervening cause."  Remand order at 42-43.  To clarify, we did not and do not find that subject imports were responsible for declining demand.  Rather, as discussed above, we previously found and continue to find that weather events beginning in 2018 and continuing into 2019, caused demand to decline.  We also previously found and continue to find that, although cumulated subject imports did not cause the decline in demand, they increased from 2017 and to 2018, and remained at elevated levels in 2019, despite declining demand.  Indeed, cumulated subject imports further increased their market share from 2018 to 2019 as the quantity of importers' U.S. shipments of subject imports even increased by 6.2 percent between 2018 and 2019 despite the *** percent decrease in apparent U.S. consumption.  CR/PR at Table C-1.  As further discussed below, other record evidence (including from purchaser questionnaire responses and contemporaneous trade publications) corroborates that cumulated subject imports had significant depressing effects on U.S. prices.  As also discussed below, we have examined other factors, including declining demand, to ensure that we are not attributing injury from any such factors to subject imports.

[178] OCP Comments at 1, 15-16; PhosAgro Comments at 15; Koch Comments at 2-3.

34

imports increased from 2.0 million short tons in 2017 to 3.0 million short tons in 2018.[179]  It is likewise uncontroverted that demand for fertilizers in the U.S. market began to decline in 2018 due to heavy precipitation in the fall of 2018 as well as a polar vortex in the winter of 2018 to 2019.[180]  In the context of the increased volume of cumulated subject imports in 2018 along with declining demand towards the latter part of that year, U.S. importers' end-of-period inventories were *** short tons in December 2018, which was their highest level thus far in the POI.[181]

Notwithstanding end-of-period inventories that were higher than the levels earlier in the POI and the decline in demand, cumulated subject imports nonetheless surged into the U.S. market as 2019 began.  In January 2019, the volume of cumulated subject imports reached its highest monthly level of the entire POI at 720,728 short tons, a level that was almost double the level of monthly imports in January 2018 (312,960 short tons) and more than triple the level of monthly imports in January 2017 (202,768 short tons).[182]  Thus, in the context of phosphate fertilizers consumption beginning in the fall of 2018, which precipitated the high levels of end-of-period inventories in December 2018, subject imports surged into the market in January

---

[179] CR/PR at Table IV-2.  We again note that this one million short ton increase in the volume of cumulated subject imports in 2018 was not due to a "supply gap" in domestic supply.  As discussed above, although Mosaic reduced its production capacity in 2018, it reduced its U.S. shipments of fertilizers by only *** short tons, while importers' U.S. shipments of subject imports increased by 604,901 short tons in 2018, and were 753,638 short tons higher in 2019 than in 2017.  CR/PR at Table C-1; Mosaic Revised Domestic Producer Questionnaire at II-7.  Moreover, during that time, Mosaic as well as Simplot and Nutrien possessed excess capacity.  CR/PR at Table III-4.

[180] Original Views at 40 (citing OCP Prehearing Br. at 35-36, 46-48; Gavilon Prehearing Br. at 11-12; PhosAgro Prehearing Br. at 6-7; IRM Prehearing Br. at 15-16; PhosAgro Posthearing Br. at 3-4).

[181] CR/PR at Table D-1.  We also note that importers' ending inventories of subject imports in each quarter in 2018 and 2019 *** exceeded their 2017 volumes, and their ending inventories in March, June, and September 2019 were larger than their ending inventories for those months in 2018.  CR/PR at Table D-1.

[182] CR/PR at Table IV-6.

35

2019 and remained substantial (relative to other monthly import volumes) in February and March 2019. That cumulated subject imports exceeded demand at the beginning of 2019 is further supported by the fact that U.S. importers' end-of-period inventories increased from *** short tons in December 2018, which had been their highest level at that point in the POI, to *** short tons in March 2019, their highest level of the entire POI, which contradicts respondents' arguments that subject imports were continuing to be imported to serve regions unaffected by severe weather.[183] Notwithstanding this high level of inventories, which according to respondents remained in place after delivery and were not otherwise relocated, substantial volumes of cumulated subject imports still continued to enter the market even as demand remained low due to flooding that occurred in the spring and fall of 2019.[184]

As we previously noted in our Original Views, several contemporaneous industry publications were reporting on oversupply conditions and price declines in the earlier part of 2019.[185] Specifically, trade publication *Argus* reported:[186]

- January 10, 2019: "US remains an outlet for 1Q.... With OCP also shipping considerably more this quarter, producers remain set on offloading tonnage in the only market that can absorb such volumes without pricing.... The US

---

[183] CR/PR at Table D-1. We further note that U.S. importers' quarterly ending inventories in March, June, and September 2019 were larger than their ending inventories for those months in 2018. *Id.*

[184] CR/PR at Table IV-6.

[185] Original Views at 41-42, citing Petition, Volume I, Exhibits I-29 – I-35; *see also* Mosaic Prehearing Br. at 59-63; Mosaic Posthearing Br. at 10-11; Simplot Prehearing Br. at 27-28; Simplot Posthearing Br., Responses to Questions pp. 16, 50-51. These articles discuss demand in the U.S. market as a whole and do not mention anywhere that there were areas of the U.S. market where demand was increasing.

[186] We note that subject imports from Morocco and Russia accounted for 84.1 percent of total import volume in 2019, up from 83.0 percent in 2018. CR/PR at Table IV-2. The volume of cumulated subject imports declined by 9.5 percent between 2018 and 2019, while the volume of nonsubject imports declined by 16.0 percent. CR/PR at Table IV-2. U.S. shipments of subject imports increased by 6.2 percent between 2018 and 2019, while shipments of nonsubject imports decreased by 11.8 percent. CR/PR at Table C-1.

36

phosphate market continues to feel the pressure of a full supply chain and steady import lineup as both DAP and MAP barges declined this week. Limited buying activity caused DAP Nola to drop by nearly $1/st from the previous week to $383-386/st fob Nola on confirmed trades. MAP barge values fell by nearly $5/st from last week's midpoint to $388-395/st fob Nola."[187]

- January 17, 2019: "US phosphate prices continue to wilt as heavy supply pressures suffocate buyer demand."[188]

- January 31, 2019: "The cold weather and full pipeline makes the US a less likely export for 1Q. There is no chance of an early application season in the south tnd the weather forecast is poor to March.... The 'polar vortex' in the US midwest saw temperatures plummet. The US domestic market followed suit. Put simply, the US market 'tanked' on cold weather, a full pipeline and heavy imports. US DAP barges fell $10/st in a week. MAP prices are now in the mid/high-$360s/st fob Nola. Firstly, with the US having covered 60pc of its 1Q 2018 total import requirements already, and with reports of heavy congestion at Nola on high water in the river system, the strategy of pushing more product into the US looks risky, at least in the short term."[189]

- February 7, 2019: "{T}he US is awash with imports ... Pushing so much DAP/MAP to the US has led to oversupply ... US phosphate prices dipped again this week as wholesalers try to incentivize buying during this period of low demand."[190]

- February 28, 2019: "{T}he US market fell dramatically with DAP into the $300s/st fob Nola, down around $15/st in a single week.... The heavy import line-up and 'polar vortex' in the US has resulted in Nola DAP barges trading at $330-338/st – down by $14/st this week.... US phosphate prices moved sharply lower this week as the market continues to be plagued by ample supplies and absent demand."[191]

- March 28, 2019: "OCP, in its 2018 financial results, projected softer prices in the first half of this year, driven by a drop in the cost of raw materials and higher inventories in the cost of raw materials and higher inventories in the US and India. It is a fair assessment. The US has a record surplus of phosphates entering the spring season, boosted by weak sales, terrible weather conditions and heavy 1Q imports, which reached a record 1.2mn t of DAP/MAP, up 27pc yoy.... The US DAP market softened this week as buyers were again put off by the combination

---

[187] Petition Volume 1, Exhibit I-31.

[188] Petition Volume 1, Exhibit I-32.

[189] Petition, Volume I, Exhibit I-33.

[190] Petition, Volume I, Exhibit I-29.

[191] Petition, Volume I, Exhibit I-34.

37

of heavy supplies and a probably limited spring application season.... Heavy January commitments by foreign producers lifted first quarter US phosphate imports past previous expectations."[192]

- April 18, 2019:  "DAP/MAP supply for 1Q is estimated at 2.3mn t.  The US DAP barge price fell again by \$5/st on oversupply amid heavy imports....  Heavy supplies and light demand continue to weigh heavily on the domestic phosphate market as DAP values continue to trickle downward.  Nola DAP barges were assessed down by \$5/st from the midpoint last week to \$320-325/st as buyers remain off put by limited field activity and prolonged closure of the upper Mississippi river.  {also noting} Record import levels."[193]

Additionally, in April 2019, *** also reported on the oversupply condition in the U.S. market due to a poor application season in the fall of 2018 and a "surge in imports in recent months."[194]

Thus, the record shows that regardless of whether subject import inventories were being reshipped once they reached their destination, the substantial volume of cumulated subject imports continuing to enter the United States in 2019 was adversely impacting U.S. prices as demand remained low due to weather events and flood in the spring of 2019.[195]  As

---

[192] Petition, Volume I, Exhibit I-30.

[193] Petition, Volume I, Exhibit I-35.

[194] Mosaic Posthearing Br. at Exhibit 3.

[195] As we noted in our Original Views, respondents blamed the oversupply conditions on demand projections that failed to materialize.  OCP Prehearing Br. at 70-73; Koch Prehearing Br. at 6-7; EuroChem Prehearing Br. at 8-9; EuroChem Posthearing Br. at 8-9; OCP Posthearing Br. at Responses to Questions pp. 27-30; Gavilon Posthearing Br. at Responses to Questions pp. 5-6; IRM Posthearing Br. at 7.  OCP further argues that in finding that subject imports contributed to oversupply conditions "regardless of the reasonableness of any demand projections," the Commission "ignored" that phosphate fertilizer is procured in advance based on forecasted demand.  OCP Comments at 24. Contrary to OCP's argument, we recognize that distributors rely on demand projections in obtaining product.  First, we note that, in 2019, *** percent of U.S. importers' U.S. commercial shipments were spot sales.  CR/PR at Table V-3.  Further as discussed above, cumulated subject imports entered the U.S. market in significant volumes, contributed to oversupply conditions, and depressed U.S. prices to a significant degree, regardless of how they were ordered.  U.S. importers claimed that they were ***. *See, e.g.*, ADM Posthearing Br. at 8-9 (stating that ***); Hearing Tr. at 227 (Lambert) (stating that "{t}hose vessels were coming.  And once they're on their way, they're coming here"); 223-224

(*continued...*)

38

explained in the Original Views,[196] this oversupply of subject imports and their low prices

exerted downward pricing pressure on the domestic like product and significantly depressed

U.S. prices in 2019.

Further, the record, including as supplemented by the remand questionnaires, does not

support respondents' assertions that additional volumes of subject imports in the latter half of

2019 merely replenished depleted inventories in areas unaffected by flooding.  As detailed

above, U.S. importers' end-of-period inventories of cumulated subject imports reached their

highest level of the POI in March 2019.[197]  Yet, according to respondents themselves, subject

imports that arrived in 2019 had been delivered "by the time record precipitation thwarted

fertilizer application in certain regions."[198]  Moreover, the supplementary questionnaire

information obtained in these remand proceedings suggests that the vast majority of subject

imports, once delivered, are not relocated or otherwise moved, but rather remain in regional

---

(Niederer).  Regardless of why or when they were ordered, however, the record shows that the subject imports had depressing effects on U.S. prices during 2019.  We also observe, as discussed above, that notwithstanding these assertions, foreign producers and importers of subject merchandise were able to respond to market changes after the petitions were filed by decreasing the volume of imports entering the U.S. market.

[196] Original Views at 39-46.

[197] CR/PR at Table D-1.

[198] OCP Comments at 15.  Respondents maintain that most subject imports of phosphate fertilizer enter through the port at NOLA, where they are loaded from vessels onto barges, barged up the Mississippi River and its tributaries, and then shipped north, west, and east by rail and truck to meet demand from farmers, which apply phosphate fertilizer twice a year in two limited windows of time. They claim that distributors and retailers store phosphate fertilizer in warehouses close to farmers and that such fertilizer stays there until it is used in those narrow application windows.  They assert that in the event of unexpected reductions in demand, such as weather or other unpredictable events, inventories are not returned or moved to other regions but instead are held and sold to farmers during the next application season.  OCP Comments at 5; PhosAgro Comments at 8-12; Koch Comments at 3-4; IRM Comments at 3-4; Eurochem Comments at 1-2.

39

inventories until used in a subsequent application period.[199]  Consequently, we find that the record indicates that substantial quantities of subject imports were in place in regional inventories by December 2018 and March of 2019, prior to the flooding that occurred in spring 2019, and such imports remained in those locations, available for subsequent application in the latter part of 2019.  Thus, the POI-high level of inventories of cumulated subject imports in March 2019 exceeded the levels maintained in prior years and according to respondents were already in place in regional locations prior to flooding.  Yet, monthly cumulated subject import volume peaked in January 2019 and continued to enter at substantial volumes.[200]  Taken together with the lower demand in three consecutive application periods, the record does not support a conclusion that inventories of U.S. imports were depleted such that the observed volumes of subject imports were needed.[201]  This is particularly so in light of the substantial inventories, expansive network of inventories, and extensive multi-modal distribution capabilities of the domestic industry.

However, even assuming for the sake of argument that importers of subject merchandise did, as respondents argue, deplete some portion of these inventories to serve areas that were unaffected by flooding, we find that the record shows that the volume of cumulated subject imports continued to exceed any demand created by alleged restocking

---

[199] *See generally* Importers Remand Questionnaires.  Additionally, OCP also claims that the new questionnaire evidence "makes clear that even as inventories built up in flooded regions, it was normal practice to keep inventories at their original intended destinations in preparation for the next application window."  OCP Comments at 18.

[200] CR/PR at Table IV-6.

[201] Indeed, importers' end-of-period inventories of cumulated subject imports increased from June 2019 to September 2019, with both months' inventory volumes larger than in the respective months in 2018.  CR/PR at Table D-1.

40

APPX0021251

needs.  As discussed above, U.S. importers' end-of-period inventories of cumulated subject

imports reached their highest level of the POI in March 2019 at *** short tons.[202]  U.S.

importers' next reported end-of-period inventories in June 2019 were *** short tons.[203]

Accordingly, U.S. importers' end-of-period inventories of cumulated subject imports from

March 2019 to June 2019 were reduced by *** short tons.  Cumulated subject imports,

however, far exceeded this amount in those months and the months that followed.  Indeed,

over 329,000 short tons of subject imports entered from April to June 2019.[204]  Moreover,

whereas the difference between end-of-period inventories from March 2019 to June 2019 was

only *** short tons, in July 2019 alone, the volume of cumulated subject imports was 281,132

short tons, and cumulated subject imports continued to enter the U.S. market at elevated levels

– 264,191 short tons in August 2019 and 178,304 short tons in September 2019 – for a three-

month total of 723,627 short tons.[205]

This pattern continued later in 2019.  U.S. importers' end-of-period inventories of

cumulated subject imports in September 2019 were *** short tons, higher than in June of 2019

but lower, by *** short tons, than in March 2019.[206]  Even assuming that this represents a

depletion of inventories to serve areas unaffected by flooding, the record shows that the

volume of cumulated subject imports far exceeded this amount in the months that followed.

Indeed, in October 2019 alone, the volume of cumulated subject imports was 244,672 short

---

[202] CR/PR at Table D-1.  As discussed above, this was up from *** short tons in 2018.  *Id.*
[203] CR/PR at Table D-1.  We note that this was higher than the quarterly inventories in June 2018 of *** short tons.  *Id.*
[204] CR/PR at Table IV-6.
[205] CR/PR at Table IV-6.
[206] CR/PR at Table D-1.

41

tons, and cumulated subject imports continued to enter the U.S. market at elevated levels –

164,187 short tons in November 2019 and 227,543 short tons in December 2019 – for a three-

month total of 636,402 short tons.[207]  Thus, whether or not U.S. importers depleted inventories

to serve areas that were unaffected by flooding in 2019, the record shows that cumulated

subject imports nonetheless continued to enter the U.S. market in excess of any purported

need to replenish inventories, further contributing to the oversupply conditions.[208]

In fact, as we previously noted in our Original Views, several contemporaneous industry

publications were reporting on oversupply conditions and price declines persisted in the latter

part of 2019.[209]  For example, trade publication *Argus* reported:[210]

- July 18, 2019:  "The US is looking fragile due to import length.  Widespread estimates of substantial carryover from spring are also hurting prices....  Ample spot availability has driven US phosphate values down this week to $304-310/st fob Nola DAP/MAP on confirmed trade....  Price pressure is poised to persist in the near-term with continued imports scheduled for July discharge."[211]

- August 4, 2019:  "Rather than maintain prices, OCP appears to be gunning for volume. . . .  Downward price pressure persisted along the US Gulf coast this week, with DAP barge values assessed at $298-300/st fob Nola – the lowest price level in nearly two years on a midpoint basis, according to Argus data....  A slate of three additional cargoes from Morocco for August arrival is anticipated to keep a lid on near-term prices, which have been steered by imports following spring applications.  DAP imports during the 2018-19 fertilizer year reached an

---

[207] CR/PR at Table IV-6.

[208] Again, we note that subject imports from Morocco and Russia accounted for 84.1 percent of total import volume in 2019, up from 83.0 percent in 2018.  CR/PR at Table IV-2.  The volume of cumulated subject imports declined by 9.5 percent between 2018 and 2019, while the volume of nonsubject imports declined by 16.0 percent.  CR/PR at Table IV-2.  U.S. shipments of subject imports increased by 6.2 percent between 2018 and 2019, while shipments of nonsubject imports decreased by 11.8 percent.  CR/PR at Table C-1.

[209] Original Views at 41-42, citing Petition, Volume I, Exhibits I-36 – I-44; *see also* Mosaic Prehearing Br. at 59-63; Mosaic Posthearing Br. at 10-11; Simplot Prehearing Br. at 27-28; Simplot Posthearing Br., Responses to Questions pp. 16, 50-51.

[210] These articles discuss demand in the U.S. market as a whole and do not mention anywhere that there were areas of the U.S. market where demand was increasing.

[211] Petition, Volume I, Exhibit I-36.

42

all-time high of 1.26mn/t on increased shipments from Morocco and Russia, according to customs data."[212]

- August 15, 2019: "In the US, DAP barge prices fell to the equivalent of $315/t cfr amid fears over more imports and large carryover.... In the US, two DAP barges traded in a $288-294/st fob range for September – a 10-year low. The paper market was even more aggressive. The driver is a substantial domestic carryover from spring, plus heavy imports and lower grain prices.... DAP barges traded at a 10-year low early this week at $288/st fob Nola for September shipment – pressuring the low end of this week's assessment.... Prices at Nola are poised to face ongoing headwinds as offshore volumes continue to trickle to port.... Downstream demand is expected to remain suppressed until the fourth quarter, when post-harvest applications resumes. In-season consumption will be key to draw down carryover inventories, and help bring the market closer to balanced."[213]

- September 26, 2019: "Mosaic has sold three October-loading DAP barges at $288/st fob Nola. But the slight firmness in the US DAP market exhibited after the Mosaic production cut subsided this week as barge values slipped below $290/st fob Nola for October shipment. DAP traded at $286-288/st fob Nola – the lowest price level since early-September. Market sentiment ... remained bearish for near-term price movement, especially as imports continue to discharge at the US Gulf coast at the current pace. The 500,000t of lost production at Mosaic's Faustina plant during the fourth quarter is poised to be replaced by offshore volumes, likely minimizing upward momentum to Nola values."[214]

- October 10, 2019: "In the U.S., DAP trade reached a new decade low of $275/st fob Nola for October shipment, a further decrease from the $280-$290/st fob assessed last week, although Mosaic did report a single DAP barge at $285/st fob. Bearish sentiment persists even after Mosaic idled its Faustina phosphate complex on 1 October which reduces total domestic production by 500,000t through the fourth quarter. Inventories are estimated to be higher than usual as the spring application season was weak this year, and the window for fall

---

[212] Petition, Volume I, Exhibit I-37.

[213] Petition, Volume I, Exhibit I-38.

[214] Petition, Volume I, Exhibit I-39. We note that, as discussed above, the volume of cumulated subject imports in October 2019 alone was 244,672 short tons, and cumulated subject imports continued to enter the U.S. market at elevated levels, 164,187 short tons in November 2019 and 227,543 short tons in December 2019, for a three-month total of 636,402 short tons. CR/PR at Table IV-6. Quarterly inventories of cumulated subject imports were lower in December 2019, at *** short tons compared to December 2018, at *** short tons; however, they remained at substantially elevated levels compared to December 2017 when they were *** short tons. CR/PR at Table D-1.

43

application is narrowing."[215]

- October 14, 2019: "In the US, DAP barges traded at a new decade low of $265/st fob Nola for October shipment, the lowest price since November 2009 ... total with few imports and a healthy export lineup, sources said it could be enough to draw inventories down to a normal level and support prices later this quarter or in early 2020."[216]

- October 31, 2019: "There was scant good news for phosphate producers this week – the US continued its inexorable slide with DAP a fresh decade low of $253/st fob Nola."[217]

- November 7, 2019: "US producer Nutrien called further US production cuts a 'futile game' this week. Nutrien argues that the market is weak because of fundamental structural oversupply and that further cuts simply signal to OCP, Russian and other producers to ship more to the US.... Phosphate barge values continued to fall this week as high buyer inventories and delays to fall application season weighed on market sentiment.... With inventories still full from two lackluster application seasons and more phosphate fertilizer shipments on the way, many doubt fall demand will be enough to rebalance the domestic phosphates market.... But buyer inventories are full following two lacklustre application seasons and high first-quarter imports."[218]

- December 12, 2019: "Nola barge prices fell to new lows this week in the first DAP trades for nearly a month.... Price support is doubted into early-2020 as additional imports and the expectation that production will resume at Mosaic's plant in Faustina, Louisiana, loom ahead."[219] [220]

Thus, the record shows that cumulated subject imports entered the U.S. market in the

---

[215] Petition, Volume I, Exhibit I-40.

[216] Petition, Volume I, Exhibit I-41. We note that Mosaic indicated in September 2019 that it was idling its Louisiana operations "as imports into the country have pushed down prices." Petition, Volume 1, I-46 "'Phosphate prices have declined further through the summer, with excess imports continuing to enter the U.S. on top of high channel inventories,' President and CEO Joc O'Rourke said in a statement. 'We expect our move to idle production to tighten supply and rebalance the market.'" *Id.*

[217] Petition, Volume I, Exhibit I-42.

[218] Petition, Volume I, Exhibit I-43.

[219] Petition, Volume 1, Exhibit I-44.

[220] Other publications, including ***, discussed the ***. Simplot Posthearing Br. at Exhibits 6 (*** reporting ***), 18 (***), 19 *** reporting ***). Moreover, respondents' witness even testified that NOLA prices were lower than prices in Brazil due to a market imbalance, and that inventory build-up was due to excessive rainfall and was not worked down "until the end of the strong fall 2020 application season." Hearing Tr. at 192-193 (Rahm).

44

latter part of 2019 in excess of any purported depletion of inventories, contributing to oversupply conditions, and having a depressing effect on domestic prices as demand remained low through 2019.[221]  Importers' end-of-period inventories were at their highest levels of the POI in December 2018 and March 2019, as subject imports peaked in January 2019.[222]  The domestic industry's sales prices for both pricing products began declining in the third quarter of 2018 and decreased to be below January 2017 levels by *** 2019, and remained there until *** 2020, after the petitions were filed and subject import volumes decreased.[223]  While apparent U.S. consumption declined by *** percent from 2018 to 2019, the domestic industry's U.S. shipment quantity decreased by *** percent by volume but *** percent by value.[224]

Additionally, the fact that cumulated subject imports continued to gain market share in 2019 as demand declined and the U.S. market contracted further demonstrates that they were not merely replenishing depleted inventories.  As we observed in our Original Views,[225] U.S. shipments of subject imports increased by 148,957 short tons (6.2 percent) between 2018 and 2019, and subject imports increased their share of the market at the expense of the domestic industry and nonsubject imports.[226]

In sum, the record shows that significant volumes of subject imports entered the U.S. market between 2017 and 2018, and as demand began to decline in the fall of 2018, U.S.

---

[221] As we noted in our Original Views, U.S. importers' ending inventories of subject imports in 2018 and 2019 were *** percent and *** percent higher, respectively, than ending inventories in 2017. CR/PR at Table C-1.  Subject import inventory levels remained at elevated levels at the end of the first and second quarters of 2020, but dropped at the end of the third quarter of 2020 as subject imports decreased after the petitions were filed at the end of June 2020.  CR/PR at Table D-1.

[222] CR/PR at Tables IV-6, C-1, D-1.

[223] CR/PR at Tables V-4, V-5, Figure V-4.

[224] CR/PR at Table C-1.

[225] Original Views at 41-43.

[226] CR/PR at Table C-1.

45

importers' inventories reached their highest level of those two years.  Notwithstanding these substantial inventories and declining demand in late 2018, subject imports surged into the U.S. market in January 2019, and continued to enter the U.S. market in large quantities, even as demand remained low in 2019.  That the continued flow of subject imports exceeded demand in the contracting U.S. market is further demonstrated by the fact that U.S. importers' quarterly inventories reached their highest level in March 2019.  Consequently, the record shows that cumulated subject imports were contributing to oversupply conditions in the beginning of 2019.  Subject imports nonetheless continued to enter the U.S. market in the latter part of 2019 in excess of any purported need to replenish depleted inventories, thereby further contributing to the oversupply conditions that continued to plague the U.S. market in the latter half of 2019.  At the same time, cumulated subject imports increased their market share at the expense of both the domestic industry as well as nonsubject imports.[227]  Numerous contemporaneous trade publications documented the oversupply conditions throughout 2019, with several noting that high levels of imports contributed to these conditions, as well as the effect that these conditions had on prices in the U.S. market.  Indeed, market prices for phosphate fertilizer DAP decreased in 2019 *** for non-phosphate fertilizers potash and urea, such that DAP prices *** .[228]

Moreover, as we observed in the Original Views,[229] U.S. purchasers also reported on the adverse effects caused by subject imports, particularly during 2019.  For instance, U.S.

---

[227] From 2018 to 2019, cumulated subject import market share increased *** percentage points, while the market shares of the domestic industry and nonsubject imports decreased ***  and *** percentage points, respectively.  CR/PR at Table C-1.

[228] CR/PR at Figure V-5; *see also* CR/PR at Figure V-6 (public prices for DAP and MAP ***).

[229] Original Views at 44-45.

APPX0021257

purchaser *** informed how *** and that "more cargo containers appear to be arriving to the U.S. on consignment with no price point established up front … {which} can lead to larger drops in price with weak demand."[230] U.S. purchaser *** reported that ***.[231] In reporting that domestic producers had reduced prices in order to compete with low-priced subject imports from Morocco, U.S. purchaser *** explained that ***.[232]

In addition to this record evidence of oversupply and imports' exertion of downward pressure on prices in the U.S. market, we also continue to find that other record evidence shows that subject imports were being offered at low prices during this time. For instance, in January 2019, ***.[233] [234] Record evidence also indicates that domestic producers reduced prices to compete with subject imports. Of the 28 responding purchasers, seven reported that U.S. producers had reduced prices in order to compete with lower-priced imports from the subject countries.[235] Five purchasers estimated domestic price reductions to compete with product imported from Morocco, and four estimated domestic price reductions to compete with product imported from Russia. The reported estimated price reductions ranged from ***

---

[230] CR/PR at II-2; *** U.S. Purchaser Questionnaire Response at III-8(b). As we noted above, *** also reported that *** CR/PR at Table V-11.

[231] *** U.S. Purchaser Questionnaire Response at II-2. In reporting that U.S. producers lowered prices by an estimated *** percent in order to compete with lower-priced subject imports, *** stated that *** CR/PR at Table V-11.

[232] CR/PR at Table V-11.

[233] Mosaic Posthearing Br. at Responses to Questions pp. 36-37, Exhibits 41-46. U.S. purchaser *** reported that ***. *** U.S. Purchaser Questionnaire Response at III-29(b). Simplot also claims that lower-priced imports forced it to lower its prices. Simplot Posthearing Br. at Responses to Questions pp. 35-37, Exhibit 4.

[234] We also note that record information shows that *** was the lowest priced in the U.S. market ***. Mosaic Posthearing Br. at Responses to Questions pp. 45-46, Exhibit 51 (exhibit data sourced from responses to Commission questionnaires).

[235] CR/PR at Table V-11. Seven purchasers reported that U.S. producers had not reduced prices in order to compete with lower-priced imports from the subject countries, and 14 reported that they did not know. CR/PR at V-25.

47

percent to *** percent, for an average of 16.0 percent.[236]

The record shows that, even though subject importers' inventories generally were not being re-shipped, the significant volumes of cumulated subject imports that continued to enter the market had significant depressing effects on U.S. prices. The contemporaneous trade publications cited above as well as purchasers' questionnaire responses show that the volumes of imports entering the port of New Orleans contributed to oversupply in the U.S. market and had adverse effects on NOLA market prices.[237] As previously noted, U.S. prices of phosphate fertilizers are highly transparent; they are published in multiple trade publications, including for the NOLA region.[238] Most responding purchasers (16 of 28) reported that they use prices reported in trade publications to negotiate purchase prices, and they cite several examples of trade publications that use NOLA-based prices.[239] Simplot reports that ***.[240] *** reported using NOLA-based prices published by a number of trade reports.[241] Purchaser responses also confirm the adverse effects of subject imports on U.S. prices and that domestic producers competed with subject imports based on NOLA prices.[242] Thus, even though subject importer distribution networks moved inventories "unidirectionally," the record shows that the volumes of cumulated subject imports entering the U.S. market had significant price depressing effects.

In light of the foregoing, we continue to find that the record demonstrates that subject

---

[236] CR/PR at V-25.

[237] We observe that New Orleans was the port of entry for nearly all U.S. imports of phosphate fertilizers from Morocco and the vast majority of U.S. imports from Russia. CR/PR at IV-11 n.16.

[238] CR/PR at V-5; Hearing Tr. at 147 (O'Rourke).

[239] CR/PR at V-5-6.

[240] CR/PR V-5.

[241] CR/PR at V-5-6.

[242] CR/PR at Table V-11.

48

imports exerted downward pricing pressure on the domestic like product and significantly depressed U.S. prices during the POI.  Although we acknowledge that some purchasers reported being unable to obtain supply from Mosaic at times during the POI,[243] we find that the record as a whole shows that subject imports contributed significantly to oversupply conditions in a declining market and had significant price-depressing effects on prices in the U.S. market in 2019.  Additionally, as discussed in greater detail below, these prices remained at depressed levels in 2020 before the petitions were filed and increased sharply as subject imports exited the market.

Respondents argue that the price declines were attributable to declines in global prices and U.S. demand, rather than subject imports.[244]  Although those factors may have contributed to price movements in the U.S. market, we continue to find that they do not negate the significant role that subject imports played in depressing domestic prices.  As shown by the evidence previously discussed, notwithstanding that demand in the U.S. market began to decline in the fall of 2018 and remained low throughout 2019, cumulated subject imports continued to enter the U.S. market at elevated levels, contributing to oversupply conditions, and having depressing effects on U.S. prices.  Respondents' arguments also fail to account for the fact that prices in other global markets were also affected by exports from subject producers in Morocco and Russia, collectively the world's largest exporters of phosphate

---

[243] *See, e.g.*, Gavilon Prehearing Br. at 20-24, Exhibit 7; IRM Prehearing Br. at 12-15, 18-19; IRM Posthearing Br. at Exhibit 4; ADM Posthearing Br. at Exhibit 1; Hearing Tr. at 205-206 (Coppess); Response of ***, CR/PR at Table V-11.

[244] OCP Prehearing Br. at 77, 88; PhosAgro Prehearing Br. at 26; Koch Prehearing Br. at 2; EuroChem Prehearing Br. at 2; OCP Posthearing Br. at 9-11; PhosAgro Posthearing Br. at 12-13; Koch Posthearing Br. at 1, 4-7.

fertilizers.[245]  Moreover, in 2019, U.S. prices were lower than and decreased by more than

global phosphate fertilizer prices.[246]  Although U.S. prices began to increase in the beginning of

2020 as weather conditions improved, they remained at levels lower than those that existed in

2017 and 2018 until after the filing of the petitions at the end of June 2020, at which point they

sharply increased to levels above other global markets.[247]

Thus, for the foregoing reasons, we find that subject imports from Morocco and Russia

depressed prices to a significant degree.

We have also considered whether subject imports prevented price increases of the

domestic like product, which otherwise would have occurred to a significant degree.  The

record indicates the domestic industry's ratio of COGS to net sales decreased from *** percent

in 2017 to *** percent in 2018 and then increased to *** percent in 2019; it was higher in

interim 2020 at *** percent than in interim 2019 at *** percent.[248]

Between 2017 and 2018, the domestic industry's total COGS decreased by *** percent.

The domestic industry's net sales volume, however, also decreased, resulting in the industry's

unit COGS increasing from $*** per short ton in 2017 to $*** per short ton in 2018.

Specifically, the domestic industry's unit raw material costs increased from $*** per short ton

in 2017 to $*** per short ton in 2018, and the industry's unit other factory costs increased from

---

[245] CR/PR at Table VII-14.

[246] Derived from CR/PR at Tables V-4-5 and Figure V-7; see also OCP Posthearing Br. at 11, Responses to Questions pp. 67-69; see also CR/PR at Table V-11 (response of U.S. purchaser ***, reporting that U.S. producers reduced prices by an estimated *** percent due to competition from subject imports:  ***).

[247] CR/PR at Tables V-4-5.  Cumulated subject imports declined substantially after the filing of the petitions, and subject imports from Morocco ceased entirely beginning in August 2020.  CR/PR at Table IV-6.  Total import volumes of phosphate fertilizers were lower in the third quarter of 2020 than in the third quarters of every other year in the POI.  See id.

[248] CR/PR at Tables IV-2, VI-1, and C-1.

50

$*** per short ton in 2017 to $*** per short ton in 2018, while the industry's unit direct labor costs remained the same at $*** per short ton in 2017 and 2018.[249] Notwithstanding this, the domestic industry's COGS to net sales ratio declined because the domestic industry's unit net sales value, which increased from $*** per short ton in 2017 to $*** per short ton in 2018, exceeded the increase in the domestic industry's unit COGS.[250]

Between 2018 and 2019, the domestic industry's total COGS decreased by another *** percent, while the domestic industry's net sales volume declined by *** percent and net sales value declined by *** percent, resulting in an increase in the industry's COGS to net sales ratio.[251] The domestic industry's unit COGS increased from $*** per short ton in 2018 to $*** per short ton in 2019, with its unit raw material costs increasing from $*** per short ton in 2018 to $*** per short ton in 2019, and the industry's unit other factory costs increasing from $*** per short ton in 2018 to $*** per short ton in 2019, while the industry's unit direct labor costs decreased from $*** per short ton in 2017 and 2018 to $*** per short ton in 2019.[252] Thus, while unit COGS increased slightly by $*** per short ton (***) percent) from 2018 to 2-019, the domestic industry's net sales unit value declined substantially, by $*** per short ton (*** percent), from $*** per short ton in 2018 to $*** per short ton in 2019,[253] resulting in a substantial *** percentage point increase in the domestic industry's COGS to net sales ratio.[254] This occurred as poor weather conditions led to a decline in U.S. demand in 2019, U.S.

---

[249] CR/PR at Table VI-1.
[250] CR/PR at Table VI-1.
[251] CR/PR at Table VI-1.
[252] CR/PR at Table VI-1.
[253] CR/PR at Table VI-1.
[254] CR/PR at Table C-1.

51

importers further increased the share of subject imports in the U.S. market (up \*\*\* percentage

points from 2018), and a significant volume of low priced subject imports continued to enter

the U.S. market, putting additional pressure on domestic prices, and substantially contributing

to oversupply conditions.  Although the domestic industry attempted to offset the collapse in

U.S. prices by idling capacity and curtailing production,[255] the record as a whole indicates that

subject imports contributed significantly to the market imbalance between supply and demand

and, as found above, depressed prices to a significant degree.[256]

In sum, for the foregoing reasons, we find that subject imports from Morocco and

Russia depressed prices to a significant degree.  We thus continue to conclude that subject

imports had significant price effects.

### D.      Impact of the Subject Imports

Section 771(7)(C)(iii) of the Tariff Act provides that the Commission, in examining the

impact of the subject imports on the domestic industry, "shall evaluate all relevant economic

factors which have a bearing on the state of the industry."[257]  These factors include output,

sales, inventories, capacity utilization, market share, employment, wages, productivity, profits,

cash flow, return on investment, ability to raise capital, research and development, and factors

affecting domestic prices.  No single factor is dispositive and all relevant factors are considered

---

[255] CR/PR at Table III-3; Mosaic Prehearing Br. at 2, Mosaic Posthearing Br. at Responses to Questions pp. 10-23, Exhibits 17-19.

[256] Mosaic Prehearing Br. at 59-63; Mosaic Posthearing Br. at 10-11.  Mosaic states that in addition to idling facilities and curtailing production, it also increased exports because the U.S. market could not absorb additional supply.  Mosaic Posthearing Br. at 11.

[257] 19 U.S.C. § 1677(7)(C)(iii); *see also* SAA at 851 and 885 ("In material injury determinations, the Commission considers, in addition to imports, other factors that may be contributing to overall injury.  While these factors, in some cases, may account for the injury to the domestic industry, they also may demonstrate that an industry is facing difficulties from a variety of sources and is vulnerable to dumped or subsidized imports.").

52

"within the context of the business cycle and conditions of competition that are distinctive to the affected industry."[258]

As we observed in our Original Views,[259] the domestic industry's output indicators declined from 2017 to 2019, but were higher in interim 2020 than in interim 2019.[260] Specifically, the domestic industry's share of apparent U.S. consumption declined from *** percent in 2017 to *** percent in 2018 and *** percent in 2019; its market share was higher in interim 2020, at *** percent than in interim 2019, at *** percent.[261] Its production decreased by *** percent between 2017 and 2019 from *** short tons in 2017 to *** short tons in 2018 to *** short tons in 2019; its production was higher in interim 2020, at *** short tons, than in interim 2019, at *** short tons.[262] Its capacity declined by *** percent from 2017 to 2019, from *** short tons in 2017 to *** short tons in 2018 and *** short tons in 2019,[263] and its capacity utilization increased by *** percentage points from *** percent in 2017 to *** percent in 2018 to *** percent in 2019.[264] The domestic industry's capacity was higher in interim 2020,

---

[258] 19 U.S.C. § 1677(7)(C)(iii).  This provision was amended by the Trade Preferences Extension Act of 2015, Pub. L. 114-27.

[259] Original Views at 49-53.

[260] As previously noted, after the petitions were filed at the end of June 2020, subject imports decreased in the U.S. market.  Mosaic restarted production at previously idled facilities, diverted shipments that had been destined for export markets, and drew down inventories, for a total of *** short tons in additional sales in interim 2020 compared to interim 2019.  Mosaic U.S. Producer Questionnaire Response at IV-16.  *** also reported more U.S. shipments in interim 2020 than in interim 2019.  *** U.S. Producer Questionnaire Responses at II-7; *** U.S. Producer Questionnaire Responses at II-7.  Consequently, the domestic industry's market share, capacity, production, and U.S. shipments were higher in interim 2020 than in interim 2019.  CR/PR at Table C-1.

[261] CR/PR at Tables IV-8, C-1.

[262] CR/PR at Tables III-4, C-1.

[263] CR/PR at Tables III-4, C-1.

[264] CR/PR at Tables III-4, C-1.

53

at *** short tons, than in interim 2019, at *** short tons, while its capacity utilization was lower in interim 2020, at *** percent, than in interim 2019, at *** percent.[265]

The domestic industry's U.S. shipments declined by *** percent between 2017 and 2019, from *** short tons in 2017 to *** short tons in 2018 and *** short tons in 2019; its U.S. shipments were higher in interim 2020, at *** short tons, than in interim 2019, at *** short tons.[266] The domestic industry's end-of-period inventories increased by *** percent from 2017 to 2019, from *** short tons in 2017 to *** short tons in 2018 and 2019; its end-of-period inventories were lower in interim 2020, at *** short tons, than in interim 2019, at *** short tons.[267] The domestic industry's ratio of end-of-period inventories to total shipments increased steadily from 2017 to 2019 but was lower in interim 2020 than in interim 2019.[268]

Employment indicators for the domestic industry also declined between 2017 and 2019. The domestic industry's number of production and related workers ("PRWs") fell from *** in 2017 to *** in 2018 and *** in 2019; its number of PRWs was lower in interim 2020, at ***, than in interim 2019, at ***.[269] Total hours worked,[270] wages paid,[271] and productivity[272] also fell from 2017 to 2019. Total hours worked and wages paid were lower in interim 2020 than in

---

[265] CR/PR at Tables III-4, C-1.

[266] CR/PR at Tables III-6, C-1.

[267] CR/PR at Tables III-7, C-1.

[268] CR/PR at Tables III-7, C-1. The ratio of end-of-period inventories to U.S. shipments was *** percent in 2017, *** percent in 2018, and *** percent in 2019. It was lower in interim 2020 at *** percent than in interim 2019 at *** percent. *Id.*

[269] CR/PR at Tables III-9; C-1.

[270] CR/PR at Tables III-9; C-1. Total hours worked decreased from *** hours in 2017 to *** hours in 2018 and *** hours in 2019. *See id.*

[271] CR/PR at Tables III-9; C-1. Wages paid decreased from $*** in 2017 to $*** in 2018 to $*** in 2019. *See id.*

[272] CR/PR at Tables III-9; C-1. Productivity per 1,000 hours decreased from *** short tons in 2017 to *** short tons in 2018 and *** short tons in 2019. *See id.*

54

interim 2019 while productivity was higher between the interim periods.[273]

The domestic industry's net sales, gross profit, operating income, and net income increased between 2017 and 2018, but deteriorated in 2019. Most of the industry's financial indicators were lower in interim 2020 than in interim 2019.[274] Specifically, the domestic industry's net sales by value increased from $*** in 2017 to $*** in 2018, then declined to $*** in 2019; its net sales by value was lower in interim 2020, at $***, than in interim 2019, at $***.[275] Its gross profit increased from $*** in 2017 to $*** in 2018, then declined to ***; its gross profit was lower in interim 2020, at ***, than in interim 2019, at ***.[276] The industry's operating income increased from $*** in 2017 to $*** in 2018, then declined to *** in 2019; its operating income was lower in interim 2020, at ***, than in interim 2019, at ***.[277] The ratio of operating income to net sales increased from *** percent in 2017 to *** percent in 2018, then declined to *** percent in 2019; it was lower in interim 2020, at *** percent, than in interim 2019, at *** percent.[278] The domestic industry's net income increased from $*** in 2017 to $*** in 2018, then declined to ***; its net income was higher in interim 2020, at ***, than in interim 2019, at ***.[279]

---

[273] Total hours worked were *** hours in interim 2019 and *** hours in interim 2020. Wages paid were $*** in interim 2019 and $*** in interim 2020. Productivity was *** short tons in interim 2019 and *** short tons in interim 2020. CR/PR at Tables III-9; C-1.

[274] U.S. prices at the beginning of 2019 were higher than later in the year. Consequently, interim 2020 prices, although increasing substantially in the last three months of the POI after the petitions were filed, remained at lower levels than in interim 2019, which, in turn resulted in lower gross profit levels despite increasing net sales quantity and lower COGS. CR/PR at VI-9, Tables V-4-5, VI-1-2.

[275] CR/PR at Tables VI-1, C-1.

[276] CR/PR at Tables VI-1, C-1.

[277] CR/PR at Tables VI-1, C-1.

[278] CR/PR at Tables VI-1, C-1.

[279] CR/PR at Tables VI-1, C-1. The ratio of net income to net sales increased from *** percent in 2017 to *** percent in 2018, then declined to *** percent in 2019; it was slightly higher in interim 2020 at *** percent than in interim 2019, at *** percent. *Id.*

55

Domestic producers' capital expenditures increased from $*** in 2017 to $*** in 2018 and $*** in 2019,[280] [281] while research and development expenses decreased each year, from $*** in 2017 to $*** in 2018 and $*** in 2019.[282]  *** also reported negative effects on investment and growth and development that *** attributed to subject imports.[283]

As discussed above, we have found that the volume of cumulated subject imports and the increase in the volume were significant during the period of investigation, and subject imports gained *** percentage points in market share at the expense of the domestic industry from 2017 to 2019 (*** percentage points from 2017-2018 and *** percentage points from 2018-2019).[284]  The record also shows that the volume of cumulated subject imports increased by one million short tons between 2017 and 2018, and as demand began to decline in the fall of 2018, U.S. importers' inventories reached their highest level of those two years. Notwithstanding these substantial inventories and declining demand, subject imports surged into the U.S. market in January 2019 and continued to flow into the U.S. market in substantial quantities, reaching 2.7 million short tons that year, even as demand declined in 2019.[285]  U.S. importers' quarterly inventories reached their highest level in March 2019, but subject imports nonetheless continued to enter the U.S. market in the latter part of 2019 in excess of any purported need to replenish depleted inventories in the latter part of 2019.  Moreover, as

---

[280] CR/PR at Tables VI-6, C-1.  The domestic producers' capital expenditures were higher in interim 2020, at $***, than in interim 2019, at $***.  *See id.*

[281] All three U.S. producers reported ***.  Specifically, Mosaic explained that ***.  Nutrien reported that its capital expenditures related to ***.  Simplot reported that ***.  CR/PR at Table VI-7.

[282] CR/PR at Tables VI-6, C-1.  The domestic producers' research and development expenses were lower in interim 2020, at $***, than in interim 2019, at $***.  *See id.*

[283] CR/PR at Tables VI-9-10.

[284] CR/PR at Table C-1.

[285] CR/PR at Tables IV-2, IV-6.

56

previously discussed, the record shows that regardless of the "unidirectional" movement of subject importers' inventories, the volumes of subject imports entering the U.S. market had significant depressing effects on U.S. prices. Record evidence shows subject imports being offered and sold at lower prices, domestic producers lowering prices to compete with subject imports, and certain purchasers purchasing subject imports rather than the domestic like product for price reasons. Consequently, subject imports – through their significant volumes that contributed to the oversupply conditions in the U.S. market during the POI and low prices – depressed prices in the U.S. market to a significant degree.

The downward pricing pressure exerted by subject imports forced the domestic industry to reduce prices, which in turn caused its revenues to be lower than they would have been otherwise. The domestic industry's U.S. shipment average unit value declined to $*** per short ton in 2019, down from $*** per short ton in 2018 and $*** per short ton in 2017.[286] The domestic industry's sales revenues declined considerably in 2019 (down from 2018 *** percent by quantity and *** percent by value) along with its profitability as its COGS to net sales ratio rose above *** percent.[287] Sales revenues and profitability continued to be weak and the industry's COGS to net sales ratio remained above *** percent into interim 2020.[288] As a consequence, we find that subject imports had a significant impact on the domestic industry.

We have evaluated the above factors within the context of the business cycle and conditions of competition distinctive to the industry. In doing so, we note that, in many investigations, there are other economic factors at work, some or all of which may also be

---

[286] CR/PR at Table C-1.
[287] CR/PR at Tables VI-1, C-1.
[288] CR/PR at Table VI-1, C-1.

57

having adverse effects on the domestic industry. Such economic factors might include

nonsubject imports; changes in technology, demand, or consumer tastes; competition among

domestic producers; or management decisions by domestic producers. The legislative history

explains that the Commission must examine factors other than subject imports to ensure that it

is not attributing injury from other factors to the subject imports, thereby inflating an otherwise

tangential cause of injury into one that satisfies the statutory material injury threshold.[289] In

performing its examination, however, the Commission need not isolate the injury caused by

other factors from injury caused by unfairly traded imports.[290] Nor does the "by reason of"

standard require that unfairly traded imports be the "principal" cause of injury or contemplate

that injury from unfairly traded imports be weighed against other factors, which may be

---

[289] The Statement of Administrative Action for the Uruguay Round Agreements Act ("SAA") at 851-52 ("{T}he Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports."); S. Rep. 96-249 at 75 (1979) (the Commission "will consider information which indicates that harm is caused by factors other than less-than-fair-value imports."); H.R. Rep. 96-317 at 47 (1979) ("in examining the overall injury being experienced by a domestic industry, the ITC will take into account evidence presented to it which demonstrates that the harm attributed by the petitioner to the subsidized or dumped imports is attributable to such other factors;" those factors include "the volume and prices of nonsubsidized imports or imports sold at fair value, contraction in demand or changes in patterns of consumption, trade restrictive practices of and competition between the foreign and domestic producers, developments in technology and the export performance and productivity of the domestic industry"); *accord Mittal Steel*, 542 F.3d at 877.

[290] SAA at 851-52 ("{T}he Commission need not isolate the injury caused by other factors from injury caused by unfair imports."); *Taiwan Semiconductor Industry Ass'n*, 266 F.3d at 1345 ("{T}he Commission need not isolate the injury caused by other factors from injury caused by unfair imports ... . Rather, the Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports."); *Asociacion de Productores de Salmon y Trucha de Chile AG v. United States*, 180 F. Supp. 2d 1360, 1375 (Ct. Int'l Trade 2002) ("{t}he Commission is not required to isolate the effects of subject imports from other factors contributing to injury" or make "bright-line distinctions" between the effects of subject imports and other causes.); *see also Softwood Lumber from Canada*, Inv. Nos. 701-TA-414 and 731-TA-928 (Remand), USITC Pub. 3658 at 100-01 (Dec. 2003) (Commission recognized that "{i}f an alleged other factor is found not to have or threaten to have injurious effects to the domestic industry, *i.e.*, it is not an 'other causal factor,' then there is nothing to further examine regarding attribution to injury"), *citing Gerald Metals*, 132 F.3d at 722 (the statute "does not suggest that an importer of LTFV goods can escape countervailing duties by finding some tangential or minor cause unrelated to the LTFV goods that contributed to the harmful effects on domestic market prices.").

58

contributing to overall injury to an industry.[291] It is clear from the statute and decisions of the Federal Circuit and Court of International Trade that the existence of injury caused by other factors does not compel a negative determination.[292]

Within this framework, we have considered respondents' arguments that the domestic industry's poor performance was not caused by subject imports, but rather was the result of other factors. Specifically, we considered the role of declining U.S. demand due to unusually poor weather conditions, which began in the latter part of 2018 and affected three consecutive application sessions – fall 2018, spring 2019, and fall 2019.[293] Although demand declines in 2019 may have exerted some degree of downward force on the domestic industry's condition, we again note that the Commission need not isolate the injury caused by other factors from injury caused by subject imports and that the "by reason of" standard does not require that unfairly traded imports be the "principal" cause of injury or contemplate that injury from unfairly traded imports be weighed against other factors, which may be contributing to overall injury to an industry. As described above, the volume of cumulated subject imports and inventories of such merchandise increased significantly from 2017 to 2018, and remained significant in 2019 despite decreased apparent U.S. consumption. In the latter half of 2019, as demand remained low due to further adverse weather conditions, U.S. importers continued to maintain elevated levels of inventories and continued to import more subject merchandise

---

[291] S. Rep. 96-249 at 74-75; H.R. Rep. 96-317 at 47.

[292] *See Nippon Steel Corp.*, 345 F.3d at 1381 ("an affirmative material-injury determination under the statute requires no more than a substantial-factor showing. That is, the 'dumping' need not be the sole or principal cause of injury.").

[293] OCP Prehearing Br. at 108-116; Gavilon Prehearing Br. at 10-11, 64-65; PhosAgro Prehearing Br. at 21-22; IRM Prehearing Br. at 31; PhosAgro Posthearing Br. at 9-10.

59

than was needed to replenish any depletion of these inventories. Moreover, as previously discussed, contemporaneous trade publications and U.S. purchaser questionnaire responses documented the adverse impact of imports on U.S. prices. Therefore, the adverse weather conditions that affected the U.S. market and prompted a decline in demand do not rebut the fact that the industry's performance would have been stronger in the absence of the significant volume of subject imports from Morocco and Russia that exerted downward pricing pressure on the domestic industry. In other words, we have observed material injury to the domestic industry by reason of subject imports that is distinct from the declining demand so as to ensure that we are not attributing injury from declining demand to the subject imports.

Respondents argue that subject imports merely filled a supply gap created by Mosaic's decision to idle its Plant City facility in December 2017,[294] which was exacerbated by Nutrien's

---

[294] OCP Prehearing Br. at 7, 24-32, 62-63; Gavilon Prehearing Br. at 20, 34, 60-63; IRM Prehearing Br. at 6-9, 19-20, 24-25; OCP Posthearing Br. at 2, 4, Responses to Questions pp. 14-15, 77-78; IRM Posthearing Br. at 5. Respondents, referring to Mosaic's public statements regarding giving up "1 million tonnes of market here in the U.S. intentionally," argue that idling the facility was part of Mosaic's global strategy to invest in lower-cost production facilities overseas and bring in product from its joint venture in Saudi Arabia. Mosaic firmly denies that it deliberately idled Plant City – which it states had accounted for 700,000 short tons of phosphate fertilizer sold into the U.S. market in 2017 – for this purpose, and we observe that Mosaic *** import from its joint venture in Saudi Arabia during the POI, and that imports from Saudi Arabia remained at much lower levels than subject imports and increased by substantially less than subject imports did during the POI. CR/PR at IV-6 & Tables IV-2, C-1. Mosaic claims that the increasing volumes of subject imports played a significant role in driving prices to levels that made it uneconomical for it to operate its Plant City facility in 2017 in the first instance, and that its decision to idle Plant City ultimately helped balance global phosphate supply and demand, and tightened U.S. supply, which caused U.S. prices to increase in 2018. This price increase, Mosaic asserts, was temporary as subject imports increased, causing a supply glut and declining prices. Mosaic Prehearing Br. at 58-59; Mosaic Posthearing Br. at Responses to Questions pp. 10-17, Exhibit 14. Incurring tens of millions of dollars in costs to idle Plant City, Mosaic states that it preserved the option of reopening the facility in the event of a significant, sustained improvement in market conditions, which did not occur due to subject imports. It ultimately was forced to close the facility in June 2019. Mosaic Posthearing Br. at Responses to Questions pp. 22-23.

60

announcement in February 2018 that it would close its Redwater facility in Canada.[295] Mosaic concedes that after it had idled Plant City, it reduced its phosphate sales volume targets with certain larger customers – specifically, with CHS by 200,000 tons and with Gavilon by 100,000 tons relative to the prior year – as well as to some ***,[296] we find that the volume of cumulated subject imports eclipsed any reduction in U.S. production as a result of Mosaic's idling of its facility in 2017. As discussed above, we find Mosaic's estimate that the idling of the Plant City facility reduced its supply to the U.S. market by approximately 700,000 tons to be credible and consistent with other record evidence. Additionally, notwithstanding this estimate, the record shows that Mosaic's U.S. shipments decreased by only *** short tons from 2017 to 2018. Subject imports, however, increased by 1 million short tons from 2017 to 2018, and U.S.

---

[295] OCP Posthearing Br. at 3, Responses to Questions pp. 15-16; IRM Posthearing Br. at 3; Koch Posthearing Br. at 2. In May 2019, Nutrien converted its phosphate operation in Redwater, Canada (***) to an ammonium sulfate plant. CR/PR at III-3 and Table III-3. As discussed above, Nutrien announced at the time that it was increasing production at its U.S. facilities in Aurora, North Carolina and White Springs, Florida in order to offset any reduction in supply from Redwater and ensure a continued supply of phosphate fertilizers to customers in Canada. CR/PR at III-3; Mosaic Prehearing Br. at Exhibit 13. Indeed, ***, Nutrien *** its U.S. production between 2018 and 2019 and this increase was more than sufficient to cover its increase in exports that year. CR/PR at Table III-4; PCS/Nutrien Domestic Producer Questionnaire at II-7. The record also shows that between 2017 and 2018, Nutrien had increased its capacity by 400,000 short tons due to ***. CR/PR at Table III-4 and III-5, n.18.

[296] *** U.S. Producer Questionnaire Response at IV-16. Mosaic further states that ***. Moreover, Mosaic states that it ***. Mosaic Posthearing Br. at Responses to Questions, p. 85. Mosaic also disputes other allegations of its refusal or inability to supply product during the POI. Specifically, Mosaic disputes ADM's testimony that Mosaic "categorically refuses to sell to us." Mosaic asserts that ***. Mosaic Posthearing Br. at Responses to Questions pp. 86-87. Mosaic also contends that some of the supply issues identified by respondent parties are with broker/traders such as ADM and Koch that compete with the domestic industry for sales and rely on a small margin, high volume business model. Mosaic Final Comments at 6; see also Simplot Posthearing Br. at Responses to Questions pp. 9-10, 21, 64 and Exhibit 5. Mosaic further contends that it has never had a sales relationship with IRM, and that it ***. Mosaic Posthearing Br. at Responses to Questions, pp. 87-88. Mosaic argues that many of the other alleged instances identified by respondents dealt with post-petition supply issues experienced by U.S. importers after their Moroccan and Russian suppliers largely and abruptly exited the U.S. market. Mosaic asserts that there was a supply shock, and Mosaic responded by diverting shipments headed to export markets and drawing down inventories. Mosaic Posthearing Br. at Responses to Questions p. 84; Mosaic Final Comments at 6.

61

shipments of subject imports increased by 604,981 short tons from 2017 to 2018 and by 753,638 short tons from 2017 to 2019.[297]  Moreover, as record-setting precipitation impacted three planting seasons in a row beginning in the fall of 2018, the volume of subject imports persisted beyond levels demanded, resulting in a substantial buildup of U.S. importer inventories of subject imports and an oversupply condition in the U.S. market.[298] [299]

Respondents further claim that Mosaic deliberately refused to supply U.S. customers in favor of exporting product.[300]  The record, however, does not support respondents' contention that domestic producers prioritized export shipments over U.S. shipments.  To the contrary, after subject imports declined in the U.S. market following the filing of the petitions, the domestic industry increased production and U.S. shipments, and also diverted export shipments to make additional product available to U.S. customers.[301]  Mosaic explains that its export markets, such as India and Brazil, help support year-round capacity utilization rates

---

[297] CR/PR at Tables IV-2, IV-7.

[298] CR/PR at Tables IV-2, IV-7.  Respondents argue that imported product was necessary to serve demand in U.S. regions unaffected by the poor weather conditions.  However, as discussed above, the record shows that the volume of cumulated subject imports in 2019 exceeded what was necessary to replenish any depleted inventories.

[299] Moreover, while demand as measured by apparent U.S. consumption declined by *** short tons between 2018 and 2019, U.S. shipments of subject imports increased by *** short tons.  CR/PR at Table C-1.  Although apparent U.S. consumption was *** short tons lower in 2019 than in 2017, the volume of cumulated subject imports was 725 thousand short tons higher and importers' U.S. shipments of subject imports 743 thousand short tons higher in 2019 than in 2017.  CR/PR at Tables IV-2, C-1.

[300] Koch Prehearing Br. at 3-5; PhosAgro Prehearing Br. at 3; Koch Prehearing Br. at 2; EuroChem Prehearing Br. at 5; OCP Posthearing Br. at 6-7.

[301] CR/PR Tables III-5, IV-7; Mosaic Posthearing Br. at Responses to Questions p. 84; Mosaic Final Comments at 6.  Mosaic states that due to the abrupt departure of subject imports after the filing of the petitions and because facilities need time to ramp up production, it also had to import product from Saudi Arabia for the first time in late 2020.  Hearing Tr. at 103-104 (Jung); Mosaic Posthearing Br. at Response to Questions p. 17 n.165.

62

during the "off-season" periods in the United States[302] and are also used for "risk management" and to retain flexibility to ship product to third country markets during times when U.S. demand is low, such as in 2019.[303]

Further undermining respondents' assertions of widespread or problematic issues with supply from domestic sources compared to subject sources, is the fact that the majority of purchasers reported that the domestically produced product was either comparable or superior to product from Morocco (16 of 24 firms) and Russia (20 of 23 firms) in availability and reliability of supply.[304]  As previously discussed, most U.S. purchasers reported that the domestic product's U.S. distribution network was superior to that of subject imports.[305]  The additional questionnaire responses gathered in these remand proceedings demonstrate the breadth and superiority of U.S. producers' distribution networks, and that the domestic industry reported moving inventories between locations while importers generally did not.[306]

We also find that the record does not support respondents' arguments that the domestic industry's financial declines were due to its cost challenges.[307]  As previously discussed, all major U.S. producers are vertically integrated with respect to the main raw

---

[302] Mosaic Prehearing Br. at 54.

[303] Mosaic Posthearing Br. at 14; Hearing Tr. at 118-120 (O'Rourke).

[304] CR/PR at Table II-9.  Although 16 of 28 purchasers reported experiencing supply constraints, we note that three of those purchasers (***, ***, and ***) specifically implicated U.S. importers only. Moreover, three other purchasers (***, ***, and ***) pointed to experiencing constraints from both U.S. importers and domestic producers.  And one purchaser (***) pointed to ***. ***, ***, ***, ***, ***, ***, and *** U.S. Purchaser Questionnaire Responses at III-11.  Consequently, only nine of 28 responding purchasers – three of which were U.S. importers (***, ***, and ***) of subject phosphate fertilizers and *** – reported supply constraints with respect to the domestic like product only.

[305] CR/PR at Table II-9.

[306] See above Section II.A.3; Remand Questionnaire Responses at 2(a)-(c).

[307] OCP Prehearing Br. at 113-115; EuroChem Prehearing Br. at 3-4.

63

material inputs used to produce phosphate fertilizers – sulfur, ammonia, and phosphate rock.[308]

To the extent domestic producers purchased certain quantities of raw materials,[309] this did not

adversely impact the domestic industry's total COGS, which declined over the POI and was

lower in interim 2020 than in interim 2019.[310]

Finally, we have also examined the role of nonsubject imports. Nonsubject imports

increased over the POI,[311] but they had a small presence in the U.S. phosphate fertilizer market.

Their market share fluctuated, increasing from \*\*\* percent in 2017 to \*\*\* percent in 2018,

before declining to \*\*\* percent in 2019, for an overall increase of \*\*\* percentage points

between 2017 and 2019.[312] Subject imports, however, gained a larger amount, \*\*\* percentage

points of market share, as \*\*\* percentage points of market share shifted from domestic to

import sources from 2017-2019 (\*\*\* percentage points from 2018-2019).[313] Moreover,

between 2018 and 2019 when demand and prices declined, subject import market share

increased by \*\*\* percentage points (from 29.0 percent to 33.3 percent), while nonsubject

---

[308] CR/PR at V-1.

[309] For instance, Mosaic states that it produces one-third of its ammonia, purchases another third on the open market, and acquires a third through a long-term contract with CF Industries. Mosaic Posthearing Br. at Responses to Questions p. 95.

[310] CR/PR at VI-1. Raw material costs increased from $\*\*\* in 2017 to $\*\*\* in 2018, then decreased to $\*\*\* in 2018 and were lower in interim 2020, at $\*\*\*, than in interim 2019, at $\*\*\*, even as production and sales were higher. *See id.*

[311] CR/PR at Tables IV-2. Nonsubject imports increased from \*\*\* short tons in 2017 to \*\*\* short tons in 2018, then declined to \*\*\* short tons in 2019; they were higher in interim 2020, at \*\*\* short tons, than in interim 2019, at \*\*\* short tons. *See id.*

[312] CR/PR at Tables IV-8, C-1. Nonsubject imports' market share was lower in interim 2020, at \*\*\* percent, than in interim 2019, at \*\*\* percent. *See id.* Nonsubject imports did not fill the supply vacated when subject imports decreased following the filing of the petitions, as total import volumes of phosphate fertilizers were lower in the third quarter of 2020 than in the third quarters of every other year of the POI. CR/PR at Table IV-6.

[313] CR/PR at Table C-1.

64

import market share decreased by \*\*\* percentage points (from \*\*\* percent to \*\*\* percent).[314]

As discussed above, the record, including the volume of subject imports, information from purchaser questionnaire responses, and contemporaneous trade publications, indicates that subject imports contributed to oversupply conditions in the U.S. market and had significant depressing effects on U.S. prices.[315] Thus, based on the available evidence, nonsubject imports cannot explain the magnitude of the adverse impact on the domestic industry.[316]

Accordingly, we continue to find that cumulated subject imports had a significant impact on the domestic industry.

---

[314] CR/PR at Table C-1. Subject and nonsubject import market shares were both lower in interim 2020 than in interim 2019, by \*\*\* percentage points and \*\*\* percentage points, respectively. *Id.*

[315] *See, e.g.*, CR/PR at Table V-11. Responding purchasers specifically discussed imports from Morocco and Russia and their impact on the U.S. market. As previously discussed, subject imports from Morocco and Russia accounted for 84.1 percent of total import volume in 2019, up from 83.0 percent in 2018. CR/PR at Table IV-2. The volume of cumulated subject imports declined by 9.5 percent between 2018 and 2019, while the volume of nonsubject imports declined by 16.0 percent. CR/PR at Table IV-2. U.S. shipments of subject imports increased by 148,957 short tons, 6.2 percent, between 2018 and 2019, while U.S. shipments of nonsubject imports decreased by 11.8 percent during that time. CR/PR at Table C-1.

[316] As noted above, nonsubject imports from Saudi Arabia increased each year of the POI until Saudi Arabia was the largest source of nonsubject imports by 2019. CR/PR at IV-2. While Mosaic has a 25 percent equity interest in MWSPC, a producer of phosphate fertilizers in Saudi Arabia, it was not the U.S. importer of nonsubject imports from Saudi Arabia until the last quarter of 2020. CR/PR at IV-6; *see* Mosaic U.S. Importer Questionnaire Response at I-2a, II-2a. It maintains that it had invested in the Saudi facility to serve India and other parts of Asia, not the U.S. market, as evidenced by the fact that after it had idled Plant City, it "imported *zero* phosphate fertilizer from Saudi Arabia," but rather "sold \*\*\* percent of its offtake from MWSPC in India." Mosaic Posthearing Br. at Responses to Questions pp. 16-17. The record indicates that India was the largest destination for exports from Saudi Arabia during the POI. CR/PR at Table VII-13. Mosaic's \*\*\*. *See id.* at Responses to Questions p. 17 n.165. Mosaic did so, rather than utilize its excess capacity because the "nature of phosphate fertilizer production makes it difficult to ramp up production quickly." *See id.* at Responses to Questions pp. 24-26.

65

## III.    Conclusion

For the foregoing reasons, we again determine that an industry in the United States is materially injured by reason of subject imports of phosphate fertilizers from Morocco and Russia that are subsidized by the governments of Morocco and Russia.

APPX0021277

## Dissenting Views of Chairman David S. Johanson

I dissented when this investigation was originally before the Commission, determining that the domestic industry was neither materially injured nor threatened with material injury by reason of subject imports of phosphate fertilizers from Morocco and Russia.  On remand from the U.S. Court of International Trade,[1] there is nothing in the record that changes my original analysis, findings, or determinations.  I therefore adopt and incorporate my original dissent in full.  *See Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final), USITC Pub. 5172 (March 2021) at 45-69 (Dissenting Views of Commissioner David S. Johanson); APPX0099630-0099666 (confidential version of same with citation to joint appendix of appellate record).  I write further, however, to address the limited additional information gathered on remand, which consists of thirteen responses of certain importers and producers to remand questionnaires and the written comments of seven parties.[2]  The additional evidence further supports negative determinations.  This is an injury case that did not demonstrate, and on remand continues not to demonstrate, present or threatened material injury.

The limited new evidence obtained on remand, as discussed below, confirms that the normal distribution flow of phosphate fertilizer in the United States is in one direction with fertilizer moving from port of entry (for imports) or production facility (for domestic product) to

---

[1] *OCP S.A. v. United States*, Consolidated Court No. 21-00219, Slip Op. 23-136 (Sept. 19, 2023).

[2] The Commission received U.S. Importer Remand Questionnaire responses from ADM, CHS, EuroChem, Growmark, IRM, Koch, MacroSource (formerly Gavilon), Mosaic, Nutrien, and OCP.  The Commission received U.S. Producer Remand Questionnaire responses from Mosaic, PCS, and Simplot. The Commission received Remand Comments from EuroChem, IRM, Koch, Mosaic, OCP, PhosAgro, and Simplot.

67

inventory terminals, usually upriver by barge or overland by train, and then distributed to

retailers and eventually farmers. The reshipment of inventory from its original intended

destination to another region with stronger demand is a not a normal business practice in the

United States, regardless of source, and numerous reasons explain this one-way distribution of

fertilizer, including the lack of infrastructure to support such movement, shipping logistics, and

prohibitive costs and economics. Importers reported as follows, for example:

- ***[3]
- ***[4]
- ***[5]
- ***[6]
- ***[7]
- ***[8]
- ***[9]
- ***[10]
- ***[11]

---

[3] U.S. Imp. Remand Q. of OCP at 2(a).
[4] U.S. Imp. Remand Q. of Koch at 2(a).
[5] U.S. Imp. Remand Q. of MacroSource at 2(a).
[6] U.S. Imp. Remand Q. of IRM at 2(a).
[7] U.S. Imp. Remand Q. of ADM at 2(c).
[8] U.S. Imp. Remand Q. of CHS at 2(a).
[9] U.S. Imp. Remand Q. of EuroChem at 2(a).
[10] U.S. Imp. Remand Q. of OCP at 2(a).
[11] U.S. Imp. Remand Q. of OCP at 2(a); *see also* U.S. Imp. Remand Q. of GrowMark at 2(a) (noting ***).

68

Domestic producers' description of their distribution network confirms this one-way pattern. For example, Mosaic described distribution from ***[12] Similarly, Simplot explained that it ships fertilizer ***[13] PCS reported that, ***[14]

Importantly, the several reported examples of exceptions to this normal flow of fertilizer through the distribution network prove the rule. Mosaic stated that it ***[15] However, Mosaic ***. The vagueness of this response and its wording support the underlying point about the normal distribution pattern. Simplot claimed to ***,[16] but ***.[17] The record does not indicate ***, but the reported volume makes the underlying point in any event, as it accounts for only *** percent of Simplot's total U.S. shipments during the period of investigation.[18] Finally, ADM explained that it moved ***.[19]

In short, the remand questionnaires reveal a distribution network designed and built to move phosphate fertilizer in one direction – from production facility or port to intermediary warehouses to customer locations. Phosphate fertilizer does not flow backwards down the Mississippi and its tributaries, or from inland distribution hubs back to river terminals. Unsold inventory remains onsite until the next application season rather than move to a different region of the country with higher contemporaneous demand. There is no evidence that the reshipment of inventory from its original intended destination to another region with higher

---

[12] U.S. Prod. Remand Q. of Mosaic at 2(b).
[13] U.S. Prod. Remand Q. of Simplot at 2(b).
[14] U.S. Prod. Remand Q. of PCS at 2(b).
[15] U.S. Prod. Remand Q. of Mosaic at 2(c).
[16] U.S. Prod. Remand Q. of Simplot at 2(a).
[17] U.S. Prod. Remand Q. of Simplot at 2(c).
[18] *See* U.S. Prod. Remand Q. of Simplot at 2(c); U.S. Prod. Final Q. of Simplot at II-7.
[19] U.S. Imp. Remand Q. of ADM at 2(b)-(c).

69

demand occurred (or even could have occurred) at the scale necessary to move any commercially meaningful quantities of unused inventory, in 2019 or at any other time, much less that such reshipment is standard industry practice.  The record clearly shows, to the contrary, that this is not standard practice for reasons including logistics and costs.

I addressed the issue of inventory reshipment in the original investigation in the context of rebutting any claim that the volume of subject imports in the U.S. market during the demand shocks of 2019 provided the requisite causal link to price declines in 2019.  *See* USITC Pub. 5172 at 52-54 (public version); APPX0099641-0099643 (pages 14-16 of confidential version).  This part of my original dissent ran three pages with extensive citations, one paragraph of which addressed inventory reshipment, on which I found that inventories were stuck upriver, without the ability to ship back downriver to supply other parts of the market.  USITC Pub. 5172 at 53 & nn.64-65; APPX0099642 & nn.64-65.  I cited as examples of record support the hearing testimony of Messrs. Lambert of EuroChem and Niederer of ADM.  USITC Pub. 5172 at 53 nn.64-65; APPX0099642 at nn.64-65.  Their hearing testimony is now corroborated and bolstered by the reopened record on remand, as discussed above.

Accordingly, the remand record supports my original determinations and does not alter my original analysis or findings.  A further takeaway on remand is that the evidentiary issue of inventory reshipment was not the only shortcoming in this injury case; it formed only a part of my rebuttal of any allegation of injury due to subject imports in 2019, and this rebuttal, in turn, formed only part of my analysis finding no present material injury or threat of material injury on the record.  *See* USITC Pub. 5172 at 45-69; APPX0099630-0099666.

70

Based on the record of this investigation as supplemented on remand, and for all of the reasons stated above and in my original dissent, I determine that an industry in the United States is not materially injured or threatened with material injury by reason of imports of phosphate fertilizers from Morocco and Russia.

71

**List 1, Doc. No. 313R – EDIS No. 859607**
**Views of the Commission**
**(originally circulated 7/28/2025)**
**(Office of Investigations)**

APPX0021942

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

## Views of the Commission

By opinion and order dated April 22, 2025, the U.S. Court of International Trade,

remanded the Commission's affirmative first remand determinations in *Phosphate Fertilizers*

*from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final) (Remand), USITC Pub. 5490 (January

2024).[1]  Upon consideration of the Second Remand Order and evidence in the record of these

investigations,[2] the Commission determines again that an industry in the United States is

materially injured by reason of phosphate fertilizers from Morocco and Russia found by the U.S.

Department of Commerce ("Commerce") to be subsidized by the governments of Morocco and

Russia.[3]

## I.      Background

### A.  Procedural History

In March 2021, the Commission determined that an industry in the United States was

materially injured by reason of subject imports from Morocco and Russia.[4]  The Commission

found that the volume of cumulated subject imports and the increase in the volume were

significant during the period of investigation ("POI").  Subject imports poured into the U.S.

market over the POI and gained [     ] percentage points in market share from the domestic

---

[1] *OCP S.A. v. United States*, Consolidated Ct No. 21-00219, Slip Op. 25-51 (April 22, 2024) ("Second Remand Order").  In the first remand determinations, the Commission addressed the issues remanded by the Court as set out in *OCP S.A. v. United States*, Consolidated Ct No. 21-00219, Slip Op. 23-136 (Sept. 19, 2023) ("First Remand Order").

[2] The Commission did not find it necessary to reopen the record for additional information in order to address the Second Remand instructions.

[3] Commissioner Johanson again determines that an industry in the United States is not materially injured or threatened with material injury by reason of subject imports from Morocco and Russia.  *See* Dissenting Views of Commissioner David S. Johanson.

[4] *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final), USITC Pub. 5172 (March 2021) and accompanying Confidential Views ("Original Views").  Citations to the page numbers of the Original Views herein refer to the Confidential Views.

APPX0021943

*Public Version*

industry.  Subject imports continued to enter the U.S. market at elevated levels in 2019 while

demand declined in the second half of 2018 through 2019, causing an oversupply in the U.S.

market and significantly depressing U.S. prices.  Due to the downward pricing pressure exerted

by the oversupply of subject imports on U.S. prices, the domestic industry was forced to reduce

prices, which in turn, caused its revenues to be lower than they would have been otherwise.  As

a consequence, the Commission found that subject imports had a significant impact on the

domestic industry.[5]

Plaintiffs OCP S.A. ("OCP"), a producer and exporter of phosphate fertilizers in Morocco,

and EuroChem North America Corporation ("EuroChem"), a U.S. importer of subject

merchandise from Morocco and Russia, appealed the Commission's final affirmative

determinations.  Several respondent interested parties participated as plaintiff-intervenors:

PhosAgro PJSC ("PhosAgro"), a producer and exporter of phosphate fertilizers in Russia, and

International Raw Materials Ltd. ("IRM") and Koch Fertilizer ("Koch"), U.S. importers of subject

merchandise.  Petitioner the Mosaic Company ("Mosaic") and J. R. Simplot Company

("Simplot"), another domestic producer, also participated in the litigation as defendant-

intervenors.

In its First Remand Order, the Court found that the Commission's finding that importers

could reship fertilizer from one destination to another to meet existing demand, was

---

[5] Original Views at 52-53.

4

*Public Version*

unsupported by the record evidence.[6]  Further, the court opined that this Commission finding

"undergirds the Commission's determination across all statutory factors."[7]

On October 27, 2023, the Commission published notice of its remand proceedings in the

Federal Register.[8]  In the notice, the Commission explained that it was reopening the record in

these proceedings for the limited purpose of issuing a short supplemental questionnaire to U.S.

producers and U.S. importers.[9]

In January 2024, the Commission determined again that an industry in the United States

was materially injured by reason of subject imports from Morocco and Russia.[10]  In its First

Remand Views, the Commission continued to find that the volume of cumulated subject

imports and the increase in the volume were significant in absolute terms and relative to U.S.

consumption during the period of investigation, and subject imports gained [    ] percentage

points in market share at the expense of the domestic industry from 2017 to 2019.[11]  The

record also showed that the volume of cumulated subject imports increased by one million

short tons between 2017 and 2018, and as demand began to decline in the fall of 2018, U.S.

---

[6] *OCP S.A. v. United States*, Consolidated court No. 21-00219, Slip Op. 23-136 (Sept. 19, 2023) ("First Remand Order") at 49.

[7] First Remand Order at 3.

[8] *Phosphate Fertilizers from Morocco and Russia*, 88 Fed. Reg. 73873 (Oct. 27, 2023).  The Commission subsequently issued a correction to the notice of remand proceedings correcting the effective date of the notice to October 23, 2023.  *Phosphate Fertilizers from Morocco and Russia; Notice of Remand Proceedings; Correction,* 88 Fed. Reg. 75308 (Nov. 2, 2023).

[9] 88 Fed. Reg. 73873.  In the First Remand Order, the court indicated that on remand, the "Commission may take new evidence, reconsider existing evidence, or take any other action allowed by its procedures" to arrive at a conclusion supported by substantial evidence.  First Remand Order at 49.

[10] *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final) (Remand), USITC Pub. 5490 (Jan. 2024) and accompanying Confidential Views ("First Remand Views").  Citations to the page numbers of the First Remand Views herein refer to the Confidential Views.

[11] First Remand Views at 28-29.

5

APPX0021945

*Public Version*

imporders' inventories reached their highest level of those two years.[12]  Notwithstanding these

substantial inventories and declining demand, subject imports surged into the U.S. market in

January 2019 and continued to flow into the U.S. market in substantial quantities, reaching 2.7

million short tons that year, even as demand declined in 2019.  U.S. importers' quarterly

inventories reached their highest level in March 2019, but subject imports nonetheless

continued to enter the U.S. market in the latter part of 2019 in excess of any purported need to

replenish depleted inventories in the latter part of 2019.  Moreover, the record showed that

regardless of the "unidirectional" movement of subject importers' inventories, the volumes of

subject imports entering the U.S. market had significant depressing effects on U.S. prices.[13]

Record evidence showed subject imports being offered and sold at lower prices, domestic

producers lowering prices to compete with subject imports, and certain purchasers purchasing

subject imports rather than the domestic like product for price reasons.  Consequently, subject

imports – through their significant volumes that contributed to the oversupply conditions in the

U.S. market during the POI at competitive and low prices – depressed prices in the U.S. market

to a significant degree.  The downward pricing pressure exerted by subject imports forced the

domestic industry to reduce prices, which in turn caused its revenues to be lower than they

would have been otherwise.  As a consequence, the Commission found that subject imports

had a significant impact on the domestic industry.[14]

      From February-June 2024, the parties filed comments addressing the Commission's First

---

[12] First Remand Views at 38-39; 62-63.

[13] First Remand Views at 62-63.

[14] First Remand Views at 63-64.  The Commission also addressed other asserted causes of injury so as to ensure it was not attributing injury from other factors to the subject imports.  First Remand Views at 65-72.

APPX0021946

*Public Version*

Remand Views.  On April 22, 2025, the Court issued its Second Remand Order, finding certain aspects of the Commission's analysis of conditions of competition, volume, and price effects to be deficient, as discussed below.  On June 4, 2025, the Commission published notice in the Federal Register of how it would proceed with second remand proceedings.[15]  The Commission did not reopen the record, but the notice "permit{ted} the parties entitled to participate in the remand proceedings to file comments concerning how the Commission could best comply with the court's remand instructions."[16]  Accordingly, domestic interested parties Mosaic and Simplot filed comments as did respondent interested parties, OCP, PhosAgro, IRM, Koch.  Eurochem did not file comments.

### B.  Parties' Arguments

Mosaic and Simplot argue that the Commission should continue to reach affirmative determinations.[17]  Mosaic further argues that the Commission should continue to find that the U.S. market was oversupplied, noting that the inventory buildup was well-documented by the trade press.[18]  Mosaic also claims that the record does not support importers' claim that additional imports were needed to meet demand in areas unaffected by flooding.[19]  Mosaic and Simplot further argue that the Commission should again find that the volume of cumulated subject imports, and the increase in that volume, is significant.[20]  Mosaic and Simplot also argue that the Commission should again find that cumulated subject imports had significant price

---

[15] *Phosphate Fertilizers from Morocco and Russia*, 90 Fed. Reg. 24411 (June 10, 2025).

[16] 90 Fed. Reg. 24411.

[17] *See generally* Mosaic Second Remand Comments; Simplot Second Remand Comments.

[18] Mosaic Second Remand Comments at 5-15.

[19] Mosaic Second Remand Comments at 7-8.

[20] Mosaic Second Remand Comments at 3-5; Simplot Second Remand Comments at 1-7.

7

*Public Version*

effects on the domestic industry, asserting that the Commission's finding that subject imports depressed prices to a significant degree is supported by substantial evidence. Both Mosaic and Simplot observe that the court did not specifically remand the Commission's impact finding and argue that the Commission should reaffirm its finding that cumulated subject imports had a significant impact on the domestic industry.[21]

Respondent interested parties repeat the court's findings that substantial evidence does not support the Commission's finding that fertilizer inventories can be reshipped, contending that absent such evidence, there is not substantial evidence that the U.S. market was oversupplied by increased volumes of subject imports, which were needed, in their view, to supply areas unaffected by flooding where demand was up in 2019.[22] Respondent interested parties also argue that the Commission improperly analyzed subject import volumes inflated by the inclusion of imports that were re-exported to Canada. In their view, such imports could not be injurious to the domestic industry.[23] Respondent interested parties assert that, per the court's instruction, the Commission must address Mosaic's refusals to supply the U.S. market in assessing the significance of the volume of cumulated subject imports.[24]

Respondent interested parties further argue that the Commission should find that there were no significant price effects.[25] They argue that the Commission should find that there was

---

[21] Mosaic Second Remand Comments at 25; Simplot Second Remand Comments at 17-18.

[22] OCP Remand Second Remand Comments at 1-7; IRM Second Remand Comments at 2-6; Koch Second Remand Comments at 3-4; PhosAgro 2-3, 6-8.

[23] OCP Remand Second Remand Comments at 7-8; IRM Second Remand Comments at 8-9; Koch Second Remand Comments at 4-5; PhosAgro 2-3, 6-7.

[24] OCP Remand Second Remand Comments at 1-3; IRM Second Remand Comments at 2-6; Koch Second Remand Comments at 3-4; PhosAgro 2-3, 6-7.

[25] OCP Second Remand Comments at 16-25; IRM Second Remand Comments at 7-9; Koch Second Remand Comments at 5-7; PhosAgro Second Comments at 10-12.

*Public Version*

not significant underselling and that the lack of underselling undermines the Commission's price depression finding.[26]  Respondent interested parties also argue that the fact that Mosaic was most frequently identified as a "price leader" shows that Mosaic drives market prices, directly contradicting the Commission's finding that subject imports depressed domestic prices.[27]  OCP and PhosAgro also argue that the Commission's reliance on lost sales information was not reasonable or supported by substantial evidence.[28]

## II.   Material Injury By Reason of Subject Imports

In responding to the court's Second Remand Order, we have considered the factual record as a whole, as well as arguments made by the parties in their submissions in both the proceedings of the original investigations and the first and second remand proceedings.  We have adopted in their entirety the Commission's findings, analysis, and conclusions in its Original Views and First Remand Views regarding issues not raised on appeal:  the legal standards, domestic like product, domestic industry, negligibility, and cumulation.[29]

In the First Remand Views, we addressed as an initial matter the court's characterization of our observation in the Original Views that importers conceded that it was possible albeit not economical to reship product from existing inventories to other locations.[30]  The court understood this to be an "important" finding upon which the Commission's "theory" that

---

[26] OCP Second Remand Comments at 16-25; IRM Second Remand Comments at 7-9; Koch Second Remand Comments at 5-7; PhosAgro Second Comments at 10-12.

[27] OCP Second Remand Comments at 18-19; IRM Second Remand Comments at 9; Koch Second Remand Comments at 7; PhosAgro Second Comments at 10.

[28] OCP Second Remand Comments at 20-24; PhosAgro Second Remand Comments at 10-11.

[29] Additionally, in our analysis below, we do not readdress several arguments raised by the parties in the original investigations that pertain to issues that were not challenged on appeal, but we adopt and incorporate our discussions and conclusions regarding those issues here.

[30] Original Views at 43 n.161, 56 n.217.

APPX0021949

*Public Version*

imports contributed to the oversupply conditions in the U.S. market "rests like an inverted pyramid on an unsupported finding regarding what might be possible if economics did not matter."[31] In our First Remand Views, we clarified that this observation was not central to our material injury analysis, and we continued to find that an industry in the United States was materially injured by reason of phosphate fertilizers from Morocco and Russia that Commerce has found to be subsidized by the governments of Morocco and Russia, without reliance upon that original finding.[32]

We also addressed domestic producers' reshipment capabilities in response to the court's instructions directing the Commission to assess in its volume analysis whether "fertilizer was 'practically unavailable from U.S. sources' to supply high-demand regions in 2019 because doing so would not have been economically viable."[33] In this regard, we noted that, in context, we understood the court's reference to "U.S. sources" to refer to domestically produced fertilizers.[34] We concluded that "the record from the original investigations and as supplemented in these remand proceedings indicates that the domestic industry's excess capacity, substantial inventories, extensive inventory locations, expansive multi-modal distribution network, and demonstrated ability to move and relocate product where it was needed shows that domestic producers were well-positioned to supply the U.S. market in 2019."[35]

---

[31] First Remand Order at 29, 35.
[32] First Remand Views at 7-8.
[33] First Remand Views at 31-33.
[34] First Remand Views at 31-32 & n.152. We further observed that our understanding appeared to be consistent with the court's citation to *Altx v. United States*, 26 CIT 709 (2002).
[35] First Remand Views at 33.

10

APPX0021950

*Public Version*

We again respectfully address the court's characterization of our findings in the Original

Views and First Remand Views.  In the Second Remand Order, the court cited the First Remand

Order as "focus{ing} on domestic industry reshipment because the Commission's unsupported

assumptions undergirded its material injury finding" and as holding that "{i}f domestic

producers could not – technically or economically – reship existing inventory domestically,

these inventories could not contribute to the supply of phosphate fertilizer available to meet

new demand."[36]  In our Original Views, however, we observed that importers, not domestic

producers, reported an inability to serve the U.S. market from existing inventories, while

conceding that reshipment was possible but cost prohibitive, which is why they chose to import

more product.  Specifically, in responding to respondents' arguments, we stated:

> Respondents argue that product was necessary to serve demand in
> U.S. regions unaffected by the poor weather conditions.  However,
> this argument fails to explain why U.S. importers could not supply
> U.S. customers from its building inventories or from product that
> sat on barges on the Mississippi River system.  Indeed, as U.S.
> importers acknowledged, it was possible for the U.S. importers to
> do so, but that it was costly to move product by rail or back down
> the Mississippi River.  Consequently, they chose to import more
> product.[37]

Thus, our original finding related to importers' representations that they could not – technically

or economically – serve the U.S. market from existing inventories or product that sat on barges,

choosing instead to import more product.  Unlike importers, however, domestic producers did

---

[36] Second Remand Order at 4, 7, citing First Remand Order, 658 F. Supp. 3d at 1318-19.
[37] Original Views at 56 n.237.  We also note that this observation did not involve "reshipping fertilizer that had already been delivered to flooded, low demand regions," as the court indicated.  First Remand Order at 5-6.  Rather, our original finding referred to the possibility of importers drawing from building inventories or from product that sat on barges on the Mississippi River system.  Original Views at 56 n.237 (emphasis added).

11

*Public Version*

not represent that they were unable to serve the U.S. market from their substantial existing inventories or product that sat on barges, or that it was cost prohibitive to do so.

Although the observation in the Original Views related to importers, we nonetheless addressed domestic producers' ability to reship inventories in the First Remand Views to address the court's remand instructions.[38]  Again, we respectfully disagree with the court's repeated characterization in the Second Remand Order that this finding was central to the First Remand Views such that without it, "the Commission's oversupply-based material injury finding collapses like a house of cards."[39]  In responding as required to the First Remand Order, domestic producers ability to reship inventories was only one factor, along with their excess capacity, substantial inventories, extensive inventory locations, and expansive multi-modal distribution network, that the Commission discussed in finding that fertilizer was not practically unavailable from U.S. sources in 2019, as directed by the First Remand Order.[40]  In other words, it was not central to the Commission's finding that fertilizer was not unavailable from U.S. sources in 2019, but rather discussed as one factor among several others.

Indeed, unlike importers, the domestic industry has not stated that they were unable to serve the U.S. market from their substantial existing inventories or product that sat on barges, or that it was cost prohibitive to do so, and they also had available excess capacity from which they could have shipped additional volumes.[41]  Thus, we respectfully disagree with the court's assumption that domestic producers could not reship their inventories and therefore "would be

---

[38] First Remand Views at 31-33.
[39] Second Remand Order at 10.
[40] First Remand Views at 31-33.
[41] *See, e.g.,* CR/PR at Tables III-4, C-1.

APPX0021952

*Public Version*

poorly positioned to supply the U.S. market so that imports would not have contributed to oversupply conditions."[42]  As explained below, we continue to find, in response to the Court's remand first and second remand instructions, that during the POI the domestic industry possessed the capability to reship fertilizer if relocation was needed.  However, even if that ability were limited, domestic producers also possessed excess capacity, substantial inventories (that unlike for importers were not reportedly stranded), extensive inventory locations, and expansive multi-modal distribution network, demonstrating that the domestic industry was well positioned to supply the U.S. market in 2019.

### A.    Conditions of Competition and the Business Cycle

#### 1.    Demand Conditions

As explained in the Original Views and First Remand Views,[43] U.S. demand for phosphate fertilizers is primarily driven by agricultural plantings, particularly for crops that consume the most fertilizer (*i.e.*, corn, soybeans, and wheat).  Weather volatility, cropping practices and crop rotation, and agricultural commodity prices also affect U.S. demand.[44]

Due to its relationship to agricultural plantings, U.S. demand for phosphate fertilizers is subject to seasonal business cycles, with most market participants reporting peak demand in the spring (second quarter, prior to planting) and fall (fourth quarter, after harvest).[45]  Mosaic stated that to meet the two seasonal surges in demand, producers manufacture phosphate fertilizers throughout the year, and the supply chain, including wholesalers and retailers, moves

---

[42] Second Remand Order at 27.
[43] Original Views at 20-22; First Remand Views at 8.
[44] CR/PR at II-11; Mosaic Prehearing Br. at 20; OCP Prehearing Br. at 6, 33; Gavilon Prehearing Br. at 10; PhosAgro Prehearing Br. at 6; PhosAgro Posthearing Br. at 3, 6.
[45] CR/PR at II-15.

13

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

product into position during the off seasons.[46] According to respondents, it takes time for distributors to obtain fertilizer and move it through the supply chain into warehouses in the off seasons for use by farmers, and distributors therefore rely on demand projections in obtaining product.[47] We note however that, notwithstanding this, the record shows that foreign producers and/or importers are able to move quickly to respond to changes in the market. Specifically, as we noted in the Original Views and First Remand Views, the parties agreed that the filing of the petitions on June 26, 2020, resulted in a large decrease in the volume of cumulated subject imports.[48] Indeed, the monthly volume of subject imports decreased from 62,426 short tons in June 2020 to 57,660 short tons in July 2020, 14,365 short tons in August 2020, and 10,599 in September 2020.[49]

---

[46] Mosaic Prehearing Br. at 24.  U.S. producers reported that [ ▮ ] percent of their commercial shipments in 2019 came from inventory with lead times averaging [ ▮ ] days.  CR/PR at II-17.

[47] OCP Prehearing Br. at 6, 37-39; Koch Prehearing Br. at 6-7; OCP Posthearing Br. at Responses to Questions pp. 27-28, 39; IRM Posthearing Br. at 7; Koch Posthearing Br. at 11-12; EuroChem Posthearing Br. at 8.  U.S. importers reported that [ ▮ ] percent of their commercial shipments in 2019 came from inventory with lead times averaging [ ▮ ] days.  Importers also reported [ ▮ ] percent of their commercial shipments came from foreign producers' inventories, with lead times averaging [ ▮ ] days.  CR/PR at II-17.

[48] Original Views at 34 n. & n.134 and First Remand Views at 9 & n.31, citing  Mosaic Prehearing Br. at 43-44, 91; Simplot Prehearing Br. at 29-30, 34; Simplot Posthearing Br. at Responses to Questions pp. 53-54; Mosaic Posthearing Br. at Responses to Questions pp. 69-70; OCP Posthearing Br. at 12, Responses to Questions pp. 33, 67-73; EuroChem Posthearing Br. at 11; IRM Posthearing Br. at 8-9; PhosAgro Posthearing Br. at 12-13, Responses to Questions.  Some U.S. importers indicated that they stopped bringing in subject imports "because the buyers and the sellers agreed that the risk of 75 percent countervailing duties was higher than either of them wanted to take."  Hearing Tr. at 337 (Aranoff); *see also* EuroChem Posthearing Br. at 11 (stating that as a result of the filing of the petitions, it shifted its purchases of phosphate fertilizers from Morocco and Russia to other global sources); [ ▮ ] U.S. Purchaser Questionnaire Response at III-11 (reporting that Koch and IRM will not quote or import material until the countervailing duty decision is issued); [ ▮ ] U.S. Purchaser Questionnaire Response at III-11 (reporting that Helm, Koch, and OCP "cut off" supplying imported product to the U.S. market in the summer of 2020).

[49] CR/PR at Table IV-6.

14

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

As we discussed in our Original Views and First Remand Views, the parties agree that while U.S. demand increased between 2017 and 2018, the U.S. market experienced unusually wet weather conditions that impacted three consecutive planting seasons beginning in the fall of 2018 and continuing into the spring of 2019 and fall of 2019.[50]   Consequently, crop plantings fell and U.S. demand for phosphate fertilizers declined in 2019.  U.S. demand, however, rebounded in January to September ("interim") 2020 with increased crop plantings.[51]  Most responding U.S. producers, importers, and purchasers reported that U.S. demand for phosphate fertilizers either fluctuated or did not change during the period of investigation.[52]

As we previously explained, data from the U.S. Department of Agriculture's ("USDA") Farm Service Agency confirm that total planted acres increased from 2017 and 2018, decreased between 2018 and 2019, then increased again between 2019 and 2020.[53]  Overall, total acres planted was 3.6 percent lower in 2019 compared to 2017 and 0.6 percent lower in 2020 compared to 2017.[54]  Apparent U.S. consumption for phosphate fertilizers increased from [ ███ ███ ] short tons in 2017 to [ ████████ ] short tons in 2018, then decreased to [ ███ ███ ] short tons in 2019 for an overall decline of [ ██ ] percent between 2017 and 2019; it

---

[50] Original Views at 21-22; First Remand Views at 9-10.

[51] CR/PR at II-11, Figure II-1; Mosaic Prehearing Br. at 20-21; OCP Prehearing Br. at 6, 34-36, 43-51; IRM Prehearing Br. at 15-17; Gavilon Prehearing Br. at 11-12, 14-16; PhosAgro Prehearing Br. at 6-7.

[52] CR/PR at Table II-4.  Specifically, two of three responding domestic producers, seven of 10 U.S. importers, and 14 of 28 U.S. purchasers indicated that U.S. demand fluctuated since January 1, 2017, while one domestic producer, two U.S. importers, and eight purchasers reported that demand did not change.  *See id.*

[53] The USDA reported that acres planted for corn, soybeans, and wheat were 226.4 million in 2017, 225.9 million in 2018, 211.3 million in 2019, and 218.4 million in 2020.  It projected the acres planted for these crops to be 227.0 million in 2021.  CR/PR at II-11 n.23.

[54] CR/PR at II-11, Figure II-1.

15

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

was [ ] percent lower in interim 2020, at [ ] short tons, than in interim 2019, at

[ ] short tons.[55]

### 2.    Supply Conditions

The domestic industry was the largest supplier of phosphate fertilizers to the U.S.

market throughout the POI.  Its share of apparent U.S. consumption declined from [ ]

percent in 2017 to [ ] percent in 2018 and [ ] percent in 2019, representing an overall

decrease of [ ] percentage points between 2017 and 2019.[56]  The domestic industry's share

of apparent U.S. consumption was [ ] percent in interim 2019 and [ ] percent in

interim 2020.[57]

In addition to supplying the majority of the U.S. market, the domestic industry also

exported substantial volumes of phosphate fertilizers to third country markets, although these

volumes declined after the petitions were filed.  The domestic industry's export shipments

accounted for [ ] percent of its total shipments in 2017, [ ] percent in 2018, and

[ ] percent in 2019; its export shipments accounted for a lower share of its total shipments

in interim 2020 at [ ] percent than in interim 2019 at [ ] percent.[58]  [ ] largest

export market was [ ], while [ ] largest export market was

---

[55] CR/PR at Tables IV-7, C-1.
[56] CR/PR at Tables IV-8, C-1.
[57] CR/PR at Tables IV-8, C-1.
[58] CR/PR at Table III-6.  U.S. producers' export shipments declined from [ ] short tons in 2017 to [ ] short tons in 2018, before increasing in 2019 to [ ] short tons.  Their export shipments were lower in interim 2020, at [ ] short tons, than in interim 2019, at [ ] short tons. *See id.*

16

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

Canada.[59]

During the POI, three firms – Mosaic, Nutrien, and Simplot – accounted for the vast majority of all known U.S. production of phosphate fertilizers, with Mosaic as the leading producer.[60]  Mosaic reported several changes in operations during the POI.  In December 2017, Mosaic idled its 2 million ton production facility in Plant City, Florida for 18 months and then permanently shuttered the facility in June 2019.[61]  In March 2019, Mosaic announced a 300,000 short ton curtailment in production, and in September 2019, Mosaic temporarily idled operations at its facilities in Saint James (Faustina) and Uncle Sam, Louisiana, curtailing production by 500,000 short tons.  It restarted operations at these facilities in December 2019, but idled its plant in Barstow, Florida that same month, curtailing production by 165,000 tons per month.  Mosaic resumed production at its Barstow facility in February 2020.[62]

From 2017 to 2018, Nutrien increased its capacity and production at its Aurora, North

---

[59] CR/PR at III-11 n.26.  [    ] accounted for [    ] percent of [        ] export shipments between 2017 and 2019.  [        ] also shipped product to [                              ].  At least [    ] percent of [        ] exports and [            ] percent of [        ] exports went to Canada during 2017-2019 and interim 2020.  They also exported product to [          ]. *See id.*

[60] CR/PR at I-3, Table III-1.  In 2019, Mosaic accounted for [    ] percent of domestic production.  CR/PR at Table III-1.  Over the past several decades, the domestic industry experienced significant contraction in the number of producers and production facilities.  Mosaic Prehearing Br. at 22; OCP Prehearing Br. at 6-16; Gavilon Prehearing Br. at 17-19; IRM Prehearing Br. at 4-6.  According to respondents, depleted U.S. phosphate ore reserves (from which the primary raw material phosphate rock is refined), caused this consolidation of the domestic industry.  OCP Prehearing Br. at 6-16; Gavilon Prehearing Br. at 17-19; IRM Prehearing Br. at 4-6.  Mosaic and Simplot maintain, however, that the United States has plenty of remaining and untapped phosphate rock reserves and that mining capacity currently exceeds production capacity.  Hearing Tr. at 139-143 (Stone, O'Rourke).  Indeed, Mosaic reports that its phosphate rock production and quality have remained consistent over the POI.  Mosaic Prehearing Br. at 92-93; Mosaic Postconference Br. at Exhibit 31.  OCP itself acknowledges that U.S. annual phosphate rock production represents nearly 15 percent of global production, rendering the United States the world's third largest producer.  OCP Prehearing Br. at 11.

[61] CR/PR at III-3.

[62] Mosaic Prehearing Br. at 2; Mosaic Posthearing Br. at Responses to Questions pp. 22-23.

APPX0021957

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

Carolina and White Springs, Florida phosphate facilities.[63]  In May 2019, Nutrien converted its phosphate operation in Redwater, Canada to an ammonium sulfate plant.[64]  Nutrien's CEO stated at the time that the increase in production in North Carolina and Florida was expected to offset the reduction in supply from its Redwater facility.[65]  Nutrien's U.S. production increased by [    ] percent from 2018 to 2019 and its production and production capacity increased [    ] of the POI.[66]

As a result of these operational changes and curtailments, and notwithstanding that [      ] increased its production capacity by [      ] short tons from 2017 to 2018, the domestic industry's capacity decreased from [      ] short tons in 2017 to [      ] short tons in 2018 and [      ] short tons in 2019.[67]  The domestic industry's capacity was higher in interim 2020 at [      ] short tons than in interim 2019 at [      ] short tons.[68]  The domestic industry's production and U.S. shipments also decreased each full year of the POI, and the domestic industry consequently had available excess capacity throughout the POI.[69]

Subject imports accounted for the second largest source of supply to the U.S. market. Their share of apparent U.S. consumption rose from [    ] percent in 2017 to [    ] percent

---

[63] CR/PR at III-3 and Table III-3.  [      ] production capacity increased by [      ] short tons, from [      ] short tons in 2017 to [      ] short tons in 2018, due to [      ].  CR/PR at III-5 n.18.

[64] CR/PR at Table III-3.

[65] CR/PR at III-3.

[66] CR/PR at Table III-3.

[67] CR/PR at Table III-3.

[68] CR/PR at Tables III-4, C-1.

[69] The domestic industry's capacity utilization rate was [    ] percent in 2017, [    ] percent in 2018, and [    ] percent in 2019; it was lower in interim 2020, at [    ] percent, than in interim 2019, at [    ] percent.  CR/PR at Tables III-5, C-1.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

## *Public Version*

in 2018 and [ ▮ ] percent in 2019, an increase of [ ▮ ] percentage points over the POI.[70]

Subject imports' share of apparent U.S. consumption was [ ▮ ] percent in interim 2019 and [ ▮ ] percent in interim 2020.[71]

Nonsubject imports were the smallest source of supply to the U.S. phosphate fertilizer market. Their share of apparent U.S. consumption increased from [ ▮ ] percent in 2017 to [ ▮ ] percent in 2018, before declining to [ ▮ ] percent in 2019.[72] Nonsubject imports' share of apparent U.S. consumption was [ ▮ ] percent in interim 2019 and [ ▮ ] percent in interim 2020.[73] According to questionnaire data, the largest nonsubject source of phosphate fertilizers to the U.S. market in 2019 was Saudi Arabia, which accounted for [ ▮ ] percent of total phosphate fertilizer imports.[74]

As we discussed in our Original Views and First Remand Views, [ ▮ ] U.S. producers, five of ten importers, and 16 of 28 purchasers reported experiencing supply constraints during the POI.[75] However, the parties disagree on the extent of any supply shortages. Respondents generally argued that the shuttering of Mosaic's Plant City facility in 2017 and Nutrien's announcement and subsequent closure of its Redwater, Canada facility in

---

[70] CR/PR at Tables IV-8, C-1.

[71] CR/PR at Tables IV-8, C-1.

[72] CR/PR at Tables IV-8, C-1.

[73] CR/PR at Tables IV-8, C-1.

[74] CR/PR at IV-2, Table IV-2. Nonsubject imports from Saudi Arabia increased from [ ▮ ] short tons in 2017 to [ ▮ ] short tons in 2018 and [ ▮ ] short tons in 2019; they were [ ▮ ] short tons in interim 2019 and [ ▮ ] short tons in interim 2020. In 2014, Mosaic acquired a 25 percent equity interest in Ma'aden Wa'ad Al Shamal Phosphate Company ("MWSPC"), a joint venture that began to produce phosphate fertilizers in Saudi Arabia in 2017. MWSPC currently has an annual capacity of 3.3 million short tons. CR/PR at VII-21; Mosaic Prehearing Br. at Exhibit 7 p.3.

[75] Original Views at 25-27 and First Remand Views at 14, citing CR/PR at II-8 – II-9.

19

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

2019 left a "gaping hole in supply," and that imports were "pulled into" the market as a result.[76]

Ten purchasers reported experiencing delays, shortages, and/or allocations from Mosaic, and

[ ███ ] elaborated that Mosaic has refused to supply the firm [ ████████ ] and that this

caused delays in its ability to supply its customers.[77]  U.S. producer [ ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ ],[78] while Mosaic acknowledged that after

its decision to idle its Plant City facility in December 2017, it reduced its phosphate sales volume

targets with certain larger customers – specifically, with CHS by 200,000 tons and with Gavilon

by 100,000 tons relative to the prior year.[79]  Mosaic reported that [ ████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ ].[80]

In the First Remand Views,[81] we clarified that to the extent that we referenced any

"supply gap" in our Original Views,[82] we did so in the context of discussing party argument

regarding respondents' assertions that subject imports were "pulled" into the U.S. market to fill

an alleged domestic industry supply gap.  As detailed below, we continue to find that the record

does not support respondents' assertions that the imports were "pulled into" the U.S. market

to fill a "gaping hole in supply" of 1.1 million short tons that was filled by the over 1 million

---

[76] *See e.g.*, OCP Posthearing Brief at 2-8 and Responses to Questions pp. 7-26, 29-32, and 74-82; PhosAgro Posthearing Brief at 3; Koch's Posthearing Brief at 14; IRM Posthearing Brief at 4-7, and 9-11.
[77] CR/PR at II-8-9.
[78] CR/PR at II-8.
[79] Mosaic Posthearing Br. at Responses to Questions p. 83.
[80] Mosaic U.S. Producer Questionnaire Response at IV-16.
[81] First Remand Views at 15.
[82] Original Views at 26-27.

20

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

short ton increase in subject imports in 2018.[83]

As we noted in our Original Views and First Remand Views,[84] Mosaic asserted that idling the Plant City facility resulted in approximately 700,000 short tons of reduced supply to the U.S. market between 2017 and 2018.[85]  We continue to find Mosaic's estimate to be credible and consistent with other record evidence.[86]  We also note that, notwithstanding this estimate, the record shows that Mosaic's U.S. shipments only decreased from 2017 to 2018 by [    ] short tons.[87]  The volume of cumulated subject imports, however, increased by a greater amount – more than one million short tons – during this time, and importers' U.S. shipments of

---

[83] *See e.g.*, OCP Posthearing Brief at 2-8 and Responses to Questions pp. 7-26, 29-32, and 74-82; PhosAgro Posthearing Brief at 3; Koch's Posthearing Brief at 14; IRM Posthearing Brief at 4-7, and 9-11.

[84] Original Views at 26-27; First Remand Views at 15-17.

[85] Hearing Tr. at 39 (McLellan) ("Plant City…produced about 1.4 million short tons when it was idled in 2017.  We sold about 700,000 short tons of that production into the U.S. market.").

[86] Original Views at 26, CR/PR at III-11, Mosaic Revised Domestic Producer Questionnaire at II-7. Specifically, a representative from Mosaic testified that Plant City produced about 1.4 million short tons at the time it was idled in 2017.  Mosaic exported [   ] percent of its total shipments in 2017, with U.S. shipments accounting for [   ] percent of total shipments that year, which would be consistent with the estimate that the idling of Plant City reduced domestic supply by only 700,000 short tons rather than the full 1.4 million short tons produced at the Plant City facility.  CR/PR at III-11 n.26.  In contrast, export shipments accounted for a [             ] during 2017-2019 and in both interim periods, accounting for no more than [   ] percent in any period.  *Id.*

[87] Mosaic Revised Domestic Producer Questionnaire at II-7.

21

APPX0021961

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

## Public Version

subject imports increased by 604,000 short tons.[88][89]  We therefore find that the volume of

cumulated subject imports far exceeded either the Mosaic's reasonable estimate of its reduced

supply or the amount by which it actually reduced its U.S. shipments, following the idling of its

Plant City facility.[90]  As such, we find respondents' argument that cumulated subject imports

---

[88] Subject imports increased from 1,971,222 short tons in 2017 to 2,978,803 short tons in 2018. CR/PR at Table IV-2.  Mosaic indicated that when it idled Plant City, it anticipated that "there would be some new imports coming in to satisfy the short-term need" because it "takes time for us to adjust." However, it further stated that "{w}e shipped into the U.S. market from Plant City approximately 700,000 short tons.  What came in was a million short tons of imports.").  Mosaic Posthearing Br. at 2-3, 13, Responses to Questions pp. 19-20; Hearing Tr. at 111 (McLellan), 127-28 (O'Rourke).  Mosaic added that following a reduction in subject imports resulting from filing of the CVD petition, some [        ]

[        ].  CR/PR at II-8-9.  As evidence that subject imports exceeded the decrease in volume to the U.S. market from Plant City, although apparent U.S. consumption was [        ] short tons ([   ] percent) lower in 2019 than in 2017, the volume of cumulated subject imports was 725 thousand short tons higher and importers' U.S. shipments of subject imports were 735 thousand short tons higher in 2019 than in 2017.  CR/PR at Tables IV-2, C-1.

[89] Moreover, from 2017 to 2018, while Mosaic's U.S. shipments declined by [        ] short tons, U.S. shipments of total imports (subject and nonsubject imports) increased by 967,904 short tons, with cumulated subject imports accounting for 604,981 short tons (62.5 percent of the increase in shipments of total imports).  CR/PR at Table C-1.   Thus, the decrease in Mosaic's supply was offset by increased nonsubject imports as well as the larger increase in subject imports, in addition to the increased production from [        ].  CR/PR at Table III-4.  From 2018 to 2019, when demand decreased, U.S. shipments of nonsubject imports decreased by 65,262 short tons while U.S. shipments of subject imports increased by 148,957 short tons.  CR/PR at Table C-1.  Importers' U.S. shipments of total imports increased by 1.05 million short tons from 2017 to 2019, with subject imports accounting for 71.7 percent of the increase.  CR/PR at Table IV-7.  In terms of import volumes (rather than importers' U.S. shipments of imports) total imports increased by 1.4 million short tons from 2017 to 2018, with cumulated subject imports accounting for 1.0 million short tons (70.1 percent) of the increase in total import volume.  CR/PR at Table IV-2.  Between 2018 and 2019, the volume of cumulated subject imports was higher 725,044 short tons higher in 2019 than in 2017 and total imports were 1.05 million short tons higher, with subject imports accounting for 68.9 percent of the increase in total import volume.  CR/PR at Table IV-7.

[90] We also observe that, as discussed below, combining U.S. importers' December 2018 end-of-period inventories of [        ] short tons with the volume of imports in January 2019 of 720,728 short tons totals approximately [        ] short tons, which exceeds even the 1.1 million short ton "supply gap" alleged by respondents in the month of January alone.  CR/PR at Tables IV-6, D-1.

22

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

were merely "pulled into" the market as a result to be unavailing.[91]

In the First Remand Views, we likewise found unavailing respondents' argument that Nutrien's closure of its Redwater facility in Canada in May 2019 contributed to a reduction in the supply of fertilizers in the United States.[92] As the Commission explained in its Original Views, at the time that the closure was announced, Nutrien's CEO stated that it would increase production at its U.S. facilities to offset the reduction in supply from its Canadian facility and ensure a continued supply of phosphate fertilizers to customers in Canada.[93] Nutrien did, in fact, increase production as well as capacity in the United States.[94] Specifically, between 2018 and 2019, Nutrien increased its U.S. production by [      ] short tons, which was more than sufficient to cover its [      ] short ton increase in exports during that time, and Nutrien reported [      ] short tons in unused capacity in 2019.[95]

As the Commission also noted in its Original Views, the domestic industry had available excess capacity throughout the POI.[96] In 2018, Nutrien and Simplot alone had a combined [      ] short tons of excess capacity, which was more than sufficient to cover either Mosaic's estimated 700,000 short ton reduction in supply or its actual reduction of U.S.

---

[91] We observe that U.S. importers' end-of-period inventories of subject imports increased from [      ] short tons in 2017, which was equivalent to [    ] percent of their U.S. shipments of subject imports, to [      ] short tons in 2018 (equivalent to [    ] percent of their U.S. shipments of subject imports) and were [      ] short tons in 2019 (equivalent to [    ] percent of their U.S. shipments. CR/PR at Table VII-11.

[92] First Remand Views at 17, discussing, *e.g.*, OCP Posthearing Brief at 2-8 and Responses to Questions pp. 7-26, 29-32, and 74-82; PhosAgro Posthearing Brief at 3; Koch's Posthearing Brief at 14; IRM Posthearing Brief at 4-7, and 9-11.

[93] Original Views at 24, 54; CR/PR at III-3.

[94] Original Views at 24, 54; CR/PR at Table III-4.

[95] CR/PR at Table III-4; PCS/Nutrien Domestic Producer Questionnaire at II-7.

[96] Original Views at 24.

23

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

### *Public Version*

shipments in the amount of [        ] short tons from 2017 to 2018.[97]  Likewise, Nutrien and

Simplot had a combined excess capacity of [        ] short tons in 2019, which more than

would have covered the reduction in supply due to the idling of Mosaic's Plant City facility as

well as the [      ] short ton increase in Nutrien's exports during that time.[98]  Moreover, the

domestic industry maintained substantial and increasing inventories throughout the POI.[99]

Thus, as in the First Remand Views,[100] we do not find that the record indicates that there

was a domestic industry supply gap and, to the extent that there was a reduction in supply

related to Mosaic's idling of its Plant City facility, the increase in volume of cumulated subject

imports eclipsed any such reduction, as further discussed below.

Similarly, we respectfully disagree with the court's conclusion in the Second Remand

Order that "{q}uestionnaire responses suggest that domestic producers were unable to relocate

their phosphate fertilizer inventories to meet new market demand; and reports from

phosphate fertilizer trading companies indicate that the largest domestic producer — Mosaic —

refused to sell to these companies," purportedly resulting in "a supply gap."[101]  As discussed

below, in assessing the evidence in the record we disagree with the court's view that the

questionnaire responses indicate an inability to relocate inventories.  More importantly,

however, as discussed throughout these and our prior Views, the ability to relocate inventories

---

[97] CR/PR at Table III-4; Mosaic Revised Domestic Producer Questionnaire at II-7; Hearing Tr. at 39 (McLellan).

[98] CR/PR at Table III-4.

[99] The domestic industry's ending inventory quantities were [        ] short tons in 2017 and [        ] short tons in 2018 and 2019; they were [        ] short tons in interim 2019 and [    ] short tons in interim 2020.  CR/PR at Table C-1.

[100] First Remand Views at 18.

[101] Second Remand Order at 48.

*Public Version*

was only one factor, along with excess capacity, substantial inventories, extensive inventory locations, and expansive multi-modal distribution network, that we relied upon to find that fertilizer was not practically unavailable from U.S. sources in 2019, as directed by the court's first remand.  Accordingly, we respectfully disagree with the court's conclusion that there was a "supply gap" related to an alleged inability of domestic producers to relocate inventories.  We likewise disagree that the record in these investigations indicates that there was "supply gap" related to Mosaic's alleged refusal to sell to trading companies, which we address in detail below in our discussion of impact.

### 3.    Substitutability and Other Conditions

We continue to find that there is a high degree of substitutability between the domestic like product and phosphate fertilizers from subject sources that are of the same chemical formulations,[102] and that phosphate fertilizers with different chemical formulations are broadly interchangeable, particularly when used in blends.[103]  As we previously observed, the record shows the vast majority of the domestic industry's U.S. shipments and U.S. importers' U.S. shipments of subject imports were of the same types of phosphate fertilizers – specifically, MAP and DAP.[104]  Moreover, all three responding U.S. producers and most purchasers (17 of 25 firms) reported that the domestic like product and phosphate fertilizers from Morocco and Russia were always interchangeable; most U.S. importers (8 of 10 firms regarding Morocco and 8 of 9 firms regarding Russia) reported that the domestic like product and phosphate fertilizers

---

[102] CR/PR at II-17.
[103]  CR/PR at I-8-10; Mosaic Prehearing Br. at 30-31; Hearing Tr. at 32-33 (Jung).
[104] CR/PR at Table IV-4.

APPX0021965

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

from each subject country were always or frequently interchangeable.[105] The vast majority of responding purchasers also indicated that both domestically produced and subject imports always or usually met minimum quality specifications,[106] and only one of 27 responding purchasers reported that a domestic or foreign supplier had failed in its attempt to qualify phosphate fertilizers or had lost its approved status since 2017.[107]

As discussed in the Original Views and First Remand Views,[108] price, along with availability and quality, are important considerations in purchasing decisions. When asked to report the top three factors considered in their purchasing decisions, U.S. purchasers most often cited price (23 firms) and availability and quality (17 firms each) as their top three factors. Purchasers most frequently cited price (11 firms) as their first-most important factor, followed by availability (9 firms),[109] and the majority of purchasers (17 of 28 firms) reported that they usually purchased the lowest-priced product.[110] When asked to rate the importance of 16 factors in their purchasing decisions, U.S. purchasers most frequently cited availability and quality meets industry standards (27 firms each), followed by price and reliability of supply (26 firms).[111] Pluralities of U.S. producers, importers, and purchasers reported that differences other than price between the domestic like product and subject imports from Morocco were

---

[105] CR/PR at Table II-10.
[106] CR/PR at Table II-11.
[107] CR/PR at II-20. Specifically, [    ] reported that it "typically do{es} not handle Moroccan or [                    ] fertilizer because it does not meet {its} product specifications in available Sulfur, and water solubility." It also added that "[                                        ]." [    ] U.S. Purchaser Questionnaire Response at III-20; CR/PR at II-20.
[108] Original Views at 29; First Remand Views at 19-20.
[109] CR/PR at Table II-6.
[110] CR/PR at II-19.
[111] CR/PR at Table II-7.

26

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

sometimes significant and pluralities of U.S. importers and purchasers also reported that

differences other than price between the domestic like product and subject imports from

Russia were sometimes significant, while two of three U.S. producers reported that they were

never significant.[112]  In addition, majorities or pluralities of purchasers reported that the

domestic like product and subject imports from each subject country were comparable on all

factors (including price, availability, quality, and reliability of supply) except for one – U.S.

distribution network – for which the majority of which reported that the U.S. product was

superior.[113]

As also discussed in the Original Views and First Remand Views,[114] U.S. prices of

phosphate fertilizers are highly transparent.  Phosphate fertilizer prices are reported in trade

publications such as Argus Phosphates ("Argus"), CRU Phosphate Fertilizer Market Outlook

("CRU"), and Green Markets.[115]  These trade publications gather market intelligence for sales

transactions, including in the New Orleans, Louisiana ("NOLA") region and publish the collected

range of prices on a daily or weekly basis.[116]  This price information is then quickly transmitted

throughout the U.S. market.[117]  [      ] of three U.S. producers ([                          ]), two of

---

[112] CR/PR at Table II-12.

[113] CR/PR at Table II-9.  Twenty of 24 responding purchasers reported that domestically manufactured phosphate fertilizers and subject imports from Morocco were comparable on price, as did 20 of 23 responding purchasers with respect to subject imports from Russia.  No purchaser reported that the U.S. product was superior on price (*i.e.*, lower priced) to subject imports from Morocco or Russia.  Sixteen of 24 responding purchasers reported that the U.S. product was superior or comparable on availability and reliability of supply to subject imports from Morocco, as did 20 of 23 responding purchasers with respect to subject imports from Russia.  *Id*.

[114] Original Views at 30; First Remand Views at 20-21.

[115] CR/PR at V-5-6; Mosaic Prehearing Br. at 29; OCP Posthearing Br. at 6; Koch Prehearing Br. at 2; Koch Posthearing Br. at 1; Hearing Tr. at 195-196 (McGinn).

[116] CR/PR at V-5; Hearing Tr. at 147 (O'Rourke).  Two of three U.S. producers, six of ten importers, and 12 of 27 purchasers reported their own prices to trade publications.  CR/PR at V-6.

[117] Simplot Posthearing Br. at Responses to Questions pp. 60-61.

27

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

nine U.S. importers ([          ]), and 16 of 28 purchasers reported that they refer to and use prices published in trade publications when negotiating prices.[118]  Additionally, most purchasers reported contacting up to four, five, or six suppliers before making a purchase.[119]

As noted above and in our previous Views, both domestically produced and imported phosphate fertilizers are primarily sold from inventories.[120]  U.S. producers reported that [      ] percent of their commercial shipments in 2019 came from inventory, with lead times averaging [   ] days, and importers reported that [     ] percent of their commercial shipments in 2019 came from inventory, with lead times averaging [   ] days.[121]  The [      ] of U.S. producers' U.S. commercial shipments and [        ] half of U.S. importers' U.S. commercial shipments were made on a spot sale basis in 2019.[122]

During the POI, phosphate fertilizers from all sources were shipped through the same channels of distribution (mainly to retailers, followed by distributors)[123] primarily by either barge, rail, or truck.[124]  Specifically, U.S. importers reported that 61.6 percent of their 2019 sales

---

[118] Purchasers reported using Green Markets (9 firms); Profercy (6 firms); Argus and Fertecon (3 firms); ICIS (2 firms); and CRU, FIS Index, and FMB (1 firm each).  Several reported using NOLA barge or NOLA f.o.b. prices, but did not specify a particular publication.  CR/PR at V-6.

[119] CR/PR at V-8.  Two purchasers reported contacting 1 to 2 suppliers before making a purchase, three reported contacting up to 3, five contact up to 4, nine contact up to 5, four contact up to 6, two contact up to 7, and one firm each reported contacting up to 8, 10, and 15 firms.  *Id.*

[120] CR/PR at II-17.

[121] CR/PR at II-17.  Importers also reported that [   ] percent of their commercial shipments in 2019 came from the foreign manufacturers' inventories, with lead times averaging [   ] days, and [   ] percent were produced-to-order, with lead times averaging [   ] days.

[122] CR/PR at Table V-3.  U.S. producers reported that [    ] percent of their U.S. sales were made on a spot basis, [    ] percent on a short-term contract basis, and [   ] percent on a long-term contract basis.  U.S. importers reported that [    ] percent of their U.S. sales were made on a spot basis, [    ] percent on a short-term contract basis, and [    ] percent on an annual contract basis.  *See id.*  Furthermore, more than half of the responding purchasers (15 of 29 firms) reported that they purchase phosphate fertilizers on a daily or weekly basis.  CR/PR at V-7.

[123] CR/PR at Table II-1.

[124] CR/PR at V-4.

28

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

of subject fertilizers were shipped by barge, 10.8 percent by rail, and 27.7 percent by truck.[125]

U.S. producers reported that 12.4 percent of their U.S. shipments were by barge, 47.1 percent

by rail, 24.7 percent by truck, and 15.8 percent by another method (including by vessel or title

transfer).[126]  U.S. producers and importers responding to the questionnaires in the remand

proceedings reported using a variety of modes of transportation (including barge, rail, truck,

and intermodal) to ship phosphate fertilizer during the POI.[127]

As discussed above and in our previous Views, most U.S. purchasers reported that the

domestic like product's U.S. distribution network was superior to that of subject imports.[128]

Respondents stated that most imports of phosphate fertilizers from Morocco and Russia were

shipped to NOLA, loaded on barges, and transported up the Mississippi River and its

tributaries.[129]  Mosaic reported that like subject imports, it transloads product onto river barges

at NOLA that are moved up the Mississippi River to warehouse positions located on the inland

U.S. waterways.[130]  Mosaic explained that its U.S. distribution network is expansive, comprising

nearly [          ] with approximately [          ] short tons in storage capacity, which

allows it to reach customers located throughout the United States.  Specifically, its network

includes:  [


]

---

[125] CR/PR at V-4.

[126] CR/PR at V-4.

[127] *See* Remand Questionnaire Responses at 2(d).

[128] First Remand Views at 22; CR/PR at Table II-9.

[129] CR/PR at IV-11 n.16, V-4; Gavilon Prehearing Br. at 28-29; PhosAgro Prehearing Br. at 3; IRM Prehearing Br. at 14-15; Koch Posthearing Br. at 3-4.

[130] Mosaic Prehearing Br. at 32; Mosaic Posthearing Br. at Responses to Questions, pp. 91-93.

29

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ ].[131]  In addition, Simplot, whose production facilities are located in Pocatello, Idaho

and Rock Spring Wyoming, stated that it ships product to and has warehouses in the West and

Midwest regions of the United States.[132]

As we explained in the First Remand Views, the additional questionnaire information

gathered in those remand proceedings further demonstrated the breadth and superiority of

U.S. producers' distribution networks.[133]  For example, Mosaic reiterated that [ ████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ ].[134]

Mosaic described that [ ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ ].[135]  According to Mosaic, [ ████████████

████████████████████████████████████████████████████████████████

---

[131] Mosaic Posthearing Br. at Responses to Questions pp. 91-93.
[132] CR/PR at Table III-1; Simplot Posthearing Br. at Responses to Question pp. 24-25, Exhibits 4, 20.  Simplot explains that it has supply chain operations and warehouses [ ████████████████████ ████████ ] and that it has sold product not only to the West, but also Midwest, regions of the United States for years.  Simplot Posthearing Br. at Responses to Question pp. 24-25, Exhibits 4, 20.
[133] First Remand Views at 23-24.
[134] Mosaic Domestic Producer Remand Questionnaire at 2(a) – 2(d).
[135] Mosaic Domestic Producer Remand Questionnaire at 2(a).

30

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

██████████████████████████████████████████████████

██████ ].[136] For example, Mosaic reported that [ ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ ].[137]

Simplot reported that [ i ██████████████████████████████████

████████████████████████████████████████████████████

████████████ ].[138] Simplot also stated that [ ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

██████ ].[139] Simplot further reported that [ ████████████████████████

████████████████████████████████████████████████████

████████████████████████ ].[140] In addition, PCS Phosphate Company, Inc. (Nutrien)

reported that [ ████████████████████████████████████ ].[141] PCS (Nutrien)

reported that [ ████████████████████████████████████████████████

████████████████████████████████████████ ].[142]

---

[136] Mosaic Domestic Producer Remand Questionnaire at 2(a) – 2(c).
[137] Mosaic Domestic Producer Remand Questionnaire at 2(c).
[138] Simplot Domestic Producer Remand Questionnaire at 2(a) – 2(c).
[139] Simplot Domestic Producer Remand Questionnaire at 2(a).
[140] Simplot Domestic Producer Remand Questionnaire at 2(b)-2(c). Simplot further explains that
[ ████████████████████████████████████████████████████
██████████████████████████ ]. *Id.* at 2(c).
[141] PCS (Nutrien) Domestic Producer Remand Questionnaire at 2(a).
[142] PCS (Nutrien) Domestic Producer Remand Questionnaire at 2(b).

31

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

Importers, on the other hand, reported less extensive inventory networks,[143] and less movement of inventories, although one importer did report relocating [ ██ ] short tons of product in 2019 due to [ ████████ ].[144] The remaining importers reported that their distribution networks were "unidirectional" and that once delivered to an inventory or customer location, product was not subsequently relocated but rather remained at that location.[145] OCP also claimed that, unlike [ ████████████████████████████ ████████████████████████████ ], importers do not retain title to product that is delivered to its intended destination, meaning that [ ████████████ ████████████████████████████ ].[146] Thus, we found in the First Remand Views and continue to find that the record shows that domestic producers possess superior distribution capabilities compared to importers of subject merchandise. Further, the record shows that domestic producers reported moving appreciable quantities of inventory between inventory locations and that importers did not do so for subject imports.[147]

---

[143] *See, e.g.*, EuroChem Importer Remand Questionnaire at 2(a) (reporting [ ████████ ████████████████ ]; Koch Importer Remand Questionnaire at 2(a) (reporting [ ████████████████ ]; Macrosource (formally Gavilon) Importer Remand Questionnaire at 2(a) (reporting [ ████████████████ ]; ADM Importer Remand Questionnaire at 2(a) (reporting [ ████████████████ ]; ADM Importer Remand Questionnaire at 2(a) (reporting [ ████ ]. [ ██ ] did not report any inventories of subject imports during the POI and importers [ ████████ ] did not specify the locations of any inventories that they maintained during the POI. *See* Importer Remand Questionnaires of [ ████████████ ].

[144] [ ██ ] Importer Remand Questionnaire at 2(b).

[145] *See* Importer Remand Questionnaires of [ ████████████ ████████████████ ].

[146] OCP Comments at 11.

[147] *See* Remand Questionnaires at 2(b).

32

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

In the Second Remand Order, the court held that {i}f the Commission wishes to continue finding that domestic inventory reshipment was part of the conditions of competition in the phosphate fertilizer industry, it must use record evidence to explain why — despite low volumes of inventory reshipment — domestic producers nonetheless had the capability to place their large inventories back into supply in the domestic phosphate fertilizer market.[148]

As a factual matter, we respectfully disagree that "there were low volumes of inventory reshipment." Nor, as a factual matter, do we agree that reshipment was a "rare practice" that was "commercially insignificant."[149] As explained above, in the First Remand Views we discussed [                                                    ] as only one example of reshipment capability. The record shows, however, that Mosaic's reshipment of inventories was not limited to only this type of [                    ]. For example, Mosaic also described other [

                                                                                          

                                        ].[150] The court's conclusions in the Second Remand Views, and its comparison of "the volume of reported reshipped inventory with domestic producers' overall shipment volume," appears to stem from reliance not on the totality of the evidence, but on the example that we discussed in our First Remand Views regarding [

                              ]. Looking at the record as a whole, on the other hand, we note that the total reshipment quantities with the additional quantities from Mosaic's other [        ] transfers equates to approximately [    ] percent of the domestic industry's total U.S.

---

[148] Second Remand Order at 27.
[149] Second Remand Order at 24-25.
[150] Mosaic Domestic Producer Remand Questionnaire at 2(b) – (c).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

shipments during the POI,[151] which we respectfully disagree is "commercially insignificant."

Further, we consider a comparison of the volume of inventories relocated to the total volume of inventories to be more probative as to whether such relocation is a regular or rare occurrence. The domestic industry's total inventory reshipments during the POI were equivalent to approximately [   ] percent of the industry's total end-of-year inventories during the period,[152] indicating that the movement of such inventories is a regular business practice and not a rare occurrence or just a theoretical possibility. Likewise, the record as a whole, in our assessment, demonstrates that domestic producers did not lack reshipment capability. We also reiterate that the domestic industry's reshipment of inventories was only one of several factors that the Commission relied on to find that the domestic industry was well-positioned to serve the U.S. market in 2019 and, unlike importers, domestic producers did not report that they were unable – technically or economically – to reship existing inventory.

Indeed, in its remand questionnaire response, Mosaic explained that it had [   ]

[   ].[153] Specifically, Mosaic reported:



---

[151] *Calculated from* Mosaic Domestic Producer Remand Questionnaire (adding its reported [   ]); Simplot Domestic Producer Remand Questionnaire (adding [   ]), CR/PR at Table C-1 (total U.S. shipments).

[152] *Calculated from* Mosaic Domestic Producer Remand Questionnaire (adding its reported [   ]); Simplot Domestic Producer Remand Questionnaire (adding [   ]), CR/PR at Table C-1 (total U.S. end-of-period inventories).

[153] Mosaic Remand Domestic Producer Questionnaire at 2(c).

34

APPX0021974

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*



[                                                                    ][154]

This shows how, unlike importers, the domestic industry was able to use alternate shipping methods to reach customers and to draw upon its extensive distribution network, which was confirmed by purchasers to be superior compared to that of subject importers.[155] The court seemingly did not appreciate the relevance of this evidence, indicating that "tons in transit" are tons that are not yet in inventory.[156]  However, as discussed above, our original finding related to the possibility of importers drawing from building inventories or product on barges.

We next turn to the court's direction to explain how if importers did not move "substantial quantities of inventory between locations," why the same is not true for domestic producers "that similarly reported limited instances of inventory reshipment."[157]  As discussed above, unlike importers, domestic producers did not report that they were unable to serve the U.S. market from existing inventories.  Moreover, the evidence shows that the domestic industry had excess capacity, substantial inventories, a demonstrated ability to move

---

[154] Mosaic Remand Domestic Producer Questionnaire at 2(c).
[155] CR/PR at Table II-9.
[156] Second Remand Order at 26.
[157] Second Remand Order at 25.

APPX0021975

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

appreciable quantities of product between downstream inventory locations, and superior

distribution networks, which enabled them to employ alternative means to ship products that

were unable to be moved via barge.  Importers, by contrast, reported less extensive inventory

networks and less movement of inventories.[158]  Only one importer reported relocating [ ▮ ]

short tons of product in 2019 due to [ ▮▮▮▮▮▮▮▮ ],[159] equivalent to only [ ▮ ]

percent of total subject import end-of-year inventories during the POI.[160]  The remaining

importers reported that their distribution networks were "unidirectional," such that once

delivered to an inventory or customer location, subject merchandise was not subsequently

relocated but rather remained at that location.[161]  Indeed, OCP specifically noted that [ ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮ ], while importers do not retain title to product that is delivered to its intended

destination, meaning that [ ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ ].[162]  Accordingly, the record shows that, while importers

reported stranded inventories and did not move substantial quantities of inventory between

---

[158] *See, e.g.*, EuroChem Importer Remand Questionnaire at 2(a) (reporting [ ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮ ]; Koch Importer Remand Questionnaire at 2(a)
(reporting [ ▮▮▮▮▮▮▮▮▮▮▮ ]; Macrosource (formally Gavilon)
Importer Remand Questionnaire at 2(a) (reporting [ ▮▮▮▮▮▮▮▮▮▮▮▮ ]; ADM
Importer Remand Questionnaire at 2(a) (reporting [ ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮ ]; ADM Importer Remand Questionnaire at 2(a) (reporting [ ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ ]. [ ▮ ] did not report any inventories of subject imports during the POI and importers
[ ▮▮▮▮▮▮ ] did not specify the locations of any inventories that they maintained during the
POI.  *See* Importer Remand Questionnaires of [ ▮▮▮▮▮▮▮▮▮ ].
[159] [ ▮ ] Importer Remand Questionnaire at 2(b).
[160] Calculated from [ ▮ ] Importer Remand Questionnaire at 2(b); CR/PR at Table C-1.
[161] *See* Importer Remand Questionnaires of [ ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ ].
[162] OCP First Remand Comments at 11.

36

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

locations, the same is not true for the domestic industry.

As we further found in the Original Views and First Remand Views, in addition to possessing an extensive distribution network, the domestic industry is vertically integrated with respect to the main raw material inputs used to produce phosphate fertilizers – sulfur, ammonia, and phosphate rock.[163] [                    ] produce sulfur and mine and beneficiate phosphate rock, although these raw materials are sometimes purchased.[164] Moreover, [                        ] and Mosaic produces and purchases ammonia.[165] During the period of investigation, prices of phosphate rock reported in CRU were relatively stable, while prices of ammonia fluctuated widely from January 2017 to January 2020, stabilized, then decreased between April and July 2020.[166] Prices for sulfur increased from January 2017 to the end of 2018, decreased through January 2020, stabilized, then increased and remained stable through July 2020.[167] Consistent with this, [                    ] and five of nine importers reported that raw material costs fluctuated with no clear trend over the POI.[168] Domestic producers' raw material costs as a share of cost of goods sold ("COGS") increased by [   ] percentage points from [    ] percent in 2017 to [    ] percent 2019 and

---

[163] Original Views at 31-33 and First Remand Views at 26, citing CR/PR at V-1. U.S. producers reported that sulfur comprised approximately [    ] percent of their total raw material costs in 2019, ammonia [    ] percent, phosphate rock [    ] percent, and other raw material inputs [   ] percent. *See id.*

[164] CR/PR at V-1. [        ] reported purchasing sulfur, and respondent OCP stated that [                                                        ]. CR/PR at V-1; OCP Prehearing Br. at 14-15.

[165] CR/PR at V-1. Mosaic stated that it produces one-third of its ammonia, purchases another third on the open market, and acquires a third through a long-term contract with CF Industries. Mosaic Posthearing Br. at Responses to Questions p. 95.

[166] CR/PR at Figure V-1.

[167] CR/PR at Figure V-1.

[168] CR/PR at Table V-1.

## Public Version

was [      ] percent in interim 2020.[169]

### B.      Volume of Subject Imports

Section 771(7)(C)(i) of the Tariff Act provides that the "Commission shall consider

whether the volume of imports of the merchandise, or any increase in that volume, either in

absolute terms or relative to production or consumption in the United States, is significant."[170]

As in the Original Views and First Remand Views, we continue to find that the volume of

cumulated subject imports and the increase in that volume were significant in absolute terms

and relative to apparent consumption in the United States during the POI.[171]  In this regard, we

reiterate that the volume of cumulated subject imports increased from 2.0 million short tons in

2017 to 3.0 million short tons in 2018, before decreasing to 2.7 million short tons in 2019, for

an overall increase of 36.8 percent between 2017 and 2019.[172]  Cumulated subject imports were

lower in interim 2020 at 1.2 million short tons than in interim 2019, at 2.0 million short tons.[173]

---

[169] CR/PR at V-1.

[170] 19 U.S.C. § 1677(7)(C)(i).

[171] Original Views at 33-35; First Remand Views at 27-29.

[172] CR/PR at IV-3, Table IV-2.

[173] CR/PR at Table IV-2.  As previously discussed, the parties acknowledge that the filing of the petitions at the end of June 2020 resulted in a large decrease of subject imports to the U.S. market. Mosaic Prehearing Br. at 43-44, 91; Simplot Prehearing Br. at 29-30, 34; Simplot Posthearing Br. at Responses to Questions pp. 53-54; Mosaic Posthearing Br. at Responses to Questions pp. 69-70; OCP Posthearing Br. at 12, Responses to Questions p. 33, 67-73; EuroChem Posthearing Br. at 11; IRM Posthearing Br. at 8-9; PhosAgro Posthearing Br. at 12-13, Responses to Questions.  Some U.S. importers indicated that they stopped bringing in subject imports "because the buyers and the sellers agreed that the risk of 75 percent countervailing duties was higher than either of them wanted to take."  Hearing Tr. at 337 (Aranoff); *see also* EuroChem Posthearing Br. at 11 (stating that as a result of the filing of the petitions, it shifted its purchases of phosphate fertilizers from Morocco and Russia to other global sources); [                    ] U.S. Purchaser Questionnaire Response at III-11 (reporting that Koch and IRM will not quote or import material until the countervailing duty decision is issued); [          ] [          ] U.S. Purchaser Questionnaire Response at III-11 (reporting that Helm, Koch, and OCP "cut off" supplying imported product to the U.S. market in the summer of 2020).  Monthly import data also confirm that subject import volume from Morocco and Russia showed notable declines after the petitions were filed at the end of June 2020, and subject import end-of-quarter inventories also declined.  CR/PR at Tables IV-6 and D-1.

APPX0021978

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

U.S. importers' U.S. shipments of subject imports increased from 1.8 million short tons in 2017 to 2.4 million short tons in 2018, and increased again to 2.5 million short tons in 2019.  U.S. shipments of subject imports declined between the interim periods, from 1.9 to 1.3 million short tons.[174]

Cumulated subject imports' market share also increased from 2017 to 2019.  U.S. shipments of subject imports increased from [    ] percent of apparent U.S. consumption in 2017 to [    ] percent in 2018.  Although the volume of cumulated imports of subject phosphate fertilizers decreased between 2018 and 2019, the volume of U.S. shipments of subject imports increased by 6.2 percent while apparent U.S. consumption declined by [    ] percent during the same period.[175]  Consequently, cumulated subject imports continued to gain market share, which increased from [    ] percent in 2018 to [    ] percent in 2019, for an overall [    ] percentage point increase in market share between 2017 and 2019 as the domestic industry lost [    ] percentage points of market share over the same period.[176] [177]

---

[174] CR/PR at Table C-1.  End-of-period inventories of subject imports held by U.S. importers [                ] percent between 2017 and 2018, from [        ] short tons to [        ] short tons, before a decline to [        ] short tons in 2019.

[175] CR/PR at Tables IV-2, IV-7-8, C-1.

[176] CR/PR at Tables IV-8, C-1.  The domestic industry's market share declined from [    ] percent in 2017 to [    ] percent in 2018 and [    ] percent in 2019.  *See id.*

[177] Subject imports decreased substantially after the filing of the petitions at the end of June 2020.  CR/PR at Table IV-6.  As a result, subject imports' market share was lower in interim 2020, at [    ] percent, than in interim 2019, at [    ] percent.  CR/PR at Tables IV-8, C-1.  At the same time, the domestic industry's U.S. shipments and market share increased.  Mosaic diverted shipments that had been destined for export markets and drew down inventories, for a total of [        ] short tons in additional sales in interim 2020 compared to interim 2019.  Mosaic Posthearing Br. at Responses to Questions p. 84; Mosaic U.S. Producer Questionnaire Response at IV-16.  [                ] also reported more U.S. shipments in interim 2020 than in interim 2019.  [        ] U.S. Producer Questionnaire Responses at II-7; [        ] U.S. Producer Questionnaire Responses at II-7.  Consequently, the domestic industry's market share was higher in interim 2020, at [    ] percent than in interim 2019 at [    ] percent.

APPX0021979

*Public Version*

We therefore continue to find that the volume of cumulated subject imports and the increase in that volume were significant in absolute terms and relative to apparent consumption in the United States during the period of investigation.

We respectfully disagree with the court that the import data that the Commission relied upon is "inaccurate" or "artificially inflated."[178]  The Commission's questionnaires, for both the preliminary and final phases of the investigations, directed importers to report as "imports" only "{t}hose products identified for Customs purposes as imports for consumption."[179]  Although the issue of reexports was raised during the preliminary phase, no respondent raised any objection to that question or suggested that the Commission collect data differently with respect to reexports in the final phase in any comments on the draft questionnaires.  Accordingly, the Commission reasonably compiled the cumulated import data based on the volumes of imports reported by importers in their responses to Commission questionnaires.[180]  Moreover, because importers reported these imports as entering the United States for the intended purpose of consumption, these data were an accurate representation of the volume of cumulated subject imports, even if such imports were at some later, unspecified point in time reexported to Canada.

In any event, the Commission, in fact, gathered information regarding importers' reported exports in its importer questionnaires.[181]  Even if we were to rely on the volume of

---

[178] Second Remand Order at 35-37.
[179] Importer Questionnaire, Definitions, EDIS Doc. Nos. 713651 (Preliminary), 727451 (Final).
[180] CR/PR at Table IV-2.
[181] Importers Questionnaire at II-5a, II-5b.  We note, however, that because these questions also included the carryover of inventories, product may have been exported in a later period than when it was imported.

APPX0021980

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

## *Public Version*

cumulated subject imports adjusted to deduct importers' reported exports, we would continue

to find the volume of cumulated subject imports and the increase in that volume to be

significant in absolute terms.  Based on these adjusted data, the volume of cumulated subject

imports increased from 1.8 million short tons in 2017 to 2.9 million short tons in 2018, before

decreasing to 2.4 million short tons in 2019, for an overall increase of 33.2 percent; the volume

of cumulated subject imports was 1.0 million short tons in interim 2020 compared to 1.9 million

short tons in interim 2019.[182]  Accordingly, even these adjusted data show cumulated subject

import volumes and increases in volume that are comparable to those shown by the

unadjusted data.[183]

---

[182] *Calculated from* Importers Questionnaire Responses at II-5a, II-5b.

[183] We therefore reject PhosAgro's arguments that the Commission's "disingenuous" finding of a more than one million ton increase in subject import volume must be "stricken" as based on inaccurate data.  PhosAgro Second Remand Comments at 2, 9.  Based on these adjusted data, the 1.1 million short ton increase in the volume of cumulated subject imports from 2017 to 2018 was more than all of the proffered alternative calculations of the amount that Mosaic reduced its supply to the U.S. market with the idling of Plant City, including PhosAgro's preferred one million ton figure as well as Mosaic's reasonable estimated 700,000 short ton reduction in supply.  Moreover, as discussed above, the domestic industry as a whole had excess capacity and substantial inventories throughout the POI.  We likewise reject PhosAgro's argument that the Commission's allegedly selective and inconsistent citations to subject import volume and subject import U.S. shipments was "unlawful cherry-picking," and that the Commission must consider that the approximately 600,000 short ton increase in U.S. shipments of cumulated subject imports, which it contends fell short of satisfying either the 1 million ton domestic supply gap that Mosaic contemporaneously announced in 2017 or the 700,000 short ton estimated domestic supply reduction with the idling of Plant City.  PhosAgro Second Remand Comments at 2, 9.  The Commission did not engage in "cherry-picking" by considering the total volume and U.S. shipments of cumulated subject imports as reported by the importers themselves.  To the contrary, the Commission complied with the statutory provision in considering both the volume of cumulated subject imports as well as U.S. shipments to measure U.S. consumption.  Moreover, irrespective of any imports that may have been re-exported, as discussed above, the data comparing U.S. shipments of imports to domestic producers' U.S. shipments of phosphate fertilizers also supports our volume analysis. Thus, a comparison of U.S. shipments shows that while Mosaic reduced its U.S. shipments from 2017 to 2018, [    ] short tons, importers' U.S. shipments of subject imports increased by 604,981 short tons in 2018, and were 753,938 short tons higher in 2019 than in 2017.  CR/PR at Table C-1; Mosaic Revised Domestic Producer Questionnaire at II-7.

(*continued...*)

41

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

We next address the court's question as to whether the Commission's volume findings can be sustained based solely on the data regarding U.S. shipments.[184]  Although we did not rely solely on U.S. shipments, we note that the statute provides that the "Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms **or** relative to production **or** consumption in the United States, is significant."[185]  Accordingly, although we relied here both on the volume of cumulated subject imports in absolute terms as well as on U.S. shipment data--which are used to calculate apparent U.S. consumption--reliance solely on U.S. shipment data to consider the significance of the volume of cumulated subject imports relative to U.S. consumption would be permissible under the statute.

In the First Remand Views, as directed by the court, we added to our volume analysis an explanation of how our volume findings are consistent with our findings on conditions of

---

We likewise reject OCP's challenges to our volume analysis.  OCP Second Remand Comments at 12-15.  First, we note that in contending that the import data adjusted for reexports shows that the increase in the volume of cumulated subject imports was only 592,154 short tons, OCP is only comparing 2017 to 2019, overlooking the 1.1 million short ton increase that occurred from 2017 to 2018, as discussed above.  Next, we also do not find it appropriate to reduce the volume of subject imports by [        ] or [        ] total purchases, given that the record does not show that the domestic industry categorically refused to supply them but rather that Mosaic would not sell to them at their preferred prices, as discussed below in the Price Effects discussion.  We also reject OCP's contention that the increase in the volume of cumulated subject imports was [            ] than the alleged reductions in supply by the domestic industry.  As we explained in the First Remand Views as well as above, we find that Mosaic's idling of Plant City in 2017 did not create a "supply gap."  To summarize what is set out above: the volume of cumulated imports exceeded Mosaic's reasonable estimate of the amount by which it reduced its supply to the U.S. market in 2017; the increase in subject import U.S. shipments also exceeded Mosaic's reduction in its U.S. shipments from 2017 to 2018; the domestic industry as a whole had excess capacity throughout the POI; and in 2019, Nutrien increased its capacity and production in the U.S., which covered its increased exports that year.

[184] Second Remand Order at 37-38.

[185] 19 U.S.C. § 1677(7)(C)(i) (emphasis added).

42

*Public Version*

competition in the U.S. phosphate fertilizer market.[186]  Nonetheless, we respectfully

maintained, and continue to maintain, that our original determinations were consistent with

our statutory mandate, and that, while the statute permits the Commission to look beyond the

quantitative volume data for purposes of its volume findings, the statute nowhere mandates

that the Commission perform such an analysis.

As we further explained in the First Remand Views, the court in its First Remand Order

appears to have misconstrued the statute on its face in stating that 19 U.S.C. § 1677(7)(C)(iii)

requires that the Commission "apply its findings regarding the conditions of competition to its

analysis of the three statutory factors: subject import volume, price effects, and impact on the

domestic industry."[187]  The specific clause cited by the court actually applies only to the

Commission's impact analysis.[188]  Section 1677(7)(C) is divided into four clauses:  (i) Volume; (ii)

Price; (iii) Impact on affected domestic industry; and (iv) Captive production.  The requirement

to consider the conditions of competition follows directly after, and specifically refers to the

impact clause (clause (iii)):  "The Commission shall evaluate all relevant economic factors

described **in this clause** within the context of the business cycle and conditions of competition

that are distinctive to the affected industry."[189]  Lest there be any doubt that each of the four

---

[186] First Remand Views at 30-33.

[187] Remand Order at 26 (citing *Altx, Inc. v. United States*, 26 CIT 709, 719 (2002); *Nucor Corp. v. United States*, 28 CIT 188, 207 (2004), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005); *Nippon Steel Corp. v. United States*, 25 CIT 1415, 1420 (2001); *Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1222 (2006)). We note that the finding in *Hynix Semiconductor* is consistent with what we view to be the plain language of the statute, as the issue in that case concerned the Commission's impact analysis.  *See* 30 CIT at 1220.  Likewise, in affirming the trial court in *Nucor*, the Federal Circuit held that "Section 1677(7)(C)(iii) in turn requires the Commission, in determining the *impact* of the subject imports on domestic producers, to 'evaluate all relevant economic factors which have a bearing on the state of the industry in the United States.'"  414 F.3d at 1336-37 (emphasis added).

[188] 19 U.S.C. § 1677(7)(C)(iii).

[189] *Id.* (emphasis added).

APPX0021983

*Public Version*

roman numerals constitutes a "clause," this is made clear in the captive production clause (clause (iv)), wherein the statute explicitly refers to elements of the impact analysis as falling within "clause (iii)": "{T}he Commission, in determining market share and the factors affecting financial performance set forth in **clause (iii)**, shall focus primarily on the merchant market for the domestic like product."[190]  Thus, on its face, section 1677(7)(C)(iii) requires that the Commission consider the relevant economic factors described in the impact clause, clause (iii), within the context of business cycle and conditions of competition but does not impose such a requirement with respect to its analysis of volume, clause (i), and price effects, clause (ii).[191] [192]  Although we complied with the court's remand instructions, we explained that this statutory framework informs our analysis.

In the Second Remand Order, the court again contends that the Commission "must consider the general 'conditions of competition' within the affected industry, 19 U.S.C. § 1677(7)(C)(iii) (flush language) and apply its 'conditions of competition findings to its analysis of the three statutory factors" as well as claiming that "{t}he Tariff Act requires the Commission to ground its material injury determination 'within the context of the business cycle and {the}

---

[190] 19 U.S.C. § 1677(7)(C)(iv) (emphasis added).

[191] We note that, although 19 U.S.C. § 1677(7)(C)(iii) is not applicable to the Commission's volume and price effects analyses, the statute does not preclude the Commission from considering conditions of competition or other relevant economic factors in its volume and price effects analyses, if the Commission finds it appropriate to do so, as it did here, for example, in considering the weather events and demand conditions in its price effects analysis.  *See* 19 U.S.C. § 1677(7)(B)(ii).

[192] The interrelationship between the conditions of competition requirement and the impact analysis is further supported by the reference in that paragraph to conditions "that are distinctive to the affected industry."  19 U.S.C. § 1677(7)(C)(iii).  Without question "the affected industry" refers to the domestic producers of the domestic like product, as reflected in the statute's definition of "industry." 19 U.S.C. § 1677(4).  In turn, clause (iii) of section 1677(7)(C) (Impact) requires an evaluation of "all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry" – an evaluation that is logically connected to the conditions of competition distinctive to that industry.

44

conditions of competition that are distinctive to the affected injury {sic.}.'"[193]  The court also

states that "{b}y requiring the Commission to consider the conditions of competition that shape

the domestic market, the Tariff Act 'prevents the {Commission} from attributing to subject

imports an injury whose cause lies elsewhere.'"[194]  We note as an initial matter that the case

upon which the court relies for this proposition, *Hynix Semiconductor,* confirms that the

statutory mandate to consider "conditions of competition" is in the context of the

Commission's impact analysis, in explaining that "the ITC's **impact** analysis 'shall evaluate all

relevant economic factors which have a bearing on the state of the industry in the United

States{.}'"[195]  In the Second Remand Order, the court continued "{b}y mandating consideration

of 'all relevant economic factors,' the statute prevents the ITC from attributing to subject

imports an injury whose cause lies elsewhere" further stating that "{t}he requirement to look to

'all relevant economic factors' is inextricably intertwined with the ITC's causation inquiry."[196]

We note that, as set forth in the legal standards sections of the Original Views, the assessment

of whether material injury to the domestic industry is "by reason of" subject imports "does not

require the Commission to address the causation issue in any particular way" as long as "the

---

[193] Second Remand Order at 4 (citing *Altx, Inc. v. United States*, 26 CIT 709, 719 (2002); *Nucor Corp. v. United States*, 28 CIT 188, 207 (2004), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005)).  As we explained in the First Remand Views, in affirming the trial court in *Nucor*, the Federal Circuit held that "Section 1677(7)(C)(iii) in turn requires the Commission, in determining the impact of the subject imports on domestic producers, to 'evaluate all relevant economic factors which have a bearing on the state of the industry in the United States.'"  First Remand Views at 29 (citing *Nucor*, 414 F.3d at 1336-37 (emphasis added)).  We further pointed out that, in *Altx,* the Federal Circuit ultimately held that the court should not "ask more of the Commission than required by the statute."  First Remand Views at 30 (citing *Altx, Inc. v. United States*, 370 F. 3d 1108, 1123 (Fed. Cir. 2004)).

[194] Second Remand Order at 4 (citing *Hynix Semiconductor, Inc. v. United States,* 30 CIT 1208, 1222 (2006)).

[195] *Hynix Semiconductor*, 30 CIT at 2222.

[196] *Hynix Semiconductor*, 30 CIT at 2222.

45

*Public Version*

injury to the domestic industry can reasonably be attributed to the subject imports" and the Commission "ensure{s} that it is not attributing injury from other sources to the subject imports."[197]  Thus, we continue to respectfully maintain that our original determinations are consistent with our statutory mandate, and that, while the statute permits the Commission to look beyond the quantitative volume data for purposes of its volume findings, the statute nowhere mandates that the Commission perform such an analysis.  Moreover, consistent with the cases cited in the Second Remand Order, we have considered issues regarding conditions of competition, causation, and nonattribution in the impact section, including incorporating our discussion from the First Remand Views regarding whether "fertilizer was 'practically unavailable from U.S. sources' to supply high-demand regions in 2019 because doing so would not have been economically viable."[198]

### C.      Price Effects of the Subject Imports

Section 771(7)(C)(ii) of the Tariff Act provides that, in evaluating the price effects of subject imports, the Commission shall consider whether –

(I)      there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

(II)     the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.[199]

As previously discussed, we continue to find that there is a high degree of substitutability between subject imports and the domestic like product that are of the same

---

[197] Original Views at 17-20.
[198] First Remand Views at 31-33.
[199] 19 U.S.C. § 1677(7)(C)(ii).

46

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

chemical formulation, and price is an important consideration in purchasing decisions, along with availability and quality.

As discussed in the Original Views,[200] the Commission in the final phase of these investigations collected monthly pricing data from U.S. producers and importers for the total quantity and f.o.b. value of two phosphate fertilizer products shipped in bulk (*i.e.*, barge-load) from NOLA to unrelated U.S. agricultural customers.[201][202]  One U.S. producer ([     ]) and seven importers provided usable pricing data, although not all firms reported pricing for both products for all months of the POI.[203]  Pricing data reported by these firms accounted for approximately [  ] percent of U.S. producers' U.S. shipments, [  ] percent of U.S. shipments of subject imports from Morocco, and [  ] percent of U.S. shipments of subject imports from Russia in 2019.[204]

The pricing data show that cumulated subject imports undersold the domestic like

---

[200] Original Views at 35-39.

[201] CR/PR at V-9.  The two pricing products were:  (1) Standard-grade monoammonium phosphate (MAP), chemical formula $NH_4H_2PO_4$, granular, excluding high-purity MAP; and (2) Standard-grade diammonium phosphate (DAP), chemical formula $(NH_4)_2(HPO_4)$, granular.  *See id.*

[202] The record indicates that the "f.o.b. NOLA price" is a universal price benchmark denoting a loaded barge at a dock/fleeting point in New Orleans irrespective of where the product originated, and is used as a primary point of reference in price negotiations in the U.S. market.  Mosaic Posthearing Br. at Responses to Questions pp. 28-32; Simplot Posthearing Br. at Responses to Questions pp. 60-62; Hearing Tr. at 33-34 (Jung), 287 (Groden).  In their daily or weekly price listings, trade publications Argus and Green Markets include "f.o.b. from NOLA" or "NOLA Barge" phosphate fertilizer prices.  CR/PR at V-5 n.5.  Domestic producers, therefore, compete with subject imports upon the f.o.b. NOLA price in selling product, and Mosaic states that to compete against subject imports at NOLA from its plants in Florida, it has to absorb the $20 per short ton cross-Gulf freight costs.  Mosaic Posthearing Br. at Responses to Questions pp. 29-32; Simplot Posthearing Br. at Responses to Questions pp. 60-62.  Thus, "for a selling price of $300/ST fob NOLA to be competitive with subject imports, it would have to be priced at $280/ST fob Florida plant."  Mosaic Posthearing Br. at Responses to Questions p.30.

[203] CR/PR at V-9.  [                             ].  CR/PR at V-9 n.12.

[204] CR/PR at V-9.

47

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

product in 34 of 170 instances (involving 381,132 short tons) at underselling margins ranging from 0.02 to 4.4 percent and an average underselling margin of 1.7 percent.  Subject imports oversold the domestic like product in the remaining 136 instances (involving 2.0 million short tons) at overselling margins between 0.02 and 17.6 percent with an average overselling margin of 3.7 percent.[205]

We observe that underselling and overselling margins were small and prices of the domestic like product and subject imports tracked each other closely over the POI.[206]  That subject imports and the domestic like product were similarly priced is consistent with the high degree of substitutability between the domestic like product and subject imports, as well as the price transparency that existed in the U.S. phosphate fertilizer market.[207]  Most purchasers reported that prices of the domestic like product were comparable to prices of subject imports from Morocco and Russia (the remaining purchasers reported that prices for the domestic like product were inferior, *i.e.*, higher priced).[208]  Some purchasers also confirmed purchasing

---

[205] CR/PR at Table V-7.

[206] CR/PR at Tables V-4-5, V-7.  On average, the underselling margin was [ ▮ ] percent for product 1 and [ ▮ ] percent for product 2 while the overselling margin was [ ▮ ] percent for product 1 and [ ▮ ] percent for product 2.  CR/PR at Table V-7.  A Mosaic representative testified at the hearing that "{t}he Commission's price data show more instances of overselling than underselling.  The Commission should not construe this as evidence of the absence of adverse price effects to the domestic industry.  First, prices are close, with average over- or underselling margins within {what} one would expect for a commodity industry with transparent pricing.  But the price trends between U.S. producers and importers were very highly correlated over time."  Hearing Tr. at 51 (Klett).

[207] *See Comm. of Domestic Steel Wire Rope and Specialty Cable Mfg. v. United States*, 24 F. Supp. 2d 1287, 1299 (Ct. Int'l Trade 2002) (stating that "'the more fungible two products are, the more likely underselling by one will affect the price of the other'") (quoting *BIC Corp. v. United States*, 964 F. Supp. 391, 400 (Ct. Int'l Trade 1997)).

[208] CR/PR at Table II-9.  Twenty of 24 firms reported that the domestic like product and subject imports from Morocco were comparable on price; 20 of 23 did so for the domestic like product and subject imports from Russia.  Four and three purchasers reported prices of the domestic like product to

(*continued*...)

48

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

## Public Version

subject imports instead of the domestic like product due to their lower prices.  Seventeen of 28

U.S. purchasers reported that they had purchased imported phosphate fertilizers from Morocco

and/or Russia instead of the domestic like product.  Nine of these 17 purchasers reported that

subject imports were lower priced than the domestic product, and 5 of these 9 purchasers

reported that price was a primary reason for purchasing subject imports rather than the

domestic like product.[209]  Four U.S. purchasers confirmed lost sales totaling 733,895 short tons

over the POI.[210]  In addition, as discussed further below, the record indicates that importers of

---

be inferior (*i.e.*, higher priced) to prices of subject imports from Morocco and Russia, respectively, while no purchaser reported prices of the domestic like product to be superior (*i.e.*, lower priced) to prices of subject imports from Morocco or Russia.  *Id.*

OCP's argument that the fact that 20 out of 24 purchasers reported prices of the domestic like product and subject imports to be comparable "confirm{s} that subject imports were not lower priced and did not cause adverse price effects, OCP Second Remand Comments at 18, overlooks that while 20 purchasers indicated that prices for the domestic like product were comparable, the remaining four reported that the domestic like product was inferior (*i.e.*, higher priced) compared subject imports; notably, no responding purchaser reported that the domestic like product was superior (*i.e.*, lower priced) compared to subject imports.  Thus, rather than confirm that subject imports were not lower priced, these purchaser responses corroborate other record evidence showing that prices for subject imports and the domestic like product closely track each other and that subject imports are at times lower priced.

[209] CR/PR at Table V-9.

[210] CR/PR at Table V-9.  Respondents argued that [          ], which accounted for [    ] percent of the total quantity of reported lost sales, directly contradicted its lost revenue response submitted in the preliminary phase of the investigations, and upon this basis, request that [          ] reported amount be discounted.  OCP Prehearing Br. at 96-97; Gavilon Prehearing Br. at 50.  We continue to find, however, that the record does not support disregarding the [          ] short tons of subject imports that [          ] reported purchasing instead of the domestic like product due at least in significant part to the lower price of subject imports.  In these final phase investigations, Growmark reported that subject imports were priced lower than the domestic product, and that price was a primary reason for purchasing subject imports instead of domestic product.  [



(*continued...*)

49

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

subject merchandise in instances offered lower prices than domestic producers during 2019 in a declining market.[211]  Thus, while we recognize the prevalence of overselling in the pricing data, we continue to find that the record demonstrates that, consistent with the high degree of price transparency in this market, the prices of the domestic product and subject imports tracked

---



]
CR/PR at V-23 n.14 (emphasis provided).  Thus, while some portion of the reported quantity of lost sales may also have been influenced by non-price reasons, [          ] clarified that [
                    ] and that [
                    ].
    We also note that [          ] response regarding U.S. producers' price reductions further supports that it increased its purchases of subject imports for price reasons.  In reporting that U.S. producers [

].
CR/PR at V-26.
    [211] *See, e.g.,* Mosaic Posthearing Brief at 36-37, Responses to Questions, pp. 44-46 and Exhibits 41-46; 50 and 51; Simplot Posthearing Br. at Responses to Questions pp. 35-37, Exhibit 4.  We are not persuaded by OCP's assertion that that Mosaic's pricing data analysis, which [

], is "misleading" because [

]. OCP Second Remand Comments at 20.  As discussed above in Section II.A.3, there is a high degree of transparency in the U.S. market, which includes phosphate fertilizer prices reported in various trade publications, published on a daily or weekly basis, along with the fact that the majority of U.S. producers and purchasers, and some importers report they rely upon these publications in setting or negotiating prices, as well as the fact that purchasers report contacting multiple suppliers before making a purchase.  Given the importance of price coupled with the high degree of transparency in the U.S. market, low prices from even a single importer are capable of being quickly transmitted throughout the U.S. market.  We therefore find that, based on these considerations, OCP's argument unpersuasive and belied by the record.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

each other closely and were generally comparable with small margins of underselling and overselling, that subject imports were in some instances lower priced, and the domestic industry lost sales to subject imports because of lower prices.[212]

In the Second Remand Order, the court held that "the Commission also fails to support its continued reliance on the lost sales figure" with substantial evidence and instructed the Commission that if it "wishes to credit some portion of the reported lost sales on remand, it must adequately explain this decision, including by addressing detracting evidence."[213] We start by clarifying that neither in the previous Views nor in these Views have we "rubber stamped" [          ] response.[214] To the contrary, the Commission staff took strides to assure the accuracy of that information. As explained above in note 210, [

          

                              ]. Having undertaken this step to further investigate and verify the information, we found and continue to find it appropriate to rely on [          ] response because "while some portion of the reported quantity of lost sales may also have been influenced by non-price reasons, [          ] clarified that [

---

[212] Accordingly, as in the Original and First Remand Views, we examined other record evidence relevant to whether there was significant subject import underselling as well as the pricing data, finding that the pricing data showed that subject imports predominantly oversold the domestic like product during the POI. Original Views at 37-39; First Remand Views at 34-36. We thus *considered* whether subject imports significantly undersold the domestic like product. We respectfully disagree with the court that the Commission "must answer" whether there was significant underselling. Second Remand Order at 40. On its face, the statutory provision requires only that the Commission consider whether there has been significant underselling. See 19 U.S.C. § 1677(7)(C)(ii) ("the Commission shall consider whether –"). As the Federal Circuit has explained, the Commission's "consideration" of a statutory factor does not encompass an obligation to come to any conclusion regarding that factor. *See Altx*, 370 F.3d at 1123 (discussing "consideration" of the magnitude of the margin of dumping); *see also Nucor Corp.*, 414 F.3d at 1339.

[213] Second Remand Order at 43-44.

[214] Second Remand Order at 47.

51

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

▮▮▮▮▮▮▮▮▮▮▮ ] and that [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ].[215]

Turning to the court's instruction that if the Commission "wishes to credit some portion of the reported lost sales on remand, it must adequately explain this decision, including by addressing detracting evidence,"[216] we note, as confirmed by the Court of International Trade, that "purchasers have little incentive to confirm allegations."[217]  Accordingly, we find [ ▮▮▮▮▮▮▮ ] response to be credible and forthcoming such that it is appropriate to continue to consider the entirety of its reported confirmed lost sales.

In any event, even if we were to attempt to identify a portion of [ ▮▮▮▮▮▮▮ ] reported lost sales and provide a basis for crediting that portion consistent with other record evidence, we would still find its response to show a significant volume of confirmed lost sales. As discussed above, [ ▮▮▮▮▮▮ ] reported that [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ].  Accordingly, a conservative estimate based on this representation would be a bare majority of [ ▮▮▮▮▮▮▮ ] reported lost sales or [ ▮▮▮▮▮ ] short tons, which remains a significant quantity of lost sales.  Although we recognize that other purchasers may not have similarly confirmed any lost sales allegations, that does not "detract" from the reality of the confirmed loss of sales to a customer [ ▮▮▮▮▮▮▮ ], who instead purchased subject imports primarily due to their lower prices.  Other evidence corroborates that the domestic industry lost sales to cumulated subject imports, including but not limited to the fact that cumulated subject imports gained market share at the

---

[215] First Remand Views, 25-51 at 36 n.168.
[216] Second Remand Order at 43-44.
[217] *Acciai Speciali Terni, S.p.A. v. United States*, 19 CIT 1051, 1056 (1995).

52

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

direct expense of the domestic industry during the POI as well as other examples given by the domestic industry and other market participants.[218]

Moreover, because our price effects finding is based on price depression, the actual volume of [ ▮▮▮▮▮ ] lost sales is less probative than its narrative responses that directly corroborate the Commission's findings that subject imports were at times lower priced and exerted competitive pressure on prices for the domestic like product.  In addition to [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ], it was [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ], which is cited below in our discussion of price depression.  Specifically, as discussed above, [ ▮▮▮▮▮ ] reported that U.S. producers [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ].[219]  Thus, [ ▮▮▮▮▮ ] confirmed lost revenues and explanation for how they came about directly corroborate our finding that subject imports depressed prices for the domestic like product to a significant degree based on the totality of the evidence discussed above and in the Commission's price analysis.  Indeed, in reporting that subject imports placed downward pressure on domestic prices, [ ▮▮▮▮▮ ] could hardly be

---

[218] *See, e.g.*, CR/PR at II-21 (certain purchasers reporting decreasing purchases of domestic product due to a "decrease in price competitiveness" and increasing purchases of subject imports due to the latter being more competitive), Tables V-9, C-1; Mosaic Posthearing Brief at 36-37, Responses to Questions, pp. 44-46 and Exhibits 41-46; 50 and 51; Simplot Posthearing Br. at Responses to Questions pp. 35-37, Exhibit 4.

[219] CR/PR at V-26.

53

*Public Version*

characterized as an "outlier" when numerous trade publications that play an integral role in the U.S. fertilizers market were reporting similar observations and widely shared experiences.

Indeed, as discussed above, we have also cited other record evidence corroborating that the domestic like product and subject imports were closely priced, with subject imports priced lower in some instances. All responding purchasers (*i.e.*, purchasers who responded to the Commission's questionnaire) indicated that prices for the domestic like product were comparable or inferior (*i.e.*, higher priced) to prices for subject imports.[220] Additionally, a number of purchasers reported that subject imports were priced lower than the domestic like product and several further reported that the lower price was a primary reason for purchasing subject imports instead of the domestic like product.[221] Furthermore, as the market declined in 2019, the record indicated that there were other instances in which importers of subject imports offered prices below those of the domestic industry.[222]

Thus, although we have not made a finding of significant underselling, we continue to find that the record demonstrates that, consistent with the high degree of price transparency in this market, the prices of the domestic product and subject imports tracked each other closely and were generally comparable with small margins of underselling and overselling, that subject imports were in some instances lower priced, and the domestic industry lost sales to subject imports because of lower prices.

---

[220] First Remand Views at 35-36.
[221] First Remand Views at 35-36.
[222] First Remand Views at 36-37, citing Mosaic Posthearing Brief at Responses to Questions, pp. 44-46 and Exhibits 50 and 51; *see also* Mosaic Posthearing Brief at 36-37, Responses to Questions, pp. 44-46 and Exhibits 41-46; 50 and 51; Simplot Posthearing Br. at Responses to Questions pp. 35-37, Exhibit 4.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

We also considered price trends for the domestic like product and subject imports. During the POI, prices for both the domestic like product and subject imports increased between 2017 and most of 2018, and then declined between 2018 and 2019.[223] Prices in interim 2020 increased, but remained below levels in January 2017 until after the filing of the petitions at the end of June 2020, after which prices experienced dramatic increases as subject import volumes to the U.S. market decreased and subject import end-of-period inventory levels decreased.[224]

The record shows that significant and increasing volumes of subject imports entered the U.S. market between 2017 and 2018 and remained at significant levels in 2019 despite a substantial demand decline due to what an OCP witness characterized as a "Black Swan" level of rainfall beginning in the fall of 2018 and lasting through 2019.[225] [226] As respondents acknowledge, heavy precipitation in the fall of 2018, a polar vortex in the winter of 2018-2019, and record setting precipitation in the spring of 2019 caused massive flooding and prolonged river closures along the Mississippi River system that stranded fertilizer barges and resulted in delayed, destroyed, or abandoned plantings, especially in the Midwest and Great Plains

---

[223] CR/PR at Tables V-4-5.

[224] CR/PR at Tables V-4-5, Figure V-4. Between 2017 to 2019, prices for the domestic like product decreased overall by [  ] percent for pricing product 1 and by [  ] percent for pricing product 2. Prices for subject imports decreased overall by [  ] percent for pricing product 1 and by [  ] percent for pricing product 2. Derived from CR/PR at Tables V-4-5. U.S. importers' inventories of subject imports declined from [     ] short tons at the end of the interim 2019 period to [     ] short tons at the end of the interim 2020 period. CR/PR at Table C-1.

[225] Hearing Tr. at 191-93 (Rahm); *see also* Mosaic Prehearing Br. at 88-91; Mosaic Posthearing Br. at 3, 13, Responses to Questions pp. 20-21.

[226] We note that, although the statute does not require us to consider conditions of competition and business cycles in our price effects analysis, we have considered certain pertinent conditions of competition and business cycles here.

55

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

regions.[227]  Accordingly, while U.S. demand increased overall between 2017 and 2018, demand

began to decline in the latter part of 2018 and continued into 2019, as the unusual weather

conditions impacted three consecutive planting seasons - fall of 2018, spring of 2019, and fall of

2019.  OCP observed that the USDA's Farm Service Agency, which tracks agricultural acreage

that farmers did not use in a particular season, reported that the volume of "prevented planting

acreage" in 2019 set a U.S. record – by a wide margin – at 19.6 million acres.[228]  Apparent U.S.

consumption of phosphate fertilizers declined by [ ▉ ] percent from 2018 to 2019, by more

than [ ▉▉▉ ] short tons, to below the level of apparent U.S. consumption in 2017.[229] [230]

---

[227] *See, e.g.*, OCP Prehearing Br. at 35-36, 46-48; Gavilon Prehearing Br. at 11-12; PhosAgro Prehearing Br. at 6-7; IRM Prehearing Br. at 15-16; PhosAgro Posthearing Br. at 3-4.  As further detailed below, the trade publication Argus repeatedly referenced oversupply conditions in early 2019, as follows: "The 'polar vortex' in the US midwest saw temperatures plummet.  The US domestic market followed suit.  Put simply, the US market 'tanked' on cold weather, a full pipeline and heavy imports (January 31, 2019); "{T}he US is awash with imports . . .  Pushing so much DAP/MAP to the US has led to oversupply" (February 7, 2019); "The US has a record surplus of phosphates entering the spring season, boosted by weak sales, terrible weather conditions and heavy 1Q imports, which reached a record 1.2mn t of DAP/MAP, up 27pc yoy" (March 28, 2019).  Petition, Volume I, Exhibits I-29, I-30, I-33.

[228] OCP Prehearing Br. at 47-48.

[229] U.S. apparent consumption declined by [ ▉ ] percent from 2018 to 2019, reflecting a [ ▉▉ ] percent decline in U.S. producers' U.S. shipments, an 11.8 percent decline in U.S. shipments of nonsubject imports, and a 6.2 percent *increase* in U.S. shipments of cumulated subject imports.  CR/PR at Table C-1.  As a result, from 2018 to 2019, cumulated subject imports' market share increased by [ ▉ ] percentage points; the domestic industry's market share decreased by [ ▉ ] percentage points; and nonsubject imports' market share decreased by [ ▉ ] percentage points.  *Id.*

[230] In its First Remand Order, the court addressed the Commission's finding that subject imports exceeded demand, contributing to oversupply conditions that resulted in price depression.  The court stated that this finding "was vulnerable to the Plaintiffs' rebuttal that bad weather, not imports, was responsible for declining demand.  Section 1677(7) requires that any material injury be 'by reason of' subject imports, and unprecedented weather events that frustrated demand projections were a potential intervening cause."  First Remand order at 42-43.  As we clarified in the First Remand Views, we did not and do not find that subject imports were responsible for declining demand.  Rather, we explained that previously found and continue to find that weather events beginning in 2018 and continuing into 2019, caused demand to decline.  We also previously found and continue to find that, although cumulated subject imports did not cause the decline in demand, they increased from 2017 and to 2018, and remained at elevated levels in 2019, despite declining demand.  Indeed, cumulated subject

(*continued*...)

56

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

## *Public Version*

Despite these market conditions, subject imports continued to enter the market in large volumes in 2019 and in excess of any purported need to restock inventory in regions that were unaffected by weather.[231]  It is uncontroverted that the volume of cumulated subject imports increased 1.0 million short tons from 2017 to 2018.[232]  It is likewise uncontroverted that demand for fertilizers in the U.S. market began to decline in 2018 due to heavy precipitation in the fall of 2018 as well as a polar vortex in the winter of 2018 to 2019.[233]  In the context of the increased volume of cumulated subject imports in 2018 along with declining demand towards the latter part of that year, U.S. importers' end-of-period inventories were [        ] short tons in December 2018, which was their highest level of the POI at that time.[234]

Notwithstanding end-of-period inventories that were higher than the levels earlier in the POI and the decline in demand, cumulated subject imports nonetheless surged into the U.S.

---

imports further increased their market share from 2018 to 2019 with the quantity of importers' U.S. shipments of subject imports increasing by 6.2 percent between 2018 and 2019 despite the [   ] percent decrease in apparent U.S. consumption.  CR/PR at Table C-1.  As further discussed below, other record evidence (including from purchaser questionnaire responses and contemporaneous trade publications) corroborates that cumulated subject imports had significant depressing effects on U.S. prices.  As also discussed below, we have examined other factors, including declining demand, to ensure that we are not attributing injury from any such factors to subject imports.

[231] OCP Comments at 1, 15-16; PhosAgro Comments at 15; Koch Comments at 2-3.

[232] CR/PR at Table IV-2.  As discussed above in Section II.B, both the unadjusted data and adjusted data show comparable increases in the volume of cumulated subject imports.  We again note that this one million short ton increase in the volume of cumulated subject imports in 2018 was not due to a "supply gap" in domestic supply.  As discussed above, although Mosaic reduced its production capacity in 2018, it reduced its U.S. shipments of fertilizers by only [        ] short tons from 2017 to 2018, while importers' U.S. shipments of subject imports increased by 604,901 short tons from 2017 to 2018, and were 753,638 short tons higher in 2019 than in 2017.  CR/PR at Table C-1; Mosaic Revised Domestic Producer Questionnaire at II-7.  Moreover, during that time, Mosaic as well as Simplot and Nutrien possessed excess capacity and inventories.  CR/PR at Table III-4.

[233] Original Views at 40 (citing OCP Prehearing Br. at 35-36, 46-48; Gavilon Prehearing Br. at 11-12; PhosAgro Prehearing Br. at 6-7; IRM Prehearing Br. at 15-16; PhosAgro Posthearing Br. at 3-4).

[234] CR/PR at Table D-1.  We also note that importers' ending inventories of subject imports in each quarter in 2018 and 2019 [            ] exceeded their 2017 volumes, and their ending inventories in March, June, and September 2019 were larger than their ending inventories for those months in 2018.  CR/PR at Table D-1.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

market as 2019 began.  In January 2019, the volume of cumulated subject imports reached its highest monthly level of the entire POI at 720,728 short tons, a level that was almost double the level of monthly imports in January 2018 (312,960 short tons) and more than triple the level of monthly imports in January 2017 (202,768 short tons).[235]  Thus, in the context of phosphate fertilizers consumption beginning in the fall of 2018, which precipitated the high levels of end-of-period inventories in December 2018, subject imports surged into the market in January 2019 and remained substantial (relative to other monthly import volumes) in February and March 2019.  That cumulated subject imports exceeded demand at the beginning of 2019 is further supported by the fact that U.S. importers' end-of-period inventories increased from [          ] short tons in December 2018, which had been their highest level at that point in the POI, to [          ] short tons in March 2019, their highest level of the entire POI, which contradicts respondents' arguments that subject imports were continuing to be imported to serve regions unaffected by severe weather.[236] [237]  Notwithstanding this high level of

---

[235] CR/PR at Table IV-6.

[236] CR/PR at Table D-1.  We further note that U.S. importers' quarterly ending inventories in March, June, and September 2019 were larger than their ending inventories for those months in 2018. *Id.*

[237] OCP contends that domestic and subject import inventories both [          ] in March 2019 before returning to [                    ] after Spring 2020 and that the ratios of subject import to domestic inventories [                    ] over the POI, showing that there was no [                    ] in subject import inventories.  OCP Remand Second Remand Comments at 6-7.  OCP overlooks that subject import end-of-period inventories increased [        ] percent from 2017 to 2018 and remained at elevated levels that were [        ] percent higher in 2019 than 2017.  CR/PR at Table C-1.  In contrast, domestic end-of-period inventories increased by only [     ] percent from 2017 to 2018 and were only [     ] percent higher in 2019 compared to 2017.  CR/PR at Table C-1.  By the same token, in describing domestic inventory levels of [          ] short tons and subject import inventory levels of [          ] short tons in the second quarter of 2020 as "return{ing} to [                    ]", OCP ignores that in the second quarter of 2017 inventories of domestic producers were indeed a relatively comparable [          ] short tons, while subject import inventory levels were substantially lower at only [          ]

(*continued...*)

58

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

inventories, which according to respondents remained in place after delivery and were not

otherwise relocated, substantial volumes of cumulated subject imports still continued to enter

the market even as demand remained low due to flooding that occurred in the spring and fall of

2019.[238]

As we previously noted in our Original Views, several contemporaneous industry

publications were reporting on oversupply conditions and price declines in the earlier part of

2019.[239]  Specifically, trade publication *Argus* reported:[240]

- January 10, 2019:  "US remains an outlet for 1Q....  With OCP also shipping considerably more this quarter, producers remain set on offloading tonnage in the only market that can absorb such volumes without pricing....  The US phosphate market continues to feel the pressure of a full supply chain and steady import lineup as both DAP and MAP barges declined this week.  Limited buying activity caused DAP Nola to drop by nearly $1/st from the previous week to $383-386/st fob Nola on confirmed trades.  MAP barge values fell by nearly $5/st from last week's midpoint to $388-395/st fob Nola."[241]

- January 17, 2019:  "US phosphate prices continue to wilt as heavy supply pressures suffocate buyer demand."[242]

- January 31, 2019:  "The cold weather and full pipeline makes the US a less likely

---

short tons.  CR/PR at Table D-1.  The record also does not support OCP's assertion that the ratios of subject import to domestic inventories [ ▮▮▮▮▮▮▮▮▮ ] over the POI.  The ratios of subject import inventories to U.S. inventories ranged from [ ▮▮▮▮ ] percent in 2018 and 2019, which far exceeds those from the beginning of the POI, which ranged from [ ▮▮▮ ] percent in 2017.  *Calculated from* CR/PR at Table D-1.

[238] CR/PR at Table IV-6.

[239] Original Views at 41-42, citing Petition, Volume I, Exhibits I-29 – I-35; *see also* Mosaic Prehearing Br. at 59-63; Mosaic Posthearing Br. at 10-11; Simplot Prehearing Br. at 27-28; Simplot Posthearing Br., Responses to Questions pp. 16, 50-51.

[240] We note that subject imports from Morocco and Russia accounted for 84.1 percent of total import volume in 2019, up from 83.0 percent in 2018.  CR/PR at Table IV-2.  The volume of cumulated subject imports declined by 9.5 percent between 2018 and 2019, while the volume of nonsubject imports declined by 16.0 percent.  CR/PR at Table IV-2.  U.S. shipments of subject imports increased by 6.2 percent between 2018 and 2019, while shipments of nonsubject imports decreased by 11.8 percent.  CR/PR at Table C-1.

[241] Petition Volume 1, Exhibit I-31.

[242] Petition Volume 1, Exhibit I-32.

59

*Public Version*

export for 1Q.  There is no chance of an early application season in the south and the weather forecast is poor to March.... The 'polar vortex' in the US midwest saw temperatures plummet.  The US domestic market followed suit.  Put simply, the US market 'tanked' on cold weather, a full pipeline and heavy imports.  US DAP barges fell $10/st in a week.  MAP prices are now in the mid/high-$360s/st fob Nola ....  Firstly, with the US having covered 60pc of its 1Q 2018 total import requirements already, and with reports of heavy congestion at Nola on high water in the river system, the strategy of pushing more product into the US looks risky, at least in the short term."[243]

- February 7, 2019:  "{T}he US is awash with imports ...  Pushing so much DAP/MAP to the US has led to oversupply ... US phosphate prices dipped again this week as wholesalers try to incentivize buying during this period of low demand."[244]

- February 28, 2019:  "{T}he US market fell dramatically with DAP into the $300s/st fob Nola, down around $15/st in a single week....  The heavy import line-up and 'polar vortex' in the US has resulted in Nola DAP barges trading at $330-338/st – down by $14/st this week....  US phosphate prices moved sharply lower this week as the market continues to be plagued by ample supplies and absent demand."[245]

- March 28, 2019:  "OCP, in its 2018 financial results, projected softer prices in the first half of this year, driven by a drop in the cost of raw materials and higher inventories in the cost of raw materials and higher inventories in the US and India.  It is a fair assessment.  The US has a record surplus of phosphates entering the spring season, boosted by weak sales, terrible weather conditions and heavy 1Q imports, which reached a record 1.2mn t of DAP/MAP, up 27pc yoy....  The US DAP market softened this week as buyers were again put off by the combination of heavy supplies and a probably limited spring application season....  Heavy January commitments by foreign producers lifted first quarter US phosphate imports past previous expectations."[246]

- April 18, 2019:  "DAP/MAP supply for 1Q is estimated at 2.3mn t.  The US DAP barge price fell again by $5/st on oversupply amid heavy imports....  Heavy supplies and light demand continue to weigh heavily on the domestic phosphate market as DAP values continue to trickle downward.  Nola DAP barges were assessed down by $5/st from the midpoint last week to $320-325/st as buyers remain off put by limited field activity and prolonged closure of the upper

---

[243] Petition, Volume I, Exhibit I-33.
[244] Petition, Volume I, Exhibit I-29.
[245] Petition, Volume I, Exhibit I-34.
[246] Petition, Volume I, Exhibit I-30.

APPX0022000

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

Mississippi river. {also noting} Record import levels."[247]

Additionally, in April 2019, [ ▮ ] also reported on the oversupply condition in the U.S. market due to a poor application season in the fall of 2018 and a "surge in imports in recent months."[248]  Notably, these articles discuss demand in the U.S. market as a whole and do not mention anywhere that there were areas of the U.S. market where demand was increasing. Nor do they indicate that inventories that may have been located in different locations or any that may have been subsequently exported did not contribute to the oversupply conditions affecting prices in the U.S. market.  Rather, consistent with our discussion above, these publications confirm the importance of NOLA pricing as a benchmark in the broader market.

Thus, the record shows that regardless of whether subject import inventories were being reshipped once they reached their destination, the substantial volume of cumulated subject imports continuing to enter the United States in 2019 was adversely impacting U.S. prices as demand remained low due to weather events and flood in the spring of 2019.[249]  As

---

[247] Petition, Volume I, Exhibit I-35.

[248] Mosaic Posthearing Br. at Exhibit 3.

[249] As we noted in our Original Views, respondents blamed the oversupply conditions on demand projections that failed to materialize.  OCP Prehearing Br. at 70-73; Koch Prehearing Br. at 6-7; EuroChem Prehearing Br. at 8-9; EuroChem Posthearing Br. at 8-9; OCP Posthearing Br. at Responses to Questions pp. 27-30; Gavilon Posthearing Br. at Responses to Questions pp. 5-6; IRM Posthearing Br. at 7.  OCP further argues that in finding that subject imports contributed to oversupply conditions "regardless of the reasonableness of any demand projections," the Commission "ignored" that phosphate fertilizer is procured in advance based on forecasted demand.  OCP Comments at 24. Contrary to OCP's argument, we recognize that distributors rely on demand projections in obtaining product.  First, we note that, in 2019, [ ▮ ] percent of U.S. importers' U.S. commercial shipments were spot sales.  CR/PR at Table V-3.  Further as discussed above, cumulated subject imports entered the U.S. market in significant volumes, contributed to oversupply conditions, and depressed U.S. prices to a significant degree, regardless of how they were ordered.  U.S. importers claimed that they were [ ▮

▮ ].  *See, e.g.*, ADM Posthearing Br. at 8-9 (stating that

[ ▮

(*continued*...)

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

explained in the Original Views and First Remand Views,[250] this oversupply of subject imports and their competitive and lower prices, including instances of being lower-priced, exerted downward pricing pressure on the domestic like product and significantly depressed U.S. prices in 2019.

Further, the record, including as supplemented by the remand questionnaires, does not support respondents' assertions that additional volumes of subject imports in the latter half of 2019 merely replenished depleted inventories in areas unaffected by flooding. As detailed above, U.S. importers' end-of-period inventories of cumulated subject imports reached their highest level of the POI in March 2019.[251] Yet, according to respondents themselves, subject imports that arrived in 2019 had been delivered "by the time record precipitation thwarted fertilizer application in certain regions."[252] Moreover, the supplementary questionnaire information obtained in the first remand proceedings suggests that the vast majority of subject

---

████████████████████████████████ ]); Hearing Tr. at 227 (Lambert) (stating that "{t}hose vessels were coming. And once they're on their way, they're coming here"); 223-224 (Niederer). Regardless of why or when they were ordered, however, the record shows that the subject imports had depressing effects on U.S. prices during 2019. We also observe, as discussed above, that notwithstanding these assertions, foreign producers and importers of subject merchandise were able to respond to market changes after the petitions were filed by decreasing the volume of imports entering the U.S. market.

[250] Original Views at 39-46; First Remand Views at 37-44.

[251] CR/PR at Table D-1.

[252] OCP Comments at 15. Respondents maintain that most subject imports of phosphate fertilizer enter through the port at NOLA, where they are loaded from vessels onto barges, barged up the Mississippi River and its tributaries, and then shipped north, west, and east by rail and truck to meet demand from farmers, which apply phosphate fertilizer twice a year in two limited windows of time. They claim that distributors and retailers store phosphate fertilizer in warehouses close to farmers and that such fertilizer stays there until it is used in those narrow application windows. They assert that in the event of unexpected reductions in demand, such as weather or other unpredictable events, inventories are not returned or moved to other regions but instead are held and sold to farmers during the next application season. OCP Comments at 5; PhosAgro Comments at 8-12; Koch Comments at 3-4; IRM Comments at 3-4; Eurochem Comments at 1-2.

62

*Public Version*

imports, once delivered, are not relocated or otherwise moved, but rather remain in regional inventories until used in a subsequent application period.[253]  Consequently, we find that the record indicates that substantial quantities of subject imports were in place in regional inventories by December 2018 and March of 2019, prior to the flooding that occurred in spring 2019, and such imports remained in those locations, available for subsequent application in the latter part of 2019.  Thus, the POI-high level of inventories of cumulated subject imports in March 2019 exceeded the levels maintained in prior years and according to respondents were already in place in regional locations prior to flooding.  Yet, despite the substantial inventories of cumulated subject imports in place in December 2018, monthly cumulated subject import volume peaked in January 2019, and despite the POI-high level of inventories of cumulated subject imports in March 2019, monthly cumulated subject import data show them continuing to enter at substantial volumes.[254]  Taken together with the lower demand in three consecutive application periods, the record does not support a conclusion that inventories of U.S. imports were depleted such that the observed volumes of subject imports were needed.[255]  This is particularly so in light of the substantial inventories, expansive network of inventories, and extensive multi-modal distribution capabilities of the domestic industry.

Even if, as respondents assert, importers of merchandise did deplete some portion of

---

[253] *See generally* Importers Remand Questionnaires.  Additionally, OCP also claims that the new questionnaire evidence "makes clear that even as inventories built up in flooded regions, it was normal practice to keep inventories at their original intended destinations in preparation for the next application window."  OCP Comments at 18.

[254] CR/PR at Table IV-6.

[255] Indeed, importers' end-of-period inventories of cumulated subject imports increased from June 2019 to September 2019, with both months' inventory volumes larger than in the respective months in 2018.  CR/PR at Table D-1.

63

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

these inventories to serve areas that were unaffected by flooding, we find that the record shows that the volume of cumulated subject imports continued to exceed any demand created by alleged restocking needs.  As discussed above, U.S. importers' end-of-period inventories of cumulated subject imports reached their highest level of the POI in March 2019 at [      ] short tons.[256]  U.S. importers' next reported end-of-period inventories in June 2019 were [     ] short tons.[257]  Accordingly, U.S. importers' end-of-period inventories of cumulated subject imports from March 2019 to June 2019 were reduced by [     ] short tons. Cumulated subject imports, however, far exceeded this amount in those months and the months that followed.  Indeed, over 329,000 short tons of subject imports entered from April to June 2019.[258]  Moreover, whereas the difference between end-of-period inventories from March 2019 to June 2019 was only [     ] short tons, in July 2019 alone, the volume of cumulated subject imports was 281,132 short tons, and cumulated subject imports continued to enter the U.S. market at elevated levels – 264,191 short tons in August 2019 and 178,304 short tons in September 2019 – for a three-month total of 723,627 short tons.[259]

This pattern continued later in 2019.  U.S. importers' end-of-period inventories of cumulated subject imports in September 2019 were [     ] short tons, higher than in June of 2019 but lower, by [     ] short tons, than in March 2019.[260]  Even assuming that this represents a depletion of inventories to serve areas unaffected by flooding, the record shows

---

[256] CR/PR at Table D-1.  As discussed above, this was up from [     ] short tons in 2018.  *Id.*
[257] CR/PR at Table D-1.  We note that this was higher than the quarterly inventories in June 2018 of [     ] short tons.  *Id.*
[258] CR/PR at Table IV-6.
[259] CR/PR at Table IV-6.
[260] CR/PR at Table D-1.

64

*Public Version*

that the volume of cumulated subject imports far exceeded this amount in the months that

followed.  Indeed, in October 2019 alone, the volume of cumulated subject imports was

244,672 short tons, and cumulated subject imports continued to enter the U.S. market at

elevated levels – 164,187 short tons in November 2019 and 227,543 short tons in December

2019 – for a three-month total of 636,402 short tons.[261]  Thus, whether or not U.S. importers

depleted inventories to serve areas that were unaffected by flooding in 2019, the record shows

that cumulated subject imports nonetheless continued to enter the U.S. market in excess of any

purported need to replenish inventories, further contributing to the oversupply conditions.[262]

As we previously noted in our Original Views and First Remand Views, several

contemporaneous industry publications continued to report that oversupply conditions and

price declines also persisted in the latter part of 2019.[263]  For example, trade publication *Argus*

reported:

- July 18, 2019:  "The US is looking fragile due to import length.  Widespread estimates of substantial carryover from spring are also hurting prices....  Ample spot availability has driven US phosphate values down this week to $304-310/st fob Nola DAP/MAP on confirmed trade....  Price pressure is poised to persist in the near-term with continued imports scheduled for July discharge."[264]

- August 4, 2019:  "Rather than maintain prices, OCP appears to be gunning for volume. . . .  Downward price pressure persisted along the US Gulf coast this week, with DAP barge values assessed at $298-300/st fob Nola – the lowest price

---

[261] CR/PR at Table IV-6.

[262] We again note that subject imports from Morocco and Russia accounted for 84.1 percent of total import volume in 2019, up from 83.0 percent in 2018.  CR/PR at Table IV-2.  The volume of cumulated subject imports declined by 9.5 percent between 2018 and 2019, while the volume of nonsubject imports declined by 16.0 percent.  CR/PR at Table IV-2.  U.S. shipments of subject imports increased by 6.2 percent between 2018 and 2019, while shipments of nonsubject imports decreased by 11.8 percent.  CR/PR at Table C-1.

[263] Original Views at 41-42 and First Remand Views at 47-49, citing Petition, Volume I, Exhibits I-36 – I-44; *see also* Mosaic Prehearing Br. at 59-63; Mosaic Posthearing Br. at 10-11; Simplot Prehearing Br. at 27-28; Simplot Posthearing Br., Responses to Questions pp. 16, 50-51.

[264] Petition, Volume I, Exhibit I-36.

65

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

level in nearly two years on a midpoint basis, according to Argus data....  A slate of three additional cargoes from Morocco for August arrival is anticipated to keep a lid on near-term prices, which have been steered by imports following spring applications.  DAP imports during the 2018-19 fertilizer year reached an all-time high of 1.26mn/t on increased shipments from Morocco and Russia, according to customs data."[265]

- August 15, 2019:  "In the US, DAP barge prices fell to the equivalent of $315/t cfr amid fears over more imports and large carryover....  In the US, two DAP barges traded in a $288-294/st fob range for September – a 10-year low.  The paper market was even more aggressive.  The driver is a substantial domestic carryover from spring, plus heavy imports and lower grain prices....  DAP barges traded at a 10-year low early this week at $288/st fob Nola for September shipment – pressuring the low end of this week's assessment....  Prices at Nola are poised to face ongoing headwinds as offshore volumes continue to trickle to port....  Downstream demand is expected to remain suppressed until the fourth quarter, when post-harvest applications resumes.  In-season consumption will be key to draw down carryover inventories, and help bring the market closer to balanced."[266]

- September 26, 2019:  "Mosaic has sold three October-loading DAP barges at $288/st fob Nola.  But the slight firmness in the US DAP market exhibited after the Mosaic production cut subsided this week as barge values slipped below $290/st fob Nola for October shipment.  DAP traded at $286-288/st fob Nola – the lowest price level since early-September.  Market sentiment ... remained bearish for near-term price movement, especially as imports continue to discharge at the US Gulf coast at the current pace.  The 500,000t of lost production at Mosaic's Faustina plant during the fourth quarter is poised to be replaced by offshore volumes, likely minimizing upward momentum to Nola values."[267]

- October 10, 2019:  "In the U.S., DAP trade reached a new decade low of $275/st fob Nola for October shipment, a further decrease from the $280-$290/st fob assessed last week, although Mosaic did report a single DAP barge at $285/st

---

[265] Petition, Volume I, Exhibit I-37.

[266] Petition, Volume I, Exhibit I-38.

[267] Petition, Volume I, Exhibit I-39.  We note that, as discussed above, the volume of cumulated subject imports in October 2019 alone was 244,672 short tons, and cumulated subject imports continued to enter the U.S. market at elevated levels, 164,187 short tons in November 2019 and 227,543 short tons in December 2019, for a three-month total of 636,402 short tons.  CR/PR at Table IV-6.  Quarterly inventories of cumulated subject imports were lower in December 2019, at [          ] short tons compared to December 2018, at [          ] short tons; however, they remained at substantially elevated levels compared to December 2017 when they were [          ] short tons.  CR/PR at Table D-1.

*Public Version*

fob. Bearish sentiment persists even after Mosaic idled its Faustina phosphate complex on 1 October which reduces total domestic production by 500,000t through the fourth quarter. Inventories are estimated to be higher than usual as the spring application season was weak this year, and the window for fall application is narrowing."[268]

- October 14, 2019: "In the US, DAP barges traded at a new decade low of $265/st fob Nola for October shipment, the lowest price since November 2009 ... total with few imports and a healthy export lineup, sources said it could be enough to draw inventories down to a normal level and support prices later this quarter or in early 2020."[269]

- October 31, 2019: "There was scant good news for phosphate producers this week – the US continued its inexorable slide with DAP a fresh decade low of $253/st fob Nola."[270]

- November 7, 2019: "US producer Nutrien called further US production cuts a 'futile game' this week. Nutrien argues that the market is weak because of fundamental structural oversupply and that further cuts simply signal to OCP, Russian and other producers to ship more to the US.... Phosphate barge values continued to fall this week as high buyer inventories and delays to fall application season weighed on market sentiment.... With inventories still full from two lackluster application seasons and more phosphate fertilizer shipments on the way, many doubt fall demand will be enough to rebalance the domestic phosphates market.... But buyer inventories are full following two lacklustre application seasons and high first-quarter imports."[271]

- December 12, 2019: "Nola barge prices fell to new lows this week in the first DAP trades for nearly a month.... Price support is doubted into early-2020 as additional imports and the expectation that production will resume at Mosaic's plant in Faustina, Louisiana, loom ahead."[272] [273]

---

[268] Petition, Volume I, Exhibit I-40.

[269] Petition, Volume I, Exhibit I-41. We note that Mosaic indicated in September 2019 that it was idling its Louisiana operations "as imports into the country have pushed down prices." Petition, Volume 1, I-46 "'Phosphate prices have declined further through the summer, with excess imports continuing to enter the U.S. on top of high channel inventories,' President and CEO Joc O'Rourke said in a statement. 'We expect our move to idle production to tighten supply and rebalance the market.'" *Id.*

[270] Petition, Volume I, Exhibit I-42.

[271] Petition, Volume I, Exhibit I-43.

[272] Petition, Volume 1, Exhibit I-44.

[273] Other publications, including [                              ], discussed the [                    ]. Simplot Posthearing Br. at Exhibits

(*continued*...)

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

Again, as discussed above, these articles discuss demand in the U.S. market as a whole and do not mention anywhere that there were areas of the U.S. market where demand was increasing.  Nor do they indicate that inventories that may have been located in different locations or any that may have been subsequently exported did not contribute to the oversupply conditions affecting prices in the U.S. market.  Rather, consistent with our discussion above, these publications confirm the importance of NOLA pricing as a benchmark in the broader market.

Importers also reported carrying higher than usual levels of inventories.  In describing trends in its reported quarterly inventories of subject imports from Morocco, [ ▮ ] reported



]²⁷⁴

Similarly, in describing trends in its reported quarterly inventories of subject imports from

---



6 ([          ] reporting [
]), 18 ([
]), 19 [        ]
reporting [                                                ]).
Moreover, respondents' witness even testified that NOLA prices were lower than prices in Brazil due to a market imbalance, and that inventory build-up was due to excessive rainfall and was not worked down "until the end of the strong fall 2020 application season."  Hearing Tr. at 192-193 (Rahm).
    ²⁷⁴ [ ▮ ] Importer Questionnaire Response at II-5c.

68

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

Morocco, [ ▮ ] reported



And in describing trends in its reported quarterly inventories of subject imports from Russia,

[ ▮ ] reported



Thus, the record shows that cumulated subject imports entered the U.S. market in the latter part of 2019 in excess of any purported depletion of inventories, contributing to oversupply conditions, and having a depressing effect on domestic prices as demand remained low through 2019.[277]

The fact that the end-of-period inventories of cumulated subject imports in 2019 remained at elevated levels ([ ▮ ] short tons) compared to 2017 ([ ▮ ] short tons)[278] further demonstrates that cumulated subject imports were contributing to oversupply conditions and not merely replenishing depleted inventories, and again, these do not include

---

[275] [ ▮ ] Importer Questionnaire Response at II-5c.
[276] [ ▮ ] Importer Questionnaire Response at II-6c.
[277] As we noted in our previous Views, U.S. importers' ending inventories of subject imports in 2018 and 2019 were [ ▮ ] percent and [ ▮ ] percent higher, respectively, than ending inventories in 2017.  CR/PR at Table C-1.  Subject import inventory levels remained at elevated levels at the end of the first and second quarters of 2020, but dropped at the end of the third quarter of 2020 as subject imports decreased after the petitions were filed at the end of June 2020.  CR/PR at Table D-1.
[278] CR/PR at Table D-1.

69

*Public Version*

any product that may have been reexported.  Additionally, the fact that cumulated subject imports continued to gain market share in 2019 as demand declined and the U.S. market contracted likewise demonstrates that they were not merely replenishing depleted inventories.  As we observed in our Original Views and First Remand Views, U.S. shipments of subject imports increased by 148,957 short tons (6.2 percent) between 2018 and 2019, and subject imports increased their share of the market at the expense of the domestic industry and nonsubject imports.[279]

In sum, the record shows that significant volumes of subject imports entered the U.S. market between 2017 and 2018, and as demand began to decline in the fall of 2018, U.S. importers' inventories reached their highest level of those two years.  Notwithstanding these substantial inventories and declining demand in late 2018, subject imports surged into the U.S. market in January 2019, and continued to enter the U.S. market in large quantities, even as demand remained low in 2019.  That the continued flow of subject imports exceeded demand in the contracting U.S. market is further demonstrated by the fact that U.S. importers' quarterly inventories reached their highest level in March 2019.  Consequently, the record shows that cumulated subject imports were contributing to oversupply conditions in the beginning of 2019.  Subject imports nonetheless continued to enter the U.S. market in the latter part of 2019 in excess of any purported need to replenish depleted inventories, thereby further contributing to the oversupply conditions that continued to plague the U.S. market in the latter half of 2019.  At the same time, cumulated subject imports increased their market share at the expense of

---

[279] Original Views at 41-43, First Remand Views at 50, CR/PR at Table C-1.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

both the domestic industry as well as nonsubject imports.[280]  Contemporaneous trade

publications documented the oversupply conditions throughout 2019, with several noting that

high levels of imports contributed to these conditions, as well as the effect that these

conditions had on prices in the U.S. market.[281]  Indeed, market prices for phosphate fertilizer

DAP decreased in 2019 [ ▮▮▮▮▮▮▮▮▮▮ ] for non-phosphate fertilizers potash and

urea, such that DAP prices [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ].[282]

Moreover, as we observed in the Original Views and First Remand Views, U.S.

purchasers also reported on the adverse effects caused by subject imports, particularly during

2019.[283]  For instance, U.S. purchaser [ ▮▮▮▮ ] informed how [ ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ] and that

"more cargo containers appear to be arriving to the U.S. on consignment with no price point

---

[280] From 2018 to 2019, cumulated subject import market share increased [ ▮ ] percentage points, while the market shares of the domestic industry and nonsubject imports decreased [ ▮ ] and [ ▮ ] percentage points, respectively.  CR/PR at Table C-1.

[281] OCP challenges our reliance on the numerous trade publications that corroborated that the significant volume of cumulated subject imports was flooding the U.S. market and contributing to the oversupply conditions that were depressing U.S. prices to a significant degree.  OCP Second Remand Comments at 10. These publications corroborate the undisputed facts discussed above: that prices in the U.S. phosphate fertilizer market are highly transparent, with multiple market participants specifically reporting their reliance upon these publications in setting or negotiating prices.  Moreover, these are contemporaneous descriptions of the U.S. fertilizers market.  OCP's attempts to dismiss these trade publications as "mere snippets" that "use sensational words to catch the attention of subscribers" ignores the vital role that they played in the U.S. market.

[282] CR/PR at Figure V-5; *see also* CR/PR at Figure V-6 (public prices for DAP and MAP [ ▮▮▮▮ ▮▮▮▮▮▮▮ ]).

[283] Original Views at 44-45; First Remand Views at 52.

71

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

established up front … {which} can lead to larger drops in price with weak demand."[284]  U.S.

purchaser [                    ] reported that [

                                              ].[285]  In reporting that domestic producers had reduced

prices in order to compete with low-priced subject imports from Morocco, U.S. purchaser

[      ] explained that [

                                                              ].[286]

In addition to this record evidence of oversupply and imports' exertion of downward

pressure on prices in the U.S. market, we also continue to find record evidence of subject

imports being offered at low prices during this time.  For instance, in January 2019, [

---

[284] Original Views at 44-45 and First Remand Views at 50, citing CR/PR at II-2; [          ] U.S. Purchaser Questionnaire Response at III-8(b).  As we noted above, [          ] also reported that
[

                                                          ] CR/PR at Table V-11.

[285] [                    ] U.S. Purchaser Questionnaire Response at II-2.  In reporting that U.S. producers lowered prices by an estimated [      ] percent in order to compete with lower-priced subject imports, [              ] stated that [

                              ] CR/PR at Table V-11.

[286] CR/PR at Table V-11.

72

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

████████████████████████████████████████ ].[287] [288]  Record evidence also indicates that domestic producers reduced prices to compete with subject imports.  Of the 28 responding purchasers, seven reported that U.S. producers had reduced prices in order to compete with lower-priced imports from the subject countries.[289]  Five purchasers estimated domestic price reductions to compete with product imported from Morocco, and four estimated domestic price reductions to compete with product imported from Russia.  The reported estimated price reductions ranged from [ ██ ] percent to [ ██ ] percent, for an average of 16.0 percent.[290]

In light of the foregoing, we continue to find that the record demonstrates that significant and increasing volumes of cumulated subject imports entered the U.S. market between 2017 and 2018 and continued at elevated levels in 2019, even as demand began to decline in the latter part of 2018, and unusual weather conditions impacted three consecutive planting seasons - fall of 2018, spring of 2019, and fall of 2019.  Despite these market conditions, cumulated subject imports continued to enter the market in large volumes in 2019 and in excess of any purported need to restock inventory in regions that were unaffected by weather, contributing to oversupply conditions in the U.S. market as corroborated by numerous

---



[287] Mosaic Posthearing Br. at Responses to Questions pp. 36-37, Exhibits 41-46.  U.S. purchaser [ ████████ ] reported that [ ████████████████████████████████████████████████████████████ ].  [ ████████ ] U.S. Purchaser Questionnaire Response at III-29(b).  Simplot also stated that lower-priced imports forced it to lower its prices.  Simplot Posthearing Br. at Responses to Questions pp. 35-37, Exhibit 4.
[288] We also note that record information shows that [ ████████████████████████████ ████████████████████ ] was the lowest priced in the U.S. market [ ████████████████ ████████████████████ ].  Mosaic Posthearing Br. at Responses to Questions pp. 45-46, Exhibit 51 (exhibit data sourced from responses to Commission questionnaires).
[289] CR/PR at Table V-11.  Seven purchasers reported that U.S. producers had not reduced prices in order to compete with lower-priced imports from the subject countries, and 14 reported that they did not know.  CR/PR at V-25.
[290] CR/PR at V-25.

73

*Public Version*

contemporaneous trade publications.  Record evidence also shows subject imports being offered at low prices in some instances during this time.  Cumulated subject imports thus, by contributing to oversupply conditions and being offered at competitive and low prices in a highly transparent market, exerted downward pricing pressure on the domestic like product and significantly depressed U.S. prices during the POI.  Although we acknowledge that some purchasers reported being unable to obtain supply from Mosaic at times during the POI,[291] we find that the record as a whole shows that the significant volume of cumulated subject imports contributed to oversupply conditions in a declining market and had significant price-depressing effects on prices in the U.S. market in 2019.[292]  Additionally, as discussed in greater detail below, these prices remained at depressed levels in 2020 before the petitions were filed and increased sharply as subject imports exited the market.

Respondents argue that the price declines were attributable to declines in global prices and U.S. demand, rather than subject imports.[293]  Although those factors may have affected

---

[291] *See, e.g.*, Gavilon Prehearing Br. at 20-24, Exhibit 7; IRM Prehearing Br. at 12-15, 18-19; IRM Posthearing Br. at Exhibit 4; ADM Posthearing Br. at Exhibit 1; Hearing Tr. at 205-206 (Coppess); Response of [ ▮ ], CR/PR at Table V-11.

[292] OCP contends that the lack of injurious oversupply of subject imports is documented by the analyses of Mr. Dougan and Mr. Rahm.  OCP Second Remand Comments at 14.  We disagree.  With respect to Mr. Dougan's analysis cited by OCP, it does not include subject import volumes or inventories and actually appears to corroborate our findings that [ ▮

▮ ] and that [ ▮

▮ ].  OCP Posthearing Br., Response to Questions at 22-23.  OCP also omits that both witnesses conceded that there was a "temporary oversupply" in the U.S. market, Hearing Tr. at 215 (Dougan), and a "hangover of phosphate inventories after the 2019 spring season," Hearing Tr. at 192 (Rahm).  Indeed, Mr. Rahm continued "{t}he New Orleans price traded at a large discount to the Brazilian price, reflecting this imbalance.  *Id.*

[293] OCP Prehearing Br. at 77, 88; PhosAgro Prehearing Br. at 26; Koch Prehearing Br. at 2; EuroChem Prehearing Br. at 2; OCP Posthearing Br. at 9-11; PhosAgro Posthearing Br. at 12-13; Koch Posthearing Br. at 1, 4-7.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

price movements in the U.S. market, we continue to find that they do not negate the significant role that subject imports played in depressing domestic prices.  As shown by the evidence previously discussed, notwithstanding that demand in the U.S. market began to decline in the fall of 2018 and remained low throughout 2019, cumulated subject imports continued to enter the U.S. market at elevated levels, contributing to oversupply conditions, and having depressing effects on U.S. prices.  Respondents' arguments also fail to account for the fact that prices in other global markets were also affected by exports from subject producers in Morocco and Russia, collectively the world's largest exporters of phosphate fertilizers.[294]  Moreover, in 2019, U.S. prices were lower than and decreased by more than global phosphate fertilizer prices.[295] Although U.S. prices began to increase in the beginning of 2020 as weather conditions improved, they remained at levels lower than those that existed in 2017 and 2018 until after the filing of the petitions at the end of June 2020, at which point they sharply increased to levels above other global markets.[296]

Thus, for the foregoing reasons, we find that subject imports from Morocco and Russia depressed prices to a significant degree.

We next turn to the court's conclusion, as well as respondent interested parties'

---

[294] CR/PR at Table VII-14.

[295] Derived from CR/PR at Tables V-4-5 and Figure V-7; *see also* OCP Posthearing Br. at 11, Responses to Questions pp. 67-69; *see also* CR/PR at Table V-11 (response of U.S. purchaser [ ████ ], reporting that U.S. producers reduced prices by an estimated [ ██ ] percent due to competition from subject imports:  [ ██████████████████ ]).

[296] CR/PR at Tables V-4-5.  Cumulated subject imports declined substantially after the filing of the petitions, and subject imports from Morocco ceased entirely beginning in August 2020.  CR/PR at Table IV-6.  Total import volumes of phosphate fertilizers were lower in the third quarter of 2020 than in the third quarters of every other year in the POI.  *See id.*

75

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

arguments, that the Commission's finding of significant price depression is undermined by the fact that Mosaic is most frequently identified by parties to be the price leader.[297]  As an initial matter, we note that the Commission questionnaires define "price leader" as "as (1) one or more firms that initiate a price change, either upward or downward, that is followed by other firms, or (2) one or more firms that have a significant impact on prices.  *A price leader is not necessarily the lowest-priced supplier*."[298]  Accordingly, a price leader may not be the lowest priced supplier.  More importantly, the fact that a firm might be identified as a price leader does not mean that its pricing decisions are insulated from competition from other market suppliers or from pricing pressure caused by an oversupplied market.[299]  Indeed, reviewing some of the responses of purchasers that identified Mosaic as a price leader, including those identified by OCP,[300] makes this abundantly clear.  For example, OCP identified [      ] and [      ] as purchasers that identified Mosaic as a price leader.  Notwithstanding that, [

].[301]  OCP also identified [        ] as a purchaser that identified Mosaic as a price leader; [

]

---

[297] *OCP III*, Slip Op. 25-51 at 43-44.

[298] Purchaser Questionnaire at III-26.

[299] *See, e.g.,* CR/PR at V-6.  The Court of International Trade has acknowledged that that the presence or absence of price leadership is not of itself decisive or determinative.  *See Nucor Corp. v. United States*, 318 F. Supp. 2d 1207, 1257 (Ct. Int'l Trade 2004) (Commission "not required to evaluate if price leadership was the reason why underselling may have decreased or increased in its consideration of underselling.").

[300] OCP Second Remand Views at 19.

[301] [      ] Purchaser Questionnaire Response at II-4, III-26, III-29; [      ] Purchaser Questionnaire Response at II-4, III-26, III-29.

76

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

## Public Version

██████████████████████████████████████████ ].[302]  Similarly, [ ██████████ ]

reported that [ ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████ ][303]  Furthermore, as discussed above, the record indicates that Mosaic

experienced competitive pressure from substantial volumes of cumulated subject imports,

which contributed to the conditions of oversupply and placed downward pressure on prices.

Additionally, to the extent that the court has found that the Commission's price

depression analysis is undermined because it "does not grapple with the fact that imports only

undersold the domestic product in twenty percent of instances,"[304] the court appears to have

overlooked that the Commission's underselling and price depression analyses are separate and

distinct.  *See Altx, Inc. v. United States*, 25 CIT 1100, 1109, 167 F. Supp. 2d 1353, 1365 (2001)

(stating that the Commission's underselling and depression analyses are "discrete" and must

not be "collapse{d}").  Indeed, a finding of significant underselling is not required for the

Commission to find significant price effects or make an affirmative injury determination.  *See,

e.g.*, *OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291, 1302 (Ct. Int'l Trade 2021) ("{T}he …

Federal Circuit … and this Court have made clear that the Commission may rely on evidence

*either* of significant underselling *or* significant price suppression or depression to support a

finding for adverse price effects."); *Siemens Energy*, 38 CIT at 898, 992 F. Supp. 2d at 1334-35

(sustaining the Commission's significant price effects finding based solely on price suppression,

---

[302] [ ████████ ] Purchaser Questionnaire Response at II-4, III-26, IV-3.
[303] [ ██████ ] Purchaser Questionnaire Response at III-26.
[304] Second Remand Order at 48-49; see also Koch Second Remand Comments at 6.

77

*Public Version*

and holding that the Commission "did not need to find" underselling in these circumstances),

*aff'd*, 806 F.3d 1367 (Fed. Cir. 2015); *Cemex, S.A. v. United States*, 16 CIT 251, 260–61, 790 F.

Supp. 290, 299 (1992) ("To require findings of underselling would be inconsistent with the

proposition that price suppression or depression is sufficient."), *aff'd*, 989 F.2d 1202 (Fed. Cir.

1993).  Thus, neither the prevalence of overselling nor the fact that we did not make a finding

of significant underselling undermines our finding that subject imports depressed prices to a

significant degree.

In the same vein, the fact that we did not make a finding of significant underselling does

not undermine our finding that record evidence demonstrated that subject imports were at

times priced lower, as OCP claims.[305]  Our finding that subject imports were at times low priced

was not based solely on the instances of underselling shown by the pricing comparisons.

Rather, we have performed a comprehensive analysis of the role of subject import prices on

prices for the domestic product, based on the totality of record evidence.[306]  We have found

the close comparability of subject and domestic prices to be consistent with the high degree of

substitutability and price transparency that existed in the U.S. market.[307]  As discussed above,

phosphate fertilizer prices are reported in various trade publications, which gather market

intelligence, including from market participants, many of which reported providing their prices

to these publications.  This price information is published on a daily or weekly basis, and quickly

transmitted throughout the U.S. market, with the majority of U.S. producers and purchasers, as

well as some importers, reporting that they rely upon these publications in setting or

---

[305] OCP Second Remand Comments at 16-17.
[306] First Remand Views at 20-21, 35-36.
[307] First Remand Views at 20-21, 35-36.

78

APPX0022018

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

negotiating prices.[308]

We have also considered whether subject imports prevented price increases of the domestic like product, which otherwise would have occurred to a significant degree.  The record indicates the domestic industry's ratio of COGS to net sales decreased from [　] percent in 2017 to [　] percent in 2018 and then increased to [　] percent in 2019; it was higher in interim 2020 at [　] percent than in interim 2019 at [　] percent.[309]

Between 2017 and 2018, the domestic industry's total COGS decreased by [　] percent.  The domestic industry's net sales volume, however, also decreased, contributing to the industry's unit COGS increasing from $[　] per short ton in 2017 to $[　] per short ton in 2018.  Specifically, the domestic industry's unit raw material costs increased from $[　] per short ton in 2017 to $[　] per short ton in 2018, and the industry's unit other factory costs increased from $[　] per short ton in 2017 to $[　] per short ton in 2018, while the industry's unit direct labor costs remained the same at $[　] per short ton in 2017 and 2018.[310] Notwithstanding this, the domestic industry's COGS to net sales ratio declined because the domestic industry's unit net sales value, which increased from $[　] per short ton in 2017 to $[　] per short ton in 2018, exceeded the increase in the domestic industry's unit COGS.[311]

Between 2018 and 2019, the domestic industry's total COGS decreased by another [　] percent, while the domestic industry's net sales volume declined by [　] percent and net sales value declined by [　] percent, resulting in an increase in the industry's COGS to

---

[308] First Remand Views at 35-36.
[309] CR/PR at Tables IV-2, VI-1, and C-1.
[310] CR/PR at Table VI-1.
[311] CR/PR at Table VI-1.

79

*Public Version*

net sales ratio.[312]  The domestic industry's unit COGS increased from $[   ] per short ton in 2018 to $[   ] per short ton in 2019, with its unit raw material costs increasing from $[   ] per short ton in 2018 to $[   ] per short ton in 2019, and the industry's unit other factory costs increasing from $[   ] per short ton in 2018 to $[   ] per short ton in 2019, while the industry's unit direct labor costs decreased from $[   ] per short ton in 2017 and 2018 to $[   ] per short ton in 2019.[313]  Thus, while unit COGS increased slightly by $[   ] per short ton ([   ]) percent) from 2018 to 2019, the domestic industry's net sales unit value declined substantially, by $[   ] per short ton ([   ] percent), from $[   ] per short ton in 2018 to $[   ] per short ton in 2019,[314] resulting in a substantial [   ] percentage point increase in the domestic industry's COGS to net sales ratio.[315]  This occurred as poor weather conditions led to a decline in U.S. demand in 2019, U.S. importers further increased the share of subject imports in the U.S. market (up [   ] percentage points from 2018), and a significant volume of cumulated subject imports continued to enter the U.S. market at competitive and lower prices, putting additional pressure on domestic prices, and substantially contributing to oversupply conditions.  Although the domestic industry attempted to offset the collapse in U.S. prices by idling capacity and curtailing production,[316] the record as a whole indicates that in a highly transparent market, competitively and lower priced subject imports contributed to the market

---

[312] CR/PR at Table VI-1.
[313] CR/PR at Table VI-1.
[314] CR/PR at Table VI-1.
[315] CR/PR at Table C-1.
[316] CR/PR at Table III-3; Mosaic Prehearing Br. at 2, Mosaic Posthearing Br. at Responses to Questions pp. 10-23, Exhibits 17-19.

80

*Public Version*

imbalance between supply and demand and, as found above, depressed prices to a significant

degree.[317]

In sum, for the foregoing reasons, we find that subject imports from Morocco and

Russia depressed prices to a significant degree.  We thus continue to conclude that subject

imports had significant price effects.

### D.        Impact of the Subject Imports

Section 771(7)(C)(iii) of the Tariff Act provides that the Commission, in examining the

impact of the subject imports on the domestic industry, "shall evaluate all relevant economic

factors which have a bearing on the state of the industry."[318]  These factors include output,

sales, inventories, capacity utilization, market share, employment, wages, productivity, profits,

cash flow, return on investment, ability to raise capital, research and development, and factors

affecting domestic prices.  No single factor is dispositive and all relevant factors are considered

"within the context of the business cycle and conditions of competition that are distinctive to

the affected industry."[319]

As we observed in our Original Views and First Remand Views, the domestic industry's

output indicators declined from 2017 to 2019, but were higher in interim 2020 than in interim

---

[317] Mosaic Prehearing Br. at 59-63; Mosaic Posthearing Br. at 10-11.  Mosaic states that in addition to idling facilities and curtailing production, it also increased exports because the U.S. market could not absorb additional supply.  Mosaic Posthearing Br. at 11.

[318] 19 U.S.C. § 1677(7)(C)(iii); *see also* SAA at 851 and 885 ("In material injury determinations, the Commission considers, in addition to imports, other factors that may be contributing to overall injury.  While these factors, in some cases, may account for the injury to the domestic industry, they also may demonstrate that an industry is facing difficulties from a variety of sources and is vulnerable to dumped or subsidized imports.").

[319] 19 U.S.C. § 1677(7)(C)(iii).  This provision was amended by the Trade Preferences Extension Act of 2015, Pub. L. 114-27.

81

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*



2019.[320]  Specifically, the domestic industry's share of apparent U.S. consumption declined from

[   ] percent in 2017 to [   ] percent in 2018 and [   ] percent in 2019; its market share

was higher in interim 2020, at [   ] percent than in interim 2019, at [   ] percent.[321]  Its

production decreased by [   ] percent between 2017 and 2019 from [   ] short

tons in 2017 to [   ] short tons in 2018 to [   ] short tons in 2019; its

production was higher in interim 2020, at [   ] short tons, than in interim 2019, at [  

  ] short tons.[322]  Its capacity declined by [   ] percent from 2017 to 2019, from [  

  ] short tons in 2017 to [   ] short tons in 2018 and [   ] short tons in

2019,[323] and its capacity utilization increased by [   ] percentage points from [   ] percent

in 2017 to [   ] percent in 2018 to [   ] percent in 2019.[324]  The domestic industry's

capacity was higher in interim 2020, at [   ] short tons, than in interim 2019, at [  

  ] short tons, while its capacity utilization was lower in interim 2020, at [   ] percent,

than in interim 2019, at [   ] percent.[325]

    The domestic industry's U.S. shipments declined by [   ] percent between 2017 and

2019, from [   ] short tons in 2017 to [   ] short tons in 2018 and [  

---

[320] Original Views at 49-53; First Remand Views at 59-60.  As previously noted, after the petitions were filed at the end of June 2020, subject imports decreased in the U.S. market.  Mosaic restarted production at previously idled facilities, diverted shipments that had been destined for export markets, and drew down inventories, for a total of [   ] short tons in additional sales in interim 2020 compared to interim 2019.  Mosaic U.S. Producer Questionnaire Response at IV-16.  [  

  ] also reported more U.S. shipments in interim 2020 than in interim 2019.  [   ] U.S. Producer Questionnaire Responses at II-7; [   ] U.S. Producer Questionnaire Responses at II-7. Consequently, the domestic industry's market share, capacity, production, and U.S. shipments were higher in interim 2020 than in interim 2019.  CR/PR at Table C-1.

[321] CR/PR at Tables IV-8, C-1.
[322] CR/PR at Tables III-4, C-1.
[323] CR/PR at Tables III-4, C-1.
[324] CR/PR at Tables III-4, C-1.
[325] CR/PR at Tables III-4, C-1.

APPX0022022

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*



[        ] short tons in 2019; its U.S. shipments were higher in interim 2020, at [            ] short tons, than in interim 2019, at [           ] short tons.[326] The domestic industry's end-of-period inventories increased by [    ] percent from 2017 to 2019, from [           ] short tons in 2017 to [          ] short tons in 2018 and 2019; its end-of-period inventories were lower in interim 2020, at [          ] short tons, than in interim 2019, at [          ] short tons.[327] The domestic industry's ratio of end-of-period inventories to total shipments increased steadily from 2017 to 2019 but was lower in interim 2020 than in interim 2019.[328]

Employment indicators for the domestic industry also declined between 2017 and 2019. The domestic industry's number of production and related workers ("PRWs") fell from [      ] in 2017 to [      ] in 2018 and [      ] in 2019; its number of PRWs was lower in interim 2020, at [      ], than in interim 2019, at [      ].[329] Total hours worked,[330] wages paid,[331] and productivity[332] also fell from 2017 to 2019. Total hours worked and wages paid were lower in interim 2020 than in interim 2019 while productivity was higher between the interim periods.[333]

The domestic industry's net sales, gross profit, operating income, and net income

---

[326] CR/PR at Tables III-6, C-1.

[327] CR/PR at Tables III-7, C-1.

[328] CR/PR at Tables III-7, C-1. The ratio of end-of-period inventories to U.S. shipments was [    ] percent in 2017, [    ] percent in 2018, and [    ] percent in 2019. It was lower in interim 2020 at [    ] percent than in interim 2019 at [    ] percent. *Id.*

[329] CR/PR at Tables III-9; C-1.

[330] CR/PR at Tables III-9; C-1. Total hours worked decreased from [          ] hours in 2017 to [          ] hours in 2018 and [          ] hours in 2019. *See id.*

[331] CR/PR at Tables III-9; C-1. Wages paid decreased from $[          ] in 2017 to $[          ] in 2018 to $[          ] in 2019. *See id.*

[332] CR/PR at Tables III-9; C-1. Productivity per 1,000 hours decreased from [      ] short tons in 2017 to [    ] short tons in 2018 and [    ] short tons in 2019. *See id.*

[333] Total hours worked were [          ] hours in interim 2019 and [          ] hours in interim 2020. Wages paid were $[          ] in interim 2019 and $[          ] in interim 2020. Productivity was [    ] short tons in interim 2019 and [    ] short tons in interim 2020. CR/PR at Tables III-9; C-1.

APPX0022023

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

increased between 2017 and 2018, but deteriorated in 2019.  Most of the industry's financial indicators were lower in interim 2020 than in interim 2019.[334]  Specifically, the domestic industry's net sales by value increased from $[          ] in 2017 to $[          ] in 2018, then declined to $[          ] in 2019; its net sales by value was lower in interim 2020, at $[          ], than in interim 2019, at $[          ].[335]  Its gross profit increased from $[          ] in 2017 to $[          ] in 2018, then declined to [          ]; its gross profit was lower in interim 2020, at [          ], than in interim 2019, at [          ].[336]  The industry's operating income increased from $[          ] in 2017 to $[          ] in 2018, then declined to [          ] in 2019; its operating income was lower in interim 2020, at [          ], than in interim 2019, at [          ].[337]  The ratio of operating income to net sales increased from [   ] percent in 2017 to [   ] percent in 2018, then declined to [          ] percent in 2019; it was lower in interim 2020, at [          ] percent, than in interim 2019, at [          ] percent.[338]  The domestic industry's net income increased from $[          ] in 2017 to $[          ] in 2018, then declined to [          ]; its net income was higher in interim 2020, at [          ], than in interim 2019, at [          ].[339]

---

[334] U.S. prices at the beginning of 2019 were higher than later in the year.  Consequently, interim 2020 prices, although increasing substantially in the last three months of the POI after the petitions were filed, remained at lower levels than in interim 2019, which, in turn resulted in lower gross profit levels despite increasing net sales quantity and lower COGS.  CR/PR at VI-9, Tables V-4-5, VI-1-2.

[335] CR/PR at Tables VI-1, C-1.

[336] CR/PR at Tables VI-1, C-1.

[337] CR/PR at Tables VI-1, C-1.

[338] CR/PR at Tables VI-1, C-1.

[339] CR/PR at Tables VI-1, C-1.  The ratio of net income to net sales increased from [   ] percent in 2017 to [   ] percent in 2018, then declined to [          ] percent in 2019; it was slightly higher in interim 2020 at [          ] percent than in interim 2019, at [          ] percent.  *Id.*

84

APPX0022024



BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

Domestic producers' capital expenditures increased from $[          ] in 2017 to $[          ] in 2018 and $[          ] in 2019,[340] [341] while research and development expenses decreased each year, from $[          ] in 2017 to $[          ] in 2018 and $[          ] in 2019.[342]  [                                        ] also reported negative effects on investment and growth and development that [      ] attributed to subject imports.[343]

As discussed above, we have found that the volume of cumulated subject imports and the increase in the volume were significant during the period of investigation, and subject imports gained [      ] percentage points in market share at the expense of the domestic industry from 2017 to 2019 ([      ] percentage points from 2017-2018 and [      ] percentage points from 2018-2019).[344]  The record also shows that the volume of cumulated subject imports increased by one million short tons between 2017 and 2018, and as demand began to decline in the fall of 2018, U.S. importers' inventories reached their highest level of those two years.  Notwithstanding these substantial inventories and declining demand, subject imports surged into the U.S. market in January 2019 and continued to flow into the U.S. market in

---

[340] CR/PR at Tables VI-6, C-1.  The domestic producers' capital expenditures were higher in interim 2020, at $[          ], than in interim 2019, at $[          ].  *See id.*
[341] All three U.S. producers reported [                                        ].  Specifically, Mosaic explained that [                                        ].  Nutrien reported that its capital expenditures related to [                                        ].  Simplot reported that [                                        ].  CR/PR at Table VI-7.
[342] CR/PR at Tables VI-6, C-1.  The domestic producers' research and development expenses were lower in interim 2020, at $[          ], than in interim 2019, at $[          ].  *See id.*
[343] CR/PR at Tables VI-9-10.
[344] CR/PR at Table C-1.

APPX0022025

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

substantial quantities, reaching 2.7 million short tons that year, even as demand declined in 2019.[345]  U.S. importers' quarterly inventories reached their highest level in March 2019, but subject imports nonetheless continued to enter the U.S. market in the latter part of 2019 in excess of any purported need to replenish depleted inventories in the latter part of 2019. Moreover, as previously discussed, the record shows that regardless of the "unidirectional" movement of subject importers' inventories, the volumes of subject imports entering the U.S. market had significant depressing effects on U.S. prices.  Record evidence shows subject imports being offered and sold at lower prices, domestic producers lowering prices to compete with subject imports, and certain purchasers purchasing subject imports rather than the domestic like product for price reasons.  Consequently, cumulated subject imports – including through their significant volumes that contributed to the oversupply conditions in the U.S. market during the POI at competitive and lower prices – depressed prices in the U.S. market to a significant degree.

The downward pricing pressure exerted by subject imports caused the domestic industry's revenues to be lower than they would have been otherwise.  The domestic industry's U.S. shipment average unit value declined to $[ ▮ ] per short ton in 2019, down from $[ ▮ ] per short ton in 2018 and $[ ▮ ] per short ton in 2017.[346]  The domestic industry's sales revenues declined considerably in 2019 (down from 2018 [ ▮ ] percent by quantity and [ ▮ ] percent by value) along with its profitability as its COGS to net sales ratio rose above [ ▮ ] percent.[347]  Sales revenues and profitability continued to be weak and the industry's COGS to

---

[345] CR/PR at Tables IV-2, IV-6.
[346] CR/PR at Table C-1.
[347] CR/PR at Tables VI-1, C-1.

APPX0022026

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

net sales ratio remained above [ ▮ ] percent into interim 2020.[348]  As a consequence, we find

that subject imports had a significant impact on the domestic industry.

We have evaluated the above factors within the context of the business cycle and

conditions of competition distinctive to the industry.  In doing so, we note that, in many

investigations, there are other economic factors at work, some or all of which may also be

having adverse effects on the domestic industry.  Such economic factors might include

nonsubject imports; changes in technology, demand, or consumer tastes; competition among

domestic producers; or management decisions by domestic producers.  The legislative history

explains that the Commission must examine factors other than subject imports to ensure that it

is not attributing injury from other factors to the subject imports, thereby inflating an otherwise

tangential cause of injury into one that satisfies the statutory material injury threshold.[349]  In

performing its examination, however, the Commission need not isolate the injury caused by

other factors from injury caused by unfairly traded imports.[350]  Nor does the "by reason of"

---

[348] CR/PR at Table VI-1, C-1.

[349] The Statement of Administrative Action for the Uruguay Round Agreements Act ("SAA") at 851-52 ("{T}he Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports."); S. Rep. 96-249 at 75 (1979) (the Commission "will consider information which indicates that harm is caused by factors other than less-than-fair-value imports."); H.R. Rep. 96-317 at 47 (1979) ("in examining the overall injury being experienced by a domestic industry, the ITC will take into account evidence presented to it which demonstrates that the harm attributed by the petitioner to the subsidized or dumped imports is attributable to such other factors;" those factors include "the volume and prices of nonsubsidized imports or imports sold at fair value, contraction in demand or changes in patterns of consumption, trade restrictive practices of and competition between the foreign and domestic producers, developments in technology and the export performance and productivity of the domestic industry"); *accord Mittal Steel*, 542 F.3d at 877.

[350] SAA at 851-52 ("{T}he Commission need not isolate the injury caused by other factors from injury caused by unfair imports."); *Taiwan Semiconductor Industry Ass'n,* 266 F.3d at 1345 ("{T}he Commission need not isolate the injury caused by other factors from injury caused by unfair imports ... . Rather, the Commission must examine other factors to ensure that it is not attributing injury from other

(*continued*...)

87

*Public Version*

standard require that unfairly traded imports be the "principal" cause of injury or contemplate that injury from unfairly traded imports be weighed against other factors, which may be contributing to overall injury to an industry.[351] It is clear from the statute and decisions of the Federal Circuit and court of International Trade that the existence of injury caused by other factors does not compel a negative determination.[352]

Within this framework, we have considered respondents' arguments that the domestic industry's poor performance was not caused by subject imports, but rather was the result of other factors. Specifically, we considered the role of declining U.S. demand due to unusually poor weather conditions, which began in the latter part of 2018 and affected three consecutive application sessions – fall 2018, spring 2019, and fall 2019.[353] Although demand declines in 2019 may have exerted some degree of downward force on the domestic industry's prices, we again note that the Commission need not isolate the injury caused by other factors from injury caused by subject imports and that the "by reason of" standard does not require that unfairly traded imports be the "principal" cause of injury or contemplate that injury from unfairly

---

sources to the subject imports."); *Asociacion de Productores de Salmon y Trucha de Chile AG v. United States*, 180 F. Supp. 2d 1360, 1375 (Ct. Int'l Trade 2002) ("{t}he Commission is not required to isolate the effects of subject imports from other factors contributing to injury" or make "bright-line distinctions" between the effects of subject imports and other causes.); *see also Softwood Lumber from Canada*, Inv. Nos. 701-TA-414 and 731-TA-928 (Remand), USITC Pub. 3658 at 100-01 (Dec. 2003) (Commission recognized that "{i}f an alleged other factor is found not to have or threaten to have injurious effects to the domestic industry, *i.e.*, it is not an 'other causal factor,' then there is nothing to further examine regarding attribution to injury"), *citing Gerald Metals,* 132 F.3d at 722 (the statute "does not suggest that an importer of LTFV goods can escape countervailing duties by finding some tangential or minor cause unrelated to the LTFV goods that contributed to the harmful effects on domestic market prices.").

[351] S. Rep. 96-249 at 74-75; H.R. Rep. 96-317 at 47.

[352] *See Nippon Steel Corp.*, 345 F.3d at 1381 ("an affirmative material-injury determination under the statute requires no more than a substantial-factor showing. That is, the 'dumping' need not be the sole or principal cause of injury.").

[353] OCP Prehearing Br. at 108-116; Gavilon Prehearing Br. at 10-11, 64-65; PhosAgro Prehearing Br. at 21-22; IRM Prehearing Br. at 31; PhosAgro Posthearing Br. at 9-10.

88

traded imports be weighed against other factors, which may be contributing to overall injury to an industry.  As described above, the volume of cumulated subject imports and inventories of such merchandise increased significantly from 2017 to 2018, and remained significant in 2019 despite decreased apparent U.S. consumption.  In the latter half of 2019, as demand remained low due to further adverse weather conditions, U.S. importers continued to maintain elevated levels of inventories and continued to import more subject merchandise than was needed to replenish any depletion of these inventories.  Moreover, as previously discussed, contemporaneous trade publications and U.S. purchaser questionnaire responses documented the adverse impact of imports on U.S. prices.  Therefore, the adverse weather conditions that affected the U.S. market and prompted a decline in demand do not rebut the fact that the industry's performance would have been stronger in the absence of the significant volume of subject imports from Morocco and Russia that exerted downward pricing pressure on the domestic industry.  In other words, we have observed material injury to the domestic industry by reason of subject imports that is distinct from the declining demand so as to ensure that we are not attributing injury from declining demand to the subject imports.[354]

To comply with the court's first remand instructions, we assessed whether "fertilizer was 'practically unavailable from U.S. sources' to supply high-demand regions in 2019 because

---

[354] We also find unpersuasive PhosAgro's assertions that public statements by Mosaic indicate a lack of causation by subject imports.  PhosAgro Second Remand Comments at 4-5.  Any such statements are outweighed by the record evidence establishing that the domestic industry was materially injured by reason of subject imports, including public and internal statements by Mosaic, discussed below.  Mosaic Posthearing Br., Response to Commission Questions at 10-20, Exhibits 11-22.  Additionally, Mosaic offered reasonable and credible explanations regarding sensitivities and concerns relating to its public statements.  Mosaic Posthearing Br., Response to Commission Questions at 12-13.

89

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

doing so would not have been economically viable."[355]  As discussed above, although we did so

in the context of our volume analysis there, we repeat and incorporate that discussion in the

proper context of our impact analysis here to ensure that we are not attributing injury from

other factors to the subject imports.  Despite declines in the domestic industry's capacity during

the POI,[356] the domestic industry had excess capacity throughout the POI, and in 2019, its

capacity utilization was [    ] percent, meaning that the domestic industry had [        ]

short tons of excess capacity in 2019.[357]

   We also note that, in addition to this excess capacity, domestic producers maintained

---

[355] *See* Remand Order at 41.

[356]  As described in our Original Views, the domestic industry's capacity decreased from [    ] short tons in 2017 to [        ] short tons in 2018 and [        ] short tons in 2019, and the declines in the domestic industry's capacity were attributed to Mosaic.  Original Views at 23, 49; CR/PR at Table III-4.  The larger decline from 2017 to 2018 coincided with its idling of the Plant City facility in December 2017.  Additionally, we note that, contrary to respondents' claims, this did not cause a "supply gap" that explains the increase subject import volume, as discussed above.  The domestic industry's capacity declined to a lesser extent from 2018 to 2019, but as described above, even with these reductions in capacity, the domestic industry maintained excess capacity.  We further note that Simplot maintained the same level of capacity throughout the POI, while Nutrien increased capacity from 2017 to 2018 and maintained the same level of capacity from 2018 to 2019.  CR/PR at Table III-4.  Moreover, we observe that in 2019, Nutrien was reported in an *Argus* article as "refer{ing} to potential further US production cuts as 'a futile game' . . ., stating that any cut would simply result in greater imports."  Petitions, Exhibit I-43.  The article continues –

> Nutrien argues that the market is weak because of fundamental structural oversupply and that further cuts simply signal to OCP, Russian and other producers to ship to the US.  It is a clear message to its competitor, Mosaic, which accounts for around three-quarters of US phosphates production.  It is rare for any producer to speak in such plain language, but the assessment is spot on....  Nutrien's view that supply cuts in the US will not deter shipments from competitors is correct but Mosaic has little choice....  The supplier is now left with the uncomfortable decision of whether to cut production in a bid to stop losing money and eroding shareholder value, or cede domestic market share to foreign lower-cost producers.

*Id.*

[357] CR/PR at Tables III-4, C-1.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

substantial inventories in 2019.  Domestic producers' end-of-period inventories by quarter were [          ] short tons in March 2019, [          ] short tons in June 2019, and [     ] short tons in September and December 2019.[358]  Furthermore, the supplementary questionnaire information obtained in the first remand proceedings indicates that domestic producers maintain these inventories [                                    ].[359]  We observe that the record both in the original investigations and as supplemented on remand shows that domestic producers rely upon [                                    ], and confirms that domestic producers [                                    ].[360]  Further, as shown above, Mosaic's reshipment of inventories was not limited to only the type of [               ] observed in the First Remand Views, but rather also included other [                                    ].[361]  The total reshipment quantities of domestic producers equated to approximately [   ] percent of the domestic industry's total U.S.

---

[358] CR/PR at Table D-1.

[359] *See* [                                    ].

[360] *See* [                    ].  Although we note that Mosaic reports that [                                    ].  Mosaic Domestic Producer Remand Questionnaire at 2(c).  Likewise, Simplot reports that [                                    ].  Simplot Domestic Producer Remand Questionnaire at 2(a) – 2(c).

[361] Mosaic Domestic Producer Remand Questionnaire at 2(b) – (c).

91

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

shipments during the POI,[362] and the domestic industry's total inventory reshipments during the POI were equivalent to approximately [    ] percent of the industry's total end-of-year inventories during the period, indicating that the movement of such inventories is a regular business practice and not a rare occurrence or just a theoretical possibility.  Furthermore, Mosaic [                                                ],[363] which shows how, unlike importers, the domestic industry was able to use alternate shipping methods and to draw upon its extensive distribution network to reach customers.

In sum, we find that the record from the original investigations and as supplemented in the first remand proceedings indicates that the domestic industry's excess capacity, substantial inventories, extensive inventory locations, expansive multi-modal distribution network, and demonstrated ability to move and relocate product where it was needed shows that domestic producers were well-positioned to supply the U.S. market in 2019.  Accordingly, having considered the conditions of competition as directed by the court, we find that the record does not indicate that fertilizer was "practically unavailable from U.S. sources."

We next address the court's remand order that the Commission "failed to account for {} detracting evidence" regarding Mosaic's alleged refusal to supply the U.S. market and only summarized Mosaic's arguments that "some of the supply issues identified . . . are with brokers/traders such as ADM and Koch that compete with the domestic industry for sales."[364]

---

[362] *Calculated from* Mosaic Domestic Producer Remand Questionnaire, Simplot Domestic Producer Remand Questionnaire, CR/PR at Table C-1.

[363] Mosaic Remand Domestic Producer Questionnaire at 2(c).

[364] Second Remand Order at 31-32.

APPX0022032

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

As an initial matter, we find that any decisions by Mosaic to prioritize its "loyal customers" over supplying trading companies that compete with it for the same customers as well as its decision to sell directly to customers, rather than selling through a "middleman," does not constitute a "refusal{} to supply the domestic market."  Moreover, the record does not show that Mosaic systematically refused to sell to these purchasers at all, as discussed in more detail below.

*ADM.*  The record does not indicate that Mosaic refused to supply fertilizers to ADM on a widespread basis consistently throughout the POI.[365]  As discussed in the Original and First Remand Views and repeated above, Mosaic disputes ADM's testimony that Mosaic "categorically refuses to sell to us," and Mosaic asserts that [ ██████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████ ].[366]  Indeed, ADM's own evidence supports Mosaic's claims.  At the hearing, the Director of Sales and Marketing for ADM testified that ADM "predominantly uses annual supply contracts so that we can effectively and cost-effectively manage deliveries throughout our distribution network.  However, Mosaic refuses to sell to us on this basis."[367]  Additionally, although the witness contended that "spot tons have never been available,"[368] ADM submitted an email exchange in May 2019, in which a Mosaic representative twice offered to supply ADM with fertilizer, but ADM complained that the price was "$10/ton

---

[365] Second Remand Order at 31-32; OCP Remand Comments at 10-11.
[366] First Remand Views at 70-71 n.296 (citing Mosaic Posthearing Br. at Responses to Questions pp. 86-87, Exhibits 53, 54).
[367] Hearing Tr. at 208-9 (Niederer).
[368] Hearing Tr. at 209 (Niederer).

93

## Public Version

above the market price at that time."[369]  This is consistent with the company's testimony that

"if {Mosaic} were willing to sell to us at market level prices, we would buy up to 400,000 tons

annually from them."[370]  That Mosaic may have declined to sell product on ADM's preferred

terms or at ADM's preferred prices does not constitute at a "categorical refusal to sell."  ADM

also submitted several unsupported claims, one email from 2017, one email from 2018, and

several exchanges that occurred after the petitions were filed.[371]  Given that the parties agree

that following the filing of the petitions, cumulated subject imports began exiting the U.S.

market,[372] which caused a supply shock, we find it appropriate to accord less weight to post-

petition indications of tight or restricted supply, which Mosaic acknowledged to have

occurred.[373]  Accordingly, we find that Mosaic's claims that it did not "categorically refuse" to

supply ADM are more credible and consistent with record evidence.

     *Gavilon.*  The record does not support a finding that Mosaic "generally declined

---

[369] ADM Posthearing Br. at 3, Exhibit 1.

[370] Hearing Tr. at 209 (emphasis added).

[371] ADM Posthearing Br. at 3, Exhibit 1.

[372] As explained in the Original and First Remand Views, the parties agreed that the filing of the petitions in June 2020, resulted in a large decrease in the volume of cumulated subject imports.  Original Views at 34 n.134; First Remand Views at 9 n.31; Mosaic Prehearing Br. at 43-44, 91; Simplot Prehearing Br. at 29-30, 34; Simplot Posthearing Br. at Responses to Questions pp. 53-54; Mosaic Posthearing Br. at Responses to Questions pp. 69-70; OCP Posthearing Br. at 12, Responses to Questions pp. 33, 67-73; EuroChem Posthearing Br. at 11; IRM Posthearing Br. at 8-9; PhosAgro Posthearing Br. at 12-13, Responses to Questions.  Some U.S. importers indicated that they stopped bringing in subject imports "because the buyers and the sellers agreed that the risk of 75 percent countervailing duties was higher than either of them wanted to take."  Hearing Tr. at 337 (Aranoff); see also EuroChem Posthearing Br. at 11 (stating that as a result of the filing of the petitions, it shifted its purchases of phosphate fertilizers from Morocco and Russia to other global sources); [        ] U.S. Purchaser Questionnaire Response at III-11 (reporting that Koch and IRM will not quote or import material until the countervailing duty decision is issued); [        ] U.S. Purchaser Questionnaire Response at III-11 (reporting that Helm, Koch, and OCP "cut off" supplying imported product to the U.S. market in the summer of 2020).

[373] First Remand Views at 16, 28, 61, 71-72.

94

*Public Version*

{Gavilon's} sales inquiries."[374]  [ ███████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████ ].[375]  Notwithstanding this, [ ████████████

███████████████████████████████ ].[376]

   *Koch*.  Similar to ADM, Scott McGinn, Executive Vice President for Koch Fertilizer,

testified at the hearing that "{i}n the last few years, we've frequently asked Mosaic if it would

sell us barges of phosphate fertilizers <u>at market prices</u>.  Mosaic has generally declined our

inquiries."[377]  Additionally, the contemporaneous documentation that Koch submitted

consisted of only one email from 2018, one from 2020 post-petition, and one from 2021.[378]

Based on the limited evidence that Koch presented, we find that the fact that Mosaic "generally

declined" to sell to Koch at Koch's preferred prices does not establish that Mosaic refused to

sell to it or to supply the U.S. market.  We likewise find unavailing OCP's argument that Koch's

[ ███████████████ ] from Mosaic demonstrate Mosaic's general and consistent unwillingness

to supply Koch as opposed to Koch's unwillingness to purchase fertilizers from Mosaic unless it

is at Koch's preferred prices.[379]

   *Heartland.*  As the court noted, Mr. Coppess, the retired Executive Vice President of

Heartland, testified that in May 2020, Mosaic refused to offer Heartland product . . . saying that

---

[374] Second Remand Views at 30.
[375] Mosaic Posthearing Br. at Responses to Questions, p. 85; [ ███████████████████████████
███████████ ]; Staff Conference Testimony of Brian Harlander President, Gavilon Fertilizer, LLC.
[376] [ ██████████████████████████████████████████████████████
██████████████████████████████████████████████████████████ ].
[377] Hearing Tr. at 196; *see also* OCP Second Remand Comments at 10; Koch Second Remand
Comments at 4-5.
[378] Koch Posthearing Br. at 4.
[379] OCP Second Remand Comments at 10-11.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

it was "out of the market at the present time."[380]  We note that Mr. Coppess appears to be discussing a specialty product, MES, and notwithstanding that statement as well as his reference to "some spot outages of MES," Mr. Coppess's testimony suggests that Mosaic continued to supply this product to Heartland.  Specifically, Mr. Coppess testified that "{a}lthough some importers offer homogeneous products like MES, . . . they're only available in quantities too large for us to take on top of our commitments to Mosaic."[381]  We further note that Heartland does not appear to be a significant purchaser in the U.S. market, as it was not listed as such by domestic producers or importers and did not submit a purchaser questioner.

As discussed above, although some purchasers reported being unable to obtain supply from Mosaic at times during the POI,[382] we find that the record as a whole indicates that subject imports contributed significantly to oversupply conditions in a declining market and had significant price-depressing effects on prices in the U.S. market in 2019, and these prices remained at depressed levels in 2020 before the petitions were filed and increased sharply as subject imports exited the market.  Given the details set out above regarding Mosaic's alleged refusals to supply the U.S. market, we find that we are not attributing to subject imports the injury caused by such alleged refusal.[383]

Nor have we misattributed to imports any alleged injury resulting from alleged supply issues.  Undermining assertions of widespread or problematic issues with supply from domestic

---

[380] Hearing Tr. at 205.

[381] Hearing Tr. at 206.

[382] *See, e.g.*, Gavilon Prehearing Br. at 20-24, Exhibit 7; IRM Prehearing Br. at 12-15, 18-19; IRM Posthearing Br. at Exhibit 4; ADM Posthearing Br. at Exhibit 1; Hearing Tr. at 205-206 (Coppess); Response of [ ███████████████ ], CR/PR at Table V-11.

[383] We also note that Mosaic is not the only domestic producer.

96

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

## Public Version

sources compared to subject sources, is the fact that the majority of purchasers reported that

the domestically produced product was either comparable or superior to product from

Morocco (16 of 24 firms) and Russia (20 of 23 firms) in availability and reliability of supply.[384]  As

previously discussed, most U.S. purchasers reported that the domestic product's U.S.

distribution network was superior to that of subject imports.[385]  The additional questionnaire

responses gathered in the first remand proceedings demonstrate the breadth and superiority of

U.S. producers' distribution networks, and that the domestic industry reported moving

inventories between locations while importers generally did not.[386]

Respondents argue that subject imports merely filled a supply gap created by Mosaic's

decision to idle its Plant City facility in December 2017,[387] which was exacerbated by Nutrien's

---

[384] CR/PR at Table II-9.  Although 16 of 28 purchasers reported experiencing supply constraints, we note that three of those purchasers ([              ], [                     ], and [        ]) specifically implicated U.S. importers only.  Moreover, three other purchasers ([       ], [       ], and [       ]) pointed to experiencing constraints from both U.S. importers and domestic producers. And one purchaser ([       ]) pointed to [                                                                                                ].  [                   ], [                        ], [        ], [          ], [        ], [          ], and [           ] U.S. Purchaser Questionnaire Responses at III-11.  Consequently, only nine of 28 responding purchasers – three of which were U.S. importers ([     ], [        ], and [      ]) of subject phosphate fertilizers and [                                                                ] – reported supply constraints with respect to the domestic like product only.

[385] CR/PR at Table II-9.

[386] *See* above Section II.A.3; Remand Questionnaire Responses at 2(a)-(c).

[387] OCP Prehearing Br. at 7, 24-32, 62-63; Gavilon Prehearing Br. at 20, 34, 60-63; IRM Prehearing Br. at 6-9, 19-20, 24-25; OCP Posthearing Br. at 2, 4, Responses to Questions pp. 14-15, 77-78; IRM Posthearing Br. at 5.  Respondents, referring to Mosaic's public statements regarding giving up "1 million tonnes of market here in the U.S. intentionally," argue that idling the facility was part of Mosaic's global strategy to invest in lower-cost production facilities overseas and bring in product from its joint venture in Saudi Arabia.  Mosaic firmly denies that it deliberately idled Plant City – which it states had accounted for 700,000 short tons of phosphate fertilizer sold into the U.S. market in 2017 – for this purpose, and we observe that Mosaic [                ] import from its joint venture in Saudi Arabia during the POI, and that imports from Saudi Arabia remained at much lower levels than subject imports and increased by substantially less than subject imports did during the POI.  CR/PR at IV-6 & Tables IV-2, C-1.  Mosaic claims that the increasing volumes of subject imports played a significant role

(*continued*...)

97

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

announcement in February 2018 that it would close its Redwater facility in Canada.[388]  Mosaic

concedes that after it had idled Plant City, it reduced its phosphate sales volume targets with

certain larger customers – specifically, with CHS by 200,000 tons and with Gavilon by 100,000

tons relative to the prior year – as well as to some [ █████████████ ],[389] we find that the

---

in driving prices to levels that made it uneconomical for it to operate its Plant City facility in 2017 in the first instance, and that its decision to idle Plant City ultimately helped balance global phosphate supply and demand, and tightened U.S. supply, which caused U.S. prices to increase in 2018.  This price increase, Mosaic asserts, was temporary as subject imports increased, causing a supply glut and declining prices.  Mosaic Prehearing Br. at 58-59; Mosaic Posthearing Br. at Responses to Questions pp. 10-17, Exhibit 14.  Incurring tens of millions of dollars in costs to idle Plant City, Mosaic states that it preserved the option of reopening the facility in the event of a significant, sustained improvement in market conditions, which did not occur due to subject imports.  It ultimately was forced to close the facility in June 2019.  Mosaic Posthearing Br. at Responses to Questions pp. 22-23.

[388] OCP Posthearing Br. at 3, Responses to Questions pp. 15-16; IRM Posthearing Br. at 3; Koch Posthearing Br. at 2.  In May 2019, Nutrien converted its phosphate operation in Redwater, Canada ([ ████████████████████████████████████████████ ]) to an ammonium sulfate plant.  CR/PR at III-3 and Table III-3.  As discussed above, Nutrien announced at the time that it was increasing production at its U.S. facilities in Aurora, North Carolina and White Springs, Florida in order to offset any reduction in supply from Redwater and ensure a continued supply of phosphate fertilizers to customers in Canada.  CR/PR at III-3; Mosaic Prehearing Br. at Exhibit 13.  Indeed, [ ████████████████████████████████ ], Nutrien [ ████████ ] its U.S. production between 2018 and 2019 and this increase was more than sufficient to cover its increase in exports that year.  CR/PR at Table III-4; PCS/Nutrien Domestic Producer Questionnaire at II-7.  The record also shows that between 2017 and 2018, Nutrien had increased its capacity by 400,000 short tons due to [ ████████ ████████████████████████████████████ ].  CR/PR at Table III-4 and III-5, n.18.

[389] [ ██████ ] U.S. Producer Questionnaire Response at IV-16.  Mosaic further states that [ ████████████████████████████████████████████████████████████████████ ████████████████████ ].  Moreover, Mosaic states that it [ ████████████████ ████████████████████████████████████████████████████████████████████ ████████████████ ].  Mosaic Posthearing Br. at Responses to Questions, p. 85.  Mosaic also disputes other allegations of its refusal or inability to supply product during the POI.  Specifically, Mosaic disputes ADM's testimony that Mosaic "categorically refuses to sell to us."  Mosaic asserts that [ ████ ████████████████████████████████████████████████████████████████████ ].  Mosaic Posthearing Br. at Responses to Questions pp. 86-87.  Mosaic also contends that some of the supply issues identified by respondent parties are with broker/traders such as ADM and Koch that compete with the domestic

(*continued*...)

98

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

## Public Version

volume of cumulated subject imports eclipsed any reduction in U.S. production as a result of Mosaic's idling of its facility in 2017. As discussed above, we find Mosaic's estimate that the idling of the Plant City facility reduced its supply to the U.S. market by approximately 700,000 tons to be credible and consistent with other record evidence. Additionally, notwithstanding this estimate, the record shows that Mosaic's U.S. shipments decreased by only [          ] short tons from 2017 to 2018. Subject imports, however, increased by 1 million short tons from 2017 to 2018, and U.S. shipments of subject imports increased by 604,981 short tons from 2017 to 2018 and by 753,638 short tons from 2017 to 2019.[390] Moreover, as record-setting precipitation impacted three planting seasons in a row beginning in the fall of 2018, the volume of subject imports persisted beyond levels demanded, resulting in a substantial buildup of U.S. importer inventories of subject imports and an oversupply condition in the U.S. market.[391] [392]

In the Second Remand Order, the court also indicated that the Commission should

---

industry for sales and rely on a small margin, high volume business model. Mosaic Final Comments at 6; *see also* Simplot Posthearing Br. at Responses to Questions pp. 9-10, 21, 64 and Exhibit 5. Mosaic further contends that it has never had a sales relationship with IRM, and that it [                                                                                ]. Mosaic Posthearing Br. at Responses to Questions, pp. 87-88. Mosaic argues that many of the other alleged instances identified by respondents dealt with post-petition supply issues experienced by U.S. importers after their Moroccan and Russian suppliers largely and abruptly exited the U.S. market. Mosaic asserts that there was a supply shock, and Mosaic responded by diverting shipments headed to export markets and drawing down inventories. Mosaic Posthearing Br. at Responses to Questions p. 84; Mosaic Final Comments at 6.

[390] CR/PR at Tables IV-2, IV-7.

[391] CR/PR at Tables IV-2, IV-7. Respondents argue that imported product was necessary to serve demand in U.S. regions unaffected by the poor weather conditions. However, as discussed above, the record shows that the volume of cumulated subject imports in 2019 exceeded what was necessary to replenish any depleted inventories.

[392] Moreover, while demand as measured by apparent U.S. consumption declined by [          ] short tons between 2018 and 2019, U.S. shipments of subject imports increased by [        ] short tons. CR/PR at Table C-1. Although apparent U.S. consumption was [              ] short tons lower in 2019 than in 2017, the volume of cumulated subject imports was 725 thousand short tons higher and importers' U.S. shipments of subject imports 743 thousand short tons higher in 2019 than in 2017. CR/PR at Tables IV-2, C-1.

APPX0022039

*Public Version*

address whether Mosaic had adopted a strategy of decreasing or forgoing business in the United States in favor of increasing its business in Brazil.[393]  As discussed in the Original Views and First Remand Views, Respondents claimed that Mosaic deliberately refused to supply U.S. customers in favor of exporting product.[394]  The record, however, does not support respondents' contention that domestic producers prioritized export shipments over U.S. shipments.  To the contrary, after subject imports declined in the U.S. market following the filing of the petitions, the domestic industry increased production and U.S. shipments, and also diverted export shipments to make additional product available to U.S. customers.[395]  Mosaic explains that its export markets, such as India and Brazil, help support year-round capacity utilization rates during the "off-season" periods in the United States[396] and are also used for "risk management" and to retain flexibility to ship product to third country markets during times when U.S. demand is low, such as in 2019.[397]  We likewise find that the evidence cited by the court also does not establish that Mosaic was decreasing business in the United States in favor of increasing business in Brazil.[398]  In both public statements as well as internal

---

[393] Second Remand Order at 32.

[394] Original Views at 69-70; First Remand Views at 68-69, citing Koch Prehearing Br. at 3-5; PhosAgro Prehearing Br. at 3; Koch Prehearing Br. at 2; EuroChem Prehearing Br. at 5; OCP Posthearing Br. at 6-7.

[395] CR/PR Tables III-5, IV-7; Mosaic Posthearing Br. at Responses to Questions p. 84; Mosaic Final Comments at 6.  Mosaic states that due to the abrupt departure of subject imports after the filing of the petitions and because facilities need time to ramp up production, it also had to import product from Saudi Arabia for the first time in late 2020.  Hearing Tr. at 103-104 (Jung); Mosaic Posthearing Br. at Response to Questions p. 17 n.165.

[396] Mosaic Prehearing Br. at 54.

[397] Mosaic Posthearing Br. at 14; Hearing Tr. at 118-120 (O'Rourke).

[398] Specifically, the court cites a statement by Gavilon's counsel regarding the 100,000 short ton reduction in supply from Mosaic to Gavilon after Plant City closed, as well as Mr. O'Rourke's statement in a 2019 analyst call stating that when Mosaic idled Plant City "that opened up a hole for some imports

(*continued*...)

100

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

communications Mosaic company officials referenced the connection between subject imports and Mosaic's various plant idlings and closures, including Plant City.  Consistent with those statements, Mosaic has rebutted claims that attempted to connect the Plant City idling to a strategic decision to shift production to Brazil.[399]  With respect to the news article cited by the court in which a Mosaic representative stated "I am excited at the prospect of Leading Mosaic's vastly expanding business in Brazil ….  This will be an ideal time for us to grow in the region…."[400] we note that the article goes on to say that "Mosaic expects that its U.S. phosphate production facilities will continue to operate at high rates in order to meet strong and growing global demand."[401]  Accordingly, we find that the evidence cited by the court does not establish that Mosaic was focusing on Brazil at the expense of its U.S. operations.  Nor does this article demonstrate that Mosaic intended to prioritize exports to Brazil over supplying the U.S. market given the record evidence discussed above showing that Mosaic diverted export shipments to supply the U.S. market when subject imports exited after the petitions were filed.  In any case, the domestic industry's exports do not explain the behavior of cumulated subject imports, which continued to enter the U.S. market at significant volumes oversupplying the

---

to increase. . . .  We went from 55%, 60% market share to a more sustainable 50-ish percent market share.  So we gave up 1 million tonnes of market share here in the U.S. intentionally."  Second Remand Order at 32-33 (citing Hearing Tr. at 270-71 (Wessel) and Gavilon Prehearing Br., 2019 Analyst Day Transcript)).  We note that, as discussed above in Section II.A.2, Mosaic explained in more detail that it estimated that the idling of Plant City in 2017 reduced the supply to the U.S. market by approximately 700,000 short tons, which is a reasonable estimate that is consistent with other record evidence.  Furthermore, we found that, notwithstanding the reasonableness of that estimate, Mosaic only reduced its U.S. shipments by [      ] short tons from 2017 to 2018.  PhosAgro cites the same earnings call and several others, characterizing them as "contemporaneous statements".  PhosAgro Second Remand Comments at 1-5.  We note, however, that these statements occurred in 2018, 2019, and 2020, and therefore were not contemporaneous with Mosaic idling of Plant City in 2017.

[399] Mosaic Posthearing Br., Response to Commission Questions at 10-20, Exhibits 11-22.
[400] Second Remand Order at 23 (citing Koch Prehearing Br., Exhibit 2).
[401] Koch Prehearing Br., Exhibit 2.

APPX0022041

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Public Version*

market and exerting downward pressure on domestic prices.

We also find that the record does not support respondents' arguments that the domestic industry's financial declines were due to its cost challenges.[402]  As previously discussed, all major U.S. producers are vertically integrated with respect to the main raw material inputs used to produce phosphate fertilizers – sulfur, ammonia, and phosphate rock.[403]  To the extent domestic producers purchased certain quantities of raw materials,[404] this did not adversely impact the domestic industry's total COGS, which declined over the POI and was lower in interim 2020 than in interim 2019.[405]

Finally, we have also examined the role of nonsubject imports.  Nonsubject imports increased over the POI,[406] but they had a small presence in the U.S. phosphate fertilizer market.  Their market share fluctuated, increasing from [ ▓ ] percent in 2017 to [ ▓ ] percent in 2018, before declining to [ ▓ ] percent in 2019, for an overall increase of [ ▓ ] percentage points between 2017 and 2019.[407]  Subject imports, however, gained a larger amount, [ ▓ ] percentage points of market share, as [ ▓ ] percentage points of market share shifted from

---

[402] OCP Prehearing Br. at 113-115; EuroChem Prehearing Br. at 3-4.

[403] CR/PR at V-1.

[404] For instance, Mosaic states that it produces one-third of its ammonia, purchases another third on the open market, and acquires a third through a long-term contract with CF Industries.  Mosaic Posthearing Br. at Responses to Questions p. 95.

[405] CR/PR at VI-1.  Raw material costs increased from $[ ▓▓▓ ] in 2017 to $[ ▓▓▓ ] in 2018, then decreased to $[ ▓▓▓ ] in 2018 and were lower in interim 2020, at $[ ▓▓▓ ], than in interim 2019, at $[ ▓▓ ], even as production and sales were higher.  *See id.*

[406] CR/PR at Tables IV-2. Nonsubject imports increased from 184,104 short tons in 2017 to 608,805 short tons in 2018, then declined to 511,245 short tons in 2019; they were higher in interim 2020, at 581,585 short tons, than in interim 2019, at 380,491 short tons.  *See id.*

[407] CR/PR at Tables IV-8, C-1. Nonsubject imports' market share was lower in interim 2020, at [ ▓ ] percent, than in interim 2019, at [ ▓ ] percent.  *See id.*  Nonsubject imports did not fill the supply vacated when subject imports decreased following the filing of the petitions, as total import volumes of phosphate fertilizers were lower in the third quarter of 2020 than in the third quarters of every other year of the POI.  CR/PR at Table IV-6.

*Public Version*

domestic to import sources from 2017-2019 ([ ▮ ] percentage points from 2018-2019).[408]

Moreover, between 2018 and 2019 when demand and prices declined, subject import market share increased by [ ▮ ] percentage points (from 29.0 percent to 33.3 percent), while nonsubject import market share decreased by [ ▮ ] percentage points (from [ ▮ ] percent to [ ▮ ] percent).[409]  As discussed above, the record, including the volume of subject imports, information from purchaser questionnaire responses, and contemporaneous trade publications, indicates that subject imports contributed to oversupply conditions in the U.S. market and had significant depressing effects on U.S. prices.[410]  Thus, based on the available evidence, nonsubject imports cannot explain the magnitude of the adverse impact on the domestic industry.[411]

---

[408] CR/PR at Table C-1.

[409] CR/PR at Table C-1.  Subject and nonsubject import market shares were both lower in interim 2020 than in interim 2019, by [ ▮ ] percentage points and [ ▮ ] percentage points, respectively.  *Id.*

[410] *See, e.g.*, CR/PR at Table V-11.  Responding purchasers specifically discussed imports from Morocco and Russia and their impact on the U.S. market.  As previously discussed, subject imports from Morocco and Russia accounted for 84.1 percent of total import volume in 2019, up from 83.0 percent in 2018.  CR/PR at Table IV-2.  The volume of cumulated subject imports declined by 9.5 percent between 2018 and 2019, while the volume of nonsubject imports declined by 16.0 percent.  CR/PR at Table IV-2.  U.S. shipments of subject imports increased by 148,957 short tons, 6.2 percent, between 2018 and 2019, while U.S. shipments of nonsubject imports decreased by 11.8 percent during that time.  CR/PR at Table C-1.

[411] As noted above, nonsubject imports from Saudi Arabia increased each year of the POI until Saudi Arabia was the largest source of nonsubject imports by 2019.  CR/PR at IV-2.  While Mosaic has a 25 percent equity interest in MWSPC, a producer of phosphate fertilizers in Saudi Arabia, it was not the U.S. importer of nonsubject imports from Saudi Arabia until the last quarter of 2020.  CR/PR at IV-6; *see* Mosaic U.S. Importer Questionnaire Response at I-2a, II-2a.  It maintains that it had invested in the Saudi facility to serve India and other parts of Asia, not the U.S. market, as evidenced by the fact that after it had idled Plant City, it "imported *zero* phosphate fertilizer from Saudi Arabia," but rather "sold [ ▮ ] percent of its offtake from MWSPC in India."  Mosaic Posthearing Br. at Responses to Questions pp. 16-17.  The record indicates that India was the largest destination for exports from Saudi Arabia during the POI.  CR/PR at Table VII-13.  Mosaic's [ ██████████████████████████████████████████████████████████████████ ].  *See id.* at Responses to Questions p. 17 n.165.  Mosaic did so, rather than utilize its excess capacity because the "nature of phosphate fertilizer production makes it difficult to ramp up production quickly."  *See id.* at Responses to Questions pp. 24-26.

103

APPX0022043

*Public Version*

Accordingly, we continue to find that cumulated subject imports had a significant impact on the domestic industry.

## III.    Conclusion

For the foregoing reasons, we again determine that an industry in the United States is materially injured by reason of subject imports of phosphate fertilizers from Morocco and Russia that are subsidized by the governments of Morocco and Russia.

APPX0022044

# List 1, Doc. No. 314R – EDIS No. 859618

# Phosphate Fertilizers from

# Morocco and Russia

# Investigation Nos. 701-TA-650–

# 651 (Final) (Second Remand)

# Publication 5658 August 2025

# (Office of Investigations)

# Phosphate Fertilizers from Morocco and Russia

Investigation Nos. 701-TA-650–651 (Final) (Second Remand)

**Publication 5658**                                                                 **August 2025**

# U.S. International Trade Commission

# U.S. International Trade Commission

### COMMISSIONERS

**Amy A. Karpel, Chair**
**David S. Johanson**
**Jason E. Kearns**

---

Catherine DeFilippo

*Director of Operations*

---

*Staff assigned*

Calvin Chang, Investigator
Courtney McNamara, Attorney
Nathanael Comly, Supervisory Investigator

**Address all communications to**
**Secretary to the Commission**
**United States International Trade Commission**
**Washington, DC 20436**

APPX0022047

# U.S. International Trade Commission

Washington, DC 20436
*www.usitc.gov*

# Phosphate Fertilizers from Morocco and Russia

Investigation Nos. 701-TA-650–651 (Final) (Second Remand)



**Publication 5658**                                                          **August 2025**

APPX0022048

APPX0022049

*Public Version*

## Views of the Commission

By opinion and order dated April 22, 2025, the U.S. Court of International Trade, remanded the Commission's affirmative first remand determinations in *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final) (Remand), USITC Pub. 5490 (January 2024).[1]  Upon consideration of the Second Remand Order and evidence in the record of these investigations,[2] the Commission determines again that an industry in the United States is materially injured by reason of phosphate fertilizers from Morocco and Russia found by the U.S. Department of Commerce ("Commerce") to be subsidized by the governments of Morocco and Russia.[3]

## I.    Background

### A.  Procedural History

In March 2021, the Commission determined that an industry in the United States was materially injured by reason of subject imports from Morocco and Russia.[4]  The Commission found that the volume of cumulated subject imports and the increase in the volume were significant during the period of investigation ("POI").  Subject imports poured into the U.S. market over the POI and gained *** percentage points in market share from the domestic

---

[1] *OCP S.A. v. United States*, Consolidated Ct No. 21-00219, Slip Op. 25-51 (April 22, 2024) ("Second Remand Order").  In the first remand determinations, the Commission addressed the issues remanded by the Court as set out in *OCP S.A. v. United States*, Consolidated Ct No. 21-00219, Slip Op. 23-136 (Sept. 19, 2023) ("First Remand Order").

[2] The Commission did not find it necessary to reopen the record for additional information in order to address the Second Remand instructions.

[3] Commissioner Johanson again determines that an industry in the United States is not materially injured or threatened with material injury by reason of subject imports from Morocco and Russia.  *See* Dissenting Views of Commissioner David S. Johanson.

[4] *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final), USITC Pub. 5172 (March 2021) and accompanying Confidential Views ("Original Views").  Citations to the page numbers of the Original Views herein refer to the Confidential Views.

3

*Public Version*

industry.  Subject imports continued to enter the U.S. market at elevated levels in 2019 while demand declined in the second half of 2018 through 2019, causing an oversupply in the U.S. market and significantly depressing U.S. prices.  Due to the downward pricing pressure exerted by the oversupply of subject imports on U.S. prices, the domestic industry was forced to reduce prices, which in turn, caused its revenues to be lower than they would have been otherwise.  As a consequence, the Commission found that subject imports had a significant impact on the domestic industry.[5]

Plaintiffs OCP S.A. ("OCP"), a producer and exporter of phosphate fertilizers in Morocco, and EuroChem North America Corporation ("EuroChem"), a U.S. importer of subject merchandise from Morocco and Russia, appealed the Commission's final affirmative determinations.  Several respondent interested parties participated as plaintiff-intervenors: PhosAgro PJSC ("PhosAgro"), a producer and exporter of phosphate fertilizers in Russia, and International Raw Materials Ltd. ("IRM") and Koch Fertilizer ("Koch"), U.S. importers of subject merchandise.  Petitioner the Mosaic Company ("Mosaic") and J. R. Simplot Company ("Simplot"), another domestic producer, also participated in the litigation as defendant-intervenors.

In its First Remand Order, the Court found that the Commission's finding that importers could reship fertilizer from one destination to another to meet existing demand, was

---

[5] Original Views at 52-53.

APPX0022051

*Public Version*

unsupported by the record evidence.[6]  Further, the court opined that this Commission finding

"undergirds the Commission's determination across all statutory factors."[7]

On October 27, 2023, the Commission published notice of its remand proceedings in the

Federal Register.[8]  In the notice, the Commission explained that it was reopening the record in

these proceedings for the limited purpose of issuing a short supplemental questionnaire to U.S.

producers and U.S. importers.[9]

In January 2024, the Commission determined again that an industry in the United States

was materially injured by reason of subject imports from Morocco and Russia.[10]  In its First

Remand Views, the Commission continued to find that the volume of cumulated subject

imports and the increase in the volume were significant in absolute terms and relative to U.S.

consumption during the period of investigation, and subject imports gained *** percentage

points in market share at the expense of the domestic industry from 2017 to 2019.[11]  The

record also showed that the volume of cumulated subject imports increased by one million

short tons between 2017 and 2018, and as demand began to decline in the fall of 2018, U.S.

---

[6] *OCP S.A. v. United States*, Consolidated court No. 21-00219, Slip Op. 23-136 (Sept. 19, 2023) ("First Remand Order") at 49.

[7] First Remand Order at 3.

[8] *Phosphate Fertilizers from Morocco and Russia*, 88 Fed. Reg. 73873 (Oct. 27, 2023).  The Commission subsequently issued a correction to the notice of remand proceedings correcting the effective date of the notice to October 23, 2023.  *Phosphate Fertilizers from Morocco and Russia; Notice of Remand Proceedings; Correction,* 88 Fed. Reg. 75308 (Nov. 2, 2023).

[9] 88 Fed. Reg. 73873.  In the First Remand Order, the court indicated that on remand, the "Commission may take new evidence, reconsider existing evidence, or take any other action allowed by its procedures" to arrive at a conclusion supported by substantial evidence.  First Remand Order at 49.

[10] *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final) (Remand), USITC Pub. 5490 (Jan. 2024) and accompanying Confidential Views ("First Remand Views").  Citations to the page numbers of the First Remand Views herein refer to the Confidential Views.

[11] First Remand Views at 28-29.

*Public Version*

importers' inventories reached their highest level of those two years.[12]  Notwithstanding these substantial inventories and declining demand, subject imports surged into the U.S. market in January 2019 and continued to flow into the U.S. market in substantial quantities, reaching 2.7 million short tons that year, even as demand declined in 2019.  U.S. importers' quarterly inventories reached their highest level in March 2019, but subject imports nonetheless continued to enter the U.S. market in the latter part of 2019 in excess of any purported need to replenish depleted inventories in the latter part of 2019.  Moreover, the record showed that regardless of the "unidirectional" movement of subject importers' inventories, the volumes of subject imports entering the U.S. market had significant depressing effects on U.S. prices.[13]  Record evidence showed subject imports being offered and sold at lower prices, domestic producers lowering prices to compete with subject imports, and certain purchasers purchasing subject imports rather than the domestic like product for price reasons.  Consequently, subject imports – through their significant volumes that contributed to the oversupply conditions in the U.S. market during the POI at competitive and low prices – depressed prices in the U.S. market to a significant degree.  The downward pricing pressure exerted by subject imports forced the domestic industry to reduce prices, which in turn caused its revenues to be lower than they would have been otherwise.  As a consequence, the Commission found that subject imports had a significant impact on the domestic industry.[14]

From February-June 2024, the parties filed comments addressing the Commission's First

---

[12] First Remand Views at 38-39; 62-63.

[13] First Remand Views at 62-63.

[14] First Remand Views at 63-64.  The Commission also addressed other asserted causes of injury so as to ensure it was not attributing injury from other factors to the subject imports.  First Remand Views at 65-72.

APPX0022053

*Public Version*

Remand Views.  On April 22, 2025, the Court issued its Second Remand Order, finding certain

aspects of the Commission's analysis of conditions of competition, volume, and price effects to

be deficient, as discussed below.  On June 4, 2025, the Commission published notice in the

Federal Register of how it would proceed with second remand proceedings.[15]  The Commission

did not reopen the record, but the notice "permit{ted} the parties entitled to participate in the

remand proceedings to file comments concerning how the Commission could best comply with

the court's remand instructions."[16]  Accordingly, domestic interested parties Mosaic and

Simplot filed comments as did respondent interested parties, OCP, PhosAgro, IRM, Koch.

Eurochem did not file comments.

### B.  Parties' Arguments

Mosaic and Simplot argue that the Commission should continue to reach affirmative

determinations.[17]  Mosaic further argues that the Commission should continue to find that the

U.S. market was oversupplied, noting that the inventory buildup was well-documented by the

trade press.[18]  Mosaic also claims that the record does not support importers' claim that

additional imports were needed to meet demand in areas unaffected by flooding.[19]  Mosaic and

Simplot further argue that the Commission should again find that the volume of cumulated

subject imports, and the increase in that volume, is significant.[20]  Mosaic and Simplot also argue

that the Commission should again find that cumulated subject imports had significant price

---

[15] *Phosphate Fertilizers from Morocco and Russia*, 90 Fed. Reg. 24411 (June 10, 2025).

[16] 90 Fed. Reg. 24411.

[17] *See generally* Mosaic Second Remand Comments; Simplot Second Remand Comments.

[18] Mosaic Second Remand Comments at 5-15.

[19] Mosaic Second Remand Comments at 7-8.

[20] Mosaic Second Remand Comments at 3-5; Simplot Second Remand Comments at 1-7.

7

*Public Version*

effects on the domestic industry, asserting that the Commission's finding that subject imports depressed prices to a significant degree is supported by substantial evidence. Both Mosaic and Simplot observe that the court did not specifically remand the Commission's impact finding and argue that the Commission should reaffirm its finding that cumulated subject imports had a significant impact on the domestic industry.[21]

Respondent interested parties repeat the court's findings that substantial evidence does not support the Commission's finding that fertilizer inventories can be reshipped, contending that absent such evidence, there is not substantial evidence that the U.S. market was oversupplied by increased volumes of subject imports, which were needed, in their view, to supply areas unaffected by flooding where demand was up in 2019.[22] Respondent interested parties also argue that the Commission improperly analyzed subject import volumes inflated by the inclusion of imports that were re-exported to Canada. In their view, such imports could not be injurious to the domestic industry.[23] Respondent interested parties assert that, per the court's instruction, the Commission must address Mosaic's refusals to supply the U.S. market in assessing the significance of the volume of cumulated subject imports.[24]

Respondent interested parties further argue that the Commission should find that there were no significant price effects.[25] They argue that the Commission should find that there was

---

[21] Mosaic Second Remand Comments at 25; Simplot Second Remand Comments at 17-18.

[22] OCP Remand Second Remand Comments at 1-7; IRM Second Remand Comments at 2-6; Koch Second Remand Comments at 3-4; PhosAgro 2-3, 6-8.

[23] OCP Remand Second Remand Comments at 7-8; IRM Second Remand Comments at 8-9; Koch Second Remand Comments at 4-5; PhosAgro 2-3, 6-7.

[24] OCP Remand Second Remand Comments at 1-3; IRM Second Remand Comments at 2-6; Koch Second Remand Comments at 3-4; PhosAgro 2-3, 6-7.

[25] OCP Second Remand Comments at 16-25; IRM Second Remand Comments at 7-9; Koch Second Remand Comments at 5-7; PhosAgro Second Comments at 10-12.

APPX0022055

*Public Version*

not significant underselling and that the lack of underselling undermines the Commission's

price depression finding.[26]  Respondent interested parties also argue that the fact that Mosaic

was most frequently identified as a "price leader" shows that Mosaic drives market prices,

directly contradicting the Commission's finding that subject imports depressed domestic

prices.[27]  OCP and PhosAgro also argue that the Commission's reliance on lost sales information

was not reasonable or supported by substantial evidence.[28]

## II.    Material Injury By Reason of Subject Imports

In responding to the court's Second Remand Order, we have considered the factual

record as a whole, as well as arguments made by the parties in their submissions in both the

proceedings of the original investigations and the first and second remand proceedings.  We

have adopted in their entirety the Commission's findings, analysis, and conclusions in its

Original Views and First Remand Views regarding issues not raised on appeal:  the legal

standards, domestic like product, domestic industry, negligibility, and cumulation.[29]

In the First Remand Views, we addressed as an initial matter the court's characterization

of our observation in the Original Views that importers conceded that it was possible albeit not

economical to reship product from existing inventories to other locations.[30]  The court

understood this to be an "important" finding upon which the Commission's "theory" that

---

[26] OCP Second Remand Comments at 16-25; IRM Second Remand Comments at 7-9; Koch Second Remand Comments at 5-7; PhosAgro Second Comments at 10-12.

[27] OCP Second Remand Comments at 18-19; IRM Second Remand Comments at 9; Koch Second Remand Comments at 7; PhosAgro Second Comments at 10.

[28] OCP Second Remand Comments at 20-24; PhosAgro Second Remand Comments at 10-11.

[29] Additionally, in our analysis below, we do not readdress several arguments raised by the parties in the original investigations that pertain to issues that were not challenged on appeal, but we adopt and incorporate our discussions and conclusions regarding those issues here.

[30] Original Views at 43 n.161, 56 n.217.

APPX0022056

imports contributed to the oversupply conditions in the U.S. market "rests like an inverted pyramid on an unsupported finding regarding what might be possible if economics did not matter."[31]  In our First Remand Views, we clarified that this observation was not central to our material injury analysis, and we continued to find that an industry in the United States was materially injured by reason of phosphate fertilizers from Morocco and Russia that Commerce has found to be subsidized by the governments of Morocco and Russia, without reliance upon that original finding.[32]

We also addressed domestic producers' reshipment capabilities in response to the court's instructions directing the Commission to assess in its volume analysis whether "fertilizer was 'practically unavailable from U.S. sources' to supply high-demand regions in 2019 because doing so would not have been economically viable."[33]  In this regard, we noted that, in context, we understood the court's reference to "U.S. sources" to refer to domestically produced fertilizers.[34]  We concluded that "the record from the original investigations and as supplemented in these remand proceedings indicates that the domestic industry's excess capacity, substantial inventories, extensive inventory locations, expansive multi-modal distribution network, and demonstrated ability to move and relocate product where it was needed shows that domestic producers were well-positioned to supply the U.S. market in 2019."[35]

---

[31] First Remand Order at 29, 35.
[32] First Remand Views at 7-8.
[33] First Remand Views at 31-33.
[34] First Remand Views at 31-32 & n.152.  We further observed that our understanding appeared to be consistent with the court's citation to *Altx v. United States*, 26 CIT 709 (2002).
[35] First Remand Views at 33.

10

*Public Version*

We again respectfully address the court's characterization of our findings in the Original

Views and First Remand Views.  In the Second Remand Order, the court cited the First Remand

Order as "focus{ing} on domestic industry reshipment because the Commission's unsupported

assumptions undergirded its material injury finding" and as holding that "{i}f domestic

producers could not – technically or economically – reship existing inventory domestically,

these inventories could not contribute to the supply of phosphate fertilizer available to meet

new demand."[36]  In our Original Views, however, we observed that importers, not domestic

producers, reported an inability to serve the U.S. market from existing inventories, while

conceding that reshipment was possible but cost prohibitive, which is why they chose to import

more product.  Specifically, in responding to respondents' arguments, we stated:

> Respondents argue that product was necessary to serve demand in
> U.S. regions unaffected by the poor weather conditions.  However,
> this argument fails to explain why U.S. importers could not supply
> U.S. customers from its building inventories or from product that
> sat on barges on the Mississippi River system.  Indeed, as U.S.
> importers acknowledged, it was possible for the U.S. importers to
> do so, but that it was costly to move product by rail or back down
> the Mississippi River.  Consequently, they chose to import more
> product.[37]

Thus, our original finding related to importers' representations that they could not – technically

or economically – serve the U.S. market from existing inventories or product that sat on barges,

choosing instead to import more product.  Unlike importers, however, domestic producers did

---

[36] Second Remand Order at 4, 7, citing First Remand Order, 658 F. Supp. 3d at 1318-19.

[37] Original Views at 56 n.237.  We also note that this observation did not involve "reshipping fertilizer that had already been delivered to flooded, low demand regions," as the court indicated.  First Remand Order at 5-6.  Rather, our original finding referred to the possibility of importers drawing from building inventories or from product that sat on barges on the Mississippi River system.  Original Views at 56 n.237 (emphasis added).

11

APPX0022058

*Public Version*

not represent that they were unable to serve the U.S. market from their substantial existing inventories or product that sat on barges, or that it was cost prohibitive to do so.

Although the observation in the Original Views related to importers, we nonetheless addressed domestic producers' ability to reship inventories in the First Remand Views to address the court's remand instructions.[38]  Again, we respectfully disagree with the court's repeated characterization in the Second Remand Order that this finding was central to the First Remand Views such that without it, "the Commission's oversupply-based material injury finding collapses like a house of cards."[39]  In responding as required to the First Remand Order, domestic producers ability to reship inventories was only one factor, along with their excess capacity, substantial inventories, extensive inventory locations, and expansive multi-modal distribution network, that the Commission discussed in finding that fertilizer was not practically unavailable from U.S. sources in 2019, as directed by the First Remand Order.[40]  In other words, it was not central to the Commission's finding that fertilizer was not unavailable from U.S. sources in 2019, but rather discussed as one factor among several others.

Indeed, unlike importers, the domestic industry has not stated that they were unable to serve the U.S. market from their substantial existing inventories or product that sat on barges, or that it was cost prohibitive to do so, and they also had available excess capacity from which they could have shipped additional volumes.[41]  Thus, we respectfully disagree with the court's assumption that domestic producers could not reship their inventories and therefore "would be

---

[38] First Remand Views at 31-33.
[39] Second Remand Order at 10.
[40] First Remand Views at 31-33.
[41] *See, e.g.,* CR/PR at Tables III-4, C-1.

APPX0022059

*Public Version*

poorly positioned to supply the U.S. market so that imports would not have contributed to oversupply conditions."[42]  As explained below, we continue to find, in response to the Court's remand first and second remand instructions, that during the POI the domestic industry possessed the capability to reship fertilizer if relocation was needed.  However, even if that ability were limited, domestic producers also possessed excess capacity, substantial inventories (that unlike for importers were not reportedly stranded), extensive inventory locations, and expansive multi-modal distribution network, demonstrating that the domestic industry was well positioned to supply the U.S. market in 2019.

### A. Conditions of Competition and the Business Cycle

#### 1. Demand Conditions

As explained in the Original Views and First Remand Views,[43] U.S. demand for phosphate fertilizers is primarily driven by agricultural plantings, particularly for crops that consume the most fertilizer (*i.e.*, corn, soybeans, and wheat).  Weather volatility, cropping practices and crop rotation, and agricultural commodity prices also affect U.S. demand.[44]

Due to its relationship to agricultural plantings, U.S. demand for phosphate fertilizers is subject to seasonal business cycles, with most market participants reporting peak demand in the spring (second quarter, prior to planting) and fall (fourth quarter, after harvest).[45]  Mosaic stated that to meet the two seasonal surges in demand, producers manufacture phosphate fertilizers throughout the year, and the supply chain, including wholesalers and retailers, moves

---

[42] Second Remand Order at 27.
[43] Original Views at 20-22; First Remand Views at 8.
[44] CR/PR at II-11; Mosaic Prehearing Br. at 20; OCP Prehearing Br. at 6, 33; Gavilon Prehearing Br. at 10; PhosAgro Prehearing Br. at 6; PhosAgro Posthearing Br. at 3, 6.
[45] CR/PR at II-15.

*Public Version*

product into position during the off seasons.[46]  According to respondents, it takes time for distributors to obtain fertilizer and move it through the supply chain into warehouses in the off seasons for use by farmers, and distributors therefore rely on demand projections in obtaining product.[47]  We note however that, notwithstanding this, the record shows that foreign producers and/or importers are able to move quickly to respond to changes in the market. Specifically, as we noted in the Original Views and First Remand Views, the parties agreed that the filing of the petitions on June 26, 2020, resulted in a large decrease in the volume of cumulated subject imports.[48]  Indeed, the monthly volume of subject imports decreased from 62,426 short tons in June 2020 to 57,660 short tons in July 2020, 14,365 short tons in August 2020, and 10,599 in September 2020.[49]

---

[46] Mosaic Prehearing Br. at 24.  U.S. producers reported that *** percent of their commercial shipments in 2019 came from inventory with lead times averaging *** days.  CR/PR at II-17.

[47] OCP Prehearing Br. at 6, 37-39; Koch Prehearing Br. at 6-7; OCP Posthearing Br. at Responses to Questions pp. 27-28, 39; IRM Posthearing Br. at 7; Koch Posthearing Br. at 11-12; EuroChem Posthearing Br. at 8.  U.S. importers reported that *** percent of their commercial shipments in 2019 came from inventory with lead times averaging *** days.  Importers also reported *** percent of their commercial shipments came from foreign producers' inventories, with lead times averaging *** days. CR/PR at II-17.

[48] Original Views at 34 n. & n.134 and First Remand Views at 9 & n.31, citing  Mosaic Prehearing Br. at 43-44, 91; Simplot Prehearing Br. at 29-30, 34; Simplot Posthearing Br. at Responses to Questions pp. 53-54; Mosaic Posthearing Br. at Responses to Questions pp. 69-70; OCP Posthearing Br. at 12, Responses to Questions pp. 33, 67-73; EuroChem Posthearing Br. at 11; IRM Posthearing Br. at 8-9; PhosAgro Posthearing Br. at 12-13, Responses to Questions.  Some U.S. importers indicated that they stopped bringing in subject imports "because the buyers and the sellers agreed that the risk of 75 percent countervailing duties was higher than either of them wanted to take."  Hearing Tr. at 337 (Aranoff); *see also* EuroChem Posthearing Br. at 11 (stating that as a result of the filing of the petitions, it shifted its purchases of phosphate fertilizers from Morocco and Russia to other global sources); *** U.S. Purchaser Questionnaire Response at III-11 (reporting that Koch and IRM will not quote or import material until the countervailing duty decision is issued); *** U.S. Purchaser Questionnaire Response at III-11 (reporting that Helm, Koch, and OCP "cut off" supplying imported product to the U.S. market in the summer of 2020).

[49] CR/PR at Table IV-6.

14

*Public Version*

As we discussed in our Original Views and First Remand Views, the parties agree that while U.S. demand increased between 2017 and 2018, the U.S. market experienced unusually wet weather conditions that impacted three consecutive planting seasons beginning in the fall of 2018 and continuing into the spring of 2019 and fall of 2019.[50]   Consequently, crop plantings fell and U.S. demand for phosphate fertilizers declined in 2019.  U.S. demand, however, rebounded in January to September ("interim") 2020 with increased crop plantings.[51]  Most responding U.S. producers, importers, and purchasers reported that U.S. demand for phosphate fertilizers either fluctuated or did not change during the period of investigation.[52]

As we previously explained, data from the U.S. Department of Agriculture's ("USDA") Farm Service Agency confirm that total planted acres increased from 2017 and 2018, decreased between 2018 and 2019, then increased again between 2019 and 2020.[53]  Overall, total acres planted was 3.6 percent lower in 2019 compared to 2017 and 0.6 percent lower in 2020 compared to 2017.[54]  Apparent U.S. consumption for phosphate fertilizers increased from *** short tons in 2017 to *** short tons in 2018, then decreased to *** short tons in 2019 for an overall decline of *** percent between 2017 and 2019; it was *** percent lower in interim 2020, at *** short tons, than in interim 2019, at *** short tons.[55]

---

[50] Original Views at 21-22; First Remand Views at 9-10.

[51] CR/PR at II-11, Figure II-1; Mosaic Prehearing Br. at 20-21; OCP Prehearing Br. at 6, 34-36, 43-51; IRM Prehearing Br. at 15-17; Gavilon Prehearing Br. at 11-12, 14-16; PhosAgro Prehearing Br. at 6-7.

[52] CR/PR at Table II-4.  Specifically, two of three responding domestic producers, seven of 10 U.S. importers, and 14 of 28 U.S. purchasers indicated that U.S. demand fluctuated since January 1, 2017, while one domestic producer, two U.S. importers, and eight purchasers reported that demand did not change.  *See id.*

[53] The USDA reported that acres planted for corn, soybeans, and wheat were 226.4 million in 2017, 225.9 million in 2018, 211.3 million in 2019, and 218.4 million in 2020.  It projected the acres planted for these crops to be 227.0 million in 2021.  CR/PR at II-11 n.23.

[54] CR/PR at II-11, Figure II-1.

[55] CR/PR at Tables IV-7, C-1.

15

*Public Version*

### 2.    Supply Conditions

The domestic industry was the largest supplier of phosphate fertilizers to the U.S. market throughout the POI.  Its share of apparent U.S. consumption declined from \*\*\* percent in 2017 to \*\*\* percent in 2018 and \*\*\* percent in 2019, representing an overall decrease of \*\*\* percentage points between 2017 and 2019.[56]  The domestic industry's share of apparent U.S. consumption was \*\*\* percent in interim 2019 and \*\*\* percent in interim 2020.[57]

In addition to supplying the majority of the U.S. market, the domestic industry also exported substantial volumes of phosphate fertilizers to third country markets, although these volumes declined after the petitions were filed.  The domestic industry's export shipments accounted for \*\*\* percent of its total shipments in 2017, \*\*\* percent in 2018, and \*\*\* percent in 2019; its export shipments accounted for a lower share of its total shipments in interim 2020 at \*\*\* percent than in interim 2019 at \*\*\* percent.[58]  \*\*\* largest export market was \*\*\*, while \*\*\* largest export market was Canada.[59]

During the POI, three firms – Mosaic, Nutrien, and Simplot – accounted for the vast majority of all known U.S. production of phosphate fertilizers, with Mosaic as the leading producer.[60]  Mosaic reported several changes in operations during the POI.  In December 2017,

---

[56] CR/PR at Tables IV-8, C-1.

[57] CR/PR at Tables IV-8, C-1.

[58] CR/PR at Table III-6.  U.S. producers' export shipments declined from \*\*\* short tons in 2017 to \*\*\* short tons in 2018, before increasing in 2019 to \*\*\* short tons.  Their export shipments were lower in interim 2020, at \*\*\* short tons, than in interim 2019, at \*\*\* short tons.  *See id.*

[59] CR/PR at III-11 n.26.  \*\*\* accounted for \*\*\* percent of \*\*\* export shipments between 2017 and 2019.  \*\*\* also shipped product to \*\*\*.  At least \*\*\* percent of \*\*\* exports and \*\*\* percent of \*\*\* exports went to Canada during 2017-2019 and interim 2020.  They also exported product to \*\*\*.  *See id.*

[60] CR/PR at I-3, Table III-1.  In 2019, Mosaic accounted for \*\*\* percent of domestic production.  CR/PR at Table III-1.  Over the past several decades, the domestic industry experienced significant

(*continued*...)

16

APPX0022063

*Public Version*

Mosaic idled its 2 million ton production facility in Plant City, Florida for 18 months and then permanently shuttered the facility in June 2019.[61]  In March 2019, Mosaic announced a 300,000 short ton curtailment in production, and in September 2019, Mosaic temporarily idled operations at its facilities in Saint James (Faustina) and Uncle Sam, Louisiana, curtailing production by 500,000 short tons.  It restarted operations at these facilities in December 2019, but idled its plant in Barstow, Florida that same month, curtailing production by 165,000 tons per month.  Mosaic resumed production at its Barstow facility in February 2020.[62]

From 2017 to 2018, Nutrien increased its capacity and production at its Aurora, North Carolina and White Springs, Florida phosphate facilities.[63]  In May 2019, Nutrien converted its phosphate operation in Redwater, Canada to an ammonium sulfate plant.[64]  Nutrien's CEO stated at the time that the increase in production in North Carolina and Florida was expected to offset the reduction in supply from its Redwater facility.[65]  Nutrien's U.S. production increased by *** percent from 2018 to 2019 and its production and production capacity increased *** of

---

contraction in the number of producers and production facilities.  Mosaic Prehearing Br. at 22; OCP Prehearing Br. at 6-16; Gavilon Prehearing Br. at 17-19; IRM Prehearing Br. at 4-6.  According to respondents, depleted U.S. phosphate ore reserves (from which the primary raw material phosphate rock is refined), caused this consolidation of the domestic industry.  OCP Prehearing Br. at 6-16; Gavilon Prehearing Br. at 17-19; IRM Prehearing Br. at 4-6.  Mosaic and Simplot maintain, however, that the United States has plenty of remaining and untapped phosphate rock reserves and that mining capacity currently exceeds production capacity.  Hearing Tr. at 139-143 (Stone, O'Rourke).  Indeed, Mosaic reports that its phosphate rock production and quality have remained consistent over the POI.  Mosaic Prehearing Br. at 92-93; Mosaic Postconference Br. at Exhibit 31.  OCP itself acknowledges that U.S. annual phosphate rock production represents nearly 15 percent of global production, rendering the United States the world's third largest producer.  OCP Prehearing Br. at 11.

[61] CR/PR at III-3.

[62] Mosaic Prehearing Br. at 2; Mosaic Posthearing Br. at Responses to Questions pp. 22-23.

[63] CR/PR at III-3 and Table III-3.  *** production capacity increased by *** short tons, from *** short tons in 2017 to *** short tons in 2018, due to ***.  CR/PR at III-5 n.18.

[64] CR/PR at Table III-3.

[65] CR/PR at III-3.

17

APPX0022064

*Public Version*

the POI.[66]

As a result of these operational changes and curtailments, and notwithstanding that *** increased its production capacity by *** short tons from 2017 to 2018, the domestic industry's capacity decreased from *** short tons in 2017 to *** short tons in 2018 and *** short tons in 2019.[67] The domestic industry's capacity was higher in interim 2020 at *** short tons than in interim 2019 at *** short tons.[68] The domestic industry's production and U.S. shipments also decreased each full year of the POI, and the domestic industry consequently had available excess capacity throughout the POI.[69]

Subject imports accounted for the second largest source of supply to the U.S. market. Their share of apparent U.S. consumption rose from *** percent in 2017 to *** percent in 2018 and *** percent in 2019, an increase of *** percentage points over the POI.[70] Subject imports' share of apparent U.S. consumption was *** percent in interim 2019 and *** percent in interim 2020.[71]

Nonsubject imports were the smallest source of supply to the U.S. phosphate fertilizer market. Their share of apparent U.S. consumption increased from *** percent in 2017 to *** percent in 2018, before declining to *** percent in 2019.[72] Nonsubject imports' share of apparent U.S. consumption was *** percent in interim 2019 and *** percent in interim 2020.[73]

---

[66] CR/PR at Table III-3.
[67] CR/PR at Table III-3.
[68] CR/PR at Tables III-4, C-1.
[69] The domestic industry's capacity utilization rate was *** percent in 2017, *** percent in 2018, and *** percent in 2019; it was lower in interim 2020, at *** percent, than in interim 2019, at *** percent. CR/PR at Tables III-5, C-1.
[70] CR/PR at Tables IV-8, C-1.
[71] CR/PR at Tables IV-8, C-1.
[72] CR/PR at Tables IV-8, C-1.
[73] CR/PR at Tables IV-8, C-1.

18

APPX0022065

*Public Version*

According to questionnaire data, the largest nonsubject source of phosphate fertilizers to the U.S. market in 2019 was Saudi Arabia, which accounted for *** percent of total phosphate fertilizer imports.[74]

As we discussed in our Original Views and First Remand Views, *** U.S. producers, five of ten importers, and 16 of 28 purchasers reported experiencing supply constraints during the POI.[75]  However, the parties disagree on the extent of any supply shortages.  Respondents generally argued that the shuttering of Mosaic's Plant City facility in 2017 and Nutrien's announcement and subsequent closure of its Redwater, Canada facility in 2019 left a "gaping hole in supply," and that imports were "pulled into" the market as a result.[76]  Ten purchasers reported experiencing delays, shortages, and/or allocations from Mosaic, and *** elaborated that Mosaic has refused to supply the firm *** and that this caused delays in its ability to supply its customers.[77]  U.S. producer ***,[78] while Mosaic acknowledged that after its decision to idle its Plant City facility in December 2017, it reduced its phosphate sales volume targets with certain larger customers – specifically, with CHS by 200,000 tons and with Gavilon by 100,000 tons relative to the prior year.[79]  Mosaic reported that ***.[80]

---

[74] CR/PR at IV-2, Table IV-2.  Nonsubject imports from Saudi Arabia increased from *** short tons in 2017 to *** short tons in 2018 and *** short tons in 2019; they were *** short tons in interim 2019 and *** short tons in interim 2020.  In 2014, Mosaic acquired a 25 percent equity interest in Ma'aden Wa'ad Al Shamal Phosphate Company ("MWSPC"), a joint venture that began to produce phosphate fertilizers in Saudi Arabia in 2017.  MWSPC currently has an annual capacity of 3.3 million short tons.  CR/PR at VII-21; Mosaic Prehearing Br. at Exhibit 7 p.3.

[75] Original Views at 25-27 and First Remand Views at 14, citing CR/PR at II-8 – II-9.

[76] *See e.g.*, OCP Posthearing Brief at 2-8 and Responses to Questions pp. 7-26, 29-32, and 74-82; PhosAgro Posthearing Brief at 3; Koch's Posthearing Brief at 14; IRM Posthearing Brief at 4-7, and 9-11.

[77] CR/PR at II-8-9.

[78] CR/PR at II-8.

[79] Mosaic Posthearing Br. at Responses to Questions p. 83.

[80] Mosaic U.S. Producer Questionnaire Response at IV-16.

19

*Public Version*

In the First Remand Views,[81] we clarified that to the extent that we referenced any "supply gap" in our Original Views,[82] we did so in the context of discussing party argument regarding respondents' assertions that subject imports were "pulled" into the U.S. market to fill an alleged domestic industry supply gap.  As detailed below, we continue to find that the record does not support respondents' assertions that the imports were "pulled into" the U.S. market to fill a "gaping hole in supply" of 1.1 million short tons that was filled by the over 1 million short ton increase in subject imports in 2018.[83]

As we noted in our Original Views and First Remand Views,[84] Mosaic asserted that idling the Plant City facility resulted in approximately 700,000 short tons of reduced supply to the U.S. market between 2017 and 2018.[85]  We continue to find Mosaic's estimate to be credible and consistent with other record evidence.[86]  We also note that, notwithstanding this estimate, the record shows that Mosaic's U.S. shipments only decreased from 2017 to 2018 by \*\*\* short tons.[87]  The volume of cumulated subject imports, however, increased by a greater amount – more than one million short tons – during this time, and importers' U.S. shipments of subject

---

[81] First Remand Views at 15.

[82] Original Views at 26-27.

[83] *See e.g.*, OCP Posthearing Brief at 2-8 and Responses to Questions pp. 7-26, 29-32, and 74-82; PhosAgro Posthearing Brief at 3; Koch's Posthearing Brief at 14; IRM Posthearing Brief at 4-7, and 9-11.

[84] Original Views at 26-27; First Remand Views at 15-17.

[85] Hearing Tr. at 39 (McLellan) ("Plant City…produced about 1.4 million short tons when it was idled in 2017.  We sold about 700,000 short tons of that production into the U.S. market.").

[86] Original Views at 26, CR/PR at III-11, Mosaic Revised Domestic Producer Questionnaire at II-7. Specifically, a representative from Mosaic testified that Plant City produced about 1.4 million short tons at the time it was idled in 2017.  Mosaic exported \*\*\* percent of its total shipments in 2017, with U.S. shipments accounting for \*\*\* percent of total shipments that year, which would be consistent with the estimate that the idling of Plant City reduced domestic supply by only 700,000 short tons rather than the full 1.4 million short tons produced at the Plant City facility.  CR/PR at III-11 n.26.  In contrast, export shipments accounted for a \*\*\* during 2017-2019 and in both interim periods, accounting for no more than \*\*\* percent in any period.  *Id.*

[87] Mosaic Revised Domestic Producer Questionnaire at II-7.

20

*Public Version*

imports increased by 604,000 short tons.[88] [89]  We therefore find that the volume of cumulated

subject imports far exceeded either the Mosaic's reasonable estimate of its reduced supply or

the amount by which it actually reduced its U.S. shipments, following the idling of its Plant City

facility.[90]  As such, we find respondents' argument that cumulated subject imports were merely

"pulled into" the market as a result to be unavailing.[91]

---

[88] Subject imports increased from 1,971,222 short tons in 2017 to 2,978,803 short tons in 2018. CR/PR at Table IV-2.  Mosaic indicated that when it idled Plant City, it anticipated that "there would be some new imports coming in to satisfy the short-term need" because it "takes time for us to adjust." However, it further stated that "{w}e shipped into the U.S. market from Plant City approximately 700,000 short tons.  What came in was a million short tons of imports.").  Mosaic Posthearing Br. at 2-3, 13, Responses to Questions pp. 19-20; Hearing Tr. at 111 (McLellan), 127-28 (O'Rourke).  Mosaic added that following a reduction in subject imports resulting from filing of the CVD petition, some ***.  CR/PR at II-8-9.  As evidence that subject imports exceeded the decrease in volume to the U.S. market from Plant City, although apparent U.S. consumption was *** short tons (*** percent) lower in 2019 than in 2017, the volume of cumulated subject imports was 725 thousand short tons higher and importers' U.S. shipments of subject imports were 735 thousand short tons higher in 2019 than in 2017.  CR/PR at Tables IV-2, C-1.

[89] Moreover, from 2017 to 2018, while Mosaic's U.S. shipments declined by *** short tons, U.S. shipments of total imports (subject and nonsubject imports) increased by 967,904 short tons, with cumulated subject imports accounting for 604,981 short tons (62.5 percent of the increase in shipments of total imports).  CR/PR at Table C-1.  Thus, the decrease in Mosaic's supply was offset by increased nonsubject imports as well as the larger increase in subject imports, in addition to the increased production from ***.  CR/PR at Table III-4.  From 2018 to 2019, when demand decreased, U.S. shipments of nonsubject imports decreased by 65,262 short tons while U.S. shipments of subject imports increased by 148,957 short tons.  CR/PR at Table C-1.  Importers' U.S. shipments of total imports increased by 1.05 million short tons from 2017 to 2019, with subject imports accounting for 71.7 percent of the increase.  CR/PR at Table IV-7.  In terms of import volumes (rather than importers' U.S. shipments of imports) total imports increased by 1.4 million short tons from 2017 to 2018, with cumulated subject imports accounting for 1.0 million short tons (70.1 percent) of the increase in total import volume.  CR/PR at Table IV-2.  Between 2018 and 2019, the volume of cumulated subject imports was higher 725,044 short tons higher in 2019 than in 2017 and total imports were 1.05 million short tons higher, with subject imports accounting for 68.9 percent of the increase in total import volume. CR/PR at Table IV-7.

[90] We also observe that, as discussed below, combining U.S. importers' December 2018 end-of-period inventories of *** short tons with the volume of imports in January 2019 of 720,728 short tons totals approximately *** short tons, which exceeds even the 1.1 million short ton "supply gap" alleged by respondents in the month of January alone.  CR/PR at Tables IV-6, D-1.

[91] We observe that U.S. importers' end-of-period inventories of subject imports increased from *** short tons in 2017, which was equivalent to *** percent of their U.S. shipments of subject imports, to *** short tons in 2018 (equivalent to *** percent of their U.S. shipments of subject imports) and were *** short tons in 2019 (equivalent to *** percent of their U.S. shipments.  CR/PR at Table VII-11.

APPX0022068

*Public Version*

In the First Remand Views, we likewise found unavailing respondents' argument that Nutrien's closure of its Redwater facility in Canada in May 2019 contributed to a reduction in the supply of fertilizers in the United States.[92] As the Commission explained in its Original Views, at the time that the closure was announced, Nutrien's CEO stated that it would increase production at its U.S. facilities to offset the reduction in supply from its Canadian facility and ensure a continued supply of phosphate fertilizers to customers in Canada.[93] Nutrien did, in fact, increase production as well as capacity in the United States.[94] Specifically, between 2018 and 2019, Nutrien increased its U.S. production by \*\*\* short tons, which was more than sufficient to cover its \*\*\* short ton increase in exports during that time, and Nutrien reported \*\*\* short tons in unused capacity in 2019.[95]

As the Commission also noted in its Original Views, the domestic industry had available excess capacity throughout the POI.[96] In 2018, Nutrien and Simplot alone had a combined \*\*\* short tons of excess capacity, which was more than sufficient to cover either Mosaic's estimated 700,000 short ton reduction in supply or its actual reduction of U.S. shipments in the amount of \*\*\* short tons from 2017 to 2018.[97] Likewise, Nutrien and Simplot had a combined excess capacity of \*\*\* short tons in 2019, which more than would have covered the reduction in supply due to the idling of Mosaic's Plant City facility as well as the \*\*\* short ton increase in

[92] First Remand Views at 17, discussing, *e.g.*, OCP Posthearing Brief at 2-8 and Responses to Questions pp. 7-26, 29-32, and 74-82; PhosAgro Posthearing Brief at 3; Koch's Posthearing Brief at 14; IRM Posthearing Brief at 4-7, and 9-11.

[93] Original Views at 24, 54; CR/PR at III-3.

[94] Original Views at 24, 54; CR/PR at Table III-4.

[95] CR/PR at Table III-4; PCS/Nutrien Domestic Producer Questionnaire at II-7.

[96] Original Views at 24.

[97] CR/PR at Table III-4; Mosaic Revised Domestic Producer Questionnaire at II-7; Hearing Tr. at 39 (McLellan).

22

*Public Version*

Nutrien's exports during that time.[98]  Moreover, the domestic industry maintained substantial

and increasing inventories throughout the POI.[99]

Thus, as in the First Remand Views,[100] we do not find that the record indicates that there

was a domestic industry supply gap and, to the extent that there was a reduction in supply

related to Mosaic's idling of its Plant City facility, the increase in volume of cumulated subject

imports eclipsed any such reduction, as further discussed below.

Similarly, we respectfully disagree with the court's conclusion in the Second Remand

Order that "{q}uestionnaire responses suggest that domestic producers were unable to relocate

their phosphate fertilizer inventories to meet new market demand; and reports from

phosphate fertilizer trading companies indicate that the largest domestic producer — Mosaic —

refused to sell to these companies," purportedly resulting in "a supply gap."[101]  As discussed

below, in assessing the evidence in the record we disagree with the court's view that the

questionnaire responses indicate an inability to relocate inventories.  More importantly,

however, as discussed throughout these and our prior Views, the ability to relocate inventories

was only one factor, along with excess capacity, substantial inventories, extensive inventory

locations, and expansive multi-modal distribution network, that we relied upon to find that

fertilizer was not practically unavailable from U.S. sources in 2019, as directed by the court's

first remand.  Accordingly, we respectfully disagree with the court's conclusion that there was a

---

[98] CR/PR at Table III-4.

[99] The domestic industry's ending inventory quantities were \*\*\* short tons in 2017 and \*\*\* short tons in 2018 and 2019; they were \*\*\* short tons in interim 2019 and \*\*\* short tons in interim 2020.  CR/PR at Table C-1.

[100] First Remand Views at 18.

[101] Second Remand Order at 48.

23

*Public Version*

"supply gap" related to an alleged inability of domestic producers to relocate inventories. We likewise disagree that the record in these investigations indicates that there was "supply gap" related to Mosaic's alleged refusal to sell to trading companies, which we address in detail below in our discussion of impact.

### 3.    Substitutability and Other Conditions

We continue to find that there is a high degree of substitutability between the domestic like product and phosphate fertilizers from subject sources that are of the same chemical formulations,[102] and that phosphate fertilizers with different chemical formulations are broadly interchangeable, particularly when used in blends.[103] As we previously observed, the record shows the vast majority of the domestic industry's U.S. shipments and U.S. importers' U.S. shipments of subject imports were of the same types of phosphate fertilizers – specifically, MAP and DAP.[104] Moreover, all three responding U.S. producers and most purchasers (17 of 25 firms) reported that the domestic like product and phosphate fertilizers from Morocco and Russia were always interchangeable; most U.S. importers (8 of 10 firms regarding Morocco and 8 of 9 firms regarding Russia) reported that the domestic like product and phosphate fertilizers from each subject country were always or frequently interchangeable.[105] The vast majority of responding purchasers also indicated that both domestically produced and subject imports always or usually met minimum quality specifications,[106] and only one of 27 responding

---

[102] CR/PR at II-17.
[103] CR/PR at I-8-10; Mosaic Prehearing Br. at 30-31; Hearing Tr. at 32-33 (Jung).
[104] CR/PR at Table IV-4.
[105] CR/PR at Table II-10.
[106] CR/PR at Table II-11.

APPX0022071

*Public Version*

purchasers reported that a domestic or foreign supplier had failed in its attempt to qualify phosphate fertilizers or had lost its approved status since 2017.[107]

As discussed in the Original Views and First Remand Views,[108] price, along with availability and quality, are important considerations in purchasing decisions.  When asked to report the top three factors considered in their purchasing decisions, U.S. purchasers most often cited price (23 firms) and availability and quality (17 firms each) as their top three factors. Purchasers most frequently cited price (11 firms) as their first-most important factor, followed by availability (9 firms),[109] and the majority of purchasers (17 of 28 firms) reported that they usually purchased the lowest-priced product.[110]  When asked to rate the importance of 16 factors in their purchasing decisions, U.S. purchasers most frequently cited availability and quality meets industry standards (27 firms each), followed by price and reliability of supply (26 firms).[111]  Pluralities of U.S. producers, importers, and purchasers reported that differences other than price between the domestic like product and subject imports from Morocco were sometimes significant and pluralities of U.S. importers and purchasers also reported that differences other than price between the domestic like product and subject imports from Russia were sometimes significant, while two of three U.S. producers reported that they were never significant.[112]  In addition, majorities or pluralities of purchasers reported that the

---

[107] CR/PR at II-20.  Specifically, *** reported that it "typically do{es} not handle Moroccan or *** fertilizer because it does not meet {its} product specifications in available Sulfur, and water solubility."  It also added that "***."  *** U.S. Purchaser Questionnaire Response at III-20; CR/PR at II-20.

[108] Original Views at 29; First Remand Views at 19-20.

[109] CR/PR at Table II-6.

[110] CR/PR at II-19.

[111] CR/PR at Table II-7.

[112] CR/PR at Table II-12.

25

APPX0022072

*Public Version*

domestic like product and subject imports from each subject country were comparable on all

factors (including price, availability, quality, and reliability of supply) except for one – U.S.

distribution network – for which the majority of which reported that the U.S. product was

superior.[113]

As also discussed in the Original Views and First Remand Views,[114] U.S. prices of

phosphate fertilizers are highly transparent.  Phosphate fertilizer prices are reported in trade

publications such as Argus Phosphates ("Argus"), CRU Phosphate Fertilizer Market Outlook

("CRU"), and Green Markets.[115]  These trade publications gather market intelligence for sales

transactions, including in the New Orleans, Louisiana ("NOLA") region and publish the collected

range of prices on a daily or weekly basis.[116]  This price information is then quickly transmitted

throughout the U.S. market.[117]  *** of three U.S. producers (***), two of nine U.S. importers

(***), and 16 of 28 purchasers reported that they refer to and use prices published in trade

publications when negotiating prices.[118]  Additionally, most purchasers reported contacting up

---

[113] CR/PR at Table II-9.  Twenty of 24 responding purchasers reported that domestically manufactured phosphate fertilizers and subject imports from Morocco were comparable on price, as did 20 of 23 responding purchasers with respect to subject imports from Russia.  No purchaser reported that the U.S. product was superior on price (*i.e.*, lower priced) to subject imports from Morocco or Russia.  Sixteen of 24 responding purchasers reported that the U.S. product was superior or comparable on availability and reliability of supply to subject imports from Morocco, as did 20 of 23 responding purchasers with respect to subject imports from Russia.  *Id.*

[114] Original Views at 30; First Remand Views at 20-21.

[115] CR/PR at V-5-6; Mosaic Prehearing Br. at 29; OCP Posthearing Br. at 6; Koch Prehearing Br. at 2; Koch Posthearing Br. at 1; Hearing Tr. at 195-196 (McGinn).

[116] CR/PR at V-5; Hearing Tr. at 147 (O'Rourke).  Two of three U.S. producers, six of ten importers, and 12 of 27 purchasers reported their own prices to trade publications.  CR/PR at V-6.

[117] Simplot Posthearing Br. at Responses to Questions pp. 60-61.

[118] Purchasers reported using Green Markets (9 firms); Profercy (6 firms); Argus and Fertecon (3 firms); ICIS (2 firms); and CRU, FIS Index, and FMB (1 firm each).  Several reported using NOLA barge or NOLA f.o.b. prices, but did not specify a particular publication.  CR/PR at V-6.

26

*Public Version*

to four, five, or six suppliers before making a purchase.[119]

As noted above and in our previous Views, both domestically produced and imported phosphate fertilizers are primarily sold from inventories.[120] U.S. producers reported that \*\*\* percent of their commercial shipments in 2019 came from inventory, with lead times averaging \*\*\* days, and importers reported that \*\*\* percent of their commercial shipments in 2019 came from inventory, with lead times averaging \*\*\* days.[121] The \*\*\* of U.S. producers' U.S. commercial shipments and \*\*\* half of U.S. importers' U.S. commercial shipments were made on a spot sale basis in 2019.[122]

During the POI, phosphate fertilizers from all sources were shipped through the same channels of distribution (mainly to retailers, followed by distributors)[123] primarily by either barge, rail, or truck.[124] Specifically, U.S. importers reported that 61.6 percent of their 2019 sales of subject fertilizers were shipped by barge, 10.8 percent by rail, and 27.7 percent by truck.[125] U.S. producers reported that 12.4 percent of their U.S. shipments were by barge, 47.1 percent by rail, 24.7 percent by truck, and 15.8 percent by another method (including by vessel or title

---

[119] CR/PR at V-8. Two purchasers reported contacting 1 to 2 suppliers before making a purchase, three reported contacting up to 3, five contact up to 4, nine contact up to 5, four contact up to 6, two contact up to 7, and one firm each reported contacting up to 8, 10, and 15 firms. *Id.*

[120] CR/PR at II-17.

[121] CR/PR at II-17. Importers also reported that \*\*\* percent of their commercial shipments in 2019 came from the foreign manufacturers' inventories, with lead times averaging \*\*\* days, and \*\*\* percent were produced-to-order, with lead times averaging \*\*\* days.

[122] CR/PR at Table V-3. U.S. producers reported that \*\*\* percent of their U.S. sales were made on a spot basis, \*\*\* percent on a short-term contract basis, and \*\*\* percent on a long-term contract basis. U.S. importers reported that \*\*\* percent of their U.S. sales were made on a spot basis, \*\*\* percent on a short-term contract basis, and \*\*\* percent on an annual contract basis. *See id.* Furthermore, more than half of the responding purchasers (15 of 29 firms) reported that they purchase phosphate fertilizers on a daily or weekly basis. CR/PR at V-7.

[123] CR/PR at Table II-1.

[124] CR/PR at V-4.

[125] CR/PR at V-4.

27

APPX0022074

*Public Version*

transfer).[126]  U.S. producers and importers responding to the questionnaires in the remand proceedings reported using a variety of modes of transportation (including barge, rail, truck, and intermodal) to ship phosphate fertilizer during the POI.[127]

As discussed above and in our previous Views, most U.S. purchasers reported that the domestic like product's U.S. distribution network was superior to that of subject imports.[128] Respondents stated that most imports of phosphate fertilizers from Morocco and Russia were shipped to NOLA, loaded on barges, and transported up the Mississippi River and its tributaries.[129]  Mosaic reported that like subject imports, it transloads product onto river barges at NOLA that are moved up the Mississippi River to warehouse positions located on the inland U.S. waterways.[130]  Mosaic explained that its U.S. distribution network is expansive, comprising nearly *** with approximately *** short tons in storage capacity, which allows it to reach customers located throughout the United States.  Specifically, its network includes:  ***.[131]  In addition, Simplot, whose production facilities are located in Pocatello, Idaho and Rock Spring Wyoming, stated that it ships product to and has warehouses in the West and Midwest regions of the United States.[132]

As we explained in the First Remand Views, the additional questionnaire information

---

[126] CR/PR at V-4.

[127] *See* Remand Questionnaire Responses at 2(d).

[128] First Remand Views at 22; CR/PR at Table II-9.

[129] CR/PR at IV-11 n.16, V-4; Gavilon Prehearing Br. at 28-29; PhosAgro Prehearing Br. at 3; IRM Prehearing Br. at 14-15; Koch Posthearing Br. at 3-4.

[130] Mosaic Prehearing Br. at 32; Mosaic Posthearing Br. at Responses to Questions, pp. 91-93.

[131] Mosaic Posthearing Br. at Responses to Questions pp. 91-93.

[132] CR/PR at Table III-1; Simplot Posthearing Br. at Responses to Question pp. 24-25, Exhibits 4, 20.  Simplot explains that it has supply chain operations and warehouses *** and that it has sold product not only to the West, but also Midwest, regions of the United States for years.  Simplot Posthearing Br. at Responses to Question pp. 24-25, Exhibits 4, 20.

28

*Public Version*

gathered in those remand proceedings further demonstrated the breadth and superiority of U.S. producers' distribution networks.[133]  For example, Mosaic reiterated that ***.[134]  Mosaic described that ***.[135]  According to Mosaic, ***.[136]  For example, Mosaic reported that ***.[137]

Simplot reported that ***.[138]  Simplot also stated that ***.[139]  Simplot further reported that ***.[140]  In addition, PCS Phosphate Company, Inc. (Nutrien) reported that ***.[141]  PCS (Nutrien) reported that ***.[142]

Importers, on the other hand, reported less extensive inventory networks,[143] and less movement of inventories, although one importer did report relocating *** short tons of product in 2019 due to ***.[144]  The remaining importers reported that their distribution networks were "unidirectional" and that once delivered to an inventory or customer location, product was not subsequently relocated but rather remained at that location.[145]  OCP also claimed that, unlike ***, importers do not retain title to product that is delivered to its

---

[133] First Remand Views at 23-24.

[134] Mosaic Domestic Producer Remand Questionnaire at 2(a) – 2(d).

[135] Mosaic Domestic Producer Remand Questionnaire at 2(a).

[136] Mosaic Domestic Producer Remand Questionnaire at 2(a) – 2(c).

[137] Mosaic Domestic Producer Remand Questionnaire at 2(c).

[138] Simplot Domestic Producer Remand Questionnaire at 2(a) – 2(c).

[139] Simplot Domestic Producer Remand Questionnaire at 2(a).

[140] Simplot Domestic Producer Remand Questionnaire at 2(b)-2(c).  Simplot further explains that ***.  *Id.* at 2(c).

[141] PCS (Nutrien) Domestic Producer Remand Questionnaire at 2(a).

[142] PCS (Nutrien) Domestic Producer Remand Questionnaire at 2(b).

[143] *See, e.g.*, EuroChem Importer Remand Questionnaire at 2(a) (reporting ***; Koch Importer Remand Questionnaire at 2(a) (reporting ***; Macrosource (formally Gavilon) Importer Remand Questionnaire at 2(a) (reporting ***; ADM Importer Remand Questionnaire at 2(a) (reporting ***; ADM Importer Remand Questionnaire at 2(a) (reporting ***.  *** did not report any inventories of subject imports during the POI and importers *** did not specify the locations of any inventories that they maintained during the POI.  *See* Importer Remand Questionnaires of ***.

[144] *** Importer Remand Questionnaire at 2(b).

[145] *See* Importer Remand Questionnaires of ***.

29

*Public Version*

intended destination, meaning that ***.[146]  Thus, we found in the First Remand Views and continue to find that the record shows that domestic producers possess superior distribution capabilities compared to importers of subject merchandise.  Further, the record shows that domestic producers reported moving appreciable quantities of inventory between inventory locations and that importers did not do so for subject imports.[147]

In the Second Remand Order, the court held that {i}f the Commission wishes to continue finding that domestic inventory reshipment was part of the conditions of competition in the phosphate fertilizer industry, it must use record evidence to explain why — despite low volumes of inventory reshipment — domestic producers nonetheless had the capability to place their large inventories back into supply in the domestic phosphate fertilizer market.[148]

As a factual matter, we respectfully disagree that "there were low volumes of inventory reshipment."  Nor, as a factual matter, do we agree that reshipment was a "rare practice" that was "commercially insignificant."[149]  As explained above, in the First Remand Views we discussed *** as only one example of reshipment capability.  The record shows, however, that Mosaic's reshipment of inventories was not limited to only this type of ***.  For example, Mosaic also described other ***.[150]  The court's conclusions in the Second Remand Views, and its comparison of "the volume of reported reshipped inventory with domestic producers' overall shipment volume," appears to stem from reliance not on the totality of the evidence, but on the example that we discussed in our First Remand Views regarding ***.  Looking at the

---

[146] OCP Comments at 11.
[147] *See* Remand Questionnaires at 2(b).
[148] Second Remand Order at 27.
[149] Second Remand Order at 24-25.
[150] Mosaic Domestic Producer Remand Questionnaire at 2(b) – (c).

30

*Public Version*

record as a whole, on the other hand, we note that the total reshipment quantities with the additional quantities from Mosaic's other *** transfers equates to approximately *** percent of the domestic industry's total U.S. shipments during the POI,[151] which we respectfully disagree is "commercially insignificant."

Further, we consider a comparison of the volume of inventories relocated to the total volume of inventories to be more probative as to whether such relocation is a regular or rare occurrence.  The domestic industry's total inventory reshipments during the POI were equivalent to approximately *** percent of the industry's total end-of-year inventories during the period,[152] indicating that the movement of such inventories is a regular business practice and not a rare occurrence or just a theoretical possibility.  Likewise, the record as a whole, in our assessment, demonstrates that domestic producers did not lack reshipment capability.  We also reiterate that the domestic industry's reshipment of inventories was only one of several factors that the Commission relied on to find that the domestic industry was well-positioned to serve the U.S. market in 2019 and, unlike importers, domestic producers did not report that they were unable – technically or economically – to reship existing inventory.

Indeed, in its remand questionnaire response, Mosaic explained that it had ***.[153] Specifically, Mosaic reported:

> ***[154]

---

[151] *Calculated from* Mosaic Domestic Producer Remand Questionnaire (adding its reported ***); Simplot Domestic Producer Remand Questionnaire (adding ***), CR/PR at Table C-1 (total U.S. shipments).

[152] *Calculated from* Mosaic Domestic Producer Remand Questionnaire (adding its reported ***); Simplot Domestic Producer Remand Questionnaire (adding ***), CR/PR at Table C-1 (total U.S. end-of-period inventories).

[153] Mosaic Remand Domestic Producer Questionnaire at 2(c).

[154] Mosaic Remand Domestic Producer Questionnaire at 2(c).

31

APPX0022078

*Public Version*

This shows how, unlike importers, the domestic industry was able to use alternate shipping methods to reach customers and to draw upon its extensive distribution network, which was confirmed by purchasers to be superior compared to that of subject importers.[155] The court seemingly did not appreciate the relevance of this evidence, indicating that "tons in transit" are tons that are not yet in inventory.[156] However, as discussed above, our original finding related to the possibility of importers drawing from building inventories <u>or</u> product on barges.

We next turn to the court's direction to explain how if importers did not move "substantial quantities of inventory between locations," why the same is not true for domestic producers "that similarly reported limited instances of inventory reshipment."[157] As discussed above, unlike importers, domestic producers did not report that they were unable to serve the U.S. market from existing inventories. Moreover, the evidence shows that the domestic industry had excess capacity, substantial inventories, a demonstrated ability to move appreciable quantities of product between downstream inventory locations, and superior distribution networks, which enabled them to employ alternative means to ship products that were unable to be moved via barge. Importers, by contrast, reported less extensive inventory networks and less movement of inventories.[158] Only one importer reported relocating ***

---

[155] CR/PR at Table II-9.

[156] Second Remand Order at 26.

[157] Second Remand Order at 25.

[158] *See, e.g.*, EuroChem Importer Remand Questionnaire at 2(a) (reporting ***; Koch Importer Remand Questionnaire at 2(a) (reporting ***; Macrosource (formally Gavilon) Importer Remand Questionnaire at 2(a) (reporting ***; ADM Importer Remand Questionnaire at 2(a) (reporting ***; ADM Importer Remand Questionnaire at 2(a) (reporting ***. *** did not report any inventories of subject imports during the POI and importers *** did not specify the locations of any inventories that they maintained during the POI. *See* Importer Remand Questionnaires of ***.

32

*Public Version*

short tons of product in 2019 due to ***,[159] equivalent to only *** percent of total subject

import end-of-year inventories during the POI.[160]  The remaining importers reported that their

distribution networks were "unidirectional," such that once delivered to an inventory or

customer location, subject merchandise was not subsequently relocated but rather remained at

that location.[161]  Indeed, OCP specifically noted that ***, while importers do not retain title to

product that is delivered to its intended destination, meaning that ***.[162]  Accordingly, the

record shows that, while importers reported stranded inventories and did not move substantial

quantities of inventory between locations, the same is not true for the domestic industry.

As we further found in the Original Views and First Remand Views, in addition to

possessing an extensive distribution network, the domestic industry is vertically integrated with

respect to the main raw material inputs used to produce phosphate fertilizers – sulfur,

ammonia, and phosphate rock.[163]  *** produce sulfur and mine and beneficiate phosphate

rock, although these raw materials are sometimes purchased.[164]  Moreover, *** and Mosaic

produces and purchases ammonia.[165]  During the period of investigation, prices of phosphate

rock reported in CRU were relatively stable, while prices of ammonia fluctuated widely from

---

[159] *** Importer Remand Questionnaire at 2(b).
[160] Calculated from *** Importer Remand Questionnaire at 2(b); CR/PR at Table C-1.
[161] *See* Importer Remand Questionnaires of ***.
[162] OCP First Remand Comments at 11.
[163] Original Views at 31-33 and First Remand Views at 26, citing CR/PR at V-1.  U.S. producers reported that sulfur comprised approximately *** percent of their total raw material costs in 2019, ammonia *** percent, phosphate rock *** percent, and other raw material inputs *** percent.  *See id.*
[164] CR/PR at V-1.  *** reported purchasing sulfur, and respondent OCP stated that ***.  CR/PR at V-1; OCP Prehearing Br. at 14-15.
[165] CR/PR at V-1.  Mosaic stated that it produces one-third of its ammonia, purchases another third on the open market, and acquires a third through a long-term contract with CF Industries.  Mosaic Posthearing Br. at Responses to Questions p. 95.

33

APPX0022080

*Public Version*

January 2017 to January 2020, stabilized, then decreased between April and July 2020.[166]  Prices

for sulfur increased from January 2017 to the end of 2018, decreased through January 2020,

stabilized, then increased and remained stable through July 2020.[167]  Consistent with this, \*\*\*

and five of nine importers reported that raw material costs fluctuated with no clear trend over

the POI.[168]  Domestic producers' raw material costs as a share of cost of goods sold ("COGS")

increased by \*\*\* percentage points from \*\*\* percent in 2017 to \*\*\* percent 2019 and was \*\*\*

percent in interim 2020.[169]

### B. Volume of Subject Imports

Section 771(7)(C)(i) of the Tariff Act provides that the "Commission shall consider

whether the volume of imports of the merchandise, or any increase in that volume, either in

absolute terms or relative to production or consumption in the United States, is significant."[170]

As in the Original Views and First Remand Views, we continue to find that the volume of

cumulated subject imports and the increase in that volume were significant in absolute terms

and relative to apparent consumption in the United States during the POI.[171]  In this regard, we

reiterate that the volume of cumulated subject imports increased from 2.0 million short tons in

2017 to 3.0 million short tons in 2018, before decreasing to 2.7 million short tons in 2019, for

an overall increase of 36.8 percent between 2017 and 2019.[172]  Cumulated subject imports

were lower in interim 2020 at 1.2 million short tons than in interim 2019, at 2.0 million short

---

[166] CR/PR at Figure V-1.
[167] CR/PR at Figure V-1.
[168] CR/PR at Table V-1.
[169] CR/PR at V-1.
[170] 19 U.S.C. § 1677(7)(C)(i).
[171] Original Views at 33-35; First Remand Views at 27-29.
[172] CR/PR at IV-3, Table IV-2.

34

*Public Version*

tons.[173]  U.S. importers' U.S. shipments of subject imports increased from 1.8 million short tons in 2017 to 2.4 million short tons in 2018, and increased again to 2.5 million short tons in 2019. U.S. shipments of subject imports declined between the interim periods, from 1.9 to 1.3 million short tons.[174]

Cumulated subject imports' market share also increased from 2017 to 2019.  U.S. shipments of subject imports increased from *** percent of apparent U.S. consumption in 2017 to *** percent in 2018.  Although the volume of cumulated imports of subject phosphate fertilizers decreased between 2018 and 2019, the volume of U.S. shipments of subject imports increased by 6.2 percent while apparent U.S. consumption declined by *** percent during the same period.[175]  Consequently, cumulated subject imports continued to gain market share, which increased from *** percent in 2018 to *** percent in 2019, for an overall *** percentage point increase in market share between 2017 and 2019 as the domestic industry lost ***

---

[173] CR/PR at Table IV-2.  As previously discussed, the parties acknowledge that the filing of the petitions at the end of June 2020 resulted in a large decrease of subject imports to the U.S. market. Mosaic Prehearing Br. at 43-44, 91; Simplot Prehearing Br. at 29-30, 34; Simplot Posthearing Br. at Responses to Questions pp. 53-54; Mosaic Posthearing Br. at Responses to Questions pp. 69-70; OCP Posthearing Br. at 12, Responses to Questions p. 33, 67-73; EuroChem Posthearing Br. at 11; IRM Posthearing Br. at 8-9; PhosAgro Posthearing Br. at 12-13, Responses to Questions.  Some U.S. importers indicated that they stopped bringing in subject imports "because the buyers and the sellers agreed that the risk of 75 percent countervailing duties was higher than either of them wanted to take."  Hearing Tr. at 337 (Aranoff); *see also* EuroChem Posthearing Br. at 11 (stating that as a result of the filing of the petitions, it shifted its purchases of phosphate fertilizers from Morocco and Russia to other global sources); *** U.S. Purchaser Questionnaire Response at III-11 (reporting that Koch and IRM will not quote or import material until the countervailing duty decision is issued); *** U.S. Purchaser Questionnaire Response at III-11 (reporting that Helm, Koch, and OCP "cut off" supplying imported product to the U.S. market in the summer of 2020).  Monthly import data also confirm that subject import volume from Morocco and Russia showed notable declines after the petitions were filed at the end of June 2020, and subject import end-of-quarter inventories also declined.  CR/PR at Tables IV-6 and D-1.
[174] CR/PR at Table C-1.  End-of-period inventories of subject imports held by U.S. importers *** percent between 2017 and 2018, from *** short tons to *** short tons, before a decline to *** short tons in 2019.
[175] CR/PR at Tables IV-2, IV-7-8, C-1.

35

*Public Version*

percentage points of market share over the same period.[176] [177]

We therefore continue to find that the volume of cumulated subject imports and the increase in that volume were significant in absolute terms and relative to apparent consumption in the United States during the period of investigation.

We respectfully disagree with the court that the import data that the Commission relied upon is "inaccurate" or "artificially inflated."[178]  The Commission's questionnaires, for both the preliminary and final phases of the investigations, directed importers to report as "imports" only "{t}hose products identified for Customs purposes as imports for consumption."[179]  Although the issue of reexports was raised during the preliminary phase, no respondent raised any objection to that question or suggested that the Commission collect data differently with respect to reexports in the final phase in any comments on the draft questionnaires.  Accordingly, the Commission reasonably compiled the cumulated import data based on the volumes of imports reported by importers in their responses to Commission questionnaires.[180]  Moreover, because importers reported these imports as entering the United States for the

---

[176] CR/PR at Tables IV-8, C-1.  The domestic industry's market share declined from *** percent in 2017 to *** percent in 2018 and *** percent in 2019.  *See id.*

[177] Subject imports decreased substantially after the filing of the petitions at the end of June 2020.  CR/PR at Table IV-6.  As a result, subject imports' market share was lower in interim 2020, at *** percent, than in interim 2019, at *** percent.  CR/PR at Tables IV-8, C-1.  At the same time, the domestic industry's U.S. shipments and market share increased.  Mosaic diverted shipments that had been destined for export markets and drew down inventories, for a total of *** short tons in additional sales in interim 2020 compared to interim 2019.  Mosaic Posthearing Br. at Responses to Questions p. 84; Mosaic U.S. Producer Questionnaire Response at IV-16.  *** also reported more U.S. shipments in interim 2020 than in interim 2019.  *** U.S. Producer Questionnaire Responses at II-7; *** U.S. Producer Questionnaire Responses at II-7.  Consequently, the domestic industry's market share was higher in interim 2020, at *** percent than in interim 2019 at *** percent.

[178] Second Remand Order at 35-37.

[179] Importer Questionnaire, Definitions, EDIS Doc. Nos. 713651 (Preliminary), 727451 (Final).

[180] CR/PR at Table IV-2.

APPX0022083

*Public Version*

intended purpose of consumption, these data were an accurate representation of the volume of cumulated subject imports, even if such imports were at some later, unspecified point in time reexported to Canada.

In any event, the Commission, in fact, gathered information regarding importers' reported exports in its importer questionnaires.[181]  Even if we were to rely on the volume of cumulated subject imports adjusted to deduct importers' reported exports, we would continue to find the volume of cumulated subject imports and the increase in that volume to be significant in absolute terms.  Based on these adjusted data, the volume of cumulated subject imports increased from 1.8 million short tons in 2017 to 2.9 million short tons in 2018, before decreasing to 2.4 million short tons in 2019, for an overall increase of 33.2 percent; the volume of cumulated subject imports was 1.0 million short tons in interim 2020 compared to 1.9 million short tons in interim 2019.[182]  Accordingly, even these adjusted data show cumulated subject import volumes and increases in volume that are comparable to those shown by the unadjusted data.[183]

---

[181] Importers Questionnaire at II-5a, II-5b.  We note, however, that because these questions also included the carryover of inventories, product may have been exported in a later period than when it was imported.

[182] *Calculated from* Importers Questionnaire Responses at II-5a, II-5b.

[183] We therefore reject PhosAgro's arguments that the Commission's "disingenuous" finding of a more than one million ton increase in subject import volume must be "stricken" as based on inaccurate data.  PhosAgro Second Remand Comments at 2, 9.  Based on these adjusted data, the 1.1 million short ton increase in the volume of cumulated subject imports from 2017 to 2018 was more than all of the proffered alternative calculations of the amount that Mosaic reduced its supply to the U.S. market with the idling of Plant City, including PhosAgro's preferred one million ton figure as well as Mosaic's reasonable estimated 700,000 short ton reduction in supply.  Moreover, as discussed above, the domestic industry as a whole had excess capacity and substantial inventories throughout the POI.  We likewise reject PhosAgro's argument that the Commission's allegedly selective and inconsistent citations to subject import volume and subject import U.S. shipments was "unlawful cherry-picking," and that the

(*continued...*)

37

*Public Version*

We next address the court's question as to whether the Commission's volume findings can be sustained based solely on the data regarding U.S. shipments.[184]  Although we did not rely solely on U.S. shipments, we note that the statute provides that the "Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms **or** relative to production **or** consumption in the United States, is significant."[185]  Accordingly, although we relied here both on the volume of cumulated subject

---

Commission must consider that the approximately 600,000 short ton increase in U.S. shipments of cumulated subject imports, which it contends fell short of satisfying either the 1 million ton domestic supply gap that Mosaic contemporaneously announced in 2017 or the 700,000 short ton estimated domestic supply reduction with the idling of Plant City.  PhosAgro Second Remand Comments at 2, 9.  The Commission did not engage in "cherry-picking" by considering the total volume and U.S. shipments of cumulated subject imports as reported by the importers themselves.  To the contrary, the Commission complied with the statutory provision in considering both the volume of cumulated subject imports as well as U.S. shipments to measure U.S. consumption.  Moreover, irrespective of any imports that may have been re-exported, as discussed above, the data comparing U.S. shipments of imports to domestic producers' U.S. shipments of phosphate fertilizers also supports our volume analysis. Thus, a comparison of U.S. shipments shows that while Mosaic reduced its U.S. shipments from 2017 to 2018, *** short tons, importers' U.S. shipments of subject imports increased by 604,981 short tons in 2018, and were 753,938 short tons higher in 2019 than in 2017.  CR/PR at Table C-1; Mosaic Revised Domestic Producer Questionnaire at II-7.

We likewise reject OCP's challenges to our volume analysis.  OCP Second Remand Comments at 12-15.  First, we note that in contending that the import data adjusted for reexports shows that the increase in the volume of cumulated subject imports was only 592,154 short tons, OCP is only comparing 2017 to 2019, overlooking the 1.1 million short ton increase that occurred from 2017 to 2018, as discussed above.  Next, we also do not find it appropriate to reduce the volume of subject imports by *** or *** total purchases, given that the record does not show that the domestic industry categorically refused to supply them but rather that Mosaic would not sell to them at their preferred prices, as discussed below in the Price Effects discussion.  We also reject OCP's contention that the increase in the volume of cumulated subject imports was *** than the alleged reductions in supply by the domestic industry.  As we explained in the First Remand Views as well as above, we find that Mosaic's idling of Plant City in 2017 did not create a "supply gap."  To summarize what is set out above: the volume of cumulated imports exceeded Mosaic's reasonable estimate of the amount by which it reduced its supply to the U.S. market in 2017; the increase in subject import U.S. shipments also exceeded Mosaic's reduction in its U.S. shipments from 2017 to 2018; the domestic industry as a whole had excess capacity throughout the POI; and in 2019, Nutrien increased its capacity and production in the U.S., which covered its increased exports that year.

[184] Second Remand Order at 37-38.

[185] 19 U.S.C. § 1677(7)(C)(i) (emphasis added).

38

*Public Version*

imports in absolute terms as well as on U.S. shipment data--which are used to calculate

apparent U.S. consumption--reliance solely on U.S. shipment data to consider the significance

of the volume of cumulated subject imports relative to U.S. consumption would be permissible

under the statute.

In the First Remand Views, as directed by the court, we added to our volume analysis an

explanation of how our volume findings are consistent with our findings on conditions of

competition in the U.S. phosphate fertilizer market.[186]  Nonetheless, we respectfully

maintained, and continue to maintain, that our original determinations were consistent with

our statutory mandate, and that, while the statute permits the Commission to look beyond the

quantitative volume data for purposes of its volume findings, the statute nowhere mandates

that the Commission perform such an analysis.

As we further explained in the First Remand Views, the court in its First Remand Order

appears to have misconstrued the statute on its face in stating that 19 U.S.C. § 1677(7)(C)(iii)

requires that the Commission "apply its findings regarding the conditions of competition to its

analysis of the three statutory factors: subject import volume, price effects, and impact on the

domestic industry."[187]  The specific clause cited by the court actually applies only to the

---

[186] First Remand Views at 30-33.

[187] Remand Order at 26 (citing *Altx, Inc. v. United States*, 26 CIT 709, 719 (2002); *Nucor Corp. v. United States*, 28 CIT 188, 207 (2004), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005); *Nippon Steel Corp. v. United States*, 25 CIT 1415, 1420 (2001); *Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1222 (2006)). We note that the finding in *Hynix Semiconductor* is consistent with what we view to be the plain language of the statute, as the issue in that case concerned the Commission's impact analysis.  *See* 30 CIT at 1220.  Likewise, in affirming the trial court in *Nucor*, the Federal Circuit held that "Section 1677(7)(C)(iii) in turn requires the Commission, in determining the *impact* of the subject imports on domestic producers, to 'evaluate all relevant economic factors which have a bearing on the state of the industry in the United States.'"  414 F.3d at 1336-37 (emphasis added).

39

*Public Version*

Commission's impact analysis.[188]  Section 1677(7)(C) is divided into four clauses:  (i) Volume; (ii) Price; (iii) Impact on affected domestic industry; and (iv) Captive production.  The requirement to consider the conditions of competition follows directly after, and specifically refers to the impact clause (clause (iii)):  "The Commission shall evaluate all relevant economic factors described **in this clause** within the context of the business cycle and conditions of competition that are distinctive to the affected industry."[189]  Lest there be any doubt that each of the four roman numerals constitutes a "clause," this is made clear in the captive production clause (clause (iv)), wherein the statute explicitly refers to elements of the impact analysis as falling within "clause (iii)":  "{T}he Commission, in determining market share and the factors affecting financial performance set forth in **clause (iii)**, shall focus primarily on the merchant market for the domestic like product."[190]  Thus, on its face, section 1677(7)(C)(iii) requires that the Commission consider the relevant economic factors described in the impact clause, clause (iii), within the context of business cycle and conditions of competition but does not impose such a requirement with respect to its analysis of volume, clause (i), and price effects, clause (ii).[191] [192]

---

[188] 19 U.S.C. § 1677(7)(C)(iii).

[189] *Id.* (emphasis added).

[190] 19 U.S.C. § 1677(7)(C)(iv) (emphasis added).

[191] We note that, although 19 U.S.C. § 1677(7)(C)(iii) is not applicable to the Commission's volume and price effects analyses, the statute does not preclude the Commission from considering conditions of competition or other relevant economic factors in its volume and price effects analyses, if the Commission finds it appropriate to do so, as it did here, for example, in considering the weather events and demand conditions in its price effects analysis.  *See* 19 U.S.C. § 1677(7)(B)(ii).

[192] The interrelationship between the conditions of competition requirement and the impact analysis is further supported by the reference in that paragraph to conditions "that are distinctive to the affected industry."  19 U.S.C. § 1677(7)(C)(iii).  Without question "the affected industry" refers to the domestic producers of the domestic like product, as reflected in the statute's definition of "industry."  19 U.S.C. § 1677(4).  In turn, clause (iii) of section 1677(7)(C) (Impact) requires an evaluation of "all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry" – an evaluation that is logically connected to the conditions of competition distinctive to that industry.

40

*Public Version*

Although we complied with the court's remand instructions, we explained that this statutory

framework informs our analysis.

In the Second Remand Order, the court again contends that the Commission "must

consider the general 'conditions of competition' within the affected industry, 19 U.S.C. §

1677(7)(C)(iii) (flush language) and apply its 'conditions of competition findings to its analysis of

the three statutory factors" as well as claiming that "{t}he Tariff Act requires the Commission to

ground its material injury determination 'within the context of the business cycle and {the}

conditions of competition that are distinctive to the affected injury {sic.}.'"[193]  The court also

states that "{b}y requiring the Commission to consider the conditions of competition that shape

the domestic market, the Tariff Act 'prevents the {Commission} from attributing to subject

imports an injury whose cause lies elsewhere.'"[194]  We note as an initial matter that the case

upon which the court relies for this proposition, *Hynix Semiconductor,* confirms that the

statutory mandate to consider "conditions of competition" is in the context of the

Commission's impact analysis, in explaining that "the ITC's **impact** analysis 'shall evaluate all

relevant economic factors which have a bearing on the state of the industry in the United

States{.}'"[195]  In the Second Remand Order, the court continued "{b}y mandating consideration

---

[193] Second Remand Order at 4 (citing *Altx, Inc. v. United States*, 26 CIT 709, 719 (2002); *Nucor Corp. v. United States*, 28 CIT 188, 207 (2004), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005)).  As we explained in the First Remand Views, in affirming the trial court in *Nucor*, the Federal Circuit held that "Section 1677(7)(C)(iii) in turn requires the Commission, in determining the impact of the subject imports on domestic producers, to 'evaluate all relevant economic factors which have a bearing on the state of the industry in the United States.'"  First Remand Views at 29 (citing *Nucor*, 414 F.3d at 1336-37 (emphasis added)).  We further pointed out that, in *Altx,* the Federal Circuit ultimately held that the court should not "ask more of the Commission than required by the statute."  First Remand Views at 30 (citing *Altx, Inc. v. United States*, 370 F. 3d 1108, 1123 (Fed. Cir. 2004)).
[194] Second Remand Order at 4 (citing *Hynix Semiconductor, Inc. v. United States,* 30 CIT 1208, 1222 (2006)).
[195] *Hynix Semiconductor*, 30 CIT at 2222.

41

*Public Version*

of 'all relevant economic factors,' the statute prevents the ITC from attributing to subject imports an injury whose cause lies elsewhere" further stating that "{t}he requirement to look to 'all relevant economic factors' is inextricably intertwined with the ITC's causation inquiry."[196] We note that, as set forth in the legal standards sections of the Original Views, the assessment of whether material injury to the domestic industry is "by reason of" subject imports "does not require the Commission to address the causation issue in any particular way" as long as "the injury to the domestic industry can reasonably be attributed to the subject imports" and the Commission "ensure{s} that it is not attributing injury from other sources to the subject imports."[197]  Thus, we continue to respectfully maintain that our original determinations are consistent with our statutory mandate, and that, while the statute permits the Commission to look beyond the quantitative volume data for purposes of its volume findings, the statute nowhere mandates that the Commission perform such an analysis.  Moreover, consistent with the cases cited in the Second Remand Order, we have considered issues regarding conditions of competition, causation, and nonattribution in the impact section, including incorporating our discussion from the First Remand Views regarding whether "fertilizer was 'practically unavailable from U.S. sources' to supply high-demand regions in 2019 because doing so would not have been economically viable."[198]

### C.        Price Effects of the Subject Imports

Section 771(7)(C)(ii) of the Tariff Act provides that, in evaluating the price effects of subject imports, the Commission shall consider whether –

---

[196] *Hynix Semiconductor*, 30 CIT at 2222.
[197] Original Views at 17-20.
[198] First Remand Views at 31-33.

APPX0022089

*Public Version*

(I)       there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

(II)      the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.[199]

As previously discussed, we continue to find that there is a high degree of substitutability between subject imports and the domestic like product that are of the same chemical formulation, and price is an important consideration in purchasing decisions, along with availability and quality.

As discussed in the Original Views,[200] the Commission in the final phase of these investigations collected monthly pricing data from U.S. producers and importers for the total quantity and f.o.b. value of two phosphate fertilizer products shipped in bulk (*i.e.*, barge-load) from NOLA to unrelated U.S. agricultural customers.[201] [202]  One U.S. producer (***) and seven importers provided usable pricing data, although not all firms reported pricing for both

---

[199] 19 U.S.C. § 1677(7)(C)(ii).

[200] Original Views at 35-39.

[201] CR/PR at V-9.  The two pricing products were:  (1) Standard-grade monoammonium phosphate (MAP), chemical formula $NH_4H_2PO_4$, granular, excluding high-purity MAP; and (2) Standard-grade diammonium phosphate (DAP), chemical formula $(NH_4)_2(HPO_4)$, granular.  *See id.*

[202] The record indicates that the "f.o.b. NOLA price" is a universal price benchmark denoting a loaded barge at a dock/fleeting point in New Orleans irrespective of where the product originated, and is used as a primary point of reference in price negotiations in the U.S. market.  Mosaic Posthearing Br. at Responses to Questions pp. 28-32; Simplot Posthearing Br. at Responses to Questions pp. 60-62; Hearing Tr. at 33-34 (Jung), 287 (Groden).  In their daily or weekly price listings, trade publications Argus and Green Markets include "f.o.b. from NOLA" or "NOLA Barge" phosphate fertilizer prices.  CR/PR at V-5 n.5.  Domestic producers, therefore, compete with subject imports upon the f.o.b. NOLA price in selling product, and Mosaic states that to compete against subject imports at NOLA from its plants in Florida, it has to absorb the $20 per short ton cross-Gulf freight costs.  Mosaic Posthearing Br. at Responses to Questions pp. 29-32; Simplot Posthearing Br. at Responses to Questions pp. 60-62.  Thus, "for a selling price of $300/ST fob NOLA to be competitive with subject imports, it would have to be priced at $280/ST fob Florida plant."  Mosaic Posthearing Br. at Responses to Questions p.30.

43

APPX0022090

*Public Version*

products for all months of the POI.[203]  Pricing data reported by these firms accounted for

approximately *** percent of U.S. producers' U.S. shipments, *** percent of U.S. shipments of

subject imports from Morocco, and *** percent of U.S. shipments of subject imports from

Russia in 2019.[204]

The pricing data show that cumulated subject imports undersold the domestic like

product in 34 of 170 instances (involving 381,132 short tons) at underselling margins ranging

from 0.02 to 4.4 percent and an average underselling margin of 1.7 percent.  Subject imports

oversold the domestic like product in the remaining 136 instances (involving 2.0 million short

tons) at overselling margins between 0.02 and 17.6 percent with an average overselling margin

of 3.7 percent.[205]

We observe that underselling and overselling margins were small and prices of the

domestic like product and subject imports tracked each other closely over the POI.[206]  That

subject imports and the domestic like product were similarly priced is consistent with the high

degree of substitutability between the domestic like product and subject imports, as well as the

---

[203] CR/PR at V-9.  ***.  CR/PR at V-9 n.12.
[204] CR/PR at V-9.
[205] CR/PR at Table V-7.
[206] CR/PR at Tables V-4-5, V-7.  On average, the underselling margin was *** percent for product 1 and *** percent for product 2 while the overselling margin was *** percent for product 1 and *** percent for product 2.  CR/PR at Table V-7.  A Mosaic representative testified at the hearing that "{t}he Commission's price data show more instances of overselling than underselling.  The Commission should not construe this as evidence of the absence of adverse price effects to the domestic industry.  First, prices are close, with average over- or underselling margins within {what} one would expect for a commodity industry with transparent pricing.  But the price trends between U.S. producers and importers were very highly correlated over time."  Hearing Tr. at 51 (Klett).

APPX0022091

*Public Version*

price transparency that existed in the U.S. phosphate fertilizer market.[207]  Most purchasers

reported that prices of the domestic like product were comparable to prices of subject imports

from Morocco and Russia (the remaining purchasers reported that prices for the domestic like

product were inferior, *i.e.*, higher priced).[208]  Some purchasers also confirmed purchasing

subject imports instead of the domestic like product due to their lower prices.  Seventeen of 28

U.S. purchasers reported that they had purchased imported phosphate fertilizers from Morocco

and/or Russia instead of the domestic like product.  Nine of these 17 purchasers reported that

subject imports were lower priced than the domestic product, and 5 of these 9 purchasers

reported that price was a primary reason for purchasing subject imports rather than the

domestic like product.[209]  Four U.S. purchasers confirmed lost sales totaling 733,895 short tons

---

[207] *See Comm. of Domestic Steel Wire Rope and Specialty Cable Mfg. v. United States*, 24 F. Supp. 2d 1287, 1299 (Ct. Int'l Trade 2002) (stating that "'the more fungible two products are, the more likely underselling by one will affect the price of the other'") (quoting *BIC Corp. v. United States*, 964 F. Supp. 391, 400 (Ct. Int'l Trade 1997)).

[208] CR/PR at Table II-9.  Twenty of 24 firms reported that the domestic like product and subject imports from Morocco were comparable on price; 20 of 23 did so for the domestic like product and subject imports from Russia.  Four and three purchasers reported prices of the domestic like product to be inferior (*i.e.*, higher priced) to prices of subject imports from Morocco and Russia, respectively, while no purchaser reported prices of the domestic like product to be superior (*i.e.*, lower priced) to prices of subject imports from Morocco or Russia.  *Id.*

OCP's argument that the fact that 20 out of 24 purchasers reported prices of the domestic like product and subject imports to be comparable "confirm{s} that subject imports were not lower priced and did not cause adverse price effects, OCP Second Remand Comments at 18, overlooks that while 20 purchasers indicated that prices for the domestic like product were comparable, the remaining four reported that the domestic like product was inferior (*i.e.*, higher priced) compared subject imports; notably, no responding purchaser reported that the domestic like product was superior (*i.e.*, lower priced) compared to subject imports.  Thus, rather than confirm that subject imports were not lower priced, these purchaser responses corroborate other record evidence showing that prices for subject imports and the domestic like product closely track each other and that subject imports are at times lower priced.

[209] CR/PR at Table V-9.

45

APPX0022092

*Public Version*

over the POI.[210]  In addition, as discussed further below, the record indicates that importers of

subject merchandise in instances offered lower prices than domestic producers during 2019 in a

declining market.[211]  Thus, while we recognize the prevalence of overselling in the pricing data,

we continue to find that the record demonstrates that, consistent with the high degree of price

transparency in this market, the prices of the domestic product and subject imports tracked

each other closely and were generally comparable with small margins of underselling and

overselling, that subject imports were in some instances lower priced, and the domestic

---

[210] CR/PR at Table V-9.  Respondents argued that ***, which accounted for *** percent of the total quantity of reported lost sales, directly contradicted its lost revenue response submitted in the preliminary phase of the investigations, and upon this basis, request that *** reported amount be discounted.  OCP Prehearing Br. at 96-97; Gavilon Prehearing Br. at 50.  We continue to find, however, that the record does not support disregarding the *** short tons of subject imports that *** reported purchasing instead of the domestic like product due at least in significant part to the lower price of subject imports.  In these final phase investigations, Growmark reported that subject imports were priced lower than the domestic product, and that price was a primary reason for purchasing subject imports instead of domestic product.  ***

CR/PR at V-23 n.14 (emphasis provided).  Thus, while some portion of the reported quantity of lost sales may also have been influenced by non-price reasons, *** clarified that *** and that ***.

We also note that *** response regarding U.S. producers' price reductions further supports that it increased its purchases of subject imports for price reasons.  In reporting that U.S. producers ***.

CR/PR at V-26.

[211] *See, e.g.,* Mosaic Posthearing Brief at 36-37, Responses to Questions, pp. 44-46 and Exhibits 41-46; 50 and 51; Simplot Posthearing Br. at Responses to Questions pp. 35-37, Exhibit 4.  We are not persuaded by OCP's assertion that that Mosaic's pricing data analysis, which ***, is "misleading" because ***.  OCP Second Remand Comments at 20.  As discussed above in Section II.A.3, there is a high degree of transparency in the U.S. market, which includes phosphate fertilizer prices reported in various trade publications, published on a daily or weekly basis, along with the fact that the majority of U.S. producers and purchasers, and some importers report they rely upon these publications in setting or negotiating prices, as well as the fact that purchasers report contacting multiple suppliers before making a purchase.  Given the importance of price coupled with the high degree of transparency in the U.S. market, low prices from even a single importer are capable of being quickly transmitted throughout the U.S. market.  We therefore find that, based on these considerations, OCP's argument unpersuasive and belied by the record.

APPX0022093

*Public Version*

industry lost sales to subject imports because of lower prices.[212]

In the Second Remand Order, the court held that "the Commission also fails to support its continued reliance on the lost sales figure" with substantial evidence and instructed the Commission that if it "wishes to credit some portion of the reported lost sales on remand, it must adequately explain this decision, including by addressing detracting evidence."[213]  We start by clarifying that neither in the previous Views nor in these Views have we "rubber stamped" *** response.[214]  To the contrary, the Commission staff took strides to assure the accuracy of that information.  As explained above in note 210, ***.  Having undertaken this step to further investigate and verify the information, we found and continue to find it appropriate to rely on *** response because "while some portion of the reported quantity of lost sales may also have been influenced by non-price reasons, *** clarified that *** and that ***.[215]

Turning to the court's instruction that if the Commission "wishes to credit some portion of the reported lost sales on remand, it must adequately explain this decision, including by

---

[212] Accordingly, as in the Original and First Remand Views, we examined other record evidence relevant to whether there was significant subject import underselling as well as the pricing data, finding that the pricing data showed that subject imports predominantly oversold the domestic like product during the POI.  Original Views at 37-39; First Remand Views at 34-36.  We thus *considered* whether subject imports significantly undersold the domestic like product.  We respectfully disagree with the court that the Commission "must answer" whether there was significant underselling. Second Remand Order at 40.  On its face, the statutory provision requires only that the Commission consider whether there has been significant underselling.  See 19 U.S.C. § 1677(7)(C)(ii) ("the Commission shall consider whether –").  As the Federal Circuit has explained, the Commission's "consideration" of a statutory factor does not encompass an obligation to come to any conclusion regarding that factor.  *See Altx*, 370 F.3d at 1123 (discussing "consideration" of the magnitude of the margin of dumping); *see also Nucor Corp.*, 414 F.3d at 1339.
[213] Second Remand Order at 43-44.
[214] Second Remand Order at 47.
[215] First Remand Views, 25-51 at 36 n.168.

47

*Public Version*

addressing detracting evidence,"[216] we note, as confirmed by the Court of International Trade, that "purchasers have little incentive to confirm allegations."[217]  Accordingly, we find \*\*\* response to be credible and forthcoming such that it is appropriate to continue to consider the entirety of its reported confirmed lost sales.

In any event, even if we were to attempt to identify a portion of \*\*\* reported lost sales and provide a basis for crediting that portion consistent with other record evidence, we would still find its response to show a significant volume of confirmed lost sales.  As discussed above, \*\*\* reported that \*\*\*.  Accordingly, a conservative estimate based on this representation would be a bare majority of \*\*\* reported lost sales or \*\*\* short tons, which remains a significant quantity of lost sales.  Although we recognize that other purchasers may not have similarly confirmed any lost sales allegations, that does not "detract" from the reality of the confirmed loss of sales to a customer \*\*\*, who instead purchased subject imports primarily due to their lower prices.  Other evidence corroborates that the domestic industry lost sales to cumulated subject imports, including but not limited to the fact that cumulated subject imports gained market share at the direct expense of the domestic industry during the POI as well as other examples given by the domestic industry and other market participants.[218]

Moreover, because our price effects finding is based on price depression, the actual volume of \*\*\* lost sales is less probative than its narrative responses that directly corroborate

---

[216] Second Remand Order at 43-44.

[217] *Acciai Speciali Terni, S.p.A. v. United States*, 19 CIT 1051, 1056 (1995).

[218] *See, e.g.*, CR/PR at II-21 (certain purchasers reporting decreasing purchases of domestic product due to a "decrease in price competitiveness" and increasing purchases of subject imports due to the latter being more competitive), Tables V-9, C-1; Mosaic Posthearing Brief at 36-37, Responses to Questions, pp. 44-46 and Exhibits 41-46; 50 and 51; Simplot Posthearing Br. at Responses to Questions pp. 35-37, Exhibit 4.

48

*Public Version*

the Commission's findings that subject imports were at times lower priced and exerted competitive pressure on prices for the domestic like product. In addition to \*\*\*, it was \*\*\*, which is cited below in our discussion of price depression. Specifically, as discussed above, \*\*\* reported that U.S. producers \*\*\*.[219] Thus, \*\*\* confirmed lost revenues and explanation for how they came about directly corroborate our finding that subject imports depressed prices for the domestic like product to a significant degree based on the totality of the evidence discussed above and in the Commission's price analysis. Indeed, in reporting that subject imports placed downward pressure on domestic prices, \*\*\* could hardly be characterized as an "outlier" when numerous trade publications that play an integral role in the U.S. fertilizers market were reporting similar observations and widely shared experiences.

Indeed, as discussed above, we have also cited other record evidence corroborating that the domestic like product and subject imports were closely priced, with subject imports priced lower in some instances. All responding purchasers (*i.e.*, purchasers who responded to the Commission's questionnaire) indicated that prices for the domestic like product were comparable or inferior (*i.e.*, higher priced) to prices for subject imports.[220] Additionally, a number of purchasers reported that subject imports were priced lower than the domestic like product and several further reported that the lower price was a primary reason for purchasing subject imports instead of the domestic like product.[221] Furthermore, as the market declined in 2019, the record indicated that there were other instances in which importers of subject

---

[219] CR/PR at V-26.
[220] First Remand Views at 35-36.
[221] First Remand Views at 35-36.

49

*Public Version*

imports offered prices below those of the domestic industry.[222]

Thus, although we have not made a finding of significant underselling, we continue to find that the record demonstrates that, consistent with the high degree of price transparency in this market, the prices of the domestic product and subject imports tracked each other closely and were generally comparable with small margins of underselling and overselling, that subject imports were in some instances lower priced, and the domestic industry lost sales to subject imports because of lower prices.

We also considered price trends for the domestic like product and subject imports. During the POI, prices for both the domestic like product and subject imports increased between 2017 and most of 2018, and then declined between 2018 and 2019.[223]  Prices in interim 2020 increased, but remained below levels in January 2017 until after the filing of the petitions at the end of June 2020, after which prices experienced dramatic increases as subject import volumes to the U.S. market decreased and subject import end-of-period inventory levels decreased.[224]

The record shows that significant and increasing volumes of subject imports entered the U.S. market between 2017 and 2018 and remained at significant levels in 2019 despite a

---

[222] First Remand Views at 36-37, citing Mosaic Posthearing Brief at Responses to Questions, pp. 44-46 and Exhibits 50 and 51; *see also* Mosaic Posthearing Brief at 36-37, Responses to Questions, pp. 44-46 and Exhibits 41-46; 50 and 51; Simplot Posthearing Br. at Responses to Questions pp. 35-37, Exhibit 4.

[223] CR/PR at Tables V-4-5.

[224] CR/PR at Tables V-4-5, Figure V-4.  Between 2017 to 2019, prices for the domestic like product decreased overall by *** percent for pricing product 1 and by *** percent for pricing product 2. Prices for subject imports decreased overall by *** percent for pricing product 1 and by *** percent for pricing product 2.  Derived from CR/PR at Tables V-4-5.  U.S. importers' inventories of subject imports declined from *** short tons at the end of the interim 2019 period to *** short tons at the end of the interim 2020 period.  CR/PR at Table C-1.

50

*Public Version*

substantial demand decline due to what an OCP witness characterized as a "Black Swan" level of rainfall beginning in the fall of 2018 and lasting through 2019.[225][226]  As respondents acknowledge, heavy precipitation in the fall of 2018, a polar vortex in the winter of 2018-2019, and record setting precipitation in the spring of 2019 caused massive flooding and prolonged river closures along the Mississippi River system that stranded fertilizer barges and resulted in delayed, destroyed, or abandoned plantings, especially in the Midwest and Great Plains regions.[227]  Accordingly, while U.S. demand increased overall between 2017 and 2018, demand began to decline in the latter part of 2018 and continued into 2019, as the unusual weather conditions impacted three consecutive planting seasons - fall of 2018, spring of 2019, and fall of 2019.  OCP observed that the USDA's Farm Service Agency, which tracks agricultural acreage that farmers did not use in a particular season, reported that the volume of "prevented planting acreage" in 2019 set a U.S. record – by a wide margin – at 19.6 million acres.[228]  Apparent U.S. consumption of phosphate fertilizers declined by *** percent from 2018 to 2019, by more than

---

[225] Hearing Tr. at 191-93 (Rahm); *see also* Mosaic Prehearing Br. at 88-91; Mosaic Posthearing Br. at 3, 13, Responses to Questions pp. 20-21.

[226] We note that, although the statute does not require us to consider conditions of competition and business cycles in our price effects analysis, we have considered certain pertinent conditions of competition and business cycles here.

[227] *See, e.g.*, OCP Prehearing Br. at 35-36, 46-48; Gavilon Prehearing Br. at 11-12; PhosAgro Prehearing Br. at 6-7; IRM Prehearing Br. at 15-16; PhosAgro Posthearing Br. at 3-4.  As further detailed below, the trade publication Argus repeatedly referenced oversupply conditions in early 2019, as follows: "The 'polar vortex' in the US midwest saw temperatures plummet.  The US domestic market followed suit.  Put simply, the US market 'tanked' on cold weather, a full pipeline and heavy imports (January 31, 2019); "{T}he US is awash with imports . . .  Pushing so much DAP/MAP to the US has led to oversupply" (February 7, 2019); "The US has a record surplus of phosphates entering the spring season, boosted by weak sales, terrible weather conditions and heavy 1Q imports, which reached a record 1.2mn t of DAP/MAP, up 27pc yoy" (March 28, 2019).  Petition, Volume I, Exhibits I-29, I-30, I-33.

[228] OCP Prehearing Br. at 47-48.

51

*Public Version*

*** short tons, to below the level of apparent U.S. consumption in 2017.[229] [230]

Despite these market conditions, subject imports continued to enter the market in large volumes in 2019 and in excess of any purported need to restock inventory in regions that were unaffected by weather.[231]  It is uncontroverted that the volume of cumulated subject imports increased 1.0 million short tons from 2017 to 2018.[232]  It is likewise uncontroverted that demand for fertilizers in the U.S. market began to decline in 2018 due to heavy precipitation in

---

[229] U.S. apparent consumption declined by *** percent from 2018 to 2019, reflecting a *** percent decline in U.S. producers' U.S. shipments, an 11.8 percent decline in U.S. shipments of nonsubject imports, and a 6.2 percent *increase* in U.S. shipments of cumulated subject imports.  CR/PR at Table C-1.  As a result, from 2018 to 2019, cumulated subject imports' market share increased by *** percentage points; the domestic industry's market share decreased by *** percentage points; and nonsubject imports' market share decreased by *** percentage points.  *Id.*

[230] In its First Remand Order, the court addressed the Commission's finding that subject imports exceeded demand, contributing to oversupply conditions that resulted in price depression.  The court stated that this finding "was vulnerable to the Plaintiffs' rebuttal that bad weather, not imports, was responsible for declining demand.  Section 1677(7) requires that any material injury be 'by reason of' subject imports, and unprecedented weather events that frustrated demand projections were a potential intervening cause."  First Remand order at 42-43.  As we clarified in the First Remand Views, we did not and do not find that subject imports were responsible for declining demand.  Rather, we explained that previously found and continue to find that weather events beginning in 2018 and continuing into 2019, caused demand to decline.  We also previously found and continue to find that, although cumulated subject imports did not cause the decline in demand, they increased from 2017 and to 2018, and remained at elevated levels in 2019, despite declining demand.  Indeed, cumulated subject imports further increased their market share from 2018 to 2019 with the quantity of importers' U.S. shipments of subject imports increasing by 6.2 percent between 2018 and 2019 despite the *** percent decrease in apparent U.S. consumption.  CR/PR at Table C-1.  As further discussed below, other record evidence (including from purchaser questionnaire responses and contemporaneous trade publications) corroborates that cumulated subject imports had significant depressing effects on U.S. prices.  As also discussed below, we have examined other factors, including declining demand, to ensure that we are not attributing injury from any such factors to subject imports.

[231] OCP Comments at 1, 15-16; PhosAgro Comments at 15; Koch Comments at 2-3.

[232] CR/PR at Table IV-2.  As discussed above in Section II.B, both the unadjusted data and adjusted data show comparable increases in the volume of cumulated subject imports.  We again note that this one million short ton increase in the volume of cumulated subject imports in 2018 was not due to a "supply gap" in domestic supply.  As discussed above, although Mosaic reduced its production capacity in 2018, it reduced its U.S. shipments of fertilizers by only *** short tons from 2017 to 2018, while importers' U.S. shipments of subject imports increased by 604,901 short tons from 2017 to 2018, and were 753,638 short tons higher in 2019 than in 2017.  CR/PR at Table C-1; Mosaic Revised Domestic Producer Questionnaire at II-7.  Moreover, during that time, Mosaic as well as Simplot and Nutrien possessed excess capacity and inventories.  CR/PR at Table III-4.

52

*Public Version*

the fall of 2018 as well as a polar vortex in the winter of 2018 to 2019.[233]  In the context of the

increased volume of cumulated subject imports in 2018 along with declining demand towards

the latter part of that year, U.S. importers' end-of-period inventories were \*\*\* short tons in

December 2018, which was their highest level of the POI at that time.[234]

Notwithstanding end-of-period inventories that were higher than the levels earlier in

the POI and the decline in demand, cumulated subject imports nonetheless surged into the U.S.

market as 2019 began.  In January 2019, the volume of cumulated subject imports reached its

highest monthly level of the entire POI at 720,728 short tons, a level that was almost double

the level of monthly imports in January 2018 (312,960 short tons) and more than triple the level

of monthly imports in January 2017 (202,768 short tons).[235]  Thus, in the context of phosphate

fertilizers consumption beginning in the fall of 2018, which precipitated the high levels of end-

of-period inventories in December 2018, subject imports surged into the market in January

2019 and remained substantial (relative to other monthly import volumes) in February and

March 2019.  That cumulated subject imports exceeded demand at the beginning of 2019 is

further supported by the fact that U.S. importers' end-of-period inventories increased from \*\*\*

short tons in December 2018, which had been their highest level at that point in the POI, to \*\*\*

short tons in March 2019, their highest level of the entire POI, which contradicts respondents'

arguments that subject imports were continuing to be imported to serve regions unaffected by

---

[233] Original Views at 40 (citing OCP Prehearing Br. at 35-36, 46-48; Gavilon Prehearing Br. at 11-12; PhosAgro Prehearing Br. at 6-7; IRM Prehearing Br. at 15-16; PhosAgro Posthearing Br. at 3-4).

[234] CR/PR at Table D-1.  We also note that importers' ending inventories of subject imports in each quarter in 2018 and 2019 \*\*\* exceeded their 2017 volumes, and their ending inventories in March, June, and September 2019 were larger than their ending inventories for those months in 2018.  CR/PR at Table D-1.

[235] CR/PR at Table IV-6.

*Public Version*

severe weather.[236] [237]  Notwithstanding this high level of inventories, which according to

respondents remained in place after delivery and were not otherwise relocated, substantial

volumes of cumulated subject imports still continued to enter the market even as demand

remained low due to flooding that occurred in the spring and fall of 2019.[238]

As we previously noted in our Original Views, several contemporaneous industry

publications were reporting on oversupply conditions and price declines in the earlier part of

2019.[239]  Specifically, trade publication *Argus* reported:[240]

- January 10, 2019:  "US remains an outlet for 1Q....  With OCP also shipping considerably more this quarter, producers remain set on offloading tonnage in the only market that can absorb such volumes without pricing....  The US

---

[236] CR/PR at Table D-1.  We further note that U.S. importers' quarterly ending inventories in March, June, and September 2019 were larger than their ending inventories for those months in 2018. *Id.*

[237] OCP contends that domestic and subject import inventories both *** in March 2019 before returning to *** after Spring 2020 and that the ratios of subject import to domestic inventories *** over the POI, showing that there was no *** in subject import inventories.  OCP Remand Second Remand Comments at 6-7.  OCP overlooks that subject import end-of-period inventories increased *** percent from 2017 to 2018 and remained at elevated levels that were *** percent higher in 2019 than 2017. CR/PR at Table C-1.  In contrast, domestic end-of-period inventories increased by only *** percent from 2017 to 2018 and were only *** percent higher in 2019 compared to 2017.  CR/PR at Table C-1.  By the same token, in describing domestic inventory levels of *** short tons and subject import inventory levels of *** short tons in the second quarter of 2020 as "return{ing} to ***", OCP ignores that in the second quarter of 2017 inventories of domestic producers were indeed a relatively comparable *** short tons, while subject import inventory levels were substantially lower at only *** short tons.  CR/PR at Table D-1.  The record also does not support OCP's assertion that the ratios of subject import to domestic inventories *** over the POI.  The ratios of subject import inventories to U.S. inventories ranged from *** percent in 2018 and 2019, which far exceeds those from the beginning of the POI, which ranged from *** percent in 2017.  *Calculated from* CR/PR at Table D-1.

[238] CR/PR at Table IV-6.

[239] Original Views at 41-42, citing Petition, Volume I, Exhibits I-29 – I-35; *see also* Mosaic Prehearing Br. at 59-63; Mosaic Posthearing Br. at 10-11; Simplot Prehearing Br. at 27-28; Simplot Posthearing Br., Responses to Questions pp. 16, 50-51.

[240] We note that subject imports from Morocco and Russia accounted for 84.1 percent of total import volume in 2019, up from 83.0 percent in 2018.  CR/PR at Table IV-2.  The volume of cumulated subject imports declined by 9.5 percent between 2018 and 2019, while the volume of nonsubject imports declined by 16.0 percent.  CR/PR at Table IV-2.  U.S. shipments of subject imports increased by 6.2 percent between 2018 and 2019, while shipments of nonsubject imports decreased by 11.8 percent. CR/PR at Table C-1.

54

Public Version

phosphate market continues to feel the pressure of a full supply chain and steady import lineup as both DAP and MAP barges declined this week. Limited buying activity caused DAP Nola to drop by nearly $1/st from the previous week to $383-386/st fob Nola on confirmed trades. MAP barge values fell by nearly $5/st from last week's midpoint to $388-395/st fob Nola."[241]

- January 17, 2019: "US phosphate prices continue to wilt as heavy supply pressures suffocate buyer demand."[242]

- January 31, 2019: "The cold weather and full pipeline makes the US a less likely export for 1Q. There is no chance of an early application season in the south and the weather forecast is poor to March.... The 'polar vortex' in the US midwest saw temperatures plummet. The US domestic market followed suit. Put simply, the US market 'tanked' on cold weather, a full pipeline and heavy imports. US DAP barges fell $10/st in a week. MAP prices are now in the mid/high-$360s/st fob Nola .... Firstly, with the US having covered 60pc of its 1Q 2018 total import requirements already, and with reports of heavy congestion at Nola on high water in the river system, the strategy of pushing more product into the US looks risky, at least in the short term."[243]

- February 7, 2019: "{T}he US is awash with imports ... Pushing so much DAP/MAP to the US has led to oversupply ... US phosphate prices dipped again this week as wholesalers try to incentivize buying during this period of low demand."[244]

- February 28, 2019: "{T}he US market fell dramatically with DAP into the $300s/st fob Nola, down around $15/st in a single week.... The heavy import line-up and 'polar vortex' in the US has resulted in Nola DAP barges trading at $330-338/st – down by $14/st this week.... US phosphate prices moved sharply lower this week as the market continues to be plagued by ample supplies and absent demand."[245]

- March 28, 2019: "OCP, in its 2018 financial results, projected softer prices in the first half of this year, driven by a drop in the cost of raw materials and higher inventories in the cost of raw materials and higher inventories in the US and India. It is a fair assessment. The US has a record surplus of phosphates entering the spring season, boosted by weak sales, terrible weather conditions and heavy 1Q imports, which reached a record 1.2mn t of DAP/MAP, up 27pc yoy.... The US DAP market softened this week as buyers were again put off by the combination

---

[241] Petition Volume 1, Exhibit I-31.
[242] Petition Volume 1, Exhibit I-32.
[243] Petition, Volume I, Exhibit I-33.
[244] Petition, Volume I, Exhibit I-29.
[245] Petition, Volume I, Exhibit I-34.

55

of heavy supplies and a probably limited spring application season.... Heavy January commitments by foreign producers lifted first quarter US phosphate imports past previous expectations."[246]

- April 18, 2019: "DAP/MAP supply for 1Q is estimated at 2.3mn t. The US DAP barge price fell again by $5/st on oversupply amid heavy imports.... Heavy supplies and light demand continue to weigh heavily on the domestic phosphate market as DAP values continue to trickle downward. Nola DAP barges were assessed down by $5/st from the midpoint last week to $320-325/st as buyers remain off put by limited field activity and prolonged closure of the upper Mississippi river. {also noting} Record import levels."[247]

Additionally, in April 2019, *** also reported on the oversupply condition in the U.S. market due to a poor application season in the fall of 2018 and a "surge in imports in recent months."[248] Notably, these articles discuss demand in the U.S. market as a whole and do not mention anywhere that there were areas of the U.S. market where demand was increasing. Nor do they indicate that inventories that may have been located in different locations or any that may have been subsequently exported did not contribute to the oversupply conditions affecting prices in the U.S. market. Rather, consistent with our discussion above, these publications confirm the importance of NOLA pricing as a benchmark in the broader market.

Thus, the record shows that regardless of whether subject import inventories were being reshipped once they reached their destination, the substantial volume of cumulated subject imports continuing to enter the United States in 2019 was adversely impacting U.S. prices as demand remained low due to weather events and flood in the spring of 2019.[249] As

---

[246] Petition, Volume I, Exhibit I-30.
[247] Petition, Volume I, Exhibit I-35.
[248] Mosaic Posthearing Br. at Exhibit 3.
[249] As we noted in our Original Views, respondents blamed the oversupply conditions on demand projections that failed to materialize. OCP Prehearing Br. at 70-73; Koch Prehearing Br. at 6-7; EuroChem Prehearing Br. at 8-9; EuroChem Posthearing Br. at 8-9; OCP Posthearing Br. at Responses to

(*continued*...)

56

APPX0022103

*Public Version*

explained in the Original Views and First Remand Views,[250] this oversupply of subject imports

and their competitive and lower prices, including instances of being lower-priced, exerted

downward pricing pressure on the domestic like product and significantly depressed U.S. prices

in 2019.

Further, the record, including as supplemented by the remand questionnaires, does not

support respondents' assertions that additional volumes of subject imports in the latter half of

2019 merely replenished depleted inventories in areas unaffected by flooding.  As detailed

above, U.S. importers' end-of-period inventories of cumulated subject imports reached their

highest level of the POI in March 2019.[251]  Yet, according to respondents themselves, subject

imports that arrived in 2019 had been delivered "by the time record precipitation thwarted

fertilizer application in certain regions."[252]  Moreover, the supplementary questionnaire

---

Questions pp. 27-30; Gavilon Posthearing Br. at Responses to Questions pp. 5-6; IRM Posthearing Br. at 7.  OCP further argues that in finding that subject imports contributed to oversupply conditions "regardless of the reasonableness of any demand projections," the Commission "ignored" that phosphate fertilizer is procured in advance based on forecasted demand.  OCP Comments at 24. Contrary to OCP's argument, we recognize that distributors rely on demand projections in obtaining product.  First, we note that, in 2019, *** percent of U.S. importers' U.S. commercial shipments were spot sales.  CR/PR at Table V-3.  Further as discussed above, cumulated subject imports entered the U.S. market in significant volumes, contributed to oversupply conditions, and depressed U.S. prices to a significant degree, regardless of how they were ordered.  U.S. importers claimed that they were ***. *See, e.g.*, ADM Posthearing Br. at 8-9 (stating that ***); Hearing Tr. at 227 (Lambert) (stating that "{t}hose vessels were coming.  And once they're on their way, they're coming here"); 223-224 (Niederer).  Regardless of why or when they were ordered, however, the record shows that the subject imports had depressing effects on U.S. prices during 2019.  We also observe, as discussed above, that notwithstanding these assertions, foreign producers and importers of subject merchandise were able to respond to market changes after the petitions were filed by decreasing the volume of imports entering the U.S. market.

[250] Original Views at 39-46; First Remand Views at 37-44.

[251] CR/PR at Table D-1.

[252] OCP Comments at 15.  Respondents maintain that most subject imports of phosphate fertilizer enter through the port at NOLA, where they are loaded from vessels onto barges, barged up the Mississippi River and its tributaries, and then shipped north, west, and east by rail and truck to meet

(*continued*...)

57

APPX0022104

*Public Version*

information obtained in the first remand proceedings suggests that the vast majority of subject imports, once delivered, are not relocated or otherwise moved, but rather remain in regional inventories until used in a subsequent application period.[253]  Consequently, we find that the record indicates that substantial quantities of subject imports were in place in regional inventories by December 2018 and March of 2019, prior to the flooding that occurred in spring 2019, and such imports remained in those locations, available for subsequent application in the latter part of 2019.  Thus, the POI-high level of inventories of cumulated subject imports in March 2019 exceeded the levels maintained in prior years and according to respondents were already in place in regional locations prior to flooding.  Yet, despite the substantial inventories of cumulated subject imports in place in December 2018, monthly cumulated subject import volume peaked in January 2019, and despite the POI-high level of inventories of cumulated subject imports in March 2019, monthly cumulated subject import data show them continuing to enter at substantial volumes.[254]  Taken together with the lower demand in three consecutive application periods, the record does not support a conclusion that inventories of U.S. imports

---

demand from farmers, which apply phosphate fertilizer twice a year in two limited windows of time. They claim that distributors and retailers store phosphate fertilizer in warehouses close to farmers and that such fertilizer stays there until it is used in those narrow application windows.  They assert that in the event of unexpected reductions in demand, such as weather or other unpredictable events, inventories are not returned or moved to other regions but instead are held and sold to farmers during the next application season.  OCP Comments at 5; PhosAgro Comments at 8-12; Koch Comments at 3-4; IRM Comments at 3-4; Eurochem Comments at 1-2.

[253] *See generally* Importers Remand Questionnaires.  Additionally, OCP also claims that the new questionnaire evidence "makes clear that even as inventories built up in flooded regions, it was normal practice to keep inventories at their original intended destinations in preparation for the next application window."  OCP Comments at 18.

[254] CR/PR at Table IV-6.

58

*Public Version*

were depleted such that the observed volumes of subject imports were needed.[255]  This is particularly so in light of the substantial inventories, expansive network of inventories, and extensive multi-modal distribution capabilities of the domestic industry.

Even if, as respondents assert, importers of merchandise did deplete some portion of these inventories to serve areas that were unaffected by flooding, we find that the record shows that the volume of cumulated subject imports continued to exceed any demand created by alleged restocking needs.  As discussed above, U.S. importers' end-of-period inventories of cumulated subject imports reached their highest level of the POI in March 2019 at \*\*\* short tons.[256]  U.S. importers' next reported end-of-period inventories in June 2019 were \*\*\* short tons.[257]  Accordingly, U.S. importers' end-of-period inventories of cumulated subject imports from March 2019 to June 2019 were reduced by \*\*\* short tons.  Cumulated subject imports, however, far exceeded this amount in those months and the months that followed.  Indeed, over 329,000 short tons of subject imports entered from April to June 2019.[258]  Moreover, whereas the difference between end-of-period inventories from March 2019 to June 2019 was only \*\*\* short tons, in July 2019 alone, the volume of cumulated subject imports was 281,132 short tons, and cumulated subject imports continued to enter the U.S. market at elevated levels – 264,191 short tons in August 2019 and 178,304 short tons in September 2019 – for a three-

---

[255] Indeed, importers' end-of-period inventories of cumulated subject imports increased from June 2019 to September 2019, with both months' inventory volumes larger than in the respective months in 2018.  CR/PR at Table D-1.

[256] CR/PR at Table D-1.  As discussed above, this was up from \*\*\* short tons in 2018.  *Id.*

[257] CR/PR at Table D-1.  We note that this was higher than the quarterly inventories in June 2018 of \*\*\* short tons.  *Id.*

[258] CR/PR at Table IV-6.

59

*Public Version*

month total of 723,627 short tons.[259]

This pattern continued later in 2019.  U.S. importers' end-of-period inventories of cumulated subject imports in September 2019 were \*\*\* short tons, higher than in June of 2019 but lower, by \*\*\* short tons, than in March 2019.[260]  Even assuming that this represents a depletion of inventories to serve areas unaffected by flooding, the record shows that the volume of cumulated subject imports far exceeded this amount in the months that followed. Indeed, in October 2019 alone, the volume of cumulated subject imports was 244,672 short tons, and cumulated subject imports continued to enter the U.S. market at elevated levels – 164,187 short tons in November 2019 and 227,543 short tons in December 2019 – for a three-month total of 636,402 short tons.[261]  Thus, whether or not U.S. importers depleted inventories to serve areas that were unaffected by flooding in 2019, the record shows that cumulated subject imports nonetheless continued to enter the U.S. market in excess of any purported need to replenish inventories, further contributing to the oversupply conditions.[262]

As we previously noted in our Original Views and First Remand Views, several contemporaneous industry publications continued to report that oversupply conditions and price declines also persisted in the latter part of 2019.[263]  For example, trade publication *Argus*

---

[259] CR/PR at Table IV-6.

[260] CR/PR at Table D-1.

[261] CR/PR at Table IV-6.

[262] We again note that subject imports from Morocco and Russia accounted for 84.1 percent of total import volume in 2019, up from 83.0 percent in 2018.  CR/PR at Table IV-2.  The volume of cumulated subject imports declined by 9.5 percent between 2018 and 2019, while the volume of nonsubject imports declined by 16.0 percent.  CR/PR at Table IV-2.  U.S. shipments of subject imports increased by 6.2 percent between 2018 and 2019, while shipments of nonsubject imports decreased by 11.8 percent.  CR/PR at Table C-1.

[263] Original Views at 41-42 and First Remand Views at 47-49, citing Petition, Volume I, Exhibits I-36 – I-44; *see also* Mosaic Prehearing Br. at 59-63; Mosaic Posthearing Br. at 10-11; Simplot Prehearing Br. at 27-28; Simplot Posthearing Br., Responses to Questions pp. 16, 50-51.

60

*Public Version*

reported:

- July 18, 2019: "The US is looking fragile due to import length. Widespread estimates of substantial carryover from spring are also hurting prices.... Ample spot availability has driven US phosphate values down this week to $304-310/st fob Nola DAP/MAP on confirmed trade.... Price pressure is poised to persist in the near-term with continued imports scheduled for July discharge."[264]

- August 4, 2019: "Rather than maintain prices, OCP appears to be gunning for volume. . . . Downward price pressure persisted along the US Gulf coast this week, with DAP barge values assessed at $298-300/st fob Nola – the lowest price level in nearly two years on a midpoint basis, according to Argus data.... A slate of three additional cargoes from Morocco for August arrival is anticipated to keep a lid on near-term prices, which have been steered by imports following spring applications. DAP imports during the 2018-19 fertilizer year reached an all-time high of 1.26mn/t on increased shipments from Morocco and Russia, according to customs data."[265]

- August 15, 2019: "In the US, DAP barge prices fell to the equivalent of $315/t cfr amid fears over more imports and large carryover.... In the US, two DAP barges traded in a $288-294/st fob range for September – a 10-year low. The paper market was even more aggressive. The driver is a substantial domestic carryover from spring, plus heavy imports and lower grain prices.... DAP barges traded at a 10-year low early this week at $288/st fob Nola for September shipment – pressuring the low end of this week's assessment.... Prices at Nola are poised to face ongoing headwinds as offshore volumes continue to trickle to port.... Downstream demand is expected to remain suppressed until the fourth quarter, when post-harvest applications resumes. In-season consumption will be key to draw down carryover inventories, and help bring the market closer to balanced."[266]

- September 26, 2019: "Mosaic has sold three October-loading DAP barges at $288/st fob Nola. But the slight firmness in the US DAP market exhibited after the Mosaic production cut subsided this week as barge values slipped below $290/st fob Nola for October shipment. DAP traded at $286-288/st fob Nola – the lowest price level since early-September. Market sentiment ... remained bearish for near-term price movement, especially as imports continue to discharge at the US Gulf coast at the current pace. The 500,000t of lost production at Mosaic's Faustina plant during the fourth quarter is poised to be replaced by offshore volumes, likely minimizing upward momentum to Nola

---

[264] Petition, Volume I, Exhibit I-36.
[265] Petition, Volume I, Exhibit I-37.
[266] Petition, Volume I, Exhibit I-38.

61

*Public Version*

values."[267]

- October 10, 2019: "In the U.S., DAP trade reached a new decade low of $275/st fob Nola for October shipment, a further decrease from the $280-$290/st fob assessed last week, although Mosaic did report a single DAP barge at $285/st fob.  Bearish sentiment persists even after Mosaic idled its Faustina phosphate complex on 1 October which reduces total domestic production by 500,000t through the fourth quarter.  Inventories are estimated to be higher than usual as the spring application season was weak this year, and the window for fall application is narrowing."[268]

- October 14, 2019:  "In the US, DAP barges traded at a new decade low of $265/st fob Nola for October shipment, the lowest price since November 2009 ...  total with few imports and a healthy export lineup, sources said it could be enough to draw inventories down to a normal level and support prices later this quarter or in early 2020."[269]

- October 31, 2019:  "There was scant good news for phosphate producers this week – the US continued its inexorable slide with DAP a fresh decade low of $253/st fob Nola."[270]

- November 7, 2019:  "US producer Nutrien called further US production cuts a 'futile game' this week.  Nutrien argues that the market is weak because of fundamental structural oversupply and that further cuts simply signal to OCP, Russian and other producers to ship more to the US....  Phosphate barge values continued to fall this week as high buyer inventories and delays to fall application season weighed on market sentiment....  With inventories still full from two lackluster application seasons and more phosphate fertilizer shipments on the way, many doubt fall demand will be enough to rebalance the domestic phosphates market.... But buyer inventories are full following two lacklustre

---

[267] Petition, Volume I, Exhibit I-39.  We note that, as discussed above, the volume of cumulated subject imports in October 2019 alone was 244,672 short tons, and cumulated subject imports continued to enter the U.S. market at elevated levels, 164,187 short tons in November 2019 and 227,543 short tons in December 2019, for a three-month total of 636,402 short tons.  CR/PR at Table IV-6.  Quarterly inventories of cumulated subject imports were lower in December 2019, at *** short tons compared to December 2018, at *** short tons; however, they remained at substantially elevated levels compared to December 2017 when they were *** short tons.  CR/PR at Table D-1.

[268] Petition, Volume I, Exhibit I-40.

[269] Petition, Volume I, Exhibit I-41.  We note that Mosaic indicated in September 2019 that it was idling its Louisiana operations "as imports into the country have pushed down prices."  Petition, Volume 1, I-46 "'Phosphate prices have declined further through the summer, with excess imports continuing to enter the U.S. on top of high channel inventories,' President and CEO Joc O'Rourke said in a statement. 'We expect our move to idle production to tighten supply and rebalance the market.'"  *Id.*

[270] Petition, Volume I, Exhibit I-42.

APPX0022109

*Public Version*

application seasons and high first-quarter imports."[271]

- December 12, 2019: "Nola barge prices fell to new lows this week in the first DAP trades for nearly a month....  Price support is doubted into early-2020 as additional imports and the expectation that production will resume at Mosaic's plant in Faustina, Louisiana, loom ahead."[272] [273]

Again, as discussed above, these articles discuss demand in the U.S. market as a whole and do not mention anywhere that there were areas of the U.S. market where demand was increasing.  Nor do they indicate that inventories that may have been located in different locations or any that may have been subsequently exported did not contribute to the oversupply conditions affecting prices in the U.S. market.  Rather, consistent with our discussion above, these publications confirm the importance of NOLA pricing as a benchmark in the broader market.

Importers also reported carrying higher than usual levels of inventories.  In describing trends in its reported quarterly inventories of subject imports from Morocco, *** reported

***[274]

Similarly, in describing trends in its reported quarterly inventories of subject imports from

Morocco, *** reported

***[275]

And in describing trends in its reported quarterly inventories of subject imports from Russia,

---

[271] Petition, Volume I, Exhibit I-43.

[272] Petition, Volume 1, Exhibit I-44.

[273] Other publications, including ***, discussed the ***.  Simplot Posthearing Br. at Exhibits 6 (*** reporting ***), 18 (***), 19 *** reporting ***).  Moreover, respondents' witness even testified that NOLA prices were lower than prices in Brazil due to a market imbalance, and that inventory build-up was due to excessive rainfall and was not worked down "until the end of the strong fall 2020 application season."  Hearing Tr. at 192-193 (Rahm).

[274] *** Importer Questionnaire Response at II-5c.

[275] *** Importer Questionnaire Response at II-5c.

*Public Version*

*** reported

       ***[276]

Thus, the record shows that cumulated subject imports entered the U.S. market in the latter part of 2019 in excess of any purported depletion of inventories, contributing to oversupply conditions, and having a depressing effect on domestic prices as demand remained low through 2019.[277]

The fact that the end-of-period inventories of cumulated subject imports in 2019 remained at elevated levels (*** short tons) compared to 2017 (*** short tons)[278] further demonstrates that cumulated subject imports were contributing to oversupply conditions and not merely replenishing depleted inventories, and again, these do not include any product that may have been reexported.  Additionally, the fact that cumulated subject imports continued to gain market share in 2019 as demand declined and the U.S. market contracted likewise demonstrates that they were not merely replenishing depleted inventories.  As we observed in our Original Views and First Remand Views, U.S. shipments of subject imports increased by 148,957 short tons (6.2 percent) between 2018 and 2019, and subject imports increased their share of the market at the expense of the domestic industry and nonsubject imports.[279]

In sum, the record shows that significant volumes of subject imports entered the U.S. market between 2017 and 2018, and as demand began to decline in the fall of 2018, U.S.

---

[276] *** Importer Questionnaire Response at II-6c.

[277] As we noted in our previous Views, U.S. importers' ending inventories of subject imports in 2018 and 2019 were *** percent and *** percent higher, respectively, than ending inventories in 2017. CR/PR at Table C-1.  Subject import inventory levels remained at elevated levels at the end of the first and second quarters of 2020, but dropped at the end of the third quarter of 2020 as subject imports decreased after the petitions were filed at the end of June 2020.  CR/PR at Table D-1.

[278] CR/PR at Table D-1.

[279] Original Views at 41-43, First Remand Views at 50, CR/PR at Table C-1.

64

*Public Version*

importers' inventories reached their highest level of those two years.  Notwithstanding these substantial inventories and declining demand in late 2018, subject imports surged into the U.S. market in January 2019, and continued to enter the U.S. market in large quantities, even as demand remained low in 2019.  That the continued flow of subject imports exceeded demand in the contracting U.S. market is further demonstrated by the fact that U.S. importers' quarterly inventories reached their highest level in March 2019.  Consequently, the record shows that cumulated subject imports were contributing to oversupply conditions in the beginning of 2019.  Subject imports nonetheless continued to enter the U.S. market in the latter part of 2019 in excess of any purported need to replenish depleted inventories, thereby further contributing to the oversupply conditions that continued to plague the U.S. market in the latter half of 2019.  At the same time, cumulated subject imports increased their market share at the expense of both the domestic industry as well as nonsubject imports.[280]  Contemporaneous trade publications documented the oversupply conditions throughout 2019, with several noting that high levels of imports contributed to these conditions, as well as the effect that these conditions had on prices in the U.S. market.[281]  Indeed, market prices for phosphate fertilizer DAP decreased in 2019 *** for non-phosphate fertilizers potash and urea, such that DAP prices

---

[280] From 2018 to 2019, cumulated subject import market share increased *** percentage points, while the market shares of the domestic industry and nonsubject imports decreased *** and *** percentage points, respectively.  CR/PR at Table C-1.

[281] OCP challenges our reliance on the numerous trade publications that corroborated that the significant volume of cumulated subject imports was flooding the U.S. market and contributing to the oversupply conditions that were depressing U.S. prices to a significant degree.  OCP Second Remand Comments at 10. These publications corroborate the undisputed facts discussed above: that prices in the U.S. phosphate fertilizer market are highly transparent, with multiple market participants specifically reporting their reliance upon these publications in setting or negotiating prices.  Moreover, these are contemporaneous descriptions of the U.S. fertilizers market.  OCP's attempts to dismiss these trade publications as "mere snippets" that "use sensational words to catch the attention of subscribers" ignores the vital role that they played in the U.S. market.

APPX0022112

*Public Version*

\*\*\*.[282]

Moreover, as we observed in the Original Views and First Remand Views, U.S.

purchasers also reported on the adverse effects caused by subject imports, particularly during

2019.[283]  For instance, U.S. purchaser \*\*\* informed how \*\*\* and that "more cargo containers

appear to be arriving to the U.S. on consignment with no price point established up front …

{which} can lead to larger drops in price with weak demand."[284]  U.S. purchaser \*\*\* reported

that \*\*\*.[285]  In reporting that domestic producers had reduced prices in order to compete with

low-priced subject imports from Morocco, U.S. purchaser \*\*\* explained that \*\*\*.[286]

In addition to this record evidence of oversupply and imports' exertion of downward

pressure on prices in the U.S. market, we also continue to find record evidence of subject

imports being offered at low prices during this time.  For instance, in January 2019, \*\*\*.[287] [288]

Record evidence also indicates that domestic producers reduced prices to compete with subject

imports.  Of the 28 responding purchasers, seven reported that U.S. producers had reduced

---

[282] CR/PR at Figure V-5; *see also* CR/PR at Figure V-6 (public prices for DAP and MAP \*\*\*).

[283] Original Views at 44-45; First Remand Views at 52.

[284] Original Views at 44-45 and First Remand Views at 50, citing CR/PR at II-2; \*\*\* U.S. Purchaser Questionnaire Response at III-8(b).  As we noted above, \*\*\* also reported that \*\*\*  CR/PR at Table V-11.

[285] \*\*\* U.S. Purchaser Questionnaire Response at II-2.  In reporting that U.S. producers lowered prices by an estimated \*\*\* percent in order to compete with lower-priced subject imports, \*\*\* stated that \*\*\*  CR/PR at Table V-11.

[286] CR/PR at Table V-11.

[287] Mosaic Posthearing Br. at Responses to Questions pp. 36-37, Exhibits 41-46.  U.S. purchaser \*\*\* reported that \*\*\*.  \*\*\* U.S. Purchaser Questionnaire Response at III-29(b).  Simplot also stated that lower-priced imports forced it to lower its prices.  Simplot Posthearing Br. at Responses to Questions pp. 35-37, Exhibit 4.

[288] We also note that record information shows that \*\*\* was the lowest priced in the U.S. market \*\*\*.  Mosaic Posthearing Br. at Responses to Questions pp. 45-46, Exhibit 51 (exhibit data sourced from responses to Commission questionnaires).

*Public Version*

prices in order to compete with lower-priced imports from the subject countries.[289]  Five

purchasers estimated domestic price reductions to compete with product imported from

Morocco, and four estimated domestic price reductions to compete with product imported

from Russia.  The reported estimated price reductions ranged from \*\*\* percent to \*\*\* percent,

for an average of 16.0 percent.[290]

In light of the foregoing, we continue to find that the record demonstrates that

significant and increasing volumes of cumulated subject imports entered the U.S. market

between 2017 and 2018 and continued at elevated levels in 2019, even as demand began to

decline in the latter part of 2018, and unusual weather conditions impacted three consecutive

planting seasons - fall of 2018, spring of 2019, and fall of 2019.  Despite these market

conditions, cumulated subject imports continued to enter the market in large volumes in 2019

and in excess of any purported need to restock inventory in regions that were unaffected by

weather, contributing to oversupply conditions in the U.S. market as corroborated by numerous

contemporaneous trade publications.  Record evidence also shows subject imports being

offered at low prices in some instances during this time.  Cumulated subject imports thus, by

contributing to oversupply conditions and being offered at competitive and low prices in a

highly transparent market, exerted downward pricing pressure on the domestic like product

and significantly depressed U.S. prices during the POI.  Although we acknowledge that some

---

[289] CR/PR at Table V-11.  Seven purchasers reported that U.S. producers had not reduced prices in order to compete with lower-priced imports from the subject countries, and 14 reported that they did not know.  CR/PR at V-25.
[290] CR/PR at V-25.

67

*Public Version*

purchasers reported being unable to obtain supply from Mosaic at times during the POI,[291] we find that the record as a whole shows that the significant volume of cumulated subject imports contributed to oversupply conditions in a declining market and had significant price-depressing effects on prices in the U.S. market in 2019.[292]  Additionally, as discussed in greater detail below, these prices remained at depressed levels in 2020 before the petitions were filed and increased sharply as subject imports exited the market.

Respondents argue that the price declines were attributable to declines in global prices and U.S. demand, rather than subject imports.[293]  Although those factors may have affected price movements in the U.S. market, we continue to find that they do not negate the significant role that subject imports played in depressing domestic prices.  As shown by the evidence previously discussed, notwithstanding that demand in the U.S. market began to decline in the fall of 2018 and remained low throughout 2019, cumulated subject imports continued to enter the U.S. market at elevated levels, contributing to oversupply conditions, and having depressing effects on U.S. prices.  Respondents' arguments also fail to account for the fact that prices in other global markets were also affected by exports from subject producers in Morocco and

---

[291] *See, e.g.*, Gavilon Prehearing Br. at 20-24, Exhibit 7; IRM Prehearing Br. at 12-15, 18-19; IRM Posthearing Br. at Exhibit 4; ADM Posthearing Br. at Exhibit 1; Hearing Tr. at 205-206 (Coppess); Response of ***, CR/PR at Table V-11.

[292] OCP contends that the lack of injurious oversupply of subject imports is documented by the analyses of Mr. Dougan and Mr. Rahm.  OCP Second Remand Comments at 14.  We disagree.  With respect to Mr. Dougan's analysis cited by OCP, it does not include subject import volumes or inventories and actually appears to corroborate our findings that *** and that ***.  OCP Posthearing Br., Response to Questions at 22-23.  OCP also omits that both witnesses conceded that there was a "temporary oversupply" in the U.S. market, Hearing Tr. at 215 (Dougan), and a "hangover of phosphate inventories after the 2019 spring season," Hearing Tr. at 192 (Rahm).  Indeed, Mr. Rahm continued "{t}he New Orleans price traded at a large discount to the Brazilian price, reflecting this imbalance. *Id.*

[293] OCP Prehearing Br. at 77, 88; PhosAgro Prehearing Br. at 26; Koch Prehearing Br. at 2; EuroChem Prehearing Br. at 2; OCP Posthearing Br. at 9-11; PhosAgro Posthearing Br. at 12-13; Koch Posthearing Br. at 1, 4-7.

APPX0022115

*Public Version*

Russia, collectively the world's largest exporters of phosphate fertilizers.[294]  Moreover, in 2019,

U.S. prices were lower than and decreased by more than global phosphate fertilizer prices.[295]

Although U.S. prices began to increase in the beginning of 2020 as weather conditions

improved, they remained at levels lower than those that existed in 2017 and 2018 until after

the filing of the petitions at the end of June 2020, at which point they sharply increased to

levels above other global markets.[296]

Thus, for the foregoing reasons, we find that subject imports from Morocco and Russia

depressed prices to a significant degree.

We next turn to the court's conclusion, as well as respondent interested parties'

arguments, that the Commission's finding of significant price depression is undermined by the

fact that Mosaic is most frequently identified by parties to be the price leader.[297]  As an initial

matter, we note that the Commission questionnaires define "price leader" as "as (1) one or

more firms that initiate a price change, either upward or downward, that is followed by other

firms, or (2) one or more firms that have a significant impact on prices.  *A price leader is not*

*necessarily the lowest-priced supplier*."[298]  Accordingly, a price leader may not be the lowest

priced supplier.  More importantly, the fact that a firm might be identified as a price leader

---

[294] CR/PR at Table VII-14.

[295] Derived from CR/PR at Tables V-4-5 and Figure V-7; *see also* OCP Posthearing Br. at 11, Responses to Questions pp. 67-69; *see also* CR/PR at Table V-11 (response of U.S. purchaser ***, reporting that U.S. producers reduced prices by an estimated *** percent due to competition from subject imports:  ***).

[296] CR/PR at Tables V-4-5.  Cumulated subject imports declined substantially after the filing of the petitions, and subject imports from Morocco ceased entirely beginning in August 2020.  CR/PR at Table IV-6.  Total import volumes of phosphate fertilizers were lower in the third quarter of 2020 than in the third quarters of every other year in the POI.  *See id.*

[297] *OCP III*, Slip Op. 25-51 at 43-44.

[298] Purchaser Questionnaire at III-26.

69

*Public Version*

does not mean that its pricing decisions are insulated from competition from other market suppliers or from pricing pressure caused by an oversupplied market.[299]  Indeed, reviewing some of the responses of purchasers that identified Mosaic as a price leader, including those identified by OCP,[300] makes this abundantly clear.  For example, OCP identified *** and *** as purchasers that identified Mosaic as a price leader.  Notwithstanding that, ***.[301]  OCP also identified *** as a purchaser that identified Mosaic as a price leader; ***.[302]  Similarly, *** reported that ***[303]  Furthermore, as discussed above, the record indicates that Mosaic experienced competitive pressure from substantial volumes of cumulated subject imports, which contributed to the conditions of oversupply and placed downward pressure on prices.

Additionally, to the extent that the court has found that the Commission's price depression analysis is undermined because it "does not grapple with the fact that imports only undersold the domestic product in twenty percent of instances,"[304] the court appears to have overlooked that the Commission's underselling and price depression analyses are separate and distinct.  *See Altx, Inc. v. United States*, 25 CIT 1100, 1109, 167 F. Supp. 2d 1353, 1365 (2001) (stating that the Commission's underselling and depression analyses are "discrete" and must not be "collapse{d}").  Indeed, a finding of significant underselling is not required for the

---

[299] *See, e.g.,* CR/PR at V-6.  The Court of International Trade has acknowledged that that the presence or absence of price leadership is not of itself decisive or determinative.  *See Nucor Corp. v. United States*, 318 F. Supp. 2d 1207, 1257 (Ct. Int'l Trade 2004) (Commission "not required to evaluate if price leadership was the reason why underselling may have decreased or increased in its consideration of underselling.").

[300] OCP Second Remand Views at 19.

[301] *** Purchaser Questionnaire Response at II-4, III-26, III-29; *** Purchaser Questionnaire Response at II-4, III-26, III-29.

[302] *** Purchaser Questionnaire Response at II-4, III-26, IV-3.

[303] *** Purchaser Questionnaire Response at III-26.

[304] Second Remand Order at 48-49; see also Koch Second Remand Comments at 6.

70

*Public Version*

Commission to find significant price effects or make an affirmative injury determination. *See, e.g.*, *OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291, 1302 (Ct. Int'l Trade 2021) ("{T}he … Federal Circuit … and this Court have made clear that the Commission may rely on evidence *either* of significant underselling *or* significant price suppression or depression to support a finding for adverse price effects."); *Siemens Energy*, 38 CIT at 898, 992 F. Supp. 2d at 1334-35 (sustaining the Commission's significant price effects finding based solely on price suppression, and holding that the Commission "did not need to find" underselling in these circumstances), *aff'd*, 806 F.3d 1367 (Fed. Cir. 2015); *Cemex, S.A. v. United States*, 16 CIT 251, 260–61, 790 F. Supp. 290, 299 (1992) ("To require findings of underselling would be inconsistent with the proposition that price suppression or depression is sufficient."), *aff'd*, 989 F.2d 1202 (Fed. Cir. 1993).  Thus, neither the prevalence of overselling nor the fact that we did not make a finding of significant underselling undermines our finding that subject imports depressed prices to a significant degree.

In the same vein, the fact that we did not make a finding of significant underselling does not undermine our finding that record evidence demonstrated that subject imports were at times priced lower, as OCP claims.[305]  Our finding that subject imports were at times low priced was not based solely on the instances of underselling shown by the pricing comparisons. Rather, we have performed a comprehensive analysis of the role of subject import prices on prices for the domestic product, based on the totality of record evidence.[306]  We have found the close comparability of subject and domestic prices to be consistent with the high degree of

---

[305] OCP Second Remand Comments at 16-17.
[306] First Remand Views at 20-21, 35-36.

*Public Version*

substitutability and price transparency that existed in the U.S. market.[307]  As discussed above,

phosphate fertilizer prices are reported in various trade publications, which gather market

intelligence, including from market participants, many of which reported providing their prices

to these publications.  This price information is published on a daily or weekly basis, and quickly

transmitted throughout the U.S. market, with the majority of U.S. producers and purchasers, as

well as some importers, reporting that they rely upon these publications in setting or

negotiating prices.[308]

We have also considered whether subject imports prevented price increases of the

domestic like product, which otherwise would have occurred to a significant degree.  The

record indicates the domestic industry's ratio of COGS to net sales decreased from *** percent

in 2017 to *** percent in 2018 and then increased to *** percent in 2019; it was higher in

interim 2020 at *** percent than in interim 2019 at *** percent.[309]

Between 2017 and 2018, the domestic industry's total COGS decreased by *** percent.

The domestic industry's net sales volume, however, also decreased, contributing to the

industry's unit COGS increasing from $*** per short ton in 2017 to $*** per short ton in 2018.

Specifically, the domestic industry's unit raw material costs increased from $*** per short ton

in 2017 to $*** per short ton in 2018, and the industry's unit other factory costs increased from

$*** per short ton in 2017 to $*** per short ton in 2018, while the industry's unit direct labor

costs remained the same at $*** per short ton in 2017 and 2018.[310]  Notwithstanding this, the

---

[307] First Remand Views at 20-21, 35-36.
[308] First Remand Views at 35-36.
[309] CR/PR at Tables IV-2, VI-1, and C-1.
[310] CR/PR at Table VI-1.

72

*Public Version*

domestic industry's COGS to net sales ratio declined because the domestic industry's unit net sales value, which increased from $*** per short ton in 2017 to $*** per short ton in 2018, exceeded the increase in the domestic industry's unit COGS.[311]

Between 2018 and 2019, the domestic industry's total COGS decreased by another *** percent, while the domestic industry's net sales volume declined by *** percent and net sales value declined by *** percent, resulting in an increase in the industry's COGS to net sales ratio.[312]  The domestic industry's unit COGS increased from $*** per short ton in 2018 to $*** per short ton in 2019, with its unit raw material costs increasing from $*** per short ton in 2018 to $*** per short ton in 2019, and the industry's unit other factory costs increasing from $*** per short ton in 2018 to $*** per short ton in 2019, while the industry's unit direct labor costs decreased from $*** per short ton in 2017 and 2018 to $*** per short ton in 2019.[313] Thus, while unit COGS increased slightly by $*** per short ton (***) percent) from 2018 to 2019, the domestic industry's net sales unit value declined substantially, by $*** per short ton (*** percent), from $*** per short ton in 2018 to $*** per short ton in 2019,[314] resulting in a substantial *** percentage point increase in the domestic industry's COGS to net sales ratio.[315] This occurred as poor weather conditions led to a decline in U.S. demand in 2019, U.S. importers further increased the share of subject imports in the U.S. market (up *** percentage points from 2018), and a significant volume of cumulated subject imports continued to enter the U.S. market at competitive and lower prices, putting additional pressure on domestic prices,

---

[311] CR/PR at Table VI-1.
[312] CR/PR at Table VI-1.
[313] CR/PR at Table VI-1.
[314] CR/PR at Table VI-1.
[315] CR/PR at Table C-1.

73

and substantially contributing to oversupply conditions.  Although the domestic industry

attempted to offset the collapse in U.S. prices by idling capacity and curtailing production,[316]

the record as a whole indicates that in a highly transparent market, competitively and lower

priced subject imports contributed to the market imbalance between supply and demand and,

as found above, depressed prices to a significant degree.[317]

In sum, for the foregoing reasons, we find that subject imports from Morocco and

Russia depressed prices to a significant degree.  We thus continue to conclude that subject

imports had significant price effects.

### D.    Impact of the Subject Imports

Section 771(7)(C)(iii) of the Tariff Act provides that the Commission, in examining the

impact of the subject imports on the domestic industry, "shall evaluate all relevant economic

factors which have a bearing on the state of the industry."[318]  These factors include output,

sales, inventories, capacity utilization, market share, employment, wages, productivity, profits,

cash flow, return on investment, ability to raise capital, research and development, and factors

affecting domestic prices.  No single factor is dispositive and all relevant factors are considered

---

[316] CR/PR at Table III-3; Mosaic Prehearing Br. at 2, Mosaic Posthearing Br. at Responses to Questions pp. 10-23, Exhibits 17-19.

[317] Mosaic Prehearing Br. at 59-63; Mosaic Posthearing Br. at 10-11.  Mosaic states that in addition to idling facilities and curtailing production, it also increased exports because the U.S. market could not absorb additional supply.  Mosaic Posthearing Br. at 11.

[318] 19 U.S.C. § 1677(7)(C)(iii); *see also* SAA at 851 and 885 ("In material injury determinations, the Commission considers, in addition to imports, other factors that may be contributing to overall injury.  While these factors, in some cases, may account for the injury to the domestic industry, they also may demonstrate that an industry is facing difficulties from a variety of sources and is vulnerable to dumped or subsidized imports.").

74

*Public Version*

"within the context of the business cycle and conditions of competition that are distinctive to the affected industry."[319]

As we observed in our Original Views and First Remand Views, the domestic industry's output indicators declined from 2017 to 2019, but were higher in interim 2020 than in interim 2019.[320]  Specifically, the domestic industry's share of apparent U.S. consumption declined from *** percent in 2017 to *** percent in 2018 and *** percent in 2019; its market share was higher in interim 2020, at *** percent than in interim 2019, at *** percent.[321]  Its production decreased by *** percent between 2017 and 2019 from *** short tons in 2017 to *** short tons in 2018 to *** short tons in 2019; its production was higher in interim 2020, at *** short tons, than in interim 2019, at *** short tons.[322]  Its capacity declined by *** percent from 2017 to 2019, from *** short tons in 2017 to *** short tons in 2018 and *** short tons in 2019,[323] and its capacity utilization increased by *** percentage points from *** percent in 2017 to *** percent in 2018 to *** percent in 2019.[324]  The domestic industry's capacity was higher in

---

[319] 19 U.S.C. § 1677(7)(C)(iii).  This provision was amended by the Trade Preferences Extension Act of 2015, Pub. L. 114-27.

[320] Original Views at 49-53; First Remand Views at 59-60.  As previously noted, after the petitions were filed at the end of June 2020, subject imports decreased in the U.S. market.  Mosaic restarted production at previously idled facilities, diverted shipments that had been destined for export markets, and drew down inventories, for a total of *** short tons in additional sales in interim 2020 compared to interim 2019.  Mosaic U.S. Producer Questionnaire Response at IV-16.  *** also reported more U.S. shipments in interim 2020 than in interim 2019.  *** U.S. Producer Questionnaire Responses at II-7; *** U.S. Producer Questionnaire Responses at II-7.  Consequently, the domestic industry's market share, capacity, production, and U.S. shipments were higher in interim 2020 than in interim 2019.  CR/PR at Table C-1.

[321] CR/PR at Tables IV-8, C-1.

[322] CR/PR at Tables III-4, C-1.

[323] CR/PR at Tables III-4, C-1.

[324] CR/PR at Tables III-4, C-1.

75

*Public Version*

interim 2020, at \*\*\* short tons, than in interim 2019, at \*\*\* short tons, while its capacity

utilization was lower in interim 2020, at \*\*\* percent, than in interim 2019, at \*\*\* percent.[325]

The domestic industry's U.S. shipments declined by \*\*\* percent between 2017 and

2019, from \*\*\* short tons in 2017 to \*\*\* short tons in 2018 and \*\*\* short tons in 2019; its U.S.

shipments were higher in interim 2020, at \*\*\* short tons, than in interim 2019, at \*\*\* short

tons.[326]  The domestic industry's end-of-period inventories increased by \*\*\* percent from 2017

to 2019, from \*\*\* short tons in 2017 to \*\*\* short tons in 2018 and 2019; its end-of-period

inventories were lower in interim 2020, at \*\*\* short tons, than in interim 2019, at \*\*\* short

tons.[327]  The domestic industry's ratio of end-of-period inventories to total shipments increased

steadily from 2017 to 2019 but was lower in interim 2020 than in interim 2019.[328]

Employment indicators for the domestic industry also declined between 2017 and 2019.

The domestic industry's number of production and related workers ("PRWs") fell from \*\*\* in

2017 to \*\*\* in 2018 and \*\*\* in 2019; its number of PRWs was lower in interim 2020, at \*\*\*,

than in interim 2019, at \*\*\*.[329]  Total hours worked,[330] wages paid,[331] and productivity[332] also

fell from 2017 to 2019.  Total hours worked and wages paid were lower in interim 2020 than in

---

[325] CR/PR at Tables III-4, C-1.

[326] CR/PR at Tables III-6, C-1.

[327] CR/PR at Tables III-7, C-1.

[328] CR/PR at Tables III-7, C-1.  The ratio of end-of-period inventories to U.S. shipments was \*\*\* percent in 2017, \*\*\* percent in 2018, and \*\*\* percent in 2019.  It was lower in interim 2020 at \*\*\* percent than in interim 2019 at \*\*\* percent.  *Id.*

[329] CR/PR at Tables III-9; C-1.

[330] CR/PR at Tables III-9; C-1.  Total hours worked decreased from \*\*\* hours in 2017 to \*\*\* hours in 2018 and \*\*\* hours in 2019.  *See id*.

[331] CR/PR at Tables III-9; C-1.  Wages paid decreased from $\*\*\* in 2017 to $\*\*\* in 2018 to $\*\*\* in 2019.  *See id*.

[332] CR/PR at Tables III-9; C-1.  Productivity per 1,000 hours decreased from \*\*\* short tons in 2017 to \*\*\* short tons in 2018 and \*\*\* short tons in 2019.  *See id*.

76

APPX0022123

*Public Version*

interim 2019 while productivity was higher between the interim periods.[333]

The domestic industry's net sales, gross profit, operating income, and net income increased between 2017 and 2018, but deteriorated in 2019. Most of the industry's financial indicators were lower in interim 2020 than in interim 2019.[334] Specifically, the domestic industry's net sales by value increased from $*** in 2017 to $*** in 2018, then declined to $*** in 2019; its net sales by value was lower in interim 2020, at $***, than in interim 2019, at $***.[335] Its gross profit increased from $*** in 2017 to $*** in 2018, then declined to ***; its gross profit was lower in interim 2020, at ***, than in interim 2019, at ***.[336] The industry's operating income increased from $*** in 2017 to $*** in 2018, then declined to *** in 2019; its operating income was lower in interim 2020, at ***, than in interim 2019, at ***.[337] The ratio of operating income to net sales increased from *** percent in 2017 to *** percent in 2018, then declined to *** percent in 2019; it was lower in interim 2020, at *** percent, than in interim 2019, at *** percent.[338] The domestic industry's net income increased from $*** in 2017 to $*** in 2018, then declined to ***; its net income was higher in interim 2020, at ***, than in interim 2019, at ***.[339]

---

[333] Total hours worked were *** hours in interim 2019 and *** hours in interim 2020. Wages paid were $*** in interim 2019 and $*** in interim 2020. Productivity was *** short tons in interim 2019 and *** short tons in interim 2020. CR/PR at Tables III-9; C-1.

[334] U.S. prices at the beginning of 2019 were higher than later in the year. Consequently, interim 2020 prices, although increasing substantially in the last three months of the POI after the petitions were filed, remained at lower levels than in interim 2019, which, in turn resulted in lower gross profit levels despite increasing net sales quantity and lower COGS. CR/PR at VI-9, Tables V-4-5, VI-1-2.

[335] CR/PR at Tables VI-1, C-1.

[336] CR/PR at Tables VI-1, C-1.

[337] CR/PR at Tables VI-1, C-1.

[338] CR/PR at Tables VI-1, C-1.

[339] CR/PR at Tables VI-1, C-1. The ratio of net income to net sales increased from *** percent in 2017 to *** percent in 2018, then declined to *** percent in 2019; it was slightly higher in interim 2020 at *** percent than in interim 2019, at *** percent. *Id*.

77

*Public Version*

Domestic producers' capital expenditures increased from $*** in 2017 to $*** in 2018 and $*** in 2019,[340] [341] while research and development expenses decreased each year, from $*** in 2017 to $*** in 2018 and $*** in 2019.[342]  *** also reported negative effects on investment and growth and development that *** attributed to subject imports.[343]

As discussed above, we have found that the volume of cumulated subject imports and the increase in the volume were significant during the period of investigation, and subject imports gained *** percentage points in market share at the expense of the domestic industry from 2017 to 2019 (*** percentage points from 2017-2018 and *** percentage points from 2018-2019).[344]  The record also shows that the volume of cumulated subject imports increased by one million short tons between 2017 and 2018, and as demand began to decline in the fall of 2018, U.S. importers' inventories reached their highest level of those two years. Notwithstanding these substantial inventories and declining demand, subject imports surged into the U.S. market in January 2019 and continued to flow into the U.S. market in substantial quantities, reaching 2.7 million short tons that year, even as demand declined in 2019.[345]  U.S. importers' quarterly inventories reached their highest level in March 2019, but subject imports nonetheless continued to enter the U.S. market in the latter part of 2019 in excess of any purported need to replenish depleted inventories in the latter part of 2019.  Moreover, as

---

[340] CR/PR at Tables VI-6, C-1.  The domestic producers' capital expenditures were higher in interim 2020, at $***, than in interim 2019, at $***.  *See id.*

[341] All three U.S. producers reported ***.  Specifically, Mosaic explained that ***.  Nutrien reported that its capital expenditures related to ***.  Simplot reported that ***.  CR/PR at Table VI-7.

[342] CR/PR at Tables VI-6, C-1.  The domestic producers' research and development expenses were lower in interim 2020, at $***, than in interim 2019, at $***.  *See id.*

[343] CR/PR at Tables VI-9-10.

[344] CR/PR at Table C-1.

[345] CR/PR at Tables IV-2, IV-6.

*Public Version*

previously discussed, the record shows that regardless of the "unidirectional" movement of subject importers' inventories, the volumes of subject imports entering the U.S. market had significant depressing effects on U.S. prices.  Record evidence shows subject imports being offered and sold at lower prices, domestic producers lowering prices to compete with subject imports, and certain purchasers purchasing subject imports rather than the domestic like product for price reasons.  Consequently, cumulated subject imports – including through their significant volumes that contributed to the oversupply conditions in the U.S. market during the POI at competitive and lower prices – depressed prices in the U.S. market to a significant degree.

The downward pricing pressure exerted by subject imports caused the domestic industry's revenues to be lower than they would have been otherwise.  The domestic industry's U.S. shipment average unit value declined to $*** per short ton in 2019, down from $*** per short ton in 2018 and $*** per short ton in 2017.[346]  The domestic industry's sales revenues declined considerably in 2019 (down from 2018 *** percent by quantity and *** percent by value) along with its profitability as its COGS to net sales ratio rose above *** percent.[347]  Sales revenues and profitability continued to be weak and the industry's COGS to net sales ratio remained above *** percent into interim 2020.[348]  As a consequence, we find that subject imports had a significant impact on the domestic industry.

We have evaluated the above factors within the context of the business cycle and conditions of competition distinctive to the industry.  In doing so, we note that, in many

---

[346] CR/PR at Table C-1.
[347] CR/PR at Tables VI-1, C-1.
[348] CR/PR at Table VI-1, C-1.

79

*Public Version*

investigations, there are other economic factors at work, some or all of which may also be having adverse effects on the domestic industry.  Such economic factors might include nonsubject imports; changes in technology, demand, or consumer tastes; competition among domestic producers; or management decisions by domestic producers.  The legislative history explains that the Commission must examine factors other than subject imports to ensure that it is not attributing injury from other factors to the subject imports, thereby inflating an otherwise tangential cause of injury into one that satisfies the statutory material injury threshold.[349]  In performing its examination, however, the Commission need not isolate the injury caused by other factors from injury caused by unfairly traded imports.[350]  Nor does the "by reason of" standard require that unfairly traded imports be the "principal" cause of injury or contemplate

---

[349] The Statement of Administrative Action for the Uruguay Round Agreements Act ("SAA") at 851-52 ("{T}he Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports."); S. Rep. 96-249 at 75 (1979) (the Commission "will consider information which indicates that harm is caused by factors other than less-than-fair-value imports."); H.R. Rep. 96-317 at 47 (1979) ("in examining the overall injury being experienced by a domestic industry, the ITC will take into account evidence presented to it which demonstrates that the harm attributed by the petitioner to the subsidized or dumped imports is attributable to such other factors;" those factors include "the volume and prices of nonsubsidized imports or imports sold at fair value, contraction in demand or changes in patterns of consumption, trade restrictive practices of and competition between the foreign and domestic producers, developments in technology and the export performance and productivity of the domestic industry"); *accord Mittal Steel*, 542 F.3d at 877.

[350] SAA at 851-52 ("{T}he Commission need not isolate the injury caused by other factors from injury caused by unfair imports."); *Taiwan Semiconductor Industry Ass'n,* 266 F.3d at 1345 ("{T}he Commission need not isolate the injury caused by other factors from injury caused by unfair imports ... . Rather, the Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports."); *Asociacion de Productores de Salmon y Trucha de Chile AG v. United States*, 180 F. Supp. 2d 1360, 1375 (Ct. Int'l Trade 2002) ("{t}he Commission is not required to isolate the effects of subject imports from other factors contributing to injury" or make "bright-line distinctions" between the effects of subject imports and other causes.); *see also Softwood Lumber from Canada*, Inv. Nos. 701-TA-414 and 731-TA-928 (Remand), USITC Pub. 3658 at 100-01 (Dec. 2003) (Commission recognized that "{i}f an alleged other factor is found not to have or threaten to have injurious effects to the domestic industry, *i.e.*, it is not an 'other causal factor,' then there is nothing to further examine regarding attribution to injury"), *citing Gerald Metals,* 132 F.3d at 722 (the statute "does not suggest that an importer of LTFV goods can escape countervailing duties by finding some tangential or minor cause unrelated to the LTFV goods that contributed to the harmful effects on domestic market prices.").

80

*Public Version*

that injury from unfairly traded imports be weighed against other factors, which may be contributing to overall injury to an industry.[351]  It is clear from the statute and decisions of the Federal Circuit and court of International Trade that the existence of injury caused by other factors does not compel a negative determination.[352]

Within this framework, we have considered respondents' arguments that the domestic industry's poor performance was not caused by subject imports, but rather was the result of other factors.  Specifically, we considered the role of declining U.S. demand due to unusually poor weather conditions, which began in the latter part of 2018 and affected three consecutive application sessions – fall 2018, spring 2019, and fall 2019.[353]  Although demand declines in 2019 may have exerted some degree of downward force on the domestic industry's prices, we again note that the Commission need not isolate the injury caused by other factors from injury caused by subject imports and that the "by reason of" standard does not require that unfairly traded imports be the "principal" cause of injury or contemplate that injury from unfairly traded imports be weighed against other factors, which may be contributing to overall injury to an industry.  As described above, the volume of cumulated subject imports and inventories of such merchandise increased significantly from 2017 to 2018, and remained significant in 2019 despite decreased apparent U.S. consumption.  In the latter half of 2019, as demand remained low due to further adverse weather conditions, U.S. importers continued to maintain elevated

---

[351] S. Rep. 96-249 at 74-75; H.R. Rep. 96-317 at 47.

[352] *See Nippon Steel Corp.*, 345 F.3d at 1381 ("an affirmative material-injury determination under the statute requires no more than a substantial-factor showing.  That is, the 'dumping' need not be the sole or principal cause of injury.").

[353] OCP Prehearing Br. at 108-116; Gavilon Prehearing Br. at 10-11, 64-65; PhosAgro Prehearing Br. at 21-22; IRM Prehearing Br. at 31; PhosAgro Posthearing Br. at 9-10.

81

APPX0022128

*Public Version*

levels of inventories and continued to import more subject merchandise than was needed to replenish any depletion of these inventories.  Moreover, as previously discussed, contemporaneous trade publications and U.S. purchaser questionnaire responses documented the adverse impact of imports on U.S. prices.  Therefore, the adverse weather conditions that affected the U.S. market and prompted a decline in demand do not rebut the fact that the industry's performance would have been stronger in the absence of the significant volume of subject imports from Morocco and Russia that exerted downward pricing pressure on the domestic industry.  In other words, we have observed material injury to the domestic industry by reason of subject imports that is distinct from the declining demand so as to ensure that we are not attributing injury from declining demand to the subject imports.[354]

To comply with the court's first remand instructions, we assessed whether "fertilizer was 'practically unavailable from U.S. sources' to supply high-demand regions in 2019 because doing so would not have been economically viable."[355]  As discussed above, although we did so in the context of our volume analysis there, we repeat and incorporate that discussion in the proper context of our impact analysis here to ensure that we are not attributing injury from other factors to the subject imports.  Despite declines in the domestic industry's capacity during

---

[354] We also find unpersuasive PhosAgro's assertions that public statements by Mosaic indicate a lack of causation by subject imports.  PhosAgro Second Remand Comments at 4-5.  Any such statements are outweighed by the record evidence establishing that the domestic industry was materially injured by reason of subject imports, including public and internal statements by Mosaic, discussed below.  Mosaic Posthearing Br., Response to Commission Questions at 10-20, Exhibits 11-22.  Additionally, Mosaic offered reasonable and credible explanations regarding sensitivities and concerns relating to its public statements.  Mosaic Posthearing Br., Response to Commission Questions at 12-13.

[355] *See* Remand Order at 41.

APPX0022129

*Public Version*

the POI,[356] the domestic industry had excess capacity throughout the POI, and in 2019, its

capacity utilization was \*\*\* percent, meaning that the domestic industry had \*\*\* short tons of

excess capacity in 2019.[357]

　　We also note that, in addition to this excess capacity, domestic producers maintained

substantial inventories in 2019.  Domestic producers' end-of-period inventories by quarter

were \*\*\* short tons in March 2019, \*\*\* short tons in June 2019, and \*\*\* short tons in

September and December 2019.[358]  Furthermore, the supplementary questionnaire information

obtained in the first remand proceedings indicates that domestic producers maintain these

---

[356]  As described in our Original Views, the domestic industry's capacity decreased from \*\*\* short tons in 2017 to \*\*\* short tons in 2018 and \*\*\* short tons in 2019, and the declines in the domestic industry's capacity were attributed to Mosaic.  Original Views at 23, 49; CR/PR at Table III-4.  The larger decline from 2017 to 2018 coincided with its idling of the Plant City facility in December 2017.  Additionally, we note that, contrary to respondents' claims, this did not cause a "supply gap" that explains the increase subject import volume, as discussed above.  The domestic industry's capacity declined to a lesser extent from 2018 to 2019, but as described above, even with these reductions in capacity, the domestic industry maintained excess capacity.  We further note that Simplot maintained the same level of capacity throughout the POI, while Nutrien increased capacity from 2017 to 2018 and maintained the same level of capacity from 2018 to 2019.  CR/PR at Table III-4.  Moreover, we observe that in 2019, Nutrien was reported in an *Argus* article as "refer{ing} to potential further US production cuts as 'a futile game' . . ., stating that any cut would simply result in greater imports."  Petitions, Exhibit I-43.  The article continues –

> Nutrien argues that the market is weak because of fundamental
> structural oversupply and that further cuts simply signal to OCP, Russian
> and other producers to ship to the US.  It is a clear message to its
> competitor, Mosaic, which accounts for around three-quarters of US
> phosphates production.  It is rare for any producer to speak in such
> plain language, but the assessment is spot on....  Nutrien's view that
> supply cuts in the US will not deter shipments from competitors is
> correct but Mosaic has little choice....  The supplier is now left with the
> uncomfortable decision of whether to cut production in a bid to stop
> losing money and eroding shareholder value, or cede domestic market
> share to foreign lower-cost producers.

*Id.*

[357] CR/PR at Tables III-4, C-1.
[358] CR/PR at Table D-1.

*Public Version*

inventories ***.[359]  We observe that the record both in the original investigations and as supplemented on remand shows that domestic producers rely upon ***, and confirms that domestic producers ***.[360]  Further, as shown above, Mosaic's reshipment of inventories was not limited to only the type of *** observed in the First Remand Views, but rather also included other ***.[361]  The total reshipment quantities of domestic producers equated to approximately *** percent of the domestic industry's total U.S. shipments during the POI,[362] and the domestic industry's total inventory reshipments during the POI were equivalent to approximately *** percent of the industry's total end-of-year inventories during the period, indicating that the movement of such inventories is a regular business practice and not a rare occurrence or just a theoretical possibility.  Furthermore, Mosaic ***,[363] which shows how, unlike importers, the domestic industry was able to use alternate shipping methods and to draw upon its extensive distribution network to reach customers.

In sum, we find that the record from the original investigations and as supplemented in the first remand proceedings indicates that the domestic industry's excess capacity, substantial inventories, extensive inventory locations, expansive multi-modal distribution network, and demonstrated ability to move and relocate product where it was needed shows that domestic producers were well-positioned to supply the U.S. market in 2019.  Accordingly, having

---

[359] *See* ***.

[360] *See* ***.  Although we note that Mosaic reports that ***.  Mosaic Domestic Producer Remand Questionnaire at 2(c).  Likewise, Simplot reports that ***.  Simplot Domestic Producer Remand Questionnaire at 2(a) – 2(c).

[361] Mosaic Domestic Producer Remand Questionnaire at 2(b) – (c).

[362] *Calculated from* Mosaic Domestic Producer Remand Questionnaire, Simplot Domestic Producer Remand Questionnaire, CR/PR at Table C-1.

[363] Mosaic Remand Domestic Producer Questionnaire at 2(c).

84

*Public Version*

considered the conditions of competition as directed by the court, we find that the record does not indicate that fertilizer was "practically unavailable from U.S. sources."

We next address the court's remand order that the Commission "failed to account for {} detracting evidence" regarding Mosaic's alleged refusal to supply the U.S. market and only summarized Mosaic's arguments that "some of the supply issues identified . . . are with brokers/traders such as ADM and Koch that compete with the domestic industry for sales."[364] As an initial matter, we find that any decisions by Mosaic to prioritize its "loyal customers" over supplying trading companies that compete with it for the same customers as well as its decision to sell directly to customers, rather than selling through a "middleman," does not constitute a "refusal{} to supply the domestic market."  Moreover, the record does not show that Mosaic systematically refused to sell to these purchasers at all, as discussed in more detail below.

*ADM.*  The record does not indicate that Mosaic refused to supply fertilizers to ADM on a widespread basis consistently throughout the POI.[365]  As discussed in the Original and First Remand Views and repeated above, Mosaic disputes ADM's testimony that Mosaic "categorically refuses to sell to us," and Mosaic asserts that ***.[366]  Indeed, ADM's own evidence supports Mosaic's claims.  At the hearing, the Director of Sales and Marketing for ADM testified that ADM "predominantly uses annual supply contracts so that we can effectively and cost-effectively manage deliveries throughout our distribution network.  However, Mosaic refuses to sell to us on this basis."[367]  Additionally, although the witness contended that "spot

---

[364] Second Remand Order at 31-32.
[365] Second Remand Order at 31-32; OCP Remand Comments at 10-11.
[366] First Remand Views at 70-71 n.296 (citing Mosaic Posthearing Br. at Responses to Questions pp. 86-87, Exhibits 53, 54).
[367] Hearing Tr. at 208-9 (Niederer).

85

*Public Version*

tons have never been available,"[368] ADM submitted an email exchange in May 2019, in which a Mosaic representative twice offered to supply ADM with fertilizer, but ADM complained that the price was "$10/ton above the market price at that time."[369]  This is consistent with the company's testimony that "if {Mosaic} were willing to sell to us <u>at market level prices</u>, we would buy up to 400,000 tons annually from them."[370]  That Mosaic may have declined to sell product on ADM's preferred terms or at ADM's preferred prices does not constitute at a "categorical refusal to sell."  ADM also submitted several unsupported claims, one email from 2017, one email from 2018, and several exchanges that occurred after the petitions were filed.[371]  Given that the parties agree that following the filing of the petitions, cumulated subject imports began exiting the U.S. market,[372] which caused a supply shock, we find it appropriate to accord less weight to post-petition indications of tight or restricted supply, which Mosaic acknowledged to have occurred.[373]  Accordingly, we find that Mosaic's claims that it did not

---

[368] Hearing Tr. at 209 (Niederer).
[369] ADM Posthearing Br. at 3, Exhibit 1.
[370] Hearing Tr. at 209 (emphasis added).
[371] ADM Posthearing Br. at 3, Exhibit 1.
[372] As explained in the Original and First Remand Views, the parties agreed that the filing of the petitions in June 2020, resulted in a large decrease in the volume of cumulated subject imports.  Original Views at 34 n.134; First Remand Views at 9 n.31; Mosaic Prehearing Br. at 43-44, 91; Simplot Prehearing Br. at 29-30, 34; Simplot Posthearing Br. at Responses to Questions pp. 53-54; Mosaic Posthearing Br. at Responses to Questions pp. 69-70; OCP Posthearing Br. at 12, Responses to Questions pp. 33, 67-73; EuroChem Posthearing Br. at 11; IRM Posthearing Br. at 8-9; PhosAgro Posthearing Br. at 12-13, Responses to Questions.  Some U.S. importers indicated that they stopped bringing in subject imports "because the buyers and the sellers agreed that the risk of 75 percent countervailing duties was higher than either of them wanted to take."  Hearing Tr. at 337 (Aranoff); see also EuroChem Posthearing Br. at 11 (stating that as a result of the filing of the petitions, it shifted its purchases of phosphate fertilizers from Morocco and Russia to other global sources); *** U.S. Purchaser Questionnaire Response at III-11 (reporting that Koch and IRM will not quote or import material until the countervailing duty decision is issued); *** U.S. Purchaser Questionnaire Response at III-11 (reporting that Helm, Koch, and OCP "cut off" supplying imported product to the U.S. market in the summer of 2020).
[373] First Remand Views at 16, 28, 61, 71-72.

*Public Version*

"categorically refuse" to supply ADM are more credible and consistent with record evidence.

*Gavilon.* The record does not support a finding that Mosaic "generally declined {Gavilon's} sales inquiries."[374] ***.[375] Notwithstanding this, ***.[376]

*Koch*. Similar to ADM, Scott McGinn, Executive Vice President for Koch Fertilizer, testified at the hearing that "{i}n the last few years, we've frequently asked Mosaic if it would sell us barges of phosphate fertilizers <u>at market prices</u>. Mosaic has generally declined our inquiries."[377] Additionally, the contemporaneous documentation that Koch submitted consisted of only one email from 2018, one from 2020 post-petition, and one from 2021.[378] Based on the limited evidence that Koch presented, we find that the fact that Mosaic "generally declined" to sell to Koch at Koch's preferred prices does not establish that Mosaic refused to sell to it or to supply the U.S. market. We likewise find unavailing OCP's argument that Koch's *** from Mosaic demonstrate Mosaic's general and consistent unwillingness to supply Koch as opposed to Koch's unwillingness to purchase fertilizers from Mosaic unless it is at Koch's preferred prices.[379]

*Heartland.* As the court noted, Mr. Coppess, the retired Executive Vice President of Heartland, testified that in May 2020, Mosaic refused to offer Heartland product . . . saying that it was "out of the market at the present time."[380] We note that Mr. Coppess appears to be

---

[374] Second Remand Views at 30.
[375] Mosaic Posthearing Br. at Responses to Questions, p. 85; ***; Staff Conference Testimony of Brian Harlander President, Gavilon Fertilizer, LLC.
[376] ***.
[377] Hearing Tr. at 196; *see also* OCP Second Remand Comments at 10; Koch Second Remand Comments at 4-5.
[378] Koch Posthearing Br. at 4.
[379] OCP Second Remand Comments at 10-11.
[380] Hearing Tr. at 205.

87

*Public Version*

discussing a specialty product, MES, and notwithstanding that statement as well as his reference to "some spot outages of MES," Mr. Coppess's testimony suggests that Mosaic continued to supply this product to Heartland. Specifically, Mr. Coppess testified that "{a}lthough some importers offer homogeneous products like MES, . . . they're only available in quantities too large for us to take on top of our commitments to Mosaic."[381] We further note that Heartland does not appear to be a significant purchaser in the U.S. market, as it was not listed as such by domestic producers or importers and did not submit a purchaser questioner.

As discussed above, although some purchasers reported being unable to obtain supply from Mosaic at times during the POI,[382] we find that the record as a whole indicates that subject imports contributed significantly to oversupply conditions in a declining market and had significant price-depressing effects on prices in the U.S. market in 2019, and these prices remained at depressed levels in 2020 before the petitions were filed and increased sharply as subject imports exited the market. Given the details set out above regarding Mosaic's alleged refusals to supply the U.S. market, we find that we are not attributing to subject imports the injury caused by such alleged refusal.[383]

Nor have we misattributed to imports any alleged injury resulting from alleged supply issues. Undermining assertions of widespread or problematic issues with supply from domestic sources compared to subject sources, is the fact that the majority of purchasers reported that the domestically produced product was either comparable or superior to product from

---

[381] Hearing Tr. at 206.

[382] *See, e.g.*, Gavilon Prehearing Br. at 20-24, Exhibit 7; IRM Prehearing Br. at 12-15, 18-19; IRM Posthearing Br. at Exhibit 4; ADM Posthearing Br. at Exhibit 1; Hearing Tr. at 205-206 (Coppess); Response of ***, CR/PR at Table V-11.

[383] We also note that Mosaic is not the only domestic producer.

88

*Public Version*

Morocco (16 of 24 firms) and Russia (20 of 23 firms) in availability and reliability of supply.[384]  As

previously discussed, most U.S. purchasers reported that the domestic product's U.S.

distribution network was superior to that of subject imports.[385]  The additional questionnaire

responses gathered in the first remand proceedings demonstrate the breadth and superiority of

U.S. producers' distribution networks, and that the domestic industry reported moving

inventories between locations while importers generally did not.[386]

Respondents argue that subject imports merely filled a supply gap created by Mosaic's

decision to idle its Plant City facility in December 2017,[387] which was exacerbated by Nutrien's

---

[384] CR/PR at Table II-9.  Although 16 of 28 purchasers reported experiencing supply constraints, we note that three of those purchasers (***, ***, and ***) specifically implicated U.S. importers only. Moreover, three other purchasers (***, ***, and ***) pointed to experiencing constraints from both U.S. importers and domestic producers.  And one purchaser (***) pointed to ***.  ***, ***, ***, ***, ***, ***, and *** U.S. Purchaser Questionnaire Responses at III-11.  Consequently, only nine of 28 responding purchasers – three of which were U.S. importers (***, ***, and ***) of subject phosphate fertilizers and *** – reported supply constraints with respect to the domestic like product only.

[385] CR/PR at Table II-9.

[386] *See* above Section II.A.3; Remand Questionnaire Responses at 2(a)-(c).

[387] OCP Prehearing Br. at 7, 24-32, 62-63; Gavilon Prehearing Br. at 20, 34, 60-63; IRM Prehearing Br. at 6-9, 19-20, 24-25; OCP Posthearing Br. at 2, 4, Responses to Questions pp. 14-15, 77-78; IRM Posthearing Br. at 5.  Respondents, referring to Mosaic's public statements regarding giving up "1 million tonnes of market here in the U.S. intentionally," argue that idling the facility was part of Mosaic's global strategy to invest in lower-cost production facilities overseas and bring in product from its joint venture in Saudi Arabia.  Mosaic firmly denies that it deliberately idled Plant City – which it states had accounted for 700,000 short tons of phosphate fertilizer sold into the U.S. market in 2017 – for this purpose, and we observe that Mosaic *** import from its joint venture in Saudi Arabia during the POI, and that imports from Saudi Arabia remained at much lower levels than subject imports and increased by substantially less than subject imports did during the POI.  CR/PR at IV-6 & Tables IV-2, C-1. Mosaic claims that the increasing volumes of subject imports played a significant role in driving prices to levels that made it uneconomical for it to operate its Plant City facility in 2017 in the first instance, and that its decision to idle Plant City ultimately helped balance global phosphate supply and demand, and tightened U.S. supply, which caused U.S. prices to increase in 2018.  This price increase, Mosaic asserts, was temporary as subject imports increased, causing a supply glut and declining prices.  Mosaic Prehearing Br. at 58-59; Mosaic Posthearing Br. at Responses to Questions pp. 10-17, Exhibit 14. Incurring tens of millions of dollars in costs to idle Plant City, Mosaic states that it preserved the option of reopening the facility in the event of a significant, sustained improvement in market conditions, which did not occur due to subject imports.  It ultimately was forced to close the facility in June 2019. Mosaic Posthearing Br. at Responses to Questions pp. 22-23.

*Public Version*

announcement in February 2018 that it would close its Redwater facility in Canada.[388] Mosaic

concedes that after it had idled Plant City, it reduced its phosphate sales volume targets with

certain larger customers – specifically, with CHS by 200,000 tons and with Gavilon by 100,000

tons relative to the prior year – as well as to some ***,[389] we find that the volume of cumulated

subject imports eclipsed any reduction in U.S. production as a result of Mosaic's idling of its

facility in 2017.  As discussed above, we find Mosaic's estimate that the idling of the Plant City

facility reduced its supply to the U.S. market by approximately 700,000 tons to be credible and

consistent with other record evidence.  Additionally, notwithstanding this estimate, the record

shows that Mosaic's U.S. shipments decreased by only *** short tons from 2017 to 2018.

Subject imports, however, increased by 1 million short tons from 2017 to 2018, and U.S.

---

[388] OCP Posthearing Br. at 3, Responses to Questions pp. 15-16; IRM Posthearing Br. at 3; Koch Posthearing Br. at 2.  In May 2019, Nutrien converted its phosphate operation in Redwater, Canada (***) to an ammonium sulfate plant.  CR/PR at III-3 and Table III-3.  As discussed above, Nutrien announced at the time that it was increasing production at its U.S. facilities in Aurora, North Carolina and White Springs, Florida in order to offset any reduction in supply from Redwater and ensure a continued supply of phosphate fertilizers to customers in Canada.  CR/PR at III-3; Mosaic Prehearing Br. at Exhibit 13.  Indeed, ***, Nutrien *** its U.S. production between 2018 and 2019 and this increase was more than sufficient to cover its increase in exports that year.  CR/PR at Table III-4; PCS/Nutrien Domestic Producer Questionnaire at II-7.  The record also shows that between 2017 and 2018, Nutrien had increased its capacity by 400,000 short tons due to ***.  CR/PR at Table III-4 and III-5, n.18.

[389] *** U.S. Producer Questionnaire Response at IV-16.  Mosaic further states that ***.  Moreover, Mosaic states that it ***.  Mosaic Posthearing Br. at Responses to Questions, p. 85.  Mosaic also disputes other allegations of its refusal or inability to supply product during the POI.  Specifically, Mosaic disputes ADM's testimony that Mosaic "categorically refuses to sell to us."  Mosaic asserts that ***.  Mosaic Posthearing Br. at Responses to Questions pp. 86-87.  Mosaic also contends that some of the supply issues identified by respondent parties are with broker/traders such as ADM and Koch that compete with the domestic industry for sales and rely on a small margin, high volume business model.  Mosaic Final Comments at 6; *see also* Simplot Posthearing Br. at Responses to Questions pp. 9-10, 21, 64 and Exhibit 5.  Mosaic further contends that it has never had a sales relationship with IRM, and that it ***.  Mosaic Posthearing Br. at Responses to Questions, pp. 87-88.  Mosaic argues that many of the other alleged instances identified by respondents dealt with post-petition supply issues experienced by U.S. importers after their Moroccan and Russian suppliers largely and abruptly exited the U.S. market.  Mosaic asserts that there was a supply shock, and Mosaic responded by diverting shipments headed to export markets and drawing down inventories.  Mosaic Posthearing Br. at Responses to Questions p. 84; Mosaic Final Comments at 6.

90

*Public Version*

shipments of subject imports increased by 604,981 short tons from 2017 to 2018 and by 753,638 short tons from 2017 to 2019.[390]  Moreover, as record-setting precipitation impacted three planting seasons in a row beginning in the fall of 2018, the volume of subject imports persisted beyond levels demanded, resulting in a substantial buildup of U.S. importer inventories of subject imports and an oversupply condition in the U.S. market.[391] [392]

In the Second Remand Order, the court also indicated that the Commission should address whether Mosaic had adopted a strategy of decreasing or forgoing business in the United States in favor of increasing its business in Brazil.[393]  As discussed in the Original Views and First Remand Views, Respondents claimed that Mosaic deliberately refused to supply U.S. customers in favor of exporting product.[394]  The record, however, does not support respondents' contention that domestic producers prioritized export shipments over U.S. shipments.  To the contrary, after subject imports declined in the U.S. market following the filing of the petitions, the domestic industry increased production and U.S. shipments, and also

---

[390] CR/PR at Tables IV-2, IV-7.

[391] CR/PR at Tables IV-2, IV-7.  Respondents argue that imported product was necessary to serve demand in U.S. regions unaffected by the poor weather conditions.  However, as discussed above, the record shows that the volume of cumulated subject imports in 2019 exceeded what was necessary to replenish any depleted inventories.

[392] Moreover, while demand as measured by apparent U.S. consumption declined by *** short tons between 2018 and 2019, U.S. shipments of subject imports increased by *** short tons.  CR/PR at Table C-1.  Although apparent U.S. consumption was *** short tons lower in 2019 than in 2017, the volume of cumulated subject imports was 725 thousand short tons higher and importers' U.S. shipments of subject imports 743 thousand short tons higher in 2019 than in 2017.  CR/PR at Tables IV-2, C-1.

[393] Second Remand Order at 32.

[394] Original Views at 69-70; First Remand Views at 68-69, citing Koch Prehearing Br. at 3-5; PhosAgro Prehearing Br. at 3; Koch Prehearing Br. at 2; EuroChem Prehearing Br. at 5; OCP Posthearing Br. at 6-7.

APPX0022138

*Public Version*

diverted export shipments to make additional product available to U.S. customers.[395]  Mosaic

explains that its export markets, such as India and Brazil, help support year-round capacity

utilization rates during the "off-season" periods in the United States[396] and are also used for

"risk management" and to retain flexibility to ship product to third country markets during

times when U.S. demand is low, such as in 2019.[397]  We likewise find that the evidence cited by

the court also does not establish that Mosaic was decreasing business in the United States in

favor of increasing business in Brazil.[398]  In both public statements as well as internal

communications Mosaic company officials referenced the connection between subject imports

and Mosaic's various plant idlings and closures, including Plant City.  Consistent with those

statements, Mosaic has rebutted claims that attempted to connect the Plant City idling to a

strategic decision to shift production to Brazil.[399]  With respect to the news article cited by the

---

[395] CR/PR Tables III-5, IV-7; Mosaic Posthearing Br. at Responses to Questions p. 84; Mosaic Final Comments at 6.  Mosaic states that due to the abrupt departure of subject imports after the filing of the petitions and because facilities need time to ramp up production, it also had to import product from Saudi Arabia for the first time in late 2020.  Hearing Tr. at 103-104 (Jung); Mosaic Posthearing Br. at Response to Questions p. 17 n.165.

[396] Mosaic Prehearing Br. at 54.

[397] Mosaic Posthearing Br. at 14; Hearing Tr. at 118-120 (O'Rourke).

[398] Specifically, the court cites a statement by Gavilon's counsel regarding the 100,000 short ton reduction in supply from Mosaic to Gavilon after Plant City closed, as well as Mr. O'Rourke's statement in a 2019 analyst call stating that when Mosaic idled Plant City "that opened up a hole for some imports to increase. . . .  We went from 55%, 60% market share to a more sustainable 50-ish percent market share.  So we gave up 1 million tonnes of market share here in the U.S. intentionally."  Second Remand Order at 32-33 (citing Hearing Tr. at 270-71 (Wessel) and Gavilon Prehearing Br., 2019 Analyst Day Transcript)).  We note that, as discussed above in Section II.A.2, Mosaic explained in more detail that it estimated that the idling of Plant City in 2017 reduced the supply to the U.S. market by approximately 700,000 short tons, which is a reasonable estimate that is consistent with other record evidence.  Furthermore, we found that, notwithstanding the reasonableness of that estimate, Mosaic only reduced its U.S. shipments by *** short tons from 2017 to 2018.  PhosAgro cites the same earnings call and several others, characterizing them as "contemporaneous statements".  PhosAgro Second Remand Comments at 1-5.  We note, however, that these statements occurred in 2018, 2019, and 2020, and therefore were not contemporaneous with Mosaic idling of Plant City in 2017.

[399] Mosaic Posthearing Br., Response to Commission Questions at 10-20, Exhibits 11-22.

92

APPX0022139

*Public Version*

court in which a Mosaic representative stated "I am excited at the prospect of Leading Mosaic's vastly expanding business in Brazil ….  This will be an ideal time for us to grow in the region…."[400] we note that the article goes on to say that "Mosaic expects that its U.S. phosphate production facilities will continue to operate at high rates in order to meet strong and growing global demand."[401]  Accordingly, we find that the evidence cited by the court does not establish that Mosaic was focusing on Brazil at the expense of its U.S. operations.  Nor does this article demonstrate that Mosaic intended to prioritize exports to Brazil over supplying the U.S. market given the record evidence discussed above showing that Mosaic diverted export shipments to supply the U.S. market when subject imports exited after the petitions were filed. In any case, the domestic industry's exports do not explain the behavior of cumulated subject imports, which continued to enter the U.S. market at significant volumes oversupplying the market and exerting downward pressure on domestic prices.

We also find that the record does not support respondents' arguments that the domestic industry's financial declines were due to its cost challenges.[402]  As previously discussed, all major U.S. producers are vertically integrated with respect to the main raw material inputs used to produce phosphate fertilizers – sulfur, ammonia, and phosphate rock.[403] To the extent domestic producers purchased certain quantities of raw materials,[404] this did not adversely impact the domestic industry's total COGS, which declined over the POI and was

---

[400] Second Remand Order at 23 (citing Koch Prehearing Br., Exhibit 2).
[401] Koch Prehearing Br., Exhibit 2.
[402] OCP Prehearing Br. at 113-115; EuroChem Prehearing Br. at 3-4.
[403] CR/PR at V-1.
[404] For instance, Mosaic states that it produces one-third of its ammonia, purchases another third on the open market, and acquires a third through a long-term contract with CF Industries.  Mosaic Posthearing Br. at Responses to Questions p. 95.

*Public Version*

lower in interim 2020 than in interim 2019.[405]

Finally, we have also examined the role of nonsubject imports.  Nonsubject imports increased over the POI,[406] but they had a small presence in the U.S. phosphate fertilizer market. Their market share fluctuated, increasing from *** percent in 2017 to *** percent in 2018, before declining to *** percent in 2019, for an overall increase of *** percentage points between 2017 and 2019.[407]  Subject imports, however, gained a larger amount, *** percentage points of market share, as *** percentage points of market share shifted from domestic to import sources from 2017-2019 (*** percentage points from 2018-2019).[408]  Moreover, between 2018 and 2019 when demand and prices declined, subject import market share increased by *** percentage points (from 29.0 percent to 33.3 percent), while nonsubject import market share decreased by *** percentage points (from *** percent to *** percent).[409] As discussed above, the record, including the volume of subject imports, information from purchaser questionnaire responses, and contemporaneous trade publications, indicates that subject imports contributed to oversupply conditions in the U.S. market and had significant

---

[405] CR/PR at VI-1.  Raw material costs increased from $*** in 2017 to $*** in 2018, then decreased to $*** in 2018 and were lower in interim 2020, at $***, than in interim 2019, at $***, even as production and sales were higher.  *See id.*

[406] CR/PR at Tables IV-2. Nonsubject imports increased from 184,104 short tons in 2017 to 608,805 short tons in 2018, then declined to 511,245 short tons in 2019; they were higher in interim 2020, at 581,585 short tons, than in interim 2019, at 380,491 short tons.  *See id.*

[407] CR/PR at Tables IV-8, C-1.  Nonsubject imports' market share was lower in interim 2020, at *** percent, than in interim 2019, at *** percent.  *See id.*  Nonsubject imports did not fill the supply vacated when subject imports decreased following the filing of the petitions, as total import volumes of phosphate fertilizers were lower in the third quarter of 2020 than in the third quarters of every other year of the POI.  CR/PR at Table IV-6.

[408] CR/PR at Table C-1.

[409] CR/PR at Table C-1.  Subject and nonsubject import market shares were both lower in interim 2020 than in interim 2019, by *** percentage points and *** percentage points, respectively.  *Id.*

depressing effects on U.S. prices.[410]  Thus, based on the available evidence, nonsubject imports

cannot explain the magnitude of the adverse impact on the domestic industry.[411]

        Accordingly, we continue to find that cumulated subject imports had a significant impact

on the domestic industry.

## III.   Conclusion

        For the foregoing reasons, we again determine that an industry in the United States is

materially injured by reason of subject imports of phosphate fertilizers from Morocco and

Russia that are subsidized by the governments of Morocco and Russia.

---

[410] *See, e.g.*, CR/PR at Table V-11.  Responding purchasers specifically discussed imports from Morocco and Russia and their impact on the U.S. market.  As previously discussed, subject imports from Morocco and Russia accounted for 84.1 percent of total import volume in 2019, up from 83.0 percent in 2018.  CR/PR at Table IV-2.  The volume of cumulated subject imports declined by 9.5 percent between 2018 and 2019, while the volume of nonsubject imports declined by 16.0 percent.  CR/PR at Table IV-2.  U.S. shipments of subject imports increased by 148,957 short tons, 6.2 percent, between 2018 and 2019, while U.S. shipments of nonsubject imports decreased by 11.8 percent during that time.  CR/PR at Table C-1.

[411] As noted above, nonsubject imports from Saudi Arabia increased each year of the POI until Saudi Arabia was the largest source of nonsubject imports by 2019.  CR/PR at IV-2.  While Mosaic has a 25 percent equity interest in MWSPC, a producer of phosphate fertilizers in Saudi Arabia, it was not the U.S. importer of nonsubject imports from Saudi Arabia until the last quarter of 2020.  CR/PR at IV-6; *see* Mosaic U.S. Importer Questionnaire Response at I-2a, II-2a.  It maintains that it had invested in the Saudi facility to serve India and other parts of Asia, not the U.S. market, as evidenced by the fact that after it had idled Plant City, it "imported *zero* phosphate fertilizer from Saudi Arabia," but rather "sold \*\*\* percent of its offtake from MWSPC in India."  Mosaic Posthearing Br. at Responses to Questions pp. 16-17.  The record indicates that India was the largest destination for exports from Saudi Arabia during the POI.  CR/PR at Table VII-13.  Mosaic's \*\*\*.  *See id.* at Responses to Questions p. 17 n.165.  Mosaic did so, rather than utilize its excess capacity because the "nature of phosphate fertilizer production makes it difficult to ramp up production quickly."  *See id.* at Responses to Questions pp. 24-26.

95

APPX0022142

## Dissenting Views of Commissioner David S. Johanson

These investigations return to the Commission on second remand.  *See OCP S.A. v. United States*, Consol. Court No. 21-00219, Slip Op. 25-51 (April 22, 2025).  I dissented in the original investigations and again in the first remand.  *See Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final), USITC Pub. 5172 (March 2021) at 45-69 and accompanying confidential opinion (Dissenting Views of Commissioner David S. Johanson); *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Remand), USITC Pub. 5490 (Jan. 2024) at 67-71 and accompanying confidential opinion (Dissenting Views of Chairman David S. Johanson).  I dissent again, continuing to determine that the domestic industry is neither materially injured nor threatened with material injury by reason of subject imports from Morocco and Russia.  I adopt and incorporate my previous views from the original and first remand proceedings, which require no further supplementation because, unlike in the first remand, the record was not reopened in this second remand.  90 Fed. Reg. 24411, 24412 (June 10, 2025).

APPX0022143

# List 1, Doc. No. 297R – EDIS No. 852760
# Notice of Remand Proceedings
# June 4, 2025
# (Office of the Secretary)

APPX0022144

# UNITED STATES INTERNATIONAL TRADE COMMISSION
## Washington, D.C.

## Investigation Nos. 701-TA-650-651 (Final) (Second Remand)

## Phosphate Fertilizers from Morocco and Russia

AGENCY:  United States International Trade Commission.

ACTION:  Notice of remand proceedings.

SUMMARY:  The U.S. International Trade Commission ("Commission") hereby gives notice of the procedures it intends to follow to comply with the court-ordered remand of its final determination in the countervailing duty investigations concerning phosphate fertilizers from Morocco and Russia. For further information concerning the conduct of these remand proceedings and rules of general application, consult the Commission's Rules of Practice and Procedure, part 201, subparts A through E (19 CFR part 201), and part 207, subpart A (19 CFR part 207).

DATE:  June 4, 2025

FOR FURTHER INFORMATION CONTACT:  Calvin Chang ((202) 205-3358), Office of Investigations, or Courtney McNamara ((202) 205-3095), Office of General Counsel, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436. Hearing-impaired persons can obtain information on this matter by contacting the Commission's TDD terminal on 202-205-1810. Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at 202-205-2000. General information concerning the Commission may also be obtained by accessing its internet server (*https://www.usitc.gov*). The public record for Investigation Nos. 701-TA-650-651 (Final) (Second Remand) may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov*.

SUPPLEMENTARY INFORMATION:

Background. -- In March 2021, the Commission determined that a domestic industry was materially injured by reason of imports of phosphate fertilizers from Morocco and Russia. *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final), USITC Pub. 5172 (March 2021).  Respondents, OCP S.A and EuroChem North America Corporation, contested the Commission's determinations before the U.S. Court of International Trade ("CIT"), along with PhosAgro PJSC, International Materials Ltd., and Koch Fertilizer.  On September 23, 2023, the CIT issued an order remanding the case to the Commission.  *OCP, S.A. v. United States*, 658 F. Supp. 3d 1297, 1324 (Ct. Int'l Trade 2023).

On January 17, 2024, the Commission filed its remand results in which it continued to find that the domestic industry was materially injured by reason of subject imports.  *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651, USITC Pub. 5490 (Jan. 2024)

APPX0022145

(Final) (Remand).  On April 22, 2025, the CIT issued a decision under seal in which it remanded the Commission's decision for further proceedings.  *OCP S.A. v. United* States, Consol. Ct. No. 21-00219, Slip Op. No. 25-51 (April 22, 2025) ("*OCP III*").  The CIT's decision has not been publicly released at this time.

Participation in the remand proceedings.-- Only those persons who were interested parties that participated in the investigations of Phosphate Fertilizers from Morocco and Russia  and were also parties to the appeal may participate in these remand proceedings.  Such persons need not file any additional appearances with the Commission to participate in the remand proceedings, unless they are adding new individuals to the list of persons entitled to receive business proprietary information ("BPI") under administrative protective order ("APO").  BPI referred to during the remand proceedings will be governed, as appropriate, by the APO issued in the investigations.  The Secretary will maintain a service list containing the names and addresses of all persons or their representatives who are parties to the remand proceedings, and the Secretary will maintain a separate list of those authorized to receive BPI under the administrative protective order during the remand proceedings.

Written submissions.--The Commission is not reopening the record and will not accept the submission of new factual information for the record.  The Commission will permit the parties entitled to participate in the remand proceedings to file comments concerning how the Commission could best comply with the court's remand instructions.

The comments must be based solely on the information in the Commission's record. The Commission will reject submissions containing additional factual information or arguments pertaining to issues other than those on which the court has remanded this matter.  The deadline for filing comments is June 20, 2025. Comments must be limited to no more than twenty-five (25) double-spaced and single-sided pages of textual material, inclusive of attachments and exhibits.

Parties are advised to consult with the Commission's Rules of Practice and Procedure, part 201, subparts A through E (19 C.F.R. part 201), and part 207, subpart A (19 C.F.R. part 207) for provisions of general applicability concerning written submissions to the Commission.  All written submissions must conform to the provisions of section 201.8 of the Commission's rules; any submissions that contain BPI must also conform with the requirements of sections 201.6, 207.3, and 207.7 of the Commission's rules.  Please note the Secretary's Office will accept only electronic filings at this time. Filings must be made through the Commission's Electronic Document Information System (EDIS, https://edis.usitc.gov). No in-person paper-based filings or paper copies of any electronic filings will be accepted until further notice.  The Commission's *Handbook on E-Filing*, available on the Commission's website at http://edis.usitc.gov, elaborates upon the Commission's rules with respect to electronic filing.

Additional written submissions to the Commission, including requests pursuant to section 201.12 of the Commission's rules, will not be accepted unless good cause is shown for accepting such submissions or unless the submission is pursuant to a specific request by a Commissioner or Commission staff.

APPX0022146

In accordance with sections 201.16(c) and 207.3 of the Commission's rules, each document filed by a party to the investigation must be served on all other parties to the investigation (as identified by either the public or BPI service list), and a certificate of service must be timely filed. The Secretary will not accept a document for filing without a certificate of service.

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued: June 4, 2025

3

# List 1, Doc. No. 304R – EDIS No. 855457
# Remand Comments
# (The Mosaic Company)

APPX0022183

WILMERHALE

+1 202 663 6000 (t)
+1 202 663 6363 (f)
wilmerhale.com

June 30, 2025

Inv. Nos. 701-TA-650-651 (Second Remand)

**PUBLIC VERSION**

**Business Proprietary Information for Which Proprietary Treatment is Requested Deleted from Pages 1-25**

**VIA ELECTRONIC FILING (EDIS)**

The Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC 20436

Re:    *Phosphate Fertilizers from Morocco and Russia*: **Comments on Remand**

Dear Secretary Barton:

On behalf of Petitioner The Mosaic Company ("Petitioner" or "Mosaic"), we hereby submit comments on how the Commission could best comply with the Court's remand instructions in *OCP S.A. v. United States*, Consol. Ct. No. 21-00219, Slip Op. No. 25-51 (Ct. Int'l Trade, Apr. 22, 2025). These comments are timely submitted in accordance with the

Wilmer Cutler Pickering Hale and Dorr LLP, 2100 Pennsylvania Avenue NW, Washington DC 20037

Beijing    Berlin    Boston    Brussels    Denver    Frankfurt    London    Los Angeles    New York    Palo Alto    San Francisco    Washington

WILMERHALE

The Honorable Lisa R. Barton
June 30, 2025
Page 2

Commission's *Notice of Remand Proceedings*.[1]

Pursuant to 19 C.F.R. § 201.6, Mosaic requests confidential treatment for the business proprietary information contained in brackets on pages 1-25. This information includes proprietary information received from other parties pursuant to the administrative protective order. Disclosure of this information would cause substantial harm to the competitive position of Mosaic and other companies providing the information and would be likely to impair the Commission's ability to obtain such information in the future as is necessary to perform its statutory functions.

The requisite certification is enclosed in accordance with 19 C.F.R. §§ 201.6(b) and 207.3(a). This submission is being served in accordance with the attached certificate of service. Please contact us if you have any questions.

Sincerely,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann

*Counsel to The Mosaic Company*

---

[1] *Phosphate Fertilizers From Morocco and Russia*, 90 Fed. Reg. 24,411, 24,412 (USITC June 10, 2025); Letter from Lisa R. Barton to Stephanie E. Hartmann, Re: Request for Extension of Time to File Remand Comments, dated June 18, 2025.

## ATTORNEY CERTIFICATION

I, Stephanie E. Hartmann, counsel to The Mosaic Company, certify that (1) I have read the enclosed submission dated June 27, 2025, and (2) to the best of my knowledge, the information contained in this submission is accurate and complete.

In accordance with section 201.6(b) of the Commission's rules, I also hereby certify that to the best of my knowledge, information substantially identical to that for which business proprietary treatment has been requested is not available to the general public.  Public disclosure of this information would cause competitive harm to Petitioner and would be likely to impair the Commission's ability to obtain such information in the future as is necessary to perform its statutory functions.

I certify that the foregoing statements are true and accurate.  I am aware that the information contained above may be subject to verification or corroboration (as appropriate) by the U.S. International Trade Commission.  I am also aware that U.S. Law (including, but not limited to 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government.

/s/ Stephanie E. Hartmann
June 27, 2025

**U.S. International Trade Commission**
**PUBLIC CERTIFICATE OF SERVICE**
**Phosphate Fertilizers from Morocco and Russia**
**Inv. Nos. 701-TA-650-651 (Remand 2)**

I, Stephanie E. Hartmann of Wilmer Cutler Pickering Hale and Dorr LLP, hereby certify that a copy of this submission was served via email on this 30th day of June 2025 on the following:

Patrick McLain
**King & Spalding LLP**
1700 Pennsylvania Ave., N.W.
Washington, DC 20006
pmclain@kslaw.com
tradeservice@kslaw.com

Shara L. Aranoff
**Covington and Burling LLP**
One Center City
850 Tenth Street, NW
Washington, DC 20001
saranoff@cov.com

Jonathan Zielinski
**Cassidy Levy Kent (USA) LLP**
900 19th Street NW
Suite 400
Washington, DC 20006
jzielinksi@cassidylevy.com
records@cassidylevy.com

Melissa M. Brewer
**Kelley Drye & Warren LLP**
3050 K Street, NW
Washington, DC 20007
mbrewer@kelleydrye.com
tradenotifications@kelleydrye.com

Peter Koenig
**Squire Patton Boggs**
2550 M Street, NW
Washington, DC 20037
Peter.koenig@squirepb.com

H. Deen Kaplan
**Hogan Lovells US LLP**
555 Thirteenth Street, NW
Washington, DC 20004
Deen.kaplan@hoganlovells.com

Kenneth G. Weigel
**Alston & Bird LLP**
950 F Steet, NW
Washington, DC 20004
Ken.weigel@alston.com

Elena G. Nosyreva
**Ministry of the Economic Development**
**of the Russia Federation**
Presnenskaya Naberzhnaya 10/2
Moscow, Russia, 125039
nosyrevaEG@economy.gov.ru

Warren E. Connelly
**Trade Pacific PLLC**
700 Pennsylvania Ave, SE, Suite 500
Washington, DC 20003
wconnelley@tradepacificlaw.com

/s/ Stepanie E. Hartmann
Stephanie E. Hartmann

APPX0022187

**BEFORE THE**
**UNITED STATES INTERNATIONAL TRADE COMMISSION**

<u>**PUBLIC VERSION**</u>

Business Proprietary Information
Deleted from Pages 1-25

*Phosphate Fertilizers from Morocco and Russia*
**Inv. Nos. 701-TA-650-651 (Second Remand)**

**COMMENTS ON REMAND DETERMINATION**

David J. Ross
Stephanie E. Hartmann
WILMER CUTLER PICKERING
  HALE and DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
*Counsel to The Mosaic Company*

June 30, 2025

APPX0022188

PUBLIC VERSION

# TABLE OF CONTENTS

I.     INTRODUCTION ......................................................................................... 1

II.    THE COMMISSION'S FINDINGS ON INVENTORY RESHIPMENT.......................... 1

III.   THE COMMISSION SHOULD REAFFIRM ITS VOLUME FINDINGS ....................... 3

    A.    Subject Import Volumes Were Significant and Took Market Share from the Domestic Industry During the POI, As the Commission Originally Found .............................................................................. 3

    B.    The Commission Should Continue to Find the U.S. Market was Oversupplied ........................................................................... 5

        1.    The record shows substantial inventory buildup by U.S. importers. ....................................................................... 5

        2.    The "inventory reshipment" issue is a red herring................... 6

        3.    The record supports the Commission's original finding that inventories can be moved to meet demand. ................ 9

        4.    Other evidence supports the Commission's oversupply findings............. 14

    C.    The Commission Did Not Fail to Consider Evidence Regarding Alleged Refusals to Supply or Alleged Re-Exports to Canada ........................... 15

        1.    The Commission should find the allegations that Mosaic refused to supply trading companies do not undermine its volume findings............................................................ 16

        2.    The Commission should explain the alleged re-exports to Canada do not undermine its volume findings. ....................... 18

IV.    THE COMMISSION SHOULD REAFFIRM ITS PRICE EFFECTS FINDINGS .......... 19

    A.    The Commission Did Not Make an Underselling Finding, and the Pricing Data Do Not Undermine Its Price Depression Finding........................... 20

    B.    The Record Evidence on Price Leadership Does Not Undermine the Commission's Price Effects Findings................................... 22

    C.    The Commission Should Reaffirm Its Lost Sales Findings................................ 23

V.     THE COMMISSION SHOULD REAFFIRM ITS IMPACT FINDINGS ....................... 25

VI.    CONCLUSION.................................................................................... 25

*Business Proprietary Information Deleted*    **PUBLIC VERSION**

## I.    INTRODUCTION

The Court remanded to the Commission for further explanation of **[**

**].**[1] The Commission should clarify again that it did not base its volume, price, and impact findings on a footnote about inventory reshipment. The record shows subject import volumes were significant throughout the POI. Significant price depression occurred in 2019 and 2020 – a trend that reversed only after subject imports exited the market post-petition. The significant volumes of subject imports and significant price depression had significant negative impacts on the domestic industry's performance and financial indicators throughout the POI.[2] The record supports these findings regardless of the inventory reshipment issue. Accordingly, the Commission should again affirm its volume, price, and impact findings and make an affirmative determination of material injury.

## II.    THE COMMISSION'S FINDINGS ON INVENTORY RESHIPMENT

**[**

---

[1] *OCP S.A. v. United States*, Consol. Ct. No. 21-00219, Slip Op. No. 23-136 (CIT, Sept. 19, 2023) ("*First Remand Opinion*").

[2] *See Phosphate Fertilizers from Morocco and Russia,* Inv. Nos. 701-TA-650-651 (Final), USITC Pub. No. 5172 at 49-52 (Mar. 2021) (APO Version) ("*Views*").

[3] *OCP S.A. v. United States*, Consol. Ct. No. 21-00219, Slip Op. No. 25-51 (CIT, Apr. 22, 2025) ("*Second Remand Opinion*") at 18.

[4] *Id.*

*Business Proprietary Information Deleted*                                                              **PUBLIC VERSION**

].[5] On

remand, the Commission should further explain its original findings as follows:

*First*, as the Commission clarified previously, footnote 217 in the original *Views* is not a

key finding that grounds the Commission's entire injury determination.[6]

*Second*, the Court misconstrues footnote 217. It addresses the respondents' argument that

imports were necessary to serve demand in U.S. regions unaffected by poor weather conditions.[7]

The Commission found this argument "fails to explain why U.S. importers could not supply U.S.

customers from its building inventories or from product that sat on barges on the Mississippi

River system."[8] The Commission did not make the finding the Court attributed to it – namely,

that "it was possible to supply phosphate fertilizer to high demand regions of the country by

reshipping fertilizer that ***had already been delivered*** to flooded, low demand regions so that

additional foreign imports were not necessary."[9] Rather, the Commission found that importers

had building inventories and product ***sitting on barges*** on the Mississippi River system – *i.e.*,

product that had ***not*** "already been delivered" – that would have been available to serve areas

unaffected by poor weather conditions. This finding is supported by the record and the

Commission should affirm it on remand, as discussed below in Section II.B.2.

*Third*, [



][10]

What the Commission actually found was that "U.S. importers acknowledged{} it was possible

---

[5] *Id.* at 19.
[6] *First Remand Results* at 7.
[7] *Views* at 56, n.217.
[8] *Id.*
[9] *Second Remand Opinion* at 18 (emphasis added).
[10] *Second Remand Opinion* at 18-19.

*Business Proprietary Information Deleted*                                    **PUBLIC VERSION**

for the U.S. importers" to supply U.S. customers from building inventories or from product that sat on barges on the Mississippi River system, "but that it was more costly to move product by rail or back down the Mississippi River," so "they chose to import more product" instead.[11] The record supports this finding, as discussed below in Section III.B.3.

*Finally*, [

][12] This is a key finding that was and continues to be supported by substantial evidence, as discussed below in Section III.B.4. Even if the record was unclear on the possibility of moving inventories, the evidence showing importers were contractually obligated to continue to accept shipments regardless of demand conditions is sufficient to support the Commission's ultimate conclusion that imports contributed to oversupply conditions.

## III.    THE COMMISSION SHOULD REAFFIRM ITS VOLUME FINDINGS

### A.    Subject Import Volumes Were Significant and Took Market Share from the Domestic Industry During the POI, As the Commission Originally Found

In the original investigation, the Commission found that cumulated subject imports were significant both in absolute terms and relative to apparent consumption.[13] The record continues to support this finding. Subject imports increased from 2.0m ST in 2017 to 3.0m ST in 2018 and 2.7m ST in 2019, a 37.4% increase over the POI.[14] U.S. importers' U.S. shipments of subject imports increased from 1.8m ST to 2.4m ST in 2018 and 2.5m ST in 2019, an increase of 38.9% over the POI.[15] The record also supports the Commission's finding that subject imports were significant compared to apparent consumption: based on the questionnaires, importers increased

---

[11] *Views* at 56, n.217.
[12] *Id.*.
[13] *Id.* at 33-34.
[14] *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final), Staff Report (Feb. 26, 2021) at IV-3, Table IV-2 ("Staff Report").
[15] *Id.* at C-3 to C-4, Table C-1.

*Business Proprietary Information Deleted*                                   **PUBLIC VERSION**

their market share from **[          ]** in 2017 to **[          ]** in 2018 and **[          ]** in 2019.[16] Subject imports were also significant compared to production: the ratio of importers' U.S. shipments to domestic production increased from **[        ]** in 2017 to **[        ]** in 2018 and **[        ]** in 2019.[17]

Although the absolute volume of subject imports declined in interim 2020, most of the decline occurred post-petition. According to official import statistics, subject import volumes averaged 223,817 ST per month in 1H 2020 but fell to less than 35,000 ST per month in 2H 2020.[18] Mosaic filed the Petitions at the end of June 2020, and OCP effectively exited the market by August 2020.[19] The lower volumes of subject imports in the interim period were petition effects and should be discounted accordingly. Nonetheless, U.S. shipments of subject imports remained substantial in interim 2020 as importers drew down their significant inventories.[20]

This substantial increase in subject imports over the POI came at the direct expense of the domestic industry, as imports flooded the oversaturated U.S. market throughout 2019 despite weakened demand. As the Commission previously found, demand as measured by apparent consumption decreased by **[        ]** from 2018 to 2019, while U.S. importers increased their share of apparent consumption by **[        ]** and captured significant market share from the domestic industry.[21] Specifically, subject imports increased their market share from **[          ]** in 2017 to **[        ]** in 2019, while the domestic industry's market share **[      ]** from **[        ]** to **[        ]**.[22] Thus, the domestic industry lost **[      ]** points of market share, and subject imports

---

[16] *Id.*
[17] *Id.*
[18] *See id.* at IV-14, Table IV-6.
[19] *See id.*
[20] *See id.* at D-3, Table D-1. On a quarterly basis, subject import ending inventories fell from **[        ]** ST as of March 31, 2020, to **[        ]** ST in September 2020; by comparison, end-of-period subject import inventories totaled **[        ]** ST in September 2019. *See id.*
[21] *Id.*, Tables IV-2, IV-7, IV-8, C-1.
[22] *See id.* at IV-19, Table IV-8.

*Business Proprietary Information Deleted*                                              **PUBLIC VERSION**

gained [        ] points of market share at the expense of the domestic industry over the POI.[23] The record continues to support the Commission's original conclusion that subject imports were significant – both in absolute terms and relative to domestic production – and increased significantly over the POI, capturing substantial market share from the domestic industry.

### B.      The Commission Should Continue to Find the U.S. Market was Oversupplied

In the original investigation, the respondents argued that subject imports "merely filled a supply gap" created by Mosaic.[24] In actuality, however, the record shows that U.S. importers oversupplied the U.S. market. As the Commission found in the original *Views*, in 2019 "the volume of subject imports persisted beyond levels demanded, resulting in a substantial buildup of U.S. importer inventories of subject imports and an oversupply condition in the U.S. market."[25] The record supports these findings, and the Commission should reaffirm them.

### 1.      The record shows substantial inventory buildup by U.S. importers.

The extensive evidence of the buildup of U.S. importers' subject import inventories over the POI demonstrates that subject imports oversupplied the market. The Commission collected detailed inventory data that show U.S. importers' quarterly inventories [          ] in 2018 and [            ] in 2019.[26] If the market had been short-supplied, the questionnaire data should have shown a drawdown in inventories, as suppliers scrambled to meet the market's needs. Instead, U.S. importers' ending inventories of subject imports *increased* [            ] over the POI, both in absolute terms and as a share of total inventories.[27]

From 2017 to 2018, as subject imports increased by approximately [       ], importers' end-of-year inventories more than [       ], from [        ] ST in 2017 to [        ] ST in

---

[23] *Id.*, Tables IV-8, C-1.
[24] *Views* at 54.
[25] *Id.* at 55-56.
[26] *See* Staff Report at D-3, Table D-1.
[27] *See id.*

*Business Proprietary Information Deleted*                                    **PUBLIC VERSION**

2018.[28] Subject import inventories **[                    ]** ST at the end of Q1 2019 and remained at extremely high levels throughout 2019 and into 2020.[29] Meanwhile, the domestic industry's U.S. shipments declined by **[        ]** from 2018 to 2019,[30] and subject imports captured an additional **[   ]** percentage points of market share in 2019.[31] Subject import volumes continued to enter at record levels in 1H 2020, until Mosaic filed the petitions and OCP abruptly withdrew from the market. This record supports a finding that subject imports oversupplied the market.

### 2.    The "inventory reshipment" issue is a red herring.

The respondents sought to downplay the evidence of importers' inventory buildup and persistent high levels of imports in 2019 and 2020 as the result of unforeseeable weather-related effects, claiming that widespread flooding in 2019 trapped inventories in low demand areas and that additional imports were needed to meet demand in areas unaffected by the flooding.[32] **[**



**]**

At the outset, the record shows that the significant volumes of subject imports and weakened demand started in late 2018 and led to massive oversupply of the U.S. market and record inventories of subject imports as early as Q1 2019, *before* the widespread flooding that purportedly trapped inventories in upriver locations. Subject import inventories **[**

**]** ST at the end of the Q1 2019 – about **[        ]** of total apparent domestic consumption in

---

[28] *See id.*
[29] *See id.*
[30] *Id.* at C-3 to C-4, Table C-1.
[31] *Id.* at C-3 to C-4, Table C-1.
[32] *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final), Hearing Transcript (Feb. 9, 2021) at 227 (Lambert) ("Hearing Tr."); *id.* at 230-31 (Niederer).

*Business Proprietary Information Deleted*                                **PUBLIC VERSION**

that quarter[33] – and remained at extremely high levels throughout calendar year 2019 and into 2020 as significant volumes of subject imports continued to enter the market.[34]

This inventory buildup in Q1 2019 was well-documented in the trade press, as the Commission found.[35] The trade press reported on the "full supply chain" and "full pipeline and heavy imports" in January 2019; that the "US is awash with imports" and "{p}ushing so much DAP/MAP to the US has led to oversupply" in February 2019; on "record surplus of phosphates" and "heavy 1Q imports, which reached a record 1.2mn t of MAP/DAP", in March 2019; and on "oversupply amid heavy imports" in April 2019.[36] Thus, the U.S. market was already oversupplied before the flooding even started in spring 2019. The Commission's finding that the volume of subject imports exceeded demand, resulting in substantial buildup of U.S. importer inventories and oversupply conditions, is supported by substantial evidence.

The record also does not support the respondents' claims that sustained high levels of imports throughout the remainder of calendar year 2019 and 1H 2020 were needed to meet demand in areas unaffected by the flooding (*i.e.*, in the Delta region) and because of the purported infeasibility of "inventory reshipment."[37] As the Commission correctly found, the record shows that, in spring 2019, U.S. importers had inventories ***sitting on barges at NOLA and in the Gulf***, *i.e.*, proximate to the location of this alleged unmet demand. Indeed, Respondents' own witnesses testified at the Hearing that product was sitting on barges waiting for river open.[38]

[

---

[33] *See* Staff Report at D-3, Table D-1; Mosaic Post-Hearing Brief and Responses to Commissioner Questions (Feb. 17, 2021), Responses to Commissioner Questions at 24 ("Mosaic Posthearing Brief").
[34] *See* Staff Report at D-3, Table D-1.
[35] *See Views* at 41-43 n.159.
[36] *See* Mosaic Pre-Hearing Brief (Feb. 3, 2021) at 60-63 (citing Petition Vol. I, Exhibits I-29, I-30, I-31,I-33, I-35) ("Mosaic Prehearing Brief").
[37] *See Phosphate Fertilizers from Morocco and Russia,* Inv. Nos. 701-TA-650-651 (Final) (Remand), USITC Pub. No. 5490 at 38, 41 (Jan. 2024) (APO Version) ("*Remand Views*").
[38] *Views* at 56 n.217; Hearing Tr. at 228 (Lambert).

*Business Proprietary Information Deleted*                    **PUBLIC VERSION**

].[39] [

].[40]

[

][41] However, the Commission made no such assumption. To the contrary, the record evidence shows that if significant demand had materialized in the Delta region, importers could have served those customers from the unsold inventories they already had sitting on barges at NOLA.[42] Further, Mosaic's phosphate fertilizer plants are located in Louisiana and Florida, so Mosaic also would have had ready access to those same customers, which it could have supplied with newly-produced fertilizer or [

].[43] In short, even if such unmet demand had existed, there would have been no need for respondents or Mosaic to supply that demand by reshipping inventories that ***had already been delivered to flooded, low demand regions***. Thus, the feasibility of "inventory reshipment," as defined by the Court, is irrelevant to the Commission's oversupply findings.

The record also shows that demand for phosphate fertilizers in states in the Delta region (*i.e.*, Alabama, Louisiana, Mississippi, Arkansas) is not particularly high compared to the

---

[39] Mosaic Posthearing Brief, Exhibit 44.
[40] [                                                    ].
[41] *Second Remand Opinion* at 6 (emphasis added).
[42] [



].
[43] *See* [

]

*Business Proprietary Information Deleted*                                            **PUBLIC VERSION**

Cornbelt states.[44] Delta farmers could not possibly have absorbed the hundreds of thousands of tons of subject imports that arrived on a monthly basis over the course of 2019.[45] The record thus does not support the respondents' argument that the significant volumes of subject imports that persisted throughout 2019 and into 2020 were needed to meet unmet demand.

> **3.      The record supports the Commission's original finding that inventories can be moved to meet demand.**

To the extent the Commission considers it necessary to revisit the issue, the Commission should continue to find the record shows it is possible to move inventories to meet demand. In its Second Remand Opinion, **[**

**]**[49]

**[**

---

[44] *See* Mosaic Prehearing Brief, Exhibit 2, Attachment 4.
[45] Staff Report, Table F-1.
[46] *Second Remand Opinion* at 19.
[47] *Id.* at 16-17.
[48] *Id.* at 23.
[49] *Id.* at 24.

*Business Proprietary Information Deleted*                                      **PUBLIC VERSION**

]. From Mosaic's perspective, a "multidirectional" shipment does not mean a shipment that is delivered to its ultimate destination and then re-delivered to a different destination. Rather, Mosaic's extensive, inter-modal distribution network allows for "multidirectional" shipments between intermediate inventory locations.[50] While the respondents assert their distribution networks are "unidirectional" – meaning where product is moved from one location to another and in only one direction[51] – Mosaic's distribution system functions as a hub-and-spoke network.[52]

Mosaic has an extensive distribution network of nearly [    ] facilities in [   ] states with approximately [     ] ST of storage capacity that allows it to reach customers located throughout the United States via barge, rail, or truck.[53] This includes: (1) [          ] warehouse facilities; (2) [                    ]; (3) [       ] warehouses; (4) [            ] warehouses; and (5) [       ] in every region of the continental United States. The [       ] of Mosaic's U.S. storage capacity – [                  ] – is in [            ]. Under [

].

Mosaic also has barge fleeting, fan track, and port terminals where product is loaded on barges, rail cars, or ocean going vessels and stored/held for furtherance on to customers or

---

[50] *See* [                                    ].
[51] *Remand Views* at 25.
[52] *See* [                                 ]. Importer [                    ].
[53] *See* [                         ].

*Business Proprietary Information Deleted*                    **PUBLIC VERSION**

warehouses. Once Mosaic's phosphate fertilizer is loaded onto a river barge, it can be sold as such (*i.e.*, on a barge-loaded basis) or moved to up-country warehouses located on the inland U.S. waterways, including the Mississippi, Missouri, Arkansas, and Ohio Rivers, and then delivered to customers via rail or truck.[54] All of these facilities are treated as inventory locations in Mosaic's questionnaire responses.

Mosaic submitted evidence showing that its extensive storage and distribution network allows it to serve customers from multiple inventory points and change shipment or delivery points or modes of transport when there is a supply chain disruption. For example, in spring 2019, when widespread flooding caused delays and river closures along the Mississippi River system, Mosaic [

].[55]

Mosaic continuously tracks the movement of inventories through its storage and distribution network and makes adjustments to meet changes in demand. For example, if a warehouse is scheduled for re-supply but another warehouse develops a more acute need for product, Mosaic will divert tons in transit to meet that demand. This may include changing transit points and/or modes of transportation, such as shipping by rail or truck instead of barge. Moreover, [

---

[54] *See id.*
[55] *Id.*

*Business Proprietary Information Deleted*                    **PUBLIC VERSION**

].[56]

[

].[57] Mosaic respectfully submits that the Court's characterization is not accurate. Mosaic treated all of its storage and distribution facilities as inventory locations in its questionnaire responses and reported movement of subtantial volumes between these inventory locations during the POI. Thus, the inventory data that informed the Commission's findings on oversupply conditions and the availability of domestic supply reflect Mosaic's inventories that were staged at various inventory locations (*i.e.*, product tons that were both "in transit" *and* "in inventory"). The Court's opinion fails to account for this record evidence.

Moreover, while some U.S. importers sought to qualify their ability to move inventories as "uni-directional," [

].[58]

Further, the Commission should also consider the record evidence from respondents that, despite the oversupply conditions in spring 2019, they needed additional imports not because it was not possible to move inventories, but because it would have been uneconomical to do so.[59] Despite submitting thousands of pages in briefing, respondents have mustered only one example of freight costs to show it would have been uneconomical or cost-prohibitive to move barges downriver. Specifically, EuroChem provided an estimate that the cost to ship fertilizer by barge from NOLA upriver to St. Paul, MN is $18 and from St. Paul, MN

---

[56] *See id.*
[57] *Second Remand Opinion* at 26.
[58] *See* [

].

[59] *See* Hearing Tr. at 264, 265 (Lambert).

*Business Proprietary Information Deleted*                          **PUBLIC VERSION**

downriver to NOLA is $35.[60] However, $35 per ton is not a prohibitively expensive for freight in this industry. For example, [



].[61] Thus, EuroChem's freight cost to move barges downriver from St. Paul, MN to NOLA was not cost-prohibitive by industry standards.

EuroChem's example of the cost to move fertilizer by barge from the headwaters of the Mississippi River to its terminus in the Gulf of Mexico is also not indicative of the cost to move barges between other locations along the Mississippi river system. [



].[62] In addition, the Arkansas River (which is considered part of the Mississippi River system) was also shut down for periods of spring 2019 due to flooding.[63] Barges sitting at terminals along that river in Oklahoma or Arkansas waiting for river open would have been even closer geographically to customers in the Delta, where demand was purportedly unaffected by the weather-related events.[64] Respondents have put forward no evidence showing it was "uneconomical" or "cost-prohibitive" to move fertilizer on barges downriver from points in Oklahoma or Arkansas to the Delta region.

EuroChem's example of barge costs from St. Paul, MN to NOLA also says nothing about the cost to move fertilizer inventories around flooded areas via rail or truck. Moving phosphate fertilizer from a barge to rail or a truck is a common practice and one that industry participants did routinely in spring 2019 when weather-related events disrupted supply chains. Several of the

---

[60] EuroChem Post-Hearing Brief at 10 (Feb. 17, 2021).
[61] Mosaic Posthearing Brief, Exhibit 32.
[62] [                                                                    ].
[63] Hearing Tr. at 264-265 (Lambert).
[64] *Id.* at 227 (Lambert).

*Business Proprietary Information Deleted*                                    **PUBLIC VERSION**

responding U.S. importers claim that moving inventories via rail or truck would have been

[

] but the record evidence contradicts these

unsupported assertions. [

].[68] [

].[69]

Thus, the record does not support a finding that new imports were necessary in 2019 because it was not possible – or even "uneconomical" or "cost-prohibitive" – to move existing inventories to areas of purportedly higher demand. Rather, the record supports the Commission's original finding that importers chose to bring in more imports because it was *cheaper* – because of the extremely low prices of unfairly subsidized phosphate fertilizer offered by Russian and Moroccan producers, as well as low ocean freight rates – than to move existing inventories that were already in the United States.[70]

>    **4.    Other evidence supports the Commission's oversupply findings.**

Even assuming, *arguendo*, [

---



[65] [                                      ].
[66] [                                      ].
[67] [                                        ].
[68] [                                        ].
[69] [                                      ].
[70] Hearing Tr. at 227 (Lambert).

**]**, the record contains other evidence that supports the Commission's findings on oversupply conditions. Specifically, there is substantial evidence showing that importers were **[                                                                    ]** regardless of demand conditions. This evidence alone is sufficient to support the Commission's conclusion that imports contributed to oversupply conditions in the U.S. market.

EuroChem's witness testified at the Hearing that imports continued to arrive throughout 2019 and into 2020 because "those vessels were coming," "once they're on their way, they're coming here."[71] This reflects the fact that **[**

**]**.[73] The record shows U.S. importers **[**

**]**. This record evidence provides an independent basis for the Commission to reaffirm its findings on oversupply conditions and volume.

**C.      The Commission Did Not Fail to Consider Evidence Regarding Alleged Refusals to Supply or Alleged Re-Exports to Canada**

**[**

**]**[75] The Commission should explain it considered

---

[71] *Id.*
[72] *See* ADM Post Hearing Brief at 7 (Feb. 17, 2021) (stating that its contracts with **[**
                               **]**); *id.* at 8 (**[**
                                    **]**); *id.* at 9 (**[**

                                    **]**).
[73] Hearing Tr. at 111-112 (McLellan).
[74] *See, e.g.,* Koch Posthearing Brief at 12 (Feb. 17, 2021); ADM Posthearing Brief at 8-9.
[75] *Second Remand Opinion* at 29.

*Business Proprietary Information Deleted*                    **PUBLIC VERSION**

this evidence and found the respondents' allegations unsupported.

> **1.    The Commission should find the allegations that Mosaic refused to supply trading companies do not undermine its volume findings.**

As a threshold matter, the Commission on remand should clarify that evidence of the domestic industry's alleged supply constraints or refusal to supply is relevant to its non-attribution analysis, not its analysis whether the volume of subject imports is significant within the meaning of 19 U.S.C. § 1677(7)(C)(i). The Commission did not improperly dismiss or fail to address such evidence in its volume analysis in the original *Views* or *Remand Views*.

In the original *Views* and *Remand Views*, the Commission correctly relied on record evidence showing the respondents' claims about Mosaic's alleged refusal to supply are meritless.[76] The Commission is familiar with allegations in other cases that domestic producers refused to sell to importers that act as distributors or trading companies.[77] This case is no different. The record shows the domestic industry was able to meet consumer demand and there was no shortage of phosphate fertilizer in the market.[78]

Mosaic also submitted evidence disproving Gavilon, ADM, and MFA's allegations. Specifically, the record shows that Mosaic sold to Gavilon [

].[79] [

---

[76] *Views* at 56; *Remand Views* at 68 n.296, 69.

[77] *See Paper Shopping Bags from Turkey*, Inv. No. 731-TA-1626 (Final), USITC Pub. No. 5504 (May 2024) at 34-35 (rejecting arguments that the domestic industry faced supply constraints and refused to supply distributors).

[78] *See* Hearing Tr. at 174-175 (O'Rourke); *id.* at 131 (Sunderland).

[79] *See* [                                                                ]; Mosaic Posthearing Brief, Responses to Commission Questions at 84-86.

]⁸⁰ Mosaic also provided evidence documenting that it did

not refuse to supply ADM. In fact, [



].⁸¹ Nonetheless, [                                    ].⁸²

Finally, in the original investigation, Gavilon alleged that another purchaser, [



].⁸³ [




].⁸⁵ Contrary to the Court's opinion,⁸⁶ Mosaic did

not allege lost sales with respect to other trading companies with which it has historically had

no sales relationship, *e.g.*, IRM.⁸⁷ Several other instances when Mosaic allegedly refused to

supply occurred post-petition, when subject foreign producers abruptly exited the market.⁸⁸

That was a severe supply shock, and Mosaic responded promptly to meet the unexpected

demand by diverting shipments from export markets and drawing down inventories.⁸⁹

In the original *Views* and *Remand Views*, the Commission properly weighed the

respondents' refusal to supply allegations against the unbiased evidence from the purchasers'

---

⁸⁰ *Second Remand Opinion* at 30 [

                                                                    ].

⁸¹ *See* Mosaic Posthearing Brief, Responses to Commission Questions at 86-87, Exhibit 53.
⁸² *See id.,* Exhibit 54*.*
⁸³ *See* Gavilon Prehearing Brief at 22 (Feb. 3, 2021).
⁸⁴ *See* Petition Vol. I, Exhibit I-53.
⁸⁵ Mosaic Posthearing Brief, Exhibits 28, 55.
⁸⁶ *Second Remand Opinion* at 32.
⁸⁷ *See* Mosaic Posthearing Brief, Responses to Commission Questions at 87.
⁸⁸ *See* [                                    ].
⁸⁹ Hearing Tr. at 41 (McLellan).

*Business Proprietary Information Deleted*                                    **PUBLIC VERSION**

questionnaire responses.[90] A majority of purchasers reported that domestic product was either "comparable" or "superior" to subject imports in terms of availability and reliability of supply, and only a minority reported supply constraints solely with respect to domestic product.[91] On this record, the Commission should continue to reject arguments regarding alleged refusal to supply.

> **2.    The Commission should explain the alleged re-exports to Canada do not undermine its volume findings.**

[



]92

In the preliminary phase, the Commission relied on official trade statistics for subheadings in the Harmonized Tariff Schedule ("HTS") covering subject merchandise, adjusted for exports to Canada.[93] In the final phase, the Commission relied on the U.S. importer questionnaire responses, with no adjustment for reported exports.[94] The Commission explained that the import data presented in the Staff Report and relied upon in the Views were compiled from the U.S. importer questionnaire responses because one U.S. importer, [                  ], had reported misclassifying out-of-scope merchandise under the HTS subheadings used in the preliminary phase.[95] The Commission cited evidence of both U.S. importers' reported imports and shipments of U.S. imports in its volume analysis.[96] The U.S. shipments data necessarily

---

[90] *Views* at 57; *Remand Views* at 70.
[91] *See Views* at 57; *Remand Views* at 70.
[92] *Second Remand Opinion* at 35. [


]
[93] Staff Report at IV-2, n.2.
[94] *Id.*, Table IV-2.
[95] *Id.* at IV-2, n.2.
[96] *Views* at 33-34.

*Business Proprietary Information Deleted*    **PUBLIC VERSION**

exclude importers' export shipments, to Canada or elsewhere.

[



].[97] On remand, the Commission should explain again that there is no inaccuracy or legal flaw in the Commission's reliance on the U.S. importer questionnaire data in its volume analysis. The Commission found the volume of cumulated subject imports and increase in volume were significant in absolute terms and relative to apparent consumption, citing U.S. importers' reported imports and U.S. shipments in the questionnaire responses.[98] The difference between the two data sets is relatively small in each year of the POI and interim periods, such that the Commission could reasonably rely either or imports or on U.S. shipments to reach the same conclusion: subject import volumes were significant and increased significantly over the POI.

Nonetheless, as Mosaic explained in its pre-hearing brief, the Commission's reliance on U.S. importers' reported imports with no adjustment for export shipments is reasonable and supported by substantial evidence, because Mosaic and other domestic producers compete directly with subject producers for sales to U.S. importers that are also distributors. Therefore, U.S. importers' purchases of subject imports may be the result of unfair import competition and constitute lost sales for the domestic industry even if the U.S. importer ultimately re-exports the product to Canada. The Commission should therefore reaffirm its volume findings on remand.

## IV.    THE COMMISSION SHOULD REAFFIRM ITS PRICE EFFECTS FINDINGS

[



]. The Commission should reaffirm its original findings as detailed below.

---

[97] *Second Remand Opinion* at 37.
[98] *Views* at 33-35; *Remand Views* at 27.

*Business Proprietary Information Deleted*                                                    **PUBLIC VERSION**

### A.    The Commission Did Not Make an Underselling Finding, and the Pricing Data Do Not Undermine Its Price Depression Finding

The Commission should explain that the statute directs the Commission to "consider" evidence of underselling; it does not require the Commission to make a *finding* on underselling.[99] The Commission complied with the statutory requirement in the original *Views* and *Remand Views* by considering evidence of underselling.[100] **[**

**]**,[101] but these are two distinct aspects of price effects.

To the extent the Commission finds it necessary to address the relevance of underselling to a price depression analysis, it should explain that the pricing data do not undermine its price depression finding. The Commission found the margins of overselling and underselling were small and prices of domestic like product and subject imports tracked each other closely over the POI.[102] The Commission also found a high degree of price transparency in the market and most purchasers reported that prices of domestic like product are "comparable" to or "inferior" (*i.e.*, higher than) subject import prices.[103] The Commission found evidence of confirmed lost revenues and lost sales and instances of importers offering lower prices for subject merchandise as the market declined in 2019.[104] These findings remain supported by substantial evidence.

By January-February 2019, subject imports were already oversupplying the U.S. market, with the trade press reporting that "the US market 'tanked' on cold weather, a full pipeline and heavy imports,"[105] that "the US is awash with imports,"[106] and that "{p}ushing so much

---

[99] *See Rhone Poulenc, S.A. v. United States*, 8 CIT 47, 55, 592 F. Supp. 1318, 1326 (1984).
[100] *Views* at 35-39; *Remand Views* at 34-35.
[101] *Second Remand Opinion* at 40-42.
[102] *Remand Views* at 35 & n.165 (citing Staff Report, Tables V-4-5, V-7).
[103] *Id.* at 35 & n.166.
[104] *Id.* at 36-37.
[105] Petition Vol. I, Exhibit I-33.
[106] Petition Vol. I, Exhibit I-29.

*Business Proprietary Information Deleted*                                    **PUBLIC VERSION**

DAP/MAP to the US has led to oversupply."[107] Then in spring 2019, record-setting precipitation caused massive flooding and prolonged river closures along the Mississippi River system and resulted in delayed, destroyed or abandoned plantings. According to the Staff Report, demand was [        ] lower in 2019 than in 2018, by roughly [            ] ST, and below levels in 2017.[108]

Subject imports nonetheless continued to arrive in significant volumes despite the U.S. market being oversupplied.[109] Subject imports were 36.8% higher in 2019 than in 2017,[110] and subject import U.S. shipments increased in 2019 by 300,000 ST or 6.2% despite the lower demand.[111] The inventory data show that subject import volumes and U.S. shipments exceeded demand, because subject import inventories grew [              ] from 2017 to 2019 and [              ] ST at the end of the Q1 2019 – equivalent to about [      ] of total apparent domestic consumption in that quarter.[112] Despite subject imports having built up inventories that were [        ] higher at the end of 2019 than in 2017,[113] subject imports continued to enter the U.S. market in the first half of 2020 in significant volumes.

The record contains substantial evidence that respondents were offering subject imports at low prices during this period, as the Commission recognized.[114] Multiple empirical analyses demonstrated that subject imports accounted for a large share of the price declines.[115] These empirical analyses included evidence on which respondent reported the lowest price in a given month in the pricing data. As explained in Mosaic's posthearing brief, [

---

[107] *Id.*
[108] Staff Report at IV-16, Table IV-7.
[109] Petition Vol. I, Exhibit I-37.
[110] Staff Report at IV-3, Table IV-2 (2017: 1,971,222 ST; 2019: 2,696,266 ST).
[111] Staff Report at C-3, Table C-1 (2018: 2,386,985 ST; 2019: 2,535,942 ST).
[112] *See* Staff Report at D-3, Table D-1; Mosaic Posthearing Brief, Responses to Commission Questions at 24.
[113] Staff Report at C-3, Table C-1.
[114] *Views* at 43 & n.162 (citing Mosaic Posthearing Brief, Responses to Commission Questions at 36-37).
[115] *See* Mosaic Prehearing Brief, Exhibit 2; Mosaic Posthearing Brief, Responses to Commission Questions at 43-45.

*Business Proprietary Information Deleted*                                           **PUBLIC VERSION**

].[116] Mosaic submitted documentation of discussions with [



].[117] Mosaic also

provided contemporaneous documentation of price negotiations showing that respondents were

offering subject imports at lower prices.[118]  The purchaser responses similarly evidence the rapid

price decline and impact on U.S. prices.[119]

The Commission confirmed the adverse impact that import-driven price declines had on

the domestic industry's profitability. For example, the Commission's variance analysis of

financial trends shows that from 2018 to 2019, declining prices explain [        ] of the

[              ] in the domestic industry's gross profits, [       ] of the [       ] in operating profits,

and [        ] the operating profit [           ] between the interim periods.[120] Moreover, the record

shows U.S. prices remained depressed in 1H 2020 – despite normal weather conditions in the

spring application season – and increased sharply post-petition after OCP exited the market.[121]

The Commission should therefore reaffirm its findings that respondents were offering

subject imports at low prices, that the domestic industry lost sales to subject imports, and that

subject imports contributed significantly to oversupply conditions in a market of declining

demand and low prices, thereby exerting downward pricing pressure on the domestic like

product and significantly depressing U.S. prices.

     **B.**     **The Record Evidence on Price Leadership Does Not Undermine the Commission's Price Effects Findings**

---

[116] Mosaic Posthearing Brief, Responses to Commission Questions at 44.
[117] *Id.*, Exhibit 50.
[118] *Id.*, Responses to Commission Questions at 26-28, Exhibits 27-36.
[119] [

].
[120] Mosaic Prehearing Brief, Exhibit 2 at 1 (basing calculations on data from Prehearing Staff Report, Table VI-5).
[121] *See* Mosaic Posthearing Brief, Responses to Commission Questions at 69-70.

*Business Proprietary Information Deleted*                                **PUBLIC VERSION**

[

].[122] The purchaser questionnaire defined "price leader" as a firm that can "initiate a price change, either upward or downward, that is followed by other firms" or a firm "hav{ing} a significant impact on prices" but "not necessarily the lowest-priced supplier".[123] Thus, a "price leader" may lead prices up or down. The purchaser responses did not specify that Mosaic led prices down.[124] The mere fact Mosaic was named as a price leader does not support the conclusion that purchasers intended to report that Mosaic led the price declines in the market.[125]

Moreover, purchaser responses to the standard Commission question about price leadership do not dictate the Commission's price effects findings. The Commission has previously found that subject imports significantly depressed prices despite a majority of purchasers identifying domestic producers as the price leaders in the U.S. market.[126] In the original *Views* and *Remand Views*, the Commission properly considered the purchaser responses in finding that subject imports exerted downward price pressure.[127] The fact that some purchasers (including parties that import Moroccan and Russian phosphate fertilizers and oppose duties) identified Mosaic – the largest U.S. producer – as a price leader does not undermine the Commission's finding, based on other evidence, that subject imports significantly depressed prices. The Commission should reaffirm this finding.

**C.      The Commission Should Reaffirm Its Lost Sales Findings**

---

[122] *Second Remand Opinion* at 43-44.
[123] *See* U.S. Purchaser Questionnaire Response of [                              ], Q III-26.
[124] Staff Report at V-8-9.
[125] *See Melamine from Germany, Japan, Netherlands, Qatar, and Trinidad and Tobago*, Inv. Nos. 701-TA-706, 708-709 and 731-TA-1667, 1669-1670, 1672 (Final), USITC Pub. No. 5577 (Jan. 2025) at 46 n. 202; *Steel Propane Cylinders from China and Thailand*, Inv. Nos. 701-TA-607 and 731-TA-1417 and 1419 (Final), USITC Pub. No. 4938 (Aug. 2019) at 31; *Grain-Oriented Electrical Steel from Germany, Japan, and Poland*, Inv. Nos. 731-TA-1233-1234 and 1236, USITC Pub. No. 4491 (Sept. 2014), Dissenting Views of Commissioner Schmidtlein.
[126] *See Hydrofluorocarbon Blends and Components from China*, Inv. No. 731-TA-1279 (Final), USITC Pub. No. 4629 (Aug. 2016), at 25 (finding price depression); Staff Report at V-9 (11 of 17 purchasers identifying domestic producers as price leaders).
[127] *Views* at 44; *Remand Views* at 54 (citing Staff Report, Table V-11).

*Business Proprietary Information Deleted*                                          **PUBLIC VERSION**

[

].[129]

The Pre-Hearing Report reflects significant volumes of lost sales, specifically 733,895 ST, that support the Commission's findings of adverse price effects. To put this number in context, importers' U.S. shipments of subject imports increased 753,938 ST between 2017 and 2019. Fully 97% of the volume gain by subject imports is explained by confirmed lost sales.

Most of the confirmed lost sales were reported by a single purchaser, [            ].[130]

[

]. However, the record shows that [          ] is a major importer/distributor. The other purchasers that reported price as the primary reason for purchasing imports instead of domestic product [

].[131] In addition, the Court is incorrect that

[

].[132]

Further, as noted in the *Remand Views*, Commission Staff followed up with [          ] on its lost sales reporting, and [          ] did not revise its reporting of lost revenue or lost

---

[128] *Second Remand Opinion* at 46.
[129] *Id.* at 47.
[130] [            ] reported [          ] of the [          ] in confirmed lost sales. *Remand Views* at 36 n.168.
[131] Staff Report at V-22-23, Tables V-8, V-9.
[132] *Id.*, Tables V-8, V-9.

*Business Proprietary Information Deleted*    **PUBLIC VERSION**

sales. **[**

**]**[133] This evidence corroborates the Commission's treatment of **[                      ]**

reporting as confirmed lost sales. The Commission should reaffirm its findings on remand.

## V.  THE COMMISSION SHOULD REAFFIRM ITS IMPACT FINDINGS

In the investigation, the Commission found that most of the domestic industry's production-related indicators declined over the full-year POI – including production, shipments, capacity, market share, and employment – while inventories increased.[134] The Commission also cited evidence showing the domestic industry's financial condition deteriorated in 2019 and interim 2020,[135] and found that "{d}ue to the downward pricing pressure exerted by the oversupply of subject imports on U.S. prices, the domestic industry was forced to reduce prices," resulting in declines in sales revenues and profitability.[136] The Commission therefore concluded that subject imports had a significant impact on the domestic industry.[137] **[**

**]**. Accordingly, the Commission should reaffirm its original impact findings.

## VI.  CONCLUSION

For the reasons set forth in this brief and our prior submissions, Mosaic respectfully requests that the Commission issue affirmative material injury determinations in this proceeding.

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
*Counsel to The Mosaic Company*

---

[133] *Remand Views* at 36 n.168.
[134] *Views* at 49-50.
[135] *Id.* at 51-52.
[136] *Id.* at 53.
[137] *Id.*

# List 1, Doc. No. 305R – EDIS No. 855489
# Remand Comments
# (Koch Fertilizer, LLC)

# ALSTON & BIRD

The Atlantic Building
950 F Street, NW
Washington, DC  20004-1404
202-239-3300 | Fax: 202-654-4831

Kenneth G. Weigel                    Direct Dial:  **202-239-3431**                    Email:  ken. weigel@alston.com

June 30, 2025

Via Electronic Filing
The Honorable Lisa R. Barton                          Inv. No.: 701-TA-650-651 (Remand 2)
Secretary to the Commission                                              Total Pages: 8
U.S. International Trade Commission                             **PUBLIC VERSION**
500 E Street, SW - Room 112A                                     Confidential (Sealed) and
Washington D.C. 20436                             Business Proprietary Information
                                                          Removed from Pages 2–7

**Re:**    *Phosphate Fertilizers from Morocco and Russia*: Comments

Dear Secretary Barton:

In accordance with the International Trade Commission's ("ITC" or "Commission") notices of June 2025[1] and extension granted by the ITC on June 18, 2025[2], we submit this letter on behalf of Koch Fertilizer, LLC ("Koch"), to provide comments for the ITC's consideration in this remand proceeding in response to the Court of International Trade's ("CIT") second remand determination.[3]  Koch respectfully submits that the ITC should find that imports of phosphate fertilizer from Morocco did not materially injure and did not threaten to materially injury the US phosphate fertilizer industry. Koch fully supports the comments of OCP S.A. and is submitting this letter to highlight certain facts.

---

[1] *Notice of Remand Proceedings,* Inv. Nos. 701-TA-650-651 (Final) (Remand 2) June 4, 2025.
[2] *Request for an Extension of Time to File Remand Comments; Phosphate Fertilizers from Morocco and Russia*; Inv. Nos. 701-TA-650-651 (Final) (Remand 2) June 18, 2025.
[3] *OCP S.A. v. United* States, No. 1:21-cv-00219, (Ct. Int'l Trade, April 22, 2025), ECF. No. 224, ("Opinion")

June 30, 2025
Page 2

Pursuant to Section 201.6 of the Commission's rules (19 C.F.R. § 201.6), we request business proprietary treatment for the bracketed information (identified by "[ ]") contained in this submission. The information is Koch's, and other parties' confidential business information pertaining to production purchases, imports and sales. Additionally, in these comments, we cite to the CIT's Opinion, which the Court filed under seal so text related or referring to this Opinion is treated as APO information in these comments. All of this information constitutes the type of information normally treated as business confidential pursuant to 19 C.F.R. § 201.6, as it is not available to the public; moreover, information for which APO is requested if made public would cause substantial harm to the competitive position of the parties involved if it were released to the public.

## I.      Introduction

[

] Koch submits that when the Commission considers the whole record, including those parts of the record that detract from or contradict the Commission's findings, the ITC will conclude that imports of phosphate fertilizer did not materially injure or threaten to materially injure the U.S. phosphate fertilizer industry.

June 30, 2025
Page 3

[

] this letter will focus on those issues that relate particularly to Koch.

## II.    There Was No Oversupply of Imports

In its remand determination, the Commission continued to find that in the period of investigation ("POI") there was sufficient phosphate fertilizer in the U.S. to supply demand based on the ability to relocate domestic supplies from the final destination to another destination to satisfy demand in another part of the U.S, market.[4] Phosphate Fertilizers from Morocco and Russia, Inv. Nos. 701-TA-650-651, USITC Pub. 5490, at 33 (Jan. 2024) ("ITC Remand Determination"). Accordingly, the Commission found that continued imports caused an oversupply of phosphate fertilizer in the U.S. market that depressed U.S. prices and had an adverse impact on the financial performance of U.S. producers. ITC Remand Determination at 54–66.

[

]  Indeed, [

---

[4] The ITC focus was on domestic supplies as the ITC stated that "the supplementary questionnaire information obtained in these remand proceedings suggests that the vast majority of subject imports, once delivered, are not relocated or otherwise moved, but rather remain in regional inventories until used in a subsequent application period." ITC Remand Determination at 44.

June 30, 2025
Page 4

]

Accordingly, Koch submits that in this remand proceeding, the Commission should find that imports in 2019 did not create an oversupply in the U.S. market in 2019, and instead that they were necessary to supply U.S. demand. As these imports were necessary, they could not have depressed US market prices.  Instead, the US phosphate fertilizer market in 2019 was affected by weather disrupting three consecutive fertilizer applications in certain areas thereby causing the usual supply not to be fully consumed.

**III.    Mosaic's Business Practices Caused Imports of Phosphate Fertilizer**

Mosaic's business practices created a shortage of phosphate fertilizer in the US market thereby causing imports to fill the gap.

Mosaic limited its supply of phosphate fertilizers to the US market by instead exporting to other markets.  [

]

Moreover, Mosaic chose not to supply certain US demand. [

]; *See also* Phosphate Fertilizers from Morocco and Russia, Koch's Remand

---

[5]  [

]

June 30, 2025
Page 5

Comments at 6 (Nov. 27, 2023); Phosphate Fertilizers from Morocco and Russia, Koch U.S. Purchasers' Questionnaire at 13 (Jan. 5, 2021) ("Koch Questionnaire at"); Phosphate Fertilizers from Morocco and Russia Koch Posthearing Brief at 10–11 (Feb. 17, 2021). The record contains testimony from representatives of Koch and Gavilon Fertilizer LLC ("Gavilon") — both major U.S. purchasers — that Mosaic has generally declined their sales inquiries. Testimony of Koch's Executive Vice President Scott McGinn, Phosphate Fertilizers from Morocco and Russia, Hearing Transcript at 196–97 (February 9, 2021) ("Tr at"); Testimony of Jared Wessel, Id. at 244–45. [

]

Imports that were required because of the domestic industry's refusal to sell cannot be considered injurious. And these imports were not *de minimis*. In this regard, in 2019, Koch accounted for [

] Phosphate Fertilizers from Morocco and Russia, Staff Report, Table IV-1 ("SR at"). Specifically, during 2019, Koch imported [

] Koch U.S. Purchasers' Questionnaire at 7. Mosaic cannot refuse to sell to Koch and then claim injury from the imports it caused.

The facts on the record provide substantial evidence that imports were needed as they supplied demand that Mosaic chose not to supply. Koch respectfully submits that in this remand the Commission consider all of the facts, especially Mosaic's business practices, and decide that import volumes were not a cause of material injury.

**IV.    Pricing**

Record evidence is that Koch sells imported phosphate fertilizer at the U.S. market price. Phosphate Fertilizers from Morocco and Russia, Koch Prehearing Brief at 1 (Feb. 3, 2021). Koch

APPX0022220

June 30, 2025
Page 6

has consistently explained phosphate fertilizer pricing, and why imports are not the cause of any price depression or suppression in the US market. *Id.* at 2–3; Tr at 195–96; Koch's Remand Comments at 9. Substantial evidence on the record supports these statements. Simply put, imports have not adversely affected U.S. market prices.

The statue has two pricing considerations.  Consistent with Koch's position that it prices at the market price, substantial evidence on the record supports a finding that under both statutory provisions, imports did not have any adverse price impact.

First, the statute directs the Commission to determine whether there has been *significant* price underselling.  19 U.S.C. §1677(7)(C)(ii)(I). The record evidence showed underselling by imports in 34 instances out of 170 comparisons.  ITC Remand Results at 34–35. [

] Koch respectfully submits that on remand the Commission should not find significant underselling by subject imports in light of record evidence showing significant overselling.

Second, the statute requires the Commission to decide whether the subject imports caused significant price depression or price suppression. *Id.* (citing 19 U.S.C. § 1677(7)(C)(ii)).  As discussed above, the Commission's price depression finding was, at least in part, based on an incorrect finding of an oversupply of imports. ITC Remand Results at 54–55. Price depression or suppression is contradicted by the evidence that shows that imports did not undersell the domestic product.  .

APPX0022221

June 30, 2025
Page 7

The evidence shows that Mosaic set the US market price.  [




]

The overwhelming evidence supports a conclusion that imports did not adversely affect US prices.

V. **Conclusion**

Koch respectfully submits that the Commission reach negative material injury and threat of material injury determinations by reason of imports in this remand proceeding.  The foundation of the Commission's affirmative finding -- an oversupply of imports that caused price depression – is not supported by substantial evidence.  Instead, the facts show that the U.S. market required imports from both a demand and supply perspective.  Moreover, Mosaic, not imports, set the U.S. market price and the evidence shows that imports did not adversely affect prices.

Please contact the undersigned if you have any questions concerning this submission.

Respectfully submitted,

/s/ Kenneth G. Weigel
Kenneth G. Weigel
Lian Yang
Robert Hawes

**ALSTON & BIRD LLP**
The Atlantic Building
950 F. Street, N.W.
Washington, D.C. 20004
*Counsel to Koch*

APPX0022222

Phosphate Fertilizers from Morocco and Russia
Inv. Nos. 701-TA-650-651

**PUBLIC CERTIFICATE OF SERVICE**

I, Robert Hawes, hereby certify that, on June 30, 2025, copies of the foregoing submission were served on the parties listed below.

| | |
|---|---|
| Stephanie Hartmann<br>**Wilmer Hale LLP**<br>1875 Pennsylvania Avenue, NW<br>Washington, DC 20006<br>stephanie.hartmann@wilmerhale.com | H. Deen Kaplan<br>**Hogan Lovells US LLP**<br>555 Thirteenth Street, NW<br>Washington, D.C. 20004<br>Deen.kaplan@hoganlovells.com |
| Melissa M. Brewer<br>**Kelley Drye & Warren LLP**<br>3050 K Street, NW Washington, DC 20007<br>mbrewer@kelleydrye.com<br>tradenotifications@kelleydrye.com | Patrick McLain<br>**King & Spalding**<br>1700 Pennsylvania Avenue, N.W.<br>Washington, DC 20006-4706<br>pmclain@kslaw.com<br>tradeservice@kslaw.com |
| Shara L. Aranoff<br>**Covington & Burlington, LLP**<br>850 Tenth Street, N.W.<br>Washington, D.C. 20001<br>saranoff@cov.com | Jonathan M. Zielinski<br>**Cassidy Levy Kent (USA) LLP**<br>900 19th Street, NW, Suite 400<br>Washington, DC 20006<br>jzielinski@cassidylevy.com<br>records@cassidylevy.com |
| Elena G. Nosyreva<br>**Ministry of the Economic Development of the Russian Federation**<br>Presnenskaya Naberzhnaya, 10/2 Moscow, Russia, 125039<br>NosyrevaEG@economy.gov.ru | Peter Koenig<br>**Squire Patton Boggs**<br>2550 M Street, NW<br>Washington, DC 20037<br>peter.koenig@squirepb.com |

_/s/ Robert Hawes_
Robert Hawes
Associate
Alston & Bird LLP

APPX0022223

# List 1, Doc. No. 306R – EDIS No. 855528
# Remand Comments
# (International Raw Materials Ltd.)

APPX0022224



**Kelley Drye &
Warren LLP**

Washington Harbour,
Suite 400
3050 K Street, NW
Washington, DC 20007

Tel: (202) 342-8400

June 27, 2025

PUBLIC VERSION

| |
|---|
| USITC Investigation Nos. 701-TA-650-651 (Second Remand) |
| Business Proprietary Information Released Under APO Deleted from Pages: 2-9 |
| **PUBLIC VERSION** |

The Honorable Lisa R. Barton
Secretary
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, DC 20436

**Re:** **Phosphate Fertilizers from Morocco and Russia – International Raw Materials Ltd.'s Comments Regarding Second Remand Proceeding**

Dear Secretary Barton:

On behalf of International Raw Materials Ltd. ("IRM"), an importer of subject phosphate fertilizers that participated in the underlying investigations and is participating in the ongoing appeal before the U.S. Court of International Trade ("the Court"), we respectfully respond to the U.S. International Trade Commission's ("Commission") request for comments on how the Commission should "best comply with the Court's remand instructions" in this second remand proceeding.[1]  The Commission is seeking comments from interested parties in response to the

---

[1]    See Notice of Remand Proceedings, 90 Fed. Reg. 24,411 (Comm'n June 10, 2025) (establishing a deadline of June 20, 2025, for the submission of comments from interested
(cont'd from previous page)

**NEW YORK    WASHINGTON, DC    CHICAGO    HOUSTON    LOS ANGELES    SAN DIEGO    PARSIPPANY    STAMFORD**

APPX0022225

The Honorable Lisa R. Barton
June 27, 2025
Page 2

PUBLIC VERSION

Court's opinion issued on April 22, 2025.  OCP S.A. v. United States, Consol. Ct. No. 21–00219, Slip Op. 25–51 (April 22, 2025) ("OCP II").  OCP II considered the Commission's first remand results, which were issued pursuant to OCP S.A. v. United States, 658 F. Supp. 3d 1297 (Ct. Int'l Trade 2023) ("OCP I").  As noted in the Request for Comments, the Court's decision has not been publicly released at this time.   Accordingly, for purposes of these comments we treat the Court's opinion as confidential in its entirety.

IRM agrees with and incorporates by reference the comments filed on behalf of OCP S.A. ("OCP") in this remand proceeding.[2]  The records compiled during the original investigation and first remand proceeding demonstrate that subject imports of phosphate fertilizer do not materially injure nor threaten material injury to the domestic industry.  As in OCP I, the Court has again instructed the Commission to reconsider its findings with respect to the statutory factors and to assess all material evidence that is relevant and detracts from its affirmative injury determination.  See OCP II, Slip Op. 25–51 at 48-49.

First, the Court held that the Commission [

] OCP II, Slip Op. 25–51 at 22-27.  In particular, the Court explained that [

---

parties to address how the Commission may best comply with the Court's remand instructions) ("Request for Comments").

[2]    See Written Comments of OCP S.A. (dated June 27, 2025) (hereinafter "OCP's Comments").

**KELLEY DRYE & WARREN LLP**

**PUBLIC VERSION**

] See id.

During the first remand proceeding, the Commission gathered new evidence regarding inventory reshipment in the U.S. market by issuing supplemental questionnaires to U.S. producers and importers.[3] The supplemental questionnaire responses on the record of the first remand proceeding confirmed that the U.S. phosphate fertilizers distribution network is "unidirectional" and the reshipment of phosphate fertilizer from its originally intended destination is not a normal business practice in the U.S. marketplace.[4] The record evidence further confirmed that subject import volumes did not create an "oversupply" during the period of investigation ("POI") and were not significant, did not cause price depression or any adverse price effects, and were not a cause of injury (or any threat thereof) to the domestic phosphate fertilizers producers.[5] Indeed, as IRM argued during the first remand proceeding, there is no correlation, let alone a causal link, between the domestic industry's performance during the POI and subject imports.[6]

---

[3] See, e.g., U.S. Producers' Questionnaires (dated Nov. 13, 2023); U.S. Importers' Questionnaires (dated Nov. 13, 2023).

[4] See Written Comments of IRM at 2-4 (dated Nov. 27, 2023) (hereinafter "IRM 2023 Comments"); see also Written Comments of OCP S.A. at 1-15 (dated Nov. 27, 2023).

[5] See generally IRM 2023 Comments.

[6] See id.

KELLEY DRYE & WARREN LLP

PUBLIC VERSION

Despite this evidence, during the first remand proceeding the Commission continued to find that subject imports created an "oversupply" situation that injured the domestic producers.[7]  The Court correctly found that [

] OCP

II, Slip Op. 25–51 at 24.  Indeed, [

] Id. at 25 (citing First Remand Determination at 25).

In re-examining the record evidence in this second remand proceeding, the Commission should find that record evidence (including the questionnaire responses filed by both domestic producers and importers) demonstrates that reshipment of fertilizer is not a common industry practice, did not lead to an oversupply situation in the U.S. market during the investigation period, and did not cause injury to the U.S. industry.  On the record, IRM has explained that it is both cost prohibitive and often logistically impossible to re-ship phosphate fertilizer between inland inventory locations once it is delivered.[8]  IRM imports phosphate fertilizer to [

---

[7]    See generally Phosphate Fertilizers from Morocco and Russia; OCP S.A. v. United States, CIT Consol. Ct. No. 21-00219, dated Jan. 17, 2024 ("First Remand Determination") (public version available at Phosphate Fertilizers from Morocco and Russia, USITC Pub. 5490 (Final) (Remand) (Jan. 2024)).

[8]    See IRM Supplemental Questionnaire Response at 2(a), (b), and (c) (dated Nov. 13, 2023) (hereinafter "IRM Importer QR").

**KELLEY DRYE & WARREN LLP**

**PUBLIC VERSION**

The Honorable Lisa R. Barton
June 27, 2025
Page 5

]⁹ This process is one-directional -- once the fertilizer arrives at a warehouse, it is not re-shipped to another warehouse, nor is it re-shipped once it arrives at the customer destination.[10] IRM never shipped product between inland warehouses because it is cost prohibitive and logistically impossible to do so.[11] Inland warehouses are equipped to handle fertilizer delivery via rail or barge, but are not outfitted to re-load fertilizer via rail or barge for out-shipment.[12] For example, [

] once

---

[9] The record demonstrates that phosphate fertilizer is imported based on demand forecasting only to the extent necessary to satisfy projected customer demand, and so it is not just sitting in inventory in large quantities waiting for purchase. See Transcript of Hearing at p. 231, lines 9-15 (Feb. 9, 2021) (Lambert) ("And as OCP testified, PhosAgro testified, and myself from EuroChem can state, we're not bringing tons with a hope-and-pray strategy. We're bringing tons with firm demand and firm customers that are requesting those tons and they're requesting them because they see the demand from their farmer or they have forecasted demand from their farmer."); see also Phosphate Fertilizers from Morocco and Russia, USITC Pub. 5172 (Final) (March 2021) at 16 ("According to respondents, it takes time for distributors to obtain fertilizers and move it through the supply chain into warehouses in the off seasons for use by farmers, and that distributors therefore rely on demand projections in obtaining product.") (citations omitted).

[10] See IRM Importer QR at (2)(a)-(c).

[11] Id.

[12] Id. at 2(a).

[13] Id.

KELLEY DRYE & WARREN LLP

**PUBLIC VERSION**

product is placed in one marketing region, it is rare to reship it to a different region.[14]

Importers' supplemental questionnaire responses confirm that IRM's distribution experience is

shared by other industry participants and that phosphate fertilizer is not re-shipped once it

arrives at its intended destination.[15]

The Court recognized that domestic producers' supplemental questionnaire responses

confirm the same experience and that the First Remand Determination failed to account fully

for these similar market experiences.[16]  [



]^[17]  Indeed, [



]^[18]  Similarly,

[          ] explains that it [

---

[14]    Id.

[15]    See Importer QRs filed on behalf of [
                                            ]

[16]    OCP II, Slip Op. 25–51 at 23-24.

[17]    See [              ] US Prod. QR.

[18]    [          ] US Prod. QR at 2(b).

KELLEY DRYE & WARREN LLP

PUBLIC VERSION

]^19    Thus, and contrary to the Commission's findings in the First Remand Determination, the parties' questionnaire responses demonstrate that reshipping inventory from its original intended destination to another region of the country is not a normal business practice in the U.S. phosphate fertilizer industry.

The Court next considered the Commission's volume and price analyses in the First Remand Determination and concluded that it is unsupported by substantial evidence.[20]  IRM has argued throughout this proceeding that none of the statutory factors is satisfied and a negative injury finding is warranted -- subject import volumes were not significant, the pricing data collected by the Commission demonstrate extensive overselling by subject imports and do not show price depression or suppression, and the record as a whole undercuts the domestic industry's claim of injury by reason of subject imports.[21]   IRM agrees with and incorporates by reference OCP's Comments with respect to the material injury analysis the Commission should undertake in this second remand proceeding, in addition to the following three points.

First, with respect to the Commission's volume analysis, the Court correctly held that

[

---

[19]    [                 ] US Prod. QR at 2(b); [              ] US Imp. QR at 2(a) ([


                                                                          ]).

[20]    OCP II, Slip Op. 25–51 at 28-49.

[21]    See e.g., IRM Final Comments (dated March 8, 2021).

**KELLEY DRYE & WARREN LLP**

**PUBLIC VERSION**

]²² In this remand proceeding, the Commission must reconsider its volume analysis and should account for the significant volume of fertilizer that was not consumed in the U.S. market but was instead re-exported. [

]²³ The inclusion of subject imports that were re-exported skewed the Commission's volume analysis and must be accounted for properly on remand. Among other reasons, once re-exported shipments are removed from the analysis, it is clear that the volume of subject imports was not significant.

Second, the remand analysis must account for Mosaic's repeated refusals to supply U.S. market participants during the investigation period.  Indeed, the Court held that the Commission [

]²⁴  During the investigation, IRM and other parties submitted extensive record evidence demonstrating that Mosaic both refused to supply on numerous occasions and told companies to instead purchase subject imports.²⁵ The Commission's first remand analysis mentioned this argument only in passing in a footnote,

---

²²  OCP II, Slip Op. 25–51 at 34-38.

²³  See [                                    ]

²⁴  Id. at 32.

²⁵  See Final Inv. Tr. at 205 (Appx0015701); Tr. at 271 (Appx0015767); Tr. at 288 (Appx0015784); Final Staff Rep. at II-9, II-15 (Appx0098405, APPX0098411).

**KELLEY DRYE & WARREN LLP**

PUBLIC VERSION

The Honorable Lisa R. Barton
June 27, 2025
Page 9

without appreciating how critical these refusals were to the analysis.[26]  This second remand proceeding should address fully the impact of supply refusals on the market.

Third, the Commission's price effects analysis on remand must take into account Mosaic's role as the price leader in the U.S. market.  The Court explained that [

]27  [

]28  The record demonstrates that [

]29  Mosaic was cited by the majority of purchasers (18 of 28) as the U.S. market price leader.[30]  Ample record evidence demonstrates that Mosaic is the driver of U.S. market pricing, such that subject imports did not cause negative price effects during the investigation period.

*     *     *

---

[26]  First Remand Determination at 68 n.296 ("Mosaic also contends that some of the supply issues identified by respondent parties are with broker/traders such as ADM and Koch that compete with the domestic industry for sales and rely on a small margin, high volume business model.").

[27]  OCP II, Slip Op. 25–51 at 43.

[28]  Id. at 44.

[29]  Final Staff Rep. at III-1 (Appx0098429).

[30]  Id. at V-8 (Appx0098470).

KELLEY DRYE & WARREN LLP

PUBLIC VERSION

The Honorable Lisa R. Barton
June 27, 2025
Page 10

    We appreciate the Commission's attention to these comments.  Please contact the

undersigned with any questions regarding this submission.

Respectfully submitted,

PAUL C. ROSENTHAL
MELISSA M. BREWER

Counsel to International Raw Materials Ltd.

ECONOMIC CONSULTANT:

MICHAEL T. KERWIN
GEORGETOWN ECONOMIC SERVICES, LLC
3050 K Street, N.W.
Washington, D.C.  20007
(202) 945-6660

**KELLEY DRYE & WARREN LLP**

## CERTIFICATION

In accordance with section 207.3(a) of the Commission's regulations, 19 C.F.R. § 207.3(a), I, Melissa M. Brewer, hereby certify on June 27, 2025, that the information contained in this document is accurate and complete to the best of my knowledge.

This certification is made in accordance with 28 U.S.C. § 1746. I declare under penalty of perjury of the laws of the United States of America that the foregoing statements are true and correct to the best of my information and belief.

_____

Melissa M. Brewer

**PUBLIC CERTIFICATE OF SERVICE**

**PHOSPHATE FERTILIZERS FROM MOROCCO AND RUSSIA**
**Inv. Nos. 701-TA-650-651 (Second Remand)**

I hereby certify that on June 30, 2025, copies of the foregoing public submission were served on the following via email to:

Kenneth G. Weigel, Esq.
Alston & Bird, LLP
950 F Street, NW
Washington, DC  20004
ken.weigel@alston.com

Shara Aranoff, Esq.
Covington and Burling LLP
850 Tenth Street, NW
Washington, DC  20001
Saranoff@cov.com

H. Deen Kaplan, Esq.
555 Thirteenth Street, NW
Columbia Square
Washington, DC  20004
deen.kaplan@hoganlovells.com

Patrick McLain, Esq.
1700 Pennsylvania Avenue, NW
Washington, DC  20006
pmclain@kslaw.com
tradeservice@kslaw.com

Peter Koenig, Esq.
Squire Patton Boggs (US) LLP
2550 M Street, NW
Washington, DC  20037
peter.koenig@squirepb.com

Stephanie Hartmann, Esq.
WilmerHale LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037
stephanie.hartmann@wilmerhale.com

**Elena G. Nosyreva, Esq.**
**Presnenskaya Naberzhnaya, 10/2,**
**Moscow, Russian Federation, Not Applicable Russia**
nosyrevaEG@economy.gov.ru

_____
Melissa M. Brewer

# List 1, Doc. No. 307R – EDIS No. 855551
# Remand Comments
# (PhosAgro PJSC)

APPX0022237



Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T  +1 202 637 5600
F  +1 202 637 5910
www.hoganlovells.com

June 30, 2025

Inv. Nos. 701-TA-650-651 (Final) (Second Remand)
Pages: 20

**PUBLIC VERSION**

Business Proprietary Information removed from pages 3–11.

*VIA ELECTRONIC FILING (EDIS)*

The Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, DC 20436

**Re:    Phosphate Fertilizers from Morocco and Russia: Second Remand Comments of PhosAgro PJSC**

Dear Secretary Barton:

On behalf of our client, PhosAgro PJSC ("PhosAgro"), and in accordance with the U.S. International Trade Commission's Schedule for the Second Remand in the above-captioned proceedings, 1/ we respectfully submit these Remand Comments.

In accordance with 19 C.F.R. §§ 201.6 and 207.3, we request business proprietary treatment for the information contained in brackets in this submission, which includes proprietary

---

1/    *Phosphate Fertilizers From Morocco and Russia*, 90 Fed. Reg. 24,412 (Int'l Trade Comm'n June 10, 2025); Letter from Int'l Trade Comm'n to Wilmer Hale LLP and King & Spalding LLP, *Request for an Extension of Time to File Remand Comments; Phosphate Fertilizers from Morocco and Russia; Inv. Nos. 701-TA-650-651 (Second Remand)* (June 18, 2025).

The Honorable Lisa R. Barton
June 30, 2025
Page 2

domestic industry, importer, and foreign producer data; and other information released to this firm under administrative protective order ("APO"). Disclosure of this information would cause substantial commercial and competitive harm to the above companies and other parties subject to the APO.

Included in this submission are certifications required by 19 C.F.R. §§ 201.6(b)(3)(iii) and 207.3(a). Service has been effectuated as required by 19 C.F.R. §§ 201.16 and 207.3(b). In accordance with 19 C.F.R. § 207.23 and the Handbook on Filing Procedures, we hereby file this submission electronically on the confidential, bracketing not final, version of this submission.

Please contact the undersigned if you have any questions.

Respectfully submitted,

**HOGAN LOVELLS US LLP**

/s/ H. Deen Kaplan
H. Deen Kaplan
Jared R. Wessel
Michael G. Jacobson

*Counsel to PhosAgro PJSC*

APPX0022239

**PUBLIC**
**CERTIFICATE OF SERVICE**

**Phosphate Fertilizers from Morocco and Russia**

**Investigation Nos. 701-TA- 650-651 (Final) (Second Remand)**

I, Colman Tokar, hereby certify that on June 30, 2025, a copy of the attached submission was served via EMAIL on the following parties:

**On behalf of Koch Fertilizer, LLC**

Kenneth G. Weigel, Esq.
ALSTON & BIRD, LLP
950 F Street, NW
Washington, D.C. 20004
ken.weigel@alston.com

**On behalf of OCP, S.A.**

Shara L. Aranoff, Esq.
COVINGTON & BURLING, LLP
850 Tenth Street, N.W.
Washington, D.C. 20001
saranoff@cov.com

**On behalf of J. R. Simplot Company**

Patrick McLain, Esq.
KING & SPALDING
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006-4706
pmclain@kslaw.com
tradeservice@kslaw.com

**On behalf of International Raw Materials Ltd.**

Melissa Brewer, Esq.
KELLEY DRYE & WARREN, LLP
3050 K Street, N.W.
Washington, D.C. 20007
MBrewer@kelleydrye.com
tradenotifications@kelleydrye.com

**On behalf of The Mosaic Company**

Stephanie Hartmann, Esq.
WILMERHALE LLP
2100 Pennsylvania Avenue, N.W.
Washington, D.C 20037
stephanie.hartmann@wilmerhale.com

**On behalf of The Ministry of Economic Development of the Russian Federation**

Elena G. Nosyreva
THE MINISTRY OF ECONOMIC
DEVELOPMENT OF THE RUSSIAN
FEDERATION
Presnenskaya Naberzhnaya,
10/2 Moscow, Russia 125039
nosyrevaEG@economy.gov.ru

**On behalf of EuroChem North America Corporation**

Peter Koenig, Esq.
SQUIRE PATTON BOGGS
2550 M Street N.W. Washington, D.C. 20037
peter.koenig@squirepb.com

/s/ Colman Tokar
Colman Tokar

**HOGAN LOVELLS US LLP**

APPX0022240

## CERTIFICATION

I, Jared R. Wessel, on this 27th day of June, 2025, do hereby swear in accordance with section 201.6(b)(3)(iii) of the International Trade Commission's regulations, 19 C.F.R. § 201.6(b)(3)(iii), that information substantially identical to the information for which we have requested proprietary treatment and removed from this submission is not available to the public.

In accordance with section 207.3(a) of the International Trade Commission's regulations, 19 C.F.R. § 207.3(a), I further certify that the information contained in the attached submission is accurate and complete to the best of my knowledge.

_____
Jared R. Wessel

Hogan Lovells US LLP
555 13th Street, N.W.
Washington, DC 20004
Tel: (202) 637-6634

**BEFORE THE**
**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

|  |  |
|---|---|
| | ) |
| **In the Matter of:** | ) |
| | ) |
| PHOSPHATE    FERTILIZERS    FROM | )  Inv. Nos. 701-TA-650-651 |
| MOROCCO AND RUSSIA | )  (Second Remand) |
| | ) |

<u>**PUBLIC VERSION**</u>

Business Proprietary Information removed from pages 3–11.

---

**SECOND REMAND COMMENTS OF PHOSAGRO PJSC**

---

H. Deen Kaplan
Jared R. Wessel
Michael G. Jacobson

**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, DC 20004-1109

*Counsel to Phosagro PJSC*

June 27, 2025

APPX0022242

## **TABLE OF CONTENTS**

I.  INTRODUCTION AND EXECUTIVE SUMMARY .............................................1

II.  STANDARD OF REVIEW...................................................................5

III.  THE COMMISSION CANNOT CONTINUE TO RELY UPON ITS UNLAWFUL FINDINGS ON MARKET OVERSUPPLY AND THE POSSIBILITY OF RESHIPMENT TO MAKE ITS INJURY DETERMINATION ....6

IV.  THE COMMISSION MUST CORRECT ITS ERRONEOUS FINDINGS ON MOSAIC'S FAILURE TO SERVE LARGE PARTS OF THE MARKET ...............8

V.  THE COMMISSION MUST CORRECT ITS ERRONEOUS USE OF IMPORT DATA RATHER THAN SHIPMENT DATA, WHICH OVER-ACCOUNTS FOR THE PRESENCE OF IMPORTS ...............................................................9

VI.  THE RECORD EVIDENCE DOES NOT EVIDENCE NEGATIVE PRICE EFFECTS .............................................................................10

VII.  SUBJECT IMPORTS DO NOT THREATEN THE DOMESTIC INDUSTRY WITH MATERIAL INJURY ...........................................................11

VIII.  CONCLUSION ...........................................................................13

APPX0022243

## Table of Authorities

**CASES**

*Burlington Truck Lines v. United States*,
    371 U.S. 156 (1962) ............................................................................................... 6

*Consol. Edison Co. of New York v. NLRB*,
    305 U.S. 197 (1938) ............................................................................................... 6

*In re NuVasive, Inc.*,
    842 F.3d 1376, 1382 (Fed. Cir. 2016) .................................................................... 6

*NLRB v. Columbian Enameling & Stamping Co.*,
    306 U.S. 292 (1939) ............................................................................................... 6

*OCP S.A. v. United States*,
    No. 1:21-cv-00219 (SAV), slip op. 25-51 ...................................................... passim

**ADMINISTRATIVE MATERIALS**

Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Phosphate Fertilizers from Morocco and Russia: Posthearing Brief of Gavilon*,
    Inv. Nos. 701-TA-650-651 (Final) (Feb. 18, 2021) ........................................... 7, 12

Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Phosphate Fertilizers from Morocco and Russia: Prehearing Brief of Gavilon*,
    Inv. Nos. 701-TA-650-651 (Final) (Feb. 3, 2021) ..................................... 1, 4, 5, 12

*Phosphate Fertilizers from Morocco and Russia*,
    Inv. Nos. 701-TA-650-651 (Final) (Remand), USITC Pub. 5490 (Jan. 2024) and
    accompanying confidential Dissenting Views of Chairman David S. Johanson ....................... 7

*Phosphate Fertilizers from Morocco and Russia*,
    Inv. Nos. 701-TA-650-651 (Final) (Remand), USITC Pub. 5490 (Jan. 2024) and
    accompanying confidential Views of the Commission ............................................ 3, 4, 9, 10

*Phosphate Fertilizers from Morocco and Russia*,
    Inv. Nos. 701-TA-650-651 (Final), Jan. 27, 2021, Prehearing Report ................................ 4, 11

*Phosphate Fertilizers from Morocco and Russia*,
    Inv. Nos. 701-TA-650-651 (Final), Transcript of the U.S. International Trade Commission's
    Hearing dated Feb. 9, 2021 ............................................................................ 2, 7

## I.   INTRODUCTION AND EXECUTIVE SUMMARY

PhosAgro PJSC ("PhosAgro") requests that the U.S. International Trade Commission ("ITC" or the "Commission") end this five-year saga in the phosphate fertilizer market by following the law and the clear record evidence to render a negative determination.  The U.S. Court of International Trade ("CIT") in now its second remand opinion and order has made clear that several key aspects of the Commission's views and affirmative determination ("ITC Remand Views") are not supported with substantial evidence.  1/  The Commission must now correct the following errors in its determination and obey the orders of the Federal Judiciary.  If it does so, there is no other possible result than a negative determination.

**First**, there was no oversupply of the market during the period of investigation ("POI"), including in 2019 when domestic performance declined.  Inventories that have reached their intended destination could not reasonably be expected to be reshipped.  Imports that served those upriver locations and were in inventory in the latter part of the POI were, therefore, not injurious.  Nor were new, high-priced subject imports coming through the port of New Orleans to service actual customer demand in 2018–2019.

**Second**, the Commission must finally recognize Mosaic's refusal to serve several large customers demonstrates that subject imports merely filled a supply gap left by Mosaic on purpose.  As Mosaic explained: "{A}s we talk to our customers, some are concerned mostly about how they're going to get their supply.  We believe that this has opened up new opportunities for outside competitors to come in and make up some of that supply."  2/  Mosaic told the market it was going

---

1/      *See OCP S.A. v. United States*, No. 1:21-cv-00219 (SAV), slip op. 25-51 (Ct. Int'l Trade Apr. 22, 2025) ("*CIT Op.*").

2/      *See* Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Phosphate Fertilizers from Morocco and Russia: Prehearing Brief of Gavilon*, Inv. Nos. 701-TA-650-651 (Final) (Feb. 3, 2021) ("*Gavilon Prehearing Brief*") at Exhibit 1A, The Mosaic Company 2020 Q2 Earnings Call (August 4, 2020) at 5–6.  This contemporaneous statement by Mosaic, and

1

to short supply the market by one million tonnes, and told customers to buy more imports, and therefore cannot act surprised when that's what happened.

**Third**, the Commission must use U.S. shipment data rather than U.S. import data when assessing the case, to reflect that actual U.S. supply dynamics and control for reshipments to Canada in the ordinary course of the supply chain. The Commission's multiple references to an increase of more than one million short tons of subject imports from 2018 to 2019 must be stricken as based on inaccurate data. The Commission must acknowledge that the much smaller increase in shipments of subject imports of approximately 600,000 short tons *significantly undershot Mosaic's public statements* that it would be short supplying the market by one million tonnes.

**Fourth**, the Commission's findings of negative price effects cannot stand. There is not substantial evidence of underselling on the record—there is 80% overselling. Indeed, there is rampant overselling in 2019, which is the time when domestic performance was declining. As then-Chair Kearns identified at the hearing, "something just isn't adding up in {Petitioner's} case." 3/ That "something" is a lack of any correlation between subject import pricing and domestic performance. This also dovetails with the evidence of price leader Mosaic's intentional shorting of supply to the market, necessitating higher-priced imports to fill the gap. Moreover, the Commission must find that there are not material lost sales or revenues on the record after correcting for the erroneous findings regarding a lone purchasers' misreporting and change in explanation for purchasing subject imports. The Commission's finding that the domestic industry lost material sales to low-priced subject imports is simply wrong. Subject imports are not the cause

---

several others by Mosaic which were put on the record by respondent parties, are not acknowledged or cited-to in the Commission's 73 page views in the first remand.

3/      *See Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final), Transcript of the U.S. International Trade Commission's Hearing dated Feb. 9, 2021 ("Hearing Tr.") at 86 (Chair Kearns).

PUBLIC VERSION
PROPRIETARY INFORMATION DELETED FROM BRACKETS

of price deterioration in 2019 amidst historically bad weather leading to declining demand and thereby declining prices.

The Commission concludes in its pricing section that "the record shows that regardless of whether subject import inventories were being reshipped once they reached their destination, the substantial volume of cumulated subject imports continuing to enter the United States in 2019 was adversely impacting U.S. prices as demand remained low due to weather events and flood in the spring of 2019" and "the oversupply of subject imports and their low prices exerted downward pricing pressure on the domestic like product and significantly depressed U.S. prices in 2019." 4/ This is the crux of the Commission's affirmative determination. But this conclusion is plainly wrong.

The CIT has found that multiple aspects of this conclusion cannot stand based on the record evidence. Specifically, [

].

Altogether, the evidence on the record establishes a lack of a causal link between domestic performance and subject import volumes and prices. The domestic industry was undoubtedly successful, and increasingly so, from 2017–2028, rising to an [

], amidst

[

---

4/     *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final) (Remand), USITC Pub. 5490 (Jan. 2024) and accompanying confidential Views of the Commission ("ITC Remand Views") at 43–44.

PUBLIC VERSION
PROPRIETARY INFORMATION DELETED FROM BRACKETS

]. 5/  Mosaic told the market that it closed its Plant City, Florida facility "intentionally" amidst this strong success, and that the closure "opened a hole for some imports to increase" (namely from Mosaic's affiliated supply in Saudi Arabia). 6/  Mosaic said that the resulting tightening of supply and demand conditions caused by its own curtailment of U.S. supply was "obviously great for Mosaic," pointing to its new affiliated supply located in Brazil. 7/  At the time of closure, Mosaic celebrated its reduction of market share "from 55%, 60% market share to a more sustainable 50-ish percent market share," which left many purchasers scrambling to backfill Plant City purchases with imports—at Mosaic's direction. 8/

The reason for the domestic industry's weaker performance in 2019 was not due to subject imports—it was due to an Act of God, historically bad weather.  The Commission found that the weather was one cause of the declining performance by the domestic industry. 9/  Mosaic admitted as such in November 2019: "Sales prices and margins have declined throughout 2019, primarily attributable to a weather-related demand decline in North America." 10/  And according to Mosaic,

---

5/      *See Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final), Jan. 27, 2021, Prehearing Report ("ITC Prehearing Report") at Tbl. C-1.

6/      *See Gavilon Prehearing Brief* at Exhibit 1A, The Mosaic Company, *Mosaic Co Analyst Day – Final* (Mar. 28, 2019) at 30–31; Exhibit 1A, Mosaic Form 10-K for the year ending December 31, 2017 (Feb. 20, 2018) at 3; Exhibit 1A, Company 2018 Q2 Earnings Call (Aug. 7, 2018) at 3, 8–9.  This contemporaneous statement by Mosaic, and several others by Mosaic which were put on the record by respondent parties, are not acknowledged or cited-to in the Commission's 73 page views in the first remand.

7/      *Gavilon Prehearing Brief* at Exhibit 1A, The Mosaic Company 2018 Q2 Earnings Call (Aug. 7, 2018) at 3.  This contemporaneous statement by Mosaic, and several others by Mosaic which were put on the record by respondent parties, are not acknowledged or cited-to in the Commission's 73 page views in the first remand.

8/      *See Gavilon Prehearing Brief* at Exhibit 1A, The Mosaic Company, *Mosaic Co Analyst Day – Final* (Mar. 28, 2019) at 30–31.  This contemporaneous statement by Mosaic, and several others by Mosaic which were put on the record by respondent parties, are not acknowledged or cited-to in the Commission's 73 page views in the first remand.

9/      ITC Remand Views at 65–70.

10/     *Gavilon Prehearing Brief* at Exhibit 1A, *The Mosaic Company Reports Third Quarter 2019 Results,* Business Wire (Nov. 4, 2019).  This contemporaneous statement by Mosaic, and several

PUBLIC VERSION
PROPRIETARY INFORMATION DELETED FROM BRACKETS

the market rebounded due to "farm economics" and that "demand is up" as the causes—and with Mosaic expressly stating that these CVD investigations make no difference in domestic performance. 11/  In light of the CIT's findings, there are no alternative causes linked to subject imports that can supersede this clear and obvious cause for changes in domestic performance during the POI.

If the Commission overturns its findings on material injury, it must then assess threat of material injury.  The record evidence clearly shows no threat of material injury at the time of the original investigation, with a rebounding market in 1H 2020 after the weather had returned to normal and optimism abound from the domestic industry.

For these reasons, the Commission must find that there is no material injury or threat thereof to the domestic industry on account of subject imports.  The CIT's decision strikes down several aspects of the Commission's findings as out of concert with the record evidence, and gives a clear roadmap for the Commission to make a negative determination grounded in the overwhelming record evidence supporting such a determination.

## II.    STANDARD OF REVIEW

The CIT directed the Commission in its Second Opinion to **[**

**]**. 12/  The

Commission is bound by the CIT's directive on remand.

---

others by Mosaic which were put on the record by respondent parties, are not acknowledged or cited-to in the Commission's 73 page views in the first remand.

11/    *See Gavilon Prehearing Brief* at Exhibit 1A, The Mosaic Company 2020 Q2 Earnings Call (August 4, 2020) at 6; Exhibit 1A, The Mosaic Company 2020 Q3 Earnings Call (Nov. 3, 2020) at 15.  This contemporaneous statement by Mosaic, and several others by Mosaic which were put on the record by respondent parties, are not acknowledged or cited-to in the Commission's 73 page views in the first remand.

12/    *CIT Op.* at 49.

PUBLIC VERSION
PROPRIETARY INFORMATION DELETED FROM BRACKETS

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." 13/  It must be "more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." 14/  Moreover, substantial evidence standard requires the agency to "articulate {a} rational connection between the facts found and the choice made." 15/  The Commission's review is limited to the record before it, and must have "adequate evidentiary basis for its findings." 16/

## III. THE COMMISSION CANNOT CONTINUE TO RELY UPON ITS UNLAWFUL FINDINGS ON MARKET OVERSUPPLY AND THE POSSIBILITY OF RESHIPMENT TO MAKE ITS INJURY DETERMINATION

The CIT, for the second time, has found that [

].

The CIT has also found, following the Commission's collection of new evidence on first remand, that [

]. For these reasons, the Commission must make negative findings on remand.

The CIT explains, correctly, that the Commission's findings must be based on [

]. 17/  When phosphate fertilizer reaches a terminal, it rarely, if ever, is reloaded on a barge to go to another terminal,

---

13/  *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938).

14/  *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

15/  *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).

16/  *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016) (internal citations omitted).

17/  *CIT Op.* at 4.

6

PUBLIC VERSION
PROPRIETARY INFORMATION DELETED FROM BRACKETS

particularly not one upriver. Barges do not have backup lights for good reason. 18/ As Commissioner Johanson stated in his dissent, "inventories were stuck upriver, without the ability to ship back downriver to supply other parts of the market." 19/

Without the ability to reship product already in inventory, the market signaled the need for additional supply in 2019. The market anticipated improvements in the weather and plantings in each of spring 2019 and then fall 2019, and additional imports were required for locations where inventories were depleted. Continued historically wet weather throughout 2019, which was contrary to industry expectations, was the cause of the domestic industry's problems amidst these market signals—not subject imports responding to the market's stated needs. These imports were not predatory, but instead were brought in to meet farmers' demand.

This was true for both subject import inventories and domestic producer inventories. In fact, domestic producer inventories were [          ] than subject import inventories throughout the POI including in 2019, and the ratio of subject import inventories to U.S. producer inventories did not materially change between 2018 and 2019. 20/

Commissioner Johanson is correct in stating in his dissenting opinion that "{t}he additional evidence further supports negative determinations." 21/ The CIT [

---

18/    *See* 2nd Revised Pub. Tr. of Oral Arg. at 139:13, *OCP*, (Nov. 8, 2022) ECF 129 (P. Rosenthal).

19/    *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final) (Remand), USITC Pub. 5490 (Jan. 2024) and accompanying confidential Dissenting Views of Chairman David S. Johanson, ("ITC Remand Dissent") at 6.

20/    *See* Hearing Tr. at 215, Slide 6 (Jim Dougan). *See also* Letter from Hogan Lovells US LLP to the U.S. International Trade Commission, *Phosphate Fertilizers from Morocco and Russia: Posthearing Brief of Gavilon*, Inv. Nos. 701-TA-650-651 (Final) (Feb. 18, 2021) ("*Gavilon Posthearing Brief*"), Responses to Commission's Questions at 2: Subject Imports in 2019.

21/    ITC Remand Dissent at 1.

PUBLIC VERSION
PROPRIETARY INFORMATION DELETED FROM BRACKETS

]. 22/  Because reshipment was

not feasible, the record continues to lack evidence of market oversupply, in particular in the latter

part of the POI in 2019 when the domestic industry saw declining performance. 23/  Thus, the

Commission must come to the only reasonable conclusion: that subject imports entered in

accordance with market demand signals in 2019, and that any decline in domestic performance

has nothing to do with excess inventories or excess imports.

## IV. THE COMMISSION MUST CORRECT ITS ERRONEOUS FINDINGS ON MOSAIC'S FAILURE TO SERVE LARGE PARTS OF THE MARKET

There is vast evidence on the record, ignored by the Commission, that Mosaic was

unwilling to meet the needs of several major purchasers.  The CIT found that [

]. 24/  The Commission

must fairly acknowledge what Mosaic told the public and its investors at the time—its goal was to

reduce supply to the market to create scarcity, and as part of that goal it chose to short supply

several major customers.  Mosaic said so openly and unabashedly.  The CIT also finds that [

]. 25/  [

].

If the Commission fairly accounts for this evidence of Mosaic's business decision to short

supply the market, it must conclude that there is no volume-based injury during the POI.

---

22/    *CIT Op.* at 16–17, 26–27.

23/    *Id.* at 27.

24/    *Id.* at 31.

25/    *Id.* at 32.

PUBLIC VERSION
PROPRIETARY INFORMATION DELETED FROM BRACKETS

**V.     THE COMMISSION MUST CORRECT ITS ERRONEOUS USE OF IMPORT DATA RATHER THAN SHIPMENT DATA, WHICH OVER-ACCOUNTS FOR THE PRESENCE OF IMPORTS**

The Commission in some instances cited import data and in other instances cited shipment data to measure the impact of imports in the market.  Such cherry-picking is unlawful.  The CIT made clear that [

]. 26/

The shipment data show lower volumes of imports in the U.S. stream of commerce, due to the regular practice of sellers to transport goods continuing through the U.S. river system into Canada and never reaching U.S. customers.  The shipment data also show a much smaller increase in the presence of subject imports in the market to fill Mosaic's stated supply gap caused by the intentional idling of Plant City.  However, the Commission referenced the import data when assessing the purported oversupply in the market—characterizing the volume of "cumulated subject imports" as increasing by "more than one million short tons" from 2017 to 2018. 27/  The Commission's constant and disingenuous repeating of this figure of imports increasing by one million short tons must be erased from the Commission's findings, because it is based on misleading data, as it includes imports ultimately destined for the Canadian market, not the U.S. market.  Instead, the record shows that from 2017 to 2018 subject import *shipments* actually only increased by approximately 600,000 short tons—far less than the one million tonnes that Mosaic told the market contemporaneously in 2017 that it was reducing supply by, and also less than the approximately 700,000 short tons that Mosaic admitted was taken off the market due to idling of Plant City.  Either way, subject import shipments fell short of the supply gap created by Mosaic— further evidence of a lack of oversupply to the market.

---

26/     *Id.* at 37.

27/     ITC Remand Views at 16, 27, 39, 63, 68.

PUBLIC VERSION
PROPRIETARY INFORMATION DELETED FROM BRACKETS

## VI.    THE RECORD EVIDENCE DOES NOT EVIDENCE NEGATIVE PRICE EFFECTS

The record does not support the Commission's finding that low-priced subject imports undercut and lowered U.S. prices.  Quite simply, subject imports were not lower-priced, nor did they cause lower market prices amidst Petitioner Mosaic serving as the price leader.

First, the CIT has made clear that [

]. 28/  The CIT has also made clear that [

]. 29/  The Commission's finding of significant price underselling must be overturned.

Second, the Commission must acknowledge that Mosaic is the price leader, which must inform the Commission's determination of the cause of price changes in the market.  The CIT explains: [

]. 30/  Higher-priced subject imports gap-filled after Mosaic told the market it was short supplying it—not the other way around.

Third, the CIT finds that [

]. 31/  The [

]. 32/  The

---

28/    *CIT Op.* at 39.

29/    *Id.* at 41–42.

30/    *Id.* at 43.

31/    *Id.* at 45.

32/    *See* ITC Remand Views at 36 n.168. *See also* [                    ] response to Commission Staff question dated February 5, 2021, admitting that [

10

PUBLIC VERSION
PROPRIETARY INFORMATION DELETED FROM BRACKETS

Commission's lost sales figure of 733,895 short tons is not supported by substantial evidence and cannot be relied upon in making its determination. 33/

The result of the CIT's [

] is a record that makes a lot more sense.  The Commission's questionnaire responses indicated that phosphate fertilizer is not a product purchased primarily on the basis of price.  As the CIT determines, availability and not price is the primary reason why purchasers bought imports. 34/  Only 2 out of the 28 responding purchasers stated that they always purchase the lowest priced option. 35/  Nearly all purchasers rated availability, quality, and reliability as "very important." 36/  When Mosaic told the market it was taking large quantities of supply offline and that purchasers needed to find alternative sources of supply, that's what purchasers did—they bought imports at higher prices to fill the gap.  When the Commission corrects these unlawful findings, the only reasonable result is a finding of no underselling and no negative price effects by reason of subject imports.

## VII.   SUBJECT IMPORTS DO NOT THREATEN THE DOMESTIC INDUSTRY WITH MATERIAL INJURY

If the Commission overturns its material injury findings, it should also find that subject imports did not threaten material injury to the domestic industry at the time of the original investigation.  The domestic industry at that time was improving and very optimistic about the future.  For example, Mosaic stated its belief that the market disruption from late 2018 through mid-2020 was over and it "wouldn't worry too much" about harm caused by global trends in the

---

].

33/    *CIT Op.* at 37.

34/    *Id.* at 46.

35/    *See* ITC Prehearing Report at II-17.

36/    *See id.* at II-17–18.

future. 37/ Mosaic also stated that imports were not a problem as of May 2020, before the Petitions were filed, stating in its Q1 2020 earnings call: "And finally, phosphate imports into North America are down year-over-year by approximately 250,000 tonnes through April. After the severe demand shock resulting from bad weather in Spring of '19, importers seem to be finding homes for tonnes elsewhere." 38/

---

37/ *See Gavilon Prehearing Brief* at Exhibit A-1, The Mosaic Company 2020 Q3 Earnings Call (Nov. 3, 2020) at 11.

38/ *See e.g.*, *Gavilon Posthearing Brief at* Exhibit 1B, Andy Jung, Phosphate and Potash Outlook 2020, CropLife (Feb. 23, 2020); *Gavilon Prehearing Brief* at Exhibit 1A, The Mosaic Company 2020 Q1 Earnings Call (May 4, 2020) at 4.

## VIII.  CONCLUSION

For the foregoing reasons, we respectfully request that the Commission overturn its affirmative determinations and make negative determinations on second remand.

Respectfully submitted,

By: /s/  H. Deen Kaplan
     H. Deen Kaplan
     Jared R. Wessel
     Michael G. Jacobson

     HOGAN LOVELLS US LLP
     555 Thirteenth Street, NW
     Washington, DC 20004-1109

     *Counsel to Phosagro PJSC*

Dated:  June 27, 2025

APPX0022257

**List 1, Doc. No. 308R – EDIS No. 855565**

**Remand Comments**

**(The J. R. Simplot Company)**

APPX0022258

# KING & SPALDING

1700 Pennsylvania Avenue, N.W.
Washington, DC 20006-4706
(202) 737-0500 (telephone)
(202) 626-3737 (fax)
www.kslaw.com

June 27, 2025

The Honorable Lisa R. Barton
Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112A
Washington, DC  20436

ITC Inv. Nos. 701-TA-650-651 (Second Remand)

**Business Proprietary Information Removed From Pages 1-10 and 12-24.**

**PUBLIC VERSION**

Re:   **Phosphate Fertilizers from Morocco and Russia: Remand Comments of The J. R. Simplot Company**

Dear Madam Secretary:

On behalf of The J. R. Simplot Company, we respectfully submit our written comments in the above-referenced remand proceedings regarding how the Commission could best comply with the U.S. Court of International Trade's remand instructions.  This submission is timely filed.[1]

All of the business proprietary information cited in this submission is already on the record before the Commission.  In accordance with 19 C.F.R. § 207.7(a)(l), the bracketed information in this submission should be disclosed only to authorized applicants, as described in 19 C.F.R. § 207.7(a)(3).  In this regard, we note that the U.S. Court of International Trade

---

[1] *See Phosphate Fertilizers From Morocco and Russia: Notice of Remand Proceedings*, 90 Fed. Reg. 24,411 (Int'l Trade Comm'n June 10, 2025); Letter from Secretary Barton Re: Request for an Extension of Time to File Remand Comments; Phosphate Fertilizers from Morocco and Russia; Inv. Nos. 701-TA-650-651 (Second Remand) (June 18, 2025).

PUBLIC VERSION

The Honorable Lisa R. Barton
June 27, 2025
Page 2

opinion giving rise to this remand proceeding remains sealed, with no public version available at

the time of our filing.  Accordingly, and consistent with guidance from Commission Staff, we

have bracketed references to that opinion.

This submission is being served as indicated in the attached certificate of service.  If you

have any questions regarding this submission, please contact the undersigned.

Respectfully submitted,

/s/ Stephen P. Vaughn
Stephen P. Vaughn
Patrick J. McLain
**KING & SPALDING LLP**
1700 Pennsylvania Ave., N.W.
Washington, DC 20006
(202) 737-0500

*Counsel for The J. R. Simplot Company*

APPX0022260

**CERTIFICATION OF COUNSEL**

City of Washington        )
                          )        ss:
District of Columbia      )


      In accordance with section 201.6(b)(3)(iii) of the Commission's regulations, 19 C.F.R. § 201.6(b)(3)(iii), I, Stephen P. Vaughn, of King & Spalding LLP, hereby certify that information substantially identical to the information for which we are requesting proprietary treatment in the attached submission is not available to the public.

      In accordance with section 207.3(a) of the Commission's regulations, 19 C.F.R. § 207.3(a), I further certify that (1) I have read the attached submission, and (2) the information contained in this submission is accurate and complete to the best of my knowledge.

      In addition, I acknowledge that any information submitted to the Commission throughout this proceeding or other proceedings may be disclosed to and used: (i) By the Commission, its employees and Offices, and contract personnel (a) for developing or maintaining the records of this or a related proceeding, or (b) in internal investigations, audits, reviews, and evaluations relating to the programs, personnel, and operations of the Commission including under 5 U.S.C. Appendix 3; or (ii) by U.S. government employees and contract personnel, solely for cybersecurity purposes.  All contract personnel will sign appropriate nondisclosure agreements.

      I declare under penalty of perjury that the foregoing is true and correct.

Dated:  June 27, 2025


                    Signature: _____

                               Stephen P. Vaughn

**Phosphate Fertilizers from Morocco and Russia**                    **PUBLIC**
Inv. Nos. 701-TA-650-651 (Final) (Second Remand)


## CERTIFICATE OF SERVICE

This is to certify that on June 30, 2025, I have caused a copy of the foregoing **PUBLIC SUBMISSION** to be served upon the following parties via the method indicated at the following addresses:

**VIA ELECTRONIC SERVICE:**

Kenneth G. Weigel, Esq.
**Alston & Bird, LLP**
950 F Street, NW
Washington, District of Columbia 20004,
United States
ken.weigel@alston.com

Shara Aranoff, Esq.
**Covington and Burling LLP**
850 Tenth Street, NW
Washington, District of Columbia 20001,
United States
saranoff@cov.com

H. Deen Kaplan, Esq.
**Hogan Lovells US LLP**
555 Thirteenth Street, NW
Columbia Square
Washington, District of Columbia 20004,
United States
deen.kaplan@hoganlovells.com

Melissa Brewer, Esq.
**Kelley Drye & Warren LLP**
3050 K Street, NW
Suite 400
Washington, District of Columbia 20007,
United States
mbrewer@kelleydrye.com;
tradenotifications@kelleydrye.com

Elena G. Nosyreva, Esq.
**Ministry of Industry and Trade of the Russian Federation**
Presnenskaya Naberzhnaya, 10/2
Moscow, Russian Federation,
nosyrevaEG@economy.gov.ru

Peter Koenig, Esq.
**Squire Patton Boggs (US) LLP**
2550 M Street, NW
Washington, District of Columbia 20037,
United States
peter.koenig@squirepb.com

Stephanie Hartmann, Esq.
**Wilmer Cutler Pickering Hale and Dorr LLP**
2100 Pennsylvania Avenue, NW
Washington, District of Columbia 20037,
United States
stephanie.hartmann@wilmerhale.com

*/s/ Stephen P. Vaughn*
Stephen P. Vaughn
**KING & SPALDING LLP**
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500

APPX0022262

**BEFORE THE**
**U.S. INTERNATIONAL TRADE COMMISSION**

| | |
|---|---|
| IN THE MATTER OF THE COUNTERVAILING DUTY INVESTIGATIONS OF: | ) ) ) ) PHOSPHATE FERTILIZERS FROM ) MOROCCO AND RUSSIA ) ) ) | **Inv. Nos. 701-TA-650-651 (Second Remand)** **Business Proprietary Information Removed From Pages 1-10 and 12-24.** **PUBLIC VERSION** |

---

**REMAND COMMENTS OF**
**THE J. R. SIMPLOT COMPANY**

---

Stephen P. Vaughn
Patrick J. McLain
**KING & SPALDING LLP**
1700 Pennsylvania Ave., N.W.
Washington, DC 20006
(202) 737-0500

June 27, 2025

APPX0022263

# TABLE OF CONTENTS

I.    INTRODUCTION........................................................................................... 1

II.   THE COMMISSION SHOULD AGAIN DETERMINE THAT VOLUME OF SUBJECT IMPORTS IS SIGNIFICANT .......................................................... 1

    A.    The Record Establishes That Subject Import Volumes Are Significant ......... 2

    B.    The Commission Should Reject Respondents' Claims Regarding Alleged Refusals To Supply .................................................................................. 3

    C.    The Commission Should Reject Respondents' Claims Regarding Alleged Re-Exports……………………………………………………………………4

III.  THE COMMISSION SHOULD AGAIN DETERMINE THAT THE PRICE EFFECTS OF SUBJECT IMPORTS ARE SIGNIFICANT ................................. 7

    A.    The Record Establishes That Subject Imports Significantly Depressed U.S. Producers' Prices ................................................................................. 7

    B.    The Instances of Overselling Do Not Undermine the Existence of Price Depression.......................................................................................... 9

    C.    Subject Imports Depressed Prices, Notwithstanding Some Purchasers Having Identified Mosaic As A Price Leader ................................................. 14

    D.    The Commission Should Reaffirm Its Significant Lost Sales Findings……..14

IV.  THE IMPACT OF SUBJECT IMPORTS IS SIGNIFICANT ...................................... 16

    A.    Subject Imports Had a Significant Adverse Impact on the Domestic Industry……………………………………………………………………….17

    B.    The Respondents' Inventory Reshipment Claim Fails To Undermine The Conclusion That The Domestic Industry Is Materially Injured "By Reason Of" Subject Imports……………………………………………………………18

V.    CONCLUSION .................................................................................................. 25

APPX0022264

## I.    INTRODUCTION

The J. R. Simplot Company ("Simplot") supports and incorporates by reference the remand comments being filed today by Petitioner The Mosaic Company ("Mosaic").  Below, Simplot provides additional comments regarding how the Commission could best comply with the U.S. Court of International Trade's remand instructions in its decision of April 22, 2025 ("*OCP III*").[1]  We address aspects of the volume and price effects factors of the Commission's analysis [                                    ], and we also discuss the "inventory reshipment" issue in the context of the impact and causation analysis.  The discussion below highlights the broad, overwhelming, and mutually reinforcing evidence establishing that subsidized imports from Morocco and Russia have materially injured the domestic phosphate fertilizer industry.  Given these facts, the Commission should again reach affirmative determinations on both subject countries.

## II.    THE COMMISSION SHOULD AGAIN DETERMINE THAT VOLUME OF SUBJECT IMPORTS IS SIGNIFICANT

In the *Original Views*, the Commission found that the volume of cumulated subject imports and the increase in that volume were significant in absolute terms and relative to apparent consumption.[2]  In its *First Remand Results*, the Commission reached the same conclusion,[3] and it found that the record did "not indicate that fertilizer was 'practically unavailable from U.S. sources.'"[4]  [

---

[1] *See Phosphate Fertilizers From Morocco and Russia: Notice of Remand Proceedings*, 88 Fed. Reg. 73,873 (Int'l Trade Comm'n Oct. 27, 2023).  *See also OCP S.A. v. United States,* Consol. Ct. No. 21-00219, Slip Op. No. 25-51 (April 22, 2025) (Sealed Version) ("*OCP III*"); *OCP S.A. v. United States*, 658 F. Supp. 3d 1297 (CIT 2023) ("*OCP I*").

[2] *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final), USITC Pub. 5172 (Mar. 2021), Views ("*Original Views*" (Public Version)) at 25-27.

[3] *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final) (Remand), USITC Pub. 5490 (Jan. 2024), Views ("*First Remand Results*" (Public Version)) at 28-29.

[4] *Id.*

]⁵ [

]

## A.    The Record Establishes That Subject Import Volumes Are Significant

Cumulated subject import entries increased from 1.97 million short tons in 2017 to 2.98 million short tons in 2018, and the 2.70 million short tons of subject imports in 2019 represent a 37.4 percent increase from 2017.[6]  U.S. importers' U.S. shipments of subject imports increased in each year from 2017 to 2019, rising from 1.782 million short tons in 2017 to 2.387 million short tons in 2018 and rising again to 2.536 million short tons in 2019 to reach an increase of 42.3 percent from 2017 to 2019.[7]  These import entry and shipment volumes are plainly significant.

The record also supports the Commission's finding that subject imports were significant compared to apparent consumption.  Based on the U.S. importers' U.S. shipment data, subject imports held [            ] share of the U.S. market throughout the period of investigation ("POI").[8]  Subject imports also increased their market share from [     ] percent in 2017 to [     ] percent in 2018, and increased their share again in 2019, to [     ] percent.[9]  Moreover, subject imports are [                              ] relative to U.S. production: the ratio of

---

⁵ [                    ]
⁶ *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final), USITC Pub. 5172 (Mar. 2021), Staff Report ("Staff Report" (Public Version)) at IV-3, Table IV-2 (Public Version).  Confidential Staff Report, Memorandum INV-TT-031 (Feb. 26, 2021) ("Posthearing Report" (Confidential Version)) at IV-3, Table IV-2.
⁷ Staff Report at C-3, Table C-1 (Public Version).
⁸ Staff Report at C-3, Table C-1 (Confidential Version).
⁹ *Id.*

2

subject imports to domestic production increased from [     ] percent in 2017 to [     ] percent in 2018 and was [     ] percent in 2019.[10]

To the extent that any additional analysis is required, the record contains extensive additional evidence confirming the significance of subject imports.  Most important, U.S. shipments of subject imports increased in absolute and relative terms in 2019, despite declining demand.  Whereas apparent domestic consumption in 2019 was [     ] percent lower compared to 2017 and [     ] percent lower versus 2018, subject import shipments in 2019 were 42.3 percent higher than in 2017 and 6.2 percent higher compared to 2018.[11]  In other words, unfairly traded subject imports increased their attack on the U.S. market in 2019 despite lower demand.

### B.	The Commission Should Reject Respondents' Claims Regarding Alleged Refusals To Supply

The Respondents' claims regarding Mosaic's alleged refusals to supply U.S. customers should be rejected for the reasons stated in Mosaic's remand comments.  In this regard, Simplot wishes to briefly underscore two points confirming that the Respondents' claims are meritless.

First, the Respondents' anecdotal supply complaints are contradicted by the questionnaire data that the Commission collected from U.S. purchasers.  Specifically, a majority of purchasers reported that domestic product was either "comparable" or "superior" to subject imports in terms of availability and reliability of supply,[12] and only a minority of purchasers reported supply constraints solely with respect to domestic product.[13]  These results are the opposite of what would be expected if domestic producers had created widespread supply shortages.

---

[10] *Id.* at IV-4, Table IV-2 (Confidential Version).
[11] *Id.* at C-3, Table C-1 (Confidential Version).
[12] Staff Report at II-24, Table II-9 (Public Version).
[13] *Original Views* at 42 n. 223 (Public Version) (citing to U.S. Purchasers' Questionnaire Responses at III-11).

3

PUBLIC VERSION

Second, the Respondents' claims are not credible in light of developments during the POI.  Domestic producers certainly had the ability to sell more phosphate fertilizers than they did – they "had available excess capacity throughout the POI," as the Commission observed in the *First Remand Results*,[14] including [          ] short tons of excess capacity in 2019.[15] Moreover, domestic producers' U.S. shipments declined [          ] from 2017 to 2018 and again from 2018 to 2019 to reach a [      ] percent decline between 2017 and 2019, whereas apparent domestic consumption declined by [          ] percent over the same period.[16]  The Respondents' "refusal to supply" theory cannot possibly explain these adverse volume trends, as that theory implies that the domestic industry treated its U.S. customers worse from 2017 to 2019 even as its profitability [          ] with its operating margin falling from [     ] percent in 2017 to [     ] percent in 2019.[17]  Such an outcome makes absolutely no sense.  Furthermore, if the adverse volume trends were attributable to domestic producers' refusals to supply customers – rather than to subject imports – then the withdrawal of subject imports after the filing of the petitions in late June 2020 should have had no effect on the domestic industry's U.S. shipments. Instead, as the record plainly shows, the opposite occurred: domestic producers' U.S. shipment volumes increased by [     ] percent from interim 2019 to interim 2020.[18]  Given these facts, the Commission should confirm that it has considered Respondents' claims on this topic and rejected them as not credible because they are contradicted by overwhelming record evidence.

**C.      The Commission Should Reject Respondents' Claims Regarding Alleged Re-Exports**

[                                            ] the Commission should make clear that

---

[14] *First Remand Results* at 15 (Public Version).
[15] *See* Staff Report at C-4, Table C-1 (Confidential Version).
[16] *Id.* at C-3 to C-4, Table C-1 (Confidential Version).
[17] *Id.* at C-4, Table C-1 (Confidential Version).
[18] *Id.*

4

it has considered and rejected the Respondents' claims regarding so-called re-exports to Canada because those claims fail to undermine the significance of subject imports. As an initial matter, there can be no legitimate complaint with respect to the Commission's data collection or the accuracy of those data. The Commission collected questionnaire data from importers on their U.S. imports, U.S. shipments, and export shipments of subject imports, and the Respondents' claims regarding re-exports are based on those very data.[19]

Next, the Respondents err in presuming that quantities exported by U.S. importers in a given period were imported in the same period, instead of reflecting exports of subject merchandise that originally entered the United States for consumption in a prior period. The U.S. importers' questionnaire defines "Export shipments" as "shipments to destinations outside the United States, including shipments to related firms" without requiring that the export shipment pertain to product that was imported in the same period.[20] Thus, the Commission should continue to use importers' reported import entries as a probative indicator of the Moroccan and Russian producers' supply of additional subject imports to the United States during the POI.

Furthermore, the recalculated version of the import data submitted by the Respondents actually confirms our position that the volume of subject imports, and the increase in that volume, are significant. In its responses to Commissioner questions from the hearing in the original investigation, OCP calculated "net import entries" data by subtracting U.S. importers' export shipments from their reported entries of subject imports during the 2017-2019 period. As shown below, however, [      ] OCP's adjusted data [            ] subject import volumes

---

[19] *See* OCP Posthearing Brief, Responses to Commissioner Questions at 19-20.
[20] U.S. Importers' Questionnaire at II-5a.

throughout the 2017-2019 period, as well as [            ] increases in subject import volumes from 2017 to 2018 and from 2017 to 2019.  For example, OCP's proposed data show that subject "net" import volumes in 2019 were [     ] percent greater than in 2017, even as U.S. producers' U.S. shipments and apparent domestic consumption both declined in absolute terms over the same period.  These facts are reflected in the table below.

### ALLEGED "NET IMPORT ENTRIES" IN THE CONTEXT OF OTHER VOLUME DATA (in short tons)[21]

| Item | | 2017 | 2018 | 2019 | 17-18 Change (ST) | 17-18 Change (%) | 17-19 change (ST) | 17-19 change (%) | |
|---|---|---|---|---|---|---|---|---|---|
| U.S. importers' subject import entries | | 1,971,222 | 2,978,803 | 2,696,266 | 1,007,581 | 51% | 725,044 | 36.8% | |
| U.S. importers' export shipments of subject imports | [ | | | | | | | | ] |
| Allleged "Net Import Entries" | [ | | | | | | | | ] |
| U.S. importers' U.S. shipments of subject imports | | 1,782,004 | 2,386,985 | 2,535,942 | 604,981 | 34% | 753,938 | 42.3% | |
| U.S. producers' U.S. shipments | [ | | | | | | | | ] |
| Apparent U.S. consumption | [ | | | | | | | | ] |

Finally, it bears repeating that no basis exists to dispute the accuracy of the subject import U.S. shipment data or the Commission's market share calculations that incorporate those data.  As noted above, those data show that subject imports held [            ] share of the U.S. market throughout the POI, that they increased their market share from [      ] percent in 2017 to [     ] percent in 2018, and that they increased their share again in 2019, to [      ] percent.[22]  In other words, during the last full year of the POI, when domestic consumption was declining, U.S. shipments of unfairly subsidized imports increased in both absolute and relative terms, held [

---

[21] Sources: Staff Report at C-3 to C-4, Table C-1 (Confidential Version); OCP Posthearing Brief, Responses to Commissioner Questions at 20.
[22] Staff Report at C-3, Table C-1 (Confidential Version).

] of the U.S. market, and captured [      ] percentage points of market share from the domestic industry, compared to 2017.[23]  Given these facts, and contrary to Respondents' claims regarding alleged re-exports, the volume of subject imports is plainly significant.

## III.    THE COMMISSION SHOULD AGAIN DETERMINE THAT THE PRICE EFFECTS OF SUBJECT IMPORTS ARE SIGNIFICANT

In the *Original Views* and *First Remand Results*, the Commission found that subject imports oversupplied the U.S. market and had adverse price effects in the form of significant price depression.[24]  [

]25  On remand, the Commission should reaffirm that subject imports had significant adverse price effects, as discussed further below.

### A.    The Record Establishes That Subject Imports Significantly Depressed U.S. Producers' Prices

The record shows that subject imports depressed the domestic industry's prices to a significant degree.  Through a significant increase in imports from 2017 to 2018, a [         ] buildup in U.S. inventories, and continued significant import volumes in 2019 when demand was declining, unfairly priced subject imports oversupplied the U.S. market and drove prices significantly lower than would have otherwise obtained.  This conclusion is strongly supported by the following facts in the record:

- Subject imports of a given formulation are highly substitutable with the domestic like product, and price is an important factor in purchasing decisions;[26]

---

[23] Staff Report at C-3, Table C-1 (Confidential Version).

[24] *Original Views* at 27-36 (Public Version); *First Remand Results* at 29-52 (Public Version).

[25] [                                      ]

[26] Staff Report at II-17, Table II-6 (Public Version); *Original Views* at 21-22, 27 (Public Version); *First Remand Results* at 16-17 (Public Version).

7

- Pricing in the U.S. market is nationwide, rather than regional, with the "f.o.b. NOLA price" being a "universal price benchmark" that is "used as a primary point of reference in price negotiations in the U.S. market";[27]

- Questionnaire data show that (i) U.S. shipments of subject imports increased from 1.78 million short tons in 2017 to 2.39 million short tons in 2018 and then increased again to 2.54 million short tons in 2019; and that (ii) subject imports gained [    ] percentage points of market share from 2017 to 2019, while the domestic industry lost [    ] percentage points of market share over the same period.[28]  These data also show that subject imports gained [   ] points of market share from 2018 to 2019, while demand was declining.[29]

- Questionnaire data show U.S. importers' ending inventories of subject imports in 2018 and 2019 were [     ] percent and [     ] percent higher, respectively, compared to inventories in 2017.[30]

- In their testimony before the Commission, respondent witnesses conceded that that there was a "temporary oversupply" in the U.S. market,[31] and a "hangover of phosphate inventories after the 2019 spring season."[32]

- Questionnaire data show that prices for both the domestic like product and subject imports declined [     ] from late 2018 through 2019.[33]

- Data in the record show that "market prices for phosphate fertilizer DAP decreased in 2019 [                    ] for non-phosphate fertilizers potash and urea, such that DAP prices [

   ]"[34]

- U.S. purchaser questionnaire responses attest to subject imports' adverse price effects.  These responses include [     ] reporting that [

];[35] [                ] reporting that [

];[36] and [            ] stating that [

---

27 *First Remand Results* at 30 n.161 (Public Version) (citing Mosaic Posthearing Brief, Responses to Commissioner Questions at 28-32; Simplot Posthearing Brief, Responses to Commissioner Questions at 60-62; Hearing Tr. at 33-34 (Jung), 287 (Groden)).
28 Staff Report at C-3, Table C-1 (Confidential Version).
29 *Id.*
30 *Id.*
31 Hearing Tr. at 215 (Dougan).
32 *Id.* at 192 (Rahm).
33 *See, e.g.*, Staff Report at V-18 (Confidential Version).
34 *First Remand Results* at 51 (Confidential Version) (citing Staff Report at Figure V-5).
35 Staff Report at Table V-11 (Confidential Version).
36 [            ] U.S. Purchasers' Questionnaire Response at II-2.

PUBLIC VERSION

]³⁷

- Multiple U.S. purchaser questionnaire responses confirm that the domestic industry lost significant sales to subject imports,[38] and was forced to reduce prices under pressure from subject imports.[39]

- [

] show subject imports' adverse price effects.[40]  These include documents appended to a sworn declaration provided by Simplot's Vice President of Wholesale Sales, one of which is [


]⁴¹

- Questionnaire data show a sharp increase in U.S. prices from June-September 2020, after the petition was filed and subsidized imports from Russia and Morocco declined substantially.[42]

- Questionnaire information shows that the domestic industry's performance improved after subject imports' post-petition pullback.[43]

Furthermore, as shown below, none of the issues [                    ] undermines the extensive

body of mutually reinforcing facts in the record establishing that subject imports had a

significant adverse effect on pricing.


### B.    The Instances of Overselling Do Not Undermine the Existence of Price Depression

[



]⁴⁴  [



---

³⁷ Staff Report at Table V-11 (Confidential Version).
³⁸ Staff Report at V-21 to V-22 (Public Version).
³⁹ *Id.* at V-23 to V-24 (Public Version).
⁴⁰ *See* Mosaic Posthearing Brief, Responses to Commissioner Questions at 36-37, Exhibits 41-46; Simplot Posthearing Brief, Responses to Commissioner Questions at 35-37, Exhibit 4.
⁴¹ Simplot Posthearing Brief, Responses to Commissioner Questions at 35-37, Exhibit 4.
⁴² *Original Views* at 34-35 (Public Version) (citing Staff Report at Tables V-4-5).
⁴³ *See First Remand Results* at 53 n.260 (Public Version).
⁴⁴ [                    ]

]$^{45}$  On remand, the Commission should clarify that, consistent with the statute, the price comparison data do not undermine the record evidence establishing significant price depression.

The statute clearly provides that, in evaluating the effect of subject imports on prices, the Commission shall "consider": (1) whether "there has been significant price underselling," and (2) whether the effect of subject imports "otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree."[46] Neither provision requires the Commission to make a specific finding about underselling. Instead, precedent shows that underselling is simply one factor to be considered as part of the Commission's overall assessment of the record in its price effects analysis.

The Court of International Trade has confirmed this plain reading of the statute unequivocally, holding in *Cemex, S.A. v. United States* that although the Commission "is required to explain its analysis of price effects . . . there is no requirement that it set forth its findings concerning underselling."[47] Indeed, the Court has held that requiring findings of underselling would "be inconsistent with the proposition that price suppression or depression is sufficient" to find significant adverse price effects by reason of subject imports.[48] Importantly,

---

[45] [                                                    ]
[46] 19 U.S.C. § 1677(7)(C)(ii).
[47] *Cemex, S.A. v. United States*, 16 C.I.T. 251, 260, 790 F. Supp. 290, 298 (1992) (emphasis added) (citation omitted), *aff'd*, 989 F.2d 1202 (Fed. Cir. 1993).
[48] *Id.*, 16 C.I.T. at 261, 790 F. Supp. at 299.

APPX0022274

in *Cemex*, the Court affirmed the Commission's determination even though one of the affirmative opinions in that case contained no discussion of underselling at all.[49]

In the *Original Views* and *First Remand Results*, the Commission fulfilled the statutory requirements to "consider" whether the subject imports significantly undersold the domestic like product, and whether they otherwise depressed or suppressed prices to a significant degree.[50] In both determinations, the Commission's finding of significant adverse price effects did not rest on evidence of underselling. Instead, the Commission relied on evidence that subject imports resulted in significant price depression.[51] The Commission's finding is entirely consistent with the statute and the precedents discussed above.

On remand, the Commission should again find significant adverse price effects, given the facts cited above. The Commission should also clarify both that its consideration of evidence relevant to underselling does not amount to a finding of significant underselling and that record evidence regarding underselling does not undermine its finding of price depression.

As an initial matter, the statute specifically instructs the Commission to consider whether price depression (or price suppression) has occurred even if significant underselling has not.[52] Furthermore, the questionnaire pricing data that the Commission has considered in its original and first remand underselling analyses are fully consistent with the heavily price-based competition in which depression occurred: "the prices of the domestic product and subject

---

[49] *Id.*, 16 C.I.T. at 260, 790 F. Supp. at 298. *See also Companhia Paulista De Ferro-Ligas v. United States*, 20 C.I.T. 473, 478 (1996) (the "Commission *is not required to find significant price underselling* to reach an affirmative material injury determination.") (emphasis added) (citation omitted).

[50] *See Original Views* at 27-36 (Public Version); *First Remand Results* at 29-52 (Public Version).

[51] *Original Views* at 27-36 (Public Version); *First Remand Results* at 29-52 (Public Version).

[52] *See* 19 U.S.C. § 1677(7)(C)(ii)(II) (providing, after setting out the underselling factor, that the Commission shall consider whether "the effect of imports of such merchandise *otherwise* depresses prices to a significant degree . . .") (emphasis added).

11

imports tracked each other closely and were generally comparable with small margins of

underselling and overselling . . . ."[53]

In sum, the Commission should continue to find significant price depression while

clarifying that that finding is fully consistent with its consideration of facts relevant to

underselling.

### C. Subject Imports Depressed Prices, Notwithstanding Some Purchasers Having Identified Mosaic As A Price Leader

[

]54  On remand, the Commission should, as an initial

matter, clarify that its standard question about price leadership is one of many sources of

information it collects to assess price effects, and that subject imports may cause adverse price

effects regardless of whether purchasers have identified one or more domestic producers as a

price leader.[55]

Furthermore, the Commission should find that the record as a whole refutes the

Respondents' claim that subject imports did not depress U.S. prices because Mosaic is

supposedly the price leader.  In the first place, purchaser responses to the price leadership

question were mixed to a significant degree.  Although Mosaic was the most frequently cited

price leader, purchasers also identified several foreign producers, U.S. importers, and U.S.

purchasers as price leaders, including ADM and Koch (3 firms each); CHS, EuroChem, Gavilon,

---

[53] *First Remand Results* at 32 (Public Version).

[54] [                                    ]

[55] *See, e.g.*, *Melamine from Germany, Japan, Netherlands, Qatar, and Trinidad and Tobago*, Inv. Nos. Nos. 701-TA-706, 708-709 and 731-TA-1667, 1669-1670, 1672 (Final), USITC Pub. 5577 (Jan. 2025) at 46 n. 202 ("We disagree with respondents that Cornerstone's alleged status as a price leader prevented subject imports from causing adverse price effects."); *Steel Propane Cylinders from China and Thailand*, Inv. Nos. 701-TA-607 an 731-TA-1417 and 1419 (Final), USITC Pub. 4938 (Aug. 2019) at 31 ("We also find the fact that domestic producers were identified as price leaders does not detract from our conclusion that subject import competition suppressed U.S. prices, particularly because in that context domestic producers were reported to be attempting to increase prices.").

12

Growmark, Helm, and OCP (2 firms each); and Ben-Trei, and Oakley (1 firm each).[56]  Thus, purchaser responses are hardly unanimous in identifying Mosaic, or any U.S. producer, as a price leader.  This limits the probative value of price leadership responses even before once considers the more specific evidence regarding pricing behavior and trends during the POI.

The more specific evidence leaves no doubt that subject imports drove U.S. prices down to a significant degree.  The following examples underscore this conclusion:

- As the Commission observed in both the *Original Views* and the *First Remand Results*, U.S. purchasers themselves "reported on the adverse effects caused by subject imports, particularly during 2019."[57]  For example, "{i}n reporting that domestic producers had reduced prices in order to compete with low-priced subject imports from Morocco, U.S. purchaser [     ] explained that [

]58

- Furthermore, the record contains extensive contemporaneous documentation of subject imports' adverse price effects in specific instances.[59]

- Seven U.S. purchasers reported that domestic producers had reduced prices in order to compete with lower-priced imports from the subject countries.[60]

- Questionnaire data show that [
] was the lowest priced in the U.S. market [

]."61

- Numerous contemporaneous reports from trade publications specifically identified subject imports as having a downward effect on U.S. prices.[62]

The straightforward conclusion from these facts and the record as a whole is that subject imports had significant adverse effects on domestic prices, because they drove those prices significantly

---

[56] Staff Report at V-7 (Public Version).
[57] *First Remand Results* at 46-47 (Public Version).
[58] *First Remand Results* at 52 (Confidential Version) (citing Staff Report at Table V-11 (Confidential Version)).
[59] *See First Remand Results* at 52-53 (Confidential Version).
[60] *See First Remand Results* at 47 (Public Version).
[61] *First Remand Results* at 53 n. 234 (Confidential Version) (citing Mosaic Posthearing Brief, Responses to Commissioner Questions pp. 45-46, Exhibit 51).
[62] *See, e.g., First Remand Results* at 36-38, 42-44 (Public Version).

13

below what they would have been in the absence of unfair trade.  By contrast, the Respondents'

price leadership claim is nonsensical because it implies that Mosaic [                    ] –

*i.e.*, that the company deliberately choose to lead prices downward from 2018 to 2019, [



]⁶³  The Commission should strongly reject such a groundless claim.  Instead,

the Commission should make clear that the any evidence regarding price leadership does not

outweigh the strong evidence in favor of a finding of significant adverse price effects.

### D.    The Commission Should Reaffirm Its Significant Lost Sales Findings

[


]⁶⁴  [



]⁶⁵  On remand, the Commission should confirm that the record

continues to show significant lost sales for the reasons discussed below.

First, the lost sales reported by purchasers must be considered in light of purchasers'

general disincentive to report facts supporting a material injury determination.  As the Court of

International Trade has found, "purchasers have little incentive to confirm allegations."⁶⁶  Given

this context, it is highly significant that (i) of the 17 purchasers who reported purchasing subject

imports instead of the domestic like product, nine (a majority) reported that imports were priced

lower; (ii) of those nine, five purchasers ([                                   ]) reported

---

⁶³ *See* Staff Report at VI-4, Table VI-3 (Confidential Version).
⁶⁴ [                         ]
⁶⁵ [              ]
⁶⁶ *Acciai Speciali Terni, S.p.A. v. United States*, 19 C.I.T. 1051, 1056 (1995).

14

that price was a primary reason for purchasing subject imports;[67] and (iii) at least [    ] of the

purchasers reporting that imports were not priced lower [

][68]

Second, with respect to [            ], the purchaser reporting the largest volume of lost

sales, the record shows that, [

] Specifically, [

][69]  Moreover, [

] Thus, there is no question that this

purchaser reported lost sales, and given the purchaser's explanation, it is reasonable for the

Commission to treat the full quantity of those lost sales as more accurate than an alternative

---

[67] Staff Report at V-24, Table V-9 (Confidential Version).
[68] *Id*.  Specifically, [

] *Id.*
[69] *Id.* at V-23 (Confidential Version); Email from [
], February 5, 2021 (emphasis added).

15

PUBLIC VERSION

quantity that the purchaser did not report.

Third, assuming for the sake of argument that any revision to [          ] lost sales

quantity would be appropriate, [

] As noted above, [

]⁷⁰ [

]⁷¹ This adjusted

volume is [

] the 753,937 short tons increase in U.S. shipments

of subject imports from 2017 to 2019.⁷² In other words, the confirmed lost sales are significant

by any measure.

For all these reasons, the Commission should reaffirm its lost sales findings, as well as all

its other price effects findings.

## IV.     THE IMPACT OF SUBJECT IMPORTS IS SIGNIFICANT

In the *Original Views* and the *First Remand Results*, the Commission found that subject

imports had a significant adverse impact on the domestic industry and ultimately determined that

the domestic industry is materially injured "by reason of" subject imports.⁷³ [

---

⁷⁰ Email from [                                                                ],
February 5, 2021 (emphasis added).
⁷¹ *See* Staff Report at V-24, Table V-9 (Confidential Version) ([
] 
⁷² *See* Staff Report at C-3, Table C-1 (Public Version); *First Remand Results* at 61-62 (Public Version).
⁷³ *Original Views* at 36-44; *First Remand Results* at 52-66  (Public Version).

16

APPX0022280

$]^{74}$

However, in the event that Commission nonetheless considers impact-related issues on remand, the discussion below confirms that subject imports had a significant impact on the domestic industry and materially injured the domestic industry.

### A.    Subject Imports Had a Significant Adverse Impact on the Domestic Industry

As shown above, the volume of subject imports and the increase in that volume were significant during the POI, with subject imports gaining [      ] percentage points of market share from the domestic industry from 2017 to 2019.[75]  Additionally, subject imports continued to enter the U.S. market and remain at elevated levels in 2019, as demand declined from the second half of 2018 through 2019, causing an oversupply and significantly depressing U.S. prices.[76] The pricing pressure from subject imports forced the domestic industry to reduce prices, which in turn caused its revenues to be lower than they otherwise would have been.[77]  The domestic industry's sales revenue declined between 2018 and 2019 along with its profitability as its ratio of costs of goods sold (COGS) to net sales rose above [      ] percent.[78]  The domestic industry's sales revenues and profitability continued to be weak in interim 2020, and its COGS-to-net sales ratio remained above [      ] percent.[79]  However, the record also establishes that the domestic industry's sales and prices improved significantly after the Petitions were filed and subject

---

[74] [

]

[75] Staff Report at C-3 (Confidential Version).
[76] *See supra* Section III.
[77] *See supra* Section III.
[78] Staff Report at C-4 (Confidential Version).
[79] *Id.*

17

APPX0022281

imports largely withdrew from the market.[80]  These post-petition improvements further confirm the causal link between subject imports and the domestic industry's injury.[81]  In sum, subject imports had a significant adverse impact on the domestic industry, and the domestic industry is materially injured by reason of subject imports.

### B.   The Respondents' Inventory Reshipment Claim Fails To Undermine The Conclusion That The Domestic Industry Is Materially Injured "By Reason Of" Subject Imports

Subject imports' injurious effects are in no way undermined by the "inventory reshipment" issue previously raised by the Respondents [                                    ][82]  This issue originated with the Respondents' claim in the original investigation that subject imports did not oversupply the U.S. market in 2019 because they allegedly were needed to serve demand in regions that were not adversely affected by bad weather.[83]  The core problem with this claim is that, to the extent there were regions with demand that was unaffected by adverse weather, the facts disprove the notion that subject imports were merely serving demand that would otherwise have gone unmet.  This conclusion holds regardless of the extent to which U.S. producers moved fertilizer inventories after they had reached their originally intended destination.

First, the Respondents' inventory reshipment claim from the investigation and first remand proceeding is undermined by the sheer scale of subject imports' presence in the U.S. market during 2019 and the absence of credible evidence showing that this presence was commensurate with U.S. demand.

- Overall U.S. demand was lower in 2019 than in 2017 (when no adverse weather is claimed), yet U.S. shipments of subject imports were significantly greater in 2019.

---

[80] *See First Remand Results* at 50 (Public Version) (citing Staff Report at Tables IV-6, V-4-5); *id.* at 53 n.260 (Public Version); Staff Report at C-4 (Confidential Version).

[81] *See id.* at 50 (Public Version) (citing Staff Report at Tables IV-6, V-4-5); *id.* at 62.

[82] [                                    ]

[83] *See, e.g.*, OCP Posthearing Brief, Responses to Commissioner Questions at 29-30.

18

According to USDA Farm Survey Agency data, the total number of U.S. acres planted in 2019 was 3.6 percent lower compared to 2017,[84] and apparent U.S. consumption of phosphate fertilizers in 2019 was [ ] percent lower than in 2017.[85]

- Despite this drop in demand, subject import volumes in 2019 were 2.696 million short tons, significantly higher than the 1.97 million short tons in 2017.[86]  Subject import U.S. shipments were 2.536 million short tons in 2019 compared to 1.782 million short tons in 2017.[87]  Comparing 2019 to 2017, subject imports were 726,000 short tons, or 36.9 percent, higher, and subject import U.S. shipments were 753,938 short tons, or 42.3 percent, higher, even though demand was lower.[88]

- The elevated subject import volumes in 2019 compounded the supply effects of a [ ] import inventory overhang: subject import U.S. inventories at the beginning of 2019 (*i.e.,* at December 31, 2018) were [                    ], which is [         ], or [ ] percent, higher than the [                    ] in subject import inventory volume at the beginning of 2017.[89]  Thus, despite starting 2019 with subject import inventory levels exceeding those of 2017 by [                    ], subject import volumes in 2019 still exceeded those in 2017 by 726,000 short tons.

- The elevated subject imports were not merely a function of elevated imports in the early part of 2019.  According to Census data, subject imports from June through December of 2019 were 350,832 short tons, or 30.4 percent, greater than during the same period in 2017.[90]

The record contains no evidence – quantitative or otherwise – that comes close to explaining how the respondent's claim of "high demand" regions could have driven such outsized subject import activity amidst aggregate demand conditions that the Respondents themselves agree were weak.[91]

Second, the Respondents' claim regarding high demand regions is at odds with their repeated, emphatic claims that adverse weather is responsible for both lower U.S. demand and the domestic industry's poor performance in 2019.  It is not credible for the Respondents to argue that "Black Swan" levels of rainfall had profound, depressing effects on U.S. demand and

---

[84] Staff Report at II-11 n.23 (Public Version).  Demand (acres planted for corn/soy/wheat): 2017: 226.4m; 2018: 225.9m; 2019: 211.3m; 2020: 218.4m; 2021 (est): 227m.  *Id.*
[85] Staff Report at C-3 (Confidential Version).
[86] Staff Report at IV-3, Table IV-2 (Public Version).
[87] *Id.* at C-3, Table C-1 (Public Version).
[88] *Id.* at IV-3, Table IV-2, C-3, Table C-1 (Public Version).
[89] Staff Report at D-5 (Confidential Version).
[90] Staff Report at IV-13 – IV-14, Table IV-6 (Public Version).
[91] *Cf.* Hearing Tr. at 191-193 (Rahm).

19

APPX0022283

prices[92] while also claiming that, at the very same time, there was sufficient demand from some regions to warrant an overall increase in subject import shipments of 42.3 percent in 2019, as compared to 2017.[93]

Third, the record shows that the real reason for the elevated subject import volumes in 2019 is unfair trade by subject foreign producers, not the requirements of "high demand" regions. Subject imports continued to enter the market in 2019 despite weak demand because of

[

]94 – tons that the U.S.

Department of Commerce found were unfairly subsidized.[95] In other words, U.S. importers continued to bring more subsidized product into the U.S. market despite weak aggregate demand not because of pockets of "high demand" but because [

]

Fourth, the Respondents' domestic reshipment argument is further contradicted by numerous contemporaneous trade publication reports, issued throughout 2019, that observed oversupply conditions and attributed the tanking of the U.S. market to "a full pipeline and heavy imports," as well as adverse weather conditions.[96] It is not credible for the Respondents to maintain that subject imports were aligned with U.S. demand when subject imports' price-

---

[92] *See, e.g.*, Hearing Tr. at 191-193 (Rahm).
[93] Staff Report at C-3, Table C-1 (Public Version).
[94] *Original Views* at 43 n.161 (Confidential Version).
[95] Staff Report at I-4 – I-5 (Public Version).
[96] *Original Views* at 31-32 n.159 (Public Version).

20

APPX0022284

depressing affects are specifically highlighted in multiple third party reports [

] market participants use in price negotiations.[97]  These reports

repeatedly confirm that subject imports oversupplied the U.S. market, depressed U.S. prices, and

injured the domestic industry.

Fifth, the Respondents incorrectly presume a regional segmentation of the U.S. market,

such that imports into supposed "high demand" areas do not pressure prices where demand is

weak and additional supply would be excessive.  The record shows that this presumption is false.

In fact, the U.S. market is national in scope, and low-priced subject imports at NOLA harm

prices nationwide.

The record shows that "U.S. prices of phosphate fertilizers are highly transparent."[98]  The

Commission found that trade publications collect phosphate fertilizer prices, "including in the

NOLA region, and publish the collected range of prices on a daily or weekly basis.  This price

information is them quickly transmitted through the U.S. market."[99]  Indeed, as the Commission

noted, "*the 'f.o.b. NOLA price' is a universal price benchmark* denoting a loaded barge a

dock/fleeting point in New Orleans irrespective of where the product originated, *and is used as a*

*primary point of reference in price negotiations in the U.S. market*. . . . Domestic producers,

therefore, compete with subject imports upon the f.o.b. NOLA price in selling product . . ."[100]

---

[97] *See, e.g.*, *First Remand Results* at 21, 41-43, 47-49 (Confidential Version).
[98] *First Remand Results* at 18, 48 (Public Version).
[99] *Id.* at 18 (Public Version).  Numerous market participants reported using prices from trade publications when negotiating prices.  Staff Report at 21 (Confidential Version) ("Two of three U.S. producers ([
]), two of nine U.S. importers ([                ]), and 16 of 28 purchasers reported that they refer to and use prices published in trade publications when negotiating prices.").
[100] *Original Views* at 28 n.141 (Public Version) (emphasis added).

21

In 2019, these NOLA benchmark prices showed no sign of "high demand" areas with unmet demand. Instead, NOLA prices plummeted to historically low levels during 2019.[101] This fact plainly refutes the Respondents' claims regarding an alleged lack of domestic reshipments. As the Commission observed, a respondent witness "even testified that NOLA prices were lower than prices in Brazil due to a market imbalance, and that inventory build-up was due to excessive rainfall and was not worked down 'until the end of the strong fall 2020 application season.'"[102] If the Respondents' domestic reshipment argument were valid, NOLA prices – *i.e.*, prices for product that was not supposedly stranded by flooding in the Midwest and northern Plains – would be relatively high, signaling a need for additional supply. But the opposite occurred – NOLA prices were historically low and at a discount to Brazil (an alternative market for subject imports).[103] Nevertheless, despite this strong signal that the entire U.S. market was oversupplied, subject imports continued to enter at levels higher than in 2017, as noted above.

Moreover, the Respondents' domestic reshipment argument presumes that subject imports and the domestic like product experienced asymmetric demand conditions in 2019, with subject imports serving "high demand" areas that would otherwise have been underserved. In the first place, the evidence shows that this is not how supplies of phosphate fertilizer would react in a fair market. And even if that were the case, import and domestic product should have exhibited divergent price trends, with subject import sales experiencing relatively high prices in

---

[101] Petition, Vol. I at Exhibit I-47, p. 65 (Public Version) ("OCP also sent substantial volumes of both DAP and MAP to the United States, even during Q4 when prices were at 13-year lows."); [

]

[102] *First Remand Results* at 44 n.220 (Public Version) (citing Hearing Tr. at 192-193 (Rahm)).

[103] Hearing Tr. at 192-193 (Rahm); Petition, Vol. I at Exhibit I-47, p. 65 (Public Version) ("OCP also sent substantial volumes of both DAP and MAP to the United States, even during Q4 when prices were at 13-year lows."); [

]

22

2019.  After all, if they were simply filling a shortage, the subject imports should have been sold at a premium.  The record shows, however, that the opposite is true.

The prices of domestic producers and subject imports exhibited very similar trends during the POI, and subject imports were low-priced at precisely the time when, according to the Respondents, they were serving supposedly high demand regions.  According to the Commission's *Original Views*, the price data show that "underselling and overselling margins were small and ***prices of the domestic like product and subject imports tracked each other closely over the POI***."[104]  As the Commission stated, "{t}hat subject imports and the domestic like product were similarly priced is consistent with the high degree of substitutability between the domestic like product and subject imports*, **as well as the price transparency that existed in the U.S. phosphate fertilizer market***."[105]  This evidence further confirms that NOLA prices have a nationwide impact, and affect pricing well beyond the southern United States.

The record leaves no doubt that subject imports were priced aggressively.  As the Commission found, "{a}ll purchasers reported that prices of the domestic like product were comparable or inferior (*i.e.*, higher priced) to prices of subject imports from Morocco and Russia."[106]  Further, the Commission observed that "record evidence shows that subject imports were being offered at low prices during" 2019,[107] and it cited record evidence that "importers of subject merchandise in instances offered lower prices than domestic producers during 2019 in a declining market."[108]  The Commission's pricing product data also show the [          ] presence of subject imports in the NOLA region in 2019, when published prices [          ] downward.[109]

---

[104] *Original Views* at 28-29 (Public Version) (emphasis added).
[105] *Id.* at 29 (Public Version) (emphasis added).
[106] *Id*.
[107] *Id.* at 33.  *See also id.* at n.162, n.163.
[108] *Original Views* at 29-30 (Public Version).
[109] *See* Mosaic Posthearing Brief, Responses to Commissioner Questions at 33-34.

23

PUBLIC VERSION

In sum, prices for subject imports followed the same trend as prices for the domestic like product and were offered at low prices in 2019.  These facts directly refute the Respondents' theory that subject imports did not oversupply the U.S. market because their elevated volumes were merely serving regional, high-demand markets that developed during that period.

These findings and data underscore the importance of distinguishing subject imports' injurious effects from the conditions of competition.  That is, the low prices [

] of subject imports entering the U.S. market in 2019 affected the economic decisionmaking of U.S. importers and purchasers, including their actions with respect to domestic reshipment.  To the extent that these factors disincentivized domestic reshipment during the POI, that is evidence of subject imports' adverse effects, not a condition of competition.  As Simplot reported in its remand questionnaire,

[

][110]

Low-priced subject imports were surely attractive to U.S. importers and traders in 2019, but that fact is simply evidence that imports were distorting market conditions and causing material injury, not an indication that the U.S. market needed additional supply.

In sum, the record contradicts the Respondents' argument that, in 2019, increased subject import U.S. shipments and subject import volumes at elevated levels were somehow benign responses to weather-related supply misallocations.  Rather, the elevated supply of low-priced

---

[110] Simplot U.S. Producers' Questionnaire Response (First Remand) at 2(c).

PUBLIC VERSION

subject imports, into a market with weakened demand, had the predictable effects of further depressing U.S. prices and injuring the domestic industry.

## V.    CONCLUSION

For the reasons set forth above, we respectfully request that the Commission issue a remand determination affirming that the domestic phosphate fertilizers industry is materially injured by reason of subject imports.

Respectfully submitted,

*/s/ Stephen P. Vaughn*
Stephen P. Vaughn
Patrick J. McLain
**KING & SPALDING LLP**
1700 Pennsylvania Ave., N.W.
Washington, DC 20006
(202) 737-0500

*Counsel for The J. R. Simplot Company*

APPX0022289

# List 1, Doc. No. 309R – EDIS No. 855566
# Written Comments
# (OCP S.A.)

APPX0022290

**COVINGTON**

BEIJING  BOSTON  BRUSSELS  DUBAI  FRANKFURT
JOHANNESBURG  LONDON  LOS ANGELES  NEW YORK
PALO ALTO  SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 6000

June 30, 2025

***VIA ELECTRONIC FILING***

The Honorable Lisa R. Barton
Secretary
U.S. International Trade Commission
500 E Street, S.W.
Washington, D.C. 20436

Inv. Nos. 701-TA-650-651 (Second Remand)

Total Pages: 31

**<u>PUBLIC VERSION</u>**

Business Proprietary Information deleted in
Brief Pages i, 1-25

***Re:***  ***Phosphate Fertilizers from Morocco and Russia, Inv. Nos. 701-TA-650-651 (Second Remand): Written Comments of OCP S.A.***

Dear Secretary Barton:

On behalf of OCP S.A., we hereby submit the enclosed public version of OCP's Written

Comments in the above-captioned proceeding. The public version deleted the business

proprietary information contained in the confidential version. In addition, we have deleted any

information citing to *OCP S.A. v. United States*, Consol. Court No. 21-00219, Slip Op. 25-51

(Ct. Int'l Trade, April 22, 2025), which remains under seal at the time of this submission.

Disclosure of that information, which is not otherwise publicly available, would cause substantial

harm to the competitive position of the parties submitting such information.  It has not been

APPX0022291

**COVINGTON**
Page 2

possible to prepare meaningful public summaries of the redacted materials.  See §19 U.S.C.

1677f(b)(l)(A)(i).

Please contact the undersigned if there are any questions concerning this submission.

Respectfully submitted,

/s/ Shara L. Aranoff
Shara L. Aranoff
James M. Smith
Sooan (Vivian) Choi
John Catalfamo
Julia Shults

**COVINGTON & BURLING LLP**

*Counsel to OCP S.A.*

# COUNSEL CERTIFICATION

## U.S. International Trade Commission

## Phosphate Fertilizers from Morocco and Russia

## Inv. Nos. 701-TA-650-651 (Second Remand)

I, Shara L. Aranoff, of Covington & Burling LLP, counsel to OCP S.A., hereby certify, pursuant to 19 C.F.R. § 201.6(b)(3)(iii), that to the best of my knowledge and belief, any information for which proprietary treatment has been requested in this submission is not available to the general public.

Further, in accordance with 19 C.F.R. § 207.3(a), I hereby certify that (1) I have read the attached submission, and (2) to the best of my knowledge, the information contained in this document is accurate and complete.

_Shara L. Aranoff_

_____
Shara L. Aranoff
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001

Date: June 27, 2025

APPX0022293

<u>PUBLIC CERTIFICATE OF SERVICE</u>

**Phosphate Fertilizers from Morocco and Russia**

**Inv. Nos. 701-TA-650-651 (Second Remand)**

I, Marissa Golub, certify that on June 30, 2025, a copy of the attached public document has been served via electronic mail on the following:

<u>**On behalf of The Mosaic Company:**</u>

Stephanie Hartmann
**Wilmer Hale LLP**
1875 Pennsylvania Avenue, NW
Washington, DC 20006
stephanie.hartmann@wilmerhale.com

<u>**On behalf of International Raw Materials Ltd.:**</u>

Melissa M. Brewer
**Kelley Drye & Warren LLP**
3050 K Street, NW
Suite 400
Washington, DC 20007
mbrewer@kelleydrye.com
tradenotifications@kelleydrye.com

<u>**On behalf of Koch Fertilizer, LLC:**</u>

Kenneth G. Weigel
**Alston & Bird LLP**
950 F Street, NW
Washington, DC 20004
ken.weigel@alston.com

<u>**On behalf of EuroChem North America Corp.:**</u>

Peter Koenig
**Squire Patton Boggs**
2550 M Street, NW
Washington, DC 20037
peter.koenig@squirepb.com

<u>**On behalf of PhosAgro PJSC:**</u>

H. Deen Kaplan
**Hogan Lovells US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
Deen.kaplan@hoganlovells.com

<u>**On behalf of J. R. Simplot Company:**</u>

Patrick McLain
**King & Spalding LLP**
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006-4706
pmclain@kslaw.com
tradeservice@kslaw.com

<u>**On behalf of the Ministry of Economic Development of the Russian Federation:**</u>

Elena G. Nosyreva
**Ministry of the Economic Development of the Russian Federation**
Presnenskaya Naberzhnaya, 10/2
Moscow, Russia, 125039
NosyrevaEG@economy.gov.ru

*/s/ Marissa Golub*
Marissa Golub

APPX0022294

PUBLIC VERSION

Inv. Nos. 701-TA-650-651 (Second Remand)

**<u>PUBLIC VERSION</u>**

Business Proprietary Information deleted
in Brief Pages i, 1-25

BEFORE THE

UNITED STATES INTERNATIONAL TRADE COMMISSION

IN THE MATTER OF

PHOSPHATE FERTILIZERS FROM MOROCCO AND RUSSIA

WRITTEN COMMENTS OF OCP S.A.

Shara L. Aranoff
James M. Smith
Sooan (Vivian) Choi
John J. Catalfamo
Julia H. Shults

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956

*Counsel to OCP S.A.*

June 27, 2025

APPX0022295

PUBLIC VERSION

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    THE RECORD REFLECTS NO OVERSUPPLY BASED ON
      INVENTORIES ................................................................................................... 1

      A.    Substantial Evidence Does Not Exist To Support a Finding that Phosphate
           Fertilizer Inventories Can Be Reshipped to Other Regions .................................. 2

      B.    Absent Evidence that Domestic Producers Could Reship Commercially
           Meaningful Inventory Volumes to Regions Needing Resupply, the Record
           Cannot Support a Conclusion that the U.S. Market in 2019 Was
           Oversupplied Based on Subject Imports Held in Inventories ................................ 4

III.   THE RECORD DOES NOT SUPPORT A FINDING OF MATERIAL
      INJURY BY REASON OF THE VOLUME OF SUBJECT IMPORTS ..................... 7

      A.    Subject Imports Destined for Canada Had No Impact on the U.S. Market ............ 7

      B.    Subject Import Volumes Sold to U.S. Purchasers That the Domestic
           Industry Refused to Supply Were Not Injurious .................................................. 9

           1.    The domestic industry refused to sell to certain purchasers ....................... 9

           2.    The domestic industry also told inquiring customers that it lacked
                the capacity to supply them, despite reporting to the Commission
                that it had [      ] production capacity throughout the POI ................... 11

      C.    Subject Import Volumes Did Not Oversupply the U.S. Market............................ 12

IV.   THERE WAS NO PRICE-BASED INJURY TO THE DOMESTIC
      INDUSTRY BY REASON OF SUBJECT IMPORTS ............................................ 15

      A.    Because Subject Imports Did *Not* Oversupply the Market, the Record
           Lacks Support For Finding That an "Oversupply" Caused Price
           Depression in 2019 ........................................................................................... 15

      B.    Additional Record Evidence Demonstrates That Subject Import Prices Did
           Not Cause Price Depression or Other Adverse Price Effects.............................. 15

           1.    The Commission lacks substantial evidence to find that "low
                prices" of subject imports caused price depression in 2019, when
                subject imports predominantly oversold domestic product over the
                POI ............................................................................................................ 16

           2.    Because U.S. producers were price-setters, the Commission lacks
                substantial evidence to find that subject imports depressed prices ........... 18

           3.    The record lacks reliable evidence of any meaningful volume of
                "lost sales" caused by subject import prices ............................................ 21

V.    CONCLUSION ................................................................................................. 25

i

APPX0022296

PUBLIC VERSION

## I.    INTRODUCTION

The Court's first remand focused on what it viewed as a dispositive error: the Commission's finding that subject imports injured the domestic industry by creating "oversupply conditions."[1] After reopening the record to collect new evidence showing no such effects, the Commission doubled down on this flawed theory, prompting a second remand.[2] This remand is much broader than the first. To comply with [

], [3] the Commission will need to move beyond its flawed and rejected reliance on "oversupply." Once the agency reassesses the full record, OCP S.A. ("OCP") respectfully submits that the only result supported by this record is a negative determination.

This case is not and never has been about oversupply. With both domestic and imported fertilizers sidelined by recurring bad weather and held in inventories that could not be relocated, unaffected regions followed a normal cycle of twice-yearly fertilizer application and inventory replenishment. Absent evidence that unneeded inventories could be relocated to normal-demand regions, there was no oversupply, and in the absence of "oversupply conditions" the record does not support a finding of price depression or other adverse price effects. What remains to explain any injury to the domestic industry is—and always has been—the historically bad weather.

## II.    THE RECORD REFLECTS NO OVERSUPPLY BASED ON INVENTORIES

Without the ability to reship inventories already delivered to their original intended destination, neither domestic producers nor importers were "well positioned to supply the U.S.

---

[1] *See OCP S.A. v. United States*, 658 F. Supp. 3d 1297, 1317-19 (Ct. Int'l Trade 2023) ("*OCP I*").

[2] The public version of the Commission's first Remand Views ("Remand Views") is contained in *Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701 TA 650-651 (Final)(Remand) USITC Pub. 5490 (Jan. 2024). Unless noted otherwise, all citations to the Remand Views and Staff Report ("SR") herein are to the confidential versions.

[3] *See generally* [

].

1

**PUBLIC VERSION**

market" with those inventories.[4] Because such inventories held in low-demand regions were effectively out of the market during three consecutive rainy application seasons, their mere existence does not support the Commission's finding that the market was oversupplied in 2019— or its ultimate material injury determination.

### A.  Substantial Evidence Does Not Exist To Support a Finding that Phosphate Fertilizer Inventories Can Be Reshipped to Other Regions

[                    ] Commission's oversupply finding on remand was unsupported by substantial evidence, because it [

].  [            ].  [

].  *Id.*

The Commission conceded that importers' "distribution networks were unidirectional," such that "once delivered to an inventory or customer location, product was not subsequently relocated but rather remained at that location." Remand Views at 25. The Commission attempted to contrast that finding with the domestic industry's reported "expansive multi-modal distribution network{s}." Remand Views at 20, 28. However, the Court had previously ruled that this evidence does not establish the domestic industry's ability to reship inventories because general information about distribution networks is "distinct from reshipment of phosphate fertilizer that has already reached its intended destination."[5] Much of the evidence on the record is *general* information about distribution networks that [                    ] whether such networks are

---

[4] *See* Remand Views at 7-8; [            ].
[5] *See* *OCP I* at 1317; [            ].

2

**PUBLIC VERSION**

multidirectional and used for reshipment. [               ]. For example, [

               ], which the company claimed demonstrates [

               ], is beside the point. [          ] US Prod. QR at 2(c). [

                                                                              ],

and thus reflect [                              ] of no relevance to reshipment. [          ] US Prod.

QR at 2(c); [               ]. [

               ]. [               ].

          [                              ], even the most generous comparison of domestic producers'

allegedly reshipped inventories to their overall shipment volumes reveals that the purportedly

reshipped inventories were commercially insignificant. OCP ITC First Remand Comments at 12;

[               ]. [

                                                                              ]

because [

               ]. [               ].

          Because record evidence establishes minimal—if any—possibility of reshipment,

domestic producers were [

               ]. [          ]. To conclude that domestic producers could

have relocated delivered inventories to other regions, the Commission would need to collect

additional evidence [

               ]. [               ]. Having declined to reopen the record,

3

PUBLIC VERSION

the Commission has no basis to claim substantial record evidence supports a finding that any

meaningful reshipment of inventories occurs, or could occur, in the U.S. fertilizer market.

> **B.      Absent Evidence that Domestic Producers Could Reship Commercially Meaningful Inventory Volumes to Regions Needing Resupply, the Record Cannot Support a Conclusion that the U.S. Market in 2019 Was Oversupplied Based on Subject Imports Held in Inventories**

The Commission on remand claimed its domestic reshipment finding was "not central" to

its injury analysis in this case. Remand Views at 7-8. However, as [                    ] the

Commission has acknowledged, it is this very finding that led the Commission to conclude that

the U.S domestic producers were "well-positioned to supply the U.S. market," had they not been

prevented from doing so by subject imports.[6] Because the record demonstrates that neither

domestic industry nor subject importer inventories can be reshipped in commercially meaningful

quantities after reaching their intended destination, the Commission cannot sustain a finding that

subject imports held in inventories created oversupply conditions.[7]

Rather than supporting a finding of oversupply, record evidence on inventories paints a

clear picture of under-demand in certain regions due to back-to-back-to-back seasons of

unanticipated adverse weather—the factual basis for which the Commission itself has

recognized. First, the Commission has stated that distributors "rely on demand projections in

---

[6] Remand Views at 7-8 (explaining that the domestic producers' "demonstrated ability to move and relocate product where it was needed shows that domestic producers were well-positioned to supply the U.S. market in 2019"); *see also* [                ]. The Commission further explained that its conclusion that imports increased beyond what was needed for depleted inventories "in light of the substantial inventories, expansive network of inventories, and extensive multi-modal distribution capabilities of the domestic industry." Remand Views at 45. In reality, it was exactly because previously delivered inventories *cannot* be reshipped that depleted inventories needed to be restocked in normal-demand regions. *See* Part III.C.

[7] Remand Views at 25 (conceding that importer inventories are "unidirectional" and "once delivered to an inventory or customer location, product was not subsequently relocated but rather remained at that location); OCP First Remand Comments at 12; [                ].

**PUBLIC VERSION**

obtaining product" because it takes time to obtain and move fertilizer into place during the offseason. Remand Views at 8-9. Second, the Commission has explained that fertilizer is primarily sold from inventories. *Id.* at 21. Notably, due to farmers' need for "just-in-time" supply,[8] distributors prefer to overestimate demand rather than risk committing the "mortal sin" of running out mid-season. Tr. at 291 (Mr. O'Neill). Finally, the Commission has noted that both domestic and imported fertilizers remain in storage until needed[9]—including when end-user demand is lower than predicted—and may be topped up based on projections for the next season.

In combination, these commercial realities mean that three consecutive seasons of adverse weather left fertilizer unused in warehouses in some regions, while other regions experienced normal application seasons that depleted local inventories.[10] For example, as demonstrated in 2019 USDA data, farmers in the upper Midwest planted significantly less than in the previous year, but that trend was not nationwide: when compared with 2018, the percentage of soybean acreage planted by June 2, 2019 was down significantly in Illinois (21% of the 2018 level), Indiana (17%), Kansas (26%), and South Dakota (14%), but higher in Louisiana (91% of the 2018 level) and Mississippi (80%). OCP Prhr'g Br., Ex. 78 at 2. Likewise, compared to 2018, the percentage of corn acreage planted by June 2, 2019 was significantly

---

[8] Tr. at 202 (Mr. O'Neill), 184 (Mr. Ameziane), 204 (Mr. Coppess, Heartland); SR at II-15.

[9] *See* Remand Views at 8-9, 44 ("{S}upplementary questionnaire information obtained during these remand proceedings suggests that the vast majority of subject imports, once delivered,. . . remain in regional inventories until used in a subsequent application period."); *see e.g.*, [      ] Imp. QR at 2(a) ([


]).

[10] *See* Remand Views (noting that "product was necessary to serve demand in U.S. regions unaffected by the poor weather conditions"); OCP Posthr'g Q&A at 29 (demand persisted in areas unaffected, or less affected, by adverse weather); Koch Prehr'g Br. at Ex. 6 ([            ] Decl.) (citing [                    ]).

5

lower in Illinois (45% of the 2018 level), Indiana (31%), and Ohio (33%), but higher in Tennessee (95% of the 2018 level), Texas (96%), and Colorado (78%). *Id.* at 1. Thus, new seasonal supply was needed to refill inventories in areas not affected by record-breaking precipitation. Because inventories could not be re-shipped once they reached their originally intended destination, previously ordered inventories were stranded until demand recovered in the regions where adverse weather occurred. These inventories were therefore effectively out of the market and did not have any adverse impact on the ability of the domestic industry to sell—or the prices at which they sold—fertilizer in other regions.

Record evidence confirms the lack of any adverse impact from import inventories. For example, while both domestic industry and subject importer inventories [          ] March 2019, based on an expectation of increased demand for Spring 2019,[11] these inventories [

          ] once weather-related demand disruptions were resolved,

[                    ] after the spring planting season in 2020. *See* Part III.C; OCP Prehr'g Br. at Att. A-6. This [          ] following improved weather illustrates what other evidence on the record confirms—certain inventories were marooned in storage due to recurring weather-related under-demand, then sold only when the weather improved.[12]

The record in this case does not support a finding that the availability of subject import inventories made purchasers reluctant to buy the domestic product or that importers offered low prices to sell inventories off quickly. In particular, the ratio between U.S. producer inventories and subject importer inventories [                    ] throughout the POI; there was [

---

[11] *See, e.g.*, OCP Prehr'g Br. at Ex. 11, p. 24 ("Mosaic Co. Analyst Call") (Mosaic predicting that "lost fall demand" from 2018 would be "recovered in . . . spring" 2019); *see also* Part III.C.

[12] *See supra* note 7.

PUBLIC VERSION

].[13] These [        ] inventory ratios across the POI—combined with the [                    ] when weather conditions improved—demonstrate that inventories from both the domestic industry and subject importers were stranded in weather-effected areas, unable to serve other regions. SR at D-3, D-4 (Table D-1). Because these stranded inventories were not on the market, they did not and could not deter purchasers located elsewhere from buying domestic product. Nor, as explained in Part IV, is there evidence of importers offering below-market prices to sell off inventories in regions with low demand.

In sum, record evidence demonstrates that inventories in low-demand areas were held in place until weather conditions improved. Because inventories in those regions were unable to be reshipped, and therefore unable to serve the general U.S. market, subject import inventories cannot be tied to any alleged adverse volume or price-based injury to the domestic industry.[14]

## III.   THE RECORD DOES NOT SUPPORT A FINDING OF MATERIAL INJURY BY REASON OF THE VOLUME OF SUBJECT IMPORTS

As demonstrated in Part II.B, the record is devoid of evidence that subject import inventories created oversupply conditions. More broadly, the record lacks substantial evidence that the U.S. market was injuriously oversupplied. Thus, regardless of whether the Commission considers the volume of subject imports to be significant, the record does not support a finding that the domestic industry was materially injured by reason of the volume of subject imports.

### A.   Subject Imports Destined for Canada Had No Impact on the U.S. Market

In its original and first remand determinations, the Commission relied on import entry

---

[13] The [        ] relationship (or ratio) between subject import and domestic inventory levels is obvious from Table D-1 in the Staff Report, which shows that [                    ]. If imports oversupplied the U.S. market by simply sitting in inventories and thereby "overhanging" the market, then [                                        ].

[14] [

                                                                                ].

APPX0022303

**PUBLIC VERSION**

data that included fertilizer bound for Canada, improperly inflating subject imports volumes.
Despite repeated warnings that some consumption entries of fertilizer at NOLA are destined for
through-shipment to Canada,[15] the Commission failed to exclude such transshipments from its
subject import volume data. Remand Views at 27. [

] [                    ].

All data on subject imports must be adjusted to exclude imports into the United States
that were never consumed in the U.S. market, but rather were entered duty-free, barged up the
Mississippi River, and re-exported into Canada for consumption. By way of example, re-exports
of subject imports saw a [                    ] in 2019 over prior years. OCP Posthr'g Br., Q&A
at 20. Indeed, this [          ] occurred in the context of overall U.S. MAP exports to Canada
nearly doubling from 820,000 tons in 2016/17 to 1.56 million tons in 2019/20. OCP Posthr'g Br.,
Att. C at 7 (Rahm Declaration). These increased exports to Canada in 2019 are unsurprising,
given the closure of Nutrien's facility in Redwater, Alberta that had previously served much of
Western Canada. OCP Posthr'g Br., Q&A at 25. These imports could not and did not affect the
volume or pricing for sales in the U.S. market and therefore cannot be included in the
Commission's consideration of whether the domestic industry was materially injured by reason
of the volume of subject imports. [

].

---

[15] From the start, Respondents have repeatedly emphasized that questionnaire responses included
re-exports to Canada. *See, e.g.*, OCP Conf. Testimony at 4; PhosAgro Prehr'g Br. at 14; OCP
Posthr'g Br., Q&A at 19.

8

PUBLIC VERSION

**B.      Subject Import Volumes Sold to U.S. Purchasers That the Domestic Industry Refused to Supply Were Not Injurious**

The record demonstrates that the domestic industry (1) refused to sell to multiple large purchasers based on strategic business decisions; and (2) declined opportunities to supply other purchasers based on self-professed inability to fulfill the requested quantities. Decisions by the domestic industry to affirmatively decline sales later filled by subject imports cannot serve as the basis for finding material injury by reason of subject imports. [                          ], the domestic industry [

] such that a [

] [              ].

**1.      The domestic industry refused to sell to certain purchasers**

Domestic producers expressly stated that they would not sell to large distributors that might compete for sales to downstream customers. Indeed, all parties agree that the domestic industry adopted a selective distribution model foreclosing sales to certain purchasers.

Mosaic said it has "rational business reasons" for why it "prioritize{s} loyal customers over trading companies." Mosaic Final Comments at 6. Specifically, "{i}t is not in the domestic industry's interest to sell to trading companies" that might "resell those volumes to domestic producers' own customers." Mosaic Posthr'g Br., Q&A at 87. Mosaic admitted that "claims of inadequate domestic supply revolve around complaints from the broker/traders–such as Koch and ADM–that compete with the domestic industry for sales." Mosaic Final Comments at 6.

Simplot's counsel likewise explained that Simplot avoids selling to distributors to ensure it does not "cannibaliz{e} their own business," including avoiding sales to retail locations. Tr. at 98 (Ms. Byers). Simplot elaborated that "selling product to a trading company – a company that competes directly with Simplot – whenever requested would ultimately undermine Simplot's

9

**PUBLIC VERSION**

business model." Simplot Posthr'g Br., Q&A at 10. Indeed, Richard Sunderland, Vice President

of Supply Chain and Procurement at Simplot, stated explicitly that Simplot would refuse to sell if

"asked to supply a purchaser with whom we may compete with in our established supply

chains." Simplot Posthr'g Br., Ex. 5 at 2.

Multiple purchasers of phosphate fertilizer reported to the Commission that Mosaic

refused to supply them. Scott McGinn, the Executive Vice President of Koch Fertilizer, noted

that Koch "frequently asked Mosaic if it would sell us barges of phosphate fertilizers at market

price," but that "Mosaic has generally declined our inquiries." Tr. at 196 (Mr. McGinn). This

assertion is further supported by [                                    ], which [

]. [                                    ] (reporting that

[        ] purchases from [                ] amounted to only [        ] ST from 2017 to 2019, out

of [            ] ST in overall purchases).

Similarly, ADM introduced into the record inquiries to Mosaic that were met with flat

refusals. ADM Posthr'g Br., Ex. 1. At the Hearing, Jake Niederer, the Director of Sales and

Marketing for ADM Fertilizer, explained that Mosaic "refuses to sell to" ADM. Tr. at 208 (Mr.

Niederer). Mr. Niederer described how Mosaic repeatedly stated that it did "not have sufficient

supply and that, instead, we need to obtain product from the import markets," and "that their spot

tons are sold out and that they do not have anything to sell or that ADM is not in Mosaic's supply

plan." Tr. at 208-209 (Mr. Niederer). Furthermore, ADM introduced evidence demonstrating that

[

]. ADM Posthr'g Br., at 1. Purchases from

[

10

PUBLIC VERSION

]. ADM Posthr'g Br., at 5. As with Koch, [

]. [                                    ]. Over the entire POI, ADM [

].

[

] [                ]. Record evidence demonstrates that Mosaic

did just that: for business reasons, it repeatedly refused sales to large U.S. distributors, forcing

those purchasers to turn to imports for nearly all volumes, then filed the petition.

**2.      The domestic industry also told inquiring customers that it lacked the capacity to supply them, despite reporting to the Commission that it had [      ] production capacity throughout the POI**

In addition to declining sales opportunities based on customer type, the domestic industry

also declined sales based on lack of capacity. No fewer than 16 of 28 purchasers—[

]—reported experiencing supply constraints during the POI,

with several purchasers specifically highlighting that Mosaic and other domestic producers

refused, declined, or were otherwise unable to supply requested fertilizer volumes. SR at II-8, II-

9. For example, Heartland's CEO noted that in May 2020, "Mosaic refused to offer {Heartland}

product or even allow us to prepay pricing as we sought to procure our summer fill for the fall's

needs, telling us that they were 'out of the market at the present time,'" and that although

Heartland would prefer to purchase from Mosaic, Mosaic "simply has not been a reliable source

of phosphate fertilizer." Tr. at 205-206 (Mr. Coppess). This record evidence suggests that an

additional portion of subject imports—separate from purchases by firms with which the domestic

industry refused to deal—were necessary to meet the needs of other purchasers that the domestic

industry admitted it lacked the capacity to supply.

11

PUBLIC VERSION

### C. Subject Import Volumes Did Not Oversupply the U.S. Market.

In finding that an oversupply of subject imports materially injured the domestic industry, the Commission emphasized the increase in subject imports across the three full years of the POI. Relying on Table IV-2 of the Staff Report, the Commission found that subject imports increased from 1,971,222 ST in 2017 to 2,696,266 ST in 2019, for an increase of 725,044 ST.[16] SR at Table IV-2; Remand Views at 27. However, as explained above, [



                    ] when assessing whether the volume of subject imports caused injury. [                    ]. With those volumes excluded, the remaining subject imports did not oversupply the market in 2019 or materially injure the domestic industry.

OCP entered into the record of the original investigation evidence of [          ] re-exports of subject imports. In 2017, there were [        ] ST of re-exports of subject imports, which [        ] to [        ] ST in 2019. OCP Posthr'g Br., Q&A at 20. [



   ]. [            ]. With that adjustment, the absolute increase in cumulated subject imports from 2017 to 2019 is [        ] ST.

**Table 1: Change in Subject Imports [                                    ], 2017-2019**

|  | 2017 | 2019 | Change Over POI |
|---|---|---|---|
| **Staff Report Subject Imports (SR, Table IV-2)** | 1,971,222 ST | 2,696,266 ST | 725,044 ST |
| *Re-Exports to Canada* | [        ] ST | [        ] ST |  |
| **Adjusted Subject Imports** | [        ] ST | [        ] ST | [        ] ST |

---

[16] PY2020 cumulated subject imports were significantly lower than in PY2019, falling from 2.0 million ST to 1.2 million ST.  Remand Views, at 27.

12

**PUBLIC VERSION**

The volume of allegedly injurious subject imports must be further adjusted to reflect sales that the domestic industry admits it affirmatively declined for strategic business reasons. As noted, Koch and ADM were able to purchase [                              ] from the domestic industry and therefore had to rely on imports. [                              ], any subject imports reported by Koch and ADM cannot be regarded as injurious volumes, as a [

                                                                    ]

[              ]. In 2019, Koch purchased [          ] ST in subject imports, while ADM obtained [         ] ST—for a combined total of [          ] ST in subject imports. [

   ]; [                              ]. By itself, the volume reported by these two firms [

        ] the [         ] ST increase in adjusted subject imports from 2017 to 2019.

        [                                      ], it is clear that the volume of subject imports did not cause the U.S. market to be oversupplied in 2019 or otherwise materially injure the domestic industry. The Commission found that the closure of Mosaic's Plant City facility led to a reduction in domestic supply of at least 700,000 ST—an estimate that is low even before taking into account the additional supply constraints stemming from Nutrien's closure of Redwater.[17] *See* Remand Views at 15; OCP Posthr'g Br., at 2-3. Accounting for both re-exports to Canada and the [                    ] of subject imports in 2019 that went to firms to which the domestic industry refused to sell, subject imports increased from 2017 to 2019 by [                ] than the reductions in domestic supply—even as calculated by the Commission.

        Moreover, this analysis does not account for the multiple other non-injurious reasons that explain subject import volumes. For example, the domestic industry refused to supply various

---

[17] While applying here the 700,000 ST reduction in domestic capacity identified by the Commission, OCP maintains that the supply reduction from the closures of Plant City and Redwater exceeded 1 million ST (as Mosaic's CEO admitted). *See* OCP Posthr'g Br., at 2-4.

13

PUBLIC VERSION

other U.S. purchasers based on capacity constraints, leaving them with no choice but to turn to imports. *See* Part III.B.2. Subject import entries also include volumes purchased on the basis of demand projections but then stranded in inventory in low-demand regions affected by adverse weather from Fall 2018 through Fall 2019. Those inventories had no impact on the domestic industry's sales volumes or prices in normal-demand regions. *See* Part II.B.

In addition, subject imports adjusted to the Black Swan weather events from Fall 2018 to Fall 2019 and significant demand shifts in certain regions with a [          ] larger response than the domestic industry. From 2018 to 2019, the domestic industry's production fell [     ], while subject import entries—a direct analogue to domestic production—declined 9.5%. SR at Table IV-2; Table C-1. Subject imports adjusted even faster "once the spring 2019 flooding was understood" in H2 2019, declining by 22% from H1 2019 and by 9.7% from H2 2018. SR at Table IV-2, Table C-1; OCP Posthr'g Br., Q&A at 31-32. In Q1 2020, subject import entries declined by 47.8% from Q1 2019, compared to [              ] for domestic production. SR at Table IV-2. In H1 2020, U.S. producers' inventories [          ] from year-end 2019, while subject import inventories [          ], by [     ]. SR at Table D-1. The data thus show subject imports reacting in a responsible fashion to acute under-demand brought on by multiple unforeseeable seasons of bad weather, which is the true proximate cause of any injury to the domestic industry.

Over the full POI, the lack of any injurious oversupply of subject imports is documented in the analyses of Mr. Dougan and Mr. Rahm, which rely on distinct data sets and time periods. *See* OCP Posthr'g Br., Q&A at 21-26; Att. C (Rahm Declaration). Moreover, if subject import volumes had oversupplied the market, the Commission could expect to see significant lost sales. However, as explained in Part IV.B.3, the record shows minimal lost sales over the POI.

14

PUBLIC VERSION

In sum, once re-exports to Canada, the reductions in U.S. supply, the domestic industry's refusals to sell, the volumes locked away in inventory in 2019, the rapid adjustment of subject imports to under-demand caused by adverse weather, and the lack of meaningful documented lost sales are taken into account, the record does not support a finding of volume-based injury.

## IV.   THERE WAS NO PRICE-BASED INJURY TO THE DOMESTIC INDUSTRY BY REASON OF SUBJECT IMPORTS

### A.   Because Subject Imports Did *Not* Oversupply the Market, the Record Lacks Support For Finding That an "Oversupply" Caused Price Depression in 2019

In the initial remand, the Commission found that the "oversupply of subject imports and their low prices exerted downward pricing pressure on the domestic like product and significantly depressed U.S. prices in 2019." Remand Views at 44. But as explained in Parts II & III, the record shows no "oversupply" of subject imports during this period—[

]. [                    ]. Therefore, in this second remand, the Commission's price effects analysis must reflect some theory other than subject import oversupply. As discussed below, however, the record also demonstrates that subject imports were not "low priced" so as to cause any significant adverse price effects on the domestic industry.

### B.   Additional Record Evidence Demonstrates That Subject Import Prices Did Not Cause Price Depression or Other Adverse Price Effects

Beyond [

], [

]. Specifically, [

15

APPX0022311

PUBLIC VERSION

]. [                    ]. As explained below, these facts

cannot be reconciled with findings that low-priced subject imports caused the domestic industry

to lose sales or depressed U.S. prices. Thus, substantial evidence does not support any finding

that subject imports caused price depression or other adverse price effects.

1.    **The Commission lacks substantial evidence to find that "low prices" of subject imports caused price depression in 2019, when subject imports predominantly oversold domestic product over the POI**

In its first remand, the Commission again found that "low prices" of subject imports

"exerted downward pricing pressure on the domestic like product and significantly depressed

U.S. prices in 2019." Remand Views at 44. To reach this finding, the Commission disregarded

the "prevalence of overselling" in the pricing data on the grounds that subject imports were "in

some instances lower priced." *Id.* at 37. [



]. [                    ].

The record demonstrates that there was no significant underselling by subject imports,

which undermines the Commission's conclusion that subject imports' low prices caused price

depression. Subject imports were priced higher than domestic product in approximately 80% of

instances and 84% of volume. Remand Views at 35. Yet the Commission found this overselling

evidence to be less probative because "prices of the domestic product and subject imports

tracked each other closely and were generally comparable with small margins of underselling

and overselling." *Id.* at 37. The average underselling margin was a miniscule 1.7%, but the

average overselling margin was more than double that level, at 3.7%—in other words, the

domestic industry priced its products 3.7% lower on average than subject imports 80% of the

time. *Id.* at 35. The Commission never explained how it can dismiss pervasive overselling based

on small margins but conclude that *far fewer instances* of underselling by *even smaller margins*

16

PUBLIC VERSION

somehow depressed domestic prices. Moreover, subject import overselling [

], undermining the Commission's conclusion that subject imports' "low prices" in 2019 caused price depression. *See* SR at Tables V-4, V-5.

In addition, the evidence relied on by the Commission to find that subject imports were "in some instances lower priced" in 2019 has major flaws. *See* Remand Views at 37, 52-53. First, Mosaic's customer emails purporting to show lost sales or lost revenue were contradicted by questionnaire responses [

],[18] or lacked basic facts such as [

].[19] Second, Mosaic's misleading pricing data analysis showed that [

]—but even when there is one importer with the lowest price in a given month, downward pricing pressure would be unlikely if other importers were higher priced than the domestic producer (which at least one importer was [    ] of the time), or if the quantity sold at the lowest price was *de minimis*. *See* Mosaic Posthr'g Br. at Ex. 51. If anything, these crude averages confirm the overselling data.[20] In no way are they substantial evidence that the

---

[18] *See* [                    ] Purch QRs at III-28 (reporting that [

]); [                    ] Purch. QRs at III-28 (reporting that [

] and that [

]).

[19] Mosaic Posthr'g Br. at Exs. 28-31. Only [

].

[20] Seven importers and one U.S. producer reported pricing data; [

]. Remand Views at 34. Statistics dictate that the odds of being the lowest in a given month are 7/8 (87.5%) for importers and 1/8 (12.5%) for the reporting domestic producer, especially if prices "tracked each other closely." In Mosaic's exhibit, an importer was lowest priced in 2019 [                    ], while the domestic producer was lowest priced [                    ]. *See* Mosaic Posthr'g Br. at Ex. 51. Thus, Mosaic's exhibit *confirms* the pervasive overselling by subject imports in 2019.

17

PUBLIC VERSION

minority of "instances" when subject imports were lower priced had the effect of "exerting downward pricing pressure" on U.S. prices.

Nor do snippets of industry publications describing "oversupply conditions and price declines" in 2019 provide the missing causal link between subject imports and price depression. Remand Views at 41-43, 47-49. These publications rely on unverified anecdotes from unnamed sources, and use sensational words to catch the attention of subscribers. Colorful press quotes describing "wilt{ing}" NOLA prices or a market "awash with imports," *id.*, hardly amount to substantial evidence that the price decline was caused by subject imports—particularly in light of other contrary record data, submitted to the Commission under oath, demonstrating that subject imports were neither oversupplying the U.S. market nor lower priced than domestic product.

Lastly, purchaser responses confirm that subject imports were not lower priced and did not cause adverse price effects. 20 of 24 purchasers responded that prices of domestic product and subject imports were "comparable." Remand Views at 35. In prior cases, the Commission found that such "comparable" responses supported a finding that imports were *not* lower priced than domestic product, yet in this case never explained why it did not draw the same inference from the same evidence.[21] Considering the record [                                            ], the Commission should find that there was no significant underselling by subject imports, and that subject imports were not low-priced so as to depress U.S. prices to a significant degree.

### 2. Because U.S. producers were price-setters, the Commission lacks substantial evidence to find that subject imports depressed prices

The Commission's finding of price depression rests on the unsupported conclusion that subject imports were in a position to "exert{} downward pricing pressure" on the domestic

---

[21] *Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan*, Inv. Nos. 731-TA-1387-1391 (Final) (Remand), USITC Pub. 5125 at 19.

18

PUBLIC VERSION

industry. Remand Views at 44. The record shows that the domestic industry set prices in the U.S. market for subject importers to follow—a fact that is not mentioned once in the Commission's Original or Remand Views. [

]. [                    ].

Purchasers overwhelmingly reported that Mosaic is the price leader in the U.S. market, with Simplot a distant second. Eighteen purchasers reported that Mosaic is the industry price leader. SR at V-8-9. Purchasers repeated that Mosaic set U.S. prices for other firms to follow,[22] and that such price leadership stemmed from Mosaic's dominant position in the U.S. market.[23] Indeed, Mosaic's price leadership is consistent with evidence that Mosaic—given [

]²⁴—was able to be highly selective about which customers to supply, and outright refused to sell to multiple U.S. purchasers. *See* Part III.B. Thus, the record before the Commission shows that Mosaic was the undisputed price leader in the U.S. market throughout the POI, a fact directly at odds with the finding of price depression.

The Commission's pricing data corroborate the fact that the domestic industry set U.S. prices, moving [                                    ] prices. This was true even in [

]. The graphs below, which chart the monthly AUVs from the Commission's pricing data for MAP (product 1) and DAP (product 2),

---

[22] SR at V-8-9; *see, e.g.,* [                    ] Purch. QRs at III-26 ("[
];" "[
]").

[23] SR at V-8-9; s*ee, e.g.,* [                ] Purch. QRs at III-26 ("[
]";
"[                                    ]").

[24] Mosaic accounted for [        ] of U.S. production in 2019, and [        ] of total apparent U.S. consumption by volume over the POI. SR at Tables III-1, C-1; Mosaic US Prod. QR at II-7.

19

**PUBLIC VERSION**

show that domestic producers—not subject importers—[                                    ] in

response to demand shocks caused by adverse weather events:

- **When prices began their [              ] in late 2018, domestic producers [          ] than subject importers.** For Product 1, domestic prices were [    ] subject import prices and then [                        ] than subject import prices between November and December 2018.

- **When prices [                      ] through the first half of 2019, domestic producer prices [          ] than subject import prices.** From December 2018 through May 2019, domestic producers' prices for Product 1 were [                        ] and [          ] by [      ], which is [                    ] in prices of subject imports of [        ] over the same period. Similarly, domestic producer prices for Product 2 [            ] than subject import prices between November 2018 through May 2019 in percentage terms ([        ] vs. [        ]) and in absolute dollars per ton ([      ] compared to [      ]).

- **When heavy rain hit again in late 2019, domestic producers were [                        ] their prices.** When demand was constrained again due to heavy rains in Q4 2019, domestic prices of both products [                    ] subject import prices in November and December 2019.

20

**PUBLIC VERSION**



In sum, purchaser responses and pricing data show that the domestic industry exerted price leadership in the U.S. market throughout the POI—and accordingly, the domestic industry [                              ] when adverse weather events affected fertilizer application in certain U.S. regions in 2019. [      ] aptly described Mosaic as [

                    ]. [      ] Imp. QR at III-15(b). Because subject imports were higher priced and [                    ] than domestic producer prices, the Commission lacks substantial evidence to find that subject imports prices "exerted downward pricing pressure" on U.S. prices in 2019.

> **3.** **The record lacks reliable evidence of any meaningful volume of "lost sales" caused by subject import prices**

On remand, the Commission again found that "the domestic industry lost sales to subject imports because of lower prices"—a finding that was central to the Commission's decision to

21

**PUBLIC VERSION**

dismiss evidence of predominant overselling and to conclude that "low prices" of subject imports depressed U.S. prices in 2019. Remand Views at 37. [

].· [                ].· [                              ], the record does not support a finding that lost sales were evidence of adverse price effects.

The Commission found lost sales on the basis of four purchasers reporting that they bought 733,895 ST of subject imports instead of domestic product due to price. Remand Views at 36. But twenty-four other purchasers (86%) did *not* report any lost sales, and the alleged 733,895 ST of lost sales is a negligible volume, equal to 2.7% of purchasers' total reported purchases and imports during the POI. SR at V-22-24. Further, purchasers were not asked to specify when the alleged lost sales occurred; because the lost sales quantity is over the entire POI, it is not evidence of low-priced subject imports *in 2019*. In fact, [                    ] submitted a purchaser response reporting a lost sales quantity of [        ] ST, and its response makes clear that [                                        ].[25]  Thus, these four purchaser responses are not substantial evidence of lost sales, nor do they support a finding of price depression in 2019.

The Commission's lost sales finding is even less tenable because the 733,895 ST figure rests on one outlier purchaser, [                ], which reported [        ] ST of lost sales—[

---

[25] [        ] reported purchasing [
        ] instead of domestic product over the POI—which is [
                        ]. [        ] Purch. QR at II-1, III-28. While [        ] also bought [                        ], the [            ] explained that this purchase [                                    ]. *See id.* at II-1, III-13, III-28. Further, the fact that [
                        ]—confirms that domestic supply was insufficient to meet U.S. demand and there was no "oversupply" in 2019. *See id.* at II-1, III-6, III-13, III-14 (stating that [
                                ]).

22

**PUBLIC VERSION**

], equal to [      ] of total reported lost sales.[26] [              ] was also [                                                                    ]—even while stating that [

].[27] Its responses are internally contradictory. [          ] confusion was apparent from the preliminary phase, when it similarly reported [                                        ], even as it stated that

[

]. *See* [              ] LSLR Survey at Q1, Q4. These facts suggest that [              ] may have fundamentally misunderstood the questions about lost sales. [

]. [              ]. The Commission, however, [

]. As a result, the Commission lacks substantial evidence to find that lost sales were evidence of adverse price effects.

The Commission also relied on other responses from [              ] in support of its finding that subject imports caused lost sales and adverse price effects, but the accuracy of those responses is equally questionable. In its Remand Views, the Commission found that "[              ] response regarding U.S. producers' price reductions further supports that it increased its purchases of subject imports for price reasons," crediting [              ] claim that

[

---

[26] *See* Remand Views at 36; SR at V-24. [              ] was [                              ] in the U.S. market, as its purchases and imports during the POI accounted for [          ] of purchasers' total reported purchases and imports. *See* SR at V-22.

[27] SR at V-23; [              ] Purch. QR at II-1 (showing that [

]).

23

PUBLIC VERSION

]. Remand Views at 36-37, n.168. As an initial matter, [                ] was again an outlier among purchasers in alleging that domestic producers reduced prices to compete with imports.[28] Record data show that domestic producers [                                    ] reduce prices in late 2018 and 2019, because they were reacting to the poor weather conditions, not to subject import prices. *See supra* Part IV.B.2. Moreover, [            ] purchase data show that it [                                        ]— rather, [            ] share of purchases from subject sources [            ] from 2017 to 2019, [                ] of its total annual purchases and imports, while its share of purchases from [                                        ] over the POI.[29] In other words, [            ] response must mean that it [                                        ]— which were [                                        ][30]—[                ]. Thus, any finding that *subject* import prices caused lost sales or adverse price effects based on these responses from [            ] is unsupported by substantial evidence.

For these reasons, [                ] responses cannot be relied upon to find lost sales or any adverse price effects. Given the absence of other record evidence supporting its conclusions, the Commission lacks substantial evidence to find that subject import prices caused the domestic industry to lose sales in 2019, or in turn that low-priced subject imports caused price depression.

---

[28] *See* SR at Table V-11. Only [      ] out of 28 responding purchasers provided estimates of price reductions by domestic producers. [                ] responded that domestic producers reduced prices by [                ], while the other [      ] estimates ranged between [                ].

[29] SR at Table V-8 (showing that [                ] share of purchases from domestic sources [                                ] from 2017 to 2019, while its share of purchases from subject sources [                ]); [                ] Purch. QR at II-1 (showing that [                ] share of purchases from nonsubject and unknown sources [                                ] from 2017 to 2019, [                                ] of purchases from domestic sources).

[30] *See* SR at Table C-1. In 2019, nonsubject imports' AUV was $327, domestic producers' AUV was [      ], and subject imports' AUV was $357.

24

PUBLIC VERSION

\*    \*    \*

In sum, the record before the Commission lacks substantial evidence to support a finding that subject imports caused price depression in 2019. Moreover, the Commission has not found that there was significant underselling by subject imports or that subject imports caused price suppression, given that the record supports neither finding. Consequently, this record shows that subject imports did not cause significant adverse price effects during the POI, such that there was no price-based injury to the domestic industry by reason of subject imports.

## V.    CONCLUSION

Taking the full record into account [                                                   ], the Commission should find that the domestic industry was not materially injured or threatened with material injury by reason of subject imports. This record is devoid of a causal link between subject imports and any injury: the abnormal and unforeseeable weather was a superseding cause, severing the chain of causation between subject imports and any injury to the domestic industry. Thus, we respectfully urge the Commission to issue a negative determination.

Respectfully submitted,

*/s/ Shara L. Aranoff*
Shara L. Aranoff
James M. Smith
Sooan (Vivian) Choi
John J. Catalfamo
Julia H. Shults

**Covington & Burling LLP**
*Counsel to OCP S.A.*

25

APPX0022321